1                   IN THE UNITED STATES DISTRICT COURT

2                  FOR THE WESTERN DISTRICT OF TEXAS

3                             WACO DIVISION

4    VLSI TECHNOLOGY LLC            *
                                    *
5                                   *
     VS.                            *  CIVIL ACTION NO. AU-19-CV-977
6                                   *
     INTEL CORPORATION              *      December 12, 2019
7
            BEFORE THE HONORABLE ALAN D ALBRIGHT, JUDGE PRESIDING
8                            MARKMAN HEARING

9    APPEARANCES:

10   For the Plaintiff:   Benjamin W. Hattenbach, Esq.
                          Charlotte J. Wen, Esq.
11                        Irell & Manella, L.L.P.
                          1800 Avenue of the Stars, Suite 900
12                        Los Angeles, CA 90067-4276

13                        J. Mark Mann, Esq.
                          Andy W. Tindel, Esq.
14                        Mann, Tindel & Thompson
                          112 East Line Street, Suite 304
15                        Tyler, TX 75702

16                        Amy E. Proctor, Esq.
                          Dominik Slusarczyk, Esq.
17                        Brian Weissenberg, Esq.
                          Irell & Manella LLP
18                        1800 Avenue of the Stars, Suite 900
                          Los Angeles, CA 90067
19
                          Justin Allen, Esq.
20                        Haley & Olson, P.C.
                          100 N Ritchie Road, Suite 200
21                        Waco, TX 76712

22
     For the Defendant:   J. Stephen Ravel, Esq.
23                        Sven Stricker, Esq.
                          Kelly Hart & Hallman LLP
24                        303 Colorado Street, Suite 2000
                          Austin, TX 78701
25

```
 1                        William F. Lee, Esq.
                          Joseph Mueller, Esq.
 2                        Louis W. Tompros, Esq.
                          Kate Saxton, Esq.
 3                        WilmerHale
                          60 State Street
 4                        Boston, MA 02109
                          Mary V. Sooter, Esq.
 5                        Wilmer Cutler Pickering Hale & Dorr LLP
                          1225 17th Street, Suite 2600
 6                        Denver, CO 80202

 7                        James Eric Wren, III, Esq.
                          Baylor University Law School
 8                        One Bear Place #97288
                          Waco, TX 76798-7288
 9
    Court Reporter:       Kristie M. Davis
10                        United States District Court
                          PO Box 20994
11                        Waco, Texas 76702-0994

12

13

14       Proceedings recorded by mechanical stenography, transcript

15  produced by computer-aided transcription.

16

17

18

19

20

21

22

23

24

25
```

| | | |
|---|---|---|
| 07:47 | 1 | (December 12, 2019, 9:05 a.m.) |
| 09:05 | 2 | THE BAILIFF:  All rise. |
| 09:05 | 3 | (Call to Order of the Court) |
| 09:05 | 4 | DEPUTY CLERK:  Markman hearing in Civil Action Austin |
| 09:05 | 5 | 19-CV-977, styled VLSI Technology, LLC vs. Intel Corporation. |
| 09:06 | 6 | THE COURT:  Good morning, ladies and gentlemen.  If you |
| 09:06 | 7 | would be so kind as to introduce yourself and tell me everyone |
| 09:06 | 8 | who will be speaking. |
| 09:06 | 9 | Mr. Mann, good morning. |
| 09:06 | 10 | MR. MANN:  Good morning, Your Honor.  Mark Mann on behalf |
| 09:06 | 11 | of VLSI, and, Your Honor, we have a number of lawyers here. |
| 09:06 | 12 | Ben Hattenbach, Dominik Slusarzyk.  I think that's Smith in |
| 09:06 | 13 | Polish.  Amy Proctor, Charlotte Wen, Justin Allen, Brian |
| 09:06 | 14 | Weissenberg, Andy Tindel, and Morgan Chu who is in trial, Your |
| 09:06 | 15 | Honor.  So he could not be here. |
| 09:06 | 16 | THE COURT:  Understood. |
| 09:06 | 17 | MR. MANN:  And we're ready to proceed. |
| 09:06 | 18 | THE COURT:  Mr. Ravel? |
| 09:06 | 19 | MR. RAVEL:  Your Honor, Steve Ravel for Intel Corporation. |
| 09:06 | 20 | Taking terms today will be Bill Lee who I've already had the |
| 09:06 | 21 | honor of introducing to you.  Mindy Sooter. |
| 09:06 | 22 | MS SOOTER:  Good morning, Your Honor. |
| 09:06 | 23 | MR. RAVEL:  Joe Mueller and myself.  Also on the team is |
| 09:07 | 24 | our client in from Santa Clara Ms. Mashood Rassam.  Other |
| 09:07 | 25 | lawyers are of course Professor James E. Wren III who needs no |

09:07  1    introduction.  Louis Tompros, Lauren Fletcher and Kate Saxton.

09:07  2        THE COURT:  Good to be here.

09:07  3        So let me tell you what I've done.  First I want to thank

09:07  4    my law clerk who has I don't think slept in the last week just

09:07  5    over the sheer excitement of getting to be here at this

09:07  6    hearing.  The briefs were outstanding.  We have both read them.

09:07  7    The tutorials are outstanding.  I've looked through those

09:07  8    already as well.  I think in fact yesterday we sent you --

09:07  9    we -- you know, we told you we had an issue with one of the

09:07  10   claims.  So we are very up to speed and have read everything.

09:07  11   It's -- maybe it's at least up with the best drafting of briefs

09:08  12   that we've had by far and so it's been very helpful.

09:08  13       So what I guess we should start with is, Mr. Mann, if you

09:08  14   would like to put on your tutorial, that would be great.  Or

09:08  15   whoever's going to do it.

09:08  16       MR. MANN:  Your Honor, I think we understood, and we

09:08  17   can -- I'm sure we can do it either way, but we're going to do

09:08  18   maybe a mini tutorial for each patent.  Is that what we planned

09:08  19   on doing?

09:08  20       THE COURT:  Yes, sir.

09:08  21       MR. MANN:  So I think Mr. Hattenbach maybe has -- Amy

09:08  22   Proctor has the first term, Your Honor.

09:08  23       THE COURT:  Okay.

09:08  24       MR. RAVEL:  For housekeeping, Judge, in that regard,

09:08  25   subject to the way you want to do it, the parties had thought

09:08  1    we would just go down through the order of the joint claim

09:08  2    construction statement claim by claim.

09:08  3        THE COURT:  That's the way I'm prepared to do it.

09:08  4        MR. RAVEL:  Okay.

09:08  5        THE COURT:  And just for the record, if we're -- if I'm

09:08  6    correct, what we're starting off with is the '522 patent, and

09:09  7    it would be regulate/regulating at least one supply from a

09:09  8    power source and an inductance.

09:09  9        MS. PROCTOR:  That's my understanding as well, Your Honor.

09:09  10       THE COURT:  Very good.

09:09  11       MS. PROCTOR:  Amy Proctor for VLSI.

09:09  12       Well, so, Your Honor, I believe you have a copy of the

09:09  13   slides.  If you don't, we can certainly pass one up to you.

09:09  14       THE COURT:  Is it what I've already seen?  I think I've

09:09  15   got a copy.

09:09  16       MS. PROCTOR:  So we have a fresh set of slides that

09:09  17   include our slides for the argument and also some of the same

09:09  18   tutorial slides and a little bit --

09:09  19       THE COURT:  You can never have too many slides.

09:09  20       MS. PROCTOR:  I'll get you a hard copy right now.

09:09  21       All right.  There we go.  We got the screen working too.

09:10  22       So can you jump to Slide 16, please?

09:10  23       Thank you.

09:10  24       All right.  So the '522 patent.  So this patent was filed

09:10  25   in November 2000.

09:10   1        MR. RAVEL:  Do you have a copy of your slides for us?

09:10   2        MS. PROCTOR:  Sure.

09:10   3        (Conference between counsel.)

09:10   4        MS. PROCTOR:  Thank you.

09:10   5        So the '522 patent developed and filed back in November

09:10   6    2000 identified a need for a method and apparatus that could

09:10   7    adjust the system clock and/or the supply voltage based on a

09:10   8    couple of things.  So the application actually being performed

09:11   9    and also the processing capabilities of the circuit.  And the

09:11   10   goal here was to conserve power.  And so exactly what the

09:11   11   inventors found is that you can do this.  If you take into

09:11   12   account the actual processing needs of the application,

09:11   13   including if there are multiple applications running, you can

09:11   14   look at what those applications actually need in terms of their

09:11   15   clock frequency and you can adjust that and then you can also

09:11   16   adjust the voltage.  And by adjusting the voltage so that

09:11   17   you're not always operating at the maximum voltage you might

09:11   18   ever need but instead you're operating at a lower voltage when

09:11   19   you don't need that maximum amount, --

09:11   20        THE COURT:  And you can go up.

09:11   21        MS. PROCTOR:  -- you can save power.

09:11   22        THE COURT:  Right?  And you can go up?

09:11   23        MS. PROCTOR:  Right.  You can go up when you need to and

09:11   24   down.

09:11   25        So one way to implement a system that can do this is to

09:11   1   use a converter.  And we talked on -- about this a little bit
09:11   2   in the tutorial, but there are a number of different types of
09:11   3   converters that can be used to convert input power to a power
09:11   4   level that's better suited to the system.
09:12   5       And there are a couple of examples.  This is actually a
09:12   6   slide in Intel's tutorial and you'll see they provided this
09:12   7   exhibit DX18 that shows five different types of converters.
09:12   8   And what they focused on were just the first two.  So they told
09:12   9   you a lot about buck converters and boost converters, but if
09:12  10   you actually look at their reference here, it goes through a
09:12  11   number of others as well, including one that we talked about in
09:12  12   our tutorial.  So the very next one on this list from Intel's
09:12  13   reference here is a buck boost converter.  And so this is a
09:12  14   converter where it's -- this is an example of one at least.
09:12  15   And so in this simple example what you have is you have an
09:12  16   inductor being powered by the power source when the switch is
09:12  17   closed.  So that switch at the top.  And then when the switch
09:12  18   is open, that inductor is then connected to power the load.  So
09:12  19   you store some amount of energy in the inductor and then you
09:13  20   can actually provide that to the load.  And so you can go back
09:13  21   and forth between these two modes where you're charging the
09:13  22   inductor or discharging the inductor, and that determines how
09:13  23   much power you actually provide to the load.  So in this
09:13  24   configuration you can either provide more.  So it -- also the
09:13  25   input is five volts.  If you charge up the inductor enough, you

09:13  1    could actually provide more than that.  You could provide six

09:13  2    volts to the load.  Now, if you charge the inductor less for a

09:13  3    shorter amount of time, you could provide a lower amount.  You

09:13  4    could provide four volts.  So it's a very flexible

09:13  5    configuration that allows you to provide different voltage

09:13  6    levels to the load.

09:13  7         And of course there are many other types of converters as

09:13  8    well.  So one more we mentioned, in Dr. Conte's explanation was

09:13  9    the flyback converter, and this is actually also discussed in

09:13  10   Intel's reference DX18, and it's similar to the buck boost, but

09:13  11   instead of having a direct coupling where the inductor is

09:13  12   actually where you have a single inductor that's part of the

09:13  13   full circuit, you have this magnetic coupling between two

09:14  14   inductors.  So it works in a very similar way.  The switch

09:14  15   could be where it's shown down here.  It could also be where

09:14  16   we've just shown on the last example at the top and you can do

09:14  17   kind of the same thing here where you can charge up an inductor

09:14  18   and then use that inductor to provide voltage to a load.  But

09:14  19   here of course there's no direct electrical connection.  So

09:14  20   these are just some examples of types of converters that could

09:14  21   be used in a circuit that can achieve the goals of the '522

09:14  22   patent.

09:14  23        And the '522 patent itself is pretty clear.  So it

09:14  24   embraces this flexibility.  It says in the specification a buck

09:14  25   converter may be -- there's a missing here -- may be used

09:14   1   instead of a boost convert or a combination of a buck and boost

09:14   2   converter may be used.  The buck boost example is a

09:14   3   combination.  This is straight from the spec of the original

09:14   4   patent.  So this demonstrates the patent's flexibility.

09:14   5       Now, you might have heard a little bit from Intel about

09:14   6   Figure 1 in the patent, and this is -- these are their labels

09:15   7   on Figure 1.  They say power source, inductance, regulating

09:15   8   circuitry, and they describe this as a boost converter, but the

09:15   9   patent is very clear this is just one embodiment.  And I know

09:15   10  Your Honor is very familiar with basic claim construction law

09:15   11  that says the illustration of a specific embodiment does not

09:15   12  limit the claim language.  And, by the way, Intel doesn't ever

09:15   13  really argue that it does.  So we'll get to that in a minute,

09:15   14  but I think the parties agree here there are a number of

09:15   15  different converters that can be used in this type of circuit.

09:15   16      So the actual claim term here, regulate or regulating at

09:15   17  least one supply from a power source and inductance.  It

09:15   18  appears, for example, in Claim 1 and throughout a number of the

09:15   19  other claims.  So Your Honor has our proposed instructions.  We

09:15   20  propose plain and ordinary meaning and Intel has proposed this

09:15   21  paragraph on the right here.  And what these two proposals show

09:15   22  is that no construction is necessary.  So it's very clear that

09:16   23  both parties have maintained every single word of the claim

09:16   24  language and proposed maintaining that.  And so you can see on

09:16   25  the right here we've kind of marked up the words Intel's added

09:16  1    in red, and if you count, it's 14 words they're trying to add

09:16  2    to the claim, but everyone agrees that the words in the

09:16  3    claim -- Intel reuses each and every single one of them.  The

09:16  4    words in the claim are understandable and do not require

09:16  5    further explanation.  And so when that's the case, it's really

09:16  6    a simple situation for Your Honor.  The claim just simply does

09:16  7    not require definition.  And the law on this is also very

09:16  8    clear, for example, in Renishaw.  The Federal Circuit has

09:16  9    explained that a claim must explicitly recite a term in the

09:16  10   definition before a definition may enter the claim from the

09:16  11   written description.  And there are plenty of examples also of

09:16  12   district courts addressing this, including the Eastern District

09:16  13   of Texas, explaining that where the parties propose repeating

09:16  14   the language of the claims in their constructions, then you

09:16  15   really don't need to do any more here and you can stick with

09:16  16   those same words.

09:17  17        So what Intel's construction does is it tries to add two

09:17  18   non claimed limitations.  So it's really a rewriting of the

09:17  19   claim.  And here's an example.  It's a little confusing of what

09:17  20   they're trying to do.  So they're moving some words around.

09:17  21   They're inserting other words, and what they've come up with is

09:17  22   a whole new set of language for the claims that adds two

09:17  23   separate limitations:  One, that the inductance be connected to

09:17  24   a power source, and, two, that the inductance be positioned

09:17  25   between the power source and the regulating circuitry.

09:17  1      Now, I know Your Honor knows that generally speaking we

09:17  2  don't just add limitations to claims.  Of course it's over a

09:17  3  century of law saying that if we want to begin to include

09:17  4  elements not mentioned in the claim to limit the claim we

09:17  5  should never know where to stop.  So this just on its face

09:17  6  violates kind of foundational principles of claim construction.

09:17  7  The patent doesn't support these new limitations.  There's no

09:18  8  requirement on the connection in the patent.  There's no

09:18  9  requirement on the specific placement that Intel wants in the

09:18  10 patent.  And, in fact, Intel agrees.  So Intel has not argued

09:18  11 and doesn't rely on the patent to add these limitations.

09:18  12 Intel's relying only on the re-examination history, which I'll

09:18  13 get to in a moment.

09:18  14      And, actually, worse than just being unsupported by the

09:18  15 patent, Intel's construction actually contradicts the

09:18  16 specification.  So we looked, for example, earlier at this

09:18  17 excerpt from the specification explaining that a buck converter

09:18  18 may be used or a combination of a buck and boost converter.

09:18  19 And Intel has described its own construction -- this is from

09:18  20 its opening brief -- as requiring a boost regulator

09:18  21 configuration.  So Intel's designed its construction in an

09:18  22 attempt to exclude all other types of converters, and that's

09:18  23 Intel's own position.  I think in their reply they came back

09:18  24 and said, oh, maybe there's something that's a boost regulator

09:18  25 that has some extra component, but this is their position, that

09:19  1   only boost regulators satisfy their construction, and it's just

09:19  2   not supported by the patent and it's not supported.  It

09:19  3   actually contradicts the specification.

09:19  4       So really absent any exceptions to the foundational rules

09:19  5   of claim construction, we're done.  It's very clear here that

09:19  6   the parties agree the claim terms are understandable and that

09:19  7   the foundational rule of applying plain and ordinary meaning

09:19  8   should apply.  Now the burden really shifts to Intel.  Intel

09:19  9   wants to invoke the re-examination history to argue that we

09:19  10  should rewrite the claim according to its kind of

09:19  11  interpretation of that re-exam history to add these two new

09:19  12  limitations, and it's just not warranted by that history.

09:19  13      So there's an incredibly high standard for disclaimer.

09:19  14  And, again, this is Intel's burden to show that the statements

09:19  15  made during re-examination or the prosecution history are both

09:19  16  clear and unmistakable.  We have -- the Federal Circuit has

09:20  17  said we have consistently rejected prosecution statements too

09:20  18  vague or ambiguous to qualify as a disavowal of claim scope.

09:20  19  And there's a very good reason for this extremely high

09:20  20  standard.  We really only rewrite claims in a couple of very

09:20  21  narrow situations, because if we start doing it more broadly,

09:20  22  more generally, it really does trample on the prosecution

09:20  23  process.  Claims are very carefully drafted and reviewed and it

09:20  24  just would violate a number of foundational principles of claim

09:20  25  construction to routinely rewrite claims in the way Intel

09:20   1   proposes.  So there are really a couple of only very narrow

09:20   2   circumstances where you can do that.  One is, for example, if

09:20   3   the inventor provides an express definition, and it makes sense

09:20   4   there because you have extremely clear guidance on how to

09:20   5   define the term.  The inventor spelled it out for you in some

09:20   6   way that's very clear.  So that's one.  And another one is if

09:21   7   there's disclaimer but only if that disclaimer is so clear and

09:21   8   unmistakable and definitional that it's even possible to come

09:21   9   up with a construction that is fair and reasonable and that

09:21  10   it's clear enough to trump the whole rest of claim construction

09:21  11   jurisprudence.

09:21  12       So if we go through the re-exam history, I have a slide

09:21  13   with each circuit.  I'm happy to look at any of them Your

09:21  14   Honor's interested in, but they are all pretty similar.  So

09:21  15   what happens is there's this -- I've tried to excerpt on these

09:21  16   slides and you'll see there's a -- like I said, a series of

09:21  17   them.  I've tried to excerpt the key discussion of each of the

09:21  18   prior art circuits for you.  And what the patent -- what the

09:21  19   patentee said were things like -- this is the first one that

09:21  20   comes up, Dancy.  Dancy does not regulate at least one supply

09:21  21   from a power source and an inductance, and here's the full

09:21  22   explanation for why.  Because the power supply control signal

09:21  23   operates switches S1 and S2 from the power source Vin alone.

09:22  24   So that's what we have to work with.  Really not clear exactly

09:22  25   what or why the circuit's being distinguished, and I'll get

09:22   1   into that a little bit more later what some other

09:22   2   interpretations are here, but that's kind of the full statement

09:22   3   we have on this.

09:22   4       So another example is Gutnik II, and here the patentee

09:22   5   described the circuit.  So it explains that it's implementing

09:22   6   with a PWM controller, driver, inductor, capacitor, and then

09:22   7   made a very similar statement:  Does not disclose regulating

09:22   8   Vout from a power source and an inductance.

09:22   9       So, again, some of this I think is just clearly background

09:22   10  just describing the circuit and then the circuit's printed

09:22   11  there and then there's just this kind of conclusion that it

09:22   12  does not disclose something.

09:22   13      And then actually if you go on right below the figure,

09:22   14  what the patentee said about Gutnik II was that it uses the LC

09:22   15  filter in a buck configuration but doesn't regulate as the

09:23   16  claim requires.  So this actually signals to me that the

09:23   17  patentee intended to include buck configurations, but, again,

09:23   18  we really don't have much guidance here on why these circuits

09:23   19  are being distinguished.

09:23   20      So six more of these we can look at, but they really are

09:23   21  pretty consistent in how they just repeat claim language and

09:23   22  say the prior art does not disclose the term.  And so these are

09:23   23  on Slides 46, 47, 48 all the way through 51.

09:23   24      And so what the Federal Circuit has said is that you

09:23   25  actually can distinguish prior art during re-exam during the

09:23  1   prosecution without constraining the definition of the claim

09:23  2   term as being argued, and so that's really what we think is

09:23  3   happening here.  There was some distinguishing.  We don't

09:23  4   dispute that, but Intel here bears the burden of showing that

09:24  5   the patentee limited the claims to Intel's proposed

09:24  6   construction clearly and unmistakably, and I just don't see

09:24  7   that here in this record.

09:24  8       So if we kind of look at this history and ask ourselves

09:24  9   some questions, what's the patentee's basis for distinguishing?

09:24  10  We have a little bit of guidance that we saw in those slides,

09:24  11  but there really are multiple reasonable interpretations.

09:24  12      What specific feature is the patent focused on

09:24  13  differentiating?  Not clear.  And then this is really the

09:24  14  critical question.  Should the claim be defined differently

09:24  15  based on those statements and how?  And we just don't have that

09:24  16  here.  This record has no affirmative defining statements.  It

09:24  17  never tells us clearly and unmistakably that the inductance has

09:24  18  to be both connected to the power source and located between

09:24  19  the power source and the regulating circuitry.  So that's

09:24  20  really the issue.  The patentee's statements are silent on the

09:25  21  location of the inductance, and it's just really not clear.  I

09:25  22  believe that they're limiting the definition in that way.

09:25  23      And so on Slide 54 there are other reasonable

09:25  24  interpretations.  So it seems like in Dancy the patentee's

09:25  25  distinguishing the power supply control signal and I would say

09:25  1   basically every discussion it seems like the patentee is just

09:25  2   providing background on some of these circuits and that

09:25  3   background does come up later.  The patentee later makes

09:25  4   arguments talking about why it wouldn't have been obvious to

09:25  5   combine these circuits with Clark '086 in part based on the

09:25  6   fact that they aren't suitable for integration and things like

09:25  7   that.  So some of this background on the circuits really is

09:25  8   just foundation for later arguments.  And, in fact, even the

09:25  9   fact that those circuits are buck -- include buck

09:25  10  configurations is background for arguments on Claims 23 and 29

09:25  11  where the patentee actually added claims during the re-exam

09:25  12  that would require the ability to increase or decrease the

09:26  13  voltage, and I have Claim 23.  I'll show you that in a second.

09:26  14  So a lot of that really was just background for later arguments

09:26  15  the patentee wanted to make.  And there's also -- it's also

09:26  16  very possible that the patentee was commenting on the

09:26  17  relationship between the inductance and the regulating

09:26  18  circuitry.  So I'll give a quick example going back to the buck

09:26  19  boost configuration on that.

09:26  20      So, again, where the alleged disavowal is ambiguous or

09:26  21  open to multiple reasonable interpretations, it just doesn't

09:26  22  rise to the standard for prosecution disclaimer.  And this has

09:26  23  comes up in cases, plenty of cases.  We have one example here

09:26  24  on Slide 56.  And what happened here was the -- in the -- the

09:26  25  patentee made statements that said, using a server through a

09:26  1   centralized interface is contrary to the claim limitations.  So
09:26  2   a pretty clear distinguishing statement.  So the district court
09:26  3   relied on that to find that the storage units cannot be
09:27  4   centrally controlled, and the Federal Circuit said, no.  It
09:27  5   kind of went too far.  The district court read more into the
09:27  6   patentee's words than were clearly there, and that's what we
09:27  7   think Intel's doing here.
09:27  8       So what the patentee has really just said references do
09:27  9   not disclose some element, that is not the same as
09:27 10   affirmatively requiring the two limitations that Intel's added.
09:27 11   It's just not there.  And, in fact, I can demonstrate this with
09:27 12   an example.  So not only is it just not clear and unmistakable
09:27 13   because there is no -- you can't draw this connection.  Intel's
09:27 14   actually wrong.  Its construction is just too narrow and it's
09:27 15   contradicted not only by the patent but by the re-examination
09:27 16   history.
09:27 17       So like we talked about before, there are many possible
09:27 18   converters.  So I've shown here the buck boost again, a flyback
09:27 19   converter and many others that the patentee never distinguished
09:28 20   during re-examination and actually explicitly says in the spec
09:28 21   may be used.
09:28 22       But the buck boost example actually may not satisfy
09:28 23   Intel's construction.  I think first of all Intel has said it
09:28 24   wouldn't satisfy Intel's construction because Intel has said
09:28 25   its construction is limited to boost configurations, but, also,

09:28  1   if we look at -- just look at the way the circuit's arranged,

09:28  2   especially the requirement that the inductor be between the

09:28  3   power source and the regulating circuitry, it's just not there.

09:28  4   If the current is flowing clockwise here, the inductor is not

09:28  5   between the power source and the regulating circuitry, but this

09:28  6   is clearly something that should fall within the scope of the

09:28  7   claims both before and after the re-examination.

09:28  8       And I mention Claim 23.  This is a claim that was added

09:28  9   during re-examination and it actually requires that the power

09:28  10  supply control signal provide the at least one supply

09:28  11  selectively at a voltage greater than or less than a voltage of

09:29  12  the power source.  So we have a dependant claim depending from

09:29  13  Claim 1 that says you have to be able to provide voltage that's

09:29  14  either higher or lower than that input power source voltage,

09:29  15  and Intel has said under its construction boost only.  So Intel

09:29  16  has said basically if you adopt its construction, this claim

09:29  17  that was added during re-examination.  So therefore clearly the

09:29  18  examiner and the patentee believed were fully consistent with

09:29  19  statements made during re-examination.  This claim would no

09:29  20  longer even be possible to satisfy -- Claim 1 would be narrower

09:29  21  than this dependent Claim 23.

09:29  22       Intel tries to kind of avoid this -- these issues with its

09:29  23  proposal saying, well, it's not fair.  It's not fair for the

09:29  24  patentee to have used this one definition when it was arguing

09:29  25  validity and now to try to argue it for a different definition,

09:30 1    but, first of all, Intel's never argued that the patentee

09:30 2    actually made inconsistent statements here on infringement and

09:30 3    validity.  And what would really be unfair, we think, is to

09:30 4    limit the claims based on Intel's after the fact

09:30 5    misinterpretation of ambiguous statements to exclude whole

09:30 6    dependent claims from even being possible to be met based on

09:30 7    assumptions and guesses about what the patentee meant.

09:30 8        And if Your Honor's concerned, oh, maybe these claims

09:30 9    never would have survived re-exam if we hadn't made this

09:30 10   argument, if the patentee hadn't said this, that, I don't

09:30 11   think, has support either because the patentee made multiple

09:30 12   arguments during re-examination.  Each of these circuits

09:30 13   appeared as part of an obviousness combination and the patentee

09:30 14   explained in each case why it would not have been obvious to

09:30 15   make that combination and why there was actually teaching a way

09:30 16   in what was identified as the primary reference from the

09:30 17   combination.  So there's also no real fairness concern there.

09:30 18       On Slide 63 I just have this one quick example of kind of

09:31 19   the dangers of rewriting claims after the fact without clear

09:31 20   guidance from the inventor and from the patentee.  Intel's

09:31 21   construction really doesn't make things more clear.  So this is

09:31 22   Intel's own picture on the left here from Intel's brief.  It

09:31 23   has labeled what it believes to be the regulating circuitry and

09:31 24   the inductance and the power source, and Intel's construction

09:31 25   requires that the inductance be between the power source and

09:31  1   the regulating circuitry.  Well, how can you assess that when

09:31  2   Intel's kind of dropped the inductance here in the middle of

09:31  3   what it's called the regulating circuitry, right?  So I think

09:31  4   there's also just a practical problem of -- so we have kind of

09:31  5   two problems with going down this path of using the

09:31  6   re-examination to rewrite the claims.  There's the legal issue

09:31  7   of when it's not clear and unmistakable, it really should not

09:31  8   trump every other foundational claim construction principle,

09:31  9   but also there's a practical problem.  If you don't have enough

09:32  10  clarity from the patentee or from the inventor on how to write

09:32  11  the claims after the fact, then you end up just creating more

09:32  12  confusion instead of more clarity.

09:32  13      So, ultimately, plain and ordinary meaning really is the

09:32  14  only appropriate construction here.  The parties agree that

09:32  15  every word in the claim is understandable to a person of

09:32  16  ordinary skill in the art, and these re-examination statements

09:32  17  simply do not have the clarity necessary to be definitional.

09:32  18  And so it just isn't fair to the patentee.  It isn't right to

09:32  19  rewrite the claims based on assumptions and guesses about what

09:32  20  the patentee meant in the way that actually contradicts both

09:32  21  the patent and the rest of the re-examination history and even

09:32  22  amended -- I'm sorry -- added claims during re-exam.

09:32  23      THE COURT:  Thank you very much.

09:33  24      MR. MUELLER:  Good morning, Your Honor.  My name is Joe

09:33  25  Mueller.

09:33  1         THE COURT:  Mr. Mueller, good morning.

09:33  2         MR. MUELLER:  May I pass out some hard copies for you?

09:33  3         THE COURT:  Of course.

09:33  4         MR. MUELLER:  So if I could, Your Honor, I'd like to start

09:33  5  with a brief review of some tutorial slides that we prepared.

09:33  6  I'll go through some of them rather quickly in the interest of

09:33  7  cutting to the core issues before Your Honor today.  May I

09:33  8  proceed?

09:33  9         THE COURT:  Absolutely.

09:33  10        MR. MUELLER:  So first there's some basic concepts on

09:33  11 current voltage and inductors, and these I'll just sort of

09:33  12 breeze through because I'm sure Your Honor's familiar with the

09:33  13 basics, but this patent involves consideration of the ways in

09:33  14 which voltage is converted or adjusted within certain types of

09:33  15 circuits.

09:33  16        And fundamentally we have current, the flow of electrons,

09:33  17 voltage, the pressure in the circuit.  And of particular

09:33  18 relevance to this patent is the circuit element of an inductor

09:34  19 or an inductor coil.  And those create magnetic fields.  When

09:34  20 current runs through them, those magnetic fields serve as

09:34  21 storage tanks for energy, converts electrical energy into

09:34  22 magnetic energy.  And there's several beneficial effects of

09:34  23 that physics concept, the concept of the magnetic field being

09:34  24 created.  It can serve to slow down current in certain

09:34  25 circumstances and it can serve to add current in others

09:34  1    depending on whether the storage vessel, this magnetic field,

09:34  2    is being created or collapsed.  Now, when it's created, it

09:34  3    takes the current flowing into it and converts that electrical

09:34  4    energy into magnetic energy, and when the magnetic field

09:34  5    collapses, it's converted back into electrical energy and

09:34  6    current flows out of the coil.  And so those are the basics for

09:34  7    inductor coils.  And you can see it here.  There's a five volt

09:34  8    input that generates the magnetic field converting some portion

09:35  9    of the electrical energy into magnetic energy, slowing down the

09:35  10   current.  When the voltage is shut off, the magnetic field

09:35  11   collapses and current is released from that storage vessel.

09:35  12        And that takes us to the next building block here from a

09:35  13   technical perspective switching regulators.  And these, as the

09:35  14   name suggests, are switches used to regulate certain circuitry.

09:35  15   And in this context, the context of power converters, these

09:35  16   switches are used to regulate voltage.  So here, and Ms.

09:35  17   Proctor showed you this earlier, is an example of two different

09:35  18   types of power converters, a buck converter and a boost

09:35  19   converter.  And I want to pause here, Your Honor, to make a

09:35  20   point that I'm going to come back to a few times, which is that

09:35  21   the labels "buck" and "boost" are really not what's critical

09:35  22   here.  They're useful labels.  They are used in the field to

09:36  23   refer to certain configuration of circuitry, and that's why we

09:36  24   use them in our tutorial and we use them in our brief.  But

09:36  25   what really matters at the end of the day is what's claimed in

09:36  1   the particular patent claim term at issue and how that

09:36  2   corresponds to certain circuit elements.  So I'll explain that

09:36  3   further when I come back to it in a bit, but I do want to make

09:36  4   that threshold point these are useful labels.  They're labels

09:36  5   that are used in the field, but at the end of the day, the

09:36  6   claim language governs.

09:36  7        And here we have a buck converter at the top and a boost

09:36  8   converter at the bottom.  And, Your Honor, may I approach the

09:36  9   screen?

09:36  10       THE COURT:  Oh, sure.  Y'all don't need to -- y'all are

09:36  11  free to move about in here.

09:36  12       MR. MUELLER:  Thank you, Your Honor.

09:36  13       So here we have an input source of voltage and we see the

09:36  14  regulating circuitry in blue.  There's a diode here which just

09:36  15  forces current in a single direction, the direction of the

09:36  16  arrow.  And then we have an inductor, that magnetic coil on the

09:36  17  right-hand side.  And of particular relevance to the dispute

09:36  18  before Your Honor, the regulating circuitry here is before the

09:37  19  inductor.  It's located physically prior to the inductor.  So

09:37  20  we have a power source, then regulating circuitry and then an

09:37  21  inductor.  And another way to put it is the regulator is

09:37  22  regulating from a power source here but not regulating from an

09:37  23  inductor.  There's no inductor before the regulating circuitry

09:37  24  takes operation.

09:37  25       If we switch down to the boost converter, it's a different

09:37   1   configuration.  And here we have the regulating circuitry in

09:37   2   the center of the diagram.  We have that diode in the top

09:37   3   right-hand corner.  We have the power source and we have the

09:37   4   inductor.  And here the power source is connected to the

09:37   5   inductor, and the regulating circuitry is downstream from the

09:37   6   inductor.  It's a critical distinction between the buck

09:37   7   converter and the boost converter.  It's downstream from the

09:37   8   inductor.  So here again we have regulating circuitry in both,

09:37   9   but in the bottom boost converter it's regulating from not only

09:38   10  the power source but also regulating from the inductor.  It's

09:38   11  regulating from both.

09:38   12      So if we talk about how these work in operation, and we'll

09:38   13  start with the boost converter, again, the inductor is

09:38   14  connected to the power source and positioned between the power

09:38   15  source and the regulating circuitry.  It's regulating from the

09:38   16  inductance and the power source.  The boost converter, the

09:38   17  inductance is located on the output of the regulating

09:38   18  circuitry.  The regulating circuitry is only regulating from

09:38   19  the power source alone.  And that distinction makes a

09:38   20  difference.  So here's the boost converter in operation.  And

09:38   21  when the switch is closed -- this is a regulating circuitry.

09:38   22  When the switch is closed, current flows through this circuit.

09:38   23  This storage vessel is charged up, that magnetic field is

09:39   24  created, and when the switch is opened -- so here you can just

09:39   25  see the magnetic field being created, electrical energy being

09:39  1   stored in the form of magnetic energy and that inductance coil.

09:39  2   When the switch is open, now the pathway for current changes

09:39  3   and it's going to flow through that diode.  And here we have

09:39  4   actually two sources of voltage that are being combined.  We

09:39  5   have the input voltage over here, but then remember we had this

09:39  6   storage vessel that had been charged up.  Now it's going to

09:39  7   discharge and so we have two sources of voltage, the input

09:39  8   voltage and the additional boost from this inductance coil,

09:39  9   this magnetic field releasing that energy.  And the combined

09:39  10  energy is higher voltage than the input voltage.  It's been

09:39  11  boosted by virtue of the magnetic field releasing that energy.

09:40  12      I'll try to skip ahead here to the buck converter.  Okay.

09:40  13  So we have the buck converter.  And as a threshold matter, if

09:40  14  you had a circuit that looks like this one, Your Honor, where

09:40  15  we have the input voltage, a regulating circuit and then some

09:40  16  load, it could be almost anything, a lightbulb or something

09:40  17  that will consume the energy on the other side.  In the

09:40  18  abstract without a buck converter, the input voltage will flow

09:40  19  through this circuit when the regulating circuit is closed and

09:40  20  so the voltage will jump from zero to the input voltage level.

09:40  21  If we shut off the regulating circuit or open it, I should say,

09:40  22  the voltage will shut off and we drop down to zero again.  And

09:40  23  each time we turn the circuit on or off, we will jump up or

09:40  24  jump down from the input voltage to zero or vice versa, and

09:40  25  what we see as a result is a square wave, a very choppy current

26

09:41   1    jumping from zero to the top voltage and back again.

09:41   2         THE COURT:  And that was on Slide 21?

09:41   3         MR. MUELLER:  That's right, Your Honor.  That's Slide 21.

09:41   4    That's Slide 21.

09:41   5         So the buck converter looks like this, and this is what we

09:41   6    looked at earlier.  We have here this regulating circuit.  We

09:41   7    have the regulating circuit right here.  There's a diode.

09:41   8    There's an inductor downstream, downstream from the regulating

09:41   9    circuitry.  And what happens is the input voltage comes in,

09:41   10   goes into the inductor coil which starts to build up that

09:41   11   magnetic field, and that tends to reduce the voltage because a

09:41   12   portion of the electrical energy that have flowed into the

09:41   13   inductor is converted into a magnetic field and so therefore

09:41   14   the current that flows out is lower.  It's the difference

09:42   15   between a storage vessel that has not yet been filled up in

09:42   16   this circumstance.  So it's going to be filling itself up with

09:42   17   the current from the input voltage as distinct from the boost

09:42   18   converter.  You recall it was fully filled up in that stage

09:42   19   one.  Then it was released.  Here it hasn't been filled up yet

09:42   20   so it's drawing energy from the current, and that serves to

09:42   21   lower the voltage as compared to what the input voltage was

09:42   22   over here.  It's reducing it.  So rather than boosting it, it's

09:42   23   reducing it.

09:42   24        THE COURT:  And that was Slide 22?

09:42   25        MR. MUELLER:  That's Slide 22 into 23, Your Honor, right

09:42  1   here when we open it up.

09:42  2        Now, when the switch is open, recall that in the absence

09:42  3   of this inductor coil, we would go all the way down to zero,

09:42  4   but here when the switch is open, that storage vessel now will

09:42  5   release the current that it has stored in the form of magnetic

09:42  6   energy.  That magnetic field will collapse and some current

09:42  7   will be released.  Now, it won't be as much as the input

09:42  8   voltage.  It'll be somewhere in between, but basically what we

09:43  9   have is the presence of the inductor coil lowering the input

09:43  10  voltage when the circuit is closed and then raising the current

09:43  11  when the circuit is open because it's releasing the energy that

09:43  12  had been stored in the form of magnetic energy.

09:43  13       And so, Your Honor, rather than that square wave that we

09:43  14  had earlier, it's a bit of a smoother flow of current over

09:43  15  time.  It's not as high as it would have been in the absence of

09:43  16  the inductance coil because that magnetic field draws off some

09:43  17  of the current when the circuit is in operation, but then

09:43  18  rather than going to zero, it goes to a bit above zero because

09:43  19  the magnetic field will release energy once the switch is

09:43  20  opened up and the input voltage is no longer being applied.  So

09:43  21  it's a more smooth flow than the square wave that we had in the

09:43  22  absence of the inductor coil, and engineers find that useful

09:44  23  for certain types of circuitry.  So therefore these buck

09:44  24  converters can serve useful purposes for some applications.

09:44  25       THE COURT:  So we can find that on 29 and 30?

09:44  1      MR. MUELLER:  Those are Slides 29 and 30, Your Honor.

09:44  2  That's right.

09:44  3      So Slide 31 here we have a summary of what we've just gone

09:44  4  through.  For a boost converter the output voltage is higher

09:44  5  voltage than input because in Stage 1 we have the magnetic

09:44  6  field charged up, and then in Stage 2 it's released along with

09:44  7  the input voltage to create that boost.  The inductor's

09:44  8  position is connected to the power source and between the power

09:44  9  source and regulating circuitry.  So in this instance the

09:44  10  regulation is from, regulating a supply from the power source

09:44  11  and the inductor coil and it adds extra energy.

09:44  12      The buck converter lower voltage than input, meaning when

09:44  13  you have the voltage applied, the inductor will draw off some

09:44  14  of it as that magnetic field is created, but then once the

09:45  15  voltage is no longer being applied, it will release that energy

09:45  16  to create that smoother flow over time.  It's located at the

09:45  17  output of the regulating circuitry.  So here the regulation is

09:45  18  from the power source alone.  It's not from the power source

09:45  19  and the inductor, and, again, the purpose of this circuit here

09:45  20  in perspective is to smooth out the current over time.

09:45  21      And, again, that's Slide 31, Your Honor.

09:45  22      So with that in mind, Your Honor, if we could turn to the

09:45  23  patent background, in Slide 33 here we just have the cover

09:45  24  page.  This is a method and apparatus for controlling power

09:45  25  consumption of integrated circuit, and as Ms. Proctor said, the

09:45  1    valid purpose of the patent is to have a more efficient

09:45  2    approach to power consumption by circuits in view of the

09:45  3    purpose of the circuit and also the application that might be

09:45  4    running on it.  That's the goal of the patent.

09:46  5        Here's Figure 1 on Slide 34, Your Honor, and this shows a

09:46  6    boost converter.

09:46  7        We have a power source.  We have an inductance.  We have

09:46  8    regulating circuitry.  This is Slide 35.  There's no dispute

09:46  9    that these are in fact what I have labeled them as.  So we have

09:46  10   a power source here.  We have an inductance and we have

09:46  11   regulating circuitry, and in this particular embodiment the

09:46  12   regulation is from the inductance in the power source, and that

09:46  13   is the circuit shown in Figure 1.

09:46  14       Now, before I leave the tutorial and move to the Markman

09:46  15   slides, Mr. Lee, if you could just pull up the patent and if

09:46  16   you'd please go to Column 6, Lines 53 to 55.

09:46  17       Your Honor, you were told a few times that there's an

09:46  18   embodiment in the patent that involves a buck converter, and it

09:47  19   absolutely correct that a buck converter is mentioned, but I

09:47  20   did want to highlight exactly where it's mentioned.

09:47  21       If you could just zoom back out, Mr. Lee.

09:47  22       This is the last paragraph of the specification.

09:47  23       If we start with the preceding discussion, Mr. Lee.

09:47  24       The last paragraph before the claims and the very last

09:47  25   sentence of the last paragraph it says:  For example, a buck

09:47  1   converter may be instead of a boost converter or a combination

09:47  2   of a buck and boost converter may be used.  There's no

09:47  3   electrical diagram of any circuit that would meet that depicted

09:47  4   anywhere else in the specification.  It's this one sentence.

09:47  5   And so the question is, is this sentence, along with the claim

09:47  6   language and the statements and re-examination, sufficient to

09:47  7   define the claim in a way that would cover a circuit

09:47  8   configuration that involves a buck converter?  And the answer,

09:47  9   as I will explain, Your Honor, is no, but I did want to put in

09:47  10  context that sentence.  There's no actual circuit design

09:47  11  depicted in this patent that shows how the invention could be

09:48  12  used.  There is in fact a sentence, but it is that sentence

09:48  13  alone.

09:48  14       So if you could go over to the Markman deck, Mr. Lee.

09:48  15       Your Honor, this is the term at issue here, and this is

09:48  16  Slide 3.  Regulate at least one supply from a power source and

09:48  17  an inductance.  Regulate at least one supply from a power

09:48  18  source and an inductance.

09:48  19       Our position, Your Honor, is, from means the power source

09:48  20  and the inductance or before the regulating circuitry.  That's

09:48  21  as simple as that.  That is our position, and our position is

09:48  22  that any doubt on that issue was confirmed by not one, not two,

09:48  23  not three, but eight statements during examination with respect

09:48  24  to -- actually more than eight statements.  Eight prior art

09:48  25  references and the applicants' distinctions of those references

09:48  1  made abundantly clear that from a power source and an

09:49  2  inductance meant from a power source and inductance upstream of

09:49  3  a regulating circuitry.  So I mentioned at the outset, Your

09:49  4  Honor, that the label "buck and boost" at the end of the day is

09:49  5  not the key.  The key is what is claimed.  The buck and boost

09:49  6  concepts, again, are industry terms and they are useful terms.

09:49  7  What really matters here, though, is, what does this mean?

09:49  8  Regulate at least one supply from, the power source and an

09:49  9  inductance.  And our position, Your Honor, is that from means

09:49  10  before.  It comes before the regulating circuitry, and that was

09:49  11  confirmed over and over and over again during the

09:49  12  re-examination.

09:49  13      So our construction is regulate at least one power supply

09:49  14  from an inductance connected to a power source where the

09:49  15  inductance is positioned between the power source and the

09:49  16  regulating circuitry.

09:49  17      Now, there was arguments made to Your Honor by Ms. Proctor

09:49  18  that we're adding words, we're trying to rewrite things.  We're

09:49  19  not, Your Honor.  What we're trying to do is to hold the patent

09:50  20  owner to precisely what the patent owner at the time -- it was

09:50  21  actually a predecessor and interest -- represented to the

09:50  22  Patent Office during re-examination.  And to set the stage for

09:50  23  this, this was an interparty's re-examination under the pre

09:50  24  America Invents Act approach to re-examination.  It involved a

09:50  25  predecessor and interest Sigma Tel that was in litigation with

32

09:50   1   another company.  That other company sought and initiated an

09:50   2   interparty's re-examination.  During that re-examination the

09:50   3   claims were amended and amended in an important way.

09:50   4        And, Mr. Lee, if you go the re-examination certificate,

09:50   5   please.

09:50   6        So this is the certificate that ultimately issued after

09:50   7   the re-examination proceeding, Your Honor, and if we could go

09:50   8   to Column 1 of the re-examination certificate.

09:50   9        And, Your Honor, if you look at Claim 9, this is at Line

09:50   10  32 to 34.  So the original language in the original patent as

09:51   11  first issued stated:  Regulating at least one supply from, and

09:51   12  then this language is in the original claim, at least one of:

09:51   13  A linear regulator and a power source and an inductance based

09:51   14  on a power source control signal.  And this is what's known as

09:51   15  the Markush format for claim writing where you can pick from a

09:51   16  series of options to satisfy the claim limitation.

09:51   17       So regulating at least one power supply from at least one

09:51   18  of a linear regulator and a power source and an inductance

09:51   19  based on a power supply control signal.  To satisfy that claim

09:51   20  as originally written, you could have a regulating circuit that

09:51   21  was regulating at least one supply from any one of those

09:51   22  things.  So this would have been met by regulating circuitry

09:51   23  that was regulating a linear regulator or a power source or an

09:52   24  inductance based on power supply.  So as originally written,

09:52   25  this would indeed cover a buck converter as one example because

09:52  1   that would have a power source before the regulating circuitry.

09:52  2   But the claim was amended.  It was amended during

09:52  3   re-examination.  It was amended for good reason.  It had to be

09:52  4   amended to overcome the eight prior art references the examiner

09:52  5   used to reject it, and it was amended by deleting this phrase

09:52  6   at least one of a linear regulator and was excised from the

09:52  7   claim.  That converted it, Your Honor, from a Markush form

09:52  8   claim into a claim where there had to be regulation of at least

09:52  9   one supply from a power source and an inductance.  So it became

09:52  10  a required conjunction instead of a series of Markush options.

09:52  11      The required conjunction was a power source and an

09:52  12  inductance.  Both of those had to be part of what was being

09:52  13  regulated from.  So the regulation from went from being

09:53  14  something that could be met by a whole variety of

09:53  15  configurations to something that required in the claim language

09:53  16  itself regulation from a power source and an inductance, both

09:53  17  of them.

09:53  18      And with that amendment in mind, Your Honor, if you go

09:53  19  back to the Markman deck, Mr. Lee.

09:53  20      During this re-examination the examiner rejected the

09:53  21  original claim language based on eight prior art buck

09:53  22  converters.  And there's no dispute that those eight prior art

09:53  23  references in fact depict buck converters.  I will show you

09:53  24  each one of them, Your Honor.  Rejected based on eight prior

09:53  25  art buck converters.  And so the applicants needed to address

09:53   1   those buck converters including in light of the amended

09:53   2   language, and they did so again and again and again.

09:53   3         So let's go through some of them.  And the presentation

09:53   4   from VLSI -- I went through them extremely quickly.  I'm going

09:54   5   to take my time a bit here, Your Honor, to show you precisely

09:54   6   what the applicants said during this re-examination.  Here's

09:54   7   Slide 7, Your Honor.  This is Dancy, one of the regulators.

09:54   8   And the applicant said that Dancy's regulator does not regulate

09:54   9   at least one supply from a power source and an inductance.

09:54   10   That's the required conjunction under the amended claim.

09:54   11   Because the power supply control signal operates switches S1

09:54   12   and S2 from the power source alone.  From the power source

09:54   13   alone.  Crystal clear under any standard that you could

09:54   14   conceivably apply to that statement, Your Honor, that they were

09:54   15   distinguishing a circuit design where regulation occurred from

09:54   16   the power source alone.

09:54   17         And then they went on and explained exactly what that

09:54   18   meant.  This is not a mystery or a question mark or any

09:54   19   ambiguity at all.  It is crystal clear.  Not from the power

09:54   20   source and the inductance as recited in Claim 1.  What that

09:55   21   means unequivocally, unmistakably under any conceivable

09:55   22   standard you can apply here is that the regulating circuitry

09:55   23   needs to be after both the power source and the inductance.

09:55   24   That's what it means to regulate from the power source and the

09:55   25   inductance, and it's not met by a buck converter because the

09:55  1   inductance is downstream.

09:55  2       And here you see, Your Honor, these are the circuit

09:55  3   components.  There's no doubt that each one of those are in

09:55  4   fact what I've depicted here.  There's no dispute between the

09:55  5   parties as to what they are.  There's a power source and a

09:55  6   regulating circuit and a magnetic inductance coil downstream

09:55  7   from the regulating circuitry.  What does that mean?  It means

09:55  8   the power source alone precedes the regulating circuitry.  The

09:55  9   regulation was from the power source alone.

09:55 10       And, again, there were more statements with respect to

09:55 11   Dancy distinguishing on this -- the basis of this precise claim

09:55 12   limitation before Your Honor.

09:55 13       The Wei reference.  Same issue.  Wei's inductance is not

09:56 14   connected to a power source and Wei does not disclose

09:56 15   regulating from a power source and an inductance.  The figure

09:56 16   in Wei was actually labeled buck converter.  Labeled "buck

09:56 17   converter."  So that one sentence I showed Your Honor at

09:56 18   Column 6, Lines 53 through 55 where there's a reference to buck

09:56 19   converters possibly meeting the claims under some alternative

09:56 20   embodiment, that's before they had to make these statements

09:56 21   during re-examination where they distinguished expressly and

09:56 22   repeatedly buck converter configurations.

09:56 23       Same thing we have regulating circuitry in a power source

09:56 24   and the inductance downstream.  The implication of that is that

09:56 25   the regulation is not from a power source and an inductor.

09:56   1        Min.  Exact same issue.  The application distinguished on

09:56   2   the basis that it did not meet the from a power source in an

09:56   3   inductance language.

09:56   4        Here we see the power source and the regulating circuitry

09:57   5   and the inductance was downstream, and Figure 3, the subcaption

09:57   6   is simplified schematic for the buck regulator.  Prior art

09:57   7   reference on its face, Your Honor, said it was a buck

09:57   8   regulator, and the applicants distinguished it on that basis.

09:57   9   And, again, the label "buck regulator" at the end of the day is

09:57   10  not the crucial point.  The crucial point is what it is, and

09:57   11  what it is is something with an inductance coil downstream, and

09:57   12  the applicant made clear that would not meet the claim

09:57   13  limitations.  That's Slide 13.

09:57   14       Goodman.  Exactly the same issue, Your Honor.  Here we

09:57   15  have the power source, the regulating circuitry and the

09:57   16  inductance downstream.  Once again, the applicant italicized

09:57   17  the language from a power source and an inductance and said

09:57   18  that Goodman did not have it.  And also said that -- this is

09:57   19  part of the applicant's statement.  Goodman's DC/DC converter

09:57   20  in fact uses the external LC filter in a synchronous buck

09:58   21  configuration.  So part of their description of what they said

09:58   22  was different was that it was a buck configuration.

09:58   23       Burd I.  Power source regulating circuitry inductance

09:58   24  downstream.  They said it doesn't meet the from a power source

09:58   25  and an inductance language.  And then they further said that

09:58   1   the DC to DC converter in fact uses the external LC filter in a

09:58   2   synchronous buck configuration.

09:58   3       Burd II, same thing.  Power source regulating circuitry

09:58   4   downstream inductance.  Once again, the applicant said that did

09:58   5   not meet the language from a power source and an inductance,

09:58   6   and they further stated that this converter was a buck

09:58   7   configuration.

09:58   8       Gutnik I, same thing.  Power source regulating circuitry

09:58   9   and inductance.  Gutnik I discloses a buck converter in the

09:58  10   words of the patent applicant, and that's different because of

09:59  11   the from a power source and inductance claim language.

09:59  12       Gutnik II, same thing.  Power source regulating circuitry

09:59  13   and inductance.  Applicant told the Patent Office this is a

09:59  14   buck configuration, distinguished it from their claims on the

09:59  15   basis of the italicized language from a power source and an

09:59  16   inductance.

09:59  17       Now, Your Honor, you were told that there's no real way to

09:59  18   know what the applicants meant.  It's a bit of a mystery.

09:59  19   There's multiple possible interpretations.  It's not a mystery

09:59  20   when you take your time and you look at what they actually

09:59  21   said.  If you look at what they actually said over and over and

09:59  22   over again, the italicized, the claim language that we're

09:59  23   focused on now, they distinguished it on the exact precise

09:59  24   basis that we are advocating that Your Honor hold them to now.

09:59  25   There's no doubt.  There's no mystery.  There's no confusion if

38

09:59   1    you look at what they actually said over and over and over

09:59   2    again.

09:59   3         So those are the representations they made, Your Honor,

09:59   4    and those are in our slide deck through Slide 19.

09:59   5         What I would say, Your Honor, is that the reason why we

10:00   6    think this is important and why we think that the construction

10:00   7    that we've asked Your Honor for --

10:00   8         And, Mr. Lee, if you'd jump to the summary of the proposed

10:00   9    constructions.

10:00   10        The reason why it's significant, Your Honor, is because

10:00   11   the jury needs to know exactly what this means from an

10:00   12   inductance and a power source.  The claim language says

10:00   13   regulating at least one supply from a power source and

10:00   14   inductance.  That's the phrase they italicized when they were

10:00   15   discussing the prior art with the examiner over and over again,

10:00   16   and what the jury needs to know is that that means the

10:00   17   inductance needs to come before the regulating circuitry, and

10:00   18   we've tried to capture that in our proposed construction to

10:00   19   indicate that you have the power source, the inductance and the

10:00   20   regulating circuitry just as Figure 1 in the patent shows and

10:00   21   just as they represented to the examiner over and over again

10:01   22   that the claim should be treated as meaning and distinction of

10:01   23   the prior art, but we know that from their position during this

10:01   24   Markman proceeding they're going to argue the inductance coil

10:01   25   can be downstream.  It can't.  That's exactly what they told

10:01  1   the examiner eight different times is different from their

10:01  2   claimed invention.  And so at the end of the day, Your Honor,

10:01  3   we think the jury would be assisted by understanding what the

10:01  4   claim language from, from a power source and an inductance

10:01  5   means.  They had to rewrite the claim to obtain confirmation of

10:01  6   patentability during re-examination and they had to explain to

10:01  7   the examiner eight different times that that meant the

10:01  8   inductance coil could not be upstream.

10:01  9        Having said that, having made the amendment, we ask Your

10:01  10  Honor that they be held to it.

10:01  11       THE COURT:  Yes, ma'am.

10:01  12       MS. PROCTOR:  Your Honor, can I make a brief response?

10:01  13       THE COURT:  You have as much as time you want.

10:01  14       MS. PROCTOR:  Thank you, Your Honor.

10:02  15       So a few points.  Intel's counsel said at the beginning of

10:02  16  his presentation 9:36 a.m. what really matters is what is

10:02  17  claimed, and he actually said that a few times.  We completely

10:02  18  agree.  That is what should control here what is claimed.  And

10:02  19  it is Intel who's trying to deviate from what is claimed, not

10:02  20  VLSI.

10:02  21       He also said, at the end of the day, the claim language

10:02  22  governs.  Again, we could not agree more.  That is really the

10:02  23  answer here.  The claim language is clear.  The parties agree

10:02  24  on that and it is what governs.

10:02  25       Now, you heard a lot from Intel's counsel about boost

10:02  1    converters and how those configurations fall within the scope
10:02  2    of the claims.  We agree, but here's how I like to think about
10:02  3    it:  So the -- let's say the claim covers something like the
10:02  4    color purple, right?  So the parties agree that lavender is a
10:03  5    shade of purple.  That doesn't mean that lavender -- that all
10:03  6    shades of purple, that purple is now defined to mean lavender
10:03  7    for all purposes, and that's what Intel's trying to do.
10:03  8    They're trying to say, oh, well, everyone agrees boost can be
10:03  9    one way to implement this.  So let's limit everything to boost
10:03  10   configuration.  It's just not supported.  And the fact that the
10:03  11   patentee might have distinguished blue from purple doesn't
10:03  12   change that.  It doesn't then somehow support limiting the
10:03  13   entire family of shades of purple to something like lavender.
10:03  14       Now, Intel distinguished buck configurations a few times
10:03  15   based specifically on the inductor being downstream from the
10:03  16   regulating circuitry.  That's actually identical to the layout
10:03  17   in the buck boost configuration.
10:03  18       If you can go to Slide 21, please.
10:03  19       So here we go.  Power source on the left, battery, switch
10:03  20   in the middle, inductor downstream.  It is crystal clear from
10:04  21   the re-examination history and from things like Claim 23 this
10:04  22   configuration falls within the scope of Claim 1, period.  And
10:04  23   it is not a configuration where the inductor is -- it is a
10:04  24   configuration where the inductor is downstream of the power
10:04  25   source on the regulating circuitry, and that's precisely how

10:04   1   Intel tried to distinguish all buck converters.

10:04   2       You also heard a fair amount about how buck configurations

10:04   3   operate, and Intel tried to distinguish what the inductor does

10:04   4   in the buck circuit from what it does in a boost or a buck

10:04   5   boost configuration.  So Intel described for example the

10:04   6   inductor as being smoothing here in a buck configuration.  I

10:04   7   don't necessarily disagree with that characterization, but it

10:04   8   really is just that.  It's a characterization.  What's actually

10:04   9   happening here is that when the switch is closed, some of that

10:04  10   current is being stored in the inductor as magnetic field, and

10:05  11   then when the switch is open, some of that stored energy is

10:05  12   going to power the load.

10:05  13       If we look at buck boost, same thing.  Switch is closed,

10:05  14   power source is going to the inductor charging up the inductor.

10:05  15   Switch is open, inductor -- that stored energy is going to

10:05  16   power the load.  It is really the same basic operation.

10:05  17   Inductors are doing what inductors do, storing energy in a

10:05  18   magnetic field and then providing that energy to the load.  So

10:05  19   this idea of smoothing is really not meaningful.

10:05  20       What it is meaningful too, though, is Intel's arguments

10:05  21   about what from means.  And I heard kind of a change in tone in

10:05  22   Intel's argument today from -- in their brief they really are

10:05  23   very clear the only support for these two limitations is the

10:05  24   re-exam history.  Today counsel tried to argue a little bit

10:05  25   that somehow the plain and ordinary meaning of from supports

10:05  1    their construction.  Well, if that were true, they would be

10:06  2    relying on the patent itself to make those arguments, not the

10:06  3    re-exam history for the re-exam history to be redefining terms

10:06  4    were in the world of disclaimer, as they know and as they've

10:06  5    tried to argue separately.  So this really isn't a plain and --

10:06  6    what is the plain and ordinary meaning question.

10:06  7        Also even if it were, I don't agree.  I think they're

10:06  8    wrong on what from means here.  So what we're regulating is the

10:06  9    output voltage, right?  And that output voltage is absolutely

10:06  10   being regulated from an inductor and a power source and a buck

10:06  11   or boost configuration.  And you saw that actually in their own

10:06  12   diagram.  So they showed you how in the buck configuration if

10:06  13   you don't have the inductor and take it away, you get that

10:06  14   square wave, right, at the output at the load.  Now, when you

10:06  15   do have the inductor there, you get more of a smoothed out

10:06  16   version.  And so the output, the voltage that's going to the

10:06  17   load, is absolutely being regulated from the inductance and the

10:07  18   power source.  Both of those components are what combine to

10:07  19   provide that output voltage.  And so it's not fair to say that

10:07  20   somehow the plain and ordinary meaning of from limits us to

10:07  21   Intel's boost only world.

10:07  22       They also talked a little bit about Claim 9 kind of in an

10:07  23   attempt to make the same argument how Claim 9 was amended

10:07  24   during the re-examination, and instead of being able to choose

10:07  25   from a linear regulator, a power source and an inductance, it

10:07   1   had to be both the power source and an inductance.  Absolutely.

10:07   2   That's what Claim 1 has always said.  Claim 1 was not amended,

10:07   3   and all the arguments Intel relies on from the re-exam history

10:07   4   are about Claim 1.  So Claim 9 is really just an attempt to

10:07   5   make it seem like there was some amendment that was relevant

10:07   6   when really Claim 1 has always said from a power source and an

10:07   7   inductance, and that's what was being discussed and was

10:07   8   ultimately held to be valid.

10:08   9       So, Your Honor, at the end of the day here Intel says

10:08   10  there's no mystery.  But I also didn't hear Intel's counsel at

10:08   11  any point show you where in the re-exam history it says the

10:08   12  inductance has to be both connected to the power source and

10:08   13  positioned between the power source and the regulating

10:08   14  circuitry.  It's not there.  It never says it in the history.

10:08   15  It is Intel's burden to show you with clear and unmistakable

10:08   16  proof that the patentee limited the claim not just in some

10:08   17  abstract way but limited the claim in the way Intel's arguing.

10:08   18  So limited the claim to have -- the claims to have both those

10:08   19  additional limitations.  It's just not there.  They have not

10:08   20  met their burden, and plain and ordinary meaning should

10:08   21  control.

10:08   22      Thank you, Your Honor.

10:08   23      MR. MUELLER:  Briefly, Your Honor?

10:08   24      THE COURT:  Yes.

10:08   25      MR. MUELLER:  Just a few points, Your Honor.  The first is

10:08  1   Ms. Proctor did not contest nor did VLSI contest in its

10:09  2   briefing any of our explanations of how those circuits

10:09  3   functioned in the eight prior art references.  That is to say

10:09  4   there's no dispute, no fact dispute between the parties that

10:09  5   when we label something as having a power source and an

10:09  6   inductance and a regulating circuit in particular positions,

10:09  7   those are in fact where they're located.  So this is not a

10:09  8   situation where the parties have different views as to the

10:09  9   underlying facts that were present before the Patent Office.

10:09  10  Those eight prior art circuits, there's no dispute, function

10:09  11  precisely the way that we've explained in our briefing to Your

10:09  12  Honor.  And in each and every one of those circuits there's a

10:09  13  power source, a regulating circuit and then an inductance coil

10:09  14  downstream, and in each and every one of those eight instances

10:09  15  the applicants told the Patent Office that was different from

10:09  16  what they were claiming.  So, again, the issue here, Your

10:09  17  Honor, is what does from a power source and an inductance mean?

10:10  18  And they explain precisely what it means to the Patent Office

10:10  19  over and over and over again.

10:10  20      If we could just go to one example, Your Honor, of the

10:10  21  Dancy reference.  This is Slide 8 of our Markman slides, Your

10:10  22  Honor.  And I showed you the slide earlier, but just to return

10:10  23  to it briefly.  Dancy's regulator down converter, however, does

10:10  24  not regulate at least one supply from a power source at an

10:10  25  inductance because the power supply control signal operates

45

10:10  1   switches S1 and S2 from the power source alone, not from the

10:10  2   power source and the inductance as recited in Claim 1.  They

10:10  3   could not have been any clearer about what that means, Your

10:10  4   Honor.

10:10  5        THE COURT:  Is my understanding about the Dancy figure

10:10  6   that it's just conceptual?

10:10  7        MR. MUELLER:  I'm sorry, Your Honor?

10:10  8        THE COURT:  Is my understanding that the Dancy figure is

10:10  9   just conceptual and not an actual?

10:11  10       MR. MUELLER:  It is, Your Honor, although it does show

10:11  11  real world circuit components that could be configured in this

10:11  12  way.

10:11  13       THE COURT:  And is the Dancy example being used for

10:11  14  voltage regulation?

10:11  15       MR. MUELLER:  Yes.  It is being used for conversion --

10:11  16  power conversion and the circuits that are claimed in this

10:11  17  power conversion as well.  So it's exactly the same field, and

10:11  18  this is the -- exactly the same type of circuit we see in, for

10:11  19  example, Figure 1 of the patent.

10:11  20       THE COURT:  And what would one skilled in the art

10:11  21  understand the word "positioned" to mean?

10:11  22       MR. MUELLER:  Positioned?

10:11  23       THE COURT:  Yes.

10:11  24       MR. MUELLER:  Just located in the series where the current

10:11  25  flows.  You need to know in what sequence they occur and so

10:11   1   where it needs to be positioned in that sequence once the

10:11   2   circuit is closed and current begins to flow.  That will

10:11   3   dictate the order of operations of the various circuit

10:11   4   elements.

10:11   5       And so here, Your Honor, where the regulating circuitry is

10:11   6   positioned in the Dancy reference and each of the other seven

10:11   7   is connected to the power source but before the inductor.

10:11   8   Again, no fact dispute on that.  And this is exactly what they

10:12   9   said, does not regulate from a power source and an inductance

10:12   10  because -- because they use the word "because" -- it regulates

10:12   11  from the power source alone, not from the power source in the

10:12   12  inductance.

10:12   13      Now, Ms. Proctor just told you a few moments ago the

10:12   14  inductance could be somewhere downstream and there still could

10:12   15  be regulation from.  That's not what they told the Patent

10:12   16  Office.  What they told the Patent Office is -- because they

10:12   17  had that here.  They had an inductor coil downstream, but they

10:12   18  told the Patent Office that's different, that when we say

10:12   19  regulate from a power source an inductance, what we mean is

10:12   20  regulate from both of them and that that's different than a

10:12   21  regulation from a power source alone, and they said it right

10:12   22  here.  That's not from the power source in the inductance.  So,

10:12   23  again, it's crystal clear on its face, Your Honor, under any

10:12   24  standard of review of the prosecution history.  That is a

10:12   25  disclaimer.  That is also a definition.  That is whatever word

10:13  1   you want to attach to it.  It is a statement about what the

10:13  2   claim means and a position to which they need to be held.

10:13  3       And we thank you, Your Honor.  Unless you have you any

10:13  4   further questions.

10:13  5       THE COURT:  I don't.

10:13  6       Do you have anything else you wanted to add?

10:13  7       MS. PROCTOR:  Just very briefly, Your Honor.

10:13  8       I want to point out two things I did not hear Intel's

10:13  9   counsel address.  Number one is the buck boost converter that

10:13  10  we spent a lot of time on and that the re-examination history

10:13  11  makes extremely clear does fall within the scope of Claim 1,

10:13  12  and that's demonstrated by, for example, Claim 23.

10:13  13      I also still have not seen an affirmative statement

10:13  14  defining what it means to regulate from a power source and an

10:13  15  inductance.  I didn't hear it that time either.  So at the end

10:13  16  of the day Intel really is just guessing.  They're make

10:13  17  assumptions about what the patentee meant.  They're

10:13  18  interpreting figures, adding their own colors and boxes and

10:13  19  then trying to guess, but that is just not good enough.  You

10:13  20  can't rewrite claims based on guesses.

10:14  21      Thank you, Your Honor.

10:14  22      MR. MUELLER:  Your Honor, just one more brief thing.

10:14  23      THE COURT:  You guys have as much time as you need.

10:14  24      MR. MUELLER:  Okay.  I appreciate it, Your Honor.

10:14  25      And Ms. Proctor did mention that I meant to mention, but I

48

10:14  1   forgot.  The buck boost idea.  So there are various ways that

10:14  2   you can take circuit elements and add different things to them.

10:14  3   So you could have in fact a boost with a buck conversion stage

10:14  4   after it.  And when I said at the very beginning of the day,

10:14  5   Your Honor, that the label at the end of the day is not the

10:14  6   most significant thing.  What matters is the circuit elements

10:14  7   as claimed, this is one example of that as well.  If you had a

10:14  8   circuit in which the regulating circuitry regulated from an

10:14  9   inductance and a power source as claimed in the patent, you

10:14  10  could have all sorts of things downstream.  You could have a

10:14  11  buck converter after that.  You can add things to a claim -- to

10:14  12  a claimed invention without escaping the scope of the claim.

10:14  13  So we're not here to say that there's some negative limitation

10:14  14  that precludes the addition of other circuit elements in

10:14  15  addition to the ones that are claimed, and I couldn't even give

10:15  16  you a full litany of all the different -- all types of circuit

10:15  17  configurations that might meet this claim.  What I can tell

10:15  18  you, though, Your Honor, and what our position is is that they

10:15  19  have to have this.  They have to have regulating circuitry from

10:15  20  a power source and an inductance.  This buck boost converter

10:15  21  that Ms. Proctor referred to was never once cited to the Patent

10:15  22  Office in reference to those eight prior art references that we

10:15  23  talked about earlier.  What they said when they were discussing

10:15  24  the prior art was what I showed you earlier.  They need to be

10:15  25  held to that, and that means that any circuit that would meet

10:15  1    this claim would have to have the regulating circuitry and the

10:15  2    inductance in the power source upstream from that so that it

10:15  3    can regulate from those two things.  Beyond that, there's an

10:15  4    infinite variation that could come downstream, additional

10:15  5    components that could be added to it, but they have to have

10:15  6    what they claimed.  They have to have the claim requirements

10:15  7    they relied on to distinguish the prior art.  So the buck boost

10:15  8    at the end of the day is a red herring, unless Ms. Proctor

10:15  9    means to suggest that a buck boost circuit could meet the claim

10:16  10   without an inductance before the regulating circuitry.  It

10:16  11   absolutely could not.  There needs to be an inductance and a

10:16  12   power source before the regulating circuitry so that it can

10:16  13   meet the requirement from regulation from a power source and

10:16  14   inductance.  The requirement they relied on eight different

10:16  15   times to obtain the re-exam claims, Your Honor.

10:16  16        Thank you.

10:16  17        MS. PROCTOR:  And, Your Honor, I'm -- I just want to be

10:16  18   crystal clear here because I think Intel's counsel attempted to

10:16  19   address the buck boost circuit but actually talked about maybe

10:16  20   a buck plus boost circuit.  Very different.  So going back to

10:16  21   the buck boost converter we've talked about here, I just want

10:16  22   to be clear.  In this circuit the inductance is downstream of

10:16  23   both the power source and the regulating circuitry, and this

10:16  24   circuit in this way absolutely is within the scope of the Claim

10:16  25   1 and within the scope of Claim 23 even after the re-exam.  So

10:16   1   they still haven't actually addressed the circuit that I've

10:17   2   been talking about and focusing on.

10:17   3       Ultimately what he said at the outset is right.  At the

10:17   4   end of the day the claim language governs, and we agree.  So

10:17   5   Intel still has not shown any reason to rewrite the claims in a

10:17   6   way that excludes Claim 23, excludes a buck boost converter and

10:17   7   dramatically changes their scope.

10:17   8       Thank you, Your Honor.

10:17   9       MR. MUELLER:  I'll just say we're not excluding Claim 23,

10:17   10  and beyond that I've already made my arguments, Your Honor.

10:17   11  Thank you.

10:17   12      MS. PROCTOR:  Thank you, Your Honor.

10:17   13      THE COURT:  I listen to a lot of Supreme Court arguments,

10:17   14  and one of my have favorite things that Justice Pryor ever said

10:17   15  was he told one counsel that I listen to what you say and I

10:17   16  think you're absolutely right and then I listen to the other

10:17   17  counsel and I think you're absolutely right.  What am I to do?

10:17   18  And I -- those were two very good arguments, and to those

10:18   19  people who are taking their time to come and watch really great

10:18   20  lawyers who are in the audience, you picked a great day to be

10:18   21  here.  All that being said -- and I mean it.  Those arguments

10:18   22  were exceptional.  The Court is going to find that there was no

10:18   23  clear and unequivocal disavowal.  We rely in great part on what

10:18   24  counsel has said with the allowance of Claim 23 and we find

10:18   25  that it would allow both a boost and a buck converter;

10:18  1  therefore, the claim construction for the first term is going

10:18  2  to be plain and ordinary meaning.

10:18  3       Next claim up?  I'm sorry.  The next claim term up?

10:18  4       MS. WEN:  Good morning, Your Honor.  Charlotte Wen for the

10:19  5  plaintiff.

10:19  6       THE COURT:  Good morning.

10:19  7       MS. WEN:  So here to talk to you today about the '485

10:19  8  patent which is the patent that generally relates to the --

10:19  9  woops.  Sorry -- concept of charge sharing.  So as the patent

10:19  10 discloses --

10:19  11      THE COURT:  Let me just go and make sure I'm on the same

10:19  12 claim term that you are.  I think I am, but...

10:19  13      MS. WEN:  Yeah.  So there are a few claim terms for this

10:19  14 patent.

10:19  15      THE COURT:  Okay.  If you'll -- I've got a lot of papers

10:19  16 up here.  If you'll let me know which claim term you're on and

10:19  17 I'll make sure that I'm on the right one in my stack.

10:19  18      MS. WEN:  Sure.  Capacitance structure is the first one.

10:19  19      THE COURT:  Okay.  I'm with you.  Thank you, ma'am.

10:20  20      MS. WEN:  Okay.  So this patent generally relates to

10:20  21 memory cells.  Memory cells, as you know, store memory, and a

10:20  22 memory cell that has high voltage is considered stable and can

10:20  23 hold the memory that it's supposed to be holding.  Now,

10:20  24 however, if you wanted to rewrite the memory to that cell,

10:20  25 it -- a memory cell that is stable enough to hold voltage is

10:20  1  not capable of being written to very well.  And so the '485

10:20  2  patent describes a charge sharing scheme that allows for charge

10:20  3  to be shared between the memory cells and the capacitance

10:20  4  structure during a write operation in order to make it easier

10:20  5  for the memory cells to be written to.

10:20  6      So during this exemplary operation, the memory is

10:20  7  decoupled from the power supply which allows it to be stable

10:20  8  enough to hold memory and it couples to the capacitance

10:20  9  structure to share a charge.  And by doing this, the voltage in

10:21  10  the memory cell is lowered which improves the writability, and

10:21  11  so this a temporary lowering of voltage using a capacitance

10:21  12  structure.  And so capacitance is a physical characteristic.

10:21  13  It describes a structure's ability to hold the charge.  And

10:21  14  types of structures that have capacitance include capacitors.

10:21  15  They include transistors and they include, as disclosed by the

10:21  16  '485 patent, dummy memory cells.

10:21  17      THE COURT:  You'll make my court reporter very happy if

10:21  18  you'll say -- when you're showing the slides which slide you're

10:21  19  showing me.

10:21  20      MS. WEN:  Sure.  So we're on Slide 69 right now.  And

10:21  21  we're discussing the types of structures with capacitance.

10:21  22      And I just want to talk to you a little bit about the

10:22  23  tutorial that Intel submitted.  Intel's tutorial focuses a lot

10:22  24  on two of the embodiments that are disclosed in the '485

10:22  25  patent, specifically in Figures 2 and 3.  And we just want to

10:22   1   be clear that it is the claims and not the specification that

10:22   2   define the invention.  Intel's tutorial confuses the

10:22   3   embodiments of the claims.  It attempts to limit the claims to

10:22   4   Figures 2 and 3 and mischaracterizes the specification.

10:22   5        So as an example, Intel told you that this figure, Figure

10:22   6   2, is the invention of the patent.  This is only an example

10:22   7   of -- this is only an example -- like an exemplary embodiment

10:22   8   of the patent.  So, for example, the patent says that various

10:22   9   changes and modifications to the embodiments herein chosen for

10:22   10  purposes of illustration will readily occur to those skilled in

10:22   11  the art.

10:22   12       As another example, Intel's slide specifically says that

10:23   13  there is a plurality of dummy cells in the invention, but not

10:23   14  every single claim requires dummy cells.  And, in fact, when

10:23   15  the patent introduces dummy cells, it says dummy SRAM cells are

10:23   16  coupled to the dummy bit lines and are conventional SRAM cells

10:23   17  in the illustrated embodiment only.

10:23   18       And so when you look at the claims, you can see that in

10:23   19  Claim 1 the patent claims a first capacitance structure which

10:23   20  includes a plurality of dummy cells.  And in Claim 17, which is

10:23   21  a claim that we're going to be talking about today, the patent

10:23   22  does not claim a plurality of -- does not require the

10:23   23  capacitance structure to include a plurality of dummy cells.

10:23   24       Similarly, Slide 20 of Intel's tutorial pointed out that

10:23   25  there's a single dummy cell that is not coupled.  And in

10:24   1   addition to what I was saying earlier that not every single

10:24   2   embodiment requires dummy cells, not every single embodiment of

10:24   3   a patent requires a single dummy cell that is not coupled.  And

10:24   4   so this is Slide 74 discussing Intel's tutorial at Slide 20.

10:24   5       And so I'm going to move into a discussion of the claim

10:24   6   term which is a capacitance structure.  And essentially the

10:24   7   parties' dispute centers around the question of whether

10:24   8   capacitance structure is a means plus function term or whether

10:24   9   it should have its plain and ordinary meaning.  As you know --

10:24   10  this is Slide 77 -- when a claim term does not use the word

10:24   11  "means," there's a presumption that Section 112, Paragraph 6

10:24   12  does not apply.  And the standard to determine whether the

10:24   13  words of a claim are understood by persons of ordinary skill in

10:25   14  the art have a -- is whether they have a sufficiently definite

10:25   15  meaning as a name for structure.  Now, Intel claims that the

10:25   16  patent doesn't explain what a capacitance structure is, that it

10:25   17  doesn't attribute any real -- it only discloses the location of

10:25   18  the capacitance structure within the claimed memory circuit,

10:25   19  but that's not quite right.  A person of ordinary skill in the

10:25   20  art would understand that the capacitance structure refers to a

10:25   21  specific class of structures.  So, for example, as Slide 79

10:25   22  shows, the '485 patent provides multiple structural examples,

10:25   23  and I'll go through several of them of what can comprise a

10:25   24  capacitance structure.

10:25   25      THE COURT:  Is it -- is it your position that the term

10:25  1    "capacitance structure" is well-known in the art as a

10:25  2    structure?

10:25  3         MS. WEN:  I think it's our position that a person of

10:25  4    ordinary skill in the art would understand the term

10:25  5    "capacitance structure" particularly within --

10:26  6         THE COURT:  To be a structure?

10:26  7         MS. WEN:  To refer to a class of structures.

10:26  8         THE COURT:  Okay.  So -- and I did what I do which is my

10:26  9    skill set as a technology person which is I Googled it and --

10:26  10   which is -- obviously I'm not one skilled in the art, but we

10:26  11   came up with about 4,000 hits when you Google capacitance

10:26  12   structure, and that's why I'm forecasting for Intel what I'm

10:26  13   going to be curious to hear from them as to why it's not

10:26  14   thought of regardless of what's in the patent or, rather, in

10:26  15   addition to what's in the patent that it wasn't already a

10:26  16   well-known term and a set of structures.

10:26  17        And also, and I've said this before, but I think it's

10:26  18   worthy of repeating because it's -- my philosophy is, you know,

10:27  19   I never had to -- or would be allowed to write a patent, but I

10:27  20   am sympathetic with those who do, and when someone is writing a

10:27  21   patent like this and they use a term like "capacitance

10:27  22   structure" and they are, my guess is, presuming that people

10:27  23   will know what it means, I think it's fair to not upset that

10:27  24   process and make the people drafting patents feel like they

10:27  25   have to explain everything as well or be its own risk.  So

10:27  1    that's just my -- I may be right or I may be wrong, but that is

10:27  2    my general philosophy on how I interpret when a -- when a term

10:27  3    like "capacitance structure" is challenged, it is a relatively

10:27  4    heavy burden on the people who are challenging it to persuade

10:27  5    me that I should disturb what the scribner did if he was in

10:28  6    good faith in thinking that it would be understood by a person

10:28  7    skilled in the art.

10:28  8        MS. WEN:  So yeah.  I agree with that completely, Your

10:28  9    Honor.  I think a person of ordinary skill in the art upon

10:28  10   reading the '485 patent would understand that the capacitance

10:28  11   structure term refers to a broad class of structures.  And so

10:28  12   I'll just go through these quickly.  It explains how a

10:28  13   capacitance structure interacts with other structures on the

10:28  14   claimed memory circuit, and to provide even more color to what

10:28  15   the capacitance structure means, it describes the role of the

10:28  16   capacitance structure plays in the charge sharing scheme

10:28  17   described in the '485 patent.

10:28  18        So this next slide, Slide 80, just provides a long list of

10:28  19   examples of the various structures disclosed in the '485 patent

10:28  20   that can correspond to the capacitance structure.  And so we

10:28  21   have memory cells.  The patent says, for example, that in

10:28  22   another embodiment the supply voltage is reduced during the

10:29  23   write operation by charge sharing with a dummy column of memory

10:29  24   cells.  The patent disclosed, as another example, dummy rows

10:29  25   and dummy columns.  I'm not going to read out the entire slide,

10:29  1   but as another example, the patent explains that the relative

10:29  2   capacitance between the dummy column and the memory array

10:29  3   columns remains substantially constant for any number of rows.

10:29  4   So this goes back to what I was talking about earlier where the

10:29  5   memory cells that are being written to share charge with a

10:29  6   capacitance structure.  And in this particular embodiment the

10:29  7   patent is talking about a dummy column.

10:29  8       Also disclosed by the patent are dummy cells and dummy

10:29  9   SRAM cells, and the patent is careful to explain that while it

10:29  10  is discussing conventional transistor SRAM cells and other

10:29  11  embodiments, the type of a cell may be different.

10:29  12      So as I was saying, Intel has cited a case that -- from

10:30  13  the Federal Circuit that found a claim term check standby unit

10:30  14  to not recite structure because it did not include any examples

10:30  15  of what structures or class of structures could fall within the

10:30  16  definition.  And here the written description does include a

10:30  17  whole litany of examples in Slide 80.

10:30  18      In addition to providing multiple examples of the

10:30  19  capacitance structure, the patent attributes specific

10:30  20  structures within the claims to the capacitance structure.  So

10:30  21  you can see in the next few slides, beginning with Slide 82,

10:30  22  that the patent contemplates several different types of

10:30  23  configurations of capacitance structures.  And, for example,

10:30  24  Claim 3 requires a dummy line and a plurality of dummy cells

10:30  25  coupled to the dummy line.  Similarly, Claim 19 requires the

10:30  1    dummy line and also a first dummy cell adjacent to but not

10:30  2    coupled to the dummy line.

10:30  3         And of course, if I go here, there are multiple claims in

10:31  4    the patent that include additional structural limitations.

10:31  5         Similarly, during prosecution, the prosecution history's

10:31  6    not very long, but the examiner noted that one of the claims of

10:31  7    the '485 patent should include a plurality of dummy cells as a

10:31  8    descriptor for a capacitance structure.  So that indicates to

10:31  9    me that the examiner also understood the capacitance structure

10:31  10   recites structure.

10:31  11        It goes back to this slide -- Slide 86 goes back to

10:31  12   Intel's argument.  The Federal Circuit has noted that when

10:31  13   dependent claims add limitations that describe particular

10:31  14   structural features, that indicates that the patent has

10:31  15   structure or the claim term recites structure, rather.

10:31  16        Third point, the patent also explains how the capacitance

10:32  17   structure interacts with other structures in the circuit.  It

10:32  18   is coupled to various structures, including the power supply

10:32  19   line in Slide 87 and in Claim 1.  In Claim 6 there's a

10:32  20   switching transistor coupled between the capacitance structure

10:32  21   and a voltage reference terminal.  And these are just further

10:32  22   examples of the idea that the inventors clearly contemplated

10:32  23   that the capacitance structure is a structure.

10:32  24        So the Federal Circuit when deciding whether a term is or

10:32  25   is not a means plus function considers whether a person of

10:32    1    ordinary skill in the art would ascribe function to a

10:32    2    particular claim term.  And it is clear that capacitance

10:32    3    structure does not recite a function.

10:32    4         As VLSI has explained -- as our expert Dr. Conte has

10:32    5    explained, capacitance is a physical characteristic that

10:32    6    describes a structure's ability to hold charge, and this is

10:32    7    supported both by Dr. Conte by the patent and as well as one of

10:33    8    the dictionary definitions that Intel provided.

10:33    9         So could we have DX28?  That's Intel's Exhibit 28.  I also

10:33   10    have the paper version.

10:34   11         Okay.  So if you see the definition of -- the definition

10:34   12    of capacitance is what Intel cites in its briefing, and we

10:34   13    think it also supports our construction, but if you look at the

10:34   14    definition of capacitor, this definition here which says a

10:34   15    component which has capacitance makes clear that a person of

10:34   16    ordinary skill in the art would not understand capacitance to

10:34   17    be a function.  It is a physical property that components have.

10:34   18         Okay.  Sorry for that.  Could we go back to the slides?

10:34   19         So further supporting the fact that the capacitance

10:35   20    structure does not recite a function.  The phrase "providing

10:35   21    capacitance" does not appear anywhere in the intrinsic record.

10:35   22    Intel hasn't cited any particular part of the record that

10:35   23    states that phrase, and the claims never ascribe any function

10:35   24    to the capacitance structure.  Only structure.  As I showed you

10:35   25    in many previous slides, all of the claim terms that include

10:35    1    capacitance structure only describe it in terms of structure.

10:35    2         And consistent with that definition that Intel provided,

10:35    3    the '485 patent repeatedly describes structures as having

10:35    4    capacitance.  For example, it states that the capacitance of

10:35    5    dummy Column 17 can be adjusted.  The capacitance of dummy

10:35    6    Column 17 is reduced and a relative capacitance between the

10:35    7    dummy column and the memory array columns remains substantially

10:35    8    constant.  So the patent repeatedly refers to capacitance as a

10:35    9    property that the structures have.

10:35    10        And so as VLSI has explained in its briefing, a person of

10:36    11   ordinary skill in the art would understand capacitance

10:36    12   structure by its plain and ordinary meaning as a class of

10:36    13   structures with capacitance that can be used in the charge

10:36    14   sharing scheme claimed in the '485 patent.

10:36    15        And just as a note, the Federal Circuit has held that it

10:36    16   is sufficient if the claim term is used in common parlance or

10:36    17   by persons of skill in the pertinent art to designate structure

10:36    18   even if the term covers a broad class of structures.

10:36    19        And that is all from me.

10:36    20        THE COURT:  Thank you.

10:36    21        Mr. Lee, good morning.

10:36    22        MR. LEE:  Good morning, Your Honor.

10:36    23        Your Honor, we're handing out copies of both the Markman

10:36    24   slides and the tutorial slides.  May I proceed, Your Honor?

10:37    25        THE COURT:  Absolutely.  Yes, sir.

10:37  1    MR. LEE:  While I have the podium, let me say three

10:37  2  things.  First, Mr. Yi e-mailed earlier today about the

10:37  3  precharging means limitation, and I should report at least for

10:37  4  Intel we are fine with the proposed construction of the Court.

10:37  5    THE COURT:  Okay.

10:37  6    MR. LEE:  Let me do two things while I have the podium

10:37  7  now.  One is to provide a little bit of bait to our tutorial

10:37  8  which Your Honor has said and then to move to the capacitance

10:37  9  structure, and while I understand Your Honor has articulated

10:38  10  the hill we have to climb and hopefully we'll be able to

10:38  11  present you with an argument that will at least cause you, in

10:38  12  Justice Pryor's words, to pause on what the correct claim

10:38  13  construction is.

10:38  14    So if I turn to the tutorial first, the one thing I would

10:38  15  mention is the priority date is 2006, and I think that becomes

10:38  16  important when we come back to what happens when you, for

10:38  17  instance, would research or Google the term "capacitance

10:38  18  structure" as of the priority date.  If I turn --

10:38  19    THE COURT:  That's a good point.

10:38  20    MR. LEE:  Sure.

10:38  21    THE COURT:  I don't know that we were that -- I don't know

10:38  22  that we were that careful at looking and seeing what would --

10:38  23  which of those were from the appropriate date.

10:38  24    MR. LEE:  Yeah.  Your Honor, I think the key thing here

10:38  25  for this record, and I'm now mixing the Markman hearing with

10:38  1   the tutorial, is this:  You have multiple declarations from Dr.

10:38  2   Conte.  In terms of providing you with a publication, a peer

10:39  3   reviewed journal, a dictionary as of the relevant time or close

10:39  4   to the relevant time before or after that said capacitance

10:39  5   structure as opposed to capacitor has an accepted meaning which

10:39  6   was Your Honor's question, there's nothing.

10:39  7       THE COURT:  Yes, sir.

10:39  8       MR. LEE:  I mean, they had that opportunity to present it

10:39  9   to you.  There was nothing.

10:39  10      Your Honor, I wouldn't disagree that the word "capacitor"

10:39  11  has an accepted meaning among engineers, but Your Honor will

10:39  12  read this patent forever and you'll not find the word

10:39  13  "capacitor."

10:39  14      THE COURT:  Right.

10:39  15      MR. LEE:  There's only capacitance structure, and I think

10:39  16  that becomes important because, as Your Honor said, you know,

10:39  17  it's hard to second guess the patent drafter, but the other

10:39  18  fact is the patent drafter has a pen in his or her hand.

10:39  19      THE COURT:  Well, no.  And you are, by the way, very --

10:39  20  not surprisingly, given your great reputation, you are

10:39  21  immediately hitting on a number of the things my law clerk and

10:39  22  I were specifically discussing issues that we talked about in

10:40  23  preparing for this -- the difference between capacitor and

10:40  24  capacitance structure, and those -- these are -- you're

10:40  25  touching on a number of things that I think are important and

10:40  1   that we have been discussing trying to get this right.

10:40  2       MR. LEE:  And, you know, I will try, Your Honor, when I

10:40  3   get into the substance of capacitance structure to try to

10:40  4   address those specifically, and with Your Honor's indulgence I

10:40  5   may take two or three minutes just to go --

10:40  6       THE COURT:  You have all the time.

10:40  7       MR. LEE:  So just for tutorial purposes, and I don't think

10:40  8   there's any real disagreement about this, the patent is talking

10:40  9   about static random access memory or SRAM.  It is, if we go to

10:40  10  Slide 3, a conventional form of computer memory.  It is static,

10:40  11  Your Honor, because unlike other certain types of memory, the

10:40  12  data doesn't have to be periodically refreshed.  It is random

10:40  13  access, and this is important because any address, any of these

10:40  14  cells can be written to or read from randomly.

10:41  15      If I go to Slide 4, Your Honor, the SRAM memory is

10:41  16  typically structured as an array of memory cells, each holding

10:41  17  one bit of data.  They're typically in these lines rather than

10:41  18  rows or columns.  That becomes important for this patent

10:41  19  because Figure 2 has the cells in columns.  Figure 3 has them

10:41  20  in rows, but it is fundamentally the same type of structure.

10:41  21      If I move to Slide 5, in order to store data in an SRAM

10:41  22  cell, a voltage supply has to be applied to the cell, and

10:41  23  that's what's shown in Slide 5.  So each cell in the array has

10:41  24  to be connected to a power supply, and the way you connect it

10:41  25  is through a line.

10:41  1      Now, if I go to Slide 6, Your Honor, there's a tension in

10:41  2  setting voltage for SRAM memory cells, and the tension is what

10:41  3  leads to the claimed problem that the patent addresses.  A

10:42  4  higher voltage provides better stability for the cell.  On the

10:42  5  other hand, the lower voltage makes it easier to write to the

10:42  6  cells.  So depending on what you're doing, you may want to have

10:42  7  a higher voltage or a lower voltage.

10:42  8      Well, before the filing date of this patent, if I move to

10:42  9  Slide No. 7, and I don't believe there's any disagreement about

10:42  10  this, this tension was resolved by having voltage high during

10:42  11  normal operations but lower during the write operation.  It's

10:42  12  very logically called write assist by those of skill in the

10:42  13  art.  There were other ways to do write assist which are

10:42  14  disclosed in the file history.  The specific type of write

10:42  15  assist that's described in this patent is shown at Slide 8 and

10:42  16  it involves charge sharing.  And specifically it describes a

10:42  17  circuit that uses charge sharing with dummy cells that during

10:43  18  the course of the write operation to a set to a row or a line

10:43  19  of cells.

10:43  20      Now, on Slide 9 we just briefly address the issue of

10:43  21  capacitance.  Again, I don't think there's any disagreement.

10:43  22  Capacitance is the ability to store electrical charge.  One

10:43  23  important point that wasn't mentioned by VLSI, but, again, I

10:43  24  don't think there's any real disagreement on, is this.  Almost

10:43  25  every component, including conductors, have some capacitance.

10:43  1  They may not be intended to be a capacitor, but they will have

10:43  2  some capacitance sometimes when it's unintentional and unwanted

10:43  3  it's called, Your Honor, parasitic capacitance, but every

10:43  4  component and conductor will have some capacitance, and that

10:43  5  becomes important as we move through some of these terms and

10:43  6  the means plus function arguments that we have to make to Your

10:43  7  Honor.

10:43  8       THE COURT:  Well, and what you might keep in mind as you

10:43  9  are making that argument too, which is another issue that my

10:43  10 clerk and I spent some time talking about, is this exact one is

10:44  11 if I determine that plain and ordinary meaning applies or that

10:44  12 it is not a means plus function, what would that do to the

10:44  13 validity -- what would that -- how much would that expand

10:44  14 Intel's ability to find prior art if every component could

10:44  15 actually be a capacitance structure?  You know, what impact

10:44  16 would that have on it or -- and I guess on the infringement

10:44  17 side as well, but I get that the plaintiff is saying, look.  We

10:44  18 gave you examples in a Jui Jitsu move, almost, which you are

10:44  19 doing, if every component is a capacitance structure, what does

10:44  20 that do to the validity of the patent?

10:44  21      MR. LEE:  Your Honor, it for sure would have consequences.

10:44  22 It would -- as Your Honor I think suggests, it would expand the

10:44  23 scope of the prior art that might fall within the scope of the

10:44  24 patent.  It also would create real definiteness problems

10:45  25 because how much is -- how much is enough and what is enough to

10:45  1   be enough.  And if every component has an electrical capacity

10:45  2   of some degree, how much is enough?  Now, there are other

10:45  3   limitations in the claim to be sure, but there would be some

10:45  4   substantial validity implications.

10:45  5       THE COURT:  I just am throwing that out there because it's

10:45  6   something my clerk and I have already -- have already been

10:45  7   thinking about.  If we go with the plaintiff's construction,

10:45  8   the impact it would have on that claim as well.

10:45  9       MR. LEE:  And, Your Honor, that's in part -- when I get to

10:45  10  capacitance structure, that's in part the reason we can -- we

10:45  11  think we can make the Section 112, Paragraph 6 argument a

10:45  12  principal argument, Your Honor, because it is something that

10:45  13  would allow the patent to have some meaning, the term to have

10:45  14  some meaning.

10:45  15      THE COURT:  You would be doing it to help them out.

10:45  16      MR. LEE:  Yeah.  Not quite yet at least.

10:46  17      THE COURT:  Okay.

10:46  18      (Laughter.)

10:46  19      MR. LEE:  If I go to Slide No. 10, Your Honor, because

10:46  20  virtually all components in an integrated circuit can store a

10:46  21  charge, the voltage of one circuit can be lowered by connecting

10:46  22  that circuit to another circuit.

10:46  23      Now, in the animation that we have now and on Slide No.

10:46  24  10 -- if I move to Slide No. 11, I have two circuits.  And when

10:46  25  the circuits are isolated and there is a voltage coming --

10:46  1    charge coming from the left-hand side into Circuit 1 but

10:46  2    there's no connection to Circuit 2 because they're isolated,

10:46  3    there will be no charge sharing.  It's just sort of a logical

10:46  4    demonstration of what charge sharing would be.

10:46  5         But if I move to Slide 12, if the circuits are coupled to

10:46  6    each other, charge from Circuit 1 can be shared with Circuit 2,

10:47  7    and the consequence of that sharing is to -- if I move to

10:47  8    slide -- the last version of Slide 12 -- is to equalize the

10:47  9    voltage between the two.  It reduces the voltage in Circuit 1,

10:47  10   increases in Circuit 2.  And that's sort of the premise of the

10:47  11   charge sharing that's described in the patent.

10:47  12        The '485 patent describes this specifically.  And if I

10:47  13   move to Slide No. 13 which is Figure 2 -- and, Your Honor, the

10:47  14   figures are important for two reasons.  One is claim language

10:47  15   determines the scope of the claim, but they're to be read in

10:47  16   light of the specification, and this specification is very

10:47  17   specific.

10:47  18        The second is there's no dispute that the other four

10:47  19   limitations before Your Honor are Section 112, Paragraph 6

10:47  20   limitations.  They are by definition limited to the structures

10:47  21   disclosed.  So this patent is one where the structure -- the

10:48  22   specifications disclosure is critically important.  So the

10:48  23   Figure 2 shows charge sharing principle.  It does it with

10:48  24   columns.  If I click, there's a first line of memory cells in

10:48  25   green on Slide 13.

68

10:48  1      THE COURT:  And that would be on the left?

10:48  2      MR. LEE:  Yes.

10:48  3      THE COURT:  Yes, sir.

10:48  4      MR. LEE:  A set in blue in the middle labeled Second Line

10:48  5  of Memory Cells.  And then on the right are the dummy cells.

10:48  6  They are also, Your Honor, conventional SRAM cells.  That's

10:48  7  what the patent discloses.

10:48  8      If I move to Slide 14, the patent discloses also a power

10:48  9  supply terminal, and that's the word that it uses.  I don't

10:48  10 think anybody disagrees that that has a meaning and it is a

10:48  11 thing.  And the power supply terminal is what provides the

10:48  12 voltage to the memory cell.

10:48  13     THE COURT:  Is there any disagreement between the parties

10:48  14 how big the purple square on Slide 14 should be -- how much

10:49  15 that -- the componentry, for example, that it does not include

10:49  16 52 and 50?

10:49  17     MR. LEE:  I don't think that there's any dispute that

10:49  18 the -- what's in purple is a power supply terminal.  I think

10:49  19 there are disputes as you move to the components between the

10:49  20 purple box and --

10:49  21     THE COURT:  That was my question.

10:49  22     MR. LEE:  And that comes to some of the other terms that

10:49  23 are before Your Honor.

10:49  24     THE COURT:  Okay.

10:49  25     MR. LEE:  And what happens, Your Honor, if we have in mind

10:49   1   that the idea here is that you're trying to write to one set of

10:49   2   cells but not to another so what you want to do is keep the

10:49   3   voltage highest to the one you're not writing to, allow them to

10:49   4   go lower to the set of cells that you are writing to, and the

10:49   5   way you do that is for that set of cells, you share the charge

10:49   6   with the dummy cells and you just pull some of it off.  As

10:49   7   Slide No. 15 shows, each line of the memory cells has its own

10:50   8   power supply.  It carries charge to the memory cells.

10:50   9       And as Slide 16 shows, I've now just focused on the second

10:50   10  line of memory cells which is the set of memory cells in this

10:50   11  example that we're writing to.  So it's the one that if you're

10:50   12  writing to this set of memory cells, Your Honor, this is the

10:50   13  one where you're going to bring the charging to.  If you

10:50   14  flipped it and you're writing to this one and you wanted not to

10:50   15  write to this one, you would just flip the exercise, but it

10:50   16  would be the same analytically.  So if Column -- if the blue is

10:50   17  the second set of cells, here's what happens in Figure 2.

10:50   18      If you go to Slide 17, for the first set of cells that

10:50   19  you're not writing to that you want to maintain the voltage of,

10:50   20  they're connected by this first power line.  That first power

10:50   21  line as shown in Figure 2 is not connected to the second line

10:51   22  of memory cells.  It never is connected to the second line of

10:51   23  memory cells.

10:51   24      Instead, if we go to Slide No. 18 where we've now put in

10:51   25  red the dummy cells on the right, the second line of memory

10:51  1    cells in blue in the middle, the second line of memory cells

10:51  2    will have its own power line.

10:51  3         THE COURT:  Right.

10:51  4         MR. LEE:  Now, what happens when you want to write is

10:51  5    this:  You decouple that second line to the power supply

10:51  6    voltage, and at that point in time the transistor will couple

10:51  7    the second line of memory cells to put out plurality of dummy

10:51  8    cells and that will then pull the charge off, and the

10:51  9    consequence of that, if I move to Slide No. 19, is to reduce

10:52  10   the voltage in the second line of memory cells, increase it in

10:52  11   the line of -- in the dummy cells and allow you to write

10:52  12   assist.

10:52  13        And as the patent says, if I move to the last slide of the

10:52  14   tutorial, you can affect the amount of charge sharing by

10:52  15   selecting the number of dummy cells that you want to count.  So

10:52  16   an example that I'll use now on the very last slide is if I

10:52  17   were to decide not to use 30 and just use 32 and 34 on the

10:52  18   right-hand side, you would reduce the charge sharing.

10:52  19        So, Your Honor, let me move to capacitance structure if I

10:52  20   could.

10:52  21        THE COURT:  Yes, sir.

10:52  22        MR. LEE:  And I will try to address the issues Your Honor

10:52  23   raised during VLSI 's argument but also make our affirmative

10:52  24   argument.

10:52  25        In the Markman slide -- so let's start at Slide 4.  And,

10:53  1    Your Honor, I know you're very familiar with the Section 112,

10:53  2    Paragraph 6 claim limitations.  I do this in part because

10:53  3    whenever I come to one of them, it's useful to remind ourself

10:53  4    where they came from and what the problem was they were trying

10:53  5    to address.  And I think that will become important in

10:53  6    answering Your Honor's question about capacitance structure

10:53  7    even though it doesn't have the word "means" in it.

10:53  8        And Section 112, Paragraph 6 comes from a case decided

10:53  9    almost 150 years ago, and it was the Morse case where he

10:53  10   invented the telegram.

10:53  11       THE COURT:  Sure.

10:53  12       MR. LEE:  And he had eight claims.  Seven were apparatus

10:53  13   claims, but the last claim was, I'm claiming anything, right?

10:53  14   Anything that will perform the function of electronically

10:53  15   transmitting information.

10:53  16       THE COURT:  I'm claiming electricity.

10:53  17       MR. LEE:  Basically it.  And, you know, if the patent had

10:54  18   had a 100 year term, it would have covered the internet,

10:54  19   covered anything, and the Supreme Court said, no.  You can't do

10:54  20   that.  We're not going to have functional claiming because it

10:54  21   would -- you know, if you allow people to claim functionally,

10:54  22   it would just basically carve out huge portions and preclude

10:54  23   innovation in the area.

10:54  24       So if I go to Slide 5, Section 112, Paragraph 6 is the

10:54  25   answer.  And I'm actually going to -- on this slide go from the

10:54  1   bottom -- start at the bottom.  And this is the point that I

10:54  2   think is important as we look at capacitance structure and

10:54  3   actually as we look at the disclosed structure for the other

10:54  4   limitations in dispute.

10:54  5       The point of Section 112, Paragraph 6 is to, and I quote,

10:54  6   "avoid pure functional claiming."  That's the purpose.  So what

10:54  7   you have to do, you can have a functional claim, but then

10:55  8   you're limited to the disclosed structure and structure

10:55  9   equivalence, which I know Your Honor knows.  I think it's

10:55  10  important that we all just keep in mind that the purpose of

10:55  11  that is to avoid functional claiming.  And if the end result of

10:55  12  interpreting a limitation would be to allow functional

10:55  13  claiming, then that's what Section 112, Paragraph 6 is intended

10:55  14  not so much to preclude, Your Honor, but to limit, and limit

10:55  15  you to the structure you've disclosed.

10:55  16      So if I move to Slide No. 6, the result of that is the two

10:55  17  requirements identifying the claim function and then

10:55  18  determining what the structure is in the spec that is clearly

10:55  19  linked to the function of the claim.

10:55  20      So with that in mind -- and I'll come back to the law only

10:55  21  briefly to discuss the Williamson case when we get -- as part

10:55  22  of the argument on capacitance structure, but let me turn to

10:55  23  capacitance structure.  Well, and if I move to Slide No. 8, we

10:56  24  have the competing claim constructions.

10:56  25      Now, Your Honor, I think literally if it were a means plus

10:56   1   function limitation, what we've described is a disclosed

10:56   2   structure.  I think if Your Honor concluded for any of these

10:56   3   that it is a means plus function, this is what the

10:56   4   specification disclosed, you might tell us to meet and confer

10:56   5   to see if we could save the structure on a simpler basis, and I

10:56   6   think that we could, but we haven't done that yet but we could.

10:56   7   VLSI is plain and ordinary meaning.  And, again, having had

10:56   8   multiple chances now to say the capacitance structure is a well

10:56   9   recognized term in the field, there's nothing that the expert

10:56   10  relies upon to say -- in fact, Dr. Apsel, our expert, says it's

10:56   11  not.  There are terms that are well recognized and I'll come to

10:57   12  those.

10:57   13       So the real question, if I move to Slide 9, is, is it a

10:57   14  Section 112, Paragraph 6 limitation?

10:57   15       And let me take Your Honor to Slide 10, because I think

10:57   16  this is -- the Williamson case is important.  Whatever

10:57   17  presumption there might have been before Williamson is

10:57   18  certainly different today, and the key part of Williamson is it

10:57   19  said, look.  If you don't use words like "means," but you use

10:57   20  words like "mechanism," "element," "device" or other nonce

10:57   21  words, they're not disclosing sufficient structure.  Stated

10:57   22  differently, Your Honor, you're functionally claiming.  Why is

10:57   23  this important now?  Because if we look at the way that it was

10:57   24  articulated by Williamson -- and this is the second bullet

10:58   25  point on Slide No. 10 -- what they say is these words like

10:58   1    "mechanism," "element," "device" reflect nothing more than

10:58   2    verbal constructs.  It is tantamount to using the word "means"

10:58   3    because they typically do not connote sufficiently definite

10:58   4    structure.

10:58   5        So what they're saying is these words "mechanism,"

10:58   6    "element," "device" or other words like it are insufficient

10:58   7    because they're not defining structure.  These are all words

10:58   8    that are just under the umbrella.  They're subsets of a word

10:58   9    structure.  If they aren't disclosing sufficient structure,

10:58   10   then the broader term "structure" is not.  And at Pages 11 and

10:58   11   12 of our briefs, Your Honor, there are cases that have dealt

10:58   12   with claim terms like "attachment structure" and said, no.  No.

10:58   13   No.  That's a nonce term.  It's Section 112, Paragraph 6.

10:59   14       Now, if I turn you to Slide 11, capacitance does refer to

10:59   15   a function.  A capacitor, as we said earlier, would refer to a

10:59   16   thing, and there is no dispute between -- there's certainly no

10:59   17   dispute from us that capacitor has a recognized meaning to one

10:59   18   of ordinary skill in the art, but as I said earlier, you won't

10:59   19   find that word in the patent.

10:59   20       And, Your Honor, if I took you to VLSI's reply brief at

10:59   21   Page 4, they actually list specifically what was disclosed in

10:59   22   the patent to perform this charge sharing function, this

10:59   23   capacitance structure.  The word "capacitor" is not there in

10:59   24   any respect.  In fact --

10:59   25       I don't know.  Can you bring up their slide?  No?  Okay.

10:59  1    Can we flip to the ELMO?

11:00  2        All right.  So, Your Honor, I'm going to put on the screen

11:00  3    their Slide 30.  And, Your Honor, this is a slide they just

11:00  4    presented to you now on what is disclosed.

11:00  5        THE COURT:  Yes, sir.

11:00  6        MR. LEE:  And there -- this is actually largely correct.

11:00  7    It does disclose memory cells, but, as I said, these dummy

11:00  8    cells are just memory cells.  They are cells but not used for

11:00  9    memory purposes.

11:00  10       Then look at the categories, Your Honor.  Dummy rows,

11:00  11   dummy columns, dummy cells, dummy SRAM cells.  That's it.  Not

11:00  12   transistors, not capacitor, not any other well recognized term

11:01  13   and no suggestion that there is a well accepted meaning, and

11:01  14   that's because if we go back to Slide No. 11, capacitance

11:01  15   refers to a function, and actually both experts agree, and

11:01  16   we've quoted from both declarations.  It refers to the ability

11:01  17   to hold an electrical charge.  It refers to the ability to

11:01  18   store a charge.  It refers to a function.

11:01  19       As a consequence, if we go to Slide No. 12, our expert Dr.

11:01  20   Apsel opined the capacitance structure, that term itself,

11:01  21   doesn't have any plain and ordinary meaning to when a --

11:01  22   recognized meaning to one of ordinary skill in the art because,

11:01  23   and this goes to Your Honor's question, virtually every

11:01  24   component has some capacitance.

11:01  25       Now, probably the best answer to Your Honor's question

11:02   1   about capacitance structure and whether it has a well

11:02   2   recognized meaning is actually Dr. Conte's declarations offered

11:02   3   by VLSI and I have them on Slide No. 13.  He says that

11:02   4   capacitance structures are a well-known class of structures

11:02   5   such as those on a memory circuit that have capacitance.  Well,

11:02   6   that is just describing it by the function.

11:02   7       And then he says, such structures can include, for

11:02   8   example, transistors, capacitors, dummy cells and arrangements

11:02   9   of the same which have capacitance.

11:02   10      He then doesn't cite for Your Honor any journal, any

11:02   11  dictionary, any publication, contemporaneously or not, that

11:02   12  would demonstrate this.

11:02   13      And, in fact, by the time he gets to his second

11:02   14  declaration, his definition gets a little bit more precise.

11:03   15  It's actually 100 percent consistent with this being a Section

11:03   16  112, Paragraph 6 claim.  A class of structures with

11:03   17  capacitance.  So it's just a structure, right, with the ability

11:03   18  to store described in the '485 patent.  So he's saying, here's

11:03   19  what it is.  It is something that can perform the function of

11:03   20  storing charge as described in the '485 patent, that is, the

11:03   21  dummy cells, and that actually is what we have asked the Court

11:03   22  to identify as the structure.  If there is -- if this were a

11:03   23  Section 112, Paragraph 6 claim as a matter of law, there's no

11:03   24  dispute about what the structure is.  It is these dummy cells.

11:03   25      So, Your Honor, it's -- if I go to Slide 14, there's no

11:03  1  dispute that the disclosed capacitance structure in the

11:03  2  embodiments in Figure 2 and 3 are the dummy cells.  This is

11:04  3  shown in Figure 14 on the right in the red block and Figure

11:04  4  15 -- I'm sorry.  Slide 15 in Figure 3 in the red block.

11:04  5      So let me come to Slide 16, and an argument that was made

11:04  6  to you this morning, which I think is legally not quite right,

11:04  7  and that is because of other claims, it has to be that the

11:04  8  capacitance structure must be broader than dummy cells.  The

11:04  9  first argument is that claims that say a first capacitance

11:04  10  structure includes the plurality of dummy cells, if you took

11:04  11  our reading, you would be limiting the claim to that.  That's

11:04  12  not true.  And, in fact, Your Honor, the IMS case from the

11:04  13  Federal Circuit says that's not right.

11:04  14      This on the left, Claims 1 and 12, would not include

11:04  15  structural equivalence, dummy cells.  So you would -- it could

11:05  16  be dummy cells, but without the plurality of dummy cells, it

11:05  17  would be dummy cells for structural equivalence.  This is

11:05  18  narrower.

11:05  19      And Claims 3 and 19 both have additional limitations as

11:05  20  shown on Slide No. 16 and those additional limitations all add

11:05  21  more.

11:05  22      If I go to Slide 17, let me answer a couple of the

11:05  23  questions Your Honor posed to suggest the hill that we had to

11:05  24  climb.  And I think that there are a number of different

11:05  25  answers.  The first is, as I said earlier, what's relevant is

11:05  1   what was known to one of ordinary skill in the art at the time

11:05  2   of the filing and, two, what was publicly available in terms of

11:05  3   dictionaries, publications, and the answer on that is there's

11:05  4   nothing in the record that VLSI has suggested provides that

11:06  5   definition.

11:06  6        The slide that VLSI offered you has the disclosed

11:06  7   structure.  They're all dummy cells.  And when Dr. Conte went

11:06  8   to -- when Dr. Conte went to describe what this class of

11:06  9   structure was, he defined it by function or what's in the '485

11:06  10  patent.  That's all that we're asking.

11:06  11       Slide 17 I think has the answer to the question Your Honor

11:06  12  asked in anticipation, which is, if it's just plain meaning and

11:06  13  anything with any structure, anything with capacitance would

11:06  14  satisfy that limitation, it's indefinite, and we would be back

11:06  15  to you not quite apart from the prior art question and how big

11:06  16  a door you open up.  We would be back to you.  So, Your Honor,

11:06  17  we recognize that, as I said to our folks, we sat down, as you

11:06  18  sat down to look at the claim, the claim term capacitance

11:07  19  structure doesn't use the word "means" like the next four

11:07  20  paragraphs do.  What do you take from that?  Well, one thing

11:07  21  you could take from that is they didn't intend for it to be

11:07  22  Section 112, Paragraph 6 which I think may be implicit in Your

11:07  23  Honor's question.

11:07  24       The other thing you could take from it is this:  They had

11:07  25  a very specific method of write assist, and what they were

11:07  1  doing in their specific method was taking something that was

11:07  2  basically functional in its articulation description and

11:07  3  claiming it in a specific way that allowed them to get a

11:07  4  patent.

11:07  5  The capacitance structure limitation has any disclosed

11:07  6  structure.  It is only the dummy cells that they gave you on

11:07  7  their own sheet of paper.  It had -- on this record it had no

11:07  8  plain and ordinary meaning.  Dr. Conte doesn't suggest

11:07  9  otherwise.  It had no support in dictionaries, publications or

11:08  10  peer reviewed journals.  It had only the disclosure of the

11:08  11  dummy cells.  So the question is, is an interpretation that

11:08  12  would walk right into an indefiniteness problem because

11:08  13  everything has some capacitance the correct interpretation, or

11:08  14  is the correct interpretation one that says, no.  There's not

11:08  15  enough structure here to disclose.  No.  It doesn't have a

11:08  16  recognized meaning.  The correct interpretation is something

11:08  17  that provides capacitance.  What's disclosed in the patent?

11:08  18  Both in Figures 2 and Figure 3, which are a part of the patent,

11:08  19  it's the dummy cells.

11:08  20  THE COURT:  Yes.

11:08  21  MR. LEE:  Thank you, Your Honor.

11:08  22  THE COURT:  No.  Thank you.

11:09  23  Let me tell you my discussion with Mr. Lee was confusing.

11:09  24  I mean -- I don't mean that in a bad way.  I mean, it makes it

11:09  25  tougher for me to decide what to do.  I am concerned -- I am

11:09  1    probably of the opinion -- I'm reluctant to find that this is a
11:09  2    112.  I'm reluctant to go with what Intel has proposed;
11:09  3    however, I'm reluctant to say plain and ordinary meaning for
11:09  4    the reasons that we stated, and I am very sympathetic with
11:09  5    Mr. Lee's position that it ought to be dummy -- that even plain
11:10  6    and ordinary meaning ought to restrict the claim to dummy cells
11:10  7    in some manner.  So help me out on what I should do.
11:10  8        MS. WEN:  Sure.  I think that the disclosure is broader
11:10  9    than just dummy cells.  I think dummy cells like we showed you
11:10  10   in the slide previously are examples of capacitance structures
11:10  11   provided by the claims.
11:10  12       THE COURT:  I'm -- I certainly get the argument that you
11:10  13   aren't going to be restricted by what was -- you know, I get
11:10  14   that argument.  I'm trying to be more helpful to you and to
11:10  15   Intel.  I'm trying to be more helpful saying that if we
11:10  16   don't -- in a situation where every component might be
11:10  17   considered to be a capacitance structure not tethering it to
11:10  18   any group of any particular cells seems to me to be very
11:11  19   problematic for VLSI.  And so I'm trying to -- lifeline is
11:11  20   probably the wrong way of phrasing it, but I do need you to
11:11  21   help me figure out what to do in lieu if I were not to go
11:11  22   with -- generally speaking with what Mr. Lee has suggested for
11:11  23   Intel and then allowing you all to say what the appropriate
11:11  24   structure ought to be through some meet and confer.  At a
11:11  25   minimum I need you to help me with what would be meant by plain

81

11:11  1  and ordinary meaning with respect to what a capacitance

11:11  2  structure is.  If you can't do that, then I think I'm just

11:11  3  setting everyone up for me to have to face an indefinite

11:11  4  argument.

11:11  5      MS. WEN:  So I think we would be okay with a construction

11:11  6  that is, for example, a structure that is used to provide

11:12  7  capacitance, and we think that the -- so Intel was saying that

11:12  8  the disclosure of the capacitance structure could include

11:12  9  virtually any component on an electrical circuit, but I don't

11:12 10  think that's true.  As we explained -- let me see if I can go

11:12 11  back to the right --

11:12 12      THE COURT:  And I get the other -- that the other claim

11:12 13  elements help you out.

11:12 14      MS. WEN:  Yeah.

11:12 15      THE COURT:  Because to take away from Mr. Lee's concern in

11:12 16  line that any component could be a capacitance structure,

11:12 17  they -- there will be no argument that they might meet the

11:12 18  terms of the patent because they wouldn't have the -- they

11:12 19  wouldn't have the other elements, but I'm still -- but I do

11:12 20  want to get this right.  Even if I give a plain and ordinary

11:12 21  meaning, I want to make sure that you all don't leave here

11:12 22  having different opinions of what the plain and ordinary

11:12 23  meaning is.  And then if I do that and Intel thinks that the

11:13 24  appropriate thing to do is to then file some kind of motion

11:13 25  with regard to indefiniteness, I'll take it up at that point.

11:13  1          MS. WEN:  Okay.

11:13  2          THE COURT:  But if we -- but I'm looking for your help in

11:13  3    terms of what I should say plain and ordinary meaning is with

11:13  4    regard to what a capacitance structure is to make sure at least

11:13  5    you all know what -- at least so it's clear what plain and

11:13  6    ordinary meaning is.

11:13  7          MS. WEN:  Okay.  So, like I said, we would be fine with a

11:13  8    structure that is used to provide capacitance, and we think

11:13  9    that it is far more limited than what Intel was saying.  As I

11:13  10   explained earlier today, the '485 patent discloses a scheme for

11:13  11   charge sharing, and as part of the scheme, there are lines of

11:13  12   memory cells that are selected for writing.  And the charge

11:13  13   sharing essentially enables that writing.  So when you select a

11:14  14   line of memory cells for writing, you couple it to the

11:14  15   capacitance structure so that it can share a charge with that

11:14  16   structure.  And so the capacitance structure is necessarily

11:14  17   limited to a class of structures that is actually capable -- it

11:14  18   has enough capacitance to enable this charge sharing.  It's not

11:14  19   completely arbitrary.  It wouldn't just include a conductor,

11:14  20   for example.  It would include a specific class of structures

11:14  21   like Dr. Conte explained like we've been explaining, and --

11:14  22         THE COURT:  So, and I may be wrong, but there's a

11:14  23   difference in my mind between the language a structure that is

11:14  24   used to provide capacitance versus me saying plain and ordinary

11:14  25   meaning would be a structure that is capable because it may or

11:14   1   may not be being used to provide capacitance.  I've worked hard

11:15   2   on trying to say this right.  I'm not doing well.

11:15   3   "Capacitance."  Is your -- would your proposal be that it is a

11:15   4   structure that is capable of providing capacitance or a

11:15   5   structure that is used to provide capacitance?

11:15   6       MS. WEN:  I think we would want a structure that is used

11:15   7   to provide capacitance.

11:15   8       THE COURT:  Okay.  And you think that would limit the

11:15   9   universe of what components -- sufficiently limit the

11:15   10  components in the products in a manner that would make a

11:15   11  capacitance structure not indefinite?

11:15   12      MS. WEN:  Yes.  We think so, especially in the context of

11:15   13  the '485 patent because it's important to note that these claim

11:15   14  terms don't exist in the abstract.  They exist in the context

11:15   15  of the claims and the specification.

11:15   16      THE COURT:  I get that.  Did you have anything else you

11:16   17  wanted to add?

11:16   18      MS. WEN:  No.

11:16   19      THE COURT:  Okay.  Thank you, ma'am.

11:16   20      Mr. Lee?

11:16   21      MS. WEN:  Is that all you wanted?

11:16   22      THE COURT:  Unless you -- if you had more, I didn't mean

11:16   23  to cut you off at all.

11:16   24      MS. WEN:  Oh, I just -- I wanted to go back to --

11:16   25      THE COURT:  I want you to do whatever you -- that's all I

11:16   1   had on that point, but you're welcome to finish any argument

11:16   2   you had.

11:16   3          MS. WEN:  I'll step down for now.

11:16   4          THE COURT:  Okay.  Mr. Lee?

11:16   5          The bid on the table is either what you would like, which

11:16   6   I understand why you want.  You don't need to repeat that.  I

11:16   7   get why you think it should be that.  Versus plain and ordinary

11:16   8   meaning which the Court would understand that the structure had

11:16   9   to be used to provide capacitance.

11:16   10         MR. LEE:  Your Honor, I think it would still have the same

11:16   11  problem that you're not -- I want to set aside the heart of the

11:17   12  argument --

11:17   13         THE COURT:  Yes, sir.

11:17   14         MR. LEE:  -- I tried to climb up hill on.  So I set aside

11:17   15  the 112, Paragraph 6 arguments and focus on a different

11:17   16  interpretation that would be plain and ordinary meaning and an

11:17   17  articulation of that.

11:17   18         The problem that we would have, respectfully, with that

11:17   19  articulation is a structure that is used to provide capacitance

11:17   20  is just defining it by function.  I actually think it's almost

11:17   21  even more problematic because it is taking the function to

11:17   22  provide capacitance and then somehow there's a question of what

11:17   23  you intend it to be.  You know, if you intend it to be --

11:17   24         THE COURT:  I get that.

11:17   25         MR. LEE:  And I understand that that might deal with the

11:17  1    fact that there are these unwanted capacitance that's out

11:17  2    there, but I don't think that would solve --

11:17  3         THE COURT:  And it does sort of a little bit back to the

11:17  4    Supreme Court case where he was saying if I use it to do that,

11:17  5    then I'm -- then it's covered.

11:17  6         MR. LEE:  Right.  Right.  Yeah.  That's -- that would

11:17  7    actually be functional claiming.  That's actually --

11:18  8         THE COURT:  That would actually be a function -- yes.  I

11:18  9    get that.

11:18  10        MR. LEE:  It would be the eighth claim of Morse's effort

11:18  11   to claim everything.

11:18  12        I think that if there was going to be -- if you took a

11:18  13   person of ordinary skill in the art reading the patent, knowing

11:18  14   what a capacitor was, knowing what a transistor was, knowing

11:18  15   what an inductor was, and they read this patent and saw there

11:18  16   were a capacitance structure, what they would understand the

11:18  17   capacitance structure to be is dummy cells because that's what

11:18  18   it said in words.  And if you recall the slide I put on the

11:18  19   screen from their presentation to you today, it's only dummy

11:18  20   cells.

11:18  21        THE COURT:  Yes.

11:18  22        MR. LEE:  So I think, Your Honor, if we sort of took a

11:18  23   Phillips look at it, which is, how would one of ordinary skill

11:18  24   in the art look at this patent and specification?  How would

11:18  25   they look at Figure 2 and 3 when capacitance structure on this

11:18  1   record has no demonstrated accepted meaning.  There's no

11:19  2   definition in the patent itself.  They don't ever call the

11:19  3   capacitance structure suggested in Figure 2 or 3.  It's

11:19  4   transistors or capacitors.  And instead what they do is

11:19  5   specifically say dummy cells, and the dummy cells are specific

11:19  6   to the claim because that is what is different from the prior

11:19  7   art, and so I think if it was going to be a plain and ordinary

11:19  8   meaning, it would be plain and ordinary meaning which is dummy

11:19  9   cells.

11:19  10         THE COURT:  Got it.

11:19  11         Counsel, anything else for VLSI?

11:19  12         Actually, let me tell you what I'm going to do just to

11:19  13  save us time.  I think I've -- and I hate doing this because I

11:19  14  like having you all leave with these things resolved in a way I

11:19  15  set things up, but what I'm going to do is have you guys get me

11:20  16  a formal proposal of what you want plain and ordinary meaning

11:20  17  to be.  Meet and confer first.  If you can't work it out, you

11:20  18  can't work it out.  I get that.  I certainly understand and am

11:20  19  probably -- at the moment leaning towards something that

11:20  20  identifies it as dummy cells unless I can be persuaded why it

11:20  21  ought to be broader, and -- but I'm going to have -- I'm going

11:20  22  to give you guys an opportunity to meet and confer, and let me

11:20  23  know by Monday or Tuesday what your proposal is.  And unless

11:20  24  you have something you want to add right now, I'll rule --

11:20  25  we'll either pick between what is proposed or do something and

11:20   1   you'll have it very quickly next week, but I want to give you

11:20   2   all a chance to make this more formal than just winging it here

11:21   3   and trying to get it right.  So does that -- is that agreeable

11:21   4   to everyone?

11:21   5       MR. LEE:  It is for Intel.  Could we have till Tuesday,

11:21   6   Your Honor, just because people travel?

11:21   7       THE COURT:  How about till Thursday?  I want to get it to

11:21   8   you -- I'm not trying to -- I'm trying to get it done as

11:21   9   quickly as possible for you all.  So if you'll have it to us by

11:21   10  Thursday of next week.  It's not going to take us a long time

11:21   11  to make our minds up.  You'll have the decision next week.

11:21   12      MR. LEE:  Thank you, Your Honor.

11:21   13      THE COURT:  If you all will meet and confer between now

11:21   14  and Monday or Tuesday if you can and then get me something by

11:21   15  Thursday and y'all will have it by Friday.

11:21   16      MS. WEN:  Okay.  Thank you, Your Honor.

11:21   17      THE COURT:  You bet.

11:21   18      Give me one second.

11:21   19      (Conference between Ms. Miles and the Court.)

11:22   20      THE COURT:  Ladies and gentlemen, I'm trying to figure out

11:22   21  what works best for you all and for us.  We have the courthouse

11:22   22  Christmas lunch today, which, believe it or not, they actually

11:22   23  invited me to this year.  So I think it would be -- for me to

11:22   24  play my part in that, it'd probably be best for me to be there

11:22   25  at 11:30.  If you all will be back by 12:30 or 12:45, whichever

11:22   1   is -- 12:45 would probably be easier on you all at this time to

11:23   2   get stuff done.  We'll start back up at 12:45 with the next

11:23   3   claim term if that works.  Unless you all would like to keep

11:23   4   going now and do something different, but that --

11:23   5        MR. LEE:  That's fine with us, Your Honor.

11:23   6        THE COURT:  Okay.  We'll see you back at 12:45.

11:23   7        (A break was taken from 11:23 to 12:50.)

12:50   8        THE BAILIFF:  All rise.

12:50   9        THE COURT:  Thank you.  You may be seated.

12:50  10        What's up next?

12:50  11        MS. WEN:  I just wanted to actually return to the

12:50  12   capacitance structure very quickly if I could.

12:50  13        THE COURT:  Sure.

12:50  14        MS. WEN:  We did some Googling of our own over the lunch

12:50  15   break.

12:50  16        (Laughter.)

12:50  17        MS. WEN:  And wanted to just provide some evidence that

12:50  18   Mr. Lee said didn't exist, specifically that 397 of about 1,090

12:51  19   hits on Google Scholar for a capacitance structure are from

12:51  20   before 2006 and we would be happy to provide more color in any

12:51  21   supplemental submission that we provide to the Court, for

12:51  22   example, the Thursday submission that you were talking about

12:51  23   before we broke for lunch.

12:51  24        THE COURT:  Okay.  Okay.  Let's move on then to the claim

12:51  25   term precharging means for precharging the capacitance

89

12:51  1  structure to a predetermined voltage prior to a write operation

12:51  2  for the second line of memory cells.

12:51  3       MS. WEN:  Yes.  And I believe, Your Honor, Josh sent an

12:51  4  e-mail just before the hearing and we are prepared to agree to

12:51  5  that construction as well.  I think Mr. Lee mentioned that

12:51  6  Intel was --

12:51  7       MR. LEE:  That's correct, Your Honor.

12:51  8       THE COURT:  Then Josh did a great job drafting it.  Great.

12:51  9  Thank you.

12:51  10      Okay.  So the construction that we are going to put in --

12:52  11  that we're going to enter in our order is the one that Josh

12:52  12  sent to you with the agreement of the parties.

12:52  13      So the next claim term we have up is first coupling means

12:52  14  for coupling the power supply terminal to the first power

12:52  15  supply line during the write operation for the second line of

12:52  16  memory cells.

12:52  17      MS. WEN:  Yes.

12:52  18      Can we jump to Slide 115?  Or I can just click through.

12:52  19      All right.  So there are two coupling functions at issue

12:52  20  here.  The first is the first coupling means for coupling the

12:52  21  power supply terminal to the first power supply line during the

12:52  22  write operation for the second line of memory cells.  And I'd

12:52  23  like to discuss this kind of at the same time as the second

12:52  24  coupling means for coupling the second supply line to the first

12:52  25  capacitance structure during the write operation for the second

12:52  1    line of memory cells.  I think the parties sort of briefed them

12:52  2    in concert as well.  And I especially want to do this because

12:53  3    VLSI has proposed the same structure for both coupling

12:53  4    functions, because, as we will show, the specification

12:53  5    explicitly states that the switching circuit or a switching

12:53  6    circuit or equivalence of that switching circuit performs both

12:53  7    of these two coupling functions exactly as recited in the

12:53  8    claim.

12:53  9         So as it says on Slide 117, Intel's proposals for

12:53  10   structure for both of these terms ignore the switching circuit

12:53  11   entirely, and they attempt to justify this by saying that

12:53  12   switching circuit is not properly structured because it is a

12:53  13   means plus function term.  And that is not borne out by the

12:53  14   evidence which I'll talk about shortly, and also want to talk

12:53  15   about why Intel's proposed structures are also specifically

12:53  16   flawed outside of the fact that they ignore the switching

12:53  17   circuit.

12:53  18        So to take a little bit of a step back, the Federal

12:53  19   Circuit requires that when you're construing a means plus

12:54  20   function term, the specification must be read as a whole to

12:54  21   determine the structure.  And in construing terms used in the

12:54  22   patent claims, it is necessary to read all portions of the

12:54  23   written description and not just some portions of it.

12:54  24   Specifically identifying corresponding structure requires the

12:54  25   Court to examine both the drawings in the abstract and the

12:54  1  patent's written description.  And this is relevant because --

12:54  2  jumping ahead to Slide 121, this is relevant because the

12:54  3  abstract discloses that the switching circuit performs the

12:54  4  claimed coupling functions.  It also performs a decoupling

12:54  5  function, but we'll get to that a little bit later.  So as you

12:54  6  can see, the -- in Slide 122 the first coupling function reads:

12:54  7  Coupling the power supply terminal to the first power supply

12:54  8  line during the write operation for the second line of memory

12:54  9  cells.  And the abstract specifically discloses that for the

12:55  10  case where the second line of memory cells is selected for

12:55  11  writing, a switching circuit couples the power supply terminal

12:55  12  to the first power supply line.

12:55  13      The same is true for the second coupling means.  The claim

12:55  14  language for the second coupling means is highlighted in

12:55  15  green -- or I'm sorry -- underlined in green, and it reads:

12:55  16  Coupling the second supply line to the first capacitance

12:55  17  structure.  In the abstract it says, where the second line of

12:55  18  memory cells is selected for writing, a switching circuit...

12:55  19      If you jump to the green underlined text, it says, couples

12:55  20  the second power supply line to the first capacitance

12:55  21  structure.

12:55  22      So, as you can see, the abstract specifically states that

12:55  23  the switching circuit performs this function.  It's not just

12:55  24  the abstract though.  Later in the specification it also says

12:55  25  that a switching circuit that has transistors that -- and

12:55  1    there's an extra "that" in there -- couple the first power

12:55  2    supply terminal to the first supply line and couple the second

12:56  3    power supply line to the first capacitance structure.

12:56  4        And on Slide 124 you'll see that we once again underline

12:56  5    the text of the first coupling function in blue and the text of

12:56  6    the second coupling function in green.

12:56  7        In addition to these disclosures, the figures of the

12:56  8    patent also disclose that a switching circuit performs the

12:56  9    coupling functions.  As our expert Dr. Conte declared,

12:56  10   transistors of the type depicted here, for example,

12:56  11   Transistor -- number's not very clear -- but Transistor 54, I

12:56  12   believe -- transistors of the type depicted here can be used to

12:56  13   couple and decouple components on demand and are examples of a

12:56  14   switching circuit.

12:56  15       THE COURT:  Don't -- I have a couple of questions for you.

12:56  16       MS. WEN:  Sure.

12:56  17       THE COURT:  Don't leave that slide which is a slide that

12:57  18   shows Figures 2 and Figures 3.

12:57  19       MS. WEN:  Yeah.

12:57  20       THE COURT:  Why should I not be concerned that switching

12:57  21   circuit is functional and not structure?

12:57  22       MS. WEN:  Sure.  So we provided -- well, first, when

12:57  23   determining, as -- we just went through this, but when

12:57  24   determining whether a term is a means plus function term, you

12:57  25   apply the test of whether first it includes the words "means,"

12:57  1  which it does not.

12:57  2      THE COURT:  I got that.

12:57  3      MS. WEN:  Yeah.  And then, second, you consider whether a

12:57  4  person of ordinary skill in the art would understand that the

12:57  5  term is structure.

12:57  6      THE COURT:  Okay.  Well, why don't you tell me, though,

12:57  7  why it's not functional?

12:57  8      MS. WEN:  Do you mean --

12:57  9      THE COURT:  Why you -- why it's -- why don't you explain

12:57  10  to me here why I should not be concerned that it is functional?

12:57  11      MS. WEN:  So I don't think -- so we provided an expert

12:58  12  declaration that explains that a person of ordinary skill in

12:58  13  the art would understand the meaning of a switching circuit

12:58  14  upon reading the disclosure of the '485 patent.  Specifically

12:58  15  that example's switching circuits can include switch circuits,

12:58  16  switching circuits, switches and transistors configured to act

12:58  17  as switches.  And the Federal Circuit has held that if a claim

12:58  18  term is used in common parlance or by persons of skill in the

12:58  19  pertinent art to designate structure, it is not necessarily a

12:58  20  means plus function term even if the term identifies the

12:58  21  structures by their function.

12:58  22      THE COURT:  Yeah.  I got that.  Here -- I don't mean to be

12:58  23  impolite.

12:58  24      MS. WEN:  No.  No.  No.

12:58  25      THE COURT:  But other than your expert who says what he

12:58  1   says -- and I have my reservations about the value of experts

12:58  2   making those statements because Intel is capable of getting

12:59  3   someone who will say exactly the opposite and they obviously

12:59  4   are both skilled in the art.  I'd like to hear your best

12:59  5   argument about why I shouldn't be concerned that a switching --

12:59  6   and if Mr. Lee thinks I'm barking up the wrong tree and they're

12:59  7   not taking this position, I won't pester you with it, but I'm

12:59  8   guessing Mr. Lee is -- agrees with my concern.

12:59  9        MR. LEE:  We do, Your Honor.

12:59  10        THE COURT:  Okay.  And so I want to -- I would like to

12:59  11   hear your best argument as to why a switching circuit is -- I

12:59  12   shouldn't be concerned that it's functional.

12:59  13        MS. WEN:  Okay.

12:59  14        THE COURT:  And I got that you have an expert that says

12:59  15   what one skilled in the art would say, but I'd like to hear

12:59  16   your best argument.

12:59  17        MS. WEN:  Right.  So in addition to our expert, we also

12:59  18   wanted to point out that in Intel's invalidity contentions they

12:59  19   state that switching circuit -- well, the use of switching

12:59  20   circuits in memory devices, including to decouple a column of

12:59  21   memory cells from a first power supply --

12:59  22        THE COURT:  You need to slow down, please.

12:59  23        MS. WEN:  Sorry.

12:59  24        Including to decouple a column of memory cells from a

01:00  25   first power supply terminal and couple that column of memory

01:00  1    cells to a second circuit node was well-known in the art prior

01:00  2    to the alleged invention of the '485 patent.

01:00  3         THE COURT:  Well, again, I think Mr. Lee will do a great

01:00  4    job speaking for himself or whoever's going to argue this, but

01:00  5    I don't think -- I don't think the quote that you just gave me

01:00  6    does anything to make me not think it's not functional.  The

01:00  7    switching circuit -- the use of switching circuits in memory

01:00  8    devices is performing that function.

01:00  9         MS. WEN:  So is your concern that it says switching in the

01:00  10   term?

01:00  11        THE COURT:  Yes.

01:00  12        MS. WEN:  Okay.  I think that a term can be functional

01:00  13   without being a means -- are you -- without being a means plus

01:00  14   function term.

01:00  15        THE COURT:  That is -- I will confess I don't know that

01:01  16   I've thought that through, but I do -- I am concerned that --

01:01  17   and the Intel folks can add to that, but I am concerned that

01:01  18   you all are proposing switching circuit as the structure, and

01:01  19   I'm -- and what I'm saying is I don't believe it is a

01:01  20   structure.  I believe it might be function.  And so you are

01:01  21   kind of going at it from the position of, is this a -- you

01:01  22   know, a means plus function term?  I think we are in agreement

01:01  23   that it is what we are fighting over because you guys have

01:01  24   agreed to the function.  What we're having a hard time here --

01:01  25   I'm having a hard time.  You're probably doing great and I'm

96

01:01  1   not following you -- is that your advocacy of a switching

01:02  2   circuit as the structure strikes me as maybe -- regardless of

01:02  3   whether Intel is right or not in what they've suggested, I'm

01:02  4   concerned that your suggestion of switching circuit is not

01:02  5   correct because it is -- because it is functional rather than

01:02  6   structural, and that's what I'm trying to get you to help me

01:02  7   with here.

01:02  8      MS. WEN:  I see.  Okay.  Well, I would start by saying

01:02  9   that a circuit is a structure.  I think we're on the same page

01:02 10   about that.  It says switching circuit and we're in agreement

01:02 11   at least that circuit is structure.

01:02 12      THE COURT:  Yes.

01:02 13      MS. WEN:  Okay.  I would say that the patent discloses

01:02 14   examples of a switching circuit specifically in these figures.

01:02 15      THE COURT:  Well, yeah.  In Figures 2 and -- Figure 2 for

01:02 16   sure and --

01:03 17      MS. WEN:  Yeah.

01:03 18      THE COURT:  You know, because we've got Transistors 52

01:03 19   and -- and 44, but, you know, you all have taken the position,

01:03 20   I believe, that Intel is wrong with what they're suggesting,

01:03 21   but isn't it true that here Transistors 52 and 44 are off,

01:03 22   meaning the power supply terminal is not connected to the first

01:03 23   power supply line?  I think I have that right, don't I?

01:03 24      MS. WEN:  Are you referring to the write operation?

01:03 25   What's occurring during the write operation?

01:03   1          THE COURT:  Yes.

01:03   2          MS. WEN:  So --

01:03   3          THE COURT:  During writing to the memory cells in Column

01:03   4   13, 52 and 44 are off.  They're not connected.

01:03   5          MS. WEN:  So okay.  So we agree with Intel that during the

01:04   6   write operation for the second line of memory cells.

01:04   7          THE COURT:  And they're on then when writing the memory

01:04   8   cells in Column 15, right?

01:04   9          MS. WEN:  Column 15, yeah.  So we agree with Intel that

01:04   10  when writing to the line of memory cells in Column 15

01:04   11  Transistor 44 is decoupled.

01:04   12         THE COURT:  So doesn't -- isn't Intel's proposal -- I

01:04   13  mean, the way they have it, doesn't that support Intel's

01:04   14  position that their structure -- their proposed structure is

01:04   15  correct?

01:04   16         MS. WEN:  I see.  I don't think we disagree with Intel in

01:04   17  terms of the specific transistors that are disclosed in Figures

01:04   18  2 and Figure 3.

01:04   19         THE COURT:  Okay.

01:04   20         MS. WEN:  I'm sorry.  Figures 2 and 3 as performing this

01:04   21  function.  We -- where we disagree is I think we're taking the

01:04   22  position that those specific transistors are not the only

01:05   23  structure that the patent discloses as capable of performing

01:05   24  the function.

01:05   25         THE COURT:  What else is there?

01:05  1      MS. WEN:  The switching circuit and of course the

01:05  2  equivalence of Transistors 52 and 44.

01:05  3      THE COURT:  Okay.  And I'm sorry I interrupted you, but --

01:05  4  so if you wanted to pick back up where you were.

01:05  5      MS. WEN:  Sure.  So just going back to the means plus

01:05  6  function point, Intel never proposed switching circuit for a

01:05  7  construction.  The term "switching circuit" appears in Claim 1

01:05  8  and Claim 12, and Claim 12 has been asserted since we filed our

01:05  9  complaint in April.  Claim 1 has been asserted since our

01:05  10  preliminary infringement contentions were served on Intel on

01:06  11  July 22nd.  When the parties exchanged claim terms for

01:06  12  construction, Intel never suggested that a switching circuit

01:06  13  was a means plus function term.  And after we proposed a

01:06  14  switching circuit as structure for these decoupling and

01:06  15  coupling terms, Intel again did not raise that switching

01:06  16  circuit should be construed for Claims 1 and 12.

01:06  17      THE COURT:  Okay.

01:06  18      MS. WEN:  And another example of the positions that Intel

01:06  19  has taken include another page in their invalidity contentions

01:06  20  in which they state that a person of ordinary skill in the art

01:06  21  would have understood how to successfully use the switching

01:06  22  circuit to switch between voltages.

01:06  23      THE COURT:  Okay.  Anything else?

01:06  24      MS. WEN:  Yes.  So I want to talk about briefly why

01:07  25  Intel's specific proposals are flawed.  Like I mentioned, it

01:07   1   excludes the embodiments -- it excludes embodiments, including

01:07   2   specifically the switching circuit, and we disagree that

01:07   3   structure should include the additional function of coupling

01:07   4   power supply voltage VDD and Conductor 35 as well as the

01:07   5   function of coupling power supply voltage VDD and Conductor 67

01:07   6   because the claimed function here is as stated in the claim,

01:07   7   which is coupling the power supply terminal in the first

01:07   8   power -- coupling the power supply terminal to the first power

01:07   9   supply line during the write operation for the second line of

01:07   10  memory cells.

01:07   11       Another reason why we disagree with Intel's proposed

01:07   12  structure for the first coupling term is because it includes a

01:07   13  clamping circuit which does not perform the first coupling

01:07   14  function.

01:07   15       THE COURT:  What does?  A reference volt?  What does

01:08   16  perform the coupling function?

01:08   17       MS. WEN:  The switching circuit is our proposal.

01:08   18       THE COURT:  Okay.  And I may have misunderstood.  I think

01:08   19  when I was -- I think VLSI was taking the position that a

01:08   20  clamping circuit is not needed, right?

01:08   21       MS. WEN:  Yes.

01:08   22       THE COURT:  Because a reference voltage could be used?

01:08   23       MS. WEN:  Yes.

01:08   24       THE COURT:  Okay.  If that were true, if you are correct,

01:08   25  what evidence do you have that a person of skill in the art

01:08  1    would understand how to implement the referenced voltage in the

01:08  2    same way as the clamping circuit that is -- that Intel proposes

01:08  3    and that's disclosed?

01:08  4        MS. WEN:  Sure.  So let's get to -- so our expert has

01:08  5    explained that the patent's disclosure of -- in another

01:09  6    embodiment, a reference voltage can be used essentially means

01:09  7    that a person of ordinary skill in the art would understand

01:09  8    that instead of coupling --

01:09  9        Can I have Figure 2 of the patent?  '485 patent.  Or maybe

01:09  10   I'll find it here first so I can point it out.

01:09  11       Okay.  So this is the clamping circuit here that Intel

01:09  12   contends is performing the first coupling function, and this

01:09  13   right here is coupled to something that is labeled VDD which,

01:09  14   as you've seen in Intel's other slides, is just a big purple

01:09  15   block that encompasses all the VDD nodes or VDD structures --

01:09  16   well, VDD references on this figure.

01:09  17       And so if -- so the patent discloses that instead of being

01:10  18   coupled to the power supply terminal, the big -- the purple

01:10  19   block with VDD, this would be coupled to another voltage source

01:10  20   like a reference voltage source.  So it was providing a

01:10  21   reference voltage.

01:10  22       THE COURT:  And where is that disclosed in the patent?

01:10  23       MS. WEN:  It is disclosed in that sentence where it

01:10  24   provides that a clamping -- that a reference voltage can be

01:10  25   used instead.

01:10  1      THE COURT:  Is that in the patent or is that in your

01:10  2  expert's declaration?

01:10  3      MS. WEN:  I think it's in the patent.  The patent

01:10  4  specifically says --

01:10  5      THE COURT:  I know that there is a reference to a

01:10  6  reference voltage.  And so where's it at?

01:10  7      MS. WEN:  In other embodiments the clamping circuit can be

01:10  8  different.  For example, in another embodiment -- and we can

01:10  9  skip this part -- a reference voltage can be used.

01:10  10      THE COURT:  And which slide are you on?

01:10  11      MS. WEN:  I'm on Slide 138.  I'm sorry.

01:10  12      And this is referring to Column 3, Rows 55 to 58 of the

01:11  13  '485 patent which is Exhibit 2.

01:11  14      And I just want to make an additional note which is that

01:11  15  Intel has not at any point contended that the clamping circuit

01:11  16  is purely functional but it follows the same nomenclature as

01:11  17  the switching circuit.

01:11  18      And if it would be helpful to the Court, I think we could

01:11  19  go back and provide you with examples of switching circuits

01:11  20  being used in the art.

01:11  21      THE COURT:  And are the parties in agreement as to what

01:11  22  the first coupling means is?  Which portion of --

01:11  23      MS. WEN:  The function?

01:11  24      THE COURT:  I'm saying -- I mean -- that was a bad

01:11  25  question.  Are you in agreement with regard, for example, as to

01:11  1    which transistors are -- make up the first coupling means?

01:12  2        MS. WEN:  Well, not the clamping circuit but the specific

01:12  3    transistors in the figures.  Yes.

01:12  4        THE COURT:  Okay.  Okay.  Did you have anything else you

01:12  5    wanted to add?

01:12  6        MS. WEN:  I wanted to move to the second coupling function

01:12  7    which should be quick.

01:12  8        THE COURT:  I'm sorry.  I just couldn't hear you.

01:12  9        MS. WEN:  I'm sorry.  I wanted to move to the second

01:12  10   coupling function because we were just dealing with them

01:12  11   together.

01:12  12       THE COURT:  Yes, ma'am.

01:12  13       MS. WEN:  Similar points.  We think that Intel's proposed

01:12  14   structure excludes the switching circuit.  It attempts to add

01:12  15   additional functions this time coupling Conductor 39 to

01:12  16   Conductor 37 and, secondly, coupling Conductor 69 to Conductor

01:12  17   71.

01:12  18       And the Federal Circuit has held that when multiple

01:12  19   embodiments in the specification correspond to the claimed

01:13  20   function, proper application of Section 112, Paragraph 6

01:13  21   generally reads these claim elements to embrace each of the

01:13  22   embodiments.

01:13  23       THE COURT:  Okay.

01:13  24       MS. WEN:  So that's all.

01:13  25       THE COURT:  Mr. Lee, will you be speaking?

01:13   1          MR. LEE:  I will, Your Honor.

01:13   2          THE COURT:  Very good.

01:13   3          MR. LEE:  So, Your Honor, if I could take you in our

01:13   4  Markman slides to Slide 24 which I'll also put on the screen.

01:13   5          THE COURT:  Okay.  Give me one second.

01:13   6          MR. LEE:  Sure.

01:13   7          THE COURT:  I'm knee deep in --

01:13   8          MR. LEE:  And it only gets worse.

01:13   9          (Laughter.)

01:13   10         THE COURT:  So let me -- I believe I'm with you.  And did

01:13   11  you say Page 24?

01:13   12         MR. LEE:  Page 24.

01:13   13         THE COURT:  Okay.  Give me one second.  I'm with you.

01:13   14         MR. LEE:  Okay.  So this is just Claim 17, and I agree

01:13   15  with Ms. Wen that we can take these two together and I think I

01:13   16  can take them together and make it a little bit more efficient.

01:13   17             There are two problems with the argument that VLSI has

01:14   18  offered, and these are the problems.  There's no disagreement

01:14   19  these are Section 112, Paragraph 6 claims.  There's no

01:14   20  disagreement as to the function.  So the only disagreement we

01:14   21  have before you is, what's the structure?  And this is a case

01:14   22  where the structure that performs this function is very

01:14   23  specifically described in Figures 2 and 3.  And harkening back,

01:14   24  without being redundant to our discussion of why you have

01:14   25  Section 112, Paragraph 6 and to your question to VLSI, you

01:14  1  know, can you just claim this functionally?  The answer is no,

01:14  2  not yes.

01:14  3      So the two problems are this:  The structure that is

01:14  4  disclosed is quite specific, and switching circuit is not part

01:14  5  of the disclosure in sufficiently specific terms to satisfy

01:14  6  Section 112, Paragraph 6.

01:14  7      THE COURT:  And correct me if I'm wrong, but the

01:14  8  structure -- as best I could tell, the structure that Intel has

01:15  9  provided is essentially just taking a section, as it were, of

01:15 10  Figure 2 and typing it out as to what is contained in that

01:15 11  particular section of Figure 2 as to what you believe that

01:15 12  coupling means is, correct?

01:15 13      MR. LEE:  Correct.  So both for the first coupling means

01:15 14  we've identified the transistor and the clamping --

01:15 15      THE COURT:  Yes, sir.

01:15 16      MR. LEE:  For the second just the transistor and --

01:15 17      THE COURT:  Basically you've taken what was in the figure

01:15 18  of the patent and just, for lack of a better word, grammar --

01:15 19  you've turned it into words.  You haven't added any -- if I

01:15 20  were to look at that figure -- if a person skilled in the art

01:15 21  were looking at the figure, they would understand where this

01:15 22  structure you proposed came from by looking at that figure,

01:15 23  correct?

01:15 24      MR. LEE:  Exactly and precisely, and as I said -- well, we

01:15 25  dealt with capacitance structure although that may have been

01:15   1   irrelevant.  You know, if Your Honor directed us to, we

01:16   2   probably could take what the specification says specifically

01:16   3   and simplify it before for the jury is charged, but we felt --

01:16   4   if I go to Slide 25.

01:16   5          THE COURT:  Okay.

01:16   6          MR. LEE:  What we'd have on the structure is just what

01:16   7   Your Honor said.  So it's -- Part 1 is Figure 2.  Part 2 is for

01:16   8   Figure 3.

01:16   9          THE COURT:  Right.

01:16   10         MR. LEE:  And we just tried to take it verbatim.  And I

01:16   11  don't think that there's any disagreement that for the first

01:16   12  coupling means there is the transistor and the clamping

01:16   13  circuit.  There's a disagreement about whether the clamping

01:16   14  circuit should be part of it, and I'll come to that.  For the

01:16   15  second -- if I go to Slide No. 26, this is the second coupling

01:16   16  means and there are a lot of words on the slide, Your Honor,

01:16   17  but most of them we agree to.  Most of them are just the claim,

01:16   18  the function, and here's the disagreement, and as Your Honor

01:16   19  suggested, we've just taken what is in Figure 2 or,

01:17   20  alternatively, Figure 3, and VLSI has just offered the

01:17   21  switching circuit.

01:17   22         THE COURT:  And is there any reason why, if I were to use

01:17   23  the structure that you proposed for each, I couldn't make it

01:17   24  clear that, for example, the transistors could be NMOS or PMOS,

01:17   25  or do you take the position that the patent only covers a

01:17   1    specific type of transistor?

01:17   2        MR. LEE:  I think the disclosure here is just a

01:17   3    transistor.  So if Your Honor said a transistor, that would be

01:17   4    fair.

01:17   5        THE COURT:  Okay.

01:17   6        MR. LEE:  Okay.  And I think that literally are -- is the

01:17   7    words, and if I move to -- let me skip 27 and go to 28.

01:17   8        So this is, as we said, if the patent is specific as what

01:17   9    the first coupling means is and what the second coupling means

01:17   10   are -- is one's a transistor alone.  The second coupling means

01:18   11   the other is the first coupling means in the clamping circuit.

01:18   12       Now, we do have a disagreement about whether the clamping

01:18   13   circuit should be included, and if I go to Slide 29, you'll see

01:18   14   that we've tried to do, Your Honor -- again, as I said, the key

01:18   15   here is, what did they say, right, when they claimed this

01:18   16   functionally?  And what they say is what is providing this

01:18   17   coupling is this Transistor 52 and the Clamping Circuit 48 and

01:18   18   50.  The mere fact that the clamping circuit can perform other

01:18   19   functions doesn't mean it's not helping perform this function.

01:18   20   And the specification itself says that that's precisely what is

01:18   21   occurring.  There is an argument that -- by VLSI about

01:18   22   Transistor 52 and a suggestion that it decouples the first

01:19   23   power line.  So we're up here.  If Your Honor looks at the

01:19   24   portion of their argument, they're talking about a situation

01:19   25   where you're writing to Column 13 and you want the voltage to

01:19   1   go down.  Our example in Claim 17 is when you're writing to the

01:19   2   second column and you're not writing to Column 13.  So if

01:19   3   that -- that structure, we suggest, is very specific, and if I

01:19   4   go to Figure 3, Slide 30, in the interest of time, it's the

01:19   5   same.  The coupling is performed by the transistor and the

01:19   6   clamping circuit that's in 100 and 102, Transistors 100, 102,

01:19   7   and the decoupling is performed by the transistor shown with

01:19   8   the X.

01:19   9       Both Figures 2 and Figure 3 are consistent and they're

01:20   10  very specific and they say, here's the function.  Here's in the

01:20   11  one case the transistor and the clamping circuit that performs

01:20   12  that function.  In the second here's the transistor that

01:20   13  performs that function.  The only response is, no.  No.  It

01:20   14  could also be a switching circuit.  And what they rely upon, if

01:20   15  I go to Slide 33, is the statement from the specification.  And

01:20   16  there are a couple of different important things about this.

01:20   17  The first thing is the switching circuit doesn't provide you

01:20   18  with any structure.  Whether you call it a means plus function

01:20   19  limitation is not particularly relevant to this discussion.

01:20   20  The question is, does it disclose specific structure that makes

01:20   21  it something other than functional?  And it doesn't.

01:20   22      THE COURT:  You said that -- I'll need to ask Ms. Wen when

01:21   23  she gets back -- you said it better than I could ask her the

01:21   24  question.  So when --

01:21   25      Ms. Wen, when you get back up here, what Mr. Lee said was

01:21  1   what I was trying inartfully to ask you about and ask you --

01:21  2   I'm going to ask you to rebut the argument he's making right

01:21  3   now because he's saying it better than I could, but I -- I

01:21  4   mean, Mr. Lee, you're making the point I was concerned about.

01:21  5       MR. LEE:  And, Your Honor, there are only two places where

01:21  6   the patent refers to the switching circuit.  One is the

01:21  7   specification which is on Slide 33.  And if I flip to Slide 34,

01:21  8   the other is in the abstract.

01:21  9       Now, these actually paraphrase what ultimately ends up in

01:21  10  Claim 1, not the claim we're looking at now.  And I think there

01:21  11  are three important points to make.  If I go to Slide 35, the

01:21  12  idea of an abstract or some general portion of the

01:22  13  specification, paraphrasing Section 112, Paragraph 6 language,

01:22  14  is not a new one.  And the argument that's being made to Your

01:22  15  Honor on the switching circuit has been made analogously in

01:22  16  other cases, and the courts have said, no.  No.  No.  You can't

01:22  17  do that.  And the reason is they're trying to avoid -- the

01:22  18  courts are trying to avoid dysfunctional claiming.  That's

01:22  19  Problem No. 1.

01:22  20      Problem No. 2 is that the structure for decoupling in the

01:22  21  first sentence and the second sentence are here very

01:22  22  specifically disclosed and never called a switching circuit.

01:22  23  They're called the transistors clamping circuit or the

01:22  24  transistors and no one ever calls them a switching circuit.

01:22  25      And then No. 3, the switching circuit is part of a

01:22   1   separate claim with separate limitations, other limitations

01:22   2   that go along with it that don't amplify the discussion we're

01:23   3   having here at all.

01:23   4        But I think at the end, Your Honor, no one disagrees it's

01:23   5   Section 112, Paragraph 6.  No one disagrees that there's a

01:23   6   function.  No one disagrees that Figures 2 and 3 are the

01:23   7   disclosed embodiments of the invention, and that has special

01:23   8   meaning for means plus function limitations, and no one

01:23   9   disagrees as to what's disclosed.  The only disagreements are

01:23  10   should a clamping circuit be included?  That's what the patent

01:23  11   says.  Can the switching circuit in general articulation save

01:23  12   it?  And the answer is no.

01:23  13        THE COURT:  Thank you, sir.

01:23  14        MS. WEN:  Could you please jump to Slide 124?

01:23  15        Thank you.

01:23  16        So to respond to the question of whether a switching

01:24  17   circuit discloses structure, I would point out in the patent,

01:24  18   and Mr. Lee was just talking about this section of the

01:24  19   specification as well.  This is Slide 124, and underlined in

01:24  20   red it says, a switching circuit has transistors that couple

01:24  21   the first power supply terminal to the first power supply line.

01:24  22   So the patent does specifically disclose a switching circuit

01:24  23   with transistors which Mr. Lee just stated neither of the

01:24  24   parties dispute are a structure.  He also noted, I think, that

01:24  25   it doesn't matter whether Intel is relying on means plus

01:24  1   function claiming with respect to their switching circuit

01:24  2   argument.  I think it does matter.  It matters first because

01:24  3   the authority that they rely on to say that you can't point to

01:24  4   functional language in the specification specifically deals

01:24  5   with means plus function terms.  And I -- and we, as I stated,

01:25  6   disagree that switching circuit is purely functional.  The

01:25  7   patent clearly states that a switching circuit has transistors.

01:25  8   The figures disclose that there are transistors that operate as

01:25  9   switches during the write operation.  And so we would say that

01:25  10  a switching circuit, if the Court would like a general

01:25  11  definition, is a class of structures that has switches that

01:25  12  open and close.

01:25  13      And so I also want to respond to Mr. Lee's argument about

01:25  14  the clamping circuit.  The clamping circuit is not required to

01:25  15  perform the first coupling function.  As we -- as I stated

01:25  16  earlier, the patent specifically contemplates that in other

01:25  17  embodiments the clamping circuit is not coupled to the power

01:25  18  supply terminal but is, rather, coupled to a different

01:25  19  reference voltage.  And here if you look at the figures

01:25  20  themselves, you can see that Transistor 52, which is coupling

01:25  21  the first line of memory cells to the power supply terminal,

01:26  22  can do so with or without Clamping Circuit 48.  So Transistor

01:26  23  52 alone is sufficient to perform the coupling function, the

01:26  24  first coupling function in this figure.

01:26  25      THE COURT:  Would you say that again?

01:26  1      MS. WEN:  Yeah.  So this figure clearly -- so Intel is

01:26  2  arguing that to perform the first coupling function you need

01:26  3  both this Transistor 52 --

01:26  4      THE COURT:  In Clamping Circuit 46?

01:26  5      MS. WEN:  Yes.

01:26  6      THE COURT:  Yes.

01:26  7      MS. WEN:  And this figure clearly shows that Transistor 52

01:26  8  alone would be sufficient to couple to the power supply

01:26  9  terminal, and this is buffered by the disclosure in the patent

01:26  10  of a clamping circuit that is not coupled to the power supply

01:26  11  terminal.

01:26  12      THE COURT:  Anything else?

01:27  13      MS. WEN:  That is it for me.

01:27  14      THE COURT:  Mr. Lee?

01:27  15      MR. LEE:  Two very quick points, Your Honor.

01:27  16      To end where -- to start where Ms. Wen ended, the question

01:27  17  is not what is sufficient to perform the function.  The

01:27  18  question is what's disclosed to perform the function because

01:27  19  that's how they define their invention and avoid the prior art.

01:27  20  And if you look at Column 3, Lines 48 to 58, you'll see that

01:27  21  the clamping circuit is part of what is performing this

01:27  22  function.

01:27  23      Second to last --

01:27  24      THE COURT:  Give me -- let me get there real quick.

01:27  25      MR. LEE:  Okay.  If I go to 48 of Column 3.

01:27  1        THE COURT:  Okay.

01:27  2        MR. LEE:  Well, actually, let's go over to Column 3 --

01:27  3   Column 4 actually.  Let's go to Column 4 first.

01:27  4        THE COURT:  Okay.

01:27  5        MR. LEE:  And Line -- come down, Mr. Lee.

01:28  6        THE COURT:  I've actually got the patent here in front of

01:28  7   me too.

01:28  8        MR. LEE:  So, Your Honor, here is a portion describing

01:28  9   specifically what the clamping circuit's doing and how it is

01:28  10  affecting the -- what is coming out of the supply terminals.

01:28  11  This is part of what they're describing as the coupling means.

01:28  12  And that's why the clamping circuit should be included.

01:28  13       THE COURT:  And what lines in Column 4?

01:28  14       MR. LEE:  It's 48 to -- so it starts as illustrated in

01:28  15  Figure 2 and it goes on.

01:28  16       THE COURT:  Got it.  Let me read that real quickly.

01:28  17       MR. LEE:  It says the Clamping Circuits 38 and 46 function

01:28  18  to limit the voltage drop on Conductors 35 and 39 to a

01:28  19  predetermined minimum voltage.  The supply voltage is only

01:28  20  reduced on the columns being written to.  The reduced supply

01:28  21  voltage functions to improve the write margin of the selected

01:29  22  cells while maintaining the cell stability of the unselected

01:29  23  cells.  That's part of the coupling function, and the clamping

01:29  24  circuit helps to control that.

01:29  25       The last point -- could I have Slide 33, Mr. Lee?

01:29   1        THE COURT:  Well, and you might want to address the

01:29   2    portion of the patent -- I've forgotten where Ms. Wen said it

01:29   3    was -- that talked about reference voltage being able to be

01:29   4    used in -- being disclosed as being able to be used as opposed

01:29   5    to a clamping circuit.

01:29   6        MR. LEE:  It may be that it can be used without a clamping

01:29   7    circuit.  The question here is what is disclosed as the

01:29   8    specific means, and this is what's disclosed with the clamping

01:29   9    circuit in every circumstance.

01:29   10        THE COURT:  And is it your position that given that it is

01:29   11    a means plus function claim I have to put in -- I have to stick

01:29   12    with what the function that's disclosed in this part of the

01:29   13    specification?

01:29   14        MR. LEE:  It is -- yes.  What the function is and then

01:30   15    what is disclosed to the spec to perform that.

01:30   16        THE COURT:  To perform that function.  Yes.

01:30   17        MR. LEE:  Slide 33.  Your Honor, here is the difference,

01:30   18    and I may have gone too quickly when I said that the switching

01:30   19    circuit was sort of paraphrase in Claim 1.  The reason you

01:30   20    don't have the same problem we had with the capacitance

01:30   21    structure or some other theory, there's a switching circuit

01:30   22    which in isolation has a problem that we talked about now.  But

01:30   23    the claim says it has transistors and then it specifically says

01:30   24    where they're located, what they're connected to and how

01:30   25    they -- how those connections work.  So there are a legion of

01:30  1  cases that say if you have a term but by defining, you know,

01:30  2  what it is, here a transistor, but where it's located, what

01:30  3  it's connected to, you're providing the structure in words.

01:30  4  That's the difference.  But that switching circuit, if you look

01:31  5  for the description of the coupling and decoupling means at

01:31  6  Figures 2 and 3, we can search forever and you won't see the

01:31  7  switching circuit suggested as the structure.

01:31  8       Thank you, Your Honor.

01:31  9       THE COURT:  Anything else from VLSI?

01:31  10       MS. WEN:  All right.  So very quickly.  Mr. Lee said that

01:31  11  the question is what is disclosed to perform the function, and,

01:31  12  like we said, the switching's the patent, the written

01:31  13  description, the abstract.  The preferred embodiments

01:31  14  repeatedly state that a switching circuit is what performs

01:31  15  these functions to the letter.  And this statement in the

01:31  16  specification it clearly discloses that there are transistors

01:31  17  within the switching circuit.  I wasn't really sure what

01:31  18  Mr. Lee was saying about the transistors being separate from

01:32  19  the switching circuit or not being within the switching

01:32  20  circuit.  This clearly contemplates a switching circuit which

01:32  21  couples the first power supply terminal to the first power

01:32  22  supply line and couples the second power supply line to the

01:32  23  first capacitance structure and the switching circuit has

01:32  24  transistors.  And --

01:32  25       THE COURT:  And that's Column 6, Lines somewhere around 50

01:32  1    through 54?

01:32  2         MS. WEN:  Yes.  That would be 47 through 58 I believe.

01:32  3         THE COURT:  Yeah.  That's the full paragraph.  Yes.

01:32  4         MS. WEN:  Yeah.

01:32  5         THE COURT:  Begins at 47.  Yes, ma'am.

01:32  6         MS. WEN:  Yes.

01:32  7         So this is -- it's very clear like both in the claims and

01:32  8    in the specification that it's the switching circuit that

01:32  9    performs the function.  And I don't have the claims on these

01:32  10   slides, but Mr. Lee pointed out to you the particular claims

01:32  11   that contain the switching circuit terminology which includes,

01:33  12   I believe, Claim 1 and Claim 12.  And I want to reiterate that

01:33  13   you can talk about circuits in terms of their functions without

01:33  14   having them be means plus function terms.  And a person of

01:33  15   ordinary skill in the art would understand switching circuit as

01:33  16   structure, and we are happy to submit examples of that if the

01:33  17   Court would like to see it.

01:33  18        THE COURT:  Anything else?

01:33  19        MS. WEN:  No.

01:33  20        THE COURT:  Mr. Lee?

01:33  21        MR. LEE:  Nothing, Your Honor.

01:36  22        (Conference between the Court and Mr. Yi.)

01:39  23        THE COURT:  The Court is going to find that the

01:39  24   construction for first coupling means for coupling the power

01:39  25   supply terminal to the first power supply line during the write

01:39  1   operation for the second line of memory cells will be the

01:39  2   agreed function is coupling the power supply terminal to the

01:40  3   first power supply line during the write operations for the

01:40  4   second line of memory cells.  The structure will be Transistor

01:40  5   52 and Transistor 96 and equivalence of either.

01:40  6       With respect to second coupling means for coupling the

01:40  7   second supply line to the first capacitance structure during

01:40  8   the write operations for the second line of memory cells, the

01:40  9   agreed function is coupling the second supply line to the first

01:40  10  capacitance structure during the write operation for the second

01:40  11  line of memory cells.  The structure will be Transistor 54 and

01:40  12  Transistor 94 and equivalence thereof.

01:40  13      We will turn now to claim term decoupling means for

01:40  14  decoupling the first power supply line from the second line of

01:40  15  memory cells during the write operation for the second line of

01:41  16  memory cells.

01:41  17      It is my inclination -- I will tell VLSI my inclination is

01:41  18  that this is indefinite.  I don't need to hear from Intel, I

01:41  19  don't think, unless I just need to hear from them after you --

01:41  20  whoever speaks for VLSI, but if you -- do what you can to

01:41  21  persuade me why I'm wrong whoever's going to speak for VLSI.

01:41  22      Give me one second.

01:41  23      (Conference between the Court and Mr. Yi.)

01:42  24      THE COURT:  On the last two claim constructions I gave, I

01:42  25  used the word "and" between the transistors.  It should be

01:42  1    "or."  It can -- it does not -- it's not required to have both.

01:42  2    And so if that wasn't clear, I want that to be clear on the

01:42  3    record.

01:42  4        So, yes, ma'am.  If you would take up the decoupling means

01:42  5    for decoupling the first power supply line.

01:42  6        MS. WEN:  Sure.  And I won't rehash too much of what we've

01:42  7    said, but I like to start that Intel has the burden to show by

01:42  8    clear and convincing evidence that the specification --

01:42  9        THE COURT:  I would -- I would skip over that.

01:42  10       MS. WEN:  All right.  Great.

01:42  11       THE COURT:  I'm pretty good with the --

01:43  12       MS. WEN:  All right.  So, again, the switching circuit is

01:43  13   structure.  Mr. Lee said that in Claim 1 -- I don't have it

01:43  14   here.

01:43  15       Can we have Claim 1?

01:43  16       THE COURT:  I'm with you on Claim 1.

01:43  17       MS. WEN:  Okay.  All right.  So it says a switching

01:43  18   circuit -- a switching circuit has transistors that connected

01:43  19   between the first power supply terminal, et cetera.  Mr. Lee

01:43  20   said that the reason that they didn't propose switching circuit

01:43  21   as a means plus function term was that the transistors make it

01:43  22   okay.  So the transistors are structure.  We agree that the

01:43  23   switching circuit discloses structure, and because the

01:43  24   switching circuit discloses structure and it also discloses

01:44  25   specifically that the switching circuit performs the decoupling

01:44  1    function --

01:44  2         Can we go back to the slides?

01:44  3         It is our position that the patent clearly discloses again

01:44  4    a switching circuit that has transistors that, when the second

01:44  5    line of memory cells is selected for writing, decouple the

01:44  6    first power terminal from the second line of memory cells.

01:44  7         In addition, it states that --

01:44  8         THE COURT:  Why don't you do this?  This will probably be

01:44  9    the most -- thing most helpful to you.  I think I'm correct,

01:44  10   and Josh can tell me if I'm -- if this is where we got to

01:44  11   yesterday, but I think it'd be most helpful for you to go to

01:44  12   the Figure 2 is what we looked at, right, and if you would go

01:44  13   to Figure 2 and explain to me, you know, basically how the

01:44  14   first power supply terminal could be coupled with the first

01:44  15   power supply line, and by coupled, that doesn't make sense to

01:45  16   me.  And so that would be -- that would be helpful to you.

01:45  17        MS. WEN:  Okay.  So I think how I would explain it is here

01:45  18   we have the first power supply line and here we have the second

01:45  19   power supply line.  I'm just using Intel's figure.  And here we

01:45  20   have the power supply terminal.  So the patent discloses that

01:45  21   the first power supply line is coupled to the power supply

01:45  22   terminal.  It also discloses that the second line of -- the

01:45  23   second power supply line is coupled to the power supply

01:45  24   terminal.  And so the patent additionally discloses that the

01:45  25   second line of -- the second power supply line becomes

01:45  1   decoupled from the power supply terminal.  And so when this

01:45  2   decoupling action occurs, it is effectively also coupled from

01:45  3   the first power supply line.

01:46  4       Maybe that wasn't clear.

01:46  5       THE COURT:  Well, what is the difference in your switching

01:46  6   circuit from the first power supply terminal?

01:46  7       MS. WEN:  Could you --

01:46  8       THE COURT:  I may not be getting this right, but my

01:46  9   thinking was that basically the switching circuit is the same

01:46  10  thing as the first power supply is what's -- aren't you arguing

01:46  11  that your switching circuit is what's in the purple box?

01:46  12      MS. WEN:  No.  No.  No.

01:46  13      THE COURT:  Okay.

01:46  14      MS. WEN:  So the switching circuit corresponds in this

01:46  15  figure to these transistors.

01:46  16      THE COURT:  Okay.  And that's -- and I think maybe this is

01:46  17  what we were talking about yesterday is are you all in

01:46  18  agreement that the purple box should not also include that?

01:46  19      MS. WEN:  Should not also include a switching circuit?

01:46  20      THE COURT:  Yeah.  Where -- as the --

01:46  21      MS. WEN:  Okay.  So the purple box is the power supply

01:46  22  terminal.

01:46  23      THE COURT:  And that would not include the circuit that's

01:47  24  below it?

01:47  25      MS. WEN:  No.  It would not.

01:47  1         THE COURT:  Okay.

01:47  2         MS. WEN:  So we have this power supply terminal which

01:47  3  is --

01:47  4         THE COURT:  Okay.

01:47  5         MS. WEN:  -- coupled to both the first power supply

01:47  6  line --

01:47  7         THE COURT:  Okay.

01:47  8         MS. WEN:  -- and the second power supply line.

01:47  9         THE COURT:  Right.

01:47  10        MS. WEN:  And it's coupled through switching circuits.

01:47  11        THE COURT:  Okay.

01:47  12        MS. WEN:  For example, this transistor.

01:47  13        THE COURT:  So that wouldn't be -- as a non technical

01:47  14  person, you're getting to where my inartful question is.  So it

01:47  15  would not include -- let me get to Figure 2.  It would not

01:47  16  include -- I guess 42 -- it would not -- it stops at the bottom

01:47  17  line of where the purple is and doesn't include anything below

01:47  18  it to be the power supply?

01:48  19        MS. WEN:  Right.  So the power supply terminal basically

01:48  20  corresponds to these VDDs.

01:48  21        THE COURT:  Okay.

01:48  22        MS. WEN:  And just those.

01:48  23        THE COURT:  And does not include anything else?

01:48  24        MS. WEN:  No.

01:48  25        THE COURT:  Okay.

01:48  1          MS. WEN:  Okay.  So with that understanding, you can see

01:48  2     that the first power of supply line is connected to the power

01:48  3     supply terminal through the switching circuit transistor.

01:48  4          THE COURT:  Okay.

01:48  5          MS. WEN:  And the second line of memory cells -- I'm

01:48  6     sorry.  The second power supply line, which is not labeled

01:48  7     here, is coupled to the same power supply terminal through a

01:48  8     different switching circuit transistor right here.  And so when

01:48  9     you decouple this second power supply line from the power

01:48  10    supply terminal, you are effectively decoupling it from the

01:49  11    first power supply line, if that makes sense.

01:49  12         THE COURT:  Yes, ma'am.  I mean, I hear what you're

01:49  13    saying.  I don't know that I agree with it, but it makes sense.

01:49  14         MS. WEN:  So that's why we're saying that it is not

01:49  15    indefinite that the patent clearly discloses that these

01:49  16    switching circuit structures decouple the first -- I'm sorry.

01:49  17    The -- yeah.  The first power supply line from the second power

01:49  18    supply line.

01:49  19         THE COURT:  And if I have Intel's -- if I understand what

01:49  20    Intel is arguing, it is that the specification does not

01:49  21    describe coupling the second line of memory cells to the first

01:49  22    power supply.  That's Intel's position, correct?

01:49  23         MS. WEN:  Yes.  They are arguing that the claim does not

01:49  24    disclose the first power supply line being directly coupled to

01:49  25    the second power supply line.

01:50  1      THE COURT:  Their position is that the specification only

01:50  2  discloses coupling the first line of memory cells to the first

01:50  3  power supply and the second line of memory cells to the second

01:50  4  power supply, correct?

01:50  5      MS. WEN:  Yes.

01:50  6      THE COURT:  And you -- if you can explain to me why

01:50  7  they're incorrect.

01:50  8      MS. WEN:  So I -- they are -- what's a good word for this?

01:50  9  They are kind of ignoring the fact that the first power supply

01:50 10  line is coupled to the power supply terminal.  The second power

01:50 11  supply line is also coupled to the power supply terminal.  So

01:50 12  when you decouple one -- for example, when you decouple the

01:50 13  second power supply line from the power supply terminal, you

01:50 14  are decoupling the first power supply line from the second

01:50 15  power supply line.

01:50 16      THE COURT:  Unfortunately my problem here is with that --

01:50 17  is with our technology.  My screen is so bad that I can't see

01:50 18  far enough to see that, and I -- and the screen is bad.  I

01:51 19  can't see this.  So I'm trying to follow along with what you're

01:51 20  saying.

01:51 21      MS. WEN:  All right.  Let me --

01:51 22      THE COURT:  Maybe we have this.  If you can tell me where

01:51 23  this slide is that you're working off of and you can give me a

01:51 24  hard copy of that.

01:51 25      MS. WEN:  It is -- let me grab that slide number back

01:51   1   actually.  Slide 149.

01:51   2       THE COURT:  Okay.  Now, using that, if you can just

01:51   3   articulate for me exactly what the purple square is going

01:51   4   around by using the numbers.

01:51   5       MS. WEN:  Yes.  So there aren't any numbers associated

01:51   6   with the power supply -- with the purple box.  You see the VDD

01:52   7   and the little circle below it and then another VDD and a

01:52   8   circle below it.

01:52   9       THE COURT:  Yes, ma'am.

01:52  10       MS. WEN:  Yes.  Those four VDDs correspond to the power

01:52  11   supply terminal that we're talking about.

01:52  12       THE COURT:  So are the power supply terminals that -- is

01:52  13   the power the VDD that attaches to Line 1 and the VDD that

01:52  14   applies to Line 2, are those not separate power supplies?

01:52  15       MS. WEN:  No.  It's the single power supply terminal, and

01:52  16   this is the position that both parties have taken throughout

01:52  17   the course of the briefing.  Intel suggested in their reply

01:52  18   briefing that these VDD -- these separate VDD reference are

01:52  19   somehow separate nodes, but that's not consistent with what

01:52  20   they've been arguing before that or how they presented the

01:52  21   power supply terminal today.  And so our position is that the

01:52  22   first power supply line and the second power supply line are

01:52  23   both connected to the same power supply terminal such that when

01:53  24   you decouple one from the power supply terminal, you're

01:53  25   decoupling the other supply line as well from the initial --

01:53  1    from the first power supply line.

01:53  2        THE COURT:  Why don't we -- Mr. Lee, who's arguing on your

01:53  3    side?

01:53  4        MR. LEE:  I am, Your Honor.

01:53  5        THE COURT:  Why don't we hear from him on that specific

01:53  6    issue and then you're welcome -- I'll have you get back up on

01:53  7    anything else you want to say, but that's what I really care

01:53  8    about.

01:53  9        MR. LEE:  Your Honor, if I could go on our slide to Slide

01:53  10   37 --

01:53  11       THE COURT:  Okay.

01:53  12       MR. LEE:  -- directly.

01:53  13       And just to put it in context, so the function that's

01:53  14   described is decoupling the first power supply line from the

01:53  15   second line of memory cells, right?  That's what we're focused

01:53  16   on, that phrase.  So in order to decouple the first power

01:53  17   supply line from the second line of memory cells, they have to

01:53  18   have been coupled to each other in the first instance.

01:54  19       If I take you then to our Slide 40, Your Honor, which is

01:54  20   the diagram that you were looking at before, the power supply

01:54  21   is up here.  These are separate nodes from the power supply,

01:54  22   but the claim of the case is not referring to the power supply

01:54  23   or power terminal.  It's talking about the supply line.

01:54  24       THE COURT:  That was the way I was taking it too.  I know

01:54  25   I was not being very articulate when I was asking Ms. Wen, but

01:54   1    that is my concern here.

01:54   2        MR. LEE:  And there is a second supply line that's

01:54   3    supplying voltage to the second column of cells, but --

01:54   4        THE COURT:  But not from that first power supply?

01:54   5        MR. LEE:  Right.

01:54   6        THE COURT:  Yes.

01:54   7        MR. LEE:  That's why we have the transistor up here to

01:54   8    decouple.  So the first power supply line is never coupled to

01:54   9    the second line of memory cells.  Because it's never coupled,

01:54   10   it can't be decoupled.

01:54   11       THE COURT:  Decoupled.

01:54   12       MR. LEE:  Your Honor, the argument that they're now making

01:54   13   to you is that they -- because they go to this -- to a common

01:55   14   voltage source is the moral equivalent of this:  You have a

01:55   15   socket in the wall.  You plug in your laptop and you plug in a

01:55   16   lamp.  They're going into this same power supply but two

01:55   17   different nodes for two different purposes.  Only the plug

01:55   18   that's plugging the lamp in is coupling the lamp.  Only the

01:55   19   plug plugging the laptop is -- right?  When you pull the plug

01:55   20   out on the lamp, you're not decoupling it from the laptop.

01:55   21   You're just decoupling it.  And in this particular instance

01:55   22   they never identified any embodiment with that yellow first

01:55   23   line, the first power supply to line being coupled to the

01:55   24   second line of memory cells.  So you can't decouple it in and

01:55   25   it's therefore indefinite.

01:55  1        THE COURT:  Got it.  Once again I've been rescued by

01:55  2   Mr. Lee who answered what I was trying to ask you.  If you

01:55  3   could respond to what he just said, that'd be great.

01:56  4        MS. WEN:  Okay.  The first thing I want to say is that

01:56  5   it's very common practice in the art that when circuit nodes

01:56  6   have the same name, that means they are the same power supply.

01:56  7   So VDD, this node, VDD, this node, they're all the same power

01:56  8   supply terminal.  And when you understand it that way, you then

01:56  9   understand that the first power supply line is coupled to the

01:56  10  second power supply line through the power supply terminal.

01:56  11  And Mr. Lee gave the example of the electrical outlet, but if

01:56  12  you have a single power source and you have two different

01:56  13  structures coupled to that power source, those structures are

01:56  14  coupled together, and that is how a person of ordinary skill in

01:56  15  the art would understand it.  For example, we submitted an

01:57  16  expert declaration.  It's I believe the responsive declaration

01:57  17  of Dr. Conte.  In Paragraph 42 he explains that again both in

01:57  18  Figures 2 and 3, and we've been looking at Figure 2, both

01:57  19  clearly show that the first power supply line is coupled to the

01:57  20  power supply terminal.  The second power supply line is also

01:57  21  coupled to the power supply terminal, and, therefore, those two

01:57  22  power supply lines are coupled together such that when you

01:57  23  decouple the second line -- the second power supply line from

01:57  24  the power supply terminal, you are decoupling the second power

01:57  25  supply line from the first power supply line.  I think Mr. Lee

01:57  1    also noted that this coupling should be disregarded because

01:57  2    they're being coupled to the power supply terminal for

01:57  3    different purposes, but this is a single memory circuit.  You

01:58  4    have the first line of memory cells and the second line of

01:58  5    memory cells both at some point coupled to the power supply

01:58  6    terminal through these power supply lines.  And in that way

01:58  7    they are coupled to each other.

01:58  8         THE COURT:  Anything else?

01:58  9         MS. WEN:  No.

01:58  10        MR. LEE:  Nothing further, Your Honor.

01:58  11        (Conference between the Court and Mr. Yi.)

02:00  12        MS. WEN:  Your Honor, could I just make one comment?

02:00  13        THE COURT:  Of course.

02:00  14        MS. WEN:  We Googled switching circuit as we've been

02:00  15   doing.  There are thousands of hits on Google, and I think --

02:00  16   it seems to us that the question of whether a switching circuit

02:00  17   does actually recite structure is a very important question for

02:00  18   you and so we would love the opportunity to submit additional

02:00  19   evidence showing that a switching circuit is a well-known

02:00  20   structure.  A person of ordinary skill in the art would

02:00  21   absolutely understand a switching circuit to disclose

02:00  22   structure.  We would love the opportunity to submit that

02:00  23   evidence if it would be helpful to you.

02:00  24        THE COURT:  It wouldn't.  I'm going to find that the claim

02:00  25   is indefinite.  If I thought submitting that would help cure my

02:01  1   concern, I would be happy to let you do that.  That's -- our

02:01  2   concern is more with the way we have interpreted the way the

02:01  3   patent works and the way -- the way we've interpreted the way

02:01  4   Figure 2 operates and we think that it's indefinite.  It's

02:01  5   really -- the problem is not with addressing whether or not

02:01  6   switching -- a switching circuit would cure that or not.

02:01  7        MS. WEN:  Do you have any specific questions about how

02:01  8   that circuit works?

02:01  9        THE COURT:  No.  Fortunately or unfortunately for you, I

02:01  10  have someone who can speak engineering really well.  And so I'm

02:01  11  pretty comfortable and he and I have discussed it a great deal.

02:01  12  And so let's move on to the '373 patent, means for providing

02:02  13  the operating voltage to the memory.

02:02  14       MR. SLUSARCZYK:  Good afternoon, Your Honor.  Dominik

02:02  15  Slusarczyk for VLSI.

02:02  16       THE COURT:  Pleasure to have you here.

02:02  17       MR. SLUSARCZYK:  Likewise.  Pleasure to be here.

02:02  18       I think we can hopefully breathe a sigh of relief.  We've

02:02  19  been talking about inductors and transistors all morning and

02:02  20  capacitors, I believe.  We can now move on to computer systems,

02:02  21  which are still complicated, but since we use them every day,

02:02  22  hopefully we have a slightly more intuitive understanding of

02:02  23  some of these concepts.

02:02  24       So '373 patent.  I'll give a very brief overview of the

02:02  25  technology and I'm happy to entertain questions as I do that.

02:02  1   A couple of decades ago, for perspective, computer engineers

02:02  2   working on processors were typically focused on performance and

02:02  3   trying to make them faster.  The question really was about how

02:02  4   to get more stuff done in a given period of time.  As they got

02:02  5   faster and more sophisticated and other developments happened,

02:03  6   which is that they started more and more to operate off of

02:03  7   batteries, and while power wasn't a concern early on, it was

02:03  8   really about how fast you make it and it really didn't matter

02:03  9   because you were usually connected directly to a power plant.

02:03  10  But we're now operating on batteries and so we've started

02:03  11  seeing a trade-off.  You can either make the processor faster

02:03  12  or you can make it more power efficient.  You can make it

02:03  13  faster by increasing the frequency of its operation,

02:03  14  effectively how many operations per second or however you want

02:03  15  to measure it's performing.  And as that goes up, the processor

02:03  16  also requires more power, which for our purposes today means

02:03  17  providing it with more voltage.  That concept is known as

02:03  18  dynamic voltage and frequency scaling which means you can scale

02:03  19  the processor's frequency by giving it more voltage.  You can

02:03  20  decrease the frequency by taking away some of that voltage and

02:03  21  thereby also saving some power.

02:03  22       Typically, not always, but typically the processor is

02:04  23  making determinations about how fast it should operate and

02:04  24  therefore how much voltage it requires.  It does that in part

02:04  25  by looking at the workload and examining some of the system

02:04  1   parameters like, you know, is someone actually using the

02:04  2   computer?  Is the screen on?  And so on and so forth.  A lot of

02:04  3   these can be far more sophisticated than the examples that I

02:04  4   just gave.

02:04  5       So the processor is usually in charge of selecting that

02:04  6   frequency and the associated voltage that's required to run on

02:04  7   that frequency.  That frequency and voltage determination

02:04  8   typically carries over to the rest of the computer system for a

02:04  9   number of reasons.  One's that it's simpler.  Another is that

02:04  10  the rest of the system can't really go faster than the

02:04  11  processor, and so if it's slowing down, you want the other

02:04  12  components to slow down as well and save power.

02:04  13      But memory, which every computer system pretty much has to

02:04  14  have, is special.  There's certain ranges within which memory

02:05  15  in fact can scale and could get faster and get slower at the

02:05  16  same time use more or less power, but there is -- there are

02:05  17  certain minimum voltages that have to be provided to the

02:05  18  memory.  If you get below that minimum voltage, your processor

02:05  19  maybe can continue operating in theory, but the memory's going

02:05  20  to start losing the data that's inside of it.

02:05  21      And so you run into situations sometimes where you want to

02:05  22  save data in the memory because you don't want to reboot the

02:05  23  whole computer for instance, but you're also perhaps not using

02:05  24  the processors.  Maybe it's asleep.  You don't want to lose

02:05  25  your data but you want the processor to be able to scale down

02:05   1   as low as it can down and so a problem develops, which is you

02:05   2   need to be able to give the memory the minimum operating

02:05   3   voltage but you also want to be able to scale the processor

02:05   4   potentially below that minimum operating voltage for the

02:05   5   memory.

02:05   6       So this '373 patent is focused on solutions for how do I

02:05   7   achieve that in a way that's practical and functional?  I'll

02:06   8   take a couple of moments to rebut a couple of points made in

02:06   9   Intel's tutorial.  I don't want to spend --

02:06   10       THE COURT:  In what?

02:06   11       MR. SLUSARCZYK:  Intel's tutorial.

02:06   12       I don't want to spend too much time on it, but I know the

02:06   13   Court said the Court has reviewed the tutorials and there's a

02:06   14   couple of I think important distinctions.

02:06   15       Intel says that the first thing you do in practicing this

02:06   16   invention is to test the memory to determine its minimum

02:06   17   operating voltage.  You can test the memory, but if you look at

02:06   18   the actual slide on the actual patent, most of the claims don't

02:06   19   require testing.  So I want to make clear that's not

02:06   20   necessarily something that's integral or required by the

02:06   21   invention.  It's an embodiment.

02:06   22       Likewise, there's some discussion about switching the

02:06   23   voltages, but, again, not a single claim actually requires any

02:06   24   kind of switch to take place.

02:06   25       And, finally, I think there's an important point here

02:06  1   which is we talked about how the processor makes determinations

02:06  2   about how fast it goes and how slow it goes, and it's not

02:07  3   always the processor that makes that determination but it is a

02:07  4   determination that's made, whereas Intel's tutorial cites

02:07  5   that's the issue and says the voltage fluctuates, but this

02:07  6   isn't -- you know, it doesn't just fluctuate with the wind, for

02:07  7   instance.  There's the -- it's a deliberate decision that's

02:07  8   made by the system in order to hit a particular performance

02:07  9   target.

02:07  10       So means for providing.  The full term here is means for

02:07  11  providing the operating voltage to the memory at a value at

02:07  12  least as great as the minimum operating voltage in response to

02:07  13  the operating value selected by the processor being below the

02:07  14  minimum operating voltage.  Both parties analyzed this as a

02:07  15  Section 112, Paragraph 6 means plus function term, but Intel

02:07  16  has proposed that the term is indefinite.  Of course I'll cover

02:07  17  those arguments as I go along this afternoon, but I will take

02:07  18  you through the nuts and bolts of our analysis first which I

02:07  19  think will address many of the indefiniteness points that Intel

02:08  20  raises in the briefing.

02:08  21       There are actually three structures in the patent that

02:08  22  correspond to the recited function.  The power supply selector

02:08  23  is the first of them.  It's also the most complicated.  So I'll

02:08  24  start with that and get the hard stuff out of the way.

02:08  25       So I'll take it in three pieces.  First, the power supply

02:08  1    selector is very clearly disclosed as providing operating

02:08  2    voltage to the memory.  Here is an excerpt from Column 2

02:08  3    starting at Line 52 of the patent, Plaintiff's Exhibit 3 at

02:08  4    Slide 163.  And says, memory 18 also includes a power supply

02:08  5    selector 21 which receives VDDmem and VDDlogic.  These are both

02:08  6    voltage values.  And provides one of these to memory array 22

02:08  7    as the memory operating voltage.  So clearly the power supply

02:09  8    selector is providing operating voltage to the memory which is

02:09  9    part of the recited function.

02:09  10   It might be useful to look at the figure for just a split

02:09  11   second to put those words into -- as some kind of visual

02:09  12   representation, and here again we have a power supply selector

02:09  13   that is inside of the memory.  It's providing voltage to the

02:09  14   memory array and it's choosing between VDDmem and VDDlogic at

02:09  15   least in this embodiment.  I could easily choose between other

02:09  16   voltages and other embodiments.

02:09  17   So the next piece of the function is that that operating

02:09  18   voltage has to be at a value at least as great as the minimum

02:09  19   operating voltage.  And, again, that is very clearly explained

02:09  20   in the patent.  I'm going to read from Column 3, Line --

02:09  21   starting at Line 30 in one embodiment.  While VDDlogic remains

02:09  22   above a minimum operating voltage required for successful reads

02:10  23   of memory array 22, power supply selector 21 selects VDDlogic

02:10  24   as the memory operating voltage provided to the memory array

02:10  25   such that the memory operating voltage is substantially equal

02:10    1    to VDDlogic.  So, in other words, as long as VDDlogic is high

02:10    2    enough, that is what we're providing to the memory in this

02:10    3    embodiment.  But when VDDlogic is scaled to a voltage that is

02:10    4    below the minimum memory operating voltage required for reads,

02:10    5    power supply selector 21 selects the higher voltage VVDmem

02:10    6    during reads cycles to ensure that reads can still be

02:10    7    successfully performed.  So reads can still be successfully

02:10    8    performed means that we are at least as high as the minimum

02:10    9    operating voltage required for reads.

02:10   10        And the final piece here is that all this is done in

02:10   11    response to the operating values selected by the processor

02:10   12    being below the minimum operating voltage.  Now, this is one

02:10   13    reason why I dwelt on that fluctuates point from the tutorial.

02:11   14    It's not just a matter of fluctuating.  It's typically the

02:11   15    processor that is selecting these frequency and voltage states,

02:11   16    and that's clearly disclosed in the patent.  In fact, the

02:11   17    patent uses this first phrase DVFS here which I introduced

02:11   18    earlier as dynamic voltage and frequency scaling.

02:11   19        So a corresponding encoded frequency, and this, by the

02:11   20    way, is starting at Column 8, Line 18, quoted on Slide 166.  A

02:11   21    corresponding encoded frequency and voltage is provided for

02:11   22    each of state 0 through state N.  And a little bit further down

02:11   23    it tells you that those states are provided -- or selected by a

02:11   24    processor 16.  And a little further down in that column at Line

02:11   25    31 it tells us that the selected voltage state corresponds to

02:11  1    the desired voltage value for VDDlogic.  And, again, VDDlogic

02:11  2    is what's being provided to the memory at least as long as it's

02:11  3    high enough.

02:11  4         Now, this is a good time to tackle this within argument

02:12  5    that Intel has made in the briefing.  And I'll make a number of

02:12  6    points about this.  First, Intel argues that Claim 14 expressly

02:12  7    provides that the means for providing, the term we're

02:12  8    discussing, must be located within the claimed memory.  So as

02:12  9    an initial matter, the word "within" is not in the claim.  I

02:12  10   think we made that point in the briefing and for a good reason.

02:12  11   We're really talking here about microscopic structures formed

02:12  12   in a die and transistors that are part of the same logical

02:12  13   block, for example, Figure 1 I believe we were looking at is --

02:12  14   that's a block diagram, right?  So transistors that are part of

02:12  15   a single block might actually be scattered throughout the die

02:12  16   depending on the electrical and other needs of the system.  So

02:12  17   it doesn't necessarily make a whole great deal of sense to use

02:12  18   the word "then."  So we'd be then in a situation of discussing

02:12  19   where where's within, where's without?

02:12  20        What the claim does say is that the means providing the

02:12  21   operating voltage is part of the memory and the exact language

02:13  22   is Claim 14 the memory of Claim 9 further comprising.  So it's

02:13  23   no dispute that the memory comprises the means.  I'm not sure

02:13  24   it's fair to say that the means must be located within the

02:13  25   memory.

02:13  1       Secondly, even if that requirement were in place, it's --

02:13  2  I would disagree that it doesn't make sense for something to be

02:13  3  within something and still be providing voltage to that

02:13  4  structure.  Car batteries and flashlight batteries are just a

02:13  5  couple of examples.  Space shuttles, nuclear submarines.

02:13  6  There's a whole slew of examples you'd give here.  It'll be

02:13  7  easier maybe to tackle this argument if we got some further

02:13  8  reasoning about why Intel makes this claim, but certainly as a

02:13  9  conclusory matter that it doesn't make sense.  I don't think

02:13  10  that argument really does anything here for Intel.  Of course

02:13  11  Intel also has patents that claim exactly these structures

02:13  12  which I think further undercuts that point.

02:13  13       I'll talk next about the scalable voltage regulator which

02:14  14  is the second of three structures that correspond to this

02:14  15  recited function and we'll take it a little bit easier.  We

02:14  16  discussed earlier that we're providing a minimum operating

02:14  17  voltage and we're doing so in response to a state selected by

02:14  18  the processor.  So the scale of a voltage regulator is provided

02:14  19  as an alternate means to make sure that that voltage is high

02:14  20  enough, but the thrust of the entire disclosure is that -- the

02:14  21  reason we're trying to provide a higher voltage is because the

02:14  22  processor is trying to scale the system down below the minimum

02:14  23  operating voltage.

02:14  24       And so, again, DVFS states -- we already looked at this

02:14  25  passage at Column 8, Line 18, but the whole purpose of doing

02:14    1    all this is that we are selecting a dynamic voltage and

02:14    2    frequency state that may make the memory inoperable.  And so

02:14    3    the claim -- the patent discloses that if you don't want to use

02:14    4    a power supply selector, you can use a scalable voltage

02:14    5    regulator.  That scalable voltage regulator is going to be

02:15    6    supplying a high enough voltage if the processor wants it to go

02:15    7    below that, there is circuitry that can prevent that.  And so

02:15    8    the scalable voltage regulator is the structure that is clearly

02:15    9    linked with that recited function, and that's covered on Slide

02:15   10    172.

02:15   11        The third structure is the charge pump.  And, again, it's

02:15   12    provided as an alternative way to boost the voltage.  It's the

02:15   13    same mechanism for the processor selecting the states and the

02:15   14    entire system determining that the state may be below the

02:15   15    minimum operating voltage, and it says at Column 5 starting at

02:15   16    Line 54, so in an alternate embodiment VDDlogic may be boosted

02:15   17    during reads through the use of a charge pump.  And, again,

02:15   18    that's in the context of, quote, unquote, when VDDlogic is to

02:15   19    fall below the first minimum operating voltage.

02:15   20        Intel's other indefiniteness argument here is that the

02:15   21    recited function is supposedly nonsensical.  And I think that's

02:16   22    a fairly bold claim.  Certainly there's nothing nonsensical

02:16   23    about the function itself.  We can read it and comprehend the

02:16   24    grammar.  The argument really that Intel has is that the

02:16   25    recited function doesn't, in Intel's view, fit with the

138

02:16  1    structure of the claim.  But as an initial matter, Intel hasn't

02:16  2    cited any authority that says that the patent has to disclose

02:16  3    an embodiment that not only links the recited function with a

02:16  4    structure but that also arranges that structure along with all

02:16  5    of the other claim elements in exactly the same way as they are

02:16  6    arranged in the claim.  I'm not aware of any such authority.

02:16  7    Intel hasn't cited it.  It's sufficient as we've covered that

02:16  8    the structure is clearly linked with the recited function, and

02:16  9    I think I covered three structures just now that do so.

02:16  10          Moreover, even if it were true that the power supply

02:16  11   selector of Claim 9 and then the means that we're covering

02:16  12   today in Claim 14 had to be -- are two different things, they

02:17  13   can be mapped onto the same single structure that is black

02:17  14   letter law from the Federal Circuit.

02:17  15          And unless the Court has any questions, I am finished with

02:17  16   the term.

02:17  17          THE COURT:  Mr. Lee?

02:17  18          Oh.

02:17  19          MS SOOTER:  Good afternoon, Your Honor.  If you're ready,

02:17  20   I will dive into a brief tutorial.

02:17  21          THE COURT:  I can't get any more ready than I am.

02:17  22          (Laughter.)

02:17  23          MS SOOTER:  So I'll go through the first few slides fairly

02:18  24   quickly because they overlap a little bit with what

02:18  25   Mr. Slusarczyk described as well, but I do want to depart a

02:18   1   little bit on some of the details that I think will be useful

02:18   2   to understanding the context of the claims.

02:18   3        So as Mr. Slusarczyk said, this is a patent that's about

02:18   4   frequency and voltage scaling.  So we'll start with that.  And

02:18   5   he did mention that --

02:18   6        THE COURT:  Let me just make sure.

02:18   7        Can you hear her, Kristie?

02:18   8        THE REPORTER:  Can you please move back to the microphone?

02:18   9        MS SOOTER:  Sure.  I'm happy to.

02:18   10        So as we already heard, integrated circuits can contain

02:18   11   multiple components.  So among those components include

02:18   12   processor or memory, and there is typically a voltage supply

02:18   13   associated with the integrated circuit that powers those

02:18   14   components.

02:18   15        And in addition there is a speed component.  One component

02:18   16   of an integrated circuit is how quickly it can execute, and

02:19   17   that speed component is determined by the frequency, and I do

02:19   18   agree that a higher frequency typically requires a higher

02:19   19   voltage.  And so the faster your chip is running, the more

02:19   20   power it's going to consume.  So there is a performance versus

02:19   21   power trade-off in general with integrated circuits.

02:19   22        And so this patent is directed to some of the concepts

02:19   23   surrounding voltage scaling on integrated circuits.  And in

02:19   24   particular, when an integrated circuit has voltage that is

02:19   25   fluctuating, that fluctuating voltage must stay within the

02:19  1    operating limits of the components on the integrated circuit.

02:19  2    And in this case you see that there's a minimum operating

02:19  3    voltage and a maximum operating voltage, and the voltage

02:19  4    supplied to the circuit can fluctuate within that range.

02:19  5         Now, sometimes, and as Mr. Slusarczyk alluded to this, the

02:20  6    different components on an integrated circuit can have

02:20  7    different operating ranges.  So in this example, and this is

02:20  8    the example that the patent relies on as well, the minimum

02:20  9    operating voltage of the memory is higher than the minimum

02:20  10   operating voltage of the processors, and the voltage that's

02:20  11   being provided to both must stay within the narrowest operating

02:20  12   range of those components.  So it's -- the fluctuation then is

02:20  13   constrained.

02:20  14        Now, that leads us to the '373 patent, the minimum memory

02:20  15   operating voltage technique patent.  The patent describes just

02:20  16   what we were saying.  The memory sometimes has a higher minimum

02:20  17   operating voltage than the processor.  And so in order to

02:20  18   account for that minimum memory operating voltage, you need to

02:21  19   know what it is.  So the patent does describe that you need to

02:21  20   test and see on a chip by chip basis what is that chip's

02:21  21   minimum memory operating voltage so that you never drop below

02:21  22   that because you don't want to render the memory nonfunctional

02:21  23   by dropping too low.

02:21  24        And the patent proposes a particular solution.  The patent

02:21  25   proposes providing, and we're on Slide 13, the same voltage to

02:21  1    the processor always.  The patent describes a first voltage

02:21  2    regulator and a second voltage regulator, and in the quote it

02:21  3    actually calls the second voltage regulator an alternate supply

02:21  4    voltage.  The patent describes always providing the first

02:21  5    voltage to the processor.  And sometimes providing that same

02:21  6    first voltage to the memory and in other times providing the

02:21  7    second regulated voltage to the memory.  In other words, you

02:22  8    may have a switch, if you want to call it that, technically the

02:22  9    patent calls it a power supply selector that sometimes can

02:22  10   provide -- select the first regulated voltage to provide to the

02:22  11   memory and under other conditions provide the second regulated

02:22  12   voltage to the memory.  But the first regulated voltage always

02:22  13   goes to the processor.

02:22  14       So what does that do for you?  Well, according to the

02:22  15   patent, what it allows you to do is provide the same regulated

02:22  16   voltage to both the processor and the logic when that first

02:22  17   regulated voltage is fluctuating within the range that's

02:22  18   acceptable to both components.  In other words, the patent

02:22  19   provides for when the first regulated voltage is greater than

02:22  20   the memory's minimum operating voltage, then you provide that

02:22  21   first regulated voltage to both.

02:22  22       And then if that regulated voltage is being provided to

02:22  23   the processor falls below what the memory can handle, then you

02:23  24   switch over.  You flip the power supply selector over from the

02:23  25   first regulated voltage to the second regulated voltage.  And

02:23  1   so then at that point you'd be providing different voltage

02:23  2   supplies to each component, and that keeps them both within

02:23  3   their minimum operating range while simultaneously, according

02:23  4   to the patent, allowing the processor voltage to drop below

02:23  5   what's being provided to the memory.

02:23  6        So all that looks like is you've got slightly different

02:23  7   fluctuations.  You may have the processor voltage fluctuating

02:23  8   as the yellow line shows.  It's fluctuating within its wider

02:23  9   operating range, whereas the memory is fluctuating when it --

02:23  10  within its narrower operating range by sometimes sharing the

02:23  11  processor's voltage and sometimes getting its own voltage to

02:23  12  keep it above its own minimum.  And that's really the gist of

02:23  13  the '373 patent.

02:23  14       So we can move on to the Markman slides.  So picking up

02:23  15  where we left off, the question here is what is the definition

02:24  16  of this means plus function term in dependent Claim 14?  And

02:24  17  both parties agree that it is a means plus function term and it

02:24  18  should be construed according to 35 USC 112, Paragraph 6, and,

02:24  19  therefore, you need to define a function and a structure, and

02:24  20  as we've already heard, Intel does contend that's indefinite

02:24  21  and VLSI identifies a function and a structure which I will

02:24  22  address as we go along here.

02:24  23       And I think it's important as we dive into the meaning of

02:24  24  those to talk about where Claim 14 fits into the patent.  So

02:24  25  Claim 9 is an independent claim.  Claim 14 is a dependent claim

02:24  1    that depends from Claim 9.  And given the problems of Claim 14

02:24  2    that we're about to discuss, we were somewhat surprised that

02:25  3    Claim 14 was added to the case and is now being asserted, but

02:25  4    the heart of this dispute and the only disputed claims for this

02:25  5    entire patent is this dependent Claim 14.  Claim 9 is an

02:25  6    apparatus claim for an integrated circuit and it requires a

02:25  7    memory and it also requires some of these other things we've

02:25  8    been talking about, first voltage regulator, a second voltage

02:25  9    regulator and a power supply selector that selects between the

02:25  10   first and the second voltage regulators to provide one or the

02:25  11   other to the memory, and then 14 adds additional limitations to

02:25  12   the memory.  It says the memory of Claim 9 has to have these

02:25  13   additional requirements.

02:25  14       Now, the parties do agree, as I said, that this is a means

02:25  15   plus function term, and if it is a means plus function term, we

02:25  16   also agree that they have identified the function that is

02:25  17   recited in the claim.  So we don't quibble with the wording of

02:25  18   the function, but we do say that in context when you look at

02:26  19   Claims 9 and 14 together, Claim 14 no longer makes sense, and

02:26  20   that's what we're going to talk about.

02:26  21       So I think before we dive into why it doesn't make sense,

02:26  22   it might make -- looking at the claim, it might make sense to

02:26  23   talk about how it got that way because it explains a lot.  The

02:26  24   inventors didn't purposely draft Claim 14 to look the way it

02:26  25   did.  What happened was during prosecution the original claim

02:26  1    that then became Claim 9 looked a lot different than it does

02:26  2    today.  And when Claim -- the original Claim 11 which is now

02:26  3    Claim 9 was first drafted, it had very little in it.  All it

02:26  4    had was memory that uses an operating voltage wherein the

02:26  5    memory is characterized as having a minimum operating voltage.

02:26  6    So there's memory with minimum operating voltage and a memory

02:26  7    location that stores that minimum operating voltage, and then

02:26  8    it was a dependent claim, Claim 18 then, which is Claim 14 now,

02:27  9    that added this means for providing the operating voltage to

02:27  10   the memory.  And then as drafted, it had far fewer problems

02:27  11   than it does today, but what happened was the original patent

02:27  12   owner had to change that original claim to get it through the

02:27  13   Patent Office and they had to narrow it dramatically.  They had

02:27  14   to add four significant limitations to it in order to get that

02:27  15   claim.

02:27  16       So one of the things that the original patent owner had to

02:27  17   add was this very last limitation, the power supply selector

02:27  18   that was not in the original claim.  That power supply selector

02:27  19   does what we were talking about a moment ago.  That power

02:27  20   supply selector sometimes supplies the first regulated voltage

02:27  21   as the operating voltage when the first operating voltage is at

02:27  22   least the minimum operating voltage.  So if the first voltage

02:27  23   is high enough for the memory, then the first voltage that's

02:28  24   already being provided to the processor is going to go both

02:28  25   just like we talked about, but if that voltage falls too low,

02:28  1  then a second voltage is going to be provided to the memory.

02:28  2  So that's where it says, and supplies the second regulated

02:28  3  voltage as the operating voltage when the first voltage is

02:28  4  below the minimum operating voltage.  So they're two mutually

02:28  5  exclusive conditions.  The power supply selector is either

02:28  6  providing the first or the second regulated voltage to the

02:28  7  memory under different conditions that are kind of those two

02:28  8  halves makes the whole.  It's either providing one or the other

02:28  9  depending on the condition.

02:28  10     THE COURT:  It wasn't lost on us as we were looking at

02:28  11  this that maybe some things happened as the drafting was going

02:28  12  on and in these claims that in hindsight wasn't perfect.

02:28  13     MS SOOTER:  I think that's right, Your Honor, and,

02:28  14  unfortunately, and this is just a dependent claim and one of

02:28  15  many asserted claims in this patent and it is one that did get

02:29  16  rendered, we think, indefinite as part of that claim drafting

02:29  17  process, and, frankly, it's not the first time that we've seen

02:29  18  a dependent claim get a little lost in the shuffle or, frankly,

02:29  19  messed up in view of some amendments to an independent claim

02:29  20  throughout the prosecution of the patent and it's probably not

02:29  21  the last time we're going to see it either.  But what's

02:29  22  happened here is that the original owner of this patent went to

02:29  23  add that power supply selector to get this claim through the

02:29  24  Patent Office, but what it did was it didn't -- it neglected to

02:29  25  amend the dependent claim Claim 14 and so now what you have is

02:29  1   Claim 9 that already has a power supply selector and then Claim

02:29  2   14 that adds a means for providing the same operating voltage

02:29  3   to the same memory, and that's problematic.

02:29  4       And as you saw, we did cite to our expert's opinion

02:30  5   Dr. Dennis Sylvester from the University of Michigan who agreed

02:30  6   that the fact that the claim is requiring two separate sources

02:30  7   of voltage to provide the operating voltage to the memory is

02:30  8   nonsensical, especially in the context of this patent and Claim

02:30  9   9 and its existing requirements, and here we show a chart which

02:30  10  we also have in our briefing which really shows the two

02:30  11  requirements side by side.  You have Claim 9 that's already

02:30  12  providing the operating voltage to the memory, and the thing

02:30  13  that's doing that is a power supply selector and it's doing

02:30  14  that when the first regulated voltage is below the minimum

02:30  15  operating voltage.  And extremely similarly, Claim 14 also

02:30  16  requires that the operating voltage be provided to the memory,

02:30  17  but this time it calls the thing that's providing that a means

02:30  18  for providing the operating voltage to the memory, and it's

02:30  19  doing it in response to the operating value selected by the

02:31  20  processor being below the minimum operating voltage.  And we

02:31  21  can talk about the differences between those two conditional

02:31  22  statements, the when and the in response to, but they're very

02:31  23  similar because they're both conditioning the provision of the

02:31  24  second operating voltage as the operating voltage of the memory

02:31  25  when another voltage falls below the memory's minimum operating

02:31   1   voltage as the claim specifies.

02:31   2        And so that's one problem, and that's frankly enough, we

02:31   3   think, to say that this claim is indefinite because it now

02:31   4   requires these two somewhat conflicting but overlapping

02:31   5   structures to provide the same voltage to the same memory, but

02:31   6   also the claim requires in another nonsensical fashion that the

02:31   7   thing that's providing the voltage to the memory be in the

02:31   8   memory, and while I appreciate the analogies that VLSI is

02:31   9   making and they are superficially certainly easy to understand,

02:32   10   they're not technically accurate.  Obviously your car battery's

02:32   11   not providing a voltage to the car or you would shock yourself

02:32   12   when you got in.  It's providing the voltage to the engine just

02:32   13   like when you provide batteries in a flashlight, you're

02:32   14   actually providing voltage to the lightbulb, not the

02:32   15   flashlight.  Otherwise, you would shock yourself when you used

02:32   16   it, and that's the same problem -- that analogy is the same

02:32   17   problem that we have here with the voltage being in the memory

02:32   18   and being provided to the memory at the same time.

02:32   19        So, again, the fact that the function does not make sense

02:32   20   within the context of Claim 9 in view of the amendments to

02:32   21   Claim 9, that's enough to hold this claim indefinite, but,

02:32   22   further, because those aren't logical functions, there's no

02:32   23   structure disclosed in this patent that performs those

02:33   24   functions.  So neither one of the two things that we've just

02:33   25   described are actually -- neither two functions we described

02:33  1   are disclosed in the patent first of all.  There's no

02:33  2   embodiment that has both of those structures providing voltage

02:33  3   to the memory.  And, second of all, there's no embodiment where

02:33  4   there's a component within a memory providing voltage to the

02:33  5   memory.  And, finally, we don't believe that the structures

02:33  6   that VLSI has identified actually even perform the function

02:33  7   because no structure is clearly linked to this actual function

02:33  8   where the value, operating value is selected by the processor.

02:33  9       So I'll talk about each of those briefly.  We already

02:33  10  talked a little bit about the fact that you need -- that

02:33  11  there's no embodiment that provides two structures.  Instead --

02:33  12  that both provide the operating voltage to the memory.

02:33  13  Instead, the patent discusses a power supply selector.  It

02:33  14  never says that there's both a power supply selector as Claim 9

02:34  15  requires and another structure that also provides the voltage

02:34  16  to the memory when the first operating voltage falls below a

02:34  17  threshold.  There simply aren't two structures disclosed in the

02:34  18  specification in any configuration that both do that.

02:34  19      Second of all, we have this problem with the memory.  Now,

02:34  20  I guess the other thing I do want to point out with the problem

02:34  21  that there -- with the voltage being inside the memory and

02:34  22  being provided to the memory simultaneously, and this is

02:34  23  telling.  Dr. Sylvester offered an opinion in support of our

02:34  24  brief where he -- we talked to him about it of course and

02:34  25  vetted this with him and he said that it doesn't make sense

02:34  1  that you would provide a memory -- voltage to the memory and

02:34  2  also from the memory, but what I think is very telling is that

02:34  3  even though VLSI submitted three expert declarations from Dr.

02:34  4  Conte, Dr. Conte never contradicted that.  So this is something

02:34  5  that is attorney argument about the batteries and the

02:35  6  flashlights and the cars, but Dr. Conte never said otherwise,

02:35  7  and you would certainly expect that he would have in one of

02:35  8  those three declarations.

02:35  9       THE COURT:  Why don't you -- I'm going to interrupt you

02:35  10  just because I've -- that's an important point.  Let me hear

02:35  11  from opposing counsel on that specific point and then I'll let

02:35  12  you get back up just so I can stay focused on that one because

02:35  13  I think that's -- may be to me the key of what I want to do.

02:35  14       MR. SLUSARCZYK:  Can I just get some clarity specifically

02:35  15  on which point, Your Honor?

02:35  16       THE COURT:  The very last point she made with respect to

02:35  17  the fact that it was from and generated by both.  I'm sorry.

02:35  18  It was the power going to and also generated by.

02:35  19       MR. SLUSARCZYK:  So the claim talks about -- let's look at

02:35  20  the claim language to make sure we're on the same page.

02:35  21       THE COURT:  Okay.

02:35  22       MR. SLUSARCZYK:  So Claim 14, means for providing the

02:36  23  operating voltage to the memory.  So we're providing voltage to

02:36  24  the memory.  I think the analogy's about providing a voltage

02:36  25  that had to do with generation like a battery for instance.

02:36  1   The idea here is the battery's providing the voltage to the

02:36  2   structure that contains it.  It's -- you can argue about

02:36  3   whether a battery's actually generating anything or whether

02:36  4   it's simply providing energy that was generated at another

02:36  5   time, but the point we're trying to make here is that you can

02:36  6   provide a voltage to a structure from within the structure, and

02:36  7   the claim doesn't have anything to say about where that voltage

02:36  8   is coming from.  And I think if we read this in light of the

02:36  9   specification, it's very clear all of the structures of the

02:36  10  integrated circuit are getting their power from off of the

02:36  11  integrated circuit.  That's simply the way they work.  There's

02:36  12  no disclosure of any sort of power generation taking place on

02:36  13  the integrated circuit, and that would probably be a completely

02:37  14  different field of endeavor for this patent.

02:37  15      The providing a voltage can be done by many structures.

02:37  16  What the power supply selector and the other structures that we

02:37  17  have identified do is they may receive a voltage.  That's sort

02:37  18  of an antecedent outside the scope of this analysis kind of

02:37  19  thing.  They are providing the voltage by making the

02:37  20  determinations about which voltage is to be provided at what

02:37  21  time.

02:37  22      Does that address the point that the Court would like to

02:37  23  hear about?

02:37  24      THE COURT:  It does.  And does the charge pump -- what

02:37  25  does the charge pump do with respect to providing higher

02:37   1   voltages to memory?

02:37   2        MR. SLUSARCZYK:  I believe that's in Column 5.  The charge

02:37   3   pump is disclosed in connection with boosting the voltage of

02:37   4   VDDlogic when --

02:37   5        THE COURT:  So -- I'm sorry.  So it only increases it?

02:37   6        MR. SLUSARCZYK:  It will -- if VDDlogic falls below the

02:37   7   level of the minimum operating voltage, the charge pump, as I

02:37   8   understand it, will cause an increase in the voltage to make

02:38   9   sure that the memory is still receiving the minimum operating

02:38   10  voltage as recited in the function.

02:38   11       THE COURT:  And that's the function is to increase --

02:38   12  that's its function in this case?

02:38   13       MR. SLUSARCZYK:  Well, it's -- it's providing the voltage.

02:38   14  It's not merely increasing it.

02:38   15       THE COURT:  I get that, but I'm saying, it's not -- it

02:38   16  doesn't operate to decrease it?

02:38   17       MR. SLUSARCZYK:  No.  No.  The charge pump will not

02:38   18  decrease the function.

02:38   19       THE COURT:  That was my point.  Okay.  And I'm -- you

02:38   20  addressed the point I wanted and I'll let counsel for Intel

02:38   21  resume if she had other points.  And I appreciate her letting

02:38   22  me interrupt her.

02:38   23       MR. SLUSARCZYK:  Thank you.

02:38   24       MS SOOTER:  So I will say --

02:38   25       THE COURT:  And you can certainly respond to what was just

02:38    1    said.  That was sort of my reason for interrupting you so you

02:38    2    could -- we could focus on this one point.

02:38    3         MS SOOTER:  Sure.  Well, what I will say is this, just to

02:38    4    pick back up on that, you know, from the memory to the memory

02:39    5    point is that the patent actually is precise when it talks

02:39    6    about providing the voltage to what it's providing it to and

02:39    7    it's actually providing it to the memory array.  So it's kind

02:39    8    of like when I talk about the flashlight having a voltage

02:39    9    providing it actually to the lightbulb, not the flashlight

02:39   10    itself, when the power supply selector is inside the memory,

02:39   11    and I'll just point to it on Slide 16, the memory is 18.  When

02:39   12    the power supply selector is inside of it, it's providing a

02:39   13    voltage to the memory array.  So not to the memory.

02:39   14         There is an embodiment, and it says that over and over

02:39   15    again in the patent.  The citations are on Slide 16.  The

02:39   16    patent does disclose an embodiment where the power supply

02:39   17    selector is outside of the memory and in that -- this is a

02:39   18    modified version of Figure 1.  It's not actually a figure in

02:39   19    the patent, but we depicted it.  So we moved what the patent

02:39   20    says that it may be outside of the memory.  So we moved the

02:39   21    power supply selector outside.  We can see it's outside of this

02:40   22    memory box which was labeled 18, but then it's not in the

02:40   23    memory as the claim requires.  And so that's Slide 17.

02:40   24         And then to address the charge pump briefly, let me find

02:40   25    that slide that I have.

02:40   1   So as Mr. Slusarczyk mentioned, they do say that the

02:40   2   charge pump is one of the structures that can be a structure to

02:40   3   provide the function.  We disagree with that.  So there are a

02:40   4   couple of reasons for that.  First of all, there's only one

02:40   5   place in the entire patent where the charge pump is mentioned,

02:40   6   and that is on Column 5 at Lines 58 to 61.  So three total

02:41   7   lines.  And it says, in an alternate embodiment, VDDlogic may

02:41   8   be boosted during reads through the use of a charge pump where

02:41   9   this boosted VDDlogic is provided to a memory array 22 for

02:41   10  reads.  So it's just saying this is -- and a charge pump is

02:41   11  nothing more than a series of capacitors and switches that

02:41   12  store energy and then let it go when you want to boost a

02:41   13  charge, boost voltage, and you can let it go.  And what it's

02:41   14  saying -- to boost the voltage.  And what it's saying here is

02:41   15  that if you wanted to use a charge pump, you can use it to

02:41   16  boost the voltage during reads, but that's not the function

02:41   17  that we need to find the structure for.  So it's not a

02:41   18  structure that's clearly linked to the claimed function that we

02:41   19  both agree on.  The function is above.  The function that we

02:41   20  agree on is providing the operating voltage to the memory at a

02:41   21  value at least as great as the minimum operating voltage in

02:41   22  response to the operating voltage selected by the processor

02:42   23  being below the minimum operating voltage.  So in order to be a

02:42   24  structure here, it needs to be tied to that conditional check.

02:42   25  Did the voltage that was requested by the processor fall below

02:42  1    my threshold?  If it did, I'm going to switch over or boost the

02:42  2    voltage or whatever, but that's not what the charge pump in the

02:42  3    patent is doing.

02:42  4         There is one other structure that's on Column 8, and it is

02:42  5    the scalable voltage regulator.  And this one's a little bit

02:42  6    complicated, but what they're doing is they're pointing to No.

02:42  7    24 as a scalable voltage regulator and saying that that's a

02:42  8    structure that can provide the function in the claim.

02:42  9         And, Mr. Lee, if we could go to Claim 9 and if you could

02:42  10   bring up Claim 1 side by side.

02:43  11        So remember what we're talking about here is VLSI says

02:43  12   that the means plus function element within Claim 14 can be No.

02:43  13   24 -- according to the patent can be No. 24, Item 24.  So we're

02:43  14   going to look at --

02:43  15        Actually Figure 1.  Sorry.

02:43  16        We're going to look at what 24 in Figure 1 is.  So 24 is

02:43  17   actually this voltage regulator, the one that's always provided

02:43  18   to the processor.  That's the first regulated voltage.  It's

02:43  19   already being provided so that --

02:43  20        If you can scale back out again.

02:43  21        It's always being provided to the processor, but

02:43  22   sometimes -- and that's what Claim 9 says, a first voltage

02:43  23   regulator for supplying a first regulated voltage, and that's

02:43  24   what's being provided to the functional circuit.  And the

02:43  25   second voltage regulator is 26, and that's sometimes provided

02:44  1   to the power supply selector and other times the voltage -- the

02:44  2   first voltage from the first voltage regulator as being

02:44  3   provided.

02:44  4        So even though Claim 1 is pointing to these two as the

02:44  5   first and the second, now VLSI is trying to argue that the

02:44  6   second voltage -- the first voltage regulator can also be the

02:44  7   first voltage regulator and it just doesn't make sense when you

02:44  8   look at the fact that what they're pointing to is actually the

02:44  9   opposite of what the claim would require.  So we believe I

02:44  10  guess for all of those reasons that, first of all, given the

02:44  11  amendments to the claim during prosecution, the function no

02:44  12  longer makes sense, and because the function doesn't make

02:44  13  sense, there are no structures that perform that function

02:44  14  disclose, and for each of those separate reasons, the claim is

02:44  15  indefinite, but even if there were the -- of the three

02:45  16  structures that VLSI has identified, the first is essentially

02:45  17  just pointing to what Claim 9 already requires.  So that's by

02:45  18  default presumptively the wrong interpretation, because --

02:45  19        If you could go to Slide 24.

02:45  20        The law tells us that the separate naming of two

02:45  21  structures in a claim strongly implies that the named entities

02:45  22  are not one in the same structure.  So their first structure is

02:45  23  presumptively incorrect.

02:45  24        The second structure, the charge pump, doesn't perform the

02:45  25  right function as disclosed in the patent.

02:45   1        And the third actually contradicts its independent claim

02:45   2   Claim 9.

02:45   3        THE COURT:  Okay.  Anything else from VLSI?

02:45   4        MR. SLUSARCZYK:  Briefly.  Just to --

02:45   5        THE COURT:  Give me one second.

01:58   6        (Conference between the Court and Mr. Yi.)

02:46   7        THE COURT:  Go ahead, please.  Thank you.

02:46   8        MR. SLUSARCZYK:  First to respond to the discussion of the

02:46   9   amendment history of the claims.  It's pure speculation.

02:46   10  Absolutely no evidence has been offered.  Counsel used terms

02:46   11  like messed up, neglected to amend, even made the claim that

02:46   12  the inventors didn't intend for the claim to use the words that

02:46   13  it does today.  There's zero evidence for any of this.  The

02:46   14  U.S. Patent Office approved the claim and issued it and the

02:46   15  claim should be respected as it appears in the patent document.

02:46   16       Next counsel argued that two separate structures can't

02:46   17  provide a voltage to a memory, but as far as I can tell, the

02:46   18  only support for that, if it supports it, is the expert

02:46   19  declaration.  In fact, the charge pump example that we were

02:46   20  discussing, it could be viewed as two separate voltage sources

02:47   21  providing voltage to the memory because it's both VDDlogic

02:47   22  being provided by a voltage regulator as well as a charge pump

02:47   23  providing voltage.

02:47   24       THE COURT:  Where's the charge pump located?

02:47   25       MR. SLUSARCZYK:  I think one having ordinary skill in the

02:47  1    art could locate the charge pump in different locations.  I

02:47  2    think the requirement would be that the charge pump has to be

02:47  3    coupled to the conductor that's bringing the VDDlogic to the

02:47  4    memory, but it certainly could be part of the memory component,

02:47  5    whatever -- wherever we would draw at that particular boundary.

02:47  6        THE COURT:  So you're going to have to rely on your

02:47  7    experts to find a charge pump in the Intel products?  Is there

02:47  8    going to be a dispute over what the charge pump is between the

02:47  9    experts?

02:47  10       MR. SLUSARCZYK:  I'm not sure that we're pointing to a

02:47  11   charge pump at the moment.  And so that's unfortunately --

02:47  12       THE COURT:  Well, you guys want me to include charge pump

02:47  13   as one of the structures, right?

02:48  14       MR. SLUSARCZYK:  That's because the patent discloses it.

02:48  15   So we're going for correctness.  We're not simply including

02:48  16   those things that are convenient and then leaving out the

02:48  17   others.

02:48  18       THE COURT:  Okay.

02:48  19       MR. SLUSARCZYK:  Finally -- or perhaps not finally, but

02:48  20   getting to the end here, counsel argued that the power supply

02:48  21   selector of Claim 9 and the means of Claim 14 are, quote,

02:48  22   unquote, somewhat conflicting, but no conflict has actually

02:48  23   been identified, and in fact --

02:48  24       THE COURT:  Let me -- have you -- has Intel heard anything

02:48  25   they want to respond to so far?

02:48  1    MS SOOTER:  The one thing I would just state, Your Honor,

02:48  2  at the risk of saying something that I know you already know,

02:48  3  is that is that the means plus function case law it does

02:48  4  require that the structure be clearly linked to the claimed

02:48  5  function, and the charge pump clearly is not, and you can't

02:48  6  impute structure to the charge pump or a location to the charge

02:48  7  pump based on the ordinary skill in the art.  It has to be

02:49  8  disclosed in the specification.

02:49  9    THE COURT:  Okay.  Josh?

02:49  10    MR. SLUSARCZYK:  I would like to respond to that, but I

01:58  11  can wait.

01:58  12    (Conference between the Court and Mr. Yi.)

02:49  13    THE COURT:  I'm going to go ahead and I'm going to find

02:49  14  that the claim is not indefinite.  We're -- I'm going to

02:49  15  construe the structure as being a power supply selector and

02:49  16  only a power supply selector.

01:58  17    (Conference between the Court and Mr. Yi.)

02:49  18    THE COURT:  I'm sorry.  And equivalence thereof or

02:49  19  equivalence thereof.

02:49  20    MR. SLUSARCZYK:  Could I please briefly respond to the

02:50  21  point about the charge pump?  I think they're fairly important.

02:50  22    THE COURT:  It's not going to change my mind.

02:50  23    MR. SLUSARCZYK:  Okay.  So with the Court's permission,

02:50  24  I'll move on to '983 patent.

02:50  25    THE COURT:  That'd be great.

02:50  1          (Brief off-the-record discussion.)

02:50  2      THE COURT:  Actually, I'm being told we're going to take a

02:50  3  break.  And so -- by higher powers.  So why don't we resume --

02:50  4  how many claim terms do we have left?  Three?  Four?

02:50  5      MR. SLUSARCZYK:  Four.

02:50  6      THE COURT:  Four?  I think we're doing great.  And so why

02:50  7  don't we take a little bit of a long break and go 20 -- to have

02:50  8  a 20-minute break until 3:10 and then we will -- we'll finish

02:50  9  up with the remaining claim terms.

02:50  10      THE BAILIFF:  All rise.

02:50  11      (A break was taken from 2:50 to 3:17.)

03:17  12      THE BAILIFF:  All rise.

03:17  13      THE COURT:  Thank you.  You may be seated.

03:17  14      Who's next?

03:17  15      MR. SLUSARCZYK:  I'll take a few minutes to introduce the

03:17  16  '983 patent.

03:17  17      THE COURT:  Okay.  And I didn't mean to be impolite to you

03:17  18  earlier by not having you argue that, but we'd -- I think we

03:17  19  already pretty well decided that wasn't something we were going

03:17  20  to include and so I don't think it would be a good use of our

03:17  21  time for you to make that argument.  So...

03:17  22      MR. SLUSARCZYK:  And we have limited time and plenty to

03:17  23  get through.

03:17  24      THE COURT:  Well, we don't -- really we have unlimited

03:17  25  time for you guys.  It's just I'm skeptical it would change my

03:18    1    mind.

03:18    2         MR. SLUSARCZYK:  Appreciate that.  Thank you.

03:18    3         So the '983 patent, the title is sequential ordering of

03:18    4    transactions in digital systems with multiple requestors, and I

03:18    5    promise when I finish my tutorial in a few minutes, that will

03:18    6    make sense.

03:18    7         Computer systems typically have a processor and we've

03:18    8    discussed that already in context with the last patent.  They

03:18    9    also usually have a number of peripherals like keyboards, audio

03:18   10    controllers, display controllers and so forth.  And I've

03:18   11    colored those here in blue in Figure 4 of a patent which shows

03:18   12    one of the exemplary embodiments.

03:18   13         We don't usually think of the processor and the peripheral

03:18   14    as peers.  They perform -- generally we think of them as doing

03:18   15    different things, but for purposes of this patent, they are all

03:18   16    peers in the sense that all of these devices operate on data.

03:18   17    They do work with data.  So the processor will perform

03:18   18    computations of all sorts.  And the peripherals will do things

03:18   19    with the data.  So just displayed on your computer screen or in

03:19   20    the case of the audio controller, you have a microphone, for

03:19   21    instance, that is an analog input signal as being transmitted

03:19   22    into ones in -- transformed into ones and zeros and out of the

03:19   23    speaker it's the opposite where a string of ones and zeros is

03:19   24    being transmitted or transformed into an analog audio signal.

03:19   25         The digital data, the ones in the zeros, are typically

03:19   1   stored in memory or in some other resource, and that other

03:19   2   resource can be on the computer.  It could be a disk drive.  I

03:19   3   won't focus on that for the remainder of my presentation

03:19   4   because typically the component of most concern that actually

03:19   5   holds the data is the system memory.

03:19   6       And, now, because of the way computers are structured,

03:19   7   typically these peripherals and the memory are in different

03:19   8   parts of the system.  They may be situated inches from one

03:19   9   another or even closer, but in terms of everything that is

03:19  10   between them in that computer sense, there's quite a bit going

03:20  11   on.  And so for -- in order for these peripherals and the

03:20  12   processor to access the data and the memory, the computer

03:20  13   provides something called a bus system.  Here it's labeled Bus

03:20  14   310 or network of Buses 310.  The analogy only gets you so far,

03:20  15   but for purposes of this tutorial, we can actually think of the

03:20  16   bus system as an actual bus as something that shuttles things

03:20  17   back and forth.

03:20  18       THE COURT:  I actually had a bunch of cases.  I -- on this

03:20  19   stuff.  I'm pretty familiar with this technology.

03:20  20       MR. SLUSARCZYK:  Excellent.

03:20  21       And so the specific thing that's being transmitted across

03:20  22   the bus here is requests and responses.  The requests typically

03:20  23   come from the processor and the peripherals, and there are

03:20  24   things like read or write to memory.  That's why they're called

03:20  25   the requestors in this context.

03:20  1    The other thing that travels over typically is the

03:20  2    responses from the memory.  And so if you have a read request,

03:20  3    the response will typically contain the data that has been

03:20  4    read.

03:20  5    So going back to the title sequential ordering of

03:21  6    transactions in digital systems with multiple requestors, the

03:21  7    final piece is the sequential ordering piece.  When you have a

03:21  8    lot of data traveling over the bus system because you have a

03:21  9    number of peripherals, for instance, the order in which the

03:21  10   requests and the responses are processed and the order in which

03:21  11   they are sent can make a difference.  The classic example we

03:21  12   usually give is if you have a write followed by a read, you

03:21  13   expect that read to give back to you what you just wrote.  If

03:21  14   those requests were processed in reverse order, you might have

03:21  15   unexpected behavior because you'll read back something that

03:21  16   you -- something other than what you just wrote, and that could

03:21  17   lead to all sorts of buggy behavior.

03:21  18   As I did with the previous patent, I'll respond very

03:21  19   quickly to a couple of points in Intel's tutorial.  The first

03:21  20   is Intel's slide -- I believe -- it looks like it's Slide 14.

03:21  21   It makes the claim that the patent proposes allowing the

03:22  22   requestors to dictate the order in which the access requests

03:22  23   are performed, and that's not exactly correct.  The claim says

03:22  24   that the requestors provide an indication of an order.  That's

03:22  25   a little bit different than dictating the actual order.

03:22  1        Likewise, that order, although Intel says that you have

03:22  2   the requestors dictate the order rather than the policies

03:22  3   implemented in the bus network, but the order indicated in the

03:22  4   embodiments can at least in part be implemented by reference to

03:22  5   policies from the bus network.  For instance, here we have a

03:22  6   quote from the patent talking about some embodiments.  In some

03:22  7   embodiments it says, multiple requests having the same thread

03:22  8   ID value may be performed in any order as long as they are

03:22  9   performed subsequent to transactions having a lower or higher

03:22  10  thread ID value.  And so that thread ID value in this

03:22  11  embodiment gives you an indication of an order, but it does say

03:22  12  that in some circumstances they can be performed in any order,

03:22  13  and in that situation the bus can easily apply its own policies

03:22  14  to figure out what the best order can be.

03:23  15       So the term we're looking at today is an indication of

03:23  16  a/the specified order and it appears in every independent claim

03:23  17  of the '983 patent.

03:23  18       I've highlighted in Claim 1 but we're going to be looking

03:23  19  at it in context, and it starts up here with the wherein

03:23  20  clause.  It's, wherein each access request includes an

03:23  21  indication of whether or not this occurrence of the access

03:23  22  request is to be performed in a sequential order among other

03:23  23  occurrences of the request, and, if so, an indication of a

03:23  24  specified order.

03:23  25       VLSI's proposal here is plain and ordinary meaning, and

03:23   1   I'll explain a little bit how we arrived at that proposal in

03:23   2   the coming minutes.  Intel's proposal is that this should be

03:23   3   construed as a second, different indication that indicates

03:23   4   a/the specified order.  And so I'll focus on some of the

03:23   5   problems that we perceive with Intel's proposal.

03:23   6       As an initial matter, Intel is unclear about whether it's

03:24   7   proposing something with a different scope than what the plain

03:24   8   and ordinary meaning language is or not.  Intel certainly

03:24   9   claims that the plain claim language supports Intel's

03:24   10  construction, and you would think from reading the briefing

03:24   11  that Intel is simply attempting to offer what it thinks is a

03:24   12  better version of that plain claim language.  And, in fact,

03:24   13  it's providing that claim language.  Here I've created a table

03:24   14  to sort of show what the -- what the difference is between

03:24   15  Intel's proposal and the actual claim term.  And I think a

03:24   16  salient -- part of this analysis is that Intel isn't clarifying

03:24   17  any technical words.  They don't appear to be contending that

03:24   18  there are any terms of art that need definition.  For example,

03:24   19  the word "indication," which could arguably be seen as a

03:24   20  technical term, is simply repeated in Intel's construction as

03:24   21  is the specified order.  What Intel has done here is reordered

03:24   22  some of the orders, perhaps rewritten a few of them and added

03:25   23  the phrase "second, different."

03:25   24      We already saw I think this quote earlier today, and when

03:25   25  you have a situation like this where the parties aren't really

03:25   1   disputing the plain meaning, it certainly seems like Intel

03:25   2   isn't proposing to clarify or change anything other than adding

03:25   3   these words which I'll get to in a minute.  It seems to support

03:25   4   a plain and ordinary construction of the term.

03:25   5       What we do take issue with is the changes that Intel is

03:25   6   proposing to make to the claim term.  First of all, they're

03:25   7   adding this second, different language, and, second of all,

03:25   8   they're crossing out of and turning that into that indicates,

03:25   9   and both of these changes potentially alter the meaning of the

03:25   10  claim.  And we haven't heard from Intel what the import of

03:25   11  those changes would actually be.

03:25   12      So one indicator here -- and excuse the pun -- is one

03:25   13  indicator that Intel's construction is incorrect here is it

03:26   14  cuts out a large number of embodiments.  So I'll cover one

03:26   15  example here which is the patent talks about embodiments where

03:26   16  a transaction ordering signals are the mechanism through which

03:26   17  you provide the claimed indication.  And it tells you -- and

03:26   18  this is Column 6 starting at Line 35 -- that any one or any two

03:26   19  of those transaction ordering signals can be omitted.  And in

03:26   20  particular there's three of these different signals.  There's

03:26   21  the thread ID signals, number one.  There's a sequence number

03:26   22  signals, number two, and the last-in-thread signal, number

03:26   23  three.  So effectively the patent says you can have all three,

03:26   24  but you can also have all one and that's still an embodiment of

03:26   25  the invention.

03:26    1        So we'll focus on the one where we are just looking at --

03:26    2    focus on embodiment where two are omitted.  So we only have one

03:26    3    mechanism for providing the claimed indication.  And it says,

03:26    4    if sequence No. Signal 372 is the only transaction ordering

03:27    5    signal used, then a value of zero is used to indicate an

03:27    6    unordered transaction and requests with non zero sequence

03:27    7    numbers are performed subsequent to transactions having a

03:27    8    sequence number that is lower in value.

03:27    9        So it's a very simple example of how we can use one

03:27   10    mechanism to provide the indications that are recited in the

03:27   11    claim, right?  And it's -- this is an optimization that

03:27   12    engineers make all the time.  You can use a zero value to

03:27   13    indicate that something's not present, and if it's non zero,

03:27   14    that further information, whatever the value is gives you some

03:27   15    quantity that is then useful, given that something is present.

03:27   16        Now, Intel hasn't told us what second or different in its

03:27   17    proposed construction actually means, but it certainly seems

03:27   18    like Intel is trying to cut these embodiments out of the scope

03:27   19    of the claims because it isn't clear whether if you have one

03:27   20    mechanism that's providing an indication of whether ordering is

03:27   21    present then providing an indication of the actual ordering --

03:27   22    I'm paraphrasing the claim here.  Is that a second and

03:28   23    different indication?  Intel has not answered that question.

03:28   24        Intel looks to the prosecution history in order to justify

03:28   25    the language.  As an initial matter, I'll throw out a

03:28  1   proposition that I don't think is controversial which is we

03:28  2   can't just go into the prosecution history and pull out any

03:28  3   word and stick it into the claims under the guise of the

03:28  4   applicant said it and therefore it should be appended to the

03:28  5   claim.  That of course is not how this process works.

03:28  6       Intel makes the argument that the applicant in

03:28  7   distinguishing a prior art reference called Weber made an

03:28  8   argument that Weber didn't correspond to the claim language

03:28  9   that was pending at the time because Weber didn't have two

03:28  10  different indications.  Well, of course these statements have

03:28  11  to be right in context and we can't just throw out the Weber

03:28  12  reference and pretend like the second and different language

03:29  13  was meant as an all purpose redefinition of the claim.

03:29  14      When we look into what actually was argued, the examiner

03:29  15  for most of the prosecution period was unclear as to what in

03:29  16  Weber actually corresponded allegedly to the claimed indication

03:29  17  term.  And so the applicant's, in trying to get further

03:29  18  clarity, repeatedly said, you have to look at all of the claim

03:29  19  language.  It says indication twice.  You've only accounted for

03:29  20  one of them.

03:29  21      In arguing that there's a second and different indication,

03:29  22  the applicant was just talking about the claim language as an

03:29  23  object.  They weren't trying to redefine the scope of the term.

03:29  24  They certainly weren't commenting on the meaning of any given

03:29  25  indication.  They were just saying, look, examiner.  Can you

03:29  1    please give us your theory?

03:29  2        Finally, on appeal the examiner clarified.  As it turns

03:29  3    out that what -- the thing in Weber the examiner was pointing

03:30  4    to was a single bit, and so the applicant said, look.  However

03:30  5    you -- however you slice this, there's a single bit.  It can't

03:30  6    give you more than a single piece of information by definition.

03:30  7    It's a zero or a one.  And so that might tell you whether

03:30  8    ordering is present, but it certainly doesn't tell you what the

03:30  9    ordering is because once you've accounted for is there an

03:30  10   ordering or not and you've exhausted the informational content

03:30  11   of that bit.

03:30  12       The single bit example of Weber, this is -- you know, it's

03:30  13   a rain drop in the ocean.  Intel is taking this language and

03:30  14   attempting to drain the entire ocean with it by saying that the

03:30  15   applicant made a statement that completely redefined the scope

03:30  16   of the claim.  Certainly there's nothing in the prosecution

03:30  17   history --

03:30  18       THE COURT:  That was a great line.

03:30  19       MR. SLUSARCZYK:  Thank you.

03:30  20       THE COURT:  Who wrote that line?

03:30  21       MR. SLUSARCZYK:  I wrote it as I was scribbling on my

03:30  22   notes today.

03:30  23       THE COURT:  That was just a great line.

03:30  24       MR. SLUSARCZYK:  I hope it made my point.

03:31  25       THE COURT:  A little hyperbolic but great.

03:31  1      MR. SLUSARCZYK:  I hope it made my point.  I think

03:31  2  hyperbole is slightly in order because there's such a disparity

03:31  3  between what was actually said and the meaning that's being

03:31  4  ascribed to it and the argument.

03:31  5      Black letter law says that a disclaimer of the sort that

03:31  6  Intel is seeking here has to be clear and unambiguous.  If

03:31  7  there's ambiguity whatsoever, you do not find disclaimer on

03:31  8  this record with extremely limited statements that were made by

03:31  9  the applicant.  It would simply be an inappropriate thing to

03:31  10  take the words "second" and "different" and splice them into

03:31  11  the claim without consideration of the completely different

03:31  12  context in which those words might be applied in the future.

03:31  13      If the Court has no questions, --

03:31  14      THE COURT:  I don't.

03:31  15      MR. SLUSARCZYK:  -- that concludes my presentation.  Thank

03:31  16  you.

03:31  17      THE COURT:  I have great anticipation that your

03:31  18  rebuttal -- you have to have another great line.

03:32  19      (Laughter.)

03:32  20      MR. MUELLER:  I'll work on it, Your Honor.  Thank you.

03:32  21      Your Honor, I think I can dispose of the tech tutorial and

03:32  22  move right to the Markman issues.

03:32  23      THE COURT:  You can.

03:32  24      MR. MUELLER:  Thank you.

03:32  25      So, Mr. Lee, if you can pull up the Markman slides.

03:32  1    The first is the title of the patent is important, and I'm
03:32  2  going to come back to the exact reason why, but, Your Honor, as
03:32  3  you heard, it's sequential ordering of transactions in digital
03:32  4  systems with multiple requestors.  And different techniques for
03:32  5  accomplishing that goal, the sequential ordering of
03:32  6  transactions in digital systems with multiple requestors.
03:32  7    And the term at issue is an indication of the specified
03:32  8  order.  And, Your Honor, our argument for this claim term has
03:33  9  two prongs, but at bottom amounts to the plain meaning of the
03:33  10 claim terms.  Now, we do think the prosecution history confirms
03:33  11 that plain meaning, but we think the language of the claim
03:33  12 itself is dispositive as well, and if I may approach the
03:33  13 screen, Your Honor.
03:33  14    We have here in the third limitation down, wherein each
03:33  15 access request includes -- and here's the first indication --
03:33  16 an indication of whether or not this occurrence of the access
03:33  17 request is to be performed in a sequential order.  So the first
03:33  18 indication that's recited in the claim is whether there will be
03:33  19 ordering at all.  And if there were -- if the answer is no,
03:33  20 that's the end of the analysis for purposes of sequential
03:33  21 order.  If there's no ordering by definition, there will be no
03:33  22 sequential ordering.
03:33  23    Then the claim continues.  It says, whether or not this
03:33  24 occurrence of the access request is to be performed in a
03:33  25 sequential order among other occurrences of the access request

03:33  1    and, if so, an indication of a specified order, and that's the

03:34  2    second indication.  So if the first one is present, if there's

03:34  3    to be an ordering, then we look to the second indication to see

03:34  4    what the order should be.  So the claim itself recites two

03:34  5    different indications.  Not just one.  It recites two different

03:34  6    indications.  And we know that in part because of the

03:34  7    conditionality.  The second indication is contingent on the

03:34  8    first.  If there's no ordering at all, there will not be a

03:34  9    second indication.  If there is ordering, then there will be a

03:34  10   second indication, and the second indication will give us the

03:34  11   specified order.  So that's what the claim says.

03:34  12       Same is true in Claim 11.  It's a little bit different

03:34  13   wording but the same concept.  It first recites an indication

03:34  14   of whether or not this occurrence of the access request has a

03:34  15   specified order.  That's the threshold indication.  And then it

03:34  16   goes on to recite, in a separate limitation, an indication of

03:34  17   the specified order in those occurrences of the access requests

03:35  18   that are ordered.  So again we have conditionality.  We have

03:35  19   two indications where the second one is contingent upon the

03:35  20   first.

03:35  21       And our construction is just that, that the second

03:35  22   indication -- so the second instance in which the word

03:35  23   "indication" is used -- refers to a second different indication

03:35  24   of the specified order.  We don't use the word "dictate."  We

03:35  25   say a second different indication of the specified order, and

03:35  1   that is the plain and ordinary meaning if you -- given the

03:35  2   language of the claim, the grammar of the claim, the disclosure

03:35  3   in the specification and the prosecution history, and plain

03:35  4   meaning is to be judged by a person of ordinary skill reading

03:35  5   all of that intrinsic evidence, and reading all that intrinsic

03:35  6   evidence, that is what the plain and ordinary meaning is.  The

03:35  7   second indication recited in these claims is a second

03:35  8   indication different from the first, conditional on the first

03:35  9   contingent on the first but different than the first.

03:35  10      And so that's the dispute, Your Honor.  The dispute is

03:36  11   whether the claims require two different indications or a

03:36  12   single indication.  The claim language, as I just walked

03:36  13   through, we believe confirms our construction.  Each

03:36  14   independent claim requires two separate and distinct

03:36  15   indications in the access request, each of which must include

03:36  16   different information.  The first one is the threshold

03:36  17   indication which indicates whether or not we have ordering.

03:36  18   And the second is if you have ordering, the specific order.

03:36  19   Two different indications.

03:36  20      And the statements during prosecution, Your Honor, also

03:36  21   confirm this construction.  I'm now at Slide 5 and this is a

03:36  22   quote from an appeal brief that the applicants filed after the

03:36  23   claims were finally rejected by the examiner.  And they stated

03:36  24   in that brief that appellant's claimed invention includes two

03:36  25   different indications, each of which are provided by the access

03:36   1   request.  A first indication is related to whether the access

03:37   2   request is to be performed in a sequential order among other

03:37   3   occurrences of the access request.  A second indication is used

03:37   4   conditionally relative to the first indication and is related

03:37   5   to an indication of a specified order.

03:37   6       Now, that's exactly what I just said, Your Honor, that

03:37   7   there's two different indications.  The first one is

03:37   8   conditional on -- the second one's conditional on the first,

03:37   9   but they're two different ones, and our construction reflects

03:37   10  exactly what they said to the Patent Office.  Your Honor, they

03:37   11  could have said, we are claiming one thing that serves two

03:37   12  different purposes.  That's not what they said.  They said the

03:37   13  invention is two different indications, each of which are

03:37   14  provided by the access request and then distinguished among

03:37   15  those two and made clear how one is conditional on the other.

03:37   16      Now, they also said the Weber reference does not teach

03:37   17  that access request contain these two different indications.

03:38   18  The examiner has not provided any specific indication as to

03:38   19  what is, went on to explain they did disagree with the

03:38   20  examiner's conclusion as to whether those two different

03:38   21  indications were met.  But they were distinguishing the Weber

03:38   22  reference -- I'm going to be coming back to the Weber reference

03:38   23  in a bit -- on the basis that it lacked the two different

03:38   24  indications and that the claims required those two different

03:38   25  indications.

03:38  1    Now, you did hear that there's multiple embodiments in the

03:38  2    specification, and that's true.   There are multiple embodiments

03:38  3    in the specification, but with respect to this term

03:38  4    "indications" and how the claims were actually drafted, the

03:38  5    plain meaning of those claims and how they were explained to

03:38  6    the patent examiner, what they claimed is two different

03:38  7    indications.   There are embodiments in the patent that have

03:38  8    exactly that, and in particular there are embodiments that use

03:38  9    a thread signal and a sequence number.   Those are labeled I

03:38  10   think with the 370 and 372 in the specification as two

03:39  11   different things that serve those two different functions.   The

03:39  12   thread signal served to indicate whether ordering would be

03:39  13   present at all, and the sequence number indicated the specific

03:39  14   ordering where there was an order.   So there is a claimed

03:39  15   embodiment covered by these claims, Your Honor.

03:39  16       THE COURT:   Well, then let's turn to Paragraph -- I'm

03:39  17   sorry -- Column 6, Line 64 if you can.

03:39  18       MR. MUELLER:   Sure.

03:39  19       Mr. Lee, can you bring that up, please?

03:39  20       THE COURT:   And that reads, if sequence number signal 372,

03:39  21   which you were just discussing, is the only transaction

03:39  22   ordering signal used, then a value of zero is used -- there's

03:39  23   probably a word "to" that was left out -- to indicate an

03:39  24   unordered transaction.   Requests with non zero sequence numbers

03:39  25   are performed subsequent to transactions having a sequence

03:39   1   number that is lower in value.

03:39   2        So doesn't that -- how does that square with what you just

03:40   3   said?

03:40   4        MR. MUELLER:  That is an embodiment, Your Honor, and as I

03:40   5   said, there are multiple embodiments.  That embodiment is not

03:40   6   claimed.  It's in the specification, to be sure.  That is a

03:40   7   signal data -- signal piece of information as opposed to

03:40   8   multiple, but that's not what they claimed.  So it is

03:40   9   absolutely their case that that's in the patent.  It's not

03:40   10  covered by the claims under the plain meaning or as illuminated

03:40   11  during their discussion with the examiner.

03:40   12       And if I go back to the deck -- unless Your Honor has

03:40   13  further questions on that.

03:40   14       THE COURT:  I'm going to ask VLSI to respond to that

03:40   15  argument, but nothing else for you.

03:40   16       MR. MUELLER:  Sure.  So the applicant's repeated assertion

03:40   17  during prosecution that the claims require two different

03:40   18  indications is directly relevant to the plain meaning.  So I --

03:40   19  we're not here to argue, Your Honor, that there's a superficial

03:40   20  meaning of the claim that would be broader and they have

03:40   21  disclaimed for this particular term.  The plain meaning is

03:40   22  identical to what they explained to the examiner.  So both as a

03:40   23  matter of the grammar of the claim but also the plain meaning,

03:41   24  when understood in light of the full intrinsic record,

03:41   25  including the back and forth with the examiner, it's the same.

03:41   1    And if there -- if there were a broader meaning, it would

03:41   2    operate as a disclaimer, but again we think the meaning in the

03:41   3    plain -- the meaning in the grammar of the claims itself is

03:41   4    plain and consistent with our position.

03:41   5        So if we could go to VLSI's argument.  This is the single

03:41   6    drop of water in the ocean argument, I believe, Your Honor.

03:41   7    And I want to show you if I could that we're not trying to

03:41   8    drain the ocean.  We're trying to swim in it, whatever is the

03:41   9    right term to give full respect to what is there.  We want to

03:41   10   show you exactly what they said and what they were arguing

03:41   11   against at the time of the prosecution.

03:41   12       So let's pull up the Weber reference itself.  And

03:42   13   remember, if we could, the title of this patent talks about

03:42   14   sequential ordering.  Okay.  So sequential ordering.  And the

03:42   15   question on the table is, do they need one indication or more

03:42   16   than one indication within the meaning of the claims?  Can the

03:42   17   claims be met and should the claims be construed to embrace a

03:42   18   single indication or do they need more than one indication as

03:42   19   claimed?

03:42   20       And, Your Honor, this is the Weber reference.  This is

03:42   21   what was at stake before the examiner and on appeal.  It's a

03:42   22   U.S. patent and it's titled various methods and apparatuses for

03:42   23   arbitration among blocks of functionality.  And it also deals

03:42   24   with arbitrating among multiple respects -- requests for access

03:42   25   to common resources.

03:42  1      And, Mr. Lee, if we could go to Figure 8, please.

03:42  2      Your Honor, this is Figure 8, and these various branches

03:42  3  are branches that are containing flows of requests from

03:43  4  different processors seeking access to common resources.  So we

03:43  5  have Branch 0, Branch 1 and Branch 2 and then various requests

03:43  6  being made over time.  The question is, how do you sequence

03:43  7  among those requests and create order among them?  And I think

03:43  8  what you heard is that what was at issue in the Weber reference

03:43  9  was a bit that might tell you at most whether there was

03:43  10  ordering but not what the order would be.  Not the actual order

03:43  11  itself.  So that was the argument that was put to Your Honor, I

03:43  12  believe.  And I want to test that by looking at the actual

03:43  13  language of Weber, and if we go to Column 8, Lines 13 to 27.

03:43  14      So this is Figure -- a description in the text of Figure

03:43  15  8, Your Honor.  The figure we just looked at.  And this states:

03:43  16  Figure 8 illustrates the same transactions from the first

03:43  17  Branch 802 which includes Transaction A0, A1 and A2 from the

03:43  18  second Branch 804 Transactions B0 and B1 and from the third

03:44  19  Branch 808 transactions C0 and C1.  So just a pause there.

03:44  20  This is in text terms describing three streams of transaction

03:44  21  requests for these common resources.  Then it continues:  And

03:44  22  the same first global group of transactions 836 is formed,

03:44  23  however.  The sequential order of how the shared resources

03:44  24  sequentially processes and receives these transactions to

03:44  25  service these transactions has been altered.  So we already

03:44  1   have a cue here that we're talking about the exact same thing

03:44  2   as the '983 patent.  It uses the term "sequential order," the

03:44  3   same term found in the title of the '983 patent.

03:44  4       Then it continues:  The field configurable component

03:44  5   upstream of the arbitration controller has attached a locking

03:44  6   indication 844, locking indication.  So we don't have to guess

03:45  7   at whether this patent was teaching us an indication of a

03:45  8   specified order.  It actually tells us it uses the term

03:45  9   "indication," singular.  Singular indication.

03:45  10  And then it goes on to say:  On Transactions A0 and A1 to

03:45  11  ensure that the shared resource services, these indicated

03:45  12  transactions sequentially.  Thus, the order within the first

03:45  13  group of transactions 836 to be serviced starts off with A0 and

03:45  14  then is followed by A1 and then sequentially B0 and lastly C0.

03:45  15      So the indication that was at issue in that patent taught

03:45  16  on its face a sequential order.  It doesn't just say whether

03:45  17  there should be ordering.  It teaches us precisely what the

03:45  18  sequence should be and enumerates it in this paragraph.

03:45  19      So this is the drop of water, Your Honor.  The patent

03:45  20  itself uses the term "indication."  It teaches using an

03:46  21  indication to arrive at a sequential order.  So it teaches both

03:46  22  ordering and the sequence in which that order should take

03:46  23  place.  It is far from a drop of water.  It is a very fulsome

03:46  24  statement as to what would happen in the Weber reference.

03:46  25      And in reaction to that Weber reference to overcome that

03:46  1   Weber reference, if we could go back to Slide 11, Mr. Lee, what
03:46  2   they said in their appeal of the examiner's decision is, the
03:46  3   examiner's analysis is improper as it conveniently ignores the
03:46  4   claim language supporting the second indication.  The claim
03:46  5   language immediately following the examiner's selected expert
03:46  6   is, and if so, an indication of a specified order.  Thus, the
03:46  7   claim language explicitly recites a first indication of whether
03:46  8   to perform in a sequential order and a second indication of the
03:46  9   specified order.  The examiner's interpretation improperly
03:46  10  ignores claim limitations directed towards two different
03:47  11  indications.

03:47  12      So what we have in front of us, Your Honor, this is the
03:47  13  record.  The Weber reference when we actually look at it and
03:47  14  actually examine the text of the specification, the figures
03:47  15  that were being described on its face use the term "indication"
03:47  16  and taught how that indication would be used not only, not only
03:47  17  to indicate whether there was ordering but how to have the
03:47  18  sequential order set, what the precise elements would be and
03:47  19  what order they would be transacted.

03:47  20      And against or in the face of that prior art, what they
03:47  21  told the Patent Office is, no.  We're different.  Our claim
03:47  22  limitations are directed towards two different indications.
03:47  23  And that, Your Honor, is exactly what we're asking for Your
03:47  24  Honor to construe the claim to mean.

03:47  25      Mr. Lee, if you could return to the claim construction.

03:48   1   Next slide, Mr. Lee.  I'm sorry.

03:48   2       All we are asking, Your Honor, is that they be held to

03:48   3   precisely what the plain meaning is, precisely what they told

03:48   4   the Patent Office in the face of the Weber reference.  The

03:48   5   second indication is a second different indication.

03:48   6       Thank you, Your Honor.

03:48   7       MR. SLUSARCZYK:  So I'll respond to a number of points

03:48   8   that Mr. Mueller made.  First, it sounds like Intel's not

03:48   9   making a disclaimer argument.  What I heard from Mr. Mueller is

03:48  10   that Intel is arguing that its proposed construction is simply

03:48  11   the plain and ordinary meaning and they're going to the

03:48  12   prosecution history in order to, quote, unquote, confirm that

03:48  13   plain and ordinary meaning.

03:49  14       THE COURT:  That's the way I heard it.

03:49  15       MR. SLUSARCZYK:  Thank you.

03:49  16       The plain and ordinary meaning that they're proposing

03:49  17   violates black letter law which very clearly says that the use

03:49  18   of two terms in a claim term requires that they connote

03:49  19   different meanings, not that they necessarily refer to two

03:49  20   different structures.  There's no dispute about what the claim

03:49  21   language that actually appears in the patent says.  It uses the

03:49  22   word "indication" twice and it ascribes different functions to

03:49  23   those indications.  We don't dispute that.

03:49  24       What concerns us about Intel's proposed construction is

03:49  25   that the use of the word "second" and "different" seem to put

03:49  1   this black letter law to bed and avoids its application to

03:49  2   this -- these particular claims.  That's improper.  No reason

03:49  3   has been given for why that should be done.

03:49  4       Next Mr. Mueller brought up a number of excerpts from

03:49  5   Weber and a number of excerpts from the prosecution history to

03:49  6   the extent that Intel is in fact relying on the prosecution

03:50  7   history to narrow the scope of the claims.  And I think what

03:50  8   matters for the analysis is the arguments that were actually

03:50  9   made by the applicant and the positions that were actually

03:50  10  taken by the examiner.  There's no dispute that the examiner

03:50  11  pointed to a single bit in Weber.  In fact, I'm going to read

03:50  12  from Page 21 of Intel's opening brief which is DI82, and Intel

03:50  13  states:  During prosecution, the examiner repeatedly rejected

03:50  14  the claims as anticipated by a patent (Weber) disclosing a

03:50  15  single bit that the examiner initially treated as satisfying

03:50  16  both claimed indications.

03:50  17      Again, the applicant's statements about a second and

03:50  18  different indication were simply meant to orient the examiner

03:50  19  and later the appeals panel to the actual claim language

03:50  20  because it appeared that the examiner was disregarding at least

03:50  21  half of it.

03:50  22      To the extent Mr. Mueller was relying on portions of Weber

03:51  23  to inform how the claim term should be read, that seems more

03:51  24  like a prior art Section 103 and 102 argument that Intel will

03:51  25  have an opportunity to make in the future, but for the record

03:51  1    I'll note that the Federal Circuit panel -- or excuse me -- the

03:51  2    Board of Patent Appeals and Interferences Panel that reviewed

03:51  3    the appeal from the examiner ultimately found that Weber didn't

03:51  4    disclose any of the recited indications.

03:51  5         Thank you.

03:51  6         MR. MUELLER:  May I briefly, Your Honor?

03:51  7         THE COURT:  Sure.

03:51  8         MR. MUELLER:  So first, Your Honor, we did say that it was

03:51  9    a single bit at issue in Weber.  That's -- nothing I said is

03:51  10   inconsistent with that.  That single bit was being used in

03:51  11   Weber to perform these functions, and the way they overcame the

03:51  12   Weber reference is to say, we're different.  We have claimed

03:51  13   this in a way that has two different indications.

03:51  14        And if we could, Mr. Lee, go up to Slide 11 one more time.

03:51  15        Again, this is what they said.  They said two different

03:51  16   indications.  The claim limitations are directed towards two

03:51  17   different indications.  So there's no doubt that Weber taught

03:52  18   an indication.  It used that term.  There's no doubt that it

03:52  19   taught indication for specified ordering.  I don't think you

03:52  20   heard any different just now.  The distinction they drew, as I

03:52  21   said, well, we're different.  We use these two different

03:52  22   indications, not a singular indication, and our position now is

03:52  23   they should be held to exactly what they said is consistent

03:52  24   with the plain meaning.

03:52  25        And the final thing I'll say, Your Honor, is it's true we

03:52   1   are not arguing the disclaimer.  We don't think it's necessary.

03:52   2   If Your Honor thought the broader -- the plain meaning was

03:52   3   broader, we believe this prosecution history is sufficient to

03:52   4   support a disclaimer, but there's no reason to go there.  On

03:52   5   its face, given the way it's drafted and given the way it was

03:52   6   argued to the Patent Office, the meaning is plain.  And if our

03:52   7   position, the Intel position violates the canons of

03:52   8   construction, well, we're just saying what they said.

03:52   9   Precisely what they said to the Patent Office what the plain

03:52  10   meaning is.  It means two different indications, and that's all

03:52  11   we're saying.

03:52  12        Thank you, Your Honor.

03:52  13        MR. SLUSARCZYK:  Two final points.  In explaining the

03:53  14   prosecution history, Mr. Mueller put up lengthy paragraphs and

03:53  15   dove into a lengthy discussion of the Weber reference.  He's

03:53  16   providing context for what second and different meant when the

03:53  17   applicant said them.  The problem with putting those words into

03:53  18   the construction is a jury, for instance, applying that

03:53  19   construction will not have any of that context, and the words

03:53  20   "second" or "different" could mean very different things that

03:53  21   were never intended by the applicant.  Certainly never intended

03:53  22   by the examiner in allowing the claims.

03:53  23        And then briefly I wanted to respond to an earlier point

03:53  24   about the embodiments.  Mr. Mueller said that the patent spends

03:53  25   multiple columns talking about embodiments that aren't claimed,

03:53  1    and that stretches credulity I think.  It's very clear the

03:53  2    patent is discussing embodiments with one, two or three

03:53  3    different mechanisms for providing an indication, and all of

03:53  4    those embodiments, including the ones that use a single

03:53  5    mechanism, fall within the scope of the claims.  Otherwise they

03:53  6    would be distinguished in the specification.

03:53  7         Thank you, Your Honor.

03:53  8         MR. MUELLER:  And just very briefly on that, Your Honor,

03:54  9    there is no canon of construction that claims or presume to

03:54  10   cover every embodiment in a patent specification.  That is not

03:54  11   an accepted canon of construction.  There is a presumption that

03:54  12   if an interpretation excludes all embodiments, that can be

03:54  13   disfavored.  That is not what we're arguing.  Our position

03:54  14   which is the plain meaning of the claim and precisely the

03:54  15   meaning they argued at the Patent Office would cover a

03:54  16   disclosed embodiment, namely, the thread signal sequence number

03:54  17   embodiment.  That is perfectly consistent with the accepted

03:54  18   canons of construction and there is no canon that requires the

03:54  19   claims to require every -- to cover every embodiment.

03:54  20        MR. SLUSARCZYK:  Again, I think it's discredulous to say

03:54  21   that the applicants would have drafted and disclosed

03:54  22   embodiments that aren't covered by the claims, and black letter

03:54  23   law says that.  The construction that excludes embodiments is

03:54  24   presumptively incorrect.

03:54  25        THE COURT:  Thank you.

185

03:54  1       MR. MUELLER:  It doesn't say that, but I've said my piece,

03:54  2  Your Honor.  Thank you.

03:55  3       (Conference between the Court and Mr. Yi.)

03:55  4       THE COURT:  With respect to the claim term an indication

03:55  5  of a/the specified order, the Court is going to find that the

03:55  6  proper construction is plain and ordinary meaning.

03:55  7       For the remaining claim terms, to speed things up a little

03:55  8  bit, though we have all the time we need, it's just -- I think

03:55  9  it would be more efficient for the Intel folks to go first

03:55  10  since the plaintiff's taking the position on the remaining

03:55  11  claim terms of plain and ordinary meaning, correct?

03:55  12       So I'd like for the Intel folks to go first and then the

03:55  13  plaintiff can respond.  If I'm correct, the next claim term up

03:55  14  is on the '025 patent and it is priority level information

03:56  15  associated, et cetera, correct?

03:56  16       MS SOOTER:  Yes, Your Honor.

03:56  17       THE COURT:  Very good.

03:56  18       MS SOOTER:  And I think that the next two terms are broken

03:56  19  out on the joint claim construction statement.  They both start

03:56  20  with priority level information, associated, and both of those

03:56  21  we were planning to argue together.

03:56  22       THE COURT:  I would be so very happy if you would.

03:56  23       (Laughter.)

03:56  24       MS SOOTER:  Okay.

03:56  25       THE COURT:  And I'm -- are there three claim terms left?

03:56  1      MS SOOTER:  Yes, Your Honor.

03:56  2      THE COURT:  I want you to know how difficult it's been for

03:56  3  me to sit waiting the entire day to hear from Steve Ravel,

03:56  4  saving the best for last, but that's probably the way I would

03:56  5  have done it too just as -- you know, you don't -- whenever

03:56  6  they tease you on the shows about some big huge story that you

03:56  7  don't -- you have to wait through the whole show to see the

03:56  8  last one, it would -- it's a great way to end the day to get

03:56  9  hear from Mr. Ravel and others, but I certainly am enjoying --

03:57  10  not to slight you in any way.  I have very much enjoyed your

03:57  11  presentation here today as well.

03:57  12      MS SOOTER:  Well, we will try to get you to the grand

03:57  13  finale as quickly as possible.

03:57  14      So let's see.  Well, we'll talk a little bit about the

03:57  15  '025 patent, and the '025 patent has to do with interrupts.

03:57  16  And so I -- this is the patent that Mr. Yi reached out about

03:57  17  yesterday and so I thought it would be helpful to provide the

03:57  18  technology tutorial here, but I do invite questions obviously.

03:57  19  We want to make sure that we cover what would be helpful to the

03:57  20  Court, and if we don't, we would very much like to hear how we

03:57  21  can help.

03:57  22      Just talking about interrupts.

03:57  23      THE COURT:  I'll let you know again I handled several

03:57  24  case -- I'm pretty familiar with this concept.

03:57  25      MS SOOTER:  Oh, good.

03:57   1          THE COURT:  And so you can go pretty quickly through the

03:57   2   tutorial.  Say whatever you'd like, but I actually understand

03:57   3   the technology here.

03:57   4          MS SOOTER:  Great.  Yeah.  So interrupts are definitely

03:58   5   not a complicated concept, and I'm sure they do come up.

03:58   6          THE COURT:  That's why they let me handle them.  That's

03:58   7   like I got the patents dealing with this technology.

03:58   8          MS SOOTER:  Well, there I guess are fairly a number of

03:58   9   aspects of interrupt handling, and in this particular patent

03:58  10   we're dealing with a particular aspect of interrupt handling

03:58  11   having to do with the prioritization of pending interrupts.

03:58  12   And as Your Honor knows, interrupts can come from any sources.

03:58  13   They can come from hardware or software and they simply cause

03:58  14   the processor to switch what it's doing from one task to

03:58  15   another task so that it can handle this pending interrupt.  And

03:58  16   what we're really going to talk about now is if you look at

03:58  17   this diagram, you may receive an interrupt -- and I'm on Slide

03:58  18   6 -- from a keyboard, for example, and then the interrupt

03:58  19   interrupts the processor and causes it to execute a program and

03:58  20   handle the interrupt.  That much you know.

03:58  21          THE COURT:  Yeah.

03:59  22          MS. SOOTER:  And the part I want to focus on is what

03:59  23   happens in between that key press and the time that the

03:59  24   processor actually shifts over to the interrupt handler.  In

03:59  25   other words, what happens in this red arrow here on Slide 6?

03:59  1  And the patent calls that an interrupt circuit.  So we'll talk

03:59  2  a little bit about the different components that are in the

03:59  3  interrupt circuit, and feel free to speed me up if I'm

03:59  4  covering --

03:59  5       THE COURT:  No.  This is very helpful.

03:59  6       MS SOOTER:  Okay.  So here's what the patent describes

03:59  7  generally is happening during this interrupt circuit, and it

03:59  8  also states that much of this was already in the prior art.  So

03:59  9  when you get an incoming interrupt like a keyboard press, then

03:59  10  that incoming interrupt is stored in an interrupt register.

03:59  11  And in this flow diagram these cylinders depict storage devices

03:59  12  or registers.  So in this particular example the keyboard press

04:00  13  would be stored in the interrupt register.  So, for example, if

04:00  14  you had four different interrupts that all came in at the same

04:00  15  time, they were all pending interrupts, they would first be

04:00  16  stored in the interrupt register which would then store a note

04:00  17  that all four had occurred.  The next thing that happens is --

04:00  18  that the patent describes happening, and this is also a common

04:00  19  feature of interrupt handling, is that some interrupts are flow

04:00  20  through and proceed and others are masked.  They're essentially

04:00  21  filtered out.  And that occurs with the assistance of something

04:00  22  called an enable register.  The enable register has flags

04:00  23  essentially indicating whether different types of potentially

04:00  24  pending interrupts are enabled or disabled, and those flags can

04:00  25  then be used by an and gate to determine whether or not an

04:01 1   interrupt that was received should be masked out or filtered or

04:01 2   whether it should be passed through to the next step.  If it

04:01 3   was masked, it stops there.  If it was not masked and it's

04:01 4   enabled, then it proceeds to the next step and it's stored in a

04:01 5   pending interrupt register.

04:01 6      So here, since we had four interrupts coming in and only

04:01 7   two of them were enabled in this simplistic example, the

04:01 8   keyboard and the mouse, those two pass through and were stored

04:01 9   in the pending interrupt register.  Then now we have two

04:01 10  pending interrupts.  So now we have the question, in what

04:01 11  sequence should they be processed?  And that's where interrupt

04:01 12  prioritization comes in.  So hypothetically you may have

04:01 13  priority levels assigned to these interrupts.  And in this case

04:01 14  you have a 1 assigned to the keyboard, and that's the highest

04:01 15  priority, and a 4 assigned to the mouse.  So presumably 1 would

04:01 16  be processed first.  And those priority levels for the

04:02 17  potentially pending interrupts are stored in a priority

04:02 18  register, and that's the information that's used to assign

04:02 19  priorities to or to prioritize those incoming interrupts.

04:02 20     Now, what the patent describes is that that prioritization

04:02 21  scheme or the set of priorities may change depending on the

04:02 22  system mode.  So you may have a high power or a high

04:02 23  performance mode.  You may have a low power or, say, battery

04:02 24  mode, and depending on the modes, you may have different

04:02 25  interrupt priorities.

04:02  1    So in this particular simplistic example on Slide 16 you

04:02  2  can see that just hypothetically in a high performance mode you

04:02  3  may put your disk drive as the highest priority and the mouse

04:02  4  as the lowest, and in a low power mode you may switch up the

04:02  5  priorities.

04:02  6    And so the patent describes all of that as the background

04:03  7  of the invention.  It already existed before the patent came

04:03  8  along, and that's where the '025 patent comes in.

04:03  9    The '025 patent is entitled, hardware managed context

04:03  10  sensitive interrupt priority level control.  So as you'll see

04:03  11  as we go through the patent and we walk through it, it uses

04:03  12  hardware to manage the interrupt priority levels based on

04:03  13  context.  It's sensitive to the context or modes that the

04:03  14  system is operating in.

04:03  15    So the patent described a problem here on Slide 19 and it

04:03  16  said -- it says that interrupt priority levels have

04:03  17  conventionally been controlled by software.  So historically

04:03  18  interrupt prioritization was controlled by software, and that

04:03  19  means that any changes in the prioritization of interrupts

04:03  20  requires additional time and programming complexity to switch

04:03  21  the prioritization by rewriting the interrupt priority

04:03  22  registers.

04:04  23    Accordingly, there is a need for improved interrupt

04:04  24  controller that allows interrupts to be quickly and efficiently

04:04  25  prioritized and a need for a high efficiency interrupt

04:04  1    prioritization scheme that allows interrupt priorities to be

04:04  2    dynamically controlled and adjusted.  So the patent is saying,

04:04  3    historically you've used software to change interrupt

04:04  4    prioritization schemes, but we need something that's more quick

04:04  5    and efficient that still allows dynamic control of interrupt

04:04  6    priorities.

04:04  7         The patent then describes the alleged solution to this

04:04  8    problem, and they describe it as a hardware mechanism.  A

04:04  9    hardware mechanism is provided to adaptively prioritize

04:04  10   interrupts based on the current mode or context, and it goes on

04:04  11   to say, by providing multiple interrupt priority registers,

04:04  12   interrupt priority registers may be switched automatically when

04:04  13   there's a change in the mode or operation.

04:04  14        So what does that look like?  Now, as you can see on Slide

04:05  15   21, instead of just having one interrupt priority register

04:05  16   that's storing the priorities to be assigned to the incoming

04:05  17   interrupts, now there -- in this example there are two.  So

04:05  18   there are two registers presumably each -- that each apply to a

04:05  19   particular system mode and that each have a set of interrupt

04:05  20   priorities that will be used depending on the mode.  And then

04:05  21   there's a switching or a multiplexer circuit, as the patent

04:05  22   calls it, that selects and passes the contents of the interrupt

04:05  23   priority register corresponding to the current mode or context.

04:05  24        So as again, a simplistic example, in a first mode you

04:05  25   might have a switching circuit that connects a first priority

04:05  1  register, and this is the one you're in a high performance

04:05  2  mode, but in another mode where you're in a battery or low

04:05  3  power mode, then the switching circuit might couple the second

04:05  4  priority register to the priority encoder so that the different

04:05  5  set of priorities are used to assign priorities to the incoming

04:06  6  interrupt.  And that's essentially what the patent describes

04:06  7  here where it says the priority encoder module receives the

04:06  8  contents of the priority register that are selected by the

04:06  9  multiplexer circuit and then it selects and forwards the

04:06  10  interrupt to the CPU after it's prioritized.

04:06  11      This conceptual diagram flowchart on the left that we've

04:06  12  been looking at corresponds to the patent's Figure 3, and you

04:06  13  can see that we've color coded the different registers.  For

04:06  14  example, you have the incoming interrupt.  It's stored in what

04:06  15  the patent calls a source register.  The patent also describes

04:06  16  in green the enable registers that we talked about.  Those are

04:06  17  passed through the and gates that are used to mask out the

04:06  18  disabled interrupts, and the ones that pass through

04:06  19  successfully are stored in pending interrupts -- pending

04:07  20  register, and then the interrupt priority registers that store

04:07  21  the different prioritization schemes are down here in purple,

04:07  22  and the mode selector is used to select one of the interrupt

04:07  23  prioritization schemes to then assign priorities to the pending

04:07  24  interrupts.

04:07  25      And that's really the overview of the technology which

04:07  1   kind of feeds into what we'll talk about with the claims.  So

04:07  2   let's go to Slide 30 of the deck.

04:07  3        This first term is found several places in Claims 1 and 9.

04:07  4   The priority level information associated with the system mode

04:07  5   for each of the one or more interrupt requests.  We maintain

04:07  6   that this should be construed to mean the priority level

04:07  7   information associated with a system mode for each of the one

04:07  8   or more potential interrupt requests, and VLSI says plain and

04:08  9   ordinary meaning.  And it really is -- the fight really is over

04:08 10   the word "potential," as you know.

04:08 11        THE COURT:  Sure.  Let me ask you a couple questions.

04:08 12        MS SOOTER:  Sure.

04:08 13        THE COURT:  Are capital N and little N the same thing?

04:08 14        MS SOOTER:  Let me look for a little N.  I know what you

04:08 15   mean by capital N.  I do not believe so.

04:08 16        THE COURT:  And we're looking at Figure 3?

04:08 17        MS SOOTER:  Right.  Actually, let me think about that.

04:08 18   And I know what you mean.  I think you're referring to the

04:08 19   capital N that's in the specification?

04:08 20        THE COURT:  Yes.

04:08 21        MS SOOTER:  In the written description where it's saying

04:08 22   that there are N different types of priorities basically?

04:08 23        THE COURT:  Yes, ma'am.

04:08 24        MS SOOTER:  It does actually look as if there -- that is

04:09 25   probably the case.  I'll -- you know, when I sit down I'll go

04:09 1    back and look at the description of the figures a little more

04:09 2    closely, but in looking at this -- let me start here.  Perhaps

04:09 3    this will help.  In rereading the patent, I saw that several

04:09 4    times within the patent it talks about having a number of bits.

04:09 5    So each bit represents one -- essentially one type of

04:09 6    interrupt --

04:09 7        THE COURT:  Right.

04:09 8        MS SOOTER:  -- that the system could receive.  So, for

04:09 9    example, in the source registers if you have eight different

04:09 10   types of interrupts, you would have eight bits, and one of

04:09 11   those bits would get flipped if there was that type of

04:09 12   interrupt that was pending.  Similarly in the enable register

04:09 13   you would have that many bits so that each type of interrupt

04:09 14   would have an enable or disable bit associated with it and then

04:09 15   you would be able to and those bits together with the 308 and

04:10 16   gates that also have N of them and it does look like given that

04:10 17   there's 0 to N minus 1 enable registers, it is likely that the

04:10 18   little N is the same as what the spec is talking about with a

04:10 19   capital N.

04:10 20       THE COURT:  Meaning number of interrupts, right?

04:10 21       MS. SOOTER:  Exactly.

04:10 22       THE COURT:  As opposed to priority definitions?

04:10 23       MS SOOTER:  Exactly.

04:10 24       THE COURT:  And then if we could go to Column 4.

04:10 25       MS SOOTER:  Yes.

04:10  1      THE COURT:  And go down to Line -- let's see.  Let's start

04:10  2  at Line 62.

04:10  3      MS SOOTER:  Okay.

04:10  4      THE COURT:  However, on chip interrupt requests may also

04:10  5  be received from the various peripherals such -- probably as --

04:11  6  there's probably an "as" missing there, but such as -- these

04:11  7  guys need to learn how to spell check.

04:11  8      MS SOOTER:  Yes.

04:11  9      THE COURT:  Which is only the value I could add to

04:11  10  drafting patents is maybe if they let me read it I would be

04:11  11  able to do it.

04:11  12      But such as the timer module 16 and/or serial module 18

04:11  13  which may feed one or more interrupts 202.  The interrupt

04:11  14  source register 204 selectively stores all interrupt requests

04:11  15  received via the physical conductors or from on chip sources or

04:11  16  alternatively routes that received interrupt requests to the

04:11  17  CPU, and it goes on.  What do you understand the word

04:11  18  "selectively" to mean?  That's on Line 65.

04:11  19      MS SOOTER:  Well, off the top of my head that's a

04:11  20  difficult question to answer.  I can tell you that this part of

04:12  21  the patent, as you probably already know, is just saying that

04:12  22  you can either store the interrupts as flags in that interrupt

04:12  23  pending register -- in that -- let me make sure I get the name

04:12  24  right -- the source register or you can just pass them through

04:12  25  essentially instead of I think latches rather than storing them

04:12  1    in a register.  I think what I would say is that this is

04:12  2    probably harkening back to the part of the patent where it's

04:12  3    talking about flipping the bits for the interrupts as they're

04:12  4    received.  So, again, if you have eight, then -- pending

04:12  5    interrupts, then you could flip a bit, but I don't think that

04:12  6    the patent is necessarily in this part of the patent where

04:12  7    you're talking about storing the interrupts as they're received

04:12  8    would be limited to that, and that's not really necessarily --

04:12  9    and I -- I think what where we're going here is what we mean by

04:12  10   potential, but what I would say is that you don't -- the patent

04:13  11   and the claims in particular aren't necessarily being -- this

04:13  12   part of them that's disputed aren't really directed toward that

04:13  13   part of the figure, the source registers, and the patent says

04:13  14   that that -- there are really -- you don't even need the source

04:13  15   registers necessarily unless the claims require them.

04:13  16        THE COURT:  Can the number of interrupt sources be greater

04:13  17   than capital N?

04:13  18        MS SOOTER:  I think the patent is using the capital N to

04:13  19   represent -- in the embodiments talking about to represent the

04:13  20   number of potential interrupts -- types.  Now, that's

04:13  21   assuming --

04:13  22        THE COURT:  Which is a way -- I'm sorry.  Which is a way

04:13  23   of saying that capital N is all possible interrupt sources?

04:13  24        MS SOOTER:  Yes.  That have been configured in the system.

04:13  25        THE COURT:  Not just those currently defined or present in

04:13   1   the machine?

04:13   2       MS SOOTER:  As in -- by present in the machine, do you

04:13   3   mean having occurred?

04:13   4       THE COURT:  Yes.

04:13   5       MS SOOTER:  I believe it is all possible pending interrupt

04:13   6   types.  Yes.  Now, some machines may have more potential

04:14   7   interrupt types than other machines, but it's whatever is

04:14   8   possible to occur in that machine.

04:14   9       THE COURT:  Give me one second.

04:14   10      Josh probably knows this, but I don't from looking at it.

04:15   11  What is NXP?  Is that N times something?

04:15   12      MS SOOTER:  Oh, yes, Your Honor.  So that's funny that you

04:15   13  should say that because it's also, I believe, a company, but --

04:15   14      THE COURT:  No.  That's -- and but it was -- it was used

04:15   15  before it was the company.  So I was guessing that was not it.

04:15   16  So but I -- I don't know what NXP meant.

04:15   17      MS SOOTER:  Well, I believe that the patent describes that

04:15   18  there can be P bits associated with each priority and each --

04:15   19  the priorities apply to the potentially pending interrupts and

04:15   20  then each priority may have a multi bit indication of its

04:15   21  priority.  So let's say, for example, you had four priority

04:15   22  levels.

04:15   23      THE COURT:  Yes, ma'am.

04:15   24      MS. SOOTER:  That would be two bits because there -- you

04:15   25  can represent four different values with your two bits.  So you

04:15  1   might have the two bit code encoding your four priority levels

04:15  2   and so that would be the P in the NXP.  So I think it's N times

04:15  3   P.

04:15  4        THE COURT:  Got it.

04:15  5        MS SOOTER:  Yeah.

04:16  6        THE COURT:  Okay.  And I interrupted you.  You can keep --

04:16  7   if you remember where you were, you can go back there.  I

04:16  8   apologize.

04:16  9        MS SOOTER:  That was -- no.  I'm glad you asked.  Well,

04:16  10  let's actually keep --

04:16  11       THE COURT:  And I think what you had just said was -- and

04:16  12  I agree with you -- is that the fight is really over, you know,

04:16  13  the addition of -- y'all's addition of one word to what the

04:16  14  claim term already says.

04:16  15       MS SOOTER:  Yes, Your Honor.  And, you know, we do believe

04:16  16  that the word "potential" in this particular phrase is

04:16  17  appropriate based on both the prosecution history as well as

04:16  18  the patent's repeated use and description of what we're talking

04:16  19  about here and so let's actually talk about -- let's orient

04:16  20  ourselves about what we're talking about, what part of the

04:16  21  claim we're talking about and -- here on Slide 31.  What we're

04:16  22  talking about we're defining the term priority level

04:16  23  information associated with a first or second system mode for

04:16  24  each of the one or more interrupt requests.

04:17  25       And this priority level information that we're defining

04:17  1   right now is if the patent -- this claim says that it's stored

04:17  2   in the interrupt priority storage devices.  So what we're

04:17  3   talking about right now is what's stored in the interrupt

04:17  4   priority storage devices.  And so what we need to do is look at

04:17  5   what the patent says about what's stored in the interrupt

04:17  6   priority storage devices, and the same is true on Claim 9.

04:17  7        So looking at Slide 33, we have here just an excerpt from

04:17  8   the patent.  It's Column 2, Lines 64 through Column 3, Line 22,

04:17  9   and it tells us what's stored in the interrupt priority

04:17  10  registers.  And in particular here the patent tells us that

04:17  11  first of all, as we know, one or more interrupt priority

04:18  12  storage registers are provided and those are shown in purple on

04:18  13  the left and the text is highlighted in purple.  Those are

04:18  14  provided for storing priority values corresponding to each of

04:18  15  the potential pending interrupt requests, and that's the NXP

04:18  16  that you were talking about.  So there are N of them and each

04:18  17  interrupt priority level may have P priority level bits

04:18  18  associated with it, thereby enabling prioritization of the

04:18  19  enabled pending interrupt requests.  So when an interrupt is

04:18  20  received and when it is -- before it is provided to the CPU to

04:18  21  be handled, it is prioritized and it's prioritized by using the

04:18  22  information stored in the interrupt priority registers which is

04:18  23  why it's logical that the interrupt priority registers store

04:18  24  priorities for the potential pending interrupt requests.  In

04:18  25  fact, that is exactly what the claims tell us.

04:18   1          If you keep reading Claim 1 here on Slide 31, you can see

04:19   2      that you -- that the claim requires providing the logic

04:19   3      circuitry with priority level information.  That's the priority

04:19   4      level information we just talked about corresponding to the

04:19   5      mode signal where the logic circuitry -- this is the important

04:19   6      part -- uses the provided priority level information to

04:19   7      prioritize one or more of the pending interrupt signals.  So

04:19   8      that's the -- now, this interrupt priority level information is

04:19   9      the information that's stored on the interrupt priority storage

04:19   10     devices so that it then can be used, according to the plain

04:19   11     language of the claim, to prioritize the pending interrupt

04:19   12     requests when they arrive.

04:19   13         And because the patent does explain over and over again

04:19   14     that the priority levels for the possible pending interrupts is

04:19   15     what's stored in the interrupt priority registers, then

04:20   16     interpreting Claims 1 and 9 that way is entirely consistent

04:20   17     with the patent.  Now, we recognize that we are adding the word

04:20   18     "potential," and we do -- we anticipated the arguments that

04:20   19     VLSI would make in response.  Of course we knew that they would

04:20   20     say that we were adding a word to the claims, but we're

04:20   21     cognizant of the law surrounding claim interpretation of

04:20   22     course.  We understand that in order to add a word to claim,

04:20   23     then it needs to be the proper interpretation in view of the

04:20   24     intrinsic evidence, including the prosecution history.  And the

04:20   25     prosecution history here actually dictates this result.

04:20   1        If you look -- let's start with Claim 9 because they're

04:20   2   accusing us actually of inserting several words into Claim 9.

04:20   3   So it's not just one word.  Potentially it's many words.  So

04:20   4   let's start with that one.  This is a prosecution history for

04:21   5   Claim 9 here on Slide 36.  You'll see the -- on the left the

04:21   6   actual language of Claim 9 is just priority level information

04:21   7   associated with a first system mode and priority level

04:21   8   information associated with a second system mode.  And as you

04:21   9   know, we are interpreting that to require that that be for each

04:21  10   potential pending interrupt, and that is not our language, Your

04:21  11   Honor.  That's the language of the original patent owner when

04:21  12   the original patent owner sought to obtain these claims from

04:21  13   the Patent Office.  There -- and so on the right is an excerpt

04:21  14   of the original patent owner's representations to the Patent

04:21  15   Office.  There they say Claims 9 through 14 and 16.  So the

04:21  16   very claim we're talking about are not obvious over Kershaw and

04:21  17   Chou.  And they're telling the Patent Office in response to the

04:21  18   examiner's rejection of those claims as being obvious over this

04:22  19   prior art, applicants respectfully request reconsideration and

04:22  20   withdrawal of the rejection because the cited art fails to

04:22  21   disclose or select -- suggest applicants disclosed interrupt

04:22  22   handling methodology.

04:22  23        So when -- in their briefing VLSI says that we're

04:22  24   misinterpreting this because all the patent applicant was doing

04:22  25   was describing the invention, but that's not actually what's

04:22  1   going on.  What's actually going on here is that the patent

04:22  2   applicant was telling the Patent Office how to construe the

04:22  3   claims because they wanted those claims construed in a way that

04:22  4   the Patent Office would grant them.

04:22  5       Well, how did they describe those claims?  Again, Claim 9,

04:22  6   the patent -- the original patent owner said, as described in

04:22  7   the application, the interrupt priority registers are provided

04:22  8   for storing priority values corresponding to each of the

04:22  9   potential pending interrupt requests depending on the system

04:23  10  context.

04:23  11      So, like I said, this is the patent applicants' words,

04:23  12  it's their description of this claim and what this claim

04:23  13  requires to the Patent Office.

04:23  14      This was similar to what the patent owner said about Claim

04:23  15  1, which we're also construing here.  Claim 1 is only one word

04:23  16  that we're fighting about, and that's the word "potential."

04:23  17  And here you can see that they were making the same argument

04:23  18  with regard to Claims 1, 3 through 8 and 17 through 20.

04:23  19  They're, once again, telling the examiner, you should not

04:23  20  reject these claims.  Let me tell you what they really mean.

04:23  21      And what they say is -- looking down to the -- they're

04:23  22  describing both.  They say -- looking down to that second

04:23  23  excerpt, as described in the application, the interrupt

04:23  24  priority registers are provided for storing priority values

04:23  25  corresponding to each of the potential pending interrupt

04:23  1    requests depending upon the system context, and then they say

04:23  2    it again, potential pending interrupts and possible potential

04:24  3    pending interrupt requests.

04:24  4         Now, what happens?  The very next thing that happened in

04:24  5    prosecution is that the patent examiner came back and said,

04:24  6    okay.  I hear you.  The Patent Office said reasons for

04:24  7    allowance.  They granted the patent right after that.  They

04:24  8    said the examiner interpreted the claims in light of the

04:24  9    specification and in further view of applicants' persuasive

04:24  10   argument.

04:24  11        So, again, it's not a description of the patent or the

04:24  12   specification generally.  It's the applicants' persuasive

04:24  13   arguments as to how to interpret the claims and the patent

04:24  14   examiner said that it was persuasive.  And what was persuasive?

04:24  15   Exactly what we've been talking about.  The patent examiner

04:24  16   said, as described in the application, the interrupt priority

04:24  17   registers are provided for storing interrupt or priority values

04:24  18   corresponding to each of the potential pending interrupt

04:24  19   requests.

04:25  20        So we'd represent to Your Honor that all we're doing with

04:25  21   this language is asking the Court to construe the term -- these

04:25  22   terms in these claims exactly how the original patent owner

04:25  23   construed these terms and these claims in order to obtain this

04:25  24   patent.  And I would just add, Your Honor, that --

04:25  25        THE COURT:  Could you go back to that?

04:25   1          MS SOOTER:  Sure.

04:25   2          THE COURT:  Give me one second on your slide.

04:25   3          MS SOOTER:  This is Exhibit 17 at Page 2, and we're on

04:25   4   Slide 38 for the record.

04:25   5          THE COURT:  Thank you very much.

04:26   6          Okay.

04:26   7          MS SOOTER:  Now, the one argument I would go ahead and

04:26   8   address now that VLSI makes is that the word "potential" does

04:26   9   appear in Claim 17 but it does not appear in Claims 1 and 9,

04:26   10  but the case law says that claim differentiation -- first of

04:26   11  all, this isn't actually a claim differentiation argument

04:26   12  because we're not talking about independent and dependent

04:26   13  claims.  They just point out -- their argument is if we wanted

04:26   14  to say potential, we knew how to do it.  Our counter to that

04:26   15  is --

04:26   16         THE COURT:  Well, not only that.  That's -- and you -- and

04:26   17  that's why if you'll go to the page before.  That's what I was

04:26   18  actually looking at is I get that -- I get that the examiner

04:26   19  writes, the reason for allowance -- he includes the word

04:27   20  "potential" pending interrupt.  I get that, but -- but he was

04:27   21  aware that -- but the way I understand this works is if the

04:27   22  examiner had wanted to require them to include the word

04:27   23  "potential," he could have made them do it.  I mean, it's -- I

04:27   24  mean, to me this actually hurts your argument that he wanted

04:27   25  that -- I -- he or she.  I'm not sure, but I'll say it was a

04:27  1    he.  That the examiner was -- I mean, I think examiners are

04:27  2    sophisticated enough that if the examiner believed that the

04:27  3    word "potential" was the reason for allowing that, he would not

04:27  4    have allowed them -- it to be omitted in the claim -- he would

04:27  5    have done -- the claim would read the way you want it to read

04:28  6    if the examiner had required that word to be in there for it to

04:28  7    be allowed.  Even though I get he has it in reading it.  Now,

04:28  8    we'll never know why he allowed it or why he wrote this.  I'm

04:28  9    just saying -- I'm telling you the way my logic works is you

04:28  10   want to -- you want me to essentially rewrite the claim term to

04:28  11   add a word that the examiner was aware and did not require them

04:28  12   to put in it.

04:28  13       MS SOOTER:  Thank you.  That was -- I appreciate you

04:28  14   explaining that and that was helpful.  So my response to that,

04:28  15   however, is that there is an entire doctrine of case law under

04:28  16   Phillips that -- as you know, that says --

04:28  17       THE COURT:  I only know about four cases, and Phillips is

04:28  18   one of them.  And so...

04:28  19       MS SOOTER:  One thing that Phillips absolutely says is

04:28  20   that you really do need to read both the specification and the

04:29  21   prosecution history and try to discern what the invention was,

04:29  22   and so there are many, many, many cases in the Federal Circuit

04:29  23   as well as the district courts that are doing just that.

04:29  24   They're not looking -- they're not stopping and looking at the

04:29  25   claim language and then ending the analysis.  And so these

04:29  1  cases that you have that are interpreting the claims in view of

04:29  2  all of that intrinsic evidence are repeatedly doing exactly

04:29  3  what we're doing here.  The entire body of case law that -- you

04:29  4  know, if the examiner required the patent owner to rewrite a

04:29  5  claim every time the patent owner interpreted the claim in a

04:29  6  way that they relied on or it disavowed some scope or

04:29  7  disclaimed some scope or changed the interpretation, then we

04:29  8  wouldn't even have that body of case law.

04:29  9      THE COURT:  But the reasons for allowance -- check me on

04:29 10  this.  That's part of the intrinsic evidence, right?

04:29 11      MS SOOTER:  Yes.

04:29 12      THE COURT:  And, again, the examiner who allowed this

04:30 13  claim to be issued without the word "potential" in it was --

04:30 14  I'm just having a hard time believing that the examiner didn't

04:30 15  do his job and require the applicants to put into the claim

04:30 16  every word that needed to be there, and I feel like you're

04:30 17  asking me to replay the role of the examiner here which I'm

04:30 18  reluctant to be.

04:30 19      MS SOOTER:  I understand.

04:30 20      THE COURT:  He had -- the examiner had the chance to

04:30 21  require this, and the reasons for allowance make it patently

04:30 22  clear that he was aware of the issue you're raising and yet he

04:30 23  didn't do it.

04:30 24      MS SOOTER:  I hear what you're saying and I won't belabor

04:30 25  the point.  I'll just state for -- our position is that this is

04:30  1    one of a very common type of example where the patent owner

04:31  2    interpreted the claim to the Patent Office and the Patent

04:31  3    Office relied on that, and it's not even one where you have to

04:31  4    read between the lines to think about what the patent owner

04:31  5    might have or might not have relied on in the patent

04:31  6    applicant's arguments.  He actually tells us what he relied on

04:31  7    and he said that he found those persuasive arguments and as a

04:31  8    result -- and he actually explains what they are and one of

04:31  9    them is that the patent owner interpreted its own claims to

04:31  10   require them to store each potential interrupt request.  So

04:31  11   that is our reading of this.  That's our understanding of the

04:31  12   case law as well.

04:31  13        I will say, Your Honor, that there are just a whole slew

04:31  14   of cases that are talking about examining the intrinsic

04:31  15   evidence in view of -- in order to obtain an interpretation of

04:31  16   the invention.  And there was just a case today actually that

04:31  17   came out of the Federal Circuit called Techtronic Industries

04:31  18   vs. ITC that reiterates much of what we said in our brief which

04:32  19   is that you really do in many cases obtain the meaning of the

04:32  20   claims from the intrinsic evidence from types of statements

04:32  21   exactly like this.

04:32  22        THE COURT:  But aren't there a lot of Federal Circuit

04:32  23   cases that tell you to look at the claims first and then go to

04:32  24   the spec?

04:32  25        MS SOOTER:  Regardless of what you look at first, you have

04:32   1   to look at all of it to discern the meaning from the claims,

04:32   2   the written description and the prosecution history.  And the

04:32   3   one today made clear several quotes.  And that's Case No.

04:32   4   182191 for the record out of the Federal Circuit.

04:32   5        Disavowal must be clear, but it need not be explicit.  And

04:32   6   this, we would argue, is clear.  Disavowal may be inferred.

04:32   7   The purpose of claim construction is to capture the scope of

04:32   8   the actual invention.  So I know that VLSI quoted several times

04:32   9   in its briefs the kind of adage that claims claim, but that

04:33  10   really should not be taken to -- as Your Honor is obviously

04:33  11   well aware, to be the end of the analysis.  And we would submit

04:33  12   that this was pretty persuasive evidence of what they really

04:33  13   meant.  And with that, I'll stop.

04:33  14        THE COURT:  Thank you very much.

04:33  15        I'm going to find -- I'm not going to add the word

04:33  16   "potential" to either of the claim terms.

04:33  17        So we have our final -- and it's not just so I get to hear

04:33  18   from Mr. Ravel more quickly, although that played a -- that did

04:33  19   play a tiny part in it.  This is the final claim term, is it

04:33  20   not?

04:33  21        MS SOOTER:  No, Your Honor.  There's also interrupt

04:33  22   priority storage device.

04:33  23        THE COURT:  I'm sorry.  Help me out.  Do I have two more?

04:33  24        Yes.  I'm sorry.  You're right.  I had -- I tell them not

04:33  25   to print on both sides of the page because I can't find

04:33  1    anything.  So the next one up is storage device for storing

04:33  2    priority level; is that correct?

04:34  3        MS SOOTER:  Yes, Your Honor.  And, you know, we make

04:34  4    similar arguments on this.  Let me just say, you know, for

04:34  5    30 seconds here.  We make similar arguments here, but we think

04:34  6    in this case the disavowal at the Patent Office was explicit.

04:34  7    It was express, and the patent owner said many times in the

04:34  8    patent and before the Patent Office that the priorities should

04:34  9    not be rewritten by software, and that is the point of the

04:34 10    invention, but I don't want to belabor the point, and if Your

04:34 11    Honor would rather not hear more about that, I'm happy to turn

04:34 12    it over to the star of the show.

04:34 13        THE COURT:  No.  No.  I was -- I know we have the show

04:34 14    pony coming up last.

04:34 15        (Laughter.)

04:34 16        THE COURT:  But I'd certainly -- if you have something --

04:34 17    I've got all the time in the world, and if you have certainly

04:34 18    any arguments you want to make, I'm much more open on this one

04:35 19    than I was on the -- the previous two I had -- I always have a

04:35 20    hard time when people are trying to persuade me to take

04:35 21    language and do what you were doing.  But no.  You're welcome

04:35 22    to make these arguments.

04:35 23        MS SOOTER:  Okay.  I think, Your Honor, in view of, you

04:35 24    know, the case law that I was just describing and the purpose

04:35 25    of the invention that I mentioned earlier which is -- was

04:35    1    really to identify a way of changing interrupt prioritization

04:35    2    schemes when the -- when the system mode changed in a fast,

04:35    3    easy, low latency manner, the patent described the invention as

04:35    4    providing multiple prioritization schemes stored in hardware

04:35    5    rather than rewriting the prioritization scheme whenever -- by

04:36    6    software whenever the mode changed.  And I would just point

04:36    7    out, Your Honor -- let's go to Slide 18.

04:36    8         THE COURT:  Okay.

04:36    9         MS SOOTER:  This one I think is an even stronger

04:36   10    prosecution history, and it is, we believe, an express

04:36   11    disavowal of claim scope in order to obtain these claims.  The

04:36   12    patent owner said here -- they emphasized once again that in

04:36   13    Claims 1, 3 through 8 and 7 through 20, they discuss the

04:36   14    interrupt priority registers.  Then they said that the -- they

04:36   15    enabled -- this is Slide 18.  They enabled the prioritization

04:36   16    of the enabled pending interrupt request while eliminating the

04:37   17    requirement for software management of priority level changes

04:37   18    during context switches.

04:37   19         And they specifically describe the prior art that the

04:37   20    claims had been rejected over by saying that Kershaw's priority

04:37   21    value managers are clearly and repeatedly described by Kershaw.

04:37   22    Kershaw's a prior art patent.  As being software based priority

04:37   23    control mechanisms.

04:37   24         But they went on to say, there is a very real difference

04:37   25    between the claimed invention and the Kershaw disclosure in

04:37   1   that the Kershaw uses the operating system software to set the

04:37   2   interrupt priority values, whereas Claim 1 specifies that

04:37   3   different interrupt priority level information for each

04:37   4   requested interrupt request is stored in interrupt priority

04:37   5   storage devices.  So, in other words, Kershaw's use of the

04:38   6   operating system software as shown on Slide 19 was a very --

04:38   7        THE COURT:  Could you go back?

04:38   8        MS SOOTER:  Yeah.  Sorry.

04:38   9        THE COURT:  So first just for my court reporter, Kershaw

04:38   10  is K-e-r-s-h-a-w.

04:38   11       So I'm reading what you're reading and -- on Slide 19,

04:38   12  does the -- and this is the problem with the English language.

04:38   13  The way it's phrased, I can't tell if this means that -- and I

04:38   14  want to hear your argument on this and of course from VLSI.

04:38   15  Does this mean it cannot use the software at all?

04:38   16       MS SOOTER:  Thank you, Your Honor.  So this -- going back

04:38   17  to the claim language itself, let's go to Slide 4.

04:39   18       THE COURT:  Okay.

04:39   19       MS SOOTER:  What we're construing right now are the

04:39   20  storage devices for storing priority level information.  The

04:39   21  claim requires a first interrupt priority storage device for

04:39   22  storing priority level information associated with a first

04:39   23  system mode and a second interrupt priority storage device for

04:39   24  storing priority level information associated with a second

04:39   25  system mode.  So what we're saying is that when the mode

04:39  1    changes and you change from one priority storage device to the

04:39  2    other, you're not doing it by rewriting the priorities with

04:39  3    software.  That's what we mean when we say the priorities are

04:39  4    not rewritten by software when the mode or context changes.

04:39  5        THE COURT:  So let's say the interrupt priorities changed

04:40  6    during or within the execution of a specific mode.  Under your

04:40  7    construction, would software be allowed to be used in any way

04:40  8    to rewrite the priority levels?

04:40  9        MS SOOTER:  Yes.  I think so, Your Honor.  So, for

04:40  10   example, if I understand your hypothetical correctly, if you're

04:40  11   just always for, I don't know, three minutes operating in the

04:40  12   same system mode but something comes along and for some reason

04:40  13   your operating system needs to change the priorities because

04:40  14   from -- you know, you got an update to your software -- your

04:40  15   operating system or something.  I don't know.  And so from here

04:40  16   on out you're always -- your interrupt priority levels are not

04:40  17   going to be what they used to be because there's some different

04:40  18   policies.  Let's say for example there's a new interrupt type

04:40  19   and so you need to add that interrupt type to the priority

04:41  20   information.  Then you would need an interrupt priority level

04:41  21   for that new interrupt type.  You could add that with software,

04:41  22   but what we're saying is that when you switch system modes, the

04:41  23   whole point of the invention is to use a prioritization scheme

04:41  24   by switching the hardware from one set of -- one storage device

04:41  25   for storing priority level information to the other.

04:41   1        THE COURT:  Okay.

04:41   2        MS SOOTER:  And that, we believe, is supported by that

04:41   3   clear and unambiguous disavowal of rewriting the priorities by

04:41   4   software in order to change the mode as opposed to switching

04:41   5   with the software.

04:41   6        THE COURT:  Okay.  Thank you, ma'am.

04:41   7        MS SOOTER:  Thank you.

04:42   8        THE COURT:  Yes, sir.

04:42   9        MR. HATTENBACH:  Good afternoon, Your Honor.  Ben

04:42  10   Hattenbach for VLSI.  It's good to see you again.

04:42  11        THE COURT:  You're just as much of a show pony as

04:42  12   Mr. Ravel.  I looked forward and hoped all day you would get

04:42  13   up.

04:42  14        (Laughter.)

04:42  15        MR. HATTENBACH:  All right.  So let's see.  I have a hard

04:42  16   time even figuring out where to begin.  We appreciate the

04:42  17   questions from the Court yesterday, but --

04:42  18        THE COURT:  However, let me just say -- yeah.  I was going

04:42  19   to say you are beloved and respected in the courtroom by

04:42  20   everyone except for my court reporter who may respect you but

04:42  21   doesn't love you.  So if you would go just a little slower,

04:42  22   you'll make her and all of us happy.

04:42  23        MR. HATTENBACH:  Absolutely.  I'll try to be a slower show

04:42  24   pony.

04:42  25        THE COURT:  Okay.

04:42  1       MR. HATTENBACH:  As I understood the questions from the

04:42  2  Court that Dr. Yi conveyed to us, I think they were all about

04:42  3  the term "potential," and we wanted to address them, but we

04:42  4  won't, given the Court's order.  If there were any remaining

04:43  5  questions on that front, I would be happy to try to address

04:43  6  them, but I don't think they pertain to the hardware addition.

04:43  7       THE COURT:  They don't, I don't think.

04:43  8       MR. HATTENBACH:  And I also was going to go through a bit

04:43  9  of a tutorial, but given Your Honor's statements at the

04:43  10 beginning, I will save us the time there.  I will just note

04:43  11 that a tutorial that we were given and the description of the

04:43  12 positions that we were given was all limited to essentially one

04:43  13 part of one preferred embodiment.  The rest of it was just cut

04:43  14 out of the patent as though it didn't exist, and of course

04:43  15 there are many cases that say, for good reason, you can't

04:43  16 interpret patents that way by ignoring the parts of them that

04:43  17 don't really work for your attempt to rewrite the claims.

04:43  18      Let me cut to the chase here.  On Slide 12 of Intel's

04:43  19 presentation they really set forth, I think, the crux of their

04:43  20 argument, and it says, upon changing mode, software does not,

04:44  21 underlined, does not rewrite the priority levels.  That's the

04:44  22 key of their argument.  They're trying to say put a hardware

04:44  23 limitation in because software does not rewrite the priority

04:44  24 levels.

04:44  25      I'd just like to refer Your Honor to the patent at

04:44  1   Column 6, Lines 60 to 63 where it states, priority values may

04:44  2   be updated or changed under software control.  That's the

04:44  3   opposite of what they're telling you about how this -- how this

04:44  4   technology works, and they left it out of their presentation,

04:44  5   and, again, you can't limit claims based on one preferred

04:44  6   embodiment when it's absolutely inconsistent with another.

04:44  7          If we could go to Slide 259.

04:44  8          Let me start there on VLSI's slides.  The first thing I

04:44  9   will note is much like their effort to put in a -- the

04:44  10  potential limitation into the last claim element, they're

04:45  11  trying to put in a hardware limitation into this claim element.

04:45  12  You can see on Slide 260 a comparison of the actual claim terms

04:45  13  on the left and their proposal on the right which essentially

04:45  14  repeat all of the technical terms in the term -- in the term

04:45  15  being construed.  There's nothing unclear about them.  They're

04:45  16  just adding to them.  And the language they're adding is the

04:45  17  language in red, and of course, and I won't belabor this point

04:45  18  because I'm sure Your Honor is familiar with it.  You don't

04:45  19  interpret claims by just adding to them.  There has to be some

04:45  20  textual basis in the claim that you're using as sort of a

04:45  21  springboard.  There has to be a word on the left of this chart

04:45  22  that you're saying means something that you're trying to add on

04:45  23  the right.  And here there can't be because if you cross off

04:45  24  all the words on the left that also appear on the right, all

04:45  25  you'll be left with is Intel's addition.  It sort of identifies

216

04:46  1    itself for us.

04:46  2        And I'm going to skip over the authority going back to

04:46  3    1895 which we heard about earlier today talking about slippery

04:46  4    slopes and the like.

04:46  5        There's no doubt that if the inventors had wanted to limit

04:46  6    their claims to hardware only embodiments, they could have done

04:46  7    so.  If we look at Slide 264, we'll see an example of a couple

04:46  8    of claims where the inventors specifically call out types of

04:46  9    hardware, logic circuitry, multiplexer circuits, selection

04:46  10   circuits, and there are other examples.  So if they wanted to

04:46  11   limit it to hardware, they certainly knew how to do so and they

04:46  12   chose not to.

04:46  13       Intel's rewriting the claim would also exclude preferred

04:46  14   embodiments.  If you see on Slide 266, this is actually the

04:46  15   language which I was referring to earlier where it specifically

04:46  16   says -- I mean, it couldn't be any more clear.  The assigned

04:46  17   priority values may be updated or changed under software

04:47  18   control.  Now, it does continue.  It says, however, there is a

04:47  19   latency issue when using software.  Well, as with any other

04:47  20   engineering problem -- engineering is often, as you probably

04:47  21   know, about optimization.  Some things work better in some

04:47  22   respects and worse in others.  Well, software's very flexible.

04:47  23   It allows you to change very easily how the system operates

04:47  24   just by putting in a new program or making a slight edit to the

04:47  25   program, whereas with hardware if you want to change how it's

04:47   1   operating, you need to fabricate an entirely new piece of

04:47   2   hardware which could take months, if not years in the case of

04:47   3   the sort of hardware that Intel makes.  So the point here is

04:47   4   the patent talks about benefits of flexibility.  It talks about

04:47   5   benefits of speed.  Flexibility's provided by software.  Speed

04:47   6   is provided by hardware.  And it says you can do either one.

04:47   7   Here it's saying you can do it under software control.  There

04:47   8   are other parts that talk about it being done with hardware.

04:48   9   And ultimately that's just a design choice for purposes of

04:48   10  optimization for particular applications, but that isn't

04:48   11  present in the claims and it doesn't limit the claims and it

04:48   12  shouldn't be added to the claims.

04:48   13      There are other examples which -- let me just skip it over

04:48   14  because I think we've hit the main point, but there are other

04:48   15  examples where software is involved in changing modes which

04:48   16  then result in changing priority values which Your Honor asked

04:48   17  about earlier.  Those are on Slides 268 and 269.

04:48   18      And then let me just move on here.  So here are some of

04:48   19  the pros and cons discussed on 271 that I was referring to

04:48   20  earlier about flexibility that software provides and speed that

04:48   21  hardware provides.  It never says you have to do one or the

04:48   22  other.

04:48   23      And here on Slide 272 there's some case law that just --

04:48   24  it's just sort of common sense.  It says a patentee's

04:48   25  discussion of shortcomings is not a disavowal.  Often

04:49  1    shortcomings, as I said, are accompanied with benefits in other

04:49  2    respects.

04:49  3         They would also -- as they're construing the claim, as

04:49  4    they're limiting the claim, it would exclude all of the

04:49  5    preferred embodiments they didn't discuss, but there's more.

04:49  6    There are two terms actually at issue here.  One talks of

04:49  7    storage devices and the other talks about priority levels.  You

04:49  8    can see on Slide 276 those claims, Claims 1 and 9, speak of

04:49  9    storage devices.  Claim 17 is directed to priority levels and

04:49  10   yet they're giving essentially the same interpretations.  It's

04:49  11   a few wording differences but not wording differences that

04:49  12   would be explained by the differences in the words they're

04:49  13   actually purporting to interpret.  So that's yet another

04:49  14   problem.  And of course the use of two terms in a claim

04:50  15   requires that they connote different meanings.  It's just

04:50  16   common sense.

04:50  17        THE COURT:  Where would you say that the hardware and

04:50  18   software interface is disclosed in the patent?

04:50  19        MR. HATTENBACH:  Hardware and software interface.  Well,

04:50  20   that's a tough one.  I mean, I think -- I think everywhere they

04:50  21   talk about software.  Probably a person of skill in the art

04:50  22   would understand that that software is going to be interacting

04:50  23   or controlling some aspect of the hardware operation where it's

04:50  24   a mixed hardware and software system.  I think some examples

04:50  25   that come to mind -- let me -- give me one moment here.  I have

04:50  1    something in mind, but I need to find the cite for it.

04:51  2        Okay.  Could we go to 26 -- let's go to 268.  So I'm not

04:51  3    sure if this is the level of detail that you're looking for,

04:51  4    but, for example, it talks about context switching based on an

04:51  5    operating system.

04:51  6        THE COURT:  Slow down just a little bit.

04:51  7        MR. HATTENBACH:  Sure.  The patent speaks of context

04:51  8    switching based on the operating system.  It talks about

04:51  9    context control bits in Column 7 at Line 61 to 67.  And,

04:52  10   generally speaking, the patent describes, and people of skill

04:52  11   in the art would understand that software can write to various

04:52  12   registers and storage devices and change modes and the software

04:52  13   can receive interrupts.

04:52  14       I think there's more on -- if we go back to 268.  There's

04:52  15   also some description here in Column 5 and Column 6 of how

04:52  16   certain things are not only preprogrammed but then can be

04:52  17   updated under software control.  That was also something that

04:52  18   we discussed in the briefing.  There was an argument that the

04:52  19   system didn't allow updating.  It just allowed programming in

04:52  20   the first instance, and we point out -- and it's here on the

04:52  21   second portion of the patent on Slide 267 where it shows, no.

04:53  22   Indeed, there can also be updating under software control.  I'd

04:53  23   say it's a combination of all those areas together with what a

04:53  24   person of ordinary skill in the art would understand about a

04:53  25   system like this.

04:53  1      THE COURT:  Very good.  Did you have any other points to

04:53  2  make?

04:53  3      MR. HATTENBACH:  Sure.  Just one more point which is on

04:53  4  the prosecution history.  The sections that counsel was relying

04:53  5  on a moment ago actually weren't, for the most part, discussing

04:53  6  the claim language.  They all used -- they all were discussing

04:53  7  what was described in the application as opposed to what was

04:53  8  claimed in a particular claim, and so I don't want to bring up

04:53  9  Slide 18 and take up the time, but it -- the quote begins with,

04:53  10  as described in the application.  And it continues on.  It says

04:53  11  in selected embodiments.  Well, talking about how selected

04:53  12  embodiments operate is very different from saying, let's talk

04:53  13  about a particular claim and particular claim language and

04:53  14  here's what it meant.  That never happened.  There are

04:54  15  references to -- let's see.  There was a reference to a

04:54  16  software based priority control mechanism.  My understanding of

04:54  17  that is it was a 100 percent software controlled system that

04:54  18  operated 100 percent using software, and that's not what the

04:54  19  claim is directed to.  And so it was entirely appropriate to

04:54  20  differentiate that.  The claims we're speaking of today require

04:54  21  storage devices as part of this process, and both parties

04:54  22  agreed -- it's in the briefing and we affirm it now -- we all

04:54  23  agree a storage device is a piece of hardware.  And so what's

04:54  24  actually claimed, if you look at the claim as a whole, is

04:54  25  really quite different from what was differentiated properly

04:54   1   during prosecution.

04:54   2          If there are any other questions or concern about the

04:54   3   prosecution history, I'd be happy to try to address it, but

04:54   4   otherwise I will yield the time back to the Court.

04:54   5          THE COURT:  Counsel?

04:54   6          MS SOOTER:  Let's start with Figure 3, please.  So I

04:55   7   believe that the answer to the question of the hardware

04:55   8   software interface is this mode context selector, 26.  So

04:55   9   basically the operating system can change the mode or the

04:55   10  context and thereby changes the input to this switching circuit

04:55   11  here which then is hardware and then it selects a different

04:55   12  register which are hardware, and that's all in hardware.  So

04:55   13  the interface to the operating system would be the mode or

04:55   14  context selector in this figure.  So that was my take on that

04:55   15  question if I understood it properly.

04:55   16         Now, let's go to Column 6 at Line 60 the last paragraph.

04:56   17  Last partial paragraph.

04:56   18         This is the part that counsel relies on to say that

04:56   19  software -- that the priority values may be updated or changed

04:56   20  under software control, but it says right in the middle there

04:56   21  starting at the end of the line in about the middle, by

04:56   22  implementing the interrupt priority register 212 as a read

04:56   23  write register, the assigned priority values may be updated or

04:56   24  changed under software control.

04:56   25         Now, first of all, it does go on to disparage that

04:56  1   technique, but let's look at -- counsel did start his argument

04:56  2   by saying that there were two embodiments here, and this 212 is

04:56  3   the first embodiment.  It's Figure 2.

04:56  4       If we could go to Figure 2.

04:56  5       Figure 2 has 212, has interrupt priority register.  It has

04:57  6   one of them, but that's not the claimed embodiment in Claims 1

04:57  7   and 9.

04:57  8       If we could go to Claim 1.

04:57  9       Claim 1 requires two hardware interrupt priority storage

04:57  10  devices.  That's not embodiment shown in Figure 2 that -- the

04:57  11  text that VLSI relies on repeatedly refers to.  The text that

04:57  12  VLSI refers to is simply not the embodiment claimed in Claims 1

04:57  13  and 9, and there's an entire body of case law, as Your Honor is

04:57  14  well aware, regarding unclaimed embodiments under the Johnson

04:57  15  and Johnston line of cases, and this is one of those cases

04:57  16  where even if -- and, frankly, Embodiment No. 1 is very

04:57  17  explicit in saying it can have one or more, but even if that

04:58  18  was an embodiment, that's not what Claims 1 and 9 are claiming

04:58  19  because they require two.  And the patent goes on at the end of

04:58  20  Column 6 to disparage the software use of writing the interrupt

04:58  21  priorities and say, we prefer the hardware, and then it spends

04:58  22  columns and columns and columns talking about the hardware, and

04:58  23  then finally it all culminated in prosecution.

04:58  24      If we could go to our Slide 22.

04:58  25      All of these statements, all of this disparagement in the

04:58  1   patent itself of the prior art, software, interrupt control,

04:58  2   techniques and the teaching and the solving of the problem

04:58  3   using hardware all culminated when the Patent Office granted

04:58  4   these claims and the patent examiner said in response once

04:58  5   again to the prior patent owner's representations that -- about

04:58  6   the scope of the claims, the Patent Office said, the examiner

04:59  7   interpreted the claims in light of the specification and in

04:59  8   further view of applicants' persuasive argument that Kershaw

04:59  9   uses the operating system software to set the interrupt

04:59  10  priority values, whereas Claim 1 specifies that a different

04:59  11  interrupt priority level information for each requested

04:59  12  interrupt priority request is stored in devices.  That's the

04:59  13  hardware.

04:59  14      And then he goes on and at the end he emphasizes that part

04:59  15  of the argument that he relied on and found persuasive was that

04:59  16  the claimed invention eliminated the requirement for software

04:59  17  management of priority level changes during context switches.

04:59  18  And all we're asking, Your Honor, is that the current owner of

04:59  19  this patent be held to the word and the representations of the

04:59  20  original owner to the Patent Office in order to obtain this

04:59  21  patent.

04:59  22      MR. HATTENBACH:  I'll be quick, Your Honor, but I will

05:00  23  speak slowly.

05:00  24      Can we go to Slide 220?

05:00  25      THE COURT:  Actually, I'm going to go with plain and

05:00    1   ordinary meaning.

05:00    2       MR. HATTENBACH:  Thank you, Your Honor.

05:00    3       THE COURT:  You're welcome.  I did that to save my court

05:00    4   reporter.

05:00    5       (Laughter.)

05:00    6       THE COURT:  However, let me make clear on the record

05:00    7   Intel's arguments are not lost on the Court.  And we will --

05:00    8   when we get out our order that tells you the basis for our

05:00    9   constructions, I feel that Intel will feel -- will understand

05:00   10   that what they've argued has been heard.  We will -- as part of

05:00   11   the plain and ordinary meaning construction in this case, we

05:00   12   will reflect what occurred during the prosecution history of

05:00   13   the case.

05:00   14       Mr. Ravel?  Please tell me I get more binders.

05:01   15       (Laughter.)

05:01   16       MR. RAVEL:  We -- you have all of them already.

05:01   17       THE COURT:  Okay.

05:01   18       MR. RAVEL:  I'm Steve Ravel for Intel, and, first of all,

05:01   19   I'd like to thank the Court for putting me and my 1977

05:01   20   political science degree at ease, and more to the point, I'd

05:01   21   really like to thank the Court for its assistance in managing

05:01   22   expectations for my appearance here in front of you today.

05:01   23       And I want to start on the slide that's before you No. 43,

05:01   24   and most specifically with the underlined red the, singular,

05:01   25   plurality of interrupt priority storage devices.  And we're

05:01  1   going to read this claim from the bottom up, and I think it's

05:02  2   very important to read it from the bottom up here because the

05:02  3   thing that drives indefiniteness here, the thing that makes

05:02  4   this analogy to a real estate legal description not reasonably

05:02  5   certain enough to enforce starts there with the singular

05:02  6   plurality, and unless I missed it, you will not see this third

05:02  7   claim limitation in VLSI's presentation at all.  And it is the

05:02  8   thing that renders it indefinite and not reasonably certain.

05:02  9   It is the thing that puts it over the edge.

05:02  10       So picking up right there with the Court's official video

05:02  11  on the anatomy of a patent case and the analogy to a real

05:03  12  estate deed, I want to go back dejavu all over again to the

05:03  13  1990s when you were a general civil common-law judge and I was

05:03  14  a general civil common-law trial lawyer and our Socratic

05:03  15  dialogues included or were actually dominated by discussions

05:03  16  about whether language was sufficiently certain in a deed and a

05:03  17  contract and a statute to put people on notice and to be

05:03  18  reasonably enforceable against them, and I think the tools we

05:03  19  developed there will stand us in good stead in determining

05:03  20  indefiniteness here today.  And a little later on I might

05:03  21  expand that real estate analogy to Michael Dell's suburban

05:03  22  homestead where he runs regular kind of horses and Arabian

05:03  23  horses and maybe use horses as the analogy as an ohmage to

05:03  24  Judge Nowlin, but it may not be necessary.

05:04  25       Let's dig into the language.  Singular, the plurality of

05:04  1  interrupt priority storage devices.  What is the clear road
05:04  2  map, the clear antecedent basis for that?  Notice that we see
05:04  3  plurality of interrupt priority storage devices twice earlier
05:04  4  in the claim connected by the conjunctive and.  So how do you
05:04  5  square the singular plurality down in the third limitation with
05:04  6  the conjunctive and tying the similar limitations in the first
05:04  7  two paragraphs?  And the answer is you don't.
05:04  8       So to understand in a little bit more formal way why the
05:05  9  claim is indefinite, it is helpful to start at the last
05:05 10  limitation because there must be an antecedent basis for that
05:05 11  last limitation.  You have to look up and you see not one but
05:05 12  two.
05:05 13       And, Judge, I think we need to slap on those virtual
05:05 14  reality goggles that would render you and me something that we
05:05 15  would never be in real life, and that is a person of ordinary
05:05 16  skill in the art.  And so what would a person of ordinary skill
05:05 17  in the art see?  That there are two places and not one where
05:05 18  the term plurality of interrupt priority storage devices is
05:05 19  used.  And the second use is distinguishable but not in a
05:06 20  material way.  And I think if you look carefully at the first
05:06 21  two limitations, the additional verbiage in the second one does
05:06 22  nothing more than make the second of the three limitations a
05:06 23  more narrow version of the first.  Hence, the analogy to
05:06 24  Michael Dell's home place, our person of ordinary skill in the
05:06 25  art trying to figure out how big the home place was and what it

05:06   1   covered and what it included and where the fancy Arabians were

05:06   2   barned and stabled in the first limitation and any old horse in

05:06   3   the second limitation.  A person of ordinary skill in the art

05:06   4   would just be hopelessly confused about where to go for the

05:07   5   Arabian only horses or the any old kind of horses.

05:07   6       And I probably should have highlighted this sooner.  The

05:07   7   blue underlines are the distinction between the first

05:07   8   limitation and the second, and they just don't move the needle

05:07   9   for making the practitioner know where to go.  It could be

05:07   10  read, conceivably could be read as a subset of the broader

05:07   11  first limitation, but it doesn't provide any clarity.

05:07   12      VLSI is asking you to do something that the cases don't

05:07   13  let you do, and that is render either the first limitation or

05:08   14  the second limitation redundant.  Notice as we walk through it

05:08   15  specifically with the singular the on the bottom they are

05:08   16  asking you to omit, to strike out either the first limitation

05:08   17  or the second limitation.  So the reasonable practitioner

05:08   18  doesn't know whether it is one plurality, two pluralities or

05:08   19  four pluralities.  It is particularly based -- on the third

05:08   20  limitation with the plurality referring to two conjunctively

05:09   21  linked similar limitations, it's just Intel's position that you

05:09   22  can't get there from here on certainty, Judge, and let me try

05:09   23  to diffuse a couple of the things that they are trying to --

05:09   24  that they're likely to say to you based on their slides.  First

05:09   25  of all, I don't -- I don't like to issue challenges, but the.

05:09   1   How do you get over the problem caused by the, singular,

05:09   2   plurality, two conjunctions and two similar limitations?

05:09   3   They're likely to cite to you an Eastern District case that

05:09   4   says redundancy is just okay and they sure over blow that case.

05:09   5   It is a -- it is a -- it's in a footnote.  It's in unlucky

05:09   6   Footnote No. 13, and it says that you can harmonize a stray

05:09   7   whereas or wherefore, but it certainly doesn't stand for the

05:10   8   proposition that one can harmonize -- and, again, I hate to

05:10   9   stress it too much, but it's -- the bulk of the argument is the

05:10   10  two conjunctive limitations coupled with the singular plurality

05:10   11  relating back is just absolutely fail to definiteness here.

05:10   12      I also want to mention from their briefing I think today

05:10   13  for the first time -- in fact, I know today for the first time

05:10   14  instead of saying definite where their expert did opine as to

05:10   15  what it could mean, and it -- and they did chide us throughout

05:10   16  their briefing for not biting down on what it could mean or

05:10   17  rejecting a reasonable expectation, but -- a reasonable

05:10   18  construction, but all of that is just self defeating, Judge.

05:11   19  When the party that's advocating for certainty use words like

05:11   20  "could" or "a reasonable," they're just admitting themselves

05:11   21  out of court.  I have some other things to say about their

05:11   22  presentation, but I'll hold it back for rebuttal, but you just

05:11   23  can't get there from here.  Two conjunctions and a singular.

05:11   24  Can't get there from here.

05:11   25      THE COURT:  Mr. Ravel tells me you can't get there from

05:11   1   here.

05:11   2        (Laughter.)

05:11   3        MR. HATTENBACH:  I believe I can get there from here.  Let

05:11   4   me take a shot at that.

05:11   5        Can we put up Slide 294?

05:11   6        This is Mr. Hattenbach again for VLSI.  And here's the

05:11   7   language that Mr. Ravel was looking at which requires a

05:11   8   plurality of certain things and a plurality of certain things

05:11   9   which sound an awful lot like the first set of certain things

05:12   10  but then also require the language that's underlined in it's

05:12   11  either blue or purple there.  I can't quite tell.  But for each

05:12   12  of the one or more interrupt requests which appears twice.  So

05:12   13  the second providing element is narrower than the first.

05:12   14       And that actually was the argument that I understood them

05:12   15  to be making in their brief that these are just duplicative and

05:12   16  you have to provide one or two.  We can't tell, so therefore

05:12   17  it's indefinite.  And we responded to that by pointing out that

05:12   18  in fact there's some duplication of text.  It's certainly not

05:12   19  the most concise claim I've ever seen.  I'll stipulate to that.

05:12   20  But it's not indefinite for that reason that was discussed in

05:12   21  the briefing because the second element adds limitations and is

05:12   22  therefore narrower than the first.

05:12   23       As to the argument about getting there from here that was

05:12   24  raised, let me try an analogy on you, Your Honor.  Let's say

05:12   25  you have a bunch of apples in your shopping cart and you go

05:13  1    back.  You decide it's just not enough apples.  You're going to

05:13  2    get another bunch of apples.  And maybe the second bunch is of

05:13  3    a particular type whereas the first bunch is just general --

05:13  4    apples in general.  So now you have two bunches of apples, or

05:13  5    as a patent lawyer would say, two pluralities of apples.

05:13  6         THE COURT:  They would say two pluralities of fruit.

05:13  7         (Laughter.)

05:13  8         MR. HATTENBACH:  Very well.

05:13  9         THE COURT:  They wouldn't want to be bound to it being

05:13  10   apples.

05:13  11        MR. HATTENBACH:  If I started speaking like that, I might

05:13  12   get thrown out of many stores, but, nonetheless, they would say

05:13  13   two pluralities of fruit.  And if someone -- you were checking

05:13  14   out and the checker said, give me one of those pieces of fruit,

05:13  15   you wouldn't say, I don't know what you're talking about.

05:13  16   You'd be able to pick one of the pieces of fruit, whether they

05:13  17   were apples or bananas or anything else.  I think the same

05:13  18   applies here.  There's a first plurality, a second plurality,

05:13  19   and then the element that comes next that he was taking issue

05:14  20   with just requires you to pick one of those things.  He didn't

05:14  21   mention this, but a plurality -- plurality's a strange word in

05:14  22   that multiple pluralities are themselves a plurality.  And the

05:14  23   claimed plurality which is on the next -- it's the next element

05:14  24   to follow and it's not on our slide because I don't think they

05:14  25   made this argument before, but the claimed -- that element

231

05:14    1    says, just pick one of the things that were introduced above.

05:14    2    It's the two bunches of apples.  You just have to pick an

05:14    3    apple.  I don't think there's anything so unclear about that

05:14    4    that the claim should be rendered indefinite.  It definitely

05:14    5    should be criticized for using excess verbiage.  Like I said,

05:14    6    we'll stipulate to that.  But figuring out what it means to

05:14    7    pick an apple from two bunches of apples is not something

05:14    8    that's beyond the capability of an elementary school student,

05:15    9    let alone a person of ordinary skill in the art even in the

05:15    10   abstract.  And here it's not being done in the abstract.  It's

05:15    11   being done in the context of a patent specification that is in

05:15    12   accord with what I just described.

05:15    13        And so on -- I don't want to take any more of your time,

05:15    14   but on Slide 297 the patent does describe two devices for

05:15    15   priority storage, storage of priority information and a -- and

05:15    16   a plurality of those devices.  Two is a plurality.  And that's

05:15    17   entirely consistent with our construction of the term.  They

05:15    18   said in their briefing, by the way -- well, let me address one

05:15    19   other issue.  In terms of the alleged lack of clarity here.  As

05:15    20   we've heard many times, and this is the Phillips case that says

05:15    21   itself but many others as well have said you have to look at a

05:16    22   the context of the particular claim or the particular element.

05:16    23   You can't just pluck it out of thin air and look at it out of

05:16    24   context.  Well, the context here -- and this is what a person

05:16    25   of skill in the art would be looking at when trying to

05:16  1   determine, do I need one plurality or two pluralities or

05:16  2   something else?  They would see, and this is, ironically,

05:16  3   enough in exactly the same element that Intel is focusing upon,

05:16  4   but they didn't mention this, that when it came to interrupt

05:16  5   priority storage devices where the patentee wanted to say I

05:16  6   want two of them as opposed to one plurality, they said a first

05:16  7   interrupt storage device and a second interrupt priority

05:16  8   storage device.  And so someone -- if someone was left

05:16  9   wondering what was happening here, they would see where

05:16  10  multiple instances of a particular type of element were desired

05:16  11  was called out in the claim.  Where they weren't, it wasn't.

05:17  12  And then I think this is in the briefing so I'll just say that

05:17  13  at least some redundancy is permissible.

05:17  14      There was also an argument in the briefing that we're

05:17  15  asking the Court to disregard the second providing limitation

05:17  16  is duplicative.  We're absolutely not.  Both elements need to

05:17  17  be satisfied for there to be infringement.  It's simply the

05:17  18  case.  But when the claims are applied -- and this is more in

05:17  19  the infringement side of things than the claim construction

05:17  20  side of things.  The same language in the claim can be

05:17  21  infringed by the same element even if that language appears

05:17  22  multiple times.  And we had a bunch of cases -- we had a bunch

05:17  23  of cases supporting that proposition in our briefing.

05:17  24      To the extent there's any lack of clarity -- and we don't

05:17  25  think there is.  They seem to think there is.  There's an easy

05:17  1    solution here.  The law disfavors invalidation of patents.  It

05:18  2    disfavors findings of indefiniteness where there's another

05:18  3    reasonable option, and the most reasonable option here, and we

05:18  4    have no problem with it whatsoever, for resolving this dispute

05:18  5    is to simply construe the claim.  You could say it requires at

05:18  6    least one plurality of interrupt storage devices itself

05:18  7    comprised of at least two such devices.  And that proposed

05:18  8    language is on Slide 307, and we'd ask Your Honor if you think

05:18  9    there's any lack of clarity, let's just -- let's just get rid

05:18  10   of it by adopting a construction that's set forth here, that's

05:18  11   completely consistent with not only the claim language but, as

05:18  12   I said, the preferred embodiment.

05:18  13       Any questions?

05:18  14       THE COURT:  Had you proposed that to us before?  I don't

05:18  15   remember seeing that.

05:18  16       MR. HATTENBACH:  I think we proposed the concept of

05:18  17   clarifying any alleged confusion with a construction in our

05:18  18   briefing.  I don't recall offhand, but I can check to see

05:18  19   whether we put that exact language, but that is what we said

05:19  20   all along we thought it meant.  So I think if you put all of it

05:19  21   together, the answer is yes.

05:19  22       THE COURT:  And I know I have in my notes as I was going

05:19  23   through it and Josh was going through it something that --

05:19  24   along the lines of what about saying something about two

05:19  25   devices, but I don't remember if you all submitted something.

234

05:19  1        MR. HATTENBACH:  If you give me just a moment, I can

05:19  2   probably track that down.

05:19  3        Well, I don't want to take up your time.  It is our

05:19  4   proposal it -- I think if it's not set forth explicitly in our

05:19  5   brief, it would be inferred from the fact that we said we think

05:19  6   this is the right construction all along and that the better

05:19  7   approach to invalidation would be to interpret it in the way

05:19  8   that we understand it.  But I don't recall whether -- I'm just

05:19  9   trying to answer your question as precisely as possible whether

05:20  10  we actually said, here's how you should interpret it, but we

05:20  11  are saying that now.

05:20  12       THE COURT:  That's all I need to know.

05:20  13       MR. HATTENBACH:  Thank you, Your Honor.

05:20  14       THE COURT:  Let me hear from Mr. Ravel.

05:20  15       MR. RAVEL:  Judge, I will represent to the Court that the

05:20  16  extent of their curative attempts up to this point have been

05:20  17  limited to the word "definite."  There was not a plain and

05:20  18  ordinary meaning.  There was not -- there was the chiding of us

05:20  19  of being rejecting of what it could be or what the most

05:20  20  reasonable reading was, but in terms of a proposed fix to the

05:20  21  problem, we saw this for the first time today, not complaining,

05:20  22  but this doesn't do the trick on many levels.  First of all,

05:20  23  it's inaccurate because at least one should really be two.  The

05:21  24  itself should be each.  And I could go on and on about why it's

05:21  25  wrong, but the real reason that it's wrong is the case law that

05:21  1    says they're leading you into error when they ask you to

05:21  2    rewrite a claim to save it from indefiniteness.  I mean, the

05:21  3    cases are just legion on that.

05:21  4        Mr. Lee, may we go to Slide 48, please?

05:21  5        I'll match their spec reference that they think is

05:21  6    clarifying with a spec reference that we think is equally

05:21  7    confusing.  So it points in both directions.  So I think that's

05:21  8    a wash.  But what I want to conclude with is something

05:21  9    remarkably simple, certainly simple to someone simple minded in

05:22  10   the way that I am.  And let's go back to the phrase "the

05:22  11   plurality."  I think we can agree that the "the" must have an

05:22  12   antecedent basis, and the unanswerable question and the

05:22  13   question that destroys definiteness is, is it the first

05:22  14   limitation or the second limitation that is the appropriate

05:22  15   antecedent basis for the the plurality?  And that's just

05:22  16   unanswerable under the four corners of this claim, Judge.

05:22  17       THE COURT:  What if they had said one of the pluralities,

05:22  18   i-e-s?

05:22  19       MR. RAVEL:  I'm quick to point out they didn't, but --

05:23  20       THE COURT:  Well, and I -- whether they did or not, they

05:23  21   didn't, but I am somewhat taken by the argument that plurality

05:23  22   is one of those words where a plurality of -- more than one

05:23  23   plurality can be a plurality.  You can have -- if you have

05:23  24   three pluralities of bananas and you put them on a table, you

05:23  25   have a plurality.

05:23 1       MR. RAVEL:  But that argument is -- runs afoul of the,

05:23 2  then why did they say it twice?  If one plurality could -- why

05:23 3  did they have to say it twice?  To get to that solution to the

05:23 4  problem, they're reading either the first limitation or the

05:23 5  second one out.  Even if that's right, it doesn't solve that

05:23 6  problem.

05:24 7       That's all I've got absent questions, Judge.

05:24 8       (Conference between the Court and Mr. Yi.)

05:24 9       THE COURT:  Could we have that -- Mr. Ravel, could I have

05:25 10 you back for a second?  I'm sorry.  I was -- could I have your

05:25 11 last slide up?

05:25 12      MR. RAVEL:  This one?

05:25 13      THE COURT:  So we in the first paragraph, providing a

05:25 14 plurality, and then in the second paragraph, providing a

05:25 15 plurality, and then in the third paragraph it says, one of a

05:25 16 plurality, and really if there's an error here, they could have

05:25 17 said one of the pluralities.  They could say one of either, but

05:25 18 it is not -- it is doesn't strain me -- it doesn't cause me too

05:25 19 much stress to think that the person who wrote this when he

05:26 20 said one of the plurality was talking about either the first

05:26 21 paragraph or the second paragraph and -- because it's

05:26 22 consistent with what is said after that.  One of the plurality

05:26 23 of interrupt priority storage devices is what starts each of

05:26 24 those, and so that paragraph makes sense if they're talking

05:26 25 about one of those two pluralities.

05:26  1        MR. RAVEL:  It's -- it's one of the devices, not one of

05:26  2   the pluralities.  It modifies something different which I

05:26  3   should have made more clear because that's the heart of the

05:26  4   argument.

05:26  5        THE COURT:  Okay.  Then I'm -- I didn't follow what you

05:26  6   just said so help me out.

05:26  7        MR. RAVEL:  Can I approach?

05:26  8        THE COURT:  Of course.

05:26  9        MR. RAVEL:  The, the plurality of interrupt storage

05:26 10   devices.

05:27 11        THE COURT:  That's just repetitive of what's said in the

05:27 12   first line of each of the other paragraphs.

05:27 13        MR. RAVEL:  Right.

05:27 14        THE COURT:  Maybe Mr. Lee can help.

05:27 15        MR. RAVEL:  I think Mr. Lee can explain what I'm trying to

05:27 16   say better.

05:27 17        THE COURT:  I think that'd be great.

05:27 18        MR. RAVEL:  And I'm happy to defer.

05:27 19        MR. LEE:  Very quickly, Your Honor.

05:27 20        THE COURT:  Sure.

05:27 21        MR. LEE:  When it says one of the plurality, it's one of

05:27 22   the plurality of interrupt priority storage devices.  So the

05:27 23   one of is not one of the plurality.  It's one of the devices if

05:27 24   you read on in the claim.  And up here it's a plurality of

05:27 25   interrupt storage devices, a plurality, and then this is the

05:27  1   plurality that's the search of the antecedent basis.  I was

05:27  2   trying to whisper in Mr. Ravel's ear because I think when Your

05:27  3   Honor focused on one of, it's not one of the pluralities.  It's

05:27  4   one of the devices.

05:27  5        THE COURT:  I understand.  Let me -- in fact, let me

05:27  6   just -- what will help -- what's unfortunate is where the slide

05:28  7   cuts off.  So let me just look at this.

05:28  8        MR. RAVEL:  You selectively couple the device, not the

05:28  9   plurality, Judge.

05:28  10        THE COURT:  Okay.  Thank you, sir.

05:28  11        Yes, sir.

05:28  12        MR. HATTENBACH:  All right.  I don't think the fact that

05:28  13   it's going to device as opposed to a plurality of devices is

05:28  14   anything we either disagree with or that affects the analysis

05:28  15   that Your Honor was articulating.  It goes back to the example

05:29  16   with the apples or, if you like, maybe I should have used the

05:29  17   word "fish" since the plural of fish is fish just like the

05:29  18   plurality of plurality is plurality.  That was hard to say.

05:29  19        If I said, I'm going to provide you with some fish and

05:29  20   then I'm going to provide you with some fish that have big

05:29  21   scary teeth and I say, you need to select one of the fish,

05:29  22   everyone would know what we were talking about.  And that's all

05:29  23   that's happening here.

05:29  24        I did have a moment to look for the answer to Your Honor's

05:29  25   other question about our Slide 307, and the answer I think is

05:29  1  yes.  On our opposition brief we said on Page 40, in any event,

05:29  2  if the Court finds that the claim would benefit from

05:29  3  clarification, it can easily be clarified through

05:29  4  interpretation in the manner VLSI proposes.  And then in our

05:29  5  reply brief we said on Page 19, quote, Claim 1 requires at

05:30  6  least one plurality of interrupt priority storage devices,

05:30  7  itself made up of at least two such devices.  So we did change

05:30  8  the word "made up" to "comprised."  Happy with either one of

05:30  9  them, but that's the concept that the claims we're trying to

05:30  10  get across, and, again, we think the worst case scenario for

05:30  11  this claim should be it should be chided for being too wordy

05:30  12  and it should be clarified or left alone.

05:30  13       Thank you, Your Honor.

05:30  14       THE COURT:  Anything else, Mr. Ravel?

05:30  15       MR. RAVEL:  No, Your Honor.

05:30  16       THE COURT:  Thank you, everyone.

05:31  17       With respect to the following claim term, the Court is

05:31  18  going to find that it is not indefinite.  We will take under

05:31  19  consideration whether or not it deserves a claim construction

05:31  20  as suggested by plaintiff, but I don't -- I don't know whether

05:31  21  that's likely or not, probably not likely, but it's not out of

05:31  22  the question that we'll get you a claim construction, but for

05:31  23  purposes of today's hearing, I find it's not indefinite.

05:31  24       Is there anything else that we need to take up?

05:32  25       MR. LEE:  Not for Intel, Your Honor.

05:32   1        THE COURT:  Counsel?

05:32   2        MR. HATTENBACH:  Not for VLSI, Your Honor, other than to

05:32   3   say thank you for your time.  I know you put a lot of effort

05:32   4   into this and we appreciate it.

05:32   5        THE COURT:  Well, and I don't know how many clients are

05:32   6   here.  I recognize at least Intel has a client here which I

05:32   7   always think is the very best thing that can happen.  I think

05:32   8   it's important for not only the lawyers who appear in front of

05:32   9   me but for their clients to be here and have some idea of who

05:32   10  their case is in front of and whether that's a good thing or

05:32   11  not.  But I will say, without any reservation, this -- you guys

05:32   12  are all exceptional.  I truly think I have the greatest job on

05:32   13  the planet, and the reason why is I have the most amazing

05:32   14  lawyers on the planet arguing things and I just hope I lived up

05:33   15  to the high standard that each one of you had in terms of the

05:33   16  preparation of your briefs and your arguments here today.  You

05:33   17  all made every single decision that I had to make very

05:33   18  difficult because the arguments on both sides were so strong

05:33   19  and well written and argued.  So I thank you all for being

05:33   20  here.  I am probably -- well, I'm certain I'm unlike most other

05:33   21  federal judges, but I am probably most different in that I am

05:33   22  the person who is least interested in seeing you guys settle.

05:33   23  I think this -- it would be tremendous to have a trial.  I

05:33   24  think settlements are great.  I think cases should settle

05:33   25  because I think that's just a good thing for America and for

05:33  1   everyone involved if you can resolve it, but I'm very much

05:33  2   looking forward to every phase of this case up through and, if

05:33  3   it happens, including trial.  So I very much appreciate

05:34  4   everyone being here.

05:34  5        We're close to Christmas.  I wish everyone a merry

05:34  6   Christmas and happy new year and I look forward to seeing you

05:34  7   all when we get back together.

05:34  8        THE BAILIFF:  All rise.

05:34  9        (Hearing adjourned at 5:34 p.m.)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1  UNITED STATES DISTRICT COURT )

2  WESTERN DISTRICT OF TEXAS     )

3

4      I, Kristie M. Davis, Official Court Reporter for the

5  United States District Court, Western District of Texas, do

6  certify that the foregoing is a correct transcript from the

7  record of proceedings in the above-entitled matter.

8      I certify that the transcript fees and format comply with

9  those prescribed by the Court and Judicial Conference of the

10  United States.

11     Certified to by me this 20th day of December 2019.

12

13                           */s/ Kristie M. Davis*
                             KRISTIE M. DAVIS
                             Official Court Reporter
14                           800 Franklin Avenue, Suite 316
                             Waco, Texas 76701
15                           (254) 340-6114
                             kmdaviscsr@yahoo.com
16

17

18

19

20

21

22

23

24

25