```
 1                IN THE UNITED STATES DISTRICT COURT
              FOR THE WESTERN DISTRICT OF TEXAS
 2                         WACO DIVISION

 3   VLSI TECHNOLOGY LLC            *
                                    *
 4   VS.                           * CIVIL ACTION NO. W-21-CV-57
                                    *
 5   INTEL CORPORATION             *    February 22, 2021

 6   BEFORE THE HONORABLE JEFFREY C. MANSKE & ALAN D ALBRIGHT,
                         JUDGES PRESIDING
 7            VOIR DIRE AND JURY TRIAL PROCEEDINGS
                        VOLUME 1 OF 7
 8
     APPEARANCES:
 9
     For the Plaintiff:        Morgan Chu, Esq.
10                             Benjamin W. Hattenbach, Esq.
                               Alan Heinrich, Esq.
11                             Ian Robert Washburn, Esq.
                               Amy E. Proctor, Esq.
12                             Dominik Slusarczyk, Esq.
                               Charlotte J. Wen, Esq.
13                             Jordan Nafekh, Esq.
                               Babak Redjaian, Esq.
14                             Irell & Manella, L.L.P.
                               1800 Avenue of the Stars, Suite 900
15                             Los Angeles, CA 90067-4276

16                             J. Mark Mann, Esq.
                               Andy W. Tindel, Esq.
17                             Mann, Tindel & Thompson
                               112 East Line Street, Suite 304
18                             Tyler, TX 75702

19   For the Defendant:        William F. Lee, Esq.
                               Joseph Mueller, Esq.
20                             Louis W. Tompros, Esq.
                               Felicia H. Ellsworth, Esq.
21                             Jordan L. Hirsch, Esq.
                               WilmerHale
22                             60 State Street
                               Boston, MA 02109
23
                               Mary V. Sooter, Esq.
24                             Amanda L. Major, Esq.
                               Wilmer Cutler Pickering Hale Dorr LLP
25                             1225 17th Street, Suite 2600
                               Denver, CO 80202
```

1                          J. Stephen Ravel, Esq.
                           Kelly Hart & Hallman LLP
2                          303 Colorado Street, Suite 2000
                           Austin, TX 78701
3
                           James Eric Wren, III, Esq.
4                          Baylor University Law School
                           One Bear Place #97288
5                          Waco, TX 76798-7288

6   Court Reporter:        Kristie M. Davis
                           United States District Court
7                          PO Box 20994
                           Waco, Texas 76702-0994
8

9

10       Proceedings recorded by mechanical stenography, transcript

11  produced by computer-aided transcription.

12

13

14

15

16

17

18

19

20

21

22

23

24

25

08:47  1        (February 22, 2021, 8:47 a.m.)

08:47  2        DEPUTY CLERK:  Jury selection in Case No. W-21-CV-54, VLSI

08:47  3   Technology LLC versus Intel Corporation.

08:47  4        MR. MANN:  Good morning, Your Honor.  Mark Mann on behalf

08:47  5   of VLSI, the plaintiff.  And we're ready to proceed, Your

08:47  6   Honor.

08:47  7        THE COURT:  All right.  Thank you, Mr. Mann.

08:48  8        MR. WREN:  Jim Wren on behalf of Intel, and we are ready

08:48  9   to proceed, Your Honor.

08:48  10       THE COURT:  Very good.

08:48  11       Counsel, I wanted to begin this morning by making some

08:48  12  announcements that Judge Albright wanted me to make certain

08:48  13  that I touched on this morning.

08:48  14       First, that is to remind everyone of the order regarding

08:48  15  sealed proceedings.  As you're aware, the Court has granted the

08:48  16  parties' request to have a realtime feed of the court

08:48  17  reporter's transcript to be accessed remotely.  This poses a

08:48  18  risk to sealed portions of the trial, so the Court did enter an

08:48  19  order ordering that anyone not permitted to observe the sealed

08:48  20  proceedings of the trial to disconnect from all of the above

08:48  21  feeds as they occur.  The courtroom deputy will be monitoring

08:48  22  those feeds and alert the Court of anyone not permitted to be

08:48  23  in attendance during the sealed portion of the proceedings.

08:48  24       Additionally, and I'm not certain whether or not Judge

08:48  25  Albright has conveyed this to you through his law clerks, but

08:49  1  he has reviewed your motions in limine.  And as it relates to

08:49  2  voir dire, rules as follows:  The attorneys may inquire as to

08:49  3  whether anyone has worked for or heard of the relevant entities

08:49  4  in this case, Intel, VLSI, Freescale, Fortress, et cetera, and

08:49  5  find out if anyone has any particular opinions or feelings

08:49  6  about any relevant company.  But neither party will comment on

08:49  7  the size of any of these entities.

08:49  8      Further, there will be no reference to Fortress as a hedge

08:49  9  fund, but either party can ask potential jurors if they have

08:49  10  heard of Fortress and are aware of what they do.

08:49  11      Any questions or clarifications regarding that particular

08:49  12  issue?

08:49  13      All right.  Judge Albright will meet with the parties

08:49  14  15 minutes prior to the start of opening statements.  And Intel

08:49  15  can then at that time proffer what they intend to say about

08:50  16  VLSI Fortress, and he will determine whether or not the proffer

08:50  17  is appropriate.

08:50  18      Additionally, due to a lack of time, Judge Albright has

08:50  19  requested that the FJC patent video not be shown to the jurors

08:50  20  either before or after voir dire selection.  He wants to get up

08:50  21  and running.  So they will not have had the benefit of seeing

08:50  22  that particular video.

08:50  23      As such, I've made a small revision to Intel's statement

08:50  24  of the case.  And that is striking "as you will learn or have

08:50  25  learned from the Federal Judicial Center patent video," if that

08:50  1   video's already been played for the jury, striking that and

08:50  2   just say "as you will learn during the trial, patents contain

08:50  3   what we call claims."

08:50  4        Is there any objection to that modification?

08:50  5        MR. WREN:  No, Your Honor.

08:50  6        THE COURT:  All right.  Very good.

08:51  7        All right.  Are there any matters that counsel would like

08:51  8   to address to the Court prior to proceeding?

08:51  9        MR. MANN:  Your Honor, Mark Mann.  Would you like us when

08:51  10  we are at the podium to wear a shield?  Is that what you would

08:51  11  like us to do?

08:51  12       THE COURT:  Yes.  I think that would be fine.

08:51  13       MR. MANN:  Okay.

08:51  14       THE COURT:  Mr. Wren, anything?

08:51  15       MR. WREN:  Nothing further from us, Your Honor.

08:51  16       THE COURT:  All right.  Well, then we'll be ready to go as

08:51  17  soon as I receive the word.  I've just received the

08:51  18  questionnaires.  I assume you all have as well, and that we'll

08:51  19  be getting the -- should already have received the order of

08:51  20  everyone.  I'm going to look my set over.  I haven't had the

08:52  21  opportunity to do that yet.  So I will remain here until I

08:52  22  receive word that the jury is ready to go.

08:52  23       (Recess taken from 8:52 to 9:00.)

09:01  24       THE COURT:  All right.  All rise for the jury panel,

09:01  25  please.

6

09:01  1          (Jury panel entered the courtroom at 9:01.)

09:03  2          THE COURT:  All right.  Be seated, everyone.

09:03  3          At this time I'll have the clerk of the Court call the

09:04  4  case.

09:04  5          DEPUTY CLERK:  Jury selection in Case No. W-21-CV-57, VLSI

09:04  6  Technology LLC versus Intel Corporation.

09:04  7          THE COURT:  Counsel, if you'll announce your appearances,

09:04  8  please.

09:04  9          MR. MANN:  Would you like me to approach?

09:04  10         THE COURT:  No.  Just right from there is fine.

09:04  11         MR. MANN:  Your Honor, good morning.  Mark Mann on behalf

09:04  12  of VLSI.  And we're ready to proceed, Your Honor.

09:04  13         THE COURT:  Thank you, Mr. Mann.

09:04  14         MR. WREN:  Your Honor, Jim Wren on behalf of Intel

09:04  15  Corporation, and we are ready to proceed.

09:04  16         THE COURT:  Thank you, Mr. Wren.

09:04  17                      VOIR DIRE PROCEEDINGS

09:04  18         THE COURT:  And good morning, everyone.  My name is Jeff

09:04  19  Manske.  Welcome to jury duty.  I know it's taken about 11 days

09:04  20  from the time we had this originally scheduled for you all to

09:04  21  be here to get to this point.  The parties are certainly eager

09:04  22  to proceed.

09:04  23         And I hope you can see that we have certainly emphasized

09:04  24  your safety.  That has been a priority to us with traveling,

09:05  25  either due to the inclement weather that we had, or also with

7

09:05  1    respect to COVID.  We have taken tremendous efforts just to

09:05  2    make certain that you all are safe.

09:05  3         And I want to thank you for your time in being here today.

09:05  4    Hopefully, you did not have any extreme hardships as a result

09:05  5    of the severe weather that just occurred.

09:05  6         Today will likely be my only opportunity to be with you

09:05  7    during trial.  I was asked to preside over the jury selection.

09:05  8    The United States District Judge, Alan Albright, will preside

09:05  9    over the trial which will begin immediately after jury

09:05  10   selection.  In other words, I'm just the opening act and here

09:05  11   to make sure we get a jury seated and selected.

09:05  12        I do again want to thank you for your time and effort in

09:05  13   coming here this morning.  Jury service is a critical part of

09:05  14   the United States Justice System.  The judge and the jury are

09:06  15   partners in seeking to do justice in the case before them.

09:06  16        The judge makes the rulings of law that bind the

09:06  17   attorneys, the parties, the witnesses and all of you who will

09:06  18   serve on the jury.  Those of you chosen to serve on the jury

09:06  19   also act as judges.  You will decide the facts based upon the

09:06  20   testimony and other evidence.

09:06  21        Today we will be selecting a jury of seven people.  Jury

09:06  22   selection takes time, but it is critically important to your

09:06  23   ability to fulfill your essential role.  Let me explain why

09:06  24   it's not just a group of randomly selected people.

09:06  25        The parties in a case deserve a hearing where people are

09:06  1   unbiased about the issues involved in their case.  This applies

09:06  2   to me as well as to you.  I can excuse myself, or attorneys can

09:07  3   ask me to step down if there's a risk of preconception or bias.

09:07  4   If you're excused during jury selection, please do not feel

09:07  5   insulted or singled out.  Your life experiences may bring you

09:07  6   too close to this particular case to be objective.  We rarely

09:07  7   use the first seven jurors called.  If you're involved in a

09:07  8   trial, wouldn't you want to be assured that the people dealing

09:07  9   your case are considering it openly and fairly?

09:07 10       Jury duty is not a duty to be taken lightly.  The effort

09:07 11   and sacrifice you took to be here today is not taken for

09:07 12   granted either by the attorneys, the judges that will be

09:07 13   presiding over the case or the courthouse staff.

09:07 14       Being a juror is a duty that requires independent thought

09:07 15   and judgment.  You are an officer of the Court.  You will take

09:08 16   an oath or affirmation that you will follow the law as given to

09:08 17   you by the Court while you exercise your individual discretion

09:08 18   in making the decisions asked of you.

09:08 19       Jury selection is also known as the voir dire process.

09:08 20   Voir dire means to speak the truth.  During this process I and

09:08 21   the lawyers will be asking you many questions about various

09:08 22   subjects that relate to the law and to this case.

09:08 23       Importantly, you should know that there is no right or

09:08 24   wrong answers.  All we are asking is that you be honest and

09:08 25   forthright.

09:08   1       Being a good juror and a good citizen means that if this

09:08   2   case is not the right one for you to serve on, just let me know

09:08   3   and we'll discuss it.

09:08   4       Many times jurors want to talk privately about an answer

09:08   5   to a question.  We never want to embarrass anyone.  That's not

09:09   6   the point of this.  If there's something you'd like to share

09:09   7   with the Court that you prefer that everyone else not hear,

09:09   8   just ask to approach and then we'll have a private conversation

09:09   9   up here at the bench regarding that particular issue.

09:09   10      It has been my experience in my 20 years as a judge that

09:09   11  many jurors believe that if they don't talk, they won't be

09:09   12  selected.  Well, let me assure you the quickest way to be

09:09   13  selected is not to say anything.  In other words, jurors who

09:09   14  talk, walk.  Jurors who have nothing to say, stay.

09:09   15      So please be honest and share your thoughts with both me

09:09   16  and the attorneys.  I think you're going to find your jury

09:09   17  service to be deeply rewarding, particularly if you do serve on

09:09   18  a jury.  You're going to get to see an inside look at our

09:09   19  system in action.  You'll often be evaluating the witnesses as

09:10   20  well as written or other evidence before determining what the

09:10   21  facts of the case truly are.

09:10   22      You will exercise independent thought and judgment.  Yet

09:10   23  you will do that as a member of a jury, sharing a seriousness

09:10   24  of purpose and a respect for the dignity of our legal process

09:10   25  of trial by jury.

09:10  1        One caution I would give you:  Do not try to prejudge a

09:10  2   case and assume that you know where the trial is going.  Wait

09:10  3   until you have heard all of the evidence, the arguments of the

09:10  4   attorneys and the Court's instructions on the law before making

09:10  5   a decision.

09:10  6        Let me kind of give you an overview as to how we're going

09:10  7   to be proceeding this morning.

09:10  8        I've got a series of questions that I'm going to be

09:10  9   asking.  Typically what would happen, you would raise your hand

09:10  10  if you had an affirmative response to a question, and I'd call

09:11  11  on you, and we'd have a dialogue about that particular subject.

09:11  12  And we would have someone on our court staff pass a microphone

09:11  13  among you.  But in light of COVID, we don't want to be passing

09:11  14  a microphone that's been handled by everybody.

09:11  15       So the way it will work, I will ask the question and if

09:11  16  you have an affirmative response to that question, I want you

09:11  17  to raise your hand, and then I'd ask that you keep your hand

09:11  18  raised until I recognize you and call you by name and juror

09:11  19  number.

09:11  20       As you can tell, we have a court reporter down here, and

09:11  21  she is making a record of these proceedings.  And it's

09:11  22  important that we do have a record of who responded in which

09:11  23  manner to what question.  So that's the purpose of that.

09:11  24       After I go through all of my questions, I'm then going to

09:11  25  recognize the attorneys for 15 minutes per side to ask some

09:11  1   general questions of you.  Again, you'll just respond by

09:12  2   raising your hand if you have an affirmative response.  There

09:12  3   won't be any dialogue at that stage.

09:12  4        After we get through that process, I will then have notes

09:12  5   before me that will have the various questions that you have

09:12  6   indicated you have an affirmative response to.  What I'm going

09:12  7   to do then is I'm going to call you up one at a time beginning

09:12  8   with Juror No. 1.  That would be Ms. Bradley.

09:12  9        So Ms. Bradley will come up here and stand at that

09:12  10  microphone right to her right.  And then I'm going to go over

09:12  11  with each of you and ask you some general questions.  I'm going

09:12  12  to ask you your name, where you're from, what you do for a

09:12  13  living, and what your spouse does for a living, talk about

09:12  14  whether or not you've ever served on a jury, you've ever been a

09:12  15  party to a lawsuit other than any type of family law matter, if

09:12  16  you've ever received any type of legal training, you've ever

09:12  17  served in the military, what your hobbies and interests are.

09:13  18  And then I'm going to go over and ask you some questions based

09:13  19  upon your questionnaire and then follow up with those questions

09:13  20  for which you had an affirmative response to.  So you're going

09:13  21  to be on your feet for a little bit with all of this.

09:13  22       After I get done asking my questions of you individually

09:13  23  while you're at the microphone, then I've given the lawyers,

09:13  24  you know, a minute or two each to go ahead and follow up with

09:13  25  you all with any questions that they have that they'd like to

09:13  1    explore further.  So that is going to be the general

09:13  2    proceeding.

09:13  3        After we do that, the lawyers will then process all of the

09:13  4    information, and the decision will be made as to which seven

09:13  5    jurors will proceed.

09:13  6        Those of you that ultimately will not be selected for the

09:13  7    jury, I'm going to ask that you stay until the jury is in the

09:13  8    box because I have learned over my years as a judge, if I let

09:13  9    everyone go at that point, that's always when some juror speaks

09:14  10   up and says:  Judge, you know, I've been thinking about a

09:14  11   particular question you asked, and I think I may need to be

09:14  12   excused.  And if I let everyone go, I don't have anyone to take

09:14  13   that individual's place.

09:14  14       We're going to be respectful of your time.  Hopefully we

09:14  15   can get through this process by lunchtime and to be ready to go

09:14  16   to proceed with the start of the trial immediately after lunch.

09:14  17       We're now about to select a jury for a case styled -- that

09:14  18   just means what the name of the case is -- VLSI Technology LLC

09:14  19   versus Intel Corporation.

09:14  20       The Court has requested each party to prepare a statement

09:14  21   summarizing what they believe this case is about.  What I'm

09:14  22   about to read to you is not evidence but merely the parties'

09:14  23   belief as to what this lawsuit involves.  I will first read the

09:15  24   plaintiff's statement and then the defendant's statement.

09:15  25       Here's plaintiff VLSI's description of the case:  This is

09:15  1   the case brought by the plaintiff, VLSI Technology LLC,

09:15  2   hereinafter referred to as VLSI, against the defendant, Intel

09:15  3   Corporation, hereinafter referred to as Intel, for patent

09:15  4   infringement.

09:15  5       VLSI owns several patents on inventions related to

09:15  6   computer technology.  Intel Corporation makes and sells

09:15  7   microprocessors, so product used in computers.

09:15  8       VLSI claims that many of the microprocessors Intel sells

09:15  9   are using VLSI's patented technologies without VLSI's

09:15 10   permission.  Intel denies that it is infringing the patents,

09:15 11   and Intel also claims that the patents are invalid.

09:16 12       VLSI claims that the patented technologies make Intel's

09:16 13   products faster and more energy efficient which allows Intel to

09:16 14   make more money.  Intel claims that the patents are not

09:16 15   valuable.  VLSI seeks monetary damages from Intel based on the

09:16 16   value of Intel's use of VLSI's patented inventions.

09:16 17       Here's defendant Intel's description of the case:  This is

09:16 18   a case of alleged patent infringement.  There are two separate

09:16 19   patents that VLSI has asserted against Intel.  The first patent

09:16 20   is U.S. Patent No. 7,523,373.  Patents are commonly referred to

09:16 21   by the last three digits of the patent number.  Thus the first

09:16 22   patent, No. 7,523,373, will be referred to as the '373 patent.

09:17 23       The other patent at issue in this case is United States

09:17 24   Patent No. 7,725,759 which will be referred to as the '759

09:17 25   patent.  You will hear these two patents referred to

09:17  1    collectively as the asserted patents or patents-in-suit.

09:17  2         As you will learn during the trial, patents contain what

09:17  3    we call claims.  To infringe a patent, a party must infringe at

09:17  4    least one claim of that patent.  VLSI contends that Intel has

09:17  5    infringed certain claims of the asserted patents and that such

09:17  6    infringement has been willful.

09:17  7         VLSI contends that it is entitled to money damages as a

09:17  8    result of that alleged infringement.  Intel denies that it has

09:18  9    infringed, willfully or otherwise, any of the asserted patents.

09:18  10   Intel also contends that the asserted claims of these patents

09:18  11   are invalid.

09:18  12        Finally, Intel contends that because it has not infringed

09:18  13   the claims of the asserted patents and because those claims are

09:18  14   invalid, VLSI is not entitled to any money damages.

09:18  15        That concludes the reading of the parties' statements.

09:18  16        At this time I'm going to introduce you to the attorneys

09:18  17   representing each of the parties, and then I'm going to have

09:18  18   them introduce the other attorneys with them, the law firm

09:18  19   they're with, as well as the corporate representative for those

09:18  20   parties.  And the reason for that of course is we want to find

09:18  21   out whether or not any of you are familiar or know any of these

09:18  22   attorneys or anyone at any of their law firms and if you happen

09:18  23   to know anyone who works for any of the companies represented

09:19  24   here today.

09:19  25        The reason for that is:  Do you have any relationship with

09:19  1   any of these individuals that would cause you to be anything

09:19  2   other than fair and impartial?

09:19  3        At this time I'm going to introduce you to Mr. Mark Mann,

09:19  4   who is an attorney with Mann Tindel in Henderson, Texas.

09:19  5        Mr. Mann, if you'll introduce yourself and everyone with

09:19  6   you, please.

09:19  7        MR. MANN:  Thank you, Your Honor.  May it please the

09:19  8   Court.

09:19  9        Good morning, ladies and gentlemen.  The members here in

09:19  10  the courtroom today, I first want to introduce my friend and

09:19  11  colleague, Mr. Morgan Chu, who is our lead counsel.  Our

09:19  12  assistants today are David Weinberg and Carrie Mason, and then

09:19  13  we have a representative from NXP, vice president, Jim Spehar.

09:19  14       Can you stand up, Mr. Spehar?

09:20  15       And our corporate representative, Your Honor, Mr. Michael

09:20  16  Stolarski, who is the chief executive officer for VLSI.

09:20  17       Would you like me to introduce those that are not here

09:20  18  today also?

09:20  19       THE COURT:  No.  I think anyone that is going to be

09:20  20  actively participating in the trial of this matter, and if

09:20  21  you've covered those, then that should be sufficient.

09:20  22       MR. MANN:  There are some others, but they're all with the

09:20  23  Irell Manella law firm, Your Honor, if that helps with

09:20  24  defining.  Otherwise, I'll be glad to read the names.

09:20  25       THE COURT:  All right.  Ladies and gentlemen, let me ask

09:20  1  you:  Are any of you familiar with or have you worked for any

09:20  2  of the attorneys or law firms whose names have just been

09:20  3  called?  If so, if you'll raise your right hand at this time.

09:20  4      Court notes for the record that no hands are raised.

09:20  5      Are either of you -- are any of you familiar with any of

09:20  6  the individuals that were identified as being a corporate

09:21  7  representative or the like for the plaintiff, VLSI?  If so,

09:21  8  raise your right hand.

09:21  9      Court notes for the record that no hands are raised.

09:21  10      Have any of you worked for or are familiar in any way with

09:21  11  the plaintiff, VLSI LLC?  If so, raise your right hand at this

09:21  12  time.

09:21  13      Court notes for the record that no hands are raised.

09:21  14      At this time I'm going to give the defendants an

09:21  15  opportunity to do the same that I just have as the plaintiffs.

09:21  16  The defendants in this matter are represented by Mr. Jim Wren

09:21  17  of Baylor Law School as well as others.

09:21  18      Mr. Wren, if you'll please introduce your team.

09:21  19      MR. WREN:  Thank you, Your Honor.

09:21  20      Here with us today is Bill Lee with the WilmerHale law

09:21  21  firm.  Then we have Joe Mueller from the WilmerHale law firm.

09:22  22  Kim Schmitt who is vice president with Intel.  Jamie Laird, one

09:22  23  of our team members.

09:22  24      And, Your Honor, we will have others, and I'll only

09:22  25  mention two because they'll be in here a lot.  It would be

17

09:22 1  Mindy Sooter with the WilmerHale law firm and Andy King, also a

09:22 2  vice president with the Intel Corporation.

09:22 3      THE COURT:  All right.  I'd ask the panel:  Are any of you

09:22 4  familiar with or do any of you know in any form or fashion any

09:22 5  of the individuals or law firms that represent the defendant

09:22 6  Intel in this matter?

09:22 7      Okay.  Keep your hands up.

09:22 8      I see Juror No. 28, Ashley Jackson, and that is Juror

09:22 9  No. 37, James Kaiser.

09:22 10     All right.  You may put your hands down.

09:23 11     Thank you very much.

09:23 12     Have any of you ever worked for -- and I'm not talking

09:23 13 about being generally familiar with the defendant Intel.  Some

09:23 14 of you may have been familiar with that name just due to your

09:23 15 knowledge of things that are IT related.  But have any of you

09:23 16 worked for or are familiar with anyone who works for the

09:23 17 defendant Intel?  If so, raise your right hand.

09:23 18     Court notes for the record that no hands are raised.

09:23 19     Did you introduce your corporate representative?

09:23 20     MR. WREN:  Yes, Your Honor.

09:23 21     THE COURT:  Yes.  Were any of you familiar with the

09:23 22 corporate representative for the defendant, Intel?

09:23 23     The Court notes for the record that no hands are raised.

09:23 24     At this time I'm going to ask the attorneys to read the

09:23 25 list of potential witnesses that they believe might be called

09:23  1   in this case.  I want you to listen carefully.  I'm going to

09:24  2   have them read the names somewhat slowly.  If you recognize the

09:24  3   name, raise your hand and I'll identify you as knowing that

09:24  4   particular witness when that name is called.

09:24  5       Mr. Mann, if you'll please read the list of witnesses you

09:24  6   believe VLSI may call in this matter.

09:24  7       MR. MANN:  Your Honor, the witnesses anticipated

09:24  8   potentially to testify here live from the stand:  Murali

09:24  9   Annavaram, David Bearden, Mark Chandler, Lee Chastain, Thomas

09:24  10  Conte, Joseph Kessler, Michele Moreland, Ami Patel Shah, Cindy

09:24  11  Simpson, Jim Spehar, who I introduced a moment ago, Your Honor;

09:25  12  Michael Stolarski, our corporate representative, Ryan Sullivan

09:25  13  and Eran Zur.

09:25  14      Those will be the live witnesses, Your Honor.

09:25  15      THE COURT:  Thank you.

09:25  16      I did not see any hands come up during the reading of the

09:25  17  names of the list of witnesses for the plaintiff.

09:25  18      Let me just confirm, if you know any of the witnesses on

09:25  19  the list called by the plaintiffs, raise your hand; otherwise,

09:25  20  I will assume you do not know any of the witnesses on that

09:25  21  list.

09:25  22      All right.  Court notes for the record that no hands are

09:25  23  raised.

09:25  24      You may be seated, Mr. Mann.

09:25  25      Mr. Wren, if you'll please read the potential list of

19

09:25  1  witnesses for Intel.

09:25  2       MR. WREN:  Thank you, Your Honor.

09:25  3       The list of witnesses live or being called by deposition

09:25  4  are Daniel Borkowski, Steve Brogden, Lee Chastain, Robert

09:25  5  Colwell, Julie Davis, Jonathan Douglas, Dirk Grunwald, Lorin

09:26  6  Hitt, Hance Huston, Joseph Kessler, Kevin Klein, Adam King,

09:26  7  Arun Krishnamoorthy, James Kovacs, Jeff Miller, Michele

09:26  8  Moreland, Efraim Rotem, Ami Patel Shah, Cindy Simpson, Aaron

09:26  9  Slan, Dennis Sylvester, Aaron Waxler and Eran Zur.

09:27  10      THE COURT:  Thank you, Mr. Wren.

09:27  11      I note for the record that no hands were raised during the

09:27  12 reading of the list of witnesses for defendant Intel.

09:27  13      One last time just to make certain, if anyone is familiar

09:27  14 with any of the individuals on the defendant's witness list, if

09:27  15 you could please raise your right hand at this time; otherwise,

09:27  16 I assume you do not know any of those individuals.

09:27  17      Court notes for the record that no hands are raised.

09:27  18      Parties have estimated that this case will take four to

09:27  19 five days to try.  Is there anyone that would suffer any type

09:27  20 of undue hardship or have a special problem serving on a jury

09:27  21 for that length of time?  If so, raise your right hand at this

09:27  22 time.

09:27  23      Court notes for the record that no hands are raised.

09:27  24      Do any of you have any illness in your family or any

09:27  25 business problem -- I know many people have made -- been

20

```
09:27   1   without power or have had burst pipes -- anything like that
09:28   2   that would make it difficult for you to be attentive to the
09:28   3   evidence in this matter?  If so, if you could raise your right
09:28   4   hand at this time.
09:28   5       Court notes for the record that no hands are raised.
09:28   6       Do any of you have any problems with your eyesight or
09:28   7   hearing or any other physical disability which in any manner
09:28   8   would prevent you from either seeing or hearing the evidence
09:28   9   presented at trial?  If so, if you could raise your right hand
09:28   10  at this time.
09:28   11      Yes, sir?  That is Mr. Miller, Juror No. 102.  No?
09:28   12      Oh, Vonderheid.  Juror 52.  Thank you.
09:28   13      All right.  After the jury selection, the parties will
09:28   14  give their opening statements, which are more detailed
09:29   15  renditions of their understanding of the facts involved in this
09:29   16  case.  But based upon the summaries of what I provided you, I
09:29   17  want to ask you a few questions concerning any knowledge you
09:29   18  might have about the case.
09:29   19      Have any of you read or heard anything from any type of
09:29   20  media source about this case or recognize it in any way prior
09:29   21  to me reading the summaries in this case?  If so, if you could
09:29   22  raise your right hand at this time.
09:29   23      All right.  I see an affirmative response from Juror 37,
09:29   24  Mr. Kaiser.
09:29   25      All right.  Thank you.
```

21

09:29  1          All right.  At this time I'm going to cover a couple of
09:29  2   concepts that you're probably familiar with from your civics or
09:29  3   government classes but that are certainly important in a civil
09:29  4   case such as this one.
09:30  5          I want to first talk to you about the jurors being the
09:30  6   sole judges of credibility.  Those of you who have served on
09:30  7   juries before are already aware that once selected as a juror,
09:30  8   you become the judge of the facts in the case, the judge of the
09:30  9   credibility of the witnesses, and the judge of the weight to be
09:30 10   given to the testimony of the witnesses.
09:30 11          It will be your prerogative as a juror to believe all of
09:30 12   the testimony of a witness, only a part of a witness'
09:30 13   testimony, or you may totally disbelieve a witness' testimony.
09:30 14   That's going to be completely up to you as a member of this
09:30 15   jury.
09:30 16          As a juror, you are exclusive judges of the facts, the
09:30 17   credibility of the witnesses and the weight to be given their
09:30 18   testimony.
09:30 19          Is there anyone among you that would have any difficulty
09:30 20   for whatever reason or are uncomfortable determining the
09:30 21   credibility or believability of a witness for any reason?  If
09:31 22   so, if you could raise your right hand at this time.
09:31 23          Court notes for the record that no hands are raised.
09:31 24          Whereas the jury is the exclusive judge of the facts, the
09:31 25   Court, which will be represented by Judge Albright, is the sole

22

09:31  1    judge of the law applicable in this case.  At the conclusion of

09:31  2    all of the testimony and before the attorneys for both sides

09:31  3    have presented their summary of the case to you in their

09:31  4    closing arguments, the Court will explain the law controlling

09:31  5    the issues involved in the lawsuit.

09:31  6         You're to be governed by the Court's explanation of the

09:31  7    applicable law, which will be set out in what is termed the

09:31  8    Court's instructions or charge.

09:31  9         If you are selected to serve as a juror on this case, will

09:31  10   you be able and willing to render a verdict solely based on the

09:31  11   evidence presented at the trial and the law as given to you by

09:31  12   Judge Albright in his instructions, disregarding any other

09:31  13   ideas, notions or beliefs about the law you may have

09:32  14   encountered in reaching your verdict?

09:32  15        Let me rephrase it this way.  If you can't do that, raise

09:32  16   your hand at this time, if you would have difficulty following

09:32  17   the law as given to you by Judge Albright at the end of this

09:32  18   case.

09:32  19        Court notes for the record that no hands are raised.

09:32  20        This is a civil case.  Therefore, the plaintiff, VLSI

09:32  21   Technology LLC, has the burden of proving its case by what is

09:32  22   called the preponderance of the evidence.

09:32  23        Those of you who have served on criminal juries are

09:32  24   certainly familiar with the requirement of proof beyond a

09:32  25   reasonable doubt.  Please bear in mind that in civil cases, the

09:32  1   proof standard is not beyond a reasonable doubt, but rather the

09:32  2   plaintiff must prove its case by a preponderance of the

09:32  3   evidence.

09:32  4        This means that the plaintiff has to produce evidence

09:32  5   which, when considered in light of all the facts, leads you to

09:33  6   believe that both the plaintiff's claim is more likely true

09:33  7   than not true.

09:33  8        Is there anyone among you who would be unable to require

09:33  9   the plaintiff to prove their case by a preponderance of the

09:33  10  evidence as I have just explained that term to you?  If so, if

09:33  11  you could raise your right hand at this time.

09:33  12       Court notes for the record that no hands are raised.

09:33  13       Is there anyone among you who would hold the plaintiff to

09:33  14  a greater or lesser standard of proof?  If so, if you could

09:33  15  raise your right hand at this time.

09:33  16       Court notes for the record that no hands are raised.

09:33  17       During the presentation of evidence in this case, there

09:33  18  may be instances where depositions are either read or shown to

09:33  19  the jury on videotape.  A deposition is a transcript of

09:33  20  questions previously asked of a witness by an attorney and the

09:34  21  witness' answers to those questions.

09:34  22       Depositions are taken before a court reporter, and the

09:34  23  witness being deposed that is questioned is answering the

09:34  24  questions under oath.  A deposition is to be treated exactly

09:34  25  the same as the evidence which is presented to you by witness

09:34  1    testimony and the exhibits admitted into evidence during the

09:34  2    course of the trial.  You're to treat a deposition as the

09:34  3    testimony of that witness, and you're to accord whatever

09:34  4    credibility and weight to that deposition evidence as you wish,

09:34  5    just as you would if the witness were testifying in your

09:34  6    presence.

09:34  7         Is there anyone among you who would be unable to consider

09:34  8    deposition testimony the same as you would other testimony and

09:34  9    evidence presented during the trial?  If so, if you could raise

09:34  10   your right hand at this time.

09:34  11        Court notes for the record that no hands are raised.

09:34  12        Let me ask you:  Do any of you recognize any of the

09:35  13   members of the Court staff, that's any of the folks along the

09:35  14   wall, myself or anyone else sitting at the table in front of

09:35  15   me?  If so, if you could raise your right hand at this time.

09:35  16        All right.  Court notes for the record that no hands are

09:35  17   raised.

09:35  18        Do any of you happen to know anyone else on the jury panel

09:35  19   from any other source or some type of social relationship?  If

09:35  20   so, if you could raise your right hand at this time.

09:35  21        All right.  The Court notes for the record that no hands

09:35  22   are raised.

09:35  23        Who here has any type of familiarity with how the United

09:35  24   States patent system works?  If so, if you could raise your

09:35  25   right hand at this time.  Anybody?

09:35  1        All right.  The Court notes for the record that no hands

09:36  2   are raised.

09:36  3        Have you, a relative or a close friend had any experience

09:36  4   with patents, patented technology, trade secrets or the United

09:36  5   States Patent and Trademark Office?  If so if you could raise

09:36  6   your right hand at this time.

09:36  7        All right.  I do note Juror No. 28, Ashley Jackson.  Thank

09:36  8   you.

09:36  9        And Juror No. 52, Gail Vonderheid.  Thank you.

09:36  10       No other hands were raised.

09:36  11       Do you or does your employer rely on patented technology

09:36  12  or trade secret information as part of its business?  If so, if

09:36  13  you could raise your right hand.

09:36  14       All right.  That would be Juror No. 37, James Kaiser.

09:36  15       And no other hands -- oh, Ms. Jackson.  Juror No. 28 as

09:36  16  well.

09:36  17       Are any of you your family's designated tech person, the

09:37  18  one who has to program and set up new devices and teach the

09:37  19  rest of the family how to go ahead and utilize that type of

09:37  20  technology?

09:37  21       All right.  I see Ms. Jackson, Juror No. 28.

09:37  22       I see Mr. Foil, Juror No. 81.

09:37  23       I see Juror No. 102, Mr. Miller.

09:37  24       And Juror No. 37, Mr. Kaiser.

09:37  25       Yes, if you could keep your hands up.  It's Ms. Jackson,

09:37  1   Juror No. 28, Juror No. 81, Juror No. 102 and Juror No. 37.

09:37  2        Thank you.

09:38  3        How many of you have owned your own business?  If so,

09:38  4   raise your right hand.

09:38  5        All right.  I see Juror No. 31, Ms. Conner.

09:38  6        And Juror No. 107, Ms. Ozga.

09:38  7        Any other business owners?

09:38  8        All right.  The Court notes for the record that no other

09:38  9   hands were raised.

09:38 10        Of those among you, how many of you negotiate deals,

09:38 11   contracts or licenses as part of your job responsibilities?

09:38 12        All right.  Juror No. 28, Ms. Jackson.

09:38 13        And Juror No. 37, Mr. Kaiser.

09:39 14        All right.  Thank you.

09:39 15        No other hands were raised.

09:39 16        Have any of you invented or developed any technology

09:39 17   yourself, whether as part of your employment or on your own?

09:39 18        Court notes for the record that no hands are raised.

09:39 19        Who has ever worked in the research and development part

09:39 20   of a particular company?  If so, if you could raise your right

09:39 21   hand.

09:39 22        Court notes for the record that no hands are raised.

09:39 23        Have you ever applied for, been granted or owned any

09:39 24   patents, or have any family members that do?  If so, if you

09:39 25   could raise your right hand.

27

09:39  1      Court notes for the record that no hands are raised.

09:39  2      Have you ever worked for a company that was involved in a

09:39  3  patent or other intellectual property dispute?

09:40  4      All right.  Ms. Jackson, Juror No. 28.

09:40  5      And Mr. Kaiser, Juror No. 37.

09:40  6      No other hands are raised.

09:40  7      All right.  Have any of you ever had a negative experience

09:40  8  of any type with either the plaintiff, VLSI, or the defendant,

09:40  9  Intel?  If so, if you could raise your right hand at this time.

09:40  10      Court notes for the record that no hands are raised.

09:40  11      All right.  That concludes my general questions.  At this

09:40  12  time, I'm going to give the plaintiffs 15 minutes to ask some

09:40  13  general questions just like I did, and then the defendants

09:40  14  15 minutes.

09:40  15      And Mr. Chu?

09:40  16      MR. CHU:  Good morning, ladies and gentlemen.  My name is

09:41  17  Morgan Chu.  And first of all, thank you very much for your

09:41  18  service.  I'm going to give you a second thank you because

09:41  19  we're all experiencing the pandemic, and so coming to court is

09:41  20  an extra burden and responsibility.  And I'm going to give you

09:41  21  a third thank you because of this past week that we've all

09:41  22  experienced.  Many of us have experienced power outages and

09:41  23  other things.

09:41  24      Both sides have the opportunity to ask you some questions.

09:41  25  Every answer is the right answer.  There's no answer that is

09:41  1    the wrong answer.  So we're going to be asking a little bit

09:41  2    about yourselves, and fair is fair, I'll tell you a little bit

09:41  3    about myself.

09:41  4        I've been lucky enough to have cases -- or to try cases in

09:41  5    a number of places in Texas:  Dallas, Houston, Austin,

09:42  6    Marshall, Tyler, Texarkana and some other places.  And of

09:42  7    course right now in Waco.

09:42  8        So I've also had the privilege of representing numbers of

09:42  9    companies here.  And I'm going to ask you some questions if

09:42  10   you're familiar with these companies.  So I've had the

09:42  11   privilege of representing Texas Instruments on a number of

09:42  12   matters, including a big case against Samsung.

09:42  13       How many of you have heard of or know anything about Texas

09:42  14   Instruments?

09:42  15       THE COURT:  All right.  This is going to take a while.

09:42  16   So Juror No. 93, Taylor Bradley.

09:42  17   Juror No. 28, Ashley Jackson.

09:42  18   Juror No. 33, Mr. Railsback.

09:43  19   Juror No. 81, Mr. Foil.

09:43  20   Juror No. 31, Janette Conner.

09:43  21   Juror No. 111, Julie Miller.

09:43  22   Juror No. 91, Ms. Ridings.

09:43  23   Juror No. 37, James Kaiser.

09:43  24   And Juror No. 107, Ms. Ozga.

09:43  25   Juror No. 99, Mr. Page.

09:43   1      Juror No. 98, Mr. Taylor.

09:43   2      Juror No. 82, Ms. Worley.

09:43   3      All right.  General questions like that will use a lot of

09:43   4 your time, I'm afraid.

09:43   5      MR. CHU:  I just learned that very quickly.  So thank you,

09:43   6 Your Honor.  I'll certainly follow that advice.

09:43   7      Have any of you ever worked for or had a family member or

09:43   8 a close friend who's worked for Texas Instruments?

09:44   9      I also mentioned Samsung.  Have any of you ever worked for

09:44 10 Samsung or had a family member or close friend who's worked for

09:44 11 Samsung?  There was a -- excuse me.

09:44 12      THE COURT:  Yes.  That is Juror No. 33, Mr. Railsback.

09:44 13      MR. CHU:  There was an inventor at Texas Instruments.  His

09:44 14 name is Jack Kilby.  In 1958 he invented the integrated

09:44 15 circuit, won the Nobel Prize.

09:44 16      Are any of you familiar with Jack Kilby or have you heard

09:44 17 of him in the past?

09:44 18      I've also had the privilege of representing the folks at

09:44 19 Baylor College of Medicine.  Have any of you worked for the

09:44 20 Baylor College of Medicine or had a family member or a close

09:44 21 friend?

09:45 22      And I've had the privilege of working with Compaq

09:45 23 Computer, that's C-o-m-p-a-q.  That became one of the world's

09:45 24 largest computer companies before they merged with Hewlett

09:45 25 Packard.  Have any of you worked for Compaq Computer or have a

30

09:45  1   family member or close friend who worked for Compaq Computer?

09:45  2   They were based in Houston.

09:45  3        THE COURT:  Juror No. 31, Janette Conner.

09:45  4        MR. CHU:  I'm going to ask you all a question about

09:45  5   whether you've had any positive experiences despite the

09:45  6   pandemic this past year.

09:45  7        So let me give you an example.  Probably all of our daily

09:45  8   lives, personally and our workplace, has been affected.  And

09:45  9   one really great positive experience I've had is my wife, who

09:46  10  is a kindergarten teacher for many decades, and I, every

09:46  11  morning go out walking, get to know our neighbors better a few

09:46  12  blocks away, get to know all the neighborhood dogs, get some

09:46  13  exercise.  And that's a real positive experience for us.

09:46  14       Have any of you had any positive experiences during the

09:46  15  course of the pandemic?

09:46  16       THE COURT:  All right.  We have a few people.

09:46  17       That is Juror No. 28, Ms. Jackson.

09:46  18       Juror No. 33, Mr. Railsback.

09:46  19       Juror No. 91, Ms. Ridings.

09:46  20       Juror No. 102, Mr. Miller.

09:46  21       Juror 37, James Kaiser.

09:46  22       Juror 49, James Scribner.

09:46  23       And Juror 55, Kelly Kemp.

09:46  24       You can put your hands down.

09:46  25       MR. CHU:  You heard that this is a patent case.  Some of

09:47  1    us think it's a really interesting patent case.  How many of

09:47  2    you, by a show of hands, think you would enjoy hearing a patent

09:47  3    case?

09:47  4         THE COURT:  All right.

09:47  5         Juror No. 2, Ms. Jackson.

09:47  6         Juror No. 55, Kelly Kemp.

09:47  7         Juror No. 82 --

09:47  8         LAW CLERK:  Judge, just a second.

09:47  9         THE COURT:  Okay.  Keep your hands up if you would.

09:47 10         Yes.  It was Juror 55, Kelly Kemp.

09:47 11         And in the jury box, Juror 82, Taylor Worley.

09:47 12         MR. CHU:  Now, some people would be interested in a patent

09:47 13    case, but some people might have the opposite point of view.

09:47 14    How many of you, by a show of hands, would really prefer to be

09:47 15    a juror in a different kind of a case?

09:48 16         THE COURT:  All right.

09:48 17         That is Juror No. 93, Taylor Bradley.

09:48 18         Juror No. 33, Jared Railsback.

09:48 19         Juror No. 111, Julie Miller.

09:48 20         Juror No. 102, Lakerian Miller.

09:48 21         Juror 107, Dorothy Ozga.

09:48 22         Juror No. 98, Mark Taylor.

09:48 23         And Juror No. 10, Teresa Shaaf.

09:48 24         MR. CHU:  If you're sitting as a juror on this case,

09:48 25    you'll hear evidence about infringement, validity of the two

09:48  1   patents involved.  But you will also hear evidence about

09:48  2   damages.  And at the end of the case, you'll hear some

09:48  3   instructions from the Court on how to assess all of that

09:49  4   evidence.

09:49  5        You'll also hear that there's a claim for what's called a

09:49  6   reasonable royalty.  And if the claim for reasonable royalty is

09:49  7   something such as 1, 2, 3, $4 per unit, but because of about a

09:49  8   billion units being sold, it could result in a very large

09:49  9   number, by a show of hands how many of you might be hesitant to

09:49  10  award large sums of money, even though you would be following

09:49  11  the Judge's instructions and the evidence that was presented to

09:49  12  you?  How many of you might be hesitant?

09:49  13       THE COURT:  All right.  I see Juror No. 52, Gail

09:49  14  Vonderheid.

09:49  15       MR. CHU:  Now, you'll hear from expert witnesses from both

09:50  16  sides, and they'll be discussing the technology that relates to

09:50  17  the particular patents here, and it's about computer technology

09:50  18  involving computer chips.

09:50  19       How many of you feel that you would be fairly comfortable

09:50  20  hearing and assessing evidence about how computer chips

09:50  21  operate?  How many, by a show of hands, would feel comfortable?

09:50  22       THE COURT:  Juror No. 81, Mr. Foil.

09:50  23       Juror No. 2, Ashley Jackson.

09:50  24       Juror No. 31, Janette Conner.

09:50  25       Juror 91, Lori Ridings.

09:50  1          Juror No. 102, Lakerian Miller.

09:51  2          Juror No. 37, James Kaiser.

09:51  3          Juror No. 49, James Scribner.

09:51  4          Juror No. 35, Lorraine Chavez.

09:51  5          And Juror No. 82, Taylor Worley.

09:51  6          You have four minutes and 45 seconds left.

09:51  7          MR. CHU:  One quick question.  How many of you would feel

09:51  8  very uncomfortable in hearing from expert witnesses about

09:51  9  computer technology?

09:51  10          THE COURT:  No. 52, Mr. Vonderheid.

09:51  11          MR. CHU:  Thank you very much, Your Honor.

09:51  12          THE COURT:  All right.  Thank you.

09:51  13          Mr. Wren, if you have some questions of the panel, you may

09:51  14  proceed.

09:51  15          MR. WREN:  Thank you, Your Honor.

09:51  16          Good morning.  I want to echo what has already been said

09:52  17  and that is, thank you.  Thank you for being here.  We

09:52  18  certainly recognize what is entailed in the months and weeks

09:52  19  and days leading up to this.  So thank you.

09:52  20          Let me start off by saying I don't think you're going to

09:52  21  hear Texas Instruments, Samsung, Compaq.  Those have nothing to

09:52  22  do with this case.  I want to ask you about things that I

09:52  23  believe you are going to be hearing about and to get your

09:52  24  responses to those.

09:52  25          The plaintiff in this case, VLSI, is accusing Intel of

34

09:52  1    infringement, of patent infringement, and asking for a lot of

09:52  2    money, as Mr. Chu said.  There are certainly -- it's a

09:52  3    possibility that people may think if a case has come this way

09:53  4    to actually come to trial and jurors to be called in, that

09:53  5    there must be something to that.  There must be some sort of

09:53  6    merit to the claims.

09:53  7        And so let me just ask you, just starting out, are there

09:53  8    any -- who has the feeling that, well, there must be some merit

09:53  9    to this case or we wouldn't be here?

09:53  10        THE COURT:  Juror 107, Dorothy Ozga; Juror No. 102,

09:53  11   Lakerian Miller; and Juror No. 82, Taylor Worley.

09:53  12        MR. WREN:  And thank you for those honest responses.

09:53  13   Because as you will hear, Intel is absolutely saying we have

09:53  14   not done anything wrong and this is for a jury to decide.  Not

09:53  15   for -- what we want this case to be based upon is the evidence

09:54  16   that is being presented here.

09:54  17        And so we are looking, hopefully, for jurors who say, even

09:54  18   though that may be my initial thought, I am willing to decide

09:54  19   this case on the evidence here and not have any sort of leaning

09:54  20   based on accusations that have been made before the evidence is

09:54  21   presented to jurors.

09:54  22        You're going to hear comparisons of patents to property,

09:54  23   to boundary disputes, et cetera.  Let me ask you to -- I want

09:54  24   to speak to the types of things that you're going to be

09:54  25   hearing.

35

09:54  1      You've heard about claims already.  You're going to be

09:54  2   hearing that within each of those claims, there are a list of

09:54  3   requirements that are called limitations and that all of those

09:55  4   requirements, every single one of those requirements, has to be

09:55  5   met by some product that the plaintiff is claiming to be

09:55  6   infringing; that close enough is not good enough.

09:55  7      Imagine for a moment that -- I know many of you are

09:55  8   homeowners.  Imagine that you are -- you bought property, you

09:55  9   invest time and money to build a home there and say, let's say,

09:55  10  some eight years later, someone comes along and says, I've got

09:55  11  a deed, a different kind of deed, and I'm claiming part of your

09:55  12  property.  In fact, I'm claiming the corner of your house, and

09:55  13  you owe me money for that.

09:55  14      Would you want a jury to -- if this were going to a

09:55  15  jury -- to examine very, very carefully the validity of that

09:56  16  new deed or that different deed, as well as carefully examining

09:56  17  every requirement of all of the boundary lines to see does it

09:56  18  really overlap with my property with my home?

09:56  19      And you know yourself, is there anyone here who says, I

09:56  20  don't think I've got the patience to dig into those

09:56  21  requirements, to look at every single one of those claims,

09:56  22  those -- excuse me -- those limitations that are in that deed

09:56  23  or in this case in that patent?

09:56  24      Is there anyone here says, I simply don't have the

09:56  25  patience to dig into, carefully, every one of those

09:56    1    requirements?

09:56    2         Okay.  Thank you.

09:56    3         Following up here on this idea of a patent involving

09:57    4    requirements, I've mentioned the fact that these limitations

09:57    5    that are within a claim.  Every single one has to be met.

09:57    6    Every single one has to be checked off.

09:57    7         Let me give you a very simple example of a fictional

09:57    8    patent claim but one to illustrate the point.

09:57    9         If there were a patent claim with these limitations or

09:57   10    these requirements, a vehicle comprised of a pickup truck with

09:57   11    a V8 engine, four heavy-duty tires and heated side mirrors that

09:57   12    can melt ice, you know yourself, is there someone here who

09:57   13    says, well, close enough is good enough.  A product that meets

09:57   14    three out of four of those requirements would be a product that

09:58   15    I might say infringes?

09:58   16         And in truth, there are many trucks that have -- that are

09:58   17    pickup trucks that have a V8 engine, that even have larger

09:58   18    tires, but don't necessarily have that fourth requirement of

09:58   19    the side mirrors with the ability to melt ice, and what we need

09:58   20    to know is:  Do you have that willingness to dig into every one

09:58   21    of those requirements?

09:58   22         And again, I just want to put that question out there.  Is

09:58   23    there anyone who says, this is a tedious area, possibly, I'm

09:58   24    going to have to follow very carefully these claims and

09:58   25    limitations requirements?

09:58  1        Anyone that says, no, that's just -- that's not for me?

09:58  2        Okay.  Thank you very much.

09:58  3        Let me turn to this idea -- and Judge Manske asked you

09:59  4   about it -- about the burden of proof and preponderance of the

09:59  5   evidence.

09:59  6        You're going to hear that this is the standard by which

09:59  7   infringement claims are determined.  That is the plaintiff,

09:59  8   VLSI, has the burden to come with proof, the greater weight of

09:59  9   the evidence.

09:59  10       If you imagine scales, that means that the greater weight

09:59  11  of the evidence has to come from the plaintiff in order to

09:59  12  prove their case.  And I will tell you, you can anticipate that

09:59  13  Intel is going to be coming with a lot of evidence.  There's

09:59  14  going to be a lot of evidence on that side of the scales, and

09:59  15  that means VLSI is going to have to come with even more

09:59  16  evidence to carry their burden of proof.

09:59  17       And this kind of goes back to what I was starting with,

09:59  18  this idea that naturally some people may think, well, if we're

10:00  19  here, there must be merit to accusations.

10:00  20       Is there anyone here who would have any difficulty or any

10:00  21  reluctance to hold VLSI to that burden of proof, to prove that

10:00  22  there is an Intel product that is infringing their patent?

10:00  23       I want to talk for a moment and ask you about invalidity.

10:00  24  In this case VLSI is asserting two patents, the '373 patent and

10:00  25  the '759 patent.  You're going to hear Intel saying, we have

10:00  1    not utilized the ideas of the '373 patent ever, not ever, not

10:00  2    in any way, not in our products.

10:00  3         On the '759 patent you're going to hear evidence that

10:01  4    Intel was actually using the idea before it was ever presented

10:01  5    to -- by the prior owners of the patent, that Intel was using

10:01  6    that idea before that was ever presented by the prior owners to

10:01  7    the Patent Office.

10:01  8         And so the Patent Office, as you will hear, did not have

10:01  9    the opportunity to evaluate that fully, that information about

10:01  10   Intel's usage.

10:01  11        But here's the question:  Given that the Patent Office,

10:01  12   part of the U.S. government, has granted that patent, although

10:01  13   possibly on incomplete information, is there anyone here who

10:01  14   says, well, I'm -- even though I've got the power as jurors to

10:02  15   invalidate a patent based on all of the information, is there

10:02  16   anyone who says:  I would have difficulty with that?  I have a

10:02  17   problem with questioning anything that the government has done,

10:02  18   even they had incomplete information?

10:02  19        Is there anyone who has an issue with that?  That is

10:02  20   potentially invalidating a patent when you have the power

10:02  21   because it's been something that the government initially

10:02  22   authorized?

10:02  23        Let me ask you just a little bit about Intel.  There

10:02  24   are -- certainly I know from your questionnaires that a number

10:02  25   of you have certainly heard of Intel.  There are others that

10:02  1    held up your hand that you have more direct knowledge of that.

10:02  2          THE COURT:  Four minutes, Mr. Wren.

10:03  3          MR. WREN:  How much, Your Honor?

10:03  4          THE COURT:  Four.

10:03  5          MR. WREN:  Thank you, Your Honor.

10:03  6          But I know that from your questionnaires many of you,

10:03  7    although having heard of Intel, really don't know much about

10:03  8    it.  It's not a splashy company, not in the news a lot.

10:03  9          You're going to hear that it's a little bit of an

10:03  10   old-fashioned company in the sense of it's been around for

10:03  11   about 50 years, research/development/manufacturer company.

10:03  12         Is there anyone here who -- here who has any sort of

10:03  13   negative feeling about companies like Intel?

10:03  14         Okay.  We're going to be asking you to look not only at

10:03  15   Intel and what it has done over these decades in terms of

10:03  16   research and development and manufacturing, but also to look

10:04  17   specifically at the patents that are being claimed in this

10:04  18   case, that are being asserted in this case by VLSI, to ask the

10:04  19   question:  How have they been used or not used during the time

10:04  20   period?

10:04  21         Anyone says, well, I really don't have the patience to dig

10:04  22   into that, to look at how they have -- those patents have

10:04  23   used -- been used or not used during this time?

10:04  24         Two more questions that I've got for you.  One relates to,

10:04  25   Mr. Chu made the point about VLSI, the plaintiff here, asking

40

10:04  1   for big damages or big numbers.  And certainly you're going to

10:04  2   hear that Intel through these years has worked hard to put

10:05  3   chips in everything from laptops to fighter jets, to produce

10:05  4   these microprocessor chips, and a very, very large number of

10:05  5   these chips.

10:05  6       But is there anyone here who says, well, because the

10:05  7   numbers of chips being produced by a company like Intel means,

10:05  8   well, that must be a big company and I just -- I'm not worried

10:05  9   about returning a big dollar verdict against a big company?  Is

10:05 10   there anyone here who says, I just -- because it's a big

10:05 11   company, I'm just -- that makes me more inclined, in and of

10:05 12   itself, to render some big verdict?

10:05 13       Last question for you.  Different people have different

10:05 14   feelings about litigation.  There's some who says, I really

10:06 15   think that some -- a new company would not file a lawsuit

10:06 16   unless there was a legitimate reason for that.  Others say,

10:06 17   well, new companies may sometimes file lawsuits in the effort

10:06 18   to get more in the courtroom than they can get in the

10:06 19   marketplace.

10:06 20       Is there anyone here who says:  I'm not really willing to

10:06 21   consider how patents actually get priced in the real world, in

10:06 22   the real-world marketplace?

10:06 23       Okay.  Folks, thank you very much for being here.  Thank

10:06 24   you for your willingness to work with us, work with all of us

10:06 25   in this case.  We appreciate your service.

                                                                      41

10:06   1        THE COURT:  Thank you, Mr. Wren.

10:06   2        MR. WREN:  Thank you, Your Honor.

10:06   3        THE COURT:  Ms. Bradley, if you'd be so kind as to step up

10:07   4   to the microphone.  Sorry, that's our -- finished just in time.

10:07   5        All right.  Good morning, Ms. Bradley.  Welcome to jury

10:07   6   selection.  If you'll tell us a little bit about yourself, just

10:07   7   state your name, where you're from, what you do for a living,

10:07   8   what your spouse does for a living and the like.

10:07   9        PROSPECTIVE JUROR:  All right.  I'm Taylor Bradley.  I

10:07  10   live here in Waco.  I do not have a spouse.  I work for Mission

10:07  11   Waco as the finance director there.  I've lived in Waco for

10:08  12   about six years.

10:08  13        THE COURT:  What brought you to Waco?

10:08  14        PROSPECTIVE JUROR:  A job.  I was working -- I went to

10:08  15   Mary Hardin-Baylor for school, so just over in Belton, and then

10:08  16   came to Patillo, Brown & Hill to work.

10:08  17        THE COURT:  Right.  And that's an accounting firm here

10:08  18   locally.

10:08  19        PROSPECTIVE JUROR:  Yes.

10:08  20        THE COURT:  What'd you do for Patillo Brown?

10:08  21        PROSPECTIVE JUROR:  I was a governmental auditor, so went

10:08  22   around to different states and counties -- I mean, not states,

10:08  23   cities and counties.

10:08  24        THE COURT:  I think I can guess, but what's your

10:08  25   bachelor's degree in?

10:08   1          PROSPECTIVE JUROR:  Accounting.

10:08   2          THE COURT:  All right.  Thank you.  And have you ever been

10:08   3   a party to a lawsuit, other than a family matter?

10:08   4          PROSPECTIVE JUROR:  No.

10:08   5          THE COURT:  Have you ever attended law school, received

10:08   6   any legal education --

10:08   7          PROSPECTIVE JUROR:  No.

10:08   8          THE COURT:  -- or worked in a law office or for a court?

10:08   9          PROSPECTIVE JUROR:  No.

10:08  10          THE COURT:  Have you ever served in the military branch?

10:08  11          PROSPECTIVE JUROR:  No.

10:08  12          THE COURT:  I do note that you raised your hand that you

10:09  13   were familiar with Texas Instruments.  Anything about that?

10:09  14          PROSPECTIVE JUROR:  Just that I had their calculator in

10:09  15   high school.

10:09  16          THE COURT:  All right.  I figured that's why most people

10:09  17   probably raised their hands.

10:09  18          PROSPECTIVE JUROR:  Yeah.

10:09  19          THE COURT:  What are your hobbies and interests?  What do

10:09  20   you like to do when you're not working?

10:09  21          PROSPECTIVE JUROR:  I like to be outside, go hiking and

10:09  22   stuff in Cameron Park here in Waco.  Travel when it's not

10:09  23   COVID...

10:09  24          THE COURT:  I think we're all eager to travel.

10:09  25          (Laughter.)

43

10:09  1        PROSPECTIVE JUROR:  Yes.  Yeah, yeah.  I like to volunteer

10:09  2    and serve, kind of along with my job.

10:09  3        THE COURT:  Are you on any type of nonprofit boards, or

10:09  4    who do you volunteer for?

10:09  5        PROSPECTIVE JUROR:  Mostly with Mission Waco, who I also

10:09  6    work for, but Caritas, Shepherd's Heart Food Pantry, yeah.

10:10  7    Harris Creek, I go to that church, so volunteer with them.

10:10  8        THE COURT:  Is there anything you've heard about this

10:10  9    particular case that, in your opinion, would make you anything

10:10  10   other than fair and impartial?

10:10  11       PROSPECTIVE JUROR:  Specifically, no.  In general, I think

10:10  12   the patent system is not great because I just don't have a lot

10:10  13   of faith in it.  So it --

10:10  14       THE COURT:  Why is that?  Explain what you mean.

10:10  15       PROSPECTIVE JUROR:  Well, I guess it seems like you can

10:10  16   get patents for whatever.  And like if someone's already doing

10:10  17   something but they don't have a patent for it, someone else can

10:10  18   go get a patent and then make you pay them.

10:10  19       THE COURT:  Let me ask you this question:  If Judge

10:10  20   Albright were to instruct you that the law in this particular

10:10  21   case is X, would you be able to follow that law regardless of

10:10  22   whatever your beliefs are in general terms about patents?

10:10  23       PROSPECTIVE JUROR:  I think so.  I mean, I would try to be

10:10  24   unbiased, despite that -- what I just said.

10:11  25       THE COURT:  As we sit here now, you don't feel more

44

10:11 1    strongly towards one party or the other, do you?

10:11 2        PROSPECTIVE JUROR:  I do, but yeah.  I guess I do.

10:11 3        THE COURT:  All right.  There's been no evidence that's

10:11 4    been offered in this case whatsoever.  Why would you feel more

10:11 5    strongly towards one side than the other?

10:11 6        PROSPECTIVE JUROR:  Umm -- I --

10:11 7        THE COURT:  I'm not trying to put you on the spot.  I just

10:11 8    want to find out what's in your mind and what's thinking to

10:11 9    make sure that you can be fair and impartial.

10:11 10       PROSPECTIVE JUROR:  Right.  I guess just patents in

10:11 11   general seem -- I don't know.  I just don't trust them very

10:11 12   much.  It seems like if it's not like super-specific on exactly

10:11 13   what it is that this is all kind of for nothing, but...

10:12 14       THE COURT:  All right.  But again, you would follow the

10:12 15   law as instructed, and you'd be able to set those beliefs aside

10:12 16   if you were selected in this jury?

10:12 17       PROSPECTIVE JUROR:  Yes.

10:12 18       THE COURT:  All right.

10:12 19       Mr. Chu?  From there just grab a microphone.  Otherwise,

10:12 20   with people going back and forth it will take forever.

10:12 21       MR. CHU:  I'm just trying not to have my back to the --

10:12 22   could I just scoot around here?

10:12 23       THE COURT:  That's fine.  Let's find a system.  Why don't

10:12 24   you reposition yourself for the entire examination?

10:12 25       MR. CHU:  Great.

10:12   1        Good morning, Ms. --

10:12   2        THE COURT:  You've got to get right on that microphone or

10:12   3   the court reporter won't hear you.

10:12   4        MR. CHU:  Yes.  Is this better?

10:13   5        PROSPECTIVE JUROR:  Sure.

10:13   6        MR. CHU:  Good morning.  Good morning, Ms. Bradley.  I

10:13   7   think you said you feel more strongly about one party over the

10:13   8   other.  Is that for the defendant Intel?

10:13   9        PROSPECTIVE JUROR:  Yes.

10:13   10        MR. CHU:  And you understand that I represent VLSI, and

10:13   11   they and the Court want a completely unbiased impartial jury.

10:13   12   I think the Court referred earlier to the risk of having

10:13   13   preconceptions of bias.

10:13   14        In light of that -- and first of all, thank you very much

10:14   15   for your candor because this entire process depends on your

10:14   16   candor and that of the other prospective jurors.

10:14   17        In light of that, would you say that at the start the

10:14   18   defendant, Intel, is just a little bit ahead because of your

10:14   19   background or experiences or attitude, or what you were

10:14   20   forthright in sharing with us this morning?

10:14   21        PROSPECTIVE JUROR:  Yes.

10:14   22        MR. CHU:  And in light of that, would you feel more

10:14   23   comfortable if you would sit on another case as a juror where

10:14   24   you didn't have any risk of preconception or bias?

10:14   25        PROSPECTIVE JUROR:  Yes.

10:14  1          MR. CHU:  Thank you very much.

10:14  2          THE COURT:  All right.  Mr. Wren?

10:14  3          MR. WREN:  Thank you, Your Honor.

10:14  4          And, Ms. Bradley, let me ask this, but precede it by

10:15  5     saying, Intel is a big believer in the patent system as long as

10:15  6     jurors are willing to look at it and enforce it the correct

10:15  7     way.  Knowing that, I think everyone involved in this case is a

10:15  8     big believer in the patent system.  You're not going to hear

10:15  9     attacks on the patent system.  You're simply going to hear:  Is

10:15  10    there an infringement in this case?  Is there validity in this

10:15  11    case?

10:15  12         Knowing that, are you willing to set your views about or

10:15  13    your thoughts about the patent system aside and decide this

10:15  14    case specifically on the evidence?

10:15  15         PROSPECTIVE JUROR:  I think I could.  I could get into the

10:15  16    details on it and be more unbiased.

10:15  17         MR. WREN:  Okay.  Thank you very much, Ms. Bradley.

10:15  18         PROSPECTIVE JUROR:  Thank you.

10:15  19         THE COURT:  All right.  Thank you.

10:15  20         All right.  If I could see both counsel.

10:16  21         (Bench conference.)

10:16  22         THE COURT:  You have to speak directly into that

10:16  23    microphone and ignore me.

10:16  24         Are there any matters we need to discuss at this time?

10:16  25         MR. CHU:  Yes, Your Honor.  We would like to challenge for

10:16  1   cause.  She was very forthright in admitting that the defendant

10:16  2   starts out a little bit ahead.  She had actually volunteered in

10:16  3   response to one of your questions, Your Honor, that she had

10:16  4   particular feelings about this kind of a case and she described

10:16  5   it in some detail.  So I do think that there is bias and a

10:16  6   preconception of the case, and, therefore, she should be

10:17  7   challenged for cause.

10:17  8        THE COURT:  Mr. Wren, do you disagree?

10:17  9        MR. WREN:  I disagree, Your Honor.  I certainly

10:17  10  acknowledge what she said at the outset, but she also made it

10:17  11  clear that she is willing to follow the evidence in this case.

10:17  12  And particularly in light of the fact that Intel is not coming

10:17  13  in challenging the patent system, which was what, I think, the

10:17  14  concern that she raised.  And when that was made clear, she

10:17  15  made it very clear she is willing to follow the evidence and

10:17  16  decide this case strictly on the evidence.

10:17  17        THE COURT:  All right.  I understand both of your

10:17  18  arguments.  I do think then that she should be challenged for

10:17  19  cause.  I am going to grant your request, and I'm going to

10:17  20  excuse her.

10:17  21        We'll go ahead and bring in a new individual to take her

10:17  22  place, and they will now be Juror No. 1.  And so we'll start

10:17  23  with that individual.

10:17  24        MR. CHU:  Okay.  Thank you, Your Honor.

10:17  25        (Bench conference concludes.)

48

10:17  1      THE COURT:  All right.  Thank you.

10:17  2      Ms. Bradley, if you could please stand.

10:17  3      I appreciate your time and your candor and your honesty in

10:18  4  coming forward this morning, but I am going to go ahead and

10:18  5  excuse you at this time.

10:18  6      At this point I'm going to request the court clerk to call

10:18  7  the name of the panelist that will take Ms. Bradley's seat.

10:18  8      And, Ms. Bradley, thank you again for your time.  You're

10:18  9  excused and free to go.  You need to continue to check the list

10:18  10  of the phone to see if you need to report for another matter.

10:18  11  Thank you.

10:18  12      DEPUTY CLERK:  The Court calls Juror No. 48, Cynthia

10:18  13  Sanchez.

10:18  14      THE COURT:  All right.  We'll wait for Ms. Sanchez to come

10:18  15  in.  My guess is we will probably take a comfort break at

10:18  16  around 10:45, because I don't think we're going to be able to

10:18  17  get through the questioning of everybody before we take a

10:18  18  break.  And I always like to give the court reporter, who is

10:18  19  sitting there working away, an opportunity to take a break for

10:18  20  a few moments as well.

10:19  21      All right.  Ms. Sanchez, if you'll stand and come to the

10:19  22  microphone, please.

10:19  23      How are you this morning?

10:19  24      PROSPECTIVE JUROR:  Good.  How are you?

10:19  25      THE COURT:  Good.  If you'll please state your full name

10:19  1      for the record.

10:19  2          PROSPECTIVE JUROR:  Cynthia Sanchez.

10:19  3          THE COURT:  Where are you from, ma'am?

10:19  4          PROSPECTIVE JUROR:  I'm born and raised in Waco.

10:19  5          THE COURT:  What do you do for a living?

10:19  6          PROSPECTIVE JUROR:  I'm currently a registrar at Harmony

10:19  7      Science Academy.

10:19  8          THE COURT:  You're a what?

10:19  9          PROSPECTIVE JUROR:  A registrar.

10:19  10         THE COURT:  Thank you.  And you did go to school at the

10:19  11     University of North Texas and received your degree in criminal

10:20  12     justice?

10:20  13         PROSPECTIVE JUROR:  Correct.

10:20  14         THE COURT:  All right.  And I see that you've -- were a

10:20  15     paralegal at a prior job.  What can you tell me about that?

10:20  16         PROSPECTIVE JUROR:  I was a paralegal for immigration.

10:20  17         THE COURT:  Is there anything about that experience that

10:20  18     would cause you to be anything other than fair and impartial in

10:20  19     this case?

10:20  20         PROSPECTIVE JUROR:  No.

10:20  21         THE COURT:  But I do know that all the jurors that were in

10:20  22     the other courtroom had the opportunity to listen to all of the

10:20  23     questions that were asked by the Court and the parties during

10:20  24     the process.  Were you listening carefully?

10:20  25         PROSPECTIVE JUROR:  Yes.

10:20  1      THE COURT:  And did you have any questions that you would

10:20  2  have responded affirmatively to?

10:20  3      PROSPECTIVE JUROR:  No.

10:20  4      THE COURT:  You don't know anybody from either the

10:20  5  plaintiff's side or the defendant's side?

10:20  6      PROSPECTIVE JUROR:  No, I do not.

10:20  7      THE COURT:  Did not know any of the witnesses called?

10:20  8      PROSPECTIVE JUROR:  No.

10:20  9      THE COURT:  Any of the legal concepts that I discussed

10:20  10  with you?  You can follow the law?  You're comfortable making a

10:20  11  credibility determination of witnesses?

10:20  12      PROSPECTIVE JUROR:  Correct.

10:20  13      THE COURT:  All right.  Very good.  Never served in the

10:20  14  military?

10:20  15      PROSPECTIVE JUROR:  No.

10:21  16      THE COURT:  Other than serving as a paralegal, have you

10:21  17  received any type of legal education or training or worked in a

10:21  18  law office or court?

10:21  19      PROSPECTIVE JUROR:  Other than my paralegal job, no.

10:21  20      THE COURT:  All right.  So I did see that you answered

10:21  21  yes, law, law firms, court system, but just the

10:21  22  immigration-related experience that you've talked about?

10:21  23      PROSPECTIVE JUROR:  Correct.

10:21  24      THE COURT:  All right.  Each of the defendants are a

10:21  25  corporation here, and I do note in your questionnaire you

10:21  1    indicated that you had a somewhat unfavorable opinion of large

10:21  2    corporations in America today.  Can you expound upon that just

10:21  3    generally?

10:21  4         PROSPECTIVE JUROR:  What was the question in the

10:21  5    questionnaire?

10:21  6         THE COURT:  It says:  What is your opinion of large

10:21  7    corporations in America today?

10:21  8         And you said:  Somewhat unfavorable.

10:21  9         PROSPECTIVE JUROR:  Okay.  I guess I would relate to when

10:21  10   I worked in big corp, it changed my mind as to whether I would

10:22  11   consider working there again.  That's the only thing that I can

10:22  12   bring up to mind.

10:22  13        THE COURT:  All right.  So there's nothing about that

10:22  14   opinion that you've stated that would impact either of these

10:22  15   two parties in this case; is that correct?

10:22  16        PROSPECTIVE JUROR:  Correct.

10:22  17        THE COURT:  All right.  And you've never been a party to a

10:22  18   lawsuit before?

10:22  19        PROSPECTIVE JUROR:  No.

10:22  20        THE COURT:  Have you ever served on a jury before?

10:22  21        PROSPECTIVE JUROR:  No, sir.

10:22  22        THE COURT:  All right.  What are your hobbies and

10:22  23   interests?  What do you like to do when you're not working?

10:22  24        PROSPECTIVE JUROR:  Traveling, gardening and being

10:22  25   outside, outdoors.

10:22  1        THE COURT:  Well, particularly after last week, I don't

10:22  2    think I was ever so happy as to be out as this weekend.

10:22  3        PROSPECTIVE JUROR:  Correct.

10:22  4        THE COURT:  Never served in the military; is that correct?

10:22  5        PROSPECTIVE JUROR:  Correct.

10:22  6        THE COURT:  Any experience or background with patents?

10:22  7    Know anything about them?

10:22  8        PROSPECTIVE JUROR:  No.

10:22  9        THE COURT:  All right.  Very good.

10:22  10       Mr. Chu?

10:22  11       MR. CHU:  Thank you very much, Your Honor.

10:22  12       Good morning, Ms. Sanchez.

10:22  13       Do you have an opinion about the number of lawsuits?  Are

10:22  14   they about right, a little high, a little low or some other

10:23  15   view?

10:23  16       PROSPECTIVE JUROR:  Do I have an opinion?  No, sir.

10:23  17       MR. CHU:  And as a paralegal, what did you like about

10:23  18   being a paralegal?  And if anything, what did you dislike?

10:23  19       PROSPECTIVE JUROR:  What I enjoyed was making sure that --

10:23  20   immigration is completely different from civil or criminal.

10:23  21   You're fighting for someone's rights.  You're fighting for

10:23  22   someone to stay here.  I enjoyed the fact that I was able to

10:23  23   grant and help those people to stay here and fight for justice.

10:23  24       One of the things I didn't like was that sometimes it was

10:23  25   unfair and impartial to some of the people who had everything

10:23   1   on their side but weren't allowed to stay.

10:23   2       MR. CHU:  Why did you leave your job as a paralegal?  It

10:23   3   sounds like a great job --

10:23   4       PROSPECTIVE JUROR:  It is.

10:23   5       MR. CHU:  -- for helping people.

10:23   6       PROSPECTIVE JUROR:  COVID happened and immigration got hit

10:23   7   really hard.

10:23   8       MR. CHU:  Thank you very much.

10:23   9       PROSPECTIVE JUROR:  Thank you.

10:23   10      THE COURT:  All right.  Mr. Wren?

10:23   11      MR. WREN:  Ms. Sanchez, who did you work with as a

10:23   12  paralegal?

10:24   13      PROSPECTIVE JUROR:  John Oliver Law Firm in Las Colinas,

10:24   14  Texas.

10:24   15      MR. WREN:  Good.  Good.  And how long were you there?

10:24   16      PROSPECTIVE JUROR:  I had just started in March, and then

10:24   17  I had to leave in July.  So I had only been there for three

10:24   18  months, but prior to that, I had other paralegal experience.

10:24   19      MR. WREN:  Okay.  Good.  Thank you so much.

10:24   20      PROSPECTIVE JUROR:  Thank you.

10:24   21      THE COURT:  All right.  Thank you.  You may be seated.

10:24   22      Ms. Jackson.

10:24   23      I don't want to make anyone suffer.  I believe there was

10:24   24  one panelist that needed to take a comfort break at this time.

10:24   25  I don't want you to wait 30 minutes.  If you need to go while

54

10:24  1  back in the back, that's fine.  I'll go ahead and excuse you

10:24  2  briefly, if you'll just go ahead and stretch your legs, and

10:24  3  then we'll come back.  Thank you.

10:24  4      All right.  Ms. Jackson, if you'll go through the drill as

10:24  5  I've outlined it.

10:24  6      PROSPECTIVE JUROR:  Okay.  Name is Ashley Jackson, born

10:24  7  and raised in Waco, Texas, and I work for a local community

10:25  8  bank.

10:25  9      THE COURT:  All right.  And I do note that you had quite a

10:25  10  bit of familiarity with patents.  Is that because of your

10:25  11  experience with the local law firm, Beard Brophy?

10:25  12      PROSPECTIVE JUROR:  Actually, it's my current job more

10:25  13  than anything else.

10:25  14      THE COURT:  All right.  Well, let's start back.  Take me

10:25  15  through your educational history, if you would.

10:25  16      PROSPECTIVE JUROR:  Okay.  Bachelor's degree in biology.

10:25  17      THE COURT:  Get close to that microphone.

10:25  18      PROSPECTIVE JUROR:  Bachelor's degree in biology from

10:25  19  Southwestern University.  And then I came back to Waco, to

10:25  20  Baylor for law school and an MBA.

10:25  21      THE COURT:  All right.  So you did their combined JD/MBA

10:25  22  program?

10:25  23      PROSPECTIVE JUROR:  Yes, sir.

10:25  24      THE COURT:  All right.  And so you decided to practice

10:25  25  law.  Was Beard Brophy your first job?

10:25  1          PROSPECTIVE JUROR:  Second.

10:25  2          THE COURT:  Second job.  What was your first job out of

10:25  3  law school?

10:25  4          PROSPECTIVE JUROR:  I worked for a mortgage servicing

10:25  5  company, First City.

10:25  6          THE COURT:  All right.  Let me ask you:  Did you have any

10:25  7  courses with Mr. Wren while you were in law school?

10:25  8          PROSPECTIVE JUROR:  Yes, sir.  I did.

10:25  9          THE COURT:  All right.  And how many courses with Mr. Wren

10:25  10  did you have in school?

10:25  11          PROSPECTIVE JUROR:  Just the practice court program.

10:25  12          THE COURT:  All right.  Is there anything with that

10:26  13  experience that would cause you to be anything other than fair

10:26  14  and impartial?

10:26  15          PROSPECTIVE JUROR:  No, sir.

10:26  16          THE COURT:  All right.  Very good.

10:26  17          After your first job you ended up with Beard Brophy.  What

10:26  18  did you do for them?

10:26  19          PROSPECTIVE JUROR:  Primarily transactional work.

10:26  20          THE COURT:  Did you have any experience in dealing with

10:26  21  any patent cases while you were with Beard Brophy?

10:26  22          PROSPECTIVE JUROR:  No, sir.

10:26  23          THE COURT:  Tell me about your duties with your current

10:26  24  employer.

10:26  25          PROSPECTIVE JUROR:  I wear a number of hats there,

10:26  1  primarily compliance officer, also information security

10:26  2  officer, HR, and then I also assist in some legal issues.

10:26  3      THE COURT:  All right.  Tell us in lay terms what each of

10:26  4  those mean.

10:26  5      PROSPECTIVE JUROR:  Compliance officer, the banking

10:26  6  industry is fairly heavily regulated, and so it is my

10:26  7  responsibility to make sure that we are in compliance with all

10:26  8  the various rules and regulations.

10:26  9      On the information security side, I assist with our IT

10:26  10  department to ensure that we are maintaining safe and sound

10:26  11  practices.

10:26  12      On the technology side, HR, I coordinate various issues

10:27  13  related to that.

10:27  14      And on the legal side, primarily just assist with legal

10:27  15  questions as they come up, that we don't request assistance

10:27  16  from outside counsel for.  And I also assist with being the

10:27  17  liaison between outside counsel on any lawsuits that the bank

10:27  18  may be involved in.

10:27  19      THE COURT:  Tell me about your familiarity with patents

10:27  20  generally.

10:27  21      PROSPECTIVE JUROR:  Nothing specific beyond just a basic

10:27  22  knowledge of what patents are and how the process works.

10:27  23      THE COURT:  In law school, did you happen to take a course

10:27  24  in patent law?

10:27  25      PROSPECTIVE JUROR:  No, sir.

10:27  1        THE COURT:  All right.  Have you ever been involved in

10:27  2    your legal career in any type of patent litigation?

10:27  3        PROSPECTIVE JUROR:  Only in my experience with my current

10:27  4    employer.

10:27  5        THE COURT:  All right.  And what would that experience

10:27  6    have been?

10:27  7        PROSPECTIVE JUROR:  In -- I believe it was 2019, the bank

10:27  8    was a defendant in a patent litigation suit.  Again, the bank

10:28  9    is also defendant in a patent litigation suit currently.

10:28  10       THE COURT:  All right.  And what was your role in each of

10:28  11   those lawsuits?

10:28  12       PROSPECTIVE JUROR:  I'm just the main point of contact

10:28  13   between our outside counsel and the bank, so communicating back

10:28  14   and forth.

10:28  15       THE COURT:  All right.  So are you making any type of

10:28  16   substantive decisions for the company?

10:28  17       PROSPECTIVE JUROR:  No, sir.

10:28  18       THE COURT:  All right.  I see in your questionnaire that

10:28  19   you indicated that you had a somewhat unfavorable opinion of

10:28  20   large corporations in America today.  Can you expound upon

10:28  21   that?

10:28  22       PROSPECTIVE JUROR:  Nothing specific.

10:28  23       THE COURT:  All right.  So you can treat each of the

10:28  24   parties fairly?

10:28  25       PROSPECTIVE JUROR:  Yes, sir.

10:28   1        THE COURT:  Is there anything based upon what you've heard

10:28   2   to date that would cause you to be anything other than fair and

10:28   3   impartial as a juror in this case?

10:28   4        PROSPECTIVE JUROR:  No, sir.

10:28   5        THE COURT:  What are your hobbies and interests?

10:28   6        PROSPECTIVE JUROR:  I enjoy cooking, art, reading.

10:28   7        THE COURT:  What's the last book you read?

10:28   8        PROSPECTIVE JUROR:  Oh, I believe it was Pride and

10:28   9   Prejudice.

10:28   10        THE COURT:  Oh, okay.  Jane Austen.  All right.  Very

10:29   11   good.

10:29   12        Mr. Chu?

10:29   13        MR. CHU:  Thank you very much, Your Honor.

10:29   14        Good morning, Ms. Jackson.

10:29   15        PROSPECTIVE JUROR:  Good morning.

10:29   16        MR. CHU:  I want to ask you questions about two things.

10:29   17   One is your connection with Baylor Law with Mr. Wren or

10:29   18   anything about that, and then I want to ask you some questions

10:29   19   about your current job with the bank.

10:29   20        Do you ever see Mr. Wren at any social gatherings, such as

10:29   21   alumni functions, bar activities, or is this the first time

10:29   22   since you left law school that you've seen Mr. Wren?

10:29   23        PROSPECTIVE JUROR:  I've seen him on occasion, nothing

10:29   24   particularly significant interactions and nothing recently.

10:29   25        MR. CHU:  And do you or does your family have any other

10:29   1   relationship with Baylor Law or Baylor University?

10:29   2       PROSPECTIVE JUROR:  Yes, sir.  My mom works at Baylor Law

10:29   3   School as well.

10:29   4       MR. CHU:  And what does she do at Baylor Law School?

10:29   5       PROSPECTIVE JUROR:  She is the associate dean.

10:30   6       MR. CHU:  And do you know that -- whether she does know

10:30   7   Mr. Wren?

10:30   8       PROSPECTIVE JUROR:  Yes.  She does.

10:30   9       MR. CHU:  And works with him?

10:30   10      PROSPECTIVE JUROR:  Yes, sir.

10:30   11      MR. CHU:  And does she or anyone else in your family ever

10:30   12  have occasion to socialize with, whether they're law school

10:30   13  activities or other things like that?

10:30   14      PROSPECTIVE JUROR:  I imagine that is probable.

10:30   15      MR. CHU:  Now, you do understand that Mr. Wren is acting

10:30   16  as a private attorney in this case.  He neither represents

10:30   17  Baylor University or Baylor Law and all of his activities here

10:30   18  are as a private attorney?

10:30   19      PROSPECTIVE JUROR:  Yes, sir.

10:30   20      MR. CHU:  Let me ask you a few questions about your role

10:30   21  in the bank.  You mentioned two lawsuits, one in 2019 that was

10:30   22  a patent lawsuit.  Was that before Judge Albright or someone

10:30   23  else?

10:30   24      PROSPECTIVE JUROR:  I believe it was before Judge

10:30   25  Albright.

10:30  1      MR. CHU:  And so you would have conversations with outside

10:30  2  counsel about the patent case pending before Judge Albright?

10:31  3      PROSPECTIVE JUROR:  I would say in that case I had very

10:31  4  limited conversations with our outside counsel.

10:31  5      MR. CHU:  In the current case, you've had more

10:31  6  conversations about the patent case, the patent litigation and

10:31  7  Judge Albright?

10:31  8      PROSPECTIVE JUROR:  More than the previous case, yes.

10:31  9      MR. CHU:  And this is a currently pending case that is

10:31  10  currently pending before Judge Albright?

10:31  11     PROSPECTIVE JUROR:  Yes, sir.

10:31  12     MR. CHU:  And since you're on the defense side, during the

10:31  13  course of this, it's -- it would be common for people, whether

10:31  14  they're on the plaintiff side or the defense side as the point

10:31  15  person to have some views.  Would that be fair?

10:31  16     PROSPECTIVE JUROR:  I understand that past experience can

10:31  17  impact your decisionmaking process, but I also understand that

10:31  18  this is a totally separate case.

10:31  19     MR. CHU:  And let me take the two things together.  So you

10:31  20  know Mr. Wren.  Your mom works with him.  He works there, and

10:32  21  she works there and has a lot of interactions, and you've been

10:32  22  the point person for your bank, and you've been very, very

10:32  23  candid about everything.  You understand that I represent VLSI,

10:32  24  and you can understand how they might feel that maybe that

10:32  25  they're just a little bit behind because of your experiences

10:32  1   both with Baylor and the relationships with Mr. Wren, plus your

10:32  2   relationships in connection with the patent case when you're on

10:32  3   the defendant's side.  You could understand that VLSI might

10:32  4   feel they're a little bit behind?

10:32  5       PROSPECTIVE JUROR:  I can understand that feeling.  I

10:32  6   would say I believe I can be impartial in this case.

10:32  7       MR. CHU:  You feel that, no matter what the feeling is,

10:32  8   that you could cast aside the relationships with Mr. Wren, as

10:33  9   well as your relationship and role at the bank in trying to

10:33  10  defend against a patent case, so that without question --

10:33  11      THE COURT:  Let me ask the question this way, ma'am:  If

10:33  12  the plaintiff, VLSI, were able to prove their case by a

10:33  13  preponderance of the evidence in this matter, would you be able

10:33  14  to enter a verdict in favor of the plaintiff despite your

10:33  15  relationship with Mr. Wren?

10:33  16      PROSPECTIVE JUROR:  If that --

10:33  17      THE COURT:  Not "relationship," but the fact that you were

10:33  18  with him in law school and your mother works with him

10:33  19  currently.

10:33  20      PROSPECTIVE JUROR:  If that's what the evidence indicated,

10:33  21  yes, sir.

10:33  22      THE COURT:  All right.  Thank you.

10:33  23      MR. CHU:  No further questions, Your Honor.

10:33  24      THE COURT:  All right.  Thank you, Mr. Chu.

10:33  25      Mr. Wren?

10:33   1       MR. WREN:  Very briefly.  Would it be fair to say you have

10:33   2   a respect for the patent system?

10:33   3       PROSPECTIVE JUROR:  Yes, sir.

10:33   4       MR. WREN:  Okay.  Ms. Jackson, thank you very much.

10:33   5       PROSPECTIVE JUROR:  Thank you.

10:33   6       THE COURT:  All right.  Thank you, Ms. Jackson.

10:34   7       Mr. Railsback.  Good morning, sir.  How are you?

10:34   8       PROSPECTIVE JUROR:  I'm good.  How are you?

10:34   9       THE COURT:  Good.  Tell us about yourself.

10:34  10       PROSPECTIVE JUROR:  My name is Jared Railsback.  I live in

10:34  11   China Spring, Texas.  Born and raised in Waco.  Not born in

10:34  12   Waco, born in Arlington, but pretty much raised here in Waco.

10:34  13   My wife is a registered nurse.  I have two kids.  I work for

10:34  14   Talbert Construction, a local construction company here.

10:34  15       THE COURT:  What do you do for them?

10:34  16       PROSPECTIVE JUROR:  I'm a little bit of everything, but

10:34  17   they call us field supervisors.  So basically I go out and

10:34  18   assess damage, mainly insurance claims, to whether it's roof,

10:34  19   pipe bursts that we've had in the past week and work with the

10:34  20   insurance company and, you know, make sure the job gets

10:34  21   completed.

10:34  22       THE COURT:  All right.  Have you ever served on -- ever

10:35  23   been a party to a lawsuit previously?

10:35  24       PROSPECTIVE JUROR:  No, sir.

10:35  25       THE COURT:  Ever served on a jury previously?

63

10:35  1          PROSPECTIVE JUROR:  Yes, sir.

10:35  2          THE COURT:  All right.  Tell us about that.  Was it a

10:35  3  criminal or civil case?

10:35  4          PROSPECTIVE JUROR:  It was a criminal case.

10:35  5          THE COURT:  I believe you noted it was a DWI case.  Were

10:35  6  you able to reach a verdict in that matter?

10:35  7          PROSPECTIVE JUROR:  Yes, sir.

10:35  8          THE COURT:  Where was that?

10:35  9          PROSPECTIVE JUROR:  It was here in Waco.

10:35  10          THE COURT:  McLennan County?

10:35  11          PROSPECTIVE JUROR:  Yes, sir.  McLennan County.

10:35  12          THE COURT:  How long ago was that?

10:35  13          PROSPECTIVE JUROR:  I want to say it was probably two

10:35  14  years ago, year and a half, two years ago.

10:35  15          THE COURT:  Were you by chance the foreperson?

10:35  16          PROSPECTIVE JUROR:  No, sir.

10:35  17          THE COURT:  All right.  I see that you used to be a high

10:35  18  school coach.  Where were you a high school coach?

10:35  19          PROSPECTIVE JUROR:  Mexia, Texas.

10:35  20          THE COURT:  What'd you teach?

10:35  21          PROSPECTIVE JUROR:  I taught biology and physical

10:35  22  education.

10:35  23          THE COURT:  All right.  Big jump from -- or different jump

10:35  24  from being a high school coach into the construction area.

10:35  25  What brought that about?

64

10:35  1      PROSPECTIVE JUROR:  Me and my wife got married and decided

10:35  2  to start a family, and I was right out of college coaching and

10:35  3  kind of saw the guys that I worked with that had kids that

10:36  4  never saw their kids during football season.  And before I was

10:36  5  too invested in it, I made a decision to be at home and, you

10:36  6  know, be an actual part of my kids' life.  And so...

10:36  7      THE COURT:  Understand and respect that.

10:36  8      Any familiarity with the field of patents?

10:36  9      PROSPECTIVE JUROR:  No, sir.

10:36  10      THE COURT:  What are your hobbies and interests?

10:36  11      PROSPECTIVE JUROR:  Right now it's my daughter's softball

10:36  12  team.  Outdoors, hunting, fishing.  Right now it's just pretty

10:36  13  much my two kids and my wife.

10:36  14      THE COURT:  Very good.

10:36  15      Mr. Chu?

10:36  16      MR. CHU:  Thank you very much, Your Honor.

10:36  17      Good morning, Mr. Railsback.

10:36  18      PROSPECTIVE JUROR:  Good morning.

10:36  19      MR. CHU:  What did you coach?

10:36  20      PROSPECTIVE JUROR:  I was offense coordinator in football

10:36  21  and then track.

10:36  22      MR. CHU:  Great.  What did you like most about coaching?

10:36  23      PROSPECTIVE JUROR:  Working with the kids, the

10:36  24  relationship I built with them.

10:36  25      MR. CHU:  And how successful were your teams?

65

10:36  1      PROSPECTIVE JUROR:  We were actually pretty good.  We met

10:37  2   Carthage and Gilmer just about every single year we were there

10:37  3   in the playoffs, which East Texas teams are -- Carthage won

10:37  4   State this year 42 to 10, I think.  So we were successful, but,

10:37  5   you know...

10:37  6      MR. CHU:  Do you miss it, or have you become a softball

10:37  7   coach for one lucky little girl?

10:37  8      PROSPECTIVE JUROR:  I miss coaching, absolutely.  The

10:37  9   Friday nights, the buildup to it, I miss that terribly.

10:37  10  Coaching my daughter kind of fills that void.  Of course it's

10:37  11  different when it's your own kid, but I enjoy that and, you

10:37  12  know, look forward to coaching my kids as they come up through

10:37  13  little league.

10:37  14     MR. CHU:  Thank you very much, Mr. Railsback.

10:37  15     PROSPECTIVE JUROR:  Thank you.

10:37  16     THE COURT:  Mr. Wren?

10:37  17     MR. WREN:  Thank you, Your Honor.

10:37  18     Mr. Railsback, I noticed on your questionnaire you

10:37  19  indicated a strongly unfavorable view of large corporations.

10:37  20  And I'm just curious, where does that come from?  What does

10:37  21  that stem from?

10:37  22     PROSPECTIVE JUROR:  I couldn't hear you.  I'm sorry.

10:38  23     MR. WREN:  Yes.  On your questionnaire I think you had

10:38  24  indicated a strongly unfavorable view of large corporations,

10:38  25  and I'm just curious where that stems from.

66

10:38  1        PROSPECTIVE JUROR:  Nothing specific.  Nothing.

10:38  2        MR. WREN:  Is there anything about that -- that on behalf

10:38  3  of Intel Corporation that we -- I should have any concern

10:38  4  about?

10:38  5        PROSPECTIVE JUROR:  No, sir.

10:38  6        MR. WREN:  Fair enough.  I take you at your word.  Thank

10:38  7  you, Mr. Railsback.

10:38  8        THE COURT:  All right.  Thank you, Mr. Railsback.  You may

10:38  9  be seated.

10:38  10        Mr. Foil?

10:38  11        Good morning, Mr. Foil.  If you'll tell us about yourself.

10:38  12        PROSPECTIVE JUROR:  Okay.  I'm James Foil.  I live just

10:38  13  outside of Lorena.  I've been retired for two months.

10:38  14  Previously I was vice president of engineering for Central

10:38  15  Texas Iron Works here in Waco.

10:38  16        THE COURT:  And as vice president of engineering, what

10:38  17  were your duties?  What did you do?  All of that.

10:38  18        PROSPECTIVE JUROR:  Okay.  We were a steel fabricator and

10:38  19  been doing that for 45 years.  But I was in charge of our

10:39  20  in-house 3-D modeling and design group and all of our

10:39  21  subcontract engineering, that we subcontract most of it.

10:39  22        THE COURT:  As part of that process, did you ever have an

10:39  23  opportunity to work with items that were patented?

10:39  24        PROSPECTIVE JUROR:  No.

10:39  25        THE COURT:  Do you have any familiarity with anything in

10:39  1    the world of patents?

10:39  2         PROSPECTIVE JUROR:  No.

10:39  3         THE COURT:  Have you ever been involved with Central Texas

10:39  4    Iron Works in any type of litigation through that business?

10:39  5         PROSPECTIVE JUROR:  No.  Not with Central Texas.

10:39  6         THE COURT:  All right.  Does your spouse work outside the

10:39  7    home, or did she?

10:39  8         PROSPECTIVE JUROR:  She did.  She was the assistant

10:39  9    children's director at Highland Baptist here in Waco.  And she

10:39  10   retired last June.

10:39  11        THE COURT:  All right.  Have you ever served in the

10:39  12   military?

10:39  13        PROSPECTIVE JUROR:  No, sir.

10:39  14        THE COURT:  Other than family matters, have you been

10:39  15   involved or as a party to a lawsuit?

10:39  16        PROSPECTIVE JUROR:  I gave a couple of depositions in the

10:39  17   past.

10:39  18        THE COURT:  All right.  And what type of -- what were the

10:39  19   circumstances of having to give a deposition?

10:39  20        PROSPECTIVE JUROR:  Okay.  I worked for Trinity Industries

10:40  21   before then, and I gave a deposition on a car wreck where they

10:40  22   claimed that our fence blocked the view.

10:40  23        THE COURT:  So as part of your employment?

10:40  24        PROSPECTIVE JUROR:  Yes.

10:40  25        THE COURT:  All right.

68

10:40   1      PROSPECTIVE JUROR:  And the other one was Trinity owns a

10:40   2  lot of different plants and they leased one, and I had to give

10:40   3  a deposition.  It was a formerly -- a lead smelting plant, and

10:40   4  there was a lawsuit over that.  And I had to go through all the

10:40   5  drawings and tell them what I knew about the paint systems.

10:40   6      THE COURT:  All right.  And I see that you've served on a

10:40   7  couple juries before.  Let's start with the most recent.  Were

10:40   8  those both in McLennan County?

10:40   9      PROSPECTIVE JUROR:  No.  They were both in Tarrant County

10:40  10  back like in late '70s, early '80s.  One was a Justice of the

10:40  11  Peace.  They were in the same time week, actually.  One was the

10:40  12  Justice of the Peace case, a landlord suit, and the other one

10:40  13  was a paternity suit.

10:40  14      THE COURT:  Were you able to reach verdicts in both of

10:40  15  those?

10:40  16      PROSPECTIVE JUROR:  Yes, sir.

10:41  17      THE COURT:  Were you by chance the foreperson?

10:41  18      PROSPECTIVE JUROR:  No, sir.

10:41  19      THE COURT:  All right.  And you have a somewhat favorable

10:41  20  opinion of corporations in America today.  Any comments with

10:41  21  respect to that?

10:41  22      PROSPECTIVE JUROR:  Well, I've worked for Trinity

10:41  23  Industries out of Dallas, who's fairly large company and had

10:41  24  good work experiences with them.  And the company here is owned

10:41  25  by a larger company.

10:41  1        THE COURT:  Anything that you've heard brought out by the

10:41  2   parties or the Court that would cause you to be anything other

10:41  3   than fair and impartial?

10:41  4        PROSPECTIVE JUROR:  No, sir.

10:41  5        THE COURT:  What are your hobbies and interests?

10:41  6        PROSPECTIVE JUROR:  Since I'm retired, mostly it's been --

10:41  7   we have a new place out in Lorena, so doing landscaping,

10:41  8   gardening, stuff like that.

10:41  9        THE COURT:  Very good.

10:41  10       Mr. Chu?

10:41  11       MR. CHU:  Thank you very much, Your Honor.

10:41  12       Good morning, Mr. Foil.

10:41  13       PROSPECTIVE JUROR:  Good morning.

10:41  14       MR. CHU:  When you filled out the questionnaire for the

10:41  15  Court, is it correct you were careful and truthful in response

10:41  16  to all of --

10:41  17       PROSPECTIVE JUROR:  Yes.

10:41  18       MR. CHU:  -- the questions?

10:41  19       And one thing you said was that there are much too many

10:42  20  lawsuits.  Why is that?

10:42  21       PROSPECTIVE JUROR:  I just feel like they get out of hand.

10:42  22  There's a lot of frivolous ones.  There's a lot of legitimate

10:42  23  ones, but there's frivolous ones too.

10:42  24       MR. CHU:  Could you give examples?  Do you know of

10:42  25  lawsuits that are particularly frivolous?  Or is it just what

10:42  1   you hear in the news?

10:42  2       PROSPECTIVE JUROR:  More of what I've heard in the news on

10:42  3   some of them.  Uh-huh.

10:42  4       MR. CHU:  Now, there was a question that -- where you said

10:42  5   you've never been involved in a lawsuit.  And the question was:

10:42  6   Have you ever been involved in a lawsuit?  And the choices were

10:42  7   as a plaintiff, as a defendant, a witness or never involved,

10:42  8   and you answered never involved.  And that's a truthful answer?

10:42  9       PROSPECTIVE JUROR:  Yeah.  I didn't consider the

10:42  10  depositions as really being involved in a lawsuit.  Maybe they

10:42  11  were.  They never went to court.

10:42  12      MR. CHU:  So you interpreted the question where it said:

10:43  13  Have you ever been involved in a lawsuit as a plaintiff,

10:43  14  defendant or a witness or never involved, you felt fair in

10:43  15  marking down "never involved."

10:43  16      PROSPECTIVE JUROR:  Uh-huh.

10:43  17      MR. CHU:  Tell me about Trinity, in the sense that isn't

10:43  18  it a company that does things like guardrails for highways and

10:43  19  things like that?

10:43  20      PROSPECTIVE JUROR:  Yes.

10:43  21      MR. CHU:  And is it sued a lot?  Because when there's an

10:43  22  accident and someone is killed or injured, they get sued?

10:43  23      PROSPECTIVE JUROR:  Yes.  I was not in any of those

10:43  24  divisions that got sued.

10:43  25      MR. CHU:  But you are aware of the fact that Trinity takes

10:43   1   out advertisements in trying to express its views about there

10:43   2   being too many lawsuits when there are people who are injured?

10:43   3        PROSPECTIVE JUROR:  No.  I haven't worked for them in

10:43   4   25 years and haven't really kept up with them since then.

10:43   5        MR. CHU:  Tell me about your being the family's tech

10:44   6   person.  What do you do?

10:44   7        PROSPECTIVE JUROR:  You know, when we buy laptops or new

10:44   8   computers and all, I'm always the one setting them up and

10:44   9   helping getting them running.

10:44  10        MR. CHU:  Thank you very much.

10:44  11        PROSPECTIVE JUROR:  Uh-huh.

10:44  12        THE COURT:  Mr. Wren?

10:44  13        MR. WREN:  Good morning.  And just very briefly.  Are you

10:44  14   enjoying your retirement?

10:44  15        PROSPECTIVE JUROR:  Yes.

10:44  16        MR. WREN:  Okay.  Congratulations on that.

10:44  17        And, Your Honor, I've got no other questions for Mr. Foil.

10:44  18        PROSPECTIVE JUROR:  Okay.

10:44  19        THE COURT:  All right.  Thank you very much.  You may be

10:44  20   seated.

10:44  21        Ms. Conner?  Good morning.  Tell us about yourself.

10:44  22        PROSPECTIVE JUROR:  I'm Janette Conner, and I live in

10:44  23   Kosse, Texas.  And I moved to this area about eight years ago.

10:44  24   I'm originally born and raised in Houston.

10:44  25        THE COURT:  What brought you here?

10:44  1       PROSPECTIVE JUROR:  Get out of the big city and move to a

10:44  2  small town.  It's actually the town where my father was born

10:44  3  and raised.

10:44  4       THE COURT:  And you are a high school teacher?

10:45  5       PROSPECTIVE JUROR:  I am.  Yes.

10:45  6       THE COURT:  Is that for -- Bremond ISD, I see, but is that

10:45  7  for the high school in Kosse or --

10:45  8       PROSPECTIVE JUROR:  No.  Kosse doesn't have a school.

10:45  9  It's too small.  It's in Bremond.  I teach at Bremond High

10:45  10 School.  And I teach English 1 and III and theater arts and

10:45  11 formerly yearbook and journalism.

10:45  12      THE COURT:  I bet you are ready for COVID to be over so

10:45  13 you can start putting on some plays.

10:45  14      PROSPECTIVE JUROR:  Very, very, very ready.

10:45  15      THE COURT:  And what does your spouse do for a living?

10:45  16      PROSPECTIVE JUROR:  He works for Reynolds & Reynolds which

10:45  17 is a tech company that supplies hardware and software for car

10:45  18 dealerships.

10:45  19      THE COURT:  Never been a party to a lawsuit; is that

10:45  20 correct?

10:45  21      PROSPECTIVE JUROR:  No.

10:45  22      THE COURT:  And you did serve on a jury here in federal

10:45  23 court; is that right?

10:45  24      PROSPECTIVE JUROR:  Absolutely, yes.

10:45  25      THE COURT:  When was that?

10:45  1          PROSPECTIVE JUROR:  About -- maybe three years ago.

10:45  2          THE COURT:  And who was the judge that presided over that

10:45  3  case?

10:45  4          PROSPECTIVE JUROR:  I do not know.

10:45  5          THE COURT:  Was it Judge Smith?

10:45  6          PROSPECTIVE JUROR:  That does not sound familiar, no.

10:46  7          THE COURT:  All right.  Judge Albright?

10:46  8          PROSPECTIVE JUROR:  Maybe.

10:46  9          THE COURT:  All right.  And what was that case about?

10:46  10          PROSPECTIVE JUROR:  It was an environmental case that the

10:46  11  City of Waco had against an environmental engineering company

10:46  12  on some cleanup.

10:46  13          THE COURT:  And was the jury able to reach a verdict in

10:46  14  that case?

10:46  15          PROSPECTIVE JUROR:  Yes.  We were.

10:46  16          THE COURT:  Were you, by chance, the foreperson?

10:46  17          PROSPECTIVE JUROR:  No, I was not.

10:46  18          THE COURT:  Anything about that experience that would

10:46  19  cause you to be anything other than fair and impartial?

10:46  20          PROSPECTIVE JUROR:  No.

10:46  21          THE COURT:  Ever served in the military?

10:46  22          PROSPECTIVE JUROR:  No.

10:46  23          THE COURT:  Any type of legal training?

10:46  24          PROSPECTIVE JUROR:  No.

10:46  25          THE COURT:  What about familiarity with patents?

10:46  1          PROSPECTIVE JUROR:  No idea.

10:46  2          THE COURT:  What are your hobbies and interests?

10:46  3          PROSPECTIVE JUROR:  I like to read.  I have two children

10:46  4  so we do a lot of outdoor activities.  We have cattle.  That

10:46  5  takes a lot of our time.

10:46  6          THE COURT:  What was the last book you read?

10:46  7          PROSPECTIVE JUROR:  Just Mercy.

10:46  8          THE COURT:  All right.  Thank you.

10:46  9          Mr. Chu?

10:46  10          MR. CHU:  Thank you very much, Your Honor.

10:46  11          Good morning, Ms. Conner.

10:46  12          PROSPECTIVE JUROR:  Good morning.

10:46  13          MR. CHU:  How do you like being a teacher?  I'm married to

10:46  14  a teacher.

10:46  15          PROSPECTIVE JUROR:  I love it.  And I did teach

10:47  16  kindergarten at one time as well, so I've gone from

10:47  17  kindergarten to high school.

10:47  18          MR. CHU:  And most of us went from kindergarten to high

10:47  19  school eventually.

10:47  20          PROSPECTIVE JUROR:  That's true.

10:47  21          MR. CHU:  Anything that you didn't care for as much about

10:47  22  teaching?

10:47  23          PROSPECTIVE JUROR:  No, not really.  I mean, there's the

10:47  24  goods and the bads of everything, so you just got to take it as

10:47  25  it comes.

10:47  1      MR. CHU:  What has teaching been like for you during the

10:47  2   pandemic?

10:47  3      PROSPECTIVE JUROR:  Challenging.  And probably the biggest

10:47  4   challenge is technology.  It's not something that we usually

10:47  5   incorporate on a daily basis in our small classroom, since I am

10:47  6   in a rural school district.  So that has been a challenge for

10:47  7   me.

10:47  8      MR. CHU:  Thank you very much for your service as a

10:47  9   teacher.

10:47 10      PROSPECTIVE JUROR:  Thank you.

10:47 11      THE COURT:  Mr. Wren?

10:47 12      MR. WREN:  Thank you, Your Honor.

10:47 13      And with regard to following up on that, the technology

10:47 14   challenge as a teacher -- and I completely get that -- I

10:48 15   noticed your husband, isn't he an IT supervisor?

10:48 16      PROSPECTIVE JUROR:  Yes, he is.

10:48 17      MR. WREN:  Has he been able to help with that, with the

10:48 18   technology challenges in that regard?

10:48 19      PROSPECTIVE JUROR:  He always tells me it's user error.

10:48 20      (Laughter.)

10:48 21      PROSPECTIVE JUROR:  But yes.  He does try to help me, but

10:48 22   it -- usually the kids help me more than anything because they

10:48 23   know way much more than I do.

10:48 24      MR. WREN:  I understand that part too.

10:48 25      So what type of IT supervisor is he?  What type of work

10:48  1   does he do in IT?

10:48  2   PROSPECTIVE JUROR:  The best way that I could explain his

10:48  3   specific job is if you go to a car dealership and you purchase

10:48  4   a new car, you may have seen the little system that lays on the

10:48  5   desk, and it's like a flat computer screen.  And that's where

10:48  6   all the documentations are, and you sign on that.  His company

10:48  7   makes those, and he is in charge of installation and setting

10:48  8   those things up for his company.

10:49  9   MR. WREN:  Got it.  One other completely unrelated sort of

10:49  10  question.  In your teaching, church or otherwise, are you

10:49  11  involved in any sort of organizational activities, leadership,

10:49  12  anything like that?

10:49  13  PROSPECTIVE JUROR:  I was the vice president of our Little

10:49  14  League in town.  So I did that for several years.  My kids are

10:49  15  no longer in Little League.  They're older now.  So I would

10:49  16  teach Sunday school classes at church, and I volunteer on

10:49  17  several different committees at our church at well.

10:49  18  MR. WREN:  Great.  Well, as one teacher to another, thank

10:49  19  you for your service.  I join Mr. Chu in that.

10:49  20  PROSPECTIVE JUROR:  Thank you.

10:49  21  MR. WREN:  Thank you, Your Honor.

10:49  22  THE COURT:  All right.  Thank you.

10:49  23  Ms. Miller, you'll be our final juror before our break.

10:49  24  Good morning, Ms. Miller.

10:49  25  PROSPECTIVE JUROR:  Good morning.

| | | |
|---|---|---|
| 10:49 | 1 | THE COURT:  If you'll tell us about yourself. |
| 10:49 | 2 | PROSPECTIVE JUROR:  Julie Miller, I live in Rockdale, |
| 10:49 | 3 | Texas.  Married. |
| 10:50 | 4 | THE COURT:  What do you do for a living? |
| 10:50 | 5 | PROSPECTIVE JUROR:  I'm a branch administrator. |
| 10:50 | 6 | THE COURT:  And I'm not familiar with the company |
| 10:50 | 7 | HydroChemPSC.  What do they do? |
| 10:50 | 8 | PROSPECTIVE JUROR:  It's an industrial cleaning company, |
| 10:50 | 9 | so they do cleaning at power plants and refineries. |
| 10:50 | 10 | THE COURT:  And as the administrator, what are your |
| 10:50 | 11 | duties? |
| 10:50 | 12 | PROSPECTIVE JUROR:  I take care of HR duties.  As far as |
| 10:50 | 13 | paperwork goes, I do accounts payable, accounts receivable, |
| 10:50 | 14 | payroll, a little bit of everything.  Whatever it takes to run |
| 10:50 | 15 | the office. |
| 10:50 | 16 | THE COURT:  And I see that you're a supervisor.  How many |
| 10:50 | 17 | employees do you supervise? |
| 10:50 | 18 | PROSPECTIVE JUROR:  Well, I'm not really a supervisor in |
| 10:50 | 19 | this position currently. |
| 10:50 | 20 | THE COURT:  It was in a previous one? |
| 10:50 | 21 | PROSPECTIVE JUROR:  I'm like my own boss, I guess. |
| 10:50 | 22 | THE COURT:  All right.  Very good. |
| 10:50 | 23 | PROSPECTIVE JUROR:  Yeah.  Previously I was a supervisor. |
| 10:50 | 24 | THE COURT:  And does your spouse work outside the home? |
| 10:50 | 25 | PROSPECTIVE JUROR:  Yes.  He is a network technician for |

10:50  1    Whinstone, which is a bitcoin company out of Rockdale.

10:50  2        THE COURT:  What does he do for them, just make sure the

10:50  3    network's up and running?

10:50  4        PROSPECTIVE JUROR:  Well, he's kind of more on the

10:50  5    construction side right now, getting everything -- the

10:51  6    buildings built and the miners set up.

10:51  7        THE COURT:  Anything about your opinion, which is somewhat

10:51  8    unfavorable of large corporations, that would impact either

10:51  9    party here today?

10:51  10       PROSPECTIVE JUROR:  No, sir.

10:51  11       THE COURT:  Have you ever served in the military?

10:51  12       PROSPECTIVE JUROR:  No.

10:51  13       THE COURT:  Any legal training?

10:51  14       PROSPECTIVE JUROR:  No.

10:51  15       THE COURT:  Ever been a party to lawsuit?

10:51  16       PROSPECTIVE JUROR:  No.

10:51  17       THE COURT:  Ever been a witness in a lawsuit?

10:51  18       PROSPECTIVE JUROR:  No.

10:51  19       THE COURT:  I see you served on a traffic court jury

10:51  20    before.  Where was that?

10:51  21       PROSPECTIVE JUROR:  In Cameron.

10:51  22       THE COURT:  How long ago?

10:51  23       PROSPECTIVE JUROR:  Probably a good two years at least.

10:51  24       THE COURT:  Were you able to reach a verdict?

10:51  25       PROSPECTIVE JUROR:  Yes.

10:51   1          THE COURT:  Were you by chance the foreperson?

10:51   2          PROSPECTIVE JUROR:  No.

10:51   3          THE COURT:  Anything about that experience that would

10:51   4  cause you to be anything other than fair and impartial?

10:51   5          PROSPECTIVE JUROR:  No.

10:51   6          THE COURT:  Any knowledge about patents of any type?

10:51   7          PROSPECTIVE JUROR:  Not -- just general.  Not really

10:51   8  anything in-depth.

10:51   9          THE COURT:  What are your hobbies and interests?

10:51  10          PROSPECTIVE JUROR:  Pretty much spend all my time with my

10:51  11  kids.  My daughter plays for a traveling softball team, so I'm

10:52  12  busy pretty much every day of the week.

10:52  13          THE COURT:  You indicated that you have a opinion that is

10:52  14  somewhat high as to the number of civil lawsuits that are

10:52  15  filed.  What can you tell us about that?

10:52  16          PROSPECTIVE JUROR:  Not much.

10:52  17          THE COURT:  Is there any particular example that comes to

10:52  18  mind?

10:52  19          PROSPECTIVE JUROR:  I just feel like there's a lot of

10:52  20  them, and sometimes I feel that they're not valid, but...

10:52  21          THE COURT:  Anything about that opinion that would cause

10:52  22  you to be anything other than fair and impartial here?

10:52  23          PROSPECTIVE JUROR:  No.

10:52  24          THE COURT:  Thank you.

10:52  25          Mr. Chu?

10:52  1          MR. CHU:  Thank you very much, Your Honor.

10:52  2          Good morning, Ms. Miller.

10:52  3          PROSPECTIVE JUROR:  Good morning.

10:52  4          MR. CHU:  Now, your husband is a data center technician?

10:52  5          PROSPECTIVE JUROR:  Yeah.  Kind of.  I don't know too much

10:52  6  of what he does.

10:52  7          MR. CHU:  Does he ever teach you anything about

10:52  8  technology?

10:52  9          PROSPECTIVE JUROR:  No.

10:52  10         MR. CHU:  He's the home tech guy --

10:52  11         PROSPECTIVE JUROR:  Yes.

10:52  12         MR. CHU:  -- if something breaks down, and you're happy

10:52  13  he's the home tech guy?

10:52  14         PROSPECTIVE JUROR:  Correct.

10:52  15         MR. CHU:  And did you grow up elsewhere before coming to

10:52  16  Texas?

10:52  17         PROSPECTIVE JUROR:  Yes.  I was born and raised in

10:53  18  California and then moved here, I guess, almost 20 years ago

10:53  19  now.

10:53  20         MR. CHU:  How do you like the change?

10:53  21         PROSPECTIVE JUROR:  I like it.  It's different.  Took

10:53  22  awhile to get used to.

10:53  23         MR. CHU:  It's different, but people everywhere are all

10:53  24  the same.

10:53  25         PROSPECTIVE JUROR:  Yeah.

81

10:53   1       MR. CHU:  Thank you very much.

10:53   2       PROSPECTIVE JUROR:  Thank you.

10:53   3       THE COURT:  Mr. Wren?

10:53   4       MR. WREN:  Thank you, Your Honor.

10:53   5       Ms. Miller, I think, if I recall correctly, you were one

10:53   6   of the ones -- and thank you for your candor, that said --

10:53   7   raised your hand and said, well, if a case is coming and we've

10:53   8   got jurors coming in, my assumption is the case must have some

10:53   9   merit.

10:53  10       PROSPECTIVE JUROR:  Uh-huh.

10:53  11       MR. WREN:  First of all, did I get that right?

10:53  12       PROSPECTIVE JUROR:  Yeah.

10:53  13       MR. WREN:  Okay.  And let me ask you:  Is that something

10:53  14   that you feel will influence you in any way in approaching this

10:53  15   case and listening to the evidence and deciding this case just

10:53  16   directly on the evidence?

10:53  17       PROSPECTIVE JUROR:  It -- I wouldn't be influenced.  I

10:53  18   would look at all the evidence.

10:54  19       MR. WREN:  Okay.  And having heard the back and forth, I

10:54  20   mean, is that really even still your thought, that -- for us to

10:54  21   even have a jury here, this case must presumably have some

10:54  22   merit?

10:54  23       PROSPECTIVE JUROR:  I think so, if I'm understanding

10:54  24   correctly.  Yes.

10:54  25       MR. WREN:  Okay.  All right.  Well, but that's not going

82

10:54   1   to influence your thinking or require the plaintiff to do

10:54   2   something other than fully prove their case?

10:54   3       PROSPECTIVE JUROR:  Oh, just that, yeah, somebody needs to

10:54   4   prove the case, for sure.

10:54   5       MR. WREN:  And specifically you understand that on the

10:54   6   question of infringement that -- that somebody is the

10:54   7   plaintiff, VLSI --

10:54   8       PROSPECTIVE JUROR:  Right.

10:54   9       MR. WREN:  -- to prove that they have evidence that

10:54   10  supports a verdict and the greater weight of the evidence in

10:54   11  this case?

10:54   12      PROSPECTIVE JUROR:  Yes.

10:54   13      MR. WREN:  Okay.  Do you think there's anything about that

10:54   14  that would make it difficult for you to be a good juror in this

10:54   15  case?

10:54   16      PROSPECTIVE JUROR:  No.

10:54   17      MR. WREN:  Okay.  That's all I need to hear.  Thank you so

10:54   18  much.  Appreciate you.

10:54   19      THE COURT:  All right.  Ladies and gentlemen, that clock

10:54   20  is incorrect.  It's 10:50, not 11:50.  So we will stand in

10:55   21  recess for 15 minutes.  What I'd like you to do is make sure

10:55   22  you return exactly to the same spot you were sitting in once

10:55   23  the break is concluded.

10:55   24      Court will stand in recess.

10:55   25      (Recess taken from 10:55 to 11:07.)

83

11:07  1          THE COURT:  All right.  Be seated, everyone.  We'll give

11:07  2     everyone an opportunity to get back to their seats.

11:09  3          All right.  It looks like we have everyone back from

11:09  4     break.  Ms. Ridings, if you'll come forward.

11:09  5          PROSPECTIVE JUROR:  Hello.  Lori Ridings, I am a

11:09  6     registered nurse.  I currently work for Aquilla ISD as their

11:09  7     district nurse and CTE instructor.

11:09  8          THE COURT:  And how long have you been in that position?

11:09  9          PROSPECTIVE JUROR:  I have been there since 2018.

11:09 10          THE COURT:  Does your spouse work outside the home?

11:09 11          PROSPECTIVE JUROR:  I'm not married.  I'm engaged, but I'm

11:09 12     not married.

11:09 13          THE COURT:  All right.  Very good.  And do you have any

11:09 14     familiarity with the field of patents?

11:09 15          PROSPECTIVE JUROR:  I do not.

11:09 16          THE COURT:  Have you ever served in the military?

11:09 17          PROSPECTIVE JUROR:  I have not.

11:10 18          THE COURT:  Other than family law matters, have you ever

11:10 19     been a party to a lawsuit?

11:10 20          PROSPECTIVE JUROR:  No, sir.

11:10 21          THE COURT:  Ever been a witness in a lawsuit?

11:10 22          PROSPECTIVE JUROR:  No, sir.

11:10 23          THE COURT:  Ever served on a jury before?

11:10 24          PROSPECTIVE JUROR:  No.  This is only the second time I've

11:10 25     ever been called for jury duty.  What's up with that?

84

11:10  1      THE COURT:  It's interesting.  In state court you're

11:10  2  called based upon your driver's license, and in federal court

11:10  3  you're charged -- called based upon voter registration, so it's

11:10  4  a little bit different in that regard.  So that's the only

11:10  5  insight as to that I can give you.

11:10  6      What are your hobbies and interests?

11:10  7      PROSPECTIVE JUROR:  Hobbies, who has time for hobbies?

11:10  8  I'm the mother of three adult children.  I have four

11:10  9  grandchildren and my mother lives next door and is 70, so

11:10  10  mostly I'm doing something for somebody.  I do get to read on

11:10  11  occasion, but...

11:10  12      THE COURT:  What's the last book you read?

11:10  13      PROSPECTIVE JUROR:  I'm actually in the middle of Sundown

11:10  14  Series, although I do have a paperback in my bag because I

11:10  15  can't bring my iPad, so yeah.  I'm really not really sure what

11:10  16  this one is, other than where did this come from?

11:10  17      THE COURT:  All right.  Very good.

11:10  18      Mr. Chu?

11:11  19      MR. CHU:  Thank you very much, Your Honor.

11:11  20      Good morning, Ms. Ridings.

11:11  21      PROSPECTIVE JUROR:  Good morning.

11:11  22      MR. CHU:  What's it like being a school nurse during the

11:11  23  pandemic?

11:11  24      PROSPECTIVE JUROR:  It was a little stressful at first

11:11  25  because I thought -- but it's more the district as opposed to

11:11  1    the kids because there's so many things we need to do to keep

11:11  2    everybody safe and put your mask up, mask up, mask up, mask up.

11:11  3    But it's good; I love the kids.  It's such a small district,

11:11  4    there's a little over 300 students.  And so I'm for the

11:11  5    whole -- yes.  I just love it.  Love the kids, so...

11:11  6        MR. CHU:  So you take care of 100 percent of the 300?

11:11  7        PROSPECTIVE JUROR:  Yes.  And the teachers, all the staff.

11:11  8        MR. CHU:  Oh, and the teachers?

11:11  9        PROSPECTIVE JUROR:  Yeah.  Because if somebody's, oh, my

11:11  10   heart's not feeling too good.  I think my blood pressure might

11:11  11   be a little high.  So I take care of them all.

11:11  12       MR. CHU:  What are the common problems in the course of a

11:11  13   week?

11:11  14       PROSPECTIVE JUROR:  In the school the common problems are

11:11  15   my tummy hurts.

11:11  16       (Laughter.)

11:11  17       PROSPECTIVE JUROR:  Peppermint and on your way, after I

11:11  18   check for temp and everything else, so...

11:11  19       MR. CHU:  Thank you very much, Ms. Ridings.

11:11  20       PROSPECTIVE JUROR:  Thank you.

11:11  21       THE COURT:  Mr. Wren?

11:11  22       MR. WREN:  Thank you, Your Honor.

11:12  23       Ms. Ridings, now can you hear me?

11:12  24       PROSPECTIVE JUROR:  Yes.

11:12  25       MR. WREN:  Good.  Ms. Ridings, I saw that you have a

86

11:12  1   laptop and personal computer that utilizes Intel

11:12  2   microprocessors.

11:12  3        PROSPECTIVE JUROR:  Yes.

11:12  4        MR. WREN:  And let me just ask:  Ever any sort of issues

11:12  5   with that?  Any aspect that raises any concern there?

11:12  6        PROSPECTIVE JUROR:  User error.  No.  I don't -- I mean,

11:12  7   no.  I don't have any problems.

11:12  8        MR. WREN:  Understand that well.

11:12  9        PROSPECTIVE JUROR:  As long as I don't have Vista anymore,

11:12  10  which, see, that's my age.  But anyway, I'm good.

11:12  11       MR. WREN:  Great.  Ms. Ridings, thank you so much.

11:12  12  Appreciate you.

11:12  13       PROSPECTIVE JUROR:  Thank you.

11:12  14       THE COURT:  All right.  Thank you.

11:12  15       Mr. Vonderheid.  Good morning, sir.  How are you?

11:12  16       PROSPECTIVE JUROR:  Sir, I'm living the dream.

11:12  17       THE COURT:  I am glad to hear that.  Tell us about

11:12  18  yourself and why you're living the dream.

11:12  19       PROSPECTIVE JUROR:  My name's Gail Vonderheid, originally

11:12  20  from Wilkes-Barre, Pennsylvania.  Currently my wife and I live

11:12  21  in Bell County.  I am retired military and a retired government

11:12  22  employee.  And my wife is also a retired government employee.

11:13  23       THE COURT:  I believe, in looking through your

11:13  24  questionnaire, you served our country in the United States

11:13  25  Army; is that correct?

87

11:13  1        PROSPECTIVE JUROR:  That is correct, sir.

11:13  2        THE COURT:  What was your MOS?

11:13  3        PROSPECTIVE JUROR:  I was a 13 Alpha 5 field artilleryman.

11:13  4        THE COURT:  All right.  Very good.  How long did you serve

11:13  5  in the military?

11:13  6        PROSPECTIVE JUROR:  28 years the first time.

11:13  7        THE COURT:  Excellent.  Thank you for your service.  And

11:13  8  what was your rank upon retirement?

11:13  9        PROSPECTIVE JUROR:  Lieutenant colonel.

11:13  10        THE COURT:  Very good.  Tell us about your government

11:13  11  employment, if you would.

11:13  12        PROSPECTIVE JUROR:  I was an administrative officer and a

11:13  13  training officer for the Pennsylvania Army National Guard and

11:13  14  then transitioned to the Tobyhanna Army Depot which is a

11:13  15  communications repair site in Northeastern Pennsylvania.  I was

11:13  16  a logistics management specialist there for some satellite

11:13  17  systems, and I was also a core contracting officer's

11:13  18  representative.

11:13  19        THE COURT:  You did indicate that you have some experience

11:13  20  in the patent field.  If you can expound upon that for us.

11:14  21        PROSPECTIVE JUROR:  What I attempted to identify was that

11:14  22  when working with some of the -- our industrial complex

11:14  23  partners -- can you say their names?  Raytheon, L3, you know,

11:14  24  they have some material that is specifically for their use only

11:14  25  or not to be put out to any other individuals or like

88

11:14  1    companies.  So we maintained, you know, tight control on that

11:14  2    and ensured that we did the best we could to control that.

11:14  3         THE COURT:  Is there anything about your background and

11:14  4    knowledge with respect to patents generally that would cause

11:14  5    you to be anything other than fair and impartial here?

11:14  6         PROSPECTIVE JUROR:  Not that I'm aware of, sir.

11:14  7         THE COURT:  Does your spouse work outside the home or did

11:14  8    she?

11:14  9         PROSPECTIVE JUROR:  She did.  She -- yeah, she did.

11:14  10        THE COURT:  Sorry to hear that.

11:15  11        I see that you have been involved in a lawsuit before.  If

11:15  12   you can tell us generally about that.

11:15  13        PROSPECTIVE JUROR:  It was a civil lawsuit.  My sister and

11:15  14   my brother and I were sued by a neighbor across a three-lane

11:15  15   state highway for the actions of my father as he improved our

11:15  16   property.

11:15  17        THE COURT:  All right.  I see that, in general, one of

11:15  18   your opinions is that you believe the number of civil lawsuits

11:15  19   that are filed is much too high.  Can you expound upon that

11:15  20   just briefly?

11:15  21        PROSPECTIVE JUROR:  Well, sir, if you just -- if you can

11:15  22   watch TV anymore and just see the ads, it's one ad after

11:15  23   another seeking individuals who can, you know, enter this

11:15  24   complaint against that company or that complaint against this

11:15  25   company.  And I just think -- yes, sir.  I think there's too

11:15  1   many.

11:15  2       THE COURT:  Is there anything about that opinion that

11:15  3   would cause you to be anything other than fair and impartial as

11:15  4   it relates to both VLSI and Intel?

11:15  5       PROSPECTIVE JUROR:  Not that I'm currently aware of, sir.

11:16  6       THE COURT:  Very good.  Other than that one experience

11:16  7   being a witness, have you ever been involved in a lawsuit?

11:16  8       PROSPECTIVE JUROR:  Yes, sir.  I observed a hit and run

11:16  9   where I had to make a disposition, but I was -- it never came

11:16  10  to a -- never had to go to court on it, and...

11:16  11      THE COURT:  Is there anything about your experience as

11:16  12  being involved in lawsuits as a witness that would cause you to

11:16  13  be anything other than fair and impartial?

11:16  14      PROSPECTIVE JUROR:  I'm not aware that I...

11:16  15      THE COURT:  And did you answer the question that you had a

11:16  16  potential hardship that might make jury service difficult on

11:16  17  you?

11:16  18      PROSPECTIVE JUROR:  I don't think so.

11:16  19      THE COURT:  All right.

11:16  20      PROSPECTIVE JUROR:  I answered the one that I have a

11:16  21  challenge hearing.

11:16  22      THE COURT:  And we do have -- if you are ultimately

11:16  23  selected to be on this jury, we do have some devices that we

11:16  24  can give you that can assist you.

11:17  25      PROSPECTIVE JUROR:  I have devices.  They seem to work

11:17  1   well when they work.

11:17  2        THE COURT:  Good.  Well, we have those as well.

11:17  3        What are your hobbies and interests?

11:17  4        PROSPECTIVE JUROR:  I'm trying to recover my front lawn

11:17  5   and my lawn around my house.

11:17  6        THE COURT:  I can understand that.

11:17  7        And you've never served on a jury from what I can tell; is

11:17  8   that correct?

11:17  9        PROSPECTIVE JUROR:  That's correct, sir.  Called many

11:17  10  times, never got past the interview.

11:17  11       THE COURT:  Is there anything about any of the comments or

11:17  12  questions that I've asked or the attorneys asked that, in your

11:17  13  opinion, would make you anything other than fair and impartial

11:17  14  here?

11:17  15       PROSPECTIVE JUROR:  Not that I'm aware of, sir.

11:17  16       THE COURT:  All right.

11:17  17       Mr. Chu?

11:17  18       MR. CHU:  Thank you very much, Your Honor.

11:17  19       Good morning, Mr. Vonderheid.

11:17  20       PROSPECTIVE JUROR:  Thank you, sir.  Appreciate it.

11:17  21       MR. CHU:  I asked a question, and by a show of hands,

11:17  22  whether anyone would be hesitant to award a certain amount of

11:17  23  damages if there was evidence to support it and it was

11:17  24  supported by the jury instructions.  And I believe you raised

11:18  25  your hand.  You might have been the only one to raise your

91

11:18 1  hand, that you would be hesitant to award --

11:18 2      PROSPECTIVE JUROR:  That was probably -- yeah, I was

11:18 3  probably that guy that did that, yes, sir.  Yep.

11:18 4      THE COURT:  We can't hear you, Mr. Vonderheid.  Would you

11:18 5  get close --

11:18 6      PROSPECTIVE JUROR:  I was probably -- yeah.  I believe I

11:18 7  was the only one who raised my arm.

11:18 8      MR. CHU:  And could you explain that?

11:18 9      PROSPECTIVE JUROR:  I just think that the awards by some,

11:18 10 you know, of a group of my peers on some accounts are too high,

11:18 11 you know.

11:18 12     MR. CHU:  And that's fair.  So you tend to think that

11:18 13 sometimes claims or damages are too high and could be in this

11:18 14 case or other cases?

11:18 15     PROSPECTIVE JUROR:  Well, that's -- I don't know how to

11:18 16 answer that, other than by saying:  Yes, I believe that there

11:18 17 are times when damages are too high.

11:18 18     MR. CHU:  Right.

11:18 19     PROSPECTIVE JUROR:  Or unrealistic.

11:18 20     MR. CHU:  So of course I represent VLSI, the plaintiff in

11:18 21 this case.  And as I think I described, the claim is for

11:18 22 reasonable royalties, but the total number might be high.

11:19 23 You've been very candid in expressing your views.

11:19 24     Could you explain a little more why you have your views

11:19 25 that the damages might be too high?

11:19  1        PROSPECTIVE JUROR:  I would -- you know, what is the cost

11:19  2   of the damage, realistically?  And then what is the cost of, I

11:19  3   guess, what the jury decides you should get?  There should be a

11:19  4   balance on that.  You know, I don't believe in some

11:19  5   astronomical windfall.

11:19  6        MR. CHU:  Could you understand that people at VLSI might

11:19  7   feel they're starting just a little bit behind the eight ball

11:19  8   at the beginning of this case?  You could understand that

11:20  9   feeling.

11:20  10       PROSPECTIVE JUROR:  You want my assumption -- I can

11:20  11  understand that.  You want my assumption?  You're both equal

11:20  12  until you open your mouth.

11:20  13       (Laughter.)

11:20  14       PROSPECTIVE JUROR:  And then it swings.

11:20  15       MR. CHU:  Okay.

11:20  16       THE COURT:  Let me ask you this question, Mr. Vonderheid.

11:20  17  If the plaintiff were able to prove by a preponderance of the

11:20  18  evidence their damages in this particular case, would you be

11:20  19  able to award damages if the law, in fact, supported it?

11:20  20       PROSPECTIVE JUROR:  Yes, sir.  I believe I could.

11:20  21       THE COURT:  All right.

11:20  22       MR. CHU:  Mr. Vonderheid, on a different subject, I think

11:20  23  you also indicated that you have personal experience with the

11:20  24  United States Patent and Trademark Office; is that right?

11:20  25       PROSPECTIVE JUROR:  To this point, sir, that because I

| | | |
|---|---|---|
| 11:20 | 1 | worked with some industrial complex companies that had patents |
| 11:20 | 2 | on their equipment that, you know, you had to buy the equipment |
| 11:20 | 3 | from them.  I could not buy a like piece of equipment or |
| 11:21 | 4 | part -- and I'm not talking computer -- but parts from someone |
| 11:21 | 5 | else to put in their -- or into their equipment, or it might |
| 11:21 | 6 | void their warranty.  That is what I was trying to identify at |
| 11:21 | 7 | that point. |
| 11:21 | 8 | MR. CHU:  Did you have any feelings about that one way or |
| 11:21 | 9 | the other? |
| 11:21 | 10 | PROSPECTIVE JUROR:  Well, I knew at some point their grasp |
| 11:21 | 11 | of that controlled material would come to an end and that it |
| 11:21 | 12 | would revert to the government to allow us to buy it at another |
| 11:21 | 13 | vendor.  But that was -- that's the rules we had to play with |
| 11:21 | 14 | and that's the rules that, you know, we had to do. |
| 11:21 | 15 | MR. CHU:  So from your point of view, you didn't like the |
| 11:21 | 16 | fact that some of these companies had patents because you |
| 11:21 | 17 | wanted to be able to buy things from alternative vendors? |
| 11:21 | 18 | PROSPECTIVE JUROR:  Well, I'm not sure that's quite what I |
| 11:21 | 19 | want to say.  I don't have a problem with a company having a |
| 11:21 | 20 | patent.  I think, "good for them."  It was the cost and the |
| 11:22 | 21 | purchasing of material to maintain property that our war |
| 11:22 | 22 | fighters' lives depended on had some concerns. |
| 11:22 | 23 | MR. CHU:  Okay.  But -- |
| 11:22 | 24 | PROSPECTIVE JUROR:  But if you have a patent, good for |
| 11:22 | 25 | you, sir. |

94

| | | |
|---|---|---|
| 11:22 | 1 | MR. CHU:  I'm sorry.  I didn't hear -- |
| 11:22 | 2 | PROSPECTIVE JUROR:  If you have a patent, good for you.  I |
| 11:22 | 3 | don't have a -- I mean, patents are, I think, important. |
| 11:22 | 4 | MR. CHU:  And you would agree that a patent owner who has |
| 11:22 | 5 | a patent that's still active has the absolute right to license |
| 11:22 | 6 | it or, if necessary, to enforce it in a lawsuit against -- |
| 11:22 | 7 | PROSPECTIVE JUROR:  I would. |
| 11:22 | 8 | MR. CHU:  -- someone that's infringing? |
| 11:22 | 9 | PROSPECTIVE JUROR:  I would. |
| 11:22 | 10 | MR. CHU:  Thank you very much. |
| 11:22 | 11 | PROSPECTIVE JUROR:  Yes, sir. |
| 11:22 | 12 | THE COURT:  Great.  Mr. Wren? |
| 11:22 | 13 | MR. WREN:  Thank you, Your Honor. |
| 11:22 | 14 | Mr. Vonderheid, during your time as an officer in the |
| 11:22 | 15 | military, did you have any experience working with Intel in any |
| 11:22 | 16 | aspect of your service? |
| 11:22 | 17 | PROSPECTIVE JUROR:  No, sir.  Not really. |
| 11:22 | 18 | MR. WREN:  Okay.  So that would not be any sort of -- did |
| 11:23 | 19 | you hear about Intel working with the military or any knowledge |
| 11:23 | 20 | of it? |
| 11:23 | 21 | PROSPECTIVE JUROR:  If I did, it was, you know, way -- you |
| 11:23 | 22 | know, on the periphery.  I was not familiar with it at all. |
| 11:23 | 23 | MR. WREN:  Okay.  Thank you very much. |
| 11:23 | 24 | PROSPECTIVE JUROR:  Yes, sir. |
| 11:23 | 25 | THE COURT:  All right.  Thank you, Mr. Vonderheid.  You |

11:23  1    may be seated.

11:23  2        Mr. Miller?  Good morning, sir.  How are you?

11:23  3        PROSPECTIVE JUROR:  All right.

11:23  4        THE COURT:  Tell us about yourself.

11:23  5        PROSPECTIVE JUROR:  My name is Lakerian Miller.  I'm from

11:23  6    Mississippi.  I moved here about ten years ago.  We are staying

11:23  7    in Killeen, as we speak.  I've been working with the City of

11:23  8    Round Rock for almost ten years now.

11:23  9        THE COURT:  And what do you do for them?

11:23  10        PROSPECTIVE JUROR:  I works in the Park Department.

11:23  11        THE COURT:  All right.

11:23  12        PROSPECTIVE JUROR:  Sir?

11:23  13        THE COURT:  And does your spouse work outside the home?

11:23  14        PROSPECTIVE JUROR:  No, sir.  She works at a home.

11:24  15        THE COURT:  All right.  Very good.

11:24  16        Have you ever served in the military?

11:24  17        PROSPECTIVE JUROR:  No, sir.

11:24  18        THE COURT:  Have you ever served on a jury before?

11:24  19        PROSPECTIVE JUROR:  No, sir.  First time.

11:24  20        THE COURT:  Other than any potential family law matters,

11:24  21    have you ever been involved in a lawsuit?

11:24  22        PROSPECTIVE JUROR:  No, sir.

11:24  23        THE COURT:  All right.  I believe you were one of the ones

11:24  24    that raised your hands that said, you know, the fact that this

11:24  25    is a patent suit might not be something high on your level of

11:24  1    interest.  Were you one of the ones that raised your hand for

11:24  2    that question?

11:24  3        PROSPECTIVE JUROR:  Yes, sir.  I just -- I'm not too

11:24  4    familiar with it.  That's all.

11:24  5        THE COURT:  All right.  Are you willing to serve on a

11:24  6    jury, if selected in this case, and listen carefully to and

11:24  7    consider the evidence as presented?

11:24  8        PROSPECTIVE JUROR:  Yes, sir, if I'm chosen.

11:24  9        THE COURT:  All right.  Very good.  What are your hobbies

11:24  10   and interests?

11:24  11       PROSPECTIVE JUROR:  Right now is AU and PlayStation.

11:24  12       THE COURT:  So that's amateur athletics; is that right?

11:24  13       PROSPECTIVE JUROR:  For my kids.

11:24  14       THE COURT:  All right.  Very good.  What's your favorite

11:24  15   game on PlayStation?

11:24  16       PROSPECTIVE JUROR:  Right now I'm playing Cold War.

11:24  17       THE COURT:  All right.  Very good.  Thank you very much.

11:25  18   Mr. Chu?

11:25  19       MR. CHU:  Thank you very much, Your Honor.

11:25  20   Good morning, Mr. Miller.

11:25  21       PROSPECTIVE JUROR:  How you doing?

11:25  22       MR. CHU:  I'm doing great.  Thanks.

11:25  23   Could you describe what your average day is working for

11:25  24   the City of Round Rock?

11:25  25       PROSPECTIVE JUROR:  Mostly morning meetings, just going to

97

11:25  1    check each park that's on my list.  If -- any maintenance that

11:25  2    needs to be done, I do it.  Clean up, sanitize, whatever.

11:25  3    Inspections.

11:25  4        MR. CHU:  And I think you described yourself as

11:25  5    tech-savvy.  Could you describe what you mean by that?

11:25  6        PROSPECTIVE JUROR:  Well, I'm kind of good with computers,

11:25  7    gaming, sound systems, wiring, things of that nature.

11:25  8        MR. CHU:  Wiring of what kind?  Do you open up the back of

11:25  9    your computer?  Do you change memory?  Do you --

11:25  10       PROSPECTIVE JUROR:  Not much as computer.  Maybe something

11:25  11   that we want to throw away, like a TV, and I just look up what

11:26  12   it needs on YouTube, and I try to fix it myself.

11:26  13       MR. CHU:  I see.  And do you know anything about computer

11:26  14   technology, not from the standpoint of a user using the

11:26  15   keyboard and using a computer, but anything about the internal

11:26  16   guts of a computer?

11:26  17       PROSPECTIVE JUROR:  No, sir.

11:26  18       MR. CHU:  Thank you very much.

11:26  19       PROSPECTIVE JUROR:  All right.

11:26  20       THE COURT:  Mr. Wren?

11:26  21       MR. WREN:  Thank you, Your Honor.

11:26  22       Mr. Miller, I think you'd also indicated that your first

11:26  23   thought would be that if a case is here in front of the jury,

11:26  24   it starts out with some sort of merit.

11:26  25       PROSPECTIVE JUROR:  With some sort of who?

98

11:26  1      MR. WREN:  Starts out with some sort of merit or there's

11:26  2  some good reason, that the evidence must already be there.  Let

11:26  3  me just ask you because I, of course -- and thank you for that

11:26  4  candor.  I just want to find out:  Are we starting out even

11:26  5  with you, where there's been no evidence at all presented in

11:26  6  this case and the burden of proof on infringement is on the

11:27  7  plaintiff?

11:27  8      PROSPECTIVE JUROR:  I just think -- well, first off, I

11:27  9  think everything should be with fairness.  So that's why I say

11:27  10  I would do my best and -- on whatever verdict comes up or

11:27  11  however, so...  But just the experience that I'm getting now is

11:27  12  everything's okay.

11:27  13      MR. WREN:  Okay.  That's all I need to hear.  Mr. Miller,

11:27  14  thank you very much.

11:27  15      PROSPECTIVE JUROR:  All right.

11:27  16      THE COURT:  All right.  Thank you.

11:27  17      Kelly Kemp.

11:27  18      And if everyone will please make an effort to step as

11:27  19  close to the microphone as you can so we can hear.  It's

11:27  20  natural to want to look at someone else when they're talking,

11:27  21  but make sure you're speaking into that microphone.

11:27  22      Good morning, Ms. Kemp.  Tell us about yourself.

11:27  23      PROSPECTIVE JUROR:  My name is Kelly Kemp.  I'm originally

11:27  24  from East Texas.  I moved to Belton area about seven years ago,

11:27  25  and I have been a stay-at-home mother, raising four children.

11:27  1    They're all adults now, and I have four grandchildren that I

11:28  2    pretty much spend most of my time with.

11:28  3        THE COURT:  All right.  On your form it indicates that

11:28  4    Suddenlink is your current employer.  Is that still correct

11:28  5    or...

11:28  6        PROSPECTIVE JUROR:  No.  That was very --

11:28  7        THE COURT:  Oh, most recent employers must be what you

11:28  8    were referring to.

11:28  9        PROSPECTIVE JUROR:  Yeah.  It was about ten years ago.

11:28  10   For the most part, I've been at home.

11:28  11       THE COURT:  Did you ever serve in the military?

11:28  12       PROSPECTIVE JUROR:  No.

11:28  13       THE COURT:  And what familiarity do you have with laws,

11:28  14   law firms and the Court system?  It indicates that you answered

11:28  15   you did have some knowledge in that regard.

11:28  16       PROSPECTIVE JUROR:  Years ago, my first job, I worked for

11:28  17   an attorney part time for the junior and senior year of high

11:28  18   school and then, I think, maybe a year afterwards.

11:28  19       THE COURT:  What'd you do for them?

11:28  20       PROSPECTIVE JUROR:  I transcribed and I typed, without a

11:29  21   computer.  I typed the wills and deeds.

11:29  22       THE COURT:  All right.  I remember taking typing in high

11:29  23   school myself.

11:29  24       (Laughter.)

11:29  25       THE COURT:  Never been a party to a lawsuit; is that

100

11:29  1  correct?

11:29  2       PROSPECTIVE JUROR:  Correct.

11:29  3       THE COURT:  And you've never served on a jury?

11:29  4       PROSPECTIVE JUROR:  Correct.

11:29  5       THE COURT:  I know you're very busy with your kids and

11:29  6  grandkids, but what are your hobbies and interests, other than

11:29  7  caring for them?

11:29  8       PROSPECTIVE JUROR:  I love to go hiking and kayaking, just

11:29  9  spending time outdoors.

11:29  10       THE COURT:  Any familiarity with patents in any way?

11:29  11       PROSPECTIVE JUROR:  No.

11:29  12       THE COURT:  Anything you've heard from me or questions by

11:29  13  the lawyers that would cause you to be anything other than fair

11:29  14  and impartial?

11:29  15       PROSPECTIVE JUROR:  No, sir.

11:29  16       THE COURT:  All right.  Mr. Chu?

11:29  17       MR. CHU:  Thank you very much, Your Honor.

11:29  18       Good morning, Ms. Kemp.

11:29  19       PROSPECTIVE JUROR:  Hello.

11:29  20       MR. CHU:  Your husband is a programmer, I think?

11:29  21       PROSPECTIVE JUROR:  Yes.

11:29  22       MR. CHU:  And has he ever taught you anything about

11:29  23  programming or technology or anything like that?

11:29  24       PROSPECTIVE JUROR:  No.

11:29  25       MR. CHU:  So he's the tech-savvy guy at home who fix

11:30  1    things?

11:30  2         PROSPECTIVE JUROR:  You would think that, but no.

11:30  3         (Laughter.)

11:30  4         MR. CHU:  Okay.  I'm not going to ask any more questions,

11:30  5    otherwise he's going to get into trouble.

11:30  6         Where in East Texas did you live?

11:30  7         PROSPECTIVE JUROR:  Kaufman County, Mabank, Gun Barrel

11:30  8    area.

11:30  9         MR. CHU:  And do you like the move?

11:30 10         PROSPECTIVE JUROR:  I do.  I've grown to love Central

11:30 11    Texas.

11:30 12         MR. CHU:  Great.  Thank you very much.

11:30 13         PROSPECTIVE JUROR:  Uh-huh.

11:30 14         THE COURT:  Mr. Wren?

11:30 15         MR. WREN:  Well, congratulations on being from the

11:30 16    Mabank/Gun Barrel City area.  I'm from Athens, so I get that.

11:30 17         PROSPECTIVE JUROR:  Oh, okay.

11:30 18         MR. WREN:  With regard to your husband, what type of

11:30 19    programming does he do?

11:30 20         PROSPECTIVE JUROR:  He works for a bank.  He programs --

11:30 21    he basically makes the ATMs work.

11:30 22         MR. WREN:  Okay.  Good.  Thank you very much.  Appreciate

11:30 23    you.

11:30 24         PROSPECTIVE JUROR:  You're welcome.

11:30 25         THE COURT:  Thank you.

11:30  1          Mr. Kaiser.

11:30  2          Hello, Mr. Kaiser.  You've had quite a few questions that

11:31  3   you responded to in the affirmative.

11:31  4          PROSPECTIVE JUROR:  Yes, sir.

11:31  5          THE COURT:  First, why don't you go ahead and give us a

11:31  6   little general background about yourself?

11:31  7          PROSPECTIVE JUROR:  Sure.  James Kaiser, originally from

11:31  8   Houston.  Have a bachelor's degree in finance from the

11:31  9   University of Houston.  33 or so years professional experience

11:31 10   in managing bank technology in -- around the state.

11:31 11          I have a certified information system security

11:31 12   professional and certified information systems auditor

11:31 13   certifications.  And in my role at First Community Services,

11:31 14   I'm the IT risk manager and supervise our cyber security team.

11:31 15   Also served as information security officer for the First

11:31 16   Community Bankshares organization.

11:31 17          THE COURT:  And I believe you had indicated that you were

11:31 18   familiar or knew or had worked with some of the parties or

11:32 19   lawyers on Intel's side; is that correct?

11:32 20          PROSPECTIVE JUROR:  Yes.  I believe that the law firm has

11:32 21   either consulted with our bank --

11:32 22          THE COURT:  Which law firm is that?

11:32 23          PROSPECTIVE JUROR:  Is it Wilmer Brown, WilmerHale?  I've

11:32 24   gotten -- I didn't catch the name.  At any rate, our

11:32 25   organization's been involved in a couple of patent suits

11:32   1   lately.  In fact, we were just informed of a third and we're

11:32   2   waiting to receive the papers on that.

11:32   3          THE COURT:  All right.  So in that lawsuit and the other

11:32   4   two that are either pending or that have -- you all have been

11:32   5   involved in, has the defendant's law firm represented you?

11:32   6          PROSPECTIVE JUROR:  I'm not positive, but we -- I know

11:32   7   that our CEO is very familiar with the firm and distributes

11:32   8   newsletters and what-have-you from the firm with -- as they

11:32   9   become available.

11:32   10          THE COURT:  What is your role in the litigation, if you

11:33   11   have a role?

11:33   12          PROSPECTIVE JUROR:  I don't have a role.

11:33   13          THE COURT:  Are you a person of contact with the law firm

11:33   14   of any type?

11:33   15          PROSPECTIVE JUROR:  No, sir.

11:33   16          THE COURT:  All right.  Is that law firm going to be

11:33   17   representing you in the new patent lawsuit to your knowledge?

11:33   18          PROSPECTIVE JUROR:  I do not know for sure.

11:33   19          THE COURT:  All right.  And what other experience in

11:33   20   dealing with patents generally have you been familiar with?

11:33   21          PROSPECTIVE JUROR:  Well, I mean, just from a general

11:33   22   practitioner standpoint of, you know, paying attention to

11:33   23   software licensing requirements and that type of thing.

11:33   24          THE COURT:  All right.  Because of your relationship --

11:33   25   your company's relationship with the -- one of the law firms

11:33  1    representing the defendant, do you feel that you can be fair

11:34  2    and impartial in this case?

11:34  3         PROSPECTIVE JUROR:  Yes.  I do.

11:34  4         THE COURT:  Would you be embarrassed or worried or

11:34  5    concerned if you were to return a verdict for the plaintiff in

11:34  6    this case despite the fact that your employer utilizes the law

11:34  7    firm representing the defendants?

11:34  8         PROSPECTIVE JUROR:  No.  That wouldn't be a problem.

11:34  9         THE COURT:  All right.  Do you have any type of opinion

11:34 10    regarding plaintiffs who are patent holders that sue others

11:34 11    or -- other companies for infringing those patents, without

11:34 12    using any type of derogatory type terminology, if you would?

11:34 13         PROSPECTIVE JUROR:  Right.  Well, you know, just the

11:34 14    discussion within management team at the company, you know,

11:34 15    there's -- there are just a number of instances where companies

11:34 16    can run afoul of patent law without, you know -- we just

11:35 17    implement and run technology.  We don't create it or modify it,

11:35 18    so to speak.  So how does a bank get drug into a patent

11:35 19    infringement case for using someone else's technology?

11:35 20         So, of course now we have to make sure that we have

11:35 21    stipulations in our contracts that the vendors that we work

11:35 22    with will hold us harmless if they get drug into -- and

11:35 23    defendants, if they get drug into court.  So it's -- it's a

11:35 24    burden, so but...

11:35 25         THE COURT:  And I also note, from reviewing your

11:35  1   questionnaire, you have a lot of familiarity with Intel

11:35  2   products generally; is that correct?

11:35  3       PROSPECTIVE JUROR:  Oh, yeah.  I mean, I've --

11:35  4       THE COURT:  How long have you worked with Intel-related

11:35  5   products?

11:35  6       PROSPECTIVE JUROR:  My whole working career basically.

11:35  7       THE COURT:  Do you have any opinions regarding their

11:35  8   products that would make you either biased in their favor or

11:35  9   prejudiced against them as a result of that?

11:35  10      PROSPECTIVE JUROR:  No.  I think their processors are

11:36  11  adequate -- you know, accurately positioned as the best in the

11:36  12  industry essentially.

11:36  13      THE COURT:  All right.  Never been a party to a lawsuit?

11:36  14      PROSPECTIVE JUROR:  No, sir.

11:36  15      THE COURT:  Never served in the military?

11:36  16      PROSPECTIVE JUROR:  No.

11:36  17      THE COURT:  But you have served on several juries, I

11:36  18  understand, both criminal and civil.

11:36  19      PROSPECTIVE JUROR:  Correct.

11:36  20      THE COURT:  Let's talk about most recent, working your way

11:36  21  back.  Where and what type of case?

11:36  22      PROSPECTIVE JUROR:  Well, most recently I was on a jury in

11:36  23  a criminal trial.  It was, I guess, using armed force against a

11:36  24  police officer.  That was in Bell County about five years ago.

11:36  25      Prior to that, I was on a civil --

| | | |
|---|---|---|
| 11:36 | 1 | THE COURT:  Were you able to reach a verdict in that case? |
| 11:36 | 2 | PROSPECTIVE JUROR:  Oh, yeah, we did. |
| 11:36 | 3 | THE COURT:  Were you, by chance, the foreperson in that |
| 11:36 | 4 | one? |
| 11:36 | 5 | PROSPECTIVE JUROR:  No, sir, I was not. |
| 11:36 | 6 | THE COURT:  All right. |
| 11:36 | 7 | PROSPECTIVE JUROR:  Previously I was on a civil jury in a |
| 11:36 | 8 | personal injury trial in Victoria County.  I was the foreperson |
| 11:36 | 9 | in that trial.  We found for the defendant in that case. |
| 11:37 | 10 | THE COURT:  All right.  And you were the foreperson? |
| 11:37 | 11 | PROSPECTIVE JUROR:  Yes, sir. |
| 11:37 | 12 | THE COURT:  All right.  Any other? |
| 11:37 | 13 | PROSPECTIVE JUROR:  Just traffic court types of things, |
| 11:37 | 14 | here and there. |
| 11:37 | 15 | I was once a witness in a forgery trial for a financial |
| 11:37 | 16 | institution in Houston. |
| 11:37 | 17 | THE COURT:  Anything about that experience that would |
| 11:37 | 18 | cause you to be anything other than fair and impartial? |
| 11:37 | 19 | PROSPECTIVE JUROR:  No.  No, sir. |
| 11:37 | 20 | THE COURT:  All right.  What are your hobbies and |
| 11:37 | 21 | interests? |
| 11:37 | 22 | PROSPECTIVE JUROR:  You know, hiking, camping, reading, |
| 11:37 | 23 | photography. |
| 11:37 | 24 | THE COURT:  What was the last book you read? |
| 11:37 | 25 | PROSPECTIVE JUROR:  I'm still reading it.  It's a book by |

11:37  1   Bruce Schneier called "Click Here to Destroy Everything."

11:37  2        THE COURT:  All right.  Thank you very much.

11:37  3        Mr. Chu?

11:37  4        MR. CHU:  Thank you very much, Your Honor.

11:37  5        You're part of a management team at your company, right?

11:38  6        PROSPECTIVE JUROR:  Yes.

11:38  7        MR. CHU:  And how big is that management team?

11:38  8        PROSPECTIVE JUROR:  Well, I mean, they're within -- it's a

11:38  9   little bit of a complicated organization, but I'm a senior vice

11:38  10  president for First Community Services.  There's six of us that

11:38  11  report to the CEO.

11:38  12       First Community Services is a part of a banking

11:38  13  organization that -- I think there are probably 30 other

11:38  14  senior-level officers.

11:38  15       MR. CHU:  Now, I wasn't sure, was there one lawsuit, two

11:38  16  lawsuits or more?

11:38  17       PROSPECTIVE JUROR:  Two patent cases in recent years.

11:38  18  I've been with my current company seven years in April.  And in

11:38  19  that time we've had two, and we've got a third coming.

11:38  20       MR. CHU:  Now, it's often the case when a company has had

11:38  21  one patent case and another patent case, then when management

11:38  22  gets together, they express their views and express the view

11:39  23  that might be negative about the parties or the lawyers or

11:39  24  someone else bringing that case because you feel that you're

11:39  25  not responsible, right?

11:39  1      PROSPECTIVE JUROR:  Well, I mean, yeah.  That -- that has

11:39  2  come up in discussions, say, with my CEO in the past, that

11:39  3  there are some people that just make their -- some people just

11:39  4  make their livelihood off of finding areas where they can bring

11:39  5  a lawsuit on a patent.  And, you know, yeah, it seems frivolous

11:39  6  in those cases.  They maybe bought the patent and did so

11:39  7  specifically for the reason of finding someone to sue.

11:39  8  That's --

11:39  9      MR. CHU:  And your CEO has expressed his view directly to

11:39  10  you that these lawsuits are frivolous?

11:39  11      PROSPECTIVE JUROR:  Yes.

11:39  12      MR. CHU:  And you respect your CEO?

11:39  13      PROSPECTIVE JUROR:  Yes, I do.

11:39  14      MR. CHU:  And his opinions?

11:39  15      PROSPECTIVE JUROR:  Yes, sir.

11:39  16      MR. CHU:  And he had a role in choosing the defendant's

11:40  17  law firm to represent --

11:40  18      PROSPECTIVE JUROR:  No.  I haven't been in that --

11:40  19      MR. CHU:  No, no.  Not you, but the CEO.

11:40  20      PROSPECTIVE JUROR:  No.  The CEO of our parent company,

11:40  21  the bank --

11:40  22      MR. CHU:  Yes.

11:40  23      PROSPECTIVE JUROR:  -- is involved in that.

11:40  24      MR. CHU:  And you understand, of course, I represent VLSI.

11:40  25      PROSPECTIVE JUROR:  Certainly, yeah.

11:40   1      MR. CHU:  You can understand why I may feel that they're

11:40   2  just starting a little bit behind.  You respect your CEO; he's

11:40   3  been derogatory about patent infringement lawsuits.  So you

11:40   4  could understand their feeling that they may feel that they're

11:40   5  starting a little bit behind?

11:40   6      PROSPECTIVE JUROR:  Yes.  I understand that.  Yeah.

11:40   7      MR. CHU:  And in light of that, in light of the fact that

11:40   8  we want not to have the risk of a preconception or bias, as

11:40   9  mentioned earlier by His Honor, would you feel more comfortable

11:40   10  sitting on a different kind of a case where there could be no

11:41   11  question that you have no bias at all?

11:41   12      PROSPECTIVE JUROR:  Well, yeah.  I think that would be a

11:41   13  preference.

11:41   14      MR. CHU:  Thank you very much.

11:41   15      PROSPECTIVE JUROR:  Certainly.

11:41   16      THE COURT:  Mr. Wren?

11:41   17      MR. WREN:  Mr. Kaiser, what has been your background in

11:41   18  training -- or your early training with regard to computer

11:41   19  programming?

11:41   20      PROSPECTIVE JUROR:  Well, not so much computer

11:41   21  programming.  I started out after I graduated, doing end-user

11:41   22  support and then moved into maintaining systems.  I built a

11:41   23  network for a bank in South Texas.  And after our company was

11:41   24  acquired by a larger bank, I shifted into security and cyber

11:41   25  security at a good time, I think.  So now I'm more or a less an

11:41  1  internal consultant on information security and cyber security

11:42  2  matters.

11:42  3      MR. WREN:  Okay.  Good.  And then Mr. Chu was asking you

11:42  4  questions about your comments by the CEO of the next

11:42  5  organization up.

11:42  6      PROSPECTIVE JUROR:  Right.

11:42  7      MR. WREN:  And you also indicated that you will decide

11:42  8  this case fairly and impartially on the evidence.

11:42  9      PROSPECTIVE JUROR:  Yes.

11:42  10      MR. WREN:  Let me just ask you very directly, very

11:42  11  frankly.  Is that true?  Can you do that?

11:42  12      PROSPECTIVE JUROR:  Yes.  I believe I can.

11:42  13      MR. WREN:  Okay.  Mr. Kaiser, thank you very much.

11:42  14      PROSPECTIVE JUROR:  Thank you.

11:42  15      THE COURT:  All right.  Counsel?

11:42  16      (Bench conference.)

11:42  17      MR. CHU:  Without going into all the details, Your Honor,

11:42  18  he respects his CEO.  It was clear that his CEO has been

11:42  19  derogatory.  And I did use that word "derogatory."  He agreed

11:42  20  with that, that he can understand the sense that VLSI is

11:43  21  starting behind, and that he'd be much more comfortable in

11:43  22  another case where he could be completely unbiased.  So I think

11:43  23  there is justification for cause.

11:43  24      THE COURT:  Mr. Wren, my biggest concern is the fact that

11:43  25  he -- his company has retained one of the law firms

11:43   1   representing the defendant and is liable to do so on this third

11:43   2   case.  Any objection to me granting the challenge for cause in

11:43   3   this matter?

11:43   4       MR. WREN:  Your Honor, in light of that, that issue right

11:43   5   there, no.

11:43   6       THE COURT:  All right.  Very good.  Court will grant the

11:43   7   challenge for cause.

11:43   8       MR. CHU:  Can I just ask a procedural question?  I had a

11:43   9   question about a juror we've already taken care of.  Would

11:43   10   there be an opportunity to raise that with you right here?

11:43   11       THE COURT:  Of course.  As I told you at the end of the

11:43   12   proceedings, I'm assuming I know who you're referring to.

11:43   13       MR. CHU:  Okay.  Thank you, Your Honor.

11:43   14       THE COURT:  Thank you.

11:43   15       (Bench conference concludes.)

11:43   16       THE COURT:  All right.  Mr. Kaiser, I am going to excuse

11:44   17   you from jury service at this time.  I appreciate your candor

11:44   18   and honesty before the Court.

11:44   19       You need to continue to check the telephone to see if

11:44   20   there might be another case in which you'll be more better

11:44   21   suited to serve.  Thank you.

11:44   22       At this time I'm going to have the clerk of court call the

11:44   23   name of the next panelist who will be seated where Mr. Kaiser

11:44   24   was.

11:44   25       DEPUTY CLERK:  The Court calls Juror No. 71, Apolinar

11:44   1   Rodriguez, Jr.

11:44   2       THE COURT:  Mr. Rodriguez, before you get seated there,

11:44   3   why don't you come on up to the microphone if you would.

11:44   4       How are you, sir?

11:44   5       PROSPECTIVE JUROR:  I'm doing good.  How are you doing?

11:45   6       THE COURT:  Good.  If you'll please tell us who you are.

11:45   7       PROSPECTIVE JUROR:  My name is Apolinar Rodriguez and I'm

11:45   8   from Clifton, Texas.

11:45   9       THE COURT:  Were you in the other room listening to the

11:45  10   various questions --

11:45  11       PROSPECTIVE JUROR:  Yes, I was.

11:45  12       THE COURT:  -- that I and the other lawyers have had of

11:45  13   the panelists?

11:45  14       PROSPECTIVE JUROR:  Yes, sir.

11:45  15       THE COURT:  Were there any questions that you would have

11:45  16   answered in the affirmative?

11:45  17       PROSPECTIVE JUROR:  No, sir.

11:45  18       THE COURT:  Do you know any of the parties or any of the

11:45  19   attorneys in this matter?

11:45  20       PROSPECTIVE JUROR:  I don't.

11:45  21       THE COURT:  Can you follow the legal concepts that we've

11:45  22   discussed?

11:45  23       PROSPECTIVE JUROR:  Yes.

11:45  24       THE COURT:  And did you know any of the witnesses who were

11:45  25   identified in this matter?

11:45  1        PROSPECTIVE JUROR:  I did not know.

11:45  2        THE COURT:  Do you have any background or experience with

11:45  3  patents?

11:45  4        PROSPECTIVE JUROR:  No, sir.  I don't.

11:45  5        THE COURT:  How are you employed?

11:45  6        PROSPECTIVE JUROR:  Yes.  I work at Clifton Sunset Home.

11:45  7  My wife and I are both LVNs there.

11:45  8        THE COURT:  How long have you been in that position?

11:45  9        PROSPECTIVE JUROR:  I've been there for four years.

11:45  10       THE COURT:  And how long have you all lived in Clifton?

11:45  11       PROSPECTIVE JUROR:  20-plus years I've been there.

11:46  12       THE COURT:  Have you ever served in the military?

11:46  13       PROSPECTIVE JUROR:  No, sir.

11:46  14       THE COURT:  Have you ever been a party to a lawsuit?

11:46  15       PROSPECTIVE JUROR:  No, sir.  I have not.

11:46  16       THE COURT:  Have you ever served on a jury previously?

11:46  17       PROSPECTIVE JUROR:  I have not.

11:46  18       THE COURT:  What are your hobbies and interests?

11:46  19       PROSPECTIVE JUROR:  Pretty much like everybody, traveling,

11:46  20  outdoors.

11:46  21       THE COURT:  All the things that we haven't been able to

11:46  22  do?

11:46  23       PROSPECTIVE JUROR:  Yes, sir.  That's correct.

11:46  24       THE COURT:  All right.  What else do you enjoy doing or

11:46  25  have been doing when you have been at home?

114

11:46  1      PROSPECTIVE JUROR:  Well, right now before the ice storm

11:46  2  hit last week, we're just trying to get the yard ready for the

11:46  3  spring's garden and stuff like that.

11:46  4      THE COURT:  Is there anything that you've heard due to the

11:46  5  nature of this case that would cause you to be anything other

11:46  6  than fair and impartial as a juror in this matter?

11:46  7      PROSPECTIVE JUROR:  No, sir.

11:46  8      THE COURT:  All right.

11:46  9      Mr. Chu?

11:46  10      MR. CHU:  All right.  Thank you very much, Your Honor.

11:46  11      Good morning, Mr. Rodriguez.

11:46  12      PROSPECTIVE JUROR:  Good morning.

11:46  13      MR. CHU:  You work with the Clifton Lutheran Sunset

11:47  14  Ministries; is that correct?

11:47  15      PROSPECTIVE JUROR:  Yes, sir.  That's correct.

11:47  16      MR. CHU:  What kind of work do you do?

11:47  17      PROSPECTIVE JUROR:  I'm a nurse there, LVN.  Yes, sir.

11:47  18      MR. CHU:  And are these people who are living in a

11:47  19  facility?

11:47  20      PROSPECTIVE JUROR:  Yes.  It's a nursing home for

11:47  21  geriatrics.

11:47  22      MR. CHU:  And what's the age range of the people living

11:47  23  there?

11:47  24      PROSPECTIVE JUROR:  I think the youngest we have is

11:47  25  probably in their 40s up to, you know, 100-plus, however long

11:47  1    they're able to live for.  Yes, sir.

11:47  2          MR. CHU:  Wow.  My wife, Helen's, mother is 96 and she

11:47  3    still lives by herself.

11:47  4          PROSPECTIVE JUROR:  Really?

11:47  5          MR. CHU:  But you're doing good work, so thank you very,

11:47  6    very much for doing that.

11:47  7          PROSPECTIVE JUROR:  Thank you.

11:47  8          THE COURT:  Mr. Wren?

11:47  9          MR. WREN:  Thank you, Your Honor.

11:47  10         Mr. Rodriguez, first a couple things.  Do you and Mr. Page

11:47  11   work together?

11:47  12         PROSPECTIVE JUROR:  Page...

11:47  13         MR. WREN:  I didn't know if you knew each other.  I

11:47  14   gathered that you might be at the same -- or part of the same

11:47  15   organization.

11:47  16         PROSPECTIVE JUROR:  I don't know.  Can you remove his

11:47  17   mask?

11:47  18         Oh.  Yeah, I know him.

11:48  19         (Laughter.)

11:48  20         MR. WREN:  It's tough with masks.  I get that.

11:48  21         THE COURT:  Let me ask you, is there anything about

11:48  22   knowing this gentleman that would cause you to be -- that would

11:48  23   make it uncomfortable for you if you had a disagreement

11:48  24   regarding the way the evidence is to be interpreted?

11:48  25         PROSPECTIVE JUROR:  No, sir.  Not at all.

11:48    1          THE COURT:  All right.  You can make a decision on your

11:48    2    own, individually, considering the evidence?

11:48    3          PROSPECTIVE JUROR:  Yes, sir.

11:48    4          THE COURT:  All right.  Thank you for bringing that up,

11:48    5    Mr. Wren.

11:48    6          MR. WREN:  And then, Mr. Rodriguez, tell us about the

11:48    7    barbecue restaurant that you run.

11:48    8          PROSPECTIVE JUROR:  Well, it's not really a restaurant.

11:48    9    Just a little side thing that my wife and I do.  Yes, sir.

11:48   10    Just --

11:48   11          MR. WREN:  How long have you been doing that?

11:48   12          PROSPECTIVE JUROR:  Just about a year or so.

11:48   13          MR. WREN:  Okay.  Well, it's been a tough time right here

11:48   14    in the middle of COVID.

11:48   15          PROSPECTIVE JUROR:  It has.  Yes, sir.

11:48   16          MR. WREN:  Best wishes to you.  Thank you, Mr. Rodriguez.

11:48   17          PROSPECTIVE JUROR:  Yes, sir.  Thank you.

11:48   18          THE COURT:  All right.  Thank you.  You may be seated.

11:48   19          Ms. Chavez?

11:48   20          Good morning, ma'am.

11:48   21          PROSPECTIVE JUROR:  Good morning.  Hello.

11:49   22          THE COURT:  Tell us about yourself.

11:49   23          PROSPECTIVE JUROR:  I'm from South Texas.  I'm a mother of

11:49   24    two, stay-at-home mom.  Currently live in Harker Heights.

11:49   25          THE COURT:  Does your spouse work outside the home?

11:49   1          PROSPECTIVE JUROR:  Yes.

11:49   2          THE COURT:  And what does he do?

11:49   3          PROSPECTIVE JUROR:  He works for Air Cav, the military.

11:49   4          THE COURT:  And what does he do for them?

11:49   5          PROSPECTIVE JUROR:  He's a pilot.

11:49   6          THE COURT:  All right.  And previously you worked for

11:49   7   Allstate Insurance Agency.  What did you do for them?

11:49   8          PROSPECTIVE JUROR:  I just sold insurance, car insurance,

11:49   9   auto insurance.

11:49   10         THE COURT:  Ever served in the military?

11:49   11         PROSPECTIVE JUROR:  No, sir.

11:49   12         THE COURT:  Never been a party to a lawsuit?

11:49   13         PROSPECTIVE JUROR:  No.

11:49   14         THE COURT:  Never been a witness in a lawsuit?

11:49   15         PROSPECTIVE JUROR:  No, sir.

11:49   16         THE COURT:  Ever served on a jury?

11:49   17         PROSPECTIVE JUROR:  No, sir.

11:49   18         THE COURT:  What are your hobbies and interests?

11:49   19         PROSPECTIVE JUROR:  I love to take photographs, and I

11:49   20   belong to a (inaudible).

11:49   21         THE COURT:  Any experience with anything patent related?

11:49   22         PROSPECTIVE JUROR:  No.

11:49   23         THE COURT:  Is there anything that you've heard that would

11:49   24   make you anything other than a fair and impartial juror in this

11:50   25   matter?

11:50  1          PROSPECTIVE JUROR:  No.

11:50  2          THE COURT:  Thank you.

11:50  3          Mr. Chu?

11:50  4          MR. CHU:  Thank you very much, Your Honor.

11:50  5          Good morning, Ms. Chavez.

11:50  6          PROSPECTIVE JUROR:  Good morning.

11:50  7          MR. CHU:  I think you indicated that you're somewhat

11:50  8   tech-savvy.  What does that mean?

11:50  9          PROSPECTIVE JUROR:  Well, I can set up a computer.  I

11:50  10  helped my daughter during this COVID trying to get her online,

11:50  11  hooked up to the school when my husband couldn't do it.

11:50  12         MR. CHU:  What's your experience been as a mom during the

11:50  13  COVID crisis?  Is it more taxing, harder on you?

11:50  14         PROSPECTIVE JUROR:  Not really.  My children are older.

11:50  15  So, yeah.  My son is in college, his first year of college, and

11:50  16  my daughter just started her sophomore yeah in high school.

11:50  17         MR. CHU:  Okay.  Great.  Thank you very much.

11:50  18         PROSPECTIVE JUROR:  You're welcome.

11:50  19         THE COURT:  Mr. Wren?

11:50  20         MR. WREN:  Ms. Chavez, first of all, I saw you drove in

11:50  21  from Harker Heights, so thank you for making that drive.  Let

11:50  22  me ask you:  The -- I noticed you did work at Troy University;

11:50  23  is that correct?

11:51  24         PROSPECTIVE JUROR:  I didn't work.  I attended school

11:51  25  there.

11:51  1        MR. WREN:  Okay.  And what type of courses did you take

11:51  2    there?  What type of major were you pursuing?

11:51  3        PROSPECTIVE JUROR:  My major was psychology, but I didn't

11:51  4    continue in that career.

11:51  5        MR. WREN:  Okay.

11:51  6        PROSPECTIVE JUROR:  Or a path.

11:51  7        MR. WREN:  And then in terms of your tech-savvy

11:51  8    background, where did you develop that?

11:51  9        PROSPECTIVE JUROR:  I just, like most people, YouTube

11:51  10   everything and make sure that I know what I'm doing when I save

11:51  11   my -- like my photography files and, you know, like in my

11:51  12   external hard drive and all that.

11:51  13       MR. WREN:  Yes.  Got it.  Thank you so much.

11:51  14       PROSPECTIVE JUROR:  You're welcome.

11:51  15       THE COURT:  Thank you, ma'am.  You may be seated.

11:51  16       Mr. Scribner?

11:51  17       Good morning, sir.

11:51  18       PROSPECTIVE JUROR:  Good morning.

11:51  19       THE COURT:  Thank you for your service.

11:51  20       PROSPECTIVE JUROR:  Uh-huh.

11:51  21       THE COURT:  Tell us about yourself.

11:51  22       PROSPECTIVE JUROR:  Well, I'm a retired Army sergeant.  I

11:52  23   live over in Killeen right now.

11:52  24       THE COURT:  How many years of service?

11:52  25       PROSPECTIVE JUROR:  20 years.

11:52  1      THE COURT:  Very good.  And your rank upon requirement?

11:52  2      PROSPECTIVE JUROR:  Staff sergeant, yeah.

11:52  3      THE COURT:  All right.  Very good.  And what was your MOS

11:52  4  when you were in the Army?

11:52  5      PROSPECTIVE JUROR:  I was a 13 Charlie.  I worked with the

11:52  6  artillery computers.  It was very specialized type.

11:52  7      THE COURT:  All right.  And did you work after your

11:52  8  service?

11:52  9      PROSPECTIVE JUROR:  No.  I've been retired, sitting at

11:52 10  home, watching the -- playing on my computer all day.

11:52 11      THE COURT:  No.  I certainly understand that.  Ever served

11:52 12  on a jury before?

11:52 13      PROSPECTIVE JUROR:  I was called for a jury selection, but

11:52 14  they dismissed the case before it got completed.

11:52 15      THE COURT:  Ever been a party to a lawsuit?

11:52 16      PROSPECTIVE JUROR:  No.

11:52 17      THE COURT:  Ever been a witness to a lawsuit?

11:52 18      PROSPECTIVE JUROR:  No.

11:52 19      THE COURT:  Any type of legal training of any type?

11:53 20      PROSPECTIVE JUROR:  Well, military.

11:53 21      THE COURT:  All right.  Tell me what type of legal

11:53 22  training you received in the military.

11:53 23      PROSPECTIVE JUROR:  Well, I mean, in the military, you

11:53 24  know, I mean, you get -- you had -- you know, you have -- you

11:53 25  have to testify and with the -- when they got some -- one of

| | | |
|---|---|---|
| 11:53 | 1 | your guys gets in trouble, you got to testify to the -- |
| 11:53 | 2 | THE COURT:  In a court marshal proceeding or something of |
| 11:53 | 3 | that nature? |
| 11:53 | 4 | PROSPECTIVE JUROR:  Yeah.  Yeah.  Stuff like that. |
| 11:53 | 5 | THE COURT:  All right.  What are your hobbies and |
| 11:53 | 6 | interests? |
| 11:53 | 7 | PROSPECTIVE JUROR:  Just basically surfing the web. |
| 11:53 | 8 | That's it. |
| 11:53 | 9 | THE COURT:  Any experience with patents? |
| 11:53 | 10 | PROSPECTIVE JUROR:  No. |
| 11:53 | 11 | THE COURT:  You hesitated there. |
| 11:53 | 12 | PROSPECTIVE JUROR:  No.  I just -- just -- no.  No.  Not |
| 11:53 | 13 | really that I can tell you. |
| 11:53 | 14 | THE COURT:  All right.  Very good. |
| 11:53 | 15 | Mr. Chu? |
| 11:53 | 16 | MR. CHU:  Thank you very much, Your Honor. |
| 11:53 | 17 | Good morning, Mr. Scribner. |
| 11:53 | 18 | What kinds of positive experiences, if any, have you had |
| 11:53 | 19 | during the pandemic? |
| 11:53 | 20 | PROSPECTIVE JUROR:  Oh, the -- well, I guess, me and my |
| 11:54 | 21 | wife are completely -- haven't really been affected by it. |
| 11:54 | 22 | MR. CHU:  Right.  But I think I shared with you and the |
| 11:54 | 23 | others one of my really good experiences was every morning |
| 11:54 | 24 | being able to go out with my wife of 50 years and meet |
| 11:54 | 25 | neighbors and everything. |

11:54   1          PROSPECTIVE JUROR:  Yeah.  Yeah.

11:54   2          MR. CHU:  You're doing things like that?

11:54   3          PROSPECTIVE JUROR:  Oh, no.  We just stay home all the

11:54   4   time.

11:54   5          MR. CHU:  Okay.  Are you enjoying your retirement?

11:54   6          PROSPECTIVE JUROR:  Oh, yes.  Yes.

11:54   7          MR. CHU:  Now, I was in a weekly poker game and there were

11:54   8   two retired Army sergeants.  They were great guys.  You play

11:54   9   poker?

11:54   10         PROSPECTIVE JUROR:  No.  Well, not anymore.

11:54   11         MR. CHU:  When -- one other question.  I have a very dear

11:54   12  friend, over 40 years, his name is Jay Scribner and he was the

11:54   13  dean of the University of Texas School of Education.  Are you

11:54   14  any relationship?

11:55   15         PROSPECTIVE JUROR:  I wouldn't think so.

11:55   16         MR. CHU:  Thank you very much.

11:55   17         THE COURT:  Mr. Wren?

11:55   18         MR. WREN:  Thank you, Your Honor.

11:55   19         Mr. Scribner, you -- going back to your college education,

11:55   20  what type of college work did you do?

11:55   21         PROSPECTIVE JUROR:  Well, I was -- I got a bachelor in

11:55   22  psychology, and then I was going to be -- I did some also with

11:55   23  English.  I had -- I was thinking about being an English

11:55   24  teacher when I got out, but there was -- when I got out, it was

11:55   25  like 2001 and there was -- everybody was -- everybody was --

11:55  1   went in that.  So I couldn't find any jobs, so I just said, the

11:55  2   heck with it.  I don't need it.

11:55  3        MR. WREN:  And let me ask you about your wife.  Has she

11:55  4   worked?  I gathered y'all are retired now.  Has she worked in

11:55  5   past?

11:55  6        PROSPECTIVE JUROR:  No.  No.  No.  She's across the street

11:55  7   right now, and so yeah.  I -- no.  She's never -- and she's

11:56  8   got -- she's got arthritis and stuff like that, so she doesn't

11:56  9   get around very much.

11:56  10       MR. WREN:  Okay.  Mr. Scribner, thank you very much.

11:56  11  Appreciate you.

11:56  12       THE COURT:  Thank you, sir.  Ms. Ozga?

11:56  13       Good morning, ma'am.

11:56  14       PROSPECTIVE JUROR:  Good morning.

11:56  15       THE COURT:  Are you cold?

11:56  16       PROSPECTIVE JUROR:  Yes.  It's cold back there.

11:56  17       THE COURT:  Oh, okay.  Tell us about yourself.

11:56  18       PROSPECTIVE JUROR:  I was born in Austin.  I currently

11:56  19  live in Copperas Cove; been there for 15 years.  I have a

11:56  20  husband who's an auto mechanic and two teenage girls.

11:56  21       THE COURT:  And what do you do for a living?

11:56  22       PROSPECTIVE JUROR:  I'm a principal's secretary in

11:56  23  elementary school in Killeen.

11:56  24       THE COURT:  How long have you been a principal?

11:56  25       PROSPECTIVE JUROR:  Principal's secretary.

| | | |
|---|---|---|
| 11:56 | 1 | THE COURT: Oh, principal's secretary. |
| 11:56 | 2 | PROSPECTIVE JUROR: Yeah. No. No. No. |
| 11:57 | 3 | THE COURT: Oh, I was going to say, you're doing multiple |
| 11:57 | 4 | jobs. |
| 11:57 | 5 | PROSPECTIVE JUROR: Don't want to do that. |
| 11:57 | 6 | THE COURT: I thought it was principal comma secretary. |
| 11:57 | 7 | PROSPECTIVE JUROR: No. I am the principal's secretary. |
| 11:57 | 8 | THE COURT: Very good. And how long have you been with |
| 11:57 | 9 | Killeen ISD? |
| 11:57 | 10 | PROSPECTIVE JUROR: About 14 years. |
| 11:57 | 11 | THE COURT: What are your duties? |
| 11:57 | 12 | PROSPECTIVE JUROR: I am the manager of the other |
| 11:57 | 13 | secretaries. There are two other secretaries in my office. |
| 11:57 | 14 | We're actually preparing to go to a much larger, three times |
| 11:57 | 15 | larger, school. So I'm going to be working on preparing |
| 11:57 | 16 | getting the school moved over to that new one. |
| 11:57 | 17 | I do finances and ordering. I pretty much do a little bit |
| 11:57 | 18 | of everything. |
| 11:57 | 19 | I've worked for KISD as a secretary for about 14 years, so |
| 11:57 | 20 | I take on the role whatever needs to be done. |
| 11:57 | 21 | THE COURT: I believe you were one of the ones that raised |
| 11:57 | 22 | your hands that said you might be happy if this were a case |
| 11:57 | 23 | involving something other than patents. |
| 11:57 | 24 | Were you one of the ones that raised your hands for that? |
| 11:58 | 25 | PROSPECTIVE JUROR: Yes. |

| | | |
|--|--|--|
| 11:58 | 1 | THE COURT:  Expound upon that. |
| 11:58 | 2 | PROSPECTIVE JUROR:  Well, I know patents exist.  Well, |
| 11:58 | 3 | when they were doing their opening statements, and you were |
| 11:58 | 4 | summarizing -- I'm sorry.  I, for the life of me, cannot |
| 11:58 | 5 | remember your name.  It's kind of hard -- |
| 11:58 | 6 | THE COURT:  Mr. Wren. |
| 11:58 | 7 | PROSPECTIVE JUROR:  Yes.  I was saying that they've been |
| 11:58 | 8 | using this technology for awhile, and then it brings into the |
| 11:58 | 9 | patent -- |
| 11:58 | 10 | THE COURT:  So is it more your unfamiliarity with patents? |
| 11:58 | 11 | PROSPECTIVE JUROR:  Yeah.  It's just a lot of jargon, kind |
| 11:58 | 12 | of goes in one ear and out the other.  I have -- I honestly |
| 11:58 | 13 | had -- I have a hard time focusing. |
| 11:58 | 14 | THE COURT:  All right.  If you were selected to be on this |
| 11:58 | 15 | jury, could you commit to focusing and listening to the |
| 11:58 | 16 | evidence and consider -- |
| 11:58 | 17 | PROSPECTIVE JUROR:  I would do my hardest.  I assure you. |
| 11:58 | 18 | I really would, but I'm going -- |
| 11:59 | 19 | THE COURT:  I mean, there's no doubt that -- |
| 11:59 | 20 | PROSPECTIVE JUROR:  -- to be honest -- |
| 11:59 | 21 | THE COURT:  -- there will be technical terms used and |
| 11:59 | 22 | technology will be talked about.  And if you do get selected on |
| 11:59 | 23 | this jury, the parties both deserve someone who listens |
| 11:59 | 24 | carefully and focuses on the evidence. |
| 11:59 | 25 | Can you commit to doing that? |

11:59  1      PROSPECTIVE JUROR:  I would do it as best as I absolutely

11:59  2  could.  I'm...

11:59  3      THE COURT:  All right.  Can -- is there anything, other

11:59  4  than what we've talked about, that would cause you to be

11:59  5  anything other than fair and impartial?

11:59  6      PROSPECTIVE JUROR:  No.

11:59  7      THE COURT:  What are your hobbies and interests?

11:59  8      PROSPECTIVE JUROR:  Making sure my two teenage girls get

11:59  9  along.  That's pretty much all I have time for.  They're

11:59 10  just -- they're 13 and 17, so it's really hard.

11:59 11      THE COURT:  Never served in the military?

11:59 12      PROSPECTIVE JUROR:  No.

11:59 13      THE COURT:  Never been a party to a lawsuit?

11:59 14      PROSPECTIVE JUROR:  No.

11:59 15      THE COURT:  Never been a witness to a lawsuit?

11:59 16      PROSPECTIVE JUROR:  No.

11:59 17      THE COURT:  Never served on a jury?

11:59 18      PROSPECTIVE JUROR:  No.

11:59 19      THE COURT:  Mr. Chu?

11:59 20      MR. CHU:  Thank you very much, Your Honor.

11:59 21      Good morning, Ms. Ozga.

12:00 22      Do you ever get into the weeds of accounting?  You are

12:00 23  kind of a jack-of-all-trades in your current job, and it

12:00 24  involved budgetary things and other things.  Do you ever get

12:00 25  into the weeds on accounting issues or not?

12:00   1          PROSPECTIVE JUROR:  Do I ever get into what?

12:00   2          MR. CHU:  The weeds.

12:00   3          PROSPECTIVE JUROR:  I'm not understanding what you're

12:00   4   asking.

12:00   5          THE COURT:  Meaning the details.

12:00   6          PROSPECTIVE JUROR:  I absolutely have to do the details

12:00   7   because I am the sole manager of the finances of my campus.

12:00   8          MR. CHU:  Okay.  And you're pretty good at that, I assume?

12:00   9          PROSPECTIVE JUROR:  Yes.

12:00   10         MR. CHU:  Okay.  What are the kinds of problems that

12:00   11  usually crop up for you?

12:00   12         PROSPECTIVE JUROR:  The biggest issue is when my -- my

12:00   13  principal and I work very closely together.  She actually has a

12:00   14  campus improvement plan in which she has to allot X amount of

12:00   15  money for X amount of things for campus improvement.  Usually

12:01   16  the biggest issue is that she allots this much money, we have

12:01   17  this much money in the account, and I have to make it work.

12:01   18         MR. CHU:  And I wasn't sure, but did you raise your hand

12:01   19  that you or your husband had owned a business?

12:01   20         PROSPECTIVE JUROR:  I did.  I was a single mom for a short

12:01   21  period of -- well, actually, single mom, just divorced.  I

12:01   22  created a photography business, and I had that for about four

12:01   23  years or so.

12:01   24         MR. CHU:  And how would you describe the overall

12:01   25  experience?

12:01  1      PROSPECTIVE JUROR:  Not worth it.  I enjoyed what I was

12:01  2  doing, but the business side of things, I was -- I didn't enjoy

12:01  3  that part.  I enjoyed the photography part.  So I decided I was

12:01  4  done.

12:01  5      MR. CHU:  Understood.  Thank you very much.

12:01  6      PROSPECTIVE JUROR:  You're welcome.

12:01  7      THE COURT:  Mr. Wren?

12:01  8      MR. WREN:  Thank you, Your Honor.

12:01  9      Ms. Ozga, you indicated some tech-savvy background.  Tell

12:02  10  us just a little bit about that.

12:02  11      PROSPECTIVE JUROR:  Well, I use a computer every day, all

12:02  12  day.  I have to know certain things to be able to accomplish my

12:02  13  job.

12:02  14      I am familiar with Quicken for the accounting side of

12:02  15  things.  E-mail because that's how most of us communicate at

12:02  16  this point in time.

12:02  17      MR. WREN:  Absolutely.  Yeah.

12:02  18      PROSPECTIVE JUROR:  And then we have a school-based data

12:02  19  system.  It's called E-School Plus.  I have to be very familiar

12:02  20  with that.  We've been using that for many years, so I'm able

12:02  21  to work through that.

12:02  22      I work with Excel quite well.  But it's very limited to

12:02  23  certain programs.  It's not just a generalized tech-savvy.  So

12:02  24  if my kids want the -- their computer set up, I'm like, "here,

12:02  25  honey."

12:03   1        MR. WREN:  Okay.  Good.  Thank you.

12:03   2        I'd also ask the question whether the fact that we've been

12:03   3   sued in this case means that this case necessarily has any

12:03   4   merit.  And I think about three people said, well, yeah, that's

12:03   5   kind a starting thought, which I get, but is that really where

12:03   6   you're coming from on this?  That there must be some merit to

12:03   7   this case simply because they have sued -- VLSI has sued Intel?

12:03   8        PROSPECTIVE JUROR:  Well, I would certainly hope that they

12:03   9   know their jobs, and they know the companies well enough that

12:03   10  if they have come this far that there's got to be something to

12:03   11  it.

12:03   12       MR. WREN:  Well, let me ask you, are we starting out

12:03   13  behind them, if you're starting with that assumption that just

12:03   14  because they have sued us that we must have done something

12:03   15  wrong?

12:03   16       PROSPECTIVE JUROR:  Not necessarily.

12:03   17       MR. WREN:  Okay.  Is there -- and you indicated a concern

12:03   18  about large corporations.  Is there anything that we need to

12:04   19  know about that?

12:04   20       PROSPECTIVE JUROR:  No.  Not necessarily.  I mean, I've

12:04   21  never had any bad experience personally with Intel.  My husband

12:04   22  actually prefers certain things with y'all.  His opinions

12:04   23  aren't necessarily mine, but I respect him and the fact that,

12:04   24  you know, I'm married to him.

12:04   25       MR. WREN:  I understand.

12:04   1        PROSPECTIVE JUROR:  But you know, in honesty, majority of

12:04   2   the time, when it comes down to it, I kind of am -- large

12:04   3   corporations have all the things and not everybody has all the

12:04   4   things.

12:04   5        MR. WREN:  Ms. Ozga, thank you so much.

12:04   6        THE COURT:  All right.  Thank you, ma'am.  You can be

12:04   7   seated.

12:04   8        All right.  There is light at the end of the tunnel.  It's

12:04   9   noon and I'm sure lunch is on folks' minds, but we are going to

12:05   10  power through and get to the point to where we can get done

12:05   11  with this proceeding so I can dismiss everyone and go on about

12:05   12  your days at the appropriate time.

12:05   13       That being said, I'm now going to be moving to visiting

12:05   14  the people who are sitting in the jury box.  I have no

12:05   15  objection if any of you all back here in the back would like to

12:05   16  take a comfort break.  If you do, just quietly step out.  You

12:05   17  know, take no more than five or ten minutes and then come back

12:05   18  to your seat if you would.

12:05   19       So that moves us to Mr. Page.  Got a microphone set up for

12:05   20  you back here, so we'll go to that one.

12:05   21       And I'll let you reposition yourself if you would like to,

12:05   22  Mr. Chu.

12:05   23       MR. CHU:  Still working?

12:05   24       THE COURT:  Yes, it's good.

12:05   25       And good afternoon, as opposed to good morning now.  How

12:05  1    are you, sir?

12:05  2         PROSPECTIVE JUROR:  Just fine.

12:05  3         THE COURT:  Tell us about yourself.

12:05  4         PROSPECTIVE JUROR:  Michael Page.  I work for Lutheran

12:05  5    Sunset Ministries.  I'm over -- I'm the director of maintenance

12:05  6    there.  So we cover everything from senior apartments

12:06  7    throughout Alzheimer's and dementia area care.

12:06  8         THE COURT:  Now, it came up that you and Mr. Rodriguez

12:06  9    know each other from that employment; is that correct?

12:06  10        PROSPECTIVE JUROR:  Yeah.  Just passing.  I mean, he's

12:06  11   obviously an LVN and I'm in maintenance.  So he may ask me to

12:06  12   do something, but other than that, you know.

12:06  13        THE COURT:  Is there anything about that relationship that

12:06  14   would make it difficult or uncomfortable for you?

12:06  15        PROSPECTIVE JUROR:  No.

12:06  16        THE COURT:  And if you disagreed with Mr. Rodriguez, are

12:06  17   you comfortable expressing why you disagreed in giving reasons

12:06  18   for that to him?

12:06  19        PROSPECTIVE JUROR:  Sure.

12:06  20        THE COURT:  All right.  Very good.  Have ever served in

12:06  21   the military?

12:06  22        PROSPECTIVE JUROR:  No, sir.

12:06  23        THE COURT:  Ever served on a jury?

12:06  24        PROSPECTIVE JUROR:  No.

12:06  25        THE COURT:  Ever been a party to a lawsuit other than

12:06  1   family matters?

12:06  2        PROSPECTIVE JUROR:  Not really.  No.

12:06  3        THE COURT:  All right.  Tell me what your degree was in.

12:06  4        PROSPECTIVE JUROR:  Agriculture services.

12:06  5        THE COURT:  And you got that from...

12:06  6        PROSPECTIVE JUROR:  Tarleton.

12:06  7        THE COURT:  What are your hobbies and interests?

12:07  8        PROSPECTIVE JUROR:  Pretty much anything outside.

12:07  9   Hunting, fishing, golf, whatever.

12:07  10        THE COURT:  Never served in military?

12:07  11        PROSPECTIVE JUROR:  No, sir.

12:07  12        THE COURT:  Any legal training?

12:07  13        PROSPECTIVE JUROR:  No.

12:07  14        THE COURT:  Any experience with patents?

12:07  15        PROSPECTIVE JUROR:  No.

12:07  16        THE COURT:  Any thoughts or comments about them prior to

12:07  17   coming in here today?

12:07  18        PROSPECTIVE JUROR:  No.

12:07  19        THE COURT:  All right.  What are your hobbies and

12:07  20   interests -- oh, I asked you that.  All right.  Very good.

12:07  21        Mr. Chu?

12:07  22        MR. CHU:  Thank you very much, Your Honor.

12:07  23        Good afternoon, Mr. Page.

12:07  24        PROSPECTIVE JUROR:  Hi, there.

12:07  25        MR. CHU:  You look terrific without your mask.  Easier to

12:07  1    recognize.

12:07  2         Now, I think you are the director of maintenance, and you

12:07  3    also indicated on the form that you maintain the operations.

12:07  4    What does that involve on a day-to-day basis?

12:07  5         PROSPECTIVE JUROR:  Most of our stuff is small-scale,

12:07  6    electrical, plumbing, carpentry-type work.

12:07  7         MR. CHU:  What are the electrical things?  Are they fixing

12:07  8    a lamp or fixing computers?  What kinds of things?

12:07  9         PROSPECTIVE JUROR:  No.  No IT really.  We have a company

12:08  10   out of Waco that takes care of that.  I may set somebody's

12:08  11   phone up, but other than that, that's about it.  And that's

12:08  12   just moving cords, you know, so...

12:08  13        MR. CHU:  What do you like about your job?

12:08  14        PROSPECTIVE JUROR:  It's real close to home.

12:08  15        (Laughter.)

12:08  16        PROSPECTIVE JUROR:  I don't know.  Something different

12:08  17   every day.  You know, in maintenance it's always something

12:08  18   different going on.  So it keeps you engaged, I guess.

12:08  19        MR. CHU:  And I'll bet you're pretty good at fixing

12:08  20   things.

12:08  21        PROSPECTIVE JUROR:  Well, I like to think so.

12:08  22        MR. CHU:  Thank you very much, Mr. Page.

12:08  23        THE COURT:  All right.  Mr. Wren?

12:08  24        MR. WREN:  Thank you, Your Honor.

12:08  25        Mr. Page, how long have you been in your supervisory role?

12:08   1          PROSPECTIVE JUROR:  About ten years with LSM.  I've been

12:08   2   in supervision pretty much throughout, after graduating

12:08   3   college.

12:08   4          MR. WREN:  Prior to that, what type of supervisory role or

12:08   5   work were you in?

12:08   6          PROSPECTIVE JUROR:  I was over production at two different

12:08   7   lime plants, over production crews, production supervisor.  And

12:09   8   then I've worked with Acme Brick as well, same capacity.

12:09   9          MR. WREN:  Okay.  And then going even further back than

12:09  10   that, what was your college work in?

12:09  11          PROSPECTIVE JUROR:  In college I worked for the college

12:09  12   farm, and I did a stint with a real estate company.

12:09  13          MR. WREN:  Okay.  Good.  Mr. Page, thank you very much.

12:09  14          PROSPECTIVE JUROR:  Uh-huh.

12:09  15          THE COURT:  All right.  Thank you.  You may be seated.

12:09  16          Mr. Ortiz, if you'll come to the mic, please.

12:09  17          Good afternoon, sir.

12:09  18          PROSPECTIVE JUROR:  Good afternoon, Your Honor.

12:09  19          THE COURT:  Tell us about yourself.

12:09  20          PROSPECTIVE JUROR:  My name is Hector Sierra.  I served in

12:09  21   the Army for 20 years.  Retired three years ago.  I live in

12:09  22   Temple, Texas.

12:09  23          THE COURT:  How long were you -- did you serve our

12:09  24   country?  And thank you for your service.

12:09  25          PROSPECTIVE JUROR:  Since '99.

| 12:09 | 1  | THE COURT:  So you're active duty still? |
| 12:09 | 2  | PROSPECTIVE JUROR:  I retired two years ago. |
| 12:09 | 3  | THE COURT:  Okay.  Two years ago.  And what was your MOS? |
| 12:09 | 4  | PROSPECTIVE JUROR:  11 Bravo Infantry. |
| 12:10 | 5  | THE COURT:  What was your rank at retirement? |
| 12:10 | 6  | PROSPECTIVE JUROR:  Sergeant first class. |
| 12:10 | 7  | THE COURT:  Very good.  Ever served on a jury before? |
| 12:10 | 8  | PROSPECTIVE JUROR:  Say again? |
| 12:10 | 9  | THE COURT:  Have you ever served on a jury before? |
| 12:10 | 10 | PROSPECTIVE JUROR:  No, Your Honor. |
| 12:10 | 11 | THE COURT:  Have you ever been a party to lawsuit? |
| 12:10 | 12 | PROSPECTIVE JUROR:  No, Your Honor. |
| 12:10 | 13 | THE COURT:  Have you ever been a witness in a lawsuit? |
| 12:10 | 14 | PROSPECTIVE JUROR:  No, Your Honor. |
| 12:10 | 15 | THE COURT:  Any type of legal training of any type? |
| 12:10 | 16 | PROSPECTIVE JUROR:  No, Your Honor. |
| 12:10 | 17 | THE COURT:  What's your knowledge or information regarding |
| 12:10 | 18 | patents? |
| 12:10 | 19 | PROSPECTIVE JUROR:  Not that many.  I have that much.  I |
| 12:10 | 20 | know that patent is needed to incorporate a product to make it |
| 12:10 | 21 | belong to a specific person or a company, prevent that to -- |
| 12:10 | 22 | somebody else to take it or -- but that pretty much it. |
| 12:10 | 23 | THE COURT:  What are your hobbies and interests? |
| 12:10 | 24 | PROSPECTIVE JUROR:  I like fishing, hunting, kayaking. |
| 12:10 | 25 | THE COURT:  Very good. |

12:10   1         Mr. Chu?

12:10   2         MR. CHU:  Thank you very much.

12:10   3         Good afternoon.

12:10   4         PROSPECTIVE JUROR:  Good afternoon, sir.

12:10   5         MR. CHU:  What's your technical experience?

12:10   6         PROSPECTIVE JUROR:  Just basic stuff.  I can do anything

12:11   7   if I read a manual, but that pretty much it.

12:11   8         MR. CHU:  Do you do things like installing routers?

12:11   9         PROSPECTIVE JUROR:  I can do it.

12:11  10         MR. CHU:  Or adding memory to a computer?

12:11  11         PROSPECTIVE JUROR:  No, sir.

12:11  12         MR. CHU:  What other kinds of things have you installed

12:11  13   either at work or at home?

12:11  14         PROSPECTIVE JUROR:  Other than computers, monitors,

12:11  15   routers.  Pretty much simple stuff.

12:11  16         MR. CHU:  So most people who use the computer, they say,

12:11  17   well, it works.  I turn it on and it starts up.  But you had

12:11  18   indicated that there's some things you like about your Intel

12:11  19   products.  What is it that you like?

12:11  20         PROSPECTIVE JUROR:  I like the way that performs in them

12:11  21   older times.  Make life easier.  Pretty much involving

12:11  22   everything from medical, science, everything is moving around

12:12  23   computers these days.

12:12  24         MR. CHU:  So with the computers you use and have used in

12:12  25   the past, you know who makes the chips inside, whether it's

12:12  1   Intel or AMD or another company?

12:12  2       PROSPECTIVE JUROR:  Most of them have Intel.

12:12  3       MR. CHU:  Okay.  And in what sense do you consider

12:12  4   yourself tech-savvy in addition to what you've already

12:12  5   described?

12:12  6       PROSPECTIVE JUROR:  Not other than that.

12:12  7       MR. CHU:  Okay.  Great.  Thank you very much.

12:12  8       THE COURT:  Mr. Wren?

12:12  9       MR. WREN:  Mr. Sierra, first of all, I'm just curious

12:12  10  about your work as a pastor.

12:12  11      PROSPECTIVE JUROR:  Yes.

12:12  12      MR. WREN:  How did you -- or when did you get into that?

12:12  13      PROSPECTIVE JUROR:  I start pastoring five years ago.

12:12  14      MR. WREN:  And how has that experience been?

12:12  15      PROSPECTIVE JUROR:  Rewarding.  Helping people, restoring

12:13  16  families, bringing families together.  I work a lot with youth

12:13  17  dealing with drugs and alcohol issues, and try to get it back

12:13  18  to shape, incorporate into society.  Helping with families that

12:13  19  have no resources, try to help them to do instead of ask, that

12:13  20  way make it -- society more workable.

12:13  21      MR. WREN:  How has this pandemic affected that work?

12:13  22      PROSPECTIVE JUROR:  Be honestly, not that much.  Because

12:13  23  people, when they don't have things, looking for places to get

12:13  24  support and help, and that's what we as society start working

12:13  25  with them.

```
12:13   1        MR. WREN:  Mr. Sierra, thank you very much.

12:13   2        PROSPECTIVE JUROR:  Thanks.

12:13   3        THE COURT:  Thank you, sir.  You may be seated.

12:13   4        PROSPECTIVE JUROR:  Thanks.

12:13   5        THE COURT:  Mr. Taylor.  Good afternoon, sir.

12:14   6        PROSPECTIVE JUROR:  Good afternoon, Your Honor.

12:14   7        THE COURT:  Thank you for making the drive in from

12:14   8   Fairfield.

12:14   9        PROSPECTIVE JUROR:  You bet.

12:14  10        THE COURT:  Tell us about yourself.

12:14  11        PROSPECTIVE JUROR:  Well, I'm a -- work for the City of

12:14  12   Fairfield.  I've been with them for 14 years.

12:14  13        THE COURT:  What do you for them?

12:14  14        PROSPECTIVE JUROR:  I lead -- I lead the work in the

12:14  15   streets department.  Of course that don't stop us from doing

12:14  16   everything else, but that's what I do.

12:14  17        THE COURT:  And probably you're going to have a lot of

12:14  18   work coming up because of this weather.

12:14  19        PROSPECTIVE JUROR:  We do.  We've been off for the last

12:14  20   week.

12:14  21        THE COURT:  I can imagine.  Tell me about your immediate

12:14  22   prior job where you were the coordinator in clean rooms for

12:14  23   chip factories.  Tell me exactly what you did there.

12:14  24        PROSPECTIVE JUROR:  Well, that's why I raised my hand up

12:14  25   awhile ago when the TI deal came on.
```

12:14   1        Back in, oh, I can't remember the years.  I think it

12:14   2   started around '94, '95.  I went to -- I used to work for IGC,

12:14   3   coal fire plant in Rockdale, Texas; and then lost the job, went

12:15   4   over to the carpenter millwright local out of Austin, Texas,

12:15   5   and that is how I got in it.

12:15   6        When Dell computers started up, we worked at Motorola,

12:15   7   worked in some of his factories coming up when he first

12:15   8   started.  From there I went to Richmond, Virginia.  Worked in

12:15   9   White Oak's semiconductor plant there.  Went to New York.

12:15  10        In other words, I've been in it awhile.  We moved in the

12:15  11   tools and made the chips.  That's basically all I know.  I

12:15  12   was -- I did all the move-ins for the, you know, chip making.

12:15  13        THE COURT:  As part of that experience, did you work any

12:15  14   with patents or anything patent related?

12:15  15        PROSPECTIVE JUROR:  No.

12:15  16        THE COURT:  Do you have any knowledge regarding patents

12:15  17   before coming into this courtroom today?

12:15  18        PROSPECTIVE JUROR:  No.  And don't care.

12:15  19        THE COURT:  All right.  Ever served on -- in a military

12:15  20   before?

12:15  21        PROSPECTIVE JUROR:  No.

12:15  22        THE COURT:  Does your spouse work outside the home?

12:15  23        PROSPECTIVE JUROR:  Yeah.  She does.  She works for Edward

12:15  24   Jones.  She's a BOA for a man by the name of Jeff Taylor there

12:16  25   in Fairfield, Texas.

12:16  1      THE COURT:  Very good.  And you have been a party to a

12:16  2  lawsuit before.  Can you share with us a little bit about that?

12:16  3      PROSPECTIVE JUROR:  Yeah.  Me and my wife was coming back

12:16  4  from my dad's funeral, a guy did a U-turn out in front of us

12:16  5  out in Robinson County, just south of Franklin, and we t-boned

12:16  6  him.  And we was hurt pretty good, my daughter and my wife.

12:16  7      THE COURT:  Anything about that experience that would

12:16  8  cause you to be anything other than fair and impartial?

12:16  9      PROSPECTIVE JUROR:  No.  Fair is fair and wrong -- I mean,

12:16  10  right is right and wrong is wrong.

12:16  11      THE COURT:  Ever been a witness to -- in a lawsuit other

12:16  12  than that one?

12:16  13      PROSPECTIVE JUROR:  No.

12:16  14      THE COURT:  Ever served on a jury?

12:16  15      PROSPECTIVE JUROR:  No, Your Honor.

12:16  16      THE COURT:  What are your hobbies and interests?

12:16  17      PROSPECTIVE JUROR:  Oh, I strictly bass fish and do my

12:16  18  hunting and do the yard work, and that's it.

12:16  19      THE COURT:  All right.  You indicated that you had a

12:16  20  somewhat unfavorable opinion of large corporations in America

12:16  21  today.  Anything about that you want to share with us that

12:17  22  would cause you to be anything other than fair and impartial

12:17  23  here?

12:17  24      PROSPECTIVE JUROR:  No.  Not that I have anything against

12:17  25  them.  It's just that sometimes I feel like they the king of

| | | |
|---|---|---|
| 12:17 | 1 | the hill and some of the coming up, young companies and stuff |
| 12:17 | 2 | like that don't get fair enough judgment. |
| 12:17 | 3 | THE COURT:  Okay.  Can you treat both of these companies |
| 12:17 | 4 | fairly? |
| 12:17 | 5 | PROSPECTIVE JUROR:  Oh, yes. |
| 12:17 | 6 | THE COURT:  All right.  Mr. Chu? |
| 12:17 | 7 | PROSPECTIVE JUROR:  Yes, Your Honor. |
| 12:17 | 8 | MR. CHU:  Thank you very much, Your Honor. |
| 12:17 | 9 | Good afternoon, Mr. Taylor. |
| 12:17 | 10 | PROSPECTIVE JUROR:  Good afternoon. |
| 12:17 | 11 | MR. CHU:  I think you mentioned that you worked for |
| 12:17 | 12 | Motorola in its Austin fab or... |
| 12:17 | 13 | PROSPECTIVE JUROR:  No.  I didn't work exactly for |
| 12:17 | 14 | Motorola.  I worked for a subcontractor called Craft Core out |
| 12:17 | 15 | of Austin, Texas. |
| 12:17 | 16 | MR. CHU:  And through that subcontractor, you were working |
| 12:17 | 17 | in a Motorola clean room? |
| 12:17 | 18 | PROSPECTIVE JUROR:  Yes.  Yes, sir. |
| 12:17 | 19 | MR. CHU:  And did you get to wear those bunny suits? |
| 12:17 | 20 | PROSPECTIVE JUROR:  Oh, every day. |
| 12:17 | 21 | MR. CHU:  The first time it's a lot of fun, second time |
| 12:17 | 22 | so-so, and after that not so much. |
| 12:18 | 23 | PROSPECTIVE JUROR:  It was a new world for me coming from |
| 12:18 | 24 | where I came from in the coal mine plants, for sure. |
| 12:18 | 25 | MR. CHU:  And what exactly were you doing?  Were you just |

12:18  1  moving equipment in or repositioning equipment?

12:18  2      PROSPECTIVE JUROR:  Well, in the clean room you have

12:18  3  different categories.  You got a metal spot for a photo etch,

12:18  4  whatever.  What we did was took the tools off the truck,

12:18  5  because a lot of them was sealed because they couldn't get any

12:18  6  outside air.  You bring them into a contained area; you take

12:18  7  them out of the crate; take them down.  You would -- a crew

12:18  8  would take them off the pallets.  You'd send it in through the

12:18  9  clean room doors, and then that crew took it and put it in its

12:18  10  final destination.

12:18  11      MR. CHU:  So you would see particular equipment from

12:18  12  equipment suppliers like Applied Materials, or ASML, or Lam

12:18  13  Research and the like?

12:18  14      PROSPECTIVE JUROR:  Yes, sir.  I handled all of them.

12:18  15      MR. CHU:  And did you know anything about the circuitry

12:18  16  that they're making?

12:18  17      PROSPECTIVE JUROR:  No, sir.  Didn't care.

12:19  18      MR. CHU:  Did you enjoy the work?

12:19  19      PROSPECTIVE JUROR:  Oh, tremendously.

12:19  20      MR. CHU:  Thank you very much.

12:19  21      PROSPECTIVE JUROR:  You're welcome.

12:19  22      THE COURT:  Mr. Wren?

12:19  23      MR. WREN:  Thank you, Your Honor.

12:19  24      And, Mr. Taylor, I just briefly want to follow up on your

12:19  25  current work.  In terms of the supervision role that you have

12:19  1    there, how many folks are you working with?

12:19  2        PROSPECTIVE JUROR:  Well, like I said awhile ago, our

12:19  3    little old group is four people.  I have a supervisor and I'm

12:19  4    his lead man, and then we got two people working.  We usually

12:19  5    take two crews because we just split the two guys in between us

12:19  6    and go out and do the same work.  But in a way, once we get

12:19  7    finished with ours, we already -- we also do work in the --

12:19  8    what you would call the plant, the septic plant, or we go over

12:19  9    and help the people in the park do work.

12:19  10       We're a little, small community.  We have maybe 15 people

12:19  11   in the whole thing.

12:20  12       MR. WREN:  I got you.  Do you enjoy the work you're doing?

12:20  13       PROSPECTIVE JUROR:  Oh, every day.

12:20  14       MR. WREN:  That's great.  Thank you, sir.

12:20  15       PROSPECTIVE JUROR:  You're welcome.

12:20  16       THE COURT:  Thank you.  You may be seated.

12:20  17       Ms. Schaaf.  Good afternoon.

12:20  18       PROSPECTIVE JUROR:  Hello.

12:20  19       THE COURT:  All right.  Tell us a little bit about

12:20  20   yourself.

12:20  21       PROSPECTIVE JUROR:  I'm Teresa Schaff, from Gatesville.  I

12:20  22   have two grown children and two grandchildren.

12:20  23       THE COURT:  All right.  What do you do for a living?

12:20  24       PROSPECTIVE JUROR:  I am retired.  I was a waitress for

12:20  25   20 years, and I was a prison guard before that for five years.

12:20  1      THE COURT:  All right.  And where did you work as a

12:20  2  waitress?

12:20  3      PROSPECTIVE JUROR:  At Rancher's Steakhouse in Gatesville.

12:20  4      THE COURT:  Right.  Right there off of 317 and --

12:20  5      PROSPECTIVE JUROR:  36 and -- or 84 and 36.

12:20  6      THE COURT:  Right.  I think I've been there a couple of

12:20  7  times.

12:20  8      Does your spouse work outside the home?

12:20  9      PROSPECTIVE JUROR:  Yeah.  He works for Burlington

12:20 10  Northern Santa Fe Railroad.  He's an engineer.

12:20 11      THE COURT:  All right.  And I saw that one of your

12:20 12  children followed in his footsteps?

12:20 13      PROSPECTIVE JUROR:  Yes.  He's an engineer also, my son.

12:20 14      THE COURT:  Very good.  Did you know anything about

12:20 15  patents before you came into court today?

12:20 16      PROSPECTIVE JUROR:  I know they exist.  That's about it.

12:20 17      THE COURT:  All right.  Fair enough.  Ever served in the

12:20 18  military?

12:20 19      PROSPECTIVE JUROR:  No.

12:20 20      THE COURT:  Ever been a party to a lawsuit?

12:21 21      PROSPECTIVE JUROR:  No.

12:21 22      THE COURT:  Ever served on a jury?

12:21 23      PROSPECTIVE JUROR:  No.  Been called, just have never

12:21 24  served.

12:21 25      THE COURT:  Any type of legal training of any type?

12:21  1          PROSPECTIVE JUROR:  No.

12:21  2          THE COURT:  How long were you a guard in the prison?  I

12:21  3  assume one of the ones in Gatesville?

12:21  4          PROSPECTIVE JUROR:  Yeah.  Five years at a female unit.

12:21  5          THE COURT:  All right.  Which unit?

12:21  6          PROSPECTIVE JUROR:  Gatesville, but when you work at

12:21  7  Gatesville unit, they have seven units combined and you work at

12:21  8  all of those units.

12:21  9          THE COURT:  Oh, okay.

12:21  10         PROSPECTIVE JUROR:  When you're short, you go.

12:21  11         THE COURT:  Very good.  What are your hobbies and

12:21  12  interests?

12:21  13         PROSPECTIVE JUROR:  Gardening and my grandbabies.

12:21  14         THE COURT:  Makes sense.

12:21  15         Mr. Chu?

12:21  16         MR. CHU:  Thank you very much, Your Honor.

12:21  17         Good afternoon, Ms. Schaaf.

12:21  18         Now, you are the auxiliary president for the United

12:21  19  Transportation Union.

12:21  20         PROSPECTIVE JUROR:  Yes.  Local 331 in Temple.

12:21  21         MR. CHU:  And what do you do in that position?

12:21  22         PROSPECTIVE JUROR:  Well, before COVID, we'd have

12:21  23  meetings, and we'd discuss the proper disposal of the men's

12:21  24  work clothes, and, you know, chemical hazards, and we'd discuss

12:21  25  it with the other women so they knew what to do when their

12:22   1   husbands come home and had been exposed.

12:22   2       MR. CHU:  Now, one of the members of your auxiliary is a

12:22   3   manager at Freescale; is that right?

12:22   4       PROSPECTIVE JUROR:  Yes.  Tracy Hopkins.

12:22   5       MR. CHU:  And do you know what she's a manager of?

12:22   6       PROSPECTIVE JUROR:  I have not a clue, but I know whenever

12:22   7   we go somewhere, she's always on the phone.

12:22   8       MR. CHU:  And --

12:22   9       PROSPECTIVE JUROR:  It's always work.

12:22   10      MR. CHU:  Okay.  Well, we all know people like that.  Do

12:22   11  you enjoy your work with the auxiliary?

12:22   12      PROSPECTIVE JUROR:  Oh, yes.  We have a really good time,

12:22   13  and it's informative.  It's not as popular with the younger

12:22   14  ones, you know.  It's kind of an older lady thing, but they

12:22   15  would learn some information if they would come.

12:22   16      MR. CHU:  Great.  Thank you very much.

12:22   17      PROSPECTIVE JUROR:  Thank you.

12:22   18      THE COURT:  Mr. Wren?

12:22   19      MR. WREN:  Ms. Schaaf, you indicated a somewhat

12:22   20  unfavorable view of large corporations, so as I've done with

12:22   21  others, let me follow up on that.  Where does that --

12:22   22      PROSPECTIVE JUROR:  You know, I don't even -- I don't

12:22   23  know.  I don't know why, you know -- I think that sometimes

12:23   24  they get all the glory, and the little guys aren't just getting

12:23   25  enough.

12:23  1        MR. WREN:  Okay.  Is there -- tell me, to what extent do

12:23  2    you think that plays into this case at all?

12:23  3        PROSPECTIVE JUROR:  Oh, I don't think it does.

12:23  4        MR. WREN:  Okay.  That's all I need to hear.

12:23  5        PROSPECTIVE JUROR:  All right.

12:23  6        MR. WREN:  Thank you very much, Ms. Schaaf.

12:23  7        PROSPECTIVE JUROR:  Thank you.

12:23  8        THE COURT:  All right.  Ms. Kelly?

12:23  9        PROSPECTIVE JUROR:  Hello.

12:23  10       THE COURT:  Hello.  Thank you for your patience in us

12:23  11   getting to you.

12:23  12       PROSPECTIVE JUROR:  Uh-huh.

12:23  13       THE COURT:  Share with us something about yourself.

12:23  14       PROSPECTIVE JUROR:  My name is Rose Kelly.  I work at

12:23  15   Residence Inn.  I'm a housekeeper.

12:23  16       THE COURT:  How long have you been at the Residence Inn?

12:23  17       PROSPECTIVE JUROR:  I've been there 21 years.

12:23  18       THE COURT:  Wow.  Good long time.  Since they opened?

12:23  19       PROSPECTIVE JUROR:  Sir?

12:23  20       THE COURT:  Is that since they opened?

12:23  21       PROSPECTIVE JUROR:  A little after they opened.  Yes.

12:23  22       THE COURT:  All right.  And does your spouse work outside

12:23  23   the home?

12:23  24       PROSPECTIVE JUROR:  Yes, he do.  He work at -- I think

12:23  25   it's Quality Care, I think.

| | | |
|---|---|---|
| 12:24 | 1 | THE COURT:  All right.  And what does he do for them? |
| 12:24 | 2 | PROSPECTIVE JUROR:  He works in the kitchen. |
| 12:24 | 3 | THE COURT:  You ever served on a jury? |
| 12:24 | 4 | PROSPECTIVE JUROR:  No.  I've been called before, but not |
| 12:24 | 5 | served. |
| 12:24 | 6 | THE COURT:  You ever been a party to a lawsuit? |
| 12:24 | 7 | PROSPECTIVE JUROR:  No. |
| 12:24 | 8 | THE COURT:  Have you ever been a witness in a lawsuit? |
| 12:24 | 9 | PROSPECTIVE JUROR:  No. |
| 12:24 | 10 | THE COURT:  Any type of military experience? |
| 12:24 | 11 | PROSPECTIVE JUROR:  No. |
| 12:24 | 12 | THE COURT:  What are your hobbies and interests? |
| 12:24 | 13 | PROSPECTIVE JUROR:  Work, home and grandkids. |
| 12:24 | 14 | THE COURT:  All right.  Prior to coming into court today, |
| 12:24 | 15 | did you know anything about patents? |
| 12:24 | 16 | PROSPECTIVE JUROR:  No. |
| 12:24 | 17 | THE COURT:  All right.  Very good. |
| 12:24 | 18 | Mr. Chu? |
| 12:24 | 19 | MR. CHU:  Thank you, Your Honor. |
| 12:24 | 20 | Good afternoon, Ms. Kelly. |
| 12:24 | 21 | PROSPECTIVE JUROR:  Hello. |
| 12:24 | 22 | MR. CHU:  Are you working at the Residence Inn here in |
| 12:24 | 23 | Waco or a different Residence Inn? |
| 12:24 | 24 | PROSPECTIVE JUROR:  Waco. |
| 12:24 | 25 | MR. CHU:  Oh, okay.  And I think you indicated that you're |

12:24   1    somewhat tech-savvy.  What did you mean by that?

12:24   2         PROSPECTIVE JUROR:  I don't know.  I don't even remember

12:24   3    what I put.

12:24   4         MR. CHU:  If people in your family or friends, they have a

12:25   5    problem with their computer or some other electronic gizmo, do

12:25   6    they ask you for help?

12:25   7         PROSPECTIVE JUROR:  Oh, no.

12:25   8         MR. CHU:  Okay.

12:25   9         PROSPECTIVE JUROR:  I don't know anything about computers.

12:25   10   I don't remember what I put.  I don't know anything about

12:25   11   computers.

12:25   12        MR. CHU:  Do you like your job at the Residence Inn?

12:25   13        PROSPECTIVE JUROR:  Yes.

12:25   14        MR. CHU:  Great.  Thank you very much.

12:25   15        PROSPECTIVE JUROR:  Thank you.

12:25   16        THE COURT:  Mr. Wren?

12:25   17        MR. WREN:  Ms. Kelly, based on anything you have heard

12:25   18   today, is there anything that would keep you from being a --

12:25   19   just a good, impartial juror in this case?

12:25   20        PROSPECTIVE JUROR:  No.

12:25   21        MR. WREN:  All I need to hear.

12:25   22        PROSPECTIVE JUROR:  All right.  Thank you.

12:25   23        MR. WREN:  Ms. Kelly, thank you very much.

12:25   24        THE COURT:  All right.  Ms. Worley.  Probably feels good

12:25   25   to stand up at this point.  And you all have been so patient

12:25  1  with us.  Thank you very much.  It's a lengthy process, but

12:25  2  it's important to all.

12:25  3       All right, Ms. Worley.

12:25  4       PROSPECTIVE JUROR:  Hi.  My name is Taylor Worley.  I'm

12:25  5  from Belton, Texas.  I got my undergraduate degree from Texas

12:26  6  A&M in biomedical science, and then after that, I got my

12:26  7  masters in business administration with the focus in health

12:26  8  care management.

12:26  9       THE COURT:  Where do you work now?

12:26  10      PROSPECTIVE JUROR:  I work in Georgetown at Strive Health

12:26  11 Services.  They're a private duty nursing company.

12:26  12      THE COURT:  What do you do for them?

12:26  13      PROSPECTIVE JUROR:  I work as an operations coordinator

12:26  14 there.

12:26  15      THE COURT:  What does that mean?

12:26  16      PROSPECTIVE JUROR:  So I handle a lot of pretty much

12:26  17 anything that's non-clinical, minus HR and scheduling 70-plus

12:26  18 nurses.

12:26  19      THE COURT:  How long have you been in that position?

12:26  20      PROSPECTIVE JUROR:  Since July of 2020.

12:26  21      THE COURT:  What'd you do before that?

12:26  22      PROSPECTIVE JUROR:  I worked at CHRISTUS Promptu Urgent

12:26  23 Care in San Antonio, and I worked at as a practice supervisor.

12:26  24 And then following that, I worked as a occupational injury

12:26  25 program administrator.  So I handled occupational injuries as

12:26   1    well as like workers comp too.

12:26   2        THE COURT:  Ever served in the military?

12:26   3        PROSPECTIVE JUROR:  No.

12:26   4        THE COURT:  Ever been a party to a lawsuit?

12:27   5        PROSPECTIVE JUROR:  No.

12:27   6        THE COURT:  Ever served on a jury?

12:27   7        PROSPECTIVE JUROR:  No.

12:27   8        THE COURT:  Any type of legal training?

12:27   9        PROSPECTIVE JUROR:  No.

12:27   10       THE COURT:  What did you know about patents before you

12:27   11   came into court?

12:27   12       PROSPECTIVE JUROR:  Just very limited.  I'm -- just from

12:27   13   my -- in school, like a basic definition.

12:27   14       THE COURT:  What are your hobbies and interests?

12:27   15       PROSPECTIVE JUROR:  I like to be outdoors.  Water skiing,

12:27   16   wake boarding, things like that.  And then reading when I can't

12:27   17   go in the lake.

12:27   18       THE COURT:  Is there anything that's come up that in your

12:27   19   mind would make you anything other than fair and impartial as a

12:27   20   juror in this case?

12:27   21       PROSPECTIVE JUROR:  No.

12:27   22       THE COURT:  All right.  Very good.

12:27   23       Mr. Chu?

12:27   24       MR. CHU:  Thank you very much, Your Honor.

12:27   25       Good afternoon, Ms. Worley.  Thank you for your patience.

12:27  1        Hard sometimes being at the end of the line.  But being a

12:27  2  W, you're probably used to that.

12:27  3        PROSPECTIVE JUROR:  Yes.

12:27  4        MR. CHU:  You indicated that you're somewhat favorable of

12:27  5  large corporations.  Why is that?

12:27  6        PROSPECTIVE JUROR:  The company I work for now is a

12:27  7  family-owned business.  And I worked -- CHRISTUS is a larger

12:28  8  corporation, and I just preferred the structure more in the

12:28  9  larger corporation.

12:28  10       MR. CHU:  And with your current job, what do you like and

12:28  11  what do you dislike?

12:28  12       PROSPECTIVE JUROR:  I like -- they're very flexible on the

12:28  13  hours, so that's something I like.  I like my co-workers.

12:28  14  They're very friendly people.  Something I dislike is being on

12:28  15  call, and being on call 24/7 is not favorable.

12:28  16       MR. CHU:  Because you have to do the scheduling for the 75

12:28  17  nurses.

12:28  18       PROSPECTIVE JUROR:  Yeah.  So someone could call out at

12:28  19  2:00 a.m. and then I have to go find coverage.

12:28  20       MR. CHU:  Understood.  Thank you very much.

12:28  21       THE COURT:  Mr. Wren?

12:28  22       MR. WREN:  Thank you, Your Honor.

12:28  23       Ms. Worley, I think you had indicated you just -- the

12:28  24  assumption being this case must have some merit if we're here.

12:28  25  Knowing that VLSI has chosen to sue Intel, does that then in

| | |
|---|---|
| 12:28 | 1 |

your mind give legitimacy to this case just based on the fact

they've filed the lawsuit?

        PROSPECTIVE JUROR:  No.

        MR. WREN:  Are we starting out even with you in that

regard?

        PROSPECTIVE JUROR:  Yes.

        MR. WREN:  Okay.  That's what I need to hear.  Thank you,

Ms. Worley.  Appreciate you.

        PROSPECTIVE JUROR:  Thank you.

        THE COURT:  All right.  Thank you.  Just as a heads up, we

are going to be turning on the noise thing here, just so if

anyone needs to make any adjustments.

        If I could see counsel, please.

        (Bench conference.)

        THE COURT:  Are there any further questions you'd like to

ask of the panel?

        MR. CHU:  Yes.  One thing that I was unclear about with

Ms. Ashley Jackson, who indicated that she knew Mr. Wren of

course, she raised her hand saying that she -- indicating that

she knew counsel on the other side; and I should have asked

whether that included anyone in addition to Mr. Wren, probably

not, but I thought that I would want to ask at least that.

        THE COURT:  All right.  Very good.

        Any further questions you'd like me to ask of any of the

panelists?

12:30   1          MR. WREN:  No, Your Honor.

12:30   2          THE COURT:  All right.  Are there any challenges for cause

12:30   3    that plaintiff wishes to make in this matter?

12:30   4          MR. CHU:  Yes.  I wanted to raise two.

12:30   5          Ms. Jackson, there is at least an implicit bias for two

12:30   6    reasons.  One is she's a point person in defending her bank in

12:30   7    connection with patent litigation in this district, including a

12:30   8    past case before Judge Albright and a current case that is

12:30   9    ongoing before Judge Albright.  So in that position, I think

12:30   10   one may surmise that there is bias or at least an implicit

12:30   11   bias.

12:30   12         And it's coupled with her knowledge of -- and she didn't

12:31   13   say directly, but I assume having been a student of Mr. Wren's,

12:31   14   as well as her mother's ongoing relationship with her mother

12:31   15   being -- well, Mr. Wren could fill us in -- as an assistant

12:31   16   dean or associate dean of the Baylor Law School.

12:31   17         So taken together, I think that those are grounds for a

12:31   18   challenge for cause.

12:31   19         THE COURT:  I have no concern regarding the relationship

12:31   20   that Ms. Jackson has with Mr. Wren or the fact that her mother

12:31   21   is a dean at the law school and works with Mr. Wren.  I believe

12:31   22   she's indicated that she can be fair and impartial with respect

12:31   23   to that.

12:31   24         I do have concern, however, with the fact that she does

12:31   25   have a case involving her company pending before Judge

12:31  1   Albright.  If it weren't a patent case, if it were a personal

12:31  2   injury case or a commercial litigation case, I wouldn't have as

12:31  3   much concern.  But in light of the fact that she is a

12:32  4   defendant -- or her company is a defendant in a patent case

12:32  5   before Judge Albright, I do have concerns regarding that.

12:32  6        Do you oppose the challenge for cause on that count?

12:32  7        MR. WREN:  We do oppose it, Your Honor, because she was

12:32  8   very clear, very explicit on two aspects of that.

12:32  9        One, she is really not the point person.  She is not the

12:32 10   one that is in any way directing that litigation.

12:32 11        And secondly, she's very clear it would not be a factor in

12:32 12   this.  I very much tried to -- based on that, I think she is

12:32 13   being very clear it will not.  If it were otherwise, I believe

12:32 14   she would say so.

12:32 15        THE COURT:  All right.  You may respond.

12:32 16        MR. CHU:  Just my recollection from the questioning and/or

12:32 17   what she said is that she is the point person in connection

12:32 18   with the litigation.  It was one or the other.  She may have

12:32 19   described that she's the point person with outside counsel.

12:33 20        (Off-the-record discussion.)

12:33 21        THE COURT:  All right.  I do note on her statement that

12:36 22   she has been an internal point of contact with outside counsel

12:36 23   on two patent infringement lawsuits.

12:36 24        MR. WREN:  But she also was very clear that she's not

12:36 25   directing it in any way.

156

```
12:36   1        THE COURT:  All right.  We'll bring her up here and let
12:36   2   you question her on that point.
12:36   3        What's your next?
12:36   4        MR. CHU:  It was Mr. Foil.  And very quick summary, I
12:36   5   think he answered incorrectly on the questionnaire on whether
12:36   6   he has been in a lawsuit as a plaintiff, defendant or a witness
12:37   7   or not involved at all.  He did answer "not involved at all" --
12:37   8        THE COURT:  What's the basis for the challenge for cause?
12:37   9        MR. CHU:  Because he admitted during the course of the
12:37  10   questioning that he's been involved as a witness in lawsuits
12:37  11   involving his company, Trinity, I believe.  His company.
12:37  12        THE COURT:  All right.  He volunteered that information.
12:37  13   I think he clarified he just made a mistake.  I'm going to
12:37  14   overrule that challenge for cause.
12:37  15        MR. CHU:  Understood.
12:37  16        THE COURT:  We'll remain up here.
12:37  17        (End of bench conference.)
12:37  18        THE COURT:  Ms. Jackson, if you'll come forward, please.
12:38  19        (Bench conference.)
12:38  20        THE COURT:  Hello, Ms. Jackson.  On your questionnaire you
12:38  21   had indicated that you were the point of contact for your
12:38  22   employer with outside counsel.
12:38  23        PROSPECTIVE JUROR:  Uh-huh.
12:38  24        THE COURT:  Involving two patent infringement cases.
12:38  25        PROSPECTIVE JUROR:  Yes, sir.
```

12:38   1          THE COURT:  And each of those cases were before Judge

12:38   2   Albright; is that correct?

12:38   3          PROSPECTIVE JUROR:  I believe so.  I'm not entirely

12:38   4   positive on the first one.

12:38   5          THE COURT:  All right.  And explain exactly what you mean

12:38   6   by "point of contact."

12:38   7          PROSPECTIVE JUROR:  I mean, I wasn't involved in any

12:38   8   negotiation or actual work on the case.  I was just kind of the

12:38   9   communication liaison between our outside counsel, who was

12:38   10  actively working the case, and management, and just keeping

12:38   11  them updated.

12:38   12         THE COURT:  Give me an example of the type of

12:38   13  communications you would have.

12:38   14         PROSPECTIVE JUROR:  So in the first case we were

12:38   15  indemnified by a third party, so my involvement was very

12:38   16  minimal.  We didn't get a ton of updates, so it was just more

12:38   17  once the case had been resolved, coordinating final actions

12:38   18  there.

12:39   19         THE COURT:  Tell me about the lawsuit that's pending

12:39   20  before Judge Albright.  It is a patent case; is that correct?

12:39   21         PROSPECTIVE JUROR:  Yes, sir.

12:39   22         THE COURT:  And your company represents one of the

12:39   23  defendants in that matter?

12:39   24         PROSPECTIVE JUROR:  My -- the bank I work for is a

12:39   25  defendant in the case, yes.

12:39   1          THE COURT:  All right.  And what are the nature of the

12:39   2   allegations against the bank you work for?

12:39   3          PROSPECTIVE JUROR:  It is patent infringement involving

12:39   4   online banking authentication software.  Again, there's other

12:39   5   companies involved.

12:39   6          THE COURT:  And what is your role in the litigation?

12:39   7          PROSPECTIVE JUROR:  Again, I'm just the point of contact,

12:39   8   so I'm communicating initially with our outside counsel that we

12:39   9   had hired, and now actually there's a second law firm that's --

12:39   10          THE COURT:  Are you making --

12:39   11          PROSPECTIVE JUROR:  -- has stepped in.

12:39   12          THE COURT:  -- any type of strategic decisions?

12:39   13          PROSPECTIVE JUROR:  No, sir.

12:39   14          THE COURT:  As part of point of contact, I'm still unclear

12:39   15   as to what your role is.

12:39   16          PROSPECTIVE JUROR:  Okay.

12:39   17          THE COURT:  What do you talk about?  I don't want you to

12:39   18   reveal any privileged information --

12:39   19          PROSPECTIVE JUROR:  I'm trying to walk that line --

12:39   20          THE COURT:  -- but just generally, what?

12:39   21          PROSPECTIVE JUROR:  Yes.  So there is a third-party

12:40   22   company involved and questions of indemnification.  So I

12:40   23   have -- I'm passing along communications between our law firm

12:40   24   and the law firm of the company that provides software to us

12:40   25   and communicating that to our management to keep them updated.

12:40  1      And then also any decisions that do need to be made, I'm

12:40  2  passing along information, occasionally making a recommendation

12:40  3  but mostly just facilitating that communication so that our

12:40  4  management team can make those decisions.

12:40  5      THE COURT:  Would it be awkward for you serving on a jury

12:40  6  where the presiding judge is also the presiding judge in a case

12:40  7  in which your company is a party before?

12:40  8      PROSPECTIVE JUROR:  I don't believe so, as long as I'm not

12:40  9  having to reveal details of what's going on in that case.

12:40  10      THE COURT:  All right.  Mr. Chu?

12:40  11      MR. CHU:  To ask questions?

12:40  12      THE COURT:  Yes.

12:40  13      MR. CHU:  Oh, okay.  First of all, do you know the names

12:41  14  of the law firms --

12:41  15      THE COURT:  You've got to speak into the mic.

12:41  16      MR. CHU:  Do you know the names of the law firm

12:41  17  representing the bank and the other party?  Is WilmerHale

12:41  18  involved at all?

12:41  19      PROSPECTIVE JUROR:  WilmerHale is not involved to my

12:41  20  knowledge.  We have been represented by Hunton Andrews Kurth,

12:41  21  and recently the company that has -- law firm that has stepped

12:41  22  in is -- oh, goodness, I'm drawing a blank -- Doug Lumish with

12:41  23  a law firm out of San Diego, I believe.

12:41  24      THE COURT:  Do you know any of the lawyers, other than

12:41  25  Mr. Wren, on the defendant's side?

12:41  1      PROSPECTIVE JUROR:  No, sir.

12:41  2      MR. CHU:  And in being that -- the point person, have some

12:41  3  of the outside lawyers been negative about either the plaintiff

12:41  4  or plaintiff's counsel in connection with the current pending

12:41  5  lawsuit or the past patent lawsuits?

12:41  6      PROSPECTIVE JUROR:  Any of the attorneys involved?

12:42  7      MR. CHU:  Yes.  In other words, sometimes lawyers

12:42  8  shouldn't do this, but they say, "That stinker, Morgan Chu, and

12:42  9  what's he doing, case doesn't have any merit, or this is a case

12:42  10 without merit."  Lawyers do that when they're talking to people

12:42  11 on the side who are not a federal lawyer --

12:42  12     PROSPECTIVE JUROR:  Yes.  Right.

12:42  13     MR. CHU:  -- does that kind of conversation --

12:42  14     THE COURT:  I don't want her to get into any

12:42  15 communications she's had regarding the potential merits of any

12:42  16 type of --

12:42  17     MR. CHU:  Yeah.  And I'm not asking about the merits,

12:42  18 but --

12:42  19     THE COURT:  -- discussion.  I'll allow that one.

12:42  20     MR. CHU:  Oh, okay.  Has the experience soured you in any

12:42  21 way, no matter how small, with respect to patent lawsuits that

12:42  22 are brought?

12:42  23     PROSPECTIVE JUROR:  I would say there's some

12:42  24 dissatisfaction at the bank I work for in the fact that we are

12:42  25 located in Waco, Texas, which has become a popular venue for

12:43  1   patent litigation.  That makes us an attractive defendant in

12:43  2   some of these patent infringement cases that perhaps involve

12:43  3   technology being used around the nation by a number of banks.

12:43  4        MR. CHU:  And in a sense, you think that might not be

12:43  5   entirely fair to your bank because you just happen to be in

12:43  6   Waco, and it's become a popular venue for patent litigation?

12:43  7        PROSPECTIVE JUROR:  I would say that has been expressed,

12:43  8   yes.

12:43  9        MR. CHU:  Thank you.

12:43  10       THE COURT:  All right.  Mr. Wren?

12:43  11       MR. WREN:  Yes.  I just want to follow up.

12:43  12       Taking into consideration all of these questions that have

12:43  13  been asked, are you comfortable serving on this jury?  And

12:43  14  specifically I'm asking:  Can you approach this case strictly

12:43  15  on the facts here and feel free and unfettered to make what you

12:43  16  believe, without any other considerations outside of the

12:43  17  evidence in this case, what is the proper decision?

12:43  18       PROSPECTIVE JUROR:  I would say yes.  I can judge this

12:43  19  case based on the facts in this case alone.

12:43  20       MR. WREN:  And are willing to do so?

12:43  21       PROSPECTIVE JUROR:  Yes, sir.

12:43  22       MR. WREN:  Okay.

12:44  23       THE COURT:  All right.  Thank you.  You may be seated.

12:44  24       And if you all could keep the conversation down, please.

12:44  25  If you all could please keep the conversation down.  It's

| | | |
|---|---|---|
| 12:44 | 1 | distracting for us up here and the court reporter.  Thank you. |
| 12:44 | 2 | We need to go back with the noise, so... |
| 12:44 | 3 | MR. CHU:  Well, she did talk about Waco being a popular |
| 12:44 | 4 | patent venue.  It's fairly clear to me that she, and perhaps |
| 12:44 | 5 | the bank also, feel that that's a bit unfair, and I think |
| 12:44 | 6 | there's some bias there, implicit bias. |
| 12:44 | 7 | So I do recognize she also said, in response to Mr. Wren's |
| 12:44 | 8 | questions, that she thinks she can be fair, but we're all human |
| 12:44 | 9 | beings and so we maintain our challenge for cause. |
| 12:44 | 10 | THE COURT:  Mr. Wren? |
| 12:44 | 11 | MR. WREN:  I think she's been very frank, Your Honor, both |
| 12:44 | 12 | about what her involvement has been and the fact that it will |
| 12:44 | 13 | not influence her approach to this case whatsoever.  I think |
| 12:45 | 14 | that this is a -- not an appropriate challenge for cause. |
| 12:45 | 15 | THE COURT:  All right.  I believe the prudent thing to do |
| 12:45 | 16 | at this point is to grant the challenge for cause, particularly |
| 12:45 | 17 | in light of the fact she does have a case pending before Judge |
| 12:45 | 18 | Albright, her company.  And the comments particularly concern |
| 12:45 | 19 | me, the most recent ones that were elicited by Mr. Chu |
| 12:45 | 20 | regarding the bank's opinion about potentially being targeted |
| 12:45 | 21 | in light of the popularity of patent litigation here in Waco, |
| 12:45 | 22 | Texas.  That kind of pushed me over the edge with respect to |
| 12:45 | 23 | that.  Thank you. |
| 12:45 | 24 | MR. CHU:  Thank you, Your Honor. |
| 12:45 | 25 | MR. WREN:  Thank you, Your Honor. |

12:45  1          (Bench conference concludes.)

12:45  2          THE COURT:  All right.  Ms. Jackson, I want to thank you

12:45  3   very much for your service here this morning, and I'm going to

12:45  4   excuse you at this time.  I appreciate -- I know we've taken up

12:45  5   a good chunk of your day, but thank you.  This is an important

12:46  6   process to the attorneys.

12:46  7          All right.  I will ask the clerk of court to please call

12:46  8   the name of the next panelist.

12:46  9          DEPUTY CLERK:  The Court calls Juror No. 90, Joanne Garza.

12:46  10         THE COURT:  All right.  Just by way of scheduling, so you

12:46  11  all can keep track, I want to keep you informed.  I'm going to

12:46  12  do my examination of Ms. Garza, give the attorneys an

12:46  13  opportunity to do that.  The attorneys have requested 15

12:46  14  minutes for me to sort of caucus before they make their

12:46  15  selections.

12:46  16         It then takes court staff about 30 minutes to be able to

12:46  17  complete the necessary paperwork to get everything together.

12:46  18  So my guess is at 1:30 we will seat the jury in this case.  At

12:47  19  that point I'm going to excuse everyone that is not selected

12:47  20  for the panel.  I explained why I need to keep you around, just

12:47  21  in case.

12:47  22         Then I'm going to allow the folks -- if you are selected

12:47  23  on the jury, lunch will be provided for you here within the

12:47  24  courthouse, I believe.  And then at 2:30 I will give you the

12:47  25  preliminary instructions and let you take your oath as jurors,

12:47  1    and then the Court will proceed with opening statements and

12:47  2    evidence later today.  So that's the game plan.

12:47  3         Ms. Garza, if you could please come up to the microphone.

12:47  4         PROSPECTIVE JUROR:  Is this close enough?  Yeah.

12:47  5         THE COURT:  Yes.  That's good.

12:47  6         Good afternoon, ma'am.  Tell us about yourself.

12:47  7         PROSPECTIVE JUROR:  Joanne Garza.  Born in Tacoma,

12:47  8    Washington but been here in Waco most of my life.

12:47  9         I work at Huck International, which has been ALCOA,

12:47  10   Arconic, and now is Howmet for -- it'll be 21 years this June.

12:48  11        THE COURT:  What do you do for them?

12:48  12        PROSPECTIVE JUROR:  Put rivets together for bridges, train

12:48  13   cars and Ford F150s.  And I have one daughter, two grandkids.

12:48  14   My husband works at Central Texas Iron Works.

12:48  15        THE COURT:  Is he a welder?

12:48  16        PROSPECTIVE JUROR:  Yes.  Uh-huh.

12:48  17        THE COURT:  All right.  I know you were listening in the

12:48  18   other room closely and assuming that you were about to get

12:48  19   ready to walk out that door --

12:48  20        PROSPECTIVE JUROR:  Yes.

12:48  21        THE COURT:  -- when your name was called.

12:48  22        PROSPECTIVE JUROR:  Yes.

12:48  23        THE COURT:  So were you carefully listening to the

12:48  24   questions that I asked the panelists as well as those asked by

12:48  25   the attorneys?

12:48   1        PROSPECTIVE JUROR:  Yes, sir.

12:48   2        THE COURT:  And were there any questions to which you

12:48   3   would have had an affirmative answer?

12:48   4        PROSPECTIVE JUROR:  No.

12:48   5        THE COURT:  Do you know any of the parties or their

12:48   6   representatives from either side?

12:48   7        PROSPECTIVE JUROR:  No, sir.

12:48   8        THE COURT:  Do you know any of the folks on the witness

12:48   9   list?

12:48  10        PROSPECTIVE JUROR:  No, sir.

12:48  11        THE COURT:  Would you have answered in the affirmative any

12:48  12   of the questions that I asked regarding the concepts of law?

12:48  13        PROSPECTIVE JUROR:  No.

12:49  14        THE COURT:  Have you ever served in the military?

12:49  15        PROSPECTIVE JUROR:  No.

12:49  16        THE COURT:  Have you ever been a party to a lawsuit, other

12:49  17   than family law matters?

12:49  18        PROSPECTIVE JUROR:  No.

12:49  19        THE COURT:  Have you ever received any legal training?

12:49  20        PROSPECTIVE JUROR:  No, sir.

12:49  21        THE COURT:  Have you ever served on a jury?

12:49  22        PROSPECTIVE JUROR:  Yes.

12:49  23        THE COURT:  Tell me where and when.

12:49  24        PROSPECTIVE JUROR:  The courthouse over here, probably

12:49  25   about year and a half, two years.

12:49  1      THE COURT:  So McLennan County Courthouse?

12:49  2      PROSPECTIVE JUROR:  Yes.  Criminal.

12:49  3      THE COURT:  What type of case?

12:49  4      PROSPECTIVE JUROR:  Criminal.  It was a robbery of a

12:49  5  smokehouse.

12:49  6      THE COURT:  Were you able to reach a verdict?

12:49  7      PROSPECTIVE JUROR:  Actually, we were stumped for a little

12:49  8  while until he came in -- the defendant came and said that he

12:49  9  pled guilty.

12:49  10      THE COURT:  Okay.  So during the process of you all

12:49  11  deliberating, the defendant --

12:49  12      PROSPECTIVE JUROR:  We were in the process, yeah.

12:49  13      THE COURT:  -- chose to plead guilty?

12:49  14      PROSPECTIVE JUROR:  Yes.

12:49  15      THE COURT:  Were you by chance the foreperson on that

12:49  16  jury?

12:49  17      PROSPECTIVE JUROR:  No, sir.

12:49  18      THE COURT:  Tell us what you know about patents.

12:49  19      PROSPECTIVE JUROR:  Just basically what everybody else

12:49  20  knows, that you need one if you invent something and it keeps

12:50  21  you from getting sued.

12:50  22      THE COURT:  Do you have any experience in working with

12:50  23  patents?

12:50  24      PROSPECTIVE JUROR:  No.

12:50  25      THE COURT:  Are you very tech-savvy?

12:50   1        PROSPECTIVE JUROR:  Not really.

12:50   2        THE COURT:  All right.  You have a somewhat favorable

12:50   3   opinion of large corporations in American.  Any reason for that

12:50   4   opinion that you feel is relevant?

12:50   5        Oh, the microphone, we need to replace the battery.

12:50   6        Even our microphones are getting tired after going at it

12:50   7   for awhile.

12:50   8        (Laughter.)

12:50   9        PROSPECTIVE JUROR:  Thank you.  Basically what I meant by

12:50   10  that is where I work now, I mean, it's a good company, but we,

12:50   11  the people that we -- the president and all the person that was

12:50   12  over it retired.  He was more family oriented and employee

12:51   13  oriented.  The people that came in now just -- it's all work,

12:51   14  work, work, not caring about what we need, what we do and all

12:51   15  that stuff, so...

12:51   16       THE COURT:  All right.  So I take it by your opinions,

12:51   17  though, there's nothing with respect to that opinion that would

12:51   18  cause you to be anything other than fair and impartial --

12:51   19       PROSPECTIVE JUROR:  No.

12:51   20       THE COURT:  -- to each of these folks?

12:51   21       PROSPECTIVE JUROR:  Huh-uh.  No.

12:51   22       THE COURT:  Is there anything that has been discussed or

12:51   23  talked about today that you feel is relevant to our discussion

12:51   24  as to whether or not you'd be an appropriate person to serve on

12:51   25  this jury?

12:51  1          PROSPECTIVE JUROR:  No.

12:51  2          THE COURT:  Mr. Chu?

12:51  3          MR. CHU:  Thank you very much, Your Honor.

12:51  4          Good afternoon, Ms. Garza.

12:51  5          PROSPECTIVE JUROR:  Hi.

12:51  6          MR. CHU:  Thank you for your patience.

12:51  7          How long have you been in Texas?

12:51  8          PROSPECTIVE JUROR:  I was three days old when we came down

12:51  9   here, so yeah.

12:51  10         MR. CHU:  Okay.

12:51  11         PROSPECTIVE JUROR:  55 now.

12:51  12         MR. CHU:  And you started to say that -- on patents, that

12:51  13  if you invent something, and I think you didn't finish your

12:52  14  thought.

12:52  15         PROSPECTIVE JUROR:  Oh.  So it's like more or less it

12:52  16  keeps you from being, you know, like, sued and protected by law

12:52  17  about what you invented.

12:52  18         MR. CHU:  Okay.  Do you think it's good to have a patent

12:52  19  system to encourage innovation?

12:52  20         PROSPECTIVE JUROR:  Yes.  Uh-huh.

12:52  21         MR. CHU:  Great.  Thank you very much.

12:52  22         THE COURT:  Mr. Wren?

12:52  23         MR. WREN:  Thank you, Your Honor.

12:52  24         Ms. Garza, for the sake of everybody here, I'm going to be

12:52  25  very brief.

| 12:52 | 1 | Have you heard anything that would cause any concern for |
| 12:52 | 2 | you in terms of serving on this jury? |
| 12:52 | 3 | PROSPECTIVE JUROR:  No.  Huh-uh. |
| 12:52 | 4 | MR. WREN:  That's all I've got, and thank you very much. |
| 12:52 | 5 | PROSPECTIVE JUROR:  Thank you. |
| 12:52 | 6 | THE COURT:  All right.  For the last time, at least while |
| 12:52 | 7 | I'm up here, we're going to turn on the noise system again. |
| 12:52 | 8 | If I could see counsel. |
| 12:52 | 9 | (Bench conference.) |
| 12:52 | 10 | THE COURT:  Does the plaintiff have any further challenges |
| 12:52 | 11 | for cause? |
| 12:52 | 12 | MR. CHU:  No, Your Honor. |
| 12:52 | 13 | THE COURT:  Does the defendant have any challenges for |
| 12:53 | 14 | cause? |
| 12:53 | 15 | MR. WREN:  No, we do not, Your Honor. |
| 12:53 | 16 | THE COURT:  Very good.  Any other matters we need to |
| 12:53 | 17 | address? |
| 12:53 | 18 | MR. CHU:  No. |
| 12:53 | 19 | THE COURT:  All right.  We're going to stand in recess and |
| 12:53 | 20 | I'm going to give you all 15 minutes to caucus.  If you'll come |
| 12:53 | 21 | back in at 1:05. |
| 12:53 | 22 | MR. WREN:  Just -- I think I understand this.  Just to be |
| 12:53 | 23 | sure, Your Honor, as we have brought in new jurors, they take |
| 12:53 | 24 | over that -- like Ms. Garza, is she now the No. 2 on the -- |
| 12:53 | 25 | THE COURT:  Ms. Garza is now No. 2 on the list. |

12:53  1          MR. WREN:  That's what I thought.

12:53  2          THE COURT:  It's not a moving up of people within the

12:53  3  panel.

12:53  4          MR. WREN:  Just wanted to be sure.

12:53  5          THE COURT:  Okay.  Thank you.

12:53  6          (Bench conference concludes.)

12:53  7          THE COURT:  All right.  Ladies and gentlemen, you all are

12:53  8  going to get to have a break until about approximately 2:30.

12:53  9  I'd ask that you, you know, not leave the immediate area of the

12:53  10  building.

12:53  11         I know the court clerk, Melissa, will give you some

12:53  12  additional instructions.  But I promise I will have you --

12:53  13  those of you not selected out of here as quickly as possible so

12:53  14  you can get on with your day.

12:54  15         It's been a long, tedious process.  Thank you very much.

12:54  16  If everyone could please rise for the jury panel.

12:54  17         (Jury panel exited the courtroom at 12:54.)

12:54  18         THE COURT:  I made a mistake.  Till 1:30, we'll have you

12:54  19  back.  It's not -- I'm confused by the clock.

12:55  20         All right.  Your caucus begins now, unless there's

12:55  21  anything further you need from me.

12:55  22         MR. CHU:  Thank you, Your Honor.

12:55  23         THE COURT:  Thank you.  My pleasure.

12:55  24         (Recess taken from 12:55 to 1:02.)

01:02  25         JUDGE ALBRIGHT:  So here's what we're going to do.

01:03  1        I'm going to have -- once we have y'all's picks, we'll

01:03  2   bring the jury in.  We'll seat the seven members of the jury.

01:03  3   We'll release the other folks.  I will then dismiss the jury --

01:03  4   and lunches are here, correct?

01:03  5        DEPUTY CLERK:  I'm not sure.  I can find out, though, for

01:03  6   sure.

01:03  7        JUDGE ALBRIGHT:  Jeff, the lunches are here?

01:03  8        JUDGE MANSKE:  What's that?

01:03  9        JUDGE ALBRIGHT:  Are there lunches here for the jury?

01:03  10        JUDGE MANSKE:  I have no clue.  Mark was coordinating

01:03  11   that.

01:03  12        JUDGE ALBRIGHT:  Okay.  Let's assume they are for purposes

01:03  13   of this.

01:03  14        The jury will have 45 minutes, and you all will have

01:03  15   45 minutes, and I'll have 45 minutes for lunch.  Whenever

01:03  16   the -- from the minute we get out, we'll have 45 minutes.

01:03  17        Come back in.  I'm going to read the preliminary

01:03  18   instructions, which we've worked out with the relative lawyers.

01:04  19   That's what I was doing back here.  And then as soon as we're

01:04  20   done with that, as soon as I'm done reading, we're going to

01:04  21   start opening arguments.

01:04  22        So we've got till roughly -- it's 1:30 now, 2:15 for

01:04  23   lunch, preliminary instructions, 15 minutes.  So you should

01:04  24   presume that your opening arguments are going to start

01:04  25   approximately 2:30.

| | | |
|---|---|---|
| 01:04 | 1 | THE CLERK:  And lunches are here. |
| 01:04 | 2 | JUDGE ALBRIGHT:  Lunches are here.  So that will work. |
| 01:04 | 3 | So also, the technical people are going to need to work |
| 01:04 | 4 | during the -- two things you all should know that happened |
| 01:04 | 5 | while y'all are right here. |
| 01:04 | 6 | One is, I told both sides, there were concerns that there |
| 01:04 | 7 | was confidential information in each side's slides to which I |
| 01:04 | 8 | said:  If that's true, then that's evidence that should not be |
| 01:04 | 9 | coming in during opening argument anyway. |
| 01:05 | 10 | So make the numbers -- make the information oblique enough |
| 01:05 | 11 | that you're not going to object to it during opening argument |
| 01:05 | 12 | because I'm not going to seal the opening -- I'm not going to |
| 01:05 | 13 | stop and seal opening argument and keep going. |
| 01:05 | 14 | So if there's stuff in there that you can't agree to, I'll |
| 01:05 | 15 | probably just take it out, but I think that's going to get |
| 01:05 | 16 | worked out.  So that's been taken care of. |
| 01:05 | 17 | And then each side -- we've gone through the slides, we've |
| 01:05 | 18 | dealt with what's in the slides.  There's one or two things I |
| 01:05 | 19 | changed. |
| 01:05 | 20 | And then half an hour -- is half an hour per side for |
| 01:05 | 21 | opening sufficient for everyone? |
| 01:05 | 22 | MR. CHU:  Yes. |
| 01:05 | 23 | MR. LEE:  Ours is closer to 45. |
| 01:05 | 24 | MR. CHU:  I thought Your Honor had said 30 per side. |
| 01:05 | 25 | JUDGE ALBRIGHT:  I thought I had too. |

01:05   1        MR. CHU:  I'm fairly sure.

01:05   2        JUDGE ALBRIGHT:  I always say it, and here's the reason

01:05   3   why.  I think what I said was I need you to stick around

01:06   4   30 minutes because I don't think juries like much longer than

01:06   5   30 minutes.  I know I say that every time.

01:06   6        Mr. Lee, if you can trim yours down to about 40 minutes, I

01:06   7   think that should --

01:06   8        MR. LEE:  I'll trim it down to 40 minutes.

01:06   9        THE COURT:  So each side will have 40 minutes for opening

01:06   10   argument, and then we'll put witnesses on.

01:06   11        MR. LEE:  And, Your Honor, I understand just from the

01:06   12   e-mail traffic, I'm not going to mention Fortress in the

01:06   13   opening.

01:06   14        JUDGE ALBRIGHT:  Correct.

01:06   15        MR. LEE:  I am going to make the proffer because I think

01:06   16   it's quite prejudicial to us not to be able to, given the chart

01:06   17   that's going to be coming in.  But I won't mention it --

01:06   18   because I understand Your Honor's ruling, I won't mention it,

01:06   19   but we'll make a proffer to you later today.

01:06   20        JUDGE ALBRIGHT:  Okay.  Understood.  But I've -- as you

01:06   21   know, I get it's just opening argument, which is just argument.

01:06   22   And I've made it clear to the lawyers who are arguing that if

01:06   23   the plaintiff puts in evidence that I find makes Fortress --

01:06   24   the relationship of Fortress relevant, then I'll take that up

01:06   25   and I'll allow it into evidence.

01:07  1        MR. LEE:  Your Honor, Fortress negotiated the purchase of

01:07  2   these patents.  VLSI didn't exist when the first set of patents

01:07  3   were purchased.

01:07  4        So it's -- you know, it's not possible to tell during the

01:07  5   direct testimony.  I understand for the opening I can deal with

01:07  6   it, and I'll deal with it.

01:07  7        But the reason I want to make a proffer to Your Honor is

01:07  8   it's not possible to tell -- the Court needs to tell these

01:07  9   collection of patents and what prices came into the hands of

01:07 10   VLSI without talking about Fortress.  They actually negotiated

01:07 11   the purchase of these two patents.

01:07 12        JUDGE ALBRIGHT:  Mr. --

01:07 13        MR. CHU:  We obviously disagree with Mr. Lee, and there'll

01:07 14   be another time to argue.

01:07 15        JUDGE ALBRIGHT:  I've heard all this, and that's exactly

01:07 16   why I'm keeping it out of the opening.

01:07 17        MR. LEE:  I understand.

01:07 18        JUDGE ALBRIGHT:  I hear what you say.  I believe you,

01:07 19   Mr. Lee.

01:07 20        Mr. Chu, who I have great respect for, I believe him when

01:08 21   he says:  We disagree.  So I don't want something coming in

01:08 22   during the opening, which is just argument.  I understand your

01:08 23   point about what you'd like to be able to say.

01:08 24        I am not in any way foreclosing Fortress from being

01:08 25   admitted during trial.

01:08  1       MR. LEE:  No.  I understand.  And, Your Honor, I'm not

01:08  2  going to mention Fortress at all in the opening.  We got

01:08  3  your -- you were very clear.  I'm going to make the proffer to

01:08  4  see what the facts are, and the proffer's going to be based on

01:08  5  their testimony.

01:08  6       JUDGE ALBRIGHT:  Okay.

01:08  7       MR. LEE:  Okay?

01:08  8       JUDGE ALBRIGHT:  Yes, sir.  So you all get back in

01:08  9  whatever amount of time -- take five extra minutes on your jury

01:08  10 selection and then come on back in.  We'll get the jury -- Jeff

01:08  11 will get the jury selected, and he will -- he'll seat seven,

01:08  12 let the rest go with our thanks, send the seven out for lunch

01:08  13 for 45 minutes.

01:08  14      And then we will start up as soon as the 45 minutes

01:08  15 expires with me reading the preliminary instructions.

01:08  16      MR. CHU:  Thank you.

01:41  17      (Recess from 1:08 to 1:41.)

01:41  18      JUDGE MANSKE:  All right.  Good afternoon, everyone.  You

01:41  19 may be seated.

01:42  20      All right.  Counsel, are there any objections to the jury

01:42  21 as seated on the document provided?

01:42  22      Anything from the plaintiff?

01:42  23      MR. CHU:  No objections, Your Honor.

01:42  24      JUDGE MANSKE:  Anything from the defendant?

01:42  25      MR. WREN:  Accurate as stated, Your Honor.

01:42  1        JUDGE MANSKE:  All right.  Very good.  Are there any

01:42  2   matters we need to take up before I have them brought in?

01:42  3        MR. CHU:  No, Your Honor.

01:42  4        MR. WREN:  No, Your Honor.

01:42  5        JUDGE MANSKE:  Very good.  Thank you.

01:42  6        All rise for the jury panel, please.

01:42  7        (Jury panel entered the courtroom at 1:42.)

01:43  8        JUDGE MANSKE:  All right.  Be seated, everyone.

01:43  9        At this time I'm going to have the clerk of court announce

01:43  10  those jurors who have been selected to serve as the jury in

01:43  11  this matter.  When your name is called, if you'll come forward,

01:43  12  and I'll have the courtroom deputy direct you to your seat.

01:43  13       DEPUTY CLERK:  Juror No. 1, Joanne Garza.

01:44  14       Juror No. 2, Julie Ann Miller.

01:44  15       Juror No. 3, Lakerian Keon Miller.

01:44  16       Juror No. 4, Kelly Michelle Kemp.

01:44  17       Juror No. 5, Apolinar Rodriguez, Jr.

01:44  18       Juror No. 6, James Philip Scribner, Jr.

01:44  19       Juror No. 7, Michael Robert Page.

01:45  20       JUDGE MANSKE:  All right.  Ladies and gentlemen, if your

01:45  21  name was not called, that means you have not been selected.  I

01:45  22  want to thank you so much for bearing with us over the past

01:45  23  11 days and for the lengthy five hours, six hours you've been

01:46  24  with us here this morning and afternoon.

01:46  25       Your work here is done.  You are free to go.  You will

01:46  1   need to continue to call and check on things, but thank you all

01:46  2   very much for your service, and I look forward to seeing you

01:46  3   next time.

01:46  4        All rise for the panel, please, as they exit.

01:46  5        (Jury panel exited the courtroom at 1:46.)

01:46  6        JUDGE MANSKE:  All right.  If the jury will remain

01:46  7   standing, and everyone else may be seated.

01:46  8        At this time I'm going to have the clerk of court

01:47  9   administer the oath regarding your service as jurors.

01:47  10       (The jury was sworn.)

01:47  11       JUDGE MANSKE:  And welcome to lunch.  You may follow

01:47  12  William, the court security officer, out.  He will set you up

01:47  13  with lunch, and then we will resume with opening statements --

01:47  14  or not opening statements.  Actually, Judge Albright will come

01:47  15  in and read to you the preliminary instructions guiding your

01:47  16  service as jurors, and then opening statements.  Thank you.

01:47  17       All rise for the jury, please.

01:47  18       (Jury exited the courtroom at 1:47.)

01:48  19       JUDGE MANSKE:  And, counsel, it was a pleasure working

01:48  20  with all of you this morning and afternoon, and I appreciate

01:48  21  your professionalism and the ease at which the process went.

01:48  22  It was long.  Go grab lunch.  Thank you.  My pleasure.

01:48  23       (Recess taken from 1:48 to 2:31.)

02:31  24       THE BAILIFF:  All rise.

02:31  25       THE COURT:  Good afternoon.  Thank you.  You may be

02:31  1   seated.

02:31  2       Could I have counsel up here for just a second before you

02:31  3   do that?

02:31  4       (Bench conference.)

02:31  5       THE COURT:  So, Mr. Chu, I want you to think -- keep in

02:31  6   mind during opening that I have an open mind about this

02:32  7   Fortress issue.  If you say something during the opening that

02:32  8   makes me think that Mr. Lee ought to be able to say something

02:32  9   about Fortress during his opening, I'll make that decision.

02:32  10      Right now my problem on the record is that there are

02:32  11  different -- it's not clear to me what happened to Fortress.  I

02:32  12  can't get Fortress out of it if I think it shouldn't come in.

02:32  13  But I understand why it might be relevant.  It won't be

02:32  14  relevant during opening unless you say something that I think

02:32  15  makes it relevant.

02:32  16      MR. CHU:  Okay.  I checked with the team under various

02:32  17  slides, which include saying that the patents were granted and

02:32  18  they were transferred to VLSI and that cycle of innovation

02:32  19  slide.  And I'm mindful of that and also mindful on what I

02:32  20  think was said about damages.  And I understand we took out the

02:32  21  reference to the specific number of chips, 987 billion, but we

02:33  22  also ran by the "about a billion units sold."  Those are the

02:33  23  closest things.

02:33  24      MR. LEE:  So, Your Honor, I tried to get down to 35 or

02:33  25  40 minutes, so I heard you loud and clear.

02:33  1        The problem with that innovation slide, that circle, it

02:33  2   has a line going from -- directly from VLSI to NXP suggesting

02:33  3   that all recovery goes to them.  Not even a majority of the

02:33  4   recovery goes to them.  And --

02:33  5        MR. CHU:  But it won't -- I'm sorry.  Go ahead.

02:33  6        THE COURT:  Can you just leave that slide out?

02:33  7        MR. LEE:  I wasn't going to say that -- I'll make clear

02:33  8   that there is some back end to VLSI that has nothing at all to

02:33  9   do with Fortress at all.  That's part of the overall deal.

02:33  10  There's a back end.

02:33  11       THE COURT:  I'll listen.  For now I'm keeping Fortress out

02:34  12  of it.

02:34  13       MR. LEE:  And I actually can address that slide without

02:34  14  referring to Fortress.

02:34  15       MR. CHU:  I'm sorry.

02:34  16       MR. LEE:  I said I can address that slide without

02:34  17  referring to Fortress or even obliquely referring to Fortress.

02:34  18       MR. CHU:  Just to make sure there's not a dispute, then

02:34  19  what I'll just say that after expenses there will be meaningful

02:34  20  return to NXP.

02:34  21       MR. LEE:  That, you can't do.  That's unfair, Your Honor.

02:34  22  It's not "after expenses."  What will come out during the

02:34  23  evidence.

02:34  24       THE COURT:  If the expenses are not going to go back to

02:34  25  Fortress.

02:34  1          MR. CHU:  No, no, no.

02:34  2          THE COURT:  See, this is my point.

02:34  3          MR. LEE:  Okay.  I won't say "after expenses," but --

02:34  4          THE COURT:  You say whatever you want to say.  I'm going

02:34  5     to listen in a detached manner.  And if it's something that I

02:35  6     think requires Mr. Lee to be able to talk about Fortress, which

02:35  7     is unlikely, because I want to hear -- I want to see it in the

02:35  8     context of the trial.  I just want you to understand -- Mr. Chu

02:35  9     to understand that I want you to be careful because this is a

02:35  10    sensitive issue during opening argument, and I want to be fair

02:35  11    to Intel.

02:35  12         MR. LEE:  Thank you, Your Honor.

02:35  13         MR. CHU:  Thank you.

02:35  14         (Bench conference concludes.)

02:35  15         DEPUTY CLERK:  Jury trial proceeding in Criminal Action

02:35  16    W-21-CV-57, styled VLSI Technology LLC versus Intel

02:35  17    Corporation.

02:35  18         THE COURT:  Gentlemen, good afternoon.  If I could hear

02:35  19    announcements from counsel, please.

02:35  20         MR. MANN:  Good afternoon, Your Honor.  Mark Mann on

02:35  21    behalf of VLSI.  And we're ready to proceed, along with my

02:35  22    colleagues, Your Honor.

02:35  23         THE COURT:  Mr. Lee?

02:36  24         MR. LEE:  Good afternoon, Your Honor.  Bill Lee for Intel,

02:36  25    together with Jim Wren, Mindy Sooter and Joe Mueller.  And we

02:36  1    are ready to proceed.

02:36  2         THE COURT:  Very good.

02:36  3         Good afternoon, ladies and gentlemen.  I have a new screen

02:36  4    on my desk which keeps me from being able to see some of you,

02:36  5    which I hate.  So I'm going to sit in an awkward position for

02:36  6    when I'm addressing you a little bit so I can see you.

02:36  7         My name is Alan Albright.  I'm the United States District

02:36  8    Judge.  You got to spend the morning with my wonderful United

02:36  9    States Magistrate Judge who has far more patience than I do,

02:36  10   which is required to select a jury in the manner that you all

02:36  11   were selected.  And we selected the jury in that manner to make

02:36  12   it as absolutely safe as possible as we could for you all and

02:36  13   also to make it as fair as possible for the parties involved to

02:36  14   get a jury that was fair and impartial.

02:36  15        I'm not sure if -- how my magistrate judge asked this, but

02:36  16   I will.  Mr. Mann or Mr. Chu, are you satisfied with the jury?

02:37  17        MR. MANN:  The plaintiff is, Your Honor.

02:37  18        THE COURT:  Mr. Lee?

02:37  19        MR. LEE:  Intel is, Your Honor.

02:37  20        THE COURT:  Thank you.

02:37  21                   PRELIMINARY JURY INSTRUCTIONS

02:37  22        THE COURT:  I'm now going to read to you the Court's

02:37  23   preliminary jury charge.  I am then going to allow opening

02:37  24   arguments by the parties.  They're usually very -- I think very

02:37  25   entertaining and educational.  I enjoy them a great deal.

02:37  1      When we finish that, the plaintiff, who is seated closest

02:37  2  to you, will begin the case by putting on their first fact

02:37  3  witness.  That's the first bit of evidence that you'll hear.

02:37  4  The opening arguments are not evidence.  They're just arguments

02:37  5  by counsel as to what they hope you're going to hear.

02:37  6      And then we'll have a couple of witnesses today, and we'll

02:37  7  go probably today till between 5:00 and 5:30, and then we'll

02:37  8  discuss when we're going to come back together in the morning.

02:37  9      So, members of the jury, you have now been sworn to try

02:38 10  this case.  As the judge, I will decide all questions of law

02:38 11  and procedure.  As the jury, you alone are the judges of the

02:38 12  facts.  At the end of the trial, I will instruct you on the

02:38 13  rules of law that you must apply to the facts as you find them.

02:38 14      You may take notes during the trial.  But do not allow

02:38 15  note-taking to distract you from listening to the testimony.

02:38 16  Your notes are only an aid to your memory.  If your memory

02:38 17  should later be different from your notes, you should rely on

02:38 18  your memory.  Do not be unduly influenced by the notes of other

02:38 19  jurors.  A juror's notes are not entitled to any greater weight

02:38 20  than each juror's individual recollection of the testimony and

02:38 21  evidence.

02:38 22      Until this trial is over -- and you'll hear me say this

02:38 23  many times throughout the court -- you'll be tired of me saying

02:39 24  this.  Do not discuss this case with anyone.  Do not permit

02:39 25  anyone to discuss it in your presence.  This includes everyone

02:39  1   you know:  Your spouse, children, relatives, friends,

02:39  2   co-workers, anyone you deal with during your day.

02:39  3        During your jury service, you may not communicate any

02:39  4   information about this case through any means or by any tools

02:39  5   of technology.  For example, do not talk face-to-face or use

02:39  6   any electronic device or media, such as a telephone, cell

02:39  7   phone, camera, recording device, PDA, computer, the Internet,

02:39  8   any Internet service, any text or instant messaging service,

02:39  9   any chat room, blog or website such as Facebook, et cetera, or

02:39  10  any other way to communicate about this case.

02:39  11       You may not communicate to anyone any information about

02:39  12  this case until you have gotten your verdict to me.

02:39  13       Do not even -- and this is equally important.  Do not

02:40  14  discuss this case amongst yourselves or with other jurors until

02:40  15  the end of the case when I tell you that it is okay for you to

02:40  16  begin to deliberate.

02:40  17       It is unfair to discuss the case at any time before then

02:40  18  because you won't have all the evidence in.  And you must have

02:40  19  it all in, because you must never become an advocate for one

02:40  20  side or the other.

02:40  21       The parties, the witnesses, the attorneys and everyone

02:40  22  associated with this case are not permitted to communicate with

02:40  23  you at any time, as in if they happen to see you, they're not

02:40  24  even permitted to tell you hello.  They're not allowed to speak

02:40  25  to you.  So don't think that they're being impolite.  They are

02:40  1  simply following my instructions.

02:40  2       Do not speak with anyone else in or around the courthouse,

02:40  3  other than your fellow jurors or court personnel.  And by that

02:40  4  I mean you're free to talk about the Dallas Cowboys or the

02:40  5  recent freeze or anything you'd like with each other because

02:41  6  you're going to be spending a fair amount of time together this

02:41  7  week.  You cannot speak about the case.

02:41  8       Also, we live in a new era with the Internet.  It's not

02:41  9  that new, but because of that, I'm going to tell you, do not

02:41  10  conduct any independent investigation of this case, period.

02:41  11  You must make your decision on your verdict exclusively from

02:41  12  what you see and hear within this courtroom.  Do not try to

02:41  13  obtain information from any other source.

02:41  14       In particular, you may not use any electronic device or

02:41  15  media such as a telephone or computer or any such device to

02:41  16  research any issue that might be related to this case.  Don't

02:41  17  go online.  Don't read a newspaper account of the trial or

02:41  18  listen to any radio or newscast about it in any format.  Do not

02:41  19  visit or view any place that might be discussed in this case.

02:41  20  Do not use Internet programs or other devices to search for or

02:42  21  to view any place that's discussed.

02:42  22       In sum, you may not ever research any information about

02:42  23  this case, the law or any of the people that you're going to

02:42  24  see as witnesses in front of you or the parties, the lawyers,

02:42  25  myself, until after you have been excused after your verdict

| | | |
|---|---|---|
| 02:42 | 1 | and are no longer jurors. |
| 02:42 | 2 | There's some issues of law or procedure that I must decide |
| 02:42 | 3 | that the attorneys and I might have to discuss.  These issues |
| 02:42 | 4 | are not part of what you must decide, and they are dealt with |
| 02:42 | 5 | outside of your presence. |
| 02:42 | 6 | I'm going to tell you it will be extremely rare that we |
| 02:42 | 7 | have bench conferences in this case.  But if we do, that means |
| 02:42 | 8 | the attorneys will come up like you saw at the beginning of the |
| 02:42 | 9 | case, and I might discuss something with them to give them some |
| 02:42 | 10 | information that they need.  It doesn't have anything to do |
| 02:42 | 11 | with the merits of the trial in any way. |
| 02:42 | 12 | If the discussions require more time than just a couple of |
| 02:43 | 13 | minutes, a very few minutes, I might ask you to leave the |
| 02:43 | 14 | courtroom while we resolve the issues, but I can promise you I |
| 02:43 | 15 | will keep those interruptions as infrequent as possible. |
| 02:43 | 16 | Do not permit the fact -- do not consider the fact that I |
| 02:43 | 17 | permit a conference to happen or not, or the fact that we had a |
| 02:43 | 18 | conference, to influence you as to how I feel about the case. |
| 02:43 | 19 | Let me make as clear as I can, the parties could have |
| 02:43 | 20 | allowed me to try this case, but they elected not to do that. |
| 02:43 | 21 | They elected to have the seven of you come here and serve as a |
| 02:43 | 22 | jury of their peers.  That means that as far as you're |
| 02:43 | 23 | concerned and I'm concerned in this case, I have no opinion |
| 02:43 | 24 | about any issue that they are going to present to you. |
| 02:43 | 25 | I care about the legal issues and getting things right |

02:44  1  legally, but every decision that's to be made here with respect

02:44  2  to the facts is exclusively in your province as a juror.  You

02:44  3  all are the judges of this case.  Again, you are the judges,

02:44  4  the exclusive judges of all facts.  My opinion matters not at

02:44  5  all.

02:44  6      This, as you heard during voir dire, is a patent case.

02:44  7  The patents involved in this case generally relate to computer

02:44  8  microprocessors or electronic devices.  That will be explained

02:44  9  in much greater detail, I assure you, by the witnesses and also

02:44  10  in the opening arguments you hear before witnesses and the

02:44  11  closing arguments you hear after.

02:44  12      The plaintiff is seated at the table closest to you.  They

02:44  13  are VLSI Technology LLC.  Probably I will refer to them as VLSI

02:45  14  throughout the trial.  They are the owner of two patents which

02:45  15  are identified as the following:  United States Patent

02:45  16  7,523,373, which you'll hear as the '373 patent.  The other is

02:45  17  United States patent 7,725,759 or the '759 patent.  We also may

02:45  18  call it -- not we.  I may call them this because I'm speaking

02:45  19  to the lawyers, but I anticipate they will refer to the patents

02:45  20  either as the '373 or '759 patent, or possibly as the VLSI

02:45  21  patents, or also as "the asserted patents."

02:45  22      There are two patents in this case.  You will hear

02:45  23  evidence related to each of them.

02:45  24      The defense counsel is seated a bit further over to my

02:45  25  left, and that company is Intel Corporation, or as we probably

02:45  1    heard them referred to this morning simply as Intel.

02:46  2         Patents in the United States are granted by the United

02:46  3    States Patent and Trademark Office.  You might hear them

02:46  4    referred to during trial as the PTO or US PTO for the United

02:46  5    States Patent and Trademark Office.

02:46  6         A patent gives the owner the right to exclude others from

02:46  7    making, using, offering to sell or selling the invention

02:46  8    claimed by that patent within the United States or importing it

02:46  9    into the United States.

02:46 10         During this trial, the parties will probably offer

02:46 11    testimony -- they don't have to, but I anticipate they will

02:46 12    offer testimony to familiarize you with how one obtains a

02:46 13    patent from the Patent Office or the PTO.

02:46 14         This is a very general background.  To obtain a patent, an

02:46 15    applicant for the patent must be filed -- an application for

02:46 16    the patent must be filed with the PTO by what we call either an

02:46 17    applicant or the inventor.

02:47 18         This application includes what is known as a

02:47 19    specification.  This specification includes a written

02:47 20    description of the invention, how it works, and how to make and

02:47 21    use it to enable others who are skilled in the art to do so.

02:47 22    The specification concludes with one or more numbered sentences

02:47 23    or paragraphs.

02:47 24         These are called the claims of the patent.  The purpose of

02:47 25    the claims themselves is to particularly identify what the

02:47  1    claimed invention is and to define the scope of the patent

02:47  2    owner's exclusive rights under each of these patents.

02:47  3        After an application for a patent is filed with the PTO,

02:47  4    that application is taken and reviewed by a person who has the

02:47  5    title of patent examiner.  A patent examiner is a person who,

02:48  6    generally speaking, trained in a specific technology area.

02:48  7    That patent examiner reviews -- or you'll hear this said

02:48  8    often -- another way of saying "review" in the patent world is

02:48  9    "examines" the patent application to determine whether or not

02:48  10   the claims that the applicant has provided to the PTO are

02:48  11   patentable and whether or not the specification that was

02:48  12   included adequately describes what that claimed invention is.

02:48  13       When the patent examiner examines the patent application,

02:48  14   he searches records available to the Patent Office to find what

02:48  15   is referred to as prior art.  And he or she also reviews prior

02:48  16   art that is submitted by the applicant.

02:48  17       You're thinking:  What is prior art?  Well, generally

02:48  18   speaking, prior art is previously existing technical

02:49  19   information and knowledge which patent examiners consider to

02:49  20   determine whether or not the claims in that application are

02:49  21   patentable.

02:49  22       The patent examiner considers, among many things, whether

02:49  23   each claim defines an invention that is new, useful and that is

02:49  24   not obvious, based on what had come before it.  That would be

02:49  25   called prior art.

02:49  1          The patent examiner also may consider whether the claims

02:49  2   are not indefinite and are adequately enabled and described by

02:49  3   the application's specification.

02:49  4          Following this prior art search, an examination of the

02:49  5   application, the patent examiner advises the applicant in

02:49  6   writing what that patent examiner's found and whether or not he

02:49  7   believes each claim is patentable.

02:49  8          In other words, whether it can be allowed as a patent.

02:50  9          The patent examiner can decide to accept or reject one or

02:50  10  more of the proposed claims that have been provided to him.

02:50  11         The applicant, the person seeking the patent, then

02:50  12  responds to what is called an office action.  They can cancel

02:50  13  certain claims.  They can change the words in the claims.  They

02:50  14  can submit new claims.  They can make arguments to the patent

02:50  15  examiner to get around or overcome that rejection.

02:50  16         In other words, it's a negotiation.

02:50  17         This process can go back and forth between the patent

02:50  18  examiner and the applicant for months or even years until the

02:50  19  patent examiner is satisfied with the application, and he's

02:50  20  decided or she has decided that the claims are patentable.

02:51  21         At that point, upon payment of an issue fee by the

02:51  22  applicant, the Patent Office or PTO issues or grants a patent

02:51  23  with the claims the examiner and the Patent Office have

02:51  24  allowed.

02:51  25         The collection of papers, the back and forth that I just

02:51  1    described that is generated by the patent examiner and the

02:51  2    applicant is called the prosecution history.

02:51  3        The act of this negotiation or communication is called the

02:51  4    prosecution of the patent.  Whatever occurs during this time is

02:51  5    physically recorded and is called the prosecution history.  It

02:51  6    may also be referred to as either the file history or a file

02:51  7    wrapper.

02:51  8        The fact that the Patent Office grants a patent does not

02:51  9    necessarily mean that any invention claimed in the patent in

02:52  10   fact deserves the protection of a patent.  For example, the PTO

02:52  11   may not have had available to it all other prior art that will

02:52  12   be presented to you.  In addition there's the possibility that

02:52  13   mistakes were made or that information was overlooked.

02:52  14   Examiners have a lot of work to do.  No process is perfect.

02:52  15       Also, unlike the court proceeding, patent prosecution

02:52  16   takes place without input from those who might later be accused

02:52  17   of infringing a patent.  For example, here Intel was not

02:52  18   allowed to participate in the prosecution process or present

02:52  19   any prior art to the patent examiner.  That is why Intel in

02:52  20   this case has the right to argue in front of you that a claimed

02:52  21   invention in the patent is invalid, because it fails to meet

02:52  22   the requirements for a patent.

02:52  23       It will then be your job as the jurors to consider the

02:52  24   evidence that was presented by the parties and determine

02:53  25   independently whether or not Intel has proven that the patent

02:53 1 is invalid.  The PTO, or Patent Office, does not consider or

02:53 2 decide issues of infringement with respect to a patent.

02:53 3     Someone is said to be infringing a claim of a patent when

02:53 4 they, without prior permission from the patent owner, begin to

02:53 5 import, make, use, offer to sell or actually sell the claimed

02:53 6 invention as defined by the claims of the patent here within

02:53 7 the United States before the term of the patent expires.

02:53 8     A patent owner who believes someone is infringing this

02:53 9 exclusive right of a patent may bring a lawsuit, just like this

02:53 10 one, in an effort to stop the alleged infringing acts or to

02:53 11 recover damages, generally meaning money paid by the infringer

02:54 12 to the patent owner to compensate for harm caused by the

02:54 13 infringement.

02:54 14     The patent owner must prove infringement of at least one

02:54 15 claim of the patent.  The patent owner must also prove the

02:54 16 amount of damages the patent owner's entitled to receive from

02:54 17 the infringer as compensation for the infringing acts.

02:54 18     It is ultimately up to you and exclusively up to you to

02:54 19 decide based on the law the factual question of whether the

02:54 20 patent owner, in this case the plaintiff, has proven

02:54 21 infringement of any valid patent claim.

02:54 22     A party accused of infringing patents can deny

02:54 23 infringement, and they can also prove that the asserted claims

02:54 24 of the patent are invalid.  A patent when issued is presumed to

02:54 25 be valid.  In other words, it is presumed to have been properly

02:55  1    granted by the PTO.  But that presumption of validity can be

02:55  2    overcome if there's clear and convincing evidence presented in

02:55  3    the court that proves that the patent is invalid.

02:55  4         What are the contentions that you're going to hear?

02:55  5    During the trial the parties will offer the testimony of

02:55  6    witnesses who will familiarize you, first -- I anticipate,

02:55  7    first, with the technology that is in the VLSI patents.

02:55  8         VLSI contends that Intel infringes claims of its patents

02:55  9    by importing, making, using, offering to sell or selling Intel

02:55  10   products that are accused of infringement.  The claims which

02:55  11   VLSI, the plaintiff, contends that Intel infringes are:

02:55  12   Claims 1, 5, 6, 9 and 11 of the '373 patent and Claims 14, 17,

02:56  13   18 and 24 of the '759 patent.  These claims may be collectively

02:56  14   referred to as the "VLSI patent claims" or the "asserted

02:56  15   claims."

02:56  16        Although I, as the Court, and the parties may refer to the

02:56  17   claims collectively, you must conduct your infringement

02:56  18   analysis with respect to each of the asserted claims in each of

02:56  19   the asserted patents.

02:56  20        VLSI must prove that Intel infringes one or more claims of

02:56  21   the VLSI patents by what is known as a preponderance of the

02:56  22   evidence.  That means that the plaintiff, VLSI, must show it is

02:56  23   more likely than not that Intel's products infringe, that it is

02:56  24   more likely that they infringe than that they do not infringe.

02:56  25        The products accused of infringement are the following

02:57  1    Intel products:  Haswell client and Broadwell client products

02:57  2    for the '373 patent and SkyLake client and server, Kaby Lake

02:57  3    client, Coffee Lake client, Whiskey Lake client, Amber Lake

02:57  4    client, Cannon Lake client, Ice Lake client and server, Cascade

02:57  5    Lake server and Tiger Lake client products that include what is

02:57  6    known as Speed Shift technology.  That's for the '759 patent.

02:57  7         There are two ways in which a patent can be directly

02:57  8    infringed.  First, a claim can be literally infringed.  VLSI

02:57  9    asserts literal infringement for each of the '373 and '759

02:58  10   patents.

02:58  11        Second, a claim can be infringed under what's called the

02:58  12   Doctrine of Equivalents.  VLSI asserts infringement under the

02:58  13   Doctrine of Equivalents with respect to each of the patents as

02:58  14   well.

02:58  15        To determine the question of infringement, you must

02:58  16   compare the accused Intel product or process with each claim of

02:58  17   the VLSI patents and VLSI assert -- that VLSI asserts are

02:58  18   infringed by that specific process or product.

02:58  19        A patent claim is literally infringed only if the accused

02:58  20   Intel product or process includes each and every element in

02:58  21   that patent claim.  You must determine literal infringement

02:58  22   with respect to each asserted patent claim individually.

02:58  23        You heard me tell you that there is more than one claim

02:58  24   asserted here and more than one claim from each of the two

02:59  25   asserted VLSI patents.  Therefore, you have to determine for

02:59  1    each of those claims whether or not it is infringed.  You have

02:59  2    to do that for each individual claim.

02:59  3        A patent claim is infringed under the Doctrine of

02:59  4    Equivalents if there is an equivalent component or process step

02:59  5    in Intel's products or processes for each element of the patent

02:59  6    claim that is not literally present in Intel's products or

02:59  7    processes.

02:59  8        VLSI must prove that it is more likely than not that

02:59  9    Intel's products or methods contain the equivalent of each

02:59  10   element of the claimed invention that's not literally present

02:59  11   in the Intel accused products.

02:59  12       An equivalent of an element is a component or method step

02:59  13   that is only insubstantially different from the claimed

02:59  14   element.  One way of showing that an element is only

02:59  15   insubstantially different is to prove that it performs

03:00  16   substantially the same function in substantially the same way

03:00  17   to achieve substantially the same result as would be achieved

03:00  18   by the element that is not literally present in the accused

03:00  19   product or method.

03:00  20       VLSI further contends that Intel willfully infringes the

03:00  21   claims of each of the '373 and '759 patents.  I will explain

03:00  22   what that means in more detail before you deliberate.  Intel,

03:00  23   of course, denies that it is infringing each of the claims of

03:00  24   the asserted patents.

03:00  25       Noninfringement of those patents is a defense to VLSI's

03:00  1    allegations and assertions of infringement.

03:00  2         Intel also contends that one of the patents, the '759

03:00  3    patent, is invalid.  Invalidity of the asserted patent claim is

03:00  4    a defense to infringement.  Therefore, even though the patent

03:01  5    examiner allowed each of the '759 patent claims, it will be up

03:01  6    to you, the jury, to decide whether each claim of the '759

03:01  7    patent that is challenged by Intel is, in fact, invalid.

03:01  8         Intel carries the burden of proof.  They must prove

03:01  9    invalidity of each challenged claim by clear and convincing

03:01  10   evidence in order to overcome the presumption of validity.  A

03:01  11   patent might be invalid for any number of reasons, including

03:01  12   because its claims are what is known as anticipated.

03:01  13        Intel contends that the asserted claims of the '759 patent

03:01  14   are anticipated.  What does that mean?  Well, a patent claim

03:01  15   may be anticipated only if all of the elements of a claim are

03:01  16   present in a single prior art device, patent or publication.

03:01  17   For anticipation Intel must show by clear and convincing

03:02  18   evidence that all of the elements of a claim are present in a

03:02  19   single prior art device patent or publication.  Invalidity must

03:02  20   be determined on a claim-by-claim basis.

03:02  21        Clear and convincing evidence means that it is highly

03:02  22   probable that the fact is true.  This standard is different

03:02  23   from the standard that applies to the other issues in this

03:02  24   case, for example, infringement.

03:02  25        With infringement there is a lower standard of proof.

03:02  1    Namely, a preponderance of the evidence.  It is fair for you to

03:02  2    consider a preponderance of the evidence as meaning slightly

03:02  3    greater than 50 percent.  That's different from what you may

03:02  4    have heard in criminal law or on shows about criminal law where

03:02  5    the standard is beyond a reasonable doubt.

03:02  6        You may think of this beyond a reasonable doubt standard

03:02  7    as approaching certainty without reasonable doubt.  The clear

03:03  8    and convincing standard is between a preponderance on the one

03:03  9    hand and beyond a reasonable doubt on the other.  It's in the

03:03  10   middle.

03:03  11       Okay.  I think that's most of the stuff that's preparatory

03:03  12   about patents.  I'm now going to tell you what you can expect

03:03  13   basically during the course of the trial.

03:03  14       First, the parties will make opening arguments.  Remember

03:03  15   this:  The opening statement that these fine lawyers are going

03:03  16   to make is not evidence.  It's just going to be anticipating

03:03  17   what the evidence will be.

03:03  18       If I were to tell you to leave at the end of the opening

03:03  19   arguments, you could not deliberate.  You would have heard no

03:03  20   evidence.  It's simply argument.  It's an opportunity for the

03:04  21   lawyers to explain what they anticipate evidence will show.

03:04  22       It will always be entirely and exclusively up to you to

03:04  23   determine whether the evidence that the testimony of the

03:04  24   witnesses that comes from the witness stand to my right and to

03:04  25   your left and any exhibits or documents that are admitted

03:04  1   support what these great lawyers tell you in their opening

03:04  2   arguments.

03:04  3        After the opening arguments, VLSI will present its

03:04  4   evidence -- because they're the plaintiff, they go first --

03:04  5   that the asserted claims have been infringed by Intel.  They

03:04  6   also, I anticipate, will argue that the infringement has been

03:04  7   willful.

03:04  8        After they conclude, then Intel will put on its case, if

03:04  9   it chooses to, to present evidence that responds or rebuts the

03:04 10   plaintiff's evidence of an infringement and willfulness.

03:04 11        I say if it chooses to because it is exclusively the

03:05 12   plaintiff, seated close to you, who has the burden and

03:05 13   exclusive burden in this case of proof for infringement.

03:05 14        Intel decides the infringement case.  Intel, as you heard,

03:05 15   I believe they intend to present evidence that the claims of

03:05 16   the '759 patent are invalid.  To do that, they will have to put

03:05 17   on additional evidence and -- because they have the burden of

03:05 18   proof.

03:05 19        After the defendant finishes, then the plaintiff may get

03:05 20   to put on additional evidence, if it chooses to, responding to

03:05 21   Intel's evidence that the '759 claims are invalid and to offer

03:05 22   any additional evidence that is relevant for your

03:05 23   consideration.  We call this rebuttal evidence.

03:05 24        I say if it chooses to with respect to responding to

03:05 25   Intel's claim of invalidity, because in the same way plaintiff

03:05  1    has the exclusive burden on infringement, defendant Intel has

03:06  2    the exclusive burden on invalidity.

03:06  3        The plaintiff's rebuttal evidence is done to respond to

03:06  4    evidence offered by Intel.

03:06  5        Both parties may also choose to present evidence on

03:06  6    damages or the amount of money, if any, that the plaintiff is

03:06  7    owed if any of the asserted claims of the VLSI patents are

03:06  8    determined by you to be infringed and also to not be invalid.

03:06  9        After the parties finish offering evidence, then you'll

03:06  10   get to hear equally great closing arguments, which again, are

03:06  11   not evidence, and then I will give you final instructions on

03:06  12   the law that will apply to this case.

03:06  13       And if you thought that what I've read already was

03:06  14   exciting, you have a great treat coming at the end of this

03:06  15   trial because I get to do this again, only it's slightly

03:06  16   longer.

03:06  17       So after the parties have -- I'm going to give you the

03:07  18   final instructions.  Remember, I'll remind you of this several

03:07  19   times at the end, the closing arguments are just arguments.

03:07  20   They're not evidence.

03:07  21       After the closing arguments are over, though, it's great

03:07  22   news because you get to begin to deliberate, and that's

03:07  23   ultimately why you're here.

03:07  24       The evidence you're to consider consists of the following:

03:07  25   Witness testimony that will come primarily through the witness

03:07   1   stand, but there's the possibility, primarily because of COVID,

03:07   2   that you will also see some evidence presented to you by video.

03:07   3   There will also be evidence admitted by documents and exhibits.

03:07   4   There may be facts that the parties agree to or stipulate to,

03:07   5   and of course whatever reasonable conclusions you draw from the

03:07   6   facts and circumstances that have been proven.  Nothing else is

03:07   7   evidence.

03:07   8       There are two types of evidence.  You know both of them

03:08   9   already.

03:08   10      One is direct evidence, such as the testimony of an

03:08   11  eyewitness.

03:08   12      The other is indirect or circumstantial evidence, which is

03:08   13  the type of evidence that proves a fact from which you can

03:08   14  logically conclude another fact exists.

03:08   15      As a general rule, we make no distinction under the law

03:08   16  between the reliability of direct and circumstantial evidence.

03:08   17  It simply requires that each of you determine the facts from

03:08   18  all of the evidence you hear in this case, whether it is

03:08   19  direct, circumstantial or a combination.

03:08   20      Now, I said that you are to consider all the evidence, and

03:08   21  you must consider all of the evidence, direct and

03:08   22  circumstantial.  That doesn't mean you have to believe or

03:08   23  accept all of the evidence.  That is why we have you here.  It

03:08   24  is entirely and exclusively up to you, listening to the

03:09   25  evidence, reviewing the evidence to -- that is received,

03:09   1   entirely up to you to decide how much weight or credibility to

03:09   2   give to any of it.

03:09   3          It will be up to you to decide which witnesses to believe,

03:09   4   which witnesses not to believe and the weight that you give to

03:09   5   the testimony you hear, if any, of any witness' testimony.

03:09   6   It's entirely up to you what you choose to accept or reject.

03:09   7          For example, let me give you some ideas of what is not

03:09   8   evidence.  What you're about to hear, the statements and

03:09   9   opening arguments, are not evidence.

03:09   10          During the examinations from that podium, the questions

03:09   11   the lawyers ask are not evidence.  If objections are made,

03:09   12   those are not evidence.

03:09   13          The attorneys that are seated in front of you may object

03:09   14   if they believe that documents or testimony that one side or

03:09   15   the other's trying to get admitted are improper, and I make

03:10   16   that decision for you.

03:10   17          Let me make clear, again, I am exclusively just an umpire.

03:10   18   I'm not here to decide facts.  I'm here to rule on issues of

03:10   19   law, and in this case an example of those is if one side or the

03:10   20   other makes an objection.  Therefore, I have to rule on an

03:10   21   objection.

03:10   22          You should never ever be influenced by how I rule.  If I

03:10   23   sustain an objection, which in parlance means I find it well

03:10   24   taken, then pretend the question was never asked.  If there was

03:10   25   an answer given, ignore it.

03:10   1      On the other hand, if an objection is made and I say

03:10   2   "overruled," then it's like the objection was never made.

03:10   3   Ignore it. Just listen to the answer and give it whatever

03:10   4   weight you think is appropriate.

03:10   5      If I give you instructions that some item of evidence is

03:11   6   received only for a limited purpose, follow my instructions and

03:11   7   do so.

03:11   8      If I give a limiting instruction during the trial, I will

03:11   9   make sure to clarify it for you at the time as to what I mean.

03:11  10   If I tell you that you should exclude or disregard something

03:11  11   because it is not evidence, then you must disregard it and not

03:11  12   consider it.

03:11  13      I anticipate that during this trial you're going to see a

03:11  14   lot of evidence. You may be shown charts or animations or

03:11  15   other physical exhibits that are going to be in an effort to

03:11  16   help you try and illustrate the testimony of witnesses. These

03:11  17   are called demonstrative evidence -- I'm sorry. These are

03:11  18   called demonstrative exhibits, and they are not evidence unless

03:11  19   I admit them into evidence.

03:11  20      What does that mean? If you hear the -- I'm going to tell

03:11  21   you because this is an issue I face after every trial when you

03:12  22   all are deliberating.

03:12  23      If you hear a lawyer say: I'm using this for

03:12  24   demonstrative purposes only, that's absolutely fine. But it

03:12  25   means you're not going to have it when you're deliberating. So

03:12  1   I'm warning you now.  I'll remind you, I hope, during closing

03:12  2   where you say:  Gosh, we'd really like to see the exhibit that

03:12  3   was on that yellow piece of paper.

03:12  4       If it was admitted for demonstrative purposes only, you

03:12  5   don't get it.

03:12  6       And so pay attention during the course of trial, if

03:12  7   something -- if you hear something that matters to you -- I'm

03:12  8   not saying it deserves any more weight, I'm just saying realize

03:12  9   that you're not going to have access to it after the trial's

03:12  10  over.

03:12  11      Throughout the course of the trial -- let me back up for

03:12  12  one second.  If you've heard anything about this case, I listen

03:12  13  to the voir dire that you all did, and it was my recollection

03:12  14  that no one had heard anything about the case, which is good.

03:13  15  But nothing you heard outside this courtroom should matter to

03:13  16  you now.  I promise you, you have a front-row seat to a trial,

03:13  17  and you will have the very best firsthand awareness of what

03:13  18  this case is about because only you will have heard all of the

03:13  19  evidence.

03:13  20      Occasionally I may instruct you that -- I've already given

03:13  21  that one.

03:13  22      Okay.  How do you go about determining credibility?  This

03:13  23  is just a suggestion.  In weighing the testimony of witnesses,

03:13  24  you can consider the witness' manner and demeanor on the

03:13  25  witness stand.  Do they have feelings or bias or interest in

03:13  1    the case?  Do they have some reason to be prejudiced that might

03:13  2    affect their testimony?  Is there consistency or inconsistency

03:13  3    of their testimony when it's considered in light of all

03:13  4    circumstances?

03:14  5        Has their testimony been contradicted by some other

03:14  6    credible evidence?  Have they made statements to you now that

03:14  7    are contrary to something they've said in the past?

03:14  8        Again, these are just guideposts for you.  It is

03:14  9    exclusively up to you to give the testimony of each witness the

03:14  10   credibility that you alone believe it deserves.

03:14  11       Now, remember this:  Even though a witness may be a party

03:14  12   to the action and, therefore, obviously interested in the

03:14  13   outcome, you can still accept the testimony as long as it's not

03:14  14   contradicted by direct evidence or by any inference that may be

03:14  15   drawn from other evidence, so long as you believe the

03:14  16   testimony.

03:14  17       You're not to decide this case by counting the number of

03:14  18   witnesses who testify for either side.  You may not -- you are

03:14  19   to weigh the testimony, not the number of witnesses themselves.

03:15  20       There's no test for relative number of witnesses.  It is

03:15  21   the relative convincing force of the evidence throughout the

03:15  22   trial.

03:15  23       For example, the testimony of a single witness for one

03:15  24   side is sufficient to prove any fact for that side even if a

03:15  25   greater number of witnesses testify to the contrary, only after

03:15  1  you have considered all of the evidence.

03:15  2      In determining the weight to give the testimony of a

03:15  3  witness, ask yourself:  Did the witness say or do something or

03:15  4  fail to say or do something that's at odds with the testimony

03:15  5  given at trial?

03:15  6      Remember this though:  People make mistakes.  We're

03:15  7  people.  A simple mistake by a witness does not necessarily

03:15  8  mean that a witness didn't tell the truth as he or she

03:15  9  remembered it.  We remember things inaccurately.  If a witness

03:16  10  makes a misstatement, it's exclusively up to you to determine

03:16  11  whether it was because it was an intentional falsehood or just

03:16  12  a mistake.  That's why we have you here, to weigh the testimony

03:16  13  of each witness.

03:16  14      The significance of a mistake will depend on whether it

03:16  15  had to do with something important or unimportant, but again

03:16  16  just guideposts.  Entirely up to you to decide what weight, if

03:16  17  any, to give to anyone.

03:16  18      Finally -- and that's the word I know you're happy to

03:16  19  hear.  Finally, the parties may present the testimony of a

03:16  20  witness by having the witness here live for you.  It may in

03:16  21  this case be by video conference.  That is, again, an effort to

03:16  22  protect people because of COVID, or by reading from a

03:16  23  deposition transcript, or maybe a deposition that was taken by

03:16  24  video.

03:16  25      I want you to understand this:  You will not see a

03:17  1  witness -- you will not hear testimony from a witness where the

03:17  2  witness is not or was not under oath.  If it's here, they're

03:17  3  under oath.  If they're appearing by video, they will be sworn

03:17  4  in.  If you're hearing a videotaped deposition, they only gave

03:17  5  that testimony after they'd been sworn in.

03:17  6      So all of the testimony in that sense, in my opinion, is

03:17  7  of equal dignity because they were all sworn.  It's entitled to

03:17  8  the same consideration regardless of whether it's here live,

03:17  9  whether it's by video.  However it's presented to you, it is

03:17  10  entitled to the same, what I refer to as dignity or

03:17  11  consideration.  You know, we're not perfect.  The quality of

03:17  12  the technology may not be as great, but that doesn't mean you

03:17  13  shouldn't give the same consideration to any witness that you

03:17  14  see.

03:17  15      I'm sure in this day and age, depositions were taken at

03:17  16  home.  That didn't happen when I was practicing law.  But it

03:18  17  did over the past year because of our situation.  So do not

03:18  18  hold the quality of the video or the location or anything like

03:18  19  that against any witness who is appearing other than live here.

03:18  20      That being said, it is exclusively in your province to

03:18  21  believe every word that any witness says, to disregard anything

03:18  22  they say or do, whatever you want to do, because you all are

03:18  23  the exclusive jurors and judges of the facts in this case.

03:18  24      That being said, Mr. Chu, are you prepared to give an

03:18  25  opening argument?

03:18   1      MR. CHU:  I am, Your Honor.  We have a very short issue to
03:18   2  call to your attention between counsel.  I think it'll be very
03:18   3  brief.
03:18   4      THE COURT:  Okay.
03:18   5      (Bench conference.)
03:19   6      MR. CHU:  Our side had understood from the rulings earlier
03:19   7  today, there'll be no confidential information.  We took out
03:19   8  all of our confidential information.
03:19   9      While I was sitting there, someone on our team told us by
03:19   10  an e-mail through Ms. Proctor that Intel is taking the position
03:19   11  they can show a slide.  It's $3 million in a agreement that
03:19   12  involves VLSI to portray the fact that $3 million was paid for
03:19   13  the patents.  That information's confidential.  We thought it
03:19   14  was going to be out.  And they've taken the position --
03:19   15      THE COURT:  I got it.
03:19   16      Mr. Lee?
03:19   17      MR. LEE:  We told them I'm not going to use the slide.
03:19   18      MR. CHU:  Oh.
03:19   19      MR. LEE:  That's fine.  It's good to know there was no
03:19   20  issue.
03:19   21      MR. CHU:  Okay.  Great.
03:19   22      (Bench conference concludes.)
03:20   23      THE COURT:  Mr. Chu, let's start again.  Are you prepared
03:20   24  to go?
03:20   25      MR. CHU:  Thank you very much, Your Honor.

OPENING STATEMENT ON BEHALF OF THE PLAINTIFF

03:20  1
03:20  2     MR. CHU:  Good afternoon, ladies and gentlemen.  Thank you
03:20  3  for all of your patience.
03:20  4     As you know, my name is Morgan Chu.  And I represent VLSI.
03:20  5  I also want to thank you because this past week has been an
03:20  6  extra layer of troubles for all of us.  Probably most of us, if
03:20  7  not all of us, have lost power or at times water or other kinds
03:20  8  of services, but you stuck it out.  You stuck it out to be of
03:20  9  service, as citizens, to be a part of our justice system.
03:20  10     So thank you very much for that.  I'm sure the Court feels
03:20  11  strongly about it.  Certainly VLSI, and I'm sure that
03:21  12  defendant, Intel Corporation, is also grateful for that.
03:21  13     This case relates to patents.  More than 200 years ago,
03:21  14  our forefathers put into our United States Constitution a
03:21  15  provision about patents.  And one of the first acts, one of the
03:21  16  first acts of Congress, was to establish the patent system.
03:21  17  And it's been so valuable to the progress, not only from the
03:21  18  late 1700s through the 1800s through the 1900s, in a way that's
03:21  19  kept the United States at the forefront of technology.  And
03:21  20  we've seen that in the last ten and 20 years in particular.  We
03:21  21  are the leader in so many different areas of technology.
03:22  22     There are two stars, two heros in a way, in this case.
03:22  23  One of them is this patent, the '373 patent.  David Bearden is
03:22  24  one of the co-inventors.  There are three other co-inventors.
03:22  25     You will hear from David Bearden either late today or more

03:22  1    likely tomorrow morning, and he'll share with you how it came

03:22  2    about, his ideas, and ultimately how a patent was granted by

03:22  3    the United States Patent Office.

03:22  4        We will refer to the patent sometimes as the Bearden

03:22  5    patent or the Bearden '373 patent.  It's quite common to just

03:22  6    use the last three digits.

03:22  7        The other star is the second patent, the '759 patent.  It

03:23  8    has a single person who is the inventor, Matthew Henson.  And,

03:23  9    unfortunately, you won't hear from Matthew Henson.  He passed

03:23  10   away at a relatively young age.  But his work is represented in

03:23  11   the Henson '759 patent.

03:23  12       The United States Patent Act recognizes that once a patent

03:23  13   has issued, the inventor or the company can enforce the patent

03:23  14   against anyone who uses the invention without permission.  In

03:23  15   short, that's why we are here.  We are here because of the

03:23  16   United States patent laws.

03:24  17       Now, ever so briefly earlier today, you were introduced to

03:24  18   two people.  One of them is Michael Stolarski.  He is the chief

03:24  19   executive officer of VLSI.  Because of certain safety

03:24  20   precautions that limit the number of people from each side who

03:24  21   can be in the courtroom, there are times certain witnesses need

03:24  22   to be here, support personnel or certain lawyers, so you may

03:24  23   not see Mr. Stolarski every day.  But he can watch what's going

03:24  24   on in an adjacent courtroom.  This is a very important case for

03:24  25   VLSI.

03:24  1    Jim Spehar is also here.  Mr. Spehar is a vice president

03:24  2  at NXP.  And you will hear how NXP and VLSI teamed up with each

03:25  3  other.  And Mr. Spehar is going to be testifying this

03:25  4  afternoon, so you'll get a chance to meet Mr. Spehar.

03:25  5    NXP is a company with U.S. headquarters in Austin.  NXP,

03:25  6  as well as Intel, have plants, facilities, employees in

03:25  7  different locations in the world, but their U.S. headquarters

03:25  8  has been and is in Austin.

03:25  9    NXP stands for "next experience."  They have 11,000

03:25  10  engineers who are working and inventing every day.  They invest

03:25  11  about 25 percent of their revenue in research and development.

03:26  12  That's an enormous amount for any company to take $0.25 of

03:26  13  every dollar and turn it back into the hope that they will move

03:26  14  technology forward.  So they're dedicated to innovation in this

03:26  15  area.

03:26  16    And they design and make chips for companies such as

03:26  17  Samsung, Amazon and many, many other companies worldwide.

03:26  18    NXP sells a wide variety of chip products to the extent

03:26  19  that if you drive a car or ride in a car, there are going to be

03:26  20  numbers of NXP chips in your car.  You notice I didn't say it

03:26  21  had to be a Ford or a GM car or a Chrysler or a Toyota or

03:26  22  anything else.  They're a leading provider of the chips to help

03:27  23  the car run better, to do all the kinds of things that our cars

03:27  24  do today.

03:27  25    Let me show you what a chip looks like.  You can see it in

03:27  1   the photograph.  Now, there's this little plastic cover to it.

03:27  2   So the plastic cover, it doesn't go inside the computer.  It's

03:27  3   just to retain this chip.  So I just wanted to give you an idea

03:27  4   of what the overall size is of a typical chip, whether it's

03:27  5   made by NXP or someone else.

03:27  6       Here's a little bit about the history of NXP.  There was a

03:27  7   company by the name of SigmaTel.  It was a small startup.  It

03:27  8   was based in Austin, Texas.  And that's where Matt Henson

03:27  9   worked.  Matt Henson worked with SigmaTel; came up with the

03:28  10  Henson invention.

03:28  11      And then over time SigmaTel merged with Motorola or a

03:28  12  company that Motorola had put their chip assets into, and they

03:28  13  renamed it Freescale.

03:28  14      Motorola, of course, you probably have heard of over the

03:28  15  years.  They were founded in 1928.  They were an incredible

03:28  16  leader in the chip business at one time for an extended period

03:28  17  of time.  They made all of the chips for the Apple computers.

03:28  18      In the early part of the first half of the 1970s, they

03:28  19  were the first company to build a chip plant in Central Texas.

03:28  20  And when there was this new company created called Freescale,

03:29  21  the same people, the same engineers, the same designers,

03:29  22  continued to work.  And many of them are, to this day, still

03:29  23  based in Central Texas.  They, like the folks at SigmaTel,

03:29  24  every day, they're trying to invent and trying to invent.

03:29  25      And eventually Motorola and SigmaTel merged into and

03:29  1    became a part of NXP.  So we'll often refer to NXP, but it's

03:29  2    the merger of all those companies.  And at some point you may

03:29  3    see SigmaTel's name on a patent document, or the Freescale

03:29  4    name, but we wanted to share with you that particular history.

03:29  5         Innovation is very expensive.  There are a lot of efforts

03:29  6    to invent that fail.  Anyone in any area, whether it's in

03:30  7    computers or any other area, we'll say, they try to invent and

03:30  8    then there's a failure; they'll try to invent, there's a

03:30  9    failure.  It's an expensive proposition.  It requires enormous

03:30  10   investment.

03:30  11        And if the investment is successful, one can apply to the

03:30  12   United States Patent Office, and it is carefully examined, the

03:30  13   application, by patent examiners.

03:30  14        And patent examiners have an unusual combination of

03:30  15   ability.  They are trained in patent law, as you would expect,

03:30  16   but they're also trained in technology.  And the technology

03:30  17   they're trained in is in the exact area of technology for which

03:30  18   one is applying for a patent.

03:30  19        So they don't have someone who's trained in

03:31  20   pharmaceuticals or biological sciences looking at a computer

03:31  21   chip patent.  So it's this very interesting combination of

03:31  22   someone who has the legal training in patent law and the exact

03:31  23   area of technical training.

03:31  24        One applies for a patent.  It goes through an examination

03:31  25   process.  It can take a year or two or more.  Some are turned

03:31  1  down forever, and some are granted.  And I brought with me a

03:31  2  copy of an original United States patent that is involved in

03:31  3  this particular case.

03:31  4      So we'll be talking about two patents that are involved in

03:31  5  this case.

03:31  6      NXP, I mentioned, had teamed up with VLSI.  VLSI stands

03:32  7  for very large-scale integration, and that refers to having a

03:32  8  lot of transistors on a single chip that might be this size.

03:32  9  And many companies make chips this size.  You might say a

03:32  10 million different transistors or parts on it, or ten million or

03:32  11 100 million, and it is quite common now for companies, whether

03:32  12 it's Intel, NXP or other chip companies, to put billions on a

03:32  13 single chip of this size.  And that explains why both consumer

03:32  14 products and other computer-related products have continued to

03:32  15 advance over the years.

03:33  16     They teamed up, and NXP and VLSI got together.

03:33  17     And how does this work?  Well, VLSI is a small company.

03:33  18 It's a very small company.  Because NXP wanted to focus on what

03:33  19 they're best at, which is inventing and pushing the frontiers

03:33  20 of technology, they said, "Well, we don't want to get involved

03:33  21 deeply in trying to license our patents."

03:33  22     So they teamed up with VLSI.  Has a tiny number of people

03:33  23 but they work with others.  They work with technology

03:33  24 specialists.  They work with people who are knowledgeable about

03:33  25 patent law.  People who can figure out if they have the

03:33  1   appropriate information, whether there is or is not

03:34  2   infringement being conducted by some other company.

03:34  3       So NXP invents.  Then patents may be granted by the United

03:34  4   States Patent Office, and the legal ownership of those patents

03:34  5   could be and were, in this instance, transferred to VLSI, and

03:34  6   then VLSI can license patents, and NXP would receive some

03:34  7   portion of the licensing income.  And then it can use that

03:34  8   licensing income to go back and invest in more inventions.

03:34  9       So VLSI, teamed up with NXP, has the cycle of innovation.

03:34  10  Now, to date I will say that we're engaged here in this case

03:35  11  about these two companies and these two patents.  And there

03:35  12  have been numbers of discussions that VLSI has had with a whole

03:35  13  bunch of other companies.

03:35  14      Those other companies, some of them very big companies

03:35  15  whose names you would you recognize, have said, "Wait, the case

03:35  16  with Intel has gone to court.  Why should we pay a reasonable

03:35  17  royalty?  We'll sit back and wait."

03:35  18      They have a wait-and-see attitude.  And that's where we

03:35  19  are, a wait-and-see attitude to see what happens in this case

03:35  20  and, in effect, to see what you do.

03:35  21      NXP invests billions in R&D, research and development, and

03:36  22  then NXP ultimately hopes to get a return for further research

03:36  23  and development.

03:36  24      The chip I showed you is a microprocessor.  It's often

03:36  25  referred to as the brains of the computer.  You can have other

03:36  1  chips that are not microprocessors, one that you're probably

03:36  2  familiar with, if you buy a smartphone today, they may say, you

03:36  3  pay a certain amount for 16 gigabytes or 64 or 128.  And if you

03:36  4  keep buying more memory -- which is another kind of chip, it's

03:36  5  not the microprocessor -- the company's going to charge you $50

03:36  6  more or $100 more or maybe even more than that.  So you have

03:36  7  some sense of a different kind of chip memory.

03:36  8       We're going to focus on microprocessors.  They can be

03:37  9  typically 100 to $500.  So at the high end of this range, you

03:37  10  know if you open up a newspaper, can be more expensive than a

03:37  11  inexpensive, a lower-end personal computer or laptop.  The

03:37  12  microprocessors can be even more expensive than that, just the

03:37  13  one microprocessor.  It could be a thousand dollars.  It could

03:37  14  be multiples of that depending on the characteristics of the

03:37  15  particular microprocessor.

03:37  16       So what's happened over the years?

03:37  17       A long time ago, there weren't so many chip companies.

03:37  18  Texas Instruments was one of the earliest and one of the best,

03:37  19  and it's still one of the best.  In 1958 Jack Kilby, working

03:37  20  in -- at Texas Instruments in Texas, came up with a new

03:38  21  invention, and he came up with the very first integrated

03:38  22  circuit.

03:38  23       We often refer to chips as shorthand for what are

03:38  24  integrated circuits.  Of course, going back to when Kilby came

03:38  25  up with his invention, they looked a little bit different, but

03:38  1    they're doing the same things.  They're doing the computing and

03:38  2    acting as the brains.

03:38  3        Jack came up with the first in 1958.  I think that's

03:38  4    roughly a decade before Intel got started.  Jack Kilby was the

03:38  5    first to put an integrated circuit into a computer in 1961.

03:38  6    And ultimately, when the world of science said, "We want to

03:38  7    recognize the person or persons who invented the microprocessor

03:39  8    or the integrated circuit," they singled out Mr. Kilby and

03:39  9    awarded him the Nobel Prize.

03:39  10       Over the years it's been really important for all

03:39  11   companies to have increased power savings of top-performing

03:39  12   machines and increasing the speed of machines.  So what's

03:39  13   happened in recent years is this:  There were other companies

03:39  14   that came along -- I showed you briefly a reference to AMD.

03:39  15   There's another company called Nvidia.  They're much younger

03:39  16   than Intel and younger than Texas Instruments.

03:39  17       But those are examples of companies that have a certain

03:39  18   amount of moxie and were able to attract terrific engineers,

03:39  19   and they have been winning orders, winning business from

03:40  20   someone like Intel.  Intel is still very big, very dominant in

03:40  21   the industry and has been for many years.  But they're facing

03:40  22   stiffer and stiffer competition from the AMDs of the world.

03:40  23       So Intel in recent years has really focused on how they

03:40  24   can get better power savings and better speed.  And you might

03:40  25   say, "Well, they've got so many engineers, that might be easy

03:40  1   to do."  Intel needs chips that save more power and are faster.

03:40  2        But these are patents that were developed by the folks at

03:40  3   NXP or the companies that merged with NXP.  There's no question

03:41  4   about the ownership of these patents, that the technology came

03:41  5   from NXP.

03:41  6        In this case what you're going to be asked to decide is

03:41  7   how or why or what happened here in terms of Intel deciding it

03:41  8   wanted to incorporate, and did incorporate, the NXP inventions

03:41  9   into its own chips and has not paid what the law recognizes as

03:41 10   a reasonable royalty for permission to use those inventions.

03:41 11        The '373 Bearden patent is a new way for circuits to

03:41 12   "sleep" when not in use.  And the whole idea is if you can

03:41 13   squeeze out some power savings, if what is called the core,

03:42 14   which is part of a chip that does the heavy number crunching,

03:42 15   but a lot of times, let's say, you're not looking at graphics,

03:42 16   you're not playing some great video games, you're not playing a

03:42 17   lot of media, you're just slowly reading through e-mail.  Well,

03:42 18   the brains of the computer doesn't have to do very much, and,

03:42 19   in fact, because the brains of the computer is so much faster

03:42 20   than we are, they can basically go to sleep.  And then you

03:42 21   might press a button maybe five seconds later.

03:42 22        But while the core is asleep, what the '373 patent does is

03:42 23   to find a new way to save power during those periods.  This is

03:42 24   the figure in the '373 Bearden patent.  These are some of the

03:42 25   components, and I'm just going to mention a couple of them now.

03:42  1   You'll hear a lot of testimony.

03:43  2        Part of the magic is there were two voltage regulators.

03:43  3   So when the circuit went to sleep, the voltage for one of the

03:43  4   voltage regulators, the one at the bottom that feeds the

03:43  5   circuit, would ramp down the voltage.  And it would do it in a

03:43  6   carefully programmed manner, programmed by Intel.

03:43  7        The circuit is using that ramp-down and has to use the

03:43  8   ramp-down because if it just plummeted to zero, it would end up

03:43  9   frying the circuits or decreasing the useful life.  So Intel

03:43  10  carefully programs how it ramps down.  In human time, it's

03:43  11  quick, but it's got to be a ramp-down.

03:43  12       But then there's another part called the memory that

03:44  13  stores data or information, and it needs a certain amount of

03:44  14  voltage, otherwise the memory will forget.  And we don't want

03:44  15  the memory to forget because it may have important information.

03:44  16       So then the second voltage regulator, the one that's on

03:44  17  top, sort of a pumpkin color, that will then feed voltage to

03:44  18  the memory.  You see the memory in the yellow, it says "memory

03:44  19  array," and there is this switch that is in gray.

03:44  20       Those are the basics of the invention.  There's much more

03:44  21  to it than that.  This is a figure.  This is the claim

03:44  22  language.  Patents have at the back of them claims which define

03:44  23  the boundary of the inventions, and we color coded it to show

03:44  24  you the two voltage regulators, the fast switch, the memory.

03:45  25  There's more to it than that, and you'll hear a lot about it,

03:45  1   but that's the key.

03:45  2          When you're thinking about infringement and other issues,

03:45  3   do the Intel chips have two voltage regulators, do they have

03:45  4   this fast switch, and are they switching back and forth between

03:45  5   the voltage regulators in order to feed the memory with enough

03:45  6   voltage?  Those are the basics.

03:45  7          The '373 patent saves power.  And how does it save power?

03:45  8   That switching I just mentioned.  It's not once per minute or

03:45  9   once per second.  It can be literally multiple hundreds of

03:45  10  times switching.  Every single second.  And every time they're

03:45  11  doing that switching -- switching the power off to the circuit,

03:45  12  ramping it down, then ramping it back up, then ramping it

03:45  13  down -- it's achieving the results that were the goal of David

03:46  14  Bearden and his coinventors on how to save power.

03:46  15         And there's a second patent, the Matthew Henson '759

03:46  16  patent.  It is focused on increasing speed.  It may also save

03:46  17  some power along the way.

03:46  18         The old way of doing things was to change speed using

03:46  19  software that's an operating system.  If you have a personal

03:46  20  computer, unless it's a Mac or an Apple, it probably runs on

03:46  21  Windows.  Windows is a kind of operating system.  And Intel

03:46  22  designed their chips before the Henson invention using Windows,

03:46  23  which is software designed outside of Intel.  That's okay, but

03:47  24  it has some disadvantages.

03:47  25         So the '759 Henson invention has this terrific idea that

03:47  1  there will be this programmable controller as a part of the

03:47  2  overall system, the inside on the actual chip, or elsewhere in

03:47  3  the overall system.

03:47  4      Now, why is that important?  Normally, on the left, the

03:47  5  old approach, the core that does the number crunching will be

03:47  6  doing other work.  It might be accounting work.  It might be

03:47  7  painting the screen on someone's computer.  It might be doing

03:47  8  all kinds of other things.  But when there's a need to change

03:47  9  speed, then the outside software has to wait in line because

03:48  10 the core is doing other things.

03:48  11     So here there is no waiting in line with the '759

03:48  12 invention because of this programmable controller.

03:48  13     The speed shifts as a result are 300 times faster.  A way

03:48  14 to think of this in human terms, we all go to the super market

03:48  15 and sometimes we say, oh, great, there's no one in line, and

03:48  16 you check out and it's quick.  Sometimes there's only one

03:48  17 person in front of you, and heaven forbid, there are other

03:48  18 times there are two and three and four or people with big

03:48  19 baskets and so on, and you have to wait awhile.

03:48  20     It's kind of similar for the computer when the core is

03:48  21 doing all the work, and the core has to do the work for

03:48  22 shifting speed.

03:48  23     But Matt Henson said, well, wait a minute, we're going to

03:48  24 get this programmable controller.  There'll be no waiting in

03:49  25 line and look at the results, that the speed shifts 300 times

03:49  1  faster.  That's blazing.

03:49  2      The '759 patent was new, valuable and valid, granted of

03:49  3  course by the United States Patent Office.

03:49  4      And Intel's lawyer may argue to you, well, it shouldn't

03:49  5  have been granted by the Patent Office.  They'll say they had

03:49  6  an old product called Yonah.  Now, they'll say, "We had this

03:49  7  product that should be what's called prior art."  They won't be

03:49  8  saying, "Oh, there's this Yonah patent."  They'll be pointing

03:49  9  to the Yonah product.

03:49  10      And they'll say, "Oh, the Yonah product did -- was a

03:49  11  little bit earlier than the '759 patent, but it did exactly the

03:49  12  same thing."

03:49  13      But here's what the evidence will be.  The reality is that

03:50  14  Intel abandoned Yonah.  If it was so good, they would have

03:50  15  continued to put the same technology in later chips, but they

03:50  16  abandoned Yonah, and they changed to the '759 programmable

03:50  17  controller.  Yonah didn't have that programmable controller at

03:50  18  all, which eliminated the waiting in line.

03:50  19      Again, here's a figure, Figure 1, from the patent and how

03:50  20  it increases speed, which you see in purple, is this

03:50  21  programmable clock controller.  You see it in the actual claim

03:50  22  language.

03:50  23      Now, the Intel lawyers, they may say, "Well, this patent

03:50  24  is just limited to MP3 players."  That is not true.  The patent

03:50  25  text does mention MP3, but it's the claims at the end of the

03:51    1    patent, not text describing how it can be used.  So often in

03:51    2    the text, the text may say, for example, in an MP3 player,

03:51    3    which is like a computer, you could do this, this and this with

03:51    4    the invention.

03:51    5        The text makes clear that it's using MP3 players as an

03:51    6    example, and that microprocessors, for a general purpose, could

03:51    7    be used.  And you have to ask yourself, if and when Intel

03:51    8    lawyers show you the patent and MP3, whether MP3 is in the

03:51    9    patent claims that you see on the right.  It's the numbered

03:51   10    paragraphs, and it usually begins with words such as "a system

03:51   11    comprising A, B and C" because those are the limitations.

03:52   12    Those are the metes and bounds of the invention.

03:52   13        And if it was limited by the Patent Office to MP3, it

03:52   14    would say so in black and white.  And I don't think they're

03:52   15    going to be able to show you language in the claims, as opposed

03:52   16    to the other text in the patent, where it does make mention of

03:52   17    MP3.  And you'll hear from experts as to why it does that, and

03:52   18    why and how it's addressing general microprocessor issues, and

03:52   19    how the claims are not limited to a "for example" of MP3s.

03:52   20        If it was limited, we wouldn't be here because then it

03:52   21    would be crystal clear of course that we couldn't bring the

03:52   22    claims against Intel.

03:52   23        Now, the Patent Office granted the patents.  They are

03:53   24    carefully evaluated for numbers of years by patent examiners

03:53   25    who have this special training in the law and the particular

03:53  1   technology.

03:53  2       So I've addressed some of the issues about infringement,

03:53  3   an issue about validity for only one of the patents because

03:53  4   Intel's lawyers will not try to argue that the other patent is

03:53  5   invalid.

03:53  6       So this is quite common in the patent case.  You will hear

03:53  7   evidence of infringement, evidence that may relate to validity

03:53  8   of the patent, and then the question becomes:  Now, why are we

03:53  9   here?

03:53  10      We're here because the law provides a remedy for a patent

03:53  11  owner.  The patent is valid and infringed, and a defendant

03:54  12  says, "I'm not paying you anything," then the patent owner can

03:54  13  go to court and ask for damages.  And that's why we're here.

03:54  14      We're going to be at the end of this case asking for

03:54  15  damages.  And you will hear evidence about damages.  You will

03:54  16  hear that Intel has sold nearly a billion infringing products.

03:54  17      You will also hear evidence about what the measure of

03:54  18  damages is.  And the only thing that we are asking for is a

03:54  19  reasonable royalty.  And the law defines what is considered to

03:54  20  be a reasonable royalty.

03:54  21      When you're thinking about all the damages issues, you

03:54  22  might want to think about the timeline of various things.  Here

03:55  23  we see the '759 patent was published.  Before the patent is

03:55  24  issued, it may be published.  It could be published in the

03:55  25  United Kingdom or Germany or another country.  Here, the United

03:55    1    States Patent Office publishes it for the world to see, even

03:55    2    before the patent is granted.

03:55    3        Anyone can pick up a simple, low-value laptop and find all

03:55    4    the published patent applications because the Patent Office has

03:55    5    a website.  And engineers or others who are interested in

03:55    6    technology -- it's a few keystrokes, 15 seconds, 30 seconds.

03:55    7    They know what they're looking for.  There are classifications

03:55    8    of different kinds of patents, so if you're looking for a

03:56    9    patent on new internal combustion engines, you know where to go

03:56    10   to.  And there are sub-categories for internal combustion

03:56    11   engines as there are for microprocessors.

03:56    12       So this application, which is one of the two NXP patents

03:56    13   but originally developed by SigmaTel, was published there in

03:56    14   2007.

03:56    15       2008, the '373 patent was published for the world to see.

03:56    16   And you see the next date is Intel designing products

03:56    17   infringing the '373 patent.

03:56    18       The evidence in this case, at least produced to VLSI,

03:56    19   doesn't have an exact start date.  But we do have evidence that

03:56    20   at least by the date here, late 2008, early 2009, the Intel

03:56    21   engineers were designing a future product that we now know

03:57    22   later incorporated the '373 patent technology.

03:57    23       And what's important here is if Intel tries to say, "Well,

03:57    24   there was a delay and a period of time," yeah, time passed by

03:57    25   for a couple of reasons.  One is that designing a chip today or

03:57  1   ten years ago or 20 years ago was a multi-year process.

03:57  2   There'll be no dispute over that.

03:57  3        And the second issue is even when the final product is

03:57  4   being shipped, you can't take easily this little chip and look

03:57  5   inside it and say, "Oh, it's infringing or not infringing."

03:57  6   Because Intel keeps this highly confidential how the circuits

03:57  7   are designed and other aspects of the chip.

03:57  8        So we know that Intel began designing products at least in

03:57  9   that 2008/9 time frame, and Intel was designing products that

03:58  10  infringed the '759 patent, at least by a date in 2011.

03:58  11       And then Intel launched the first product.  They

03:58  12  code-named their chips.  So the first one was called Haswell

03:58  13  and another one was called Broadwell.  And they were

03:58  14  introducing these chips that infringed in 2013 and 2014.

03:58  15       And then Intel's lawyers will say, "Well, this

03:58  16  technology's not very valuable."  And things that aren't very

03:58  17  valuable get thrown by the wayside, particularly by technology

03:58  18  companies.  They'll invent around it.  They'll leap forward

03:58  19  with some new inventions.  That's if they're not valuable.

03:58  20       But what are the facts in this case?  What did Intel do

03:58  21  with the NXP technology?  Intel launched chips with the '759

03:59  22  technology.  And each of the boxes you see is another code name

03:59  23  for a family of chips.  And each of those code names have

03:59  24  multiple chips in many areas, including in consumer goods.

03:59  25  They have what are called SKUs or SKUs.  They're stocking

03:59   1   units.

03:59   2       So for example, if you buy Colgate toothpaste, there will

03:59   3   be many SKUs, different sizes and purposes and the like, maybe

03:59   4   some mint flavor.  But each of these boxes with a particular

03:59   5   code name like SkyLake actually has a lot of SKUs.

03:59   6       So this technology that Intel will say is not very

03:59   7   valuable from 2013 to '14 to '15, they keep replicating and

04:00   8   replicating it in new families for what they hope will be the

04:00   9   most competitive, best chips in the market.

04:00   10      Indeed, during this period of time, Intel uses the NXP

04:00   11  patents across all of its mainstream processors.  Intel, by its

04:00   12  conduct, as opposed to what Intel might try to say in this

04:00   13  courtroom, by its conduct showed the value of these inventions.

04:00   14      I said before that we would be asking for a reasonable

04:00   15  royalty.  The law is actually the damages shall be not less

04:00   16  than a reasonable royalty.  In other words, the law mandates,

04:00   17  assuming there's infringement and validity of the patent, of

04:01   18  not less than a reasonable royalty.  We're not asking for more

04:01   19  than a reasonable royalty.  We're asking for what the law

04:01   20  mandates as the minimum.

04:01   21      In conclusion, the United States Patent Office awarded

04:01   22  these patents after a careful examination.

04:01   23      There will be a lot of evidence of Intel's infringement.

04:01   24  And you will hear some detailed discussion about the evidence

04:01   25  that supports the particular damage claim in this case.  But as

04:01  1   I mentioned, there's been about a billion of the Intel products

04:01  2   sold.  And year after year after year new families and new

04:01  3   variations of each of those families were being sold by Intel.

04:02  4        Ladies and gentlemen, we're going to be on a journey

04:02  5   together.  I thank you very, very much for your patience and

04:02  6   your attention.  Thank you.

04:02  7        THE COURT:  Mr. Lee?

04:02  8        MR. LEE:  Your Honor, while we set up the podium, I'll

04:02  9   address some issues that Your Honor had talked to us about

04:02  10  before.

04:02  11       THE COURT:  I couldn't hear you.  I'm sorry.

04:02  12       MR. LEE:  While we set up the podium (inaudible).

04:02  13       THE COURT:  Come up here.  I still can't --

04:02  14  Mr. Chu?

04:02  15       (Bench conference.)

04:03  16       MR. LEE:  I'm not going to change the opening now, but,

04:03  17  Your Honor, for them to be able to say we're a very small

04:03  18  company when Fortress negotiated the acquisitions, Fortress

04:03  19  pays the CEO, it's really unfair.  And to have us cut off,

04:03  20  letting people think they're a very small company when it's a

04:03  21  very small company with some very big friends, it's not right.

04:03  22       I won't change the opening now, but, Your Honor, this is

04:03  23  going to be a recurring issue.

04:03  24       THE COURT:  Well --

04:03  25       MR. LEE:  But it can't be both ways.

04:04  1        THE COURT:  No, it can't.  If it occurs while we're

04:04  2   putting on evidence, I understand your argument and we'll take

04:04  3   it up at that time.

04:04  4        MR. LEE:  Okay.

04:04  5        MR. CHU:  Just a real quick response.  They have tried to

04:04  6   make a big point about the number of employees and that VLSI

04:04  7   doesn't make chips.  And I was just --

04:04  8        THE COURT:  I have no problem with your opening.  I'm

04:04  9   saying -- and it's just an opening, just argument.

04:04  10       MR. LEE:  That's why I'm not changing mine.

04:04  11       THE COURT:  However, I'm -- we'll just take it up as we go

04:04  12  when the evidence comes in.

04:04  13       MR. LEE:  Yeah.  I just wanted to --

04:04  14       THE COURT:  Would you like -- you had a long opening.

04:04  15  Would you like me to take a break now and give the jury ten

04:04  16  minutes?  Or would you like to go forward with your opening?

04:04  17  I'll do whichever you want.

04:04  18       MR. LEE:  Ten minutes would be great, and then we can get

04:04  19  it done.

04:04  20       MR. CHU:  And my concern -- Mr. Spehar has to leave.  He

04:04  21  just -- I don't want to impose upon Mr. Lee, but we've got to

04:05  22  get him off the stand today.

04:05  23       THE COURT:  Well, we're going to take ten minutes either

04:05  24  now or after.  If we take them now, we're going to --

04:05  25       MR. CHU:  Okay.  Good.

04:05  1          (Bench conference concludes.)

04:05  2          THE COURT:  Ladies and gentlemen of the jury, I assure you

04:05  3   starting tomorrow things will go pretty quickly, or at least

04:05  4   things will go more normally than what happened today in the

04:05  5   sense that we'll still be taking care of your safety, but

04:05  6   things will be a lot more accessible in terms of moving

04:05  7   forward.

04:05  8          Because we've already gone pretty long now, and if I

04:05  9   didn't promise you an afternoon break, I should have.  We're

04:05  10  going to take a recess.  It is 4:05.  We'll come back in ten

04:05  11  minutes.

04:05  12         Remembering my -- you'll hear this every time.

04:05  13  Remembering my instructions not to discuss the case amongst

04:05  14  yourselves, you can talk about anything else you want.

04:06  15         Leave your notebooks in here, please, throughout the

04:06  16  course of the trial.

04:06  17         If you'll come back in ten minutes, we will hear an

04:06  18  opening argument from Intel's counsel, and then plaintiff will

04:06  19  call its first witness.

04:06  20         THE BAILIFF:  All rise.

04:06  21         (Jury exited the courtroom at 4:06.)

04:06  22         THE COURT:  You may be seated.  Let me take up one minute

04:06  23  of your time.  If you -- I said this on the call earlier, but

04:06  24  none of you were there because you were doing the voir dire.

04:06  25         The way I try to handle my end of the day is that I don't

04:06  1    like carrying witnesses over.  Sometimes that may mean that we

04:06  2    quit at 4:40.  It may mean we go till 5:30 or 6:00.  I like

04:07  3    when witnesses -- I like for the witness to be finished.

04:07  4        One caveat is, if someone wants to put on an expert and

04:07  5    they put on their resume and something like that that's

04:07  6    non-controversial, and we can knock out a little bit of time, I

04:07  7    will allow that.  But anything where it's actual testimony, I

04:07  8    want it to be completed.

04:07  9        So, Mr. Chu, I don't care how long your first witness

04:07  10   takes.  I'm just telling you that whenever he finishes, if it's

04:07  11   before 5:00, we may get started your second witness, depending.

04:07  12   If it's not, we'll deal with that, and that second witness may

04:07  13   get carried over until tomorrow.

04:07  14       But we're not going to have someone left hanging in the

04:07  15   middle of their testimony.  And we will finish -- we will

04:07  16   finish the first witness today.  So whatever that takes.

04:07  17       So y'all have ten minutes.  Is there anything else we need

04:07  18   to take up?

04:07  19       MR. CHU:  No, Your Honor.

04:07  20       MR. LEE:  Not for Intel.

04:07  21       THE COURT:  Thank you.

04:07  22       THE BAILIFF:  All rise.

04:07  23       (Recess taken from 4:07 to 4:22.)

04:22  24       THE BAILIFF:  All rise.

04:22  25       THE COURT:  Please remain standing for the jury.

| | | |
|--|--|--|
| 04:22 | 1 | (The jury entered the courtroom at 4:22.) |
| 04:23 | 2 | THE COURT:  You may be seated.  Thank you. |
| 04:23 | 3 | OPENING STATEMENT ON BEHALF OF THE DEFENDANT |
| 04:23 | 4 | MR. LEE:  Good afternoon.  My name is Bill Lee, and |

04:23  5  together with my colleagues, Mindy Sooter, Jim Wren and Joe

04:23  6  Mueller, I represent Intel Corporation.

04:23  7      Let me introduce you to the folks on our team.  Mindy is

04:23  8  originally from Texas with many generations of family from San

04:23  9  Saba.  She graduated from Texas A&M University with an

04:23  10  electrical engineering degree but lives in Colorado now with

04:23  11  her husband and three kids.

04:23  12      Jim you met this morning.  He was the one who got to talk

04:23  13  to you this morning.  He grew up in Athens, Texas in between

04:23  14  Corsicana and Tyler and moved to Waco 45 years ago.  He came

04:24  15  because he was a freshman at Baylor.  He's a professor, as you

04:24  16  now know, at the Baylor Law School.  And his wife and three

04:24  17  children are all Baylor grads.

04:24  18      Joe Mueller is my partner who lives in a small town --

04:24  19  grew up in a small town in Northeast Massachusetts.  He lives

04:24  20  in the same town now, married his wife there, has three kids,

04:24  21  two boys that are in high school and his daughter's in the

04:24  22  seventh grade.

04:24  23      And I'm the senior citizen of our group.  I grew up in

04:24  24  Philadelphia.  I've been doing this for about 45 years.  I live

04:24  25  in Boston with my wife to whom I've been married for 49 years.

04:24  1   We have three children, five grandchildren, and I really adore

04:24  2   them.

04:24  3       Now, with us today from Intel is Adam King.  He lives in

04:24  4   California and is a vice president and general manager of

04:24  5   strategic planning for Intel's client computing group.

04:24  6   Mr. King will be here with us throughout the trial.

04:25  7       Let me begin by thanking each of you for taking the time

04:25  8   today and throughout this trial to listen, to listen to what we

04:25  9   have to say, and to give careful consideration to the issues

04:25  10  you'll be asked to decide.

04:25  11      We understand that your jury service imposes burdens upon

04:25  12  you.  And particularly at this time, it possess additional

04:25  13  burdens.  But this case is important.  It is important to

04:25  14  Intel, the company that invented the microprocessor, the brains

04:25  15  of your computer, and a company that has invested great time,

04:25  16  great effort, great money in developing the products that

04:25  17  someone now accuses of infringing their patents.

04:25  18      And it is important to the Intel engineers, several of

04:25  19  whom you'll hear from during the course of the trial, who spent

04:25  20  years independently developing those products, who made

04:25  21  real-world products that have made it into your laptops and

04:26  22  your smartphones and elsewhere, and who take great pride in

04:26  23  their work.

04:26  24      And to be clear -- and I'll come back to this in a

04:26  25  minute -- you will not hear any evidence that the engineers who

04:26  1  designed these products knew of these patents or these patent

04:26  2  applications.  Not one shred of evidence.

04:26  3      Now, Intel takes it very seriously when someone accuses it

04:26  4  of using their technology.  Intel and its engineers, as you

04:26  5  have heard from these people themselves, folks like you and me,

04:26  6  spend their time not looking at patents or patent applications

04:26  7  but on developing thousands of new inventions in different

04:26  8  fields of technology.

04:26  9      But Intel knows it's a big company, and it sometimes can

04:26  10  be a target for lawsuits.  And that brings us to why Mr. King

04:26  11  is here.

04:26  12      When Intel is being accused unfairly, when it believes

04:26  13  it's being sued unfairly, it defends itself just like each one

04:27  14  of you would do if it was you.  Mr. King is here and we are

04:27  15  here to defend Intel.

04:27  16      Now, as you were listening to Mr. Chu, I hope you were

04:27  17  wondering what is the other side of the story?  If everything

04:27  18  that he says is true, why are we even here?

04:27  19      Well, as His Honor told you at the outset, we have trials

04:27  20  because there's another side of the story.  And this is my

04:27  21  chance, this is Intel's chance to tell you the other side of

04:27  22  the story.  This is our opportunity to tell you what the other

04:27  23  evidence that has not been mentioned to you will be.

04:27  24      And I know it's late in the day.  I know you've been here

04:27  25  for a long time, and it's 4:30.  I just ask you to bear with me

04:27  1  as I try to put before you what you will hear during the course

04:27  2  of the trial.

04:27  3       Now, what you will learn during the course of the trial is

04:27  4  the other side of the story, and it's actually quite

04:28  5  straightforward.  Intel doesn't use either of these patents.

04:28  6       For the '373 patent, what you'll learn is Intel does not

04:28  7  use the idea claimed in the patent.  It never has, but more

04:28  8  importantly, no one ever has.  Not SigmaTel, not Freescale, not

04:28  9  NXP.  No one has ever used it in a product.  No one.

04:28  10      Intel instead has used technology that it independently

04:28  11  developed that is different from -- and I'll come back into it

04:28  12  in detail -- the patent.

04:28  13      For the '759 patent the story is a little bit more

04:28  14  complicated.  Again, at the most simple level, Intel does not

04:28  15  infringe.  But here there was an earlier product.  Intel

04:28  16  developed the ideas in the patent before the patent application

04:29  17  was filed.

04:29  18      Now, the Patent Office never had a chance to know that.

04:29  19  It never knew about Intel's earlier product.  We will show you

04:29  20  that if it had, it would not have issued the patent.  It was

04:29  21  not a mistake by anybody; it was not an error by anyone.  It

04:29  22  was, as His Honor suggested to you, the Patent Office doesn't

04:29  23  have the information, how can they make the correct decision?

04:29  24      But as I said, that was an older product.  The products

04:29  25  accused infringe -- of infringement came about ten years later.

04:29 1   Those are the products that VLSI say infringe.

04:29 2       But Intel had continued to innovate and invent during that

04:29 3   decade, and those products have, you'll find, a better, more

04:29 4   robust design that is better for real-world products.  Those

04:29 5   newer products are different.  They are better than the design

04:30 6   of the '759 patent.

04:30 7       So that is at the most simple level, the other side of the

04:30 8   story.  Intel doesn't use the two patents.  And as to the '759,

04:30 9   Intel actually had come up with the idea first and put it into

04:30 10  a product.

04:30 11      Now, let me back up a little bit and tell you a little bit

04:30 12  about Intel and how it became the company that it is today.

04:30 13  You will learn that Intel was started in 1968 by two engineers

04:30 14  Bob Noyce and Gordon Moore.  It was a two-person company.  They

04:30 15  started the company with the idea of building little chips that

04:30 16  could improve computers.

04:30 17      Today we're a big company.  Mr. Wren said so.  Mr. Chu

04:30 18  said so.

04:30 19      Today we employ over 110,000 people around the world and

04:30 20  more than 50,000 in the United States where we're

04:30 21  headquartered, where our research takes place, where our

04:31 22  development takes place, and where we have major manufacturing

04:31 23  facilities to make real-world products.  Not imaginary

04:31 24  products.  Real-world products.

04:31 25      Intel has manufacturing facilities for producing these

235

04:31  1   real-world products in Arizona, New Mexico and Oregon.  On your

04:31  2   screen now is a photograph of the facility in Arizona.  On your

04:31  3   screen now is an inside picture of a portion of that facility

04:31  4   where literally thousands of people are working together to

04:31  5   manufacture, to make these very complicated microprocessors.

04:31  6        You'll also learn during the evidence that Texas has been

04:31  7   a growth area for Intel.  Today Intel has four facilities here

04:31  8   in Austin employing around 1,700 people.

04:31  9        So what do all these folks do?  Well, understanding what

04:32  10  all these folks do and understanding Intel's technology

04:32  11  requires us to turn back the clock for just a couple minutes,

04:32  12  turn it back more than 50 years to when Intel was founded.

04:32  13       When Intel was founded, computers were so large that a

04:32  14  single computer filled up an entire room.  That is what's on

04:32  15  your screen now.  Dr. Noyce and Dr. Moore wanted to use

04:32  16  semiconductors made of silicon materials to replace all these

04:32  17  clunky components on your screen.

04:32  18       Their idea was to integrate all of that computing

04:32  19  functionality, everything in that room, onto a few small pieces

04:32  20  of silicon to reduce the size, to reduce the cost, to make the

04:32  21  microprocessors a reality.  They founded Intel for that goal.

04:32  22       A few years later Intel invented the first microprocessor.

04:32  23  It's on the screen now.  This is 1971.  It was the size of a

04:33  24  penny, just a penny.  But it contained 2,000 transistors, tiny

04:33  25  devices that control the flow of electronic signals, and it

04:33   1   provided all the computing power of that entire room -- that

04:33   2   entire room that I showed you just a few minutes ago.  Over the

04:33   3   next 50 years Intel innovated and invented to improve

04:33   4   microprocessor technology.

04:33   5        Today's microprocessors -- and I'm holding one in my hand

04:33   6   now, this is the size of one of the products that has been

04:33   7   accused of infringement.  This is one of the products that we

04:33   8   sell today.  There are 7 billion transistors in this little

04:33   9   product.  It's the same size as that 1971 product, but it has

04:34  10   7 billion transistors more.

04:34  11        Now, even if you're not familiar with how a microprocessor

04:34  12   works, you have probably used an Intel microprocessor.  The

04:34  13   term "Intel inside" on the screen now, that you may have seen

04:34  14   on the TV commercial or a little sticker on your laptop, just

04:34  15   indicates to you that you're using a computer or a device

04:34  16   powered by Intel.

04:34  17        Intel's microprocessors are best known for desktops and

04:34  18   laptops.  The microprocessor in those devices allows the

04:34  19   devices to perform billions of calculations very quickly and

04:34  20   enables the function that we all use their devices for to check

04:34  21   our e-mail, to use the Internet, to create documents, to upload

04:34  22   photos, to play videos and more.

04:34  23        Intel's microprocessors are also used in products ranging

04:34  24   from ventilators to cars to computers to the systems that run

04:35  25   the most complicated military planes that the country has.

04:35   1        Now, VLSI has accused 12 generations of Intel's

04:35   2   microprocessors of infringement.  Each has a name:  Haswell,

04:35   3   Broadwell, SkyLake and others.  You will hear them referred to

04:35   4   sometimes as the "accused products" or the "accused features."

04:35   5   The evidence will establish that these products are incredibly

04:35   6   complex, as you can imagine if there are 7 billion transistors

04:35   7   in those little products.

04:35   8        On each of these products, Intel's engineers have

04:35   9   literally integrated billions of transistors, thousands of

04:35   10  circuits to perform thousands and thousands of different

04:35   11  functions.

04:35   12       You will learn that to develop just one of these

04:35   13  microprocessors requires more than a thousand engineers

04:36   14  collectively spending literally millions of hours to design,

04:36   15  build and test them.  This is what they do with their lives.

04:36   16  They design.  They test.  They build.

04:36   17       These engineers, who as I said are just folks working like

04:36   18  you and me, have put endless hours into developing the accused

04:36   19  products that these folks now say infringe their patents.  But

04:36   20  as I said, you will not hear any evidence that any of them knew

04:36   21  of these patents when they're doing their work.  You will not

04:36   22  hear any evidence that any of them had seen the patents when

04:36   23  they're designing the features these folks now say infringe.

04:36   24       As a result of their work, Intel has pursued patents on

04:36   25  its own work, as Mr. Wren suggested to you this morning.  And

04:36  1   the United States Patent and Trademark Office has literally

04:37  2   granted Intel thousands of patents on its own innovations that

04:37  3   are in the very products on the screen that I just showed you.

04:37  4        Now, let me turn to VLSI.  Let me turn to VLSI because

04:37  5   again, there is more to the story than you've been told so far.

04:37  6        Mr. Chu described VLSI as a small company.  Let me put

04:37  7   some meat on the bone to that characterization.

04:37  8        Until recently VLSI had one person working for it, its CEO

04:37  9   Michael Stolarski.  He's a lawyer.  Today it has two people,

04:37  10  Michael Stolarski and Cindy Simpson.  No one else works for

04:37  11  VLSI.  None of the named inventors ever worked for VLSI.  VLSI

04:37  12  does not make any products.  VLSI does not sell any products.

04:37  13  VLSI does not conduct any research.  VLSI does not invest in

04:37  14  its own inventions.

04:37  15       In fact, until Intel got sued by VLSI in these cases,

04:38  16  Intel had never even heard of VLSI.

04:38  17       Well, then you might say to yourself, "Well, if that's

04:38  18  true, where did these patents come from?"

04:38  19       Well, VLSI bought these patents, along with hundreds of

04:38  20  others, from NXP.  But NXP didn't invent these patents either.

04:38  21       I'm going to put a timeline on this screen now that will

04:38  22  help fill in the blanks that weren't provided to you earlier

04:38  23  today.

04:38  24       The '759 patent was filed by a company named SigmaTel in

04:38  25  2005, 15 years ago.  Now, SigmaTel made semiconductor products,

04:38    1    but you will hear no evidence that SigmaTel ever used the '759

04:38    2    patent in any of its products.  Not SigmaTel, not Freescale,

04:39    3    not NXP.

04:39    4        The '373 patent, if I put the next entry on the

04:39    5    chronology, was filed by a company called Freescale.  That was

04:39    6    back in 2006.

04:39    7        A couple of years later in 2008, as Mr. Chu said,

04:39    8    Freescale acquired SigmaTel and all of its patents, including

04:39    9    the '759 patent.  So in 2008 Freescale owned both patents, both

04:39   10    of the patents that VLSI just described to you as stars.

04:39   11        As you'll learn, Freescale was making semiconductor

04:39   12    products at that time and continued to do so for many years.

04:39   13    But again, you will not hear any evidence that Freescale ever

04:39   14    used either of these patents in a product.  Not at all.

04:39   15        Several years later, in 2015, NXP acquired Freescale and

04:40   16    all of its patents, including these two.

04:40   17        Now, Mr. Chu described NXP in some detail in his opening.

04:40   18    To be clear, NXP's not a party to this case.  To be clear, the

04:40   19    inventors who made these inventions were not working for NXP at

04:40   20    the time.  To be clear, NXP, the company, didn't invest a

04:40   21    single dollar of research and development in these patents.

04:40   22        Now, NXP is a substantial and successful company.  It has

04:40   23    11,000 engineers.  It literally owns thousands of patents.  It

04:40   24    also makes very successful semiconductor products, and it uses

04:40   25    many of its own patents in its semiconductor products.

04:40  1        But even though NXP owned both of these patents, even

04:41  2   though it had all of these engineers, even though it had all of

04:41  3   these products on the market, you will hear no evidence that

04:41  4   NXP ever used these patents, not at all.

04:41  5        So what?  What happened to the patent next after a number

04:41  6   of years?  In 2016, some folks filed the paperwork to create

04:41  7   VLSI, the entity that's a plaintiff in this case.  Three days

04:41  8   later VLSI purchased some patents from NXP.  Over the next two

04:41  9   years, VLSI purchased more patents from NXP.

04:41  10        VLSI agreed to buy the two patents in this case in

04:41  11   December of 2018, but VLSI itself has never used these patents

04:42  12   in a product of any kind.  Instead, in April 2019, just a few

04:42  13   months after it bought the patents, without any notice to

04:42  14   Intel, it filed the lawsuit.

04:42  15        Now, Mr. Chu showed you this slide and represented to you

04:42  16   that it's VLSI enabling the cycle of innovation.  Let me just

04:42  17   say two things about it as you think about the slide.

04:42  18        First, the evidence will demonstrate that it has never

04:42  19   occurred.  There has not been a single dollar that VLSI has

04:42  20   sent to NXP as a result of its licensing activities.  It hasn't

04:42  21   occurred.

04:42  22        And the second thing I'll tell you is the evidence will

04:42  23   demonstrate it's incomplete.  There are parts missing, but

04:42  24   we'll fill it in for you as the evidence develops.

04:42  25        Now, as I said, Mr. Chu described these two patents as --

04:43   1   and I think I have down correctly -- as "stars" and suggested

04:43   2   that these are important inventions.

04:43   3       And I'm not suggesting that the engineers who did the

04:43   4   work, like Mr. Bearden, weren't doing good work.  But people

04:43   5   come up with ideas and sometimes they're good in products and

04:43   6   sometimes they're not good in products.  Sometimes they never

04:43   7   make it into products.  Sometimes they do and they're

04:43   8   successful.  Sometimes they're not.

04:43   9       But here the real-world evidence of what occurred will

04:43   10  tell you whether these were stars or not.

04:43   11      First, if they were stars, you would expect the owners to

04:43   12  use them.  But as I said, no one did.  Not SigmaTel, not

04:43   13  Freescale, not NXP, not VLSI.

04:43   14      Why does that matter?  Because if they really were stars,

04:43   15  wouldn't the people making semiconductors trying to compete in

04:44   16  the marketplace, use them themselves if they owned them?

04:44   17      Now, Mr. Chu showed you at the end of his opening

04:44   18  PDX-4.32, and I'm going to bring it up on the screen.  Do you

04:44   19  remember this chronology?

04:44   20      This chronology was offered to you, I think to suggest

04:44   21  that there were these published patent applications on the

04:44   22  left, and then Intel started designing the products and then

04:44   23  there's this huge number of products that incorporate the

04:44   24  inventions.

04:44   25      You just need to know two things about this slide.

04:44  1          The first is:  There's no evidence, I said, that any

04:44  2   engineer designing these products knew about -- these weren't

04:44  3   even the patents.  These were public -- published patent

04:44  4   applications in some Patent Office, I think Mr. Chu said, maybe

04:44  5   in the UK.  There's no evidence that anybody knew about these.

04:44  6          And yes.  We have sold these billions of products on the

04:45  7   right-hand side.  But if you put this slide together and you

04:45  8   realize that on the left-hand side, the owners of the patents

04:45  9   weren't using them, and the right-hand side Intel was having

04:45  10  enormous success selling its products, what it actually tells

04:45  11  you is Intel's products are different.  That's what this

04:45  12  chronology will tell you.  Intel's products are different from

04:45  13  the two patents.

04:45  14         If that's true, then what is this case about?  And you'll

04:45  15  be asked to answer three questions.  First, you'll be asked to

04:45  16  decide the question of its infringement, as His Honor suggested

04:45  17  to you.  Do Intel's accused products infringe the two patents,

04:45  18  or do they use Intel's innovations and technologies that are

04:45  19  different from the patents, different from what's in the words

04:45  20  of the claims?

04:45  21         And the second, but just for the '759, Intel's not out

04:45  22  there attacking every patent for every reason that it can.  But

04:46  23  for the '759 you'll be asked to decide, did Intel actually do

04:46  24  it first?  Did it actually develop a product, put that product

04:46  25  on the market before the patent application was filed and the

04:46  1   Patent Office never had a chance to know?

04:46  2       And finally, the third question, as His Honor suggested,

04:46  3   will be the question of damages.  Because Intel doesn't

04:46  4   infringe the patents, because the '759 patent's invalid, we

04:46  5   will argue to you that the right number is zero.

04:46  6       But I'm going to talk about it briefly at the end because

04:46  7   the two presentations that you'll hear during the course of the

04:46  8   evidence will tell you a lot about the presentations and the

04:46  9   arguments being made to you by the parties.

04:46  10      Now, let me turn in more detail to the '373 patent.  As

04:46  11  it's, again, what I said is most important, Intel doesn't use

04:46  12  it and never has.  And there's a reason.

04:47  13      The '373 patent was filed on August 30, 2006.  The patent

04:47  14  relates generally to managing power to a microprocessor.  It

04:47  15  focuses on something you'll learn about called "voltage" that

04:47  16  is applied to the microprocessor's memory, which stores

04:47  17  information to be used by other parts of the chip.

04:47  18      Now, you will learn that the idea of managing the voltage

04:47  19  supplied to a microprocessor's memory has been around for a

04:47  20  long time.  It wasn't invented by these inventors.

04:47  21      You'll learn that the '373 patent actually covers a very

04:47  22  specific idea for supplying voltage to memory.  The idea

04:47  23  focuses on something called a minimum operating voltage.  You

04:47  24  can see it right in the title of the patent.

04:47  25      What they tell you is:  We're claiming as our invention

04:47  1  the minimum operating voltage, right?  And a very specific

04:48  2  technique.  And you'll learn that the minimum operating voltage

04:48  3  is, as it would seem to you, the lowest voltage or the lowest

04:48  4  amount of voltage a memory can use and properly function.  But

04:48  5  that was well-known before the '373 patent as well.

04:48  6      So what is the special technique?  What is the very

04:48  7  specific technique that's described in the patent?

04:48  8      Well, this is the abstract.  And one thing Mr. Chu and I

04:48  9  agree upon, it's the claims that will tell you what's covered

04:48  10  by the patent.

04:48  11      But the patent itself was drafted by the applicant.  Intel

04:48  12  had nothing to do with it.  It was the applicant who wrote the

04:48  13  words, and let's look at what they said in the abstract.

04:48  14      They said the patent requires that you first determine the

04:48  15  memory's minimum operating voltage.  It requires that you then

04:48  16  store the minimum operating voltage.  And then you use the

04:49  17  minimum operating voltage to decide when to switch supplies.

04:49  18      So you determine it, you store it, and you use it to

04:49  19  switch supplies in a specific way.

04:49  20      Now, this seems like a pretty simple idea.  And you might

04:49  21  say it's a simple idea.  If it's practical, it has some real

04:49  22  use.  But it turns out that it's not practical in a real-world

04:49  23  product.

04:49  24      Going through those three steps for memory in a real-world

04:49  25  product is costly, unnecessarily expensive and doesn't get you

04:49  1    anything.

04:49  2        Now, VLSI accuses two different Intel products of

04:49  3    infringing the '373 patent:  Haswell and Broadwell.  As I said,

04:49  4    you'll hear from the engineers who developed these products.

04:49  5    You will learn that Intel does not determine or store a minimum

04:50  6    operating voltage of what VLSI claims is the memory.  And it

04:50  7    doesn't use any minimum operating voltage to determine when to

04:50  8    switch.  In fact, what you'll learn is that what VLSI says is a

04:50  9    minimum operating voltage is not a minimum at all.

04:50  10       Now, you're not going to take my word for it because what

04:50  11   I tell you is not evidence.  It's just a statement.

04:50  12       Instead, you'll hear from Intel engineer Jonathan Douglas.

04:50  13   He has -- he's an electrical engineer with a degree in

04:50  14   electrical engineering who's worked at Intel for nearly

04:50  15   30 years.  He will describe his actual work on Haswell.  He

04:50  16   will describe his actual work on Broadwell.  And he'll tell you

04:50  17   how Intel's engineers spent years developing those products

04:50  18   without any knowledge of the '373 patent.

04:50  19       More importantly, he will tell you how the products work.

04:51  20   He will explain that those features don't use a minimum

04:51  21   operating voltage.  That Intel's engineers actually came up

04:51  22   with a different and actually simpler approach that is more

04:51  23   practical, which has been implemented in real-world products

04:51  24   and helps explain all those products that we have been

04:51  25   successful with.

04:51  1      But it won't just be Mr. Douglas who you hear from.  You

04:51  2  will also hear from Dr. Dennis Sylvester.  He's a professor of

04:51  3  electrical engineering in computer science at the University of

04:51  4  Michigan.  He has studied the '373 patent.  He has studied

04:51  5  Intel's accused products.  He has learned how those products

04:51  6  work from Intel's engineers, design documents and schematics.

04:51  7  He will walk you through the claims of the '373 patent, and he

04:51  8  will explain how and why Intel's products are different.  He

04:51  9  will explain why there's no infringement.

04:52  10     Let me just give you a brief preview of what he'll say.

04:52  11  Here is the claim, Claim 1 of the '373 patent.  If you recall,

04:52  12  as His Honor instructed you, this is what defines the

04:52  13  invention.  And VLSI has the burden of proving that the accused

04:52  14  features in Intel's products satisfy each and every limitation

04:52  15  in the claim.  Not two or three that are highlighted, but every

04:52  16  single one.

04:52  17     Every word counts, as His Honor instructed you.  Every

04:52  18  limitation counts.  It was the patent applicant who drafted

04:52  19  those words and should be held to them.

04:52  20     Now, as you can see, there are lots of words in the

04:52  21  claims.  If Intel's products don't satisfy even one portion of

04:52  22  it, one set of limitations, there's no infringement.

04:52  23     Dr. Sylvester will explain to you that Intel's accused

04:52  24  feature actually doesn't do several things that are in the

04:52  25  claims.  For example, he'll explain to you that Intel doesn't

04:53  1   determine or store the memory's minimum operating voltage,

04:53  2   again, the specific memory that VLSI focuses upon.

04:53  3       In fact, Dr. Sylvester will be able to show you that what

04:53  4   they call a minimum operating voltage isn't a minimum at all.

04:53  5       He'll also explain that Intel's products do not use a

04:53  6   minimum operating voltage to decide when to switch the voltage

04:53  7   applied to the memory.

04:53  8       Instead, Intel's products use a much simpler and efficient

04:53  9   way to switch when the computer enters a low-power mode.  For

04:53  10  those of you that have laptops, you know when your computer

04:53  11  goes to sleep for you, Intel's figured out how to make that

04:53  12  switch efficiently and effectively.

04:53  13      And he'll also explain to you that there's a third set of

04:53  14  limitations that are not satisfied, and those limitations

04:54  15  require what's in the green at the bottom.  And I'll go through

04:54  16  it in more detail during the course of the evidence.  But what

04:54  17  you'll learn is that Intel's products don't provide this -- get

04:54  18  the quote right -- first regulated voltage to the functional

04:54  19  circuit.  Instead what Intel's products do is they go to sleep.

04:54  20  They go to sleep because that's what we want it to do.

04:54  21      As you'll learn, Intel's system, Intel's products are

04:54  22  simpler and more practical in a real-world product.  That's why

04:54  23  Intel doesn't infringe.  That's why NXP doesn't use the '373

04:54  24  patent.  That's why SigmaTel and Freescale didn't either.

04:54  25      So let me turn to the second patent, the '759 patent.

04:54  1   This is a patent where Intel actually had developed a product.

04:54  2   Not a product that it abandoned, but a product that it brought

04:55  3   to market.  And then over the next decade -- over the next

04:55  4   decade -- moved on to a more sophisticated approach that is

04:55  5   entirely different from the '759 patent and its current

04:55  6   products.

04:55  7       The '759 patent was filed on June 29, 2005, more than

04:55  8   15 years ago.  As you might expect, it describes an old

04:55  9   technology.

04:55  10      Now, the patent itself describes the MP3 players that

04:55  11  Mr. Chu referred to.  You'll never hear us claim that the

04:55  12  claims are limited to MP3 players.  You'll never hear that come

04:55  13  out of our mouths.  But this is what the patent applicant said:

04:55  14  Here is the background for the invention, and the background

04:55  15  was MP3 players.  And this is an invention that was made to

04:55  16  make MP3 players better.

04:55  17      As the title says, the '759 patent describes a system and

04:56  18  method of managing clock speed in an electronic device.  Clock

04:56  19  speed is the speed at which the electronic device operates.

04:56  20  You'll also hear it referred to as clock frequency during the

04:56  21  course of the evidence.

04:56  22      Here's Figure 1 from the patent on the screen.  It shows

04:56  23  an electronic device that includes two master devices.  They're

04:56  24  shown in blue.  They are connected to each other and other

04:56  25  components by a bus which I've shown for you in yellow.

04:56  1   There's a clock controller which is shown in orange, which

04:56  2   takes an input clock signal and then changes it to speed up or

04:56  3   slow down.  The clock controller controls the speed or the

04:56  4   frequency of the clock used for both master devices and for the

04:56  5   bus.

04:56  6       Now, as you'll learn, all of these components were

04:57  7   well-known before the '759 patent.  There is nothing new about

04:57  8   master devices, buses, clock controllers or clocks.

04:57  9       So what does this patent say was its invention, its

04:57  10  advance on what had been done before?

04:57  11      Again, I'm going to go to the claim because that's what

04:57  12  determines whether we infringe or not, and I'm going to put

04:57  13  Claim 14 on the screen.

04:57  14      And for the '759 patent, there are two important things to

04:57  15  highlight, two things that allowed this applicant to get this

04:57  16  patent from the Patent Office.

04:57  17      What did they say?  They said, first, in our invention the

04:57  18  patent requires that one of the master devices, the blue, send

04:57  19  a request to change the clock frequency.

04:57  20      In other words, one of those blues has to send a message

04:57  21  that says:  We need to go faster or we need to go slower.

04:58  22      But second -- this is now the words of the claim -- in

04:58  23  response to receiving that request, the claims say that the

04:58  24  requested clock frequency, the up or the down, needs to control

04:58  25  both another master device and the bus.  The two require -- the

04:58  1    two -- last two requirements -- this is in the last two

04:58  2    requirements that are shown in gray.

04:58  3        And as it says, this requested clock frequency has to be

04:58  4    an output to control the clock frequency of both the second

04:58  5    master device and the bus.  A request, a new clock frequency

04:58  6    controlling the master -- the second master device and

04:58  7    controlling the bus.  Common control.  A request and common

04:58  8    control.

04:58  9        But even that was actually not new, but the Patent Office

04:58  10   had absolutely no way to know it.  It turned out that Intel had

04:59  11   done precisely that in a product, not abandoned, but a product

04:59  12   that it brought to market and sold and people bought.

04:59  13       You will learn that Intel has been working on clock

04:59  14   frequency and clock speed and clock control for decades.  You

04:59  15   will hear from an Intel engineer named Efi Rotem, who has

04:59  16   traveled here from Israel to be with us.  He is a leading

04:59  17   engineer at Intel, with his Ph.D., his doctoral degree in

04:59  18   electrical engineering.  He's been with Intel more than

04:59  19   28 years.

04:59  20       Dr. Rotem will testify and describe Intel's work on Yonah.

04:59  21   The work was done in the early 2000s, you can see on the screen

04:59  22   now, well before the '759 patent was filed.  He was the lead

04:59  23   power architect on Yonah.  He will show you what was inside of

04:59  24   Yonah.  This is from one of Intel's real documents.  He will

05:00  25   show you two cores, two master devices.  He will show you a

05:00  1    bus.  He will show you a clock controller.  And he will explain

05:00  2    how the clock speed was controlled in Yonah.

05:00  3        And you will learn that one of the cores could send a

05:00  4    request to change the speed.  And in response, the clock speed

05:00  5    would be changed and both the cores and the bus would all have

05:00  6    common clock control, exactly what's described in the claims.

05:00  7    But exactly what the Patent Office didn't know about, couldn't

05:00  8    have known about.

05:00  9        And as Your Honor explained to you earlier today, we do

05:00  10   get to challenge the validity of the patent.  And we get to

05:00  11   challenge it, because the first time anyone will hear this

05:00  12   evidence about Yonah and compare it to what they said their

05:00  13   invention was, is you.  You will be the first people who get to

05:00  14   make a determination based upon a full deck of cards.

05:01  15       You'll hear from Dr. Dirk Grunwald who's a professor of

05:01  16   computer science at the University of Colorado.  He has studied

05:01  17   the '759 patent, as well as all the technical details for

05:01  18   Yonah.  And he will tell you that Yonah did exactly what is in

05:01  19   the claims.

05:01  20       But the story didn't end there.  Mr. Chu suggested that

05:01  21   Intel abandoned Yonah and had to copy somehow the '759.  There

05:01  22   will be no evidence of that.  What happened is over the next

05:01  23   decade, ten years, Intel continued to innovate after Yonah.

05:01  24       And during that period of time, it continued to make

05:01  25   inventions in its microprocessors, and it continued to change

05:01  1  the architecture of its products.  And you will learn that

05:01  2  those inventions, those innovations, implemented after Yonah

05:02  3  made Intel's new products different, better and non-infringing.

05:02  4      The products that VLSI accused us of infringing, the '759

05:02  5  patent, are shown on the screen.  They start with the SkyLake

05:02  6  product which Intel began selling in 2015.  They are several

05:02  7  generations later than Yonah.  They have been successful

05:02  8  products.  We take great pride in the fact that they have been.

05:02  9      Dr. Rotem will explain how he and his colleagues at Intel

05:02  10  spent years developing a new clock control system.  As you'll

05:02  11  learn, this new approach was fundamentally different from and

05:02  12  better than the older technology that they had invented ten

05:02  13  years earlier in Yonah.

05:02  14      In fact, Dr. Rotem wrote his Ph.D. dissertation -- you

05:02  15  know, the big thing you have to write to get your Ph.D. -- he

05:02  16  wrote it about this new approach and received his Ph.D.

05:03  17      You'll also hear from Dan Borkowski, the Intel engineer

05:03  18  who actually wrote much of the code for the computer that

05:03  19  implements this new approach.

05:03  20      Dr. Grunwald will then explain to you why Intel's SkyLake

05:03  21  and later products don't infringe.

05:03  22      As I said, His Honor will instruct you -- has instructed

05:03  23  you VLSI must show that each and every limitation of Claim 14,

05:03  24  which is on the screen now, is satisfied.  Every word counts.

05:03  25      And Dr. Grunwald will tell you that there are multiple

05:03  1   reasons that the words are not in the Intel products, including

05:03  2   these two.

05:03  3          First, instead of changing clock speeds based upon

05:03  4   requests from the cores as the patent requires, Intel's newer

05:03  5   products use an automatic clock control system.  This system

05:03  6   uses an algorithm, a mathematical formula, that Dr. Rotem

05:04  7   developed with his colleagues, in part as part of his Ph.D.

05:04  8   dissertation, that collects information about how the cores,

05:04  9   the master devices, are operating.

05:04  10         It sends that information on, and then the device

05:04  11  automatically determines whether to change the clock speed or

05:04  12  not.  There's no request.  It's information coming back.

05:04  13  There's an algorithm that considers it, and it makes its own

05:04  14  automatic and independent decision of whether the clock speed

05:04  15  should change.

05:04  16         But there's more, and this will make sense to you, I

05:04  17  think, even though microprocessor technology may not have been

05:04  18  something you were thinking about when you walked into the

05:04  19  courthouse this morning.

05:04  20         The Intel system doesn't use common clock control.  It

05:04  21  doesn't require that both master devices in the bus all have

05:04  22  the same frequency when it changes.  Instead, it allows the

05:05  23  clock frequency for each one of them to be different and to

05:05  24  operate at the optimal speed.

05:05  25         That's why Intel's products are different.  They don't use

05:05 1    a request.  They don't use common clock control.  Instead, they

05:05 2    have a process and protocol that allows it to consider a

05:05 3    variety of complicated information, make a decision of whether

05:05 4    to change and then make a decision to change for each of the

05:05 5    different components and to give them the right speed for the

05:05 6    components.  That's why there's no infringement.

05:05 7         Now, let me briefly address the issue of damages.  As I

05:05 8    said, because the patents do not infringe, we will ask you to

05:05 9    award zero.  Because the '759 patent is invalid, the damages

05:05 10   for that patent should be zero.

05:05 11        But I'm going to spend a couple minutes on damages because

05:05 12   when the evidence begins, the drastic overstatement of the

05:06 13   value that VLSI wants you to attribute to the patents

05:06 14   contradicts the real-world facts.

05:06 15        You're going to get two presentations.  One presentation

05:06 16   is from Intel, which will be based on real-world facts, actual

05:06 17   licenses that people went into, actual deals that people

05:06 18   entered into, actual deals that these folks entered into for

05:06 19   these patents.

05:06 20        VLSI on the other hand is going to give you a complicated

05:06 21   six-step made-for-litigation model that's never been used

05:06 22   anywhere but here.

05:06 23        Now, let me tell you just a little bit about the

05:06 24   real-world evidence that you will hear, things that actually

05:06 25   occurred that you can look at and see in black and white.

05:06  1      I've already said that you'll hear no evidence about the

05:06  2  use of these inventions by the people who own them, but you'll

05:06  3  also hear about VLSI's own purchase of the '373 and '759

05:07  4  patents just months before they sued Intel.

05:07  5      Now, VLSI says that information's confidential, so I'm not

05:07  6  going to mention it to you now.  I'm only going to tell you

05:07  7  that when the evidence comes in of what they actually paid,

05:07  8  we'll ask you to compare that to the amount of damages that

05:07  9  they're going to ask you for, and we'll ask you to conclude

05:07  10  that that amount is neither reasonable nor consistent with the

05:07  11  real-world facts.  The numbers aren't even in the same

05:07  12  universe.

05:07  13      You'll actually learn that these two patents were valued,

05:07  14  were valued, by the prior owners, Freescale, SigmaTel and NXP,

05:07  15  when they acquired the patents, and the numbers are real-world

05:07  16  numbers.

05:07  17      You will learn that Freescale and NXP and Intel have

05:07  18  entered into patent agreements.  Intel knows that it doesn't

05:08  19  make all the inventions.  Intel knows that other people make

05:08  20  inventions of importance and significance.  Intel takes

05:08  21  licenses when other people have made inventions of

05:08  22  significance, and you'll see those licenses and the amount

05:08  23  that's paid and you can decide which universe those licenses

05:08  24  reside in.

05:08  25      And you'll also learn about the thousands of features that

05:08  1  contribute to the success of the Intel products, the thousands

05:08  2  of features that explain all of those products by Mr. Chu's

05:08  3  chart that VLSI now wants to take credit for.

05:08  4      You will hear about that rule of evidence from Hance

05:08  5  Huston.  Mr. Huston was an engineer at IBM for more than a

05:08  6  decade.  For the next two decades, he worked in intellectual

05:08  7  property licensing at IBM, eventually becoming the director of

05:08  8  patent licensing and intellectual property strategy.

05:09  9      He reviewed all the real-world evidence, the actual

05:09  10  agreements, the actual purchase agreements, the actual

05:09  11  licenses.  And based upon his decades of experience, he will

05:09  12  tell you what a reasonable amount is.  He will tell you what an

05:09  13  unreasonable amount is.

05:09  14      Now, as I mentioned, without going into the numbers,

05:09  15  VLSI's going to offer you a very large number.  It's based upon

05:09  16  this six-step model that someone named Dr. Sullivan has created

05:09  17  for this case.  It's called hedonic regression.  And then he

05:09  18  uses that hedonic regression as part of this complicated

05:09  19  six-step process.

05:09  20      But I ask you to listen to the evidence as the trial

05:09  21  proceeds and listen to see whether anybody has ever used this

05:09  22  hedonic regression six-step process in an actual license

05:09  23  negotiation, an actual patent purchase, whether Freescale used

05:10  24  it, whether SigmaTel used it, whether NXP used it, whether any

05:10  25  of them used it.  The answer will be no.

05:10  1      If you get to the point of considering damages, and we

05:10  2   believe that -- we hope that the evidence we provide you will

05:10  3   suggest you don't need to, you will have two very different

05:10  4   approaches:  Intel's approach based upon real-world evidence

05:10  5   with real-world numbers that are events that you can look at

05:10  6   the documents in black and white and say, yeah, yeah, that

05:10  7   really occurred, or a made-for-litigation model from a paid

05:10  8   expert.

05:10  9      We will come back and ask you to bring your collective

05:10  10  judgment and wisdom to bear, the great strength of our jury

05:10  11  system, and decide what is reasonable and what is not.

05:10  12      So let me end where I began, by thanking you for your time

05:10  13  and attention and bearing with me at this late hour in the day.

05:10  14      I know it must seem like you're drinking water from a

05:11  15  technology firehose, right?  And for that I would apologize,

05:11  16  but there's no way for us to present our case without doing so.

05:11  17      But at the end of the trial, I hope you'll have the full

05:11  18  side of the story.  I hope you understand why I get a chance to

05:11  19  respond to their opening and say, "There's more that you need

05:11  20  to know."

05:11  21      And I hope you'll see that it's actually quite

05:11  22  straightforward.  Intel hasn't used the '373 patent and no one

05:11  23  has.  Intel doesn't use the '759 patent in its most modern

05:11  24  processors because it's got a new and different, robust way of

05:11  25  doing it, and Intel's older products actually used what was

05:11  1    claimed as its invention in 2005.

05:11  2         We'll ask you to find there's no infringement.  We'll ask

05:11  3    you to find the '759 patent is invalid, and we'll ask you to

05:11  4    return Intel to the marketplace where it can compete on

05:11  5    innovation, invention and the quality of its products.

05:11  6         Thank you.

05:11  7         THE COURT:  Thank you, Mr. Lee.

05:12  8         MR. LEE:  Thank you, Your Honor.

05:12  9         THE COURT:  As I promised you, ladies and gentlemen of the

05:12  10   jury, you'd have two outstanding opening arguments, and I was

05:12  11   not disappointed at all.

05:12  12        I failed to give you a couple of instructions I need to

05:12  13   before we have any evidence.  These won't take nearly as long

05:12  14   as the others, so let me go through them fairly quickly.

05:12  15        You're going to hear from expert testimonies --

05:12  16   testimonies.  It's the end of the day.  You're going to hear

05:12  17   from expert witnesses.  Expert testimony is testimony from a

05:12  18   person who has developed a special skill or knowledge in some

05:12  19   science, profession or business.  The skill or knowledge is not

05:12  20   common to the average person.  It's been acquired through

05:12  21   special study or expertise and experience.

05:12  22        You will get to weigh that expert's testimony, but you do

05:12  23   it just like you would any other witness' testimony.  You'll

05:12  24   consider the qualifications, the basis and reason for the

05:12  25   opinions they give you, the reliability of the information that

05:13  1    supports their opinions and all the other factors I've already

05:13  2    told you about when -- to take into consideration in weighing

05:13  3    the testimony of each witness.

05:13  4        Expert testimony receives whatever weight or credit that

05:13  5    you alone decide is appropriate for that person.  You should

05:13  6    measure it against all the other testimony and evidence you

05:13  7    hear in the case.  As with other -- any witness, you're free to

05:13  8    accept all or part or reject all or part of any expert witness.

05:13  9        A stipulation is an agreement.  When there's no dispute

05:13  10   regarding certain facts, the parties may agree or stipulate to

05:13  11   those facts.  If I give you a stipulated fact, you must treat

05:13  12   that fact as having been proven here in court.

05:13  13       Do not let bias, prejudice or sympathy play in any part of

05:13  14   your deliberations.  Whether you are familiar or not familiar

05:13  15   with any party, it should not play any part in your

05:13  16   decisionmaking.  A corporation and all other persons are to

05:14  17   stand equally before you.  They must be treated equally in a

05:14  18   court of justice.

05:14  19       The fact that a person brought a lawsuit in this Court and

05:14  20   is seeking damages here creates no inference that the person or

05:14  21   corporation is entitled to a judgment.  The act of making the

05:14  22   claim in a lawsuit by itself does not in any way tend to

05:14  23   establish that the claim is valid or not valid and is not

05:14  24   evidence.

05:14  25       To assist you in deliberations, you have a notebook that

05:14   1   contains paper, a copy of the patents, and we're going to give

05:14   2   you witness notebooks.  And what I mean by that is at the end

05:14   3   of the trial, you'll have a photo of each person who testified

05:14   4   so you can go back through and say, oh, that's the -- that's

05:14   5   Mr. So-and-so.  That'll help you in your deliberations.

05:14   6       Could I have counsel up here for a second?

05:14   7       (Bench conference.)

05:15   8       THE COURT:  Mr. Chu, what do you want to do with your

05:15   9   witness?

05:15   10       MR. CHU:  Mr. Mann is handling the witness.

05:15   11       THE COURT:  Mr. Mann?

05:15   12       MR. MANN:  I hate to put him on this late, but he's only

05:15   13   about an 18-minute witness.

05:15   14       THE COURT:  How long do you think you'll have?

05:15   15       MR. WREN:  I think it's Joe, so --

05:15   16       MR. LEE:  I think Joe has about 20 or 25 minutes.

05:15   17       THE COURT:  Will he be done by 6:00?

05:15   18       MR. LEE:  Yes.

05:15   19       THE COURT:  We'll go on then.  Very good.  Thank you.

05:15   20       (Bench conference concludes.)

05:15   21       THE COURT:  Again, you're wondering, what are they talking

05:15   22   about?  What we're trying to -- what -- I'll tell you.  I was

05:15   23   just trying to figure out what to do with the next witness

05:15   24   because it's a little late in the evening.  But since we've got

05:15   25   no witnesses on today, I was -- I'm going to go ahead and allow

05:16  1    one witness to be called so we can make the most of today.

05:16  2         As happy or unhappy as that makes you, we have a limited

05:16  3    number of hours in the case, and so you're paying forward by

05:16  4    using one of them now.  They only have so many hours, and this

05:16  5    will pay dividends down on the other side.

05:16  6         So, Mr. Chu -- I'm sorry.  Mr. Mann?

05:16  7         MR. MANN:  Thank you, Your Honor.

05:16  8         Call James Spehar, Your Honor, to the stand.

05:16  9         (The witness was sworn.)

05:16  10        THE COURT:  And let me tell you and all -- the lawyers can

05:16  11   tell all the other witnesses, because you're behind plexiglass,

05:16  12   if you feel comfortable taking that mask off, that'll make

05:17  13   them -- easier for them to hear you, and I'll tell you all in

05:17  14   the jury, we've had three full jury trials before you were the

05:17  15   witness was seated --

05:17  16        (Audio issues.)

05:17  17        (The witness was sworn.)

05:17  18        THE COURT:  Oh, yes.  The rule had been invoked.  If you

05:17  19   are covered by the rule, you need to leave.

05:17  20        Mr. Mann, are we good?

05:17  21        MR. MANN:  We're ready, I think, Your Honor.

05:17  22        THE COURT:  Please move forward.

05:17  23                          DIRECT EXAMINATION

05:17  24   BY MR. MANN:

05:17  25        Q.   May it please the Court.  I know it's been a long

05:17  1   day, but would you please introduce yourself to the jury?

05:17  2        A.   Jim Spehar.

05:18  3        Q.   Thank you, Mr. Spehar.  What do you do for a living?

05:18  4        A.   I'm the VP of R&D for NXP.

05:18  5        Q.   Get as close as you to that microphone.

05:18  6        A.   Is that better?

05:18  7        Q.   (No audio).

05:18  8        A.   Thank you.

05:18  9        Q.   Let me ask the question again.  What do you do for a

05:18  10  living?

05:18  11       A.   I'm the VP of R&D for NXP Semiconductors.  That's

05:18  12  research and development.

05:18  13       Q.   I was going to ask you.  Can you tell us a little bit

05:18  14  about your family, please?

05:19  15       A.   Yeah.  So I've been married for 30 years.  I have

05:19  16  three kids.  One's in the Marines in Okinawa, and I have twins

05:19  17  that are 27 years old.

05:19  18       Q.   And where do you live?

05:19  19       A.   I live in Phoenix -- or Cameron, Arizona, outside

05:19  20  Phoenix.

05:19  21       Q.   Okay.  You mentioned that you work for NXP.  I'd like

05:19  22  to begin by showing you a demonstrative, 13.1.

05:19  23       Can you tell us a little bit -- at a high level what this

05:19  24  is?

05:19  25       A.   Well, this is like the, you know, NXP-type.  So we've

05:19  1  been in business for over 60 years, you know, and there's over

05:19  2  11,000 employees -- excuse me, 11,000 engineers, and then as

05:19  3  you can see, there's 29,000 employees, and we have $8 billion

05:19  4  in revenue.

05:19  5      Q.   And are you one of those 11,000?

05:19  6      A.   Yes.  I'm a number of 11,000.

05:20  7      Q.   Okay.  And also just at a high level, can you tell us

05:20  8  what NXP does or what they make?

05:20  9      A.   So NXP's a very innovative company and what we do is

05:20  10 we make, you know, products like you see normally used, for

05:20  11 example, in your car, your antilock braking systems that keep

05:20  12 you safe, radar.  We also do things like, for example, in a

05:20  13 mobile phone, where you do fast charging.  If you ever pay with

05:20  14 your phone, we do a Google Pay.  So it's a wide range of

05:20  15 different things.

05:20  16     Q.   Does NXP make processors or chips?

05:20  17     A.   Yes.  NXP does make -- we make processors.  And so we

05:20  18 do processors on digital networking, we make processors mobile,

05:20  19 and then also --

05:20  20     Q.   Let me show you -- on this document camera I'm

05:20  21 showing you what are Demonstratives 32, 33 and 34, and let me

05:21  22 turn over one.  Can you tell us what these are?

05:21  23     A.   Those are microprocessors.

05:21  24     Q.   Do we call them chips also?

05:21  25     A.   Yeah.  We can call them chips.

05:21  1      Q.   Are those the brains of the things you were talking

05:21  2   about, like antilock brakes and things like that?

05:21  3      A.   Yeah.  Those processors would be the brains that can

05:21  4   control your car.

05:21  5      Q.   Actually that's a --

05:21  6      A.   It's only showing up on that screen.  Oh, there it

05:22  7   is.

05:22  8      Q.   Is it showing on yours?

05:22  9      A.   Yeah, we can see it now.  At least I can.

05:22  10     Q.   Okay.  Here we go.  Sorry about that.  I'm putting

05:22  11  down a dime next to it.  Or, actually, that's an English dime.

05:22  12  Can you tell us a little bit about what these do in products?

05:22  13     A.   So what these processors do in a sense is they're

05:22  14  like the brains of the system.  So they, in a sense, control

05:22  15  all the peripherals that are around them, make sure that they

05:22  16  do the right things.  So, for example, if you're trying to

05:22  17  brake, they make sure your brakes don't over-brake.  Or in

05:22  18  radar, trying to make sure that in a sense you don't bump into

05:22  19  somebody else.

05:22  20     Q.   And can you tell us who some of NXP's customers are?

05:23  21     A.   Yeah.  They're like mainly Amazon, Google, and, you

05:23  22  know, of course all the major automotive companies that, you

05:23  23  know, that if you're driving -- NXP's in all of them because

05:23  24  we're number one in automotive electronics.

05:23  25     Q.   And how long have you been working in the

05:23  1    semiconductor industry?

05:23  2        A.    I've been there 30 years.

05:23  3        Q.    All right.  And during your career, how competitive

05:23  4    has the semiconductor industry been?

05:23  5        A.    The semiconductor industry is extremely competitive.

05:23  6    You know, just like we showed earlier, Nvidia has just risen up

05:23  7    to the top out of nowhere.  And what we're always finding is

05:23  8    that we're having to figure out how to make things cheaper, how

05:23  9    to make them faster and how to make them use less power.

05:23  10       Q.    Okay.  And can you tell us in the semiconductor

05:23  11   industry, can you just sit back and depend on your name or what

05:23  12   you've done in the past to boost you into the future?

05:23  13       A.    No.  No.  Absolutely not.  You have to keep on

05:23  14   innovating.  You have to keep coming up with new ideas.  That's

05:23  15   why you have to count on your company in order to keep coming

05:23  16   up with these ideas which make a difference for your customers.

05:24  17       Q.    What are some of the most important attributes of a

05:24  18   semiconductor chip that companies like NXP focus on?

05:24  19       A.    Well, the main things when we're like doing

05:24  20   something for our -- what our customers want us to focus on, of

05:24  21   course, is they want to make sure that we're doing it as cheap

05:24  22   as possible so they can sell their products cheaper.

05:24  23       Then the other thing is they want us to do it as low a

05:24  24   power as possible so that your batteries last longer, those

05:24  25   types of things, and of course as fast as possible, so you're

05:24   1   not sitting there for a delayed response.  You know, Siri, and

05:24   2   then you wait ten minutes for it to come back.

05:24   3       Q.   So are speed and power savings important from a

05:24   4   competitive standpoint?

05:24   5       A.   Extremely important.

05:24   6       Q.   And why are speed and power important for

05:24   7   competition?

05:24   8       A.   Well, the reason they're important is because even a

05:24   9   small percentage of one or two percent could make a difference

05:24   10  between whether or not someone will buy your product.  They

05:24   11  might buy it from someone else.

05:25   12      Q.   Okay.  So can -- 1 or 2 percent doesn't sound like a

05:25   13  lot.  Can it make a big difference in the product itself?

05:25   14      A.   It can.  In a very competitive world, it does.

05:25   15  Because if you think about it, you know, you see these

05:25   16  manufacturers fighting for, say, for example, ten hours of

05:25   17  battery life on your phone versus 11 or 12.  And so it's

05:25   18  really, really important that you can do that.

05:25   19      Q.   And how much of a difference can a power savings of

05:25   20  1 or 2 percent make?

05:25   21      A.   Well, it could make the difference of whether you

05:25   22  sell billions of parts or you sell none.

05:25   23      Q.   Can you tell us a little about the work that you

05:25   24  actually do at NXP?

05:25   25      A.   Oh, okay.  Yeah.  So, you know, I've been there for

05:25  1   quite a long time.  So one of the things I've done you've

05:25  2   probably used before is that little track point on the -- you

05:25  3   know, the IBM computers used to have.  So I was actually --

05:25  4   designed the chip for that one way, way back in -- I think it

05:25  5   was like 1997 or something.

05:25  6       If you charge your phone, you've probably done something

05:26  7   I've -- you've worked with something that I've designed.

05:26  8       If you've used thumbprint recognition, it's probably

05:26  9   something that I've worked on myself.

05:26  10      And if you've ever tapped your phone to pay your credit

05:26  11  card, I've worked on those things too.

05:26  12      Q.   Okay.  Do you actually hold patents?

05:26  13      A.   Yes, I do.

05:26  14      Q.   How many?

05:26  15      A.   Over ten.

05:26  16      Q.   Okay.  Now, what is the annual budget for research

05:26  17  and development at NXP?

05:26  18      A.   So NXP spends about $1.7 billion a year of their --

05:26  19  you know, of their revenue.  And that ends up being about 25

05:26  20  percent of their sales.

05:26  21      Q.   Okay.  How many people report to you at NXP?

05:26  22      A.   I've got 100 people that report to me, and then a

05:26  23  bunch indirectly.

05:26  24      Q.   I probably should have asked you this at the

05:26  25  beginning, but your educational background, what is that?

05:26  1    A.   So I have a B.S. in electrical engineering and a MS

05:26  2  in electrical engineering from the University of New Mexico,

05:26  3  which I got in 1991 and '94.

05:26  4    Q.   So that -- when you say B.S., Bachelor of Science?

05:26  5    A.   Yeah.  Bachelors of Science, yeah.

05:26  6    Q.   MS, masters --

05:27  7    A.   And a masters of -- yeah.

05:27  8    Q.   Okay.  And how did you come to work for NXP?

05:27  9    A.   Well, you know, my wife -- or wasn't my wife, it was

05:27  10  my girlfriend at the time -- knew someone there.  And so she

05:27  11  got me an interview so I married her.

05:27  12    (Laughter.)

05:27  13  BY MR. MANN:

05:27  14    Q.   Okay.  That's the most honest statement of the day.

05:27  15    Can you tell us a little bit about -- tell the jury a

05:27  16  little bit about the products you personally worked on, in

05:27  17  addition to the ones that you've just talked about where you

05:27  18  worked in collaboration with people?

05:27  19    A.   So, yeah.  Oh, thank you.  So at NXP, you know,

05:27  20  there's -- in the business I'm in which is called advanced

05:27  21  analog, we have ten product lines.  So a lot of the things that

05:27  22  my team has worked on, for example, if you have a friend that

05:27  23  has hearing problems, cochlear implant, we've done those chips.

05:27  24    We would also do the PMICs, which are power management

05:27  25  units which are -- in a sense, supply the processors.

05:27  1          Other things that we do is we do simple things like, you

05:28  2  know, the general purpose analog or a key fob.  So if you go in

05:28  3  and use a key fob, there's a good chance that that's NXP's

05:28  4  technology too.

05:28  5          Q.   What is near-field -- what is NFC, Near-Field

05:28  6  Communication?

05:28  7          A.   That's the technology that NXP developed in early

05:28  8  2000s.  And that's what enables like, you know, the Google Pay.

05:28  9  So when you go up there -- so it's a way in order in a sense to

05:28  10  communicate back and forth between a reader and a phone device.

05:28  11          Q.   I want to take you back to 2005 to 2010, in that time

05:28  12  period.  As far as Intel selling microprocessors or processors

05:28  13  for personal electronic devices, such as cell phones, were they

05:28  14  doing that at the time?

05:28  15          A.   Not as I -- not to the best of my recollection.

05:28  16          Q.   Are there any considerations that would be especially

05:28  17  important in the mobile market that NXP was working on during

05:28  18  that time?

05:28  19          A.   Well, in the mobile market, of course, as you guys --

05:29  20  most people have cell phones, right?  Is that, like we talked

05:29  21  about, battery life is really important.  So the mobile market

05:29  22  was very important in driving a lot of the power techniques in

05:29  23  a sense and to improve.  So that would be extremely key there.

05:29  24          Q.   Okay.  Well, what about somebody that has a desktop

05:29  25  where it's plugged in all the time?  Is the power as much as of

05:29    1    an issue?

05:29    2         A.   No.  It's not as much of an issue.

05:29    3         Q.   And why not?

05:29    4         A.   Well, the reason is because you have a direct power

05:29    5    supply, and usually it's not a mobile device either.  So it's

05:29    6    something that in a sense is stationary.  Even if it's a

05:29    7    laptop, it's fairly -- got a fairly big battery and usually

05:29    8    only lasts maybe two, three hours.

05:29    9         Q.   Okay.  Does NXP have patents?

05:29   10         A.   Yes.  Lots of patents.

05:29   11         Q.   All right.  And are you familiar with the criteria

05:29   12    that NXP uses to decide whether to patent something or not?

05:29   13         A.   Yes.  Definitely.

05:29   14         Q.   And tell us just at a high level what the criteria

05:29   15    are at NXP for patenting technology.

05:30   16         A.   So at a high level, you know, of course we don't --

05:30   17    you know, you don't want to just patent anything.  You have to

05:30   18    patent something that makes a difference.

05:30   19         Okay.  So the first thing we do is we have a group of

05:30   20    engineers and attorneys that get together and we look with

05:30   21    experts to make sure that a patent is something that adds

05:30   22    value.  And at that point, then once we decide if it adds

05:30   23    value, then we'll go ahead and do research to see if there's

05:30   24    any competing art.  And once that's done, we'll file the patent

05:30   25    with the Patent Office, or the disclosure with the Patent

05:30   1    Office.

05:30   2         Q.   I'm sorry.  Have you ever worked on a patent

05:30   3    committee for either Phillips or NXP?

05:30   4         A.   Yeah, for many years.

05:30   5         Q.   Who was Phillips?

05:30   6         A.   So Phillips was the company that owned -- was owned

05:30   7    by Phillips -- well, Phillips owned Phillips Semiconductors.

05:30   8    And then Phillips Semiconductor was sold by Phillips to become

05:30   9    NXP.

05:30   10        Q.   All right.  And back a little more in history, when

05:30   11   you went to work for what's now NXP, what was the company you

05:30   12   worked for?

05:30   13        A.   It was called Signetics.

05:31   14        Q.   So did Signetics turn to somebody else, or become

05:31   15   merged with someone else?

05:31   16        A.   Yeah.  So Signetics became Phillips Semiconductors

05:31   17   which became NXP, which is still NXP.

05:31   18        Q.   All right.  Okay.  In the course of your work for

05:31   19   NXP, did you learn about a company called Freescale?

05:31   20        A.   Yes, I did.

05:31   21        Q.   Who was Freescale?

05:31   22        A.   So Freescale was really -- was heavily into

05:31   23   processors.  And what they were doing is -- and they were very

05:31   24   competitive in the automotive industry, so they were like

05:31   25   number one in automotive.  And they were based out of Austin,

05:31 1    Texas.

05:31 2        Q.    Okay.  And at a high level, besides their business,

05:31 3    do you know whether Freescale had patents?

05:31 4        A.    Yes.  They had a lot of patents.

05:31 5        Q.    And when Freescale and NXP merged, did NXP get

05:31 6    Freescale's patents?

05:31 7        A.    Yeah.  When you purchase a company, you get all their

05:31 8    intellectual property too.

05:31 9        Q.    Okay.  Do you know whether NXP tries to make money by

05:32 10   licensing NXP's patents to other companies?

05:32 11       A.    Yes, we do.

05:32 12       Q.    And when we talk about licensing, what is licensing?

05:32 13       A.    Well, licensing is just like what you'd expect, is

05:32 14   that you in a sense give somebody permission to use your

05:32 15   invention.

05:32 16       Q.    Do you know, from your personal knowledge, what

05:32 17   happens when NXP tries to license to someone else for using

05:32 18   their products and they will not license with NXP?

05:32 19       A.    Well, it's a difficult situation because, you know,

05:32 20   NXP is not -- we're not a company that goes out and tries, you

05:32 21   know, to do licensing because that's not our core focus.

05:32 22       Our core focus is, of course, innovation and then product

05:32 23   development because that's where we make our money.  So if

05:32 24   somebody's using our patent and then they won't work with us on

05:32 25   licensing, it's not our expertise.  So that's why we would go

05:32    1    with a company like VLSI to in a sense go off.  They're experts

05:33    2    in that area and we're not.

05:33    3        Q.   Okay.  You in a sense partner up with somebody?

05:33    4        A.   Yeah.  We partner up with someone that is an expert

05:33    5    in that area.

05:33    6        Q.   And VLSI, as in this case, what, would you consider

05:33    7    them to be a partner in this case?

05:33    8        A.   I would consider them to be a partner that knows how

05:33    9    to do these types of things in order to, you know, invest a lot

05:33    10    of money in your -- do a lot of innovation.  And, of course,

05:33    11    you want to do more, and so you would expect that you want to

05:33    12    be -- you want to get the right licensing for that.

05:33    13        Q.   All right.  Now, does NXP, speaking through you, know

05:33    14    whether or not its patents are being used by other companies?

05:33    15        A.   That's not something that we typically would know.

05:33    16    And the --

05:33    17        Q.   Okay -- I'm sorry.  Go ahead.

05:33    18        A.   No, no.  You, please.

05:33    19        Q.   Well, I was going to ask why not?

05:33    20        A.   Yeah.  The reason we wouldn't know is because, you

05:33    21    know, we're -- it's not our main function.  If I was doing

05:33    22    that, I wouldn't be innovating, and I wouldn't be designing new

05:33    23    products.  So that's why -- that's why we don't do that

05:34    24    particular function.

05:34    25        Q.   Do you know what VLSI did to investigate this case?

05:34  1        A.    From what I understand at a high level, is that they

05:34  2   had to spend, you know, a lot of money to go in in order to be

05:34  3   able to see -- you know, to figure out if there was an

05:34  4   infringement.  But that also meant that they had to -- I guess

05:34  5   they had to have some agreements with Intel in order to be able

05:34  6   to go in and look and verify that they -- if there was a patent

05:34  7   infringement.

05:34  8        Q.    Do you know whether NXP stands to profit -- talking

05:34  9   about the company you work for, NXP -- stands to profit from

05:34  10  VLSI's assertion of the patents in this case?

05:34  11       A.    Yeah.  They could significantly, yeah, benefit from

05:34  12  it.

05:34  13       Q.    And I'm sorry.  I didn't hear that.

05:34  14       A.    They could significantly benefit from it.

05:34  15       Q.    Do you know what NXP would do with its recovery from

05:34  16  this case?

05:34  17       A.    Well, what we would do is what we normally do with,

05:34  18  you know, when we have money is that we go in and we innovate

05:34  19  more.  You know, so we go -- and then we also develop more

05:35  20  products.  So we would put it back into the cycle of, you know,

05:35  21  developing more products so that we could keep ahead, you know,

05:35  22  making sure that we're competing on the speed, power.

05:35  23       Q.    I want to show you, I guess, 13.3.

05:35  24       MR. MANN:  Mr. Simmons, if you could pull that up,

05:35  25  Demonstrative 13.3.

05:35    1    BY MR. MANN:

05:35    2        Q.   You saw this earlier in Mr. Chu's opening and also

05:35    3    Mr. Lee talked about it.

05:35    4        A.   Yes.  I did.

05:35    5        Q.   Are you familiar with the cycle of innovation?

05:35    6        A.   Yes.  I am.

05:35    7        Q.   And let's just go one by one very quickly since we've

05:35    8    been through this some -- No. 1, with NXP, SigmaTel and

05:35    9    Freescale, what's the invention part of the cycle?

05:35   10        A.   Well, the invention part of the cycle is, you know,

05:35   11    you're going off and doing a new technology.  And once you

05:35   12    identify something, you write -- a person would write a

05:36   13    disclosure.  And if it's approved, then it would be submitted

05:36   14    to the Patent Office as an invention disclosure.

05:36   15        Q.   So No. 2, if the patent is granted, what happens

05:36   16    after that?

05:36   17        A.   So once the patent's granted, then, you know, as far

05:36   18    as we go off and we have to figure what we -- you know, as far

05:36   19    as, you know, how do we in a sense make sure that the licensing

05:36   20    happens or that, you know, people aren't infringing on it?  So

05:36   21    then we would work with somebody like VLSI in order to go off

05:36   22    and figure out if the patent's being violated.

05:36   23        Q.   All right.  And then once -- if there's money paid by

05:36   24    licensing, by sales or by litigation, does NXP reinvest the

05:36   25    income?

05:36  1        A.   Oh, definitely.  We have to.

05:36  2        Q.   And why do you call it a cycle?

05:36  3        A.   Well, the reason I call it a cycle is because

05:36  4   remember we talked about, you know, if you look at just your

05:36  5   mobile phone from, say, 2000, look how much it's improved.  So

05:36  6   the cycle, people keep investing over and over again in order

05:37  7   to keep ahead of their competition.  Because if you don't do

05:37  8   that, then eventually what happens is somebody else will

05:37  9   out-innovate you.  Someone will make a product that's better

05:37  10  than your product.  So you have to keep reinvesting into that.

05:37  11       Q.   Are you being compensated by VLSI for this case?

05:37  12       A.   No.  I'm not.

05:37  13       Q.   All right.  Do you know whether NXP uses its own

05:37  14  products -- uses in its own products any of the technologies

05:37  15  covered by the patents it transferred to VLSI?

05:37  16       A.   I have not undertaken that investigation.

05:37  17       Q.   And why not?

05:37  18       A.   Well, the main reason I haven't done that is because

05:37  19  my job is to be innovating and, of course, developing new

05:37  20  products.  So my main focus, of course, is going to be going

05:37  21  off and making sure that we're getting new products out into

05:37  22  the market and, of course, creating new inventions.

05:37  23       Q.   Is it true here that NXP retained the rights to use

05:37  24  these patents?

05:37  25       A.   Yeah.  Whenever you sell, you know, when you would

05:37  1    license patents out, you would never give away -- your own

05:38  2    rights away.

05:38  3         Q.   Let's take a quick look at Exhibit 2.  Well, while

05:38  4    you've got PDX-13.2, let me talk about that.

05:38  5         A.   Okay.

05:38  6         Q.   This is a document that has your name at the top of

05:38  7    it.  Is this a program or something that you've done related to

05:38  8    power while at NXP?

05:38  9         A.   Yeah.  I was invited to be a guest speaker at a power

05:38  10   conference.  And so what I was talking about was the challenges

05:38  11   that are coming with respect to power, you know.  And so it was

05:38  12   about innovating at the edge, IoT devices, which is the

05:38  13   Internet of things.  And what it talked about is that the

05:38  14   number of devices that are growing in 2020 was 40 billion

05:38  15   devices at the edge, and it'll be 75 billion by 2024.

05:38  16        And then the other thing that they talked about was how

05:38  17   important power was in that.  Because eventually, if you don't

05:38  18   keep, you know, improving the power performance, what'll happen

05:39  19   eventually is there'll be severe power shortages.

05:39  20        Q.   And did you give this presentation to some -- to

05:39  21   colleagues that are in the same --

05:39  22        A.   Yeah.  I gave it to -- it was reviewed and was given

05:39  23   to peers.

05:39  24        Q.   Okay.  Now, let's pull up Exhibit No. 2.  Do you know

05:39  25   what this is?

05:39   1      A.   Yes.

05:39   2      Q.   This is the --

05:39   3      MR. MANN:  If you'll flip to the next page, Mr. Simmons,

05:39   4  please, and if you would highlight that top portion.

05:39   5  BY MR. MANN:

05:39   6      Q.   Are you familiar with this patent at a high level?

05:39   7      A.   At a high level, I am.

05:39   8      Q.   Do you know -- did you know Mr. Henson?

05:39   9      A.   Only in reputation.  He's, of course -- he is

05:39   10  deceased.

05:39   11     Q.   All right.  And it shows that he worked for SigmaTel.

05:39   12  Who was SigmaTel?

05:39   13     A.   SigmaTel was a company that was purchased by

05:39   14  Freescale.

05:39   15     Q.   Okay.  And then, of course, as you said, Freescale

05:39   16  was merged or purchased by NXP?

05:39   17     A.   Yes.

05:39   18     Q.   All right.  Are you personally familiar with this

05:39   19  patent?

05:40   20     A.   Like I said, at a high level.

05:40   21     Q.   Okay.

05:40   22     MR. MANN:  Now, let's look at Exhibit No. 1, Mr. Simmons.

05:40   23  BY MR. MANN:

05:40   24     Q.   Are you familiar with this patent?

05:40   25     A.   This one too, at a high level.

05:40  1          Q.   Okay.  And did you --

05:40  2          MR. MANN:  Let's flip to the second page.  If you'd

05:40  3   highlight the top, Mr. Simmons.

05:40  4   BY MR. MANN:

05:40  5          Q.   Do you know David Bearden?

05:40  6          A.   Yeah.  I do know David.

05:40  7          Q.   And how do you know him?

05:40  8          A.   I know him since NXP bought Freescale.  And I know

05:40  9   him mostly from, you know, from innovation calls, and I met him

05:40  10  for the first time in person just over in your office.

05:40  11         Q.   All right.  Are you -- have you done an analysis of

05:40  12  these patents?

05:40  13         A.   Well, I was looking at these, you know, looking at --

05:40  14  I did look at a high level.  You know, I looked at the

05:40  15  abstract, of course looked at some of the claims and then some

05:40  16  of the pictures.  But it was -- it was very -- it was a quick

05:40  17  review.

05:40  18         Q.   Okay.  Have you done an analysis of the importance of

05:41  19  these patents?

05:41  20         A.   Yeah.  You know, I did look at it.  NXP uses this

05:41  21  service where -- that looks, you know, looks at patents, and

05:41  22  what we found was is these patents score in the top ten

05:41  23  percentile of patents.

05:41  24         Q.   And what is that source?

05:41  25         A.   It's called Innography.

05:41  1        Q.    Okay.  And do other companies use and rely on that
05:41  2   third-party service?
05:41  3        A.    Yes.  They do.
05:41  4        Q.    All right.  You know that VLSI is alleging in this
05:41  5   case that Intel infringes the patents.
05:41  6        Have you personally done any work to try to do that
05:41  7   analysis to determine whether Intel infringes on these NXP to
05:41  8   VLSI's patents?
05:41  9        A.    There's no way I could do that.  Because -- well, and
05:41  10  the reason is because, first of all, it costs a lot of money to
05:41  11  do it.  And the second thing is -- is, you know, this is very
05:41  12  important technology to Intel.  So I would have to be able to
05:41  13  go into Intel and look at, you know, their databases, their
05:41  14  software, do a complete analysis.  And that's just not
05:41  15  something that I would be capa- -- would be allowed to do or --
05:42  16  would be allowed to do.
05:42  17       Q.    So you don't have access to Intel's source code?
05:42  18       A.    No.  I don't.
05:42  19       Q.    And what is source code?
05:42  20       A.    Well, you know, source code is -- there's a couple of
05:42  21  ways it could be looked at.  It could be like RTL, which in a
05:42  22  sense, you know, does the placement of the transistors, you
05:42  23  know, kind of figures out the complexity; or it could be also
05:42  24  source code from the perspective of computer language in a
05:42  25  sense which tells the processors what to do.

05:42  1        Q.   Is it the ingredients, like knowing what goes into

05:42  2   Coke?

05:42  3        A.   Yeah.  It's -- well, yeah.  Because if you think

05:42  4   about it, the permutations are infinite as to what you could do

05:42  5   in there.

05:42  6        Q.   Are you generally familiar with the size of the

05:42  7   market which these patents at issue are directed?

05:42  8        A.   Yeah.  I am actually.  It's -- you know, there's, you

05:42  9   know, tens of billions of chips.  And then, of course --

05:42  10       MR. MUELLER:  I object, Your Honor.  Motion in Limine,

05:42  11   No. 6.

05:43  12       THE COURT:  Why don't you re-ask the question, Mr. Mann?

05:43  13   BY MR. MANN:

05:43  14       Q.   Are you familiar with whether the market is a large

05:43  15   market?

05:43  16       A.   The market is very large.

05:43  17       Q.   Okay.  Thank you, Mr. Spehar.

05:43  18       MR. MANN:  I pass the witness.

05:43  19       THE COURT:  Counsel?

05:43  20       MR. MUELLER:  Thank you, Your Honor.  May I pass out the

05:43  21   cross-exhibit binders?

05:43  22       THE COURT:  Sure.

05:44  23       MR. MUELLER:  Your Honor, Joe Mueller on behalf of Intel.

05:44  24   May I proceed?

05:44  25       THE COURT:  Of course.

05:44   1          MR. MUELLER:  Good afternoon, ladies and gentlemen.

05:44   2                          CROSS-EXAMINATION

05:44   3   BY MR. MUELLER:

05:44   4          Q.   Good afternoon, Mr. Spehar.  It's nice to meet you.

05:44   5          A.   Thank you.

05:44   6          Q.   My name is Joe Mueller, and I'd like to ask you a few

05:44   7   questions, if I could, sir.

05:44   8          A.   Yes, please.

05:44   9          Q.   Now, you, sir, are here as the representative of NXP,

05:44   10  correct?

05:44   11         A.   That is correct.

05:44   12         Q.   And Mr. Chu this morning told the ladies and

05:44   13  gentlemen of the jury that you're here as the representative of

05:44   14  NXP, and Mr. Stolarski is here as the representative of VLSI,

05:44   15  right?

05:44   16         A.   That's correct.

05:44   17         Q.   And we also heard that your companies had teamed up

05:44   18  in an effort that resulted in this case, correct?

05:44   19         A.   That's my understanding.

05:44   20         Q.   Now, I want to ask you a little bit about this team

05:44   21  that you put together.  Okay?

05:44   22         When was the first time you met Mr. Stolarski?

05:44   23         A.   I just met him today.

05:44   24         Q.   Today?

05:44   25         A.   Yeah.

05:44   1        Q.   That was the first time you met him, today?

05:45   2        A.   Yes.

05:45   3        Q.   When was the first time you spoke to him?

05:45   4        A.   Might have been awhile ago.  I don't remember the

05:45   5   exact time.

05:45   6        Q.   But the very first time you met the representative of

05:45   7   the other team member was today?

05:45   8        A.   That's correct.

05:45   9        Q.   Okay.  Now, you told us about VLSI's investigation

05:45  10   and what occurred in terms of how they came to bring these

05:45  11   patents, right?

05:45  12        A.   Yes.  I did.

05:45  13        Q.   Now, you just met Mr. Stolarski today, right?

05:45  14        A.   That's correct.

05:45  15        Q.   So you couldn't have heard about it from him before

05:45  16   today, right?

05:45  17        A.   No.  Actually I heard about it -- I've heard about it

05:45  18   recently.

05:45  19        Q.   So you heard about it recently but not from him,

05:45  20   correct?

05:45  21        A.   That's correct.

05:45  22        Q.   You heard about it from the lawyers, right?

05:45  23        A.   I heard that from both the lawyers and NXP counsel.

05:45  24        Q.   So you understand there's two folks who work at VLSI,

05:45  25   Mr. -- excuse me.  Let me just grab some water.  I apologize.

05:46  1   Dry throat.

05:46  2       Do you understand there's two folks who work at VLSI,

05:46  3   Mr. Stolarski and a woman named Cindy Simpson, correct?

05:46  4       A.   Yes.

05:46  5       Q.   You've never met Cindy Simpson, right?

05:46  6       A.   I don't believe I have.

05:46  7       Q.   You met Mr. Stolarski today for the first time.  And

05:46  8   those are the only two folks who work there, correct?

05:46  9       A.   I don't know the full employment.

05:46  10      Q.   So everything you told this jury about what VLSI had

05:46  11  done, you didn't learn from Mr. Stolarski and you didn't learn

05:46  12  from Ms. Simpson, true?

05:46  13      A.   That's true.  But Mr. Stolarski did confirm it.

05:46  14      Q.   You learned it for the first time from the lawyers,

05:46  15  correct?

05:46  16      A.   That's correct.

05:46  17      Q.   Now, let's put up a slide that we've seen a couple

05:46  18  times today, "VLSI Enables Cycle of Innovation."  And you

05:46  19  testified about this, sir, right?

05:46  20      A.   Yes.  I did.

05:46  21      Q.   Now, I want to go through this piece by piece, if we

05:47  22  could; is that fair?

05:47  23      A.   Okay.  Oh, please.

05:47  24      Q.   First piece is labeled "No. 1 NXP Invents."

05:47  25      Do you see that, sir?

05:47   1        A.   Yes.  I do.

05:47   2        Q.   Now, you told the jury about Google Pay and cellphone

05:47   3   inventions and cochlear implants and a whole host of ideas that

05:47   4   you and your colleagues at NXP have come up with over the

05:47   5   years, right?

05:47   6        A.   That's correct.

05:47   7        Q.   Now, you're of course rightfully proud of those

05:47   8   ideas, right?

05:47   9        A.   Yes.  I am.

05:47   10       Q.   But not a one is in this case, correct?

05:47   11       A.   That's not my area of -- I don't -- expertise.

05:47   12       Q.   Sir, your patents are not part of this case, correct?

05:47   13       A.   That's correct.

05:47   14       Q.   All those inventions you told the jury about have

05:47   15   nothing at all to do with the two patents in this case, right?

05:47   16       A.   That's true.

05:47   17       Q.   Now, when it says NXP invents, for the two patents

05:47   18   that are actually at issue in this case, they were not invented

05:47   19   by NXP, right?

05:47   20       A.   That's correct.

05:47   21       Q.   In fact, they came from other companies that either

05:47   22   merged into or were acquired by NXP, correct?

05:48   23       A.   Yeah.  That's right.

05:48   24       Q.   SigmaTel and Freescale, right?

05:48   25       A.   Yes.

05:48  1    Q.   So when it says NXP invents, that's just not true

05:48  2  with respect to the two patents in this case, correct?

05:48  3    A.   NXP bought those companies, and they used money that

05:48  4  they -- they used money to buy those companies.

05:48  5    Q.   Sir --

05:48  6    THE COURT:  Excuse me.  When your lawyer is asking you a

05:48  7  question, you get to say whatever your lawyer is satisfied with

05:48  8  your answer.  When you're being cross-examined, you need to

05:48  9  answer this gentleman's questions directly.

05:48  10    THE WITNESS:  Okay.

05:48  11    THE COURT:  And if you feel like you need to add something

05:48  12  after that, your lawyer, Mr. Mann, is going to have an

05:48  13  opportunity to give you a chance to say anything you'd like to

05:48  14  add.  But for the purposes of cross, you need to answer this

05:48  15  gentleman's questions.

05:48  16    THE WITNESS:  Okay.  Thank you, Your Honor.

05:48  17    MR. MUELLER:  Thank you, Your Honor.

05:48  18  BY MR. MUELLER:

05:48  19    Q.   NXP did not invent these two patents, correct?

05:48  20    A.   Yes, that's correct.

05:48  21    Q.   They told the jury that NXP spends over $1 billion a

05:49  22  year on research and development, right?

05:49  23    A.   That's true.

05:49  24    Q.   Not a penny of that went to these two patents,

05:49  25  correct?

05:49  1      A.   That's correct.

05:49  2      Q.   Now, it says in Box 2 here, "patents granted on

05:49  3  inventions" with an arrow that goes to VLSI.  Do you see that,

05:49  4  sir?

05:49  5      A.   I do.

05:49  6      Q.   Now, you know these two patents were not granted to

05:49  7  VLSI, right?

05:49  8      A.   That's true.

05:49  9      Q.   VLSI bought them after NXP bought them, right?

05:49  10     A.   That's true.

05:49  11     Q.   So it's just not true that the patents were granted

05:49  12  on inventions with an arrow to VLSI.  That didn't happen, did

05:49  13  it?

05:49  14     A.   I'm sorry.  One more time?

05:49  15     Q.   Patents were not granted with an arrow to VLSI.  That

05:49  16  did not happen, correct?

05:49  17     A.   So -- can -- you're saying that -- the question is

05:49  18  that the -- were the patents directly granted to VLSI?

05:49  19     Q.   They were not, were they?

05:49  20     A.   No, they weren't.

05:49  21     Q.   Now, on the bottom here it says "VLSI licenses

05:49  22  patents."  Do you see that, sir?

05:49  23     A.   Yes.

05:49  24     Q.   Now, of course NXP has its own licensing department,

05:50  25  right?

05:50  1      A.   They do.

05:50  2      Q.   And how many folks work there?

05:50  3      A.   I don't know.

05:50  4      Q.   Dozens?

05:50  5      A.   I would think -- I would think there's a few at

05:50  6  least.

05:50  7      Q.   A few dozen, right?

05:50  8      A.   I don't know.

05:50  9      Q.   There's a lot more licensing folks working at NXP

05:50 10  than the one licensing attorney at VLSI, correct?

05:50 11      A.   I don't know enough about -- I'm taking your word

05:50 12  that...

05:50 13      Q.   NXP does not need VLSI to be able to strike a

05:50 14  license, correct?

05:50 15      A.   I don't agree.

05:50 16      Q.   It's been doing it for years, hasn't it?

05:50 17      A.   I don't agree with what you said.

05:50 18      Q.   NXP has a licensing department, correct?

05:50 19      A.   They do.

05:50 20      Q.   And they have struck many licenses over the years?

05:50 21      A.   They have.

05:50 22      Q.   Now, it says VLSI licenses patents.  The truth of the

05:50 23  matter is, sir, VLSI has not licensed these two patents for

05:50 24  payment to anyone; isn't that true?

05:50 25      A.   That -- I think that's true.

05:50  1        Q.   Now, Mr. Chu told the jury during opening statement

05:51  2   that the industry was in a wait-and-see attitude.  Do you

05:51  3   remember that?

05:51  4        A.   I do remember that.

05:51  5        Q.   But another way to put it is no one's paid VLSI a

05:51  6   penny for these two patents, right?

05:51  7        A.   That's my understanding.

05:51  8        Q.   And the arrow from 3 to 4, where money is going to

05:51  9   VLSI to invest -- for investment by NXP, that's never happened

05:51  10  either, has it?

05:51  11       A.   I don't know.

05:51  12       Q.   Sir, to your knowledge has NXP ever received one

05:51  13  penny from VLSI?

05:51  14       A.   I don't know.

05:51  15       Q.   You're not aware of it, are you?

05:51  16       A.   I'm not aware.

05:51  17       Q.   Sir, to the best of your knowledge, this cycle has

05:51  18  not happened a single time, has it?

05:51  19       A.   I don't know.

05:51  20       Q.   So you're not aware of it happening once, are you?

05:51  21       A.   I don't know.  I'm being honest.

05:51  22       Q.   And you're here as the corporate representative of

05:51  23  NXP, right?

05:51  24       A.   That's correct.

05:51  25       Q.   And you don't know of this happening once; isn't that

05:51  1   true?

05:51  2        A.   I don't know if it's happened once.

05:52  3        Q.   Now, sir, you have been working at NXP for about

05:52  4   30 years, right?

05:52  5        A.   That's correct.

05:52  6        Q.   And you've worked as an engineer, correct?

05:52  7        A.   That is true.

05:52  8        Q.   You've told the jury about many products that you

05:52  9   worked on, right?

05:52  10       A.   Yes.

05:52  11       Q.   And that takes a lot of hard work by you and your

05:52  12  colleagues, correct?

05:52  13       A.   That's true.

05:52  14       Q.   So tell us a little bit about the day -- a day in the

05:52  15  life of an engineer at NXP working on computer chip technology.

05:52  16  What's it like?

05:52  17       A.   Do you -- well, we -- I guess I'm trying to

05:52  18  understand the context of what you want in the question.  You

05:52  19  just want me to explain like, you know, they go to work, okay.

05:52  20  So the way it works with an engineer, of course, is we get --

05:52  21  we go in.  We have a product definition team that comes and

05:52  22  defines the product and tells us:  This is what we need to do.

05:52  23       A lot of times there's a lot of challenges based on the

05:52  24  specs that they give us, so the team has to work really hard to

05:52  25  figure out how do you -- how do you address, how do you

05:52  1    accomplish those things that are needed in order to make your

05:52  2    product, you know, something that somebody would want to buy?

05:53  3         So it becomes an innovation and a learning and a

05:53  4    development cycle.  So every day we're getting together,

05:53  5    challenging each other, running simulations, you know, looking

05:53  6    at designs, you know, just working together, working with peers

05:53  7    consulting each other, trying to in a sense make sure that our

05:53  8    design is good enough that we will be able to sell it.

05:53  9         Q.   And it takes a lot of hard work by a lot of really

05:53  10   smart folks day after day after day, correct?

05:53  11        A.   That's true.

05:53  12        Q.   Now, I notice you didn't say a word about reading

05:53  13   other companies' patents as part of that work, right?

05:53  14        A.   It depends on the context.

05:53  15        Q.   And as part of your normal routine, you are not

05:53  16   reading other companies' patents, you're focused on your own

05:53  17   ideas, right?

05:53  18        A.   There are times where I do read other people's

05:53  19   patents.

05:53  20        Q.   Sir, you focused on your own innovation, didn't you?

05:53  21        A.   Yes.

05:53  22        Q.   Now, you did serve on a patent review committee at

05:53  23   NXP, correct?

05:53  24        A.   That's true.

05:53  25        Q.   And that was a review committee for reviewing NXP

05:54   1    patents, right?

05:54   2          A.   NXP disclosures.

05:54   3          Q.   And when you say "disclosure," you mean a disclosure

05:54   4    of an invention.  And the patent review committee would try to

05:54   5    figure out if this is worth seeking a patent, correct?

05:54   6          A.   Yes.

05:54   7          Q.   And you served on that committee with some other

05:54   8    folks, right?

05:54   9          A.   That is true.

05:54   10         Q.   And you tried to figure out which inventions were

05:54   11   sufficiently valuable to pursue patent protection, correct?

05:54   12         A.   That's true.  But --

05:54   13         Q.   And you've also held very --

05:54   14         A.   -- one clarification.

05:54   15         Q.   -- important goals --

05:54   16         THE COURT:  Counsel.

05:54   17   BY MR. MUELLER:

05:54   18         Q.   Go ahead, yeah.

05:54   19         A.   One clarification.  We didn't determine the value.

05:54   20   We determined the -- tried to figure out if it was important.

05:54   21         Q.   Important?

05:54   22         A.   Yeah.

05:54   23         Q.   And when you say "important," you mean important to

05:54   24   real products, right?

05:54   25         A.   That's true.

05:54    1        Q.   Whether these ideas could be important to using in

05:54    2   real products, correct?

05:54    3        A.   Yes.

05:54    4        Q.   Now, sir, you've held various executive positions in

05:54    5   research and development at NXP, right?

05:54    6        A.   That's correct.

05:54    7        Q.   So let's just make sure we understand this.  You

05:54    8   served on a patent review committee, right?

05:54    9        A.   That's true.

05:55   10        Q.   And you've had a series of senior positions for

05:55   11   research and development, correct?

05:55   12        A.   That's true.

05:55   13        Q.   And part of those positions involved determining

05:55   14   where there was real innovation happening within the company,

05:55   15   correct?

05:55   16        A.   That's correct.

05:55   17        Q.   Which ideas were important, right?

05:55   18        A.   That's true.

05:55   19        Q.   Which ones were worth including in products, correct?

05:55   20        A.   I don't think -- can I clarify?  I don't think it was

05:55   21   which ones were worthy of being included in products, but were

05:55   22   they worthy of being patented.

05:55   23        Q.   And certainly one of the reasons to be worthy of

05:55   24   being patented is to use it in actual products you could sell

05:55   25   in the marketplace, correct?

05:55  1       A.   That's definitely one point, yes.

05:55  2       Q.   I'm sorry, sir?

05:55  3       A.   Yes.

05:55  4       Q.   And, in fact, you hold some patents of your own,

05:55  5  right?

05:55  6       A.   I do.

05:55  7       Q.   And some of your patents have made their way into NXP

05:55  8  products, correct?

05:55  9       A.   That's correct.

05:55  10      Q.   Now, you were asked some questions by Mr. Mann about

05:55  11 what information you have access to and what information you

05:55  12 don't, right?

05:55  13      A.   That's true.

05:55  14      Q.   One thing we can certainly agree is you have access

05:56  15 to information about NXP products, correct?

05:56  16      A.   That's true.

05:56  17      Q.   You have information about how those NXP products

05:56  18 work, right?

05:56  19      A.   The ones that I work on, yes.

05:56  20      Q.   And certainly, sir, as a senior executive in the

05:56  21 company, if you needed to know more about how some piece of an

05:56  22 NXP product works, you could ask somebody and they'd tell you,

05:56  23 right?

05:56  24      A.   That's true.

05:56  25      Q.   And you're coming here, again, as the corporate

05:56  1    representative of the company, right?

05:56  2         A.   That's true.

05:56  3         Q.   You've prepared yourself for that, didn't you?

05:56  4         A.   Uh-huh.  Yes.

05:56  5         Q.   You did the due diligence necessary to come to court

05:56  6    and testify?

05:56  7         A.   I'm not sure exactly what your question is going --

05:56  8    where it's going.

05:56  9         Q.   Let me ask you a few more.  I'll try to clarify.

05:56  10        You sat in this case for a deposition, right?

05:56  11        A.   Yes, I did.

05:56  12        Q.   So let's explain exactly what that is to the ladies

05:56  13   and gentlemen of the jury.

05:56  14        A deposition is our opportunity to ask folks questions

05:56  15   before the trial, right?

05:57  16        A.   That's true.

05:57  17        Q.   It's our opportunity -- actually both sides have the

05:57  18   same opportunity, the opportunity to ask witnesses questions to

05:57  19   find out the truth before trial, right?

05:57  20        A.   That's true, yes.

05:57  21        Q.   And as part of the fairness of the process -- we

05:57  22   don't want to get here and get surprised, we want to find out

05:57  23   the facts --

05:57  24        THE COURT:  Counsel, I have no idea how there's any

05:57  25   relevance to the deposition process.

| | | |
|---|---|---|
| 05:57 | 1 | MR. MUELLER:  Well, if you'll give me a minute, Your |
| 05:57 | 2 | Honor. |
| 05:57 | 3 | THE COURT:  I -- |
| 05:57 | 4 | MR. MUELLER:  I'll keep going. |
| 05:57 | 5 | THE COURT:  I would. |
| 05:57 | 6 | BY MR. MUELLER: |
| 05:57 | 7 | Q.  Let me ask you this:  The '373 patent, that's one of |
| 05:57 | 8 | the patents in front of you, right? |
| 05:57 | 9 | A.  Yes. |
| 05:57 | 10 | Q.  And Mr. Chu described that as one of the two star |
| 05:57 | 11 | patents, two heroes of this trial, right? |
| 05:57 | 12 | A.  I heard that, yes. |
| 05:57 | 13 | Q.  And in fact, if we could take a look at PDX-4.22, it |
| 05:57 | 14 | was described as saving powers -- power hundreds of times per |
| 05:57 | 15 | second, right? |
| 05:58 | 16 | A.  I remember that.  Yes. |
| 05:58 | 17 | Q.  It's described as a pretty important patent, right? |
| 05:58 | 18 | A.  Uh-huh.  Yes. |
| 05:58 | 19 | Q.  Very valuable, right? |
| 05:58 | 20 | A.  Yeah.  I heard that. |
| 05:58 | 21 | Q.  Sir, the truth of the matter is you're not aware of |
| 05:58 | 22 | NXP ever using the '373 patent, correct? |
| 05:58 | 23 | A.  No.  I'm not. |
| 05:58 | 24 | Q.  You're not aware of it? |
| 05:58 | 25 | A.  No. |

05:58  1       Q.   No.  You're not aware of it; is that right?

05:58  2       A.   No.  I'm not aware of it, yeah.

05:58  3       Q.   Okay.  You're not aware of a single NXP product that

05:58  4  uses that patent, correct?

05:58  5       A.   No.  I'm not.

05:58  6       Q.   And how many products has NXP released over the last

05:58  7  five years?

05:58  8       A.   Probably, like, thousands.

05:58  9       Q.   Thousands.  And out of all those thousands of

05:58  10 products, you can't identify a single one that uses the '373

05:58  11 patent?

05:58  12      A.   I didn't do that investigation.

05:58  13      Q.   Again, you could have.  You had access to all the

05:58  14 information, right?

05:58  15      A.   Yes.

05:58  16      Q.   But you didn't do it, did you?

05:58  17      A.   No.  I wouldn't.

05:59  18      Q.   Let's go to the other patent, the '759 patent.  This

05:59  19 was also described as a "hero" or "star" patent.

05:59  20      Do you recall that, sir?

05:59  21      A.   I do remember that.

05:59  22      Q.   Now, let me pull up DDX-1.13.  Did you see Mr. Lee

05:59  23 deliver his opening statement?

05:59  24      A.   Yes.  I was here.

05:59  25      Q.   And did you see that he showed this particular slide

05:59  1    to the ladies and gentlemen of the jury?

05:59  2         A.   Yes.  I remember that.

05:59  3         Q.   Now, when he showed this slide to the ladies and

05:59  4    gentlemen of the jury, he was talking about some of the

05:59  5    arguments that Mr. Chu made in his opening statement, right?

05:59  6         A.   I'm sorry, one more time.  I apologize.

05:59  7         Q.   Sure.  Mr. Lee was responding to some of the

05:59  8    arguments that Mr. Chu had made in his opening statement,

05:59  9    right?

05:59  10        A.   Yes.  I remember that.

05:59  11        Q.   And there was a timeline that Mr. Lee presented right

05:59  12   here, right?

05:59  13        A.   If I recall, yeah.  I believe so, but...

05:59  14        Q.   And I just want to go through the timeline to see if

05:59  15   you have any evidence to contradict any of this.

05:59  16        For the 2005 entry there's a filing of an application for

06:00  17   the '759 patent.  Do you see that, sir?

06:00  18        A.   Yes.  I do.

06:00  19        Q.   And you're not here to contest that, right?

06:00  20        A.   No.  I'm not.

06:00  21        Q.   Now, in 2006 there's a filing of the '373.  Do you

06:00  22   see that, sir?

06:00  23        A.   I do see that.

06:00  24        Q.   You're not contesting that's the correct date, right?

06:00  25        A.   No.  I think that's evidence.

06:00  1      Q.   In 2008 Freescale acquired SigmaTel and one of these

06:00  2  patents, the '759.  That's true as well, right?

06:00  3      A.   Yes.

06:00  4      Q.   In 2015 NXP acquired Freescale and both these

06:00  5  patents, the '373 and the '759, right?

06:00  6      A.   Yes.

06:00  7      Q.   And that's a fact?

06:00  8      A.   Yeah.  I think so.

06:00  9      Q.   In 2016 VLSI is created.  Do you see that, sir?

06:00  10      A.   I do see that.

06:00  11      Q.   Do you know who created it?

06:00  12      A.   The gentleman over there.

06:00  13      Q.   Are you aware of anyone else being involved other

06:00  14  than Mr. Stolarski?

06:00  15      A.   I don't have that information.

06:00  16      Q.   So you don't know one way or the other --

06:01  17      A.   No.

06:01  18      Q.   -- if anyone else was involved in the creation of

06:01  19  VLSI.  Do I have that right?

06:01  20      A.   Yeah.  You're correct.

06:01  21      Q.   And let me ask you one more question about that.  Do

06:01  22  you know whether any -- well, withdrawn.

06:01  23      You told the jury that NXP stands to benefit from this

06:01  24  case, correct?

06:01  25      A.   That's true.

06:01  1      Q.   Do you know if anyone else other than NXP stands to

06:01  2  benefit?

06:01  3      A.   Yeah.  I do.

06:01  4      Q.   Who?

06:01  5      A.   There's, like, teachers unions.  It's like pension

06:01  6  funds, I guess.  You know, those -- it's investors.

06:01  7      Q.   Investors?

06:01  8      A.   Yeah.  And pension funds --

06:01  9      Q.   All you know is investors?

06:01 10      A.   Well, I know pension funds.  I guess there's a --

06:01 11  Texas A&M has a vested stake in it too.  So those are the three

06:01 12  that I know of.

06:01 13      Q.   And so the lawyers told you that too, right?

06:01 14      THE COURT:  Counsel.

06:01 15      MR. MUELLER:  I'll move on, Your Honor.

06:01 16  BY MR. MUELLER:

06:01 17      Q.   The next entry here, December --

06:01 18      THE COURT:  Well, no.  I -- Counsel, did you just ask him

06:01 19  what the lawyers told him?

06:01 20      MR. MUELLER:  Your Honor, I was just asking because I

06:01 21  didn't understand that -- other basis for that information.

06:01 22      THE COURT:  Don't do that again.

06:01 23      MR. MUELLER:  Understood.

06:02 24  BY MR. MUELLER:

06:02 25      Q.   Sir, if we could go to December 2018.  We have VLSI

06:02  1  buying the '373 and '759 patents, right, sir?

06:02  2      A.   Yes.

06:02  3      Q.   And you have no basis to contest that fact either,

06:02  4  right?

06:02  5      A.   That's true.

06:02  6      Q.   And in April of 2019, VLSI sued Intel, correct, sir?

06:02  7      A.   Yes.

06:02  8      Q.   And again that's a fact, right?

06:02  9      A.   I believe that's true.  Yes.

06:02  10      Q.   So the timeline that Mr. Lee presented to the jury,

06:02  11  all these entries are facts, correct?

06:02  12      A.   I believe so.  Yes.

06:02  13      Q.   These two patents have been in the hands of several

06:02  14  companies, right?

06:02  15      A.   That's true.

06:02  16      Q.   Freescale, right?

06:02  17      A.   Uh-huh.

06:02  18      Q.   SigmaTel for one of them, correct?

06:02  19      A.   Uh-huh.  Yeah.

06:02  20      Q.   NXP?

06:02  21      A.   Yes.

06:02  22      Q.   Sir, you have no knowledge of the '759 patent being

06:02  23  used by any of these companies during any of the time period

06:02  24  that we see here; isn't that true?

06:02  25      A.   That'd be outside --

06:02  1      Q.   I'm sorry, sir?

06:02  2      A.   No.  I don't have any.  I don't have any.  I wouldn't

06:02  3  know.  I wouldn't do that research.

06:03  4      Q.   You can't identify a single product made by any of

06:03  5  these companies --

06:03  6      A.   It's not something --

06:03  7      Q.   -- that use the '759 patent?

06:03  8      A.   It's not something that I would have done.

06:03  9      Q.   Sir, if you'd stay with my question, please.

06:03 10      You can't identify a single product used by any of these

06:03 11  companies incorporating the '759 patent?

06:03 12      A.   Not me personally.

06:03 13      Q.   Now, you hadn't even heard of either of these two

06:03 14  patents until very recently, correct?

06:03 15      A.   Until my deposition.

06:03 16      Q.   So until you were deposed in this case, you had not

06:03 17  heard about either the '373 patent or the '759 patent.  Do I

06:03 18  have that right?

06:03 19      A.   Can I clarify?  I did know about it a little before,

06:03 20  when the case came, but yeah.  It was around the deposition

06:03 21  time.  Yes.

06:03 22      Q.   And you were deposed last July, right?

06:03 23      A.   Yes.  That's correct.

06:03 24      Q.   Before then, you didn't know about these two patents?

06:03 25      A.   No.  I did not.

06:03  1       Q.   Thank you, sir.

06:03  2       MR. MUELLER:  I have no further questions.  I pass the

06:03  3  witness, Your Honor.

06:03  4       THE COURT:  Mr. Mann, redirect?

06:03  5       MR. MANN:  I have less than a minute, Your Honor.

06:03  6                      REDIRECT EXAMINATION

06:03  7  BY MR. MANN:

06:04  8       Q.   Mr. Spehar, you were asked by Intel's counsel when

06:04  9  you were deposed -- do you remember being deposed December

06:04  10  16th, 2019?

06:04  11      A.   Yes.

06:04  12      Q.   Okay.  And -- where the Intel lawyers had a chance to

06:04  13  ask you 121 pages worth of questions?

06:04  14      A.   Yes.  I do remember that.

06:04  15      Q.   All right.  Did you know something about the patents

06:04  16  then?

06:04  17      A.   A little -- after a quick reading and all that, I did

06:04  18  know something about them, yes, then -- by then.

06:04  19      Q.   Lastly, why did you not do an investigation into the

06:04  20  patents that VLSI holds that came from NXP?

06:04  21      A.   Well, the reason is is that's not my expertise as far

06:04  22  as -- so I'm, you know, off innovating and designing products.

06:04  23  So going off and, you know, figuring out who's using a patent

06:04  24  in the company is outside my purview.  And there's experts that

06:05  25  can do that stuff.  They're trained to do that.  I'm not

06:05  1    trained to do that.

06:05  2        Q.   And do you know whether experts have been retained in

06:05  3    this case to do that type of work?

06:05  4        A.   Yes.  There are experts have been hired to go off and

06:05  5    do this analysis, and that's why I haven't done it.

06:05  6        Q.   Thank you very much, Mr. Spehar.

06:05  7        MR. MANN:  I pass the witness, Your Honor.

06:05  8        MR. MUELLER:  No further questions, Your Honor.  Thank

06:05  9    you.

06:05  10       THE COURT:  You may step down.

06:05  11       May he be excused?

06:05  12       MR. MUELLER:  Yes, Your Honor.

06:05  13       THE COURT:  Okay.  Thank you for being here, sir.

06:05  14       THE WITNESS:  Thank you.

06:05  15       THE COURT:  You're free to leave.

06:05  16       Ladies and gentlemen of the jury, that's it for today.

06:05  17    I'm planning on starting tomorrow at 9:00, unless that causes

06:05  18    you all some stress.  Typically we'll go from 9:00 until about

06:05  19    5:00, may go a little -- if the witnesses finish before 5:00,

06:05  20    you get to go a little early.  If they go after 5:00 to finish,

06:06  21    we go a little late.  That's the way I try to run the Court.

06:06  22       Remembering my instructions not to discuss the case

06:06  23    amongst yourselves, I dismiss you for the evening.  And again

06:06  24    tomorrow when you get here, if you'll recall, I practiced law

06:06  25    for a long time and occasionally you're in the courthouse and

06:06  1   you run into someone that you know is on the jury, and if you

06:06  2   grew up in Texas, you don't know what to do because you can't

06:06  3   not say good morning, but you aren't allowed to say it.

06:06  4       So again, if for some reason while you're coming in the

06:06  5   courthouse, if you run into anyone that's sitting over there

06:06  6   that recognizes you, they're not going to say anything to you,

06:06  7   but that's my fault.  So please don't take it personally.

06:06  8       Have a good evening, and we'll see you tomorrow morning.

06:06  9   If you'd be here by 8:45, that'd be terrific.

06:06  10       THE BAILIFF:  All rise.

06:06  11       (Jury exited the courtroom at 6:06.)

06:07  12       THE COURT:  Thank you.  You may be seated.

06:07  13       I'll start with Mr. Mann.  Is there anything we need to

06:07  14   take up before tomorrow morning?

06:07  15       MR. MANN:  No, Your Honor.

06:07  16       THE COURT:  Mr. Lee?

06:07  17       MR. LEE:  No, Your Honor.

06:07  18       THE COURT:  If I could see Mr. Lee and Mr. Chu back in my

06:07  19   chambers for just a few seconds.

06:07  20       (Hearing adjourned at 6:07 p.m.)

21

22

23

24

25

```
 1   UNITED STATES DISTRICT COURT  )

 2   WESTERN DISTRICT OF TEXAS     )

 3

 4        I, Kristie M. Davis, Official Court Reporter for the

 5   United States District Court, Western District of Texas, do

 6   certify that the foregoing is a correct transcript from the

 7   record of proceedings in the above-entitled matter.

 8        I certify that the transcript fees and format comply with

 9   those prescribed by the Court and Judicial Conference of the

10   United States.

11        Certified to by me this 8th day of March 2021.

12
                              /s/ Kristie M. Davis
13                            KRISTIE M. DAVIS
                              Official Court Reporter
14                            800 Franklin Avenue
                              Waco, Texas 76701
15                            (254) 340-6114
                              kmdaviscsr@yahoo.com
16

17

18

19

20

21

22

23

24

25
```