```
1                   IN THE UNITED STATES DISTRICT COURT
                  FOR THE WESTERN DISTRICT OF TEXAS
2                           WACO DIVISION

3   VLSI TECHNOLOGY LLC              *
                                     *
4   VS.                             * CIVIL ACTION NO. W-21-CV-57
                                     *
5   INTEL CORPORATION                *     February 23, 2021

6       BEFORE THE HONORABLE ALAN D ALBRIGHT, JUDGE PRESIDING
                      JURY TRIAL PROCEEDINGS
7                        VOLUME 2 OF 7

8   APPEARANCES:

9   For the Plaintiff:       Morgan Chu, Esq.
                             Benjamin W. Hattenbach, Esq.
10                           Alan Heinrich, Esq.
                             Ian Robert Washburn, Esq.
11                           Amy E. Proctor, Esq.
                             Dominik Slusarczyk, Esq.
12                           Charlotte J. Wen, Esq.
                             Jordan Nafekh, Esq.
13                           Babak Redjaian, Esq.
                             Irell & Manella, L.L.P.
14                           1800 Avenue of the Stars, Suite 900
                             Los Angeles, CA 90067-4276
15
                             J. Mark Mann, Esq.
16                           Andy W. Tindel, Esq.
                             Mann, Tindel & Thompson
17                           112 East Line Street, Suite 304
                             Tyler, TX 75702
18
    For the Defendant:       William F. Lee, Esq.
19                           Joseph Mueller, Esq.
                             Louis W. Tompros, Esq.
20                           Felicia H. Ellsworth, Esq.
                             Jordan L. Hirsch, Esq.
21                           WilmerHale
                             60 State Street
22                           Boston, MA 02109

23                           Mary V. Sooter, Esq.
                             Amanda L. Major, Esq.
24                           Wilmer Cutler Pickering Hale Dorr LLP
                             1225 17th Street, Suite 2600
25                           Denver, CO 80202
```

```
 1                              J. Stephen Ravel, Esq.
                                Kelly Hart & Hallman LLP
 2                              303 Colorado Street, Suite 2000
                                Austin, TX 78701
 3
                                James Eric Wren, III, Esq.
 4                              Baylor University Law School
                                One Bear Place #97288
 5                              Waco, TX 76798-7288

 6   Court Reporter:           Kristie M. Davis
                                United States District Court
 7                              PO Box 20994
                                Waco, Texas 76702-0994
 8

 9

10        Proceedings recorded by mechanical stenography, transcript

11   produced by computer-aided transcription.

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

08:31   1          (February 23, 2021, 8:31 a.m.)

08:31   2          THE COURT:  Mr. Lee?

08:31   3          MR. LEE:  Yes, Your Honor.  If we could get Your Honor's

08:32   4   guidance, it'll make things move faster this third, fourth and

08:32   5   fifth days.

08:32   6          THE COURT:  We can't hear you with your mask on.

08:32   7          MR. LEE:  I'm sorry.  I said I think, Your Honor, if we

08:32   8   get your guidance, this will help for the third, fourth and

08:32   9   fifth days and resolve some disputes.

08:32   10          So by category, Your Honor, for the things that we object

08:32   11   to that we'd like to have resolved before Dr. Conte takes the

08:32   12   stand -- there are a couple that relate to Dr. Sullivan that

08:32   13   could wait till tomorrow.  But first --

08:32   14          THE COURT:  Mr. Lee, let me interrupt you and ask you

08:32   15   first, would you feel comfortable talking at the podium not

08:32   16   wearing a face mask?

08:32   17          MR. LEE:  Sure, if it helps.

08:32   18          THE COURT:  It helps.

08:32   19          MR. LEE:  Better?

08:32   20          THE COURT:  Much.  And let me say for everyone, in my last

08:32   21   trials the person speaking at the podium didn't wear a mask and

08:32   22   the sound was dramatically better.

08:32   23          MR. LEE:  I'm good with that.  And I kept yesterday during

08:32   24   the opening trying to poke myself in the face.

08:32   25          So, Your Honor, there are a few categories of documents

08:33   1    that we'd like your guidance on.

08:33   2         THE COURT:  Okay.

08:33   3         MR. LEE:  The first is, there are these what they call

08:33   4    1006 exhibits that are PTX-4418 and PTX-4419.  And, Your Honor,

08:33   5    those are claim charts which Your Honor knows from your private

08:33   6    practice days with just tons and tons of citations to

08:33   7    depositions.  And it's basically an information dumped in the

08:33   8    form of a 1006 exhibit.

08:33   9         If Dr. Conte's going to put in his testimony that

08:33   10   describes what he says demonstrates infringement, that's what

08:33   11   should go in.  These are not 1006 exhibits in the classic

08:33   12   sense.  But more importantly, and this is the reason I've

08:33   13   objected to these in other cases, you get up on appeal and

08:33   14   someone says, oh, there's substantial evidence.  And they point

08:33   15   to these claim charts that are 600 pages long, and say, oh,

08:33   16   it's in there at Page 483.

08:33   17        And for the same reason that Your Honor wants to ensure

08:33   18   that we don't, you know, have a list of exhibits and then

08:34   19   suggest they're admitted without anybody ever referring to

08:34   20   them, this is the same thing.  So they're not 1006 exhibits.

08:34   21   They were given to us like on February 2nd, but they're claim

08:34   22   charts.

08:34   23        And they shouldn't come into evidence for a whole host of

08:34   24   reasons.  There are evidentiary reasons.  There's hearsay,

08:34   25   there's testimony, there's things in there that are irrelevant.

08:34  1    But mostly it's an information dump that's going to just create

08:34  2    a mess.  I think on JMOL for Your Honor, and it's going to

08:34  3    create a mess on appeal.

08:34  4         Second -- let me lay out the three or four categories and

08:34  5    then yield the podium.

08:34  6         THE COURT:  Okay.

08:34  7         MR. LEE:  Second category is, in Dr. Conte and

08:34  8    Dr. Annavaram's demonstratives, they have deposition excerpts,

08:34  9    but they're excerpts that are not are being designated to be

08:34  10   played to the jury.  And I think Your Honor has indicated that

08:34  11   if it's going to be something that goes to the jury, it needs

08:34  12   to be designated and counter-designated.  And just flashing up

08:35  13   portions of a deposition without any chance to play the

08:35  14   testimony or the counter-designate is -- it's not inappropriate

08:35  15   use of deposition, it's hearsay.

08:35  16        Third category --

08:35  17        THE COURT:  Let me stop you there.

08:35  18        MR. LEE:  Okay.

08:35  19        THE COURT:  If I understand what you're saying, I agree

08:35  20   with you.  And what I mean by that is, if an expert is going to

08:35  21   rely on deposition testimony -- whatever he was going to rely

08:35  22   on, whether it's something someone said in the courtroom that

08:35  23   we all heard, or he's going to say that X -- Joe Smith said

08:35  24   this in his deposition, that testimony is going to have to be

08:35  25   put into the record during the course of the trial, or I agree

08:35  1  with you, it is hearsay.

08:35  2      So unless VLSI is planning to do something other than what

08:35  3  you just said, they -- before their experts or your expert --

08:36  4  before any expert can rely on -- now, it can -- I'm okay with

08:36  5  it coming in later.

08:36  6      For example, what I mean is, you know, I anticipate

08:36  7  someone will say this if there's an order problem in terms of

08:36  8  who said -- you know, there's -- if it's easier to play the

08:36  9  deposition testimony later, I'm okay with it being out of

08:36  10 order.  But experts will only be able to rely on deposition

08:36  11 testimony that the jury actually hears and is actually in the

08:36  12 record.

08:36  13     MR. LEE:  Okay.  We agree.  And we understand that if

08:36  14 someone represents that Dr. Conte's going to rely upon this

08:36  15 excerpt but they plan to play the excerpt later, we understand

08:36  16 that completely.  And I think we agree that that's

08:36  17 inappropriate.

08:36  18     I don't know if Your Honor wants anything further on the

08:36  19 first, on the claim charts.

08:36  20     THE COURT:  Well, I think what I'm going to do on the

08:36  21 claim charts -- and I don't think I need to hear from VLSI

08:36  22 unless they need to be heard.  I think they'll be okay with

08:36  23 what I'm saying.  What would be helpful to me is when the

08:36  24 witness -- is the next witness -- is this going to come up with

08:37  25 the next witness?

08:37  1      MR. LEE:  I think it's going to come up one witness later.

08:37  2      THE COURT:  Okay.

08:37  3      MR. LEE:  But it will come up this morning -- may come up

08:37  4  this morning.

08:37  5      THE COURT:  So I think what we should try to do, if we

08:37  6  can, is -- it may be too complicated -- I'm happy, when that

08:37  7  issue comes up, to take a short recess.  And I'll see what VLSI

08:37  8  actually wants to do with that record, with their witness.  And

08:37  9  when I see what they're attempting to do, I will rule on

08:37  10  whether or not that's -- I'm not going to do it -- I appreciate

08:37  11  the heads up.  That's helpful.

08:37  12      I want to actually see how VLSI is going to use it, and

08:37  13  then we'll bring the jury back.  I'll rule one way or the

08:37  14  other, but I'll know in the context of what they're doing.

08:37  15      MR. LEE:  Fair enough.  I just -- if I got up on my feet,

08:37  16  I wanted you to know why.

08:37  17      THE COURT:  No, no.  And if -- and it probably will be

08:38  18  easier for me to excuse the jury for a short period of time and

08:38  19  make sure I fully understand what VLSI wants to do and what

08:38  20  your objection to it is, so I can have a ruling that makes

08:38  21  sense.

08:38  22      MR. LEE:  There are two other -- there's another category

08:38  23  which is they just have a random quote from Steve Jobs from

08:38  24  Apple about -- not attributable to any source -- about what

08:38  25  Intel needed to do.  It's hearsay.  It has no foundation.

08:38  1     There's plenty for them to make their arguments based upon

08:38  2  what Intel says, but having a random quote from someone who is

08:38  3  neither here nor alive any longer --

08:38  4     THE COURT:  If and when VLSI attempts to get that in, just

08:38  5  like any other question, you can object that it's hearsay and

08:38  6  I'll understand.  I'll listen in the context of the question.

08:38  7     MR. LEE:  Okay.  And the last category for today, there

08:38  8  are a couple of categories of documents for Dr. Sullivan, but

08:38  9  my bet is that'll be tomorrow.  And they all fall in the same

08:39  10  category.  They're voluminous financial records with lots of

08:39  11  information that are irrelevant to this case and subject to

08:39  12  Your Honor's in limine motion.  And how we deal with them is

08:39  13  the issue.

08:39  14     But Dr. Conte and Dr. Sullivan both take expert reports

08:39  15  from the Delaware case, which Your Honor's familiar with, and

08:39  16  they want to play -- they want to basically show excerpts from

08:39  17  experts on the patents in the Delaware case who are not

08:39  18  involved here to prove points here.

08:39  19     So it's not even, in some cases, a deposition.  It's an

08:39  20  expert report provided to the Delaware court for a patent in a

08:39  21  Delaware court on an expert who's not going to appear here.

08:39  22  And they want to put that up on the screen, and it's hearsay

08:39  23  100 percent, for sure.

08:39  24     THE COURT:  Let me ask Mr. Chu or whoever, who will be

08:39  25  handling Dr. Ryan?

08:39  1      MR. HEINRICH:  Good morning, Your Honor.  Alan Heinrich.

08:39  2  I'll be directing Professor Conte.  And then Amy Proctor will

08:40  3  be directing Dr. Ryan.

08:40  4      THE COURT:  Okay.  So when Ms. Proctor is putting Dr. Ryan

08:40  5  on, do you have an estimate -- this is just -- it could be

08:40  6  totally wrong and I won't -- do you have an estimate of about

08:40  7  how long Dr. Ryan -- Dr. Sullivan's going to be on the witness

08:40  8  stand?

08:40  9      MR. HEINRICH:  I'd say around an hour and a half to an

08:40  10  hour and 45 minutes.

08:40  11      THE COURT:  I was thinking an hour.  That makes sense.  Do

08:40  12  you have an idea of where in his testimony this would come up?

08:40  13      MR. HEINRICH:  I'd say probably towards the middle.

08:40  14      THE COURT:  Okay.  So what we'll do is, if we can, I'll

08:40  15  figure out a way where after about an -- get to the point with

08:40  16  Dr. Ryan -- Dr. Sullivan where this is an issue that's going to

08:40  17  come up, and just, you know, ask if we could take a short

08:40  18  break.  I'll give the jury -- we'll recess.  I'll hear what it

08:40  19  is Dr. Sullivan wants to rely on and why Intel objects to it,

08:41  20  and then we'll bring the jury back in.

08:41  21      MR. LEE:  Right.  That probably -- we can deal with all

08:41  22  three categories of Dr. Sullivan, which is reliance on other

08:41  23  expert reports, reliance on other litigation -- which I think

08:41  24  is subject to Your Honor's limine motion -- ruling, I'm

08:41  25  sorry -- and then just how we're going to deal with all of the

08:41  1   numbers that are irrelevant.  I understand that there's some

08:41  2   numbers in the public filings that are relevant, but there are

08:41  3   some that are not.

08:41  4       THE COURT:  Well, let me amend what I just said then.

08:41  5   Let's do it this way.

08:41  6       Even if it seems odd that a jury, depending on where --

08:41  7   how long we've gone and, you know, all that, let's take it up

08:41  8   before Dr. Sullivan gets on, right when he's about to get on

08:41  9   the witness stand.  I'll take it up in the context of what

08:41  10  he's -- each of his issues, and then we'll bring the jury back

08:41  11  in.

08:41  12      MR. HEINRICH:  Thank you, Your Honor.

08:41  13      THE COURT:  So I'll have Ms. Proctor, can you give me an

08:41  14  idea of what she's going to ask, a question or two.  You can

08:41  15  tell me why she should not be allowed to do that.  I can make

08:42  16  my ruling, and then we can -- and then I have no problem

08:42  17  with -- but I'll know one way or the other -- but then I'll

08:42  18  have no problem during the direct examination of you objecting

08:42  19  and saying something on the e-mail on the basis we've

08:42  20  previously -- you will -- I think I preserved your --

08:42  21      MR. LEE:  No, no.  This is exactly the guidance we asked

08:42  22  for.  And I understand we couldn't deal with these sort of all

08:42  23  at once.

08:42  24      THE COURT:  Right.

08:42  25      MR. LEE:  But just to alert Your Honor to what the

08:42  1   categories of the issues are, and then I think the best thing

08:42  2   to do is address them as they come up.

08:42  3        THE COURT:  Well, we can do that with Dr. Sullivan.

08:42  4        Is there anything else, Mr. Lee, on behalf of your client?

08:42  5        MR. LEE:  No, Your Honor, other than to respond to --

08:42  6   there are a few of -- the things that they're going to raise

08:42  7   separately.  But I'll let them raise them with Your Honor

08:42  8   first.

08:42  9        THE COURT:  Got you.

08:42  10       And for VLSI?

08:42  11       MR. HEINRICH:  Good morning.  I'm happy to talk without

08:43  12  the mask on.  That's much better.  And is it okay to examine

08:43  13  witnesses --

08:43  14       THE COURT:  Yes.  That's what I mean, yes.

08:43  15       MR. HEINRICH:  Fabulous.

08:43  16       So just addressing what Mr. Lee raised, first for the FRE

08:43  17  1006 charts, we do think that the charts that are Exhibits 4418

08:43  18  and 4419 meet the conditions for 1006 charts.  They are

08:43  19  summaries --

08:43  20       THE COURT:  I'm going to take that up when --

08:43  21       MR. HEINRICH:  Okay.

08:43  22       THE COURT:  I'm pushing that off until --

08:43  23       MR. HEINRICH:  Okay.  I would -- okay.

08:43  24       THE COURT:  I haven't -- I am intentionally not ruling on

08:43  25  it right now.  It's been raised.  I understand what the issue

08:43   1   is.  But right before that witness, we're going to take a

08:43   2   break.  You're going to give me a concrete example of how --

08:43   3   with the witness, how you'd like to use them.  Mr. Lee or

08:43   4   whoever on his side can object and explain why he doesn't want

08:43   5   you to.  And I'll make my ruling, and then we'll proceed with

08:44   6   the jury.

08:44   7       MR. HEINRICH:  Thank you.  So with respect to excerpts of

08:44   8   deposition testimony, just a little bit of background.

08:44   9       All of this deposition testimony was cited in Professor

08:44   10  Conte's report.  And he relied on the deposition testimony for

08:44   11  the evidence for the support that he'll be presenting to the

08:44   12  jury.

08:44   13      We thought that presenting the testimony in this way would

08:44   14  be easier for the jury to fit it into the issues here.  They

08:44   15  can certainly --

08:44   16      THE COURT:  I understand, but it needs to be put into

08:44   17  evidence.

08:44   18      MR. HEINRICH:  Okay.  So all of this testimony --

08:44   19      THE COURT:  All of the testimony that anyone is going to

08:44   20  rely on has to be put in, because whatever snippet you want to

08:44   21  use of a deposition, Mr. Lee and his team may feel like they

08:44   22  need to cross-designate some other portion from a deposition.

08:44   23      Also in terms of time, I'm intentionally making you all

08:45   24  decide whether or not you want to use -- you or Intel wants to

08:45   25  use some of your time to put in this testimony.  But I want the

08:45  1    jury to hear the testimony that any experts rely on.

08:45  2         MR. HEINRICH:  Okay.  So all of the testimony that

08:45  3    Dr. Conte was going to show on slides was designated as part of

08:45  4    the pretrial deposition designation process.  We weren't

08:45  5    planning on showing it all, but we now will show everything

08:45  6    that will be on the slides.

08:45  7         THE COURT:  Right.

08:45  8         MR. HEINRICH:  And I think -- I think that's the only

08:45  9    other issue with Professor Conte.

08:45 10         THE COURT:  Mr. Lee?

08:45 11         MR. LEE:  The one other thing we just wanted to raise to

08:45 12    get Your Honor's guidance is there are a lot of demonstratives

08:45 13    that, like, have just, like, a whole list of exhibits on the

08:45 14    left-hand side.  And I know, Your Honor, you have -- the

08:45 15    guidance you have offered us is that we will, if the witness

08:46 16    refers to an exhibit, then it goes in.

08:46 17         THE COURT:  No.  No.  If I said that -- if I did say that,

08:46 18    I was in error.

08:46 19         If you offer a witness an exhibit, an exhibit, and the

08:46 20    other side doesn't object, I'm considering it's in.  The fact

08:46 21    that there's a list somewhere that someone may reference, that

08:46 22    doesn't mean any of those exhibits can come into evidence.

08:46 23         It's only if -- I'm just -- I'm just trying to make it so

08:46 24    you don't -- we don't have to do the two-step of:  I move for

08:46 25    admission, no objection; move for admission, no objection.

08:46   1        If you know you're not going to object, I'm fine with you

08:46   2   all just using them and then, you know, and then in listening,

08:46   3   if there is an objection, I can rule on it.

08:46   4        MR. LEE:  That was our mistake.  I was concerned about,

08:46   5   you know, Items 2 through 50 that are not mentioned at all in

08:46   6   the testimony.  They're not coming in.

08:46   7        THE COURT:  They are not coming in.

08:46   8        MR. LEE:  Thank you, Your Honor.

08:46   9        THE COURT:  They're not coming in unless someone actually

08:46   10  physically uses them during the trial --

08:47   11       MR. LEE:  Thank you, Your Honor.

08:47   12       THE COURT:  -- without objection.

08:47   13       MR. HEINRICH:  And just to be clear, we don't have slides

08:47   14  with a long list of exhibits.  But I -- if I could get your

08:47   15  guidance.

08:47   16       What we do have is we have some slides with exhibit

08:47   17  numbers.  I'm planning to ask the witness what these exhibits

08:47   18  are.  Almost all of them are not even objected to.  So in the

08:47   19  context of that slide, the witness is going to explain what the

08:47   20  exhibit is, and then we'll explain the pertinence of the -- the

08:47   21  subject matter on the slide.

08:47   22       THE COURT:  If you talk about an exhibit in that instance,

08:47   23  then it's going to be admitted.

08:47   24       MR. HEINRICH:  Thank you.

08:47   25       THE COURT:  And that -- it will go -- and it will go back

08:47  1    to the jury because it will have been admitted then.

08:47  2        MR. HEINRICH:  Great.  Okay.  Thank you very much.

08:47  3        THE COURT:  If you talk about an exhibit -- then you can't

08:47  4    talk about an exhibit unless it has been admitted.  If your

08:47  5    witness is talking about it and the other side doesn't object,

08:47  6    I'm going to assume they didn't have an objection, and it's now

08:47  7    in evidence.

08:47  8        MR. HEINRICH:  Very good.  We do have some objections with

08:48  9    respect to cross exhibits that they've disclosed to us.  I

08:48  10   don't know if you'd like to hear that now, or should we do that

08:48  11   as they come in?

08:48  12       THE COURT:  Unless there's something in them, for

08:48  13   example -- I'll try to be funny here -- if there's something

08:48  14   that shows Mr. Lee has a criminal history he hasn't divulged

08:48  15   before that he wouldn't want us to know about, then you

08:48  16   probably ought to let me know now, and we can take them up

08:48  17   outside.

08:48  18       If it's just a typical objection, like I've seen a

08:48  19   thousand times, I'm happy when Mr. Lee or whomever on behalf of

08:48  20   Intel moves to admit them, you can say:  Your Honor, I object.

08:48  21   And I'll rule on it.

08:48  22       MR. HEINRICH:  So I do have one that fits into that

08:48  23   category.

08:48  24       THE COURT:  Well, hopefully not that Mr. Lee --

08:48  25       MR. LEE:  Yeah.  I was going to -- if it's going to be my

08:48    1    criminal record, we'd ask to seal the proceedings.  I think

08:48    2    it's --

08:48    3        (Laughter.)

08:48    4        MR. HEINRICH:  Well, I'd say prejudicial in a sort of an

08:48    5    over-the-top way.  It's Defendant's Exhibit 870 that shows

08:49    6    Professor Conte in a fancy sports car.

08:49    7        MR. LEE:  Oh, I think we sent them an e-mail this morning

08:49    8    saying we're withdrawing those.

08:49    9        MR. HEINRICH:  Thank you very much.

08:49   10        THE COURT:  Okay.  Lots of folks in Waco have fancy sports

08:49   11    car.  I'm sure none of them would be bothered by that at all.

08:49   12        So is there anything else we need to take up?

08:49   13        MR. LEE:  Not for Intel, Your Honor.

08:49   14        MR. HEINRICH:  Not for VLSI.

08:49   15        THE COURT:  Okay.  Good.

08:49   16        So I'll make sure the jury's here.  If the jury is all

08:49   17    here, do you all have any -- never mind.  I was going to -- I

08:49   18    was overruled.  Kristie knew I was going to say we could start

08:49   19    a little early.  We're not going to start a little early.

08:49   20    Kristie has to take care of a couple things.

08:49   21        We will start at 9:00, and you can absolutely feel free to

08:49   22    not stay in the courtroom if you don't want to stay in the

08:49   23    courtroom.  I'm -- as long as you're here when we are ready to

08:49   24    go at 9:00, I'm perfectly fine with that.

08:50   25        THE BAILIFF:  All rise.

| | | |
|---|---|---|
| 08:50 | 1 | (Recess taken from 8:50 to 9:03.) |
| 09:03 | 2 | THE BAILIFF:  All rise. |
| 09:03 | 3 | (The jury entered the courtroom at 9:03.) |
| 09:04 | 4 | THE COURT:  Thank you.  You may be seated. |
| 09:04 | 5 | We need to swear the witness. |
| 09:04 | 6 | (The witness was sworn.) |
| 09:04 | 7 | MR. HATTENBACH:  All right.  Good morning.  It's good to |
| 09:04 | 8 | see you. |
| 09:04 | 9 | Good morning, ladies and gentlemen.  My name is Ben |
| 09:04 | 10 | Hattenbach, and I'm one of the people working with Mr. Chu and |
| 09:04 | 11 | Mr. Mann from yesterday for VLSI, and I'm going to be |
| 09:04 | 12 | presenting our next witness. |
| 09:04 | 13 | DIRECT EXAMINATION |
| 09:04 | 14 | BY MR. HATTENBACH: |
| 09:04 | 15 | Q.  Good morning, Mr. Bearden.  Could you please |
| 09:04 | 16 | introduce yourself to the jury? |
| 09:04 | 17 | A.  Yes.  My name is David Bearden.  I'm a fellow at NXP, |
| 09:05 | 18 | and I'm one of the co-inventors of the '373 patent that I |
| 09:05 | 19 | believe is involved in this case. |
| 09:05 | 20 | Q.  And could you tell us a little bit -- |
| 09:05 | 21 | (Reporter clarification.) |
| 09:05 | 22 | BY MR. HATTENBACH: |
| 09:05 | 23 | Q.  Mr. Bearden, can you tell us a little bit about |
| 09:05 | 24 | yourself personally? |
| 09:05 | 25 | A.  Sure.  I live in Austin with my wife and son.  I've |

09:05  1  always enjoyed my engineering career.  There's always a good

09:05  2  challenge that kind of keeps the mind stimulated, so that's

09:05  3  always a good thing.  In my spare time, and I'll say there's

09:05  4  not a lot of spare time, but I enjoy scuba diving and

09:05  5  astronomy.  And in fact right now I'm trying to get a remote

09:05  6  observatory set up in the hill country of Central Texas.

09:05  7      Q.   And you work at NXP currently?

09:05  8      A.   Yes.  I do.

09:05  9      Q.   And yesterday was a long day.  Can you remind us,

09:05  10  what is NXP?

09:06  11      A.   Yes.  NXP is one of the top ten semiconductor

09:06  12  companies in the world, and their U.S. operations are

09:06  13  headquartered in Austin.

09:06  14      Q.   And can you give us a few examples of some of the

09:06  15  types of products that NXP makes?

09:06  16      A.   Sure.  NXP makes a lot of different high-tech

09:06  17  products.  At their core, I'd say there's either a

09:06  18  microprocessor or microcontroller.  And they're used in many

09:06  19  different applications, right, so anything from computer

09:06  20  networking equipment all the way over to automobiles, right?

09:06  21      Then if you think about the automobile example, then you

09:06  22  know it's used in many different things, helping the cars

09:06  23  understand their environments, helping with human interactions

09:06  24  in the vehicle, doing things like managing the electric

09:06  25  batteries for, you know, the batteries for electric cars.  And

09:06  1    then as well, if you think about the displays in today's modern

09:06  2    cars, the big displays you see, it's actually our technology

09:06  3    that is in many of those.

09:06  4         Q.   And what type of work do you personally do at NXP?

09:07  5         A.   So I'm a senior engineer.  I do -- give technical

09:07  6    guidance to the various NXP design programs.  And in addition,

09:07  7    I do problem-solving related to semiconductor design.

09:07  8         Q.   And I want to talk a little bit about the work you

09:07  9    did before joining NXP, but first, can you tell the jury a

09:07 10    little bit about your educational background?

09:07 11         A.   Sure.  I have a bachelor's degree in electrical

09:07 12    engineering from the University of Oklahoma, which I received

09:07 13    in 1984.  And then I have a masters degree in electrical

09:07 14    engineering as well, which I received from the University of

09:07 15    California at Berkeley in 1985.

09:07 16         Q.   And what did you do after you received your masters

09:07 17    degree?

09:07 18         A.   So I actually started working for AT&T Bell

09:07 19    Laboratories in 1984.  And then I continued to work for them up

09:07 20    until I think 1989, when I left AT&T Bell Labs and began

09:08 21    working at Motorola.

09:08 22         Q.   Why did you join Motorola?

09:08 23         A.   Well, I wanted to be involved in leading edge

09:08 24    microprocessor design, and Motorola had a campus in Austin and

09:08 25    was doing that type of work there at the time.

09:08  1          They have a long history of innovation at Motorola, you

09:08  2     know, thinking all the way back to, let's say, 1940, when they

09:08  3     invented the first walkie-talkie, right?  As well, if you look

09:08  4     at other innovations that Motorola was involved in, things like

09:08  5     the radio on the first mission to the moon, that was a Motorola

09:08  6     radio, right?

09:08  7          And so they, again, have many decades of innovation and

09:08  8     had started working in microchips, you know, building

09:08  9     microprocessors and other things for things like cell phones

09:08  10    and computers.  And so when I had the chance to kind of join

09:08  11    Motorola, it was pretty exciting.

09:08  12         Q.   And what type of work did you do for Motorola?

09:08  13         A.   Well, I worked my way up through the engineering

09:08  14    ranks essentially working on various microprocessor designs.

09:08  15         I was involved with the first -- I'm not sure if people

09:09  16    know this, but the old power PC microprocessors, right?  This

09:09  17    was the joint development between Apple and IBM that were used

09:09  18    in the computers at both companies, both Apple and IBM.

09:09  19         And over the years, I kept working on more and more

09:09  20    advanced microprocessors, you know, kind of for computer

09:09  21    networking and again for things like automobiles and other

09:09  22    things like that.

09:09  23         And as we were putting more and more things onto the

09:09  24    processor, right, so multicore designs, or kind of taking other

09:09  25    pieces of the system and kind of moving it onto that single

09:09  1  piece of silicon, you know, we were kind of struggling with

09:09  2  power, right?  And so that began to get a lot of our attention.

09:09  3      Q.   And how long were you with Motorola?

09:09  4      A.   Well, I never -- I like to say I never really left

09:09  5  Motorola.  I tend to think of the company as having changed

09:09  6  underneath me, if you will, right?

09:09  7      So I was with Motorola in the semiconductor product sector

09:09  8  probably until about, I'd say 2004, when in fact that product

09:10  9  sector, the semiconductor, was spun off of Motorola and became

09:10  10  Freescale.  And Freescale operated as a standalone company for

09:10  11  many years, I think until about 2015 or something like that,

09:10  12  when in fact then Freescale merged with NXP, and I'm still with

09:10  13  NXP today.

09:10  14      Q.   And where was Freescale based?

09:10  15      A.   Freescale was based in Austin as well.  Ever since I

09:10  16  joined Motorola in 1989, I've been based in Austin and, in

09:10  17  fact, still in the same building that I joined in.

09:10  18      Q.   Can you tell us a little bit about Freescale's

09:10  19  business?

09:10  20      A.   So Freescale continued to do essentially the -- you

09:10  21  know, continued the businesses, if you will, that Motorola had

09:10  22  started, right?

09:10  23      So they continued to do advancements in microprocessors

09:10  24  and microcontrollers used for a broad range of things, right?

09:10  25  So from, let's say, communications, aeronautics, automotive,

09:11  1   cell phones, you know, various things, you know, personal

09:11  2   health, right?  So a lot of markets that we are often designing

09:11  3   computing systems for.  So a lot of different things, again,

09:11  4   designing and manufacturing these computing systems.

09:11  5       Q.   Can you give the jury some specific examples of

09:11  6   products that Freescale made?

09:11  7       A.   Sure.  Maybe a couple.

09:11  8       So, you know, I think two good references are maybe back

09:11  9   in 2010, when I was at Freescale, 70 percent of the wireless

09:11  10  calls went through a Freescale microprocessor.  And if you

09:11  11  think about the e-readers, right, so things like the Amazon

09:11  12  Kindle, 75 percent of those used Freescale technology, right?

09:11  13      And so, again, there was a lot of other things that

09:11  14  Freescale did developing microprocessors for, again, airplanes

09:11  15  to cars sort of things.

09:11  16      Q.   Did you personally work on any microprocessors at

09:11  17  Freescale?

09:11  18      A.   Yes.  That was my main focus, essentially working on

09:12  19  microprocessors that were always at the leading edge of the

09:12  20  technology development, and again, you know, focused in on

09:12  21  things from computing to networking and others.

09:12  22      Q.   Now, in the work you've done on microprocessor

09:12  23  design, has there been a particular emphasis or focus?

09:12  24      A.   Probably two things that I would point out that we

09:12  25  are focussed in on, or that I was personally focussed in on is

09:12  1    essentially, you know, two problems, either trying to figure

09:12  2    out a way to reduce power or, you know, trying to figure out a

09:12  3    way to improve speed or performance, right?

09:12  4         So if it's, you know, some circuit design issue that I was

09:12  5    involved in trying to go through and, you know, solve a

09:12  6    problem, those were the two things, reducing the power or

09:12  7    increasing the speed.

09:12  8         Q.   And why were you trying to reduce the amount of power

09:12  9    used by the microprocessors you were developing?

09:12  10        A.   So probably comes down to, let's say, several things,

09:12  11   if you will, right?

09:12  12        So the first is just, you know, take an application that's

09:12  13   maybe a mobile processor, right?  You want the longest battery

09:13  14   life, and so for that reason you need to reduce the power

09:13  15   demand, right?

09:13  16        The other thing that, you know, probably you can

09:13  17   appreciate is no one likes a hot laptop or a hot cell phone

09:13  18   from the heat of the electronics, so reducing the power,

09:13  19   allowing it to run cooler helps to go through and kind of

09:13  20   improve the user experience, but it's also good from a

09:13  21   reliability perspective of the part itself.

09:13  22        You know, another application is -- of saving power is

09:13  23   that if you can afford a certain amount of power, and now you

09:13  24   can go through and reduce that power, then in a sense what it

09:13  25   allows you to do is to kind of either run the circuit faster

09:13   1   again or go off and add more circuits back in there.  So

09:13   2   there's benefits in terms of managing that power.

09:13   3        And last, I would probably say, you know, just the

09:13   4   environmental characteristic of the thing, right, lower

09:13   5   electric bill, less impact on the environment.

09:13   6        Q.   Okay.  You mentioned that you now work at NXP.  Do

09:13   7   you know whether NXP came to own the '373 patent that's sitting

09:14   8   in front of you there on which you're an inventor?

09:14   9        A.   Yes.  When I -- when Freescale merged with NXP, then

09:14   10  I went to work for NXP, and NXP came to acquire some of the

09:14   11  Freescale patents, which included the '373 patent.

09:14   12       Q.   And do you know whether NXP has an interest in this

09:14   13  case?

09:14   14       A.   So I understand that NXP has assigned the '373 patent

09:14   15  to VLSI and that NXP does have an interest in any recovery that

09:14   16  may come about by VLSI's efforts, right?  I personally do not

09:14   17  have any interest in the case, but if Intel is found to

09:14   18  infringe, then NXP would benefit.  And my understanding is that

09:14   19  NXP would take any recoveries and go off and invest it in the

09:14   20  next generation of design.

09:14   21       Q.   Does the fact that NXP stands to benefit from your

09:14   22  patents if VLSI prevails here have any impact at all on your

09:15   23  testimony in this case?

09:15   24       A.   No.  I'm just here to answer the questions

09:15   25  truthfully.

09:15   1       Q.   All right.  Have you personally done any work to try

09:15   2   to determine whether Intel infringes your '373 patent?

09:15   3       A.   No, I have not.  And no one has asked me to do that

09:15   4   work.  In fact, I'm not even sure how I really would tackle

09:15   5   that problem, as Intel keeps a lot of the design techniques of

09:15   6   their processors secret, right?

09:15   7       Now, that being said, I do understand that as part of this

09:15   8   litigation that Intel has been required to provide documents

09:15   9   and other information about how exactly their processors work.

09:15   10   And so that does exist, but I do not have access to that and

09:15   11   have not seen it.

09:15   12       Q.   All right.

09:15   13       MR. HATTENBACH:  Mr. Simmons, if we could put up Exhibit

09:15   14   PTX-4 on the screen.

09:15   15   BY MR. HATTENBACH:

09:15   16       Q.   And we'll ask Mr. Bearden if he recognizes this

09:15   17   document.

09:15   18       A.   It's not quite up yet.

09:16   19       Q.   It's not coming up yet.  There we go.

09:16   20       A.   And if you can't hear me, please wave at me again.

09:16   21       Q.   I think we're good.  So do you recognize this

09:16   22   document, Mr. Bearden?

09:16   23       A.   I still don't see it here yet.

09:16   24       Q.   Oh.  It's up on my screen.

09:16   25       MR. HATTENBACH:  Maybe I have to -- do I have to hit

09:16   1   podium input?

09:16   2        THE COURT:  This is when we call in the pros.

09:16   3        THE WITNESS:  Okay.

09:16   4   BY MR. HATTENBACH:

09:16   5        Q.   All right.  Success.

09:16   6        A.   Yeah.  And this is going to be a glasses exercise, it

09:16   7   looks like.  Okay.  So please ask the question again.

09:16   8        Q.   Yes.  Do you recognize this document?

09:16   9        A.   Yes.  This is what's referred to as the '373 patent

09:17  10   that myself and my Freescale colleagues invented back in the

09:17  11   mid 2000s.

09:17  12        Q.   And when did you file the application that led to

09:17  13   this '373 patent?

09:17  14        A.   So as shown on the documents, it was filed in --

09:17  15   thank you.  That's much better.  It was filed in 2006.  And you

09:17  16   can see up in the upper right that it was granted in 2009.

09:17  17        Q.   And do you know how many different examiners at the

09:17  18   United States Patent Office reviewed your application materials

09:17  19   before deciding to award you and your coworkers this '373

09:17  20   patent?

09:17  21        A.   Yes.  It was three different patent examiners.  And

09:17  22   that's shown in the prosecution history of the patent itself,

09:17  23   essentially the back-and-forth between Freescale and the Patent

09:17  24   Office.

09:17  25        Q.   And who are these other inventors listed here on the

09:17   1    first page of your patent?

09:17   2        A.   So Andrew and Shayan -- I guess the first name and

09:18   3    the last name, but Andrew and Shayan were both, you know,

09:18   4    senior memory designers working on leading edge designs at

09:18   5    Freescale at the time.

09:18   6        Bradford was kind of a more junior individual at that

09:18   7    point in time, working under the tutelage of the others.

09:18   8        Q.   And who was the person who first came up with the

09:18   9    ideas that led to the patent?

09:18   10       A.   So it was essentially a joint invention, if you will,

09:18   11   between initially Andrew and myself.  And then subsequently,

09:18   12   Bradford and Shayan added additional items.

09:18   13       Q.   Did you and your fellow inventors all have the same

09:18   14   level of seniority at the company at that time?

09:18   15       A.   No.  I was a project manager at that point and so was

09:18   16   senior to the other individuals.

09:18   17       Q.   And what were you working on when you and your team

09:18   18   came up with the ideas in the '373 patent?

09:18   19       A.   So we were working on a next-generation Freescale

09:18   20   microprocessor for use in computing in, you know,

09:19   21   communications, Internet networking applications.

09:19   22       Q.   Were there any particular problems you were trying to

09:19   23   solve at that time?

09:19   24       A.   Yes.  There were -- apologies for the mic.  But

09:19   25   essentially what we were trying to do on that microprocessor

334

09:19   1   was to have multiple operating states, right?  So essentially

09:19   2   different ways of saving power, right?

09:19   3       And the problem we were struggling with is that, you know,

09:19   4   different circuits on the microprocessor can have different

09:19   5   voltage requirements for it to properly operate.

09:19   6       You think about, let's say, a circuit that's just doing

09:19   7   calculations, maybe something that's just adding numbers, if

09:19   8   you will, right?  They may have a -- that type of circuit may

09:19   9   have a different voltage constraint than, let's say, something

09:19  10   else, like a memory where you're trying to store data.

09:19  11       So these different circuit constraints were challenging in

09:19  12   terms of trying to figure out how do we lower the power on one

09:19  13   portion of the design while --

09:19  14       THE COURT:  Excuse me.  Let me -- ladies and gentlemen of

09:20  15   the jury, can you see what he's talking about?

09:20  16       MR. HATTENBACH:  Oh.  He's not talking about the patent --

09:20  17   he's not talking about what's on the screen at the moment.

09:20  18   He's just talking about his -- the problems he was trying to

09:20  19   solve when he came up with the ideas that ended up in the

09:20  20   patent.

09:20  21       THE COURT:  Okay.  I'm sorry to interrupt you.  I

09:20  22   shouldn't have done that.  Someone told me that the jury

09:20  23   couldn't see the document.

09:20  24       THE WITNESS:  I'm kind of doing a little bit of hand

09:20  25   waving over here.

335

09:20   1          MR. HATTENBACH:  The patent is not on the screen for the

09:20   2    jury?

09:20   3          THE COURT:  Right.  That's what I was trying to tell you.

09:20   4          MR. HATTENBACH:  Is there something we can do about that?

09:20   5    I think we hit "request to publish video" and we thought it had

09:20   6    shown up at that point.

09:20   7          THE WITNESS:  Apologies.

09:20   8          MR. HATTENBACH:  Thank you for mentioning that, Your

09:20   9    Honor.  I was unaware.

09:21   10         (Off-the-record discussion.)

09:21   11         MR. HATTENBACH:  All right.  Thank you.  Sorry about that.

09:21   12   BY MR. HATTENBACH:

09:21   13         Q.   Let's go back and tell us, was there a particular

09:21   14   problem you were trying to solve at that time you came up with

09:21   15   these ideas in the '373 patent?

09:21   16         A.   Yes.  So on that microprocessor that we were working

09:21   17   on, we were trying to have multiple operating states to save

09:21   18   power, right?  And essentially, if you look at what's on a

09:21   19   microprocessor, there's different circuit types, the ones doing

09:21   20   the calculations or things like, you know, a memory, as an

09:21   21   example, that may store data.

09:21   22         And those different circuit types may have different

09:22   23   voltage constraints in terms of how much voltage do they

09:22   24   require to actually perform their function, if you will, right?

09:22   25   What may work for this circuit doing the calculation may not

09:22  1   work for the memory where it's trying to store the data.  And,

09:22  2   in fact, if its voltage got too low, you would perhaps lose the

09:22  3   data you wanted to store.

09:22  4       Q.   And did you and your team come up with any ideas for

09:22  5   solving those problems?

09:22  6       A.   Yes.  It was -- essentially, we were trying to figure

09:22  7   out, again, how to manage those two different voltage

09:22  8   requirements in the circuit.  And we came up with a way to do

09:22  9   that that we thought would save power.

09:22  10      Q.   And can you explain how you thought your idea would

09:22  11  save power?

09:22  12      A.   Yes.  And so if you go off -- and again, we

09:22  13  recognized that these two different circuits had different

09:22  14  constraints on the voltages that they required, right?  And,

09:22  15  you know, again, if you tried to lower the voltage on the

09:22  16  memory, you might have an issue with respect to storing the

09:22  17  data and retaining it, right?

09:22  18           And it's complicated a little bit by the fact that in

09:22  19  general, if you look at a microprocessor, most of these

09:23  20  different circuits are all kind of connected to a common

09:23  21  supply, if you will.  So one power rail.

09:23  22           And so if you just wanted to go off and save power on

09:23  23  these calculating circuits, you know, by lowering them down,

09:23  24  that voltage down, then in fact since we have one power rail.

09:23  25  And if you went off and lowered that one power rail, then in

337

09:23 1    fact, yes, you would save power on this circuit, but you'd lose

09:23 2    data over here, right?  And your processor would no longer

09:23 3    function when you tried to bring it back out of that state, in

09:23 4    a sense, right?

09:23 5         So we developed a way to selectively manage the voltages

09:23 6    between these two circuits, such that we could save the power

09:23 7    when we wanted to on these computation circuits, but, again,

09:23 8    have the memory to retain the data that we wanted such that

09:23 9    when we came out of that sleeping state, if you will, as an

09:23 10   example, that in fact, you'd be ready to operate properly.

09:23 11        Q.   Was power savings important to you in this context?

09:23 12        A.   Absolutely.  Power savings is critical to processor

09:23 13   design.  It was critical back in 2006.  It is absolutely still

09:24 14   critical today with -- even with technology advancements.  And

09:24 15   it's very important to microprocessors and any other system

09:24 16   like that, really, that has, you know, let's say memory and

09:24 17   other multiple circuits that maybe have different requirements.

09:24 18        Q.   Okay.  In your experience, have power savings been

09:24 19   important to the success of the products that you've worked

09:24 20   with?

09:24 21        A.   Sure.  You know, everybody wants -- maybe a couple of

09:24 22   examples.  Everybody wants the fastest processor.  Everybody

09:24 23   wants the longest battery life.  And so power savings is

09:24 24   essential, right?  It's critical to the financial and

09:24 25   commercial success of today's products and, again, products

09:24   1   back then and up through today.

09:24   2        It's critical in terms of what a customer may look for and

09:24   3   critical in terms of, you know, marketing to those customers,

09:24   4   if you will.

09:24   5        Q.   Thank you.  Let's go back to your patent for a

09:24   6   moment.  Hopefully everyone can see it now.  If not, just give

09:24   7   me a shout.

09:24   8        But on the first page of your patent, there's a section

09:25   9   titled "Abstract."  Can you tell the jury what the abstract is?

09:25   10       A.   Yes.  And thank you for making it larger.

09:25   11       But, you know, so the abstract's essentially just, you

09:25   12   know, an overview of some of the ideas of the patent.

09:25   13       Q.   And if the abstract's just this high-level overview,

09:25   14   is there a place where the legal definitions of the inventions

09:25   15   are set forth in the patent?

09:25   16       A.   Yes.  It's in the claim section of the patent itself.

09:25   17   And that's where, in a sense, we document the inventions.  And

09:25   18   I'll say that that's a -- you know, those claims and the

09:25   19   document as a whole is written by patent attorneys.  And they

09:25   20   use a language that I find rather tedious and, you know,

09:25   21   sometimes hard to follow.

09:25   22       Q.   On behalf of patent lawyers, I'll apologize for that.

09:25   23       Now, did you have a chance to watch the opening statements

09:25   24   yesterday?

09:25   25       A.   Yes.  I did.

09:25  1      Q.   And do you recall Intel's lawyer making some

09:26  2  statements about the abstract of your patent?

09:26  3      A.   Yes.  Which I thought was rather odd when I heard it.

09:26  4  I think the discussion was, essentially, something like:  Both

09:26  5  sides can agree that the inventions are, in fact, outlined in

09:26  6  the claims, right?

09:26  7      But then immediately, you know, he jumped into

09:26  8  essentially:  But here's what the abstract requires, right?

09:26  9  And that's starting, in my opinion, to confuse the jury in

09:26  10  terms of exactly where are the inventions defined.  And the

09:26  11  inventions are defined in the claims themselves.

09:26  12      Q.   All right.  Let's turn to Page 5 of your patent.  And

09:26  13  the section entitled "Detailed Description of the Drawings."

09:26  14  Sorry that it's small.

09:26  15      A.   Yeah.

09:26  16      Q.   But just generally speaking, can you tell the jury

09:26  17  what that section relates to?

09:26  18      A.   Yes.  There are four different figures in the

09:26  19  document.  And really what the detailed description of the

09:26  20  drawings is trying to do is kind of walk through some examples

09:27  21  of how the inventions may be used, right?

09:27  22      So, you know, example embodiments are essentially examples

09:27  23  of, you know, ways that you might take the inventions and

09:27  24  implement something, right?  But these are really only examples

09:27  25  and not limited.

340

09:27   1      Q.   Okay.  So let's take a look at Figure 1 of your '373

09:27   2   patent.  And can you just explain at a high level what we're

09:27   3   seeing here?

09:27   4      A.   Yes.  Again, this is, you know, one example of an

09:27   5   implementation.  And you can see some of the features that

09:27   6   we've essentially showed in this example with respect to the

09:27   7   patent, right?

09:27   8      So you can see there's a power supply selector switch,

09:27   9   which I think is labeled 21.  And there are two voltage

09:27   10   regulators also in there, which I think are labeled 26 and 24.

09:27   11   And essentially, it's these additions that we've kind of, you

09:27   12   know, added in to allow us to go off and recognize these

09:27   13   constraints of the circuits.  You know, different circuits have

09:28   14   different limitations.

09:28   15      And by adding those two elements, the power supply,

09:28   16   selector switch and the additional voltage regulators, really

09:28   17   what that lets us do is to go off and manage the voltage into

09:28   18   these different IPs for the states of the design that we really

09:28   19   need to have.  It's a way for us to go through and optimize the

09:28   20   system and improve the power of the design.

09:28   21      Q.   And in this example shown in Figure 1, was it your

09:28   22   first instinct to add the power supply selector and the second

09:28   23   voltage regulator?

09:28   24      A.   No.  Not necessarily.  And that's maybe the

09:28   25   interesting piece in a sense, right?

09:28  1      Usually, if you're trying to reduce power, you kind of

09:28  2  might want to simplify things or, you know, take things out of

09:28  3  the system, right?  That's normally the first approach, if you

09:28  4  will.

09:28  5      Here, we went off and kind of made the system more

09:28  6  complex, and essentially by adding that complexity which is not

09:28  7  your normal first course of action, we kind of enabled it to be

09:29  8  more efficient, right?  We could go through and optimize the

09:29  9  different operating states and end up saving power by adding

09:29  10  that complexity.

09:29  11      Q.   Why did you choose to have voltage regulators instead

09:29  12  of using unregulated voltages?

09:29  13      A.   Well, there's maybe a couple of things.  And perhaps

09:29  14  the easiest thing that we've kind of already talked about is

09:29  15  just simply if I've got two different operating states, I want

09:29  16  a first voltage applied, and then I want to move off to a

09:29  17  second voltage, right, then obviously you need to apply the

09:29  18  target voltage that you were designing for, right?  So that is

09:29  19  one reason of having a voltage regulator.

09:29  20      But the other point is as you're moving between those two

09:29  21  states, right, so if I'm at a high-voltage state going to a low

09:29  22  voltage or vice versa, right, you have to be concerned about

09:29  23  reliability, right?  And on microprocessors, you want them to

09:29  24  be as reliable as possible.  You want them to last as long as

09:29  25  possible.  And so the thing that you're trying to avoid is you

09:29  1   don't want to change the state too quickly in that voltage.

09:30  2       If you do, what can happen is that, in fact, you may get

09:30  3   some overshoot, right, where you're trying to get to a

09:30  4   particular voltage, but in fact you overshoot it a little bit

09:30  5   before coming back, right, with these quick transitions, right?

09:30  6   And that would, you know, damage the part, you know, maybe

09:30  7   permanently damage the part such that it would no longer work,

09:30  8   right?

09:30  9       So by having kind of a controlled ramp rates between these

09:30  10  two states of that voltage, we're using that voltage to go

09:30  11  through and improve the reliability of the microprocessor.

09:30  12      Q.   All right.  Are there other figures in your patent?

09:30  13      A.   Yes.  I think there's a total of four.  And so if you

09:30  14  go to the next page, so here's figure -- thank you -- Figures 2

09:30  15  and 3 are here and then essentially Figure 4 on the page

09:30  16  following.

09:30  17      Q.   Great.  And can you describe, just in general, what

09:30  18  other information your patent contains?

09:30  19      A.   Yes.  If you go to the next page.

09:30  20      So here you can see the -- you know, there's a couple of

09:31  21  sections here on this page.  There's the field of invention and

09:31  22  the related art, so this is really the background against the,

09:31  23  you know, what we are innovating against, right, so what's the

09:31  24  background of the design that we were trying to go off and

09:31  25  improve the state of the art, if you will, right?

09:31   1          There's another section here, the brief description of the

09:31   2   drawings, which are really just, you know, some high level

09:31   3   overview of the drawings.

09:31   4          And then again the detailed description of the drawings

09:31   5   are in a sense, you know, where we've walked through these

09:31   6   examples of how the inventions may be used, and, again, you

09:31   7   know, they're examples and not necessarily intended to be

09:31   8   limiting.

09:31   9          Q.   Well, did you make that clear in the patent?

09:31   10         A.   Yes.   In multiple cases.   And let me see if I can

09:31   11   find -- if you look at Line -- around Line 30, 29 and 30, I

09:31   12   think.

09:31   13         MS. SOOTER:   Your Honor.   I'm sorry to interrupt, but I

09:31   14   object to the witness testifying about the scope of the patents

09:31   15   in the claim coverage.

09:31   16         MR. HATTENBACH:   He's just testifying about what he said

09:32   17   in the patent.   You can see it right on the screen.   These are

09:32   18   just examples.

09:32   19         THE COURT:   I agree.   I'll overrule the objection.

09:32   20   BY THE WITNESS:

09:32   21         A.   So there's text here that's included in the patent

09:32   22   that basically, you know, again written by patent attorneys,

09:32   23   but the present invention is illustrated by way of example and

09:32   24   not limited by the accompanying figures essentially.

09:32   25         And then I think there's another entry, I believe, on

09:32  1    Column 12, Line -- around Line 15, I believe.

09:32  2        And I'm going to paraphrase this because I, you know,

09:32  3    again reading the legal phrasing, if you will, is, you know, I

09:32  4    don't know.  I personally find it tedious in a sense.  But

09:32  5    essentially what it says here is that the invention's been

09:32  6    described with reference to specific embodiments, right?  So

09:32  7    these are examples, right?

09:32  8        How one of ordinary skill -- so if you work in this area,

09:32  9    that's what that essentially means.  One of ordinary skill in

09:32  10   the art appreciates that various modifications and changes --

09:33  11       THE COURT:  You need to slow down just a little bit.

09:33  12       THE WITNESS:  Sorry.

09:33  13   BY THE WITNESS:

09:33  14       A.   -- can be made without departing from the scope of

09:33  15   the present invention, right?

09:33  16       So again, you know, you and I might say it differently in

09:33  17   terms of how we would say it, but the point is we're giving

09:33  18   examples in these detailed descriptions.

09:33  19       If you're practicing this area, you can kind of see how

09:33  20   you would use the inventions to kind of do other particular

09:33  21   things around that space.

09:33  22   BY MR. HATTENBACH:

09:33  23       Q.   And why did you include these two statements that you

09:33  24   just pointed out to us?

09:33  25       A.   Well, we thought certainly the invention or

09:33   1   inventions would, you know, have broad application across a

09:33   2   number of products in the industry, right?

09:33   3       So the idea was essentially to kind of, you know, make

09:33   4   clear that, you know, this was -- these examples were not

09:33   5   limiting.

09:33   6       Q.   Okay.  Did your patent contain any other materials?

09:33   7       A.   Yes.  I believe -- at this point, let's go to the

09:33   8   next page, please, which is Columns 13 and 14.

09:34   9       So here this is in fact the section that has the claims,

09:34   10  and you can see there are a number of paragraphs from 1 to -- I

09:34   11  can't see the bottom necessarily -- but 1 through 16.  Thank

09:34   12  you.

09:34   13      And it's essentially here that the inventions are outlined

09:34   14  and kind of the boundaries of the patent rights are set within

09:34   15  this text.

09:34   16      Q.   And in your mind what were the benefits of the

09:34   17  inventions that you made with your colleagues and patented?

09:34   18      A.   So, you know, probably a few things, right?

09:34   19      The first was just we recognized this voltage as a

09:34   20  variable that we could go off and apply to the circuits

09:34   21  differently, right?  And that, you know, allowed us to kind of,

09:34   22  you know, construct the design in a way that, depending upon

09:34   23  what we wanted to manage, is this a computation circuit or is

09:34   24  this a memory circuit with a different constraint on its

09:34   25  voltage.  You know, how do we go through and kind of manage

09:35    1    that circuit itself, right?

09:35    2         And again, I think the benefit is it really allows you to

09:35    3    kind of move quickly between, let's say, a low power state, a

09:35    4    sleep state or something like that back to a full operational

09:35    5    state very quickly without having lost the memory itself.

09:35    6         Q.   Okay.  Back in 2006, were there any particular

09:35    7    products that you thought might benefit from your inventions?

09:35    8         A.   Well, certainly microprocessors we thought would

09:35    9    benefit and really anything else that again has this, you know,

09:35   10    interplay of essentially memory and requiring to maintain that

09:35   11    memory state versus also going back in and having these other

09:35   12    circuits that we could take into a lower power operating state.

09:35   13         Q.   Okay.  Do you know if Freescale ever used the

09:35   14    inventions in the '373 patent in its own products?

09:35   15         A.   No.  I do not.  And in general, that's not something

09:35   16    that I would keep track of, right?  Freescale -- and, you know,

09:36   17    is essentially -- it's a company that has a broad range of

09:36   18    products.  And I'd say there's probably over a thousand

09:36   19    products, right?  So they're not focused in on one particular

09:36   20    area, you know, let's say, like, you know, processors for PCs,

09:36   21    a broad range of applications, and again we kind of said, you

09:36   22    know, airplanes to cars, if you will, right?

09:36   23         So lots of different applications, lots of different

09:36   24    circuits and keeping track of where a particular patent was

09:36   25    used was not something that anyone did.

09:36   1       Q.   Do you recall during the opening statement from Intel

09:36   2   yesterday there was some criticism about NXP not analyzing your

09:36   3   patent against its products to figure out if the patent was

09:36   4   being used in the NXP products?

09:36   5       A.   I do recall that.  You know, I -- that would -- you

09:36   6   know, I do a lot of searching through, you know, various

09:36   7   designs that we do and, you know, trying to find different IPs,

09:36   8   if you will, in a sense, right?

09:36   9       Taking on the task of trying to track down where the

09:37  10   invention might have been used would be formidable, right?  It

09:37  11   would be a -- you know, at the very least it would be a

09:37  12   full-time job for many years, and my personal opinion is that

09:37  13   it would be an impractical job.

09:37  14       Q.   All right.  About how many products does NXP make?

09:37  15       A.   I don't know the exact number, but certainly it's in

09:37  16   the thousands.  Again, you know, NXP is like Freescale, that --

09:37  17   it's a broad range of products in their portfolio.

09:37  18       Q.   And would you have any reason to try to determine

09:37  19   whether NXP uses your '373 patent in its products?

09:37  20       A.   No.  There's -- you know, given that we own the

09:37  21   patent, there's no reason to try to track down precisely where

09:37  22   it might have been used.

09:37  23       Q.   And are you aware of any reason why NXP's use or

09:37  24   nonuse of your patent would have any bearing on whether Intel

09:37  25   is using or not using that patent?

09:37   1        A.   No.   That is not related at all, right?  The patent

09:37   2   is the patent of the idea and I think stands on its own as, you

09:38   3   know, that, you know, patenting of the inventions.

09:38   4        Q.   Okay.  How do the ideas you just described a few

09:38   5   minutes ago result in a patent application being filed?

09:38   6        A.   So myself and my co-inventors, we all kind of agreed

09:38   7   that this was a new and novel idea and that it would be useful

09:38   8   in the industry, useful a broad number of places, right?  So we

09:38   9   did a write-up that essentially was a presentation of the

09:38  10   concepts, if you will, that we had at the time and took it

09:38  11   before the Freescale internal patent committee.

09:38  12        Q.   And what was that committee?

09:38  13        A.   So the Freescale internal patent committee was

09:38  14   essentially a collection of senior engineers and patent

09:38  15   attorneys, I have to throw them into the mix, that, you know,

09:38  16   essentially reviewed ideas that came before them and tried to

09:38  17   decide:  Does this idea have sufficient merit that we should

09:38  18   invest the time and the money into trying to pursue a patent?

09:39  19        Q.   And at the time, did you think your ideas were new

09:39  20   and novel?

09:39  21        A.   Yes.  We certainly did, right?  You know, this was,

09:39  22   you know, in a sense a new approach to go off and, you know,

09:39  23   tackle the problem of power savings, you know, bringing in the

09:39  24   complexity, bringing in, you know, the additional power supply

09:39  25   selector switch, the voltage regulators.  That was something

09:39    1    that we had not seen before and we thought again was valuable

09:39    2    to the industry.

09:39    3        Q.   And once the Freescale patent committee said you

09:39    4    should go ahead and file for a patent, were you able to do

09:39    5    that?

09:39    6        A.   Not immediately.  The -- in fact, what Freescale had

09:39    7    at the time was a -- I think it was the Freescale Strategic

09:39    8    Impact Review Board, right?

09:39    9        And so this -- you know, there were various patent

09:39   10    committees that would bring up ideas that they thought were

09:39   11    worthy, but really it had to go past an additional bar from the

09:40   12    Strategic Impact Review Board of trying to say:  Does this

09:40   13    really fit within one of the areas that we think is very

09:40   14    important to the company, right?

09:40   15        And so they -- you know, they did review the patent ideas

09:40   16    and agreed that it was of value and very -- again, one of the

09:40   17    critical areas that they wanted to protect.

09:40   18        Q.   All right.  Did you personally have involvement in

09:40   19    applying for the patent?

09:40   20        A.   I certainly reviewed the write-up.  I reviewed the --

09:40   21    you know, the claims, the document at the time and, you know,

09:40   22    thought that it captured the inventions properly.  And -- but I

09:40   23    did not write the patent application, and I'm not a patent

09:40   24    attorney.

09:40   25        Q.   All right.  Different topic.

09:40  1        Do you recall that your patent discusses the minimum

09:40  2  operating voltage of a memory, generally speaking?

09:40  3        A.   Yes.  I believe it does.

09:40  4        Q.   Is there only one way to determine the minimum

09:40  5  operating voltage of a memory?

09:40  6        A.   No.  There's multiple ways of, you know, determining

09:40  7  the minimum operating voltage of the memory.

09:40  8        You know, essentially, the first thing you have to decide

09:41  9  is, you know, what type of operating -- what type of operation

09:41  10  are you trying to cover, right?  Are you reading the memory,

09:41  11  writing the memory, or maybe you just want to retain the state,

09:41  12  right?  So you need to kind of bound the space.

09:41  13        But then once you've done that, then you can go off and

09:41  14  determine the minimum operating voltage that you want to use in

09:41  15  a lot of different ways, right?

09:41  16        You may go to the foundry, right, who manufactures the

09:41  17  parts.  You may go to the foundry and use their data for the

09:41  18  distribution characteristics of how the bit cell might behave.

09:41  19        You might run your own silicon and see what measurements

09:41  20  you would take and use.  You might, in fact, do a circuit

09:41  21  simulation using the models of the technology to try to see

09:41  22  what the minimum operating voltage may be.

09:41  23        So there's multiple ways that you can go off and determine

09:41  24  that value.

09:41  25        Q.   And what is a guard band, briefly?

09:41   1        A.    Guard band is something that, you know, we engineers

09:41   2   use in a number different of ways, right?  We -- because the

09:42   3   advanced technology nodes have a lot of variability, right, in

09:42   4   terms of how the -- when you build something, there's a lot of,

09:42   5   you know, range in the characteristics that you may get out,

09:42   6   right?  And so we guard band lots of different things, right?

09:42   7        Specifically, an example is if you had a measured minimum

09:42   8   operating voltage, if you had a simulated minimum operating

09:42   9   voltage, you'd want some guard band on that because again,

09:42   10  there's a distribution characteristic of what comes off the

09:42   11  manufacturing line, and you need to account for that as well as

09:42   12  other things about how the circuit may change over time as you

09:42   13  operate the circuit.

09:42   14       Q.    And do you recall whether your patent discusses the

09:42   15  use of guard bands?

09:42   16       A.    I believe it discussed margins at some level.  I

09:42   17  can't remember the exact phrasing, but guard band or margining,

09:42   18  one of the two.

09:42   19       Q.    Okay.  Did you receive any award from Freescale

09:42   20  relating to the inventions in your '373 patent?

09:42   21       A.    Yes.  I did.  It was standard practice that when you,

09:43   22  you know, applied for a patent then, in fact, you know,

09:43   23  Freescale would give you a cash award, if you will, to each one

09:43   24  of the inventors.  And I can't remember the exact value,

09:43   25  somewhere between 1,000 and $3,000, right?

09:43   1        And so that's good money.  I was happy about that and, you

09:43   2    know, proud of the work on the patent.  And I would be happy if

09:43   3    NXP received the benefit of the patent itself.

09:43   4        Q.   Okay.  Did you have an understanding about whether

09:43   5    that amount of your award was supposed to have any relationship

09:43   6    to the value of your invention?

09:43   7        A.   No.  It was just a nice thank-you from the company

09:43   8    for helping them out on something that was important to them.

09:43   9        Q.   Okay.  Just one more question.

09:43  10        When you presented your inventions to Freescale, did you

09:43  11    have any thoughts or ideas about the value they could derive?

09:43  12        A.   Sure.  We thought that -- you know, again, this was

09:44  13    an invention that was, you know, allowing us to save power in

09:44  14    electronic devices, in microprocessors or other things of that

09:44  15    nature, right?  And, you know, if it's used on a product that's

09:44  16    sold in high volumes, as an example, then obviously the value

09:44  17    would be very high, very significant, right?

09:44  18        You know, hundreds of millions of microprocessors are sold

09:44  19    every year.  And so if the patent is used to save even a little

09:44  20    bit of power, then the cumulative benefit over all of those

09:44  21    parts would be significant.

09:44  22        Q.   Thank you very much, Mr. Bearden.

09:44  23        MR. HATTENBACH:  Pass the witness.

09:44  24                        CROSS-EXAMINATION

09:44  25    BY MS. SOOTER:

09:45   1          Q.   My name is Mindy Sooter, and it's nice to meet you.

09:45   2          A.   Nice to meet you.

09:45   3          Q.   Now, you just spent a fair amount of time testifying

09:45   4   about the '373 patent, correct?

09:45   5          A.   Yes, I did.

09:45   6          Q.   You've been on the stand already for about

09:45   7   40 minutes, right?

09:45   8          A.   I didn't keep track of the time, but I'll believe

09:45   9   you.

09:45  10          Q.   Okay.  You talked to the jury about the front page of

09:45  11   the patent, right?

09:45  12          A.   Yes, I did.

09:45  13          Q.   You talked to the jury about the abstract of the

09:45  14   patent, correct?

09:45  15          A.   Yes, I did.

09:45  16          Q.   You pointed to Figure 1 of the patent, right?

09:45  17          A.   Yes.

09:45  18          Q.   In fact, you looked at all of the -- you talked about

09:45  19   all of the figures, right?

09:45  20          A.   Not all of the figures.  I did highlight the fact

09:45  21   that there were Figures 2 and 3, but -- 4, sorry, but we did

09:45  22   not go through those.

09:45  23          Q.   Exactly.  You talked about the background section of

09:45  24   the patent, right?

09:45  25          A.   Yes.

09:45   1      Q.   You talked about the specification of the patent,

09:45   2   didn't you?

09:45   3      A.   Yes.

09:46   4      Q.   And you talked about the claims of the patent, right?

09:46   5      A.   I don't know that I went into any detail on the

09:46   6   claims.

09:46   7      Q.   You would agree that the claims are what define the

09:46   8   scope of the invention though, right?

09:46   9      A.   That's true.

09:46  10      Q.   Now, during your deposition last year, you were

09:46  11   uncomfortable making any statements relating to the '373

09:46  12   patent; isn't that right?

09:46  13      A.   So at the time -- again, this was -- I think that

09:46  14   patent was invented, if you will, 15 years ago, approximately,

09:46  15   now.  And I had not reviewed the patent at that point in time,

09:46  16   and so it was not fresh in my mind with respect to what was in

09:46  17   that document.

09:46  18      Q.   Mr. Bearden, I believe you have a black binder in

09:46  19   front of you.

09:46  20      A.   Maybe.  Okay.

09:46  21      Q.   Your deposition transcript is at Tab 1.  Can you

09:47  22   please turn to Tab 1?

09:47  23      A.   And I will point out that I've had a detached retina

09:47  24   in the past, and so any small font is -- does not get along

09:47  25   with me.

| | | |
|---|---|---|
| 09:47 | 1 | Q.   We'd be happy to show it on the screen. |
| 09:47 | 2 | A.   That's probably better if you would. |
| 09:47 | 3 | Q.   As a matter of fact, let's go ahead and bring that |
| 09:47 | 4 | up, your deposition transcript at Page 228, Lines 9 through 15. |
| 09:47 | 5 | Now, you were deposed in April of 2020, right? |
| 09:47 | 6 | A.   I believe that is correct, yes. |
| 09:47 | 7 | Q.   Ten months ago, correct? |
| 09:47 | 8 | A.   Yes. |
| 09:47 | 9 | Q.   And you were under oath at the time, right? |
| 09:47 | 10 | A.   Yes. |
| 09:47 | 11 | Q.   And you were shown the patent before your deposition, |
| 09:47 | 12 | right? |
| 09:47 | 13 | A.   I believe what I testified then was, in fact, when I |
| 09:47 | 14 | was alerted to the fact -- |
| 09:47 | 15 | THE COURT:  Sir, sorry. |
| 09:47 | 16 | Let's take the transcript off until you're going to show |
| 09:47 | 17 | it. |
| 09:47 | 18 | MS. SOOTER:  Thank you.  Thank you, Your Honor. |
| 09:47 | 19 | BY THE WITNESS: |
| 09:48 | 20 | A.   Sorry.  Go ahead and ask the question again. |
| 09:48 | 21 | BY MS. SOOTER: |
| 09:48 | 22 | Q.   You were shown the '373 before your deposition? |
| 09:48 | 23 | A.   So when I was given heads up that the deposition |
| 09:48 | 24 | would occur, then the counsel -- I guess NXP and the VLSI |
| 09:48 | 25 | counsel did show me the front page of the patent.  That |

09:48  1    basically -- essentially, the conversation was one of, hey, do

09:48  2    you remember this patent?

09:48  3        And, you know, after a little bit of head scratching, then

09:48  4    I kind of said, yeah, vaguely.  Right?  So, yes.

09:48  5        Q.   So before your deposition, VLSI's counsel showed you

09:48  6    the '373 patent, right?

09:48  7        A.   They did.

09:48  8        Q.   So let's go to --

09:48  9        A.   And again, I was aware of the patent.

09:48  10       Q.   Let's go ahead and bring up your deposition

09:48  11   transcript Page 228, Lines 9 through 15.  Now --

09:48  12       MR. HATTENBACH:  Objection, Your Honor.  This is not

09:48  13   impeaching.  It's exactly consistent with what he has already

09:48  14   said.

09:48  15       THE COURT:  Well, let me say, this is not impeachment.

09:48  16   What you need to do, counsel, is ask him a question, and if the

09:49  17   answer to the question he gives that you ask in front of the

09:49  18   jury is different, then you can show the deposition.  You don't

09:49  19   get to use the deposition to ask the questions.

09:49  20       MS. SOOTER:  Yes, Your Honor.  I will ask again.

09:49  21   BY MS. SOOTER:

09:49  22       Q.   You said earlier you're not comfortable -- at your

09:49  23   deposition, you were not comfortable testifying about the '373

09:49  24   patent, correct?

09:49  25       A.   That is correct.

09:49  1        Q.   Now, you just told the jury about the process by

09:49  2   which you came up with the ideas for the '373 patent, right?

09:49  3        A.   Yes.

09:49  4        Q.   You spent a fair amount of time talking about what

09:49  5   you and your coworkers were working on to come up with the

09:49  6   ideas in the patent, right?

09:49  7        A.   Yes.

09:49  8        Q.   You explained the technology, and you talked about

09:49  9   the problem you were trying to solve, right?

09:49 10        A.   Yes.  And essentially what happened in the April time

09:49 11   frame was that, you know, I was given a very short notice, if

09:50 12   you will, that in fact there would be a deposition.  And Intel

09:50 13   requested --

09:50 14        THE COURT:  Excuse me.  Here's the way it works.  When

09:50 15   you're on cross, this is cross.  This isn't direct.  On direct,

09:50 16   you get to say whatever you want in response to your counsel.

09:50 17        THE WITNESS:  Okay.

09:50 18        THE COURT:  When you're on cross, the attorney for the

09:50 19   person asking the question on cross gets to ask you questions.

09:50 20   If they do it in what we call a leading manner which gets a yes

09:50 21   or no, you answer her question.

09:50 22        And then when she's finished, your lawyer's going to get

09:50 23   to ask you whatever they want to help clarify any answer you

09:50 24   may have given.

09:50 25        THE WITNESS:  Thank you, Your Honor.

09:50   1          THE COURT:  But if she asks you a yes or no question, I

09:50   2      appreciate a yes or no answer.

09:50   3          THE WITNESS:  Okay.

09:50   4      BY MS. SOOTER:

09:50   5          Q.  Sir, here was my question.  During your direct

09:50   6      testimony you explained to the jury the path by which you came

09:50   7      up with the ideas in the '373 patent --

09:50   8          A.  Yes.

09:50   9          Q.  -- right?

09:50   10         During your deposition ten months ago, you could not

09:51   11     remember any details about how you came up with the ideas in

09:51   12     the '373 patent, could you?

09:51   13         A.  I was able to refresh my memory, given the documents

09:51   14     that Intel requested I provide.

09:51   15         MS. SOOTER:  Let's go ahead and bring up your deposition

09:51   16     transcript, Page 124, Lines 24 through 125, Line 1.

09:51   17     BY MS. SOOTER:

09:51   18         Q.  At your deposition ten months ago you were asked, "Do

09:51   19     you remember any details about how you came up with the ideas

09:51   20     in the '373 patent?"

09:51   21         Your answer was, "The path to it, no, I don't."

09:51   22         Did I read that correctly?

09:51   23         A.  Yes, ma'am.

09:51   24         Q.  Thank you.

09:51   25         And you were under oath then, right, sir?

09:51  1      A.   Yes.

09:52  2      Q.   And you know that your deposition was Intel's chance

09:52  3  to ask you questions about the '373 patent and your ideas,

09:52  4  right?

09:52  5      A.   I understand that, yes.

09:52  6      Q.   And in fact, it was Intel's only opportunity to ask

09:52  7  you questions about these ideas before today, right?

09:52  8      A.   Yes, but the request was not made that I read the

09:52  9  patent.

09:52 10      Q.   But you were shown the patent by VLSI's lawyers,

09:52 11  right?

09:52 12      A.   The first page, yes.

09:52 13      Q.   Mr. Bearden, you don't remember how much time you

09:52 14  spent working on the ideas in the '373 patent, do you?

09:52 15      A.   Not precisely after 15 years.

09:52 16      Q.   That's a good point, sir.  The ideas in the patent

09:52 17  came from 2006, right?

09:52 18      A.   Yes.

09:52 19      Q.   That's almost 15 years ago; isn't that right?

09:52 20      A.   Approximately now, yes.

09:52 21      Q.   You can't say whether you spent more or less than ten

09:53 22  hours working on the ideas in the '373 patent, can you?

09:53 23      A.   It's been too long that I can't remember the exact

09:53 24  duration and time.

09:53 25      Q.   And if you came up with a number of hours that you

09:53   1   spent working on those ideas, you'd just be making it up,

09:53   2   right?

09:53   3       A.   I think anything that I would give would just be a --

09:53   4   you know, a guess at some level, and that likely would not be

09:53   5   accurate.

09:53   6       Q.   Now, let's talk about those ideas in the '373 patent,

09:53   7   okay?

09:53   8       A.   Sure.

09:53   9       Q.   Now, did you have the opportunity to see Mr. Chu's

09:53   10  opening statement?

09:53   11      A.   Yes, I did.

09:53   12      Q.   And he talked a lot about the '373 patent having to

09:53   13  do with sleep states, right?

09:53   14      A.   I believe he mentioned that term, yes.

09:53   15      Q.   He used the term a number of times, didn't he?

09:53   16      A.   I didn't count, but I believe he used the term.

09:53   17      Q.   And you yourself used that term a couple of times

09:53   18  today, right?

09:53   19      A.   Yes.

09:53   20      Q.   And you used that term in connection with the '373

09:53   21  patent, didn't you?

09:53   22      A.   Yes, I did.

09:53   23      Q.   If I were to read the '373 patent front to back, the

09:54   24  word "sleep" is not found in that patent, is it?

09:54   25      A.   That I don't know.  I believe we used the term

09:54   1   "retention" or "standby."

09:54   2        Q.   And if the jury is to read the patent front to back,

09:54   3   as they are probably going to have to do to decide this case,

09:54   4   they won't see the word "sleep" in this patent either, will

09:54   5   they?

09:54   6        A.   They would have to be aware that the word "sleep" and

09:54   7   "standby" are essentially the same to those skilled in the art.

09:54   8        Q.   Sir, my question is this.  And I would really like to

09:54   9   get a yes or no answer if I could.  If the jury reads the

09:54  10   patent front to back, they will not see the word "sleep" in

09:54  11   that patent, will they?

09:54  12        A.   I don't know for sure, but I think we used the word

09:54  13   "standby."

09:54  14        Q.   Also, sir, you used the word "ramp" a number of times

09:54  15   today, didn't you?

09:54  16        A.   I believe I did, yes.

09:54  17        Q.   Ramp is not in the '373 patent, is it?

09:54  18        A.   I don't think that we spelled that out in the patent.

09:55  19        Q.   I believe you testified that you work at NXP now,

09:55  20   right?

09:55  21        A.   That is correct.

09:55  22        Q.   And you spent a fair amount of time during your

09:55  23   direct testimony talking about NXP and what it does, right?

09:55  24        A.   Yes.

09:55  25        Q.   NXP is not a party to this case, is it?

```
09:55   1        A.   I believe that this case is between VLSI and Intel.

09:55   2        Q.   NXP is not a party to this case, is it?

09:55   3        A.   No.

09:55   4        Q.   Before NXP you worked at Freescale, right?

09:55   5        A.   Yes.  I did.

09:55   6        Q.   You also spent a fair amount of time talking about

09:55   7    Freescale and before at Motorola, right?

09:55   8        A.   Yes.  I did.

09:55   9        Q.   Freescale is not a party to this case, is it?

09:55   10       A.   No.  Freescale does not exist anymore.

09:55   11       Q.   And Motorola is not a party to this case either?

09:55   12       A.   No.  They're not.

09:55   13       Q.   The plaintiff in this case is VLSI Technologies LLC,

09:56   14   right?

09:56   15       A.   That's my understanding.  I don't know precisely the

09:56   16   full company name, but that sounds right.

09:56   17       Q.   You don't work for VLSI, do you?

09:56   18       A.   No.  I don't.

09:56   19       Q.   In fact, you've never worked for VLSI, right?

09:56   20       A.   No.  I have not.

09:56   21       Q.   And before you got involved in this litigation, you

09:56   22   had never even heard of VLSI Technologies LLC, had you?

09:56   23       A.   No.  I had not.

09:56   24       Q.   Now, you understand that NXP sold the '373 patent to

09:56   25   VLSI, right?
```

09:56  1      A.   I don't know the precise nature of the transfer.  I

09:56  2  only know that it was assigned, and I have no other information

09:56  3  about precisely what that means.

09:56  4      Q.   Assigned means that NXP does not own the patent

09:56  5  anymore, right?

09:56  6      A.   I'm not an expert in that, and so I can't say.

09:56  7      Q.   NXP has thousands of patents, right?

09:56  8      A.   I believe they do.  Yes.

09:56  9      Q.   NXP does not own the '373 patent any longer, right?

09:57  10     A.   Again, I'm not involved in that part of the business,

09:57  11  if you will, and so I can't answer that question.

09:57  12     Q.   Well, you weren't involved in the sale of the patent,

09:57  13  right?

09:57  14     A.   No.  I was not.

09:57  15     Q.   You didn't negotiate the terms of the sale, did you?

09:57  16     A.   No.  I did not.

09:57  17     Q.   And you don't know how much VLSI paid for the '373

09:57  18  patent, do you?

09:57  19     A.   No.  I do not.

09:57  20     MS. SOOTER:  Can we bring up PTX-4, the '373 patent,

09:57  21  please?

09:57  22  BY MS. SOOTER:

09:57  23     Q.   Now, up on the top right is the patent number, right,

09:57  24  sir?

09:57  25     A.   Yes.

09:57 1      Q.   Ends in '373, and that's why we call it the '373

09:57 2  patent, right?

09:57 3      A.   Yes.  It would be tedious to repeat all those

09:57 4  numbers.

09:57 5      Q.   The inventors are listed over on the left-hand side,

09:57 6  right?

09:57 7      A.   Yes.

09:57 8      Q.   And I believe you testified earlier there are four

09:57 9  inventors on the patent, right?

09:57 10     A.   Yes.

09:57 11     Q.   You're the second named inventor, right?

09:57 12     A.   Yes.  That is true.

09:57 13     Q.   It's not uncommon to refer to a patent by the

09:58 14  inventor's name, is it?

09:58 15     A.   No.  It's not.

09:58 16     Q.   In fact, the first named inventor is listed on the

09:58 17  top of the patent on the second row, right?

09:58 18     A.   Yes.

09:58 19     Q.   Safe to say you could call this the Russell patent,

09:58 20  right?

09:58 21     A.   I'm sorry.  I didn't catch the question.

09:58 22     Q.   The first named inventor is named Andrew Russell?

09:58 23     A.   Oh, okay.  Sorry.  I got it now.

09:58 24     Q.   Right.  Sorry.  I skipped a question.

09:58 25     A.   I heard Russell and I...

09:58  1       Q.   My fault.  I skipped a question.

09:58  2       The first named inventor is Andrew Russell, right?

09:58  3       A.   Yes.

09:58  4       Q.   And Mr. Russell's name is listed at the top?

09:58  5       A.   Yes.  It is.

09:58  6       Q.   So we could call this the Russell patent, right?

09:58  7       A.   For a shorthand, you perhaps could.

09:58  8       Q.   And that's pretty conventional, right?

09:58  9       A.   In general, yes.

09:58 10       Q.   Now, there were two other named inventors, right?

09:58 11       A.   Yes.  Bradford and Shayan.

09:58 12       Q.   All four of you contributed to the ideas in the '373

09:58 13  patent, right?

09:58 14       A.   Yes.

09:58 15       Q.   And all four of you worked at Freescale at the time,

09:59 16  right?

09:59 17       A.   Yes.  We did.

09:59 18       Q.   And that's why you assigned the patent to Freescale,

09:59 19  correct?

09:59 20       A.   Yes.

09:59 21       Q.   Now, switching gears slightly, the semiconductor

09:59 22  market is highly competitive; wouldn't you agree?

09:59 23       A.   It's a very competitive business.  Yes.

09:59 24       Q.   And the semiconductor market is characterized by

09:59 25  rapid technological change, right?

09:59   1       A.   I think that's been its hallmark over the years.

09:59   2   Yes.

09:59   3       Q.   In fact, in the semiconductor industry, you can't

09:59   4   just sit back and depend on what you've done in the past to

09:59   5   boost you into the future, can you?

09:59   6       A.   No.   It's a continuous cycle of research and

09:59   7   development.

09:59   8       Q.   In the semiconductor industry, you have to keep on

09:59   9   innovating, don't you?

09:59   10      A.   Yes.   You do.

09:59   11      Q.   And to compete, you have to keep coming up with new

09:59   12  ideas, right?

09:59   13      A.   Yes.   You do.

09:59   14      Q.   And you testified that one of the things that's

10:00   15  important to the semiconductor market is power savings, didn't

10:00   16  you?

10:00   17      A.   Absolutely.   Yes.

10:00   18      Q.   And would you agree that over the years it's been

10:00   19  really important for all companies to have increased power

10:00   20  savings?

10:00   21      A.   I think that's been a focus for the majority of the

10:00   22  companies in the industry.   Yes.

10:00   23      Q.   And your customers expect that you'll make products

10:00   24  as low a power as possible so the batteries last longer, right?

10:00   25      A.   In some applications batteries are a consideration,

10:00  1   but in general, power is a prime consideration for any design.

10:00  2        Q.   Now, Freescale, the original owner of this patent,

10:00  3   was in the semiconductor market, right?

10:00  4        A.   Sure.

10:00  5        Q.   And when Freescale owned the '373 patent, it had all

10:00  6   the rights it needed to use the patent, didn't it?

10:00  7        A.   Yes.  They did.

10:00  8        Q.   But you're not aware of any Freescale product that

10:01  9   has used the '373 patent, are you?

10:01  10        A.   So I testified earlier that I'm not aware of where it

10:01  11   might have been used throughout Freescale.  I can only testify

10:01  12   to what I know from my personal experience for the products I

10:01  13   worked on.

10:01  14        Q.   You're not aware of any Freescale product that has

10:01  15   used the '373 patent, are you?

10:01  16        A.   No.  Given the change in the focus of the processors

10:01  17   we were building.

10:01  18        Q.   Now, NXP acquired the patent in 2015, right?

10:01  19        A.   Yes.

10:01  20        Q.   And, in fact, NXP is still, to this day, has the

10:01  21   rights to use the '373 patent, doesn't it?

10:01  22        A.   I believe that's the case.  Yes.

10:01  23        Q.   So NXP has had the right to use the '373 patent for

10:01  24   over five years?

10:01  25        A.   I believe that's correct.

368

10:01  1       Q.   But you're not aware of any NXP product that has used

10:02  2   the invention of the '373 patent, are you?

10:02  3       A.   Again, it's the same problem, that many, many parts,

10:02  4   and I can't keep track of where it might have been used.  I

10:02  5   could only tell you my personal experience on projects and

10:02  6   programs I've been involved in.

10:02  7       Q.   You're not aware of any NXP product that has used the

10:02  8   invention of the '373 patent, are you?

10:02  9       A.   I do not know where it might have been used.

10:02  10      Q.   Now, sir, have you seen in your everyday life when

10:02  11  you're using a product or, you know, even a consumer product

10:02  12  and it has a patent number written on it?

10:02  13      A.   Yes.

10:02  14      Q.   NXP has never put the '373 patent number on any of

10:02  15  its products, has it?

10:02  16      A.   That I'm not aware of.  No.

10:02  17      Q.   And Freescale never put the number of the '373 patent

10:02  18  on any of its products either, did it?

10:02  19      A.   That's not information that I would have at my hand

10:02  20  here.

10:02  21      Q.   Now, you're a fellow at NXP, right?

10:02  22      A.   Yes.  That's true.

10:03  23      Q.   That's a pretty senior position in the engineering

10:03  24  ranks, right?

10:03  25      A.   Yes.  It is.

10:03   1      Q.   And you're a named inventor of course on the '373

10:03   2   patent, as we've heard, right?

10:03   3      A.   Yes.

10:03   4      Q.   And that's a patent that Mr. Chu called a "star" and

10:03   5   a "hero" patent, right?

10:03   6      A.   Yes.  Because -- I think he gave it that description

10:03   7   given the applicability to different markets.

10:03   8      Q.   And you believe that the '373 patent is a

10:03   9   power-saving invention; is that right?

10:03   10      A.   Absolutely.

10:03   11      Q.   But to the best of your knowledge, no product at NXP

10:03   12   or Freescale has ever used the '373 patent; isn't that right?

10:03   13      A.   The patent was done for a particular application, and

10:03   14   that power-saving technique did not work anymore for the types

10:03   15   of products that we were building in customer application, so

10:03   16   we had to search for new ways to save power.

10:03   17      THE COURT:  Again, let me remind you.  She's asking you

10:03   18   questions that allow you to answer yes or no.  If there's a

10:03   19   reason that the answer is yes or a reason that the answer's no,

10:04   20   your counsel's going to have all the time he wants to have you

10:04   21   explain.

10:04   22      THE WITNESS:  Sorry, Your Honor.

10:04   23   BY MS. SOOTER:

10:04   24      Q.   To the best of your knowledge, sir, no NXP or

10:04   25   Freescale product has used the ideas in the '373 patent; isn't

10:04  1   that right?

10:04  2       A.   I don't know of any particular product.

10:04  3       Q.   In fact, you said it would take you thousands of

10:04  4   hours to find that out, right?

10:04  5       A.   That would be a very tall order.  Yes.

10:04  6       Q.   And you never asked anyone to do that, right?

10:04  7       A.   No.

10:04  8       Q.   Thank you.  That's all I have.

10:04  9       A.   Sure.

10:04  10                    REDIRECT EXAMINATION

10:04  11  BY MR. HATTENBACH:

10:04  12      Q.   Hello again, Mr. Bearden.  I just have a handful of

10:04  13  questions for you.

10:04  14           To start with, you were asked some questions about whether

10:05  15  you had reread your full deposition transcript from cover to

10:05  16  cover right before your deposition, and you weren't allowed to

10:05  17  explain why that didn't happen.  Could you explain that?

10:05  18      A.   Yeah.  I believe the question was had I read the

10:05  19  patent before the deposition.

10:05  20      Q.   Oh, I'm sorry.  You're right.  So why didn't you read

10:05  21  the full --

10:05  22      A.   I believe that was the question asked.

10:05  23      Q.   Why didn't you read the full patent, cover to cover,

10:05  24  right before your deposition?

10:05  25      A.   You know, it was short-ordered in terms of:  Here's

10:05  1   the patent.  Do you remember this?

10:05  2        And also it was, Intel has requested that you find all

10:05  3   documentation available with respect to the patent.

10:05  4        And this was in April, and this was prime COVID time,

10:05  5   right?  And the world was pretty much chaotic.  NXP was

10:05  6   fundamentally shut down.

10:05  7        And to get into the plants, which, you know, everyone was

10:05  8   working from home, and so I had to go into the plant.  You

10:05  9   know, it was quite an ordeal, right?  You had -- it was full

10:06  10  mask, goggles, you know, the ten questions, the thermal thing,

10:06  11  and then walking into essentially an empty, dead building,

10:06  12  right?

10:06  13       And so I spent the time that I had on the weekends

10:06  14  searching through all paper documents that I could find,

10:06  15  searching through -- I had several old laptops that had been

10:06  16  sitting around forever that I managed to power back up and

10:06  17  search through old e-mails.

10:06  18       And so I spent the majority of my time before that

10:06  19  deposition, in fact, fulfilling Intel's request to go through

10:06  20  and find all available documentations with respect to the

10:06  21  patent.

10:06  22       And so at that point in time, I had to get back to my day

10:06  23  job, and I did not have time to read the full patents.

10:06  24       Q.   Okay.  And then you were shown the single deposition

10:06  25  excerpt, none of the context, where you suggested at that time

10:06  1   you weren't comfortable without reviewing the patent, talking

10:06  2   about it in detail.  Do you remember that generally?

10:06  3       A.   Generally, I remember that conversation.

10:06  4       MR. HATTENBACH:  Mr. Simmons, could you put up from his

10:07  5   deposition Page 29, Lines 12 to 19?

10:07  6   BY MR. HATTENBACH:

10:07  7       Q.   I just want to provide a couple of other contextual

10:07  8   examples.

10:07  9       Sir, is this another passage from your deposition that you

10:07  10  recall that you weren't shown earlier today?

10:07  11      A.   One moment here.

10:07  12      Yes.  That looks familiar, and it kind of sounds like me.

10:07  13      Q.   Okay.  So you did tell the Intel lawyers that you

10:07  14  certainly have an understanding of the original idea that was

10:07  15  presented to the patent committee, et cetera, but that you're

10:07  16  not a lawyer, right?

10:07  17      A.   Yes.

10:07  18      Q.   Okay.

10:07  19      MR. HATTENBACH:  Mr. Simmons, if you could put up Page 93,

10:07  20  Lines 19 to 24.

10:08  21      Why don't we do this just to save time, Your Honor.  Could

10:08  22  I just have the witness read the testimony to the jury?

10:08  23      THE COURT:  I was hoping you were going to say that.

10:08  24      MR. HATTENBACH:  Okay.

10:08  25  BY MR. HATTENBACH:

373

10:08  1        Q.   So the question was:  Do you have any understanding

10:08  2   of what this patent comprises?  And the answer was?

10:08  3        A.   Should be yes.

10:08  4        Q.   The answer was -- tell me if I'm reading this

10:08  5   correctly.  "I certainly have an understanding" --

10:08  6        A.   Oh, I'm sorry.  I didn't realize.

10:08  7        Q.   That's okay.

10:08  8        A.   I thought you were trying to advance to something

10:08  9   else, and I was just out of sync with you.

10:08  10       Q.   So the answer -- was the answer, "I certainly have an

10:08  11  understanding of" -- lost the page here.  "I certainly have an

10:08  12  understanding of what the original idea was that was presented

10:09  13  to the patent committee.  Exactly commenting on the patent

10:09  14  write-up, I think there's a reason why engineers write

10:09  15  technical papers and lawyers write patents.  It's two different

10:09  16  worlds here, right?"

10:09  17       A.   Yes.

10:09  18       Q.   That was your testimony?

10:09  19       A.   Yes.  And that -- you know, the point was yes, we

10:09  20  understood what the invention was related to.  But to go off

10:09  21  and comment on a legal document at the time was not something

10:09  22  that -- you know, in general, that's not my area of expertise.

10:09  23       Q.   All right.  To save time and video issues, I won't

10:09  24  show you others.  But let me ask you a different question.

10:09  25       Ms. Sooter asked you about sleep states.  Do you recall

10:09  1    that generally?

10:09  2         A.   Yes.

10:09  3         Q.   And as you understand your ideas in your '373 patent,

10:09  4    can they be used to implement sleep states in microprocessors?

10:09  5         A.   Absolutely.  You know, and again, we used, as I

10:09  6    remember the phrases, "retention" or "standby" in the patent.

10:09  7    And again, to someone that's kind of in the business, if you

10:09  8    will, those mean essentially the same thing in terms of a lower

10:09  9    power state and inactive idle state.

10:10  10        Q.   All right.  And do you recall Ms. Sooter also asking

10:10  11   you some questions about VLSI?

10:10  12        A.   Yes.

10:10  13        Q.   Has it been helpful to you personally to have VLSI

10:10  14   working with NXP?

10:10  15        A.   You know, there's certainly no way that I have the

10:10  16   time in my day job to go off and track down where any

10:10  17   particular patent might have been used, either internally or

10:10  18   externally, right?

10:10  19        And again, with the fact that the nature of many designs

10:10  20   are kept secret, there's no way that I could have pursued that,

10:10  21   right?  So certainly there's a benefit of VLSI's involvement.

10:10  22        Q.   Thank you very much, Mr. Bearden.

10:10  23        A.   Thank you.

10:10  24        THE COURT:  Any other questions, ma'am?

10:10  25        MS. SOOTER:  Just one or two questions, Your Honor.

10:10  1          THE COURT:  As many as you would like.

10:10  2                         RECROSS-EXAMINATION

10:10  3   BY MS. SOOTER:

10:10  4          Q.  Hi.

10:10  5          A.  Hi.

10:10  6          Q.  Regardless of the reason, sir, prior to your

10:11  7   deposition of last year, you simply didn't read the '373

10:11  8   patent, did you?  Yes or no.

10:11  9          A.  Prior to the deposition, no.

10:11 10          Q.  In fact, you had never read the '373 patent before

10:11 11   your deposition; isn't that right?

10:11 12          A.  I read the '373 patent application at the time in

10:11 13   2006 when we signed off on that document that was submitted.

10:11 14          Q.  You never read the patent itself after that, right?

10:11 15          A.  Not after that, no.

10:11 16          Q.  Thank you.  That's all I have.

10:11 17          THE COURT:  You're done.

10:11 18          May this witness be excused?

10:11 19          MR. HATTENBACH:  Yes, Your Honor.  Thank you.

10:11 20          THE WITNESS:  Thank you, sir.

10:11 21          THE COURT:  Is Intel good with excusing him as well?

10:11 22          MS. SOOTER:  Yes, Your Honor.

10:11 23          THE COURT:  Who will the next witness be for the

10:11 24   plaintiff?

10:11 25          MR. HEINRICH:  Plaintiffs call Professor Tom Conte.

| | | |
|---|---|---|
| 10:12 | 1 | (The witness was sworn.) |
| 10:12 | 2 | DIRECT EXAMINATION |
| 10:12 | 3 | BY MR. HEINRICH: |
| 10:12 | 4 | Q.   Are you Professor Tom Conte? |
| 10:12 | 5 | A.   I am. |
| 10:12 | 6 | Q.   Good morning, ladies and gentlemen.  My name's Alan |
| 10:12 | 7 | Heinrich, and I'm one of the folks representing VLSI in this |
| 10:12 | 8 | case. |
| 10:12 | 9 | So good morning, Professor Conte. |
| 10:12 | 10 | A.   Good morning. |
| 10:13 | 11 | Q.   Could you please introduce yourself to the jury? |
| 10:13 | 12 | A.   Sure.  I'm Tom Conte.  I'm a professor at Georgia |
| 10:13 | 13 | Tech.  I live with my wife, our two kids and our four rescue |
| 10:13 | 14 | dogs in Decatur, Georgia. |
| 10:13 | 15 | Q.   And what's your role in this case? |
| 10:13 | 16 | A.   So I was asked to analyze the two patents you heard |
| 10:13 | 17 | about, and then Intel's products, and do a technical analysis |
| 10:13 | 18 | to determine if those Intel products infringe those patents. |
| 10:13 | 19 | Q.   And how many hours have you spent working on this |
| 10:13 | 20 | case? |
| 10:13 | 21 | A.   About 300. |
| 10:13 | 22 | Q.   Are you being compensated for your time? |
| 10:13 | 23 | A.   I am. |
| 10:13 | 24 | Q.   And what's your rate for your time? |
| 10:13 | 25 | A.   My rate's my normal and customary $600 per actual |

10:13  1    hour of work.

10:13  2        Q.   Is your compensation dependent in any way on the

10:13  3    outcome of the case?

10:13  4        A.   No.  Not at all.

10:13  5        Q.   All right.  Did you prepare some slides to help

10:13  6    illustrate your testimony today?

10:13  7        A.   I did, and here they are.

10:14  8        Q.   Can you summarize your educational background?

10:14  9        A.   Sure.  I received my bachelor's degree in electrical

10:14  10   engineering at the University in Delaware in 1986, then got

10:14  11   accepted to the University of Illinois where I got my masters

10:14  12   in 1988 and then my Ph.D. in 1992.

10:14  13       Q.   And what's your professional experience?

10:14  14       A.   Well, I've been a teacher ever since.  I started at

10:14  15   the University of South Carolina, moved to North Carolina State

10:14  16   and then Georgia Tech.  But also during summers and a day a

10:14  17   week, I would work in industry.

10:14  18       Q.   And can you give us some examples of your work in

10:14  19   industry?

10:14  20       A.   Sure.  So I work, for example, in the IBM's embedded

10:14  21   power PC processor group.  That power PC that you heard about

10:15  22   earlier that Freescale was a partner in, IBM was the other

10:15  23   partner.  And I worked in the group that designed IBM's

10:15  24   processors for that.

10:15  25       Q.   Any other industry experience?

378

10:15   1       A.   Yes.   Then a group of us left, and we started a

10:15   2    company called Billions of Operations Per Second, Inc. -- it's

10:15   3    a mouthful, and so we call it BOPS -- and we designed a

10:15   4    microprocessor we called Manta.

10:15   5       Q.   And what happened to BOPS?

10:15   6       A.   BOPS was acquired by Altera, I believe.

10:15   7       Q.   And did you work at any other industry companies?

10:15   8       A.   Yes.   Then after that, many of my colleagues from IBM

10:15   9    went and Qualcomm established a division in Cary,

10:15   10   North Carolina called the Qualcomm Processor Solutions

10:15   11   Division.   And there we built the Qualcomm Snapdragon.

10:15   12      Q.   What's that?

10:15   13      A.   Snapdragon is the name of the processor that Qualcomm

10:16   14   puts in a lot of cell phones, pretty much everything but Apple

10:16   15   cell phones.

10:16   16      Q.   So have you personally designed a microprocessor?

10:16   17      A.   Yes.   Several times.

10:16   18      Q.   Have you received any recognition for your work?

10:16   19      A.   Yes.   I'm a fellow of my professional organization,

10:16   20   IEEE.   That's .1 percent of the membership that can be a

10:16   21   fellow.   I was elected for my contributions to, for example,

10:16   22   microprocessor design.

10:16   23      Q.   Did you also serve in a leadership capacity?

10:16   24      A.   I did.   I was elected to and served as the president

10:16   25   of the IEEE Computer Society.   I served in that role in 2015.

10:16   1        Q.   Are you familiar with patents?

10:16   2        A.   I am.

10:16   3        Q.   Are you a named inventor on any of them?

10:16   4        A.   Yeah.  I'm the named inventor on 40 patents.

10:16   5        Q.   And have you written any articles on microprocessor

10:16   6   technology?

10:16   7        A.   Yes.  I've written over 100 peer-reviewed technical

10:17   8   articles.

10:17   9        MR. HEINRICH:  So at this point, Your Honor, we would

10:17  10   tender Professor Conte as an expert in microprocessor

10:17  11   technology, including the subject matter of the

10:17  12   patents-in-suit.

10:17  13        MR. LEE:  No objection, Your Honor.

10:17  14        THE COURT:  He'll be so recognized.

10:17  15   BY MR. HEINRICH:

10:17  16        Q.   All right.  So can you give us a roadmap for your

10:17  17   testimony today?

10:17  18        A.   Sure.  So what I'm going to do is I'm going to

10:17  19   introduce some general things about what an expert does in my

10:17  20   role.  And then I'm going to give you a technology overview.

10:17  21   So I'm going to teach you the things you need to know to

10:17  22   understand my analysis.  And then I'll walk through my analysis

10:17  23   of the '373 patent and then the '759 patent.

10:17  24        Q.   All right.  So what methodology did you use in

10:17  25   analyzing infringement in this case?

10:17  1      A.   So I analyzed the asserted patent claims, and we'll

10:17  2   see some of them in a little bit.  And when presented with

10:17  3   terms in the claims, I used ordinary meaning to one of skill in

10:17  4   the art.

10:17  5      And then what I did -- and I'll show you this too -- is I

10:18  6   prepared the claims to the accused products to determine

10:18  7   whether or not that claimed elements in the product.

10:18  8      Q.   You mentioned the term "a person skilled in the art."

10:18  9   Who's that person for this case?

10:18  10      A.   So that's an individual with a bachelor's degree in

10:18  11   electrical engineering, computer engineering or computer

10:18  12   science, and three years experience in computer engineering, or

10:18  13   equivalent education experience.  So that would characterize a

10:18  14   lot of my past students.

10:18  15      Q.   What documents and other information did you consider

10:18  16   as part of your work in this case?

10:18  17      A.   So I looked at many things.  I looked at Intel

10:18  18   confidential documents.  I looked at top secret Intel source

10:18  19   code.  I looked at Intel engineers' sworn testimony.  And, of

10:18  20   course, I applied my own personal knowledge and experience.

10:18  21      Q.   Now, how did you gain access to this confidential and

10:18  22   top secret Intel information?

10:18  23      A.   That's a good question.  I understand Intel produced

10:19  24   these documents during the course of this lawsuit.  And what I

10:19  25   did was I signed a confidentiality agreement that I wouldn't

10:19   1    disclose them outside this lawsuit so that I could access them.

10:19   2        Q.   But you can tell us that here in court today?

10:19   3        A.   I'm sorry?

10:19   4        Q.   You can tell --

10:19   5        A.   Exactly.  Exactly.

10:19   6        Q.   Now, would you have been able to access these top

10:19   7    secret Intel documents and information without the process of

10:19   8    discovery and litigation?

10:19   9        A.   No.  These are, again, top secret.

10:19   10       Q.   All right.  Now, as part of your work in this case,

10:19   11   did you prepare expert reports that summarize and really

10:19   12   detailed your analysis?

10:19   13       A.   Yes.  That was the majority of my time.  So there was

10:19   14   my opening expert report, and that was about 750 pages.  And

10:19   15   then I wrote a report in reaction to some of the positions

10:19   16   Intel's expert took.  And that was about 400 -- almost

10:19   17   500 pages.

10:19   18       Q.   And how long did it take you to prepare those

10:19   19   reports?

10:20   20       A.   About 300 hours.

10:20   21       Q.   Now, you mentioned source code earlier.  What's

10:20   22   source code?

10:20   23       A.   Okay.  So source code is really the -- you can think

10:20   24   of it like a building.  It's the blueprint for the building.

10:20   25   And so looking at that, it tells you what was built.

10:20  1        So Intel source code -- and I'm going to show you some,

10:20  2   I'll walk it through, I'll walk you through it so you can see

10:20  3   how it works.

10:20  4        Intel source code described to me what I needed to know to

10:20  5   determine whether or not the products infringed.

10:20  6        And I also reviewed an extensive amount of that source

10:20  7   code.  I was provided with a computer at my home that I used to

10:20  8   securely log in to Intel's servers and access.  There was a

10:20  9   camera that watched me all the time.  I think they saw some of

10:20  10  my dogs.

10:20  11       Q.   And would you have been able to access that source

10:20  12  code outside the discovery process and litigation?

10:20  13       A.   No.  I would not.

10:20  14       Q.   All right.  And finally, what understanding of

10:20  15  infringement did you apply?

10:21  16       A.   Okay.  So I applied the understanding that literal

10:21  17  infringement occurs when all the claim terms are present.  And

10:21  18  then there's also the Doctrine of Equivalents.  That's when all

10:21  19  the claim terms are present or their equivalents.

10:21  20       Q.   And what test did you apply for Doctrine of

10:21  21  Equivalents?

10:21  22       A.   The same test that Your Honor discussed this morning,

10:21  23  which is even if an element is not literally present -- I'm

10:21  24  sorry, yesterday morning -- there is still infringement of any

10:21  25  structure if it performs substantially the same function in

10:21   1   substantially the same way to achieve substantially the same

10:21   2   result as the claimed element.

10:21   3        Q.   So we'll get into the details, but can you summarize

10:21   4   your conclusions?

10:21   5        A.   Sure.  So I'm going to present a lot of analysis.

10:21   6   And after that analysis, I'll present why I concluded that

10:21   7   Intel infringes these two patents, and I'll also present some

10:21   8   analysis about what these patents' value are to Intel.

10:22   9        Q.   So let's turn to your technology overview, and we're

10:22   10  going to be spending a lot of time talking about processors or

10:22   11  chips.  So can you tell us what a processor is?

10:22   12       A.   Sure.  So a processor, in general, is -- well, it's

10:22   13  what runs your program.  It's the brains of the computer.  And

10:22   14  it performs most of the data processing paths in the computer.

10:22   15       Q.   What are some of the key components of a processor

10:22   16  that are going to be relevant today?

10:22   17       A.   So let's take the top off of that.

10:22   18       They are the cores.  The cores are really the main

10:22   19  workhorses.  They process -- they really run the programs.

10:22   20  Then there's -- uh-oh.  My clicker stopped working.  Sorry.

10:22   21  The microprocessor in here's having problems.

10:23   22       There we go.  It's back again.

10:23   23       So we have the cores that process information.  Memory,

10:23   24  that's what stores the information to process or that's already

10:23   25  been processed.

10:23  1        You have a bus, which sounds like what it is.  It moves

10:23  2   information around.  You have a clock that sets the speed of

10:23  3   all the components.  And then you have a voltage regulator,

10:23  4   that's -- well, it's like a power company.  It supplies

10:23  5   reliable voltage.

10:23  6        Q.   And how does a core run a computer program?

10:23  7        A.   Yeah.  This is the way I describe it to my students,

10:23  8   is you can think of programs as just like a series of

10:23  9   instructions in a recipe.

10:23  10       Computers aren't very bright, okay?  I'm a terrible chef

10:23  11  when it comes to baking, but I can make a cake by following the

10:23  12  steps in a recipe.  And that's exactly what programs are.

10:23  13       For example, Microsoft Excel has instructions that tell it

10:23  14  how to add up numbers in a column.

10:23  15       Q.   And you mentioned clocks.  How do clocks set the

10:24  16  speed of cores?

10:24  17       A.   Okay.  So the clock is what coordinates how quickly

10:24  18  the instructions execute.

10:24  19       So this clock, in essence, it's like a conductor.  It sort

10:24  20  of synchronizes everything.  And you can have clocks that run

10:24  21  at different speeds.  So one -- a low frequency clock would run

10:24  22  instructions slow; a high frequency clock would run them fast.

10:24  23       Q.   All right.  You mentioned voltage.  What's the

10:24  24  relationship between voltage and power?

10:24  25       A.   Okay.  This is the analogy I use with my students.

10:24   1   It turns out electricity -- I don't know why people make it so

10:24   2   complicated.  It's like water, okay?  And here I'm showing

10:24   3   water going over a waterfall, and it's turning a waterwheel at

10:24   4   the bottom, so it's generating power for that waterwheel.

10:24   5       The height of that waterfall aboveground determines the

10:24   6   voltage.  So if I instead had a taller waterwheel, that would

10:25   7   be a higher voltage and result in more power.  And that's

10:25   8   really what we need to know.

10:25   9       Q.   Is there a relationship between speed and power in a

10:25   10  computer?

10:25   11      A.   Yes.  There is.

10:25   12      And so this is kind of key, and I think you've heard some

10:25   13  about this already from Mr. Bearden.  But of course, we want

10:25   14  low power.  We want long battery life.  We want things that

10:25   15  don't burn up in your pocket, like your cell phone.  But you

10:25   16  also want things to go fast.  And the problem is that they're

10:25   17  in direct competition with each other.

10:25   18      So if you use up more power, you have to go slower.  If

10:25   19  you go faster, you're going to use more power.  So they're in a

10:25   20  tug of war.

10:25   21      Q.   Do engineers try to reduce the amount of power used

10:25   22  in computer circuitry?

10:25   23      A.   They do.

10:25   24      Q.   And why is that?

10:25   25      A.   Well, because if you reduce the power, you can go

10:26  1  faster.

10:26  2      Q.  How important is power savings in designing a

10:26  3  processor?

10:26  4      A.  It's extremely important, in fact.

10:26  5      Q.  And has it been important in your working industry?

10:26  6      A.  Yes.  Throughout the -- all the processors that I've

10:26  7  been involved with, power was a key consideration for us.

10:26  8      Q.  All right.  So what's the first patent you'd like to

10:26  9  discuss today?

10:26  10      A.  The first one is the '373, okay.

10:26  11      Q.  Okay.  And let's turn to Exhibit 1 on the following

10:26  12  slide.

10:26  13      A.  Okay.

10:26  14      Q.  And we've seen this before.  Can you just remind us

10:26  15  about some of the information of the '373 patent?

10:26  16      A.  Yeah.  So the '373 patent, you just heard Mr. Bearden

10:26  17  talk about.  It was -- these are the inventors.  The inventors

10:26  18  worked at Freescale, and it was issued in, I believe -- well, I

10:27  19  can't even read it -- 2009.

10:27  20      Q.  Now, Mr. Bearden talked about the different parts of

10:27  21  the patent.  What part of the patent are you going to focus

10:27  22  your analysis on today?

10:27  23      A.  Yeah.  So let me step back.

10:27  24      A patent has multiple parts, and you're going to get used

10:27  25  to hearing this.  It has a cover page, tells you who the

387

10:27  1    inventors are, right?  And then after that, there's this

10:27  2    narrative that gives examples of the invention.

10:27  3         And all of that is just to lead up to the -- this end

10:27  4    part, and those are these claims.  These are these numbered

10:27  5    sentences, and the numbered sentences define the invention.

10:27  6         Q.   Now, why not focus on the abstract?  Does the

10:27  7    abstract define the invention?

10:27  8         A.   No.  Not at all.

10:27  9         Q.   Okay.  So we'll be talking about the details, but at

10:27  10   a high level, what's the '373 patent about?

10:27  11        A.   So this patent, in general, is about trying to trade

10:28  12   off and optimize or balance speed and performance.

10:28  13        Q.   Now, we've already heard a little bit about

10:28  14   Freescale.  Were you familiar with Freescale before your work

10:28  15   in this case?

10:28  16        A.   Yeah.  As I said, when I was at IBM, we were in a

10:28  17   cooperative agreement with Freescale on a kind of instruction

10:28  18   set.  That is the -- you know, Intel has their x86 and

10:28  19   Freescale and Apple and IBM had their power PC, we called it.

10:28  20        Q.   So what was the goal of the '373 inventors?

10:28  21        A.   So the goal of the '373 inventors is described right

10:28  22   here in the patent.  That is, they talked about -- let me just

10:28  23   read it.  "For example, processors may operate at a maximum

10:28  24   voltage and frequency when peak performance is required, and

10:29  25   they may operate at a low voltage and frequency to reduce power

388

10:29   1   consumption.  And, therefore, trade-offs can be made between

10:29   2   performance and power."

10:29   3        So that's the goal, is to enhance those trade-offs.

10:29   4        Q.   So can you help us understand what's at issue for

10:29   5   those trade-offs between power and performance?

10:29   6        A.   Yeah.  And this is key.

10:29   7        What's at issue here is that when processors have a lot of

10:29   8   work to do, the cores are all running, and they're all going to

10:29   9   be consuming power, okay?

10:29   10       Q.   So --

10:29   11       A.   So -- I'm sorry.

10:29   12       Q.   So what's one way to save power?

10:29   13       A.   Well, one way to save power is to put some of those

10:29   14   processors to sleep, so put this one to sleep and this one to

10:29   15   sleep.  Now, why might you want to put them to sleep?  Because

10:29   16   they're not doing anything.  So why have them -- you know, why

10:29   17   leave the lights on?

10:29   18       Q.   So is it possible for all of the cores to go to

10:29   19   sleep?

10:29   20       A.   Yes, indeed.  It's possible to put all the cores to

10:30   21   sleep, and Intel actually gives us a name, so this is the first

10:30   22   piece of jargon.  You won't have a copy of my slides, I

10:30   23   understand, so you might want to write this down.  It's called

10:30   24   Package C7.  That is this deep sleep.

10:30   25       Q.   Now, do engineers always use the term "sleep" when

10:30  1    they're referring to processors going to sleep, or do they use

10:30  2    their own language?

10:30  3        A.   There's a lot of different terms for that.  Indeed.

10:30  4        THE COURT:  Counsel, I want to -- whenever you are at a

10:30  5    place where you think it'd be nice to break, it's fine with me,

10:30  6    but we're going to take our morning break whenever you're at a

10:30  7    point with the doctor where it makes sense, where you're about

10:30  8    to start something new.

10:30  9        MR. HEINRICH:  Okay.  So I just started this, so it might

10:30  10   make sense to just break here and then --

10:30  11       THE COURT:  See, that was my sense as well.

10:30  12       Ladies and gentlemen of the jury, we're going to take our

10:30  13   morning recess.  We're going to start back up at -- that clock

10:30  14   is wrong so I always have to translate.  We're going to start

10:31  15   back up at 10:45.  Remembering my instructions not to discuss

10:31  16   the case amongst yourselves, you are dismissed until that time.

10:31  17       THE BAILIFF:  All rise.

10:31  18       (Jury exited the courtroom at 10:31.)

10:31  19       THE COURT:  You may be seated.  We need to take two

10:31  20   things -- one thing up for sure, which is I want to make sure

10:31  21   that VLSI gets to us the list of documents, exhibits that they

10:31  22   think were admitted yesterday, if that has not been done.  I'm

10:31  23   not sure if it has.  I don't think so.

10:31  24       The other is, Mr. Lee, is this a good time to take up the

10:31  25   issue that you raised earlier this morning for this witness?

10:32  1          THE WITNESS:  Your Honor, may I step down off the witness

10:32  2   stand?

10:32  3          THE COURT:  Yeah.  I'm sorry.  Yes, sir.  Of course.

10:32  4   Thank you.  I should have said that to you.

10:32  5          MR. LEE:  Your Honor, the claim chart is the 1006

10:32  6   exhibits.  I don't know if Mr. Heinrich is close to where he

10:32  7   plans to offer those.

10:32  8          MR. HEINRICH:  Yeah.  And just to be right up front, I was

10:32  9   planning on doing that at the very end, after Professor Conte's

10:32  10  gone through his analysis.

10:32  11         THE COURT:  That's fine.  That works just fine with me.

10:32  12  Whatever you want to do is fine with me.

10:32  13         So then let's do this.  Are you going to have him on the

10:32  14  stand through lunch?

10:32  15         MR. HEINRICH:  Oh, yes.  Yes.

10:32  16         THE COURT:  I'm sure the jury is -- will be thrilled by

10:32  17  that.

10:32  18         (Laughter.)

10:32  19         THE COURT:  And so let's do this.  We will go forward.

10:32  20  We'll take our break at roughly lunchtime.

10:32  21         Whenever we come back, we'll take up this issue before I

10:32  22  bring the jury back in and that will give them a little bit of

10:32  23  extra time.

10:32  24         Mr. Chu, did you have something you wanted to add?

10:33  25         MR. CHU:  I believe the exhibits that were referred to

10:33  1   yesterday were Exhibits 1 and 2, the two patents, and another

10:33  2   one of them, Exhibit, I think 4, which is just the digital

10:33  3   copy.  And I assume there also won't be an objection to

10:33  4   Exhibit 5, again the digital copy for the second patent.

10:33  5       So that's where we are in the exhibits.

10:33  6       THE COURT:  Very good.

10:33  7       MR. CHU:  A practical question.  I noticed that

10:33  8   Professor Conte was having sunlight coming into his eyes, and I

10:33  9   don't know whether we can do much about it, except maybe

10:33  10  it's -- looking at the faces of some of Your Honor's court

10:33  11  staff, I guess we will wait until the afternoon for it to fix

10:33  12  itself.

10:33  13      THE COURT:  Yeah.  I don't know how we fix the sunlight.

10:33  14  And I've never had anyone raise that issue.  Is it made worse

10:33  15  because of the Plexiglass?

10:34  16      MR. CHU:  I do not know.  I know -- I just saw him a

10:34  17  number of times, it would be on part of his face and he'd move

10:34  18  his head to try and dodge the sun rays.

10:34  19      THE COURT:  Do you have a solution, which I'm happy to --

10:34  20      MR. CHU:  I don't.  Maybe I will write a letter to the

10:34  21  General Services Administration.

10:34  22      (Collective laughter.)

10:34  23      THE COURT:  Does he want to put a hat on?  I've got a

10:34  24  cowboy hat in the back.

10:34  25      MR. CHU:  Yeah.  Well, we'll work it through and maybe --

10:34  1        THE COURT:  Yes, sir.  Doctor?

10:34  2        THE WITNESS:  Your Honor, if you can cover the Plexiglass

10:34  3   on just this side, I don't think the jury needs to see me.

10:34  4   That would stop the sunlight.

10:34  5        THE COURT:  We'll get it -- we'll find a sheet or

10:34  6   something we'll put up on that side.  That's why I was -- I

10:34  7   figured you sitting there might know.  I couldn't tell which

10:34  8   way the sun was coming in.

10:34  9        But if you're having a problem with that, thank you for

10:34  10  bringing it to our attention.  We'll find something at the

10:34  11  break to cover that side of the glass, and that will make

10:34  12  everyone happy.

10:35  13       MR. CHU:  Great.

10:35  14       THE COURT:  That's what I'm here for, is to make everyone

10:35  15  happy.  And get a high Yelp review.

10:35  16       So is there anything else, Mr. Chu, that we need to take

10:35  17  up?

10:35  18       MR. CHU:  No.

10:35  19       THE COURT:  Mr. Lee?

10:35  20       MR. LEE:  Nothing, Your Honor.  Thank you.

10:35  21       THE COURT:  Okay.  Let me ask you all this:  Currently it

10:35  22  appears to me -- maybe it's because we are able to present this

10:35  23  by phone, and I know people are listening, but I think we've

10:35  24  had fewer people attend than I had anticipated, I guess because

10:35  25  they are able to listen in without coming personally.

393

10:35  1    Would it benefit either side to have one or two more

10:35  2  people in the courtroom while the trial's going on?  We might

10:35  3  have to change that if we get a rush of people, but I see no

10:35  4  reason -- I mean, we've got a total of maybe ten people in

10:35  5  the -- and I think we could easily have four or five more

10:35  6  people spread out.

10:35  7    So if either side would like to add two people per side

10:36  8  who would stay in the courtroom during the trial, unless

10:36  9  something changes with the number of people who come in, I

10:36  10  don't see any health risk in doing that.  I'll expand the

10:36  11  number of people by two.

10:36  12    MR. CHU:  Thank you very much, Your Honor.

10:36  13    THE COURT:  Mr. Lee?

10:36  14    MR. LEE:  I think that's fine, Your Honor.  As long as we

10:36  15  monitor it.  But if we have a rush from the -- to the public

10:36  16  area for the public, as long as we keep the numbers down.

10:36  17    THE COURT:  If we have a rush for that, then we'll worry

10:36  18  about that.  I really thought we'd have issues with the number

10:36  19  of people who attended.  And like I said, I think the phone

10:36  20  deal has been wonderful.

10:36  21    I know a number of people are able to listen in.  And

10:36  22  so -- and why wouldn't they with lawyers as good as you?  If I

10:36  23  were practicing, I would be doing the same thing.  So each side

10:36  24  can have two more folks in the courtroom, and that shouldn't be

10:36  25  a problem at all.

```
10:36   1        MR. CHU:  Thank you very much, Your Honor.  We appreciate
10:36   2   it.
10:36   3        (Recess taken from 10:36 to 10:48.)
10:48   4        THE BAILIFF:  All rise.
10:48   5        THE COURT:  Please remain standing.
10:48   6        (The jury entered the courtroom at 10:48.)
10:48   7        THE COURT:  Welcome back.  You may be seated.
10:48   8        Doctor, is that better?
10:48   9        THE WITNESS:  It is, and it's very colorful.
10:48  10        THE COURT:  We're trying to protect our witnesses from the
10:48  11   sun, which I -- after two and a half years, I didn't realize we
10:48  12   had a sunlight problem.  But it was brought to my attention, so
10:48  13   try and ignore the colorful blanket that we put up there and
10:48  14   focus on what the good doctor's saying.
10:48  15        You may resume your direct.
10:49  16        MR. HEINRICH:  Thank you.
10:49  17   BY MR. HEINRICH:
10:49  18        Q.  So right before the break, we were talking about this
10:49  19   Intel sleep state called Package C7.
10:49  20        A.  Yes.
10:49  21        Q.  How often do the Intel processors go into that sleep
10:49  22   state?
10:49  23        A.  You'd be surprised to know it, but they go into it
10:49  24   hundreds of times per second.  So they actually deep sleep.
10:49  25   It's a little bit like my students probably do when I lecture.
```

395

10:49  1    Their eyes glaze over.

10:49  2        Q.   Now, can we just snap our fingers and put a core to

10:49  3    sleep any time we want?

10:49  4        A.   No, we can't.  And here's the deal on that.

10:49  5        So the cores, when they go to sleep, they're going to

10:49  6    forget where they left off.  So they have to write a Post-It to

10:49  7    themselves, in essence, so that when they wake back up they can

10:49  8    pick up where they left off.

10:49  9        So you take that and what you do is you -- if you're a

10:49  10   core, you write where you left off into the memory here before

10:49  11   you go to sleep.  And then when you wake back up, you use that

10:50  12   memory to figure out where to pick up.

10:50  13       Q.   And what does Intel call that memory?

10:50  14       A.   Okay.  So today we will be facing a barrage of Intel

10:50  15   jargon, and this is the first one.  This is C6 SRAM is the name

10:50  16   for that.  Improbable.  That stands for -- SRAM is static

10:50  17   random access memory.

10:50  18       Q.   Now, is it a good idea to put this C6 SRAM memory to

10:50  19   sleep?

10:50  20       A.   No.  That's a bad idea.

10:50  21       Q.   Why is that?

10:50  22       A.   Well, if you put that to sleep, then when the cores

10:50  23   wake up, they won't know where they left off and your computer

10:50  24   crashes.

10:50  25       Q.   Now, are there other computer circuits aside from

10:50  1    cores that can be put to sleep?

10:50  2         A.   Yes, there are.

10:50  3         Q.   And what are some examples?

10:50  4         A.   So, for example, if the cores are asleep, then you

10:50  5    don't need the bus anymore because there's nobody asking to

10:50  6    move information around.  So you don't have those lights on and

10:50  7    you save power.

10:51  8         Q.   Can you save a lot of power that way?

10:51  9         A.   Yes, you can.

10:51  10        Q.   Now, did the Freescale inventors identify

10:51  11   complications when building circuits that can be put in these

10:51  12   sleep or standby states?

10:51  13        A.   They did.

10:51  14        Q.   And can you explain that for us?

10:51  15        A.   Yeah.  Here it is from the patent:  "However, note

10:51  16   that different types of circuitry within a data processing

10:51  17   system may have different ranges of allowable operating

10:51  18   voltage."

10:51  19        Q.   And why does that raise complications?

10:51  20        A.   So that raises complications because memory, if you

10:51  21   lower the voltage on memory, you'll forget, for example.

10:51  22        Q.   And can you illustrate that for us?

10:51  23        A.   Yeah.  So here's an example here.  And I've put

10:51  24   together some pieces.  You're going to see a variant of this as

10:51  25   we go on.  So here's a voltage meter here.  And here I show the

397

10:51  1    operating voltage.

10:51  2         Now, imagine you want to put this circuit here to sleep.

10:52  3    What you do is you lower that voltage, right?  But the problem

10:52  4    is you lower the voltage too on the memory, so the memory's

10:52  5    going to forget.  So again, then the cores can't wake back up

10:52  6    and your computer crashes.

10:52  7         Q.   Why not just put each chip component on its own

10:52  8    voltage source?

10:52  9         A.   Well, each one of these is like a power company, so

10:52  10   that'd be like having a power company per house in a

10:52  11   neighborhood.

10:52  12        Q.   Now, can you walk us through the Freescale solution

10:52  13   using Figure 1 of the patent?

10:52  14        A.   I can.  And here it is.  And you'll see here, here's

10:52  15   that thing we just saw, voltage, and here's the memory and

10:52  16   here's the circuits.  Let me pop that out of there.

10:52  17        And what the Freescale engineers did was they added this

10:52  18   as a selector and now a second voltage regulator, which I'm

10:52  19   always going to show in orange so you know what it is.

10:52  20        And that one's there so that when you go ahead and you

10:53  21   want to put this circuit to sleep, the selector moves over to

10:53  22   that and it gives power to the memory but only the memory, so

10:53  23   that this big circuit can go to sleep.

10:53  24        Q.   Was this power savings solution that the Freescale

10:53  25   inventors came up with a conventional approach or an

10:53   1   unconventional approach?

10:53   2       A.   Yeah.  I think Mr. Bearden mentioned this.  It was

10:53   3   unconventional.

10:53   4       You see, the conventional wisdom is really to save power,

10:53   5   to have less circuits, right?  I mean, if you want to save

10:53   6   power, you don't put in things that use power.

10:53   7       But what the Freescale engineers actually did was they

10:53   8   added circuits and ultimately showed it saved power.

10:53   9       Q.   Now, is the jury going to hear any argument from

10:53   10   Intel in this trial that the Patent Office made a mistake in

10:53   11   issuing the '373 patent?

10:53   12       A.   No, they won't.

10:53   13       Q.   Okay.  Let's turn to your claim analysis.

10:53   14       A.   Okay.  Here we go.

10:54   15       Q.   And what is a claim analysis?

10:54   16       A.   So this is where I'm going to step through the

10:54   17   claims, each and every element.  And for each one I'm going to

10:54   18   show you where I found evidence of that.

10:54   19       Q.   What claims are you going to focus on today?

10:54   20       A.   Okay.  I'm going to focus on the asserted claims,

10:54   21   which are Claims 1, 5, 6, 9 and 11.

10:54   22       Q.   And what Intel products did you compare those claims

10:54   23   to?

10:54   24       A.   So the --

10:54   25       MR. LEE:  Your Honor, I object.  There's confidential

10:54   1   information on the bottom of the slide.  We discussed the units

10:54   2   with Your Honor before.  We either have to seal the courtroom

10:54   3   or --

10:54   4        (Clarification by Reporter.)

10:54   5        MR. LEE:  I'm sorry.  We've addressed the confidentiality

10:54   6   of this precisely before.  So we either need to seal the

10:54   7   courtroom, which is fine with us, or the number needs to come

10:54   8   off.

10:54   9        MR. HEINRICH:  He doesn't need to say the number.

10:54   10       THE COURT:  And the jury can't see --

10:54   11       MR. LEE:  The number's on the screen.  It's on the screen

10:54   12   for the public at this particular moment in time.

10:54   13       THE COURT:  Well, is the number on the screen that you can

10:54   14   see above your head, Mr. Lee?

10:55   15       MR. LEE:  There's nothing on the screen any longer.

10:55   16       THE COURT:  If you're going to publish that demonstrative,

10:55   17   you can publish it so that only the jury can see it and the

10:55   18   witness can see, but not the public.

10:55   19       Mr. Lee, does that satisfy you?

10:55   20       MR. LEE:  Yes.  I think that's the way to deal with it,

10:55   21   Your Honor.

10:55   22       THE COURT:  Okay.

10:55   23   BY MR. HEINRICH:

10:55   24       Q.  So what are the products that you compared to the

10:55   25   claims?

| 10:55 | 1 |     A.   They are -- so Intel has code names for their |
| 10:55 | 2 | products.  And these are Haswell and Broadwell.  And these |
| 10:55 | 3 | sold -- I'm not sure I can say that. |
| 10:55 | 4 |     Q.   You can skip that -- |
| 10:55 | 5 |     A.   Okay. |
| 10:55 | 6 |     Q.   -- since it's on the screen for the jury. |
| 10:55 | 7 |     When was Intel developing the first products that you're |
| 10:55 | 8 | analyzing under the '373 patent? |
| 10:55 | 9 |     A.   They were developing these in the 2008/2009 time |
| 10:56 | 10 | frame. |
| 10:56 | 11 |     Q.   All right.  And what claim are we going to start |
| 10:56 | 12 | with? |
| 10:56 | 13 |     A.   So we're going to start with Claim 9.  And here it |
| 10:56 | 14 | is, but I'm not going to use the way it appears in the patent |
| 10:56 | 15 | because, well, although it's nice that it indents each of the |
| 10:56 | 16 | elements this way, it's really hard for me to work through it. |
| 10:56 | 17 | I'm going to take that same text, and I'm going to put it into |
| 10:56 | 18 | a table like this.  It's the same text I've just put into a |
| 10:56 | 19 | table, and then we'll discuss each of the elements as I go |
| 10:56 | 20 | down. |
| 10:56 | 21 |     Q.   Okay.  So let's start with -- |
| 10:56 | 22 |     MR. LEE:  Your Honor, there's nothing on the screen. |
| 10:56 | 23 | There's nothing on the screens on the table. |
| 10:56 | 24 |     THE WITNESS:  Nor are the jurors. |
| 10:56 | 25 |     MR. HEINRICH:  I think it's still off.  Can you see that |

| | | |
|---|---|---|
| 10:57 | 1 | now? |
| 10:57 | 2 | THE WITNESS:  No. |
| 10:57 | 3 | (Off-the-record discussion.) |
| 10:57 | 4 | THE WITNESS:  So your monitors have gone to sleep. |
| 10:57 | 5 | (Laughter.) |
| 10:57 | 6 | JUROR:  Got it. |
| 10:57 | 7 | BY THE WITNESS: |
| 10:58 | 8 | A.   Okay.  So let me go back. |
| 10:58 | 9 | This is how the patent appears -- I'm sorry -- the claim |
| 10:58 | 10 | appears in the patent.  And although it's nice that it indents |
| 10:58 | 11 | each of these elements, it's kind of hard for me to work |
| 10:58 | 12 | through.  So I'm going to take this text and I'll put it in a |
| 10:58 | 13 | table here.  It's the same text, but this way we can walk |
| 10:58 | 14 | through each and every element. |
| 10:58 | 15 | BY MR. HEINRICH: |
| 10:58 | 16 | Q.   So the first part of the claim says "an integrated |
| 10:58 | 17 | circuit."  And was there confirmation from -- testimony from an |
| 10:58 | 18 | Intel engineer on that? |
| 10:58 | 19 | A.   Yes.  I think it was likely pretty easy for him to |
| 10:58 | 20 | admit.  This is Intel engineer Robert Hayes and -- |
| 10:58 | 21 | THE COURT:  Excuse me, Doctor. |
| 10:58 | 22 | MR. LEE:  Your Honor, this is subject to Your Honor's |
| 10:58 | 23 | ruling about the testimony ultimately being offered. |
| 10:58 | 24 | THE COURT:  May I look over your shoulder? |
| 10:58 | 25 | THE WITNESS:  You may, sir. |

402

10:59  1      MR. LEE:  It's just deposition testimony, Your Honor.  It

10:59  2  was representation that they intend to offer that subsequently

10:59  3  is fine.

10:59  4      THE COURT:  Well, I think -- Mr. Lee, I think what I heard

10:59  5  VLSI's counsel tell me this morning is they understood my

10:59  6  ruling, and that they're going to offer all -- everything that

10:59  7  they rely on with this witness, they are going to offer in the

10:59  8  form of deposition testimony at some point in the trial.

10:59  9      MR. LEE:  Okay.  That's fine.

10:59  10     MR. HEINRICH:  Thank you.

10:59  11 BY MR. HEINRICH:

10:59  12     Q.  And this is Slide 43?

10:59  13     A.   It is.  And just to begin again, this is Intel

10:59  14 principal engineer Robert Hayes.  And so he was asked, "Is

10:59  15 Haswell a standalone integrated circuit?"

10:59  16     And he says, "Haswell is a standalone integrated circuit.

10:59  17 Yes.  Haswell would be a standalone integrated circuit."

10:59  18     Then he was asked, "Is Broadwell a standalone integrated

10:59  19 circuit?"

10:59  20     And then he replied, "Broadwell is a standalone integrated

10:59  21 circuit, yes."

10:59  22     And later on, I understand, you'll hear him actually say

10:59  23 these words.

11:00  24     Q.  Okay.  So let's turn to the next claim element.

11:00  25     A.   Okay.

11:00  1      Q.   And what is that?

11:00  2      A.   So that claim element has two pieces, so I'm going to

11:00  3  break them up.  I'm going to start with "a memory that operates

11:00  4  using an operating voltage."

11:00  5      Q.   Okay.  And what did you find for that?

11:00  6      A.   Yes.  So Intel has that.  As I already discussed,

11:00  7  it's called the C6 SRAM.  Here's Intel engineer -- or Intel

11:00  8  fellow, Jonathan Douglas, and he stated, "I believe all the

11:00  9  '373 accused products have a C6 SRAM...  Yes, I believe it's an

11:00  10  SRAM memory array."

11:00  11      Q.   Okay.  Let's turn to the next part of Element A.

11:00  12      A.   Okay.  So this one is, "wherein the memory is

11:00  13  characterized as having a minimum operating voltage."

11:00  14      In other words, you got to keep power on the memory and

11:00  15  you got to keep above this.

11:00  16      Q.   And did you consider testimony from Mr. Douglas on

11:01  17  that as well?

11:01  18      A.   I did.  And so actually what he does is he restates

11:01  19  the question and answers it.

11:01  20      So he says, "Is there a voltage where, if it goes below

11:01  21  some point on a product, one or more of the components within

11:01  22  the C6 SRAM array would not function properly?"  And he said,

11:01  23  "That is correct."

11:01  24      Q.   So what did you conclude for Element A?

11:01  25      A.   I concluded that's present as well, so I put a check

11:01   1   box there.  And here's what I'm going to do.  I also wrote over

11:01   2   here as sort of a reminder that that's a C6 SRAM.

11:01   3       Q.   Okay.  What's the next claim element?

11:01   4       A.   The next one is "a memory location that stores a

11:01   5   value representative of the minimum operating voltage."

11:01   6       Q.   And do Haswell and Broadwell have a memory location

11:01   7   that stores such a value?

11:01   8       A.   They do.

11:01   9       Q.   And how do you know?

11:01   10      A.   I looked at Intel documents.

11:01   11      Q.   Anything else?

11:01   12      A.   And testimony as well.  And also I examined the

11:02   13  source code.

11:02   14      Q.   Okay.  So let's turn to Exhibit 3662.  And what is

11:02   15  this document?

11:02   16      A.   Okay.  So this is the first of a lot of documents

11:02   17  like this you're going to see --

11:02   18      THE COURT:  Doctor --

11:02   19      MR. LEE:  Your Honor, this is -- this document is

11:02   20  confidential.

11:02   21      MR. HEINRICH:  Okay.  So maybe from here on out we should

11:02   22  just display the documents to the jury and counsel.

11:02   23      THE COURT:  Mr. Lee, will that satisfy you?

11:02   24      MR. LEE:  As long as it's no one reading from the

11:02   25  documents, yes.

11:02   1        MR. HEINRICH:  Okay.  Then there's going to be a lot of --

11:02   2   maybe we should seal the courtroom at this point, because

11:02   3   there's going to be a lot of Intel information from here on

11:02   4   out.

11:02   5        THE COURT:  I'm happy to do that.

11:02   6        We'll seal the courtroom.  If you are not under the

11:02   7   protective order, you'll need to leave.  And we'll need to make

11:02   8   sure that the phone communication that's going out publicly is

11:02   9   cut off for this period.

11:03   10        If you are listening in, the jury -- so you know, this is

11:03   11   being broadcast by phone.  People all across the United States

11:03   12   are listening in to this trial, wishing they had your seats on

11:03   13   the jury and could be here.  And so we are going to cut that

11:03   14   feed off at this time, and we'll resume it when we ]unseal the

11:03   15   courtroom.

11:47   16        (Sealed proceedings.)

11:47   17        THE COURT:  I'm going to go ahead and just keep going,

11:47   18   start with the next patent.  But we'll open the courtroom until

11:47   19   lunch.  So...

11:47   20        MR. HEINRICH:  Is there a preferred lunchtime you have?

11:47   21        THE COURT:  Wherever you -- there's not.  So wherever you

11:47   22   feel comfortable taking a break, I'm pretty good.

11:47   23        MR. HEINRICH:  Okay.  Great.

11:47   24        THE WITNESS:  Actually, Your Honor, could we take a break

11:47   25   now if you don't mind?

11:47  1      THE COURT:  Well, listen, as far as I'm concerned, we can

11:47  2  take a break now and just then get started back up at 1:00.  So

11:47  3  that's fine.  Let's do that.

11:47  4      Ladies and gentlemen, remembering my instructions not to

11:47  5  discuss the case amongst yourselves, we're going to stand in

11:48  6  recess now until 1 o'clock.  Thank you.

11:48  7      THE BAILIFF:  All rise.

11:48  8      (Jury exited the courtroom at 11:48.)

11:48  9      THE COURT:  You may be seated.  Thank you.

11:48  10     Did you want to step down?

11:48  11     THE WITNESS:  Thank you, sir.

11:48  12     THE COURT:  So what I would suggest we do is take an hour

11:48  13 for lunch and then bring this gentleman back, and in an hour we

11:48  14 take up the issues Mr. Lee wanted to take up.

11:48  15     Does that work, or is there a better way to do it?

11:48  16     MR. HEINRICH:  That sounds perfect.

11:48  17     THE COURT:  Mr. Lee, are you okay with that?

11:48  18     MR. LEE:  That's great, Your Honor.

11:48  19     THE COURT:  So is there -- leaving that issue with the

11:48  20 doctor aside, is there any other issue from VLSI's point of

11:49  21 view we need to take up?

11:49  22     MR. HEINRICH:  No.

11:49  23     THE COURT:  Mr. Lee?

11:49  24     MR. LEE:  No, Your Honor.

11:49  25     THE COURT:  Okay.  Then we're in recess.

11:49  1        We'll be back at 12:45, and we'll take up the issues of

11:49  2    the 1006 before us.

11:49  3        THE BAILIFF:  All rise.

11:49  4        (Recess taken from 11:49 to 12:50.)

12:50  5        THE COURT:  Thank you.  You may be seated.  If you'd like

12:50  6    to recall the witness to the stand.

12:50  7        Well, it was cold in here this morning, and I feel like

12:50  8    it's getting warm now.

12:51  9        If you would tell the Court what it is you intend to do

12:51  10   with this witness, and then I'll hear from Mr. Lee as to why he

12:51  11   objects.

12:51  12       MR. HEINRICH:  So at the end of our claim analysis of the

12:51  13   '759 patent, I'm going to ask him about two exhibits, 4418 and

12:51  14   4419.

12:51  15       THE COURT:  Do you have those available?

12:51  16       MR. HEINRICH:  Yes.

12:51  17       THE COURT:  Thank you, sir.

12:51  18       MR. HEINRICH:  Thank you.

12:51  19       THE COURT:  Okay.  I've got, you said 4418?

12:51  20       MR. HEINRICH:  Right.

12:51  21       THE COURT:  I'm looking at it.

12:51  22       MR. HEINRICH:  Yes.  That's our 1006 chart for his

12:52  23   infringement opinion on the '373 patent, and it is a summary of

12:52  24   very voluminous materials that basically just summarizes the

12:52  25   evidence that he considered without any argument per the rule.

12:52  1          THE COURT:  And was all of this disclosed to the Court?

12:52  2          MR. HEINRICH:  Yes.  We took the exhibits from his report,

12:52  3    and what we did is we simply deleted any argument from them.

12:52  4          THE COURT:  Mr. Lee?

12:52  5          MR. LEE:  Your Honor, can I do it from here?

12:52  6          THE COURT:  Wherever you care to.

12:52  7          MR. LEE:  Your Honor, that document you have now has

12:52  8    citations and quotations of depositions that have not been

12:52  9    offered during the course of his testimony.  And his notes, as

12:52  10   far as I know, are not going to be offered.

12:52  11         It has the exhibits that were in his report but that have

12:52  12   not been offered and not been identified to us as exhibits that

12:53  13   are going to be offered.  And it has references to a host of

12:53  14   other materials that are not going to come into evidence.

12:53  15         THE COURT:  Got it.  Counsel, my concern isn't with the

12:53  16   format of the exhibit.  My concern is anything that's contained

12:53  17   in either of these exhibits that the jury hasn't actually --

12:53  18   where either the doctor hasn't testified about them or the --

12:53  19   you're not going to provide that evidence to the jury for their

12:53  20   consideration.

12:53  21         I'm sympathetic to Mr. Lee's position that essentially you

12:53  22   are kind of bootstrapping in evidence through this document

12:53  23   that is not -- the jury hasn't actually considered.

12:53  24         I get that that the doctor's considered it.  I understand

12:53  25   that.  But the jury will not have heard -- the jury won't have

12:53  1  heard this evidence themselves, and yet they might -- if they,

12:54  2  when they -- if they were to get this document back in the jury

12:54  3  box they might read through and say, "oh, the doctor considered

12:54  4  all this information."

12:54  5      They're not -- they're certainly not going to understand

12:54  6  and be able to decide whether or not they heard it themselves.

12:54  7      MR. HEINRICH:  So we'd certainly be willing to redact or

12:54  8  delete references to evidence that was not brought up during

12:54  9  his direct, and we could submit a replacement version of these

12:54  10  exhibits.

12:54  11      THE COURT:  Mr. Lee, assuming whatever is in the -- I'm

12:54  12  just going to say the amended PTX-4418, if it includes only

12:54  13  information that the doctor -- either that the doctor testified

12:54  14  about during the trial as having considered or that the

12:54  15  plaintiff puts into evidence.

12:54  16      MR. LEE:  Your Honor, that becomes just a demonstrative at

12:54  17  that point in time, and the other demonstratives are not going

12:55  18  back.  I mean, the jury has all testimony that Dr. Conte

12:55  19  provided today and their memories of it.  They have the actual

12:55  20  exhibits that he identified, which will go in because they were

12:55  21  without objection.

12:55  22      THE COURT:  Let me hear a response to why it should not

12:55  23  just be a demonstrative.

12:55  24      MR. HEINRICH:  Well, I -- it's -- it's Rule 1006, because

12:55  25  it really is for this purpose.  And I have a suggestion, which

12:55  1   is:  I can, in my examination, simply establish a foundation

12:55  2   for these exhibits, and then we can do briefing on their

12:55  3   admissibility.

12:55  4        THE COURT:  I think that's wise.  Knowing that -- knowing

12:55  5   that -- because I'm not going to admit them at this time, until

12:55  6   after I consider the briefing, and know that in terms of your

12:55  7   briefing, the only thing I intend to allow to be in these

12:55  8   exhibits is information either that you specifically -- for

12:55  9   example -- I don't know this well enough -- if you ask the

12:56  10  doctor a question and, however he does it, he puts that

12:56  11  information into -- through him, where they can cross-examine

12:56  12  him in front of the jury, then it's -- I'm going to allow it in

12:56  13  here.

12:56  14       If it is deposition testimony that you, as we discussed

12:56  15  earlier, play for the jury, I'm going to allow this -- I'm

12:56  16  going to allow that also to be in this exhibit.

12:56  17       I'll then take up, after I get the briefing, whether or

12:56  18  not I will allow the exhibit in as a demonstrative or as a

12:56  19  actual exhibit.

12:56  20       MR. HEINRICH:  Excellent.  Thank you.

12:56  21       THE COURT:  Mr. Lee, are you satisfied with that?

12:56  22       MR. LEE:  We are, Your Honor.  Thank you.

12:56  23       THE COURT:  And my understanding is that at least the next

12:56  24  little tranche of his testimony will not be confidential; is

12:56  25  that correct?

12:56   1        MR. HEINRICH:  Correct.

12:56   2        THE COURT:  Okay.  I'll leave it up to you and Mr. Lee to

12:56   3  signal to me when you are shifting into that which is sealed.

12:56   4  But for the moment, I'm going to allow anyone into the

12:56   5  courtroom who wants to listen to it, and we're going to go back

12:57   6  to where it is being broadcast telephonically.

12:57   7        MR. HEINRICH:  Very good.  Thank you.

12:57   8        THE COURT:  And, Mr. Lee, are you okay with that?

12:57   9        MR. LEE:  That's good, Your Honor.

12:57  10        THE COURT:  Okay.  Is there anything else we need to take

12:57  11  up be before we bring the jury in?

12:57  12        MR. HEINRICH:  Not from VLSI.

12:57  13        THE COURT:  Mr. Lee?

12:57  14        MR. LEE:  Not from Intel, Your Honor.

12:57  15        THE COURT:  It's slightly -- give me one second.  I'm

12:57  16  going to step off the bench.

12:57  17        We're going to collect the jury.  We'll bring them back

12:57  18  in, and you're welcome to just remain there if that's

12:57  19  convenient for you.

12:57  20        THE WITNESS:  Yes, sir.

01:00  21        THE COURT:  Okay.  Thank you, all.

01:00  22        THE BAILIFF:  All rise.

01:00  23        THE COURT:  Please remain standing for the jury.

01:00  24        (The jury entered the courtroom at 1:00.)

01:00  25        THE COURT:  Thank you.  You may be seated.

01:00   1        Counsel, you may proceed with this witness.

01:00   2        MR. HEINRICH:   Thank you.

01:00   3        Good afternoon, ladies and gentlemen.

01:00   4   BY Mr. Heinrich:

01:00   5        Q.   So, Professor Conte, can you just recap from where we

01:00   6   left off at lunch and provide a summary of the invention of the

01:01   7   '373 patent?

01:01   8        A.   I'd be happy to.

01:01   9        So again, what the invention added was the second voltage

01:01   10  regulator and this mux, and what it enables is really that you

01:01   11  can put this circuit to sleep because you can switch over here

01:01   12  and retain the memory by switching over to a second voltage

01:01   13  supply.

01:01   14       So mux, Intel has that.   Second voltage supply, Intel has

01:01   15  that.   They switch, et cetera.

01:01   16       Q.   Thank you very much.

01:01   17       So let's turn next to the '759 patent.   And can you give

01:01   18  us a roadmap of what you'll be discussing for the '759?

01:01   19       A.   Yes.   I'd be happy to.

01:01   20       So what I'm going to do is I'm going to talk about the

01:01   21  '759, and then I'll talk about Intel Speed Shift.   Then I'll

01:01   22  present my claim analysis like I did for the '373, and then

01:01   23  I'll discuss the patent's value to Intel.

01:02   24       Q.   Okay.   Why don't you give us some background on the

01:02   25  '759 patent?

01:02  1        A.   Okay.  So the patent was filed in 2005, and it issues

01:02  2   in 2010.  Matt Henson is the inventor, and it's assigned to

01:02  3   SigmaTel.  And it's about balancing speed and power.

01:02  4        Q.   Can you tell us more about the inventor, Matt Henson?

01:02  5        A.   Matt Henson received his electrical engineering

01:02  6   degree from Carnegie Mellon, then went on to work for

01:02  7   Freescale, then SigmaTel as the director of architecture, then

01:02  8   XWare as the CTO, and then LiveMosaic as the founder.  And he

01:02  9   passed away in 2011.  I think he was in his mid-30s.

01:02  10       Q.   Now, were you familiar with SigmaTel before your work

01:02  11  in this case?

01:02  12       A.   Oh, yes.  I've had past students who worked for

01:02  13  SigmaTel.  And so what SigmaTel did was they created integrated

01:03  14  circuits that went into television, laptops, desktops, set-top

01:03  15  boxes, MP3 players, et cetera.

01:03  16       Q.   Now, what problem was Matt Henson trying to solve

01:03  17  that led to the '759 patent?

01:03  18       A.   So it tells you here in the patent, "Accordingly,

01:03  19  there is a need for an improved system and method of

01:03  20  controlling a clock frequency in an electronic device in order

01:03  21  to selectively deliver faster clock speeds."

01:03  22       Q.   Now, was that a problem just for MP3 players, or was

01:03  23  that a broader problem?

01:03  24       A.   No.  That's a broader problem.  And I should say at

01:03  25  that time, when he was talking about MP3 players, that included

01:03   1   the first iPhone.  These are really computing devices.  They

01:03   2   are really minicomputers.

01:03   3       Q.   And is the solution that's claimed in the '759 patent

01:03   4   a solution just for MP3 players?

01:03   5       A.   No.  It's applicable to general computer systems.

01:04   6       Q.   So take us back before Mr. Henson's invention.  What

01:04   7   was the conventional way of controlling speed on computers?

01:04   8       A.   Okay.  So the old way to do it was that you had the

01:04   9   operating system, like Windows, control the speed, and it would

01:04   10  tell the hardware what speed to run at.  And Windows, of

01:04   11  course, is running your whole computer, it has many things to

01:04   12  do.  It's running your programs and all of this.

01:04   13      If you take those speed instructions and you make them too

01:04   14  complicated, what'll happen is it'll slow down all your

01:04   15  programs, right?  It's intrusive.

01:04   16      And also those instructions have to wait in line after

01:04   17  everything else Windows does before it can do it.  So it's --

01:04   18  it takes awhile to get around that loop.  And as we'll see, it

01:04   19  could do it at most three times a second, I think it was.

01:04   20      Q.   Now, despite these limitations, was it in fact the

01:04   21  conventional wisdom to use an outside operating system, like

01:05   22  Windows, to control speed?

01:05   23      A.   It was.  So, for example, here is a research paper

01:05   24  from 2000.  This is PDX-3695.  The author of this paper is the

01:05   25  gentleman who's Intel's expert, Dirk Grunwald.  And he talks

01:05  1   about "we believe that the decision to change processor speed

01:05  2   and voltage must be controlled by the operating system."

01:05  3       Q.   Well, what did Mr. Henson do that was different from

01:05  4   this conventionalism?

01:05  5       A.   So what Mr. Henson did, and I'll show that in a

01:05  6   moment, but what he did was he ultimately came up with a way to

01:05  7   do this in hardware.

01:05  8       Q.   Can you explain?

01:05  9       A.   Yes.  So let me show you with the patent itself.  So

01:05  10  here's Figure 1 of the patent.  And what Mr. Henson did was he

01:05  11  introduced this dedicated controller, and it was the dedicated

01:06  12  controller inside that then had the responsibility for speed

01:06  13  and power control.

01:06  14      Q.   So can you walk us through and help us explain the

01:06  15  invention -- help us understand the invention using the figure?

01:06  16      A.   Yeah.  So the patent teaches that there are these

01:06  17  things called multiple master devices.  Okay.  That is, in

01:06  18  essence, cores.  And each master device can be doing different

01:06  19  things, like cores.

01:06  20           The master devices are connected on a bus to communicate.

01:06  21  The master devices in the bus are connected to a clock circuit,

01:06  22  which sets their speed.  And there's a dedicated programmable

01:06  23  controller, which in the art we call a microcontroller, that

01:06  24  adjusts the system.

01:06  25      Q.   And how does that programmable controller or

01:06  1   microcontroller adjust speed?

01:07  2       A.   So here's an example I prepared.

01:07  3       So first step is the master device requests a speed

01:07  4   adjustment.  Next, the microcontroller decides whether or not

01:07  5   to adjust the speed.  It might decide not to, for example, if

01:07  6   there's other things it knows about.

01:07  7       If it decides to adjust the speed, it instructs the clock

01:07  8   controller -- well, actually the clock controller is part of --

01:07  9   includes the microcontroller, but it instructs the clock

01:07 10   circuit to adjust the speed of the master devices.  And because

01:07 11   they're now moving faster, it might elect to adjust the speed

01:07 12   of the bus.

01:07 13       Q.   So how does the '759 invention compare to the old

01:07 14   approach?

01:07 15       A.   Well, the conventional wisdom was, as you've heard

01:07 16   before, adding hardware uses power, so don't add hardware.  And

01:07 17   Matt Henson didn't just add a little hardware.  He added a lot

01:08 18   of hardware.  He added pretty much a computer in a computer to

01:08 19   do this control.

01:08 20       And what ended up is a system that's far more responsive,

01:08 21   less intrusive and more power efficient than the old approach.

01:08 22       Q.   Okay.  So let's turn to Intel's Speed Shift

01:08 23   technology.  At a high level, can you explain the components

01:08 24   that we'll be talking about?

01:08 25       A.   Yes.  I'd be happy to.

01:08   1        So there's several components in play.  There are cores,

01:08   2   the bus, the clock circuit and what's called -- we've heard

01:08   3   about this, by the way, in the '373 -- this PCU.  That's power

01:08   4   control unit, and it includes a microcontroller.

01:08   5        Q.   So let's pull up Exhibit PTX-1949-NAT.  And can you

01:08   6   tell us what exhibit this is?

01:08   7        A.   Yeah.  So this is a presentation by Intel.  It's

01:09   8   called "Intel Architecture, Code Name Skylake Deep Dive:  A New

01:09   9   Architecture to Manage Power Performance and Energy

01:09   10  Efficiency," by Efraim Rotem.

01:09   11       Q.   So let's go to Page 5 of this exhibit.  And did this

01:09   12  Intel document help guide your analysis?

01:09   13       A.   It did.  What I'm going to do is actually use this

01:09   14  figure, so let me take out the things we don't need to talk

01:09   15  about because they're not relevant to the patent, and blow it

01:09   16  up.

01:09   17       Q.   And can you use this simplified figure to walk

01:09   18  through the operation of Speed Shift?

01:09   19       A.   Yes.  So here's how this works.  The core requests a

01:09   20  speed adjustment -- sorry.  It's right after lunch.

01:09   21       The core requests an adjustment, a speed adjustment, and

01:09   22  what it does is it sends a signal, and I'll show you that

01:09   23  signal, called "Core_Active" to the PCU.

01:10   24       Now, the PCU has decision code to decide whether or not to

01:10   25  shift the speed.  If it decides to shift the speed, it will,

01:10  1   for example, speed up the cores and then it might also decide

01:10  2   to speed up the bus, because the cores are communicating

01:10  3   faster.

01:10  4        MR. HEINRICH:  Okay.  And at this point we're going to be

01:10  5   turning to some Intel confidential information, so we'd

01:10  6   request -- Intel requests the Court be sealed.

01:10  7        THE COURT:  Okay.  That's fine.  We'll clear the

01:10  8   courtroom, unless you're under the protective order, and we'll

01:10  9   shut off the feed.

01:10  10       (Sealed proceedings.)

01:10  11       MR. HEINRICH:  Subject to the issues that we discussed on

02:12  12   the Rule 1006 exhibits, those are my questions for my direct.

02:12  13       THE COURT:  Mr. Lee, might I suggest we take a short break

02:12  14   before you begin?

02:12  15       MR. LEE:  That'd be great, Your Honor.  We can get set up

02:12  16   and get the notebooks there.

02:12  17       THE COURT:  Very good.

02:13  18       Ladies and gentlemen, it's about 2:15.  We will resume at

02:13  19   2:30.  Remembering my instructions not to discuss the case

02:13  20   amongst yourself.

02:13  21       THE BAILIFF:  All rise.

02:13  22       (Jury exited the courtroom at 2:13.)

02:13  23       THE COURT:  You can step down, Doctor.

02:13  24       Ladies and gentlemen, Mr. Lee, do you have all of your --

02:13  25   how much of your cross do you anticipate being under seal?

02:13  1        MR. LEE:  I'm sorry, Your Honor.  I couldn't hear.

02:13  2        THE COURT:  I'm trying to figure out whether we can let

02:13  3   the audience back in for part of this cross, or what we're

02:13  4   going to do.

02:13  5        MR. LEE:  Can I take a quick look, Your Honor?

02:13  6        THE COURT:  You absolutely can.

02:13  7        MR. LEE:  Your Honor, we have a good 20 minutes or

02:14  8   25 minutes that are on the public record we could get back in.

02:14  9        THE COURT:  Very good.  So when we -- for the record, when

02:14 10   we come back in, until Mr. Lee identifies where we're going

02:14 11   into a sealed area, it'll be on the public record, and phone

02:14 12   access will be maintained.

02:14 13        MR. LEE:  Thank you, Your Honor.

02:14 14        THE COURT:  What I do want to do before tomorrow is, I'm

02:14 15   concerned about balancing and protecting Intel's information

02:14 16   with the public's right to be able to hear some of this trial.

02:14 17   And tomorrow I'm concerned at how much -- I'm anticipating how

02:14 18   much is going to be sealed with respect to the damages

02:14 19   testimony.

02:14 20        MR. LEE:  And, Your Honor, it actually has confidential

02:15 21   information, both Intel and VLSI.  Your Honor will recall from

02:15 22   the openings, there is a significant amount that they've

02:15 23   designated as confidential.  So it's a task for both of us.

02:15 24        THE COURT:  Okay.  I will express my concern at how much

02:15 25   of this we're not being allowed to make public.  And I

02:15   1    understand why we're not doing it, but tomorrow we need to

02:15   2    figure out a way to make as much of it public as we can.

02:15   3         MR. LEE:  Your Honor, this is just something we've done in

02:15   4    other cases, particularly in the damages portion.  If we could

02:15   5    ensure the public can't see the monitors for our two tables,

02:15   6    it's very easy to prepare to say I'm putting Slide 7 on the

02:15   7    screen now.  I'm not going to say the number but His Honor and

02:15   8    the jury can see the number and get the witness to address it

02:15   9    without addressing the number.

02:15   10        THE COURT:  I want to do as much of that as possible

02:15   11   tomorrow where we limit the access.  Because of course publicly

02:15   12   they won't see the slide no matter -- they won't see the

02:16   13   exhibit no matter what.  If someone is in the courtroom, we can

02:16   14   make sure it's not being shown on the public TV and it's only

02:16   15   being shown to the jury and relevant people.

02:16   16        But I want you all to work as hard as you can to make as

02:16   17   much of tomorrow's direct and cross-examination public, because

02:16   18   I -- this is -- as you know, this case has received a fair

02:16   19   amount of attention.  And so I want it to be -- as much of it

02:16   20   as possible for the public.  So whatever the result is, I want

02:16   21   people to be able to understand why the result was what it was.

02:16   22   So I think that's a goal that we all share.

02:16   23        Anything we need to take up for VLSI, Mr. Chu?

02:16   24        MR. CHU:  No, Your Honor.

02:16   25        THE COURT:  Mr. Lee?

02:16   1          MR. LEE:  No, Your Honor.

02:16   2          THE COURT:  Okay.  We'll be back in just a few minutes.

02:16   3          (Recess taken from 2:16 to 2:36.)

02:36   4          THE BAILIFF:  All rise.

02:36   5          THE COURT:  Please remain standing.

02:36   6          (The jury entered the courtroom at 2:36.)

02:36   7          THE COURT:  You may be seated.

02:36   8          Mr. Lee, are you prepared to move forward?

02:36   9          MR. LEE:  I'm prepared to proceed, Your Honor.  Can I

       10   proceed?

       11          THE COURT:  We both said it at the same time, yes, sir.

       12          MR. LEE:  Thank you, Your Honor.

       13          THE COURT:  You're free to proceed.

       14                        CROSS-EXAMINATION

       15   BY MR. LEE:

02:36  16          Q.   Good afternoon, Dr. Conte.

02:36  17          A.   Good afternoon.

02:36  18          Q.   Now, Dr. Conte, for the last few hours you have shown

02:36  19   the jury a number of different documents, correct?

02:36  20          A.   Yes.

02:36  21          Q.   Many of them are from Intel --

02:36  22          (Clarification by Reporter.)

02:36  23   BY THE WITNESS:

02:36  24          A.   Sorry, I hit the off button.

02:36  25   BY MR. LEE:

02:37  1     Q.   Okay.  Why don't you do a test to see if we can hear?

02:37  2     A.   Okay.  For the record, I said good morning -- or good

02:37  3  afternoon.

02:37  4     Q.   Good afternoon to you.

02:37  5          So to back up, during the last three hours or so you have

02:37  6  shown the jury a number of documents, correct?

02:37  7     A.   Yes.

02:37  8     Q.   Many from Intel, correct?

02:37  9     A.   Yes.

02:37  10    Q.   They include source code, correct?

02:37  11    A.   Yes.

02:37  12    Q.   Schematics, correct?

02:37  13    A.   I don't believe I showed schematics.

02:37  14    Q.   Specifications?

02:37  15    A.   Yes.

02:37  16    Q.   Articles describing documents, correct?

02:37  17    A.   Yes.

02:37  18    Q.   Marketing materials, correct?

02:37  19    A.   Yes.

02:37  20    Q.   Testing documents, correct?

02:37  21    A.   Yes.

02:37  22    Q.   They were all Intel documents, correct?

02:37  23    A.   Yes.

02:37  24    Q.   Now, you described earlier this series of events and

02:37  25  problems that were being addressed by the '759 patent, correct?

02:37   1      A.   Yes.

02:37   2      Q.   You described the work being done at SigmaTel that

02:37   3  led to the '759 patent; is that correct?

02:38   4      A.   Uh-huh.

02:38   5      Q.   Is that right?

02:38   6      A.   Yes.

02:38   7      Q.   Now, in describing that work to the ladies and

02:38   8  gentlemen of the jury, you didn't show them a single document

02:38   9  from SigmaTel, did you?

02:38   10     A.   No.

02:38   11     Q.   You didn't show them a specification, correct?

02:38   12     A.   Well, I showed the patent specification.

02:38   13     Q.   Other than the patent, you did not show them any

02:38   14  internal specification from SigmaTel, correct?

02:38   15     A.   That's correct.

02:38   16     Q.   You did not show them any source code from SigmaTel,

02:38   17  correct?

02:38   18     A.   Correct.

02:38   19     Q.   You did not show any internal documents describing

02:38   20  the implementation of the invention, correct?

02:38   21     A.   That's correct.

02:38   22     Q.   You did not show the jury any documents from SigmaTel

02:38   23  testing the benefits of the invention, correct?

02:38   24     A.   That's correct.

02:38   25     Q.   You did not show the jury any documents from Intel --

02:38  1   I'm sorry -- from SigmaTel describing in narrative terms the

02:38  2   benefits of the invention, correct?

02:38  3       A.   That's correct.

02:38  4       Q.   So all the documents you showed today were Intel

02:38  5   documents describing features that have been developed by

02:39  6   Intel's engineers, correct?

02:39  7       A.   And marketing material, but yes.

02:39  8       Q.   And you showed no documents describing the process by

02:39  9   which the '759 patent came to be, correct?  Other than the

02:39  10  patent?

02:39  11      A.   Are you referring to -- oh, I thought you were

02:39  12  referring -- no.  Yeah, that's correct.

02:39  13      Q.   All right.  And you were here when Mr. Bearden

02:39  14  testified about the '373 patent, correct?

02:39  15      A.   Yes.

02:39  16      Q.   And similarly, there were no documents shown to the

02:39  17  jury about testing the benefits of the '373 patent, correct?

02:39  18      A.   Do you mean documents from Freescale?

02:39  19      Q.   Yes.  Documents from Freescale that would be doing

02:39  20  the same types of tests that Intel did on its own products.

02:39  21      A.   I'm sorry.  I don't quite -- can you restate?

02:39  22      Q.   Sure.  You were here for Mr. Bearden's testimony,

02:39  23  correct?

02:39  24      A.   Yes.

02:39  25      Q.   He described the process by which the Freescale folks

02:40  1   came to make the invention, correct?

02:40  2        A.   Yes.

02:40  3        Q.   During the course of providing that description, he

02:40  4   didn't describe any testing of the benefits of the '373 patent,

02:40  5   correct?

02:40  6        A.   I believe that's correct.

02:40  7        Q.   Right.  None of the type of testing that Intel has

02:40  8   done on, for instance, its products, correct?

02:40  9        A.   He didn't describe any.  Correct.

02:40  10       Q.   And you didn't show the ladies and gentlemen of the

02:40  11  jury anything like that, correct?

02:40  12       A.   Correct.

02:40  13       Q.   All right.  So let me go back, step back a little

02:40  14  bit, Dr. Conte.

02:40  15       I think you told us that you've been retained to testify

02:40  16  on behalf of VLSI LLC, correct?

02:40  17       A.   That's right.

02:40  18       Q.   Now, you submitted an expert report in July of last

02:40  19  year, correct?

02:40  20       A.   I believe that's when.  Yes.

02:40  21       Q.   And you submitted a second one, as you told us, that

02:40  22  was quite extensive in September of that year, correct?

02:40  23       A.   Yes.

02:40  24       Q.   And your deposition was taken in September of last

02:41  25  year, correct?

02:41   1          A.    Yes.

02:41   2          Q.    And you know that the reports and the deposition were

02:41   3    our opportunity to learn what you were going to say when you

02:41   4    get on the stand, correct?

02:41   5          A.    Yes.

02:41   6          Q.    That was our last chance to know what you were going

02:41   7    to say, correct?

02:41   8          A.    Yes.  I said yes.

02:41   9          Q.    Okay.  I'm sorry.

02:41  10          And you told us you were being compensated at $600 an

02:41  11    hour, correct?

02:41  12          A.    That's correct.

02:41  13          Q.    And you had spent 300 hours working on this case,

02:41  14    correct?

02:41  15          A.    That's correct.

02:41  16          Q.    Now, let's be sure I have it right, and correct me if

02:41  17    I'm wrong, in that 300 hours you made an infringement

02:41  18    determination on the '373 patent, correct?

02:41  19          A.    That's correct.

02:41  20          Q.    Reviewing all of the Intel documents, correct?

02:41  21          A.    Did I review every single document?  I'm sorry.  Is

02:41  22    your question --

02:41  23          Q.    Sure.  Reviewing all of the Intel documents you've

02:41  24    described to the jury today, correct?

02:41  25          A.    No.  I didn't -- oh, that I described to the jury.

02:42  1    Yes, that's correct.

02:42  2         Q.   And in that 300 hours, you made an infringement

02:42  3    determination for the '759 patent, correct?

02:42  4         A.   Yes.

02:42  5         Q.   You addressed issues of validity.  I'm not going to

02:42  6    ask you about them now.  But you addressed issues of validity,

02:42  7    correct?

02:42  8         A.   Correct.  In the rebuttal, yes.

02:42  9         Q.   You wrote two extensive reports totaling hundreds of

02:42  10   pages, correct?

02:42  11        A.   Yes.

02:42  12        Q.   And you gave your deposition, correct?

02:42  13        A.   Correct.

02:42  14        Q.   And you got all that done in 300 hours which is a lot

02:42  15   of hours, correct?

02:42  16        A.   Well, the 300 I think includes prep for this trial.

02:42  17        Q.   So that -- fair enough.

02:42  18        So if I add, in addition, preparing to testify at the

02:42  19   trial, the total is 300 hours, correct?

02:42  20        A.   300 was up through -- yeah, I believe that's correct.

02:42  21        Q.   Right.  But the one thing we can agree is you did

02:42  22   many things in that 300 hours, including deciding that Intel

02:43  23   infringes the '373 patent, correct?

02:43  24        A.   That's correct.

02:43  25        Q.   Including deciding that Intel infringes the '759

02:43  1    patent, correct?

02:43  2         A.   Yes.  That's correct.

02:43  3         Q.   Were you here this morning when Mr. Bearden testified

02:43  4    that it would be a full-time job for many years to track down

02:43  5    where an invention was being used?

02:43  6         A.   To track down where an invention was being used?  I

02:43  7    don't recall that.

02:43  8         Q.   You don't recall.  Do you recall him being asked

02:43  9    whether he had determined -- withdraw it.

02:43  10        Do you recall him being asked whether he knew whether the

02:43  11   '373 patent had been used by Freescale?

02:43  12        A.   Yes.

02:43  13        Q.   And do you recall him saying -- and I'm reading from

02:43  14   the rough transcript -- that "trying to track down where the

02:43  15   invention might have been used would have been a full-time job

02:43  16   for many years."  Do you remember him saying that?

02:43  17        A.   Yes.

02:43  18        Q.   Yes.

02:43  19        A.   I can explain.

02:43  20        Q.   But you got it done in a lot less than several years,

02:44  21   correct?

02:44  22        A.   It's not the same task.  Incorrect.

02:44  23        Q.   Now, you didn't determine whether Freescale had

02:44  24   produced any products using the '373 invention, correct?

02:44  25        A.   It was not my task, no.

02:44  1        Q.   You weren't asked to do it, correct?

02:44  2        A.   That's correct.

02:44  3        Q.   And the same is true for the '759, you were not asked

02:44  4   to determine whether SigmaTel had used the invention, correct?

02:44  5        A.   Again, it was not my task.

02:44  6        Q.   You weren't asked to do it?

02:44  7        A.   Correct.

02:44  8        Q.   And you weren't asked to determine whether Freescale

02:44  9   used the '759 patent, correct?

02:44  10       A.   It was not my task.

02:44  11       Q.   You weren't asked to do it?

02:44  12       A.   Correct.

02:44  13       Q.   But you could have done it if you had been asked,

02:44  14   right?

02:44  15       A.   Correct.

02:44  16       Q.   Right.  But no one asked, correct?

02:44  17       A.   I was not asked.

02:44  18       Q.   And you weren't asked to determine whether NXP uses

02:44  19   the '759 patent, were you?

02:44  20       A.   It was not my task.

02:44  21       Q.   And you weren't asked to determine whether NXP uses

02:45  22   the '373 patent, correct?

02:45  23       A.   Again, it was not my task.

02:45  24       Q.   Yeah.  Fair enough.

02:45  25            So for -- just to put it all together, for SigmaTel,

02:45  1   Freescale, NXP and let me add in VLSI, you did not determine

02:45  2   whether any of them had ever made a product that used either of

02:45  3   the two inventions you've been testifying about here today,

02:45  4   correct?

02:45  5       A.   It was not my task, so no.

02:45  6       Q.   Right.  And the one thing we can agree upon is if you

02:45  7   had been asked, and if NXP had given you the information, you

02:45  8   could have done it, right?

02:45  9       A.   Sure.  Would take more hours.

02:45  10      Q.   It would take more hours, but it certainly wouldn't

02:45  11  take many years like Mr. Bearden suggested, correct?

02:45  12      A.   It's not the same task.

02:45  13      Q.   Now, you were first contacted about this case by

02:45  14  lawyers from Irell and Manella, our colleagues on the other

02:45  15  side of the room, correct?

02:45  16      A.   I believe that's correct.  Yes.

02:45  17      Q.   And you've worked with them before, correct?

02:46  18      A.   I've -- well, if what you're asking is have I been

02:46  19  retained by clients who also were retaining them, then yes.

02:46  20      Q.   Yeah.  Fair enough.  That's the question that you're

02:46  21  comfortable answering and the answer is yes, correct?

02:46  22      A.   Yeah.

02:46  23      Q.   And you've done that four or five times, correct?

02:46  24      A.   Yes.

02:46  25      Q.   Now, before you filed your first report in this case,

02:46   1    you didn't know very much about VLSI, correct?

02:46   2        A.   I did not.

02:46   3        Q.   You thought it was important to find out something

02:46   4    about the plaintiff, correct?

02:46   5        A.   It was not my task.

02:46   6        Q.   But you made some effort to find out something about

02:46   7    the company that was retaining you to testify in a federal

02:46   8    court, didn't you?

02:46   9        A.   Again, beyond the patents and the litigation, I did

02:46   10   not.  No.  It wasn't my task.

02:46   11       Q.   Well, you knew that VLSI was an intellectual property

02:46   12   company, correct?

02:47   13       A.   I'm sorry?

02:47   14       Q.   You knew that VLSI was an intellectual property

02:47   15   company, correct?

02:47   16       A.   I didn't make that determination back then.

02:47   17       Q.   You didn't decide that?  Would you turn in Volume 1

02:47   18   of the notebook to Tab 2, which is your deposition from

02:47   19   September 28th.

02:47   20       And if it's easier for me to put it on the screen, I'll

02:47   21   put it on the screen.

02:47   22       A.   It's kind of tight in here, so...

02:47   23       Q.   No.  No.  Fair enough.  Whatever's easier for you,

02:47   24   we'll make it work.

02:47   25       MR. LEE:  So could we have on the -- if I could put on the

02:47  1    screen, Your Honor?

02:47  2         THE COURT:  Of course.

02:47  3         MR. LEE:  Could I have the September 28th deposition

02:47  4    transcript, Page 82, Line 14 to 17?

02:47  5    BY MR. LEE:

02:47  6         Q.   Question:  "Does VLSI make any products?"

02:47  7         Answer:  "I don't know one way or the other.  I know this

02:48  8    is their business.  It's an intellectual property company."

02:48  9         That's what you knew at the time, correct?

02:48  10        A.   That refreshes my recollection.  Yes.

02:48  11        Q.   No.  You didn't know whether they made any products,

02:48  12   correct?

02:48  13        A.   That's correct.

02:48  14        Q.   You didn't know whether they had ever successfully

02:48  15   licensed anyone, correct?

02:48  16        A.   Not -- I didn't know one way or the other.

02:48  17        Q.   Okay.  Now, Dr. Conte, as you told us, you've been a

02:48  18   professor of electrical engineering for more than 25 years,

02:48  19   correct?

02:48  20        A.   29 years now.  Yes.

02:48  21        Q.   You've done engineering, consulting and litigation

02:48  22   work, in addition to being a professor, correct?

02:48  23        A.   Yes.  Georgia Tech allows that.

02:48  24        Q.   And you've read a lot of patents, correct?

02:48  25        A.   Yes.  I have over the years.

02:48  1      Q.   And as you told the jury, you have patents of your

02:48  2  own, correct?

02:48  3      A.   Yes.  I do.

02:48  4      Q.   And you were here -- you watched the opening

02:48  5  statements, correct?

02:49  6      A.   I didn't watch all of them.  I was not here.

02:49  7      Q.   Did you hear Mr. Chu describe the two patents in this

02:49  8  case as stars?

02:49  9      A.   I don't recall.

02:49 10      Q.   Okay.  The first time that you ever saw the '373

02:49 11  patent, the very first time was when the lawyers in this case

02:49 12  sent it to you, correct?

02:49 13      A.   I'd need to think back.  It might be.

02:49 14      Q.   You can't say one way or the other?

02:49 15      A.   Yeah.  It probably was.

02:49 16      Q.   And the same's true for the '759 patent.

02:49 17  Notwithstanding all your years in the industry, notwithstanding

02:49 18  your own 40 patents, the very first time you saw the '759

02:49 19  patent was when the lawyers sent it to you for this case,

02:49 20  correct?

02:49 21      THE COURT:  Mr. Lee, I'm having a hard time hearing you.

02:49 22      Are you all able to understand what he's asking?

02:49 23      MR. LEE:  I'll stick closer to the mic, and if I don't, if

02:49 24  someone raises their hand, it will make me -- okay.

02:50 25      THE WITNESS:  I can hear you sort of.

02:50  1   BY MR. LEE:

02:50  2       Q.   I think they can hear both of us, Dr. Conte.  If you

02:50  3   can't hear me, you let me know too.

02:50  4       A.   I sure will.

02:50  5       Q.   Okay.  Now, just to be sure I have the question

02:50  6   answered, before you were retained in this case, you had never

02:50  7   heard of the '759 patent, correct?

02:50  8       A.   Well, I don't think that -- that's hard to answer.

02:50  9   And I'll tell you why.

02:50  10      I review, of course, as part of my work thousands of

02:50  11  patents, so I don't recall whether or not I had seen it before.

02:50  12      Q.   Well, did you -- at your deposition, did you testify

02:50  13  that it was part of being retained in this case?

02:50  14      A.   Oh, yeah.  It was part of being retained in this

02:50  15  case.

02:50  16      Q.   Now, you've have never worked at SigmaTel, correct?

02:50  17      A.   I have not.

02:50  18      Q.   But you do know that SigmaTel developed and sold

02:50  19  semiconductor products, correct?

02:51  20      A.   As I've said, I've had past students that worked

02:51  21  there.

02:51  22      Q.   And it was a substantial company that made good and

02:51  23  sophisticated products for some period of time, correct?

02:51  24      A.   Yes.  I'd agree.

02:51  25      Q.   Right.  And you talked to the jury about Freescale,

02:51  1    correct?

02:51  2         A.   Yes.

02:51  3         Q.   And at some point in time Freescale came to own both

02:51  4    patents, correct?

02:51  5         A.   Yes.  That's correct.

02:51  6         Q.   And at some point in time, NXP came to own both

02:51  7    patents, correct?

02:51  8         A.   I believe that's correct.

02:51  9         Q.   Okay.  And then ultimately VLSI did, correct?

02:51  10        A.   I don't know the terms of the agreement, sir.  Sorry.

02:51  11        Q.   Okay.  And for all of those entities, you cannot

02:51  12   identify even a single prototype product that any of them made

02:51  13   implementing the inventions of the '373 patent, correct?

02:51  14        A.   No.  I could identify if I was given enough

02:52  15   information.

02:52  16        Q.   But you weren't, correct?

02:52  17        A.   I was not.

02:52  18        Q.   And you haven't -- you did not identify in your

02:52  19   expert report any prototype product implementing the '373

02:52  20   patent from any of those entities, correct?

02:52  21        A.   That's right.

02:52  22        Q.   And the same's true for the '759 patent.  You did not

02:52  23   identify in your expert report any testing -- I'm sorry -- any

02:52  24   prototype product for the '759 patent, correct?

02:52  25        A.   That's correct.

02:52  1        Q.   And I'll combine the two now if I could.

02:52  2        It's also true that for all those companies you didn't

02:52  3   identify a single test on performance for a prototype or a

02:52  4   product for either of the two patents at any of those

02:52  5   companies, correct?

02:52  6        A.   Again, it was not my task, so correct.

02:52  7        Q.   Right.  Now, let me turn to the '373 patent, if I

02:52  8   could.

02:52  9        And it's both in your binder, Dr. Conte, and I'll put it

02:53  10  up on the screen.  But to level-set us all, I'll put it on the

02:53  11  screen.  And can you see it?

02:53  12       A.   Can you tell me which volume it's in?

02:53  13       Q.   The patent itself is in Volume 2 of the binders, Tab

02:53  14  7.

02:53  15       A.   Give me a moment.

02:53  16       Q.   Sure.  Tell me when you're there.

02:53  17       A.   Let me just unclip it.  That'll make this easier.

02:53  18  Okay.

02:53  19       Q.   Do you have it?

02:53  20       A.   I do.

02:53  21       Q.   Now, the title of the patent is "Minimum Memory

02:53  22  Operating Voltage Technique," correct?

02:53  23       A.   That's correct.

02:53  24       Q.   The application was filed in August 2006, correct?

02:53  25       A.   That's what it says.

02:53  1      Q.   And the patent was issued in April of 2009, correct?

02:53  2      A.   That's what it says.  Yes.

02:53  3      Q.   So the patent issued almost 12 years ago, correct?

02:53  4      A.   If my math is right, yes.

02:54  5      Q.   The first time you saw it was in 2019, correct?

02:54  6      A.   Hundreds of thousands of patents I've seen.

02:54  7      Q.   Yes.  The answer is yes?

02:54  8      A.   I don't know if I've seen it before, but I believe I

02:54  9  had not.

02:54  10      Q.   Okay.  Now, there are four named inventors on the

02:54  11  patent, correct?

02:54  12      A.   There are.

02:54  13      Q.   Andrew Russell, correct?

02:54  14      A.   Yes.

02:54  15      Q.   David Bearden, correct?

02:54  16      A.   Yes.

02:54  17      Q.   Bradford Hunter, correct?

02:54  18      A.   Yes.

02:54  19      Q.   Shayan Zhang, correct?

02:54  20      A.   Yes.

02:54  21      Q.   Now, before submitting your expert reports, you did

02:54  22  not talk to any of the named inventors, correct?

02:54  23      A.   Correct.

02:54  24      Q.   You did not speak with Mr. Bearden, correct?

02:54  25      A.   That's correct.

02:54   1        Q.   And you did not speak to any of them before you

02:54   2   provided your deposition, correct?

02:54   3        A.   That's correct.

02:54   4        Q.   Now, you were here physically, I think, in the

02:54   5   courtroom for Mr. Bearden's testimony today, correct?

02:55   6        A.   I was in the adjoining courtroom, but yes.

02:55   7        Q.   Okay.  Now, I want to ask you a little bit about the

02:55   8   opinions you offered the jury right before lunch on the value

02:55   9   of the '373 patent.  Do you have that in mind?

02:55  10        A.   Yes.

02:55  11        Q.   And you were trying to identify the value compared to

02:55  12   what had existed before, correct?

02:55  13        A.   I wouldn't characterize it that way.

02:55  14        Q.   Okay.  But you were trying to identify what you

02:55  15   called the value of the '373 patent, correct?

02:55  16        A.   I was.

02:55  17        Q.   And you discussed Dr. Annavaram's test results,

02:55  18   correct?

02:55  19        A.   I did.

02:55  20        Q.   All right.  So let's see what was known before so we

02:55  21   can compare the invention -- the value of the invention to what

02:55  22   existed before.  Determining a minimum operating voltage of a

02:55  23   memory was a concept known before the '373 patent, correct?

02:56  24        A.   Yes, generally.

02:56  25        Q.   Integrated circuits were known before the '373

02:56  1    patent, correct?

02:56  2        A.   Yes.

02:56  3        Q.   Memory was known, correct?

02:56  4        A.   Yes.

02:56  5        Q.   Memory and integrated circuit was known, correct?

02:56  6        A.   Yes.

02:56  7        Q.   Processors were known?

02:56  8        A.   Yes.

02:56  9        Q.   Voltage regulators were known?

02:56  10       A.   Yes.

02:56  11       Q.   All of these things were known before the '373 patent

02:56  12   application was filed, correct?

02:56  13       A.   All of those things we just discussed, yes.

02:56  14       Q.   Right.  And before the '373 patent, there were

02:56  15   examples of memories with two voltages, correct?

02:56  16       A.   Yes.  I believe that's correct.

02:56  17       Q.   And there were examples of voltages -- two voltages

02:56  18   provided to standard random access -- I'm sorry -- SRAMs,

02:56  19   correct?

02:56  20       A.   I believe that's correct.

02:56  21       Q.   All right.  Now, let me bring up PDX-4.34 which is a

02:57  22   diagram that you showed the ladies and gentlemen of the jury.

02:57  23       Do you see it on the screen?

02:57  24       A.   I do.

02:57  25       Q.   Now, as part of the diagram, there is in green the

02:57  1    words "new!"  Correct?

02:57  2         A.   That's correct.

02:57  3         Q.   The voltage regulator 2 is labeled as new, correct?

02:57  4         A.   That's correct.

02:57  5         Q.   And the selector in the middle is also identified as

02:57  6    new, correct?

02:57  7         A.   The combination was new, yes.

02:57  8         Q.   Now, you told the ladies and gentlemen of the jury

02:57  9    that you reviewed the prosecution history, the back-and-forth

02:57  10   between the applicants and the Patent Office, carefully,

02:57  11   correct?

02:57  12        A.   I don't believe we discussed the prosecution history

02:57  13   in my direct.

02:57  14        Q.   No.  As part of your -- I'm sorry.  As in preparing

02:57  15   your reports, you reviewed the prosecution history of the '373

02:58  16   patent carefully, did you not?

02:58  17        A.   I did.

02:58  18        Q.   All right.  Now, you have seen the original claims

02:58  19   that Freescale tried to get from the Patent Office, have you

02:58  20   not?

02:58  21        A.   At some point in time, yes.

02:58  22        Q.   And in fact, you described those claims that

02:58  23   Freescale wanted to get at the outset in your expert report,

02:58  24   correct?

02:58  25        A.   I believe that's true.

02:58  1      Q.   And in fact, those -- but Freescale asked the Patent

02:58  2  Office at the outset, received a response from the Patent

02:58  3  Office, didn't it?

02:58  4      A.   Very likely.

02:58  5      Q.   Yeah.  And it said no, you can't do this.  Other

02:58  6  people have done it before, correct?

02:58  7      A.   I would need to look at the file history to know what

02:58  8  the response was.

02:58  9      Q.   Okay.  Let's do that.  Volume 4 of your notebook, Tab

02:58  10  34 has PTX-7 which is the file history for the '373 patent.

02:59  11      A.   Okay.  Give me a moment.

02:59  12      Q.   And tell me when you get to that tab and then I'll

02:59  13  give you a page and I'll also pull it up on the screen,

02:59  14  Dr. Conte.

02:59  15      A.   Okay.  I'm there.

02:59  16      Q.   Okay.  And we'll put up on the screen from Page 20 of

02:59  17  PTX-7, the claim, Claim 11, that was being sought by Freescale.

02:59  18      Do you see it?

02:59  19      A.   Yes.  I see it.

02:59  20      Q.   It had all of these things, integrated circuit,

02:59  21  correct?

02:59  22      A.   It does.

02:59  23      Q.   Had a memory, correct?

02:59  24      A.   It calls out a memory, yes.

02:59  25      Q.   With an operating voltage, correct?

| | | |
|---|---|---|
| 02:59 | 1 | A.   It calls it out, yes. |
| 02:59 | 2 | Q.   Calls out a minimum operating voltage, correct? |
| 02:59 | 3 | A.   Yes. |
| 02:59 | 4 | Q.   Calls out a location to store a value, correct? |
| 02:59 | 5 | A.   That's correct. |
| 03:00 | 6 | Q.   And if you scroll down a little bit further to |
| 03:00 | 7 | original Claim 12, this is another claim that Freescale said to |
| 03:00 | 8 | the Patent Office:  Could we have this claim too?  And it |
| 03:00 | 9 | described -- see where I am on Claim 12? |
| 03:00 | 10 | A.   I do. |
| 03:00 | 11 | Q.   Do you see Claim 12? |
| 03:00 | 12 | A.   I do. |
| 03:00 | 13 | Q.   Claim 12 depends from Claim 11, correct? |
| 03:00 | 14 | A.   It does. |
| 03:00 | 15 | Q.   And Claim 12 actually adds a second voltage |
| 03:00 | 16 | regulator, correct? |
| 03:00 | 17 | A.   Yes. |
| 03:00 | 18 | Q.   A power supply selector, correct? |
| 03:00 | 19 | A.   Correct. |
| 03:00 | 20 | Q.   The two things that on your demonstrative you said |
| 03:00 | 21 | were new, correct? |
| 03:00 | 22 | A.   I'm sorry.  Are we referring to Claim 12 in isolation |
| 03:00 | 23 | of Claim 11? |
| 03:00 | 24 | Q.   No.  We're referring to Claim 11 and Claim 12 |
| 03:01 | 25 | together. |

03:01  1        A.   That's correct.

03:01  2        Q.   And the claims together refer to the second voltage

03:01  3   regulator, correct?

03:01  4        A.   Yes.  I see that.

03:01  5        Q.   It refers to the power supply selector, correct?

03:01  6        A.   I see that.

03:01  7        Q.   Precisely the things you said on your demonstrative

03:01  8   were new, correct?

03:01  9        A.   Yes.

03:01  10       Q.   And if we go to, in the file history -- and I'll

03:01  11  bring it up on the screen -- the Patent Office rejected these

03:01  12  claims, didn't they?

03:01  13       A.   I'm sorry.  Where's the office action?

03:01  14       Q.   The easiest thing might be I'll read you a statement

03:01  15  from your report and tell me if you agree or disagree.

03:01  16       A.   Okay.  I'm still -- sir, give me a moment to find the

03:01  17  office.

03:01  18       Q.   Sure.  Take whatever time you need.

03:01  19       A.   Okay.  Go ahead and read.

03:01  20       Q.   Go to Page -- if this is easier for you, Dr. Conte,

03:02  21  go to Page 45.

03:02  22       A.   Thank you.  That helps a lot.  Okay.  I'm there.

03:02  23       Q.   Okay.  And the Patent Office rejected Claims 1 to 21.

03:02  24  So it rejected Claims 11 and 12 that had what you said were

03:02  25  new, correct?

03:02  1        A.   Yes, that's correct.

03:02  2        Q.   Right.  So the very things that you said this morning

03:02  3   were new, the Patent Office said almost 15 years ago, no,

03:02  4   they're old.  Someone else has done those before.

03:02  5        MR. HEINRICH:  Objection.  There's a MIL on this and it's

03:02  6   misleading about the prosecution history.  So it's 403 MIL.

03:02  7   This is an interim prosecution -- interim office action.

03:03  8        THE COURT:  You'll be able to bring that up on cross.  If

03:03  9   you think what he's saying isn't correct or isn't accurate,

03:03  10  you'll be able to bring that out on cross.

03:03  11  BY MR. LEE:

03:03  12       Q.   Now, I think you described the invention of the '373

03:03  13  patent as unconventional.  Did I write that down correctly?

03:03  14       A.   It went against conventionalism.

03:03  15       Q.   Yes.  Okay.

03:03  16       Now, if -- I'm going to focus you on the patent, if I

03:03  17  could, and I'm going to take you to the abstract first.  The

03:03  18  abstract's part of the patent, correct?

03:03  19       A.   It's a nonbinding part of the patent, but yes.

03:03  20       Q.   Well, when you read the claims, you read the claims

03:03  21  in light of the specification, correct?

03:03  22       A.   You read them in light of the specification and one

03:04  23  of ordinary skill in the art.

03:04  24       Q.   The abstract is part of the specification, correct?

03:04  25       A.   It is.

03:04  1      Q.   It's not included there for no reason.  It's where

03:04  2   the patent begins, correct?

03:04  3      A.   I would not characterize it that way, sir.

03:04  4      Q.   Okay.  Well, I'm going to come to the claims, but I

03:04  5   want to be sure that we understand what the abstract says.  And

03:04  6   then we'll read the claims in light of the entire patent.

03:04  7      MR. LEE:  So if I could have the abstract on the screen.

03:04  8   BY MR. LEE:

03:04  9      Q.   It does refer to a minimum operating voltage and

03:04  10  determining when an alternative power supply can be switched to

03:04  11  the memory, correct?

03:04  12     A.   Yes.

03:04  13     Q.   But it's the claims that really determine

03:04  14  infringement, correct?

03:04  15     A.   Yes.

03:04  16     MR. LEE:  Now, if we could, could we have PDX-4.20 on the

03:04  17  screen?

03:04  18  BY MR. LEE:

03:05  19     Q.   Now, during its opening, VLSI said that the three

03:05  20  separate --

03:05  21     A.   I'm sorry sir.  What -- PTX-4?

03:05  22     Q.   PDX-4.20.  It's one of VLSI's demonstratives.  I'll

03:05  23  put it on the screen.  Do you see it?

03:05  24     A.   Yes.

03:05  25     Q.   And Mr. Chu used this in the opening and said that

03:05  1   the '373 patent was a new way for circuits to sleep when not in

03:05  2   use, correct?

03:05  3       A.   That's correct.

03:05  4       Q.   Now, the word "sleep" is nowhere in the '373 patent,

03:05  5   is it?

03:05  6       A.   The word itself, no.

03:05  7       Q.   Yes.  The word "sleep" is nowhere in the claims of

03:05  8   the '373 patent, is it?

03:05  9       A.   The word itself, no.

03:05  10      Q.   Okay.  Now, let me be sure we understand your

03:05  11  infringement contentions.  I'm not going to go through them all

03:05  12  in detail.  You understand that Intel has retained

03:06  13  Professor Sylvester from the University of Michigan to address

03:06  14  the '759 patent and Professor Grunwald to address the other, or

03:06  15  did I get them --

03:06  16      A.   I think you got them reversed.

03:06  17      Q.   I got them flipped.  But you understand that they're

03:06  18  both going to come and testify, and I'm not going to try to go

03:06  19  into the details of their testimony.  Okay?

03:06  20      Now, let's have PDX-4.32 on the screen.  This is a slide

03:06  21  from the opening statement by VLSI in this case, and I want to

03:06  22  go to the bottom.

03:06  23      And it says, "Intel uses NXP patents across the mainstream

03:06  24  products."

03:06  25      Do you see that?

03:06  1        A.    Yes.

03:06  2        Q.    Now, there are only two patents before the members of

03:06  3   the jury, the '373 and the '759, correct?

03:07  4        A.    Yes.

03:07  5        Q.    For the '373 patent, the only products you accuse of

03:07  6   infringing are Haswell and Broadwell, correct?

03:07  7        A.    Yes.

03:07  8        Q.    You do not accuse any of the Skylake and later

03:07  9   products, the products listed on this slide, of infringing the

03:07  10  '373 patent, correct?

03:07  11       A.    Correct.

03:07  12       Q.    So the fact -- if I look at the bottom, Intel uses

03:07  13  NXP patents across mainstream processors, that's not quite

03:07  14  accurate, correct?

03:07  15       A.    I disagree.

03:07  16       Q.    Well, there are two patents in issue, correct?

03:07  17       A.    Yes.

03:07  18       Q.    '373 patent is accused of infringing only Haswell and

03:07  19  Broadwell, correct?

03:07  20       A.    Yes.

03:07  21       Q.    Haswell and Broadwell are not on this slide, correct?

03:07  22       A.    Yes.  They are.  They're right there.  2013, 2014 --

03:08  23       Q.    Okay.  Okay.  You're right.  So fair enough.  So

03:08  24  Haswell and Broadwell would infringe the '373, correct?

03:08  25       A.    That's correct.

03:08   1         Q.   But the rest of them would not, correct?

03:08   2         A.   That's correct.  I showed they infringed the '759.

03:08   3         Q.   Fair enough.  Now, the microprocessors that you

03:08   4   described are complicated products, are they not?

03:08   5         A.   Oh, indeed.  Yes.

03:08   6         Q.   And you would agree that small changes in even one

03:08   7   process step, one circuit, one transistor, can have extremely

03:08   8   unanticipated and cascading consequences, correct?

03:08   9         A.   In some cases.  Yeah.

03:08  10         Q.   In fact, you have said just that in your expert

03:08  11   report, did you not?

03:08  12         A.   And I just agreed with it.

03:08  13         Q.   Okay.  Now, each of the Haswell and Broadwell

03:08  14   microprocessors contains more than a billion dollars in -- more

03:08  15   than a billion transistors, correct?

03:08  16         A.   You're saying billion transistors, not a billion

03:08  17   dollars?

03:08  18         Q.   Billion transistors.

03:08  19         A.   Yes.

03:08  20         Q.   And each of the Haswell and Broadwell microprocessors

03:09  21   have multiple features, correct?

03:09  22         A.   Yes.

03:09  23         Q.   They have literally thousands of features, correct?

03:09  24         A.   Yes.

03:09  25         Q.   And you've accused two features -- you have accused a

03:09  1   feature of the Haswell and Broadwell products of infringing the

03:09  2   '373 patent, correct?

03:09  3       A.   That's correct.

03:09  4       Q.   Now, you did study the documents from the Intel

03:09  5   engineers that describe the development of the accused

03:09  6   features, did you not?

03:09  7       A.   I did.

03:09  8       Q.   And you've learned -- you knew about this before, I'm

03:09  9   sure -- about something called tape-in, correct?

03:09  10      A.   I'm sorry?

03:09  11      Q.   You've learned about something called "tape-in"?

03:09  12      A.   Okay.

03:09  13      Q.   You know what it is?

03:09  14      A.   It's when you log the design in.

03:09  15      Q.   Right.  The Haswell product was taped in in

03:09  16   August 2011, correct?

03:09  17      A.   I would need to refresh my recollection.

03:09  18      Q.   All right.  Well, if it will help you if you go to

03:10  19   your opening report.

03:10  20      A.   Mr. Lee, if I said that in my opening report, it's

03:10  21   fine.  I don't remember the exact dates sitting here today.

03:10  22      Q.   Well, that's fair enough.  I'll represent to you that

03:10  23   you said just that in your opening report.

03:10  24      A.   Fine.  Let's save each other some time.

03:10  25      Q.   And I'll also represent to you that you said in your

03:10  1    opening report that Broadwell taped in in October 2012.  You

03:10  2    would agree?

03:10  3        A.   That's -- if it's represented, yes.

03:10  4        Q.   And I will also represent to you that you said

03:10  5    explicitly that the Haswell and Broadwell products were

03:10  6    fabricated about ten weeks later.

03:10  7        A.   Okay.

03:10  8        Q.   Okay.  Now, let's turn to your specific opinions.

03:10  9    You gave opinions on Claims 1, 5, 6, 9 and 11 to the members of

03:10  10   the jury, correct?

03:10  11       A.   Yes.

03:10  12       Q.   Of those claims, only Claims 1 and 9 are independent

03:10  13   claims, correct?

03:10  14       A.   Yes.

03:10  15       Q.   I'm going to bring up -- but again, if it's easier

03:11  16   for you on the hard copy, use that.  I'm going to bring up

03:11  17   Claim 1 of the '373 patent and put it on the screen.  Do you

03:11  18   have it?

03:11  19       A.   I do.

03:11  20       Q.   Now, as you told us, for there to be an infringement,

03:11  21   literal infringement, VLSI has to show that Intel's products

03:11  22   contain each and every requirement of that claim literally,

03:11  23   correct?

03:11  24       A.   This is a method claim.  So I have to show that Intel

03:11  25   performs these steps.

03:11  1        Q.   Literally, correct?

03:11  2        A.   Correct.

03:11  3        Q.   And each and every step literally, correct?

03:11  4        A.   Correct.

03:11  5        Q.   If even one step is missing, there's no infringement,

03:11  6    correct?

03:11  7        A.   Correct.

03:11  8        Q.   Now, every word counts, correct?

03:11  9        A.   Yes.

03:11  10       Q.   Now, in your expert report and in your testimony

03:11  11   today, you have offered an opinion of literal infringement of

03:11  12   the '373 patent, correct?

03:12  13       A.   Yes.

03:12  14       Q.   In your direct testimony, you do not address the

03:12  15   Doctrine of Equivalents for the '373 patent, correct?

03:12  16       A.   Correct.

03:12  17       Q.   So I'm not going to ask you any questions about that,

03:12  18   and I'm going to move on to the literal infringement issue.

03:12  19   Are you with me?

03:12  20       A.   Yes.

03:12  21       Q.   Okay.

03:12  22       MR. LEE:   So, Your Honor, I think this is when -- actually

03:12  23   we can extend the public records longer, a little longer.

03:12  24   BY MR. LEE:

03:12  25       Q.   Now, let's go to the claim, Claim 1.  And what I'd

03:12  1   like to do is take some time to talk about the words of the

03:12  2   claim because it's the words of the claim that will determine

03:12  3   infringement, correct?

03:12  4      A.   That's correct.

03:12  5      Q.   Now, I'm going to highlight on DDX-3.2 on the screen

03:12  6   two of the limitations.  The first is "determining a value of a

03:13  7   minimum operating voltage of the memory," correct?

03:13  8      A.   Yes.

03:13  9      Q.   And "storing the value of the minimum operating

03:13  10  voltage of the memory," correct?

03:13  11     A.   Yes.

03:13  12     Q.   Now, the other independent claim that you testified

03:13  13  about to the members of the jury is Claim 9, correct?

03:13  14     A.   Yes.

03:13  15     Q.   Let me put Claim 9 on the screen.  And Claim 9 has

03:13  16  similar but not identical language.  And Claim 9 requires

03:13  17  storing a value representative of the memory's minimum

03:13  18  operating voltage, correct?

03:13  19     A.   Not quite what the element is, but...

03:13  20     Q.   Well, it refers to an integrated circuit that has a

03:13  21  minimum operating voltage, correct?

03:13  22     A.   The claim speaks for itself.  It refers to an

03:13  23  integrated circuit -- "a memory that operates using an

03:13  24  operating voltage, wherein the memory is characterized as

03:14  25  having a minimum operating voltage."

03:14  1    Q.   Right.

03:14  2    A.   And the second part, you left out the first piece, "a

03:14  3  memory location that stores the value representative of the

03:14  4  minimum operating voltage."

03:14  5    Q.   Fair enough.  So we have a minimum operating voltage

03:14  6  and we have a location where it's stored, correct?

03:14  7    A.   Yes.

03:14  8    Q.   Now, you would agree that if Intel's products do not

03:14  9  store a minimum operating voltage, they do not infringe

03:14  10  Claim 1, correct?

03:14  11    A.   Yes.

03:14  12    Q.   You would agree that if Intel's products do not have

03:14  13  a value representative of the memory's minimum operating

03:14  14  voltage, they do not infringe Claim 9, correct?

03:14  15    A.   You said "if"?  I'm sorry.

03:14  16    Q.   If Intel's products do not have a value

03:14  17  representative of the memory's minimum operating voltage, they

03:14  18  do not infringe Claim 9, correct?

03:14  19    A.   Correct.

03:14  20    Q.   All right.  Now, you have focused on something called

03:15  21  the C6 SRAM in Intel's products, correct?

03:15  22    A.   Yes.

03:15  23    Q.   You say that's the memory -- that is the memory for

03:15  24  your infringement analysis, correct?

03:15  25    A.   Yes.

03:15   1        Q.   Now, so the jury understands, that's not the only

03:15   2   memory in these complicated microprocessors, is it?

03:15   3        A.   No.

03:15   4        Q.   There are many, many, many memories, correct?

03:15   5        A.   Yes.

03:15   6        Q.   And you have picked one, the C6 SRAM, to be the focus

03:15   7   of your opinion, correct?

03:15   8        A.   Yes.

03:15   9        MR. LEE:   And, Your Honor, we now will move to the

03:15  10   confidential record.

03:15  11        THE COURT:   Okay.   We'll seal the courtroom.   If you are

03:15  12   not under the protective order, you need to excuse yourself,

03:15  13   and we'll turn off the telephonic feed.

03:15  14        (Sealed proceedings.)

03:31  15   BY MR. LEE:

03:31  16        Q.   All right.   Dr. Conte, switching gears to the '759

03:31  17   patent, do you see it on the screen?

03:31  18        A.   I do.

03:31  19        Q.   And again, just to level-set us, application filed

03:32  20   June 29, 2005, correct?

03:32  21        A.   That's correct.

03:32  22        Q.   About 15 years ago, correct?

03:32  23        A.   15 and a half, I guess.

03:32  24        Q.   Yeah.   Fair enough.   Now, when you talked about the

03:32  25   '759, you mentioned the Apple iPhone.   The Apple iPhone wasn't

03:32  1    even on the market in 2005, was it?

03:32  2        A.   iPods were, but not the iPhone.

03:32  3        Q.   Right.  And you weren't suggesting that the '759

03:32  4    patent was ever used in the iPhone, were you?

03:32  5        A.   No.  I wasn't.

03:32  6        Q.   Right.  As far as you know, it never was, correct?

03:32  7        A.   I haven't determined one way or the other.

03:32  8        Q.   Okay.  Now, as you said, there was a discussion of

03:32  9    MP3 players in the patent itself, correct?

03:32  10       A.   Yes.

03:32  11       Q.   And that's in the background of the invention,

03:32  12   correct?

03:32  13       A.   Yes.  That's true.

03:32  14       Q.   And that's where the inventor was describing the

03:32  15   problem that he was trying to address, correct?

03:33  16       A.   In that section, yes.

03:33  17       Q.   And it's discussing the concept of clock frequency in

03:33  18   that context, correct?

03:33  19       A.   In the context of?  I'm sorry, sir.

03:33  20       Q.   I'll restate the question.  It was confusing.

03:33  21   He was discussing MP3 players, correct?

03:33  22       A.   In the background section, correct.

03:33  23       Q.   Yes.  And in the background section he was discussing

03:33  24   the concept of clock frequency for MP3 players, correct?

03:33  25       A.   Hang on.  I thought he was generally discussing clock

03:33  1    frequency for a computer system, sir.

03:33  2        Q.   Well, take a look at the background section, and

03:33  3    we'll bring it up.  I'll draw your attention to Line 16 to

03:33  4    Line 19, "One way to increase the performance of the MP3 player

03:34  5    and provide quicker access to stored files is to increase the

03:34  6    clock" -- "frequency of the clock used in the device.  However,

03:34  7    as the clock frequency increases to deliver more performance,

03:34  8    the power consumption of the MP3 player also increases."

03:34  9        A.   That's what it says.

03:34  10       Q.   Okay.  Now, I want to talk to you a little bit about

03:34  11   where you ended your testimony, which was on the value of the

03:34  12   '759 patent, again, where you discussed Dr. Annavaram's

03:34  13   results, correct?

03:34  14       A.   Yes.

03:34  15       Q.   Now, the patent itself, its title is "System and

03:34  16   Method of Managing Clock Speed in an Electronic Device."  Do I

03:34  17   have that right?

03:34  18       A.   Yes.

03:34  19       Q.   Now, many of the components that are described in the

03:34  20   patent were actually known well before this time, correct?

03:34  21       A.   Yes.

03:34  22       Q.   And I want to go through some of the different things

03:34  23   that you described to the members of the jury just to be sure

03:34  24   that we know that they had been invented by someone else

03:35  25   before.

03:35  1       Master devices were known before, correct?

03:35  2       A.   Yes.

03:35  3       Q.   Buses were known before, correct?

03:35  4       A.   Yes.

03:35  5       Q.   Clocks were known before, correct?

03:35  6       MR. HEINRICH:  Objection.

03:35  7  BY THE WITNESS:

03:35  8       A.   Yes.

03:35  9       MR. HEINRICH:  They don't have an obviousness defense.

03:35  10  They only have an anticipation defense.  So this is -- there's

03:35  11  a MIL on this, and it's 403.

03:35  12       MR. LEE:  It's not, Your Honor.  This goes directly to the

03:35  13  value of the patent, and he gave testimony on the value of the

03:35  14  patent.  And we asked Your Honor for clarification on the MIL,

03:35  15  and Your Honor said if it goes to damages, which is what he was

03:35  16  testifying about, we could ask about the comparative value of

03:35  17  the patent.

03:35  18       THE COURT:  Counsel?

03:35  19       MR. HEINRICH:  So there's nothing about this question that

03:35  20  has any context relating to damages.

03:35  21       THE COURT:  Okay.  Could you re-ask the question?

03:35  22       MR. LEE:  Sure.

03:35  23  BY MR. LEE:

03:35  24       Q.   The answer was:  Clock frequency was known?

03:35  25       A.   Yes.

03:35  1      Q.   Clock controllers were known, correct?

03:36  2      MR. HEINRICH:  Objection.  There's no context for damages.

03:36  3  This is covered by the ruling on MIL 6.7.

03:36  4      MR. LEE:  Your Honor, it's not.  In order to determine the

03:36  5  value of an invention, you have to compare the value to what

03:36  6  existed before.  That's all I've done.

03:36  7      THE COURT:  I understand that.  I think -- I feel like

03:36  8  we've gone over this before, though --

03:36  9      MR. LEE:  Yeah.

03:36  10     THE COURT:  -- with all these same questions of what was

03:36  11  known before.

03:36  12     MR. LEE:  It was for the '373 patent, Your Honor.

03:36  13     THE COURT:  I don't think any of the items -- I think if

03:36  14  they were well known for the one patent, I think they'll be

03:36  15  equally well-known for this one.

03:36  16     MR. LEE:  Your Honor, that is -- as the predicate, we'll

03:36  17  take it.

03:36  18  BY MR. LEE:

03:36  19     Q.   So the invention of the '759 patent was how these

03:36  20  components were combined, correct?

03:36  21     A.   The claims speak for themselves.  So yes.  There is

03:36  22  an apparatus claim, and I believe that's a combination of

03:37  23  elements.  So yes.

03:37  24     Q.   Okay.  Now, as you told us, you reviewed the

03:37  25  prosecution history of the '759 patent, correct?

03:37  1        A.   I have.

03:37  2        Q.   Now, the prosecution -- well, let's do it this way.

03:37  3        During the prosecution of the '759 patent, the Patent

03:37  4   Office actually rejected the proposed claims multiple times,

03:37  5   correct?

03:37  6        A.   Yes.  That's true.

03:37  7        Q.   About eight different times, correct?

03:37  8        A.   Sure.  That sounds typical.

03:37  9        Q.   And what happened was the patent applicant actually

03:37 10   cancelled the claims it was asking the Patent Office for.  It

03:37 11   said:  We're not going to ask for those.  We understand there's

03:37 12   a problem.  And they submitted new claims during prosecution,

03:37 13   correct?

03:37 14        A.   That's typical and allowed, so correct.

03:37 15        Q.   That's typical and that's what they did?

03:37 16        A.   Yes.

03:37 17        Q.   And they actually did it multiple times, correct?

03:37 18        A.   Again, that's typical.

03:37 19        Q.   Did they do it multiple times or not?

03:38 20        A.   I believe at least twice.

03:38 21        Q.   So let's look at what they did and what they said to

03:38 22   the Patent Office to get their patent.  The prosecution history

03:38 23   is in Volume 3, Dr. Conte, of -- at Tab 24.

03:38 24        A.   Okay.

03:38 25        Q.   Do you have that before you?  And I'm going to turn

03:38  1    you to Page 429, and we'll put it on the screen.

03:38  2         A.   Give me a moment to get there.

03:38  3         Q.   Sure.  Just tell me when you're there.

03:38  4         A.   Okay.  Thanks.

03:38  5         29, you said, sir?

03:39  6         Q.   So Volume 3, Tab 24, at Page 429.

03:39  7         A.   Okay.

03:39  8         Q.   And this is Exhibit 249, lots of numbers flying

03:39  9    around.  But I'll put it on the screen as well, if that's

03:39  10   easier.

03:39  11        A.   I have it.

03:39  12        Q.   All right.  Now, you see the amendments that were

03:39  13   made by the applicant in an effort to get this patent, correct?

03:39  14        A.   Yes.

03:39  15        Q.   And the -- so everybody understands, the underlining

03:39  16   are things that were added to the claims in order to get them

03:39  17   allowed?

03:39  18        MR. HEINRICH:  Objection.  This is now getting into claim

03:39  19   construction issues.  There's a MIL on this, 5.3.  It's not

03:39  20   appropriate questioning to bring the prosecution history in

03:39  21   this way.

03:39  22        MR. LEE:  Absolutely incorrect, Your Honor.  Because there

03:40  23   was a motion for summary judgment on prosecution history

03:40  24   estoppel.  Your Honor denied it because there were questions of

03:40  25   fact.

03:40   1          THE COURT:  I agree.

03:40   2          MR. LEE:  We're now just trying to question the fact on

03:40   3   that issue.

03:40   4          THE COURT:  I agree.  I'm overruling the objection.

03:40   5   BY MR. LEE:

03:40   6      Q.   So, Dr. Conte, do you see the underlining on proposed

03:40   7   Claim 44?

03:40   8      A.   Yes, I do.

03:40   9      Q.   Now, the Patent Office issued these claims only after

03:40   10  the patent applicant made these very specific additions,

03:40   11  correct?

03:40   12     A.   Yes.

03:40   13     Q.   And it was after these specific additions were made

03:40   14  that the claims were allowed, correct?

03:40   15     A.   I believe this turned into Claim 14; is that correct?

03:40   16     Q.   It did.  It turned into a claim in the patent as

03:40   17  issued, correct?

03:41   18     A.   I need to check the language, but if you're

03:41   19  presenting that this turned into a claim in the final patent in

03:41   20  this form, then yes.

03:41   21     Q.   All right.  And we can agree that the limitations

03:41   22  that were added are the ones underlined, both of which begin

03:41   23  "provide the clock frequency," two separate paragraphs,

03:41   24  correct?

03:41   25     A.   Yes.

03:41  1        Q.   All right.  Now, before we get to the claim

03:41  2   specifically, the products you've identified are Intel Skylake

03:41  3   and other Lake microprocessors, correct?

03:41  4        A.   That's correct.

03:41  5        Q.   And you know that those microprocessors contain

03:41  6   literally billions of transistors, correct?

03:41  7        A.   That's correct.

03:41  8        Q.   Now, it was -- you talked about Speed Shift today.

03:41  9   Do you remember that?

03:41  10       A.   Yes.

03:41  11       Q.   And you talked about people praising the benefits of

03:41  12  Speed Shift.  Do you remember that?

03:42  13       A.   Yes.

03:42  14       Q.   And you talked about the performance benefits that

03:42  15  could come from Speed Shift, correct?

03:42  16       A.   That's correct.

03:42  17       Q.   You haven't seen anything like that for the work on

03:42  18  the '759 patent done at SigmaTel, Freescale or NXP, have you?

03:42  19       A.   I didn't search for it.  So no.  I do not -- I did

03:42  20  not.

03:42  21       Q.   Okay.  Now, Intel was not praising the '759 patent.

03:42  22  Intel was praising its Speed Shift feature itself, correct?

03:42  23       A.   I'm not sure that's a precise question.  I'm sorry.

03:42  24       Q.   All right.  The documents that you -- the marketing

03:42  25  documents and the advertising documents that you referred the

03:42  1   jury to today, do you have those in mind?

03:42  2       A.   Yes.

03:42  3       Q.   Those were praising Speed Shift and its benefits,

03:42  4   correct?

03:42  5       A.   Yes.

03:42  6       Q.   The work that resulted from Intel's engineers,

03:43  7   correct?

03:43  8       A.   Yes.

03:43  9       Q.   Now, you used Speed Shift/HWP and a hardware P-state

03:43  10  to mean basically the same thing, correct?

03:43  11      A.   I would put it slightly differently.

03:43  12      Q.   Well, if I represent to you that you said in your

03:43  13  deposition that you used Speed Shift/HWP and hardware P-state

03:43  14  to mean the same thing, and you said generally, yes, would that

03:43  15  be accurate?

03:43  16      A.   I said generally.

03:43  17      Q.   Okay.  Now, I want to ask you about tape-in dates

03:43  18  again, because at some point in time we're going to come back

03:43  19  and give the jury the whole chronology of what occurred here.

03:43  20  Intel's first tape-in date for Skylake was April 2013, correct?

03:43  21      A.   I believe so.  Yes.

03:43  22      Q.   And that was eight years after the application was

03:43  23  filed for the '759 patent, correct?

03:43  24      A.   Yes.

03:43  25      Q.   Skylake didn't launch till 2015, correct?

03:43  1        A.    That's correct.  September 1st, I think.

03:44  2        Q.    Almost a decade after the filing of the 2005 --

03:44  3   almost a decade after 2005.  Do you remember that?

03:44  4        A.    I think it's slightly more than a decade.  But yes.

03:44  5        Q.    And you were here this morning when Dr. -- when

03:44  6   Mr. Bearden talked about just how fast things move in the

03:44  7   semiconductor field of technology, were you not?

03:44  8        A.    Yes.  Some things do move fast in the semiconductor

03:44  9   technology field.

03:44  10       Q.    So let's put Claim 14 on the screen, if we could.

03:44  11       A.    Are we done with this, or do you want me to continue

03:44  12  to hold it?

03:44  13       Q.    No.  We may come back to it, but for right now I'm

03:44  14  going to look at the patent.

03:44  15       A.    Okay.

03:44  16       Q.    Okay.

03:44  17       A.    I'm going to put it on the floor then.

03:44  18       Q.    Sure.  Let me know when you're ready to go.

03:44  19       A.    I'm ready.

03:44  20       Q.    Okay.  I'm going to put Claim 14 on the screen, and

03:44  21  that's one of the claims you say is infringed, correct?

03:44  22       A.    That's correct.

03:45  23       Q.    Now, I want to focus you on the first requirement, a

03:45  24  request, in the claims.  Can we do that?

03:45  25       A.    Yes.

03:45  1       Q.   All right.  And I'm going to bring up DDX-3.12.  Do

03:45  2  you have that before you?

03:45  3       A.   Are you going to show it on the screen, sir?

03:45  4       Q.   Yes.  Claim 14 is on the screen with portions

03:45  5  highlighted in light red?

03:45  6       A.   I thought you said you were going to show me another

03:45  7  PTX.  I'm sorry.

03:45  8       Q.   Okay.  I'm sorry.  We'll get back on the same page.

03:45  9  We're in the '759 patent, correct?

03:45  10      A.   Yes.

03:45  11      Q.   We're looking at Claim 14, correct?

03:45  12      A.   Yes.

03:45  13      Q.   You have on the screen Claim 14 with two portions

03:45  14 highlighted, correct?

03:45  15      A.   Yes.

03:45  16      Q.   And the claim requires that the first master device

03:45  17 configured to provide a request to change a clock frequency of

03:46  18 a high-speed clock, correct?

03:46  19      A.   Yes.

03:46  20      Q.   Now, Claim 14 also requires, a little further down,

03:46  21 that the clock controller receive the request provided by the

03:46  22 first master device, correct?

03:46  23      A.   Yes.

03:46  24      Q.   All right.  Now, let's bring up Claim 18.  '759

03:46  25 patent still, Claim 18.  Are you with me?

03:46    1        A.    Yes.

03:46    2        Q.    And I've put on the screen Claim 18 and highlighted a

03:46    3   portion that refers twice to requests.  Do you see those?

03:46    4        A.    Yes.

03:46    5        Q.    Twice, correct?

03:46    6        A.    Twice.

03:46    7        Q.    So all of the asserted claims -- we've now looked at

03:46    8   the two independent claims, all of them require a request,

03:46    9   correct?

03:46   10        A.    Yes.

03:46   11        Q.    Now, let's turn to your opinion that Intel's products

03:46   12   actually send a request.  According to you, in the Lake

03:46   13   products which you say is the first master device, it's one of

03:47   14   the cores of the product, correct?

03:47   15        A.    That's correct.

03:47   16        Q.    And it's your opinion that in Intel's Lake products,

03:47   17   a change in what you told the ladies and gentlemen of the jury,

03:47   18   C0 residency data is the required request from the claims,

03:47   19   correct?

03:47   20        A.    In the DOE argument, yes.

03:47   21        Q.    But not in your literal infringement argument,

03:47   22   correct?

03:47   23        A.    Not with what I presented today, no.

03:47   24        Q.    Okay.  But actually what you presented today is

03:47   25   different than what you said in your deposition, isn't it?

03:47   1      A.    That's --

03:47   2      THE COURT:  If it is, why don't you show him?

03:47   3      MR. LEE:  Yeah.  Let's turn if we could to Volume 1, Page

03:47   4  91, Lines 12 to 16.

03:47   5      MR. HEINRICH:  Objection to displaying this on the screen.

03:48   6      THE COURT:  Displaying his deposition?

03:48   7      MR. HEINRICH:  Deposition testimony.

03:48   8      THE COURT:  Why?

03:48   9      MR. HEINRICH:  This is not in evidence and this is

03:48   10  improper impeachment.

03:48   11      THE COURT:  I don't know any other way to do it.  So you

03:48   12  can certainly show him.

03:48   13  BY MR. LEE:

03:48   14      Q.    Question:  So is the C0 residency data the request?

03:48   15      Answer:  Not precisely.

03:48   16      Question:  How would you put it more precisely?

03:48   17      Answer:  The C0 residency data, when it changes from the

03:48   18  prior C0 residency data, is the request.

03:48   19      Have I read that correctly?

03:48   20      A.    You have.

03:48   21      Q.    Now, so the jurors understand, after your deposition

03:48   22  was finished, you got a written transcript of your deposition,

03:48   23  correct?

03:48   24      A.    Yes.

03:48   25      Q.    You had a chance to read it and make corrections,

03:48  1  correct?

03:48  2       A.   That's correct.

03:48  3       Q.   You never changed that answer, did you?

03:48  4       A.   No.  And I stand by my answer.

03:49  5       Q.   But that's not what you identified as the request

03:49  6  this morning -- this afternoon, correct?

03:49  7       A.   That's incorrect.

03:49  8       Q.   All right.  Now, C0 residency information is counted

03:49  9  in C0 residency counters, correct?

03:49  10      A.   It's "C0," by the way, sir.

03:49  11      Q.   C0.  I'm sorry.  C0 residency information is counted

03:49  12  in C0 residency counters, correct?

03:49  13      A.   Yes.  There are counters inside the PCU called C0

03:49  14  residency.

03:49  15      Q.   And those counters inside the PCU send that data

03:49  16  along periodically, correct?

03:49  17      A.   Those counters are sampled periodically.  One can

03:49  18  think of it as being sent.

03:49  19      Q.   Well, you know, to be precise, let's look at what you

03:49  20  said in your deposition again.  Turn, if you would, to Volume

03:49  21  1, Tab 2, your September 28th deposition at Page 161, Lines 12

03:50  22  to 25.

03:50  23      MR. HEINRICH:  Can I just take a look before it's

03:50  24  published?

03:50  25      THE COURT:  Yes.

03:50  1        MR. HEINRICH:  If you could give us the cite again,

03:50  2   please.

03:50  3        MR. LEE:  Yes.  It the September 28th deposition, Page

03:50  4   161 --

03:50  5        (Simultaneous conversation.)

03:50  6        MR. LEE:  Line 21 to 25.

03:50  7        (Off-the-record discussion.)

03:50  8        (Conference between counsel.)

03:50  9   BY THE WITNESS:

03:50  10       A.  I'll ask what volume is my deposition in, sir?

03:50  11  BY MR. LEE:

03:50  12       Q.  I'm sorry.  Volume 1, Tab 2.

03:50  13       A.  Okay.  Thank you.

03:50  14       And hopefully without irritating you too much, could you

03:50  15  say that one more time?

03:50  16       Q.  It wouldn't irritate me at all if we all got

03:50  17  ourselves on the same page.

03:50  18       A.  Exactly.

03:50  19       Q.  Volume 1, Tab 2 which is your September 28th

03:51  20  deposition, correct?

03:51  21       A.  Yes.

03:51  22       Q.  Page 161.  Are you with me?

03:51  23       A.  Well, I will be.  Hang on.  Okay.

03:51  24       Q.  Do you have it?

03:51  25       A.  Yes.

03:51  1      Q.   Now, this is the testimony you gave in your

03:51  2  deposition, correct?

03:51  3      A.   Yes.

03:51  4      Q.   So Question --

03:51  5      MR. LEE:  And there's a long question, but let's scroll up

03:51  6  so we can see the whole thing.

03:51  7  BY MR. LEE:

03:51  8      Q.   And I just -- I want to make sure I understand your

03:51  9  understanding is of how this is sent.  And I will confess I am

03:51 10  tripped up by the use of "continuously" in one place and

03:51 11  periodically in another.  So I guess my -- my question is, when

03:51 12  is C0 residency counter information sent?

03:52 13      Answer:  All right.  So let me see if I can clear this up.

03:52 14  The C0 residency counter information is pushed to the PCU

03:52 15  periodically, the cores, the request, when that C0 residency

03:52 16  information changes.  So that's in that periodic sense, some of

03:52 17  those are requests.  So I'm referring to this as it happens so

03:52 18  frequently as continuously.  By continuous, I'm talking about

03:52 19  this -- this nature that it occurs very rapidly.

03:52 20      Do you see that?

03:52 21      A.   I do.

03:52 22      Q.   And you described the counter information being

03:52 23  pushed out by the PCU, correct?

03:52 24      A.   I do.

03:52 25      Q.   And you described it as occurring periodically,

03:52   1   correct?

03:52   2        A.   I do.

03:52   3        Q.   Isn't it true that you also testified in that same

03:53   4   deposition that the periodic reading of information is not a

03:53   5   request?

03:53   6        A.   Yes.

03:53   7        Q.   All right.  So you described the accused feature as

03:53   8   periodic, correct?

03:53   9        A.   Yes.

03:53  10        Q.   And you said on the very next page that a periodic

03:53  11   push-out of information is not a request, correct?

03:53  12        A.   That's correct.

03:53  13        Q.   Now, let me go to a different topic but within the

03:53  14   '759 patent.  You discussed this being a hardware solution and

03:53  15   it being unconventional because --

03:53  16        A.   Can I put this folder down?  I'm sorry.

03:53  17        Q.   No.  That's okay.  You can put that aside and I'll

03:53  18   bring you to it.

03:53  19        A.   Okay.

03:53  20        Q.   Okay.  I'm going back to your direct testimony where

03:53  21   you were describing why this was -- this invention worked

03:53  22   against the conventional wisdom, okay?

03:53  23        A.   Yes.

03:53  24        Q.   And I think one of the things you said is it was

03:54  25   working against the conventional wisdom because it was

03:54   1   hardware-based.  It was building more hardware in, correct?

03:54   2       A.   That's correct.

03:54   3       Q.   Now, let's -- and I think you said that -- if I've

03:54   4   written it down right -- the invention was autonomous,

03:54   5   self-control hardware?

03:54   6       A.   Okay.  That sounds like something I would say.

03:54   7       Q.   Okay.  So let's bring up Claim 14 again, because it's

03:54   8   the words of the claim that are most critical, correct?

03:54   9       A.   Correct.

03:54   10      Q.   Now, the word "autonomous" is not in the claims,

03:54   11  correct?

03:54   12      A.   The word is not.

03:54   13      Q.   The word "self-control" is not in the claims,

03:54   14  correct?

03:54   15      A.   The specific words are not.

03:54   16      Q.   Now, when you were asked for the basis for your

03:54   17  conclusion that the claims require an autonomous system, you

03:55   18  said it was based on the specification, correct?

03:55   19      A.   I might have.

03:55   20      Q.   I'll represent to you that that's what you said, but

03:55   21  I'll take you to the page if you'd like.

03:55   22      A.   That's fine.

03:55   23      Q.   Okay.  Now, the word "autonomous" actually doesn't

03:55   24  appear anywhere in the patent at all, correct?

03:55   25      A.   The word does not.

03:55  1        Q.   The word "self-control" doesn't appear in the claim,

03:55  2   correct?

03:55  3        A.   It does not.

03:55  4        Q.   The word "self-control" actually doesn't appear

03:55  5   anywhere in the patent, correct?

03:55  6        A.   Self-control does not -- the words do not appear in

03:55  7   the patent.

03:55  8        Q.   Now, you've also suggested that the system

03:55  9   invention --

03:55  10       A.   Can you stand closer to the mic?

03:55  11       Q.   Sure.  You also suggested that the invention was

03:55  12   something that was operating entirely through hardware,

03:55  13   correct?

03:55  14       A.   It's using a hardware controller, so yes.

03:55  15       Q.   Right.  But the specification actually -- which you

03:56  16   talked about today -- says that the system can be implemented

03:56  17   in hardware, firmware or software, does it not?

03:56  18       A.   The specification might say that, yes.

03:56  19       Q.   Well, let's be sure.  This is important to look at.

03:56  20   Could we have, from the patent, which is --

03:56  21       A.   I know the lines you're referring to.

03:56  22       Q.   Pardon?

03:56  23       A.   Pull them up, but I know the lines you're referring

03:56  24   to.

03:56  25       Q.   And I think we've stated them accurately, have I?

03:56   1        A.    You have.

03:56   2        Q.    Now, let me bring up one of the demonstratives that

03:56   3   you used today.  It's PDX-4.171.  You have that before you?

03:56   4        A.    I do.

03:56   5        Q.    And you provided us your opinion that in Intel's

03:56   6   products Core_Active is what corresponds to the request,

03:57   7   correct?

03:57   8        A.    I did.

03:57   9        Q.    That's different than what you said in your

03:57  10   deposition, was it not?

03:57  11        A.    I --

03:57  12        THE COURT:  If you're going to ask him that, you need to

03:57  13   show him what he said in his deposition.

03:57  14        MR. LEE:  I thought I had just a few minutes ago, Your

03:57  15   Honor.

03:57  16        THE COURT:  Well, still I think it'd be fair for him to

03:57  17   see what --

03:57  18   BY MR. LEE:

03:57  19        Q.    Do you recall what you said about this issue in your

03:57  20   deposition?

03:57  21        THE COURT:  Well, I don't like questions that say:  Do you

03:57  22   recall, because the jury doesn't know what's in the deposition.

03:57  23        MR. LEE:  Sure.

03:57  24        THE COURT:  So ask him the questions, and if something

03:57  25   different, then you can show him the deposition and remind him

| | | |
|---|---|---|
| 03:57 | 1 | or see what he says. |
| 03:57 | 2 | MR. LEE:  I'll bring it up again.  Could I have -- |
| 03:57 | 3 | Give me a second, Your Honor. |
| 03:58 | 4 | Yes.  Could I have what I showed you before from your |
| 03:58 | 5 | deposition?  It's at Volume 1, Tab 2, at Page 91, Lines 12 to |
| 03:58 | 6 | 16. |
| 03:58 | 7 | MR. HEINRICH:  Could I have just a minute to take a look |
| 03:58 | 8 | before it's published? |
| 03:58 | 9 | MR. LEE:  Sure.  Could I have just a second, Your Honor? |
| 03:58 | 10 | THE COURT:  Of course.  And, Mr. Lee, don't wait for me. |
| 03:58 | 11 | You're welcome to start as soon as the counsel -- |
| 03:58 | 12 | MR. LEE:  Yeah.  I'm just waiting for Mr. Heinrich to say |
| 03:58 | 13 | he's taken a look at it. |
| 03:58 | 14 | BY THE WITNESS: |
| 03:58 | 15 | A.  I'm sorry.  What page, sir? |
| 03:58 | 16 | BY MR. LEE: |
| 03:58 | 17 | Q.  Volume 1, Tab 2, Page 91. |
| 03:59 | 18 | A.  Okay. |
| 03:59 | 19 | Q.  And the question begins at 12 and there are two |
| 03:59 | 20 | questions. |
| 03:59 | 21 | MR. LEE:  Have you had a chance to look at it? |
| 03:59 | 22 | MR. HEINRICH:  Yes. |
| 03:59 | 23 | MR. LEE:  Okay. |
| 03:59 | 24 | BY MR. LEE: |
| 03:59 | 25 | Q.  So the question at 12 is:  "So is the C0 residency |

03:59   1    data the request?

03:59   2         "Answer:  Not precisely.

03:59   3         "How would you put it more precisely?

03:59   4         "Answer:  The C0 residency data, when it changes from the

03:59   5    prior C0 residency data, is the request."

03:59   6         Do you see that?

03:59   7         A.   Yes.

03:59   8         Q.   That's what I was referring to.  Do you recall we

03:59   9    looked at this just a few minutes ago?

03:59   10        A.   Yes.

03:59   11        Q.   And you told me that after your deposition you did

03:59   12   not change this answer, correct?

03:59   13        A.   That's correct.

03:59   14        Q.   Now, could we go back to PDX-4.171?

03:59   15        And the title is "Core_Active is a request to change

04:00   16   speed," correct?

04:00   17        A.   Yes.

04:00   18        Q.   All right.  And is it your testimony that those are

04:00   19   the same things, a change in C0 residency data is the same as

04:00   20   Core_Active?

04:00   21        A.   No.

04:00   22        Q.   Okay.  Fair enough.

04:00   23        Now, I just want to cover one more thing with you.

04:00   24        MR. LEE:  And, Your Honor, this would be on the

04:00   25   confidential record.

| 04:00 | 1 | THE COURT:  Okay.  Then we'll seal the -- I don't believe |

04:00  1    THE COURT:  Okay.  Then we'll seal the -- I don't believe

04:00  2    there's anyone in the courtroom that is not supposed to be.

04:00  3    Therefore, we'll just terminate the -- we'll suspend the

04:00  4    telephonic coverage.

04:00  5        MR. LEE:  Okay.

04:00  6        (Sealed proceedings.)

04:07  7        MR. LEE:  Thank you, Your Honor.  Nothing further.

04:07  8        THE COURT:  Could I have counsel up at the bench, just

04:07  9    Mr. Lee and Mr. Chu, please?

04:07  10       (Bench conference.)

04:07  11       THE COURT:  I'm just curious, when you're finished with

04:07  12   this gentleman, who would your next witness be?

04:07  13       MR. CHU:  It'll probably be Murali Annavaram, a professor

04:07  14   at USC.  And I'm not handling him, but I don't think it'll be

04:08  15   really short, if you're thinking about when we would finish for

04:08  16   the day.  I have the impression that there'll be some

04:08  17   meaningful redirect, although --

04:08  18       (Off-the-record discussion.)

04:08  19       THE COURT:  I'm allotting the next hour to finishing up

04:08  20   this witness, and I won't start another witness.

04:08  21       Well, let me ask you this:  Is the next person an expert?

04:08  22       MR. CHU:  Yes.

04:08  23       THE COURT:  Why don't we do this, with your permission,

04:08  24   let's finish up with him and then you put your expert on and

04:08  25   just do whatever you want to do.  If you're going to do

04:08  1    something to prove him up as an expert.

04:08  2         MR. CHU:  Oh, okay.

04:08  3         THE COURT:  And we'll get that knocked out, and then we'll

04:08  4    break.  And that way -- nothing substantive, just we'll use a

04:08  5    little more time, just to get out of the way and save our time

04:08  6    tomorrow.

04:08  7         MR. CHU:  Okay.  And then if I can just have one minute to

04:08  8    contact my colleague who's handling it, just to let him know

04:09  9    what the game plan is.  Just one minute.

04:09  10        THE COURT:  Absolutely.

04:09  11        MR. LEE:  Thank you, Your Honor.

04:09  12        (Bench conference concludes.)

04:09  13        THE COURT:  Mr. Chu, are we good?

04:09  14        MR. CHU:  We're good.

04:09  15        THE COURT:  Thank you, sir.  You may proceed with your

04:09  16   redirect.

04:09  17        Are you doing okay, Doctor?

04:09  18        THE WITNESS:  I'm hanging in there.  Thank you, sir.

04:09  19        THE COURT:  Doctor, if you wind up needing a short break,

04:10  20   you let me know, okay?

04:10  21        THE WITNESS:  Yeah.  If you don't mind.

04:10  22        THE COURT:  Would you like just a five- or ten-minute

04:10  23   break?

04:10  24        THE WITNESS:  That'd be great.

04:10  25        THE COURT:  Let's do that.  Just you've been sitting

04:10  1  there -- we've all been sitting here, but you've been sitting

04:10  2  here in a different situation than the rest of us.

04:10  3      So we're going to take just -- we're going to take a very

04:10  4  quick break.  Y'all will run back, don't discuss the case.  And

04:10  5  in just a couple of minutes, we'll come back.  And we'll give

04:10  6  everyone a chance just to get out of this room, if nothing

04:10  7  else.  That's probably a good idea anyway.

04:10  8      THE BAILIFF:  All rise.

04:10  9      (Jury exited the courtroom at 4:10.)

04:20  10      (Recess taken from 4:10 to 4:20.)

04:20  11      THE BAILIFF:  All rise.

04:20  12      THE COURT:  Please remain standing.

04:20  13      (The jury entered the courtroom at 4:20.)

04:21  14      THE COURT:  Thank you.  You may be seated.

04:21  15      Counsel, you may proceed with redirect.

04:21  16                  REDIRECT EXAMINATION

04:21  17  BY MR. HEINRICH:

04:21  18      Q.   Good afternoon, again, Professor Conte.

04:21  19      A.   Good afternoon.

04:21  20      Q.   Just have a few questions to follow up on some --

04:21  21      THE COURT:  Counsel, is this -- I apologize.  Is this

04:21  22  sealed or unsealed?

04:21  23      MR. HEINRICH:  I don't think this -- I don't think I'll

04:21  24  get into anything that needs to be sealed.

04:21  25      THE COURT:  Very good.  This will be unsealed and the

04:21  1    broadcast will go out.  Thank you, sir.

04:21  2    BY MR. HEINRICH:

04:21  3        Q.   So just a few follow-up questions for you.  I'll

04:21  4    start at the end and then I'll go back to Mr. Lee's beginning.

04:21  5        So at the end he asked you a question about knowledge of

04:21  6    the patents by Intel.  Does Intel need to be aware of the

04:21  7    patents or know the patents or copy the patents to infringe the

04:21  8    claims that you led us through?

04:21  9        A.   No.  My understanding as an inventor is that it's

04:21 10    like property.  If somebody trespasses on my property, they're

04:21 11    still trespassing even if they don't realize it.

04:22 12        Q.   Okay.  Now, Mr. Lee started by asking you a lot of

04:22 13    questions about whether you did an analysis of whether NXP or

04:22 14    Freescale or SigmaTel practiced the claims of these two

04:22 15    patents.  Do you recall that?

04:22 16        A.   I do.

04:22 17        Q.   Now, does it matter one bit to your infringement

04:22 18    analysis of Intel's products whether NXP practiced these

04:22 19    patents?

04:22 20        A.   No, it doesn't.

04:22 21        Q.   Do you have to establish that Freescale practiced the

04:22 22    claims in some of its products for Intel to be liable for

04:22 23    infringement?

04:22 24        A.   No.

04:22 25        Q.   And how about SigmaTel?

04:22   1       A.   No.

04:22   2       Q.   Is your analysis of Intel's infringement related in

04:22   3   any way to having to do an analysis, whether these patents were

04:22   4   used by NXP or Freescale or SigmaTel?

04:22   5       A.   No.

04:22   6       Q.   Mr. Lee asked you some questions about whether

04:23   7   SigmaTel or NXP or Freescale obtained value from using these

04:23   8   patents.  Do you recall that?

04:23   9       A.   Yes.

04:23  10       Q.   Does the value that Intel has gotten from using these

04:23  11   patents depend on testing any SigmaTel or NXP or Freescale

04:23  12   products?

04:23  13       A.   No.  Of course not.

04:23  14       Q.   And is -- are any of the issues you addressed here on

04:23  15   Intel's infringement or the value to Intel dependent on the

04:23  16   tasks that Mr. Lee was asking you about regarding NXP or

04:23  17   SigmaTel or Freescale products?

04:23  18       A.   No.

04:23  19       Q.   Okay.  Mr. Lee asked you about whether you looked at

04:23  20   engineering documents from Freescale or SigmaTel or prototypes.

04:23  21   Do you recall that?

04:23  22       A.   Yes.

04:23  23       Q.   Did you need to, or would it be proper to compare

04:24  24   those engineering prototypes or engineering documents to

04:24  25   Intel's product as part of your analysis?

04:24 1      A.   Absolutely not.

04:24 2      Q.   What do you need to compare to Intel's products for a

04:24 3  proper infringement analysis?

04:24 4      A.   The patent.

04:24 5      Q.   So was the patent what you needed on the Freescale

04:24 6  side or the SigmaTel side to determine whether Intel infringed

04:24 7  based on your review of Intel information?

04:24 8      A.   Correct.

04:24 9      Q.   Now, you were asked some other questions about NXP.

04:24 10 And is there any reason why NXP may not have decided to use the

04:24 11 '373 patent?

04:24 12     A.   Yes, there is.  So NXP produces chips that go into

04:24 13 planes and cars.  And in situations like that, mission-critical

04:24 14 situations, doing things like putting cores to sleep might risk

04:25 15 someone's life.  So you don't do that.  It's okay to spend a

04:25 16 little more power for safety.

04:25 17     Q.   Is that different from Intel's business model?

04:25 18     A.   Yes.

04:25 19     Q.   Okay.  Let's put up PTX-7 at Page 45.  And you were

04:25 20 asked some questions about the Patent Office purportedly

04:25 21 rejecting a claim of the '373 patent.  Do you recall that

04:25 22 question series?

04:25 23     A.   Yes, I do.

04:25 24     Q.   All right.  Now, let's highlight the top part here.

04:25 25 First, do you recognize this as one of those back-and-forth

483

04:25  1   between the Patent Office and the inventor?

04:25  2        A.   Yes.  I've seen this for my own patents, for example.

04:25  3        Q.   And first, is it uncommon to get an office action, in

04:26  4   other words, a communication from the Patent Office, that

04:26  5   issues a provisional rejection of claims?

04:26  6        A.   Not at all.  It's usually the first communication you

04:26  7   get from them.

04:26  8        Q.   So is this a final rejection or is this a non-final

04:26  9   rejection?

04:26  10       A.   It's a non-final rejection.

04:26  11       Q.   So did the Patent Office ultimately agree with

04:26  12  Freescale and the Freescale inventors that their claims were

04:26  13  novel and nonobvious?

04:26  14       A.   Yes, they did.

04:26  15       Q.   And is there even any dispute in this trial about the

04:26  16  validity of the claims of the '373 patent that you presented

04:26  17  today?

04:26  18       A.   No, there is not.

04:26  19       Q.   Now, you were asked some questions about the

04:26  20  RING_RETENTION_VOLTAGE in the Intel chips, correct?

04:27  21       A.   Yes.

04:27  22       Q.   And can you just remind us what you identified the

04:27  23  RING_RETENTION_VOLTAGE as, in terms of the claims of the '373

04:27  24  patent?

04:27  25       A.   It was the worst-case retention voltage for the C6

04:27  1    SRAM.

04:27  2        Q.   And the claims say that's the minimum operating

04:27  3    voltage?

04:27  4        A.   That's right.  The minimum operating voltage.

04:27  5        Q.   Now, Mr. Lee was asking you some questions, well, you

04:27  6    know, it's the RING_RETENTION_VOLTAGE for the entire ring

04:27  7    domain.  And he said, well, that includes the CBO, right?

04:27  8        A.   Yes.

04:27  9        Q.   Is the RING_RETENTION_VOLTAGE value the -- does that

04:27  10   have any application to the CBO?

04:27  11       A.   No.  The CBO doesn't have much memory at all in it.

04:27  12       Q.   And what does this value have to represent?  What

04:27  13   does retention mean?

04:27  14       A.   It's about memory.

04:27  15       Q.   And what about the ring?  Is that the ring retention

04:27  16   value for just the ring regardless of the memory?

04:27  17       A.   No.  Again, the ring doesn't have much memory at all.

04:27  18       Q.   And this is the value for the memory in the LLC and

04:28  19   the C6 SRAM?

04:28  20       A.   That's correct.

04:28  21       Q.   Now, is there any difference in the memory cells

04:28  22   between the LLC and the C6 SRAM?

04:28  23       A.   No.  They're the same memory cells.  And in fact they

04:28  24   also use the same error correction codes throughout.

04:28  25       Q.   All right.  So what's your opinion on how the

485

04:28  1    RING_RETENTION_VOLTAGE value applies to the C6 SRAM?

04:28  2         A.   My opinion is that it is the minimum operating

04:28  3    voltage of the C6 SRAM.

04:28  4         Q.   And is that what Intel itself says?

04:28  5         A.   Yes.

04:28  6         Q.   Now, you were also asked about how the

04:28  7    RING_RETENTION_VOLTAGE is used in the context of the mux.  And

04:28  8    I think Mr. Lee was asking you if it was the precise decision

04:29  9    point for the mux.  Can you explain broadly how it's used in

04:29  10   the power management system of which the mux is a part?

04:29  11        A.   Yes.  So as I said, it's used to lower the memory to

04:29  12   the minimum retention voltage in some sleep states such as C3

04:29  13   and C6.

04:29  14        Q.   And if we're in that sleep state where the voltage is

04:29  15   right at the RING_RETENTION_VOLTAGE, what does the mux do?

04:29  16        A.   The mux is still going to allow VCCI -- I'm sorry --

04:29  17   VCCR, our purple, to be supplied to the memory.

04:29  18        Q.   And if you're just under that RING_RETENTION_VOLTAGE

04:29  19   level because you're going to down into C7, what does the mux

04:29  20   do then?

04:29  21        A.   It has to switch or C6 SRAM would forget.

04:29  22        Q.   And is that exactly what the claim requires?

04:29  23        A.   Yes.

04:29  24        MR. HEINRICH:  Let's pull up the '759 patent.  Let's go to

04:29  25   the background section.

04:29  1  BY MR. HEINRICH:

04:30  2      Q.   You were asked some questions about the background

04:30  3  and the references to MP3 players.  Do you recall that?

04:30  4      A.   Yes.

04:30  5      MR. HEINRICH:  If you can just blow up that first

04:30  6  paragraph.

04:30  7  BY MR. HEINRICH:

04:30  8      Q.   And Mr. Lee asked you some questions about -- well,

04:30  9  about the passage that we see here that starts, "One way to

04:30  10  increase the performance of the MP3 player and provide quicker

04:30  11  access to stored files is to increase the clock frequency of

04:30  12  the clock used in the device.  However, as the clock frequency

04:30  13  increases to deliver more performance, the power consumption of

04:30  14  the MP3 player also increases."

04:30  15      Is that relationship between increased speed and increased

04:30  16  power consumption some unique property to MP3 players?

04:30  17      A.   No.  That's true of any computer system.

04:31  18      Q.   And does the method and the system that the '759

04:31  19  patent describes for balancing speed and power consumption, is

04:31  20  that limited to MP3 players?

04:31  21      A.   No.  It is not.

04:31  22      Q.   And do the claims require an MP3 player?

04:31  23      A.   They do not.

04:31  24      Q.   Now, Mr. Lee also asked you a question about a

04:31  25  statement in the specification of the patent that could be

04:31  1    hardware or software.  Do you recall that?

04:31  2        A.   Yes.

04:31  3        Q.   Now, do you compare the Intel products to the

04:31  4    specification or do you have to focus on the claims?

04:31  5        A.   The claims.

04:31  6        Q.   And you focused on, among others, Claim 14?

04:31  7        A.   Yes.

04:31  8        Q.   What kind of solution is claimed in Claim 14, a

04:31  9    hardware solution or software solution?

04:31  10       A.   It is a hardware solution.  It's an apparatus claim.

04:31  11       Q.   And what's the key part of the Henson invention as we

04:32  12   talked about for Claim 14?

04:32  13       A.   Programmable clock controller.

04:32  14       Q.   Okay.  So you were asked some questions about your

04:32  15   deposition testimony.  Do you recall that?

04:32  16       A.   Yes.

04:32  17       Q.   And you were asked a number of questions about some

04:32  18   testimony you provided about the C0 residency?

04:32  19       A.   Yes.

04:32  20       Q.   Now, you gave a literal infringement opinion to the

04:32  21   ladies and gentlemen of the jury based on what being the

04:32  22   request?

04:32  23       A.   Core_Active.

04:32  24       Q.   What's the relationship with -- between the

04:32  25   Core_Active signal and C0 residency?

04:32  1          A.    Okay.  It works like this.  Core_Active starts these

04:33  2    C0 residency counters.  And then when you send an inactive, it

04:33  3    stops them.

04:33  4          Q.    Are Core_Active signals sent periodically?

04:33  5          A.    No.

04:33  6          Q.    When are they sent?

04:33  7          A.    They're sent whenever the core becomes active.

04:33  8          Q.    So does any of that testimony about periodic signals

04:33  9    apply to the Core_Active requests?

04:33  10         A.    No.

04:33  11         Q.    You also testified that you were retained four or

04:33  12   five times for other clients that the firm I'm with has

04:33  13   represented over the years.  Do you recall that?

04:33  14         A.    Yes, I do.

04:33  15         Q.    And do you have an understanding of why you have been

04:33  16   requested as an expert for other cases?

04:34  17         A.    Yes.  There was a case in the Northern District, I

04:34  18   believe, of Wisconsin where the University of Wisconsin --

04:34  19         MR. LEE:  Your Honor, your MIL said that we weren't going

04:34  20   to get into his other cases.

04:34  21         MR HEINRICH:  He opened the door.

04:34  22         MR. LEE:  All I asked about was retention.  So if we wants

04:34  23   to get into the cases, I'll get into the cases.  He's going to

04:34  24   open the door.

04:34  25         (Conference between counsel.)

| | | |
|---|---|---|
| 04:34 | 1 | THE COURT:  Counsel, do you want to ask this question and |
| 04:34 | 2 | we'll go back and forth?  I agree with Mr. Lee that I'm going |
| 04:34 | 3 | to let -- we're either going to keep this primarily out or I'm |
| 04:34 | 4 | going to let you both ask whatever you want.  It's up to you. |
| 04:34 | 5 | BY MR. HEINRICH: |
| 04:35 | 6 | Q.   Did you on one of the -- or two of the four or five |
| 04:35 | 7 | cases, did they involve cases in the Eastern District of Texas? |
| 04:35 | 8 | A.   They did. |
| 04:35 | 9 | Q.   And can you tell us what happened in those cases? |
| 04:35 | 10 | A.   In those cases it was -- I was representing or -- |
| 04:35 | 11 | actually, I was retained by USAA.  That's a -- some of you |
| 04:35 | 12 | might know what that is.  It's a company that provides |
| 04:35 | 13 | insurance and banking services for current or former members of |
| 04:35 | 14 | the Armed Services. |
| 04:35 | 15 | And they had developed a mobile application, you know, |
| 04:35 | 16 | that way you take pictures of your check?  USAA invented that |
| 04:35 | 17 | and they marketed it and everything. |
| 04:35 | 18 | And on the other side was Wells Fargo who had just decided |
| 04:35 | 19 | to deploy their own version of that same thing.  So I got up in |
| 04:35 | 20 | court and I testified about why I thought what Wells Fargo was |
| 04:36 | 21 | doing was the same as the USAA patents. |
| 04:36 | 22 | Q.   And what did the jury find? |
| 04:36 | 23 | A.   Jury found that I was correct. |
| 04:36 | 24 | Q.   And do you know how much was awarded to USAA? |
| 04:36 | 25 | A.   Of those two cases, I believe it was about |

04:36   1     $250 million.

04:36   2          Q.   And where is USAA based?

04:36   3          A.   They're based in San Antonio.

04:36   4          MR. HEINRICH:   That's all I have, Your Honor.

04:36   5          THE COURT:   Mr. Lee?

04:36   6          (Conference between counsel.)

04:36   7          THE COURT:   Mr. Lee, I think he may have one more.

04:36   8     BY MR. HEINRICH:

04:36   9          Q.   So just to clear up one last thing.  So Mr. Lee was

04:36   10    asking you some questions about whether individual computer

04:36   11    components, like a voltage regulator or a core, other basic

04:36   12    stuff like that, were known individually before these patents.

04:36   13         Do you recall that?

04:36   14         A.   Yes.

04:36   15         Q.   Just because basic computer components are known,

04:36   16    does that mean that you can't come up with new inventions that

04:37   17    combine those known components in novel ways?

04:37   18         A.   Of course not.  I mean, canvas and paint was known

04:37   19    before the Mona Lisa.  That doesn't mean the Mona Lisa wasn't

04:37   20    an excellent intellectual property.

04:37   21         Q.   Thank you very much.

04:37   22         THE COURT:   Mr. Lee?

04:37   23                        RECROSS-EXAMINATION

04:37   24    BY MR. LEE:

04:37   25         Q.   Dr. Conte, a few questions.  Mr. Heinrich wanted to

04:37  1    ask you about your other cases.

04:37  2         You testified in a case on behalf of something called the

04:37  3    Wisconsin Alumni Research Foundation, correct?

04:37  4         A.   I did.

04:37  5         Q.   You testified that there was infringement, correct?

04:37  6         A.   Yes.  I found infringement against Apple Computer for

04:37  7    some --

04:37  8         Q.   And it went all the way to the Court of Appeals?

04:37  9         THE COURT:  Mr. Lee?

04:37 10         MR. HEINRICH:  Objection.

04:37 11         THE COURT:  And your objection is?

04:37 12         MR. HEINRICH:  This is a 403.

04:37 13         THE COURT:  Overruled.

04:37 14    BY MR. LEE:

04:37 15         Q.   It went all the way to the Court of Appeals in

04:37 16    Washington, D.C., correct?

04:38 17         A.   That's my understanding.  Yes.

04:38 18         Q.   And the Court of Appeals found that no reasonable

04:38 19    jury could find infringement based upon what you had said,

04:38 20    correct?

04:38 21         MR. HEINRICH:  Objection.  That misstates the opinion.

04:38 22         MR. LEE:  Well, I just asked him if that's what --

04:38 23         THE COURT:  You can bring that up when you do -- when you

04:38 24    ask questions after Mr. Lee -- I mean, yes, after Mr. Lee.

04:38 25    BY THE WITNESS:

04:38  1        A.   I believe that's not accurate.

04:38  2   BY MR. LEE:

04:38  3        Q.   Well, there was a jury verdict based upon your

04:38  4   testimony, correct?

04:38  5        A.   Yes.

04:38  6        Q.   It got reversed, correct?

04:38  7        A.   Yes.

04:38  8        Q.   And let me see if I can refresh your recollection.

04:38  9   Let me get to the very end of the Court of Appeals opinion.

04:38 10   "No reasonable jury could infer or draw the inference that load

04:38 11   tags will always represent multiple load instructions."

04:38 12        That was that issue in the case, correct?

04:38 13        A.   Yes.

04:38 14        Q.   And what they cite from that proposition is your

04:39 15   testimony, correct?

04:39 16        A.   In part.  Yes.

04:39 17        Q.   And the one thing that we can agree upon is the

04:39 18   ultimate decision by the Court of Appeals, the same Court of

04:39 19   Appeals that will get this case if it's ever appealed, was that

04:39 20   no reasonable jury could find infringement based upon your

04:39 21   testimony, correct?

04:39 22        A.   I think that's inaccurate.

04:39 23        Q.   All right.  Now, let me ask you a couple of other

04:39 24   questions.

04:39 25        You said on redirect that Claim 14 of the '759 patent, if

04:39  1  I could have it on the screen.  Do you see it?

04:39  2       A.   Yes.

04:39  3       Q.   Now, it refers to an "embedded computer program."

04:39  4       MR. LEE:  Can we highlight that?

04:39  5  BY MR. LEE:

04:39  6       Q.   Do you have it?

04:39  7       A.   Yes.

04:39  8       Q.   An embedded computer program is a software program,

04:39  9  correct?

04:40  10      A.   Yes.

04:40  11      Q.   Now, Mr. Heinrich asked you some questions about what

04:40  12  SigmaTel, Freescale, NXP, VLSI have done with the patents,

04:40  13  correct?

04:40  14      A.   Yes.

04:40  15      Q.   You gave opinions on the value of the patents,

04:40  16  correct?

04:40  17      A.   Yes.

04:40  18      Q.   You were present when Mr. Chu described these patents

04:40  19  as "stars," correct?

04:40  20      A.   I was not.  We already discussed this.

04:40  21      Q.   Okay.  But you know that he did, correct?

04:40  22      A.   That's correct.

04:40  23      Q.   Now, you would agree with me that one of the

04:40  24  indications of value is what the owners of the patents actually

04:40  25  did with the patents, correct?

04:40   1       A.   I know there's a whole set of rules about this.  I

04:40   2   forget --

04:40   3       Q.   No rules.  Just common sense.  If we want to look at

04:40   4   whether someone thought something was valuable, we would look

04:40   5   at what they did with it, wouldn't we?

04:40   6       A.   That would be one indicia.  There could be many.

04:41   7       Q.   It would be a very commonsense indicia of whether

04:41   8   there was real value, wouldn't it?

04:41   9       A.   Among others.

04:41   10      Q.   Thank you.

04:41   11      MR. LEE:  Nothing further, Your Honor.

04:41   12                  FURTHER REDIRECT EXAMINATION

04:41   13   BY MR. HEINRICH:

04:41   14      Q.   Couple questions.  So the WARF case that Mr. Lee

04:41   15   referred to, did the Court of Appeals disagree with your

04:41   16   technical analysis, or did the Court of Appeals disagree with

04:41   17   how the Court -- the District Court interpreted a claim term?

04:41   18      A.   There was a claim term at issue.  I interpreted it

04:41   19   accordingly to the District Court.  And the Court of Appeals

04:41   20   then decided the decision should be reversed based on that

04:41   21   claim term.

04:41   22      Q.   And do you understand if that case is actually still

04:41   23   going on?

04:41   24      A.   It is.

04:41   25      Q.   Thank you very much.

04:41  1          (Conference between counsel. )

04:41  2     BY MR. HEINRICH:

04:41  3          Q.   What was the jury verdict in that case?

04:42  4          A.   I believe it was --

04:42  5          THE COURT:   That -- it's irrelevant.

04:42  6     BY THE WITNESS:

04:42  7          A.   -- a lot.

04:42  8                    FURTHER RECROSS-EXAMINATION

04:42  9     BY MR. LEE:

04:42  10         Q.   Dr. Conte, let me read you what the Court of Appeals

04:42  11    said.  "WARF's expert," that would be you, right?

04:42  12         A.   Yes.

04:42  13         Q.   "WARF's expert jumped to the conclusion that aliasing

04:42  14    is extremely rare," testimony of Dr. Conte.  "But in light of

04:42  15    Dr. Conte's testimony, it is unreasonable to infer that the .1

04:42  16    percent statistic was referring to frequency of aliasing."

04:42  17         That's what the Court of Appeals said, correct?

04:42  18         A.   I disagree with the Court.

04:42  19         Q.   You disagree with the Court, but that is what they

04:42  20    said.

04:42  21         A.   They're discussing this claim term.  They disagreed

04:42  22    with how I was instructed to interpret the claim term.

04:42  23         Q.   Did I read correctly what the Court of Appeals wrote

04:42  24    in black and white?

04:42  25         A.   Yes.

04:42  1        Q.   Okay.  Thank you.

04:43  2        THE COURT:  Anything else for this gentleman?

04:43  3        MR. HEINRICH:  No, Your Honor.

04:43  4        MR. LEE:  Nothing, Your Honor.

04:43  5        THE COURT:  May he be excused?  Oh, is he going to be

04:43  6  coming back?  Are we going to see him again?

04:43  7        MR. HEINRICH:  He'll be back in a rebuttal case.

04:43  8        THE COURT:  Understood.

04:43  9        Doctor, you get a few more wonderful days in Waco.  Who

04:43 10  wouldn't want that?

04:43 11        (Laughter.)

04:43 12        THE COURT:  So -- and I'm sorry for your dogs -- your

04:43 13  absence from your dogs.

04:43 14        THE WITNESS:  The boys are taking care of them, so...

04:43 15        THE COURT:  Counsel, who will your next witness be for

04:43 16  VLSI?

04:43 17        MR. WASHBURN:  Professor Murali Annavaram.

04:43 18        THE COURT:  Okay.

04:43 19        Ladies and gentlemen, let me tell you what I'm going to

04:43 20  do.  Suzanne's mad at me because she was all ready to swear him

04:43 21  in.

04:43 22        Let me just tell you what we're going to do.  I think I

04:43 23  told you yesterday that I try and get witnesses to be

04:43 24  completely done in one -- and not overnight.

04:43 25        What we're going to do is counsel's going to introduce

04:43  1  this gentleman to you and give you the same kind of background

04:44  2  you heard with the prior witness, Dr. Conte, about his

04:44  3  qualifications.

04:44  4      And then we're going to finish for the day and -- when

04:44  5  they're done with that.  And we'll resume with this

04:44  6  gentleman -- are you a doctor?

04:44  7      With the good doctor tomorrow morning.  So we'll will be

04:44  8  done probably in the next few minutes, more or less.

04:44  9      (The witness was sworn.)

04:44  10      MR. WASHBURN:  Your Honor, may I proceed?

04:44  11      THE COURT:  Yes, sir.  I'm sorry.

04:44  12                    DIRECT EXAMINATION

04:44  13  BY MR. WASHBURN:

04:45  14      Q.   Good afternoon, Professor Annavaram.

04:45  15      A.   Good afternoon.

04:45  16      Q.   Could you briefly introduce yourself for the jury?

04:45  17      A.   Ladies and gentlemen, my name is Murali Annavaram.  I

04:45  18  am a professor at the University of Southern California.

04:45  19      Q.   And what are you here to testify about today and

04:45  20  tomorrow, Professor?

04:45  21      A.   I'm going to discuss some of the work that I have

04:45  22  done with regards to the power benefits and power analysis that

04:45  23  I have done for the two infringing patents.

04:45  24      Q.   Now, before we get to that, which I think will be

04:45  25  tomorrow, let's talk a little bit about your background.

04:45  1      What do you do for a living?

04:46  2      A.   I teach for a living.  I am a faculty member, which

04:46  3  means I teach both undergraduate level students as well as

04:46  4  graduate level students.

04:46  5      And I have, at any one point in time, somewhere between

04:46  6  six and eight Ph.D. students who work under me.  And we do a

04:46  7  lot of work on power management, power efficiency, reducing the

04:46  8  power consumption of computer systems, and that's really the

04:46  9  core of what I do.

04:46  10      Q.   And, sir, have you received any awards for your work?

04:46  11      A.   So a lot of the work that we do with my research

04:46  12  group gets published at top-tier conferences where acceptance

04:46  13  rates are extremely tight.

04:46  14      And for continuously publishing lots of papers in these

04:46  15  conferences, I have been inducted into three different halls of

04:46  16  fame, both from ACM, which is a big computing organization,

04:46  17  Association of Computing Machinery, and IEEE, which is another

04:47  18  agency -- or computing professional organization.

04:47  19      MR. WASHBURN:  Your Honor, we offer Professor Murali

04:47  20  Annavaram as an expert in computer testing.

04:47  21      MR. MUELLER:  No objection.

04:47  22      THE COURT:  Doctor, your time with us today is short.  I

04:47  23  appreciate you very much being here.

04:47  24      Ladies and gentlemen of the jury, if we start tomorrow at

04:47  25  9:00, will that work for everyone?

04:47  1        Very good.  Remembering my instructions not to discuss the

04:47  2  case amongst yourself, don't do any research about the case

04:47  3  while you're out.  Don't talk to anyone.  Tell your family

04:47  4  members that you had a lovely day but nothing more, that you're

04:47  5  in front of a wonderful judge with a great sense of humor,

04:47  6  something like that.  In other words, you don't have to be

04:47  7  truthful.

04:47  8        So -- but we will see you tomorrow at 9:00.  If you could

04:47  9  be here by 8:45, that would be wonderful.

04:47  10       And, Doctor, you'll be back at 9:00 tomorrow morning as

04:47  11  well.

04:47  12       THE BAILIFF:  All rise.

04:48  13       (Jury exited the courtroom at 4:47.)

04:48  14       THE COURT:  You all may be seated.

04:48  15       Ladies and gentlemen, Suzanne tells me that the plaintiff

04:48  16  has used -- I'm rounding up by one minute, but the plaintiff

04:48  17  has used four hours and that the defendant has used two hours

04:48  18  and 15 minutes, is what our -- what we show.

04:48  19       Is that what you all show?

04:48  20       MR. CHU:  I don't know because I haven't been able to

04:48  21  consult with the timekeepers on our side about today.  I do

04:48  22  know that there was a discrepancy yesterday, and I think a

04:48  23  member of our team was going to speak with Suzanne and opposing

04:48  24  counsel, and we were going to work that out.  As far as --

04:48  25       THE COURT:  Has that been done, Suzanne?

04:49  1        DEPUTY CLERK:  Yes.  For some reason the clock stopped, so

04:49  2   I went back and verified the time and moved it forward.

04:49  3        THE COURT:  We've done that, Mr. Chu.

04:49  4        MR. CHU:  Okay.  And then we'll thank you for sharing the

04:49  5   Court's totals with us now, and then we'll check on that this

04:49  6   evening.

04:49  7        THE COURT:  While you're standing, is there anything that

04:49  8   we need to take up on behalf of VLSI tonight?

04:49  9        MR. CHU:  There is not.  Thank you.

04:49  10        THE COURT:  Mr. Lee?

04:49  11        MR. LEE:  Not at this time, Your Honor.

04:49  12        THE COURT:  Let me again, I'll probably do this every day,

04:49  13   I hope I get to, compliment all the counsel who were at the

04:49  14   podium today.  I thought it was an exceptionally good day by

04:49  15   both sides.

04:49  16        I thought -- I'm just amazed at how well you are -- not --

04:49  17   I'm not amazed because I didn't expect it.  I'm amazed, I'd

04:49  18   say, because you all are living up to my expectations, which

04:49  19   were very high when we got here.  So I very much appreciate

04:49  20   everything that you all are doing and the fine lawyers.

04:50  21        Yes, sir, Mr. Lee?

04:50  22        MR. LEE:  Your Honor, it did occur to me, they may rest

04:50  23   tomorrow, and we wanted to ask what Your Honor's preference was

04:50  24   for JMOL.  Do you want us to do it orally at the end?  Do you

04:50  25   want us to just make the motion and then follow it up with a

04:50  1    written motion?

04:50  2          THE COURT:  I think oral will be sufficient.

04:50  3          MR. LEE:  Okay.

04:50  4          THE COURT:  And, Mr. Chu, is that your sense?  When we --

04:50  5    is Mr. -- I'm sorry.  Is Dr. Sullivan going to be your last

04:50  6    witness?

04:50  7          (Conference between counsel.)

04:50  8          MR. CHU:  No.  I don't think so, but I just need to check

04:50  9    with my colleagues.

04:50  10         THE COURT:  Who do we have tomorrow?  We have the doctor I

04:50  11   just saw tomorrow and then we have Dr. Sullivan.  Who else do

04:50  12   we have?

04:50  13         MR. CHU:  Yes.

04:50  14         MR. HEINRICH:  We're going to have the deposition plays.

04:50  15         THE COURT:  Oh, okay.

04:50  16         (Conference between counsel.)

04:50  17         MR. HEINRICH:  So at minimum we'll have the deposition

04:50  18   plays that we discussed today because they're for sure getting

04:50  19   teed up now.

04:50  20         THE COURT:  May I make a suggestion to you all?  But I

04:50  21   don't care.  I mean, it's -- y'all have done a million more

04:51  22   trials than me.  I would not finish by reading depositions.

04:51  23         (Laughter.)

04:51  24         THE COURT:  I would do it somewhere -- anytime you want,

04:51  25   tomorrow after the doctor or whenever you want.  I would not

04:51  1  finish with deposition testimony, but it's entirely up to you.

04:51  2  And the same is obviously true for Intel, however you do it.

04:51  3  Here I'm trying to look out for the jury.  So and --

04:51  4      Mr. Lee, anything else?

04:51  5      MR. LEE:  Nothing, Your Honor.  Thank you.

04:51  6      MR. CHU:  Your Honor, I just want to say, we agree, I need

04:51  7  to consult with and coordinate with my colleagues about exactly

04:51  8  who are the live witnesses as well as the depositions and when

04:51  9  we're going to play both.  We'll get it all straightened out.

04:51  10     THE COURT:  Well, here's what I'm taking away from this.

04:51  11 Who will -- Mr. Lee, do you know who the first witness will --

04:51  12 you intend to call for Intel?

04:51  13     MR. LEE:  Yes.  It's Mr. King.

04:52  14     THE COURT:  Okay.  He should be ready to go tomorrow, but

04:52  15 the same rules will apply.  If we can't get him started and

04:52  16 finished by the end of the day, he won't go.  It would not be a

04:52  17 bad thing to end with the plaintiff's case and start afresh the

04:52  18 next day.  But if we have a lot of time left, I'm --

04:52  19     I wind up talking about people like they're in the third

04:52  20 person who are sitting here.  I apologize for that.  I know

04:52  21 you're sitting here, but I generally talk to the lawyers about

04:52  22 people who are sitting here.

04:52  23     So you should have your first witness ready to go, but

04:52  24 we're not -- I'm not going to stay late tomorrow unless,

04:52  25 Mr. Lee, with your other scheduling problems, you feel that

04:52  1   that would be best.  I will -- I'll defer to you if you think

04:52  2   staying, for example, tomorrow until 6:00 to get one witness

04:52  3   completed, I'll do whatever you think is best for you so that

04:52  4   we can get you done here.  I understand your time conflict.

04:53  5   So --

04:53  6        MR. LEE:  Thank you, Your Honor.

04:53  7        THE COURT:  -- since it's your witness, I'll let you make

04:53  8   the decision on what to do there and I'll abide by it.

04:53  9        Mr. Chu, anything else?

04:53  10       MR. CHU:  Nothing further, Your Honor.  Thank you.

04:53  11       THE COURT:  Have a good evening.

04:53  12       THE BAILIFF:  All rise.

04:53  13       (Hearing adjourned at 4:53 p.m.)

       14

       15

       16

       17

       18

       19

       20

       21

       22

       23

       24

       25

1  UNITED STATES DISTRICT COURT )

2  WESTERN DISTRICT OF TEXAS    )

3

4       I, Kristie M. Davis, Official Court Reporter for the

5  United States District Court, Western District of Texas, do

6  certify that the foregoing is a correct transcript from the

7  record of proceedings in the above-entitled matter.

8       I certify that the transcript fees and format comply with

9  those prescribed by the Court and Judicial Conference of the

10  United States.

11       Certified to by me this 8th day of March 2021.

12

13                              */s/ Kristie M. Davis*
                                KRISTIE M. DAVIS
                                Official Court Reporter
14                              800 Franklin Avenue
                                Waco, Texas 76701
15                              (254) 340-6114
                                kmdaviscsr@yahoo.com
16

17

18

19

20

21

22

23

24

25