07:04

1

                    IN THE UNITED STATES DISTRICT COURT
2                 FOR THE WESTERN DISTRICT OF TEXAS
                            WACO DIVISION
3

VLSI TECHNOLOGY LLC              *
4                                       *
VS.                             *  CIVIL ACTION NO. W-21-CV-57
5                                       *
INTEL CORPORATION               *       February 24, 2021
6
        BEFORE THE HONORABLE ALAN D ALBRIGHT, JUDGE PRESIDING
7                       JURY TRIAL PROCEEDINGS
                          VOLUME 3 OF 7
8

APPEARANCES:
9

For the Plaintiff:          Morgan Chu, Esq.
10                              Benjamin W. Hattenbach, Esq.
                                Alan Heinrich, Esq.
11                              Ian Robert Washburn, Esq.
                                Amy E. Proctor, Esq.
12                              Dominik Slusarczyk, Esq.
                                Charlotte J. Wen, Esq.
13                              Jordan Nafekh, Esq.
                                Babak Redjaian, Esq.
14                              Irell & Manella, L.L.P.
                                1800 Avenue of the Stars, Suite 900
15                              Los Angeles, CA 90067-4276

16                              J. Mark Mann, Esq.
                                Andy W. Tindel, Esq.
17                              Mann, Tindel & Thompson
                                112 East Line Street, Suite 304
18                              Tyler, TX 75702

19  For the Defendant:          William F. Lee, Esq.
                                Joseph Mueller, Esq.
20                              Louis W. Tompros, Esq.
                                Felicia H. Ellsworth, Esq.
21                              Jordan L. Hirsch, Esq.
                                WilmerHale
22                              60 State Street
                                Boston, MA 02109
23
                                Mary V. Sooter, Esq.
24                              Amanda L. Major, Esq.
                                Wilmer Cutler Pickering Hale Dorr LLP
25                              1225 17th Street, Suite 2600
                                Denver, CO 80202

1                                J. Stephen Ravel, Esq.
2                                Kelly Hart & Hallman LLP
                                 303 Colorado Street, Suite 2000
3                                Austin, TX 78701

4                                James Eric Wren, III, Esq.
                                 Baylor University Law School
5                                One Bear Place #97288
                                 Waco, TX 76798-7288
6
     Court Reporter:            Kristie M. Davis
7                                United States District Court
                                 PO Box 20994
8                                Waco, Texas 76702-0994

9

10

11       Proceedings recorded by mechanical stenography, transcript

12   produced by computer-aided transcription.

13

14

15

16

17

18

19

20

21

22

23

24

25

| | | |
|---|---|---|
| 08:45 | 1 | (February 24, 2021, 8:45 a.m.) |
| 08:45 | 2 | THE BAILIFF:  All rise. |
| 08:45 | 3 | THE COURT:  Thank you.  You may be seated. |
| 08:45 | 4 | Good morning, ladies and gentlemen.  My understanding is |
| 08:45 | 5 | we have a couple of issues to take up.  I apologize.  I had |
| 08:45 | 6 | another hearing I had to get done this morning.  I couldn't get |
| 08:45 | 7 | in here soon enough.  I apologize. |
| 08:45 | 8 | Yes, sir? |
| 08:45 | 9 | MR. HATTENBACH:  Good morning, Your Honor.  One of the |
| 08:46 | 10 | issues we wanted to raise is Intel has a witness, Mr. Douglas. |
| 08:46 | 11 | The issue is he was never disclosed as an expert, no expert |
| 08:46 | 12 | report, no expert deposition.  And last night we received these |
| 08:46 | 13 | demonstratives which include a large physical board with a |
| 08:46 | 14 | bunch of moveable -- |
| 08:46 | 15 | THE COURT:  He's not going to go today, is he? |
| 08:46 | 16 | MR. HATTENBACH:  He may.  I think it depends on how |
| 08:46 | 17 | quickly the proceedings move. |
| 08:46 | 18 | MR. MUELLER:  I think it's unlikely, Your Honor. |
| 08:46 | 19 | THE COURT:  I thought yesterday we thought that there |
| 08:46 | 20 | would just be one Intel witness that we got to today.  And so |
| 08:46 | 21 | just for the sake of time and getting started, if I could take |
| 08:46 | 22 | this one up later, either today or tonight or whatever.  I've |
| 08:46 | 23 | got it.  I'll take it up, but I don't want to take up the time |
| 08:46 | 24 | right now. |
| 08:46 | 25 | MR. HATTENBACH:  Okay.  That's fine.  I think he is their |

| | | |
|---|---|---|
| 08:46 | 1 | first witness. |
| 08:46 | 2 | MR. MUELLER:  He's not.  It's Mr. King. |
| 08:47 | 3 | MR. HATTENBACH:  Thank you, Your Honor. |
| 08:47 | 4 | THE COURT:  See, I'm paying attention. |
| 08:47 | 5 | MR. HATTENBACH:  Appreciate it. |
| 08:47 | 6 | THE COURT:  Yes, sir, Mr. Lee. |
| 08:47 | 7 | MR. LEE:  Thank you, Your Honor.  I think there are two |
| 08:47 | 8 | things that if I could ask Your Honor to consider -- |
| 08:47 | 9 | THE COURT:  Sure. |
| 08:47 | 10 | MR. LEE:  -- that need to be considered this morning. |
| 08:47 | 11 | One is with Mr. Stolarski.  We were informed last night |
| 08:47 | 12 | about 11 o'clock that he has left the jurisdiction. |
| 08:47 | 13 | Mr. Stolarski has been the corporate representative at all the |
| 08:47 | 14 | hearings before Your Honor, introduced to the jurors at voir |
| 08:47 | 15 | dire, jury selection, introduced to the jury.  He was disclosed |
| 08:47 | 16 | as a witness.  They disclosed him. |
| 08:47 | 17 | THE COURT:  Did you subpoena him? |
| 08:47 | 18 | MR. LEE:  We did not subpoena him.  He's on the will call |
| 08:47 | 19 | list. |
| 08:47 | 20 | THE COURT:  Well, Mr. Lee, I hate -- |
| 08:47 | 21 | MR. LEE:  But, Your Honor, actually I'm not -- if I could |
| 08:47 | 22 | suggest what we think we need to do, if that's all right with |
| 08:47 | 23 | Your Honor, I asked yesterday at 5 o'clock whether he was going |
| 08:48 | 24 | to testify because Your Honor had asked the question.  I was |
| 08:48 | 25 | told yes. |

08:48  1        Now, if I'd been told no, I would have issued a subpoena.

08:48  2   But since he's left the jurisdiction, we will have to amend our

08:48  3   deposition disclosures to add disclosures to him.  We will

08:48  4   argue the empty chair, which Your Honor would expect.  We will

08:48  5   offer -- we will make a proffer to Your Honor on Fortress,

08:48  6   because we now are in a circumstance where --

08:48  7        THE COURT:  I haven't ruled on -- I haven't -- you all

08:48  8   have not done anything with respect to Fortress during the

08:48  9   trial.  I haven't decided if Fortress is in or out.

08:48  10       MR. LEE:  And look, Your Honor, I'm not suggesting that

08:48  11  you either have the power or should order him to come back.

08:48  12  I'm not suggesting that I want to subpoena him if he's left the

08:48  13  jurisdiction.

08:48  14       THE COURT:  But I just want to take up -- you know, I had

08:48  15  an issue during the opening with Fortress because of the

08:48  16  conflict and what I was hearing about their role in the case

08:49  17  and all that, and because the opening argument is just argument

08:49  18  and it's not evidence.

08:49  19       I haven't -- Intel has not addressed the Fortress issue at

08:49  20  all as far as I could tell, in asking to be allowed to bring it

08:49  21  in as an evidentiary issue.  And so when you say you're going

08:49  22  to make a proffer on it, I haven't ruled that it's not coming

08:49  23  in.

08:49  24       MR. LEE:  We understand, Your Honor.  And so our intention

08:49  25  had been to put it in through Mr. Stolarski, who was going to

08:49  1   be the second or fifth witness, depending on the disclosure.

08:49  2   Since he's not here any longer, I wanted to offer Your Honor

08:49  3   our position so it was clear as soon as the issue arose.

08:49  4       We will supplement our deposition designations from both

08:49  5   this case and Delaware.  There was cross use for this.  We will

08:49  6   argue the presence or absence of a witness.  The one thing I

08:49  7   don't want to have happen is to have someone get up in closing

08:49  8   and provide an explanation for why he's here if it's not part

08:50  9   of the evidentiary record.  And I think that would be --

08:50  10      THE COURT:  Let's take that up down the road.

08:50  11      MR. LEE:  Yeah -- inappropriate.

08:50  12      And the Fortress evidence would have been put in through

08:50  13  Mr. Stolarski.  So the reason we're going to make the proffer

08:50  14  to Your Honor is so you can have it at the same time we give

08:50  15  you the deposition designations for him.

08:50  16      THE COURT:  Is it not in the deposition?

08:50  17      MR. LEE:  It is in the deposition.

08:50  18      THE COURT:  Okay.  So, well, then I'll -- Mr. Chu, are you

08:50  19  opposed to him using the deposition?

08:50  20      MR. CHU:  Of course we're not -- excuse me.  Trying to get

08:50  21  to a mic.

08:50  22      THE COURT:  Yes, sir.

08:50  23      MR. CHU:  We're in favor of using depositions, but not

08:50  24  related to Fortress for reasons --

08:50  25      THE COURT:  I get that.

08:50    1              MR. CHU:  Right.

08:50    2              THE COURT:  And so --

08:50    3              MR. CHU:  So if they -- they had designated a lot of

08:50    4    Mr. Stolarski's deposition previously.  And we don't have a

08:51    5    blanket objection to their using, if appropriate and relevant

08:51    6    and meeting the normal rules, Mr. Stolarski's deposition.

08:51    7              THE COURT:  Okay.  So, Mr. Lee, it sounds to me like the

08:51    8    issue that we have -- we have a couple of issues that aren't

08:51    9    ripe yet.

08:51   10              One is, because Mr. Chu says you're going to -- he's not

08:51   11    going to object, and I wouldn't -- if he did, I would overrule

08:51   12    it.  But you're using the deposition since he's not here.  I

08:51   13    get that.

08:51   14              When you go to put on the -- when you go to call that, it

08:51   15    doesn't seem to me like it makes much difference when you -- in

08:51   16    the order that you play that deposition.  Maybe it does to you,

08:51   17    I don't know.  But it seems to me like I can take up the part

08:51   18    of the deposition that relates to Fortress immediately before

08:51   19    you -- when the jury's not in here.

08:51   20              If you'll -- we probably have it, but if you'll get the

08:51   21    section just on Fortress that you care about, that you will

08:52   22    want to have admitted, if you'll get that to Evan in a discrete

08:52   23    way -- I don't want the whole depo -- but if you can get us

08:52   24    just the section that you want to put in, and that Mr. Chu is

08:52   25    going to object to coming in, so I can read it in advance.  And

08:52  1    then you all can argue about whether or not it's admissible.

08:52  2        MR. LEE:  Yeah.  We'll do that, Your Honor.

08:52  3        I think the likelihood now is to play his deposition

08:52  4    closer to the end of our case so we have some time.  I wanted

08:52  5    to raise it with Your Honor because the issue has just arisen,

08:52  6    and it will require us to supplement our deposition

08:52  7    designations.

08:52  8        THE COURT:  You'll be permitted to do so.  I'm not giving

08:52  9    you -- I'm not saying one way or the other about the

08:52  10   admissibility of Fortress, but in terms of your ability to --

08:52  11   I'm not going to hear them say it's too late for you to

08:52  12   supplement now because you anticipated being able to call him

08:52  13   and he's not here.

08:52  14       And so I'm -- I've been in your shoes, Mr. Lee.  I have --

08:52  15   everything that's going on here I have experienced myself.  So

08:53  16   I understand exactly what's going on in the middle of trial.

08:53  17   And you may supplement your deposition of him, the transcript

08:53  18   that you want to play, in any manner you seek.  And at

08:53  19   someplace on Friday, I guess, where -- what is today?

08:53  20       MR. LEE:  Today's Wednesday.  I think sometime Friday we

08:53  21   can get to it.

08:53  22       THE COURT:  We can do it tomorrow, you know.  This may be

08:53  23   the best time.  As of right now, I think the best time for you

08:53  24   all -- for us to do the jury charge is tomorrow evening after

08:53  25   the trial.  If it weren't for your schedule, Mr. Lee, I would

08:53  1   probably put it off until like Monday morning and do it and

08:53  2   then have the closing arguments.  But I don't want to waste

08:53  3   that time for you if you need to get out of here.

08:53  4       MR. LEE:  I appreciate it, Your Honor, only because the

08:53  5   other hearing is starting.

08:54  6       THE COURT:  Right.  And so I will -- we'll do the jury

08:54  7   charge either tomorrow night, or possibly at worst, Friday

08:54  8   night after trial.  But we won't take up any daytime time doing

08:54  9   the jury charge.

08:54 10       And what I'm saying is if we do the jury charge tomorrow

08:54 11   night, we may as well wrap in the Fortress issue as well.  And

08:54 12   I'll see what's in the deposition, and you can argue why it

08:54 13   should come in.  Mr. Chu can argue why it should stay out.  And

08:54 14   I'll make a ruling, and you'll be able to play it on Friday.

08:54 15       MR. LEE:  And, Your Honor, what we might accompany the

08:54 16   deposition designations with this is just -- what I called the

08:54 17   proffer -- it's just a very short brief -- it says:  Given

08:54 18   what's occurred during the evidence, here's why we should offer

08:54 19   it.  So you'll at least have our argument.

08:54 20       THE COURT:  Well, you don't need a proffer yet.

08:54 21       MR. LEE:  Okay.

08:54 22       THE COURT:  I would suggest you wait to offer -- you're

08:54 23   being way too pessimistic.  I don't know what I'm going to do,

08:54 24   but you'll only need the proffer if I decide to exclude it.

08:54 25       MR. LEE:  Fair enough.

08:54  1       THE COURT:  Also, and it may very well be when I see what

08:55  2   he said in the deposition, I may allow some of what he said

08:55  3   about Fortress in and not other things.  I'll have to read what

08:55  4   he said to make that decision.

08:55  5       MR. LEE:  Fair enough.

08:55  6       Your Honor, for Dr. Sullivan, who we will get to this

08:55  7   morning, a few things.  One is in his demonstratives he has a

08:55  8   new opinion.  He has a per-unit royalty, $1 per unit.  It's

08:55  9   nowhere in his expert reports.

08:55  10      When we raised the issue, we were told it's just math.  If

08:55  11  you do the math, you'd come up with a number.  But that's --

08:55  12  everything on the damages end "it's just math."  It's an

08:55  13  entirely new number.

08:55  14      THE COURT:  Well, let me ask you this because I haven't

08:55  15  heard -- I didn't hear during opening what the number was.

08:55  16  We're all -- all of America's waiting to find out the answer to

08:55  17  that question with rapt attention.

08:55  18      But my sense from the beginning has been -- my sense from

08:55  19  the opening argument was that it was essentially going to be --

08:55  20  work out to be about $1 per unit, was --

08:56  21      MR. LEE:  Your Honor, that's not in any expert report.

08:56  22      THE COURT:  Okay.

08:56  23      MR. LEE:  Not once.

08:56  24      THE COURT:  Well, if -- here's -- I'm just going to have

08:56  25  to deal with this as it -- here's my problem.  I'm a big:  Has

08:56  1   to be in the expert report, but if -- I'm just going to make

08:56  2   this up -- if it turns out that -- I'm just making these

08:56  3   numbers up -- if it turns out that Intel sold one and a half

08:56  4   billion allegedly infringing units, and Dr. Sullivan says the

08:56  5   amount of damages is $1.5 billion, and Mr. Chu says, "what does

08:56  6   that work out to be?"  And he says, "it's $1 per unit."  In

08:56  7   that sense, to me that is just math.

08:56  8       Now, what I would not -- that would not bother me.  If it

08:56  9   was the other direction, and he was saying how did you get to

08:57  10  the number?  I thought the right number was $1 and they sold

08:57  11  1.5 billion, and that was not disclosed in the report, then

08:57  12  that I would have a concern about.  Does that make sense?

08:57  13      MR. LEE:  Your Honor, and this is -- I apologize for

08:57  14  taking more time, but I think this is an important part of my

08:57  15  making the record.

08:57  16      THE COURT:  Yes.

08:57  17      MR. LEE:  There is a fundamental difference between what

08:57  18  he did and a per-unit royalty.  And responding to a per-unit

08:57  19  royalty and identifying the problems with even your -- the

08:57  20  first part of your analogy, which is 1.5 divided by 1.5, there

08:57  21  is a separate attack on the legitimacy of that type of royalty.

08:57  22      We have not had a chance to respond to it, because it

08:57  23  wasn't in his report.  It is a separate analytical framework.

08:57  24  It is a separate legal framework.

08:57  25      And to have him now do this on the third day of trial for

08:57  1    the first time under the guise of "it's just math," it's not

08:58  2    just math.  We would have a full-throated response as to why

08:58  3    this was not right.

08:58  4         And Your Honor will recall that one of your motions in

08:58  5    limine was to exclude evidence of royalty stacking.  Believe

08:58  6    me, if they did a per-unit royalty, you would have heard a ton

08:58  7    about the royalties we're paying now and royalty stacking.

08:58  8         THE COURT:  Well, here's what we're going to do.  I'm not

08:58  9    going to rule, so don't -- I'm not going to hear from VLSI at

08:58  10   this point because I'm not going to rule right now.  When we

08:58  11   get to that point of Dr. Sullivan's direct where they want

08:58  12   to -- where VLSI wants to use that slide, we'll take a break.

08:58  13   I'll hear what the questions are going to be from counsel to

08:58  14   Dr. Sullivan and his answers.  And then I'm going to ask the

08:58  15   plaintiff to show me what in his report prior to this time

08:59  16   supports him being able to say that.

08:59  17        MR. LEE:  Fair enough.

08:59  18        THE COURT:  If it's in the report, if I decide it is,

08:59  19   he'll get to testify about it.  If I decide that it's not, then

08:59  20   he won't.

08:59  21        MR. LEE:  Fair enough, Your Honor.

08:59  22        THE COURT:  So the burden's on VLSI when they get to this

08:59  23   point to say, you know, Judge, this would be a good time to

08:59  24   take a break.  I'll understand what that means.  I'll excuse

08:59  25   the jury, and we'll take up -- this is an issue I can't decide

08:59  1  kind of out of context.

08:59  2       MR. LEE:  No.  Certainly these issues are, as we did

08:59  3  yesterday with the 1006 issue, it's just to alert you to the

08:59  4  issue so it doesn't pop up while the jury's sitting there.

08:59  5       Just a couple others we can do quickly.  There are a

08:59  6  series of demonstratives that -- where Dr. Sullivan picks

08:59  7  numbers out, big numbers, research and development numbers,

08:59  8  total revenue numbers.

08:59  9       Your Honor has ruled on that in Rule No. 7 and said those

08:59 10  numbers should be out.  We have said that for the exhibits that

08:59 11  have them in, you know, we'll work with the other side to

09:00 12  redact what shouldn't come in under Your Honor's ruling, but to

09:00 13  allow what should come in that is critical to his analysis.

09:00 14       But the slides that he has now, and just to alert you

09:00 15  because I will be objecting to them, they have these other

09:00 16  numbers that have nothing to do with his analysis other than

09:00 17  the fact they're big numbers from, as Your Honor knows from

09:00 18  your own experience, SEC reports, annual reports of a whole

09:00 19  host of numbers, there's a bunch of demonstratives that have

09:00 20  those in and so we would be objecting to those so Your Honor

09:00 21  knows.

09:00 22       THE COURT:  Are those numbers in his report?

09:00 23       MR. LEE:  The documents are in his report, but that was

09:00 24  before Your Honor's MIL ruling on what would come in and

09:00 25  wouldn't and before we had the argument on the entire market

09:00   1   value rule and the 403 issues.

09:00   2        THE COURT:  Let me hear from counsel for VLSI, and I'm

09:00   3   presuming you don't want to put something in I ruled on in a

09:00   4   MIL -- well, let me start over.

09:00   5        The point of the MIL is to have you come to me before you

09:01   6   put it in, and it's not actually a ruling that it's

09:01   7   inadmissible.

09:01   8        Let me ask you -- try it this way.  Is this something --

09:01   9   and, Mr. Lee, I want you to -- I want you to weigh in on this

09:01  10   as well.  Is this something that you can show the demonstrative

09:01  11   and, Mr. Lee, you can object at that time and I can see from

09:01  12   what is happening in the questioning of whether or not I think

09:01  13   it should be admissible or not?

09:01  14        MILs are typically to keep something out that where just

09:01  15   the prejudice of showing it to the jury would be so profound

09:01  16   that, you know, I can't just rule on the relevance of it as we

09:01  17   go.

09:01  18        What -- let me ask you what you think about that and then

09:01  19   I'll hear from Mr. Lee.  It seems to me this is something I can

09:01  20   probably deal with as you show the demonstrative.  I hear the

09:01  21   context of what you're asking, and Mr. Lee can object.

09:02  22        MS. PROCTOR:  I think that's fine, Your Honor.  I would

09:02  23   love to hear from Mr. Lee what specific demonstratives he's

09:02  24   concerned about because the SEC filing demonstratives we've

09:02  25   submitted do not include any of the big numbers.  They just

09:02 1   include statements about the competition in the market.

09:02 2        THE COURT:  Well, what would certainly make me happy going

09:02 3   forward is if someone has a concern with someone else's

09:02 4   demonstratives, if they make sure the other side knows which

09:02 5   demonstratives those are.  So, Mr. Lee, if you have not favored

09:02 6   VLSI with which demonstratives you are unhappy about, I would

09:02 7   do that.

09:02 8        MR. LEE:  We did last night, Your Honor.

09:02 9        MS. PROCTOR:  And I'm so -- I'm not sure which ones you're

09:02 10  referring to now because there are none -- I'm sorry, Your

09:02 11  Honor.  I'm not sure which ones he's referring to now because

09:02 12  there are none with the large numbers that relate to SEC

09:02 13  filings, and we also offered to submit just selected pages from

09:02 14  the SEC filings into evidence, and we've prepared those

09:02 15  redacted versions that we would be happy to submit in place of

09:02 16  the full SEC filings.

09:02 17       THE COURT:  Okay.  Well, here's what I'm going to do.

09:03 18       Mr. Lee, this seems to me to be something we can deal with

09:03 19  as Dr. Sullivan's testifying.  You can object to them, and I'll

09:03 20  see in the context of the question and answer whether or not I

09:03 21  think they should come in as evidence or not.

09:03 22       MR. LEE:  That's fine, and to the extent there's any

09:03 23  ambiguity, I'll rescind the list of the ones that we are

09:03 24  objecting to because there'll be some time when Dr. Annavaram's

09:03 25  on the stand.

520

09:03  1        THE COURT:  Okay.

09:03  2        MS. PROCTOR:  And one other comment I wanted to make, Your

09:03  3   Honor, just on the per unit versus the overall numbers, I know

09:03  4   you're going to address that later.  We understand your ruling.

09:03  5   We'll happily go through and show you how Dr. Sullivan

09:03  6   disclosed a running royalty in his report and that's always

09:03  7   been the form of royalty, but I want to make sure that the

09:03  8   Court is aware.  Intel's also objecting to our use of the total

09:03  9   accused revenues which you ruled on during the MIL phase and

09:03  10  said that those can come in.  The issue is those numbers are

09:03  11  for one patent 50 billion, for another patent 123 approximately

09:04  12  billion dollars.

09:04  13       And so in order for us to show the math of Dr. Sullivan's

09:04  14  calculation, we have to use those 50 billion or $123 billion

09:04  15  numbers or we have to divide, just simple division like Your

09:04  16  Honor said, the total royalty by the total number of units and

09:04  17  do it on a per-unit basis.

09:04  18       So it's the exact same math.  I'm happy to show you the

09:04  19  slides and show you the support in the report, but I want to be

09:04  20  clear that this is an issue that's been brought on actually by

09:04  21  Intel's objections and their -- basically they said we can't

09:04  22  use the big numbers.  They think that's prejudicial so we've

09:04  23  tried to adjust and use the small ones.

09:04  24       THE COURT:  Well, when Dr. Sullivan tries to move forward,

09:04  25  I'll decide whether he can use the big numbers or the method

09:04  1  he's using to not use the big numbers, but I'll understand it

09:04  2  better if I hear Dr. Sullivan's testimony.

09:04  3      MS. PROCTOR:  Absolutely, Your Honor.  And we'll show you

09:04  4  the calculations both ways, and we think both are admissible.

09:04  5      THE COURT:  Okay.  Mr. Lee?

09:04  6      MR. CHU:  Go ahead.

09:04  7      MR. LEE:  Last issue with Dr. Sullivan, Your Honor, he has

09:05  8  a series of slides to show the hypothetical negotiation as

09:05  9  between Intel and NXP.  It's between Intel and Freescale at the

09:05 10  time of the hypothetical negotiation of the date.

09:05 11      This is something Your Honor addressed in part in the

09:05 12  opening slides.  They just need to be correct on who the

09:05 13  parties are to the hypothetical negotiation.

09:05 14      THE COURT:  I definitely agree that it should be between

09:05 15  Freescale and Intel.

09:05 16      MR. LEE:  Thank you, Your Honor.

09:05 17      MS. PROCTOR:  And I'm sorry.  Very briefly on that, Your

09:05 18  Honor.  It's very clear on our slides -- sorry -- it's clear on

09:05 19  our slides that it would be between Freescale and Intel.

09:05 20  That's what Dr. Sullivan will say.  We've just put NXP's logo

09:05 21  next to Freescale to remind the jury of the relationship

09:05 22  between the companies now and the merger.

09:05 23      THE COURT:  Why don't we take NXP off?  Because I think it

09:05 24  does need to be made clear.

09:05 25      You can -- he can certainly say that, but I think it's

09:05   1   fair to Intel that the jury understand that even -- it might be

09:05   2   NXP now, but the negotiation would have been between Freescale

09:06   3   as it stood at the time and Intel as it stood at the time and

09:06   4   NXP's -- and the relationship between Freescale and NXP is --

09:06   5   there's no relevance to that for the hypothetical negotiation.

09:06   6       MS. PROCTOR:  Understood, Your Honor.

09:06   7       THE COURT:  As I understand hypothetical negotiations and

09:06   8   who knows how well I do so... anything else, Mr. Chu?

09:06   9       MR. CHU:  Yes.  At the end of the day yesterday, promised

09:06   10  to get back to the Court about the time.  And Suzanne's time

09:06   11  keeping and your rounding up is perfectly fine and consistent

09:06   12  with our time keeping.

09:06   13      Second, I wanted to give -- share with Your Honor a short

09:06   14  report on written discovery, but more importantly on deposition

09:06   15  designations, and then third, we are going to read in the list

09:06   16  of the exhibits that we thought were admitted.

09:06   17      So my neutral report without faulting either side, there

09:06   18  have been designations and counter-designations.  I'm not sure

09:07   19  they're all complete.  They may be largely complete, but I

09:07   20  think both sides have objections, and we will work with Intel's

09:07   21  counsel to get you those objections as soon as possible.

09:07   22      I want to confirm that the running time in the deposition

09:07   23  is charged against the party who had designated that.

09:07   24      THE COURT:  Correct.

09:07   25      MR. CHU:  Okay.  And what is the Court's preferred way to

09:07  1  get you the objections?  Would it be for us to just to mark it

09:07  2  on the deposition transcripts or in some other way?

09:07  3      THE COURT:  I think -- here's what I would do.  If you

09:07  4  just give me the portions of the transcript and highlight the

09:07  5  portions that one side's objected to, I've done this long

09:07  6  enough where I'm not going to really pay attention to what your

09:07  7  objections are.  I'm just going to read through it, and I'll

09:07  8  know -- I think I'll be able to figure it out.  If I have a

09:07  9  question, I'll say, why are you objecting to this, but I think

09:07 10  I can read those pretty quickly and decide whether or not I

09:08 11  think they're objectionable.

09:08 12      MR. CHU:  So we'll work with Intel's counsel, try and get

09:08 13  those to you as quickly as possible, but it may be that we

09:08 14  don't get all or everything to you today in time so that --

09:08 15      THE COURT:  That's fine.

09:08 16      MR. CHU:  Okay.  And then there may be some written

09:08 17  discovery we want to read to the jury.  So it may be --

09:08 18      THE COURT:  Responses to interrogatories and that sort of

09:08 19  stuff?

09:08 20      MR. CHU:  Yes, responses to written discovery.

09:08 21      THE COURT:  Okay.

09:08 22      MR. CHU:  So it may be when we have called our last

09:08 23  witness that we formally will not have rested subject to the

09:08 24  items I just discussed.

09:08 25      THE COURT:  Understood.

```
09:08   1        MR. CHU:  And then my colleague, Mr. Heinrich, will do a
09:08   2    superb job of reading exhibit numbers.
09:08   3        THE COURT:  Well, he did a fine job on his direct
09:08   4    yesterday.  I expect nothing less today.
09:08   5        MR. HEINRICH:  And I won't go too fast.  PTX-0007,
09:09   6    PTX-0227, PTX-1588-NAT, PTX-1669, PTX-1669-NAT, PTX-1670-NAT,
09:09   7    PTX-1696-NAT, PTX-1802, PTX-1805, PTX-1949-NAT, PTX-1979-NAT,
09:09   8    PTX-3481, PTX-3484, PTX-3494, PTX-3511, PTX-3523, PTX-3574,
09:09   9    PTX-3579, PTX-3588, PTX-3588-NAT, PTX-3628, PTX-3638,
09:10  10    PTX-3641-NAT, PTX 3659, PTX-3662, PTX-3662-NAT, PTX-3695,
09:10  11    PTX-3845, PTX-3851, PTX-4375, PTX-4396, D-1065, D-1145 and
09:10  12    D-1154.  The last three were excerpts from source code files.
09:10  13    Does Intel agree?
09:10  14        MR. MUELLER:  I think there was four of them that we did
09:10  15    not understand to be admitted.  What I would suggest, Your
09:10  16    Honor, if we could with Your Honor's permission confer with
09:11  17    VLSI's counsel and at lunch perhaps let you know the final
09:11  18    numbers.
09:11  19        THE COURT:  Absolutely.
09:11  20        MR. MUELLER:  Thank you, Your Honor.
09:11  21        THE COURT:  And that's why we do this.  I mean, I want to
09:11  22    be on the same page as to what's been admitted.
09:11  23        Is there anything else we need to take up before I bring
09:11  24    in the jury?
09:11  25        MR. CHU:  No, Your Honor.
```

09:11  1          MR. LEE:  No, Your Honor.

09:11  2          THE COURT:  Okay.  If you all will get ready and if you

09:11  3   can bring your witness up, I'll step back, we'll bring in the

09:11  4   jury and we'll be in in a few seconds.

09:13  5          THE BAILIFF:  All rise.

09:13  6          THE COURT:  Please remain standing for the jury.

09:13  7          (The jury entered the courtroom at 9:13.)

09:14  8          THE COURT:  You may be seated.

09:14  9          Yes.  It's always fascinating to me to see how you move

09:14  10  during the week.  Do you put on more clothes, do you put on

09:14  11  less clothes, is it hot in here, is it not hot in here.  I wear

09:14  12  this and so I can never tell what the temperature in here

09:14  13  really is for you all sitting here.  Welcome back.

09:14  14         Counsel, you may proceed with your direct.

09:14  15         MR. WASHBURN:  Good morning.  Things ended a little

09:14  16  quickly yesterday.  I don't think I got a chance to introduce

09:14  17  myself.  My name is Ian Washburn.  It's nice to meet you.

09:14  18                    DIRECT EXAMINATION

09:14  19  BY MR. WASHBURN:

09:14  20    Q.    And good morning, Professor Annavaram.

09:14  21    A.    Good morning.

09:14  22    Q.    Now, I'm not going to qualify you again, but just

09:14  23  because there was a lot of technical testimony yesterday, could

09:14  24  you briefly remind the jury who you are?

09:14  25    A.    Just in case you forgot, my name is Murali Annavaram.

09:15  1    I am a professor at USC.

09:15  2        Q.   And did you prepare any slides for your presentation

09:15  3    today, professor?

09:15  4        A.   Yes.  I have prepared a few slides so that you can

09:15  5    follow along as I describe some of the technology-related

09:15  6    issues.

09:15  7        Q.   All right.  Now, just to situate us before we get to

09:15  8    your opinions, could you explain to the jury using your slides

09:15  9    if you like what your role is on this case?

09:15  10       A.   My role in this case is to quantify the benefits.

09:15  11   Basically, you heard Professor Conte with respect to what the

09:15  12   infringing technologies are and what my role is, to say what

09:15  13   does that mean in terms of power benefits?  Does it improve

09:15  14   your system performance, system powered by 5 percent, 10

09:15  15   percent, whatever that number is, and so it's just trying to

09:15  16   quantify and putting numbers, some technical numbers to the

09:16  17   infringing technologies, and so I worked with Professor Conte

09:16  18   to provide this analysis.

09:16  19       Q.   And do you have an understanding of what was done

09:16  20   with the results of your analysis?

09:16  21       A.   My understanding is that the data that I provided to

09:16  22   Professor Conte was then sent or given to Dr. Sullivan, who you

09:16  23   will hear from a little bit later, which is then used to do

09:16  24   damage calculations.

09:16  25       Q.   All right.  Now, let's get to your specific analyses.

09:16   1   What specifically were the analyses you did in this case?

09:16   2       A.   So I did two specific tasks that I'm listing in the

09:16   3   slide.  The first one relates to the '373 patent, and here you

09:16   4   heard again from Professor Conte regarding these two power

09:16   5   supplies versus a single power supply connecting to the memory,

09:16   6   and my role here is to show you what is the power savings

09:17   7   associated with that ability to switch between the two power

09:17   8   supplies.

09:17   9       And then my second analysis is associated with the '759,

09:17  10   and in this particular patent, my role is to provide the power

09:17  11   used by the ring domain compared to the total chips.  Because

09:17  12   the total chip has some power, what is the fraction of the

09:17  13   power that the ring is going to consume?

09:17  14       Q.   And, Professor, at least on my screen, the -- like a

09:17  15   good teacher, you're making annotations on the slides.  At

09:17  16   least on my screen those are not appearing just for your

09:17  17   information.  They may not be on the jury's.

09:17  18       A.   Okay.

09:17  19       Q.   Now, was your approach in this case similar to your

09:17  20   universal research or was it different?

09:17  21       A.   So the approach that I took to this task is similar

09:18  22   to the research that I conduct in my research group, in the

09:18  23   sense that we followed rigorous existing scientific methodology

09:18  24   to provide the power analysis.

09:18  25       But in addition, I also had the advantage of getting

09:18   1   access to Intel's confidential tools.  And since I had access

09:18   2   to those confidential tools, I was able to conduct this

09:18   3   analysis more precisely because it's -- these tools are

09:18   4   designed and developed by Intel.

09:18   5       MR. WASHBURN:  Now, and, Your Honor, we believe what's on

09:18   6   our slides and what he's planning to say is not confidential.

09:18   7   Intel can inform us if they disagree.

09:18   8       MR. MUELLER:  Your Honor, I would ask if we could turn off

09:18   9   the monitors for the public.  I'm not asking to seal the

09:18  10   courtroom --

09:18  11       THE COURT:  Perfect.

09:18  12       MR. MUELLER:  -- just turn off the monitors, please, Your

09:18  13   Honor.

09:18  14       THE COURT:  But -- and Intel understands that this is

09:18  15   being broadcast by telephone, so I assume you're okay with that

09:19  16   as well?

09:19  17       MR. MUELLER:  Yes, Your Honor.  The only thing else I'd

09:19  18   ask is that if the witness is going to refer to specific

09:19  19   numbers in some of these spreadsheets, if he could instead just

09:19  20   refer to the screen in front of the jury without reading them.

09:19  21       THE COURT:  That'd be fine.

09:19  22       Are you okay with that, sir?

09:19  23       MR. WASHBURN:  We'd like to read exhibit numbers, but

09:19  24   aside from that, yes.

09:19  25       THE COURT:  Oh, no.  Sure.  Of course.  But -- you're

09:19  1    welcome to.

09:19  2         Doctor, do you understand?

09:19  3         THE WITNESS:  Yeah.  Thank you.

09:19  4         THE COURT:  Very good.  Thank you.

09:19  5    BY MR. WASHBURN:

09:19  6         Q.   All right, sir.  Then on the note of those

09:19  7    confidential tools, what specific tools did you use?

09:19  8         A.   Yeah.  So as I just mentioned, I used tools that were

09:19  9    provided to me by Intel.  These are Intel's confidential tools

09:19  10   that I have used.

09:19  11        And in particular I used two of the Intel's confidential

09:19  12   tools for doing power modeling.  One is called the Intel Power

09:19  13   Model.  The other one is called the Fox2.  So these are the two

09:19  14   tools that I used in this analysis.

09:19  15        Q.   And how did you get access to these confidential

09:19  16   tools?

09:19  17        A.   So since these are confidential tools, it's not

09:20  18   something that, even as a university professor, I would have

09:20  19   access to directly.  It's not a website I can go and download

09:20  20   them from.

09:20  21        Instead, I would have to sign a protective order, and I

09:20  22   would have to go through some security protocols to log into

09:20  23   systems to get access.  And there is a continuous video camera

09:20  24   on the computer that will monitor my access to these tools.

09:20  25        So every minute that I'm on the -- actually every second

09:20  1   I'm on the machine, there is a video that is continuously

09:20  2   streamed to Intel so they can see that I'm actually accessing

09:20  3   that tool.

09:20  4        Q.  All right.  Now, the first of the two tools that you

09:20  5   mentioned is the Intel Power Model tool.  What is the Intel

09:20  6   Power Model tool?

09:20  7        A.  So let me take a little bit of a deep dive into just

09:20  8   explaining what does that tool look like.  This is a sort of a

09:20  9   screenshot of the Power Model tool.  It might look a lot like a

09:21  10  spreadsheet that you may have seen before, like an Excel or

09:21  11  some other kind of spreadsheets, except this is fairly

09:21  12  complicated and it has thousands and thousands of inputs that

09:21  13  go into the model.

09:21  14       And these inputs are then used to compute the power

09:21  15  consumption of the chip.  So we can say, when I put in these

09:21  16  inputs, the chip consumes less than 14 watts of power.  And

09:21  17  again, watts are nothing but a unit of power, you probably

09:21  18  heard electric bulb is two watts, four watts.  It's the same.

09:21  19  That's what power here stands for.

09:21  20       And this tool not only tells you the whole chip power, but

09:21  21  it can also divide the chip into multiple pieces and provide

09:21  22  the power consumption information for each of the pieces within

09:21  23  the chip.  So it can kind of break down the power into multiple

09:21  24  components within the chip.

09:21  25       Q.  And are you referring to Exhibit 77 there, sir?

09:22   1        A.   Yes.   It's hard to read, but my screen doesn't show

09:22   2   the exhibit number at the bottom, so...

09:22   3        Q.   Have you seen any evidence of how much time Intel

09:22   4   spent building this Power Model tool?

09:22   5        A.   So I reviewed Mr. Stephen Gunther's testimony, and he

09:22   6   has -- he was asked the same question regarding the effort

09:22   7   required to build these tools.   And in his opinion, it takes

09:22   8   many thousands of hours to design and build these tools.

09:22   9        Q.   And how does Intel use these Power Model tools?

09:22  10        A.   So the way these tools are used is imagine that you

09:22  11   have a design and you want to make a change to the design.   And

09:22  12   you want to make that one change, keeping everything else

09:22  13   constant.

09:22  14        So if you want to make that design change, you want to

09:22  15   know what is the impact of the change on the system's power.

09:23  16        So previously, if it was consuming 14 watts, if I made

09:23  17   this change, does it consume more than 14 watts or less than

09:23  18   14 watts?   And I want to be able to make that analysis by doing

09:23  19   these comparisons.   And these are the kinds of comparisons

09:23  20   Intel, I believe, does, which is also something -- again I

09:23  21   can't see the trial exhibit in here because it's hidden.   So I

09:23  22   can just say that this is Intel's document that talks about

09:23  23   essentially this comparison analysis.   We can use this for

09:23  24   doing, you know, what-ifs scenarios of a design.

09:23  25        Q.   And, sir, are you referring to Slide 8.8, that has

09:23   1   the Exhibit No. 2477 on it?

09:23   2       A.    Yeah.  So I can see the slide number but not the --

09:23   3       Q.    Thank you, sir.

09:23   4       A.    -- the exhibit number, so...

09:23   5       Q.    All right.  The second of those two power testing

09:23   6   tools that you mentioned was the Fox2 tool.  What is the Fox2

09:24   7   tool?

09:24   8       A.    So Fox2 is another one of Intel's Power Model.  And

09:24   9   the difference between this Power Model and the previously

09:24   10  described Power Model, the spreadsheet model, is that this

09:24   11  tool, the Fox2, can monitor the power consumption varying over

09:24   12  time.  For example, if the CPU or the processor is running real

09:24   13  fast because it has to do a lot of work, it's going to burn

09:24   14  more power.  So it's going to consume more power and that's

09:24   15  tracked at that instance in time.

09:24   16      And let's say a second later, the processor goes to some

09:24   17  idle state, like not much to do, sit there and go to sleep, in

09:24   18  which case its power goes down.  And when the power goes up or

09:24   19  down, it's tracking these changes over time and continuously

09:24   20  figuring out what is the power consumption that chip is burning

09:24   21  as the workload goes up and down.

09:25   22      Q.    And did you see any evidence of whether Intel finds

09:25   23  this tool reliable?

09:25   24      A.    So again, I looked at a few documents that Intel has

09:25   25  provided me, which includes some e-mails where Intel engineers

533

09:25  1   talked about how good this tool is.  "Tool" here Fox2.  And

09:25  2   they talk about near 100 percent accurate correlation, which

09:25  3   means the data that this tool provides you is as close to the

09:25  4   actual physical chip that you are going to test on.  So it's a

09:25  5   very good, accurate simulation of the tool -- of the chip.

09:25  6       Q.   And are the two documents these referred to

09:25  7   Exhibits 2478 and 2465?

09:25  8       A.   That's right.  So you will see that this says

09:25  9   PTX-2478 and PTX-2465.

09:25  10      Q.   So we've now talked about two tools you used for your

09:26  11  testing of power benefits of the patents.  Did you have to

09:26  12  provide any inputs to those tools?

09:26  13      A.   So there are two inputs that these tools take.  The

09:26  14  first one is because Intel has literally, you know, dozens of

09:26  15  various kinds of processors, you have to first pick what

09:26  16  processor model that you want to actually measure this data on.

09:26  17  So one of the inputs is the processor model.  And you've

09:26  18  probably heard by now words like "Haswell," "Broadwell."  So

09:26  19  you have to first input one of that.  That's the first input to

09:26  20  this system.

09:26  21      And the second input to the system, these tools, is what

09:26  22  kind of workload, does this -- this processor is likely to be

09:26  23  used.  So is it doing computations or is it doing like Word

09:26  24  document reading?  So we have to kind of give that input as

09:27  25  well.

534

09:27   1        So those are the two inputs that one has to give.  One is

09:27   2    the CPU information, which you want to measure, and second is

09:27   3    the workload that you want to simulate on these systems.

09:27   4        Q.   So starting with the first of those two inputs, how

09:27   5    did you decide which products to use as representative samples

09:27   6    in your analysis?

09:27   7        A.   So when I started doing the analysis, I looked for

09:27   8    the processors which have the highest volume in terms of number

09:27   9    of units that are actually sold to pick that as the model that

09:27  10    I want to simulate in my system.  And so I picked the

09:27  11    processors that are accused processors and also have the

09:27  12    highest volume.  So that's how I picked what to simulate as the

09:27  13    processor.

09:27  14        Q.   And then turning to the second of those two inputs

09:27  15    you described, how did you decide what work those products

09:28  16    would be doing in your tests?

09:28  17        A.   So if you recall the second of the inputs, the first

09:28  18    one is the processor model; the second one is the workload, the

09:28  19    kind of work the system is expected to do.  And here I relied

09:28  20    on a -- something called a "MobileMark."  This is a benchmark

09:28  21    suite, and obviously it's not a very common term.  So benchmark

09:28  22    is nothing but a collection of applications --

09:28  23        (Interruption.)

09:28  24        (Off-the-record discussion.)

09:28  25        THE COURT:  No one else is allowed to have a phone, so...

09:28   1   If anyone else's goes off, you get a pass.

09:28   2       (Laughter.)

09:28   3       THE WITNESS:  I didn't even bring my phone in just to be

09:28   4   safe.

09:28   5   BY MR. WASHBURN:

09:28   6       Q.   So, sir, I think you were describing your use of

09:28   7   benchmarks in your analysis.

09:28   8       A.   Correct.  And so for the MobileMark, it's a

09:29   9   collection of applications, and I kind of listed a few here

09:29   10  that are quite familiar to many of you:  Word documents, you

09:29   11  must have read, edited things like Word documents; Internet

09:29   12  Explorer, which is a browser you can browse the web with; Excel

09:29   13  spreadsheets; and PDF document readers.  So these are things

09:29   14  that you would have used on a daily basis in using your

09:29   15  computers.

09:29   16      And so it's packaged, the collection of applications that

09:29   17  are packaged together, and that's what is called a MobileMark.

09:29   18      Q.   Now, is MobileMark limited to laptops in terms of its

09:29   19  use in research like yours?

09:29   20      A.   So there is a little bit of a misnomer here.  It says

09:29   21  "MobileMark," kind of giving you an impression that it is a

09:29   22  mobile, which typically corresponds to things that can be

09:29   23  moved, like laptops.

09:29   24      But if you look at the applications that -- I've

09:29   25  highlighted a few of them, like the Word, Excel spreadsheets

09:30   1   and PDF readers -- these are not just on laptops.  They're also

09:30   2   on your desktops and like, for example, the PowerPoint that we

09:30   3   are projecting on this particular screen is not just a

09:30   4   laptop-only projection, but it is on desktops and such.

09:30   5       So these are used across a broad spectrum of computing

09:30   6   systems, if you would like to think of it that way.

09:30   7       Q.   Did you do any of your own testing to confirm the

09:30   8   data in Intel's Power Model?

09:30   9       A.   So the Intel Power Model, as well as the Fox2,

09:30   10  require you to pick the work -- the application that the user

09:30   11  is going to look at or run, and they come with their own data

09:30   12  set for picking that workload.

09:30   13      What I did was I took six different computers, and I ran

09:31   14  the MobileMark on those six different computers.  These are

09:31   15  some of the accused processors have -- these systems have them.

09:31   16  And when this MobileMark is running on these computer systems,

09:31   17  I measured how active the CPU is, how sleepy the CPU is at

09:31   18  various times as the workload continues to progress.

09:31   19      So just to give you an idea, the MobileMark, for example,

09:31   20  really simulates the end user behavior, like, for instance,

09:31   21  think of Word document.  You are not editing every single

09:31   22  second.  You edit a few words and then you're going to just

09:31   23  sort of stare at what you wrote so that you can go back and

09:31   24  edit again.  And so it has this notion of idleness, where

09:31   25  you're actually just staring at the screen, and it can actually

09:31  1   simulate that behavior also.

09:31  2        And so as it simulates, it actually tells you what the CPU

09:32  3   usage looks like.  Oh, now I'm actually active, now I'm not

09:32  4   active, now I'm active.  So it's maintaining this information.

09:32  5   And so I measured that.

09:32  6        And once I measured that, I then chose that measured

09:32  7   values to see which of the Intel's various power available

09:32  8   system -- power models that are available have a reasonable

09:32  9   match, and I picked the one which has a close match to that.

09:32  10       Q.   All right.  Well, thank you for that discussion of

09:32  11  the two tools that you used.

09:32  12       I'd now actually like to turn back to the first of the two

09:32  13  analyses that you did with these tools.  The first, I believe,

09:32  14  related to the '373 patent.  Could you describe that analysis

09:32  15  for the jury?

09:32  16       A.   Yeah.  So just to recollect the -- this particular

09:32  17  slide.  You've seen this multiple times, I believe, in

09:32  18  Professor Conte's presentation.  So if you recall the '373

09:32  19  solution that Professor Conte described as having two power

09:33  20  supplies, which are shown in these two different colors, and

09:33  21  when my ring is sleeping here, the CBO and the ring is

09:33  22  sleeping, then basically the power comes from the top power

09:33  23  supply.

09:33  24       When the ring is not sleeping, so when the ring is

09:33  25  actually -- so this is showing you what ring is sleeping, but

09:33  1   let's say the ring is actually active, then the power comes

09:33  2   from this.

09:33  3        And so I simulated this and this mux which is nothing but

09:33  4   a selection between these two choices.  And I simulated both of

09:33  5   them and said, okay, so this is how much power is going to be

09:33  6   consumed if I did this '373.

09:33  7        The alternative solution, if I didn't have this muxing

09:33  8   capability, is to have a single power supply which is what is

09:33  9   shown here, on the alternative strategy.  So I simulated the

09:34 10   alternative strategy where the power is provided to the ring

09:34 11   and to the memory, the C6 SRAM.

09:34 12        And even if the ring is sleeping, we still have the power

09:34 13   going to the SRAM from this power supply, and therefore the

09:34 14   ring is also getting that power even if it is sleeping.  So

09:34 15   it's kind of going to borrow a little bit of extra power simply

09:34 16   because the way these systems work, if you give them power even

09:34 17   if they are sleeping, they would burn some of it.

09:34 18        Q.   So thank you for that conceptual explanation.  And

09:34 19   could you just explain briefly -- or concretely what you

09:34 20   actually did?

09:34 21        A.   Yeah.  So let me take the slide down.

09:34 22        So the way to do this experiment, those two scenarios that

09:34 23   I described, is to take the power model, and within the Power

09:34 24   Model you create a scenario where whenever the ring sleeps, the

09:34 25   power to the C6 SRAM comes from the top power supply.  Whenever

09:35  1   the ring is awake, the power to the C6 SRAM comes from the

09:35  2   bottom of the two power supplies.  And so you do that

09:35  3   simulation.

09:35  4        And for the alternative strategy is simply ignore whether

09:35  5   this ring is sleeping or not, constantly provide the power to

09:35  6   the C6 SRAM and the ring always from the same power supply.

09:35  7   And so now you have these two choices that you can model within

09:35  8   that Intel Power Model.

09:35  9        Q.   And what did you find in your '373 analysis, sir?

09:35  10       A.   So I'm going to put some numbers to the benefit.  So

09:35  11  basically this is a Haswell processor, which is one of the

09:35  12  accused processors, I believe.  It is two cores is what I

09:35  13  simulated with 15-watt power consumption.  And this is the

09:35  14  power consumption without the mux.  So this is -- I didn't have

09:35  15  that solution where there is no selected.  It burned 1761

09:36  16  milliwatts.

09:36  17       When I have the mux, basically I can reduce the power

09:36  18  consumption down by 96 milliwatts to 1665 milliwatts.  And

09:36  19  therefore the total power savings, because of the selection

09:36  20  capability, is 5.45 percent which is just simply 96 divided by

09:36  21  the 1761.

09:36  22       Q.   Was Haswell the only accused product for which you

09:36  23  did this analysis?

09:36  24       A.   I did this analysis also for the second of the

09:36  25  accused products, for '373 which is the Broadwell processor.

540

09:36  1   And here the Broadwell processor, two cores again, same

09:36  2   analysis, 1353 milliwatts versus 1261 [sic] so you save

09:36  3   6.36 percent.

09:36  4         Q.   All right.   Thank you.

09:36  5         Let's turn now to the second of your two analyses, the one

09:36  6   related to the '759 patent.

09:36  7         Can you describe that for the jury?

09:36  8         A.   Yeah.   So for the '759 I'm interested in measuring

09:37  9   the power consumed by the ring bus domain as a fraction of the

09:37  10  total chip.   And so that's the analysis that I am interested in

09:37  11  conducting.

09:37  12        Q.   And how did you go about that analysis?

09:37  13        A.   So let me again take down the slide just a minute

09:37  14  here to explain.

09:37  15        So for the '759 analysis, what I have done is I have taken

09:37  16  the Fox2, the model that I mentioned, the second of the two

09:37  17  power models.

09:37  18        And in this Fox2 I can essentially run a workload, and it

09:37  19  is measuring as the work is continuing.   Let's say, for a

09:37  20  second, it will measure how the processor is going

09:37  21  active/inactive, active/inactive and all of that.   And it will

09:37  22  basically divide the total power available of the chip and say

09:37  23  this is the power consumed by the ring domain, this is the

09:37  24  power consumed by the cores or the processors themselves.

09:38  25        So you can do this on Fox2 and you run it for whatever

09:38  1   number of minutes or seconds that you're interested in, and you

09:38  2   get the data back.

09:38  3        Q.   And what results did you find?

09:38  4        A.   So the results -- let me again put some numbers here.

09:38  5   So this is on a Whiskey Lake which is, I believe, one of the

09:38  6   accused products.  It's a two-core Whiskey Lake that I used.

09:38  7   The ring domain consumes 1021 milliwatts from the Fox2 analysis

09:38  8   out of the total chip power of 5412.  And so it is 1000 divided

09:38  9   by 5400 will give you 18.86 percent.

09:38  10       Q.   Did you take any steps to confirm that number?

09:38  11       A.   So I have also run this -- remember, this is done

09:38  12  with Fox2.  I also have the ability to run this with the Power

09:38  13  Model, so I also did something similar with the Power Model

09:38  14  analysis, but not on Whiskey Lake but on other products.

09:39  15  There, the ring domain consumed between 17 to 24 percent.  So

09:39  16  it's in the same ballpark here.

09:39  17       Q.   And did you perform this exercise for any accused

09:39  18  products other than Whiskey Lake?

09:39  19       A.   So let me go to my next slide, and I show you -- this

09:39  20  is for Skylake which is the second of the accused products.

09:39  21  And here is the power.

09:39  22       MR. MUELLER:  I apologize for interrupting, Your Honor.

09:39  23  If we could just indicate the numbers rather than reading them

09:39  24  out loud for this section.

09:39  25       THE COURT:  That would be fine.

09:39  1          MR. WASHBURN:  No objection, Your Honor.

09:39  2          MR. MUELLER:  Thank you, Your Honor.

09:39  3  BY THE WITNESS:

09:39  4      A.   So here is the ring bus domain power, and here is the

09:39  5  total power.  And you just divide this power by the total, you

09:39  6  get the ring bus domain power.

09:39  7  BY MR. WASHBURN:

09:39  8      Q.   Thank you, sir.

09:39  9          To wrap up, after you completed your assignment, did you

09:40  10  report your findings to Professor Conte?

09:40  11      A.   Yes.  So after I finished my analysis, I provided

09:40  12  these results to Professor Conte who has explained some of that

09:40  13  and how he has used it in his own work.

09:40  14          So to -- basically to summarize the results that I

09:40  15  provided to Professor Conte, the memory power savings features

09:40  16  saves at least, you know, the number of power that -- since I'm

09:40  17  not supposed to speak the number, I will just highlight the

09:40  18  numbers.  And the ring domain consumes at least the number that

09:40  19  is shown here.

09:40  20      Q.   Are your results relevant to other accused products?

09:40  21          THE COURT:  Counsel, you might want to, if you didn't,

09:40  22  make sure he references exactly for the record, on appeal,

09:40  23  which slides he's on since he's not giving the numbers.  You

09:40  24  might want to do something to tether this part of his testimony

09:40  25  so when -- if anyone's looking at this, they know exactly which

543

09:41  1    slides.

09:41  2        MR. WASHBURN:   Your Honor, I appreciate it.

09:41  3    BY MR. WASHBURN:

09:41  4        Q.   Sir, were you referring to Slide 23 just now?

09:41  5        A.   Yes.   I was referring when I mentioned the numbers

09:41  6    that I cannot say loud, they are listed on PDX-8.23.

09:41  7        Q.   And are your results relevant to other accused

09:41  8    products?

09:41  9        A.   So I have shown the results for the two core

09:41  10   products, but these are also applicable to systems that have

09:41  11   different -- potentially different number of cores.

09:41  12       Q.   Are you confident the results that you got accurately

09:41  13   measure the relevant power considerations?

09:41  14       A.   I don't have any reason to doubt it.   These are

09:41  15   fairly well-established robust tools.

09:41  16       Q.   And why do you say that your results would be

09:41  17   relevant to products with different numbers of cores?

09:41  18       A.   So the basic underlying technology is this mux, the

09:42  19   selection process that will switch between -- if I am looking

09:42  20   at '373, just focusing on that.

09:42  21       And there, it doesn't matter whether I have four of those

09:42  22   processors or two of those processors.   It's just simply the

09:42  23   ability to switch.   And, therefore, it's not as relevant to my

09:42  24   analysis to focus on four or eight, so I picked two.

09:42  25       Q.   Now, could Intel have run a power analysis like yours

09:42   1    if it believed your results were incorrect?

09:42   2        A.   So these are Intel's tools.  So I would imagine it is

09:42   3    possible for Intel to run the same analysis that I have

09:42   4    conducted.

09:42   5        Q.   Did Intel run a power analysis like yours?

09:42   6        A.   To my understanding, they have not provided it --

09:42   7    that analysis from their end.

09:42   8        Q.   Thank you, Professor Annavaram.

09:42   9        MR. WASHBURN:  No further questions.

09:42   10       THE COURT:  Counsel?

09:42   11       MR. MUELLER:  Thank you, Your Honor.

09:42   12                        CROSS-EXAMINATION

09:42   13   BY MR. MUELLER:

09:43   14       Q.   Good morning, sir.  My name is Joe Mueller and I'd

09:44   15   like to ask you a few questions if I could.

09:44   16       A.   Please.

09:44   17       Q.   Sir, you are testifying here today on behalf of VLSI,

09:44   18   correct?

09:44   19       A.   That's my understanding.

09:44   20       Q.   Now, the first time that you had heard of VLSI was

09:44   21   this case, right?

09:44   22       A.   That's correct.

09:44   23       Q.   Now, you understand there's two folks that work at

09:44   24   VLSI, and I want to ask you about each of them.  Okay?

09:44   25       A.   Okay.

09:44  1        Q.   The first person I want to ask you about is Cindy

09:44  2   Simpson, the chief technology officer.  You've heard of her,

09:44  3   correct?

09:44  4        A.   I have not.

09:44  5        Q.   You've not spoken with her?

09:44  6        A.   No.

09:44  7        Q.   The second person is Michael Stolarski, the CEO, who

09:44  8   was sitting in that chair right there on Monday.  Do you know

09:44  9   him?

09:44  10       A.   Not before this case, no.

09:44  11       Q.   And as of last September you were not familiar with

09:44  12  VLSI's business, correct?

09:44  13       A.   That's correct.

09:44  14       Q.   Now, the jury heard earlier this week from Mr. Spehar

09:45  15  from NXP.  Did you review that testimony?

09:45  16       A.   Only briefly, yes.

09:45  17       Q.   You have not spoken with Mr. Spehar, right?

09:45  18       A.   I have not spoken to him, no.

09:45  19       Q.   The jury also heard from Mr. Bearden from NXP.  You

09:45  20  reviewed his testimony?

09:45  21       A.   I watched parts of those, yes.

09:45  22       Q.   And, sir, you have not spoken with Mr. Bearden,

09:45  23  correct?

09:45  24       A.   I have not.

09:45  25       Q.   Now, you are not offering any opinion in this case

09:45  1   that Intel infringes the '373 patent or the '759 patent,

09:45  2   correct?

09:45  3        A.   That's correct.  My analysis is not associated with

09:45  4   the infringement part of it.

09:45  5        Q.   And you are not offering an opinion to the jury on

09:45  6   the issue of the validity of the '759 patent, right?

09:46  7        A.   I am not offering whether the patent is valid or not,

09:46  8   correct.

09:46  9        Q.   What you're here to talk about are your opinions on

09:46  10  certain power testing issues, correct?

09:46  11       A.   That is my understanding, as I described.

09:46  12       Q.   Now, you've been retained as an expert by VLSI,

09:46  13  right?

09:46  14       A.   That's my understanding.

09:46  15       Q.   And, sir, they have paid you in connection with your

09:46  16  work against Intel hundreds of thousands of dollars, correct?

09:46  17       A.   That's correct.

09:46  18       Q.   And that's part of the normal process for an expert

09:46  19  witness like you to be compensated for your time?

09:46  20       A.   That would be correct.

09:46  21       Q.   And you, in fact, have been compensated for your time

09:46  22  in this case, correct?

09:46  23       A.   I have been compensated, correct.

09:46  24       Q.   Now, sir, you've been working in the field of

09:46  25  computer architecture for decades, right?

09:46   1        A.   Yes.  I have been -- from '96 or so I have been in

09:46   2   the field.  1996.

09:46   3        Q.   And, sir, you've you published many papers?

09:46   4        A.   Easily, 100-plus papers.

09:47   5        Q.   You've taught courses for quite some time?

09:47   6        A.   I have been at USC for about 13 years, so I taught

09:47   7   during that time many courses.

09:47   8        Q.   And you of course have tried to stay current and

09:47   9   up-to-date on significant developments in the field of computer

09:47  10   architecture, right?

09:47  11        A.   That's a fair statement, correct.

09:47  12        Q.   It's an important part of your job as a professor,

09:47  13   correct?

09:47  14        A.   Yes.  So we usually read the latest developments as

09:47  15   part of our research progress.

09:47  16        Q.   And yet, sir, you'd never heard of the '373 patent

09:47  17   before this case?

09:47  18        A.   No.  I haven't heard of '373 before.

09:47  19        Q.   Nor, sir, had you heard of the '759 patent before

09:47  20   this case?

09:47  21        A.   No.  I have not heard of '759.

09:47  22        Q.   Now, I want to show you in an article that was shown

09:47  23   to the jury earlier this week -- actually a demonstrative that

09:48  24   has an excerpt of an article.

09:48  25        MR. MUELLER:  If we could pull up PDX-13.2, please.

548

09:48   1    BY MR. MUELLER:

09:48   2        Q.   And I believe you testified, but I want to make sure

09:48   3    I have this right, that you at least reviewed a portion of

09:48   4    Mr. Spehar's testimony; is that right, sir?

09:48   5        A.   Just briefly, correct.

09:48   6        Q.   Okay.  Let me just show you what was shown to the

09:48   7    jury right here.  This is an article that Mr. Spehar authored.

09:48   8    And do you see, sir, it says "Power Challenges Caused By IOT

09:48   9    Edge Nodes Securing and Sensing Our World"?  Do you see that?

09:48  10        A.   I see that.

09:48  11        Q.   And the first paragraph, the highlighting that was

09:48  12    actually in the version that was shown to jury, I'm not going

09:48  13    to read all of it.  I really just want to just focus your

09:48  14    attention, if I could, sir, on the very next sentence.

09:48  15        Do you see it says:  There exists many approaches to

09:48  16    reduce power.  Do you see that, sir?

09:48  17        A.   That's correct.

09:48  18        Q.   And that's a true statement?

09:48  19        A.   Yeah.  I think there are many ways to reduce power

09:48  20    consumption in computer systems.

09:48  21        Q.   And, in fact, there is an almost infinite number of

09:49  22    ways to do it, correct?

09:49  23        A.   And infinite may be too much, but yes, there are many

09:49  24    methods to reduce power consumption, and some of the work that

09:49  25    we do in my lab is an example of that.

09:49  1        Q.   You've done work yourself over the years on ways to

09:49  2   increase power consumption, correct?

09:49  3        A.   Decrease power consumption.

09:49  4        Q.   I'm sorry.  Decrease power -- I misspoke.  Decrease

09:49  5   power consumption.

09:49  6        A.   That is correct.

09:49  7        Q.   And other folks have too?

09:49  8        A.   Yeah, there is an active research group in the

09:49  9   country and around the world where people look at computer

09:49 10   powers as -- their action techniques and how to reduce the

09:49 11   power consumption of computer systems.

09:49 12        Q.   And certainly no one has a patent on all of the

09:49 13   different ways to save power, correct?

09:49 14        A.   I wouldn't know one way or the other.  I have not

09:49 15   analyzed that.

09:49 16        Q.   You're not aware of a single patent that covers every

09:49 17   possible way of saving power?

09:49 18        A.   I think it's infeasible in my opinion.

09:50 19        Q.   Infeasible?

09:50 20        A.   Everything in the world, no.

09:50 21        Q.   Okay.  Now, sir, you did some testing in this case to

09:50 22   measure various types of power use and consumption, correct?

09:50 23        A.   Yeah.  So I -- as I explained in my direct, I have

09:50 24   done some analysis.

09:50 25        Q.   And I'd like to ask you, if I could, sir, about a

550

09:50  1    hypothetical to try to get at the methodology that might be

09:50  2    used in a case like this.  Okay?

09:50  3        A.   Sure.

09:50  4        Q.   So I'm going to pose a hypothetical, and if any part

09:50  5    of it is unclear, please just tell me and I'll try to clarify.

09:50  6        A.   Understood.

09:50  7        Q.   All right.  So let's assume that the Ford Motor

09:50  8    Company comes up with an invention for saving fuel consumption

09:50  9    when a gas-powered vehicle is in fifth gear.  Are you with me

09:50  10    so far?

09:50  11        A.   I'm not a big car guy, but I understand.

09:50  12        Q.   Understood.  I'll try to -- again, if I'm unclear at

09:50  13    any point, just let me know and I'll try to rephrase.

09:50  14        A.   Sure.

09:50  15        Q.   But the idea is Ford comes up with a way to save

09:51  16    gasoline use when a gas-powered vehicle is in fifth gear.

09:51  17    You're with me so far?

09:51  18        A.   Yes.  I believe I am.

09:51  19        Q.   Okay.  And Ford decides to use this across its entire

09:51  20    fleet of gas-powered vehicles.  Still with me?

09:51  21        A.   Understood.

09:51  22        Q.   And, again, this is only for fifth gear.  All right?

09:51  23        A.   Okay.

09:51  24        Q.   And let's assume other companies don't have this

09:51  25    invention.  Chevrolet, Toyota, Honda do not have this same

09:51   1    invention.  Still with me?

09:51   2        A.   Yeah, I am.

09:51   3        Q.   Now, you would agree with me that Ford has many

09:51   4    different types of vehicles, right?

09:51   5        A.   Yeah.  I mean, I'm not a big car person so I don't

09:51   6    know all the models, but I assume they have dozens of models.

09:51   7        Q.   So in my hypothetical, if Ford wanted to figure out

09:51   8    how this much this invention saves gas use across its entire

09:51   9    fleet, it would need to look across its entire fleet, correct?

09:51   10       A.   I'm not sure how gas-powered car analysis is done,

09:52   11   but I guess so.  I'm not sure.

09:52   12       Q.   It would make sense.

09:52   13       A.   It's -- I guess depends on how the systems are --

09:52   14   engines are designed.  If there is some aspect of the fifth

09:52   15   gear is similar to multiple cars, you can do on one car and

09:52   16   apply it.  So it's -- again, I'm not an automotive person to

09:52   17   know that detail.

09:52   18       Q.   Let me ask you this.  You wouldn't test a Chevy

09:52   19   vehicle to determine how much savings could come from the Ford

09:52   20   invention, correct?

09:52   21       A.   Yeah, as long as their technologies are different, I

09:52   22   think that is possible.

09:52   23       Q.   And you wouldn't test a vehicle's gas use in first

09:52   24   gear because this is a fifth-gear invention, correct?

09:52   25       A.   Yeah.  So, I mean, some of the analogy is lost on me

09:53  1   simply because I don't have a multigear car and so it's hard to

09:53  2   understand, but I think I understood that if it is applied to

09:53  3   first gear, maybe.

09:53  4       Q.   It wouldn't make sense to test it in first gear if

09:53  5   it's a fifth-gear invention, correct?

09:53  6       A.   Possibly.  Again, I wouldn't know.

09:53  7       Q.   So let's talk about your testing.

09:53  8       Now, just so we're clear here, what VLSI is saying

09:53  9   infringes the '373 patent are two families of Intel processors,

09:53  10  the Broadwell processors and the Haswell processors, correct?

09:53  11      A.   That's my understanding, that those are the two

09:53  12  accused products.

09:53  13      Q.   Now, for the other patent in the case, the '759

09:53  14  patent, those families of processors, Broadwell and Haswell,

09:53  15  are not accused, correct?

09:53  16      A.   That's my understanding.

09:53  17      Q.   For the '759 patent it's different families of Intel

09:54  18  processors.  They're called the Lake series because they're

09:54  19  named after lakes, right?

09:54  20      A.   Yeah, that's what I heard from Professor Conte's

09:54  21  deposition presentation yesterday.

09:54  22      Q.   And so for the '373 patent, you did an analysis of

09:54  23  Broadwell and Haswell, correct?

09:54  24      A.   I provided results for both Broadwell and Haswell for

09:54  25  the '373.

09:54    1       Q.   And for the '759 patent, you analyzed these Lake

09:54    2   series processors, right?

09:54    3       A.   That's correct.

09:54    4       Q.   Now, let's be clear.  You didn't actually hook up any

09:54    5   of these chips to equipment to measure the electricity in them,

09:54    6   right?

09:54    7       A.   Yeah.  As I mentioned, these were done through the

09:54    8   power models, not connecting the chip to some power monitoring

09:54    9   infrastructure.

09:54   10       Q.   You took these two Intel tools, the Power Model and

09:54   11   Fox2, and used those to compute your estimates, right?

09:54   12       A.   I used them to compute the numbers I provided you.

09:55   13   Correct.

09:55   14       Q.   So let's go to PDX-8.14, and I want to start, if I

09:55   15   could, sir, with your analysis of the products accused for the

09:55   16   '373 patent.  Do you have those in mind?

09:55   17       A.   Yeah.

09:55   18       Q.   Okay.  So let's go to PDX-8.14.  This was the slide

09:55   19   you showed the ladies and gentlemen of the jury, right?

09:55   20       A.   That's correct.

09:55   21       Q.   Now, on the left-hand side here you have "373

09:55   22   solution."  Do you see that, sir?

09:55   23       A.   Yes.

09:55   24       Q.   And then below that you have the C6 SRAM.  Do you see

09:55   25   that, sir?

554

09:55    1        A.    Yeah.

09:55    2        Q.    Now, let's be clear.  The C6 SRAM that you're putting

09:55    3    here, that's not actually in the '373 patent.  That's what's

09:55    4    accused?

09:55    5        A.    That's my understanding, as in I didn't do any

09:55    6    infringement analysis.

09:55    7        Q.    Right.  But this portion of your diagram right here

09:55    8    underneath the heading "'373 Solution," that's not actually in

09:55    9    the patent, correct?

09:55    10       A.    The C6 SRAM as a word I don't think appears.

09:56    11       Q.    Now, this is the portion of your analysis where you

09:56    12   use the Intel Power Model, right?

09:56    13       A.    Yeah.

09:56    14       Q.    It's a large spreadsheet with lots of complex

09:56    15   formulas in it?

09:56    16       A.    That's a fair statement.

09:56    17       Q.    It involves hundreds of thousands of inputs?

09:56    18       A.    Yeah, it has lots and lots of inputs, takes a long

09:56    19   time to run these actually on a computer system.

09:56    20       Q.    And this is a spreadsheet that was created by Intel

09:56    21   engineers?

09:56    22       A.    Yes.  Absolutely.

09:56    23       Q.    Now, you did not do a test of each of the Haswell and

09:56    24   Broadwell processors using this Power Model, correct?

09:56    25       A.    I did the two systems that I mentioned, the two-core

09:56  1   Haswell and two-core Broadwell, 15-watt products.

09:56  2       Q.   The Broadwell and Haswell processors are each a

09:57  3   family of processors, right?

09:57  4       A.   Yeah, as I explained to the jury, gentlemen and

09:57  5   ladies, that there are different variations but the underlying

09:57  6   core technology, that's correct.

09:57  7       Q.   There's 350 different versions, correct?

09:57  8       A.   I don't recall the exact number.  Yes.

09:57  9       Q.   You do remember there's hundreds of versions of these

09:57  10  processors?

09:57  11      A.   That's possible.  That's very possible.

09:57  12      Q.   And of those you tested two, correct?

09:57  13      A.   So I tested the two-core 15-watt products, correct.

09:57  14      Q.   And what you did to test -- your testing involved the

09:57  15  use of some laptops to figure out workload, correct?

09:57  16      A.   So I used the laptop data to figure out which Power

09:57  17  Model data to use.  Correct.

09:57  18      Q.   So let's try to make sure we're on the same page

09:57  19  here.  What you did is you used some laptops to figure out what

09:57  20  inputs to put into the Power Model.  Do I have that right?

09:57  21      A.   I would revisit as to what inputs to select from the

09:58  22  Power Model.

09:58  23      Q.   Fair enough.  Select from the Power Model.

09:58  24      A.   Correct.

09:58  25      Q.   Let's take a look at PDX-8.12.  And you used the

09:58  1   MobileMark program in conjunction with six different actual

09:58  2   computers, correct?

09:58  3       A.   That's correct.

09:58  4       Q.   And this was to help you figure out which inputs to

09:58  5   select in the Power Model?

09:58  6       A.   That's a fair statement.  Yes.

09:58  7       Q.   We can take this down.

09:58  8       Now, of the six computers that you used, it turned out

09:58  9   four of them did not actually have accused chips within them,

09:58  10  correct?

09:58  11      A.   They were Ice Lake and other Lake products in them.

09:58  12      Q.   Well, let's take a look, if we could, at your report

09:58  13  if you want to refresh your memory, and there should be a Tab 1

09:58  14  in your binder, and I'd like you to take a look at, sir, if you

09:59  15  wouldn't mind, Paragraph 49.

09:59  16      MR. MUELLER:  And I won't show it to the jury, Your Honor.

09:59  17  I'll let him review it first.

09:59  18      THE COURT:  Sure.

09:59  19  BY MR. MUELLER:

09:59  20      Q.   And, sir, just let me know when you're there.

09:59  21      A.   Yeah, I am on -- I am on my report, yes.

09:59  22      Q.   So Paragraph 49 lists the six computers you tested,

09:59  23  correct?

09:59  24      A.   That is correct.

09:59  25      Q.   And the last four on the list use Lake processors

09:59  1    which are not accused of infringing the '373 patent, correct?

09:59  2        A.   That is correct.

09:59  3        Q.   So for your '373 testing, you used products that were

09:59  4    not actually accused of infringing the '373 patent, right?

09:59  5        A.   The -- the residency numbers across all the six were

09:59  6    quite close.

10:00  7        Q.   Sir, the Lake processors are not accused of

10:00  8    infringing the '373 patent.

10:00  9        A.   That's correct.

10:00  10       Q.   Now, there's more than 300 different Haswell

10:00  11   processors, right?

10:00  12       A.   I don't remember the exact SKU numbers available, but

10:00  13   I would take your word for it.

10:00  14       Q.   And that is a family accused of infringing the '373?

10:00  15       A.   That would be correct.

10:00  16       Q.   But you didn't use any computers at all that

10:00  17   contained a Haswell processor; isn't that true?

10:00  18       A.   I used the Broadwell but not the Haswell, correct.

10:00  19       Q.   Now, you understand that what's being accused for the

10:00  20   '373 in particular is this component called the C6 SRAM, right?

10:00  21       A.   That's my understanding.  Correct.

10:00  22       Q.   It's one of the thousands of components within these

10:00  23   chips, correct?

10:00  24       A.   Yeah, certainly there are many components in these

10:00  25   chips.

10:00  1      Q.   And you had to figure out what the power usage was

10:00  2  associated with that C6 SRAM, fair?

10:01  3      A.   That's one of the things that I had to do.

10:01  4      Q.   Now, sir, if you go to Paragraph 59 of your report,

10:01  5  and I may ask you to refer to it, but if you just take a look

10:01  6  at it, let me know when you're there.

10:01  7      A.   Yes.  I am.

10:01  8      Q.   Now, sir, in this section of your report, it was

10:01  9  showing data that you generated from testing those six

10:01 10  computers, right?

10:01 11      A.   Yeah.  This is the spreadsheet of the data of the

10:01 12  residencies.

10:01 13      Q.   And, again, you were trying to figure out the

10:01 14  workload associated with actually using the C6 SRAM?

10:01 15      A.   I was trying to figure out which of the various power

10:01 16  models I should select based on the residency data.

10:01 17      Q.   To approximate use of the C6 SRAM?

10:02 18      A.   Yeah.  To find a close -- reasonably close match.

10:02 19      Q.   Now, the first column -- and if we could pull this

10:02 20  figure up here just to make sure we're all on the same page.

10:02 21      The first column identifies what's called the C-state

10:02 22  residency.

10:02 23      MR. MUELLER:  And, Your Honor, if we could turn off the

10:02 24  public monitors for this --

10:02 25      THE COURT:  Okay.

10:02    1          MR. MUELLER:  -- but we don't have to seal the courtroom.

10:02    2   BY MR. MUELLER:

10:02    3          Q.   Sir, the first column here identifies the C-state

10:02    4   residency that you're measuring, right?

10:02    5          A.   It's measuring the C0 residency.  Correct.

10:02    6          Q.   And the other six columns represented each of the six

10:02    7   computers you tested, right?

10:02    8          A.   The -- these six columns represent the six computers

10:02    9   that I measured.  Correct.

10:02   10          Q.   Now, if we look down to the middle of this table, do

10:02   11   you see you put in bold a row that says system Core C7?  Do you

10:02   12   see that, sir?

10:03   13          A.   Yeah.  It says C7 residency.  Correct.

10:03   14          Q.   The values in the Core C7 state row are listed right

10:03   15   there, right?

10:03   16          A.   Yes.

10:03   17          Q.   And let's be really clear with the ladies and

10:03   18   gentlemen of the jury, this is Core C7, right?

10:03   19          A.   So this is the Core C7.

10:03   20          Q.   And that's what you put in bold, correct?

10:03   21          A.   That's correct.

10:03   22          Q.   But, sir, the truth is C6 SRAM is not actually used

10:03   23   in Core C7, is it?

10:03   24          A.   It's used in the package when the package was sent to

10:03   25   the --

10:03  1      Q.   It's used in the package C7, right?

10:03  2      A.   It's used in the package.  Correct.  Package state.

10:03  3      Q.   It's not used in the core state?

10:03  4      A.   If only a single core is sleeping, no.

10:03  5      Q.   I'm sorry, sir?

10:03  6      A.   If there's only a single core that is sleeping, it

10:03  7  doesn't.

10:03  8      Q.   So when you bolded the Core C7, that was not right?

10:04  9      A.   But as I mentioned, this is just to get an

10:04  10  approximate match to the actual Intel data.  Correct.

10:04  11      Q.   If you'd just stay with my question:  When you bolded

10:04  12  Core C7, that was not a correct indication of when C6 SRAM is

10:04  13  used, right?

10:04  14      A.   I guess you could say that, if you -- if that makes

10:04  15  it easier.

10:04  16      Q.   Now, you took the data from your six laptops, and you

10:04  17  used that to select the inputs back in the Power Model, right?

10:04  18      A.   Yeah.  So I actually only used this data to find the

10:04  19  closest one, but I didn't use this data to actually do my

10:04  20  computations.

10:04  21      Q.   Now, again there were two of these six laptops that

10:04  22  had actual accused processor in them, right?

10:04  23      A.   Correct.

10:04  24      Q.   Then you went back --

10:04  25      A.   For the '373 patent.

10:04  1      Q.   For the '373.  Yep.

10:04  2      A.   Just to be clear.  Yes.

10:04  3      Q.   Thank you.

10:04  4           Then when you went back to the Power Model, that had a

10:04  5   long list of SKU, which is the model number for the various

10:05  6   products, correct?

10:05  7      A.   That's correct.

10:05  8      Q.   But when you went back to the Power Model, you did

10:05  9   not use the same two SKUs that you had used in the laptops, did

10:05 10   you?

10:05 11      A.   As I explained, I picked the processors which are the

10:05 12   most volume-wise sold products.  Correct.

10:05 13      Q.   Sir, if you'd please just stay with my question.

10:05 14           You didn't use the same processors for the Power Model as

10:05 15   you used for the laptops, did you?

10:05 16      A.   They are the same family, but not the exact -- I

10:05 17   don't remember the exact SKU number.  I don't think so.

10:05 18      Q.   They were not?

10:05 19      A.   I don't recall that number, the precise SKU numbers.

10:05 20      Q.   Let's go over to the '759 patent.  Do you have that

10:05 21   in mind?

10:05 22      A.   Sure.

10:05 23      Q.   And this patent, what's being accused are these Lake

10:05 24   series processors, correct?

10:05 25      A.   That's my understanding.

562

10:05  1       Q.   Now, here you use something called Fox2, right?

10:06  2       A.   That's the tool I used for analysis.

10:06  3       Q.   And this is a tool that was developed by Intel

10:06  4   engineers?

10:06  5       A.   That's my understanding.  Correct.

10:06  6       Q.   And you applied this tool to some Broadwell processor

10:06  7   technology, correct?

10:06  8       A.   Say that again?  I don't think I'm on the same page

10:06  9   with you on that.

10:06  10      Q.   Sure.  Let me try to clarify.  You adjusted the Fox2

10:06  11  tool for your work in analyzing the '759 patent issues, right?

10:06  12      A.   I selected the processor model for Fox2.  Correct.

10:06  13      Q.   And you adjusted it based on tests that you ran on a

10:06  14  Broadwell processor, correct?

10:06  15      A.   On the collection across various systems.  I don't

10:06  16  remember if it was just the Broadwell.

10:06  17      Q.   Let me try to refresh your memory.  If you could look

10:06  18  at your report, sir, at Paragraph 137, and take your time, and

10:06  19  let me know when you're there.

10:06  20      A.   Okay.  Thank you.  Yes.

10:07  21      Q.   And do you see, sir, in Paragraph 137, you

10:07  22  specifically stated that you had run tests on a Broadwell CPU

10:07  23  as a test system?

10:07  24      A.   That's correct.

10:07  25      Q.   So you adjusted the Fox2 tool using this Broadwell

10:07   1   test?

10:07   2        A.   That's correct.  Yes.

10:07   3        Q.   But, sir, the Broadwell processors are not accused of

10:07   4   infringing the '759 patent, are they?

10:07   5        A.   Yeah.  Yeah.

10:07   6        Q.   Yes, they are not?

10:08   7        A.   Yes.  They are not.  Yes.

10:08   8        Q.   Now, there's ten processor families accused of

10:08   9   infringing the '759 patent, correct?

10:08   10       A.   I believe that's correct.  I'm not exactly sure the

10:08   11  numbers there.

10:08   12       Q.   You had access to the Fox2 tool for multiple Lake

10:08   13  series processors, correct?

10:08   14       A.   Could you please repeat the question, please?

10:08   15       Q.   Sure.  You had access to this Fox2 tool for multiple

10:08   16  Lake series processors, right?

10:08   17       A.   I believe I had only access to two of them.  The

10:08   18  Skylake and the Whiskey Lake, which is what I used in my

10:08   19  analysis.

10:08   20       Q.   Well, let's take a look at your report at

10:08   21  Paragraph 64, and if you could let me know when you're there.

10:09   22       Are you there, sir?

10:09   23       Do you see in the last sentence it says -- you said,

10:09   24  "Intel has produced nearly identical versions of Fox2 for

10:09   25  Whiskey Lake, Coffee Lake, Kaby Lake and Skylake."

10:09   1          Do you see that, sir?

10:09   2          A.   That's correct.

10:09   3          Q.   And so you had access to those, right?

10:09   4          A.   Yeah.  That's what I was saying, that I didn't have

10:09   5   access to all the ten different versions, but the few versions

10:09   6   that are identical.

10:09   7          Q.   But you did not use the version that you had access

10:09   8   to for Coffee Lake, correct?

10:09   9          A.   Yeah.  I used two of those four.  Correct.

10:09  10          Q.   You did not use it for Coffee Lake, did you?

10:09  11          A.   I did not use it for Coffee Lake.  Correct.

10:09  12          Q.   And you did not use it for Kaby Lake, correct?

10:09  13          A.   Yeah.  I used other two.  Correct.  That's correct.

10:09  14          Q.   So you used two and you said that was enough for all

10:09  15   ten accused Lake series families, correct?

10:09  16          A.   That's correct.  Yes.

10:09  17          Q.   Now, for this '759 patent analysis, Dr. Conte, who we

10:10  18   heard from yesterday, asked you to calculate the portion of

10:10  19   processor power consumed by the ring interconnect relative to

10:10  20   some other components in Intel's processors.  Do I have that

10:10  21   right, sir?

10:10  22          A.   I believe the exact --

10:10  23          Q.   And if it helps, sir, Paragraph 122 in your report.

10:10  24          A.   Yeah.

10:10  25          Q.   Take your time.  And do you see, sir, in that second

565

10:10  1    sentence, it says, "I have been asked by Professor Conte to

10:10  2    calculate the percentage of power used by the ring interconnect

10:10  3    relative to other components involved in Speed Shift's

10:11  4    operation"?  Do you see that, sir?

10:11  5         A.    That's correct.

10:11  6         Q.    And that is what Mr. Conte -- or Dr. Conte asked you

10:11  7    to do?

10:11  8         A.    That's correct.

10:11  9         Q.    Now, your Fox2 test calculated the power usage of

10:11 10    something called the "CLR domain," right?

10:11 11         A.    There's the ring domain.  Yes.  That's correct.

10:11 12         Q.    And that contains multiple components, correct?

10:11 13         A.    That's my understanding.  Correct.

10:11 14         Q.    You calculated a single power usage value for all the

10:11 15    components within that CLR domain, right?

10:11 16         A.    So I computed the fraction of the power consumed by

10:11 17    the ring bus domain, which I think you're calling a CLR domain.

10:11 18         Q.    Right.  And the CLR domain includes the ring itself,

10:11 19    correct?

10:11 20         A.    It has the ring.  Yes.

10:11 21         Q.    It also includes something called the C-B-O, right?

10:11 22         A.    The CBO.  Yeah.  That's correct.

10:11 23         Q.    And the LLC, correct?

10:11 24         A.    That's my understanding.  Correct.

10:11 25         Q.    Now, you did not isolate the ring from those other

10:12  1    components I just named, did you?

10:12  2        A.   I measured the power consumption of the whole domain.

10:12  3    Correct.  Not the individual pieces inside.

10:12  4        Q.   Not individually the ring, correct?

10:12  5        A.   Not individually the ring.

10:12  6        Q.   Just a few final questions, sir.

10:12  7        All the work you did in this case was with respect to

10:12  8    Intel products, correct?

10:12  9        A.   That's correct.

10:12  10       Q.   Using some Intel tools, right?

10:12  11       A.   These are Intel tools.  Exactly.

10:12  12       Q.   Developed by Intel engineers?

10:12  13       A.   Absolutely.

10:12  14       Q.   You did not do any power testing analysis to show the

10:12  15   benefits of the '373 patent using NXP products, correct?

10:12  16       A.   No.  I did not use NXP tools.

10:12  17       Q.   Nor Freescale products?

10:12  18       A.   No.

10:12  19       Q.   Nor SigmaTel products?

10:12  20       A.   I did not use SigmaTel.

10:12  21       Q.   Nor did you do any testing of the '759 patent alleged

10:12  22   benefits with respect to NXP products?

10:12  23       A.   I did not do NXP products.  Correct.

10:13  24       Q.   Freescale products?

10:13  25       A.   No.  I didn't.

10:13    1        Q.   SigmaTel products?

10:13    2        A.   I did not do SigmaTel products.

10:13    3        Q.   And in the testimony of this trial that you've

10:13    4   reviewed, no such product has been identified, correct?

10:13    5        A.   That's -- I mean, I only listened to parts of the

10:13    6   things, so I don't know exactly.  Yeah.

10:13    7        Q.   You're not aware of a single Freescale, SigmaTel, NXP

10:13    8   product that uses either the '373 or the '759 patent, correct?

10:13    9        A.   I would imagine -- I mean, I'm not sure of all the

10:13   10   details, but that's what -- if you tell me, I'll take that word

10:13   11   for you.

10:13   12        Q.   You're not here to identify any such product

10:13   13   yourself, are you?

10:13   14        A.   I am not identifying that product.

10:13   15        Q.   Okay.  Last couple of questions.

10:13   16        You understand Intel's position is that the products you

10:13   17   tested don't infringe either the '373 or the '759 patent?  Do

10:13   18   you understand that's their position?

10:13   19        A.   I'm sure that's why we are in the Court.  Yeah.

10:13   20        Q.   And you're not here to dispute that either?

10:14   21        A.   I am not speaking about infringement analysis.

10:14   22   Correct.

10:14   23        Q.   Thank you, sir.

10:14   24        MR. MUELLER:  I have no further questions.

10:14   25        THE WITNESS:  Thank you.

REDIRECT EXAMINATION

BY MR. WASHBURN:

Q.   Just a few questions, Professor.

All right.  To begin with, Intel's lawyer started your cross-examination asking you a series of questions about individuals and certain companies.  Do you recall that?

A.   Yeah.  The two VLSI names he spoke of.  Yes.

Q.   Was your --

A.   And some of the inventors' names, I think he mentioned.  Correct.

Q.   Was your work in this case focused on individual people and companies, or was your work in this case focused on the benefits of the patented technology?

A.   I mean, I'm a technical guy.  So I -- my work is related to the technology analysis and what the power benefits are.

Q.   There were also some questions about whether you -- when you had heard of the '373 patent and the '759 patent.  Do you recall that?

A.   Yeah.

Q.   All right.  In your usual work, are you focused on reviewing patents or are you focused on your own research and publishing?

A.   Yeah.  I don't need to review.  I mean, it's not something that I have to do.  No.

10:15   1       Q.   Would it be fair for someone to suggest that if you

10:15   2   haven't heard of a patent by number, that means it's not

10:15   3   important?

10:15   4       A.   Yeah.  Lots of patents are issued every day, and so

10:15   5   it's obviously not possible to track every single patent.

10:15   6       Q.   So you would agree then, sir, that there are probably

10:15   7   many important patents that you are not familiar of the numbers

10:15   8   with?

10:15   9       A.   I am sure about that.  I am not familiar with all the

10:16   10  patents that are being issued on a daily basis.

10:16   11      Q.   Now, there were some questions about -- strike that.

10:16   12      Let's go to Paragraph 59.

10:16   13      MR. WASHBURN:  Can we bring that up on the screen?

10:16   14  BY MR. WASHBURN:

10:16   15      Q.   This is Paragraph 59 of your expert report.

10:16   16      MR. WASHBURN:  And, Mr. Simmons, can we bring that up?

10:16   17      Thank you very much.

10:16   18  BY MR. WASHBURN:

10:16   19      Q.   Now, Intel's lawyers had a lot of questions about

10:16   20  what you bolded here.  Do you recall that?

10:16   21      A.   Yes.

10:16   22      Q.   And in particular was focused on the fact that you

10:16   23  had bolded some C-states.  Do you recall that?

10:16   24      A.   Yeah.  He mentioned about the Core C7 states,

10:16   25  correct.

10:16  1      Q.   Right.  Did you also bold the package C-states in

10:16  2  this chart?

10:16  3      A.   Yeah.  In fact, if you just go down -- oh, yeah.

10:17  4  It's actually here.  Just a few rows below, I bolded the

10:17  5  package C7 states, which as I explained are also associated

10:17  6  with the ability to do the mux selection.

10:17  7      Q.   Now, given the questions about this paragraph in your

10:17  8  cross-examination, could you explain what you were doing here

10:17  9  and why?

10:17  10      A.   So I wanted to sort of bring out to your attention

10:17  11  that Intel's Power Model has many versions offered.  You can

10:17  12  think of them as -- if you think of it like a

10:17  13  three-dimensional, there is a third dimension which is

10:17  14  basically, you know, can I use a particular Input 1, Input 2,

10:17  15  Input 3.  These are the different kind of inputs that you can

10:17  16  provide.

10:17  17      And when you have those dozens or even more than dozens of

10:17  18  options, you have to pick one that is something that you can

10:18  19  confidently come out and present in front of the jury that

10:18  20  "this makes sense."

10:18  21      And so the best way to do that for me is to run on real

10:18  22  systems, real laptops and then measure the residencies, which

10:18  23  is what you see in this chart, and eventually look for a data

10:18  24  that Intel uses.  Not -- this data does not go into any

10:18  25  computation.  It's just to find, of the ten choices that I

10:18    1   have, which one should I pick?  And I look for something that's

10:18    2   the closest match.

10:18    3       I did not directly use this data to drive my '373

10:18    4   analysis, for example.

10:18    5       Q.   Now, you mentioned residency data, and I think there

10:18    6   were some questions referring to residency data.  Have any of

10:18    7   Intel's experts identified any other residency data that you

10:18    8   should have used instead?

10:18    9       A.   Not to my recollection.  Sorry.

10:18   10       Q.   Have any of Intel's experts come forward with their

10:19   11   own residency data analysis?

10:19   12       A.   I reviewed all their reports.  To the best of my

10:19   13   recollection, I don't -- I don't recall them using their own

10:19   14   residency information.

10:19   15       Q.   Okay.

10:19   16       MR. WASHBURN:  Now, could we please go to Paragraph 137?

10:19   17   BY MR. WASHBURN:

10:19   18       Q.   Let me know when you're there.

10:19   19       There were a series of questions about this paragraph.  Do

10:19   20   you recall that?

10:19   21       A.   Yeah.  This is regarding the Fox2, correct.

10:19   22       Q.   Yeah.  Could you explain what you're describing in

10:19   23   Paragraph 137?

10:19   24       A.   So without going into the real weeds of the

10:19   25   discussion, let me sort of explain what I was trying to look

10:20  1   for.  The Fox2 tool requires a workload, basically some sort of

10:20  2   an input that emulates how much time the CPU is busy, how much

10:20  3   time the CPU is idle.  It needs that input as part of its

10:20  4   computation.

10:20  5       And so when it needs that input, I have to provide that.

10:20  6   And so I was looking to figure out what would be a good way to

10:20  7   provide that input.  And so I picked the Broadwell, and I

10:20  8   measured the -- you can think of how fast the processor is and

10:20  9   how often the processor is really fast, how often the processor

10:20  10  is sleeping -- I picked that information, and that's what I

10:20  11  provided as input to the Fox2 tool.

10:21  12      Q.   All right.  There were some questions --

10:21  13      MR. WASHBURN:  We can take that down.

10:21  14  BY MR. WASHBURN:

10:21  15      Q.   There were some questions about your testing of Lake

10:21  16  products.  Do you recall that?

10:21  17      A.   Yes.

10:21  18      Q.   Why were you comfortable testing two Lake products in

10:21  19  reaching your conclusions in this case?

10:21  20      A.   So for the Lake products, which is the '759, the

10:21  21  analysis is really about the ring domain and whether it has a

10:21  22  Skylake core attached to it.  If you think of the ring as a

10:21  23  communication mechanism, you could have different things

10:21  24  connected to it, whether it be a Skylake or a Coffee Lake or a

10:21  25  Kaby Lake, many other options.

10:21  1        But my goal really was how does the ring, which is what is

10:21  2   communicating between these processors -- it's not really about

10:21  3   the processor itself, it's the ring domain.

10:22  4        And so I was trying to figure out what is the ring power

10:22  5   consumption, not what particular processor is attached to it.

10:22  6        Q.   Now, you referred a moment ago to ring domain.  There

10:22  7   were some questions in your cross-examination about ring

10:22  8   domain.  Did Professor Conte have any communication with you

10:22  9   regarding tests of a ring domain?

10:22  10       A.   That's -- yeah, that's exactly right.  I followed

10:22  11  what Professor Conte asked me to conduct analysis from -- in

10:22  12  terms of analysis.

10:22  13       Q.   All right.  Now, more generally, there were a lot of

10:22  14  questions from Intel's lawyer regarding how many products you

10:22  15  tested, as discussed in your direct testimony, versus how many

10:22  16  variations on products are in the processor families.  Do you

10:22  17  recall those questions?

10:22  18       A.   Yes.

10:22  19       Q.   Did you think it was necessary to test every variant

10:22  20  of every processor accused of infringing the patents in this

10:23  21  case?

10:23  22       A.   So I think I went -- briefly touched upon it in my

10:23  23  direct -- in my presentation in my slides, that the core

10:23  24  underlying technology here, which is whether or not I can

10:23  25  switch or toggle with this mux, is not that directly related to

10:23  1   whether it is two cores or four cores.  And so my analysis is,

10:23  2   as a result, focused on those two, but it is applicable to

10:23  3   broader range of systems.

10:23  4        Q.   All right.  And can you explain why you believe it's

10:23  5   applicable to a broader range of systems?

10:23  6        A.   Because the -- if you again look at, for instance --

10:23  7   let me give you a little bit more concrete example.

10:23  8        Imagine that the ring for the '759, I tested with two

10:23  9   cores attached to that ring.  What is the purpose of ring?  It

10:23  10  is to allow you to communicate with each other, right?  I mean,

10:24  11  it's a mechanism for us to talk to each other, basically.

10:24  12  That's what the ring does.

10:24  13        When two people are talking, there is some amount of data

10:24  14  that needs to be sent.

10:24  15        Now, imagine I put four instead of two.  What happens to

10:24  16  the communication?  More communication occurs.  Because more

10:24  17  people need to talk to each other.

10:24  18        What happens if I put eight?  Even more communication

10:24  19  occurs.

10:24  20        And what does communication transform into?  More power

10:24  21  for the ring, because the ring is going to consume more and

10:24  22  more power as more and more people need to talk on that ring.

10:24  23        And so I picked the most conservative option, which is

10:24  24  when only two people talk, it's the least power-consuming

10:24  25  system.  When there are eight people talking, it'll be noisy,

10:24  1    loud.  And that's equal then to power, a lot more power.

10:24  2        Q.   Now, there were some questions from Intel's lawyer

10:24  3    about whether your testing work was modeling-based or whether

10:25  4    you directly tested products.  Do you recall that?

10:25  5        A.   Yes.

10:25  6        Q.   Would it be realistic to imply that you should have

10:25  7    directly measured the power consumed by an individual circuit

10:25  8    in a consumer product?

10:25  9        A.   Not if you have a billion transistors.  I mean, it's

10:25  10   difficult to imagine the chip where you're trying to find the

10:25  11   power consumption in some small portion of the chip.  It would

10:25  12   be not practical.

10:25  13       Q.   Would it be possible with commercially-available

10:25  14   tools to directly measure the power?

10:25  15       A.   I've been in the field for many years, and I don't

10:25  16   think there is a way for anybody to measure that level of

10:25  17   breakdown, like this piece within this multibillion transistor

10:25  18   chip.  It's not practical.

10:25  19       Q.   Did any of Intel's experts do such an analysis?

10:25  20       A.   Not that I could recall.

10:25  21       Q.   All right.  Now, there were some questions suggesting

10:25  22   that results between different processor families could be far

10:25  23   off.  Do you recall those questions?

10:26  24       A.   Approximately, yes.

10:26  25       Q.   All right.

10:26  1        MR. WASHBURN:  Could we pull up Slide 28 of Professor

10:26  2   Annavaram's?

10:26  3   BY MR. WASHBURN:

10:26  4        Q.   You still have your clicker?

10:26  5        A.   Yes.

10:26  6        Q.   All right.  Could we proceed to the results of your

10:26  7   '759 analysis?

10:26  8        MR. WASHBURN:  Sir, could we pull up Professor Annavaram's

10:26  9   slides?

10:26  10   BY MR. WASHBURN:

10:26  11        Q.   And I'm going to ask you to navigate to the results

10:26  12   of your '759 analysis.

10:26  13        A.   It's not showing.

10:26  14        MR. WASHBURN:  Mr. Simmons?

10:26  15   BY MR. WASHBURN:

10:26  16        Q.   All right.  Well, we can do without slides.

10:26  17        Do you recall the -- well, we're not supposed to say it

10:26  18   out loud, so we actually are going to have to wait for the

10:26  19   slide, unless we can seal the courtroom.

10:26  20        A.   I think it's coming up.

10:26  21        Q.   Thank you very much, sir.

10:26  22        A.   Let me -- no, this is --

10:27  23        Q.   All right.  Now, sorry for that delay, sir.

10:27  24        Again, there were some questions suggesting that results

10:27  25   from different processor families could diverge greatly.  Do

10:27  1   you recall that?

10:27  2       All right.  What was the results from your '759 testing in

10:27  3   the Skylake family?

10:27  4       A.   Yes.  I couldn't say this loud because the numbers

10:27  5   were not allowed to be spoken loud.  But I think it's obvious

10:27  6   if you see, this is Skylake number which is the ring bus

10:27  7   domain.  And this is Whiskey Lake and the ring bus domain.  And

10:27  8   I just want the members of the jury to take a look at those two

10:28  9   numbers.  It's hard to tell the difference.  They're

10:28  10  essentially identical.

10:28  11      Q.   All right.  Just a moment, please, sir.

10:28  12      (Conference between counsel.)

10:28  13  BY MR. WASHBURN:

10:28  14      Q.   Now, there were some questions about different Lake

10:28  15  products and how many of them you tested.  Do you recall that?

10:28  16      A.   Yes.

10:28  17      Q.   Why did you test two of ten Lake products?

10:28  18      A.   Because, again, as I was explaining earlier, for the

10:28  19  '759 I'm interested in the ring bus domain.  And if you look at

10:28  20  the two Lake products that I tested, it's 18.8 -- I'm sorry.

10:28  21  The numbers are very close.

10:28  22      And, too, whether I attach a Skylake or I attach a Kaby

10:28  23  Lake or attach a Coffee Lake, some other Lake processor, the

10:29  24  communication is what is causing those systems to burn power.

10:29  25  So I thought it would be appropriate to use two instead of all

10:29   1    the ten.

10:29   2         Q.   All right.  Thank you very much, Professor.

10:29   3                        RECROSS-EXAMINATION

10:29   4    BY MR. MUELLER:

10:29   5         Q.   Sir, just a few more questions, if I could.

10:29   6         A.   Yes.

10:29   7         Q.   Mr. Washburn directed your attention to your report,

10:29   8    Paragraph 59.  I'm going to ask you to bring it up again,

10:29   9    Paragraph 59 of your report.

10:29   10        Are you there?

10:30   11        A.   I'm there.

10:30   12        Q.   So let's just level-set.  This is a section of your

10:30   13   report where you were conducting your '373 testing analysis,

10:30   14   correct?

10:30   15        A.   That's, I think, a fair statement.

10:30   16        Q.   And you understand that what Dr. Conte is alleging as

10:30   17   infringing for that patent is something called the C6 SRAM,

10:30   18   correct?

10:30   19        A.   That's my understanding.

10:30   20        Q.   And that is one component of many components in the

10:30   21   Haswell and Broadwell family of chips, correct?

10:30   22        A.   Again, that is my understanding.

10:30   23        Q.   Now, I asked you on my first set of questions to

10:30   24   focus on the column that you bolded that says, "Core C-states."

10:30   25   Do you see that, sir?

10:30  1      A.   Yeah.  The row that you asked me, yeah, right.

10:31  2      Q.   And we can agree that in that particular condition,

10:31  3  the Core C-state condition, C6 SRAM is not being used.  We can

10:31  4  agree on that?

10:31  5      A.   I agree on that, correct.

10:31  6      Q.   Now, Mr. Washburn, on his questions to you just a few

10:31  7  moments ago, scrolled down a little further.  Let's do the

10:31  8  same.  And he noted that there are also some other rows that

10:31  9  are in bold that say "package C-states."  Do you see that, sir?

10:31  10      A.   Correct.

10:31  11      Q.   But, sir, the row that you used to select the inputs

10:31  12  in the Power Model was the one at the top, right?

10:31  13      A.   I don't recall exactly which, because there are a lot

10:31  14  of numbers, but I might have to look at the specific paragraph

10:31  15  or something.

10:31  16      Q.   Well, let's just make sure we're on the same page.

10:31  17  Do you see what we've highlighted in yellow --

10:31  18      A.   Correct.

10:31  19      Q.   -- the Core C7 row, Professor?

10:31  20      A.   Correct.

10:31  21      Q.   That's the one you used to select the residency

10:31  22  model, correct?

10:31  23      A.   My recollection of exact usage, I don't remember, but

10:32  24  maybe that's what I used.  Correct.

10:32  25      Q.   Well, if it would refresh your memory, you can take a

10:32  1    look at your deposition.

10:32  2         A.   Yeah.

10:32  3         Q.   It should be Tab 3 in your binder.  And take your

10:32  4    time.  Why don't you flip to Tab 3?

10:32  5         And I'd like to direct your attention, if I could, sir, to

10:32  6    Page 201, Line 24 to Page 202, Line 12.

10:32  7         And I won't show it to the jury, Your Honor, but just to

10:32  8    refresh the witness' memory?

10:32  9         A.   Could you please repeat that page number and the

10:32  10   line?

10:32  11        Q.   Yes.  It's Page 201, starting at Line 24, carrying

10:32  12   you over to the next page 202, Line 12.

10:33  13        A.   Yeah.  I reviewed it.

10:33  14        Q.   And that refreshes your memory that the line that

10:33  15   we've highlighted in yellow there, the Core C-states, was the

10:33  16   one that you used to select the residency and workload settings

10:33  17   in the Intel Power Model?

10:33  18        A.   That's correct.  Yes.

10:33  19        Q.   And we can agree that the one you used does not

10:33  20   reflect use of C6 SRAM, correct?

10:33  21        A.   If it is a Core C7, it doesn't use the C6 SRAM.

10:33  22        Q.   Again, sir, the one that's highlighted in yellow,

10:33  23   Core C-states does not use C6 SRAM?

10:33  24        A.   That's correct.

10:33  25        Q.   And that's the one you used?

10:33  1      A.   That's the one I used to match, not to compute.

10:33  2      Q.   Now, a few final questions.  Mr. Washburn asked you

10:33  3  about your selection of certain models for both your '373

10:33  4  testing and your '759 testing, right?

10:34  5      A.   Yeah.  I'm not sure which particular question, but he

10:34  6  did ask me.

10:34  7      Q.   Now, again you weren't using power testing equipment

10:34  8  on individual chips, right?

10:34  9      A.   I mentioned that clearly.  No.

10:34  10      Q.   And I'm not criticizing you.  I'm just trying to make

10:34  11  sure we're on the same page.

10:34  12      A.   Okay.

10:34  13      Q.   You were using spreadsheets, right?

10:34  14      A.   I was using the Power Model and the Fox2, correct.

10:34  15      Q.   Now, you used the Power Model for the '373 patent

10:34  16  analysis you did, correct?

10:34  17      A.   That is correct.

10:34  18      Q.   That's a spreadsheet?

10:34  19      A.   It's a spreadsheet with, as you said, hundreds of

10:34  20  thousands of inputs.

10:34  21      Q.   And then you used Fox2 for your '759 analysis, right?

10:34  22      A.   That is correct.

10:34  23      Q.   That's another tool or spreadsheet?

10:34  24      A.   It's actually not a spreadsheet.  It's more of a

10:34  25  software that actually tracks the PCM usage.

582

10:34  1        Q.   Fair enough.  It's a piece of software?

10:34  2        A.   Yeah.

10:34  3        Q.   And for each of these, you made certain selections

10:34  4   and saw what the results were?

10:34  5        A.   Yeah.  I think you can say that fairly.

10:34  6        Q.   And, sir, the bottom line is for the '373, you only

10:35  7   performed this analysis with respect to two out of hundreds of

10:35  8   processors that are accused, correct?

10:35  9        A.   The analysis, as I said, is done on the two parts.

10:35 10        Q.   Now, you had the spreadsheet and could have done

10:35 11   more, right?

10:35 12        A.   I don't remember all the various queues available in

10:35 13   the spreadsheet.

10:35 14        Q.   You could have selected more than two model numbers,

10:35 15   right?

10:35 16        A.   I believe it is possible there are more SKUs.

10:35 17   Correct.

10:35 18        Q.   And you didn't?

10:35 19        A.   Yeah, because the numbers were pretty consistent.

10:35 20        Q.   For the '759 patent, you chose two of the ten Lake

10:35 21   series families, correct?

10:35 22        A.   That is correct.

10:35 23        Q.   You could have done more, right?

10:35 24        A.   I mean, they're so close, the 18 point -- I can't --

10:35 25   sorry, I keep messing up the numbers.  I shouldn't say the

10:35  1    numbers, but they are pretty close and so I just took those

10:35  2    two.  Correct.

10:35  3         Q.   You could have done more than two, correct?

10:35  4         A.   I could have done more than two, but the numbers were

10:35  5    so close.

10:35  6         Q.   But you didn't?

10:35  7         A.   No.  I didn't.

10:36  8         Q.   Thank you, sir.

10:36  9         MR. MUELLER:  I have no further questions.

10:36  10        THE WITNESS:  Thank you.

10:36  11                      FURTHER REDIRECT EXAMINATION

10:36  12   BY MR. WASHBURN:

10:36  13        Q.   Professor Annavaram, there were, again, some

10:36  14   questions about Paragraph 59 of your expert report.  Do you

10:36  15   recall that?

10:36  16        A.   Yes.

10:36  17        Q.   All right.  I don't know that we need to go through

10:36  18   it again, but just to be completely clear, did any of that data

10:36  19   in that model -- did any of the data on that -- in that

10:36  20   paragraph go into your calculations that led to the results

10:36  21   that you are reporting in this case?

10:36  22        A.   So the only reason that that data exists is that you

10:36  23   can pick, of the ten choices that are there, dozens of

10:36  24   choices -- I don't remember, many, many choices -- which of the

10:36  25   choices should I select?  And, therefore, it is not used.  That

10:36  1    number did not go into my computation.  It is just simply, here

10:37  2    are the ten things.  Which ones should I pick?

10:37  3         Q.   And you were just trying to select the most

10:37  4    representative of Intel's models, right?

10:37  5         A.   Closest match.  It's not -- it's never going to be --

10:37  6    I had no illusion they would have an exact match, but it would

10:37  7    be the closest to that match because, you know, if you're

10:37  8    running the test and you move your mouse, it has a slightly

10:37  9    different numbers versus if you did not move the mouse.  And so

10:37  10   it's not an exact match but possible.  So you find the closest

10:37  11   match.

10:37  12        Q.   And the -- when you say you found the closest match,

10:37  13   were you looking overall at the different data?

10:37  14        A.   Yeah.  So, in fact, I have looked at not just one

10:37  15   number to match.  I was looking across this whole spectrum of

10:37  16   numbers to find -- looking for something like a correlation

10:37  17   across multiple numbers.

10:37  18        Q.   All right.  Now, there were some questions about

10:37  19   whether you tested a few, the variants in the processor family

10:37  20   or whether you tested all 300.  Do you recall that?

10:37  21        A.   Yeah.  Various SKUs that was mentioned.

10:38  22        Q.   Do you know how much it would have cost to test -- to

10:38  23   do all 300 tests, how much time it would have taken?

10:38  24        A.   I can't hazard a guess.  It took, as they -- it was

10:38  25   brought up it was already many hundreds of hours to do this

10:38    1    analysis.

10:38    2        Q.   All right.  Now, were there other considerations in

10:38    3    selecting the Power Model that you used in your testing?

10:38    4        A.   So these are tools provided and used by Intel, and

10:38    5    they are tools doubled up with thousands hours of immense

10:39    6    research and engineering effort from Intel.  And if there's any

10:39    7    one reason, that's a strong reason from my viewpoint, from a

10:39    8    scientifically, technically solid viewpoint.  It's been

10:39    9    validated, tested, doubled up, so I would want to use them.

10:39   10        Q.   Based upon on your experience with academic research,

10:39   11    do you believe that the tests you did were representative of

10:39   12    the accused products as a whole?

10:39   13        A.   So since the basic underlying technology -- and I

10:39   14    think I mentioned this already if you're not bored by it -- is

10:39   15    the same concept, whether it is a ring, whether it's a

10:39   16    different processor attached to it, or whether it's the ring

10:39   17    that's doing the communication, I think it's fair to say that

10:39   18    what I have done is a good representation of the various

10:39   19    products.

10:39   20        Q.   All right.  Thank you, sir.  No further questions.

10:40   21        MR. MUELLER:  I have no further questions, Your Honor.

10:40   22    Thank you.

10:40   23        THE COURT:  May this witness be excused?

10:40   24        MR. MUELLER:  Yes, Your Honor.

10:40   25        THE COURT:  You may step down.  Thank you, sir.

10:40  1      Ladies and gentlemen of the jury, I think this is a good

10:40  2  time for us to take our break.  It is 10:40.  Why don't we

10:40  3  gather back together at five minutes before 11:00?

10:40  4      Remembering my instructions not to discuss the case

10:40  5  amongst yourselves.  We'll be back in a few minutes.

10:40  6      THE BAILIFF:  All rise.

10:40  7      (Jury exited the courtroom at 10:40.)

10:40  8      THE COURT:  You may be seated.

10:40  9      Who is your next witness?  Dr. Sullivan?  Is your next

10:41  10  witness Dr. Sullivan?

10:41  11      MS. PROCTOR:  Yes, Your Honor.  He's our next live

10:41  12  witness.

10:41  13      THE COURT:  Okay.  Is there anything we need to take up

10:41  14  before we take a break?

10:41  15      MR. LEE:  Just one thing, Your Honor.  There was a mention

10:41  16  today of offering some written discovery.  We haven't had

10:41  17  notice that anything was going to be offered.  If they could

10:41  18  just tell us what they're going to offer so that if we have any

10:41  19  issues to raise with Your Honor, we can raise them without the

10:41  20  jury.

10:41  21      THE COURT:  For sure.

10:41  22      Mr. Chu or whomever, if you are going to offer -- I mean,

10:41  23  you certainly are entitled to do it, but if you're going to put

10:41  24  into evidence responses to -- if either side is going to put in

10:41  25  responses to discovery, please let the other side know in

| | |
|---|---|
| 10:41 | 1 |

10:41  1   advance so they can have any counter-answers that they want to

10:41  2   make sure are put in.

10:41  3        Does that make sense?

10:41  4        MR. CHU:  Of course we'll let them know in advance, and

10:41  5   then whether it's proper to have a counter or not is an open

10:42  6   question.  So I don't know what they --

10:42  7        THE COURT:  Well, you get to put in what you want, and

10:42  8   they get to put in what they want.

10:42  9        MR. CHU:  Absolutely.

10:42  10       THE COURT:  Anything else, Mr. Chu?

10:42  11       MR. CHU:  No.

10:42  12       THE COURT:  Mr. Lee?

10:42  13       MR. LEE:  No, Your Honor.

10:42  14       THE COURT:  Okay.  We'll be back in a few minutes.

10:42  15       THE BAILIFF:  All rise.

10:42  16       (Recess taken from 10:42 to 10:57.)

10:57  17       THE BAILIFF:  All rise.

10:57  18       THE COURT:  Please remain standing.

10:57  19       (The jury entered the courtroom at 10:57.)

10:58  20       THE COURT:  Thank you.  You may be seated.

10:58  21       Counsel, you may call your next witness.

10:58  22       MS. PROCTOR:  Thank you, Your Honor.  We'd like to call

10:58  23   Dr. Ryan Sullivan.

10:58  24       (The witness was sworn.)

10:58  25       THE COURT:  Counsel, I'm going to be relying on you all to

588

10:58   1   let me know when we need to shift to the nonpublic forum.

10:58   2       MS. PROCTOR:  And, Your Honor, we're going to try to just

10:58   3   have the slides up and to not say confidential numbers out loud

10:58   4   so that we can maintain public access to as much of this

10:58   5   proceeding as possible.

10:58   6       THE COURT:  Perfect.

10:59   7       MS. PROCTOR:  And Intel's welcome to object at any time if

10:59   8   they have any concerns about that.

10:59   9       MR. LEE:  Your Honor, just a few things.  There's actually

10:59  10   confidential information both ways, but we'll address it with

10:59  11   Your Honor, and I think when the slide is up for the jurors, we

10:59  12   just need to turn the public monitor off.

10:59  13       THE COURT:  We'll do that.

10:59  14                   DIRECT EXAMINATION

10:59  15   BY MS. PROCTOR:

10:59  16       Q.   So good morning, Dr. Sullivan.

10:59  17       A.   Good morning.

10:59  18       MS. PROCTOR:  And good morning, everyone on the jury.

10:59  19   BY MS. PROCTOR:

10:59  20       Q.   My name is Amy Proctor, and I'm part of the team with

10:59  21   Mr. Chu and Mr. Washburn representing VLSI in this proceeding.

10:59  22   So now that I've introduced myself, Dr. Sullivan, can you

10:59  23   please introduce yourself to the jury?

10:59  24       A.   Yes.  Good morning.  My name is Ryan Sullivan.  I

10:59  25   serve as president of a company that is known as Intensity, and

10:59   1    I work as an economist.  So that means that I use data and

10:59   2    market information to evaluate and analyze revenue costs and

11:00   3    profitability.

11:00   4        Q.   And why are you here today, Dr. Sullivan?

11:00   5        A.   I am here to provide my -- describe my expert

11:00   6    analysis and provide my expert opinions regarding the economic

11:00   7    damages that were incurred by VLSI as a result of the alleged

11:00   8    infringement by Intel.

11:00   9        Q.   And have you prepared anything to assist with your

11:00   10   testimony?

11:00   11       A.   Yes.  I have a set of demonstratives that I have

11:00   12   created.

11:00   13       Q.   Can we pull those up, please?

11:00   14   BY MS. PROCTOR:

11:00   15       Q.   Would you please describe your educational

11:00   16   background?

11:00   17       A.   Yes.  I have a bachelor's degree, a masters degree

11:00   18   and a Ph.D.  They are all in economics and all from the

11:00   19   University of California in San Diego.

11:00   20       Q.   Have you published any work, Dr. Sullivan?

11:00   21       A.   Yes.  I have.  I have published several articles in

11:00   22   what are considered top-tier, peer-reviewed academic journals.

11:01   23   I've also published a paper in the Licensing Executive

11:01   24   Society's Journal as well as other articles on intellectual

11:01   25   property and the economics thereof.

11:01   1      Q.   And what type of work do you do?

11:01   2      A.   I have been providing professional economic services

11:01   3   for over 28 years now.  This comes into really three categories

11:01   4   for me currently.

11:01   5      So I work with companies to help with what is referred to

11:01   6   as strategic decision making, and this is where I do work such

11:01   7   as valuation, licensing and building statistical models to help

11:01   8   companies as they're competing in the marketplace.

11:01   9      I also serve providing expert analysis and testimony in

11:01   10   cases such as this one.  And I also provide strategic guidance

11:01   11   to the firm that I work with.

11:02   12      Although it varies from time to time, currently I spend

11:02   13   about 50 percent of my time working on cases on litigation

11:02   14   matters.

11:02   15      Q.   What types of companies have you worked with?

11:02   16      A.   Oh, I have worked with all kinds of companies, large

11:02   17   and small.  In the technology arena, I have worked on behalf of

11:02   18   IBM, Microsoft, Apple and Adobe as a few examples.

11:02   19      Q.   Have you worked for any not-for-profit organizations?

11:02   20      A.   Yes.  I have.  I have had the -- the honor, really,

11:02   21   to serve as treasurer and an officer on the board of trustees

11:02   22   for San Diego Zoo Global, which is oftentimes thought of as one

11:02   23   of the world's premier wildlife organizations.

11:02   24      Q.   Have you worked with my law firm in other cases?

11:02   25      A.   Yes.  I have, on a number of occasions.

11:02   1      Q.   And have you been qualified to testify in any trials?

11:03   2      A.   Yes.  I have provided testimony in more than 25

11:03   3   trials at this point.

11:03   4      Q.   Have you testified on behalf of both plaintiffs and

11:03   5   defendants?

11:03   6      A.   I have.  Approximately half of my work is on behalf

11:03   7   of plaintiffs or patent holders and the other half on behalf of

11:03   8   defendants or alleged infringers.

11:03   9      Q.   Is your firm, Intensity, being compensated for your

11:03  10   time in this matter?

11:03  11      A.   Yes.  Intensity is compensated at a rate of $1,150

11:03  12   per hour for my time.

11:03  13      Q.   Now, does that compensation depend on the outcome of

11:03  14   this case?

11:03  15      A.   No.  Not at all.

11:03  16      MS. PROCTOR:  Your Honor, I would like to offer Dr. Ryan

11:03  17   Sullivan as an expert on economics, finance, statistics and

11:03  18   patent damages.

11:03  19      MR. LEE:  No objection, Your Honor.

11:03  20      THE COURT:  He'll be admitted as an expert.

11:03  21      MS. PROCTOR:  Thank you.

11:03  22   BY MS. PROCTOR:

11:03  23      Q.   So, Dr. Sullivan, what were you asked to do in this

11:04  24   case?

11:04  25      A.   As I mentioned a few moments ago, I was asked to

11:04  1    evaluate the damages incurred by VLSI as a result of the

11:04  2    alleged infringement by Intel.

11:04  3         And more specifically, I was asked to calculate a specific

11:04  4    form of damages that are known as reasonable royalties for each

11:04  5    of the two patents at issue here, the '373 patent and the '759

11:04  6    patent.

11:04  7         Q.   What did you consider in forming your opinions?

11:04  8         A.   I reviewed and considered and evaluated a great deal

11:04  9    of information in my work.  Of course I considered the patents

11:04  10   at issue themselves, but I also examined financial data, market

11:04  11   research and company documents.

11:04  12        I've also evaluated testimony of other witnesses and

11:04  13   reviewed expert reports.  So there's been a great deal of

11:04  14   information that I have considered.

11:04  15        Q.   And can you describe the work that you did in this

11:05  16   case?

11:05  17        A.   Yes.  So it would have been in the summer of last

11:05  18   year, of 2020, that I submitted a report.  And this consisted

11:05  19   of about 128 pages of written description of the work that I

11:05  20   did, along with over 400 footnote citations to underlying and

11:05  21   supporting evidence and information.

11:05  22        My report also consisted of over 1200 pages of data,

11:05  23   tables and charts, along with computer code that I used in

11:05  24   performing my analysis.  And the purpose of my report is to

11:05  25   provide full transparency of the work that I did, both to Intel

11:05  1  and its experts, as well as to the Court, for review and

11:05  2  consideration.

11:05  3      Q.  So what products are accused of infringement here?

11:05  4      A.  For the '373 patent, it is the Broadwell and Haswell

11:06  5  products.  And for the '759 patent, there are ten different

11:06  6  product families, and those are all in the Lake families, such

11:06  7  as Skylake, Cannon Lake and Ice Lake.

11:06  8      Q.  Are any of these products accused under both patents?

11:06  9      A.  No.  They are not.  It is two separate sets of

11:06  10  products that are accused of infringement under each of the

11:06  11  different patents, and this reflects the different

11:06  12  contributions that those patents can make.  And in part, that

11:06  13  can be seen because there are different numbers of units that

11:06  14  have been sold that are accused of infringement.

11:06  15      For example, for the '373 patent, here on Slide 7.5,

11:07  16  you'll see that there are approximately 384 million units

11:07  17  accused of infringing the '373 patent.

11:07  18      And for the '759 patent, there are approximately 603

11:07  19  million units that have been accused of infringement.

11:07  20      Q.  So what is the total number of units that are accused

11:07  21  of infringing in this case?

11:07  22      A.  Approximately 987 million units that Intel has sold

11:07  23  of the allegedly infringing units.

11:07  24      Q.  And have you personally analyzed whether those

11:07  25  987 million units actually infringe the two patents?

594

11:07   1        A.   No.   I have no opinion on whether the products

11:07   2   actually infringe or not.  As an economist who is providing

11:07   3   expertise on the calculation of damages, it is my role to

11:07   4   simply assume that the products do infringe for purposes of my

11:08   5   analysis, and thus I refer to the products as either "accused

11:08   6   products" or "infringing products" for that reason.

11:08   7        Q.   Now, I believe you mentioned earlier a reasonable

11:08   8   royalty.  What is a reasonable royalty?

11:08   9        A.   A reasonable royalty is the form of damages that

11:08  10   apply in this particular case.

11:08  11        So in looking at the legal statute, it states that

11:08  12   "damages should be adequate to compensate for the infringement,

11:08  13   but in no event less than a reasonable royalty for the use made

11:08  14   of the invention by the infringer."

11:08  15        So there are two key points here.  The first is that the

11:08  16   reasonable royalty is the minimum amount of damages, and the

11:08  17   second key point is that it is based upon the use of the

11:08  18   technology by the infringer.

11:08  19        Q.   Now, Dr. Sullivan, how did you determine a reasonable

11:08  20   royalty in this case?

11:08  21        A.   The most typical and appropriate way to calculate

11:09  22   damages in a reasonable royalty is through what is known as a

11:09  23   hypothetical negotiation.  So this is a negotiation that would

11:09  24   have occurred right at the eve of infringement back in time.

11:09  25        And it's hypothetical because it did not actually happen,

595

11:09  1    otherwise, we all would not be sitting here today.

11:09  2         And it's kind of an interesting framework work for us to

11:09  3    work within, because it's a situation where the parties

11:09  4    understand that they have to come to an agreement based upon

11:09  5    certain requirements of that negotiation.

11:09  6         And more specifically, at this negotiation, the parties

11:09  7    would recognize that the patent is valid, and they would agree

11:09  8    to that.  They would recognize that the patent is infringed,

11:10  9    and they would agree to that, which would, of course, include

11:10  10   consideration for the unit sales that would be forthcoming that

11:10  11   would be sold under those infringing technologies, and also

11:10  12   that it includes a willing licensor and a willing licensee.

11:10  13        Now, the licensor, that's the patent holder.  And the

11:10  14   licensee is the alleged infringer.  That's the entity that

11:10  15   would be seeking a license.  They'd be looking to pay a

11:10  16   particular amount to the patent holder in order to have rights

11:10  17   to use that technology.

11:10  18        And because of the construct of this hypothetical

11:10  19   negotiation, neither party can simply walk away from this

11:10  20   negotiation, but rather they have to be willing to enter into

11:10  21   that agreement.  And that's part of the fundamental nature of

11:10  22   this negotiation.

11:10  23        Q.   Who would have participated in the hypothetical

11:10  24   negotiation in this case?

11:11  25        A.   Here, the patent holder, the licensor would be

11:11 1    Freescale, and the licensee that would be looking to obtain

11:11 2    rights to the patents is Intel.

11:11 3        And these hypothetical negotiations for the '373 patent

11:11 4    would occur around October 2011 and for the '759 patent around

11:11 5    June 2013.  And this is the time period right when Intel began

11:11 6    its infringement through the testing of the technologies.

11:11 7        Q.   And what information should be used to determine a

11:11 8    reasonable royalty?

11:11 9        A.   Well, really it's all relevant information.  Even

11:11 10   though it's called a hypothetical negotiation, it really is

11:11 11   grounded in real-world facts.

11:11 12       What's interesting about a hypothetical negotiation is

11:12 13   unlike -- it's kind of like playing a card game where all the

11:12 14   cards are out on the table for both sides to see.

11:12 15       So, you know, when we're typically playing a card game, we

11:12 16   think of, oh, we've got to, you know, hold our cards close to

11:12 17   our chest so nobody can see.

11:12 18       But this is very different.  This is -- this construct,

11:12 19   this legal framework for calculating damages puts all of the

11:12 20   cards out on the table so that both sides can see.  That means

11:12 21   that the confidential and top secret information of Intel in

11:12 22   terms of sales, in terms of financials, in terms of the way

11:12 23   their products work and the testing, that's available out on

11:12 24   the table for both parties to see.

11:12 25       And that's a fundamental aspect of this negotiation, which

11:12  1   makes it a little bit different than as you might think of as

11:12  2   just a standard real-world negotiation.

11:12  3       Q.   And why is Freescale, the patent holder, at the

11:13  4   hypothetical negotiation?

11:13  5       A.   So at the time of these negotiations in 2011 and

11:13  6   2013, that's at the time of Freescale owning the patents.  And

11:13  7   because Freescale owned the patents, they are the entity, the

11:13  8   licensor at the hypothetical negotiation that owns those

11:13  9   patents.  Because, you know, before that time -- this is the

11:13  10  time period after the acquisition of SigmaTel, but it's before

11:13  11  NXP acquired Freescale.  And so it's Freescale who is at the

11:13  12  hypothetical negotiation.

11:13  13      Q.   And what is Freescale's position in the hypothetical

11:13  14  negotiation?

11:13  15      A.   Well, Freescale as the patent holder would be the one

11:13  16  that would be granting rights to the technology.  You know,

11:13  17  they started off as the chip division of Motorola.  And then in

11:14  18  2004, they became their own independent company.

11:14  19      They developed into a global leader in microcontrollers,

11:14  20  employing over 20,000 individuals headquartered in Austin with

11:14  21  a focus on innovation.  Freescale was investing approximately

11:14  22  $1 billion each year in research and development.

11:14  23      Q.   And what is Intel's position in the hypothetical

11:14  24  negotiation?

11:14  25      A.   Intel is the entity that would be requiring a license

11:14  1   in order to be able to use the patented technology.  And Intel

11:14  2   is the world's dominant manufacturer of processors, and they

11:14  3   would be seeking a license to the technology to help them

11:14  4   maintain their position in the competitive marketplace.

11:14  5        Q.   Dr. Sullivan, are you familiar with the

11:15  6   Georgia-Pacific factors?

11:15  7        A.   Yes.  I am.  They are a set of 15 factors that were

11:15  8   set forth by a court back in 1970, and some of these factors

11:15  9   can be useful in providing guidance for determining a

11:15  10  reasonable royalty.  So I reviewed, considered and analyzed all

11:15  11  15 of these factors as part of my analysis.

11:15  12       Q.   Did you find any of those 15 Georgia-Pacific factors

11:15  13  to be particularly relevant to your work?

11:15  14       A.   Yes.  Factor 5 relates to the commercial relationship

11:15  15  between the parties.  And because Freescale and Intel had a

11:15  16  competitive relationship, this highlights the importance of the

11:15  17  competitive nature of the marketplace.

11:15  18       Factors 9, 10 and 14 relate to the importance of the

11:15  19  patents.

11:15  20       Whereas Factors 8, 11 and 12 relate to the value of the

11:16  21  technology to Intel.  In particular, Factor 11 relates to the

11:16  22  extent of use of the patented technology by Intel.

11:16  23       And Factor 13 relates to the relative contributions that

11:16  24  both Freescale and Intel made to the additional revenues and

11:16  25  profitability that were provided by the patented technology.

11:16  1    Q.   So with that context, what is the proper approach to

11:16  2  determining damages here?

11:16  3    A.   Well, first off, the proper analysis should reflect

11:16  4  the infringing product sales, the amount of those sales and

11:16  5  thus the extent of use.

11:16  6    Second, it should -- the proper analysis should reflect

11:16  7  the actual benefits of the technology.  And this can be

11:16  8  determined through the testing that has been performed on the

11:17  9  accused products.

11:17  10    And this is important because it allows the damages and

11:17  11  the royalty to be apportioned to the specific contributions of

11:17  12  the patented technology separate and apart from all the other

11:17  13  features, functionalities and contributions to Intel's

11:17  14  products.

11:17  15    And, third, it should be based upon the value of the use

11:17  16  of the technology by Intel.

11:17  17    Q.   Now, Dr. Sullivan, in your opinion, do Intel's

11:17  18  damages experts apply a proper damages analysis here?

11:17  19    A.   In my view, no.  And I'll explain that as we go.

11:17  20    Q.   So let's turn now to the first key topic you

11:17  21  identified, the competitive marketplace.

11:17  22    How would you describe the marketplace in which Intel

11:17  23  competes?

11:17  24    A.   Based upon all the research I've done, the statements

11:18  25  and documents from Intel, it is clear that this is a highly

600

11:18  1   competitive marketplace where innovation improvements are

11:18  2   required in order to maintain one's competitive position.

11:18  3       Q.   Can we pull up your slide on Plaintiff's Exhibit

11:18  4   2617?  What is this exhibit?

11:18  5       A.   This is what is known as a 10-K filing.  It's an

11:18  6   annual report that is prepared by Intel and submitted to the

11:18  7   United States Securities and Exchange Commission.

11:18  8       This is a particular 10-K for the year 2013, and this

11:18  9   information is provided by Intel with a fiduciary

11:18 10   responsibility to be truthful.

11:18 11       Here you can see, at Page 8 of PTX-2617, that Intel is

11:19 12   explaining that the computer industry continuously evolves and

11:19 13   that Intel faces significant competition.

11:19 14       Q.   And would you please turn to your slide on

11:19 15   Plaintiff's Exhibit 2618?  What is this document?

11:19 16       A.   This is another 10-K report that was filed by Intel.

11:19 17   This one is for the year 2019.  So here on PTX-2618 at Page 33,

11:19 18   you can see that they state that they are expecting "an

11:19 19   increasingly competitive environment in 2020."

11:19 20       And this is demonstrating that not only was the industry

11:19 21   competitive, but it has continued to be competitive and is

11:19 22   expected to continue to be competitive.  Just by way of one

11:19 23   example, recently Apple, who had been purchasing their chips

11:20 24   from Intel for their Mac computers, recently decided to stop

11:20 25   having Intel supply chips for the Macs.

11:20   1       Q.   So let's turn now to the second key topic you

11:20   2   identified, and that was the importance of the patents.  Can

11:20   3   you describe the benefits provided by these two VLSI

11:20   4   patents-in-suit?

11:20   5       A.   Yes.  My understanding, based upon the work that was

11:20   6   performed by Professor Conte and Professor Annavaram, is that

11:20   7   the '373 patent provides power savings and that the '759

11:20   8   patent, through its role with Speed Shift technology, provides

11:20   9   performance improvements.

11:20   10      Q.   And in thinking about the benefits of these patents,

11:20   11  is it relevant whether Freescale or NXP or SigmaTel ever

11:20   12  incorporated the asserted patents into specific products?

11:21   13      A.   No, it is not.  That particular issue is not relevant

11:21   14  and typically would be considered a red herring issue.  That

11:21   15  means that it's a distraction from that which is actually

11:21   16  relevant.

11:21   17      And you can see that because the value of the technology

11:21   18  as it relates to calculating damages for determining a

11:21   19  reasonable royalty, that is to be based upon the use and value

11:21   20  to Intel, not the use or potential use or value at NXP, at

11:21   21  Freescale or at SigmaTel.

11:21   22      It's also what I would consider to be a misleading issue,

11:21   23  because large technology companies such as Freescale, NXP, they

11:21   24  do not have a practice of determining which products of theirs

11:22   25  use which patents.

11:22  1    It's actually -- to be able to do that is a very expensive

11:22  2    and resource-intensive endeavor, to be able to do that for all

11:22  3    of their patents and all of their products.

11:22  4    And yet, even though it is very expensive to do, it

11:22  5    doesn't yield them value, right?  They don't gain any

11:22  6    additional innovation as a result of that, right?  They want to

11:22  7    be able to have the innovation and the benefits of that

11:22  8    innovation.

11:22  9    So even though you might see in certain products -- I

11:22  10   remember this particularly for my children's toys.  Some of

11:22  11   them would be marked with, you know, a patent on it, and that

11:22  12   makes sense, right?  Because there's maybe a very clear patent

11:22  13   on that particular product.  Sometimes you'll see it on

11:22  14   beverages, on particular cans or tops that open, things of that

11:23  15   nature.

11:23  16   But what we're talking about here are computer chips.  And

11:23  17   as you have observed, they are complex.  They're not simple.

11:23  18   And as a result, companies such as Intel, NXP, they do not mark

11:23  19   their products with patents as a simple matter of industry

11:23  20   practice.

11:23  21   Q.   So rather than focusing on NXP's products or

11:23  22   Freescale's products, you focused on Intel's products, right?

11:23  23   A.   Exactly.

11:23  24   Q.   Now, are these power savings and performance

11:23  25   improvements to Intel's products, are they important to Intel

603

11:23  1    and to Intel's customers?

11:23  2         A.   Yes, they are.  So here on Slide 7.20, I have here a

11:23  3    quote from PTX-4112 at Page 27.  And this is in relation to a

11:24  4    presentation that Intel put together where they state that

11:24  5    "it's the biggest Gen-Over-Gen improvement in battery life in

11:24  6    Intel's history."

11:24  7         Gen-Over-Gen means generation-over-generation.  And this

11:24  8    is exemplifying the importance of the '373 patent to Intel.

11:24  9         Here I also have listed a quote from PTX-4032 at Page 19,

11:24 10    and this is a 2016 presentation that Intel created.  And they

11:24 11    state that "a new revolutionary approach to power performance

11:24 12    management."  And this is explaining and demonstrating the

11:24 13    importance of the benefits of the '759 patent to Intel.

11:24 14         Q.   Have you seen any --

11:24 15         MR. LEE:  Your Honor, just for the record, PTX-4112 is one

11:25 16    of these documents that has numbers in it.  I have no objection

11:25 17    to the portion coming in that's on the slide.  It would be

11:25 18    anything else that would follow that would be subject to the

11:25 19    objection.

11:25 20         THE COURT:  Okay.

11:25 21         MS. PROCTOR:  We'll take that up with them after.

11:25 22         THE COURT:  Yes, ma'am.

11:25 23    BY MS. PROCTOR:

11:25 24         Q.   Have you seen any other evidence that these

11:25 25    performance benefits and power savings are important to Intel

11:25   1   and to its customers?

11:25   2       A.   Yes.  In my report I list out many, many, many

11:25   3   documents in this regard.  What I have here on Slide 7.21 is

11:25   4   just a handful of these documents.  It includes competitive

11:25   5   analyses prepared by Intel, pricing strategies prepared by

11:25   6   Intel, additional 10-K filings from Intel, their website, press

11:25   7   releases, news items.

11:25   8       So there's a great deal of information demonstrating that

11:26   9   the patented benefits are important.  And it also demonstrates

11:26  10   that these benefits help Intel improve their pricing.

11:26  11       MR. LEE:  Your Honor, same objection as to anything else

11:26  12   that would follow.  No objection at all to what's being shown

11:26  13   to the jury.

11:26  14       THE COURT:  Okay.

11:26  15   BY MS. PROCTOR:

11:26  16       Q.   Now, you mentioned pricing.  Does Intel price its

11:26  17   products based at least in part on performance?

11:26  18       A.   Yes, they do.  And here is an excerpt from PTX-4125

11:26  19   at Page 20.  And this is a price strategy document for

11:26  20   Broadwell that was prepared by Intel in 2015.

11:26  21       And you can see down here at the bottom, which I have

11:26  22   expanded up here at the top, that Intel states "Continued

11:26  23   strong demand for performance.  There is still room to test

11:27  24   elasticity of demand on top of the stack."

11:27  25       And elasticity of demand, this is an economic principle.

11:27   1   And what this is saying is that because of the demand for

11:27   2   performance, Intel is able to continue to increase their prices

11:27   3   without that causing them to lose so many sales that their

11:27   4   revenue would go down.

11:27   5       So in other words, they have the ability because of higher

11:27   6   performance to increase their prices and increase revenue, and

11:27   7   of course then profitability.

11:27   8       Q.   Have you seen any testimony supporting this

11:27   9   relationship between price and performance?

11:27   10      A.   Yes, I have.   There are several Intel witnesses on

11:27   11  pricing that have testified that pricing is based, in part, on

11:27   12  the performance of the products.

11:27   13      Q.   Now, what is your primary takeaway from reviewing all

11:27   14  of these materials in your work on this case?

11:27   15      A.   Well, I think it's clear that Intel operates in a

11:28   16  competitive marketplace where power savings and performance

11:28   17  improvements are necessary for them to maintain their

11:28   18  competitive position.

11:28   19      Q.   Thank you, Dr. Sullivan.

11:28   20      So let's turn now to the third key topic that you

11:28   21  identified, and that was the value of the patents to Intel.

11:28   22  How did you go about determining this value?

11:28   23      A.   I developed and used a quantitative mathematical

11:28   24  analysis -- it's known as a regression analysis -- that

11:28   25  measures and quantifies the price effects or price benefits

11:28  1   that are attributable to the patented benefits separate and

11:28  2   apart from other features and functionalities that contribute

11:28  3   to Intel's prices.

11:28  4          Q.   And what are the inputs to your analysis?

11:28  5          A.   Well, there's a couple of them to start with, which

11:29  6   are the patented benefits that were determined based upon the

11:29  7   work of Professor Annavaram and Professor Conte.

11:29  8          For the '373 patent you may recall that they determined

11:29  9   that the patented technology provides power savings of

11:29  10  5.45 percent.

11:29  11         For the '759 patent they determined that the technology

11:29  12  provides a performance improvement of 1.11 percent.  And I used

11:29  13  these as inputs to my analysis.

11:29  14         Q.   And how are these inputs used in your analysis?  Do

11:29  15  they allow you to focus just on the benefits that VLSI's

11:29  16  patents provide?

11:29  17         A.   They do.  And that, in my view, is part of why using

11:30  18  the actual tested benefits is so important in calculating a

11:30  19  reasonable royalty.  Because it identifies the specific

11:30  20  benefits of the patented technologies, which is what the

11:30  21  royalty is intended to do.  And that way it's separate from any

11:30  22  other factors and functionalities.  It allows this

11:30  23  apportionment to the technology specifically.

11:30  24         Q.   So how do you actually use these inputs provided by

11:30  25  Professors Conte and Annavaram in your analysis?

607

11:30  1    A.   Well, first off, I understand from Professor Conte

11:30  2  that a 1 percent power savings or a 1 percent improvement in

11:30  3  performance can be valued as a 1 percent improvement in clock

11:30  4  speed.

11:30  5    And as a matter of economics, this makes really good

11:30  6  sense.  Because if Intel has opportunity to improve performance

11:31  7  or reduce power, there's multiple things that they can do with

11:31  8  that.  They can increase clock speed with that.  They could

11:31  9  reduce power or they could improve other aspects of

11:31  10  performance.

11:31  11    And because they can choose how best to use these

11:31  12  benefits, they can choose the most valuable one.  And thus, if

11:31  13  they choose to increase clock speed, that might be the best

11:31  14  opportunity for them, but they might have something that's even

11:31  15  better.

11:31  16    So what I look at is the improvement in clock speed,

11:31  17  because we know that the benefits of the technology are at

11:31  18  least as valuable as an improvement in clock speed, because

11:31  19  Intel has these other options.

11:31  20    Q.   So what benefit does Intel actually get from an

11:31  21  increase in clock speed?

11:31  22    A.   Higher prices.  If the technology provides the

11:32  23  opportunity for power savings and performance improvements, and

11:32  24  we know that can be valued as an increase in clock speed, this

11:32  25  results in higher prices.

608

11:32  1        Customers like higher clock speed, and thus, they are

11:32  2   willing to pay for it.

11:32  3        Q.   So how do you actually quantify the effect of clock

11:32  4   speed on Intel's pricing?

11:32  5        A.   Well, as I mentioned earlier, I create a quantitative

11:32  6   analysis to be able to do this.

11:32  7        To start off with, it's probably easiest to think about a

11:32  8   simple analogy.  Earlier we were hearing about some Ford

11:32  9   vehicles, and maybe that was recognizing that I was going to be

11:32 10   wanting to talk about some Ford Explorers.

11:32 11        So suppose we have two types of vehicles, two Ford

11:32 12   Explorers, okay?  On the left is our standard Ford Explorer,

11:33 13   and then on the right we have another one.  Except this one's a

11:33 14   little different, because it has what I'm going to call a

11:33 15   lightning bolt technology.

11:33 16        Think about this as something -- the technology that

11:33 17   allows the fuel efficiency to increase from 25 miles per gallon

11:33 18   to 30 miles per gallon.  And as a result, the price of the

11:33 19   vehicle increases from $32,000 to $35,000.

11:33 20        So the difference between the 32,000 and the 35,000, you

11:33 21   know, that's our $3,000.

11:33 22        So in this simple example, one can see that if one's

11:33 23   focused on the lightning bolt technology and you have these two

11:33 24   products, you can observe that the price effect is $3,000 for a

11:33 25   lightning bolt.

11:33   1      Q.   So in your work here, did you find identical Intel

11:33   2   products that allowed you to do that type of direct comparison?

11:33   3      A.   No.  Intel does not have two sets of products where

11:34   4   one set has the technology and the other set does not but is

11:34   5   otherwise identical.

11:34   6      Q.   So how do you quantify the price effects when the

11:34   7   products are not otherwise identical?

11:34   8      A.   Well, it's a bit more complicated.

11:34   9      So going back to this car analogy, now, instead of our

11:34  10   having a Ford Explorer, suppose we have a Ford Escape.  Similar

11:34  11   but different.  It's a smaller vehicle; it costs less.  It does

11:34  12   not carry as many passengers, has lower horsepower.

11:34  13      So it makes it a bit more complicated because now we're

11:34  14   not just trying to control for the lightning bolt technology in

11:34  15   this comparison, we also have to control for these other

11:34  16   differences between the vehicles.

11:35  17      Q.   So in this type of a more complicated situation, how

11:35  18   do you isolate the value of a single factor on price?

11:35  19      A.   There is a tool that is specifically designed for

11:35  20   this purpose, and it's referred to as regression analysis.  And

11:35  21   I mentioned that term earlier.  This is a mathematical or a

11:35  22   statistical tool, framework, method that allows one to examine

11:35  23   the effects of clock speed on price while accounting for the

11:35  24   other differences among the products.

11:35  25      Q.   And how are regression models typically used?

11:35  1      A.   Well, regression analysis has been around for a long

11:35  2  time.  It was first created over 200 years ago.  And it is now

11:35  3  very widely used throughout companies, universities.  It is

11:36  4  taught in basic courses in statistics, basic economics courses,

11:36  5  econometrics describe regression analysis.

11:36  6      It is the subject of thousands of academic journal

11:36  7  articles.  It is in many different textbooks.  It's -- certain

11:36  8  types of regression analysis have been the focus of the Nobel

11:36  9  Prize in economics.

11:36  10     I was fortunate to study and have one of my dissertation

11:36  11  advisors, he earned his Nobel Prize for a particular type of

11:36  12  regression analysis called Arch.  And so this is a very widely

11:36  13  used, widely studied methodology.

11:36  14     Q.   And is regression analysis used in the context of

11:36  15  litigation for determining damages?

11:36  16     A.   Yes.  It is very common for regression analysis to be

11:37  17  used in litigation.  One example of this is that the Federal

11:37  18  Judicial Center, which is the educational organization for the

11:37  19  federal courts, they have manuscripts that describe how to use

11:37  20  regression in litigation.  It is very commonly used.

11:37  21     Q.   So what about outside of litigation?  Is regression

11:37  22  ever used in negotiations that are separate, not involving any

11:37  23  litigation?

11:37  24     A.   It is.  For negotiations for a patent license, it

11:37  25  does get used, but it's less common.  Because there are certain

11:37  1    data requirements, and it also takes resources, time to put

11:37  2    towards it.  It's not an inexpensive endeavor, and so it's used

11:38  3    sometimes but not overly frequently.

11:38  4        Q.   Now, does Intel dispute that regression is a widely

11:38  5    used tool in economics?

11:38  6        A.   No.  They do not.  You know, in fact, one of their

11:38  7    experts uses regression analysis in his own academic work to

11:38  8    evaluate the effect of features on prices.

11:38  9        Q.   So for your work in this case, did you build a custom

11:38  10   regression model?

11:38  11       A.   I did.  I used, you know, standard methods, standard

11:38  12   techniques that are, you know, used by the government to

11:38  13   determine inflation indices.  When you hear about the CPI, the

11:38  14   Consumer Price Index, well, that's the type of model that I

11:38  15   used here.  So it's widely used.

11:38  16       But of course my goal here is to calculate and determine

11:38  17   the benefits of these particular technologies for Intel's

11:38  18   products.  And that's based upon, you know, the confidential

11:39  19   information of Intel's financials and based upon their specific

11:39  20   products.  And thus I tailored the regression analysis that I

11:39  21   did specific for this case.

11:39  22       Q.   So what type of data do you use in your regression

11:39  23   model for this case?

11:39  24       A.   So what I want to do is I want to be able to compare

11:39  25   prices on the one hand to the features and characteristics of

11:39  1  the products on the other hand, so I used two sets of data.

11:39  2      On the left-hand side here, on Slide 30, you'll see that I

11:39  3  used sales data from Intel that includes six and a half million

11:39  4  transactions, sales transactions.  These are the actual sales

11:39  5  made for actual products and the actual prices that were paid

11:40  6  for those products where each transaction sometimes has several

11:40  7  thousand units that are sold within an individual transaction,

11:40  8  and I compared those to the features and characteristics of the

11:40  9  products that are sold.

11:40  10      There's a particular website database that Intel maintains

11:40  11  for the public called ARK, A-R-K.  And this lists out the

11:40  12  different features and characteristics of each of the products

11:40  13  that they are advertising and promoting to the public.  And so

11:40  14  I used those features and characteristics, and I compared them

11:40  15  to the prices using a regression analysis.

11:40  16      Q.   And how do you go about determining which features or

11:40  17  factors to include in your regression model?

11:40  18      A.   Well, I start with all of the available features and

11:40  19  characteristics that are available on Intel's database, and

11:41  20  then I remove those that have too much missing data.

11:41  21      I remove the factors that are already accounted for by

11:41  22  other factors, that there's, you know, so much overlap that

11:41  23  they aren't adding anything.

11:41  24      And then there's certain variables that just simply are

11:41  25  not relevant or informative, such as whether that product is

11:41  1   still being sold today.  Well, that of course doesn't matter

11:41  2   for when it actually had been sold.  So that doesn't add any

11:41  3   information for us.

11:41  4       Q.  So after going through this detailed analysis to

11:41  5   analyze the features that Intel advertises, what features or

11:41  6   factors did you ultimately include in your model?

11:41  7       A.  I have those listed here on Slide 7.32.  There, you

11:41  8   know, of course I have clock speed, which is reflected in

11:41  9   Base/Turbo frequency and Max Turbo frequency, but there's over

11:42  10  35 other features that -- and characteristics that I use as

11:42  11  control factors.

11:42  12      I also look at the year in which the product was launched.

11:42  13  I looked at the calendar quarter in which the transaction takes

11:42  14  place, because of course the marketplace evolves and changes

11:42  15  over time and I account for that.

11:42  16      And I also look at different customer categories because

11:42  17  different customers and different sizes and types might get

11:42  18  different types of pricing than others, and so I take that into

11:42  19  account as well.

11:42  20      Q.  So, Dr. Sullivan, what are the results of your

11:42  21  regression analysis?

11:42  22      A.  Well, associated with each factor is what's called a

11:42  23  coefficient.  And here on Slide 7.33 I've listed out all of the

11:42  24  coefficients for all of the different factors.

11:42  25      Now, here there's over 150 different factors and that's

614

11:43   1   because some of the features actually have multiple factors

11:43   2   associated with them.  So it's actually up to 150 factors.

11:43   3       Q.   And so what is the coefficient on clock speed?

11:43   4       A.   Well, you can see that up here at the top left.  I'll

11:43   5   blow that up.  So here on Slide 7.34 you can see that the

11:43   6   coefficient for clock speed is 0.764.

11:43   7       This is the key result of the regression, okay?  So 0.764,

11:43   8   you know, that's a bit less than one, just a little bit more

11:43   9   than three-fourths.  And this is providing the mathematical

11:43   10  relationship between price and clock speed separate and apart

11:43   11  from all of the other features and factors.

11:43   12      Q.   So, Dr. Sullivan, what does this result mean?

11:43   13      A.   Well, what it means is that if there's a 1 percent

11:44   14  improvement in speed, that that results in a price that is

11:44   15  .764 percent greater.  There's a price benefit of .764 percent

11:44   16  for every 1 percent improvement in speed.

11:44   17      So if we had a 2 percent speed improvement, then we would

11:44   18  take two times the .764 percent and that would equal, you know,

11:44   19  about 1.5 percent, 1.53 percent.

11:44   20      Q.   And does this price benefit include any other

11:44   21  features that would appear in Intel's products?

11:44   22      A.   No.  This is specific and unique to clock speed

11:44   23  separate and apart from everything else.

11:44   24      Q.   So, Dr. Sullivan, did you perform any analyses to

11:45   25  determine whether your model was actually reliable?

11:45  1    A.   Yes.  I did.  I performed a full collection of

11:45  2  standard tests to determine whether the model is reliable.  And

11:45  3  here on Slide 7, I'm just listing a few of those.

11:45  4    So up top you can see that for clock speed the p-value --

11:45  5  and p-value's a probability value on whether or not a factor is

11:45  6  not relevant, and you want it to be as close to zero as

11:45  7  possible.  Here it's 0.0000.  It's effectively zero, you know,

11:45  8  numerically speaking.  And so that means it's highly

11:45  9  significant.

11:45  10    I also have listed out the p-values for all of the control

11:45  11  factor groups, and you can see those are either effectively

11:45  12  zero or very close to zero.

11:46  13    And then I also have listed down here at the bottom the

11:46  14  $R^2$.  The $R^2$ range is between zero and one, closer to one is

11:46  15  better.  And here the $R^2$ of the model is 0.9391.  And so that's

11:46  16  very good for this model.

11:46  17    And taken in -- all total, what this means is that there's

11:46  18  very high statistical confidence that the estimate on the

11:46  19  coefficient for clock speed, that 0.764, that that is

11:46  20  statistically significant with a high degree of confidence.

11:46  21  And ultimately that just means that as an economist, it's

11:46  22  appropriate to rely upon that.

11:46  23    Q.   So based on all of your work building the regression

11:46  24  and all of your analysis that you've explained here, are you

11:46  25  confident in the results you obtained for clock speed?

616

11:46  1    A.   Yes.

11:46  2    Q.   Now, have Intel's experts made any arguments about

11:46  3    your regression analysis?

11:47  4    A.   Yes.   They have set forth a number of different

11:47  5    critiques relating to what they refer to as "unexpected

11:47  6    coefficients."   There's a Speed Shift, omitted variable bias

11:47  7    and binning.

11:47  8    Q.   So let's start with that first argument, the

11:47  9    unexpected coefficients.   Should the coefficients on the

11:47  10   control factors be interpreted as direct effects on price?

11:47  11   A.   Not necessarily.

11:47  12       So let's go back and take a look at the full collection of

11:47  13   coefficients.   Keep in mind that it's this clock speed that I

11:47  14   focused on, right?   That's the important piece.   And I made

11:47  15   sure to not include other variables that overlap with that

11:47  16   clock speed that could muddy that estimate.

11:47  17       So let me just give you a couple of examples.   So the next

11:47  18   one down here, cores.   So I'll blow that up.   And you can see

11:48  19   that as the number of cores increases, that the coefficient

11:48  20   increases, and that makes perfect sense.   That's great.

11:48  21       However, it's not always that way.   So you can see here on

11:48  22   the next slide, I've got the coefficients for product family,

11:48  23   and I've highlighted here the Westmere coefficient of 2.29.

11:48  24   Well, you'll notice that's the largest coefficient among the

11:48  25   different product families, and Westmere's one of the oldest

11:48  1  product families so that might almost seem odd or unexpected.

11:48  2       But keep in mind I also have a factor for launch year,

11:48  3  when this product is launching.  And so there's overlap between

11:48  4  those two.

11:48  5       So if you were to only look at the coefficient on Westmere

11:48  6  without thinking about that overlap, you might think that's

11:48  7  unexpected.  But irrespective of the overlap on the control

11:49  8  factors, it doesn't affect the clock speed estimate that I have

11:49  9  here.

11:49  10      Q.   So the clock speed result has been isolated from all

11:49  11  of these other factors?

11:49  12      A.   Exactly.  Even though there can be overlap in the

11:49  13  control factors.

11:49  14      Q.   So let's turn to that second argument that Intel

11:49  15  raised.  Is the Speed Shift feature included in your regression

11:49  16  model?

11:49  17      A.   I include Speed Shift through the benefits that Speed

11:49  18  Shift has on clock speed.  I do not include a separate factor

11:49  19  for Speed Shift itself, the feature itself.  And there's very

11:49  20  good reason for that.

11:49  21      And so I'd like to go back to our car example.  Unlike

11:49  22  Dr. Annavaram, I actually enjoy Fords.  So here you can think

11:50  23  about, you know, the lightning bolt technology, that improves

11:50  24  fuel efficiency, the miles per gallon, and that affects the

11:50  25  price.

618

11:50  1    So the proper way to value or evaluate this lightning bolt

11:50  2    technology is through the benefits of that technology, which is

11:50  3    through a fuel efficiency.  It would not be appropriate to

11:50  4    include the lightning bolt technology as a separate factor

11:50  5    because of the overlap, right?  Because otherwise then some of

11:50  6    the effects are going to go to miles per gallon and some of the

11:50  7    effect is going to go to this feature, and so you're diluting

11:50  8    that effect.

11:50  9    And even worse is that customers care about the benefits

11:50  10   of the feature, not the feature itself.  You know, thinking

11:50  11   about the Ford Explorer, it's not just the lightning bolt

11:50  12   technology itself, you know, that has maybe a little lightning

11:51  13   bolt emblem, the feature.  It's the benefit, right?  It's the

11:51  14   fuel efficiency and thus the savings in fuel costs.  It's that

11:51  15   benefit.

11:51  16   And so the same is true here in our case.  Because the

11:51  17   patents provide a benefit for clock speed and that clock speed

11:51  18   has an effect on the higher prices.  And that's the way the

11:51  19   benefits observe.  And if we were to include just Speed Shift

11:51  20   technology as a feature, you know, those words aren't the

11:51  21   benefit and instead that would just dilute the effects.

11:51  22   Q.   So in your view it was appropriate to not include

11:51  23   Speed Shift directly as a separate factor in the model?

11:51  24   A.   Correct.

11:51  25   Q.   So let's turn to Intel's third argument, omitted

11:51  1   variable bias.  Did you consider whether you included enough

11:51  2   control factors?

11:51  3        A.   Yes.  So, you know, there's kind of two issues in

11:51  4   building a regression.  One is, you know, do you have too many

11:52  5   factors, and then the other is, you know, do you have enough?

11:52  6        And I already talked about the too many and the overlap

11:52  7   and what is referred to as multicollinearity, but there's

11:52  8   another issue that economists consider, which is omitted

11:52  9   variable bias.

11:52  10       This just means that there's a bias that can occur.  And

11:52  11  what's referred to as bias, it's a statistical term for just

11:52  12  saying that the number might not be fully accurate.  And if

11:52  13  there's not a sufficient collection of features or factors,

11:52  14  that could create a bias.

11:52  15       Here we know that's not an issue.  And that's because the

11:52  16  model reliability results that I showed you earlier, the

11:52  17  p-values, the $R^2$ and the performance of the model, we know that

11:52  18  omitted variable bias is not an issue.

11:52  19       Q.   Now, are you familiar with Intel's damages expert

11:52  20  Dr. Lorin Hitt?

11:53  21       A.   Yes.

11:53  22       Q.   And have you reviewed Dr. Hitt's work in this case?

11:53  23       A.   Yes.  I reviewed his report.  I also read through the

11:53  24  transcript of his deposition.

11:53  25       Q.   And what is your opinion of Dr. Hitt's regression

11:53  1   analyses?

11:53  2       A.   Well, a key piece of his work in this case is running

11:53  3   what would be referred to as mini regressions.  These are

11:53  4   regressions that are run on just individual products, so small

11:53  5   samples of the data.  And there's some problems with this.

11:53  6       First off is that it ends up removing, you know, most of

11:53  7   the data each of these mini regressions moves anywhere between

11:53  8   59.4 percent and 99.8 percent of the data.  So we're losing a

11:53  9   lot of data when we do that, we're losing information, we're

11:53  10  reducing reliability of the calculations.

11:53  11      But there's another more fundamental issue here, which is

11:54  12  the importance of including both accused infringing products as

11:54  13  well as non-accused, non-infringing products for the regression

11:54  14  analysis.  Because one -- in order to figure out the value of

11:54  15  the technology, one has to be able to draw a comparison between

11:54  16  the products that have it versus those that don't.

11:54  17      Let's go back to the car example and think about the two

11:54  18  Ford Explorers.  And if all the Ford Explorers had the

11:54  19  lightning bolt technology, it wouldn't be possible then to

11:54  20  measure the price effects of the technology.

11:54  21      And so, not surprisingly, when Dr. Hitt is performing mini

11:54  22  regressions, he's not able to come up with the appropriate

11:54  23  estimate of what the effect is of having improved clock speed.

11:55  24      Q.   So the fourth argument you mentioned was binning.

11:55  25  Dr. Sullivan, what is binning as it relates to Intel's pricing?

11:55  1     A.   Binning is a pricing process that Intel uses to put

11:55  2  products into different bins -- think of a bucket -- based upon

11:55  3  the characteristics of that product, and in particular the

11:55  4  performance of that product.

11:55  5     So products with higher performance and better

11:55  6  characteristics are placed into a higher bin, and those bins

11:55  7  then result in higher prices.

11:55  8     And, you know, this is -- you know, this process is one of

11:55  9  the things that demonstrates the relationship, that there is a

11:55  10  relationship between performance and price and improvements in

11:55  11  clock speed and price.

11:55  12     Q.   So does your analysis account for binning?

11:55  13     A.   Yes.  Directly.  All of the six and a half million

11:56  14  transactions that I use as part of the regression analysis,

11:56  15  those are all sales that were made after those products had

11:56  16  been put through the binning process.

11:56  17     And so they -- by their very nature, by definition they

11:56  18  include the effects of the binning.  They reflect Intel's

11:56  19  actual pricing processes because they are the actual prices.

11:56  20     Q.   Now, are you familiar with Dr. Hitt's binning

11:56  21  analysis?

11:56  22     A.   I am.

11:56  23     Q.   And what is your opinion of Dr. Hitt's binning

11:56  24  analysis?

11:56  25     A.   Well, in my view, it is not correct.  And in

11:56  1    particular, Dr. Hitt creates his own binning process.  It's not

11:56  2    based upon the pricing process that Intel uses.  Instead, he

11:56  3    uses his own optimization algorithm which then makes up prices

11:57  4    that aren't the ones that Intel actually received, and thus it

11:57  5    does not reflect the benefits to Intel that they actually

11:57  6    receive from the technology because of those actual prices.

11:57  7         There's also the other issue that it's -- his analysis is

11:57  8    based upon, you know, limited data.  It's really for overall

11:57  9    only a couple of years' period of time and so it doesn't

11:57  10   reflect what has happened across time.  But the fundamental

11:57  11   issue is it's not the actual data.

11:57  12        You know, and as I've described and the method that I've

11:57  13   employed is using the actual prices.  So I can look at the

11:57  14   actual benefits that Intel received.

11:57  15        Q.   Thank you, Dr. Sullivan.

11:57  16        And the next area I want to discuss is to go back to your

11:58  17   regression model and talk about how you actually used it to

11:58  18   calculate damages here.  But before we do that, I'm hoping that

11:58  19   we can take a break.  If that works for everyone.

11:58  20        THE COURT:  It does.  Ladies and gentlemen, it is right at

11:58  21   noon.  If you'll be back by 1:15 and resume -- I'll get started

11:58  22   as close as possible, but it may not be till 1:30 that we

11:58  23   actually resume trial.  But if you'll be back at 1:15, that'd

11:58  24   be great.  Remembering my instructions not to discuss the case

11:58  25   amongst yourselves, you are dismissed.

| | | |
|---|---|---|
| 11:58 | 1 | THE BAILIFF:  All rise. |
| 11:58 | 2 | (Jury exited the courtroom at 11:58.) |
| 11:58 | 3 | THE COURT:  Dr. Sullivan, you may step down. |
| 11:58 | 4 | Is this the point you break because you're about to -- I'm |
| 11:59 | 5 | going to suggest that we go to lunch and we meet back here at |
| 11:59 | 6 | 1:00 and we'll take up the issues that Mr. Lee raised. |
| 11:59 | 7 | Does that work for you, Mr. Lee? |
| 11:59 | 8 | MR. LEE:  It does, Your Honor. |
| 11:59 | 9 | THE COURT:  And counsel? |
| 11:59 | 10 | MS. PROCTOR:  Yes.  Thank you, Your Honor. |
| 11:59 | 11 | THE COURT:  We'll see you in about an hour. |
| 12:05 | 12 | (Recess taken from 11:59 to 1:17.) |
| 01:17 | 13 | THE BAILIFF:  All rise. |
| 01:17 | 14 | THE COURT:  Thank you.  You may be seated. |
| 01:17 | 15 | I think Mr. Chu is sending me a subliminal message here. |
| 01:17 | 16 | MR. CHU:  No, no.  Not at all, Your Honor.  We're very |
| 01:17 | 17 | well protected by the Court from COVID but not the common cold |
| 01:17 | 18 | this morning. |
| 01:17 | 19 | THE COURT:  If Dr. Sullivan would take the stand, and if |
| 01:17 | 20 | you would tell me the questions that you're seeking to get from |
| 01:17 | 21 | him, and also where in his report that information is shown, |
| 01:17 | 22 | that would be great. |
| 01:17 | 23 | And, Mr. Lee, then I'll give you an opportunity. |
| 01:17 | 24 | MS. PROCTOR:  Absolutely, Your Honor. |
| 01:18 | 25 | So if we could pull up the slides.  And I'll just show you |

01:18  1   the slides we have, Your Honor.  And I actually just sent a

01:18  2   couple of revised slides to Intel, so they have them, a couple

01:18  3   of updated ones that we may add based on your guidance.

01:18  4       THE COURT:  Okay.

01:18  5       MS. PROCTOR:  So if we can look at the next slide.  This

01:18  6   is the -- we want to show basically two per-unit calculations.

01:18  7   And let me take a step back.  What we really want to do is we

01:18  8   want to show this calculation two ways.

01:18  9       So if you'll go ahead to Slide 49.

01:18  10      So this is the calculation that is in his report exactly

01:18  11  like this in one of the attachments.  We can look at if you'd

01:18  12  like -- it's D -- let's see.  It's -- well, it's Plaintiff's

01:19  13  Exhibit 3910.

01:19  14      So this is the calculation that's in the report.  He walks

01:19  15  through these numbers, he does this math, and he actually has

01:19  16  an attachment that just shows exactly these numbers and this

01:19  17  result.

01:19  18      Now, what we also want to show is the per-unit

01:19  19  calculation.

01:19  20      And if we can go back two slides.

01:19  21      I want to ask him to walk through this at a per-unit

01:19  22  level.  And, Your Honor, these are the exact same numbers, so

01:19  23  this infringing revenue per unit is literally just the accused

01:19  24  revenues which are in the report in multiple places.

01:19  25      I can give you a pincite if you'd like.

01:19  1       They are in his attachments.  He has an attachment that

01:19  2  just calculates accused revenues per patent.  We just take the

01:19  3  accused revenues and divide by number of units.  So this is

01:19  4  total revenue per unit.  It is one calculation just doing that

01:19  5  division.  And we're doing the exact same math that he shows in

01:19  6  his report but showing it at a per-unit level.

01:20  7       And so this is -- these are all numbers that were

01:20  8  disclosed to them.  It is absolutely material that they had

01:20  9  available to them and that they understood.

01:20  10      And I want to address Mr. Lee's point about how this

01:20  11  supposedly prejudiced Intel, that this is somehow a surprise.

01:20  12  So this just simply is not a surprise.  They've had all of

01:20  13  these numbers.

01:20  14      They actually objected, Your Honor, to a couple of other

01:20  15  calculations we did where we took two numbers, one for each

01:20  16  patent, and added them.  And they said that was unfair because

01:20  17  it wasn't in the report.  And they've since withdrawn those

01:20  18  objections, because we all agree either party here can add two

01:20  19  numbers together.  That's what we need to do to explain our

01:20  20  case to the jury.

01:20  21      And here we have the exact same situation.  In order to

01:20  22  explain our case to the jury and show how this works, and to

01:20  23  avoid actually Intel's objection that showing the total accused

01:20  24  revenues somehow creates an appeal issue, to avoid that issue,

01:20  25  this is what we would do --

01:20   1        THE COURT:  And that appeal issue being the stacking

01:21   2   issue?

01:21   3        MS. PROCTOR:  No.  I'm sorry.  They have an objection

01:21   4   under the entire market value rule.

01:21   5        THE COURT:  Okay.

01:21   6        MS. PROCTOR:  And they say that showing that $50 billion

01:21   7   total accused revenue or $123 billion total accused revenue

01:21   8   will somehow skew the damages horizon for the jury in a way

01:21   9   that will prejudice them.  And so they're preserving that

01:21   10  argument for appeal.

01:21   11       So we want to, in response to that, to basically

01:21   12  accommodate their request, let's take that big number they

01:21   13  don't like.  Let's divide it by the number of units, and let's

01:21   14  explain it to the jury that way.

01:21   15       So it's the exact same calculation.  The 5.45 is there,

01:21   16  the .764 is there.  We've just divided revenues by units and

01:21   17  that gets you this additional revenue per unit.

01:21   18       The report is very clear that Dr. Sullivan is seeking a

01:21   19  running royalty and that that royalty should reflect the extent

01:21   20  of use, and it should reflect the number of units.

01:21   21       And they deposed Dr. Sullivan about this.  He was clear in

01:21   22  his deposition that the -- his damages number would be higher

01:22   23  if there were more units that infringe and lower if there were

01:22   24  fewer, right?  We all agree his damages have always been

01:22   25  proportional to the number of units.  There's a direct

01:22   1    connection there.

01:22   2         And so, again, I just don't understand how this is a

01:22   3    surprise.  We actually deposed their witnesses on this royalty

01:22   4    stacking issue.  And their 30(b)(6) witnesses on licensing said

01:22   5    simply:  We do not track royalties on a per-unit basis.  We do

01:22   6    not have any data on any royalty burden on our products.

01:22   7         So, Your Honor, if they thought it would help them to do

01:22   8    this division and make a royalty stacking argument, you would

01:22   9    have already heard about it.  This is really just a very

01:22   10   straightforward way to demonstrate, to explain, to show the

01:22   11   jury what we've done in a way that tries to avoid one of their

01:22   12   concerns and tries to at least mitigate this potential appeal

01:23   13   issue by spending less time.

01:23   14        Our goal is to spend less time showing, looking at,

01:23   15   talking about the big numbers.

01:23   16        THE COURT:  Okay.

01:23   17        MS. PROCTOR:  And just one other small point.

01:23   18        If we can go ahead I think three slides.  Let's see if

01:23   19   that gets us there.

01:23   20        So I've added now after we do the calculation at the total

01:23   21   revenue level that was in his report that they object to only

01:23   22   because the numbers are too big, Your Honor mentioned that

01:23   23   perhaps we could, after we show the calculation of something

01:23   24   like the 2.1 billion, which is all apportioned, we could maybe

01:23   25   then just say, Dr. Sullivan, if you divide that by number of

01:23  1    units, what would you get?

01:23  2         So this is another slide that we just added.  We've sent

01:23  3    it to the other side.  And it's another option where we can

01:23  4    show it.

01:23  5         But our view is that we need to be able to show these

01:23  6    numbers to prove up our case.  These are how we -- this is how

01:23  7    we calculated damages.  We've just done nothing but this small

01:23  8    tweak to address, actually, one of Intel's concerns about the

01:24  9    magnitude of the numbers.

01:24  10        THE COURT:  Got it.

01:24  11        Mr. Lee?

01:24  12        MR. LEE:  Your Honor, this is not a small tweak.

01:24  13        If I could have the slide that -- it's PDX-7.49.  Let me

01:24  14   make sure we've got the right one.  Let's use PDX-7.52.

01:24  15        I think this is one she said was the way it was presented

01:24  16   in his report.  And he did present an analysis that was based

01:24  17   upon his analysis times infringing revenues for the units.

01:25  18        But in his report, Your Honor, and in his deposition, he

01:25  19   said he could present his analysis and ultimate opinion without

01:25  20   having to disclose the total number of all the accused

01:25  21   products.

01:25  22        And if I could hand up to you Page 143 of his deposition

01:25  23   transcript and Page 123 of his opening report.  I'll give

01:25  24   copies to Ms. Proctor.

01:25  25        So, Your Honor, the lay of the land until this morning, or

01:25   1   until last night, was they were presenting his analysis.  It

01:25   2   was based upon the total infringing revenues, which as

01:25   3   Ms. Proctor says was the analysis he presented in his report.

01:25   4   And he said he could present that analysis without disclosing

01:26   5   the total infringing revenues.

01:26   6       That is fine with us because, well, we disagree with it,

01:26   7   but it's fine with us for him to present it, because that's

01:26   8   what's in his report.  That's the analysis in his report.  And

01:26   9   you'll see in the footnote in his report he himself says he can

01:26   10  present it without disclosing the total revenues.  And then we

01:26   11  asked him that question and he said it would be reasonable to

01:26   12  do so.

01:26   13      So all we're asking is that he do what he said in his

01:26   14  report and his deposition.

01:26   15      You will not find in the report anywhere this per-unit

01:26   16  calculation.  And it's not just a tweak, Your Honor, and it's

01:26   17  not just math.  Because if I go to their later slides --

01:26   18      If I could -- just give me a second, Your Honor.

01:26   19      They translate this into a per-unit royalty later in their

01:27   20  slides.  This is a different type of royalty.  It's not just

01:27   21  math.  It would have different implications for the case.  We

01:27   22  would have responded to it differently, and so it's just a new

01:27   23  theory.

01:27   24      And we have no objection to him pursuing the theory that

01:27   25  he pursued before.

01:27  1    Yes, Your Honor.  If I could ask Mr. Lee to bring up, for

01:27  2    instance, Slide No. 7.47, where he computes an additional

01:27  3    revenue per unit.  Then they take that additional revenue per

01:27  4    unit, they reduce it, and they come up with what they call a

01:27  5    per-unit royalty.  A per-unit royalty is different.  We would

01:28  6    have responded to it differently.  It's not in the expert

01:28  7    report.

01:28  8    So all we're asking is that they be held to what they

01:28  9    represented before.  He has an analysis that is power savings

01:28  10   times price benefit times total revenues of the accused

01:28  11   products.  He said he could present that, as Your Honor sees,

01:28  12   without disclosing the total accused revenues.  And we think

01:28  13   that that is the way to go.

01:28  14   Now, that would require some adjustments to these charts,

01:28  15   because there's like -- there's three different ways of

01:28  16   presenting it in these charts.  Half of them should go out

01:28  17   because they're on a per-unit basis, which was never the basis

01:28  18   for what he disclosed.  And it would be prejudicial and unfair,

01:28  19   and honestly, Your Honor, we would have responded to it had we

01:28  20   had the chance.

01:28  21   On the others, he can present it, but he doesn't need

01:28  22   the -- if we hold him to his word, he doesn't need the total

01:28  23   revenues in the record or to say them.  He can just describe

01:28  24   what he does, and he can come up with the number that is his

01:29  25   number.

01:29  1      THE COURT:  Okay.  Yes, ma'am.

01:29  2      MS. PROCTOR:  So, Your Honor, turning to the deposition

01:29  3  excerpt that Mr. Lee just provided to you and the portion of

01:29  4  his report, what Dr. Sullivan was saying that it -- was that if

01:29  5  Intel had won its motion in limine where they asked you to

01:29  6  exclude the accused revenues, would it be possible for him to

01:29  7  do the same calculation with a black box there instead of a

01:29  8  number?  Sure.  We could present it that way, but this is --

01:29  9  that is highly confusing to the jury, and there's no basis for

01:29  10  Intel's trial team here to dictate how Dr. Sullivan presents

01:29  11  his analysis.

01:29  12      So I'm not sure how the bit that you just got from Mr. Lee

01:29  13  really relates to this dispute, because what Dr. Sullivan was

01:29  14  saying is that, yes.  He could basically not show the math.

01:30  15      THE COURT:  Mr. Lee, I'll tell you that's the way I read

01:30  16  this as well.  The prior -- the -- I mean, I only have this

01:30  17  page, but it reads now -- the answer was, "Now, it could be

01:30  18  that the Court deems it appropriate to disclose that data

01:30  19  information to the jury and perhaps not."

01:30  20      And Mr. Hirsch says, "I think I understand."

01:30  21      Then he asks this question and he says, "In my view,

01:30  22  that's reasonable."

01:30  23      But I don't see that as him saying he's not going to do

01:30  24  it.  I see it as kind of an alternative statement.

01:30  25      With respect to his report, I'm looking at the footnotes

01:30   1   and especially the ones you've highlighted.  One says, "The

01:30   2   determination for the reasonable royalties herein does not

01:30   3   require disclosure of accused sales or the effective percentage

01:30   4   royalty rate as the determination of reasonable royalties as

01:31   5   based upon a portion of revenue that's specifically attributed

01:31   6   to the patented technology."

01:31   7       And it sounds to me like that's what he's about to do

01:31   8   and -- which I'm okay with.

01:31   9       And then he says, "The determination of reasonable

01:31  10   royalties herein does not require disclosure of accused sales

01:31  11   or the effective percentage royalty rate as the determination

01:31  12   of reasonable royalties based upon a portion of revenues that

01:31  13   is specifically attributable," but it sounds to me like that's

01:31  14   what he's going to be asked to do here as well.

01:31  15       Power savings times the price benefit times the infringing

01:31  16   revenue per unit is what he is doing in terms of apportioning

01:31  17   the revenue specifically attributable to the patented

01:31  18   technology.  What am I missing?

01:31  19       MS. PROCTOR:  That's exactly right, Your Honor.  One

01:31  20   moment.

01:31  21       MR. LEE:  So, Your Honor, there are two separate issues.

01:32  22       THE COURT:  Okay.

01:32  23       MR. LEE:  Okay.  The first is one you just identified.

01:32  24   And, you know, all I can say is we would disagree.  I think

01:32  25   that Uniloc would say, no.  He shouldn't be able to do that,

01:32  1    and Ericsson would also say that.  But we've made our position

01:32  2    clear to Your Honor.  If that's your ruling, we understand it.

01:32  3         If I could have on the screen though PDX-7.63.  And

01:32  4    then -- and maybe the next.  This is different.  This is --

01:32  5         THE COURT:  Just to protect your record, if you can make

01:32  6    sure you state on the record what it is I'm looking at.

01:32  7         MR. LEE:  Yes.  It's PDX-7.64, and I think I have the

01:32  8    numbers right because we don't have the newest set.  But for

01:32  9    the set I have right now it's PDX-7.64, Your Honor.

01:32  10        This reasonable royalty per unit number is a new number.

01:32  11   It's not in the reports anywhere.

01:33  12        THE COURT:  Okay.

01:33  13        MR. LEE:  How does that come in?

01:33  14        MS. PROCTOR:  So, Your Honor, this is exactly what you

01:33  15   contemplated when Mr. Lee first raised this this morning.

01:33  16        This is our total damages award.  If you divide it by the

01:33  17   number of units, this is what you get.  And we're just showing

01:33  18   that you can also calculate it at a per-unit level, just like

01:33  19   we just showed.  This is just the next step.

01:33  20        So Your Honor just described his analysis quite well,

01:33  21   saying that we start by apportioning the revenue down to just

01:33  22   the patented benefit.  Then there's another step where we look

01:33  23   at each party's contribution and award the royalty just based

01:33  24   on Freescale's contribution.

01:33  25        And so that's what we're doing here.  We're starting with

01:33   1    that incremental -- just the additional revenue attributable to

01:33   2    the patent multiplying it by the contribution that Freescale

01:33   3    made and that's how we get to the reasonable royalty.

01:33   4        The report has this exact calculation except instead of

01:33   5    dividing the first number and the last number by the units, we

01:33   6    have the undivided numbers that Intel objects to as being too

01:34   7    large.

01:34   8        THE COURT:  Mr. Lee, I am concerned that you're trying to

01:34   9    have it both ways.  If -- you're making the one objection that

01:34   10   you're making, and they are trying to address this, and as long

01:34   11   as those -- and let me make sure I'm clear, where it says

01:34   12   "additional revenue per unit of 5.50," was that in his report?

01:34   13       MS. PROCTOR:  The additional revenue attributable to all

01:34   14   the accused products in his report divided by the number --

01:34   15       THE COURT:  -- by the number of units.

01:34   16       MS. PROCTOR:  -- which is also in his report.

01:34   17       THE COURT:  So really what you -- all this has done is

01:34   18   taken the math of the additional revenue against the number of

01:34   19   units, which I assume was in the report as well?

01:34   20       MS. PROCTOR:  Absolutely.

01:34   21       THE COURT:  And so it's taken that, and it's -- and by

01:34   22   doing that, it said it's additional revenue per unit -- that

01:35   23   math equals $5.50.

01:35   24       MS. PROCTOR:  Exactly.

01:35   25       THE COURT:  And then with respect to the Freescale

01:35 1    contribution, is that number in his report as well?

01:35 2         MS. PROCTOR:  Yes.  That exact calculation with that

01:35 3    percentage just without the division by the number of units

01:35 4    that you just described.

01:35 5         THE COURT:  Mr. Lee, anything else?

01:35 6         MR. LEE:  Your Honor, everything captured in Ms. Proctor's

01:35 7    statement is they just go on in the next step, and there are

01:35 8    two separate issues without a doubt.

01:35 9         We understand that if Your Honor's ruling, that the total

01:35 10   revenues can come in, then that set of slides is his analysis.

01:35 11   That's in his report.  And subject to what we've said about

01:35 12   Uniloc, that should come in because that's in his report.

01:35 13        A -- doing the next step and restating the damages number

01:35 14   as a per-unit royalty is a different damages analysis.  We

01:35 15   would have responded to it differently.  We would have had a

01:36 16   royalty stacking argument at a minimum.  Our experts would have

01:36 17   computed reasonable royalties per unit on comparable licenses.

01:36 18   It would have been a different defense.

01:36 19        So you are right.  It's -- we're not -- I don't think

01:36 20   we're trying to have it both ways.  We understand that if Your

01:36 21   Honor rules total revenues are on the slide because that's what

01:36 22   he's done, that's where we are and we'll deal with it.

01:36 23        This is a different damages presentation, and I think the

01:36 24   one thing we both agree upon is this 4.19 per unit for the '373

01:36 25   patent is nowhere in his report.

| | | |
|---|---|---|
| 01:36 | 1 | THE COURT: You faded out. I just couldn't hear you. |
| 01:36 | 2 | MR. LEE: I'm sorry. The $4.19 per unit is nowhere in his |
| 01:36 | 3 | report. |
| 01:36 | 4 | THE COURT: So as I understand it -- and jump in here if I |
| 01:36 | 5 | don't, I'm doing my best -- the additional revenues per unit |
| 01:36 | 6 | number of $5.50 comes from his methodology, breaking it down by |
| 01:37 | 7 | the number of units that are accused in this case, correct? |
| 01:37 | 8 | MS. PROCTOR: Yes. |
| 01:37 | 9 | MR. LEE: That's what we understand. This is, as I said, |
| 01:37 | 10 | new. So we had to confirm it. |
| 01:37 | 11 | THE COURT: The $5.50 is new? |
| 01:37 | 12 | MR. LEE: The math to get there, but I don't have any |
| 01:37 | 13 | reason to believe that that's not an accurate -- it's not an |
| 01:37 | 14 | accurate mathematical calculation. |
| 01:37 | 15 | THE COURT: It's not an inaccurate? |
| 01:37 | 16 | MR. LEE: Yeah. I have no reason to believe it's |
| 01:37 | 17 | inaccurate. |
| 01:37 | 18 | THE COURT: And so I must be having a hard day of hearing |
| 01:37 | 19 | you. I'm sorry. |
| 01:37 | 20 | And -- but the number of units is in his report or a |
| 01:37 | 21 | number that maybe it had gotten -- made more current, but what |
| 01:37 | 22 | he did in his report was said, there's a number of units, and |
| 01:37 | 23 | in his report there is the whole number that, if divided by the |
| 01:37 | 24 | number of units, would have $5.50, correct? That is in his |
| 01:38 | 25 | report. |

01:38  1         MR. LEE:  Yes.

01:38  2         THE COURT:  Okay.  And then the Freescale -- the concept

01:38  3  of a Freescale contribution of 76.2 percent is in his report,

01:38  4  correct?

01:38  5         MR. LEE:  Yes.

01:38  6         THE COURT:  Okay.  So as odd as this may seem, I

01:38  7  understand Intel's concern with saying what a reasonable

01:38  8  royalty is per unit, and I'm not going to allow VLSI to do that

01:38  9  math.  But I am okay with the slide other than the equals part.

01:38  10        In other words, if Dr. Sullivan wants to say the total

01:38  11  number and explain that math, that is a way.  There's an

01:38  12  additional revenue per unit times Freescale contribution winds

01:38  13  up for the total number of units with the total number, I would

01:39  14  be okay with that.

01:39  15        MR. LEE:  Your Honor, one other thing for Dr. Sullivan.

01:39  16  Could I have the slide --

01:39  17        MS. PROCTOR:  So before we move on.

01:39  18        MR. LEE:  Oh, go ahead.  I'm sorry.  I apologize.

01:39  19        MS. PROCTOR:  So, Your Honor, I think the concern you may

01:39  20  have is what Mr. Lee voiced at the very end there about calling

01:39  21  this is a "royalty per unit."

01:39  22        THE COURT:  Correct.

01:39  23        MS. PROCTOR:  What if we just call it "effective rate per

01:39  24  unit" or something else because the math is very clear.  The

01:39  25  jury can do this.  If that's the concern, we can reframe it

01:39  1   slightly so that we're not saying it's a per-unit royalty.

01:39  2   We're just saying, here's the math, here's the calculation at a

01:39  3   per-unit level.

01:39  4       THE COURT:  Mr. Lee?

01:39  5       MR. LEE:  We would object.  There's -- there's a reason

01:39  6   that the damages claim was not stated on a royalty per-unit

01:39  7   basis.  We responded to the damages claim knowing that it

01:39  8   wasn't offered on that basis.  And halfway through the trial,

01:40  9   it would be very prejudicial to have the playing field shift.

01:40  10      I think he should give the opinion -- the number

01:40  11  ultimately.  The large number isn't the same, but how he gets

01:40  12  there is important.  And I think trying to backdoor in an

01:40  13  effective royalty rate/effective unit rate is -- we would have

01:40  14  responded differently, Your Honor.

01:40  15      MS. PROCTOR:  Your Honor, they have very --

01:40  16      THE COURT:  Well, Mr. Lee, didn't he get to his whole

01:40  17  number by doing the reverse math, which is whatever his number

01:40  18  is was gotten to by the revenue per unit times the number of

01:40  19  units, so the big number he's going to start from in terms of

01:40  20  the additional revenue that he's going to argue was generated

01:40  21  is in his report, right?

01:40  22      MR. LEE:  Your Honor, without a doubt there is -- the

01:40  23  numbers that he's using to make these computations were in his

01:41  24  report in some form.

01:41  25      My concern -- setting aside the first concern, which I

01:41  1    understand Your Honor has ruled on and we'll address in

01:41  2    cross -- we don't want a per-unit royalty, which is a different

01:41  3    analysis that he undertook, to come in the back door.

01:41  4        And I think he can present what he's going to present in

01:41  5    exactly the way he presented in his report.  But there

01:41  6    shouldn't be even an effective royalty rate or an effective

01:41  7    rate.  That's just another way to get the different -- it's --

01:41  8    it gets to the same ultimate number, as Your Honor has

01:41  9    suggested, but it is analytically different and would have had

01:41  10   a different response from us.

01:41  11       THE COURT:  Counsel, anything else?

01:41  12       MS. PROCTOR:  So I just don't agree that it's analytically

01:41  13   different.  These are the numbers.  These are the calculations

01:41  14   we did.  We're just dividing by the number of units.  Like I

01:41  15   said, I think a very slight tweak to the wording here would

01:42  16   address Mr. Lee's concern.

01:42  17       Also Your Honor suggested that perhaps after he does the

01:42  18   calculation, he could go back and we could just say, now, if

01:42  19   you divide by the number of units, what would you get as just

01:42  20   on a per-unit basis?  And so we've added a slide showing

01:42  21   that -- if we can advance one, let's try one forward.  One

01:42  22   more.  One more.  There we go.

01:42  23       Sorry, this is the new slide.

01:42  24       But where we just show, here's the royalty he calculated,

01:42  25   divide by the number of units.  These are both very clearly

01:42  1   numbers in his report, and we could call it an "effective rate

01:42  2   per unit" or something like that.

01:42  3        There's really no dispute that this is his methodology.

01:42  4   These are the numbers he used.  He described it as a running

01:42  5   royalty tied to the extent of use in his report.  This is --

01:42  6        THE COURT:  I guess, here's the question:  Is -- in his

01:42  7   report anywhere, did he suggest that the way he got to the

01:42  8   reasonable royalty of 1,611,000,000 -- actually, yes,

01:43  9   1,611,609,964, is there anywhere in his report that indicates

01:43  10  that that was gotten to by the use of multiplying the number of

01:43  11  units times some other number?

01:43  12       MS. PROCTOR:  So the way he did it in his report was by

01:43  13  looking at the overall effect across the units.  So calculating

01:43  14  it at the level of total revenues, total additional revenues.

01:43  15  So he did not do the per-unit calculation in his report, but I

01:43  16  think it is important.  This is just a presentation issue, and

01:43  17  it is important for us to be able to present our case to the

01:43  18  jury in a way they can understand.

01:43  19       THE COURT:  Well, no.  I mean, I think if he did not

01:43  20  involve the infringing units to get to the reasonable

01:43  21  royalties, that's my concern.

01:43  22       MS. PROCTOR:  Yeah.  So let me clarify.  He absolutely

01:43  23  did, and the calculations are absolutely tied to the number of

01:43  24  units in the sense that if you add one unit, the number would

01:44  25  go up, the total number.  If you take one away -- these are

01:44  1  very clearly proportional.

01:44  2      And it goes back to what Your Honor was saying a moment

01:44  3  ago, this whole analysis is tied to the idea that in every

01:44  4  single infringing chip, it's getting that extra power savings

01:44  5  or that extra speed increase.  So it's a per-chip benefit.

01:44  6      THE COURT:  I just want to know if there's anything in his

01:44  7  report that gave Intel notice that they might be facing

01:44  8  testimony here today that the effective royalty rate is $4.19.

01:44  9      MS. PROCTOR:  Yeah.  So these numbers are there.  The

01:44  10  reasonable royalty's there, the infringing units are there.

01:44  11  The $4.19, we didn't calculate that exact number in the report,

01:44  12  but these inputs are there.  This is just the same as adding

01:44  13  two numbers together.  We're just showing it to the jury on a

01:44  14  per-unit basis.

01:44  15      And I think his running royalty section is quite clear.

01:44  16  He says over and over again, "This royalty has to be tied to

01:44  17  number of units Intel is selling.  It has to be tied to the

01:44  18  extent of use.  It has to be directly linked to the actual

01:45  19  sales Intel is making, both on a revenue basis and on a

01:45  20  per-unit basis."

01:45  21      So if you're asking what --

01:45  22      (Conference between the Court and law clerk.)

01:46  23      THE COURT:  Anything else you'd like to add?

01:46  24      MS. PROCTOR:  Your Honor, were you looking at the royalty

01:46  25  structure section of the report?  Or would you like to?  That's

01:46   1    the part I was referring to.  It's Section 9.1.

01:46   2        MR. CHU:  If I may, Your Honor.

01:46   3        THE COURT:  I don't know that I have Section -- I don't

01:46   4    know if I do or don't have it.  I've got Pages 123 and 124 of

01:46   5    his report.

01:46   6        MS. PROCTOR:  So, okay.  So can we pull up Page 52 of

01:46   7    Dr. Sullivan's report in this case?

01:47   8        MR. CHU:  While we're doing that, Your Honor, the word

01:47   9    "math" has been used.  It's not that fancy.  This is

01:47  10    arithmetic.

01:47  11        Mr. Lee argues, oh, they're terribly surprised.  They

01:47  12    would have prepared their case differently.  They would have

01:47  13    done arithmetic for the lump sum royalties that they want to

01:47  14    rely upon.

01:47  15        So let's say there's an agreement that's 2 million,

01:47  16    3 million, 4 million.  They take the same number of units, do

01:47  17    the calculation -- or we could do the calculation and say it's

01:47  18    $0.02 per unit.  It makes it understandable for a jury.

01:47  19        THE COURT:  Well, I have --

01:47  20        MR. CHU:  It's just arithmetic.

01:47  21        THE COURT:  I have to tell you I could see an argument

01:47  22    from Intel where they would come in and say, ladies and

01:47  23    gentlemen, this number that Sullivan is giving you is

01:47  24    ridiculous.  That works out to be -- if you do the math, works

01:47  25    out to be X, you know, number of dollars per unit by just doing

01:48   1   the math, so I understand your point.

01:48   2       MR. CHU:  Right.  But if we had just done it on a per-unit

01:48   3   and didn't have the total, they would have done the

01:48   4   multiplication.  This is just doing the division.  Everyone

01:48   5   here passed arithmetic.

01:48   6       MS. PROCTOR:  So there's just one point I want to -- one

01:48   7   little part I want to point to in here.

01:48   8       THE COURT:  Okay.

01:48   9       MS. PROCTOR:  All right.  Can I just read you one

01:48   10  sentence, Your Honor?

01:48   11      THE COURT:  Yes, ma'am.

01:48   12      MS. PROCTOR:  Probably easiest at this point.

01:48   13      "The benefits, i.e., revenues and profits that Intel

01:48   14  receives from using the technology increase as sales of the

01:48   15  accused products increase.  Thus a royalty" -- two sentences --

01:49   16  "Thus a royalty that is directly related to sales measures the

01:49   17  actual value gained by Intel through its use of the

01:49   18  technology."

01:49   19      This is not a new theory.  Our theory was very clear.  Our

01:49   20  royalty is tied to Intel's actual sales in terms of revenue and

01:49   21  units.  And this simple calculation, simple arithmetic is just

01:49   22  a presentation issue to help the jury understand our damages

01:49   23  case.

01:49   24      THE COURT:  Mr. Lee?

01:49   25      MR. LEE:  Two things, Your Honor.  One is that number,

01:49  1   that reasonable royalty number is not in the reports anywhere.

01:49  2   I think we both agree upon that now.

01:49  3       The second is, it's not simple arithmetic, at least not to

01:49  4   me.  In order to respond, as Mr. Chu said, we would have to

01:49  5   take these comparable licenses that we have identified, both

01:49  6   for these patents and other patents.

01:50  7       We would then have had to identify the number of units

01:50  8   that were covered by those licenses.  And it's going to vary

01:50  9   and different, something that we didn't do, and then we'd have

01:50 10   to compute this effective reasonable royalty rate which we

01:50 11   haven't done.

01:50 12       There are purchases of these patents.  There are licenses

01:50 13   between Intel and Freescale.  There are other Intel licenses.

01:50 14   And some of them cover the same universe of products; some of

01:50 15   them don't.  And so the idea that you can just do math to

01:50 16   figure out the effective royalty rate of these license

01:50 17   agreements is simply not true.

01:50 18       And the best indication, Your Honor, that we didn't think

01:50 19   this was coming is what Mr. Chu suggested that we do, we

01:50 20   haven't done.  And I'm not sure for some of the agreements that

01:50 21   we have enough information to do it.

01:50 22       MR. CHU:  They use lump sums either --

01:51 23       THE COURT:  If you'll take your mask off, I can hear you

01:51 24   better.  Thank you.

01:51 25       MR. CHU:  Oh.  Thank you, Your Honor.

01:51  1      They use lump sums, either a purchase price or lump sum

01:51  2  licenses.  They don't want to do a per-unit royalty because it

01:51  3  will seem infinitesimally small.  And, therefore, they make it

01:51  4  extremely difficult.

01:51  5      They knew by having two numbers which were always in

01:51  6  Dr. Sullivan's report, the total number of units and the total

01:51  7  amount of damages.  That was very clear.  They always had those

01:51  8  numbers.

01:51  9      The fact that Dr. Sullivan didn't expressly say, I take

01:51  10  one number, I divide by the number of units, here's what it is

01:51  11  per unit.

01:51  12      What they're trying to do is not only dictate what

01:51  13  Dr. Sullivan says, they're trying to dictate what I can say in

01:52  14  closing argument.

01:52  15      How could it be that I couldn't get up and say:  Here's

01:52  16  the total amount of damages.  Here's what it ends up being on a

01:52  17  per-unit basis?  I can't imagine that that would be supported

01:52  18  in law, that one would be barred from doing that simple

01:52  19  arithmetic.

01:52  20      They make arguments with respect to their license

01:52  21  agreements that have to do with, well, there were more patents

01:52  22  that were licensed or more patents that were sold and things

01:52  23  like that.  That's fair game.  They're entitled to put forward

01:52  24  their case on damages.  I think we are as well.

01:52  25      They had notice of the basic numbers and the basic

01:52  1   theories, as well as the way in which there were allocations

01:52  2   down, the percentages and the like.

01:52  3       But the final number that they're complaining about is

01:52  4   just the total which was there, the total number of units which

01:52  5   was there which came from them, and that's it.  And it's a

01:53  6   much -- there's obviously much more detailed analysis in

01:53  7   Dr. Sullivan's report.  And they can cross-examine him about

01:53  8   it.

01:53  9       THE COURT:  Mr. Lee, anything else?

01:53  10      MR. LEE:  Your Honor, the comparable license agreement

01:53  11  offer involved different patents, different number of patents,

01:53  12  different products, different periods of time.  If we had been

01:53  13  asked to respond to a reasonable royalty rate on a per-unit

01:53  14  basis, there would have been a different analysis.  We can't do

01:53  15  that now.

01:53  16      What they're asking you to do in the guise of a tweak is

01:53  17  to allow them to present an additional theory that we won't

01:53  18  have a chance to respond to.  We couldn't even respond to it by

01:53  19  the time our damages person testifies, because I couldn't

01:53  20  generate the information.  This is not just two plus two equals

01:53  21  four.  It's a much more complicated analysis.

01:54  22      We don't disagree for a second, given Your Honor's ruling

01:54  23  on the total revenues of the accused products.  He should be

01:54  24  able to present what's in his 123-page report, and we'll

01:54  25  cross-examine on it.

01:54   1       But numbers that are not in the report, it should not be

01:54   2   presented.  And particularly if those numbers embody a new

01:54   3   theory, and a per-unit royalty is a new theory.

01:54   4       THE COURT:  Well, here's where I see it headed.

01:54   5       Mr. Lee, your concern is -- in part, your concern is that

01:54   6   Dr. Sullivan indicates that he came up with a per-unit royalty,

01:54   7   which I think we've established he did not.

01:54   8       I mean, that wasn't his methodology.  He didn't come up

01:54   9   and say, I'm going to have a per-unit royalty.  It's X number

01:54   10  of dollars -- X number of units were sold so the total is X

01:54   11  times Y equals Z.  It's Z.

01:55   12      What I'm having a much harder time preventing Dr. Sullivan

01:55   13  from doing is, if he were to be asked, you've given the jury

01:55   14  the number of 1 point whatever.  And the number of units that

01:55   15  were sold, as it turns out, was this.

01:55   16      What does that wind up being per unit?  To me, that is

01:55   17  just math.  That is not -- he didn't use it as a methodology.

01:55   18  It just -- it is doing the math for the jury so they

01:55   19  understand.

01:55   20      And I don't -- and part of me says if I were Intel, I

01:55   21  might want them to hear that and say that's too much per unit.

01:55   22      MR. LEE:  Your Honor, I'm not sure I have anything to add

01:55   23  that I haven't said before, and I don't want to be redundant.

01:55   24  I guess if that's Your Honor's ruling, you'll preserve our

01:55   25  objection.  If --

648

01:56  1          THE COURT:  Well, I'm just saying that I get that -- and I

01:56  2    would not permit Dr. Sullivan to say, I used a methodology of a

01:56  3    per-unit royalty to get to a total amount.  He didn't do that.

01:56  4          But I don't understand -- I'm just -- I can't get my arms

01:56  5    around how he can't just perform the role of a human calculator

01:56  6    to say:  I've given you the total number.  I've given you what

01:56  7    I think the total -- I came up with a total number.  And here's

01:56  8    how I did it.  And that's within the boundaries of his report.

01:56  9          MR. LEE:  Right.

01:56  10         THE COURT:  And it turns out Intel sold X number of units.

01:56  11   And so that winds up being, if you divide those two things, Z.

01:56  12   That is just what is.  I mean, any juror could do that.

01:57  13         MR. LEE:  I don't disagree.  The slide I'm objecting to is

01:57  14   the one where he characterized it as a reasonable royalty per

01:57  15   unit.

01:57  16         THE COURT:  No, they're not going to use that.  And I

01:57  17   think I've made clear -- and again, will say it for the

01:57  18   seventieth time, you're preserving your error, that you don't

01:57  19   think I'm doing the right thing to begin with, so --

01:57  20         MR. LEE:  No, no, no.  There are many right things, I just

01:57  21   disagree with a few.

01:57  22         THE COURT:  That's fine.  But so I'm not tampering with

01:57  23   that.

01:57  24         MR. LEE:  Sure.

01:57  25         THE COURT:  But what I will allow the plaintiff to do is

01:57    1    to be what I would call a human calculator.

01:57    2        MR. LEE:  Fine.

01:57    3        THE COURT:  If he does his entire methodology and has a

01:57    4    number, and he has -- and it gets into evidence, which it will,

01:57    5    whatever the most accurate -- whatever number -- I know there

01:57    6    may be some slippage between numbers of sales, you know,

01:57    7    between report and whatever the trial is.  But whatever you all

01:57    8    have agreed is the number of units that's involved, if he says

01:58    9    that.  And if the plaintiff wants to turn him into a human

01:58   10    calculator to say, that winds up being whatever the number is

01:58   11    per -- you know, per unit, that's okay.

01:58   12        MR. LEE:  All right.

01:58   13        THE COURT:  He cannot intimate that he used a per-unit

01:58   14    royalty as a coefficient to get the correct number.

01:58   15        MR. LEE:  Fair enough.  Could I -- I know the jury's

01:58   16    waiting.  Could I raise one more point --

01:58   17        THE COURT:  Of course.

01:58   18        MR. LEE:  -- where I may have misspoke this morning?  I

01:58   19    said that I didn't think the Fortress issue would come up until

01:58   20    Mr. Stolarski's designations.  I didn't realize that there was

01:58   21    a Slide 7.71 in Dr. Sullivan's direct.

01:58   22        If I could just bring that up for you really quick, Your

01:58   23    Honor.

01:58   24        THE COURT:  Sure.  Yes, sir.

01:59   25        MR. LEE:  This is just one slide, but it says,

01:59  1   "NXP's interest actual value includes significant share of

01:59  2   royalties."  That would be from us.

01:59  3        It would be almost impossible to cross-examine without

01:59  4   going into Fortress, which holds a carried interest --

01:59  5        THE COURT:  Help me out here.  Is this Intel's slide?

01:59  6        MR. LEE:  That's their slide.  It would require me to go

01:59  7   into Fortress.

01:59  8        THE COURT:  Well, let me just say were I VLSI, I would be

01:59  9   cautious about using that slide while the Fortress issue is

01:59  10  still before me.

01:59  11        MR. CHU:  Understood, Your Honor.

01:59  12        Did you hear me?

01:59  13        THE COURT:  Yes, sir.  I did, and Kristie did too.

01:59  14        Anything else?

01:59  15        MR. LEE:  Nothing, Your Honor.

01:59  16        THE COURT:  And thank you for bringing -- Mr. Lee, thank

01:59  17  you for bringing that to our attention before the jury got in.

01:59  18  That's --

01:59  19        MR. LEE:  No.  I didn't know when I was supposed to.  I'm

02:00  20  sorry.

02:00  21        THE COURT:  No.  No.  Anything else?

02:00  22        MS. PROCTOR:  Yes, Your Honor.

02:00  23        THE COURT:  Yes, ma'am.  Yes, there is?

02:00  24        MS. PROCTOR:  Really quickly.  There are a couple of

02:00  25  summaries of voluminous evidence that show the accused revenues

02:00  1   per -- sorry, that show the accused revenues, the total accused

02:00  2   revenues and the total number of units.

02:00  3        And those are things that they've objected to, but they've

02:00  4   also objected to our bringing in all the supporting financial

02:00  5   documents that they produced because they say those include

02:00  6   additional company-wide revenues that are not accused --

02:00  7        THE COURT:  I'm going to allow in summaries.

02:00  8        MS. PROCTOR:  Thank you, Your Honor.

02:00  9        THE COURT:  Anything else?

02:00  10        MS. PROCTOR:  That's it for me for now.

02:00  11        THE COURT:  Okay.

02:00  12        THE BAILIFF:  All rise.

02:00  13        (Recess taken from 2:00 to 2:03.)

02:04  14        THE BAILIFF:  All rise.

02:04  15        THE COURT:  Please remain standing for the jury.

02:04  16        (The jury entered the courtroom at 2:04.)

02:04  17        THE COURT:  You may be seated.

02:04  18        You may begin your -- you may resume your direct.

02:04  19        MS. PROCTOR:  Thank you, Your Honor.

02:04  20   BY MS. PROCTOR:

02:04  21        Q.   So welcome back, Dr. Sullivan.

02:04  22        A.   Thank you.

02:04  23        Q.   Before we jump into your slides and the calculation,

02:04  24   did you prepare some attachments that show the accused revenues

02:04  25   and the accused number of units in this case?

02:04  1        A.   Yes.  So those are part of the 1200 pages I referred

02:04  2   to earlier, the tables and charts and data.

02:04  3        THE COURT:  I apologize.  Where are we at in terms of who

02:04  4   can see what that he's discussing?  Is -- should this be only

02:04  5   on monitors that the jury can see?

02:05  6        MS. PROCTOR:  Let's keep everything on private monitors

02:05  7   for now so that it's confidential.

02:05  8   BY MS. PROCTOR:

02:05  9        Q.   So can we turn to Plaintiff's Exhibit 3903?  It

02:05  10  should be in the big binder you have there.

02:05  11       What -- it's also on the screen if that's easier,

02:05  12  Dr. Sullivan.

02:05  13       A.   I see it on both places.  This is a summary of United

02:05  14  States revenue for the products that are specifically accused

02:05  15  of infringing upon each of the patents.

02:06  16       So over here at the far right, you'll see the total

02:06  17  revenue associated with the '373 patent.  And over here also

02:06  18  right below that is a number, which is the total U.S. revenue

02:06  19  associated with the products infringing under the '759 patent.

02:06  20       I'm not allowed to say those here in open court.  Clearly

02:06  21  those are numbers that feed into the calculations.

02:06  22       MS. PROCTOR:  And so I'm not sure the jury is seeing

02:06  23  those.  Can we make sure that it's being published to the jury?

02:06  24       Okay.  Well, we can come back to this.  Although, I guess

02:07  25  they won't be able to see your slides either.

02:07  1      All right.  We're back in business.

02:07  2  BY MS. PROCTOR:

02:07  3      Q.   So, Dr. Sullivan, thank you for describing this

02:07  4  Exhibit 3903.  Can -- and do you want to just -- now that the

02:07  5  jury can see it, just give another quick description for us?

02:07  6      A.   Yes.  So this is a recap.  So these are the United

02:07  7  States revenues for the products that are accused of infringing

02:07  8  each of the two patents at issue here.

02:07  9      So the top line has the revenue for the products accused

02:07  10 of infringing the '373 patent listed out on an annual basis for

02:08  11 each year, and then the total is highlighted in yellow over to

02:08  12 the right in U.S. dollars.

02:08  13     And then the second row is revenue for products that are

02:08  14 infringing upon the '759 patent and -- again on an annual

02:08  15 basis.  And the number at the very far right in yellow is the

02:08  16 total revenue for this time period.

02:08  17     And these are the revenues that are specific to these

02:08  18 products, and it's after what are considered discounts and

02:08  19 rebates.  So it's kind of that -- think of that as that net

02:08  20 final amount of revenue that Intel receives.

02:08  21     Q.   Thank you so much, Dr. Sullivan.

02:08  22     MS. PROCTOR:  And, Mr. Simmons, can we pull up Plaintiff's

02:08  23 Exhibit 3904?

02:08  24 BY MS. PROCTOR:

02:08  25     Q.   And, Dr. Sullivan, what is this exhibit?

02:08  1      A.   This is a parallel set of data.  But rather than

02:09  2  revenue, these are the unit sales.  And so here, for the '373

02:09  3  patent, that's the data that are in the top row, again these

02:09  4  are unit sales by year.

02:09  5      And in the far right you can see in the total column,

02:09  6  those are the total number of unit sales across this time

02:09  7  period for the products accused of infringing the '373.

02:09  8      And then in the second row are the unit sales in the

02:09  9  United States.  All of this here is for United States sales.

02:09  10  And the second row is for the products accused of infringing

02:09  11  the '759 patent, so these are the Lake family of products.  And

02:09  12  the total number of unit sales is in the far right column

02:09  13  across those years.

02:09  14      Q.   And if you add those two numbers up, that's how you

02:09  15  got your 987 million units; is that right?

02:09  16      A.   That's exactly right.

02:09  17      Q.   Great.  Thank you.

02:09  18      So if we can go back to the slides, we can show the jury

02:09  19  how you use those numbers.

02:10  20      So we talked a lot about your regression model.  What do

02:10  21  you do with the results of your regression model, Dr. Sullivan?

02:10  22      A.   The regression model, as you recall, provides an

02:10  23  estimate, the relationship between clock speed and price.  I

02:10  24  combine that with the testing information that was provided by

02:10  25  Dr. Conte and Dr. Annavaram regarding the benefits of the

| | | |
|--|--|--|
| 02:10 | 1 | patented technology.  So in effect I combined those.  It's -- |
| 02:10 | 2 | mathematically, it's a multiplication, as I'll show you.  And |
| 02:10 | 3 | what that does is it then provides the price benefit specific |
| 02:10 | 4 | to the patented technology. |
| 02:10 | 5 | Q.   So can you show us the calculation you did for the |
| 02:10 | 6 | '373 patent? |
| 02:10 | 7 | A.   Yes.  So on the next slide here, I have this -- it's |
| 02:10 | 8 | intended to look like a chalkboard.  Maybe this takes me back |
| 02:11 | 9 | to my teaching days. |
| 02:11 | 10 | Do we want -- |
| 02:11 | 11 | Q.   Want the total -- sorry.  One second.  Make sure we |
| 02:11 | 12 | get the right slide for you guys. |
| 02:11 | 13 | MS. PROCTOR:  We want to see those accused revenues |
| 02:11 | 14 | multiplied by the rates Dr. Sullivan just talked about. |
| 02:11 | 15 | (Off-the-record discussion.) |
| 02:11 | 16 | THE WITNESS:  Yep.  Here we go. |
| 02:11 | 17 | BY MS. PROCTOR: |
| 02:11 | 18 | Q.   Yeah.  I'm sorry.  Can you explain your calculation |
| 02:11 | 19 | on Slide 49, please? |
| 02:11 | 20 | A.   Sure.  So this is for the '373 patent.  And as you'll |
| 02:11 | 21 | recall, based upon the work of Professor Conte, Professor |
| 02:12 | 22 | Annavaram, the power savings associated with the '373 patent is |
| 02:12 | 23 | 5.45 percent. |
| 02:12 | 24 | You'll also recall from the regression that the price |
| 02:12 | 25 | benefit associated with this improvement is 0.64, and as we |

656

02:12  1   just described on one of the attachments that I was showing,

02:12  2   that the total infringing revenues is this number here.  And

02:12  3   this is -- we're -- right now we're looking at Slide 7.49.

02:12  4        And so just performing this multiplication provides

02:12  5   additional revenues.  That is this number here.  And these are

02:13  6   the additional revenues that were received by Intel as a result

02:13  7   of using the technology from the '373 patent.  Thus it is a

02:13  8   fraction -- think of it in a small piece, a sliver, if you

02:13  9   will, of the overall revenues.  It's just the piece that is

02:13  10  attributable to the patented technology separate and apart from

02:13  11  the other factors and features and functionalities of the

02:13  12  products.

02:13  13       Q.   And just to clarify for the record, it's the

02:13  14  5.45 percent times .764, right?

02:13  15       A.   Correct.

02:13  16       Q.   Now, if you look at those additional revenues across

02:13  17  the number of units, what is the additional revenue on a

02:13  18  per-unit basis?

02:13  19       A.   Do we have a slide on this or -- okay.  We do.  All

02:13  20  right.

02:14  21       So taking that additional revenue from the prior slide and

02:14  22  dividing that by the number of units, which I was showing you

02:14  23  earlier, that comes straight from Intel's financial data, that

02:14  24  results in additional revenues per unit of this amount here

02:14  25  that is listed on the bottom right of Slide 7.50.

02:14   1        Q.    Thank you.

02:14   2        Now, did you perform a similar calculation for the '759

02:14   3   patent?

02:14   4        A.    Yes.  The calculations are parallel.

02:14   5        Q.    Can you show us that calculation?

02:14   6        A.    So here on Slide 7.53, you'll recall that the

02:14   7   performance improvement provided by the technology in the '759

02:14   8   patent, that was provided by the work of Professor Conte and

02:15   9   Professor Annavaram, is this amount here.

02:15   10       I multiply that by the price benefit of this number here,

02:15   11  the 0.764 that comes from the regression analysis that I

02:15   12  performed.  And the revenue associated with the infringing

02:15   13  products I showed you just a couple of minutes ago, based upon

02:15   14  Intel's financial data, is this third number on the slide.

02:15   15       When I perform that multiplication, that results in

02:15   16  additional revenues that are resulting from the use of the

02:15   17  technology in the '759 patent.  That is at the bottom right of

02:15   18  this slide.

02:15   19       Q.    Now, what is that in terms of the number of units

02:15   20  that you also showed us for the '759 patent?

02:16   21       A.    So expressing this just in terms of number of units,

02:16   22  here on Slide 7.54, here are those very same additional

02:16   23  revenues that I just calculated.  And just dividing that by the

02:16   24  number of units sold that are allegedly infringing the '759

02:16   25  patent, which I showed you a few minutes ago, that results in

02:16   1    additional revenues on a per-unit basis of this amount here

02:16   2    that is listed at the bottom right of this slide.

02:16   3         Q.   Thank you.

02:16   4         So does Intel dispute any of your math or any of these

02:16   5    calculations?

02:16   6         A.   No.  You know, there's no dispute over whether the

02:16   7    arithmetic or the calculations are performed correctly.  No

02:16   8    dispute over whether the regression calculations have been

02:16   9    performed correctly.  They have disputes over the regression

02:16   10   overall, but not, you know, just in terms of how the

02:17   11   calculations are performed.

02:17   12        Q.   And now that you've calculated these additional

02:17   13   revenues, what's the next step in your analysis?

02:17   14        A.   What I just described for you are revenues, the

02:17   15   additional revenues from using the patented technology.  So the

02:17   16   next step is to look at what the costs are associated with

02:17   17   implementing the technology, and then subtracting off costs

02:17   18   would provide profit.

02:17   19        And I just want to highlight one thing here, which is the

02:17   20   word in the top row, across all of this, is "additional,"

02:17   21   right?  Because when we're looking at the revenues, we're

02:17   22   looking at just the additional revenues, not the whole revenues

02:17   23   for the product.  We're not looking at whole company revenue.

02:17   24   We're just looking at that increment of additional revenue.

02:17   25        That means when we're looking at the costs, we want to

02:17   1    look at the costs associated with that increment so we can

02:18   2    think about the additional profitability associated with this

02:18   3    incremental revenue.

02:18   4        Q.   So what additional costs did Intel have as a result

02:18   5    of using the infringing technology?

02:18   6        A.   There's two categories of costs here that might be

02:18   7    relevant.

02:18   8        So the first is, this one here that I'm listing up here on

02:18   9    Slide 56 is manufacturing costs.  And the question is whether

02:18   10   implementing the technology caused Intel to incur additional

02:18   11   manufacturing costs.

02:18   12       And based upon the work of Professor Conte, the

02:18   13   determination is that there is not any additional or meaningful

02:18   14   manufacturing costs.  Even though the technologies have

02:18   15   significant customer benefits, they do not require additional

02:18   16   costs in order to implement them.

02:18   17       The second category of potential sales -- excuse me --

02:19   18   potential costs are sales and marketing costs.  So the idea

02:19   19   here is that as prices are higher as a result of using the

02:19   20   technology, that can cause some increase in selling costs or

02:19   21   marketing costs.

02:19   22       You know, there's some indication that for some sales that

02:19   23   Intel makes that they pay a commission to their sales personnel

02:19   24   associated with those sales.  And if the prices go up, then the

02:19   25   commissions on some of the sales would go up.  So I account for

02:19 1   those additional costs.

02:19 2       Q.   So what is the overall relationship here between the

02:19 3   additional revenues you calculated and some additional profit?

02:19 4       A.   The additional sales costs that I just referred to

02:19 5   are quite small, and I'll describe it in more detail in just a

02:20 6   moment or two.  But because they are small, what this means is

02:20 7   that the additional revenue that we calculated earlier, that

02:20 8   most of it, not all of it, most of it would be considered

02:20 9   additional profit.

02:20 10      Q.   So let's turn now to the fourth key topic you

02:20 11  identified, which was the relative contributions of the

02:20 12  parties.

02:20 13      Do any of the Georgia-Pacific factors relate specifically

02:20 14  to those relative contributions?

02:20 15      A.   Yes.  So Georgia-Pacific Factor 13 states:  The

02:20 16  portion of the realizable profit that should be credited to the

02:20 17  invention as distinguished from non-patented elements.

02:20 18      And what this is recognizing is that when there are

02:20 19  additional revenues or additional profits that are generated by

02:20 20  using the patented technology, that it takes two to tango, so

02:21 21  to speak, to bring that realization, and thus we want to give

02:21 22  credit to both Freescale and Intel for their contributions.

02:21 23      Q.   So based on your analysis here, how did Intel and

02:21 24  Freescale each contribute to realizing these additional

02:21 25  profits?

02:21  1       A.    Freescale as the patent holder is contributing its

02:21  2   patented inventions.  That's how it is contributing to the --

02:21  3   you know, to causing these additional revenues and profits to

02:21  4   occur.

02:21  5       On the other hand is Intel, and they are the ones that are

02:21  6   implementing this technology, and they have the additional

02:21  7   sales, potential sales commissions that, you know, their

02:21  8   contributions are being able to get these products to what is

02:21  9   called commercialized and in particular commercializing this

02:21 10   particular technology.

02:22 11       Q.    So how did you determine what share of the additional

02:22 12   profit goes specifically to Freescale?

02:22 13       A.    This is based directly upon the financial data of

02:22 14   Intel.  They have in their financial data for each of their

02:22 15   products -- so I do this specific to each of the accused

02:22 16   products -- what they call total spending, and this total

02:22 17   spending is comprised or consists of these three items that I

02:22 18   have listed here.  The sales and marketing, research and

02:22 19   development and general and administrative.

02:22 20       So you'll recall a moment ago we were just talking about

02:22 21   sales and marketing as potentially being an increased cost or

02:22 22   an additional cost.  So I account for that here.  However,

02:22 23   there are other activities that Intel undertakes to bring this

02:23 24   technology and the benefits of it into its products in the

02:23 25   marketplace.  This is reflected in its research and development

02:23  1    in general and administrative expenditures, those activities.

02:23  2         And so I compare this total spending to the revenues

02:23  3    associated with these products, and it's the ratio, the

02:23  4    spending divided by the revenues, that provides a factor for

02:23  5    Intel's contributions here.

02:23  6         Now, to be clear, when Intel produced the data, they

02:23  7    provided all three of these items together.  And they did not

02:23  8    split them out.  So that means that the factor that I apply,

02:23  9    and you'll see this ratio factor in just a second on the next

02:23  10   slide, incorporates both the cost effects of sales and

02:23  11   marketing and separately the R&D and G&A contribution pieces.

02:24  12        So in other words, I'm doing two apportionments, one for

02:24  13   costs and one for Intel's contributions.  But I do it in one

02:24  14   mathematical calculation.  Well, it's just a multiplication.

02:24  15   It's just in one step that I do the actual calculation.

02:24  16        Q.   So what are the actual numbers that you use in that

02:24  17   calculation?

02:24  18        A.   So here they are on Slide 7.62.  And it's separate

02:24  19   for each patent because the data are different for each patent.

02:24  20   This says the cost data are specific to the products accused

02:24  21   under each patent, so for the '373 patent the contribution for

02:24  22   Intel is 23.8 percent and the contribution of Freescale is

02:24  23   76.2 percent.

02:25  24        For the '759 patent, the contribution of Intel is

02:25  25   20.7 percent and the contribution for Freescale is

| | | |
|---|---|---|
| 02:25 | 1 | 79.3 percent.  And, again, this reflects both those -- that |
| 02:25 | 2 | cost apportionment and the contribution apportionment in one |
| 02:25 | 3 | calculation. |
| 02:25 | 4 | Q.   So how do these relative contributions impact the |
| 02:25 | 5 | reasonable royalties you calculated? |
| 02:25 | 6 | A.   So I take the additional revenues that I calculated |
| 02:25 | 7 | earlier and I showed you earlier on similar chalkboard slide, I |
| 02:25 | 8 | multiply it by Freescale's contribution here that we just |
| 02:25 | 9 | looked at, and when I perform that multiplication, that |
| 02:25 | 10 | provides the apportionment that gives us a reasonable royalty. |
| 02:25 | 11 | Q.   And would you please show us your reasonable royalty |
| 02:25 | 12 | calculation for the '373 patent? |
| 02:25 | 13 | A.   Yes.  So for the '373 patent here on Slide 7.64, I |
| 02:26 | 14 | take the additional revenues that I showed you earlier.  I |
| 02:26 | 15 | multiply that by Freescale's contribution of 76.2 percent that |
| 02:26 | 16 | I just showed you, and when I perform that multiplication, |
| 02:26 | 17 | that's what provides the reasonable royalty that is here at the |
| 02:26 | 18 | bottom right of Slide 7.64. |
| 02:26 | 19 | Q.   And if we were to look at that royalty across the |
| 02:26 | 20 | number of units you showed us, what would that be? |
| 02:26 | 21 | MR. LEE:  I object to the form of the question as asking |
| 02:26 | 22 | for the royalty across the units. |
| 02:26 | 23 | THE COURT:  Mr. Lee, I still couldn't hear you again. |
| 02:26 | 24 | MR. LEE:  It was a form of the question, Your Honor.  It |
| 02:26 | 25 | was asking what the effective royalty rate was across units. |

02:26  1          THE COURT:  Would you restate the question?

02:26  2          MS. PROCTOR:  Sure.

02:26  3   BY MS. PROCTOR:

02:26  4          Q.   If we look at that amount you just calculated, how

02:27  5   does that relate to number of units?

02:27  6          A.   Here on Slide 7.65 I take that reasonable royalty

02:27  7   that I just calculated and showed you, and here is the number

02:27  8   of units that are accused of infringing the '373 patent, and

02:27  9   we've already seen that a couple of times now.

02:27  10         So just performing that math, this amount here at the

02:27  11  bottom right is the reasonable royalty expressed just relative

02:27  12  to the number of units.

02:27  13         Q.   And did you do any calculations for the '759 patent?

02:27  14         A.   I did.  And those calculations are in parallel.

02:27  15         Here on Slide 7.66, and this is for the '759 patent,

02:28  16  you'll see I have the additional revenues that I had described

02:28  17  to you earlier.  I multiply that by Freescale's contribution of

02:28  18  79.3 percent that is calculated from the financial data of

02:28  19  Intel, and that provides a reasonable royalty here at the

02:28  20  bottom right when I performed that multiplication.

02:28  21         Q.   And how does that relate to the number of units?

02:28  22         A.   Here, when I take that reasonable royalty from the

02:28  23  prior slide, I'm now on Slide 7.67, and if I divide it by the

02:28  24  number of units, sales of Intel's Lake products that are

02:28  25  accused of infringing the '759 patent, which we have talked

02:28  1   about before, which is roughly 603 million units, that means

02:28  2   that the royalty on a per-unit basis is this amount here at the

02:29  3   bottom right of this slide.

02:29  4       Q.   So I'll definitely give you a chance to summarize the

02:29  5   numbers you've calculated for us, but before we do that, I want

02:29  6   to talk a little bit about Intel's damages approach.  At a high

02:29  7   level how did Intel's experts calculate damages in this case?

02:29  8       A.   At a very high level, they use certain data points.

02:29  9   They look at certain prior transactions.  They selected some

02:29  10  agreements that Intel has entered into and some other

02:29  11  agreements.  And they looked at some items that they believe

02:29  12  are offers.

02:29  13      They consolidate these down into both a range of royalties

02:29  14  and focus on what they have referred to as a simple average of

02:30  15  those data points.

02:30  16      Q.   And are any of the -- are any of those data points

02:30  17  considered by Intel's experts useful in determining a

02:30  18  reasonable royalty for Intel's use of the invention?

02:30  19      A.   In my view, they are not.  These are all historical

02:30  20  types of agreements or transactions that do not reflect Intel's

02:30  21  use of the patented technologies or the benefits that Intel

02:30  22  actually received from the use of the technologies.

02:30  23      There's a -- I think it's a fun example to help illustrate

02:30  24  this.  So recently in the Super Bowl, we had Tom Brady and

02:30  25  Patrick Mahomes.  Tom Brady, when he was a rookie, was drafted

02:30  1   as the 199th pick as a rookie, and then, of course, he goes on

02:30  2   over time and becomes one of the most storied quarterbacks of

02:31  3   all time, going to ten Super Bowls and winning seven of them.

02:31  4        Somewhat similarly for Patrick Mahomes, when he was a

02:31  5   rookie, he got a very healthy package of $10 million, give or

02:31  6   take, but over time as his true value became realized, his

02:31  7   performance became known, he then received an enormous

02:31  8   compensation package of roughly $500 million.

02:31  9        The point is that as information becomes known and the

02:31  10  uncertainties become resolved, then the numbers can change,

02:31  11  just like we wouldn't think that Tom Brady as the 199th pick is

02:31  12  the answer to his current contributions to the Buccaneers.

02:31  13       Q.   So I want to take one more little detour relating to

02:31  14  this slide while we're on this example.  Do the rates people

02:31  15  charge in your industry vary significantly, like what you just

02:32  16  talked about?

02:32  17       A.   They do.  Now, they range anywhere from around 300 to

02:32  18  $500 to more than $2,000 per hour.

02:32  19       Q.   And you mentioned that only around 50 percent of your

02:32  20  work is for litigation; is that right?

02:32  21       A.   Roughly speaking.

02:32  22       Q.   Do you charge different rates for the 50 percent of

02:32  23  work you do on other matters, other -- for the companies?

02:32  24       A.   My firm receives the same rates regardless of whether

02:32  25  it's litigation-related work or non-litigation.

02:32  1      Q.   So are there -- what other projects have you worked

02:32  2  on outside of litigation?

02:32  3      A.   Well, I've brought up this example with the NFL.

02:32  4  There's a few others that I've worked on that I find to be

02:32  5  really fun ones.

02:32  6      One was working with the Players Association for the NBA.

02:32  7  They went through a negotiation in 2016 over the collective

02:33  8  bargaining agreement, and I worked performing economic analysis

02:33  9  on behalf of the Players Association for the NBA so that they

02:33 10  could come to an agreement with the League.  And that was one

02:33 11  of the more enjoyable projects I've done.

02:33 12      Also in sports, you know, I did work for the Boston Red

02:33 13  Sox to help them develop algorithms for pricing of tickets.

02:33 14  Now, granted this was preCOVID, but the idea was that we could

02:33 15  better have prices in different parts of the stadium at

02:33 16  different times to be able to get more people to the games, and

02:33 17  so we helped set up what those algorithms are.

02:33 18      A couple of other examples, I worked with an online

02:33 19  retailer known as wine.com.  And they provide and sell many

02:33 20  bottles and different types of wine throughout the United

02:34 21  States.

02:34 22      So we developed pricing algorithms based upon each of

02:34 23  their bottles relative to other online retailers as well as

02:34 24  brick and mortar, and so we would do this on a -- what's called

02:34 25  a SKU basis, each and every bottle.

02:34   1         We set up statistical algorithms that would see, okay,

02:34   2   what's really the right price for that day for that bottle?

02:34   3   And some prices would change, and some would stay the same.

02:34   4         The last one I'll share with you is one I also really

02:34   5   enjoyed.  So you may recall there was a movie about five or six

02:34   6   years ago called Joy.  And it was about Joy Mangano, who had

02:34   7   been on Home Shopping Network selling the Miracle Mop, and it's

02:34   8   the story of her and her development as a person and a

02:34   9   professional.  She was played by Jennifer Lawrence and the

02:35  10   movie had Robert DeNiro and Bradley Cooper.

02:35  11         So right around the time of this movie, Home Shopping

02:35  12   Network was looking to bring more of Joy's products, not just

02:35  13   to be on HSN but also to be in brick and mortar stores, such as

02:35  14   Target and Bed Bath and Beyond, so I worked with them to

02:35  15   develop the business plan, the business strategy and the

02:35  16   logistics and the pricing to establish the right way to do that

02:35  17   launch associated right around the time of the movie.

02:35  18         So those are a few of the examples that I've really

02:35  19   enjoyed.

02:35  20         Q.   Thanks, Dr. Sullivan.

02:35  21         So if we go back to your example with Patrick Mahomes and

02:35  22   Tom Brady, how does that relate to Intel's approach here?

02:35  23         A.   In my view, based upon the statute, the right way to

02:35  24   calculate a reasonable royalty is by looking at the technical

02:35  25   benefits that are provided by these particular patents, by

02:36  1   utilizing Intel's data, the financial data, the feature data

02:36  2   and thus determine what the extent of use is and the value is

02:36  3   associated with that use.

02:36  4       By the very nature of the historical data points that

02:36  5   Intel uses for their analysis, it does not use any of those.

02:36  6   It's not related to these specific patents.  It's not related

02:36  7   to the benefits that Intel has actually received, and in my

02:36  8   view, that results in their damages analysis not being correct.

02:36  9       Q.   And I just want to clarify one point my colleague

02:36  10  pointed out.  Going back to the work you just described, how

02:36  11  sometimes in litigation, sometimes outside of litigation on

02:36  12  those cool projects you were telling us about, in both cases

02:36  13  would you consider the rate you're being paid to be a customary

02:37  14  rate in the industry?

02:37  15      A.   Oh, yes.  Definitely.

02:37  16      Q.   And you charge the same rates in both circumstances?

02:37  17      A.   I do.  Granted, I'm very fortunate.  I have worked

02:37  18  super hard throughout my entire life to get to where I'm at.

02:37  19  Sorry.  So yes.  It is customary in my field, and I recognize

02:37  20  it is very substantial.  I think I've earned it.

02:37  21      Q.   Thank you, Doctor.

02:37  22       So do Intel's experts in doing this analysis, do they

02:37  23  account for Intel's use of the patents?

02:37  24      A.   No.  They don't.  So if -- so this is kind of

02:37  25  interesting to me.

02:37  1    You know, as I mentioned earlier, the statute provides

02:37  2    that, you know, the royalty, the reasonable royalty should be

02:38  3    for the use made of the invention by the infringer.  When we

02:38  4    look at the real-world data, there's two types of real-world

02:38  5    data that you can consider about use.

02:38  6        There's data over here.  This is intended to be a bar here

02:38  7    to show Intel's proposed royalty.  It's not very much.  And

02:38  8    it -- it's based upon real-world agreements perhaps, but

02:38  9    they're not reflecting the use of this technology and Intel's

02:38  10   benefit of this technology.

02:38  11       The analysis that I performed uses Intel's real-world data

02:38  12   to look at their actual sales, to look at the actual benefits

02:39  13   that they received.  And here on Slide 73, you can see that

02:39  14   when we add up, you know, for both patents the additional

02:39  15   revenue that I've already shown you, it's the number up here at

02:39  16   the top, and that's based upon Intel's real-world data and the

02:39  17   real world benefits.

02:39  18   Q.   And in calculating its proposed royalty here, that

02:39  19   red bar, did Intel's experts rely on all of the licenses that

02:39  20   were produced in this case?

02:39  21   A.   Oh, no.  There's several hundred license agreements

02:39  22   that Intel produced, and Intel's experts rely upon a relatively

02:39  23   small set of those.  You know, they are all lower dollar amount

02:39  24   ones.  Yet there are a number of other agreements that they

02:39  25   decided not to use that have much, much higher dollar amounts.

02:40  1      Q.   And do any of those licenses, the executed license

02:40  2  agreements that Intel's damages experts looked at, do any of

02:40  3  them involve the patents-in-suit here?

02:40  4      A.   No.

02:40  5      Q.   So let's go back to the law, and you described that

02:40  6  as requiring a hypothetical negotiation.  So at that

02:40  7  hypothetical negotiation, what are some of the key

02:40  8  considerations?  Taking into account all of the analysis you've

02:40  9  done, what do you think those key considerations are for the

02:40  10  parties?

02:40  11      A.   In my view -- I've put them here on Slide 74, and

02:40  12  we've talked about these already.  There's the power savings of

02:40  13  5.45 percent associated and attributable to the '373 patented

02:40  14  technology.

02:40  15      There's the performance improvement of 1.11 percent

02:40  16  that's attributable to the '759 patent.  This results in

02:40  17  additional revenue that I have calculated specific to these

02:41  18  patented technologies and a number of unit sales of -- for both

02:41  19  patents combined of 987 million units.  And this is something

02:41  20  where all of these items can be considered in determining a

02:41  21  reasonable royalty.

02:41  22      And here again, the magnitudes are significant.  They're

02:41  23  substantial.  And I had been trying to think of a way to, you

02:41  24  know, how do I convey this in a way that makes sense and

02:41  25  provide that context?  And what I came up with, this is one

02:41    1    example, is that for the 987 million products, each one of

02:41    2    these is pretty small.  I know that you've, you know, kind of

02:41    3    seen some of these from a distance.  They're typically less

02:42    4    than two inches wide.

02:42    5         If you were to line them all up next to each other, they

02:42    6    would be about 25,000 miles long.  It would go all the way

02:42    7    around Earth.  That's a lot of product, a lot of product.

02:42    8         Q.   Thank you, Dr. Sullivan.

02:42    9         So can you summarize your reasonable royalty findings for

02:42   10    us?

02:42   11         A.   Yes.  Based upon --

02:42   12         MR. LEE:  Your Honor, I object.  If you look at the --

02:42   13    before the jurors see this slide.  If you look at the fourth

02:42   14    column over.

02:42   15         THE COURT:  I can't see the slide unless...

02:42   16         MS. PROCTOR:  I think they're going to make a quick change

02:42   17    to it, Your Honor.  I apologize for that.

02:42   18         THE COURT:  No problem.

02:42   19    BY MS. PROCTOR:

02:43   20         Q.   So let's try that again.  Dr. Sullivan, can you

02:43   21    summarize your reasonable royalty findings for us?

02:43   22         A.   Yes.  So here on Slide 7.76 are the numbers.  Just a

02:43   23    quick recap.  In the analysis I performed, I looked at the

02:43   24    nature of competition in the marketplace, the need for Intel to

02:43   25    continue to innovate, the importance of these particular

02:43  1   patents in terms of power savings and performance improvement.

02:43  2       I looked at that relative to clock speed, used financial

02:43  3   data and feature data to be able to determine what the price

02:43  4   effects are and then directly attributable to the patented

02:44  5   technologies, calculated additional revenues that are

02:44  6   attributable to the patents specifically, and then accounted

02:44  7   for both additional costs and the commercialization

02:44  8   contributions of Intel relative to the patented contributions

02:44  9   of Freescale.

02:44  10      That results, for the '373 patent, additional revenues

02:44  11  relative to a reasonable royalty.  You'll see -- I suppose I

02:44  12  can't say what the difference is roughly, but you can probably

02:44  13  calculate that fairly easily.  Recognizing that not all but

02:44  14  most of that difference is profit, that then is maintained by

02:44  15  Intel.

02:44  16      That's the incentive for them to enter into this agreement

02:44  17  because it is not only profit enhancing for them but also

02:45  18  allows them to maintain their position in the marketplace.

02:45  19      We discussed the number of units that are infringing, thus

02:45  20  taking the royalty, dividing by the number of units.  It's that

02:45  21  amount per unit.  And the same is true for the '759 patent.

02:45  22  You can look at the additional revenues and compare those to

02:45  23  the reasonable royalty.  Most of that difference is profit that

02:45  24  would be retained by Intel.

02:45  25      Here again is the number of infringing units.  That means

02:45  1    that on a per-unit basis, this is the royalty for the '759

02:45  2    patent.

02:45  3        Q.   And so based on your analysis, Intel is getting the

02:45  4    benefit of hundreds of millions of dollars in profit from these

02:45  5    patents?

02:45  6        A.   Correct.

02:45  7        Q.   And Intel's actually keeping hundreds of millions of

02:45  8    dollars in profit on these patents even after paying the

02:46  9    royalties that you proposed?

02:46 10        A.   That's right.  So it's profit -- it's profit

02:46 11    enhancing for Intel to pay these royalties in two ways.

02:46 12        One, the direct benefits, as we were just describing, of

02:46 13    having those additional profits, but also because of their

02:46 14    ability to maintain sales in the competitive marketplace to

02:46 15    maintain their position.

02:46 16        Q.   So, Dr. Sullivan, in your opinion, are these

02:46 17    royalties reasonable?

02:46 18        A.   Yes.  In my view they are.  They are very

02:46 19    substantial.  I recognize that.  However, they do reflect the

02:46 20    actual benefits that Intel has received, reflects the

02:46 21    substantial use by Intel, and it reflects that the profits are

02:46 22    shared between the parties, and it is a profit-enhancing

02:46 23    proposition for Intel.

02:46 24        Q.   Thank you very much, Dr. Sullivan.

02:46 25        MS. PROCTOR:  That's all for now.

| | | |
|---|---|---|
| 02:47 | 1 | THE COURT:  Mr. Lee, will you be doing the cross? |
| 02:47 | 2 | MR. LEE:  Yes, Your Honor. |
| 02:47 | 3 | THE COURT:  Do you need a moment to -- would it help you |
| 02:47 | 4 | if we took a break or... |
| 02:47 | 5 | MR. LEE:  Yeah.  Then we can get the binders around and |
| 02:47 | 6 | get set up. |
| 02:47 | 7 | THE COURT:  Let's do that.  We'll take literally just a |
| 02:47 | 8 | five- or ten-minute recess and we'll be right back. |
| 02:47 | 9 | Remembering my instructions not to discuss the case. |
| 02:47 | 10 | (Jury exited the courtroom at 2:47.) |
| 02:47 | 11 | THE COURT:  Mr. Lee?  There you are.  Is there anything we |
| 02:47 | 12 | need to take up before I come back in? |
| 02:48 | 13 | MR. LEE:  No. |
| 02:48 | 14 | THE COURT:  Mr. Chu? |
| 02:48 | 15 | MR. CHU:  No, Your Honor. |
| 02:48 | 16 | THE COURT:  We'll be back in just a couple of minutes. |
| 02:54 | 17 | (Recess taken from 2:48 to 2:57.) |
| 02:57 | 18 | THE BAILIFF:  All rise. |
| 02:57 | 19 | THE COURT:  Please remain standing for the jury. |
| 02:57 | 20 | (Jury entered the courtroom at 2:57.) |
| 02:57 | 21 | THE COURT:  Ladies and gentlemen, thank you for coming |
| 02:57 | 22 | back.  You may be seated. |
| 02:57 | 23 | Mr. Lee? |
| 02:57 | 24 | MR. LEE:  Thank you, Your Honor. |
| 02:57 | 25 | CROSS-EXAMINATION |

02:57  1    BY MR. LEE:

02:57  2        Q.   Good afternoon, Dr. Sullivan.

02:57  3        A.   Good afternoon.

02:57  4        Q.   Dr. Sullivan, you told the ladies and gentlemen of

02:57  5    the jury earlier today that you've worked both for plaintiffs

02:57  6    and defendants, correct?

02:57  7        A.   That's right.

02:57  8        Q.   And you understand having worked for defendants in

02:57  9    patent cases that it's important for the jurors to hear the

02:57  10   full story on all issues, correct?

02:57  11       A.   I do believe that it's important to listen, hear and

02:58  12   think through all the issues.  Yes.

02:58  13       Q.   And it's important to hear the defendant's case on

02:58  14   damages in order to -- before you determine the issue of

02:58  15   damages, correct?

02:58  16       A.   I would agree.

02:58  17       Q.   Now, you know that Intel has a damages expert named

02:58  18   Hance Huston, correct?

02:58  19       A.   That's right.

02:58  20       Q.   You didn't mention him by name today, correct?

02:58  21       A.   That's right.

02:58  22       Q.   But you have read his reports, correct?

02:58  23       A.   Yes.  I have.

02:58  24       Q.   Now, I want to ask you about some testimony you gave

02:58  25   about whether SigmaTel, Freescale or NXP made use of the

02:58  1    patents.  Do you recall that testimony?

02:58  2         A.   Yes.  I do.

02:58  3         Q.   And you said that you thought it was a red herring

02:58  4    and misleading to talk about that issue.  Do you remember that?

02:58  5         A.   Not to talk about the issue yet my perception of the

02:58  6    arguments that Intel and, with all due respect, you, Mr. Lee,

02:59  7    have been making.  I do believe those issues are, as I would

02:59  8    describe them, a red herring and misleading.

02:59  9         Q.   Yeah.  That's what you said.  You said they were a

02:59  10   red herring and misleading, correct?

02:59  11        A.   Yes.

02:59  12        Q.   Now, Hance Huston has given the opinion that what

02:59  13   SigmaTel and Freescale and NXP did with the patents tells you a

02:59  14   lot about the value of the patents, hasn't he?

02:59  15        A.   He has said something along those lines.

02:59  16        Q.   Right.  And he --

02:59  17        A.   I disagree, but yes.

02:59  18        Q.   My question was focused on him.  Has he given the

02:59  19   opinion in his reports that what SigmaTel, Freescale and NXP

02:59  20   did with the patents is important in determining the value?  He

02:59  21   did that, didn't he?

02:59  22        A.   That is my recollection.

02:59  23        Q.   Now, when he did that, he specifically referred to

02:59  24   the Georgia-Pacific factors, correct?

03:00  25        A.   He may have.  I don't have that level of specificity

03:00  1    in mind.

03:00  2         Q.   But you referred to the Georgia-Pacific factors this

03:00  3    morning, correct?

03:00  4         A.   Yes.  I did.

03:00  5         Q.   And you put on the screen PDX-7.124 a little bit.  Do

03:00  6    you recall this?

03:00  7         A.   I do.  I even made the slide.  So yes.

03:00  8         Q.   Now, these are the factors from this case called

03:00  9    Georgia-Pacific, correct?

03:00 10         A.   That's right.

03:00 11         Q.   And these are the factors that you examined, correct?

03:00 12         A.   Yes.  Amongst others, but yes.  I did examine these.

03:00 13         Q.   And you expect that His Honor will instruct the jury

03:00 14    that they should apply these factors in determining the issue

03:00 15    of a reasonable royalty, correct?

03:00 16         A.   I will defer to Your Honor in terms of what it is

03:00 17    that the jury is instructed.  I would imagine that part of

03:00 18    those instructions will be to consider the Georgia-Pacific

03:01 19    factors.

03:01 20         Q.   So the answer's yes?

03:01 21         A.   The one distinction there -- two distinctions.  One

03:01 22    is I cannot speak on behalf of the Court.  The other

03:01 23    distinction is that the Georgia-Pacific factors, albeit as

03:01 24    something that provides a guidepost, is not typically --

03:01 25    damages are not constrained to those factors only.

03:01  1      Q.   I'm sorry if my question wasn't clear.  I didn't ask

03:01  2  if damages were constrained.  I just asked whether you

03:01  3  understood that His Honor would instruct on the factors.  Just

03:01  4  yes or no.

03:01  5      A.   I would imagine that His Honor will instruct on the

03:01  6  factors in some way, shape or form.

03:01  7      Q.   Okay.  So, now we know that -- I want to focus a

03:01  8  little bit on your slide.  You know that Mr. Huston actually is

03:01  9  someone who has an electrical engineering degree, correct?

03:01 10      A.   I do not recall his degree.

03:01 11      Q.   Well, we'll wait till he testifies before the jury.

03:02 12      But he did say that Factors 8, 9 and 10 of the

03:02 13  Georgia-Pacific factors specifically implicate whether the

03:02 14  licensor has made use of the patent, correct?  Isn't that what

03:02 15  he said?

03:02 16      A.   I cannot speak to what Mr. Huston has said.  I can

03:02 17  provide you with my opinions in these regards --

03:02 18      MR. LEE:  Your Honor?

03:02 19      THE WITNESS:  -- but I cannot speak for Mr. Huston.

03:02 20      THE COURT:  Dr. Sullivan, just yes or no.  That'd be fine.

03:02 21      MR. LEE:  Your Honor, if we --

03:02 22      THE COURT:  If you could just repeat the question.  He'll

03:02 23  answer it directly.  And I'm sure he will going forward as

03:02 24  well.

03:02 25  BY MR. LEE:

03:02  1      Q.   Dr. Sullivan, Mr. Huston specifically relied upon

03:02  2  Factors 8, 9 and 10 as related to the question of whether

03:02  3  SigmaTel, Freescale and NXP made use of the patent, didn't he?

03:02  4      A.   I recall something along those lines from Mr. Huston.

03:03  5      Q.   So let's look at Factor No. 10.  Now, this is not one

03:03  6  of the factors that you focused upon or highlighted, correct?

03:03  7      A.   I disagree.

03:03  8      Q.   Well, let's focus on it together.  It is "the nature

03:03  9  of the patented invention, the character of the commercial

03:03  10  embodiment of it as owned and produced by the licensor and the

03:03  11  benefits to those who have used the invention."

03:03  12      Do you see that?

03:03  13      A.   I do.

03:03  14      Q.   Now, when the ladies and gentlemen of the jury apply

03:03  15  Factor 10, if they do to this case, the licensor is Freescale,

03:03  16  correct?

03:03  17      A.   The licensor is Freescale.

03:03  18      Q.   And --

03:03  19      A.   There are other parts to the factor.

03:03  20      Q.   And Factor 10 specifically refers to the licensor,

03:03  21  correct?

03:03  22      A.   And the use of the invention.  Yes.

03:04  23      Q.   Yes.  And if the licensor doesn't use the invention

03:04  24  at all, it tells you something, doesn't it?

03:04  25      A.   No.  It does not.

681

03:04  1        Q.    Okay.  You think that suggesting the fact that the

03:04  2   licensor does not have a commercial embodiment, to use the

03:04  3   words of Factor 10, is a red herring and misleading?  Is that

03:04  4   your testimony?

03:04  5        A.    Yes.

03:04  6        Q.    Okay.  Now, I'm going to come back to those factors,

03:04  7   but I wanted -- as you said, one of the people you are accusing

03:04  8   of being misleading was me.  And I wanted to clarify and be

03:04  9   sure we were on the same page.

03:04  10       Now, as you told us, you're not here to give an opinion on

03:04  11  infringement, correct?

03:04  12       A.    That's right.

03:04  13       Q.    So when you used the term "infringing units" during

03:04  14  your testimony today, you were assuming that the jury found

03:04  15  them based upon Dr. Conte's testimony to be infringing,

03:04  16  correct?

03:04  17       A.    Correct.  As a damages expert it is my role to simply

03:05  18  assume infringement.

03:05  19       Q.    All right.  But you agree if Intel does not infringe

03:05  20  the '373 patent, then the damages that the jury should award

03:05  21  for that patent would be zero, correct?

03:05  22       A.    I think that is correct.

03:05  23       Q.    And if the jury finds the '759 patent does not

03:05  24  infringe, the damages would be zero, correct?

03:05  25       A.    I believe that's correct.

| | | |
|---|---|---|
| 03:05 | 1 | Q.   And if the jury finds the '759 patent is invalid, the |
| 03:05 | 2 | damages would be zero, correct? |
| 03:05 | 3 | A.   That would be my understanding. |
| 03:05 | 4 | Q.   Now, you understand, and you told the jury that |
| 03:05 | 5 | Intel's -- the products accused of infringement are |
| 03:05 | 6 | microprocessors, correct? |
| 03:05 | 7 | A.   Yes. |
| 03:05 | 8 | Q.   You yourself do not have an engineering degree, |
| 03:05 | 9 | correct? |
| 03:05 | 10 | A.   That's right. |
| 03:05 | 11 | Q.   You have never designed a microprocessor, correct? |
| 03:05 | 12 | A.   That too is correct. |
| 03:05 | 13 | Q.   You have never worked as an engineer at a |
| 03:06 | 14 | microprocessor company, correct? |
| 03:06 | 15 | A.   Correct. |
| 03:06 | 16 | Q.   You described your company, Intensity, as an |
| 03:06 | 17 | economics and data science firm, correct? |
| 03:06 | 18 | A.   Yes.  That's right. |
| 03:06 | 19 | Q.   Okay.  And as you told us, you do consulting work. |
| 03:06 | 20 | You do litigation work, correct? |
| 03:06 | 21 | A.   Yes. |
| 03:06 | 22 | Q.   Now, you submitted an expert report in this case in |
| 03:06 | 23 | August of 2020, correct? |
| 03:06 | 24 | A.   Yes. |
| 03:06 | 25 | Q.   And that's the report you described to Ms. Proctor |

03:06  1   earlier today, correct?

03:06  2        A.   Yes.

03:06  3        Q.   And then after that point in time, you actually had

03:06  4   your deposition taken where we got to ask you questions,

03:06  5   correct?

03:06  6        A.   Yes.  Two days of deposition.

03:06  7        Q.   As of the time of your deposition, you could not

03:06  8   identify any time you had been the lead negotiator for a

03:06  9   microprocessor patent license; is that correct?

03:06  10       A.   That's right.  I do not serve as a lead negotiator.

03:07  11       Q.   And just to be clear, the hypothetical that you've

03:07  12   been discussing with us today is a hypothetical license

03:07  13   negotiation, correct?

03:07  14       A.   I'm not sure what you mean by that.

03:07  15       Q.   It's a hypothetical license negotiation that's going

03:07  16   to occur.  That's the phrase, correct?

03:07  17       A.   I've not really heard it referred to as such.  It's a

03:07  18   hypothetical negotiation where the parties negotiate over a

03:07  19   license to the patented technology.

03:07  20       Q.   Okay.  If that's a description you're comfortable

03:07  21   with, let's use that description.

03:07  22            Now, you've been retained by the plaintiff in this case

03:07  23   VLSI, correct?

03:07  24       A.   My firm has.  Yes.

03:07  25       Q.   You've actually been hired as an expert in litigation

03:07  1    cases more than 150 times, have you not?

03:07  2        A.   I believe that's correct.

03:07  3        Q.   And you've actually worked on probably more than 300

03:07  4    litigation cases, correct?

03:08  5        A.   Throughout my career, yes.

03:08  6        Q.   Now, you told us your hourly rate is $1,150 an hour,

03:08  7    correct?

03:08  8        A.   Yes.

03:08  9        Q.   Now, before your deposition in September, your

03:08  10   company had billed VLSI for your time plus the time of others,

03:08  11   correct?

03:08  12       A.   Yes.

03:08  13       Q.   As of September of 2020, so about five months ago,

03:08  14   you yourself had worked 200 hours or more, correct?

03:08  15       A.   I believe that's about right.

03:08  16       Q.   And as of today, you've worked 300 hours or more,

03:08  17   correct?

03:08  18       A.   Yes.

03:08  19       Q.   So for your time, your company's billing is somewhere

03:08  20   in excess of $300,000, correct?

03:08  21       A.   Yes.

03:08  22       Q.   But there are other individuals at your company who

03:08  23   are also billing time, correct?

03:08  24       A.   Yes, that's right.

03:08  25       Q.   There are six of them, correct?

03:08   1        A.   Who have worked on this engagement from time to time,
03:08   2   that's right.
03:09   3        Q.   And they have hourly rates as well, correct?
03:09   4        A.   They do.
03:09   5        Q.   Their hourly rates vary from $250 an hour to $800 an
03:09   6   hour, correct?
03:09   7        A.   I believe that's correct.
03:09   8        Q.   And they've worked another 300 hours or so, correct?
03:09   9        A.   Collectively or all total across the team?
03:09  10        Q.   I would say collectively, all-told across the team,
03:09  11   right up until today.
03:09  12        A.   I'm sorry.  I did not follow.
03:09  13        Q.   Sure.  For the other six people, I'm not trying to
03:09  14   ask you to break them down, just for those six people other
03:09  15   than you, have they collectively worked since the beginning of
03:09  16   the case until today, 300 hours or so?
03:09  17        A.   I would think something along those lines.
03:09  18        Q.   So in total Intensity's been paid or will be paid
03:09  19   somewhere close to $500,000 for your work in this case,
03:09  20   correct?
03:09  21        A.   I have not examined the data on that, but something
03:10  22   along those lines would be about correct.
03:10  23        Q.   Now, you are working for VLSI Technology, correct?
03:10  24        A.   No.  The firm was engaged on behalf of VLSI
03:10  25   Technology LLC, I believe.

03:10  1      Q.   Fair enough.  And it was formed in 2016, correct?

03:10  2      A.   Yes.  That is my understanding.

03:10  3      Q.   There are two people who work at VLSI, if I can call

03:10  4  it that.  If I refer to it as just VLSI, you'll understand what

03:10  5  I mean?

03:10  6      A.   Yes.

03:10  7      Q.   There are two people who work at VLSI, correct?

03:10  8      A.   That is my understanding.

03:10  9      Q.   One is Michael Stolarski, correct?

03:10  10     A.   Yes.

03:10  11     Q.   Before you formed your opinions about the reasonable

03:10  12  royalties in this case, did you meet with Mr. Stolarski?

03:10  13     A.   No.  I did not.

03:10  14     Q.   Did you talk to Mr. Stolarski?

03:10  15     A.   No.

03:10  16     Q.   Did you meet -- Cindy Simpson is the chief technology

03:11  17  officer of VLSI.  Have you ever met with her?

03:11  18     A.   No.  I have not.

03:11  19     Q.   Have you ever met with either Mr. Stolarski -- have

03:11  20  you ever met with Mr. Stolarski in person at any time?

03:11  21     A.   Yes.  I met him, I think it was yesterday or the day

03:11  22  before.  Yeah, here in the trial.

03:11  23     Q.   Okay.  So the first time you met Mr. Stolarski was

03:11  24  yesterday, that would be Tuesday, in connection with the trial,

03:11  25  correct?

```
03:11   1       A.    Yes.

03:11   2       Q.    And you've never met Cindy Simpson, the chief

03:11   3   technology officer, correct?

03:11   4       A.    That's right.

03:11   5       Q.    But you do know that VLSI does not design

03:11   6   microprocessors, correct?

03:11   7       A.    That is my understanding.

03:11   8       Q.    They do not manufacture microprocessors, correct?

03:11   9       A.    That too is my understanding.

03:11  10       Q.    They don't manufacture any product of any kind, do

03:12  11   they?

03:12  12       A.    I'm not aware of them manufacturing any sort of

03:12  13   physical product.

03:12  14       Q.    They've never sold any products, correct?

03:12  15       A.    Not a physical product.

03:12  16       Q.    And they don't have any engineers or technologists or

03:12  17   scientists who are engaged in research and development,

03:12  18   correct?

03:12  19       A.    Not as employees as I understand it.

03:12  20       Q.    And no one at VLSI has ever filed for a patent

03:12  21   application as a person working for VLSI, correct?

03:12  22       A.    I am not aware of any patents being filed by

03:12  23   Ms. Simpson or Mr. Stolarski.

03:12  24       Q.    Okay.  And in fact, before you were hired by my

03:12  25   colleagues at Irell & Manella, you had never heard of VLSI,
```

03:13  1   correct?

03:13  2       A.   I think that's right.

03:13  3       Q.   Now, one company you had heard of before this

03:13  4   litigation was Intel, correct?

03:13  5       A.   Yes.

03:13  6       Q.   And as you told the jurors, Intel manufactures

03:13  7   microprocessors and has for almost 50 years, correct?

03:13  8       A.   I didn't hear the time period.

03:13  9       Q.   50 years.

03:13 10       A.   No.  I don't think I mentioned that.  I think it's

03:13 11   true, but --

03:13 12       Q.   I'm sorry.

03:13 13       A.   -- I don't think I mentioned it.

03:13 14       Q.   I'm sorry.  If I misstated the question, I apologize.

03:13 15   I didn't ask whether you'd mentioned it.  I said, you know that

03:13 16   Intel has been making microprocessors for 50 years, correct?

03:13 17       A.   That's my understanding.  Yes.

03:13 18       Q.   And there have been thousands of engineers who have

03:13 19   worked on making those -- designing those products, making

03:13 20   those products and selling them, correct?

03:13 21       A.   Thousands of engineers designing in a system with the

03:14 22   manufacturing.  I think some of the engineers help on the sales

03:14 23   side, but there's also other non-engineer types on the sales

03:14 24   side.

03:14 25       Q.   Fair enough.  Now, you talked about large numbers of

03:14   1    sales to the jurors during your direct testimony, correct?

03:14   2        A.   In my view the sales are large and significant.

03:14   3        Q.   Intel has been very successful in selling

03:14   4    microprocessors over 50 years, correct?

03:14   5        A.   They have experienced significant financial success.

03:14   6        Q.   They were successful before the '373 patent was

03:14   7    applied for, and they were selling a ton of microprocessors

03:14   8    before that patent was applied for, correct?

03:14   9        A.   I think that's right.

03:14   10       Q.   They were successful before the '759 patent was

03:14   11   applied for, and they were selling a ton of microprocessors

03:14   12   before that time, correct?

03:14   13       A.   Similarly.  Yes.

03:15   14       Q.   And they continued to sell a ton of microprocessors

03:15   15   after the patents were applied for, after the patents were

03:15   16   issued, right up until today, correct?

03:15   17       A.   Yes.

03:15   18       Q.   All right.  Now, you know that Intel manufactures

03:15   19   these microprocessors, these -- the number that you say would

03:15   20   basically surround the world.  And they manufacture them in a

03:15   21   number of locations, correct?

03:15   22       A.   Yes.

03:15   23       Q.   This includes Arizona, correct?

03:15   24       A.   That's one location.

03:15   25       Q.   Oregon, correct?

03:15  1      A.   That's a second.

03:15  2      Q.   And New Mexico, correct?

03:15  3      A.   That is my understanding.

03:15  4      Q.   And you know that Intel also has facilities right

03:15  5  here in Texas, correct?

03:15  6      A.   That too is my understanding.

03:15  7      Q.   And Intel has in the United States more than 10,000

03:16  8  people involved in manufacturing these microprocessors, that if

03:16  9  laid end-to-end would surround the world, correct?

03:16  10     A.   Yes and no.  You're mixing a couple of items there,

03:16  11  but close.

03:16  12     Q.   And you know it has as many as 1,700 people working

03:16  13  in Austin doing research and development on the next

03:16  14  generations of technologies so that Intel can continue to sell

03:16  15  a ton of microprocessors, correct?

03:16  16     A.   I know there are roughly that number of employees,

03:16  17  and I know some of them at least are working on R&D.  I can't

03:16  18  speak to all of them.

03:16  19     Q.   And you know that Intel has made significant

03:16  20  inventions and innovations of its own that are in its products,

03:16  21  correct?

03:16  22     A.   That is my understanding.

03:16  23     Q.   And you know that those products are complex

03:16  24  products, correct?

03:16  25     A.   Yes.  They are complex.

03:16  1      Q.   With many features?

03:16  2      A.   Yes.

03:17  3      Q.   Billions of transistors, as you told us earlier

03:17  4  today?

03:17  5      A.   I'm sorry.  I did not follow the question.

03:17  6      Q.   Billions of transistors in a single microprocessor?

03:17  7      A.   Yes.

03:17  8      Q.   Correct?

03:17  9      A.   There are.

03:17  10     Q.   And those billions of transistors result in many

03:17  11 features, correct?

03:17  12     A.   I would think of it a little bit differently, that

03:17  13 there are many features in the products, and there are billions

03:17  14 of transistors on the products.  I don't think of it in the

03:17  15 same causality as you suggested.

03:17  16     Q.   And some of those features contribute to power and

03:17  17 power savings, correct?

03:17  18     A.   Yes.

03:17  19     Q.   And some of those features contribute to speed and

03:17  20 performance, correct?

03:17  21     A.   That too is true.

03:17  22     Q.   And many of those features have nothing to do with

03:17  23 what VLSI accuses of infringing in this case, correct?

03:17  24     A.   They are different.

03:17  25     Q.   Yeah.  Now, let me ask you a few questions about

03:18   1   these patents in particular.  There are two.  One is the '373

03:18   2   which issued in 2009, correct?

03:18   3       A.   Yes.

03:18   4       Q.   There are -- there is the '759 patent that issued in

03:18   5   2010, correct?

03:18   6       A.   Yes.

03:18   7       Q.   So both patents have been around for more than a

03:18   8   decade, correct?

03:18   9       A.   Correct.

03:18   10      Q.   Now, as you told us at your deposition, you've

03:18   11  reviewed a gazillion patents.  That was your word, correct?

03:18   12      A.   I'm sorry?

03:18   13      Q.   You told us that you had reviewed a gazillion

03:18   14  patents, correct?

03:18   15      A.   I don't recall saying that, but it's true.

03:18   16      Q.   You would agree that you have.  You've reviewed a lot

03:18   17  of patents?

03:18   18      A.   I have, yes.

03:18   19      Q.   All right.

03:18   20      A.   Yes.

03:18   21      Q.   But the first time you ever saw these patents was in

03:18   22  the second half of 2019, correct?

03:18   23      A.   Yes.  That's right.  That's very typical.

03:19   24      Q.   That was after you were retained to act as a damages

03:19   25  expert in this case, correct?

03:19  1      A.   Yes.  Exactly.

03:19  2      Q.   And in all your work both in litigation but also in

03:19  3  the consulting work you've done for other purposes, you had

03:19  4  never even heard of these patents, correct?

03:19  5      A.   That's right.

03:19  6      Q.   You had never heard of the inventors of these

03:19  7  patents, correct?

03:19  8      A.   I think that's right.

03:19  9      Q.   Incidentally, in preparing your analysis did you talk

03:19  10  to any of the inventors of either patent?  Now, one inventor,

03:19  11  Mr. Henson's passed away, but did you talk to any of the other

03:19  12  four?

03:19  13      A.   No, I did not.

03:19  14      Q.   Now, you would agree with me that the '373 and the

03:19  15  '759 patents are not the only patents related to

03:19  16  microprocessors that have been issued by the United States

03:19  17  Patent Office, correct?

03:19  18      A.   I would definitely agree with you on that one.

03:20  19      Q.   In fact, there are probably hundreds of patents that

03:20  20  relate to microprocessor features that have been issued by the

03:20  21  same Patent Office, correct?

03:20  22      A.   By the US PTO, yes.

03:20  23      Q.   Yes.  And many of those microprocessor patents were

03:20  24  issued before the '373 and '759 patents, correct?

03:20  25      A.   Yes.

694

03:20  1      Q.   And some of those patents identified improved power

03:20  2   savings, correct?

03:20  3      A.   I would imagine that they have.

03:20  4      Q.   And somebody identified improved performance as well,

03:20  5   correct?

03:20  6      A.   Yes.

03:20  7      Q.   Now, the '759 patent was originally owned by

03:20  8   SigmaTel, correct?

03:20  9      A.   Yes.

03:20  10     Q.   You agree with me that SigmaTel made and sold

03:20  11  semiconductor products?

03:20  12     A.   Yes.

03:20  13     Q.   But you can't identify and have not identified any

03:20  14  product that SigmaTel ever used a patent in, correct?

03:20  15     A.   That's right.  I have not investigated that issue.

03:20  16     Q.   So the patent issued -- let's take each of the two

03:21  17  patents.  The '373 patent issued in 2009, correct?

03:21  18     A.   I did not hear that.

03:21  19     Q.   I'm sorry.  The '373 patent issued in 2009, correct?

03:21  20     A.   That's my recollection, yes.

03:21  21     Q.   The '759 patent issued in 2010, correct?

03:21  22     A.   Yes.  I think we discussed that.

03:21  23     Q.   So the patents have been around --

03:21  24     A.   For about a decade.

03:21  25     Q.   So the patents have been around for about a decade,

03:21  1    correct?

03:21  2         A.   Yes.

03:21  3         Q.   And in that time, as far as you know, none of the

03:21  4    owners of the patents in that entire decade ever made use of it

03:21  5    in a commercial product, correct?

03:21  6         A.   I do not know.  I'm not an engineer.  I don't

03:21  7    determine use or infringement or practicing, so I simply do not

03:21  8    know.

03:21  9         Q.   One way or the other?

03:21  10        A.   That's right.

03:21  11        Q.   Okay.

03:21  12        A.   I'm an economist.

03:21  13        Q.   So let me ask you to assume that there's been no

03:22  14    evidence that SigmaTel or Freescale or NXP made a product using

03:22  15    either of the two patents.  Just make that assumption, okay?

03:22  16        A.   Okay.

03:22  17        Q.   And I want to take you back to the Tom Brady/Patrick

03:22  18    Mahomes example that you gave, okay?

03:22  19        A.   I remember it.

03:22  20        Q.   Now, I'm from Boston so I followed the career of

03:22  21    both.  Brady was a sixth-round draft choice, correct?

03:22  22        A.   Yes.

03:22  23        Q.   But by his second year, the Patriots figured out what

03:22  24    they had and they put him in the game, and he won the Super

03:22  25    Bowl, correct?

696

03:22  1      A.   Yes.  My recollection is he sat on the bench for the

03:22  2  first year, give or take, and then second year really took off.

03:22  3      Q.   So they figured out what they had, they put him in

03:22  4  the game and they won the Super Bowl, correct?

03:22  5      A.   That's how I remember it.

03:22  6      Q.   No one put the '373 patent into the game, did they?

03:22  7      A.   I do not know.

03:22  8      Q.   No one put the '759 patent in the game, did they?

03:23  9      A.   Well, I mean, aside from Intel and the allegations

03:23  10  here, but I'm assuming you're asking about SigmaTel, Freescale,

03:23  11  NXP.

03:23  12      Q.   That's precisely what I'm asking about.

03:23  13      Did the people -- now, the Patriots didn't own Brady, but

03:23  14  they had a contract with Brady.  And they figured out what they

03:23  15  had and they put him in the game, right?

03:23  16      A.   Yes.

03:23  17      Q.   Did the people who owned SigmaTel, Freescale, NXP --

03:23  18  did the people who owned these patents figure out what they had

03:23  19  and put the patents in the game?

03:23  20      A.   They may have or they may not have.  Earlier you

03:23  21  asked me to assume that they had not.  But I don't think the

03:23  22  evaluation of that has been done.  It's very difficult to

03:23  23  determine whether or not a patent is being used.

03:23  24      Q.   If I could ask my question again.  As far as you

03:23  25  know, neither Freescale nor SigmaTel nor NXP put those patents

03:24  1   into the commercial game, correct?

03:24  2        A.   As far as I know, to my knowledge, that's correct.

03:24  3        Q.   Now, you also can't identify any circumstance where

03:24  4   Freescale licensed either the '373 or the '759 patents,

03:24  5   correct?

03:24  6        A.   That's fair.

03:24  7        Q.   All right.  Now, VLSI acquired these patents in 2018,

03:24  8   as we said earlier, correct?

03:24  9        A.   I'm sorry.  What year did you say?

03:24  10       Q.   2018.

03:24  11       A.   Yes.

03:24  12       Q.   And the only thing that VLSI has done with the

03:24  13  patents is sue Intel?

03:24  14       A.   My understanding is that there have been efforts to

03:24  15  undertake licensing but that those efforts have been chilled as

03:24  16  a result of this litigation.

03:25  17       Q.   Those efforts have been unsuccessful, correct?

03:25  18       A.   Thus far, yes.

03:25  19       Q.   Now, during the time that VLSI has owned the patents,

03:25  20  it has not used the patents to generate any revenue at all,

03:25  21  correct?

03:25  22       A.   I believe they are seeking to.

03:25  23       Q.   So the answer to my question is correct, they have

03:25  24  not?

03:25  25       A.   It has not been realized.

03:25  1        Q.   Right.   Now, you talked about the United States

03:25  2   patent system today, and you put Section 284 on the screen for

03:25  3   the jurors.   Do you remember that?

03:25  4        A.   I do recall the statute, yes.

03:25  5        Q.   And were you here or watching the opening arguments,

03:25  6   opening statements?

03:25  7        A.   I was doing my best to watch via Zoom, which is kind

03:25  8   of the mechanism in today's day and age.

03:25  9        Q.   Sure.   You heard Mr. Chu talk about the importance of

03:26  10  the patent system and how it promotes innovation, correct?

03:26  11       A.   Yes.

03:26  12       Q.   Now, do you agree that the economy and innovation is

03:26  13  harmed when plaintiffs recover unreasonable damages?

03:26  14       A.   When those damages are objectively unreasonable, I

03:26  15  would agree.

03:26  16       Q.   Yeah.   It harms the economy, and it harms innovation,

03:26  17  correct?

03:26  18       A.   If the damages are objectively unreasonable, I would

03:26  19  agree.

03:26  20       Q.   Now, I'll come to it in more detail a little later,

03:26  21  but have you analyzed the documents by which VLSI acquired

03:26  22  these two patents and others in 2018?

03:26  23       A.   I have, I think, seen some documents.   I would not

03:27  24  characterize it as analyzed.

03:27  25       Q.   But you cited them in your report, correct?

03:27  1        A.   I likely did.  I cited a lot of documents.  Not a

03:27  2   gazillion, but a lot.

03:27  3        Q.   Okay.  You yourself have never negotiated a

03:27  4   microprocessor patent license for anything like the numbers

03:27  5   that you showed the ladies and gentlemen of the jury on the

03:27  6   screens today, correct?

03:27  7        A.   I have participated in negotiations that ultimately

03:27  8   would lead to such numbers.  But not like a single upfront

03:27  9   payment.

03:27  10       Q.   Okay.  Fair enough.

03:27  11       Now, Dr. Sullivan, you heard of the Texas Rangers?

03:27  12       A.   In multiple ways, yes.

03:27  13       Q.   They're a Major League Baseball team that plays out

03:27  14   of Arlington?

03:27  15       A.   That's one of the Texas Rangers I was thinking about.

03:27  16       Q.   Just to put the numbers that you've given the jurors

03:28  17   in context, the hypothetical negotiation here was:  In what

03:28  18   year?

03:28  19       A.   2011 and '13.

03:28  20       Q.   The Texas Rangers were sold in its -- their entirety

03:28  21   in 2010 for $593 million.  Does that sound right to you?

03:28  22       A.   I would not dispute that.

03:28  23       Q.   Right.  And your damages number would be enough to --

03:28  24       MS. PROCTOR:  Objection, Your Honor.

03:28  25       THE COURT:  I can't hear you.

03:28  1      MS. PROCTOR:  Objection, Your Honor.  We have a motion in

03:28  2  limine on this.  It is also Rule 403.

03:28  3      MR. LEE:  I'm not sure what limine motion she's referring

03:28  4  to.

03:28  5      MS. PROCTOR:  No. 2, Section 4, Your Honor.

03:28  6      THE COURT:  Hang on a second.  I'm going to overrule the

03:29  7  objection.

03:29  8  BY MR. LEE:

03:29  9      Q.   You've also heard of the Dallas Mavericks?

03:29  10     A.   Yes.

03:29  11     Q.   An NBA team?

03:29  12     A.   That's right.

03:29  13     Q.   And you did some work for the NBA Players

03:29  14  Association, correct?

03:29  15     A.   Yes.

03:29  16     Q.   And in 2015 they were sold in their entirety for

03:29  17  $1.5 billion, correct?

03:29  18     A.   That sounds familiar.

03:29  19     Q.   Right.  And you yourself have written articles about

03:29  20  the purchase and sale of some professional sports teams,

03:29  21  correct?

03:29  22     A.   Yes.  The Atlanta Hawks.

03:29  23     Q.   You also wrote about the sale of the Los Angeles

03:29  24  Clippers, correct?

03:29  25     A.   I -- relatedly.  It was in -- well, you'll get to it,

701

03:30 1    I'm sure, but it was in that context.

03:30 2         Q.   And you described the purchase price of the Los

03:30 3    Angeles Clippers as astronomical, correct?

03:30 4         A.   Yes.  In relation to previous purchases of basketball

03:30 5    teams.

03:30 6         Q.   And the number for that sale was $2 billion, correct?

03:30 7         A.   That's right.

03:30 8         Q.   Now, let's focus on what you did specifically in

03:30 9    constructing, and I think the word you used was "developing"

03:30 10   your model, okay?  I want to turn to that specifically.  Can we

03:30 11   do that?

03:30 12        A.   I'm happy to talk about my model.

03:30 13        Q.   Okay.  Now, the hypothetical negotiation, as you told

03:30 14   us, had Freescale on one side, correct?

03:30 15        A.   Yes.

03:30 16        Q.   The earliest time it would occur would be the first

03:30 17   quarter of 2011, correct?

03:30 18        A.   Which quarter did you say?

03:31 19        Q.   Fourth quarter of 2011.  I may have misspoke, so let

03:31 20   me say it again.  The earliest time it would have taken place

03:31 21   would have been the fourth quarter of 2011.

03:31 22        A.   I'd have to go back and look if it was third or

03:31 23   fourth, but right around that time period.

03:31 24        Q.   Okay.  So let's fix ourselves in that time period.

03:31 25   We have Freescale at one side of the table; we have Intel on

03:31  1    the other.  And let's take you through the steps specifically

03:31  2    that you used to get to your numbers, okay?

03:31  3        A.   Sure.

03:31  4        Q.   First, you relied on Dr. Conte to provide you with

03:31  5    patent specific performance and power benefits, correct?

03:31  6        A.   I do use his work as inputs.

03:31  7        Q.   If Dr. Conte's numbers are incorrect, then your

03:31  8    ultimate numbers are going to be incorrect?

03:32  9        A.   It depends upon in which way his numbers are

03:32  10   incorrect.  But I'll grant you, if his numbers should be

03:32  11   different, then my numbers would be different.  They flow

03:32  12   through and they scale.

03:32  13       Q.   And after receiving Dr. Conte's numbers from his

03:32  14   work, you performed a regression, correct?

03:32  15       A.   I don't think of it chronologically quite the way you

03:32  16   put it, but I did perform a regression analysis.

03:32  17       Q.   All right.

03:32  18       A.   Of course.

03:32  19       Q.   And then you multiplied your regression analysis by

03:32  20   the inputs from Dr. Conte, correct?

03:32  21       A.   Not quite.  I took the result, which is a coefficient

03:32  22   from the regression analysis on -- and I multiplied that by the

03:32  23   improvements provided by Dr. Conte.

03:32  24       Q.   Okay.  So we have the model, the regression model

03:32  25   that you have developed.  We have Dr. Conte's inputs, and then

03:33  1    you're using them together, correct?

03:33  2        A.   Yes.

03:33  3        Q.   And that gives you what you call the price effect,

03:33  4    correct?

03:33  5        A.   Using the coefficient multiplied by the benefits --

03:33  6        Q.   Right.

03:33  7        A.   -- provides a price benefit --

03:33  8        Q.   And then you use something called "cost

03:33  9    apportionment," correct?

03:33  10       A.   Yes.  I used cost apportionment and commercialization

03:33  11   apportionment.

03:33  12       Q.   And then you do something called "contribution

03:33  13   apportionment," correct?

03:33  14       A.   Contribution or commercialization.  I kind of use

03:33  15   those terms somewhat interchangeably, but it is that next

03:33  16   apportionment after profit.

03:33  17       Q.   So just so we all understand, your analysis relies

03:33  18   upon numbers provided to you by Dr. Conte, correct?

03:33  19       A.   I do use those numbers.

03:33  20       Q.   Dr. Conte relies upon numbers that came from

03:33  21   Dr. Annavaram, correct?

03:33  22       A.   Yes.

03:33  23       Q.   And then you combine the numbers Dr. Conte gave you

03:34  24   with the coefficients from your regression analysis, correct?

03:34  25       A.   I do.

704

03:34   1       Q.   And if any of those is wrong, if Dr. Annavaram's data

03:34   2   is wrong or Dr. Conte's data is wrong or the coefficients from

03:34   3   your regression analysis is wrong, then your damages number is

03:34   4   not correct, right?

03:34   5       A.   All depends upon in what way they are wrong.  Yet

03:34   6   again, I will grant you, if those numbers should be different,

03:34   7   then my number or the reasonable royalty would be different.

03:34   8       Q.   If Dr. Annavaram was wrong by a factor of ten

03:34   9   percent, your number would be different, correct?

03:34  10       A.   By ten percent.

03:34  11       Q.   Right.  And if Dr. Conte was wrong by ten percent,

03:34  12   your number would be wrong by ten percent?

03:34  13       A.   Again, yeah.  It's what would be considered a scaler,

03:35  14   so it scales.

03:35  15       Q.   Right.  But in any event, each step in the process is

03:35  16   dependent upon a step that occurred before, correct?

03:35  17       A.   Well, it's all used together.

03:35  18       Q.   Okay.  Now, it's true, is it not, that you could not

03:35  19   identify for us any license agreement in the real world that

03:35  20   was negotiated using the process that I've just described,

03:35  21   correct?

03:35  22       A.   The general process of identifying technical benefits

03:35  23   multiplying them by a price benefit adjusting for profit and

03:35  24   relative contributions, that's a very common approach.

03:35  25       Q.   Tell us, identify by party and name, a single license

03:35   1   agreement anywhere on the face of the Earth that was negotiated

03:35   2   using this process.

03:35   3       A.   We both know that's not a fair question because --

03:36   4       Q.   Dr. Sullivan --

03:36   5       A.   Well, okay.  I'll just leave it at that.  There's a

03:36   6   reason why that's not a fair question.

03:36   7       THE COURT:  Dr. Sullivan, you need to listen to

03:36   8   Mr. Lee's -- you don't get to judge his question.  You need to

03:36   9   answer his question with a yes or no or tell him you don't

03:36  10   understand it.

03:36  11       THE WITNESS:  Thank you, Your Honor.

03:36  12   BY MR. LEE:

03:36  13       Q.   Dr. Sullivan, can you identify for me by name, by

03:36  14   license or by licensee, any license agreement on the face of

03:36  15   the Earth that was ever negotiated using this multistep process

03:36  16   that you and I have just described?

03:36  17       THE COURT:  Yes, ma'am.

03:36  18       MS. PROCTOR:  I'm going to object on the basis of

03:36  19   confidentiality concerns.

03:36  20       (Clarification by Reporter.)

03:36  21       MS. PROCTOR:  Objection on the basis of confidentiality

03:36  22   concerns.

03:36  23       MR. LEE:  It's just a yes or no question.

03:36  24       THE COURT:  I'll limit it.  I'll allow him to answer with

03:36  25   a yes or no.  If Mr. Lee wants to -- if the answer is yes, he

03:37  1  can.  And -- I will clear the courtroom and allow us to move

03:37  2  forward.  If in fact it is, Mr. Lee, if you would then find out

03:37  3  whether or not --

03:37  4      MR. LEE:  Fair enough.  Yes.

03:37  5      THE COURT:  -- if there is a yes, whether the information

03:37  6  he has is or is not confidential.

03:37  7      MR. LEE:  Yes.

03:37  8  BY MR. LEE:

03:37  9      Q.  Can you answer that yes or no?

03:37  10     A.  I am -- now I don't recall which way the question

03:37  11 went, but I am unable to disclose or provide for you a name of

03:37  12 such an agreement.

03:37  13     Q.  Okay.  So let me be a little bit more specific, and

03:37  14 let me focus on Intel and Freescale.  Could we do that?

03:37  15     A.  Sure.

03:37  16     Q.  You can't identify any instance where Intel

03:37  17 determined an appropriate royalty rate using the multistep

03:37  18 methodology that you used, correct?

03:37  19     A.  That's fair.

03:37  20     Q.  You cannot identify any instance where Freescale used

03:37  21 the multistep process that you've identified to negotiate a

03:37  22 license, correct?

03:38  23     A.  That's right.

03:38  24     Q.  You cannot identify any instance where NXP used the

03:38  25 multistep process that you employed to negotiate a license,

03:38  1   correct?

03:38  2         A.   That too is correct.

03:38  3         Q.   And the same's true for SigmaTel, correct?

03:38  4         A.   Yes.

03:38  5         Q.   So let's go back to the steps of your process and run

03:38  6   through them quickly.  As you told us, you're not an engineer,

03:38  7   so you didn't perform any power testing experiment yourself,

03:38  8   correct?

03:38  9         A.   That's right.

03:38  10        Q.   And you relied on Dr. Annavaram and Dr. Conte,

03:38  11  correct?

03:38  12        A.   Correct.

03:38  13        Q.   Now, as you told us, Dr. Conte told you that the '373

03:38  14  patent provides a 5.45 percent power savings benefit in Intel's

03:38  15  Haswell and Broadwell products, correct?

03:38  16        A.   Yes.

03:38  17        Q.   And he said that the '759 patent provided a

03:39  18  1.11 percent performance benefit in the Lake products, correct?

03:39  19        A.   Correct.  The accused Lake products.

03:39  20        Q.   Right.  And you just took those numbers as given to

03:39  21  you, correct?

03:39  22        A.   I did use those numbers.  That's right.

03:39  23        Q.   Did you ever meet with Dr. Annavaram when he

03:39  24  completed his testing to discuss his testing with him?

03:39  25        A.   I did have discussions with Dr. Annavaram.

708

03:39   1       Q.   Did you have discussions with him before he conducted

03:39   2   his tests?

03:39   3       A.   Not relatedly.  No.

03:39   4       Q.   Okay.  Did you have any discussions with Dr. Conte

03:39   5   before he provided you his numbers?

03:39   6       A.   Yes.

03:39   7       Q.   All right.  And when he provided you his numbers, did

03:39   8   you discuss the numbers with him?

03:39   9       A.   As I think of it, yes.

03:40  10       Q.   Okay.  But as of the time of your deposition, you

03:40  11   couldn't say where Dr. Conte got his performance test results

03:40  12   from, correct?

03:40  13       A.   That's fair.

03:40  14       Q.   At the time of your deposition, you couldn't say

03:40  15   where Dr. Conte got his '373 power saving numbers from,

03:40  16   correct?

03:40  17       A.   That's right.  I wasn't speaking on behalf of

03:40  18   Dr. Conte.

03:40  19       Q.   Right.  Now, let's go to the regression analysis that

03:40  20   you described in your regression model.  Okay.  Are you with

03:40  21   me?

03:40  22       A.   Sure.

03:40  23       Q.   Okay.  Dr. Sullivan, you're not aware of any

03:40  24   regression analysis ever being used to value the '373 patent,

03:40  25   correct?

03:40  1        A.   Well, not aside from this case.

03:40  2        Q.   Aside from you in this case and your group at

03:40  3   Intensity who were retained for this case, correct?

03:41  4        A.   Correct.

03:41  5        Q.   Now, you're also not aware of anyone ever using a

03:41  6   regression analysis to value the '759 patent, correct?

03:41  7        A.   Same as with the '373.  That's right.

03:41  8        Q.   And you're certainly not aware of anybody at

03:41  9   SigmaTel, NXP or Freescale using a regression analysis to value

03:41  10  either of these patents, correct?

03:41  11       A.   Correct.

03:41  12       Q.   And no one at VLSI did either, correct?

03:41  13       A.   As far as I know.

03:41  14       Q.   All right.  Now, you do know -- as you told me, you

03:41  15  know who Mr. Stolarski is, correct?

03:41  16       A.   I do.

03:41  17       Q.   The CEO of VLSI, correct?

03:41  18       A.   That is my understanding.

03:41  19       Q.   And you know that he was a lawyer at Motorola for

03:41  20  22 years, don't you?

03:41  21       A.   Sounds familiar.

03:41  22       Q.   And Motorola is the company that spun off Freescale,

03:41  23  correct?

03:42  24       A.   Yes.

03:42  25       Q.   And Mr. Stolarski was involved in negotiating

03:42    1    hundreds of licenses at Motorola, wasn't he?

03:42    2        A.   I do not recall.

03:42    3        Q.   You know that he was involved in negotiating licenses

03:42    4    at Motorola, correct?

03:42    5        A.   That sounds right.

03:42    6        Q.   And you know that Mr. Stolarski never personally used

03:42    7    a regression analysis in any one of those negotiations,

03:42    8    correct?

03:42    9        A.   That would not surprise me.

03:42   10        Q.   And, in fact, he never asked anybody in connection

03:42   11    with any of those license negotiations to conduct a regression

03:42   12    analysis, correct?

03:42   13        A.   I could not say one way or the other.

03:42   14        Q.   Now, you also reviewed the deposition of Kevin Klein,

03:42   15    K-l-e-i-n, correct?

03:42   16        A.   That name sounds familiar, but at the moment I cannot

03:42   17    place it.

03:42   18        Q.   Mr. Klein was the director of licensing at Freescale,

03:42   19    correct?

03:42   20        A.   I'm going to have to take your word for that one.

03:43   21    I've reviewed far too many depositions in this case.

03:43   22        Q.   If it helps you, and you can look at it if you like,

03:43   23    I'll represent to you if you look at Tab 20 in the notebook in

03:43   24    your report, you reviewed the deposition of Mr. Klein.

03:43   25        A.   I totally believe you.  I just don't have all of

03:43  1    these names committed to memory.

03:43  2        Q.   Okay.  Mr. Klein was at Freescale, and I will

03:43  3    represent to you that in your report you identify his

03:43  4    deposition as one of the depositions you reviewed in preparing

03:43  5    your opinions, okay?

03:43  6        A.   Sounds great.

03:43  7        Q.   And Mr. Klein couldn't identify a single instance

03:43  8    where Freescale used a regression analysis in a patent license

03:43  9    negotiation, correct?

03:43  10       A.   I do not recall that, but that may be the case.

03:43  11       Q.   Any reason to disagree?

03:43  12       A.   No.

03:43  13       Q.   Okay.  You also reviewed the deposition of someone

03:43  14   called Aaron Waxler.  Do you recall that?

03:44  15       A.   I do.

03:44  16       Q.   And Mr. Waxler now was at NXP, correct?

03:44  17       A.   I'm sorry.  I'm not quite following the time.  Are

03:44  18   you saying he is now but wasn't --

03:44  19       Q.   No.  He was at the time of his deposition the vice

03:44  20   president of IP licensing at NXP, correct?

03:44  21       A.   I do not recall his title, but I do recall him doing

03:44  22   licensing at NXP.

03:44  23       Q.   And, in fact, you know from having read his

03:44  24   deposition that there's a whole group of folks at NXP who do

03:44  25   nothing other than license patents, correct?

03:44   1          A.   They do have a licensing group.  That's my

03:44   2   understanding.

03:44   3          Q.   And it's not a small group, is it?

03:44   4          A.   I don't recall the size.

03:44   5          Q.   Now, you know from your review that Mr. Waxler

03:44   6   testified that no one at NXP has ever used a regression

03:44   7   analysis to value patents or negotiate a license agreement,

03:44   8   correct?

03:44   9          A.   I do not have that recollection, but that may be the

03:45  10   case.

03:45  11          Q.   Do you have any reason to disagree with me?

03:45  12          A.   No.

03:45  13          Q.   Okay.  You also reviewed the deposition of James

03:45  14   Kovacs, correct?

03:45  15          A.   Yes.

03:45  16          Q.   Now, Mr. Kovacs is the director of licensing

03:45  17   trademarks and standards at Intel, correct?

03:45  18          A.   Yes.

03:45  19          Q.   And he testified that in all his time at Intel, no

03:45  20   one has ever used a regression analysis to negotiate a license

03:45  21   agreement, correct?

03:45  22          A.   That does sound familiar.

03:45  23          Q.   Now, in your regression analysis -- let's turn to

03:45  24   your regression analysis.  We heard that VLSI's accusing

03:45  25   certain Intel products that you described earlier today,

03:45  1    correct?

03:45  2         A.   I did not hear that.  Just try again.

03:45  3         Q.   Sure.  Intel has accused certain Skylake products and

03:45  4    certain Broadwell and Haswell products of infringing these two

03:45  5    patents, correct?

03:45  6         A.   Yes.  Lake products and well products.

03:46  7         Q.   Okay.  And now, in your regression model, I think you

03:46  8    explained to the jurors that you included both accused features

03:46  9    and nonaccused features, correct?

03:46  10        A.   I did, yeah.  I don't think that's the question you

03:46  11   intended to ask.

03:46  12        Q.   But you did include both features accused of

03:46  13   infringement and other features not accused of infringement,

03:46  14   correct?

03:46  15        A.   Yes.

03:46  16        Q.   And, in fact, it was your belief that it was

03:46  17   impossible to perform your regression model only on accused

03:46  18   products, correct?

03:46  19        A.   It would not be feasible to run the regression on

03:46  20   only accused products to be able to determine what the valid

03:46  21   price effect is associated with the technology.

03:46  22        Q.   So the answer is it would not be feasible to use your

03:46  23   regression model and include only accused products, correct?

03:47  24        A.   That would not be my model.  That's correct.

03:47  25        Q.   Now, let me focus you on the '373 patent.  You never

714

03:47  1    performed your regression on just the accused Haswell and

03:47  2    Broadwell products, did you?

03:47  3        A.   No.  That would not be proper.

03:47  4        Q.   And for the Lake products, you never performed a

03:47  5    regression just on the products accused of infringing the '759?

03:47  6        A.   Similarly, no.  I did not.

03:47  7        Q.   And you never performed an analysis showing what the

03:47  8    impact was of nonaccused products on your regression analysis,

03:47  9    correct?

03:47  10        A.   That would not be valid.

03:47  11        Q.   And just so I'm clear with you on the terminology,

03:47  12    there are accused products and nonaccused products, correct?

03:47  13        A.   Yes.

03:47  14        Q.   And if I go to the first category of accused

03:47  15    products, within the accused products, there are accused

03:48  16    features and nonaccused features, correct?

03:48  17        A.   In effect, yes.

03:48  18        Q.   And so within the products accused of infringing,

03:48  19    there are many features that are not accused of infringing the

03:48  20    '373 or '759 patent, correct?

03:48  21        A.   That's right.

03:48  22        Q.   And can we refer to them as nonaccused features?

03:48  23        A.   If you'd like.  I think of it more as features and

03:48  24    characteristics and functionalities.

03:48  25        Q.   Okay.  So I'm going to talk about nonaccused

03:48 | 1    features.  Intel's microprocessors have many nonaccused

03:48 | 2    features that contribute to performance, correct?

03:48 | 3         A.   I would agree.

03:48 | 4         Q.   Intel's microprocessors have many nonaccused features

03:48 | 5    that contribute power savings, correct?

03:48 | 6         A.   I would agree with that too.

03:49 | 7         Q.   Now, when you did your regression analysis, you

03:49 | 8    actually prepared a table at H. -- H.1 of your report.

03:49 | 9         MR. LEE:  And actually, Your Honor, I don't know when you

03:49 | 10   wanted to take a break, but I'm about to go into this report,

03:49 | 11   if this is the right time.

03:49 | 12        Why don't we -- why don't we keep going?

03:49 | 13   BY MR. LEE:

03:49 | 14        Q.   Turn in your binder to Tab 24.

03:49 | 15        Now, I'm going to ask you to go to attachment H.1A.  And

03:49 | 16   I'm only going to put it up on the jurors' screens, the Court

03:49 | 17   and counsel because VLSI has designated it confidential.

03:49 | 18        MS. PROCTOR:  We're -- objection to this being shown.

03:49 | 19        THE COURT:  I can't hear you.

03:49 | 20        MS. PROCTOR:  I'm just objecting to this being shown on

03:50 | 21   the screens at this point in the examination.

03:50 | 22        THE COURT:  I can't hear you.

03:50 | 23        MS. PROCTOR:  Your Honor, I apologize.  I object to this

03:50 | 24   being shown at this point in the examination on the screens.

03:50 | 25        MR. LEE:  It's the schedule from his report, Your Honor.

03:50   1       THE COURT:  Well, we can limit it.  I assume your concern

03:50   2   is that anyone see it beyond the jury, correct?

03:50   3       MS. PROCTOR:  Well, I guess it depends what he's going to

03:50   4   ask, Your Honor, but that he -- yes, that anyone else see it

03:50   5   and also that it be shown to the jury.

03:50   6       THE COURT:  That he not show it to the jury?

03:50   7       MS. PROCTOR:  Well, I'll let him ask the question, Your

03:50   8   Honor.  Based on -- I want to hear the question he's going to

03:50   9   ask before he shows it to the jury, Your Honor.  I apologize.

03:50  10       THE COURT:  Well, let's not show it to anybody until we

03:50  11   hear the question, and then if we show it to anyone, we'll

03:50  12   limit it to the jury.

03:50  13   BY MR. LEE:

03:50  14       Q.   Now, turn, if you would, to Tab 24 in your binder.

03:51  15   Do you have that?

03:51  16       A.   Yes.  I'm there.

03:51  17       Q.   Do you find a copy of attachment H.1 A from your

03:51  18   expert report?

03:51  19       A.   Correct.

03:51  20       Q.   Do you recognize it?

03:51  21       A.   As a matter of fact, I do.

03:51  22       Q.   And that is one of the schedules that you attached to

03:51  23   your report, correct?

03:51  24       A.   Yes.  It's one of the tables.

03:51  25       Q.   Now, here, Your Honor, I would ask now to put it up

03:51  1   on the jurors' screens and counsels' screen but not the public

03:51  2   screen.

03:51  3        THE COURT:  Okay.  Yes, sir.

03:51  4        MS. PROCTOR:  That's fine, Your Honor.

03:51  5        MR. LEE:  That's fine.

03:51  6   BY MR. LEE:

03:51  7        Q.   Do you have it before you?

03:51  8        A.   Yes.  I do.

03:51  9        Q.   All right.  Now, this is entitled "ARK Variable

03:51  10  Selection for Modeling," correct?

03:51  11       A.   Yes.

03:51  12       Q.   ARK is the Intel website that lists specification for

03:52  13  Intel products as you've told us before, correct?

03:52  14       A.   That's right.

03:52  15       Q.   So if the jurors look at the second column, it says,

03:52  16  "ARK Feature Name," correct?

03:52  17       A.   Yes.

03:52  18       Q.   And the -- as you've told us, the variables that you

03:52  19  use in your regression are based on the features listed on the

03:52  20  ARK website, correct?

03:52  21       A.   That's right.

03:52  22       Q.   And you compiled a list of the features from ARK, and

03:52  23  you then included some of them, and you excluded some of them

03:52  24  from your regression, correct?

03:52  25       A.   That's right.

03:52  1       Q.   Now, if we look at the column all the way to the

03:52  2  right that says "Variable Considered," do you see that?

03:52  3       A.   I do.

03:52  4       Q.   This refers to whether the variable was considered or

03:52  5  not considered in your regression analysis, correct?

03:52  6       A.   No.

03:52  7       Q.   Well, when it says Variable Considered, when you say

03:53  8  yes, you included data for that variable, correct?

03:53  9       A.   This is part of the initial review of the data.  This

03:53 10  isn't the data that determines what factors go into the model.

03:53 11  This is a summary of the data.

03:53 12       Q.   Well, let me see what you said at your deposition.

03:53 13  Tab 1 of your binder, day one of your deposition, Page 195,

03:53 14  Lines 3 to 10, and we can bring it up on the screen if it's

03:53 15  easier for you, Dr. Sullivan.

03:53 16       A.    I'm also there, so either way.

03:53 17       MS. PROCTOR:  Mr. Lee, can you repeat -- Mr. Lee, can you

03:53 18  repeat the page, please?

03:53 19       MR. LEE:  Yes.  195, Lines 3 to 10.

03:53 20  BY MS. LEE:

03:53 21       Q.   Are you with me?

03:53 22       A.   Yes, I'm there.

03:53 23       Q.   Question:  "And when you list yes in that column,

03:54 24  that means you use that feature in your regression model,

03:54 25  correct?"

03:54   1          Answer:  "It means I include data for that variable.
03:54   2    Although ARK often refers to these items and features, some of
03:54   3    them really are more like characteristics for other types of
03:54   4    reporting items.  They are not actually all features."
03:54   5          That was your answer, correct?
03:54   6      A.   Yes.  That's right.
03:54   7      Q.   And you stand by it?
03:54   8      A.   I do.
03:54   9      Q.   And when you say "no," that means that you do not
03:54   10   include data for that variable in your regression model,
03:54   11   correct?
03:54   12     A.   Well, in effect, it's whether it's ultimately
03:54   13   included, I think, is a better way to put it.  I think it's
03:54   14   fair to say "considered."
03:54   15     Q.   So whether it's ultimately considered, if it's no, it
03:54   16   means that it was ultimately not considered, correct?
03:54   17     A.   No.  I would not put it that way.  I would put it the
03:55   18   way I did a moment ago.
03:55   19     Q.   Well, let's see what you said in your deposition.
03:55   20   Again, Page 195, Line 24 to 196, Line 5.  It's right after what
03:55   21   we just talked about a few minutes ago.
03:55   22         "When you list 'no' in that column titled 'Variable
03:55   23   Considered,' that means you did not include the variable in the
03:55   24   regression model, correct?"
03:55   25         Answer:  "That is generally the intention," correct?

03:55  1        A.   Exactly.

03:55  2        Q.   Now, if I look at the table that was before you and I

03:55  3   count up the yeses, there are 39 of them.  Does that sound

03:55  4   about right to you?

03:55  5        A.   It should be about that number.

03:55  6        Q.   Okay.  Now, we heard that Dr. Conte accuses Intel

03:55  7   Speed Shift of infringing the '759 patent, correct?

03:56  8        A.   My understanding is that the '759 patent does

03:56  9   implicate Speed Shift, yeah.

03:56  10       Q.   You were here for Dr. Conte's testimony yesterday,

03:56  11  were you not?

03:56  12       A.   No.  I was not.  I was listening via Zoom.

03:56  13       Q.   Speed Shift is listed in your attachment H.1A at Page

03:56  14  2, correct?

03:56  15       A.   It should be on the list.  I just don't know on what

03:56  16  page.

03:56  17       Q.   We're highlighting it on the list.  You have no doubt

03:56  18  that Speed Shift is what Dr. Conte accuses of infringement,

03:56  19  correct?

03:56  20       A.   That's the product that's accused, but the feature

03:56  21  that's implicated is the Speed Shift technology, as I

03:56  22  understand it.

03:56  23       Q.   And the --

03:56  24       A.   And yes.  It is on Page 2.

03:56  25       Q.   Fair enough.

03:56  1       And the entry on your chart for whether Speed Shift was

03:56  2  considered in your analysis was no, correct?

03:56  3       A.   It was not included.

03:57  4       Q.   Right.  And you talked about a little bit of it on

03:57  5  your direct earlier today, correct?

03:57  6       A.   Yes.  I explained why.

03:57  7       Q.   But the one thing we can agree upon is the accused

03:57  8  feature, Speed Shift, was not considered in your analysis,

03:57  9  correct?

03:57  10      A.   Well, I considered it.  That's why it's listed here.

03:57  11 But it was not included in the regression model.

03:57  12      Q.   Okay.  Fair enough.  So you considered it, but you

03:57  13 didn't include it, correct?

03:57  14      A.    In the model.  That's right.

03:57  15      Q.   So let's look at a few things that you did include in

03:57  16 your model.  There's something called hyperthreading

03:57  17 technology.

03:57  18      MR. LEE:  Can we highlight that?

03:57  19 BY MR. LEE:

03:57  20      Q.   Do you see that, Dr. Sullivan?

03:57  21      A.   Yes.

03:57  22      Q.   Hyperthreading technology is not accused of

03:57  23 infringing the -- either of the two patents, correct?

03:58  24      A.   As far as I know, that's not implicated.  But I --

03:58  25 again, I'm approaching this not as an engineer --

03:58  1        Q.   Okay.  But as far as you know, it's not been accused

03:58  2   of infringing, correct?

03:58  3        A.   Well, the product is.  And hyperthreading's in the

03:58  4   product.

03:58  5        Q.   Is the feature accused of infringing?

03:58  6        A.   That's not my understanding.

03:58  7        Q.   Now, there's also Intel's Identity Protection

03:58  8   Technology.  Do you see that?

03:58  9        A.   Yes.

03:58 10        Q.   And you know that identity protection technology,

03:58 11   particularly today, is important technology, correct?

03:58 12        A.   There are security aspects that are important.  And

03:58 13   it's, you know, debatable whether this is playing an important

03:58 14   role for customers or not.

03:58 15        Q.   And that was considered and included in your

03:58 16   analysis, correct?

03:59 17        A.   Yes.  I do.

03:59 18        Q.   But no one accuses that feature of infringing either

03:59 19   of the patents, correct?

03:59 20        A.   That's my understanding.

03:59 21        Q.   You also considered Intel's Trusted Execution

03:59 22   Technology, correct?

03:59 23        A.   Yes.  That too is a security feature.

03:59 24        Q.   And security features are really important today, are

03:59 25   they not?

03:59  1          A.   Generally, they can be.  The role depends upon --

03:59  2          Q.   And you included -- I'm sorry.  I didn't mean to stop

03:59  3    you.

03:59  4          A.   Nothing.  I'm good.

03:59  5          Q.   And you included this feature.  You considered this

03:59  6    feature and included it in your regression analysis, correct?

03:59  7          A.   Yes.

03:59  8          Q.   But it's not accused of infringing either patent,

03:59  9    correct?

03:59  10         A.   That is my understanding.

03:59  11         Q.   Okay.

03:59  12              MR. LEE:  Your Honor, is it a good time to take the

03:59  13   afternoon break?

03:59  14              THE COURT:  Do you have more?

03:59  15              MR. LEE:  I have a little bit more, and I asked to use a

03:59  16   break to basically fix what I need to do.

03:59  17              THE COURT:  Absolutely.  I'm sure no one on the jury is

04:00  18   opposed to us taking a break.  And so -- and if they are,

04:00  19   they're not going to admit it in front of the other jurors.

04:00  20              So if you all would remember my instructions not to

04:00  21   discuss the case amongst yourselves.

04:00  22              Did you have a particular need?  Is ten minutes enough,

04:00  23   Mr. Lee?

04:00  24              MR. LEE:  Pardon, Your Honor?

04:00  25              THE COURT:  Is ten minutes enough?

724

04:00    1          MR. LEE:  Ten minutes is great.

04:00    2          THE BAILIFF:  All rise.

04:00    3          (Jury exited the courtroom at 4:00.)

04:00    4          THE COURT:  Mr. Lee, is there something you needed take

04:00    5     up?

04:00    6          MR. LEE:  No, no.  I just thought it seemed like the right

04:00    7     time.

04:00    8          THE COURT:  Oh.  And anyone can be seated who wants to.

04:00    9     I'm just tired of sitting.

04:00   10          I anticipate -- how -- are you almost done with -- I don't

04:00   11     care.  Just trying to figure out the rest of the day.

04:01   12          MR. LEE:  I think probably 20 minutes and I'll be done.

04:01   13          THE COURT:  Redirect?

04:01   14          MS. PROCTOR:  Yes, Your Honor.

04:01   15          THE COURT:  I know the "yes."

04:01   16          (Laughter.)

04:01   17          THE COURT:  I was hoping for an amount of time.

04:01   18          MS. PROCTOR:  Hard to say.  Maybe ten to 15 minutes, Your

04:01   19     Honor, depending on how things go.

04:01   20          THE COURT:  It sounds to me like we'll be close to

04:01   21     5 o'clock.

04:01   22          Now, the question is whether or not you all wanted to

04:01   23     start your -- I'll leave this up to you, because -- Mr. Lee,

04:01   24     because if your witness wants to go today and we can get him

04:01   25     out of the way, and I think you said in under an hour, I'm

04:01  1    happy to do that.  I'm also happy to break at 5:00.

04:01  2         MR. LEE:  Your Honor, I guess the question I have is --

04:01  3         THE COURT:  Oh.  I know we've still got -- they've still

04:01  4    got depositions.

04:01  5         MR. LEE:  They have depositions, and they have -- so

04:01  6    before I think we would want them to rest.

04:01  7         THE COURT:  Absolutely.  You'd think I'd never been in a

04:02  8    trial.  I'm sorry.  I forgot that there's more to come.

04:02  9         So what we'll do is this.  Where do the -- does

04:02  10   plaintiff's counsel have any -- is Dr. Sullivan the last

04:02  11   witness?

04:02  12        MS. PROCTOR:  Yes, Your Honor.

04:02  13        THE COURT:  Okay.  So do you all have depositions ready to

04:02  14   go today, or would it be easier for you if we started in the

04:02  15   morning?  I'll do whatever.

04:02  16        MS. PROCTOR:  I believe we do have some plays ready to go

04:02  17   today.

04:02  18        (Conference between counsel.)

04:02  19        MR. HEINRICH:  I think it's going to be easier to do it in

04:02  20   the morning.

04:02  21        THE COURT:  Mr. Lee, are you okay with that?

04:02  22        MR. LEE:  That's fine with us, Your Honor.

04:02  23        THE COURT:  Okay.  So here's what -- we'll finish with

04:02  24   Dr. Sullivan whenever that happens.  Then you'll have the rest

04:02  25   of the evening to just take off and have a cozy fun evening.

04:02  1      MR. LEE:  Actually, for those of us from Boston, to enjoy

04:02  2  the weather is what we'll do.

04:02  3      THE COURT:  And then in the morning we'll start with --

04:02  4  the depositions will be ready to go.  But I haven't seen any

04:03  5  deposition designations.  If there are -- if you all are

04:03  6  expecting me to rule on objections to depositions, I don't

04:03  7  think -- if you've given them to my clerks, I haven't seen

04:03  8  them.

04:03  9      MS. PROCTOR:  We will submit those to you if there are any

04:03  10  remaining objections after tonight, Your Honor.

04:03  11      THE COURT:  Okay.  I would encourage you -- I would

04:03  12  strongly encourage you -- it is highly unlikely I will sustain

04:03  13  any objections in a deposition unless it was something very

04:03  14  substantive.  You know, something -- in other words, something

04:03  15  I would sustain if the person were here.

04:03  16      I get a lot of irrelevant, duplicative, all that.  You can

04:03  17  presume I would not sustain those objections in either

04:03  18  direction of any deposition.  But if there's something in the

04:03  19  deposition that you really believe was inappropriate and the

04:03  20  jury shouldn't get to hear it, let me know and we can take that

04:04  21  up in the morning and I'll rule on that.  Otherwise, you should

04:04  22  plan on just playing the depositions.

04:04  23      MS. PROCTOR:  Yes, sir.

04:04  24      THE COURT:  And then how long do we have on depositions?

04:04  25      MS. PROCTOR:  It'll be relatively short, Your Honor.

04:04 1    Maybe half an hour at the most, I think.

04:04 2         THE COURT:  Okay.  Then we'll have -- I'll take up your

04:04 3    motions.  And then you should have your witnesses prepared to

04:04 4    go.

04:04 5         MR. LEE:  And our plan was, Your Honor, to make the

04:04 6    motions briefly and then file something in writing to amplify

04:04 7    them.

04:04 8         THE COURT:  That's absolutely fine.

04:04 9         MR. LEE:  Thank you, Your Honor.

04:04 10        THE COURT:  Okay.  We'll come back in just a few minutes.

04:04 11        (Recess taken from 4:04 to 4:14.)

04:14 12        THE BAILIFF:  All rise.

04:14 13        THE COURT:  Please remain standing for the jury.

04:15 14        (The jury entered the courtroom at 4:14.)

04:15 15        THE COURT:  Thank you.  You may be seated.

04:15 16        Mr. Lee, you may resume.

04:15 17        MR. LEE:  Thank you, Your Honor.

04:15 18        (Off-the-record discussion.)

04:15 19        THE COURT:  Mr. Lee, now that we have a witness back, you

04:15 20    may proceed.

04:15 21        (Laughter.)

04:15 22        MR. LEE:  I will, Your Honor.

04:15 23    BY MR. LEE:

04:15 24    Q.   All set, Dr. Sullivan?  All set?

04:15 25    A.   Oh, yes.

04:15   1        Q.   Okay.  Now, Dr. Sullivan, I want to go back to your

04:16   2   model and the point in which you multiplied the regression

04:16   3   coefficients by the data that Dr. Conte gave you.  Do you

04:16   4   recall that?

04:16   5        A.   Yes.  The coefficient for clock speed.

04:16   6        Q.   Yes.  Now, Dr. Conte's tests for the '373 patent

04:16   7   measured power savings provided by the patent, correct?

04:16   8        A.   Yes.

04:16   9        Q.   And Dr. Conte's tests for the '759 patent measured --

04:16  10   or claimed to measure performance improvement provided by the

04:16  11   patent, correct?

04:16  12        A.   Yes.

04:16  13        Q.   But the regression model you used determines the

04:16  14   specific relationship between price and frequency, correct?

04:16  15        A.   Yes.  That's right.

04:16  16        Q.   Your regression model does not determine the

04:16  17   relationship between price and power savings, correct?

04:17  18        A.   It measures the benefit but not those separately.

04:17  19        Q.   Right.  There's no separate variable in your

04:17  20   regression analysis for a performance benchmark, correct?

04:17  21        A.   That's right.

04:17  22        Q.   And so in your damages model, you assume that a

04:17  23   1 percent increase in power savings is valued as a 1 percent

04:17  24   increase in frequency, correct?

04:17  25        A.   That's right.  And that's a minimum threshold.

04:17  1        Q.   Right.   And you assume that a 1 percent increase in

04:17  2   performance is valued as the same as a 1 percent increase in

04:17  3   frequency, correct?

04:17  4        A.   At least as much.   That's right.

04:17  5        Q.   And you rely upon Dr. Conte for those assumptions,

04:17  6   correct?

04:17  7        A.   I do.   I mean, as a matter of economics and economic

04:17  8   principles, I rely upon that as well.

04:17  9        Q.   Well, do you know if there's any relationship among,

04:18  10  for instance, frequency and voltage and speed?

04:18  11       A.   Yes.

04:18  12       Q.   Okay.   And is there a 1:1 relationship?

04:18  13       A.   Not as I understand it from an engineering

04:18  14  perspective.   That's why I approached this as an economist.

04:18  15       Q.   But the assumption of 1:1 came from Dr. Conte,

04:18  16  correct?

04:18  17       A.   He provided support for that notion, yes.

04:18  18       Q.   Okay.   Now, I want to move to a different subject

04:18  19  which is the acquisition of patents by VLSI, in particular the

04:18  20  acquisition of the two patents in this case, okay?

04:18  21       A.   Okay.

04:18  22       Q.   Now, if you turn to Volume 1, Tab 7.   And let me ask

04:19  23  it this way first, Dr. Sullivan.   In preparing your lengthy

04:19  24  report, you reviewed some of the documents by which VLSI

04:19  25  acquired patents from NXP, correct?

04:19  1        A.   I do recall a couple of documents in that regard.

04:19  2        Q.   Sure.  And if you turn to Volume 1, Tab 7, you'll

04:19  3   find a patent purchase and cooperation agreement.  Do you see

04:19  4   it?

04:19  5        A.   Yes, I do.

04:19  6        Q.   This is Defendant's Exhibit 40.  And if it helps --

04:19  7   don't put it on the screen quite yet.  And if it helps, it is

04:19  8   cited in your expert report at Paragraph 17, Footnote 7.

04:20  9        A.   That sounds right.

04:20 10        Q.   Okay.  Now, let's put D-40 on the screen, but not for

04:20 11   the public, just for the members of the jury, the Court and

04:20 12   counsel.

04:20 13        MS. PROCTOR:  And, Your Honor, I want to preserve

04:20 14   objections to any use of other sections of this that are not

04:20 15   cited in the report or the use of it for other purposes.

04:20 16        THE COURT:  Let's wait and see what Mr. Lee does.  And if

04:20 17   he does something you're unhappy with, make an objection.

04:20 18   BY MR. LEE:

04:20 19        Q.   The agreement is dated June 30, 2016, correct?

04:20 20        A.   Yes.

04:20 21        Q.   And having reviewed the document, you know that VLSI

04:20 22   purchased from NXP a number of patent families, correct?

04:20 23        A.   That is my recollection.

04:20 24        Q.   In fact, if you turn to Exhibit A, Page 37, there's a

04:21 25   list of patent families, correct?  Over the next several pages.

04:21  1        A.   Yes.

04:21  2        Q.   I've counted them up.  There are 21.  Do you have any

04:21  3   reason to disagree?

04:21  4        A.   No.  I have not done that count, but I'll take your

04:21  5   word for it.

04:21  6        Q.   But you know from your own review the '373 and '759

04:21  7   patents were not included on this list, correct?

04:21  8        A.   That sounds familiar.

04:21  9        Q.   Turn if you would to Volume 1, Tab 8 in your

04:21 10   notebook.  And do you find Defendant's Exhibit -- or D-119?

04:22 11        A.   Yes.

04:22 12        Q.   This is an amendment to the purchase agreement

04:22 13   between VLSI and NXP, correct?

04:22 14        A.   That's my understanding.

04:22 15        Q.   And you reviewed this as well and referred to it at

04:22 16   the same place in your report, correct?

04:22 17        A.   Yes.

04:22 18        Q.   And it's dated December 2017, correct?

04:22 19        A.   Yes.  December 4th.

04:22 20        Q.   And this agreement identifies more patents that VLSI

04:22 21   has purchased from NXP, correct?

04:22 22        A.   I do not recall the specifics.

04:22 23        Q.   Turn, if you would, to Annex C, which is at Page 32.

04:22 24        A.   I see that.

04:22 25        Q.   And if you go from Annex C to Annex D, you will see

04:23  1   the patents that had been previously selected and patents that

04:23  2   were being selected now.

04:23  3        A.   I see the headings.

04:23  4        Q.   And I've counted them up and there are 137 patent

04:23  5   families that are being acquired at this moment in time.  Any

04:23  6   reason to disagree?

04:23  7        A.   I'm not sure that's right.  I would have to go back

04:23  8   and review.  I have not thought about this agreement in the way

04:23  9   you're asking.

04:23  10       Q.   Now, the '373 patent is not included on that list,

04:23  11  correct?

04:23  12       A.   Which list?

04:23  13       Q.   The two lists, Annex C and Annex D.

04:23  14       A.   I can take your word for it, or I can take a look

04:24  15  through here.

04:24  16       Q.   Well, do you know of the precise agreement that

04:24  17  resulted in the purchase of the '373 and '759 agreement?

04:24  18       A.   I'm sorry.  I did not follow.

04:24  19       Q.   All right.  Do you know which agreement between NXP

04:24  20  and VLSI resulted in the purchase of the '373 patent and the

04:24  21  '759 patent?

04:24  22       A.   Not sitting here at the moment.

04:24  23       Q.   All right.  Now, but you have reviewed this

04:24  24  agreement, as you said in your report, correct?

04:24  25       A.   Yes.  That's why I had a report.

733

04:24  1      Q.   And if I go to Page 4, Section 1(n), there is the

04:24  2  amount that's being paid.  Now, we can agree that the patents

04:24  3  that are being sold are on Annex C and Annex D, correct?

04:25  4      A.   No.  I mean, I can take your word for it, but I have

04:25  5  not --

04:25  6      Q.   I'll represent to you that Mr. Stolarski has

04:25  7  testified that those are the patents that were transferred.

04:25  8      A.   Okay.

04:25  9      Q.   And the price for all of those patent families, which

04:25  10  as I said -- I suggested were about 100-plus, was the number

04:25  11  that I'm going to highlight now.  I'm not going to say the word

04:25  12  because the jurors will have this back in the jury room, this

04:25  13  actual document.

04:25  14      So for multiple patents from NXP sold to VLSI and multiple

04:25  15  patent families, the price was the number that's on the screen

04:25  16  right now in this exhibit, correct?

04:25  17      A.   My recollection is that is a partial payment or a

04:26  18  partial price.

04:26  19      Q.   You think that that is the partial -- how much more

04:26  20  was paid?

04:26  21      A.   If I recall -- and again, I haven't looked at this

04:26  22  recently, but if I recall the agreement and transaction is

04:26  23  structured in part is an upfront payment and part as a share of

04:26  24  future royalties.

04:26  25      Q.   Sure.  How much have they gotten in future royalties?

734

04:26  1        A.    Thus far, I believe that number is zero, but of

04:26  2    course that number could be different from zero.

04:26  3        Q.    Right.  The amount that has actually been paid by

04:26  4    VLSI to NXP for all of these patent families in this actual

04:26  5    transaction is the number on the screen right now, correct?

04:26  6        A.    I could not verify the exact amounts for you.

04:26  7        Q.    And you don't know of an additional penny that's been

04:26  8    paid beyond that, correct?

04:27  9        A.    I have not performed such an audit.  I'm not

04:27  10   disputing.  I'm just -- I can't validate.

04:27  11       Q.    Okay.  Well, let's turn if we could to Tab 9 of your

04:27  12   binder to PTX-4267.

04:27  13       A.    I'm sorry.  Which tab?

04:27  14       Q.    Tab 9 of your binder.  Do you have that before you,

04:27  15   Dr. Sullivan?

04:27  16       A.    Yes.

04:27  17       Q.    This is Amendment 2 to the patent purchase agreement

04:27  18   between VLSI and NXP, correct?

04:27  19       A.    Yes.

04:27  20       Q.    And again, this is a document that you reviewed,

04:27  21   correct?

04:27  22       A.    This is not immediately looking familiar, but that

04:27  23   doesn't mean I have not reviewed it.

04:27  24       Q.    Well, I'll represent to you that in your

04:27  25   Attachment A-3a, at Page 31, you refer specifically to this

04:28  1    document.

04:28  2        A.   Okay.  I'll take your word for it.

04:28  3        Q.   Okay.  Now, it's on the screen now.  It's PTX-4267.

04:28  4    You do know that this is the agreement under which VLSI finally

04:28  5    bought the '373 and '759 patents, correct?

04:28  6        A.   I do not have that personal knowledge.  I'll take

04:28  7    your word for it.

04:28  8        Q.   Well, and you reviewed Mr. Stolarski's deposition?

04:28  9        A.   I have looked at parts of that.  Yes.

04:28  10       Q.   And you know that he testified that this was the

04:28  11   amendment that led to the sale of these two patents to VLSI,

04:28  12   correct?

04:28  13       A.   He may have.

04:28  14       Q.   Now, the agreement was entered into in December of

04:28  15   2018, correct?

04:28  16       A.   I see that here.

04:28  17       Q.   Four months later this lawsuit was filed, correct?

04:28  18       A.   Roughly.

04:28  19       Q.   Okay.  Now, just to be sure, if you turn to

04:29  20   Exhibit D-44 at Tab 10 of your binder.  Do you have that before

04:29  21   you?

04:29  22       A.   Yes.

04:29  23       Q.   Exhibit D-44 is a list showing the third set of

04:29  24   patents that VLSI bought from NXP, correct?

04:29  25       A.   I do not know.

04:29  1      Q.   Well, if we -- you see the specific reference to

04:29  2  Amendment No. 2, which you in fact reviewed, correct?

04:29  3      A.   I do not recall Amendment No. 2.  I may have reviewed

04:29  4  it or seen it.  I just don't recall it.

04:29  5      Q.   This is the page of your report that I specifically

04:29  6  referred you to, where you referred to this document by Bates

04:29  7  number.  Do you recall that just a few minutes ago?

04:29  8      A.   So you referenced Attachment A-3a to my report, which

04:30  9  is a list of all documents that I had access to for

04:30  10  consideration.  That's not a set of documents that's

04:30  11  demonstrating I have reviewed all those documents.

04:30  12      Q.   Oh, so you had access to them, but you didn't review

04:30  13  all of them?

04:30  14      A.   I did my best to consider as much information as I

04:30  15  could, but I am human and I did not read every document from

04:30  16  cover to cover.

04:30  17      Q.   Well, let's look at D-44 to see if it refreshes your

04:30  18  recollection that in fact this is the time when the '759 and

04:30  19  '373 patent were transferred.

04:30  20      MR. LEE:  At Page 2, could I have on the screen D-44?

04:30  21  BY MR. LEE:

04:30  22      Q.   So we're now near the end of 2018.  Do you have the

04:30  23  time frame in mind?

04:30  24      A.   I have that time frame.

04:30  25      Q.   And of the patents that VLSI purchased from NXP, one

04:30 1    of them is listed -- one of them that is listed is the '759

04:31 2    patent, correct?

04:31 3        Do you see it highlighted?

04:31 4        A.   Yes.  I see that.

04:31 5        Q.   And if we go down to Page 5, we see that one of the

04:31 6    other patents that has been selected is '373, correct?

04:31 7        A.   I see that listed.

04:31 8        Q.   And there are a number of other patents and patent

04:31 9    families listed, correct?

04:31 10       A.   Yes.

04:31 11       Q.   By my count, there are 18 patent families in total.

04:31 12   Does that seem about right to you?

04:31 13       A.   I have not counted them, but I'll take your word for

04:31 14   it.

04:31 15       Q.   So let's go back to PTX-4267 and put it back on the

04:31 16   screen?

04:32 17       MR. LEE:  Not for the public, Your Honor.  Just for the

04:32 18   jurors, the Court and counsel.

04:32 19   BY MR. LEE:

04:32 20       Q.   And I'm going to go to Page 7, and I want to focus on

04:32 21   what in 2018 VLSI paid to NXP for the two patents in the case

04:32 22   plus 16 other patent families.

04:32 23       I'm putting on the screen now Paragraph 1(a).  Do you see

04:32 24   it?

04:32 25       A.   Yes.  I see it.

738

04:32   1      Q.   Okay.  And if we go down to what's being paid for

04:32   2   this purchase, it's in 1(a)(ii), and I'm now highlighting the

04:32   3   number that is being paid by VLSI to NXP for these two patents

04:33   4   plus others, correct?

04:33   5      A.   Well, I'm not so sure about that.  As I mentioned

04:33   6   earlier, there's -- the way the transaction, as I understand

04:33   7   it, is arranged is for certain initial payments to be made plus

04:33   8   a partnership.  I think they call it a cooperation agreement,

04:33   9   whereby then there are other payments that are made to NXP as

04:33   10  well.

04:33   11     Q.   Well, you reviewed the Chastain deposition, did you

04:33   12  not?

04:33   13     A.   Yes.  I have --

04:33   14     Q.   And you know that --

04:33   15     A.   -- reviewed pieces of that.

04:33   16     Q.   You know that Chastain testified that the total price

04:33   17  of the agreement is the number that I've highlighted here,

04:33   18  correct?

04:33   19     A.   I could not validate that for you.

04:33   20     Q.   You don't know one way or another?

04:33   21     A.   I do not have somebody else's deposition committed to

04:33   22  memory.

04:33   23     Q.   I'm just asking about a deposition you reviewed.

04:34   24          Do you recall that from reviewing that deposition, that

04:34   25  the deponent, Chastain, was very specific about the amount that

04:34   1   was paid for the '373 the '759 and all of these other patents?

04:34   2       A.   I do not have that specific recollection.

04:34   3       Q.   All right.  And you can't tell us one way or another

04:34   4   whether the number that's highlighted on the screen is the

04:34   5   amount that in fact has been paid and the only amount that has

04:34   6   been paid?

04:34   7       A.   Well, I think we were establishing earlier that there

04:34   8   were other amounts that were paid.  But under this amendment, I

04:34   9   cannot validate that for you.  That's not my role.

04:34  10       Q.   Okay.  Now, you said that there might be some other

04:34  11   amounts paid if amounts were recovered under the -- for the

04:34  12   patents, correct?

04:34  13       A.   If there are royalties or other payments made for the

04:34  14   patents, then yes.  My understanding is that a substantial

04:35  15   share of that goes to NXP.

04:35  16       Q.   And amounts go to other folks as well, correct?

04:35  17       A.   Oh, I do recall some testimony earlier in this case

04:35  18   on that point.

04:35  19       Q.   Well, I'm not going to ask you about the other folks

04:35  20   because I'm going to come to that in Mr. Stolarski's deposition

04:35  21   testimony.

04:35  22       But I am going to ask you this:  It's true, is it not,

04:35  23   that Mr. Stolarski, who was here on Monday, gets 3.5 percent of

04:35  24   the recovery, of any amounts recovered, for the patents

04:35  25   licensed to VLSI -- sold by NXP to VLSI?

04:35    1          Let me state it again so it's clear on the record.

04:35    2          It's true, is it not, that Mr. Stolarski gets 3.5 percent

04:35    3    of any recovery under the two patents that are in litigation

04:35    4    here, correct?

04:36    5          A.   I do not know.

04:36    6          Q.   All right.  You have -- you've read his deposition

04:36    7    and you still don't know that?

04:36    8          A.    That is correct.

04:36    9          Q.   3.5 percent of the damages number you gave to the

04:36   10    jurors would be a very, very large number, correct?

04:36   11          MS. PROCTOR:  And I want to object that that misstates the

04:36   12    record and mischaracterizes the evidence.  And the prior

04:36   13    question as well.

04:36   14          THE COURT:  I don't know what record it misstates.

04:36   15          MS. PROCTOR:  He's misstating the documents relating to

04:36   16    Mr. Stolarski's --

04:36   17          THE COURT:  Well, if so, you can clarify that with the

04:36   18    witness on cross.

04:36   19    BY MR. LEE:

04:36   20          Q.   The best person to hear about this from would be

04:36   21    Mr. Stolarski, right?

04:36   22          A.   I do not know.

04:36   23          Q.   Now, I just want to correct one thing.  I think you

04:36   24    asked me about Mr. Waxler at NXP.  And I think I may have

04:37   25    suggested that he was at NXP at the time of his deposition.  To

04:37  1    be accurate, he had been at NXP but was no longer there, but

04:37  2    that doesn't change the answers to your questions, correct?

04:37  3         A.   No.

04:37  4         MR. LEE:  Okay.  Thank you, Your Honor.  Nothing further.

04:37  5         THE COURT:  Redirect?

04:37  6         MS. PROCTOR:  Thank you, Your Honor.

04:37  7                        REDIRECT EXAMINATION

04:37  8    BY MS. PROCTOR:

04:37  9         Q.   Hi, Dr. Sullivan.

04:37  10        A.    Good afternoon.

04:37  11        Q.    So can we go back to your Slide 712, and maybe

04:38  12   Mr. Simmons can help us pull that up.

04:38  13        And I believe you were asked about -- this is the slide on

04:38  14   the Georgia-Pacific factors.  There we go.  I believe you were

04:38  15   asked about Factor 10.  Do you recall that?

04:38  16        A.    Yes.  I do.

04:38  17        Q.    And what is covered by Factor 10 of the

04:38  18   Georgia-Pacific factors?

04:38  19        A.    Well, the last part of it, I think, is the most

04:38  20   telling.  It is the benefits to those who have used the

04:38  21   invention, and here that -- those who have used the invention

04:38  22   as alleged is Intel, and, thus, Factor 10 is relating to the

04:38  23   use of the invention by Intel.

04:38  24        Q.    So Factor 10 is not limited to uses by the licensor?

04:38  25        A.    Correct.

04:38  1      Q.   And what does the statute tell us about which uses

04:38  2  are relevant in calculating damages here?

04:38  3      A.   According to --

04:38  4      MR. LEE:  Your Honor, I object, Your Honor.  This is a

04:39  5  legal question.  What does the statute tell us?  That's for

04:39  6  Your Honor, not for the witness.

04:39  7      THE COURT:  Could you rephrase the question?

04:39  8      MS. PROCTOR:  Sure.

04:39  9  BY MS. PROCTOR:

04:39  10      Q.   You testified earlier that your -- that your

04:39  11  calculation of damages is based on the use of the invention to

04:39  12  Intel; is that right?

04:39  13      A.   Yes.  So I have performed damages analyses and

04:39  14  reasonable royalties in many cases, and my understanding is

04:39  15  that the proper framework is to evaluate the royalty based upon

04:39  16  the use of the technology by the alleged infringer.

04:39  17      Q.   So in your view, the relevant benefit here is the

04:39  18  benefit that Intel's obtaining from this technology?

04:39  19      A.   Yes.  Exactly.

04:39  20      Q.   And in your experience, is the purchase price of a

04:39  21  patent relevant to a proper damages analysis?

04:39  22      A.   Typically not.  Because a purchase does not reflect

04:40  23  the use of the technology by another entity, and in particular

04:40  24  recognizing that in many or most instances that information is

04:40  25  highly confidential is not known.

04:40  1       Whether there's infringement, the likelihood of

04:40  2  infringement, the extent of use, which products, what the sales

04:40  3  are, all of those things are confidential.  So patent purchases

04:40  4  typically do not reflect that kind of value.

04:40  5       Q.  So, for example, Mr. Lee asked you about some patent

04:40  6  acquisition documents.  Do you remember that?

04:40  7       A.  Yes.

04:40  8       Q.  And at the time of those agreements, did NXP have

04:40  9  evidence about the value of Intel's use of the '373 and '759

04:40  10  patents?

04:40  11       A.  No.  That would not be available because again, that

04:41  12  would be based upon confidential information of Intel that is

04:41  13  only available through, you know, a court proceeding such as

04:41  14  this and it's still maintained confidential.

04:41  15       Q.  So that's right actually.  We here in this room,

04:41  16  especially those of us who can see the screen, know things that

04:41  17  even NXP does not know to this day, right?

04:41  18       A.  That is correct.

04:41  19       Q.  And in fact, no one from NXP is allowed to see the

04:41  20  screens that the jury is seeing today, right?

04:41  21       A.  That is my understanding.

04:41  22       Q.  And so is it fair to say that a patent acquisition

04:41  23  deal like that where there's no actual ability to access

04:41  24  confidential information about the patent's value is akin to

04:41  25  that rookie contract you were talking about?

04:41  1      A.   Yes.  I think the analogy with Tom Brady and Patrick

04:41  2  Mahomes is reasonably fitting for the situation.

04:41  3      Q.   So I want to go back and talk just a little bit

04:42  4  briefly about your regression analysis again.  Has regression

04:42  5  analysis generally been used in connection with real-world

04:42  6  licensing negotiations?

04:42  7      A.   Yes.  It has.  Now I have used, personally used

04:42  8  regression analysis in helping companies with their license

04:42  9  negotiations and entering into agreements at least a dozen

04:42  10 times and, you know, I recognize -- I'm an economist so that's

04:42  11 often what I'm called upon to do.

04:42  12      I do recognize that across all licensing negotiations

04:42  13 that's not typical, because oftentimes there's not access to

04:42  14 the confidential information or the market data that would be

04:42  15 necessary as inputs to that type of an analysis.

04:42  16      Q.   So oftentimes in a licensing negotiation you wouldn't

04:42  17 have access to the information you would need to do the type of

04:43  18 regression analysis that you did here; is that right?

04:43  19      A.   That's right.

04:43  20      Q.   And your regression model absolutely relies on

04:43  21 confidential Intel materials that, as we said, are still not

04:43  22 available to companies like NXP, right?

04:43  23      A.   That's right.  You know, the key piece of the

04:43  24 regression is built upon the actual sales transactions, the 6.5

04:43  25 million sales transactions from Intel's data, and that is

04:43  1    highly confidential to Intel and that is not available, you

04:43  2    know, outside of this.

04:43  3         Q.   And is that why when you testified earlier that you

04:43  4    weren't surprised that certain people may not have been able to

04:43  5    use regression in their licensing negotiations?  Is that why

04:43  6    it's related to the confidential information and the access to

04:43  7    that?

04:43  8         A.   That is a key piece of it.

04:43  9         Q.   So in connection with your specific regression,

04:44 10    Mr. Lee showed you a number of features and suggested that you

04:44 11    didn't consider certain of those features like Speed Shift.  Do

04:44 12    you remember that?

04:44 13         A.   I do.

04:44 14         Q.   And is that accurate?

04:44 15         A.   No.  That's not accurate.  You know, clearly I

04:44 16    considered all of these features.

04:44 17         It -- you'll probably recall from my testimony earlier

04:44 18    today that it would not be appropriate to include the feature,

04:44 19    Speed Shift, along with the benefit of the feature.  If you do

04:44 20    so, that's double counting and that results in duplicative

04:44 21    effects and thus dilutes the effect.

04:44 22         It's, you know, very similar to the car analogy where if

04:44 23    you have the lightning bolt technology, customers care about

04:44 24    the benefits, not the lightning bolt itself.  All right?  So

04:44 25    one -- the right way to measure its benefits is to look at the

04:44  1    benefits it has on fuel efficiency, on price, which is in

04:45  2    effect how I went about my analysis here.

04:45  3        Q.   So in your analysis here, you focused on valuing the

04:45  4    benefits that the patents provide to Intel's products?

04:45  5        A.   Exactly.  Customers care about the benefits, and

04:45  6    that's the focus of the work that I did.

04:45  7        Q.   Now, Mr. Lee also asked about some nonaccused

04:45  8    features that you included in your regression.  Why did you

04:45  9    include features that are not accused of infringement in that

04:45  10   regression model that you built?

04:45  11       A.   Well, it's essential to do so because I wanted to

04:45  12   separate out the effects of clock speed and the benefits of the

04:45  13   technology separate and apart from all of the other features

04:45  14   and functionalities.

04:45  15       I precisely did that so that when I developed the

04:45  16   royalties, it's isolated just to the benefits of the

04:45  17   technology.  And you can see that in part because there's the

04:46  18   coefficient on clock speed, and then I have, you know, the

04:46  19   non-accused, you know, functionalities.

04:46  20       But not only that, I only then apply the results, you

04:46  21   know, that coefficient of 0.764 to -- only to the sales of the

04:46  22   accused products, right?  So it's limited to the accused

04:46  23   products, so I take that result and narrowly apply it.

04:46  24       Q.   So you included some of those nonaccused features in

04:46  25   the model as control factors just so that you could make sure

04:46  1   that you weren't counting them in your damages; is that fair?

04:46  2        A.   Exactly.

04:46  3        Q.   Now, just to be super clear on that point, do the

04:46  4   ultimate damages you calculated here as reasonable royalties

04:46  5   actually include value from those nonaccused features?

04:46  6        A.   No.  And that's by design.  By using the benefits of

04:46  7   the patents as determined by Professors Conte and Annavaram, by

04:47  8   using the coefficient on clock speed, those items ensure that

04:47  9   the royalty is isolated to the benefits of the patented

04:47 10   technology separate and apart from all other features and

04:47 11   functionalities.

04:47 12        Q.   Thank you.

04:47 13        You were also asked some questions about real-world

04:47 14   licenses.  Are there any differences between negotiating in the

04:47 15   real world and negotiating in the hypothetical negotiation, or

04:47 16   in calculating damages in the hypothetical negotiation?

04:47 17        A.   There's a number of differences.  I think one of the

04:47 18   key differences is that at the hypothetical negotiation for

04:47 19   that damages framework, as I mentioned earlier, it's as if one

04:47 20   is playing cards with all of the cards face up where everybody

04:47 21   knows all of the information, and, of course, in a real-world

04:47 22   negotiation, the parties are holding their cards very close to

04:48 23   the vest so that that information isn't known.  And they try to

04:48 24   use those information differences to gain an advantage in the

04:48 25   negotiation.

04:48   1      But here, when calculating a reasonable royalty, that

04:48   2  information is all known to the parties.

04:48   3      Q.   So here, what real-world facts do you think are most

04:48   4  relevant to calculating a reasonable royalty?

04:48   5      A.   Well, I think there's several.  You know, in my view,

04:48   6  looking at the tested benefits of the technology, that

04:48   7  allows -- that uses Intel's confidential information to

04:48   8  identify specifically the benefits of the technology,

04:48   9  technically speaking.

04:48   10      Secondly is the actual sales data.  And that enables a

04:48   11  determination of what the effect is on price and then being

04:48   12  able to use, again, the -- you know, the financial data to

04:48   13  determine the appropriate adjustments for costs and relative

04:49   14  contributions, and ultimately what that provides is a

04:49   15  determination of what is the value to Intel as a result of

04:49   16  using the technology specific to this technology.

04:49   17      MS. PROCTOR:  Okay.  I'll pass the witness.

04:49   18      Thank you, Dr. Sullivan.

04:49   19      THE COURT:  Mr. Lee?

04:49   20                    RECROSS-EXAMINATION

04:49   21  BY MR. LEE:

04:49   22      Q.   Just a few questions, Dr. Sullivan.

04:49   23      MR. LEE:  Could I have PDX-7.12 on the screen?

04:49   24  BY MR. LEE:

04:49   25      Q.   It's your Georgia-Pacific chart.

749

04:49   1        Are you with us?

04:50   2        A.   Yes.

04:50   3        Q.   So I want to examine your testimony about the

04:50   4   relevance of real-world agreements to the hypothetical

04:50   5   negotiation you just talked about with Ms. Proctor, correct?

04:50   6        A.   I did.

04:50   7        Q.   Georgia-Pacific Factor No. 1:  "The royalties

04:50   8   received by the patentee for the licensing of the

04:50   9   patent-in-suit proving or tending to prove an established

04:50   10  royalty."  Have I read that correctly?

04:50   11       A.   You did.

04:50   12       Q.   That's referring to real-world agreements, isn't it?

04:50   13       A.   It's referring to royalties, if they exist.  That

04:50   14  would be received by the patent holder.

04:50   15       Q.   Real-world agreements?

04:50   16       A.   It can be, yes.

04:50   17       Q.   Georgia-Pacific Factor No. 2:  "The rates paid by the

04:50   18  licensee for the use of other patents comparable to the

04:50   19  patent-in-suit," that refers to real-world agreements, doesn't

04:50   20  it?

04:50   21       A.   Real-world royalty rates.

04:51   22       Q.   Now, if we go down to No. 8:  "The established

04:51   23  profitability of the product made under the patent, the

04:51   24  commercial success, and its current popularity."

04:51   25       Do you see that?

04:51  1        A.    Yes, I do.

04:51  2        Q.    That's not limited to the accused infringer, is it?

04:51  3        A.    Not limited.  But it's certainly relevant.

04:51  4        Q.    Right.  And it doesn't exclude the patent owner, does

04:51  5    it?

04:51  6        A.    Not necessarily.

04:51  7        Q.    And if I go to No. 9, "the utility and advantages of

04:51  8    the patent property over the old modes and devices, if any,

04:51  9    that had been used for working out similar results."  Do you

04:51  10   have that in mind?

04:51  11       A.    I do.

04:51  12       Q.    That is a reference to real-world utility and

04:51  13   advantages of the patent, correct?

04:51  14       A.    Yes.  Exactly like--

04:51  15       Q.    It's not limited to the accused infringer, correct?

04:51  16       A.    I'm sorry.  I did not hear.

04:51  17       Q.    It's not limited to the accused infringer, correct?

04:51  18       A.    Not limited.  No.

04:51  19       Q.    It could include the patent owner, correct?

04:52  20       A.    It could.  In theory.

04:52  21       Q.    And Georgia-Pacific Factor No. 10 refers explicitly

04:52  22   to products or -- withdrawn.

04:52  23            It refers explicitly to the commercial embodiment as owned

04:52  24   and produced by the licensor, correct?

04:52  25       A.    Yes.  That's right.

04:52  1        Q.   That's the patent owner, correct?

04:52  2        A.   Yes.

04:52  3        Q.   So we've looked at five of the Georgia-Pacific

04:52  4   Factors that don't exclude activity by the patent owner, do

04:52  5   they?

04:52  6        A.   That's right.

04:52  7        Q.   And that referred to events occurring in the real

04:52  8   world with real products and real agreements, correct?

04:52  9        A.   All except for the last part, but yes.

04:52  10        MR. LEE:   Okay.  Nothing further, Your Honor.

04:52  11                    FURTHER REDIRECT EXAMINATION

04:52  12   BY MS. PROCTOR:

04:53  13        Q.   Very briefly, Dr. Sullivan.  Thank you for your

04:53  14   patience.

04:53  15        MS. PROCTOR:   Can we pull up the Georgia-Pacific factors

04:53  16   one more time?

04:53  17   BY MS. PROCTOR:

04:53  18        Q.   So on Georgia-Pacific Factor 1, were there any

04:53  19   licenses that were relevant under this factor here?

04:53  20        A.   No.

04:53  21        Q.   And under Georgia-Pacific Factor 2, were there any

04:53  22   agreements that Intel looked at that you found to be comparable

04:53  23   here?

04:53  24        A.   No.

04:53  25        Q.   And as we talked about already on Georgia-Pacific

04:53  1    Factor 10, the last bit there is the benefits to those who have

04:53  2    used the invention, right?

04:53  3        A.   Yes.

04:53  4        Q.   And in this case, of course, that's Intel, right?

04:53  5        A.   That's right.

04:53  6        Q.   And, Dr. Sullivan, in all of your analysis that we've

04:53  7    talked about this afternoon, did you consider all of the

04:53  8    Georgia-Pacific factors and all the relevant evidence under

04:53  9    each of those factors?

04:53  10       A.   Yes.  I did.

04:53  11       Q.   Thank you, Dr. Sullivan.

04:53  12                    FURTHER RECROSS-EXAMINATION

04:53  13   BY MR. LEE:

04:54  14       Q.   Just one more question.

04:54  15       MR. LEE:  If we could keep that on the screen.

04:54  16       THE COURT:  I'm willing to bet it's not just one more

04:54  17   question.

04:54  18       (Laughter.)

04:54  19       THE COURT:  But I'll --

04:54  20       MR. LEE:  I'm going to take that bet so I can win it.

04:54  21   BY MR. LEE:

04:54  22       Q.   Dr. Sullivan, Mr. Huston disagrees with you on the

04:54  23   question of whether there are license agreements that are

04:54  24   relevant under Georgia-Pacific Factor No. 1, correct?

04:54  25       A.   He does under Factor 2, but I don't recall the

04:54  1  disagreement under Factor 1 at the moment.

04:54  2       MR. LEE:  He'll be here to testify.  Nothing further, Your

04:54  3  Honor.

04:54  4       THE COURT:  Good job.

04:54  5       Anything else for, Dr. Sullivan?

04:54  6       MS. PROCTOR:  No, Your Honor.

04:54  7       THE COURT:  Dr. Sullivan, you may step down.

04:54  8       Ladies and gentlemen of the jury, we are going to recess

04:54  9  for the evening.  Is there any problem with starting tomorrow

04:55  10 morning at 9 o'clock?

04:55  11      If not, then remembering my instructions not to discuss

04:55  12 the case amongst yourselves or, since you're going home, with

04:55  13 anyone else.  I'll see you tomorrow.  Hopefully if you'll be

04:55  14 here by 8:45, that would be great.

04:55  15      THE BAILIFF:  All rise.

04:55  16      (Jury exited the courtroom at 4:55.)

04:55  17      THE COURT:  Thank you.  You may be seated.

04:55  18      A couple of things.  Housekeeping.

04:55  19      One is, we are going to do the jury charge Friday

04:55  20 afternoon after we finish with the trial day.  I always hated

04:55  21 it when I was in trial and the judge made me come sit and work

04:55  22 on the jury charge while I thought maybe I could be getting

04:56  23 ready for the next day in trial, so I'm trying to avoid that

04:56  24 for you all.  And so that's why I'm doing it Friday afternoon

04:56  25 as opposed to tomorrow.

04:56  1        Number two, the plaintiffs, by our calculation, have used

04:56  2   six hours and 26 minutes.  The defendant has used four hours

04:56  3   and 19 minutes is what we show.  If tomorrow you tell me that

04:56  4   there's a substantial discrepancy, let me know.

04:56  5        But it appears to me that the plaintiff has only used six

04:56  6   hours and 26 minutes at this point, and you're essentially done

04:56  7   with your case-in-chief.  Doesn't look to me like anyone's in

04:56  8   great peril of running out of time with the amount of time I

04:56  9   gave you for trial, so I don't know that it's that big a deal

04:56  10  one way or the other.

04:56  11       So having said that, let me start with the plaintiff.

04:56  12       Mr. Chu, is there anything we need to take up this evening

04:56  13  before we part?

04:56  14       MR. CHU:  Nothing further, Your Honor.  Thank you.

04:56  15       THE COURT:  I love the jacket.  I think that's a good

04:57  16  look.

04:57  17       MR. LEE:  Oh, two things, Your Honor.  Mr. Mueller should

04:57  18  deal with the exhibit question that came up earlier today, just

04:57  19  for the record.

04:57  20       THE COURT:  Okay.

04:57  21       MR. LEE:  But this relates to the 255 case and I'm sure

04:57  22  that --

04:57  23       (Clarification by Reporter.)

04:57  24       THE COURT:  Why don't you come to the podium?

04:57  25       MR. LEE:  Okay.  Your Honor, this deals with the motion to

04:57   1   transfer in the 255 case, and I'm sure they haven't had a

04:57   2   chance to address it, but we'd like to get an extension to

04:57   3   March 10th to respond, only because we're here working on this

04:57   4   case.

04:57   5       THE COURT:  I don't have a problem with that if they don't

04:57   6   have a problem with that.

04:57   7       MR. CHU:  We do have a problem.

04:57   8       THE COURT:  Okay.

04:57   9       MR. CHU:  The basis for the motion, as well as their

04:57  10   opposition, has been briefed multiple times.  It's the same

04:57  11   issues.

04:57  12       THE COURT:  Yeah.  Let me interrupt you, Mr. Chu.  Is this

04:57  13   motion to transfer the April setting?

04:58  14       MR. CHU:  Yes.

04:58  15       THE COURT:  I'll double-check, Mr. Lee, but I don't think

04:58  16   Austin is open in April.  I think they've already made that

04:58  17   decision.  I think that's correct.

04:58  18       If you all know that that's incorrect, let me know.  But

04:58  19   the most recent order I saw -- and I am pretty certain they're

04:58  20   closed in April.  And I am pretty certain that they have not

04:58  21   yet decided if and when -- that's the wrong word -- that they

04:58  22   have not decided when they will resume having trials in Austin.

04:58  23       MR. LEE:  Your Honor, I don't disagree with Mr. Chu that

04:58  24   the basic issues have been briefed before.  I also expect that

04:58  25   we will -- the briefs will be very similar to what you've seen

04:58  1   before.  And I expect the ruling will be, if Austin's closed,

04:58  2   what we've seen before.  We'd just like a little extra time to

04:58  3   do it because we're in trial.

04:59  4       THE COURT:  I understand.

04:59  5       Mr. Chu, I will forecast for you that what Mr. Lee just

04:59  6   predicted is accurate, that if I'm correct that the Austin

04:59  7   court is not going to be open in April and they are not able to

04:59  8   say that they'll be open immediately after April, given what

04:59  9   I've decided in the past, I can assure you that the resolution,

04:59  10  you may not need to file a reply.  Or I'll know -- I mean, it's

04:59  11  their reply -- maybe it's -- you won't need to file a rebuttal.

04:59  12      MR. CHU:  Here's our concern, Your Honor.

04:59  13      THE COURT:  Okay.

04:59  14      MR. CHU:  We think there is at least the tiny possibility

04:59  15  that Intel will run to the Federal Circuit.  There's some data

04:59  16  in this particular litigation between the parties.  And then as

04:59  17  a result of that, the current trial date gets delayed.  They --

04:59  18  as a practical matter, 99 times out of 100, I am always willing

05:00  19  to grant reasonable extensions.

05:00  20      THE COURT:  I understand.

05:00  21      MR. CHU:  But this is an old motion that they have filed

05:00  22  twice in this Court, went to the Federal Circuit twice, and

05:00  23  they've shown the capacity to do the full briefing in 24 hours.

05:00  24      THE COURT:  Can you tell me when we're set for trial in

05:00  25  April?  I know we are, but I don't know.

05:00  1      MR. CHU:  April 12, I believe.

05:00  2      THE COURT:  Mr. Lee, I don't want to be obstreperous here.

05:00  3  I understand you're in trial.  But Mr. Chu makes a pretty good

05:00  4  point that if I deny it -- let's say I do deny the motion on

05:00  5  March 16th, and to protect your client you go to the Federal

05:00  6  Circuit.  I am worried if I wait till then that it may disturb

05:00  7  our trial setting here.

05:00  8      MR. LEE:  Your Honor, I can represent to you that if there

05:00  9  are no changed circumstances -- we understand what Your Honor's

05:01  10  ruling will be.  And if there are no changed circumstances, I'm

05:01  11  not going to file a petition for a mandamus.

05:01  12      Now, the only reason I say it that way is something could

05:01  13  happen.  I doubt that it will, but that's not our intention.

05:01  14  Our intention is to propose the motion because we have to for

05:01  15  the record, but we expect to be on trial before Your Honor on

05:01  16  April the 12th.

05:01  17      THE COURT:  Very good.  I'm satisfied with that

05:01  18  representation because -- let me do this.

05:01  19      Let me -- before -- Mr. Lee, before I grant your motion,

05:01  20  let me find out from Austin what the status is of the Austin

05:01  21  courthouse.  And that way that will be -- I see it as a

05:01  22  two-step deal.  You all can tell me if you see it differently.

05:01  23      The concern -- the reason we're having the case now here

05:01  24  in Waco was not only because the Austin courthouse was

05:01  25  unavailable in January and in February, but they couldn't tell

05:02  1    me with any certainty when it would be reopened.  I'm 99

05:02  2    percent sure it will be closed in April.  And as best I can

05:02  3    tell, they won't be able to tell me when it's going to reopen.

05:02  4         And under those two circumstances, I would definitely

05:02  5    continue the trial in Waco on the 12th.  And I would be -- if I

05:02  6    grant this, unlike the last time, this time I probably would be

05:02  7    very unhappy if you went to the Circuit.  I heard what you

05:02  8    said.  I don't anticipate you will.  But this time I might be

05:02  9    more concerned about Intel going to the Circuit if it's an

05:02  10   identical situation that the Circuit has already addressed.

05:02  11        So with that being said, let me try and find out overnight

05:02  12   what the status is in Austin.  If it is as I believe it is, I'm

05:02  13   going to grant Intel the extension of time to file the motion

05:03  14   or pleading, whatever it is, but Intel should expect the same

05:03  15   ruling as there was in this case if the circumstances are the

05:03  16   same.

05:03  17        Yes, sir.

05:03  18        MR. CHU:  Not necessarily to do it right at this instance,

05:03  19   because we had no notice that this exact issue comes up.  If we

05:03  20   could reserve a response until tomorrow morning in terms of if

05:03  21   the circumstances Your Honor just described are in fact true,

05:03  22   then what a reasonable date would be in terms of their

05:03  23   responding.  And obviously of course what Your Honor learns

05:03  24   between now and tomorrow may have an impact.

05:03  25        THE COURT:  Okay.  Anything else?

05:03  1      MR. CHU:  Not for me.

05:03  2      THE COURT:  Yes, sir.

05:03  3      MR. MUELLER:  Yes, Your Honor.  Just briefly on the

05:03  4 exhibits.

05:03  5      THE COURT:  Oh, please.

05:03  6      MR. MUELLER:  And, Your Honor, this is with respect to the

05:03  7 list that was read this morning before we started.

05:03  8      THE COURT:  Oh, good.

05:03  9      MR. MUELLER:  We had two.

05:04 10      THE COURT:  It's sad when you have to remind me of what

05:04 11 you did this morning and I truly had not remembered it.

05:04 12      MR. MUELLER:  No problem.

05:04 13      THE COURT:  It's been a long day.

05:04 14      MR. MUELLER:  So, Your Honor, there's two issues.

05:04 15      Number one is there were two exhibits that we could not

05:04 16 find referred to on the record during the testimony.  I'll read

05:04 17 those two.

05:04 18      The first one is PTX-1696.  The second is PTX-3851.  And

05:04 19 my understanding is our team notified their team and asked for

05:04 20 a transcript cite, and we haven't received it yet.  So those

05:04 21 two we don't think should be admitted until we have some clear

05:04 22 indication that they were used.

05:04 23      THE COURT:  And let me hear from -- do you have any reason

05:04 24 to believe that --

05:04 25      MR. HEINRICH:  So PTX-1696 was addressed by Dr. Conte, but

05:04  1    we didn't call out that particular exhibit number.  It was on

05:04  2    the slide but not stated.  And I do believe -- I need to

05:05  3    confirm, but I do believe 3851 was in error.  So I think

05:05  4    there's just one at issue.

05:05  5        THE COURT:  Well, if the doctor discussed it without

05:05  6    objection -- a slide without objection that referred to an

05:05  7    exhibit, then I'm going to admit that exhibit.

05:05  8        MR. HEINRICH:  Okay.

05:05  9        THE COURT:  Assuming that's correct, if the jury's heard a

05:05  10   discussion of a slide that was derived from an exhibit and

05:05  11   there was no objection to the slide, I'm going to admit the

05:05  12   exhibit.

05:05  13       MR. MUELLER:  And, Your Honor, the other three were

05:05  14   exhibits that were used on cross-examination of Dr. Conte.  We

05:05  15   would ask that these be added to the list of admitted exhibits.

05:05  16   And those are DX-249, DX-517 and PTX-1590, and I have page

05:05  17   citations, if necessary, to where those were used.

05:06  18       MR. HEINRICH:  We have no objections.

05:06  19       THE COURT:  There you go.

05:06  20       MR. MUELLER:  Thank you, Your Honor.

05:06  21       THE COURT:  Winning.

05:06  22       (Laughter.)

05:06  23       THE COURT:  Is there anything that we need to take up,

05:06  24   Mr. Lee?

05:06  25       MR. LEE:  No, Your Honor.

05:06  1          THE COURT:  Mr. Chu?

05:06  2          MR. CHU:  No, Your Honor.  Thank you.

05:06  3          THE COURT:  Okay.  I hope to see that jacket tomorrow.

05:06  4          (Hearing adjourned at 5:06 p.m.)

1  UNITED STATES DISTRICT COURT )

2  WESTERN DISTRICT OF TEXAS      )

3

4       I, Kristie M. Davis, Official Court Reporter for the

5  United States District Court, Western District of Texas, do

6  certify that the foregoing is a correct transcript from the

7  record of proceedings in the above-entitled matter.

8       I certify that the transcript fees and format comply with

9  those prescribed by the Court and Judicial Conference of the

10  United States.

11       Certified to by me this 8th day of March 2021.

12

13                              /s/ Kristie M. Davis
                                KRISTIE M. DAVIS
                                Official Court Reporter
14                              800 Franklin Avenue
                                Waco, Texas 76701
15                              (254) 340-6114
                                kmdaviscsr@yahoo.com
16

17

18

19

20

21

22

23

24

25