1          IN THE UNITED STATES DISTRICT COURT
          FOR THE WESTERN DISTRICT OF TEXAS
2                   WACO DIVISION

3   VLSI TECHNOLOGY LLC          *
                                 *
4   VS.                          * CIVIL ACTION NO. W-21-CV-57
                                 *
5   INTEL CORPORATION            *    March 1, 2021

6      BEFORE THE HONORABLE ALAN D ALBRIGHT, JUDGE PRESIDING
                   JURY TRIAL PROCEEDINGS
7                    VOLUME 6 OF 7

8   APPEARANCES:

9   For the Plaintiff:      Morgan Chu, Esq.
                            Benjamin W. Hattenbach, Esq.
10                          Alan Heinrich, Esq.
                            Ian Robert Washburn, Esq.
11                          Amy E. Proctor, Esq.
                            Dominik Slusarczyk, Esq.
12                          Charlotte J. Wen, Esq.
                            Jordan Nafekh, Esq.
13                          Babak Redjaian, Esq.
                            Irell & Manella, L.L.P.
14                          1800 Avenue of the Stars, Suite 900
                            Los Angeles, CA 90067-4276
15
                            J. Mark Mann, Esq.
16                          Andy W. Tindel, Esq.
                            Mann, Tindel & Thompson
17                          112 East Line Street, Suite 304
                            Tyler, TX 75702
18
    For the Defendant:      William F. Lee, Esq.
19                          Joseph Mueller, Esq.
                            Louis W. Tompros, Esq.
20                          Felicia H. Ellsworth, Esq.
                            Jordan L. Hirsch, Esq.
21                          WilmerHale
                            60 State Street
22                          Boston, MA 02109

23                          Mary V. Sooter, Esq.
                            Amanda L. Major, Esq.
24                          Wilmer Cutler Pickering Hale Dorr LLP
                            1225 17th Street, Suite 2600
25                          Denver, CO 80202

```
1                                J. Stephen Ravel, Esq.
                                 Kelly Hart & Hallman LLP
2                                303 Colorado Street, Suite 2000
                                 Austin, TX 78701
3
                                 James Eric Wren, III, Esq.
4                                Baylor University Law School
                                 One Bear Place #97288
5                                Waco, TX 76798-7288

6   Court Reporter:             Kristie M. Davis
                                 United States District Court
7                                PO Box 20994
                                 Waco, Texas 76702-0994
8

9

10       Proceedings recorded by mechanical stenography, transcript

11  produced by computer-aided transcription.

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

08:04  1        (March 1, 2021, 8:04 a.m.)

08:04  2        THE COURT:  Good morning.  You may be seated.

08:06  3        Okay.  Let's go ahead and proceed.

08:06  4        Mr. Chu, what would you like to take up this morning?

08:06  5        MR. CHU:  Allocation of time.

08:06  6        THE COURT:  Okay.

08:06  7        MR. CHU:  At the very end of the day on Friday, we had

08:06  8   almost five hours left of the 15.  We had 4 hours, 42 minutes.

08:07  9   And then Your Honor, after excusing the jury, said you want to

08:07  10  finish today.  And the way you counted it, there would be a

08:07  11  total of four hours for both sides.

08:07  12       We had been efficient and stayed on budget, and we were

08:07  13  about one hour ahead of the other side.  We thought that the

08:07  14  reasonable split is that we would have two and a half hours and

08:07  15  the other side would have one and a half.  I don't think the

08:07  16  Court --

08:07  17       THE COURT:  Mr. Chu, let me tell you what the problem is,

08:07  18  and I'm sympathetic to what you're saying.  And I'm even

08:07  19  willing to do some 60/40 type allocation.

08:07  20       All I care about is, since I don't know what you're going

08:07  21  to put on in rebuttal, I don't want to find ourselves in a

08:07  22  situation where it's 2:30 and you say on rebuttal we rest or

08:08  23  we're done, and the defendant doesn't get an adequate amount of

08:08  24  time to deal with your rebuttal.

08:08  25       So I'm open to you -- and Mr. Lee I'll hear from of

08:08  1    course, but I'm open to a slight -- plaintiff gets 60 to 40

08:08  2    because of that, but I'm going to make sure that -- what is

08:08  3    your suggestion to guarantee that Intel has sufficient time to

08:08  4    cross-examine any witnesses you do on rebuttal?

08:08  5        MR. CHU:  So here's the total time, from 8:30 to 2:30 is

08:08  6    six hours, two and a half in the afternoon, three and a half in

08:08  7    the morning.  Subtract an hour for lunch, that's five hours.

08:08  8    Subtract 15 minutes for one break in the morning, that's 4:45.

08:08  9        THE COURT:  Okay.

08:08  10       MR. CHU:  If you say the total time for both sides split

08:09  11   in a way that you think is fair and we are held to that, so

08:09  12   whether it's 60/40 or two and a half hours, one and a half

08:09  13   hours, we are held to our allocated time, then we will finish

08:09  14   with plenty of time before 2:30.  And I think that's the way to

08:09  15   govern it.

08:09  16       THE COURT:  Mr. Lee?

08:09  17       MR. LEE:  Your Honor, we thought that the proposal you

08:09  18   made yesterday, or at least Evan communicated to us, was very

08:09  19   fair.  It gives us time to finish our case, and then they can

08:09  20   start their rebuttal case.

08:09  21       We had a disagreement about what should come in, but we

08:09  22   understand Your Honor's ruling, and particularly if it's going

08:09  23   to be that broad, the time constraint makes sense.  And the

08:09  24   50/50 split once they start rebuttal makes sense to us.

08:09  25       We have to finish Dr. Grunwald.  We have Mr. Huston,

—1321—

08:09   1   who'll be about an hour and ten on direct, and then we will

08:10   2   rest at that point in time.

08:10   3       THE COURT:  Start over.  Let me just write -- I need to

08:10   4   write down -- write down the math.  And -- well, let me start

08:10   5   over and say this:  What I was trying to do yesterday was

08:10   6   give -- to balance these -- these are the competing interests,

08:10   7   I want to put on the record.

08:10   8       Competing interests are this:  I know I'm shortchanging

08:10   9   you from what we originally had, the total number of hours.  I

08:10  10   get that.  In part I'm doing that, Mr. Lee, to accommodate your

08:10  11   ability to get out of here because of the conflict of that.  So

08:10  12   mindful of that -- but I also do, if we can, I would like to

08:10  13   get finished today just because it's been a long trial.  So I

08:10  14   have that factor.

08:10  15       I am aware of the fact that Intel has used slightly more

08:10  16   time.  It's an hour, but it's more time than the plaintiff has

08:10  17   used.  I wanted to make sure that -- I wanted to give you

08:11  18   enough warning that from the -- in this case the plaintiff's

08:11  19   perspective, as they were doing crosses of your witnesses

08:11  20   today, that they were saving sufficient time to, if they wanted

08:11  21   to put on rebuttal case, put on a rebuttal case.

08:11  22       So I am also, though -- you know, I'm not totally against

08:11  23   if we need to do this to allow the plaintiff to get in what

08:11  24   they want to get in and to make sure Intel has an opportunity

08:11  25   to do a cross, which I'm trying to balance, trying to get all

08:11  1   the planes in on time, I would be -- I would even consider

08:11  2   going until 3:00 -- read my deal, which I think is like --

08:11  3   it's a long -- my concern is it's long.  It's 40 pages, I

08:11  4   think, and I tend to read about a minute a page.  So I've

08:12  5   allocated -- whatever number of pages the charge is, you'll see

08:12  6   for me it winds up being about that many minutes.

08:12  7       I'm also though totally happy to go to 6:00 today to

08:12  8   finish the trial and give everyone enough time to do what you

08:12  9   need to get done.

08:12  10       So I'm also perfectly happy, for example, another

08:12  11  suggestion I might have is that I give Mr. Chu a cut-off of

08:12  12  2:30 to get his -- to do whatever they're going to do on their

08:12  13  rebuttal case, which would save 30 minutes for defendant on

08:12  14  that final witness to finish, and then we would start at 3:00.

08:12  15       I'm just trying to make this as fair as I can and let you

08:12  16  all get in your evidence and finish today.

08:12  17       MR. LEE:  Your Honor, they actually have two witnesses on

08:12  18  rebuttal.

08:12  19       THE COURT:  No.  I get that.  I understand.  I'm saying

08:12  20  I'm trying to get -- make sure everyone gets to put on their

08:13  21  evidence and do their cross.

08:13  22       MR. LEE:  Can I make a suggestion that may help?

08:13  23       THE COURT:  Absolutely.

08:13  24       MR. LEE:  I mean, we have to finish with Dr. Grunwald this

08:13  25  morning, then we have Mr. Huston and then we'll rest.  Is it

08:13   1   possible that what we do is come back to Your Honor at that

08:13   2   point, Mr. Chu and I, at a break and just say here's how much

08:13   3   time's left, then you tell us how to split it?

08:13   4       THE COURT:  That's absolutely fine with me.  I'll have

08:13   5   more information then.  I just didn't want the plaintiff -- I

08:13   6   wanted the plaintiff -- the plaintiff needs to know they need

08:13   7   to be reasonable in terms of their cross.

08:13   8       And what I may also do -- now you know -- I'll say this

08:13   9   going in, I am a big let the lawyers do what they want to do.

08:13   10  It's your time.

08:13   11      But I think what I'm going to do for the witnesses -- I

08:13   12  don't want this to seem unfair, but I'm letting you know now --

08:13   13  you get a direct, you get a cross, you get a redirect, and you

08:13   14  get a recross and then we're done with that witness as opposed

08:13   15  to what I have been doing, which is let you all go on because

08:13   16  it was your time.

08:13   17      So keep that in mind as well, that you're only going to

08:14   18  get one second chance to put someone on.

08:14   19      MR. LEE:  And, Your Honor, there are some issues with

08:14   20  Mr. Chandler, who's one of the two, and what he can testify to.

08:14   21  Your Honor may recall, we had a Daubert on him, which you

08:14   22  granted in part.  That actually may cut the time down too,

08:14   23  because there are at least three major issues, which we could

08:14   24  address whenever Your Honor wants.

08:14   25      THE COURT:  Well, let's do it now.

08:14  1      MR. LEE:  Okay.  Mr. Mueller's going to address them for

08:14  2  us.

08:14  3      MR. CHU:  Could I --

08:14  4      THE COURT:  Mr. Chu, you can say anything you'd like.

08:14  5      MR. CHU:  We would be far more comfortable if Your Honor

08:14  6  would just make a call and allocate of the four hours, because

08:14  7  we should be done by 2:30 if the total for both sides is four

08:14  8  hours.  And we can plan for that, and we'll live within those

08:14  9  time limits.

08:14  10      The proposal that Your Honor had suggested on Sunday would

08:14  11  allow them to run out the clock.

08:14  12      THE COURT:  Okay.  Mr. Chu, I agree with that too.  It's

08:14  13  like Justice Breyer once said to both sides -- Mr. Lee might

08:15  14  have been the lawyer he said it to -- but he said, you know,

08:15  15  the really hard thing is I listen to you, and I think you're

08:15  16  right; I listen to him, I think he's right, and what do I do?

08:15  17      I'm going to give the plaintiff two and a half hours.  I'm

08:15  18  going to give the defendant two hours, and we're going to

08:15  19  finish by 3 o'clock.

08:15  20      MR. CHU:  Thank you.  And we can go to that issue.  We

08:15  21  have a couple of issues too.  I can bring up one issue very

08:15  22  quickly.

08:15  23      THE COURT:  And you all have 15 minutes to get everything,

08:15  24  you know, done.

08:15  25      MR. CHU:  Last week we had proposed playing some Delaware

08:15  1   depositions on willful blindness.  Several witnesses, who were

08:15  2   Intel engineers, said Intel has a policy that we're not allowed

08:15  3   to look at patents.

08:15  4       And then Your Honor said, were these 30(b)(6) depositions?

08:15  5   Mr. Lee got up instantly and said, no, they're not 30(b)(6)

08:16  6   depositions.

08:16  7       And from the transcript, Your Honor had said, well, if

08:16  8   they're 30(b)(6) depositions, it seemed like you were going to

08:16  9   allow them; but if they're not 30(b)(6) depositions, you ruled

08:16  10  that they were out.  They are 30(b)(6) depositions.

08:16  11      THE COURT:  Mr. Lee?

08:16  12      MR. LEE:  Your Honor, they were not 30(b)(6) depositions

08:16  13  on this topic.  These were engineers who were 30(b)(6)s on

08:16  14  technical issues but not on this topic.

08:16  15      THE COURT:  Let me make clear on the record.  I'm only --

08:16  16  I would only allow it in if Intel had offered -- if the

08:16  17  question was:  Put up someone from Intel as a 30(b)(6) witness

08:16  18  to describe the policy, you know, with respect to -- I mean, it

08:16  19  needs to be on this topic, not just that Witness X was there to

08:16  20  tell you how the widget worked as the corporate representative

08:16  21  and you asked them this and he also said that during the depo.

08:16  22      MR. HATTENBACH:  Your Honor, the topics that they were

08:16  23  designated by Intel for included the subject matter on which we

08:16  24  wanted to play the deposition testimony.

08:17  25      So as an example, all facts relating to Intel's decision

08:17  1    to develop the accused features, including the considerations

08:17  2    that factored into those decisions, all facts and circumstances

08:17  3    relating to non-infringing alternatives.

08:17  4        Those sorts of things we believe firmly encompass

08:17  5    corporate policy that forbade affirmatively them from even

08:17  6    looking at patents as part of that decision-making process.

08:17  7        And it was represented to you explicitly that they were

08:17  8    not 30(b)(6) witnesses, not that they weren't 30(b)(6)

08:17  9    witnesses on a particular topic.  And that was just incorrect.

08:17  10       THE COURT:  Mr. Lee?

08:17  11       MR. LEE:  Your Honor, they were not 30(b)(6)s on the

08:17  12   question of this patent policy.  That's correct.  It remains

08:17  13   correct.  They have not cited to you in their papers a single

08:17  14   reference.

08:17  15       The other thing is this is way too late in the day.

08:17  16       THE COURT:  No.  I -- I'm going to exclude those

08:17  17   witnesses.

08:17  18       What's the next issue?

08:18  19       Or I'm not going to allow -- I'm not going to exclude

08:18  20   them.  I'm not going to permit them to testify.

08:18  21       Next topic?

08:18  22       MR. MUELLER:  Yes, Your Honor.  We had the issue Mr. Lee

08:18  23   referenced with respect to Mr. Chandler who's one of the two

08:18  24   witnesses testifying today.  So we do have one discrete issue

08:18  25   with Mr. Huston, who will testify this morning.  And

08:18   1   Mr. Chandler wouldn't testify till the afternoon.  So I think

08:18   2   it would be more efficient to just address --

08:18   3       THE COURT:  I'm going to do both of them right now.

08:18   4       MR. MUELLER:  Okay.

08:18   5       THE COURT:  So Mr. Mueller jumped up before you did, so

08:18   6   I'm going to let him.

08:18   7       MR. MUELLER:  May I pass this up, Your Honor?

08:18   8       THE COURT:  Yes.  Of course.

08:18   9       MR. MUELLER:  Judge, you recall that at Daubert you

08:18  10   excluded a portion of Mr. Chandler's opinions related to

08:18  11   holdout and expressions with respect to the character of Intel

08:18  12   and so on.

08:18  13       The slides that you have before you, Your Honor, we think

08:18  14   contravene that decision.  And I'll direct your attention, if I

08:18  15   could, Your Honor, to Slide 6. --

08:18  16       THE COURT:  Are these the closing argument slides?

08:19  17       MR. MUELLER:  No.  These are for Mr. Chandler.  These are

08:19  18   for Mr. Chandler.

08:19  19       THE COURT:  Okay.

08:19  20       MR. MUELLER:  6.19, there's a fork in the road you can

08:19  21   see.  And the clear implication is that Intel is forcing the

08:19  22   patent owner to risk long and expensive litigation or take less

08:19  23   money than patents are worth.  This is another way of

08:19  24   expressing the holdout arguments.

08:19  25       THE COURT:  You know, I'm not going to allow that slide.

08:19  1      MR. MUELLER:  The second problem we have, Your Honor, with

08:19  2  Mr. Chandler's slides, and also the exhibits that we have

08:19  3  received in connection with Mr. Chandler, if you turn to the --

08:19  4  6.21, Your Honor.

08:19  5      THE COURT:  Oh, and -- and by the way, it would be the --

08:19  6  there's a next slide as well that has an X on it.  I would not

08:19  7  permit that one either.

08:19  8      MR. MUELLER:  Thank you, Your Honor.

08:19  9      If you look at, Your Honor, Slide 6.21, there's -- this is

08:19 10  one example of slides referring to various settlement

08:19 11  agreements.

08:19 12      We've received disclosures of settlement agreements

08:19 13  ranging from an antitrust case to various patent cases, and we

08:20 14  think there's at least three distinct grounds on which these

08:20 15  agreements should be precluded.

08:20 16      No. 1, Mr. Chandler is not saying that any of these are

08:20 17  comparable license agreements.  Quite the contrary.  He's

08:20 18  explicitly saying that they're not comparable.

08:20 19      Now, he says that they are, quote, "informative."  And so

08:20 20  what we take this to mean is he's going to try to show the jury

08:20 21  these large numbers from settlement agreements, despite

08:20 22  explicitly acknowledging that they're not comparable to the

08:20 23  hypothetical negotiation.

08:20 24      THE COURT:  You can -- I -- I've given Intel great liberty

08:20 25  in what they've done in the other direction.  I'm going to

08:20   1    allow -- you can certainly point that on cross.

08:20   2        MR. MUELLER:  Okay.  And the last thing, Your Honor, is

08:20   3    there's some slides that refer to --

08:20   4        THE COURT:  So let me protect the record.  I'm overruling

08:20   5    your objection.  I will allow VLSI to use that slide.

08:20   6        MR. MUELLER:  Understood, Your Honor.

08:20   7        The last issue is -- may I just address, Your Honor, if I

08:20   8    could just lodge a running objection -- rather than getting up

08:20   9    and objecting over and over again -- but a running objection to

08:20   10   those agreements?

08:21   11       THE COURT:  You will need to object when -- on the record

08:21   12   at least once.  You don't have -- you can just say, however you

08:21   13   want to say it, "Your Honor, I -- you know, I raise the

08:21   14   objection I raised this morning."  And I'll put that on the

08:21   15   record.  I want to make sure -- I'm just trying to make sure I

08:21   16   protect your record.  And then, yes, you may have your running

08:21   17   objection.

08:21   18       MR. MUELLER:  Thank you, Your Honor.  I appreciate that.

08:21   19       The last thing is there's a couple of slides here that

08:21   20   refer to Dr. Sullivan's opinions.  And we think this is an

08:21   21   attempt to have Mr. Chandler corroborate Dr. Sullivan's

08:21   22   opinions, including with -- in respects in which Mr. Chandler

08:21   23   himself did not offer opinions.

08:21   24       And so an example of this would be No. 13 -- 6.13,

08:21   25   hypothetical negotiation versus real-world negotiations.  He's

08:21  1    referring to this information gap.  These are issues that came

08:21  2    up in the context of Dr. Sullivan that Dr. Chandler -- or

08:21  3    Mr. Chandler did not opine on.  We just ask that he be held to

08:21  4    his opinions.

08:21  5         THE COURT:  Well, here's what I'm going to order, and I

08:22  6    have no way of knowing how you all do this.  I'm not going to

08:22  7    allow VLSI to represent to Mr. Chandler an opinion was made if

08:22  8    it wasn't made.  If it wasn't made, then they can't represent

08:22  9    that.

08:22  10        I don't know what they're going to say.  If you -- if when

08:22  11   they say, Dr. Sullivan said this, you can object and the

08:22  12   plaintiff should have some way of being able to show me in the

08:22  13   record or something where he did say it, or it was in his

08:22  14   report or whatever it is.

08:22  15        Anything they are -- but they are -- VLSI is certainly

08:22  16   able to cross on anything that they can establish that the jury

08:23  17   did hear from Dr. Sullivan.

08:23  18        MR. MUELLER:  Understood, Your Honor.

08:23  19        So just to make sure I understand Your Honor's rulings on

08:23  20   the other issues, they can refer to the settlement agreements

08:23  21   but cannot make any of these holdout arguments.

08:23  22        THE COURT:  They cannot make any argument that is

08:23  23   somewhat -- here's what I care about.  They cannot say that

08:23  24   Intel -- the expense of litigation was a factor in the decision

08:23  25   making here.

1331

08:23  1      MR. MUELLER:  Okay.  Thank you, Your Honor.  I appreciate

08:23  2  it.

08:23  3      THE COURT:  And that's -- that, I do not think is

08:23  4  appropriate.  Under -- again, with always being -- saying if

08:23  5  somehow you open the door, you know, and they can show me that

08:23  6  this gentleman says something where it becomes fair to raise

08:23  7  that because of something he said, if they -- and let me add

08:23  8  one more thing.

08:23  9      I don't believe that anyone gets to, on cross, open a

08:23 10  door.  And what I mean by this in this situation is VLSI

08:23 11  doesn't get to ask a question of Mr. Chandler, he answers it,

08:24 12  and then he says, oh, he's opened the door.

08:24 13      No.  In my opinion, he just answered your question that

08:24 14  you decided to put to him.  You can't open the door for -- to

08:24 15  bring in something when you're on your feet.

08:24 16      MR. MUELLER:  Okay.

08:24 17      THE COURT:  But if -- as far as I'm concerned, that -- the

08:24 18  idea of avoiding litigation costs is not an appropriate subject

08:24 19  for the jury to consider.

08:24 20      MR. MUELLER:  Thank you, Your Honor.

08:24 21      THE COURT:  Yes, sir.

08:24 22      MR. HEINRICH:  Good morning, Your Honor.

08:24 23      THE COURT:  Good morning.

08:24 24      MR. HEINRICH:  So we have just one objection to one

08:24 25  discrete demonstrative from Mr. Huston.

1332

08:24  1        THE COURT:  Okay.

08:24  2        MR. HEINRICH:  And let's see.  Well, my --

08:24  3        THE COURT:  Is it that it's too big?

08:24  4        MR. HEINRICH:  Well, no.  My ELMO skills are not great.

08:24  5  So this is --

08:24  6        THE COURT:  You can try just handing it to me.

08:24  7        MR. HEINRICH:  This is Mr. Huston's final demonstrative.

08:24  8  And it's just factually and legally inappropriate.  He's trying

08:25  9  to suggest that the asserted patents are this motel and you can

08:25  10  license or rent this room.

08:25  11        THE COURT:  Go ahead.

08:25  12        MR. HEINRICH:  He's trying to suggest that the patents are

08:25  13  this motel, you can rent -- take a license --

08:25  14        THE COURT:  You know, I -- I, actually, in a case, had

08:25  15  someone do exactly this on the other side to me, and I dealt

08:25  16  with it pretty well on cross.

08:25  17        MR. HEINRICH:  Okay.

08:25  18        THE COURT:  And so -- so I'm assuming that the quality of

08:25  19  lawyers on your side, you can -- you can deal with this.  If I

08:25  20  could, every lawyer in front of me is way better than I was as

08:25  21  a trial lawyer.  I'm sure you can -- you can handle it.

08:25  22        MR. HEINRICH:  Okay.  Thank you, Your Honor.

08:25  23        THE COURT:  I'll overrule your objection.

08:25  24        Is there anything else we need to take up?

08:25  25        MR. LEE:  Not for Intel, Your Honor.

08:25   1          THE COURT:  Mr. Chu?

08:25   2          MR. CHU:  Not this morning.

08:25   3          THE COURT:  Is that a warning?

08:25   4          MR. CHU:  No, no, no.  I know that we collectively, and

08:25   5    the Court in particular, wants the jury --

08:26   6          THE COURT:  We do.  So I'm going to go, and if you'll get

08:26   7    the jury in, we will bring the jury in just as soon as we can

08:26   8    get them over here.

08:26   9          THE BAILIFF:  All rise.

08:26   10          (Recess taken from 8:26 to 8:28.)

08:28   11          THE BAILIFF:  All rise.

08:28   12          THE COURT:  Please remain standing for the jury.

08:28   13          (The jury entered the courtroom at 8:28.)

08:29   14          THE COURT:  Thank you.  You may be seated.

08:29   15          MR. CHU:  May I begin?

08:29   16          THE COURT:  Yes, sir.

08:29   17          MR. CHU:  Thank you very much, Your Honor.

08:29   18          Good morning, ladies and gentlemen.

08:29   19                         CROSS-EXAMINATION

08:29   20    BY MR. CHU:

08:29   21          Q.   Good morning, Dr. Grunwald.

08:29   22          A.   Good morning.

08:29   23          Q.   I'd like to call up Page 165 of your expert report

08:29   24    and show the jury a figure.  And at the bottom -- I'm going to

08:29   25    blow that up -- and in particular, you expressed an opinion in

08:29  1  the box that is called the "GV3 controller & VID Stepper"; is

08:30  2  that right?

08:30  3      A.  Yes.

08:30  4      Q.  I'm going to be asking you a question just about that

08:30  5  box because you were pointing to that as a matter of your

08:30  6  opinion.

08:30  7      A.  Yes.

08:30  8      Q.  When your deposition was taken, you were asked

08:30  9  questions about it.  And is the following correct:  That does

08:30  10 not have a computer program having instructions; is that

08:30  11 correct?  Yes or no.

08:30  12     A.  The GV3 stepper, I think I -- that's correct.  Yes.

08:30  13     Q.  Thank you.  I'm going to a different subject now.

08:30  14     You would agree that it's very important to follow the

08:30  15 correct legal principles in forming your opinion; is that

08:30  16 correct?

08:30  17     A.  Yes.

08:30  18     Q.  When you started on your analysis for your expert

08:31  19 report on validity of the '759 patent, you did not assume

08:31  20 validity or invalidity -- let me ask it again.

08:31  21     When you started your analysis for your expert report on

08:31  22 validity of the '759 patent, you did not presume validity or

08:31  23 invalidity; is that correct?  Yes or no.

08:31  24     A.  I assumed that the patent --

08:31  25     Q.  Sir, can you answer the question yes or no?

08:31   1        A.   I don't think I can answer it just yes or no.

08:31   2        Q.   You did not presume validity or invalidity of the

08:31   3   '759 patent when you were working on your expert report; is

08:32   4   that correct?  Yes or no.

08:32   5        A.   I don't think I can answer that fully with a -- with

08:32   6   just a yes or no, if I'm understanding the question correctly.

08:32   7        Q.   I'm going to go to another subject, sir.

08:32   8        Dr. Conte offered an opinion about the closest

08:32   9   non-infringing alternative; is that correct?

08:32  10        A.   Yes.

08:32  11        Q.   You criticized him, correct?  Can you answer that yes

08:32  12   or no?

08:32  13        A.   Yes.

08:32  14        Q.   Yes, you did criticize Dr. Conte on his opinion about

08:32  15   the closest non-infringing alternative; is that correct?

08:32  16        A.   Yes.  That's correct.

08:32  17        Q.   You did not offer your own opinion on the closest

08:33  18   non-infringing alternative; is that correct?  Yes or no.

08:33  19        A.   Yes.  It's correct.

08:33  20        Q.   Dr. Conte also testified about comparison testing,

08:33  21   correct?

08:33  22        A.   Yes.  I think so.

08:33  23        Q.   And what he was comparing was HWP autonomous, which

08:33  24   for shorthand we also called Speed Shift; is that correct?

08:33  25        A.   Yes.

08:33  1        Q.   That was part of it?

08:33  2        A.   Yes.

08:33  3        Q.   And he was comparing that to the legacy speed

08:33  4   changes, correct?

08:33  5        A.   The -- yes.

08:33  6        Q.   And you criticized Dr. Conte's comparison of Speed

08:34  7   Shift with legacy speed changes, correct?

08:34  8        A.   Yes.

08:34  9        Q.   Professor Conte's comparison was based on tests that

08:34  10  Intel had done on the exact same comparison, correct?

08:34  11       A.   Yes.  The tests were labeled that.  Yes.

08:34  12       Q.   In your criticism you said that Professor Conte,

08:34  13  instead of comparing Speed Shift to legacy, was that he should

08:34  14  have compared it to what you called "true legacy," correct?

08:34  15       A.   Yes.

08:34  16       Q.   You did not do that comparison between Speed Shift

08:35  17  and what you called true legacy; is that correct?

08:35  18       A.   That's correct.

08:35  19       Q.   You never bothered to ask anyone to run that test for

08:35  20  you; is that correct?

08:35  21       A.   Yes.  That's correct.

08:35  22       Q.   You knew that Intel has a very substantial

08:35  23  performance testing group; is that correct?

08:35  24       A.   Yes.  That's right.

08:35  25       Q.   You also had contact with Dr. Rotem, who we heard

08:35  1    from last week, correct?

08:35  2         A.   Yes.  I spoke to him twice.

08:35  3         Q.   And you also had contact with Dan Borkowski, who we

08:35  4    heard from last week; is that correct?

08:35  5         A.   Yes.  I think I spoke to him twice too.

08:35  6         Q.   And you could have asked Dr. Rotem to do the test but

08:35  7    you did not do so, correct?

08:35  8         A.   That's correct.

08:35  9         Q.   You could have asked Dan Borkowski to do the test,

08:35  10   but you did not do so, correct?

08:35  11        A.   Yes.  I did not ask him.

08:35  12        Q.   You could have asked a small fraction of the large

08:36  13   Intel performance testing group to do the test, but you did not

08:36  14   do so; is that correct?

08:36  15        A.   Yes.  That's correct.

08:36  16        Q.   Thank you very much, Doctor.

08:36  17        THE COURT:  Mr. Chu?

08:36  18        MR. CHU:  Just for the record, the first figure I

08:36  19   mentioned is from Exhibit D-267 at 11.

08:36  20        THE COURT:  Thank you, sir.

08:36  21        MR. CHU:  Thank you, Doctor.

       22        THE COURT:  Redirect?

       23        MS. SOOTER:  Thank you, Your Honor.

       24        If we could go to Slide 71 of Professor Grunwald's slide

       25   deck, please.

1338

1                    REDIRECT EXAMINATION

2    BY MS. SOOTER:

08:37   3        Q.   Professor Grunwald, you were just asked about the GV3

08:37   4    stepper at the bottom of this figure that you see here.  Do you

08:37   5    remember that?

08:37   6        A.   Yes.

08:37   7        Q.   Can you please explain to us whether or not that is

08:37   8    what you're pointing to as the programmable clock controller in

08:37   9    Yonah?

08:37   10       A.   No.   That's not the only part of the programmable

08:37   11   clock controller.

08:37   12       Q.   What are you pointing to as a programmable clock

08:37   13   controller in Yonah?

08:37   14       A.   So it combines all of the things shown on this slide

08:37   15   plus microcode that is used to provide results to this slide,

08:37   16   plus microcode that manipulates the GV3 stepper, which I think

08:37   17   is what the next slide describes.

08:37   18       Q.   So we would have to look at more than just that to

08:37   19   see the programmable clock controller?

08:37   20       A.   Yes.

08:37   21       Q.   Professor Grunwald, you were just asked a number of

08:37   22   questions about the testing of Speed Shift as compared to

08:37   23   SpeedStep.  Do you remember that?

08:38   24       A.   Yes.

08:38   25       Q.   Is it possible to measure the value of the '759

1339

08:38  1   patent by looking at Intel's products?

08:38  2        A.   No.  Because even in the alleged products, the legacy

08:38  3   mode is actually implemented by the same hardware.  And the --

08:38  4   so it would be using that same hardware to test sort of two

08:38  5   different modes of operation.

08:38  6        Q.   Now, I believe that, regarding this testing that you

08:38  7   were just asked about, you testified earlier that the

08:38  8   plaintiff's expert, Dr. Annavaram, used the wrong tool.  Can

08:38  9   you please remind us what you meant by that?

08:38  10       A.   Dr. Annavaram used the Fox2 Power Model tool.  So

08:38  11  that -- or I'm sorry, not power model, power debugging tool.

08:38  12  So it's used to determine whether the P-code --

08:38  13       MR. CHU:  Excuse me, Doctor.  And I apologize, counsel.

08:38  14  This is beyond the scope of cross.

08:39  15       THE COURT:  I believe the question was when you asked him

08:39  16  about something, wasn't it?

08:39  17       MS. SOOTER:  Yes, Your Honor.

08:39  18       THE COURT:  Then --

08:39  19       MR. CHU:  I did not ask questions about Dr. Annavaram's

08:39  20  testing or the Fox2 tool.  I asked questions about work that

08:39  21  Professor Conte did.

08:39  22       THE COURT:  Could you ask the question again?

08:39  23       MS. SOOTER:  Sure.  I'll ask the question.

08:39  24  BY MS. SOOTER:

08:39  25       Q.   Professor Grunwald, would it have made sense for you

08:39  1    to go to Intel to ask them to run the Fox2 tests?

08:39  2        A.   No.

08:39  3        Q.   Why not?

08:39  4        A.   Wrong tool for the wrong job, I think was the phrase

08:39  5    I used earlier.

08:39  6        Q.   What do you mean by that?

08:39  7        A.   The Fox2 tool is not used for measuring power or

08:39  8    performance.  It's for debugging code.

08:39  9        Q.   Do you remember that Mr. Chu asked you some questions

08:39  10   on Friday afternoon about what the Patent Office knew when it

08:40  11   decided to grant the '759 patent?

08:40  12       A.   Yes.

08:40  13       Q.   And specifically Mr. Chu asked you about something

08:40  14   called SpeedStep.  Do you remember that?

08:40  15       A.   Yes.  I do.

08:40  16       Q.   Let's look at the document Mr. Chu showed you.

08:40  17       MS. SOOTER:  If we could bring up PTX-8-A, please.

08:40  18   BY MS. SOOTER:

08:40  19       Q.   This is the prosecution history for the '759 patent,

08:40  20   and I'd like to turn to the page Mr. Chu showed you.

08:40  21       MS. SOOTER:  Page 68, please.

08:40  22   BY MS. SOOTER:

08:40  23       Q.   Now, do you remember Mr. Chu asking you questions

08:40  24   about this article?

08:40  25       A.   Yes.

1341

08:40  1      Q.   Which processors is this article about?

08:40  2      A.   It's about, as it says, the Mobile Intel Pentium III

08:40  3  Processor Family.  Those are a unit processor or a single-core

08:40  4  family.

08:40  5      Q.   Thank you.

08:40  6      And why is that significant, that there is a single core

08:40  7  on these processors?

08:40  8      A.   Because a central part of the '759 patent is that it

08:41  9  deals with multiple master devices.

08:41  10      Q.   And what does VLSI map to a master device?

08:41  11      A.   A core.

08:41  12      Q.   And so which Intel product was the first client

08:41  13  product to have two cores?

08:41  14      A.   The Intel Yonah processor.

08:41  15      Q.   Did the Patent Office know about Yonah when it

08:41  16  decided to grant the '759 patent?

08:41  17      A.   No.   They did not.

08:41  18      Q.   Was that significant to its analysis?

08:41  19      MR. CHU:   Objection.  Lack of foundation.  Calls for

08:41  20  speculation as to what an examiner had in his mind.

08:41  21      THE COURT:   I will -- the way it was phrased, I'll sustain

08:41  22  it, but you can certainly re-ask.

08:41  23  BY MS. SOOTER:

08:41  24      Q.   Professor Grunwald, did the Patent Office have before

08:41  25  it, when it was deciding whether or not to grant the '759

08:41  1    patent, a processor with two cores that ran SpeedStep?

08:41  2        A.   No.

08:41  3        Q.   Is that significant to the language of the claims

08:42  4    that we're talking about in this case?

08:42  5        A.   Yes.

08:42  6        Q.   Professor Grunwald, you were asked a lot of questions

08:42  7    on Friday afternoon about things that might happen in a

08:42  8    restaurant.  Do you remember that?

08:42  9        A.   Yes.

08:42  10       Q.   And Mr. Chu asked you about whether things that

08:42  11   happened in restaurants might be considered requests, right?

08:42  12       A.   Yes.

08:42  13       Q.   And during that discussion about restaurants, do you

08:42  14   remember whether Mr. Chu showed you the actual claims of the

08:42  15   '759 patent?

08:42  16       A.   I don't remember.

08:42  17       MS. SOOTER:  Can we bring up Professor Grunwald's slide

08:42  18   DDX-10.34, please?

08:42  19   BY MS. SOOTER:

08:42  20       Q.   Professor Grunwald, what do we see here?

08:42  21       A.   These are Claims 14 and 18.

08:42  22       Q.   Now, what do the claims require -- let me ask you

08:42  23   this:  What part of the system must send or provide the

08:42  24   requests?

08:43  25       A.   The first master device.

1343

08:43  1      Q.   And what part of the system must receive the

08:43  2  requests?

08:43  3      A.   The clock controller.

08:43  4      Q.   And what must the requests be requesting?

08:43  5      A.   The first master device configured to provide a

08:43  6  request to change a clock frequency of a high-speed clock.

08:43  7      Q.   Now, notwithstanding all of the questions about

08:43  8  restaurants, do Intel's products have the claims that are

08:43  9  required -- I'm sorry -- the requests that are required by the

08:43 10  '759 patent?

08:43 11      A.   No.  They don't.

08:43 12      Q.   Can you remind us what -- remind the jury, please,

08:43 13  how Intel's Lake processors adjust clock speeds instead of

08:43 14  using requests?

08:43 15      A.   In the diagram and in the Intel document it's called

08:43 16  telemetry.  It uses these autonomous algorithms that take in

08:43 17  telemetry information and then make requests -- or sorry --

08:43 18  changes.

08:43 19      Q.   And again, what do you mean by "autonomous

08:44 20  algorithms"?

08:44 21      A.   The algorithms that Dr. Rotem and his group developed

08:44 22  that run on the PCU.  So they're software that's running on the

08:44 23  PCU.

08:44 24      Q.   And do the accused products use requests or

08:44 25  autonomous algorithms?

08:44  1         A.    They use autonomous algorithms.

08:44  2         Q.    And did anything Mr. Chu asked you on Friday change

08:44  3    your noninfringement opinions in this case?

08:44  4         A.    No.

08:44  5         Q.    Now, Mr. Chu asked you a number of questions about

08:44  6    Dr. Rotem's testimony on Friday as well.  Do you remember that?

08:44  7         A.    Yes.

08:44  8         Q.    And Mr. Chu asked you about two lines on Page 250 of

08:44  9    a 365-page transcript.  Do you remember that?

08:44  10        A.    Yes.

08:44  11        Q.    Now, Mr. Chu didn't show you any other testimony

08:44  12   offered by Dr. Rotem, did he?

08:44  13        A.    No.

08:44  14        Q.    And he didn't provide you any context for those lines

08:45  15   of testimony, did he?

08:45  16        A.    That's correct.

08:45  17        Q.    Were you here when Dr. Rotem testified on Friday?

08:45  18        A.    Yes.  I was.

08:45  19        Q.    Do you recall that Dr. Rotem was asked about those

08:45  20   same two lines of his deposition testimony on Friday here?

08:45  21        A.    Yes.  I was.

08:45  22        Q.    And Dr. Rotem -- do you recall whether Dr. Rotem

08:45  23   answered questions about that deposition testimony?

08:45  24        A.    Yes.  He did.

08:45  25        MS. SOOTER:  I'd like to bring up the trial transcript

08:45  1   starting at Page 1199, Line 22, please.

08:45  2       MR. CHU:  Objection, Your Honor.  I think it's improper in

08:45  3   the context of the fact that there's testimony that is in the

08:45  4   trial record.  It is already in the trial record and ought not

08:45  5   to be used simply to republish that same testimony with another

08:45  6   witness.  It's 403 at least.  And it's argumentative.

08:45  7       THE COURT:  Overruled.

08:45  8       MS. SOOTER:  So starting at --

08:46  9       THE COURT:  What I would prefer is for you to read it into

08:46  10  the record -- what I prefer is for you to show the jury what --

08:46  11  in writing what was said and allow him to comment on it.

08:46  12      MS. SOOTER:  I'm sorry?

08:46  13      THE COURT:  I would -- do you have a written version of it

08:46  14  that you can show the jury?

08:46  15      MS. SOOTER:  Yes.

08:46  16  BY MS. SOOTER:

08:46  17      Q.  Do you recall that Dr. Rotem testified, "And I said

08:46  18  it, Yonah, did not have a hardware controller.  This is the

08:46  19  same answer I gave right now.  It did have a programmable

08:46  20  clock"?

08:46  21      A.  Yes.

08:46  22      Q.  Now, Mr. Chu didn't ask you about that testimony from

08:47  23  Dr. Rotem, did he?

08:47  24      A.  That's correct.

08:47  25      Q.  And he didn't give you the opportunity to explain any

1346

08:47  1    of your answers Friday, did he?

08:47  2        A.   Yes.  That's right.

08:47  3        Q.   Now, can you explain what you meant when you

08:47  4    testified about Dr. Rotem's answers in his deposition?

08:47  5        A.    In his deposition Dr. Rotem mentioned that he was

08:47  6    confused what he was being asked about in those two lines and

08:47  7    then corrected themselves I think at that time and at the trial

08:47  8    here, if I recall correctly.

08:47  9        Q.   Do you agree with Dr. Rotem that Yonah had a

08:47  10   programmable clock controller?

08:47  11       A.   Yes.

08:47  12       Q.   Do you agree with Dr. Rotem's description about how

08:47  13   the Yonah products worked?

08:47  14       A.   Yes.

08:47  15       Q.   And do you agree with Dr. Rotem's description of how

08:47  16   the Lake series products worked?

08:47  17       A.   Yes.

08:47  18       Q.   You have no reason to disagree with Dr. Rotem, do

08:48  19   you?

08:48  20       A.   No.  None.

08:48  21       Q.   Let's take a look at your Slide 47, please.

08:48  22       Oh, let me ask you this:  Do you remember when Mr. Chu

08:48  23   asked you a number of questions about the last two providing

08:48  24   requirements of Claim 14?

08:48  25       A.   Yes.

―1347―

08:48  1       Q.   Let's bring those up on your Slide 47, please.

08:48  2       Now, are these last two requirements, 14[F] and 14[G], the

08:48  3  two requirements that you have a shorthand way of referring to?

08:48  4       A.   Yes.  They are.

08:48  5       Q.   And what is that?

08:48  6       A.   I use the phrase "common clock" to mean

08:48  7  "provide the clock frequency of the high-speed clock as an

08:48  8  output to control the clock frequency of."

08:48  9       Q.   According to the language of the claims, how does the

08:48  10 language in 14[F], "Provide the clock frequency of the

08:48  11 high-speed clock as an output to control," compare to the

08:49  12 language in 14[G], "Provide the clock frequency of the

08:49  13 high-speed clock as an output to control"?

08:49  14      MR. CHU:  Objection, Your Honor.  May I have a running

08:49  15 objection with respect to claim construction testimony?

08:49  16      THE COURT:  You may.

08:49  17      MR. CHU:  Thank you.

08:49  18 BY MS. SOOTER:

08:49  19      Q.   Is that language the same in 14[F] as it is in 14[G]?

08:49  20      A.   Yes.  The same words are used.

08:49  21      Q.   What does a system need to do to meet the last two

08:49  22 requirements of Claim 14?

08:49  23      A.   Provide -- so 14[B] introduces a clock frequency of a

08:49  24 high-speed clock.  In 14[F] and [G], the provide the clock

08:49  25 frequency of the high-speed clock as an output, that needs to

1348

08:49  1  provide that as an output to both the second master device and

08:49  2  the bus.

08:49  3      Q.   The requested clock frequency?

08:49  4      A.   The requested clock frequency.  Correct.

08:49  5      Q.   And which components must that requested clock

08:50  6  frequency control, according to the plain meaning of the

08:50  7  claims?

08:50  8      A.   The second master device and the bus, the variable

08:50  9  speed bus as it's called.

08:50  10     Q.   Did anything Mr. Chu ask you on Friday change your

08:50  11 noninfringement opinions with regard to these two elements?

08:50  12     A.   No.

08:50  13     MS. SOOTER:  Let's bring up your Slide 52, please.

08:50  14 BY MS. SOOTER:

08:50  15     Q.   Can you please remind us why the Lake series of

08:50  16 products do not meet those claim requirements?

08:50  17     A.   So, again, there's the -- the use of the autonomous

08:50  18 algorithms.  So in the Lake series products, there's a running

08:50  19 computation that is figuring out what the desired clock

08:50  20 frequency setting should be.  That just runs continuously based

08:50  21 upon the telemetry information, the autonomous algorithms.

08:50  22     And then there are independent clocks for different parts

08:50  23 of the processor.  And so independent clock frequencies are

08:51  24 then set.

08:51  25     Q.   What does that mean with regard to the infringement

08:51  1    of the '759 patent?

08:51  2        A.   That's why it doesn't infringe.

08:51  3        MS. SOOTER:  I have nothing further.  Pass the witness.

08:51  4        Thank you, Dr. Grunwald.

08:51  5        MR. CHU:  No further questions, Your Honor.

08:51  6        Thank you, Doctor, for your time.

08:51  7        THE COURT:  You may step down.

08:51  8        MR. LEE:  Your Honor, ladies and gentlemen of the jury,

08:51  9    our next witness will be Mr. Hance Huston, and Mr. Mueller will

08:51 10    do the examination.

08:51 11        (The witness was sworn.)

08:51 12        MR. MUELLER:  Good morning, ladies and gentlemen.

08:51 13                        DIRECT EXAMINATION

08:51 14    BY MR. MUELLER:

08:52 15        Q.   Good morning, Mr. Huston.  Could you please introduce

08:52 16    yourself to the jury?

08:52 17        A.   Good morning.  My name is Hance Huston.  I live in

08:52 18    Fishkill, New York with my wife of 38 years.  We have two grown

08:53 19    daughters, a grandson who's 14 months, and we'll have a new

08:53 20    granddaughter later this month.

08:53 21        Q.   Sir, could you tell us where you went to college?

08:53 22        A.   I went to the Pennsylvania State University.

08:53 23        Q.   And what did you study?

08:53 24        A.   I studied engineering science, which is the honors

08:53 25    program for engineering at Penn State.

08:53  1        Q.   What year did you graduate?

08:53  2        A.   I graduated with my bachelor's degree in 1982.

08:53  3        Q.   And what did you do next?

08:53  4        A.   I worked for IBM starting in 1982.

08:53  5        Q.   Now, did you also continue your studies in the same

08:53  6   time period?

08:53  7        A.   Yes.  I did.  I was actually able to complete all of

08:53  8   my coursework for both my bachelor's and my master's and

08:53  9   engineering science within the four years that I was at Penn

08:53  10  State, and so I just needed to complete my thesis, which I did

08:53  11  in 1984.

08:53  12       Q.   So you earned your master's in '84?

08:53  13       A.   Correct.

08:53  14       Q.   Now, what was IBM when you joined it in 1982?

08:53  15       A.   It was the largest information technology company in

08:53  16  the world.

08:54  17       Q.   Does IBM still exist?

08:54  18       A.   Yes.  It does.

08:54  19       Q.   And what type of patent portfolio has IBM maintained

08:54  20  over the years?

08:54  21       A.   The largest.  IBM has actually been the leader in

08:54  22  U.S. patent issuance for 28 years in a row now.

08:54  23       Q.   For how long did you end up working at IBM?

08:54  24       A.   For a total of 33 years.

08:54  25       Q.   And are you still working there today?

08:54  1      A.   No.   I retired in 2015.

08:54  2      Q.   Now, sir, can you give us -- well, what was your

08:54  3 first position when you started there back in 1982?

08:54  4      A.   I started as a reliability engineer in

08:54  5 semiconductors.

08:54  6      Q.   What does it mean to be a reliability engineer?

08:54  7      A.   It's a multidisciplinary field working all the way

08:54  8 from basic physics through applied materials, through design

08:54  9 systems, electrical engineering, software, and statistics.

08:54 10      Q.   And for how long did you work as a reliability

08:55 11 engineer at IBM?

08:55 12      A.   For 11 years.

08:55 13      Q.   Did you receive a patent as a result of any of your

08:55 14 work in that time period?

08:55 15      A.   Yes.   I did.

08:55 16      Q.   What was the subject matter?

08:55 17      A.   The subject matter was the reuse of silicon wafers as

08:55 18 new.

08:55 19      Q.   Now, after you finished working as a reliability

08:55 20 engineer, what did you do next?

08:55 21      A.   I changed and became a patent engineer.

08:55 22      Q.   What does it mean to be a patent engineer at IBM?

08:55 23      A.   So a patent engineer is another multidisciplinary

08:55 24 field in which you take the technical knowledge you have about

08:55 25 products and systems and materials and you apply that with an

1352

08:55   1    understanding of patents in order to understand the value of

08:55   2    patents.

08:55   3        Q.   So what is the purpose of having a patent engineer be

08:55   4    part of a license negotiation team?

08:55   5        A.   In every case, when we were doing patent licensing,

08:55   6    we would always have three people at the table.  One of them

08:55   7    would be a patent engineer so that you would have the technical

08:56   8    information necessary to understand the value of the patent.

08:56   9    We'd also have a patent attorney in order to understand the

08:56   10   legal aspects.  And we would have a licensed negotiator.

08:56   11       Q.   Now, you're not a lawyer, right?

08:56   12       A.   No.  I'm not.

08:56   13       Q.   But as a patent engineer, you helped folks understand

08:56   14   what they were negotiating over in terms of the technology?

08:56   15       A.   Yes.

08:56   16       Q.   Now, how many patents did you analyze over the years

08:56   17   as a patent engineer?

08:56   18       A.   It would be tens of thousands of patents.

08:56   19       Q.   And did you help the negotiators set a reasonable

08:56   20   price for those patents?

08:56   21       A.   Yes.  In every case.

08:56   22       Q.   Did any of those patents relate to microprocessor

08:56   23   technology, computer chips?

08:56   24       A.   Many of them did.  All of the semiconductor ones

08:56   25   would have been relevant.  Many of them included specifically

08:56  1  microprocessor patents.  And some of the systems ones would

08:56  2  have included microprocessors as part of the system.

08:56  3      Q.   Now, sir, at some point did you move into a different

08:56  4  role in patent licensing?

08:56  5      A.   Yes.  After about six years I moved to become a

08:57  6  licensed negotiator at our cooperate headquarters.

08:57  7      Q.   So let's be clear.  You actually sat at the table and

08:57  8  negotiated license agreements?

08:57  9      A.   Yes.  I did.

08:57  10     Q.   How many times did you sit at the table and negotiate

08:57  11  patent license agreements?

08:57  12     A.   Over 500.

08:57  13     Q.   And were you the lead negotiator in many of those

08:57  14  negotiations?

08:57  15     A.   Yes.

08:57  16     Q.   Can you give us a few examples of some of the

08:57  17  companies that you negotiated with?

08:57  18     A.   Some of them would be the major companies that you

08:57  19  would probably hear of, like Sony or Hitachi or Samsung or

08:57  20  Panasonic, a lot of Japanese and Asian companies because that

08:57  21  was my first assignment.

08:57  22     Q.   And what was your first assignment?

08:57  23     A.   It was as the director of patent licensing for the

08:57  24  entire Asia-Pacific region, running from Japan through Korea,

08:57  25  China, Taiwan, Singapore.

08:57  1      Q.   And for how long did you serve in that role?

08:57  2      A.   That was three and a half years.

08:57  3      Q.   What did you do next?

08:58  4      A.   I returned to the United States, and I worked as

08:58  5  director of patent licensing at our corporate headquarters.

08:58  6      Q.   Now, as director of licensing, fair to say you were

08:58  7  one of the top executives at IBM in the licensing department?

08:58  8      A.   Yes.

08:58  9      Q.   And how many patent license agreements did you

08:58 10  negotiate in that role?

08:58 11      A.   Again, over 500.

08:58 12      Q.   Now, did you also negotiate patent purchase

08:58 13  agreements?

08:58 14      A.   Yes.  I did.

08:58 15      Q.   And can you give us an estimate of the number of

08:58 16  patent purchase agreements you personally negotiated?

08:58 17      A.   It would have been more than 50.

08:58 18      Q.   For the purchase agreements and the license

08:58 19  agreements that you personally negotiated, did any of those

08:58 20  involve microprocessor patents?

08:58 21      A.   Most all of them would have.  Microprocessors are

08:58 22  fundamental to computers and information technology.  And many

08:58 23  of the patent licenses were so broad as to include

08:58 24  microprocessors as well.

08:58 25      Q.   Now, sir, you have a master's degree in engineering,

08:58   1   and you worked as an engineer for 11 years.  How many -- how

08:59   2   often did you draw on that experience when you were negotiating

08:59   3   patent licenses and patent purchases?

08:59   4       A.   In every case.

08:59   5       MR. MUELLER:  Your Honor, at this point we offer

08:59   6   Mr. Huston as an expert in patent licensing and valuing

08:59   7   microprocessor patents.

08:59   8       MR. HEINRICH:  No objection.

08:59   9       THE COURT:  He'll be admitted.

08:59   10      MR. MUELLER:  Thank you, Your Honor.

08:59   11  BY MR. MUELLER:

08:59   12      Q.   Now, sir, you're here today as an independent expert;

08:59   13  is that right?

08:59   14      A.   That is correct.

08:59   15      Q.   You've been retained to provide an analysis on behalf

08:59   16  of Intel; is that right?

08:59   17      A.   That is right.

08:59   18      Q.   You're being compensated for your time?

08:59   19      A.   Yes.  I am.

08:59   20      Q.   And what's your normal consulting rate?

08:59   21      A.   It is $500 per hour.

08:59   22      Q.   Are you charging that same rate in this case?

08:59   23      A.   Yes.

08:59   24      Q.   And how many hours have you spent working on the

08:59   25  case?

08:59  1      A.   Around 300 hours over the last three years.

08:59  2      Q.   Now, has Intel engaged you for a few other projects

08:59  3  over the last few years?

08:59  4      A.   Yes.  They have.

08:59  5      Q.   But is this the first time you've ever testified in

08:59  6  court for Intel?

08:59  7      A.   Yes.

08:59  8      Q.   In fact, is this the first time you've testified in

08:59  9  court for anyone?

08:59  10      A.   Yes.

08:59  11      Q.   Does your compensation depend in any way whatsoever

09:00  12  on the opinions that you're going to provide to the ladies and

09:00  13  gentlemen of the jury?

09:00  14      A.   Not at all.

09:00  15      Q.   Does it depend on the outcome of this case?

09:00  16      A.   No.

09:00  17      Q.   Your opinions are your own?

09:00  18      A.   Yes.  They are.

09:00  19      Q.   All right.  Let's talk more about patent licensing,

09:00  20  and I want to get into the factors that you used in your career

09:00  21  at IBM, okay?

09:00  22      A.   Yes.

09:00  23      Q.   First, can you explain to the ladies and gentlemen of

09:00  24  the jury what exactly is a patent license?

09:00  25      A.   So a patent license is when you have a patent owner

09:00   1   and he has the ability to license other companies in order to

09:00   2   use the patent.

09:00   3       Q.   When you pay for a license, what do you get?

09:00   4       A.   You get the ability to use the patent.

09:00   5       Q.   Are you familiar with the terms "exclusive" and

09:00   6   "nonexclusive" in this context?

09:00   7       A.   Yes.  I am.

09:00   8       Q.   What is the difference between an exclusive patent

09:00   9   license on the one hand and a nonexclusive patent license on

09:00  10   the other?

09:00  11       A.   In an exclusive license, the patent owner will be

09:01  12   licensing the patent to one and only one party and cannot

09:01  13   license it to anybody else.

09:01  14       In a nonexclusive license, the patent owner will license

09:01  15   the patent to as many parties as he wishes to.

09:01  16       Q.   Now, if I take a license, does that mean I have any

09:01  17   sort of ownership stake in the patent?

09:01  18       A.   No.  Not at all.

09:01  19       Q.   Now, sir, do you have an analogy to help us

09:01  20   understand some of these issues?

09:01  21       A.   Yes.  I do.

09:01  22       MR. MUELLER:  So let's pull up DDX-13.2.

09:01  23   BY MR. MUELLER:

09:01  24       Q.   What do we see here?

09:01  25       A.   So this is a motel.  And I'd like to make the analogy

1358

09:01  1   of a patent to a motel, where if you own a motel, then you can

09:01  2   grant licenses, rent out rooms, in that motel.

09:01  3        MR. MUELLER:  So let's go to DDX-13.3.

09:01  4   BY MR. MUELLER:

09:01  5        Q.   And if I asked you in this analogy for a nonexclusive

09:01  6   patent license, what would that look like?

09:01  7        A.   So in a nonexclusive license, you can rent out many

09:02  8   rooms in that motel.  And you could rent out $30 for a room on

09:02  9   the second floor or $30 for a room on the first floor.  More

09:02  10  than one person can rent out rooms.

09:02  11       Q.   So even if I get a room, someone else might as well?

09:02  12       A.   Yes.

09:02  13       MR. MUELLER:  Let's go to DDX-13.4.

09:02  14  BY MR. MUELLER:

09:02  15       Q.   And now I want to ask you:  If I were to request an

09:02  16  exclusive patent license, how would that work in your analogy?

09:02  17       A.   So in this case, the motel owner would be able to

09:02  18  rent the hotel only to one person, you.  And therefore every

09:02  19  room would be reserved only for your use.

09:02  20       MR. MUELLER:  Let's go to DDX-13.5.

09:02  21  BY MR. MUELLER:

09:02  22       Q.   What if I wanted to purchase a patent?  How would

09:02  23  that work in your analogy?

09:02  24       A.   It would be just like purchasing the actual motel and

09:02  25  becoming the new owner and you could buy it for, say, $200,000.

—1359

09:02  1      Q.   Now, what's more expensive, buying a patent or taking

09:02  2  a license to a patent?

09:02  3      A.   Buying a patent.

09:02  4      Q.   And why is that?

09:03  5      A.   Because as -- when you buy the patent, you become the

09:03  6  new owner and you have all the control of the patent itself as

09:03  7  well as the ability to license it to others.

09:03  8      MR. MUELLER:  We can take this slide down now.

09:03  9  BY MR. MUELLER:

09:03  10     Q.   Now, sir, I want to ask you about the types of

09:03  11 information that you used in the hundreds of times you sat at

09:03  12 the table and negotiated licenses.  Do you that subject in

09:03  13 mind?

09:03  14     A.   Yes.  I do.

09:03  15     MR. MUELLER:  Let's take a look at DDX-13.6.

09:03  16 BY MR. MUELLER:

09:03  17     Q.   What do we see here?

09:03  18     A.   So these -- this is the five different types of

09:03  19 information that I would commonly use that are real-world

09:03  20 evidence of what the price of a patent license should be.

09:03  21     Q.   Now, why is real-world evidence significant?

09:03  22     A.   Well, it demonstrates what people have actually

09:03  23 valued patents as, and therefore it is the best evidence with

09:03  24 regard to the value of what a patent is.

09:03  25     Q.   So let's go through these one by one.

09:03   1        MR. MUELLER:  We'll go to DDX-13.8.  I want to focus on

09:04   2   the top one, the nature of the patents, so we can go to 13.8.

09:04   3   BY MR. MUELLER:

09:04   4        Q.   What do we see here?

09:04   5        A.   So the patents themselves have obviously been

09:04   6   invented by somebody, and perhaps they've even been owned by

09:04   7   several different owners over time.

09:04   8        The fact of their actual use by these prior owners is

09:04   9   important because it demonstrates that the patents are valuable

09:04   10  and are actually used by someone.

09:04   11       Q.   Now, when you were at IBM, did IBM actually use its

09:04   12  important patents?

09:04   13       A.   Yes.  We did, and we knew exactly which ones we were

09:04   14  using.

09:04   15       Q.   Now, were you here when Dr. Sullivan testified

09:04   16  earlier in this trial?

09:04   17       A.   Yes.

09:04   18       Q.   And he's VLSI's damages expert, right?

09:04   19       A.   Yes.

09:04   20       MR. MUELLER:  Let's pull up on the screen some testimony

09:04   21  he gave on Day 3.  This is Page 689, Lines 10 through 25.

09:04   22  BY MR. MUELLER:

09:04   23       Q.   Question:  "And in thinking about the benefits of

09:04   24  these patents, is it relevant whether Freescale or NXP or

09:05   25  SigmaTel ever incorporated the asserted patents into specific

09:05  1    products?"

09:05  2        Dr. Sullivan answered, "No.  It is not.  That particular

09:05  3    issue is not relevant and typically would be considered a red

09:05  4    herring issue.  That means it's a distraction from what is

09:05  5    actually relevant."

09:05  6        And then he continued.  I want to ask you about what he

09:05  7    said right there.  Do you agree?

09:05  8        A.   No.  I strongly disagree.

09:05  9        Q.   And why do you disagree?

09:05  10       A.   Because the actual use is real-world evidence of the

09:05  11   value of the patents by the inventors or the subsequent owners.

09:05  12       MR. MUELLER:  Let's go to Dr. Sullivan at Page 764, Line

09:05  13   23, through 765, Line 6.

09:05  14   BY MR. MUELLER:

09:05  15       Q.   Question:  "And you said you thought it was a red

09:05  16   herring and misleading to talk about that issue.  Do you

09:05  17   remember that?"

09:05  18       Answer from Dr. Sullivan, "Not to talk about the issue,

09:06  19   yet my perception of the arguments that Intel and, with all due

09:06  20   respect, you, Mr. Lee, have been making.  I do believe those

09:06  21   issues are, as I would describe them, a red herring and

09:06  22   misleading."

09:06  23       Mr. Huston, do you think it was misleading for Intel to

09:06  24   focus on the use or lack thereof of these patents by the prior

09:06  25   owners?

1362

09:06  1        A.   Absolutely not.

09:06  2        Q.   Why not?

09:06  3        A.   Because, again, the real-world evidence of actual use

09:06  4   by the owners is the first and primary estimate of what the

09:06  5   value of the patents is.

09:06  6        MR. MUELLER:  Let's go back to DDX-13.8.

09:06  7   BY MR. MUELLER:

09:06  8        Q.   There's a second bullet point here, "whether other

09:06  9   companies sought a license to the patents."  What does that

09:06 10   refer to?

09:06 11        A.   Well, it refers to the fact that if a patent is

09:06 12   widely used, then many different companies will want to have a

09:06 13   license to that patent so that they can use it as well.

09:06 14        Q.   Why is that meaningful?

09:06 15        A.   Well, it's meaningful because it not only

09:06 16   demonstrates the value of the patent itself, but it also

09:07 17   provides information with regard to the value of that patent

09:07 18   based upon the licenses that are entered into.

09:07 19        MR. MUELLER:  Let's go to DDX-13.9.

09:07 20   BY MR. MUELLER:

09:07 21        Q.   And this category of information, the nature of the

09:07 22   patents, can you put that into the terms of your analogy?

09:07 23        A.   Yes.  So I would compare this to, in one case, a

09:07 24   motel that's along a freeway.  It's like many other motels, but

09:07 25   there's lots of cars that just simply go by.  Some people may

09:07  1    stop or maybe they just continue right on by.

09:07  2        On the other hand, you could have a motel that is at a

09:07  3    resort.  It's a really nice place.  It's something that lots of

09:07  4    people want to go to, as in getting a license.

09:07  5        Q.   And which would charge the higher price?

09:07  6        A.   The one that is the resort motel.

09:07  7        MR. MUELLER:  Let's go to DDX-13.10.

09:07  8    BY MR. MUELLER:

09:07  9        Q.   The second category of information, "prior sales of

09:07  10   the patents," what does that refer to?

09:07  11       A.   It refers to actual sales of the patents as they are

09:08  12   passed from one owner to another.

09:08  13       Q.   Why is that meaningful in a license negotiation?

09:08  14       A.   Because it again shows the actual value that has been

09:08  15   negotiated with regard to the value of the patents and have

09:08  16   been agreed to by two different parties.

09:08  17       MR. MUELLER:  Let's go to DDX-13.11.

09:08  18   BY MR. MUELLER:

09:08  19       Q.   And can you put this in the terms of your analogy?

09:08  20       A.   So in this case, if you look at a motel and you know

09:08  21   that it has been sold twice previously, perhaps for $175,000 or

09:08  22   $200,000, then not only do you know what the value of that

09:08  23   motel is, but you have a pretty good idea of what the rental

09:08  24   rate or license rate would be for a room at that hotel.

09:08  25       Q.   Would you pay as a rental rate any price similar to

1364

09:08    1    the purchase price?

09:08    2         A.   No.  It would be much, much less.

09:08    3         MR. MUELLER:  Let's go to DDX-13.12.

09:08    4    BY MR. MUELLER:

09:08    5         Q.   Third category, "prior comparable agreements between

09:08    6    the parties."  What does this refer to?

09:08    7         A.   So this refers to the fact that if you know that the

09:09    8    two parties to a negotiation have previously had agreements for

09:09    9    patents that are comparable, then comparable patents, the new

09:09   10    ones, would probably have about the same value.

09:09   11         Q.   And why is that relevant to a license negotiation?

09:09   12         A.   Because it again shows the value that these parties

09:09   13    in particular have placed on patents that are similar.

09:09   14         MR. MUELLER:  So let's go to DDX-13.13.

09:09   15    BY MR. MUELLER:

09:09   16         Q.   And how would this work in your analogy?

09:09   17         A.   So if you know that for a particular motel that there

09:09   18    have been agreements previously, you've stayed and have paid

09:09   19    $25 a night or $30 a night in a particular room, then for a

09:09   20    very similar room in the same motel, you would pay about the

09:09   21    same.

09:09   22         MR. MUELLER:  Let's go to DDX-13.14 and turn to the fourth

09:09   23    category.

09:09   24    BY MR. MUELLER:

09:09   25         Q.   "Prior comparable negotiations between the parties,"

09:09  1    what does that refer to?

09:09  2        A.    That refers to actual offers that have been made by

09:10  3    one or more of the parties with regard to similar patents.

09:10  4        Q.    And why is that relevant?

09:10  5        A.    Because it again shows the specific value that has

09:10  6    been placed by the parties on patents that are similar.

09:10  7        MR. MUELLER:  So let's go to DDX-13.15.

09:10  8    BY MR. MUELLER:

09:10  9        Q.    How would this category of information fit into your

09:10  10   analogy?

09:10  11       A.    So if you have a motel and you know that it has been

09:10  12   advertised that -- or offered that you can rent a room for $25

09:10  13   or $35 a night, then it would be expected that for another room

09:10  14   in the same motel that the value would be about the same.

09:10  15       MR. MUELLER:  Let's go to DDX-13.16.

09:10  16   BY MR. MUELLER:

09:10  17       Q.    Last category, "prior comparable agreements with

09:10  18   third parties."  What is this?

09:10  19       A.    So this is where one of the parties to the

09:10  20   negotiation has also had similar agreements, comparable

09:10  21   agreements, with other parties.

09:10  22       Q.    Why is that significant?

09:10  23       A.    Because it shows a broader range of exactly how

09:11  24   patents have been valued that are similar to the patents that

09:11  25   are at question.

09:11  1          MR. MUELLER:  Let's go to DDX-13.17.

09:11  2    BY MR. MUELLER:

09:11  3          Q.   Can you explain what we see here?

09:11  4          A.   So, again, along the same freeway, if you have

09:11  5    several motels that are pretty much the same, and you know that

09:11  6    previously you had stayed at one of them for $25 a night or $30

09:11  7    for the other two, then a very similar motel on that same

09:11  8    freeway would end up costing about the same.

09:11  9          MR. MUELLER:  Let's go to DDX-13.18.

09:11  10   BY MR. MUELLER:

09:11  11         Q.   We've now gone through all five categories of

09:11  12   real-world evidence.  And again, sir, did you, in fact, use

09:11  13   these same categories of information yourself in your career at

09:11  14   IBM?

09:11  15         A.   Yes.  This was a rather standard toolkit that we

09:11  16   would use in any negotiation where we could.

09:11  17         Q.   And this toolkit reflects economics, and it also

09:11  18   reflects common sense; is that fair?

09:11  19         A.   Yes.  It is.

09:11  20         Q.   Now, have you ever heard of something called "hedonic

09:11  21   regression"?

09:11  22         A.   I have heard of hedonic regression only in the

09:12  23   context of this litigation.

09:12  24         Q.   Did you ever include hedonic regression in the

09:12  25   toolkit you used in license negotiations at IBM?

1367

09:12  1       A.   Never.

09:12  2       Q.   Now, you've explained to us some of the categories of

09:12  3    information that you analyzed in conducting a license

09:12  4    negotiation.  I want to ask you about a little bit different

09:12  5    subject, the form of the payments in the agreements that you

09:12  6    negotiated.  Do you have that subject in mind?

09:12  7       A.   Yes.  I do.

09:12  8       Q.   First, are you familiar with the term "lump sum

09:12  9    payment"?

09:12  10      A.   Yes.  I am.

09:12  11      Q.   What is it?

09:12  12      A.   A lump sum payment is a single payment that has been

09:12  13   contracted that will be paid once and only once and will

09:12  14   satisfy the terms of the contract.

09:12  15      Q.   Are you also familiar with the term "running

09:12  16   royalty"?

09:12  17      A.   Yes.

09:12  18      Q.   What does that refer to?

09:12  19      A.   A running royalty is a payment that would be based on

09:12  20   something, like number of units or perhaps revenue, and would

09:13  21   have to have royalty reports in order to demonstrate the value.

09:13  22      Q.   What was the form of payment in the hundreds of

09:13  23   agreements that you negotiated in your years at IBM?

09:13  24      A.   In every case, they were a lump sum.

09:13  25      Q.   In every case, it was a lump sum?

09:13   1      A.   Yes.

09:13   2      Q.   Why was that?

09:13   3      A.   There are several reasons why just about everybody

09:13   4  does lump sum payments.  They provide clarity and certainty.

09:13   5  You know exactly how much is going to be paid.  You don't have

09:13   6  to take a look at what are royalty reports or what are disputes

09:13   7  with regard to royalty reports or audits of royalty reports.

09:13   8      Q.   And when you pay a lump sum for a license, how often

09:13   9  are you able to use the patents that you take the license to?

09:13  10      A.   You're able to use the patents for all and any use.

09:13  11      Q.   As many times as you want?

09:13  12      A.   Yes.

09:13  13      Q.   And that was the customary form of payment in the

09:13  14  industry when you practiced?

09:13  15      A.   Yes.

09:13  16      Q.   Now, I want to take this toolkit you described and

09:14  17  apply it to the facts in this case.  Okay, sir?

09:14  18      A.   Yes.

09:14  19      Q.   But before we do that, I want to get some basic facts

09:14  20  on the table.  Who owns the '373 and '759 patents that are

09:14  21  asserted in this case?

09:14  22      A.   VLSI.

09:14  23      Q.   How did VLSI come to own these two patents?

09:14  24      A.   They bought them from NXP.

09:14  25      Q.   Before this case, had you ever heard of either the

1369

09:14  1    '373 or '759 patent?

09:14  2        A.   Never.

09:14  3        Q.   Now, there's been some arguments and suggestions in

09:14  4    this case about NXP receiving money if there were a recovery in

09:14  5    this case.  You heard -- you've heard those arguments?

09:14  6        A.   Yes.

09:14  7        Q.   I want to ask you the following question, just yes or

09:14  8    no, okay?  Yes or no.

09:14  9        Yes or no, would NXP receive the majority of any money

09:14  10   that VLSI gets from this case?

09:14  11       A.   No.

09:14  12       Q.   Now, you recall at the very beginning of this trial

09:15  13   Mr. Stolarski, the CEO of VLSI, was sitting over here?

09:15  14       A.   Yes.

09:15  15       Q.   Would Mr. Stolarski personally stand to benefit from

09:15  16   any recovery in this case?

09:15  17       A.   Yes.

09:15  18       Q.   Now, you've watched this trial since it began; is

09:15  19   that right, sir?

09:15  20       A.   Yes.

09:15  21       Q.   And you've heard Intel's witnesses explain that

09:15  22   Intel's position is it does not infringe either one of these

09:15  23   two patents.  Do you understand that's Intel's position?

09:15  24       A.   Yes.  I do understand that.

09:15  25       Q.   If they're right, what would be owed by Intel to

09:15   1   VLSI?

09:15   2       A.   Exactly zero.

09:15   3       Q.   Now, sir, have you done an analysis of what the value

09:15   4   of the patents would be to Intel in some hypothetical world

09:15   5   where Intel is using the patents?

09:15   6       A.   Yes.  I have.

09:15   7       Q.   And how'd you do that?

09:15   8       A.   I -- I worked through what is called a hypothetical

09:15   9   negotiation.

09:15  10       Q.   And what factors did you consider in analyzing this

09:16  11   hypothetical negotiation?

09:16  12       A.   All of the ones that I've described with regard to a

09:16  13   toolkit of valuing patents.

09:16  14       Q.   So I want to ask you about this hypothetical

09:16  15   negotiation.  But just to be crystal clear, you're analyzing a

09:16  16   hypothetical world where Intel uses the patents, right?

09:16  17       A.   Yes.

09:16  18       Q.   But you understand in this world, Intel's position is

09:16  19   it doesn't use the patents?

09:16  20       A.   Yes.  I do understand that.

09:16  21       Q.   Okay.  So let's go into the hypothetical negotiation

09:16  22   world.  Who's sitting at the table in this hypothetical

09:16  23   negotiation?

09:16  24       A.   It would be Intel and Freescale.

09:16  25       Q.   Why is Freescale sitting there?

09:16    1          A.   Because at the time of the first alleged

09:16    2    infringement, Freescale was the owner of both patents.

09:16    3          Q.   And when is the first allegation of infringement?

09:16    4          A.   It is the fourth quarter of 2011.

09:16    5          Q.   So the hypothetical negotiation has Intel and

09:16    6    Freescale sitting at the table back in 2011.  Do I have that

09:16    7    right?

09:16    8          A.   Yes.

09:16    9          Q.   And they're negotiating a license to the two patents,

09:16   10    again, in this hypothetical world.  Do I have that right?

09:17   11          A.   Yes.

09:17   12          Q.   And so what did you do to try to figure out what

09:17   13    would happen in that discussion?

09:17   14          A.   So I looked at agreements.  I looked at the nature of

09:17   15    the patents.  I looked at agreements that are comparable.  I

09:17   16    went through all of the different things that would show the

09:17   17    value of the patents.

09:17   18          Q.   And how did your analysis of this hypothetical

09:17   19    negotiation compare to all the negotiations you conducted at

09:17   20    IBM?

09:17   21          A.   It was similar.

09:17   22          MR. MUELLER:  Let's go to DDX-13.19.

09:17   23    BY MR. MUELLER:

09:17   24          Q.   And, sir, did you, in fact, go through each one of

09:17   25    these factors and apply them to the facts in this case?

09:17  1      A.   Yes.  I did.

09:17  2      Q.   So let's do that.

09:17  3      MR. MUELLER:  Let's go to DDX-13.20, and let's start with

09:17  4  the "nature of the asserted patents."  And let's go to

09:17  5  DDX-13.21.

09:17  6  BY MR. MUELLER:

09:17  7      Q.   What did you find?

09:17  8      A.   Well, I found that there was no evidence of use by

09:17  9  the owners.  Any of the owners.  And that no other company ever

09:17  10  sought a license.  And that these patents have been sold

09:18  11  multiple times for small amounts of money.

09:18  12      Q.   Now, sir, have you read the patents yourself?

09:18  13      A.   Multiple times.

09:18  14      Q.   Do you understand them?

09:18  15      A.   Yes.  I do.

09:18  16      Q.   And how does the nature of the patents relate to what

09:18  17  would have happened in this hypothetical negotiation?

09:18  18      A.   Well, both of the parties, Freescale and Intel, would

09:18  19  have understood the nature of the patents and would have valued

09:18  20  them appropriately.

09:18  21      Q.   So the prior owners of these patents were some

09:18  22  companies called SigmaTel, Freescale and NXP, right?

09:18  23      A.   Yes.

09:18  24      Q.   Did those companies make products?

09:18  25      A.   Yes.  They did.

09:18   1        Q.   Could they have used the asserted patents in their

09:18   2   products if they wanted to?

09:18   3        A.   Yes.

09:18   4        Q.   And have you seen any evidence whatsoever that they

09:18   5   did?

09:18   6        A.   None.

09:18   7        Q.   So what would that look like in your motel analogy,

09:18   8   for example?

09:18   9        A.   It would look as though nobody was renting a room at

09:18   10  the motel.

09:18   11       MR. MUELLER:  Let's go to DDX-13.22.

09:18   12  BY MR. MUELLER:

09:18   13       Q.   Second category, "prior sales of the asserted

09:19   14  patents."

09:19   15       MR. MUELLER:  And, Your Honor, here I'm -- I'm going to

09:19   16  have to ask Your Honor, with your permission, to seal the

09:19   17  courtroom.  And it's for confidential information of VLSI and

09:19   18  other companies that I just want to be careful to protect.

09:19   19       THE COURT:  Okay.  If you're not under the protective

09:19   20  order, I'd ask you to leave the courtroom at this time.

        21       MR. MUELLER:  And if we could also just shut off the

        22  public feed.

        23       THE COURT:  We will.

        24       MR. MUELLER:  Thank you, Your Honor.

        25       (Sealed proceedings.)

1374

09:43  1          MR. MUELLER:  Your Honor, at this point we can unseal the

09:43  2   courtroom.

09:43  3          THE COURT:  You read my mind.

09:44  4          MR. MUELLER:  Now, I want to put up DDX-13.41.

09:44  5   BY MR. MUELLER:

09:44  6          Q.   And, sir, I'm not going to ask you about all the work

09:44  7   we've done to get here.  But what do we see here?

09:44  8          A.   So in addition to identifying what I would consider

09:44  9   to be the correct value, $2.2 million for the two patents, I

09:44 10   also looked at how that would be distributed amongst the two

09:44 11   patents if only one of them were found to be infringed.

09:44 12          Q.   And what are those numbers, sir?

09:44 13          A.   Those numbers are 1.47 million for the '759 patent

09:44 14   and $750,000 for the '373 patent.

09:44 15          Q.   And, again, these are lump sums?

09:44 16          A.   Yes.

09:44 17          Q.   Now, you heard Dr. Sullivan and what he suggested to

09:44 18   the jury in terms of what these patents are worth, right?

09:44 19          A.   Yes.

09:44 20          Q.   I'm not going to ask you about any of the specifics

09:44 21   of his math, and I also don't want you to say his specific

09:44 22   number out loud, okay?

09:45 23          A.   Okay.

09:45 24          Q.   But I want to ask you this:  Is the number he's

09:45 25   suggesting to the jury in the millions or the billions?

09:45  1      A.   The billions.

09:45  2      Q.   Well, how can it be that he's suggesting these

09:45  3  patents are worth billions and you're saying 2.2 million?

09:45  4      A.   Well, there's several things.

09:45  5      One, the method that he uses, hedonic regression, is

09:45  6  something that I have never seen in any negotiation.  And it is

09:45  7  not only unreliable but obviously can give incorrect results.

09:45  8      Q.   Sir, you've negotiated hundreds of licenses in your

09:45  9  time at IBM, right?

09:45  10     A.   Yes.

09:45  11     Q.   If someone sat at the table and asked you for

09:45  12 billions for two of these types of patents, how would you have

09:45  13 responded to them?

09:45  14     A.   I would have rejected it and walked out.

09:45  15     MR. MUELLER:  Now we can take this slide down.

09:45  16 BY MR. MUELLER:

09:46  17     Q.   Earlier in this case we heard about the

09:46  18 Georgia-Pacific factors.  You're not a lawyer, but do you know

09:46  19 what the Georgia-Pacific factors are?

09:46  20     A.   Yes.  I do.

09:46  21     Q.   And how many factors are there?

09:46  22     A.   There are 15.

09:46  23     Q.   Have you considered these 15 Georgia-Pacific factors

09:46  24 in your work in this case?

09:46  25     A.   Yes.  I have.

—1376

09:46  1      Q.   All 15?

09:46  2      A.   Yes.

09:46  3      MR. MUELLER:  Now, let's pull up DDX-13.42.

09:46  4  BY MR. MUELLER:

09:46  5      Q.   What do we see here, sir?

09:46  6      A.   So these are three of the Factors, 8, 9 and 10, that

09:46  7  are specific to the use of the patents by the licensor, which

09:46  8  in this case would be Freescale in the hypothetical, VLSI in

09:46  9  this lawsuit.

09:46  10     Q.   And why do you find these three factors significant?

09:46  11     A.   Because again the actual use by the licensor is

09:46  12 relevant.  It is required by the Georgia-Pacific factors, and

09:46  13 the fact that there is no evidence of any use by any previous

09:46  14 owner shows that there's very little value associated with the

09:47  15 patents.

09:47  16     MR. MUELLER:  Let's go to DDX-13.43.

09:47  17 BY MR. MUELLER:

09:47  18     Q.   We have three more Georgia-Pacific factors here.

09:47  19 Tell us what we see.

09:47  20     A.   So the first one, No. 1, actually has to do with have

09:47  21 these patents been licensed?  And the fact that nobody has ever

09:47  22 specifically licensed these patents and no one has sought a

09:47  23 license shows that the value is low.

09:47  24     Q.   So how do these factors impact your opinion as to

09:47  25 what would happen in a hypothetical negotiation?

—1377—

09:47  1        A.   All of these factors are supported by my analysis and

09:47  2   support my analysis as well.

09:47  3        MR. MUELLER:  Let's go to PDX-4.12.

09:47  4   BY MR. MUELLER:

09:47  5        Q.   This is a slide from VLSI's opening statement.  You

09:47  6   saw the opening statement?

09:47  7        A.   Yes.  I did.

09:47  8        Q.   It says "The Cycle of Innovation."  I want to ask you

09:47  9   a couple questions.

09:47  10       Has VLSI ever actually licensed the '373 patent to any

09:48  11  other company?

09:48  12       A.   No.  They have not.

09:48  13       Q.   Ever licensed the '759 patent to any other company?

09:48  14       A.   No.  They have not.

09:48  15       Q.   Are you aware of any evidence whatsoever that this

09:48  16  cycle has actually happened?

09:48  17       A.   None whatsoever.

09:48  18       MR. MUELLER:  We can take this down.

09:48  19  BY MR. MUELLER:

09:48  20       Q.   Dr. Sullivan and his analysis, just a few more

09:48  21  questions about that.

09:48  22       Have you seen Dr. Sullivan identify any real-world patent

09:48  23  sales that support his approach?

09:48  24       A.   None.

09:48  25       Q.   Have you seen Dr. Sullivan identify any real-world

—1378

09:48  1    licenses that support his approach?

09:48  2         A.    None.

09:48  3         Q.    And how many times have you encountered someone using

09:48  4    a methodology like the one Dr. Sullivan advocated to the jury?

09:48  5         A.    Never.

09:48  6         MR. MUELLER:  Now, let's pull up Dr. Sullivan transcript

09:48  7    Page 757, Lines 19 through 22.

09:48  8    BY MR. MUELLER:

09:49  9         Q.    Question:  "Thank you, Doctor.  So do Intel's experts

09:49  10   in doing this analysis, do they account for Intel's use of the

09:49  11   patents?

09:49  12        Answer:  "No.  They don't.  So if -- so this is kind of

09:49  13   interesting to me."

09:49  14        Now, do you understand Dr. Sullivan to be criticizing you

09:49  15   for not having considered the extent of alleged use of these

09:49  16   patents?

09:49  17        A.    Yes.

09:49  18        Q.    Now, again Intel's position is they've not used them

09:49  19   at all, but we're in this hypothetical world right now.  Did

09:49  20   you consider use of the patents in this hypothetical world?

09:49  21        A.    Yes.  I did.

09:49  22        Q.    And what, in fact, did you consider?

09:49  23        A.    I actually considered, based upon identifying all of

09:49  24   these various agreements, the fact that Intel in those

09:49  25   agreements could use the patents as much -- for any and all

—1379

09:49   1   use, which is greater than the alleged use of these specific

09:49   2   patents.

09:49   3       Q.   And is that consistent or inconsistent with your two

09:50   4   decades of experience at IBM?

09:50   5       A.   Consistent.

09:50   6       MR. MUELLER:  Let's pull up the transcript at Page 831, 4

09:50   7   to 10.  It's Dr. Sullivan again.

09:50   8   BY MR. MUELLER:

09:50   9       Q.   Question:  "And at the time of those agreements, did

09:50   10  NXP have evidence about the value of Intel's use of the '373,

09:50   11  '759 patents?

09:50   12      "No.  That would not be available because, again, that

09:50   13  would be based upon confidential information of Intel that is

09:50   14  only available through, you know, a court proceeding such as

09:50   15  this and is still maintained confidential."

09:50   16      Now, you understand Dr. Sullivan's criticism here to be

09:50   17  that there's certain information that can only be learned

09:50   18  through a case like this and that that would affect the royalty

09:50   19  in a hypothetical negotiation.  You understand that's his

09:50   20  position?

09:50   21      A.   I understand that.

09:50   22      Q.   Do you agree with that?

09:50   23      A.   I disagree.

09:50   24      Q.   And why do you disagree?

09:50   25      A.   I disagree because the parties, NXP, Freescale,

09:50  1    Intel, are all sophisticated parties.  They have licensing

09:51  2    professionals, like myself, patent engineers, patent lawyers.

09:51  3        They understand what the value is specifically of their

09:51  4    own patents.

09:51  5        They understand how those patents are used in their own

09:51  6    products.

09:51  7        They have access to publicly available information with

09:51  8    regard to Intel's products, such as specifications, technical

09:51  9    articles, patents, lots of different things.  And they would

09:51  10   have a good basis for understanding the use and value of the

09:51  11   patents.

09:51  12       Q.   And how did you yourself deal with this issue when

09:51  13   you were negotiating agreements at IBM?

09:51  14       A.   Well, we would do exactly what I just described.  We

09:51  15   would look at all of the publicly available information.  We

09:51  16   would even buy, for instance, Intel products and tear them

09:51  17   apart in order to understand them or test them.

09:51  18       So there's a lot of different ways that these companies,

09:51  19   or VLSI, could understand the actual use and value of the

09:52  20   patents.

09:52  21       Q.   Now, you said you never used hedonic regression in

09:52  22   your own career, right?

09:52  23       A.   I never used it.

09:52  24       Q.   You've also reviewed a number of deposition

09:52  25   transcripts in this case?

09:52    1          A.   Yes.

09:52    2          Q.   You understand VLSI's CEO Michael Stolarski has done

09:52    3   work as a licensing attorney himself, right?

09:52    4          A.   Yes.

09:52    5          Q.   According to his deposition, had he ever used hedonic

09:52    6   regression personally in his own career?

09:52    7          A.   No.

09:52    8          Q.   How about Kevin Klein, the former director of patent

09:52    9   licensing at Freescale, had he used hedonic regression?

09:52   10          A.   No.

09:52   11          Q.   How about Aaron Waxler, the former vice president of

09:52   12   intellectual property at NXP, had he used regression?

09:52   13          A.   No.

09:52   14          Q.   James Kovacs, Intel's director of patent listening,

09:52   15   had he ever used regression?

09:52   16          A.   No.

09:52   17          Q.   Now, we spent some time going through what would have

09:52   18   happened in this hypothetical world, right, Mr. Huston?

09:52   19          A.   Yes.

09:52   20          Q.   I now want to leave that hypothetical world and

09:53   21   return to right here, where Intel says it's never used or

09:53   22   infringed these two patents once.  If they're right, what do

09:53   23   they owe?

09:53   24          A.   Exactly zero.

09:53   25          Q.   Thank you, sir.

09:53  1        MR. MUELLER:  I have no further questions.

09:53  2        MR. HEINRICH:  Is this a good time for a short break?

09:53  3        THE COURT:  I was just trying to figure out which lawyer

09:53  4   was going to stand up.  I think this would be a great time for

09:53  5   a break.  We're going to keep it short.  If -- we'll be

09:53  6   bringing you back in at five minutes after 10:00.

09:53  7        Remembering my instructions not to discuss the case

09:53  8   amongst yourselves, you are dismissed.

09:53  9        THE BAILIFF:  All rise.

09:53 10        (Jury exited the courtroom at 9:53.)

09:53 11        THE COURT:  Thank you.  You may be seated.

09:53 12        Doctor -- is it doctor?

09:53 13        THE WITNESS:  Mister.

09:53 14        THE COURT:  Mister -- you may -- no offense.  You may step

09:54 15   down.

09:54 16        Anything we need to take up briefly?

09:54 17        MR. HEINRICH:  Not from us.

09:54 18        MR. LEE:  Not for us, Your Honor.

09:54 19        THE BAILIFF:  All rise.

09:54 20        (Recess taken from 9:54 to 10:07.)

10:07 21        THE BAILIFF:  All rise.

10:07 22        THE COURT:  Please remain standing for the jury.

10:07 23        (The jury entered the courtroom at 10:07.)

10:07 24        THE COURT:  Thank you.  You may be seated.

10:08 25        Yes, sir.

10:08  1        MR. HEINRICH:  Good morning, ladies and gentlemen.

10:08  2                    CROSS-EXAMINATION

10:08  3  BY MR. HEINRICH:

10:08  4        Q.  Good morning, Mr. Huston.

10:08  5        A.  Good morning.

10:08  6        Q.  You got involved in this case after you were

10:08  7  recommended to Intel's attorneys by a former IBM attorney who

10:08  8  went on to become an attorney at Intel, correct?

10:08  9        A.  Yes.

10:08  10       Q.  And you worked with this Intel attorney for 22 years?

10:08  11       A.  Yes.

10:08  12       Q.  And you consider this Intel attorney to be a friend?

10:08  13       A.  Yes.

10:08  14       Q.  And this was your first experience as an expert

10:08  15  witness; is that right?

10:08  16       A.  Yes.

10:08  17       Q.  But since coming into this case, you're now serving

10:08  18  as an expert witness for Intel in four or five other cases?

10:08  19       A.  Currently, I have three active cases with Intel and

10:08  20  one case with another company.

10:09  21       Q.  And they're all with Mr. Lee's firm, correct?

10:09  22       A.  No.  Actually one of the Intel cases is with another

10:09  23  firm.

10:09  24       Q.  But you're working with multiple cases with Mr. Lee's

10:09  25  firm, correct?

10:09  1      A.   Yes.

10:09  2      Q.   Now, you were deposed in this case, correct?

10:09  3      A.   Yes.

10:09  4      Q.   And through the time of your deposition, you had

10:09  5   worked about 200 hours on the Intel/VLSI dispute.  Do you

10:09  6   recall that?

10:09  7      A.   It was around 150 to 200 hours.  Yes.

10:09  8      Q.   Okay.  So I just want to talk about what you did in

10:09  9   those 150 to 200 hours.  You submitted an expert report in this

10:09  10  case, correct?

10:09  11     A.   Yes.

10:09  12     Q.   It was over 750 pages long?

10:09  13     A.   Yes.

10:09  14     Q.   And as part of that work, you reviewed over 40 other

10:09  15  expert reports?

10:09  16     A.   Yes.

10:09  17     Q.   And around 80 deposition transcripts?

10:10  18     A.   Yes.

10:10  19     Q.   Each of which was 100, 200 pages long?

10:10  20     A.   Yes.

10:10  21     Q.   And thousands and thousands of pages of documents

10:10  22  that the parties produced?

10:10  23     A.   Yes.

10:10  24     Q.   And all of the many license agreements that you

10:10  25  testified about earlier this morning?

1385

10:10    1      A.   Yes.

10:10    2      Q.   And patents that were licensed under those

10:10    3   agreements?

10:10    4      A.   Yes.

10:10    5      Q.   And you did that all in 150 to 200 hours?

10:10    6      A.   Yes.

10:10    7      Q.   And without any help from anyone?

10:10    8      A.   It was my own work.  Yes.

10:10    9      Q.   Now, you mentioned one type of royalty structure

10:10   10   called a lump sum structure, correct?

10:10   11      A.   Yes.

10:10   12      Q.   There's also a royalty structure called a running

10:10   13   royalty.  Are you familiar with that?

10:10   14      A.   Yes.

10:10   15      Q.   Now, let's just talk about this terminology.

10:11   16      Under a running royalty, the more the licensee uses the

10:11   17   licensed patents, the more the licensee pays in royalties,

10:11   18   correct?

10:11   19      A.   Use is --

10:11   20      Q.   Can you --

10:11   21      A.   -- one of the things that can be used with regard to

10:11   22   a running royalty.

10:11   23      Q.   So you're familiar with running royalty agreements

10:11   24   where the more the licensee uses the licensed patents, the more

10:11   25   the licensee pays in royalties, correct?

10:11  1      A.   I'm familiar --

10:11  2      Q.   Can you answer that yes or no?

10:11  3      A.   Not exactly.

10:11  4      Q.   Okay.  Then I'll try to ask a better question then.

10:11  5      So there are running royalty agreements where the licensee

10:11  6 pays a royalty based on the sales of the licensed products.

10:11  7 You're familiar with that, correct?

10:12  8      A.   Yes.

10:12  9      Q.   So the more products the licensee sells that are

10:12  10 covered by the licensed patents, the more the licensee pays in

10:12  11 royalties, correct?

10:12  12      A.   Yes.

10:12  13      Q.   So let's say that incorporating the licensed patents

10:12  14 turns out to be very valuable for the licensee's products, and

10:12  15 incorporating that technology allows the licensee to sell many

10:12  16 more licensed products because of that technology, under a

10:12  17 running royalty structure, the licensee would wind up paying

10:12  18 more to the patent owner in royalties, correct?

10:12  19      A.   When there is more use, then there would be more

10:12  20 payment based upon the number of units sold.

10:12  21      Q.   Under a running royalty structure?

10:12  22      THE COURT:  We are trying to get done with the trial.

10:13  23 And -- which is not your fault.  But if you would -- on the

10:13  24 cross, if you'd answer his questions just directly with a yes

10:13  25 or a no, if you can, that'll save us a little bit of time.

1387

10:13  1          THE WITNESS:  Okay.  Thank you, Your Honor.

10:13  2    BY MR. HEINRICH:

10:13  3          Q.   So that's under a running royalty structure, correct?

10:13  4          A.   Yes.

10:13  5          Q.   Now, a lump sum royalty doesn't vary based on use of

10:13  6    the licensed technology, correct?

10:13  7          A.   No.

10:13  8          Q.   Are you saying no, you disagree?  Or no, it doesn't

10:13  9    vary by use?

10:13  10         A.   It does not vary by use because it uses any and all

10:13  11   use.

10:13  12         Q.   So the licensee pays a single lump sum regardless of

10:13  13   how much or how little the licensee uses the licensed patents,

10:13  14   correct?

10:13  15         A.   That is correct.

10:13  16         Q.   So if the licensee decides not to use the licensed

10:14  17   patents at all, it doesn't get a discount, right?

10:14  18         A.   That is correct.

10:14  19         Q.   And if it decides to use the licensed patents a lot,

10:14  20   it doesn't have to pay more, correct?

10:14  21         A.   That is correct.

10:14  22         Q.   So even if the licensee incorporates the licensed

10:14  23   technology, the licensed patents in its products, and turns out

10:14  24   it's valuable, very valuable for the licensee, and they wind up

10:14  25   selling many more products as a result of incorporating that

1388

10:14   1   licensed technology in their products, they're not going to pay

10:14   2   any more for that license than they paid initially because it

10:14   3   was a lump sum, correct?

10:14   4       A.   That is correct.

10:14   5       Q.   And you're proposing a lump sum in this case,

10:14   6   correct?

10:14   7       A.   Yes.

10:14   8       Q.   But do you agree that for a proper damages analysis,

10:15   9   the jury finds in VLSI's favor on liability, the jury will have

10:15  10   to award no more but also no less than the value that VLSI's

10:15  11   patented inventions have provided to Intel.  Would you agree

10:15  12   with that?

10:15  13       A.   Yes.

10:15  14       Q.   Now, you testified that -- I believe you said you

10:15  15   couldn't recall any case in your years at IBM in which there

10:15  16   was not a lump sum structure for a license agreement.  Do you

10:15  17   recall that testimony?

10:15  18       A.   My testimony was that I had not done any.

10:16  19       Q.   Okay.  Now -- and you can't recall an example of a

10:16  20   running royalty license at IBM in the semiconductor space,

10:16  21   correct?

10:16  22       A.   Correct.

10:16  23       Q.   Now, IBM did have a patent license and policy under

10:16  24   which it would license one patent to a company for a running

10:16  25   royalty of 1 percent up to a running royalty of 5 percent on

10:16   1   the overall selling price of the licensed products, correct?

10:16   2        A.   Specifically --

10:16   3        Q.   Can you answer that yes or no?

10:16   4        A.   Yes.  And I --

10:16   5        Q.   Okay.  So --

10:16   6        A.   -- can explain.

10:16   7        THE COURT:  Doctor, we don't --

10:16   8        THE WITNESS:  Okay.

10:16   9        THE COURT:  Your lawyers get to have the explanation if

10:16   10  they'd like it.

10:16   11  BY MR. HEINRICH:

10:16   12       Q.   But I think I'm going to help you out because what

10:17   13  you told me at your deposition was that --

10:17   14       THE COURT:  Counsel, just ask the question.

10:17   15  BY MR. HEINRICH:

10:17   16       Q.   Okay.  So it's your recollection that that IBM

10:17   17  running royalty policy only applied to IBM PC clones; is that

10:17   18  right?

10:17   19       A.   Yes.

10:17   20       Q.   And you couldn't recall any instance at IBM where

10:17   21  that 1 percent policy applied to semiconductors.  Is that -- is

10:17   22  that your testimony?

10:17   23       A.   Yes.

10:17   24       Q.   Now, I want to take you back to 1997.  Okay?  In 1997

10:17   25  you were responsible for all licensing of IBM's patents to

10:17 1    semiconductor companies, correct?

10:17 2         A.   Yes.

10:17 3         Q.   And you would have been aware of all of IBM's

10:18 4    licenses to semiconductor companies, correct?

10:18 5         A.   Yes.

10:18 6         Q.   All IBM licenses for semiconductor products, in 1997

10:18 7    you would have been aware of all such licenses, right?

10:18 8         A.   Yes.

10:18 9         Q.   Now, you recall a license agreement in 1997 that IBM

10:18 10   entered into with a company called JDS Uniphase?

10:18 11        A.   No.

10:18 12        Q.   Well, let me see if I can refresh your recollection.

10:18 13   Do you recall that IBM licensed JDS Uniphase for products that

10:18 14   are called semiconductor laser chips?

10:18 15        A.   I do not recall that.

10:18 16        Q.   You don't recall this being an instance where, in

10:18 17   fact, IBM licensed this other company to IBM patents for

10:19 18   semiconductor chips at a running royalty of 1 percent per

10:19 19   patent up to 5 percent on the sale of these semiconductor

10:19 20   products?

10:19 21        A.   I do not recall that.

10:19 22        Q.   Well, maybe I can help you out with the licensed

10:19 23   patents.

10:19 24        So I'll give you an example.  Do you recall a patent -- an

10:19 25   IBM patent that was the '535 patent titled "semiconductor laser

1391

10:19    1    diode deposited on a structured substrate surface."  Does that

10:19    2    ring a bell?

10:19    3         A.   No.

10:19    4         Q.   And you don't recall that patent being licensed to

10:19    5    Uniphase at a running royalty?

10:19    6         A.   No.

10:19    7         Q.   Now, are you familiar with a treatise drafting

10:19    8    technology patent license agreements?

10:20    9         A.   No.

10:20   10         Q.   Would it surprise you that that treatise has a 1997

10:20   11    agreement between IBM and JDS Uniphase that was, in fact, a

10:20   12    running royalty agreement for a semiconductor chip?

10:20   13         A.   Would it surprise me?

10:20   14         Q.   Yes.

10:20   15         A.   No.

10:20   16         Q.   Now, it's hard for us to test your memory of these

10:20   17    past IBM license agreements because almost all of them are

10:20   18    confidential, correct?

10:20   19         A.   Yes.

10:20   20         Q.   So there's really no way for us to determine just how

10:20   21    many IBM licenses in the semiconductor space there have been

10:20   22    for a running royalty instead of a lump sum; is that fair?

10:21   23         A.   That is fair.

10:21   24         Q.   Now, when you were working at IBM, IBM had for years

10:21   25    over a billion dollars in patent licensing revenue, correct?

10:21  1       A.   No.

10:21  2       Q.   Well, so how about over the course of your time?

10:21  3   Well over a billion dollars in licensing revenue, correct?

10:21  4       A.   Over 22 years, it would have been greater than 1

10:21  5   billion.   Yes.

10:21  6       Q.   And there were some years where IBM generated more in

10:21  7   patent licensing revenue than it did in its operating

10:21  8   divisions?

10:21  9       A.   No.

10:21  10      Q.   Now, you testified about some transactions that you

10:21  11  think are comparable to the reasonable royalty that would have

10:21  12  been negotiated in this case, correct?

10:22  13      A.   Yes.

10:22  14      Q.   Now, only three of those transactions involve the

10:22  15  agreements and negotiations and purchases you pointed out, only

10:22  16  three of them actually involved the '373 patent or the '759

10:22  17  patent, correct?

10:22  18      A.   Yes.

10:22  19      MR. HEINRICH:  So can we pull up Mr. Huston's Slide 23, so

10:22  20  DDX-13.23.

10:22  21      MR. MUELLER:  Your Honor, I think we have to seal the

10:22  22  courtroom for VLSI confidential.

10:22  23      THE COURT:  Do you want the courtroom sealed?

10:22  24      MR. HEINRICH:  Yes.  Yes.

10:22  25      THE COURT:  Then we'll go off the public record.

10:22   1          (Sealed proceedings.)

10:22   2          THE COURT:  Can we go back on the public record?

10:52   3          MR. HEINRICH:  Excuse me?

10:52   4          THE COURT:  Can we go back on the public record?

10:52   5          MR. HEINRICH:  Oh, yes.  Yes.

10:52   6          THE COURT:  And, Mr. Mueller, you can tell me if we have

10:52   7   to go off of the public record, but I just wanted to get us

10:52   8   started on it unless you need it.

10:52   9          MR. MUELLER:  And, actually, I think I can stay on the

10:52  10   public record the entire time, but if we could just maybe keep

10:52  11   the monitors off.

10:52  12          THE COURT:  That would be fine.  We'll try to do it that

10:52  13   way.

10:52  14                       REDIRECT EXAMINATION

10:52  15   BY MR. MUELLER:

10:52  16      Q.   I want to pick up right where we left off.  You were

10:52  17   asked about some agreements that Intel entered into to settle

10:52  18   certain litigations, right?

10:52  19      A.   Yes.

10:52  20      Q.   I'm not going to ask you about the specific amounts

10:52  21   because we're on the public record, but I just want to be

10:52  22   really clear about this.  Were any of those agreements for two

10:53  23   patents?

10:53  24      A.   No.

10:53  25      Q.   One of the agreements we heard about, I'm not going

10:53  1    to give the name of it, but it was the very last one you were

10:53  2    asked about.  It starts with an N.  That covered about 1,000

10:53  3    patents, didn't it?

10:53  4         A.   More than 1,000.

10:53  5         Q.   The other agreement, hundreds of patents, right?

10:53  6         A.   Correct.

10:53  7         Q.   Did you see any agreement inside of litigation or

10:53  8    outside of litigation in this case, out of everything you've

10:53  9    reviewed, in which two patents were subject to a price of

10:53  10   billions of dollars?

10:53  11        A.   Never.

10:53  12        Q.   Have you ever heard of such a thing in your entire

10:53  13   career?

10:53  14        A.   No.

10:53  15        Q.   Now, you were asked some questions about the use of

10:53  16   patents and how that might relate to a hypothetical

10:53  17   negotiation.  Do you recall those questions?

10:53  18        A.   Yes.

10:53  19        Q.   And the suggestion was the more you use something,

10:53  20   the more you should pay, right?

10:53  21        A.   Yes.

10:53  22        Q.   So I want to explore that in the context of

10:53  23   licensing.  You have licensed patents for many decades, right?

10:53  24        A.   Correct.

10:53  25        Q.   Two decades at least, right?

1395

10:53   1        A.   Yes.

10:53   2        Q.   Okay.  And did you consider this issue of use in your

10:54   3   own negotiations?

10:54   4        A.   I considered the issue of use, but in all cases, we

10:54   5   would end up doing any and all use.  So it would be for

10:54   6   anything.

10:54   7        MR. MUELLER:  Now, let's pull up on the -- on the

10:54   8   screen -- but not the public monitors, just the screen for the

10:54   9   ladies and gentlemen of the jury -- DDX-13.23.

10:54   10  BY MR. MUELLER:

10:54   11       Q.   These are the prior sales of the asserted patents,

10:54   12  right?

10:54   13       A.   Yes.

10:54   14       Q.   So the patents are actually being sold; is that

10:54   15  correct, sir?

10:54   16       A.   That is correct.

10:54   17       Q.   And how many times could the new owners use them?

10:54   18       A.   The new owners could use these patents as much or as

10:54   19  little as they wanted.  They could use them for any and all of

10:54   20  their products.

10:54   21       Q.   They can use them once.  They could use them a

10:54   22  million times.  They could use them a billion times.  They

10:54   23  could use them a trillion times; isn't that right?

10:54   24       A.   That is correct.

10:54   25       Q.   And those are the prices that were paid?

10:54  1      A.   Yes.

10:54  2      Q.   Now, this reflects basic common sense.  If I'm

10:54  3  selling a house, do I have to know what the owner is going to

10:54  4  use it for to set a price?

10:54  5      A.   No.

10:54  6      Q.   What if I'm selling a car?  Do I have to know how

10:54  7  often it's going to be driven to set a price for the car?

10:55  8      A.   Of course not.

10:55  9      Q.   And if I'm selling a patent, do I have to know

10:55  10  exactly how many times it's going to be used to set a price for

10:55  11  that patent?

10:55  12      A.   No.

10:55  13      Q.   And how did you deal with this issue over the years

10:55  14  at IBM?

10:55  15      A.   So when we would negotiate these kinds of licenses,

10:55  16  we would recognize that we were going to be granting a complete

10:55  17  usage of the patents for as much as the licensee would have,

10:55  18  and we would price it in a way that would be acceptable to both

10:55  19  sides for unlimited use.

10:55  20      Q.   Now, did you ever negotiate with competitors of IBM?

10:55  21      A.   Always.

10:55  22      Q.   And did you assume that those competitors were going

10:55  23  to use the patents you were licensing to them?

10:55  24      A.   Yes.

10:55  25      Q.   Did you take that into account in setting the prices?

—1397—

10:55  1      A.   Yes.

10:55  2      MR. MUELLER:  Let's go to DDX-13.25.

10:55  3  BY MR. MUELLER:

10:55  4      Q.   Here we have the prior comparable agreements that

10:55  5  Intel struck with Freescale and NXP over the years.  Do you see

10:55  6  these, sir?

10:55  7      A.   Yes.

10:55  8      Q.   I'm not going to read the terms because we're on the

10:55  9  public record.  These were in one instance a purchase agreement

10:56 10  and one instance a license, right?

10:56 11      A.   Correct.

10:56 12      Q.   How many times could Intel use the patents that it

10:56 13  purchased or licensed under these agreements?

10:56 14      A.   As much as they wanted for all of their products.

10:56 15      Q.   Million times, billion times, trillion times?

10:56 16      A.   Correct.

10:56 17      Q.   Freescale, NXP, they were sophisticated parties,

10:56 18  right?

10:56 19      A.   Yes.

10:56 20      Q.   And they struck these agreements for these amounts?

10:56 21      A.   Correct.

10:56 22      Q.   And they knew Intel could use these patents as much

10:56 23  as they wanted?

10:56 24      A.   Yes.  That was fundamental.

10:56 25      MR. MUELLER:  Next slide, DDX-13.38.

| | | |
|---|---|---|
| 10:56 | 1 | BY MR. MUELLER: |
| 10:56 | 2 | Q.   These are the 18 agreements that you found comparable |
| 10:56 | 3 | in this case; is that right, sir? |
| 10:56 | 4 | A.   Yes. |
| 10:56 | 5 | Q.   Under each and every one of these agreements, how |
| 10:56 | 6 | many times could Intel use the patents that it was either |
| 10:56 | 7 | purchasing or licensing? |
| 10:56 | 8 | A.   As much as they wanted in all of their products. |
| 10:56 | 9 | Q.   Billions, trillions.  They could use as much as they |
| 10:56 | 10 | wanted, right? |
| 10:56 | 11 | A.   Correct. |
| 10:56 | 12 | Q.   And those were the prices that were struck? |
| 10:56 | 13 | A.   Yes. |
| 10:56 | 14 | Q.   Now, you've identified 18 comparable license |
| 10:57 | 15 | agreements.  You've also identified comparable agreements for |
| 10:57 | 16 | the prior owners.  You've also identified prior sales |
| 10:57 | 17 | agreements for these patents, right, sir? |
| 10:57 | 18 | A.   Yes. |
| 10:57 | 19 | Q.   Do you understand that in patent law there's this |
| 10:57 | 20 | concept called the "comparable license agreement"? |
| 10:57 | 21 | A.   Yes. |
| 10:57 | 22 | Q.   And that's relevant to a hypothetical negotiation? |
| 10:57 | 23 | A.   Yes. |
| 10:57 | 24 | Q.   How many comparable agreements did Dr. Sullivan and |
| 10:57 | 25 | VLSI identify in this case? |

10:57   1      A.   Zero.

10:57   2      Q.   Now, you were asked a couple questions about

10:57   3  Dr. Colwell and some work that he had done.  Do you recall

10:57   4  that?

10:57   5      A.   Yes.

10:57   6      Q.   On the subject of technological comparability?

10:57   7      A.   Yes.

10:57   8      Q.   Now, you, sir, are an engineer with a master's

10:57   9  degree, correct?

10:57  10      A.   Correct.

10:57  11      Q.   You worked at IBM as an engineer for 11 years?

10:57  12      A.   Correct.

10:57  13      Q.   Did you yourself do an independent technological

10:57  14  comparability analysis in this case?

10:57  15      A.   Yes.  I did.

10:57  16      Q.   And are the opinions you gave the jury based on your

10:57  17  own independent work?

10:57  18      A.   Yes.

10:57  19      Q.   Last few questions.  You were asked about the

10:58  20  financial terms of some of these agreements and the suggestion

10:58  21  was made:  Well, those were just numbers that the accountants

10:58  22  for folks like the prior owners had come up with, right?

10:58  23      A.   Correct.

10:58  24      Q.   Have you taken the accountants at their word and

10:58  25  assumed they weren't lying?

10:58  1      A.   I have.

10:58  2      Q.   And have you based your analysis on the accounting

10:58  3  valuations given to these patents in the actual agreements?

10:58  4      A.   Yes.

10:58  5      Q.   Now, you've observed all of the testimony in this

10:58  6  case, correct, sir?

10:58  7      A.   Yes.

10:58  8      Q.   And you know the only witness who's taken the stand

10:58  9  in this case to say there's been any use by Intel of these two

10:58 10  patents is Dr. Conte, right?

10:58 11      A.   Correct.

10:58 12      Q.   If the ladies and gentlemen of the jury decide that

10:58 13  Dr. Conte was wrong, that there is no infringement, then what

10:58 14  does Intel owe for these two patents?

10:58 15      A.   Exactly zero.

10:58 16      Q.   And in the hypothetical world where Intel is using

10:58 17  them, do you think that in that hypothetical world they would

10:58 18  pay a running royalty or a lump sum?

10:58 19      A.   A lump sum.

10:58 20      Q.   But if there's no use at all, the number is?

10:59 21      A.   Zero.

10:59 22      Q.   Thank you, sir.

10:59 23      MR. MUELLER:   I have no further questions.

10:59 24      MR. HEINRICH:   Can we pull up DDX-13.38?

10:59 25                    RECROSS-EXAMINATION

1401

10:59  1    BY MR. HEINRICH:

10:59  2        Q.    So, Mr. Huston, you pointed to this slide a moment

10:59  3    ago and said that Intel could use the patents licensed under

10:59  4    these agreements in billions of products, right?

10:59  5        A.    Or more.

10:59  6        Q.    And yet you didn't point the ladies and gentlemen of

10:59  7    the jury to even one single Intel product covered by the

10:59  8    claimed invention of any of these licensed patents, correct?

11:00  9        A.    Correct.

11:00  10       Q.    Now, let's talk about numbers of patents and

11:00  11   royalties for numbers of patents.

11:00  12       MR. HEINRICH:  And let's pull back up PTX-212.

11:00  13   BY MR. HEINRICH:

11:00  14       Q.    Under the IBM licensing practices that we talked

11:00  15   about a few moments ago, IBM would license a single patent for

11:00  16   1 percent, correct?

11:00  17       A.    For PC clones.  Yes.

11:00  18       Q.    And for two patents, they would license for a

11:00  19   2 percent running royalty on sales, correct?

11:00  20       A.    For PC clones.  Yes.

11:00  21       Q.    And 2 percent -- well, even 1 percent is much more

11:00  22   than what Dr. Sullivan is proposing, correct?

11:00  23       A.    Yes.

11:00  24       MR. HEINRICH:  No further questions.  Thank you very much.

11:00  25       THE COURT:  You may step down, sir.

| | | |
|---|---|---|
| 11:00 | 1 | Mr. Lee? |
| 11:01 | 2 | MR. LEE:  Your Honor, ladies and gentlemen of the jury, |
| 11:01 | 3 | Intel rests. |
| 11:01 | 4 | We would renew our motions, but we can do that at the |
| 11:01 | 5 | break so we don't waste the jury's time. |
| 11:01 | 6 | THE COURT:  Very good. |
| 11:01 | 7 | Mr. Chu? |
| 11:01 | 8 | MR. CHU:  Thank you, Your Honor.  And at an appropriate |
| 11:01 | 9 | time we will have some motions to make as well.  And then I |
| 11:01 | 10 | will turn the next stage of the trial over to one of my |
| 11:01 | 11 | colleagues. |
| 11:01 | 12 | THE COURT:  And, Mr. Lee, you approve of waiting on those |
| 11:01 | 13 | motions as well? |
| 11:01 | 14 | MR. LEE:  I'm sorry, Your Honor? |
| 11:01 | 15 | THE COURT:  You approve on us waiting on Mr. Chu's motions |
| 11:01 | 16 | as well? |
| 11:01 | 17 | MR. LEE:  Yes. |
| 11:01 | 18 | THE COURT:  Okay. |
| 11:01 | 19 | MR. LEE:  I think we can make them -- |
| 11:01 | 20 | THE COURT:  I just wanted to -- I need -- |
| 11:01 | 21 | MR. LEE:  We can follow the same procedure. |
| 11:01 | 22 | THE COURT:  Sure.  I just needed it on the record. |
| 11:01 | 23 | MR. LEE:  That's perfectly fine. |
| 11:01 | 24 | THE COURT:  Yes. |
| 11:01 | 25 | MR. HEINRICH:  VLSI calls its next witness Professor Tom |

11:01    1    Conte.

2        THE COURT:  Dr. Conte, if you will recall that you are

3    under oath.

4        MR. HEINRICH:  May I proceed?

5        THE COURT:  Yes, please.

6                        DIRECT EXAMINATION

7    BY MR. HEINRICH:

11:02    8    Q.   Welcome back, Professor Conte.

11:02    9    A.   Thank you.

11:02   10    Q.   Were you present here in court on Friday when

11:02   11    Dr. Grunfeld [sic] testified regarding the validity of the '759

11:02   12    patent?

11:02   13    A.   Dr. Grunwald, I think you mean.

11:02   14    Q.   Oh, sorry.  Dr. Grunwald, I apologize.

11:02   15    Were you here for that?

11:02   16    A.   Yes.  I was.

11:02   17    Q.   And can you summarize your opinions after carefully

11:03   18    considering his testimony?

11:03   19    A.   Yes.  I'd be happy to.  I prepared a slide on this.

11:03   20    There it is.

11:03   21    Okay.  So I listened to Dr. Grunwald's opinions.  And I

11:03   22    concluded, when he described Yonah, that Yonah is the old

11:03   23    approach that I talked about, and I'll talk a little bit more

11:03   24    about that.  And the '759 patent is the new approach, and I'll

11:03   25    talk some more about that.

11:03   1        I also listened, and I am still convinced that the U.S.

11:03   2   Patent Office thoroughly examined and correctly issued the '759

11:03   3   patent.  He did not provide any clear and convincing evidence

11:03   4   of invalidity.  Definitely nothing --

11:03   5        MR. LEE:  Your Honor, I object to the (inaudible) --

11:03   6        THE REPORTER:  Counsel, I can't hear you.

11:03   7        THE COURT:  I can't hear you, Mr. Lee.

11:03   8        MR. LEE:  It's not his job to decide what clear and

11:03   9   convincing evidence is.  That's the jury's job.  He gets to

11:03  10   just put his testimony in.

11:03  11        THE COURT:  I'll sustain that.

11:03  12        If you could re-ask the question.

11:04  13   BY MR. HEINRICH:

11:04  14        Q.   So in your opinion, is there clear and convincing

11:04  15   evidence of invalidity?

11:04  16        MR. LEE:  I object.

11:04  17        THE COURT:  I'll sustain.

11:04  18   BY MR. HEINRICH:

11:04  19        Q.   What's your opinion on the validity of the '759

11:04  20   patent?

11:04  21        A.   I believe it's valid.  I know that if it were

11:04  22   invalid, what would happen would be you're taking away a patent

11:04  23   owner's rights.  You're taking away their property.  I own 40

11:04  24   patents, so I understand what that means.  And the '759 is

11:04  25   valid.

11:04  1          Q.   Okay.  So can you remind us what Yonah's approach was

11:04  2     for speed control?

11:04  3          A.   Sure.  So -- and this is what I showed last Tuesday.

11:04  4     So if you remember, it's the operating system in Yonah that

11:04  5     determines how to what they say "step the speed," right?  So it

11:04  6     controls the speed.  It's what makes the decisions.

11:04  7          And it has to wait in line -- I mean, those speed

11:04  8     instructions have to wait in line after all your programs are

11:05  9     running, right?

11:05  10         So it ends up -- if you were to put in more instructions,

11:05  11    that would be "too intrusive."  And because it takes this long

11:05  12    time, it's really slow.

11:05  13         Q.   And why do you have too intrusive in quotes there?

11:05  14         A.   That's what Dr. Rotem described the old approach as

11:05  15    in his IEEE paper.

11:05  16         Q.   And just remind us, what does Intel call this old

11:05  17    approach?

11:05  18         A.   They call it SpeedStep.

11:05  19         Q.   And was the '759 patent's approach to speed control

11:05  20    the same or different than the Yonah old approach?

11:05  21         A.   It was different.  Okay.  So the '759 teaches that

11:05  22    you have this programmable clock controller with an embedded

11:05  23    computer program.  That's what makes the control decisions.

11:05  24    That's what changes the speed.  And it's dedicated, right?

11:05  25    It's this computer-in-a-computer, and it can do it over a

—1406—

11:05   1   thousand times faster.

11:05   2       Q.   Now, in the Yonah SpeedStep approach, what was making

11:06   3   the decisions to change speed?

11:06   4       A.   In Yonah it was the operating system that did that.

11:06   5       Q.   And did we get a confirmation of that at trial?

11:06   6       A.   Yes.  We did.

11:06   7       Q.   So let's pull up -- well, can you summarize the

11:06   8   testimony that you recall on that?

11:06   9       A.   Yeah.  I recall -- actually, here it is.  Dr. Rotem

11:06  10   testified, "So the OS," the operating system, "power manager

11:06  11   tracks the utilization of the core.  And based on that

11:06  12   utilization, it makes an explicit decision."

11:06  13       So it's the operating system making the calls, making the

11:06  14   decisions.

11:06  15       Q.   Now, in the '759 patent, where is the operating

11:06  16   system running?

11:06  17       A.   In the '759 patent, it's running on the cores.

11:06  18       Q.   Now, what's the role of the cores in making the speed

11:07  19   changes in the '759 approach?

11:07  20       A.   All they do is they provide requests.

11:07  21       MR. HEINRICH:  So let's pull up PTX-2, the '759 patent,

11:07  22   and let's go to Claim 14, Element B.

11:07  23   BY MR. HEINRICH:

11:07  24       Q.   And what does the patent itself tell us about the

11:07  25   role of the cores or the first master device in this system?

—1407—

11:07   1       A.   Yeah.   Here it is.   This is one of the claims, and it

11:07   2   says, "The first master device is configured to provide a

11:07   3   request."   That's what it does.   It provides a request to that

11:07   4   programmable clock controller, that embedded

11:07   5   computer-in-a-computer.

11:07   6       Q.   And under this '759 approach, what component is

11:07   7   actually making the decision to increase speed?

11:07   8       A.   It's that programmable clock controller.

11:07   9       Q.   So let's turn to this Column 5 at Lines 55 to 56, the

11:08   10   same patent, the '759.   And what does the '759 patent say about

11:08   11   this decision to increase speed?

11:08   12       A.   So here I'll read it out.   It says, "Moving to

11:08   13   Decision Step 204, the controller determines whether to enable

11:08   14   the request."

11:08   15       So it's the controller making the calls.

11:08   16       Q.   And it references Decision Step 204.

11:08   17       MR. HEINRICH:   And let's pull up Figure 2 of the patent to

11:08   18   look at that step.

11:08   19   BY MR. HEINRICH:

11:08   20       Q.   And what does the patent show us here in Figure 2?

11:08   21       A.   All right.   So this is some of what the programmable

11:08   22   clock controller is doing.   And you see it says, like in 202,

11:08   23   "receive a request to increase speed."   And then 204 is that

11:08   24   decision block.   We talked about this on Tuesday.   And it

11:08   25   decides whether or not to listen to that request and -- and

| 11:08 | 1 | speed things up. |

11:08 1 speed things up.

11:08 2     Q.   Now, does this -- this method, using a dedicated

11:09 3 computer within a controller, have an impact on how fast the

11:09 4 speed control changes can be made?

11:09 5     A.   Yes.  It does.  It's much, much faster.

11:09 6     MR. HEINRICH:  So, Mr. Simmons, let's bring up D-273 and

11:09 7 go to Page 5 of 60.

11:09 8 BY MR. HEINRICH:

11:09 9     Q.   And do you recall Dr. Grunwald's testimony about this

11:09 10 slide during cross-examination?

11:09 11     A.   I do.

11:09 12     Q.   So let's highlight the -- the line here that says,

11:09 13 "300 to 1,000 milliseconds."  And what is -- first of all, is

11:09 14 this document about the Yonah SpeedStep approach?

11:09 15     A.   Yeah.  You can see right there, it says Yonah.

11:09 16     Q.   And what does this 300 to 1,000 millisecond reference

11:09 17 mean?

11:10 18     A.   It means that at most the operating system can make a

11:10 19 speed change at about a third of a second.  Sometimes it's

11:10 20 saying it's as slow as a second.

11:10 21     Q.   Now, let's contrast that to the '759 approach.

11:10 22     MR. HEINRICH:  Can we go back to PTX-2, the '759 patent,

11:10 23 and go to Column 4, at Lines 8 through 10.

11:10 24 BY MR. HEINRICH:

11:10 25     Q.   And what does the patent say here?

11:10   1       A.   Yeah.   So look here, it says, "The predefined time

11:10   2   interval may vary from one microsecond to several

11:10   3   milliseconds."

11:10   4       Q.   So that's -- that's much faster than the Yonah

11:10   5   approach?

11:10   6       A.   Over 1,000 times.

11:10   7       Q.   And has Intel itself benefitted from the new approach

11:10   8   that is described and claimed in the '759 patent?

11:10   9       A.   Yes, they have.   Greatly.

11:10   10       Q.   And what does Intel call its implementation of the

11:10   11   '759 patent?

11:10   12       A.   They call it Speed Shift.

11:10   13       Q.   Okay.   So let's go to your opinion on validity.

11:10   14       And you understand that Intel claims that the '759 patent

11:11   15   is anticipated by Yonah?

11:11   16       A.   I do.

11:11   17       Q.   And what tests for anticipation did you apply in your

11:11   18   analysis?

11:11   19       A.   Let's go back to my slides, if we could.

11:11   20       Nope.

11:11   21       Q.   Let's go -- okay.

11:11   22       MR. HEINRICH:   Let's go to the next slide.

11:11   23   BY THE WITNESS:

11:11   24       A.   There we go.

11:11   25       So I applied this test.   "For anticipation, Intel must

11:11  1  prove by clear and convincing evidence that all of the

11:11  2  requirements of the claim are present in a single piece of

11:11  3  prior art."

11:11  4  BY MR. HEINRICH:

11:11  5      Q.   And is that test met, in your opinion?

11:11  6      A.   No.  I'll show you not only are -- not all of the

11:11  7  elements of the claim present in Yonah, but what Dr. Grunwald

11:11  8  pointed to was not a single piece of prior art.

11:11  9      Q.   Okay.

11:11  10      MR. HEINRICH:  So let's pull up Claim 14.

11:11  11  BY MR. HEINRICH:

11:12  12      Q.   And before you get into the details, can you identify

11:12  13  for us what claim element or claim elements you believe are

11:12  14  missing from Yonah?

11:12  15      A.   Yes.  So I think we probably all have this memorized

11:12  16  by now, don't we?  So I'll go over it -- and "Yonah does not

11:12  17  have this programmable clock controller having an embedded

11:12  18  computer program therein.  The program including instructions

11:12  19  to and D, E and F."  Okay.  So I'll go over that.  It doesn't

11:12  20  at least have that.

11:12  21      Q.   Okay.

11:12  22      MR. HEINRICH:  So, Mr. Simmons, let's go to the trial

11:12  23  transcript and pull up Page 1386 and blow up Lines 16 through

11:12  24  24.

11:12  25  BY MR. HEINRICH:

11:12  1        Q.   Who's testifying here?

11:12  2        A.   This is Dr. Grunwald.

11:12  3        Q.   And what is Dr. Grunwald saying here, first about the

11:12  4   old legacy Yonah processor?

11:12  5        A.   He said it -- it does not have a PCU.  Yonah did not

11:12  6   have a PCU.

11:12  7        Q.   Do you agree with that?

11:12  8        A.   Yes.

11:12  9        Q.   And what about the Skylake processors?

11:12 10        A.   He said that Skylake does have a PCU.

11:13 11        Q.   And does Dr. Grunwald contest that the Skylake and

11:13 12   Lake processors' PCU is, in fact, a programmable clock

11:13 13   controller?

11:13 14        A.   No.  He does not.  He agrees with that.

11:13 15        Q.   Okay.  Now, is the claimed programmable clock

11:13 16   controller a hardware controller or a software controller?

11:13 17        A.   It's a hardware controller.

11:13 18        Q.   And after Yonah was introduced, did Intel actually

11:13 19   add this hardware controller, the PCU, with the Speed Shift

11:13 20   functionality to its Lake processors?

11:13 21        A.   It did.

11:13 22        Q.   Could a person of skill have taken the Yonah approach

11:13 23   and come up with this Speed Shift approach using the '759

11:13 24   technology without undue experimentation?

11:13 25        A.   No.  They could not have.

11:13  1      Q.   And is there some real-world evidence of that?

11:14  2      A.   Sure.  Intel, in fact, calls -- if you remember, they

11:14  3  call Speed Shift a revolutionary new approach.

11:14  4      Q.   And how long did it take Intel to introduce its first

11:14  5  processor with Speed Shift after Yonah was introduced?

11:14  6      A.   Well, let's see.  Skylake was introduced in 2015.  I

11:14  7  think Yonah was introduced in 2010 or '11.  I think it's 2011.

11:14  8      Q.   Okay.  So let's talk in more detail about

11:14  9  Dr. Grunwald's anticipation analysis.

11:14  10      A.   Okay.

11:14  11      Q.   What did he point to as --

11:14  12      MR. HEINRICH:  Well, you know, actually, let's go to --

11:14  13  let's go to the next slide.

11:14  14  BY THE WITNESS:

11:14  15      A.   Okay.

11:14  16  BY MR. HEINRICH:

11:14  17      Q.   And what did Dr. Grunwald point to as Yonah's

11:14  18  programmable clock controller?

11:14  19      A.   Okay.  Well, first, this -- this -- I was going to go

11:15  20  and walk through the elements that are missing.  I had a nice

11:15  21  little graphic.  We'll see that again.

11:15  22      What he pointed to was this piece here called the power

11:15  23  management logic.

11:15  24      Q.   And is the power management logic a programmable

11:15  25  clock controller with an embedded computer program, in your --

11:15  1    in your opinion?

11:15  2         A.   No.  Well, first, logic is kind of computer

11:15  3    engineering-ese for simple circuits.  And in this case, there's

11:15  4    no OS -- first, let me back off.

11:15  5         Simple circuits, let's go back there.  The OS controls

11:15  6    this thing.  The OS is calling the shots.  We already talked

11:15  7    about that.  This is not programmable.  It has no embedded

11:15  8    computer instructions in it.

11:15  9         Q.   Is this power management logic that Dr. Grunwald is

11:15  10   pointing to, is this a computer-within-a-computer like

11:15  11   Mr. Henson conceived?

11:15  12        A.   No.  Not at all.

11:16  13        Q.   Let's go through some of Dr. Grunwald's other slides

11:16  14   now.

11:16  15        MR. HEINRICH:  So can you -- Mr. Simmons, can you pull up

11:16  16   DDX-10.72?  And let's blow up the -- the figure on the left.

11:16  17   BY MR. HEINRICH:

11:16  18        Q.   And the -- Professor Conte, is this a slide that

11:16  19   Dr. Grunwald presented during his direct testimony to show that

11:16  20   the Yonah controller was programmable?

11:16  21        A.   Yeah.  So I want you to understand that engineers

11:16  22   sometimes use programmable just to mean that you can configure

11:16  23   it.  And here it's talking about "with programmable five US,"

11:16  24   that's five microsecond delay per step.

11:16  25        And the next one is "wait five micro seconds until

11:16  1    unlocked, programmable."  "Wait until five microseconds until

11:16  2    unlocked, programmable."  "With programmable, five-microsecond

11:16  3    delay."

11:16  4         This is as programmable as a kitchen timer.  Okay?  And,

11:17  5    ladies and gentlemen, if you recall when I talked about how a

11:17  6    program's a step of -- a set of instructions, like you do to

11:17  7    make a cake, this is like saying that your kitchen timer could

11:17  8    make a cake.

11:17  9         Q.   Now, does the use of the word "programmable" standing

11:17  10   alone mean that Yonah had a programmable clock controller with

11:17  11   an embedded computer program?

11:17  12        A.   No.  Not at all.

11:17  13        Q.   Did Yonah have an embedded computer program in the

11:17  14   functionality that Dr. Grunwald was pointing to?

11:17  15        A.   No.  It did not.

11:17  16        MR. HEINRICH:  Okay.  So let's bring up DDX-10.70.  And,

11:17  17   again, blow up the image on the left.

11:17  18   BY MR. HEINRICH:

11:17  19        Q.   Professor Conte, did Yonah measure performance in a

11:17  20   predefined time interval?

11:17  21        A.   No.  Yonah did not.  The operating system did.

11:17  22   That's what this is talking about.  It's the operating system

11:18  23   that's doing that.

11:18  24        MR. HEINRICH:  Let's go to Exhibit -- or Slide -- Mr. --

11:18  25   Dr. Grunwald's Slide DDX-10.67.

11:18  1   BY MR. HEINRICH:

11:18  2       Q.   And is this another image that he showed the jury

11:18  3   during his testimony?

11:18  4       A.   Yes.  It is.

11:18  5       Q.   And what do we see on the left here?

11:18  6       MR. HEINRICH:  Let's blow that up again.

11:18  7   BY THE WITNESS:

11:18  8       A.   This is the die photo of Yonah.

11:18  9   BY MR. HEINRICH:

11:18 10       Q.   And is there a programmable clock controller here in

11:18 11   the Yonah processor?

11:18 12       A.   There is not.

11:18 13       Q.   Okay.

11:18 14       MR. HEINRICH:  And let's pull up DDX-10.71.  And, again,

11:18 15   blow up the diagram on the left, please.

11:18 16   BY MR. HEINRICH:

11:18 17       Q.   And I think we heard some testimony about this figure

11:18 18   earlier today.  What do we -- what do we see here?

11:18 19       A.   Well, I guess he used this because it looks pretty

11:18 20   complicated, right?  But there's really just a couple of

11:18 21   registers, they go down to a bunch of adders and then they go

11:19 22   into these latches, and that's about it.  It's -- it's

11:19 23   circuitry as complicated as what my sophomores would build.

11:19 24       Q.   And there's a reference to a GV3 stepper here.  Do

11:19 25   you see that?

11:19  1        A.   Yes.  I do.

11:19  2        Q.   Is that a programmable clock controller with embedded

11:19  3   computer programs?

11:19  4        A.   No.  It's not.

11:19  5        Q.   We heard some reference from Dr. Grunwald this

11:19  6   morning about microcode.  Do these GV3 steppers have in them

11:19  7   microcode?

11:19  8        A.   No.  Microcode is in the core.

11:19  9        Microcode is not an embedded computer program.

11:19 10        Microcode is what -- it's what you use to decode the

11:19 11   complicated instructions.  It just tells you how to break them

11:19 12   into simple instructions.  That's all it is.

11:19 13        Q.   So after reviewing Dr. Grunwald's evidence and

11:19 14   listening carefully to his testimony, what's your conclusion

11:20 15   about whether Yonah anticipates the '759 patent asserted

11:20 16   claims?

11:20 17        A.   Yonah does not anticipate the '759 patent asserted

11:20 18   claims.

11:20 19        Q.   And what are the missing elements, in your opinion?

11:20 20        A.   Well, we have a slide.  Yeah.  This is that pretty

11:20 21   slide I said.

11:20 22        So Yonah, as I showed, does not have a programmable clock

11:20 23   controller having an embedded computer program therein.  And

11:20 24   that means --

11:20 25        THE COURT:  Doctor, you need to slow down just a little

11:20    1    bit.

11:20    2         THE WITNESS:  Yeah.  Okay.  I took too much coffee this

11:20    3    morning.

11:20    4         THE COURT:  Whatever it is, you're reading faster than I

11:20    5    can listen.  So just slow down a little bit.

11:20    6         THE WITNESS:  My wife tells me that all the time, by the

11:20    7    way.

11:20    8    BY THE WITNESS:

11:20    9         A.   All right.  So there's not that programmable clock

11:20   10    controller with an embedded computer program.  It doesn't

11:20   11    receive the request provided by the -- by the cores.  It

11:20   12    doesn't do ENF either.  And we'll talk about those later.

11:20   13    BY MR. HEINRICH:

11:21   14         Q.   Okay.  And does your analysis of Claim 14 apply to

11:21   15    all of the asserted claims of the '759 patent?

11:21   16         A.   Yes.  It does.

11:21   17         Q.   And so then what's your summary on Intel's

11:21   18    anticipation defense?

11:21   19         A.   Intel's anticipation defense is -- is full of holes.

11:21   20    It didn't change that the '759 patent is valid.

11:21   21         Q.   Okay.  So let's switch gears a little bit and talk

11:21   22    about your response to some of Intel's noninfringement

11:21   23    arguments that we heard at trial last week.

11:21   24         A.   Okay.

11:21   25         Q.   Do you recall Dr. Grunwald's criticism of your

11:21  1    opinion about what the request is in the Lake processors?

11:21  2        A.   I do.

11:21  3        Q.   And just remind us, what is the request in the Lake

11:21  4    processors?

11:21  5        A.   So remember when you change the load, that's when the

11:22  6    cores send this Core_Active to the PCU.  So it's the

11:22  7    Core_Active signal.

11:22  8        Q.   Does Dr. Grunwald agree with that?

11:22  9        A.   No.  He doesn't.

11:22  10       MR. HEINRICH:  So let's -- Mr. Simmons, if you could pull

11:22  11   up the trial transcript at Page 1302 and blow up Line 25 and go

11:22  12   on to the next page to Line 1.

11:22  13   BY MR. HEINRICH:

11:22  14       Q.   And what does Dr. Grunwald testify here to?

11:22  15       A.   So he was asked, "Is the Core_Active signal an input

11:22  16   into the autonomous algorithms that calculate the clock speed

11:22  17   ratios?"

11:22  18       And he said, "No."

11:22  19       Q.   And do you agree with that?

11:22  20       A.   I do not agree with that.

11:22  21       Q.   Now, where do these autonomous algorithms occur, or

11:22  22   where are they running in the Lake processors?

11:22  23       A.   They're running in the PCUs.

11:22  24       So if we go back to my slides.  So this is actually

11:23  25   Dr. Grunwald's slide here and he shows, right here, here's the

11:23  1   autonomous algorithms.  They're running in the PCU.

11:23  2       Q.   And at the top here there's an arrow pointing to a

11:23  3   little green folder and it says "Core C0 Residency."  What's

11:23  4   that?

11:23  5       A.   If you remember on Tuesday, we talked about this.

11:23  6   Inside the PCU are these counters.  They're called C0 residency

11:23  7   counters.  And the way they work is that Core_Active sends a

11:23  8   signal to the PCU, and that starts these counters counting.

11:23  9       Q.   Now, despite the way it's presented on Dr. Grunwald's

11:23  10  slide, is the Core C0 Residency within the PCU?

11:23  11      A.   Yes.  It is.

11:23  12      Q.   Okay.  And is there a relationship between the Core

11:23  13  C0 Residency and the Core_Active requests?

11:23  14      A.   There is.  So let me take you to slide -- and I'll

11:23  15  blow that up.  And here's exactly what I said on Tuesday.  The

11:23  16  core sends Core_Active signal and that starts this counter

11:24  17  counting.  And that's measured in this activity window we

11:24  18  talked about.

11:24  19      Q.   Is the Core_Active then an input to the autonomous

11:24  20  algorithms that calculate the speed of the cores?

11:24  21      A.   Absolutely.  In fact -- I'm sorry.

11:24  22      Q.   Can you explain -- can you explain?

11:24  23      A.   Yeah.  I'd be happy to.  I was trying to.  Okay.

11:24  24       If you didn't have that signal to turn on the counters,

11:24  25  the PCU would never know that the cores' load changed.  It

11:24  1    would never change the speed of the cores due to loading.

11:24  2         Q.   And there was some discussion on Friday and then

11:24  3    again this morning about Dr. Grunwald's restaurant analogy.

11:24  4         Just to be clear, who was the one that raised this

11:24  5    restaurant analogy?

11:24  6         A.   Dr. Grunwald in his report raised that.

11:24  7         Q.   Okay.  So let's turn to Dr. Grunwald's argument

11:24  8    regarding the clock elements.  So these are Elements [E] and

11:25  9    [F].  Do you recall his testimony about that?

11:25 10         A.   I do.

11:25 11         MR. HEINRICH:  So let's -- Mr. Simmons, let's pull up

11:25 12    DDX-10.52.

11:25 13    BY MR. HEINRICH:

11:25 14         Q.   And this is another one of Dr. Grunwald's slides.

11:25 15    What is Dr. Grunwald trying to argue through his slide here?

11:25 16         A.   He's trying to argue that the clock frequency of the

11:25 17    bus and the clock frequency of the second master are required

11:25 18    to be the same in the '759 patent.

11:25 19         Q.   So in other words, he's arguing that Elements [E] and

11:25 20    [F] require controlling the second master and the bus so that

11:25 21    they're operating at the same frequency?

11:25 22         A.   Yes.

11:25 23         Q.   Okay.  So let's take another look at the claim

11:25 24    elements themselves.

11:25 25         MR. HEINRICH:  So, Mr. Simmons, can you bring up PTX-2,

11:25   1   the '759 patent, and blow up Elements [E] and [F] of Claim 14?

11:26   2       Okay.  Thank you.

11:26   3   BY MR. HEINRICH:

11:26   4       Q.   So would a person of skill, reading Elements [E] and

11:26   5   [F], conclude that these elements require setting the second

11:26   6   master and the bus to the same ultimate frequency?

11:26   7       A.   No.  So if you step back and just think about it, if

11:26   8   the patentee wanted that, the patentee wouldn't have put in two

11:26   9   elements.  The patentee would have just said, "Provide the

11:26  10   high-speed clock to the second master in the bus."  Much

11:27  11   simpler language.

11:27  12       Instead the patentee said, "Provide the clock frequency of

11:27  13   the high-speed clock as an output to control a clock frequency

11:27  14   of a second master device."

11:27  15       And furthermore, said, "Provide the clock frequency of the

11:27  16   high-speed clock as an output to control," and used even

11:27  17   different words, "variable clock frequency of the bus."

11:27  18       And so to an engineer that's why -- that's who he was

11:27  19   writing to.  To an engineer, that means that these are

11:27  20   different frequencies that are going to the bus in the second

11:27  21   master.

11:27  22       MR. HEINRICH:  So, Mr. Simmons, let's pull up PTX-3588 and

11:27  23   go to Page 15 and then blow up the top half of that figure.

11:27  24   BY MR. HEINRICH:

11:27  25       Q.   Do you recall this figure that Dr. Grunwald was

11:27  1    questioned about during his cross-examination?

11:27  2        A.   Yes.  And I think y'all probably remember me using

11:27  3    this on Tuesday, too, right?

11:27  4        Q.   First, what figure is this?

11:28  5        A.   This is the Skylake client clock circuit.

11:28  6        Q.   Now, how many -- is there a high-speed clock shown

11:28  7    here?

11:28  8        A.   Yes.  That's BCLCK.

11:28  9        Q.   And how many high speed clocks are shown in this

11:28  10   clock circuit?

11:28  11       A.   One.

11:28  12       Q.   So does that mean that the resulting frequencies have

11:28  13   to be the same?

11:28  14       A.   No.  You see what happens, like I explained, is

11:28  15   that's an output that goes into these PLLs.  Remember those?

11:28  16   Those are used to further adjust that clock to deliver a clock

11:28  17   to the core.  There's CPLL, that delivers the clock to the

11:28  18   core.  And CLR PLL, that takes that, that further adjusts it

11:28  19   and delivers that to the bus.

11:28  20       Q.   So in the Lake processors, the output of the

11:28  21   high-speed clock is further adjusted by the PLLs and then

11:28  22   controls the cores and the bus?

11:29  23       A.   That's right.

11:29  24       Q.   Now, does the '759 patent say that the high-speed

11:29  25   clock must directly control the various components on the chip

11:29  1    to the same frequencies?

11:29  2         A.   No.  It says in fact the opposite.

11:29  3         MR. HEINRICH:  So let's bring up PTX-2 and pull up

11:29  4    Column 4 at Lines 39 through 41.

11:29  5    BY MR. HEINRICH:

11:29  6         Q.   What does the patent say, in fact?

11:29  7         A.   This is saying that the clock that goes through the

11:29  8    bus is further adjusted from that high-speed clock.  It's

11:29  9    saying exactly what I said the claim calls out.

11:29  10        Q.   And how does that relate to Intel's Lake processors?

11:29  11        A.   That matches what the PLLs do.  That matches what the

11:29  12   Intel Lake processors do.

11:29  13        Q.   Okay.

11:29  14        MR. HEINRICH:  Let's switch gears again and turn to the

11:29  15   '373 patent.

11:29  16   BY MR. HEINRICH:

11:29  17        Q.   Were you present in the courtroom when Dr. Sylvester

11:30  18   testified last week?

11:30  19        A.   I was.

11:30  20        Q.   Did you hear him say that the word "sleep" doesn't

11:30  21   appear in the '373 patent?

11:30  22        A.   Yes.  I recall that.

11:30  23        Q.   Well, putting aside whether it uses that particular

11:30  24   word, does the '373 patent in fact discuss the concept of a

11:30  25   computer circuit going to sleep?

11:30    1        A.   Yes.  It does.

11:30    2        MR. HEINRICH:  So let's pull up PTX-1, the '373 patent,

11:30    3   and highlight Column 4, Lines 42 through 45.

11:30    4   BY MR. HEINRICH:

11:30    5        Q.   And what does the '373 patent say here,

11:30    6   Professor Conte?

11:30    7        A.   Okay.  So here it's talking about the minimum standby

11:30    8   voltage for the memory array, minimum standby voltage, which

11:30    9   represents a minimum operating voltage allowable for the memory

11:30   10   array during standby.  Standby means sleep.

11:30   11        Q.   Okay.  So let's turn to another issue that

11:31   12   Dr. Sylvester raised.

11:31   13        Do you recall Dr. Sylvester saying that the

11:31   14   RING_RETENTION_VOLTAGE, the value that you were telling us

11:31   15   about early last week, that that didn't refer to C6 SRAM?

11:31   16        A.   I do.

11:31   17        Q.   And do you agree with that?

11:31   18        A.   No.  I don't.  If you -- and I showed you this.  If

11:31   19   you looked at that ring domain, inside it is a memory that

11:31   20   includes the C6 SRAM.  And what's more, all the memory there is

11:31   21   built out of the same identical bit cell circuitry.

11:31   22        Q.   So in your opinion, does the RING_RETENTION_VOLTAGE,

11:31   23   is that the minimum operating voltage for the C6 SRAM memory?

11:31   24        A.   It is.

11:31   25        Q.   Okay.  Last issue for you, Professor Conte.

| | | |
|---|---|---|
| 11:31 | 1 | Do you recall on cross-examination that Dr. Sylvester was |
| 11:31 | 2 | asked about his slide showing that RING_RETENTION_VOLTAGE in |
| 11:32 | 3 | his analysis was actually higher than the voltage level of what |
| 11:32 | 4 | I'll call VOLTAGE_0? |
| 11:32 | 5 | A.   Yes.  I recall that. |
| 11:32 | 6 | MR. HEINRICH:  And, Mr. Simmons, can we pull up that |
| 11:32 | 7 | cross-examination slide? |
| 11:32 | 8 | BY MR. HEINRICH: |
| 11:32 | 9 | Q.   And on the left side, is this from Dr. Sylvester's |
| 11:32 | 10 | slide showing what I just indicated? |
| 11:32 | 11 | A.   Yes.  It is. |
| 11:32 | 12 | Q.   Okay.  And then on the right side, this is a figure |
| 11:32 | 13 | that Mr. Chu used from D-505? |
| 11:32 | 14 | A.   That's correct. |
| 11:32 | 15 | MR. HEINRICH:  So let's actually pull up D-505 and go to |
| 11:32 | 16 | Page 24. |
| 11:32 | 17 | BY MR. HEINRICH: |
| 11:32 | 18 | Q.   And this is an actual Intel document? |
| 11:32 | 19 | A.   This is an Intel document, indeed. |
| 11:32 | 20 | MR. HEINRICH:  And yeah.  If we can blow up the figures at |
| 11:33 | 21 | the top there. |
| 11:33 | 22 | BY MR. HEINRICH: |
| 11:33 | 23 | Q.   First, let's just start by referencing Vretention. |
| 11:33 | 24 | A.   Right there?  Yeah. |
| 11:33 | 25 | Q.   Can you clear up what that dotted line is called |

11:33   1   Vretention?

11:33   2        A.   In this context that's the RING_RETENTION_VOLTAGE.

11:33   3        Q.   And are you sure about that?

11:33   4        A.   I am.

11:33   5        MR. LEE:  Your Honor, this is confidential.  Could we just

11:33   6   turn off the public monitor?

11:33   7        THE COURT:  Absolutely.  Do you need it to -- Mr. Lee, do

11:33   8   you want it to be taken off of the public feed as well, or do

11:33   9   you just want it off the monitor?

11:33   10       MR. LEE:  Only if he's going to start talking through the

11:33   11  details.  Generally it's fine.

11:33   12       THE COURT:  Okay.  We will make this so that only the only

11:33   13  the jury and appropriate people can see the monitors.

11:33   14  BY MR. HEINRICH:

11:33   15       Q.   Now, in this Intel document, where is the voltage V0

11:33   16  shown in relationship to the RING_RETENTION_VOLTAGE level?

11:33   17       A.   So that's that voltage.  It's -- he gave the name as

11:34   18  RING_VOLTAGE_VF_0.  If you don't mind, I'll just call it V0 to

11:34   19  shorten things.  But it's shown above the

11:34   20  RING_RETENTION_VOLTAGE.

11:34   21       Q.   So let's go back to the cross-examination slide.  On

11:34   22  the left, where is Dr. Sylvester showing this V0 or

11:34   23  RING_VF_VOLTAGE_0 in relationship to the

11:34   24  RING_RETENTION_VOLTAGE?

11:34   25       A.   He's showing it below.  And -- now wait.  Just think

11:34  1    about this.  This is the voltage you need to remember, right?

11:34  2    Why would you ever operate a circuit below the voltage you need

11:34  3    for the memories to remember?  That just can't be.

11:34  4         Q.   So what's going on here then?

11:34  5         A.   Well, here's what he's doing.  Dr. Sullivan didn't

11:35  6    compensate for something --

11:35  7         Q.   Dr. Sylvester?

11:35  8         A.   Did I say -- I get my Ss confused.

11:35  9         Dr. Sylvester didn't compensate for something called

11:35  10   inverse temperature dependance.

11:35  11        Here's what that is.  Imagine -- and I bet this will be

11:35  12   easy to do.  Imagine it's a really cold day, and you go out and

11:35  13   you try to turn on your car and it won't crank over.  What's

11:35  14   happening is because it's so cold, the voltage on your battery

11:35  15   is suppressed.

11:35  16        Well, Intel knows when their chips are cold that it has to

11:35  17   boost a voltage in order to use it.  And that's what they do

11:35  18   with V0 here.

11:35  19        Q.   Okay.  So we're going to talk about that in more

11:35  20   detail.  But first, did you hear Dr. Sylvester say that his

11:35  21   values here that he used to generate this graph were based on

11:35  22   4 million or so parts of fused data that he analyzed?

11:35  23        A.   Yes.  I heard that.

11:35  24        Q.   And how did he measure those values?

11:35  25        A.   He measured them with a script, which is a kind of

11:36  1    computer program.

11:36  2        Q.   And I have on the document camera here Defendant

11:36  3    Exhibit 1107.  Is this --

11:36  4        A.   Can you -- can you put that up?  I can't see it.

11:36  5        Q.   And --

11:36  6        A.   I still can't see it.  Okay.  There it is.  Yeah.

11:36  7        Q.   And Dr. Sylvester was asked some questions --

11:36  8        MR. HEINRICH:  And then, actually, we can go on the public

11:36  9    record for this.

11:36  10   BY MR. HEINRICH:

11:36  11       Q.   Is -- Dr. Sylvester was shown Exhibit D-1107A during

11:36  12   his testimony.  Do you recall that?

11:36  13       A.   He was.

11:36  14       Q.   Now, is this actually Intel source code?

11:36  15       A.   No.  It's not.

11:36  16       Q.   Who wrote this code?

11:36  17       A.   I wrote this code.

11:37  18       Q.   And why did you write this code?

11:37  19       A.   I wrote this code because Intel gave us this

11:37  20   complicated encoded database of millions of entries, and I had

11:37  21   to write code to decode that so I could analyze it.

11:37  22       Q.   How did Dr. Sylvester get your code?

11:37  23       A.   So the Court required that anything we wrote like

11:37  24   this, the other side could get.

11:37  25       Q.   And then did Dr. Sylvester use your code to generate

| | | |
|---|---|---|
| 11:37 | 1 | the values that he showed in that slide? |
| 11:37 | 2 | A.   Yes.  He did. |
| 11:37 | 3 | Q.   Did he interpret the data he obtained from using your |
| 11:37 | 4 | code correctly? |
| 11:37 | 5 | A.   No.  He interpreted it mis- -- incorrectly.  He |
| 11:37 | 6 | misinterpreted it. |
| 11:37 | 7 | Q.   And can you explain how (loss of audio) to do that? |
| 11:37 | 8 | A.   -- compensate for when the chip is cold.  So when you |
| 11:37 | 9 | compensate for when the chip is cold, that ends up with what |
| 11:37 | 10 | you see on the right with V0 above the ring retention voltage. |
| 11:38 | 11 | And, again, that makes sense, right?  You want to operate at |
| 11:38 | 12 | the voltage above where you -- you can remember. |
| 11:38 | 13 | Q.   So he's comparing in his slide here the |
| 11:38 | 14 | RING_VF_VOLTAGE_0 to the RING_RETENTION_VOLTAGE, correct? |
| 11:38 | 15 | A.   Yes.  He is. |
| 11:38 | 16 | Q.   But is he comparing them on an apples-to-apples basis |
| 11:38 | 17 | at the same temperature? |
| 11:38 | 18 | A.   No.  So V/F 0 is measured at 100 degrees Celsius. |
| 11:38 | 19 | RING_RETENTION_VOLTAGE is measured at zero degrees Celsius. |
| 11:38 | 20 | That's the difference between boiling water and ice. |
| 11:38 | 21 | Q.   Now, what happens if you measure V0 and the |
| 11:38 | 22 | RING_RETENTION_VOLTAGE calibrated to the same temperatures? |
| 11:38 | 23 | A.   If you measure them calibrated to the same |
| 11:39 | 24 | temperatures, they, no surprise, match the Intel graph over |
| 11:39 | 25 | here on the right. |

11:39   1       Q.   So the data that Dr. Sylvester presented to the jury

11:39   2    in arguing that the RING_RETENTION_VOLTAGE can't be a minimum

11:39   3    operating voltage because V0 is beneath it, was -- was he

11:39   4    comparing those two values on an apples-to-apples basis or not?

11:39   5       A.   No.  He wasn't.

11:39   6       Q.   Now, does Intel itself calibrate those voltage levels

11:39   7    to the same temperature before presenting analysis?

11:39   8       A.   Yes.  They do.

11:39   9       Q.   And when they're calibrated to a same temperature,

11:39   10   apples-to-apples basis, what's the relationship between V0 and

11:39   11   the RING_RETENTION_VOLTAGE?

11:39   12      A.   So, again, Dr. Sylvester misinterpreted the results

11:39   13   of my code.  V0 is calibrated at a different temperature than

11:40   14   the RING_RETENTION_VOLTAGE.  When you compensate for

11:40   15   temperature, V0 is going to be always above the

11:40   16   RING_RETENTION_VOLTAGE.

11:40   17      Q.   So how does this relate to your opinion that the

11:40   18   RING_RETENTION_VOLTAGE is, in fact, the minimum operating

11:40   19   voltage for the C6 SRAM, as claimed by the '373 patent?

11:40   20      A.   Again, when I interpret the data correctly, it

11:40   21   further confirms my opinion.

11:40   22      Q.   And is that what we see in Intel's own Exhibit 505?

11:40   23      A.   That's correct.

11:40   24      Q.   Now, did you see any other evidence about how the

11:40   25   RING_RETENTION_VOLTAGE is -- is compensated?

11:40   1          A.   I did.

11:40   2          MR. HEINRICH:   And can we go to Exhibit 3662 at Page 702?

11:40   3   BY MR. HEINRICH:

11:41   4          Q.   And is this the document we saw last week in your

11:41   5   direct testimony?

11:41   6          A.   It is.   And I believe Dr. Sullivan also used this

11:41   7   document.

11:41   8          Q.   Dr. Sylvester?

11:41   9          A.   I did it again.   Dr. Sylvester.

11:41   10         MR. HEINRICH:   So let's pull up the row on

11:41   11  RING_RETENTION_VOLTAGE.

11:41   12  BY MR. HEINRICH:

11:41   13         Q.   What does this document tell us about the temperature

11:41   14  at which the RING_RETENTION_VOLTAGE is measured at?

11:41   15         A.   Okay.   Remember that phenomena I talked about?   It's

11:41   16  called inverse temperature dependance, ITD.   Look at the last

11:41   17  sentence.   This is inverse temperature dependance corrected to

11:41   18  zero degrees Celsius.

11:41   19         Q.   And then, again, when the V0 is similarly IDD

11:41   20  corrected at zero degrees, what do we see?

11:41   21         A.   V0, of course, is going to be above this minimum

11:41   22  voltage, you need remember.

11:41   23         Q.   Okay.   So did you hear anything last week from

11:42   24  Dr. Sylvester or Intel's other witnesses that changed your

11:42   25  opinion that Intel infringes the '373 patent?

11:42  1      A.   No.

11:42  2      Q.   And did you see anything or hear anything last week

11:42  3  that changed your opinion about whether Intel infringes the

11:42  4  '759 patent?

11:42  5      A.   No.  I did not.

11:42  6      Q.   Okay.

11:42  7      MR. HEINRICH:  Thank you very much, Professor Conte.

11:42  8      THE WITNESS:  Thank you.

11:42  9      THE COURT:  Mr. Lee, I won't hold you to this.  Do you

11:42  10  anticipate going longer than about 30 minutes with this

11:42  11  gentleman?

11:42  12      MR. LEE:  No.  Your Honor, I'm going to try -- I'm not

11:42  13  going to plow old ground.  I'm going to try to finish with him

11:43  14  in 15 minutes.

11:43  15      THE COURT:  Perfect.  Thank you.  And I'm not counting.

11:43  16  I'm just --

11:43  17      MR. LEE:  I know.  15 minutes will be enough and then it

11:43  18  will be lunchtime.

11:43  19      THE WITNESS:  I respect this booth protects us all from

11:43  20  COVID, but I just wish it was a little bigger.

11:43  21      (Laughter.)

11:43  22      THE COURT:  We'll work on that for the next trial.

11:43  23      THE WITNESS:  Thank you, Your Honor.

11:43  24                  CROSS-EXAMINATION

11:43  25  BY MR. LEE:

11:43   1          Q.   Dr. Conte, good morning.

11:43   2          A.   Good morning.

11:43   3          Q.   Let me end where -- let me start where you ended on

11:43   4    infringement issues.  Can we do that?

11:43   5          A.   Yes.

11:43   6          Q.   Now, I'm not going to replow old ground.  I'm going

11:43   7    to try to do this very quickly, if we can.

11:43   8          Let me start with the '373 patent.  Can we do that?

11:43   9          A.   Yes.

11:43   10         Q.   And I'm going to ask you about some facts relevant to

11:43   11   the C6 SRAM.  That's what you say is the memory, correct?

11:43   12         A.   Yes.

11:43   13         Q.   In Haswell, correct?

11:43   14         A.   Yes.  And also in Broadwell.

11:44   15         Q.   Now, you were here when Jonathan Douglas testified,

11:44   16   were you not?

11:44   17         A.   I was.

11:44   18         Q.   He testified that Intel does not identify a lowest

11:44   19   retention voltage for the C6 SRAM, correct?

11:44   20         A.   I believe that was his testimony.  Yes.

11:44   21         MR. LEE:  And if I could have DDX-19.3.

11:44   22   BY MR. LEE:

11:44   23         Q.   We can agree that you and he simply disagree,

11:44   24   correct?

11:44   25         A.   That's correct.

                                                                        1434

11:44  1        Q.   Now, Mr. Douglas also testified that there's no

11:44  2   relationship between RING_RETENTION_VOLTAGE and the C6 SRAM.

11:44  3   Do you recall that testimony?

11:44  4        A.   I do.

11:44  5        Q.   And, again, the two of you disagree, correct?

11:44  6        A.   Yes.  We disagree.

11:44  7        Q.   Now, Mr. Douglas also testified that the ring

11:44  8   retention -- the ring -- withdrawn.

11:44  9        Mr. Douglas also testified that the ring domain operates

11:44  10  at a voltage below RING_RETENTION_VOLTAGE, known as

11:44  11  RING_VF_VOLTAGE_0, correct?

11:44  12       A.   He did.

11:45  13       Q.   Right.  And, again, you just disagree with the person

11:45  14  who came here, testified under oath, who designed the product,

11:45  15  correct?

11:45  16       A.   I did.

11:45  17       Q.   Right.  And on each of these different issues, you

11:45  18  and Mr. Douglas -- were you here for his cross-examination?

11:45  19       A.   I was.

11:45  20       Q.   And you heard everything he said about how the

11:45  21  accused features work in Haswell?

11:45  22       A.   I believe I did.

11:45  23       Q.   And in Broadwell?

11:45  24       A.   Yes.

11:45  25       Q.   And on these key issues that are key to infringement,

11:45  1   the two of you simply disagree, correct?

11:45  2        A.   I wouldn't characterize it that way.

11:45  3        Q.   Now, let me ask you -- well, we just looked at the

11:45  4   slides.  Where he said no, you said yes.  Where he said no, you

11:45  5   said yes.  You would call that disagreement, wouldn't you?

11:45  6        A.   On those issues, yes.

11:45  7        Q.   And those are issues that are important to the jury's

11:45  8   determination of infringement, correct?

11:45  9        A.   Yes.

11:45  10       Q.   All right.

11:45  11       MR. LEE:  Now, could I have D-505?

11:45  12   MY MR. LEE:

11:45  13       Q.   Which you talked to the jury about today.

11:46  14       Do you have that on the screen?  Do you recall that?

11:46  15       A.   I do.

11:46  16       Q.   And you were using this document to talk about that

11:46  17   comparative set of charts that you had put on the screen.  Do

11:46  18   you recall that?

11:46  19       A.   Yes.

11:46  20       Q.   Now, you know that this document was something that

11:46  21   didn't describe a finished product, don't you?

11:46  22       A.   I believe virtually all the documents Intel produced

11:46  23   were drafts.

11:46  24       Q.   This was -- in particular, if I turn you to Page 23,

11:46  25   refers to TBD, correct?  You see TBD, TBD, TBD.

—1436—

11:46   1        A.   I do.

11:46   2        Q.   You know what that is.  That's to be determined,

11:46   3   correct?

11:46   4        A.   That's right.

11:46   5        Q.   If I turn you to Page 27, and I highlight 2.3.5.1,

11:47   6   you'll see "TBD, the following is not the POR."  That's to be

11:47   7   determined, the following is not the plan of record, correct?

11:47   8        A.   That's correct.

11:47   9        Q.   So the one thing we can agree upon, this document,

11:47   10  surely, is not a final description of the products, correct?

11:47   11       A.   That's correct.

11:47   12       Q.   Now, you were here when Mr. Borkowski testified as

11:47   13  well, correct?

11:47   14       A.   I was.

11:47   15       Q.   He actually wrote much of the code, correct?

11:47   16       A.   I'm sorry?

11:47   17       Q.   He wrote some of the code, correct?

11:47   18       A.   You're referring to the P-code?

11:47   19       Q.   Yes.

11:47   20       A.   Yes.  He did.

11:47   21       Q.   Now, he said that ring -- RING_VF_VOLTAGE_0, which

11:47   22  you just talked to Mr. Heinrich about, does, in fact,

11:47   23  correspond to a voltage level actually used in some conditions,

11:47   24  correct?

11:47   25       A.   That's correct.

11:47  1        Q.   And, again, you just disagree?

11:48  2        A.   That's incorrect.

11:48  3        Q.   Well, you agree that it is then?  You agree with him

11:48  4   on that issue?

11:48  5        A.   Yes.  It's a --

11:48  6        Q.   Okay.  Fair enough.

11:48  7        A.   It's a voltage that's actually used, yes.

11:48  8        Q.   Good.  Now, the '373 patent also claims regulated

11:48  9   voltages, correct?

11:48  10       A.   Yes.

11:48  11       Q.   And you told the jury last week that a regulated

11:48  12  voltage is a reliable voltage, correct?

11:48  13       A.   It's a controlled voltage.

11:48  14       Q.   And Mr. Douglas told the jury, when he came here to

11:48  15  talk about his own product, that VCCR is a floating and not

11:48  16  reliable voltage, correct?

11:48  17       A.   I believe that was his testimony.  Yes.

11:48  18       MR. LEE:  So can I have DDX-19.7?

11:48  19  BY MR. LEE:

11:48  20       Q.   Again, the two of you now just disagree, correct?

11:48  21       A.   I don't think so.  And I can explain.

11:48  22       Q.   Well, your answer is you don't think so?

11:49  23       A.   That's correct.

11:49  24       Q.   Okay.  Let me ask you about a different topic.

11:49  25       You told the jury -- you told the jury last week that the

11:49  1    ramp -- that there was a ramp as part of the Package C7

11:49  2    transition, correct?

11:49  3        A.   That's correct.

11:49  4        Q.   You said it happens hundreds of times per second,

11:49  5    correct?

11:49  6        A.   Up to.  Yes.

11:49  7        MR. LEE:  Can I have DDX-19.10?

11:49  8    BY MR. LEE:

11:49  9        Q.   Mr. Douglas came here and he said it happens a few

11:49  10   times per second.  Do you recall that?

11:49  11       A.   Yes.  I do.

11:49  12       Q.   And on cross-examination, he wasn't asked a single

11:49  13   word about whether that was correct or not?

11:49  14       A.   I don't recall one way or the other.

11:49  15       Q.   Now, let's go to the '759 patent.  You were here when

11:49  16   Dr. Rotem testified, correct?

11:49  17       A.   Yes.

11:49  18       Q.   You were here when Mr. Borkowski testified, correct?

11:49  19       A.   Yes.

11:49  20       Q.   Now, let's just look at where we -- you agree or

11:50  21   disagree with them.

11:50  22       Dr. Rotem and Mr. Borkowski testified about Speed Shift in

11:50  23   particular, correct?

11:50  24       A.   Yes.  That's correct.

11:50  25       Q.   Now, you disagree with them about how some of the

11:50  1   features of Speed Shift works, correct?

11:50  2        A.   I don't believe I disagree in any substantive

11:50  3   feature.

11:50  4        Q.   Well, let's see.

11:50  5        MR. LEE:   Could I have DDX-19.11 on the screen?

11:50  6   BY THE WITNESS:

11:50  7        A.   Oh, I see.  Yes.  I disagree with that.

11:50  8   BY MR. LEE:

11:50  9        Q.   Yes.  Dr. Rotem says that the Lake series of

11:50  10  processors, using his revolutionary algorithms that led to his

11:50  11  Ph.D. thesis, is totally different from Yonah, correct?

11:50  12       A.   I don't disagree with that.

11:50  13       Q.   Right.  Now, if we -- he also testified that it is

11:51  14  totally autonomous.  We don't get any requests, correct?

11:51  15       A.   I disagree with that.

11:51  16       Q.   So Dr. Rotem says no request; you say a request,

11:51  17  correct?

11:51  18       A.   That's correct.

11:51  19       MR. LEE:   Let's turn to DDX-19.12.

11:51  20  BY MR. LEE:

11:51  21       Q.   Now, we're looking at Mr. Borkowski's testimony.  Do

11:51  22  you see that?

11:51  23       A.   Yes.

11:51  24       Q.   And again he designed some of the P-code, right?

11:51  25       A.   Yes.  I see that.

11:51  1      Q.   Now, when he was asked whether the PCU requested

11:51  2  information, he said, "No.  It doesn't...  There's no explicit

11:51  3  trigger."

11:51  4      You disagree, correct?

11:51  5      A.   Not exactly.

11:51  6      Q.   Okay.  Well, we'll let the testimony stand.  But we

11:51  7  do agree on the request issue, you disagree with Dr. Rotem,

11:51  8  correct?

11:51  9      A.   Not precisely.

11:51  10     Q.   Well, let's go back and look at it.

11:51  11     A.   Okay.

11:51  12     MR. LEE:  Can I have the prior demonstrative, please?

11:52  13  BY MR. LEE:

11:52  14     Q.   Dr. Rotem:  "We don't get any request."

11:52  15     Dr. Conte:  "So there is a request as required by the

11:52  16  claims?

11:52  17     "There is."

11:52  18     That's the testimony the jury heard last week, correct?

11:52  19     A.   Yes.  I believe so.

11:52  20     Q.   All right.  Now, let me go to another issue to

11:52  21  explore your agreement or disagreement -- withdrawn.

11:52  22     You've talked extensively today about your disagreement

11:52  23  with Dr. Sylvester, correct?

11:52  24     A.   Among other things.  Yes.

11:52  25     Q.   And with Dr. Grunwald, correct?

11:52   1        A.    Among other things.  Yes.

11:52   2        Q.    I thought I was listening carefully this morning, but

11:52   3   I didn't hear you mention Dr. Rotem, Mr. Borkowski or

11:52   4   Mr. Douglas.  And I want to focus upon them, okay?

11:52   5        A.    Okay.

11:52   6        MR. LEE:  Now, let me bring up DDX-9.15 if I could,

11:52   7   Dr. Conte.

11:52   8   BY MR. LEE:

11:52   9        Q.    This is the testimony you gave on one-to-one

11:53  10   relationships.  Do you recall that?

11:53  11        A.    I do.

11:53  12        Q.    And this is an assumption -- or this is information

11:53  13   that you provided to Dr. Sullivan that is part of his six-step

11:53  14   damages analysis, correct?

11:53  15        A.    Yes.

11:53  16        Q.    You say that there's a one-to-one relationship, power

11:53  17   to speed, correct?

11:53  18        A.    Yes.

11:53  19        Q.    Dr. Rotem said that's not true.  It's much more

11:53  20   complicated than that, correct?

11:53  21        Is that what he said, sir?

11:53  22        A.    That's what he said here.

11:53  23        Q.    Right.  So just so we're clear, on the '759 patent,

11:53  24   on the question of requests, you and Dr. Rotem disagree,

11:53  25   correct?

11:53  1        A.   Not entirely, but in -- with the testimony you

11:53  2   pointed to, yes.

11:53  3        Q.   And we can agree that the claim term specifically

11:54  4   requires a request, correct?

11:54  5        A.   It does.

11:54  6        Q.   And if Dr. Rotem is correct and there is no request,

11:54  7   there's no infringement, correct?

11:54  8        A.   I can't conclude that one way or another.  Sorry.

11:54  9        Q.   You don't know?

11:54  10       A.   I can't conclude that one way or another.  Sorry.

11:54  11       Q.   So let me ask again:  If Dr. Rotem is correct and

11:54  12   there is no request, is there or is there not infringement?

11:54  13       A.   Again, I can't conclude that one way or another.

11:54  14       Q.   And if I go back to the '373 patent, if the

11:54  15   minimum -- if the RING_RETENTION_VOLTAGE is, in fact, not a

11:54  16   minimum as Mr. Douglas said, there is no infringement, correct?

11:54  17       A.   Again, I cannot answer that one way or the other.

11:54  18       Q.   All right.  So let me just ask you a few questions

11:54  19   before I finish on the question of invalidity.

11:55  20            You understand that there's no dispute among the parties

11:55  21   that Yonah came first, correct?

11:55  22       A.   I don't believe that's true.

11:55  23       Q.   You don't -- didn't anyone tell you that the parties

11:55  24   met with His Honor and agreed that it was prior art?

11:55  25            THE COURT:  Counsel.

11:55   1    BY THE WITNESS:

11:55   2         A.   At the time of my report, that wasn't an agreement.

11:55   3    I'm sorry.

11:55   4    BY MR. LEE:

11:55   5         Q.   Okay.  I'm not talking about the time of your report.

11:55   6    I'm talking about March 1st, 2021 in this trial.  Did you know

11:55   7    that the parties have reached the agreement that Yonah came

11:55   8    first?

11:55   9         A.   I did not know that.  Thank you for informing me.

11:55   10        Q.   All right.  So I'm going to represent to you that

11:55   11   that's the agreement, Yonah indisputably came first.  Do you

11:55   12   have that in mind?

11:55   13        A.   I have in mind the parties agreed to that.

11:55   14        Q.   Now, you actually had taken a position in your report

11:55   15   to the contrary, correct?

11:55   16        A.   I had.

11:55   17        Q.   So your report disagrees with what the parties have

11:55   18   agreed to for this case, correct?

11:55   19        A.   In that one instance.  Yes.

11:56   20        Q.   Yeah.  And I want to ask you just a couple more

11:56   21   questions about what occurred at the Patent Office on the '759

11:56   22   patent.

11:56   23        You understand there's a difference between SpeedStep,

11:56   24   SpeedStep in Yonah, and Speed Shift, don't you?

11:56   25        A.   You're asking if there's a difference between those

11:56  1    three things?

11:56  2        Q.   Yes.

11:56  3        A.   Yes.  There's a difference between those three

11:56  4    things.

11:56  5        Q.   SpeedStep existed before Yonah, correct?

11:56  6        A.   It did.

11:56  7        Q.   Yonah had SpeedStep in a two-core processor, correct,

11:56  8    in the two-core microprocessor, correct?

11:56  9        A.   Yes.  What was different was that Yonah had two

11:56  10   cores.

11:56  11       Q.   Right.  And I'm going to take you now to the document

11:56  12   that Mr. Chu showed Dr. Grunwald on Friday afternoon.

11:56  13       MR. LEE:  Could I have PTX-008-A at Page 68?

11:56  14   BY MR. LEE:

11:57  15       Q.   Now, Mr. Chu was asking Dr. Grunwald whether the

11:57  16   Patent Office had before it SpeedStep.  Do you recall that?

11:57  17       A.   Yes.

11:57  18       Q.   He didn't ask whether it had before it Yonah,

11:57  19   correct?

11:57  20       A.   Correct.

11:57  21       Q.   And he focused just on this first paragraph, under

11:57  22   the title "Intel Pentium III with enhanced SpeedStep

11:57  23   Technology."  Do you see that?

11:57  24       A.   I see that.

11:57  25       Q.   And he asked Dr. Grunwald some questions about the

11:57   1    first paragraph and the first paragraph only.

11:57   2         A.   I believe so.  I can't recall.

11:57   3         MR. LEE:  Could I go down to -- and ask to blow up a

11:57   4    paragraph that was not discussed, "0.18 Micron Technology."

11:57   5    BY MR. LEE:

11:57   6         Q.   Do you see that?

11:57   7         A.   Yes.

11:57   8         Q.   If I look at the last sentence, it says, "This

11:58   9    innovation makes it possible for CPUs to include up to

11:58   10   28.1 million transistors in the core."

11:58   11        The product that was before the Patent Office was a

11:58   12   single-core product, correct?

11:58   13        A.   Yes.

11:58   14        Q.   There is no evidence in the record at all that the

11:58   15   two-core product called Yonah was before the Patent Office; is

11:58   16   that not correct?

11:58   17        A.   That's correct.

11:58   18        Q.   Now, just a few more questions on Yonah.  You agree

11:58   19   it had two cores, correct?

11:58   20        A.   Yes.

11:58   21        Q.   You agree that it had a clock, correct?

11:58   22        A.   Yes.

11:58   23        Q.   You agree that the clock generated a clock frequency,

11:58   24   correct?

11:58   25        A.   Yes.

11:58   1        Q.   You agree that in Yonah software had ultimate control

11:58   2   over frequency changes, correct?

11:58   3        A.   The operating system, yes.

11:58   4        Q.   Yeah.  Fair enough.  It's an operating system,

11:58   5   correct?

11:58   6        A.   Yes.

11:58   7        Q.   And the operating system was executed in the cores of

11:59   8   Yonah, correct?

11:59   9        A.   Yes.

11:59   10       Q.   And it was that operating system in Yonah that made

11:59   11  requests for changes in frequency, correct?

11:59   12       A.   Well, it asked the hardware to change the

11:59   13  frequencies.  Yes.

11:59   14       Q.   Okay.

11:59   15       MR. LEE:  Now, could I have the '759 patent?

11:59   16       And could I have Columns 2 -- Column 2, Line 51 to 57?

11:59   17  BY MR. LEE:

11:59   18       Q.   Do you recall reviewing this portion of the patent?

11:59   19       A.   Yes.

11:59   20       Q.   Okay.  And this portion refers specifically to

11:59   21  firmware, correct?

11:59   22       A.   Yes.

11:59   23       Q.   And it also refers specifically to software, correct?

12:00   24       A.   Yes.

12:00   25       Q.   Now, you would agree with me that Yonah had something

| | | |
|--|--|--|
| 12:00 | 1 | called a PLL or phase-locked loop, correct? |
| 12:00 | 2 | A.   Yes. |
| 12:00 | 3 | Q.   It had one, correct? |
| 12:00 | 4 | A.   I don't recall. |
| 12:00 | 5 | Q.   You don't recall one way or another? |
| 12:00 | 6 | A.   It probably had one.  Yes. |
| 12:00 | 7 | Q.   It had one that provided common clock control to all |
| 12:00 | 8 | of Yonah, correct? |
| 12:00 | 9 | A.   I believe that's correct.  Yes. |
| 12:00 | 10 | Q.   Thank you. |
| 12:00 | 11 | MR. LEE:  Nothing further, Your Honor. |
| 12:00 | 12 | THE COURT:  Thank you, Mr. Lee.  Counsel? |
| 12:00 | 13 | MR. HEINRICH:  I have about 20 minutes to half an hour. |
| 12:00 | 14 | Should we break for lunch now or should we break later? |
| 12:00 | 15 | THE COURT:  I think we need to continue to go. |
| 12:00 | 16 | MR. LEE:  20 minutes to half an hour on redirect? |
| 12:00 | 17 | THE COURT:  Redirect is going to be limited to what |
| 12:00 | 18 | Mr. Lee raised. |
| 12:00 | 19 | MR. HEINRICH:  Understood.  Should we do that now? |
| 12:00 | 20 | THE COURT:  Ladies and gentlemen of the jury, which would |
| 12:00 | 21 | you prefer to do?  Lunch now or finish with this witness? |
| 12:01 | 22 | JUROR:  Finish. |
| 12:01 | 23 | THE COURT:  Let's finish. |
| 12:01 | 24 | MR. HEINRICH:  Okay. |
| 12:01 | 25 |                    REDIRECT EXAMINATION |

—1448—

12:01  1    BY MR. HEINRICH:

12:02  2        Q.    Hello again, Professor Conte.  So just taking up

12:02  3    where Mr. Lee left off, he showed you a passage from the patent

12:02  4    that referred to software or hardware.  Do you recall that?

12:02  5        A.    Yes.  I do.

12:02  6        Q.    Now, to do a proper validity analysis, is it your

12:02  7    understanding that you have to compare the prior art to a

12:02  8    passage in the specification, or do you have to compare it to

12:02  9    the claim?

12:02  10       A.    You compare it to the claim.

12:02  11       Q.    And Claim 14 in the asserted claims, are they

12:02  12   referring to a software implementation, or are they referring

12:02  13   to an implementation in a programmable clock controller with

12:03  14   embedded computer program?

12:03  15       A.    They're referring to the latter, in hardware.

12:03  16       Q.    And does anything with -- that Mr. Lee pointed to

12:03  17   change your opinion that Yonah doesn't have a programmable

12:03  18   clock controller with an embedded computer program?

12:03  19       A.    No.  It does not.

12:03  20       Q.    And does that mean that Yonah is missing a number of

12:03  21   limitations of the claims of the '759 patent?

12:03  22       A.    Yes.

12:03  23       MR. LEE:  Your Honor, I'm going to object.  This is

12:03  24   redirect and he's just leading him.  He's not asking questions.

12:03  25       THE COURT:  Well, to the extent he's asking what you said

12:03  1    and filling that in, I'm okay with.  But generally speaking, I

12:03  2    will not let him lead.  But I think you're -- I'll overrule

12:03  3    that objection.  But I appreciate it.

12:03  4        MR. HEINRICH:  So let's turn to SpeedStep.

12:03  5    BY MR. HEINRICH:

12:03  6        Q.   And Mr. Lee pointed you to the SpeedStep document

12:04  7    that was cited in prosecution of the '759 patent.  Do you

12:04  8    recall that?

12:04  9        A.   Yes.  I do.

12:04  10       Q.   Now, did that -- how did that implementation of

12:04  11   SpeedStep work in relationship to what you explained to the

12:04  12   jury today?

12:04  13       A.   That SpeedStep implementation worked identical to how

12:04  14   it worked in Yonah.

12:04  15       Q.   And what was making the decisions under the SpeedStep

12:04  16   implementation that was disclosed to the Patent Office during

12:04  17   the prosecution of the '759 patent?

12:04  18       A.   That was the operating system.  That was Windows.

12:04  19   That was what Microsoft makes in Redmond, Washington.

12:04  20       Q.   Now, was that cited application of SpeedStep, did

12:04  21   that have a programmable clock controller with an embedded

12:04  22   computer program?

12:04  23       A.   No.  It did not.

12:04  24       Q.   Any more than Yonah did?

12:05  25       A.   Correct.  No more than Yonah did.

12:05  1      Q.   Okay.  So you were asked -- so does it matter, for

12:05  2  purposes of the mechanism of speed control, whether there's one

12:05  3  core or two cores or four cores?

12:05  4      A.   No.  It does not.

12:05  5      Q.   Now, you were asked some questions about Mr. Douglas'

12:05  6  testimony.  Do you recall that?

12:05  7      A.   I do.

12:05  8      Q.   And one of the questions you were asked was about

12:05  9  Mr. Douglas, who was comparing V0 to the

12:05  10  RING_RETENTION_VOLTAGE.  Do you recall his testimony on that --

12:05  11  on that point?

12:05  12      A.   I do.

12:05  13      Q.   And he made a graph during the course of his

12:05  14  testimony purporting to show the relative levels?

12:06  15      A.   I recall that.  Yes.

12:06  16      Q.   And is there a simple disagreement between you and

12:06  17  Mr. Douglas or something else?

12:06  18      A.   It's much more than that.

12:06  19      Q.   Can you explain?

12:06  20      A.   Yes.  Like I said, it -- how can you operate a

12:06  21  circuit below the retention voltage of the memory?  Your memory

12:06  22  wouldn't work.

12:06  23      Q.   And how does Mr. Douglas' graph that he showed relate

12:06  24  to Dr. Sylvester's?

12:06  25      A.   They're extremely close.

12:06  1        Q.   And did Mr. Douglas make the same error that

12:06  2   Dr. Sylvester made?

12:06  3        A.   I can only conclude he did.

12:06  4        Q.   When the values are compensated, what's the

12:06  5   relationship between V0 and RING_RETENTION_VOLTAGE?

12:06  6        A.   When you compensate them with equations that were in

12:06  7   that very document we were looking at, you'll end up with V0

12:06  8   always above RING_RETENTION_VOLTAGE.

12:06  9        Q.   And -- and what did you do to study the relative

12:07 10   levels of these values and the ring retention levels in

12:07 11   particular?

12:07 12        A.   I examined the actual P-code.

12:07 13        Q.   And what is that?

12:07 14        A.   That is the code running on the -- again, on the

12:07 15   programmable clock controller that includes the PCU in the case

12:07 16   of the Skylake products.

12:07 17        Q.   Did you rely solely on Exhibit 505 for your analysis?

12:07 18        A.   I did not.

12:07 19        Q.   Now, Mr. Lee showed you some other portions of

12:07 20   Exhibit 505 that said TBD.  Do you recall that?

12:07 21        A.   I do.

12:07 22        Q.   Does -- do those other portions relate to that graph

12:07 23   that we -- we saw?

12:07 24        A.   I don't believe so.  No.

12:07 25        Q.   The fact that other -- there's other references of

```
12:07   1    TBD in that document, does it change the fact that V0 is above

12:08   2    the RING_RETENTION_VOLTAGE when it's calibrated

12:08   3    apples-to-apples?

12:08   4         A.   It doesn't.  Because, again, I verified with the code

12:08   5    that's in the PCU.

12:08   6         Q.   So what is "TBD," by the way?

12:08   7         A.   To be determined.

12:08   8         Q.   Does -- does that -- you mentioned that you saw

12:08   9    mostly drafts of Intel documents.  Do they still provide

12:08   10   meaningful information that experts, such as yourself, can rely

12:08   11   on reliably?

12:08   12        A.   Yes.  They do.

12:08   13        Q.   Okay.  So you were shown some slides and you offered

12:08   14   to explain in reference to some of Mr. Lee's questions -- why

12:08   15   don't we take a look at some of those.

12:09   16        MR. HEINRICH:  Can we pull up DDX-19.7, for example?

12:09   17   BY MR. HEINRICH:

12:09   18        Q.   So --

12:09   19        A.   I don't -- I don't see it.

12:09   20        Q.   Hopefully it'll come on in a moment.

12:09   21        A.   I see it.  Okay.

12:09   22        Q.   And I believe you were asked if you simply disagreed

12:09   23   with Mr. Douglas, and you offered to explain.  Do you recall

12:09   24   that?

12:09   25        A.   Yes.
```

12:09  1      Q.   And can you explain for us?

12:09  2      A.   Yeah.  If you remember me talking about this, Intel

12:09  3  drains that tank and they ramp it down slowly.  And when

12:10  4  they're done, they know that voltage remains at zero throughout

12:10  5  the time that they have the CLR domain sleeping.

12:10  6      So they've controlled it when it's up.  They control it

12:10  7  when it ramps down, and they control it when it's zero.

12:10  8      Q.   And what's that conclusion based on, Professor Conte?

12:10  9      A.   That conclusion is based on looking at the source

12:10 10  code.  It's based on also looking at Intel documents.

12:10 11      Q.   Okay.  So you were also asked about some testimony

12:10 12  from Dr. Rotem.

12:10 13      MR. HEINRICH:  And let's go to DDX-19.11.

12:10 14  BY MR. HEINRICH:

12:10 15      Q.   And, again, you offered to explain, and can you do

12:10 16  that here, sir?

12:10 17      A.   Yes.  So I think what he's talking about here is he's

12:10 18  looking at it from the standpoint of the C0 residency counters.

12:11 19  And when you only go that far, then we can say, well, there's

12:11 20  no request.  But you got to remember, those counters are going

12:11 21  to be adjusted because you get the C's -- this Core_Active

12:11 22  signal from the cores.

12:11 23      So we actually, I think, don't exactly disagree.  It just

12:11 24  depends on what part of the system you're looking at.

12:11 25      Q.   And, again, did you base your analysis on the source

12:11  1    code of Intel's products?

12:11  2        A.   I did.

12:11  3        Q.   And did you examine in particular the source code for

12:11  4    that Core_Active request?

12:11  5        A.   I did.

12:11  6        Q.   Is the Core_Active request telemetry information?

12:11  7        A.   Yes.

12:11  8        Q.   Now, do you recall Dr. Grunwald's testimony about a

12:11  9    request being able to constitute a statement of condition?  Do

12:12  10   you recall that?

12:12  11       A.   Yes.  I do.

12:12  12       Q.   And how does that relate to what counsel's calling a

12:12  13   disagreement between you and Dr. Rotem?

12:12  14       A.   Well, it is correct as a statement of condition,

12:12  15   right?  It's saying the core is active.

12:12  16       So Dr. Rotem is saying that's not a request.  He's looking

12:12  17   only at the core -- the C0 residency counters.

12:12  18       But think about it this way:  These counters change as you

12:12  19   go through these windows.  So imagine you start at the window

12:12  20   with a five in one of those counters; and you go all the way to

12:12  21   the end of the window, and at the end, it's five.

12:12  22       Then you go to the next window, and during the next window

12:12  23   there's a Core_Active and it goes six, seven, eight, nine, ten,

12:12  24   and then you end.

12:12  25       So what Dr. Rotem is not considering a request is really

12:12   1   the fact that the counter from this window to this window

12:12   2   actually changes.  But if you recall, there was a lot of talk

12:12   3   about that on Tuesday.  And I said that that's indicative of a

12:13   4   request.

12:13   5        Q.   And if one were to accept Dr. Grunwald's

12:13   6   acknowledgement that a statement of condition can be a request,

12:13   7   then what's your conclusion?

12:13   8        A.   Then I also agree that this -- Lake products

12:13   9   infringe.

12:13   10       Q.   Okay.  Finally, you were asked some questions about

12:13   11  your opinions regarding the conservative estimate of a

12:13   12  one-to-one power savings speed or performance in speed idea.

12:13   13  Do you recall that?

12:13   14       A.   I do.

12:13   15       Q.   And during your testimony -- or during your direct

12:13   16  testimony you pointed to one source of evidence on that,

12:13   17  PTX-3523.

12:13   18       MR. HEINRICH:  Why don't we pull that up?

12:14   19       You know what?  Why don't we do this.  Why don't we pull

12:14   20  up PDX-4.115, which was Professor Conte's demonstratives from

12:14   21  last week.

12:14   22  BY THE WITNESS:

12:14   23       A.   Okay.  Here we are.

12:15   24  BY MR. HEINRICH:

12:15   25       Q.   And whose paper were you relying on in part for your

12:15   1   opinion on this subject?

12:15   2       A.   Dr. Rotem's paper.

12:15   3       MR. HEINRICH:   And can we go to the passage in the paper

12:15   4   that refers to the one-to-one ratio?

12:15   5   BY THE WITNESS:

12:15   6       A.   Here -- actually, can we go a little further than

12:15   7   that?  Just I need that next line.  That's good.  That's good.

12:15   8       Okay.  Here it is.  So "IPC features that caused

12:15   9   one-to-one ratio of power to IPC."  That is talking -- IPC

12:15   10  means instructions per cycle.  So that means speed.  How many

12:15   11  instructions are you doing per cycle?  And he's saying it's a

12:15   12  one-to-one ratio of power to speed in his own paper.

12:15   13  BY MR. HEINRICH:

12:15   14      Q.   And, again, that's Dr. Rotem, right?

12:15   15      A.   That's Dr. Rotem, yes.

12:15   16      Q.   Now, is Dr. Rotem saying this in the context of this

12:16   17  litigation or is he saying that outside the context of this

12:16   18  litigation?

12:16   19      A.   He's saying that outside the context of this

12:16   20  litigation.  And this references the time frame of Haswell and

12:16   21  Broadwell, I should indicate.

12:16   22      Q.   So -- and is there a disagreement between you and

12:16   23  what Dr. Rotem wrote at the relevant time period outside of

12:16   24  litigation?

12:16   25      A.   No.

```
12:16   1        Q.   Okay.

12:16   2        MR. HEINRICH:   Thank you very much, Professor Conte.

12:16   3        THE COURT:   Mr. Lee?

12:16   4                       RECROSS-EXAMINATION

12:16   5   BY MR. LEE:

12:17   6        Q.   Just a few more questions, Dr. Conte.

12:17   7        You were just criticizing Mr. Douglas' chart.  Do you

12:17   8   remember that?

12:17   9        A.   Yes.

12:17  10        Q.   Now, Mr. Douglas came and took the same stand that

12:17  11   you're testifying from, correct?

12:17  12        A.   That's correct.

12:17  13        Q.   He was cross-examined, correct?

12:17  14        A.   That's correct.

12:17  15        Q.   He was never asked a single question about that chart

12:17  16   on cross-examination, was he?

12:17  17        A.   He was not.  No.

12:17  18        Q.   And, you know, now that you're criticizing the chart,

12:17  19   he doesn't get a chance to come back and answer your

12:17  20   criticisms, correct?

12:17  21        A.   That's my understanding.  Yes.

12:17  22        Q.   Because no one asked him about it on

12:17  23   cross-examination, correct?

12:17  24        A.   They didn't ask him.  No.

12:17  25        Q.   Right.  And they didn't ask Dr. Sylvester either, did
```

1458

12:17  1    they?

12:17  2         A.   That's incorrect.

12:17  3         Q.   Well, they didn't ask Dr. Sylvester about

12:18  4    Mr. Douglas' chart, did they?

12:18  5         A.   That's incorrect.

12:18  6         Q.   All right.  Fair enough.

12:18  7         So what we can agree about is, they didn't ask Mr. Douglas

12:18  8    about the chart he prepared for the jury that you're

12:18  9    criticizing for the first time today, correct?

12:18  10        A.   That's correct.

12:18  11        Q.   Now, you said you reviewed the P-code, correct?

12:18  12        A.   That's correct.

12:18  13        Q.   Mr. Borkowski wrote the P-code, didn't he?

12:18  14        A.   My understanding is he wrote a large portion of it.

12:18  15        MR. LEE:  And can I have lastly DDX-19.15?

12:18  16   BY MR. LEE:

12:18  17        Q.   You know that in Dr. Rotem's testimony he actually

12:18  18   explained exactly the portion of his thesis and article that

12:18  19   you were just discussing with Mr. Heinrich, correct?

12:18  20        A.   I don't recall one way or the other.

12:18  21        Q.   And after having considered what he had written when

12:18  22   he disclosed his revolutionary idea, he said that there's no

12:19  23   one-to-one relationship, correct?

12:19  24        A.   At the time frame he was indicating, I believe that's

12:19  25   correct.

12:19   1          Q.   Now, since you've referred several times to

12:19   2   Dr. Rotem's Ph.D. dissertation, correct?

12:19   3          A.   I don't think I actually have.

12:19   4          Q.   Have you referred to the article?

12:19   5          A.   Yes.

12:19   6          Q.   Have you seen any articles or publications or Ph.D.

12:19   7   theses written by the inventors of the '373 patent?

12:19   8          A.   I don't recall one way or the other.

12:19   9          Q.   The '759 patent?

12:19   10         A.   Again, same answer.

12:19   11         Q.   The -- after the hundreds of hours of work you've

12:19   12  done, you cannot identify for us a single article or

12:19   13  publication that would describe either of those two patents as

12:19   14  stars or revolutionary, the way that Dr. Rotem described his

12:19   15  own invention, correct?

12:19   16         A.   Wow.  I don't quite understand your question.  I'm

12:19   17  sorry.

12:19   18         Q.   Okay.  If you can't answer it, you can't answer it.

12:20   19         MR. LEE:  Nothing further, Your Honor.

12:20   20         THE COURT:  You may step down, Doctor.

12:20   21         THE WITNESS:  Thank you.

12:20   22         THE COURT:  Ladies and gentlemen of the jury, it is -- if

12:20   23  you all will give me one second.  Mr. Lee, if I could have you

12:20   24  and Mr. Chu up here for just one second.

12:20   25         (Bench conference.)

12:20  1        THE COURT:  So plaintiff has one witness left, right?

12:20  2        MR. CHU:  Yes.  And it'll be short.

12:20  3        THE COURT:  So I think that takes care of our time.  So

12:20  4   it's 12:20.  I'm going to have the jury come back at 2:00.

12:20  5   Here's why.  We have issues to take up before the jury charge.

12:21  6   I will put the witness on, which we'll get done and then we'll

12:21  7   have everything done.

12:21  8        At 2:00 we'll put on the witness.  As soon as the witness

12:21  9   is done -- and you also can make your record during this period

12:21  10  of time on the motions.  As soon as you're done with your

12:21  11  witnesses, you're going to rest -- or I think we're going to do

12:21  12  the charge and then closing arguments.  That way they don't sit

12:21  13  around waiting for us for the charge.

12:21  14       MR. LEE:  Okay.

12:21  15       THE COURT:  We will -- I'm holding you with your two --

12:21  16  it'll be short.  I will encourage you if I see that it's not

12:21  17  going too short.

12:21  18       MR. CHU:  Yes.  Charlotte Wen, junior lawyer -- Charlotte

12:21  19  Wen, who is a junior lawyer in our office, is going to be

12:21  20  handling the witness.  And she assures me it's going to be

12:21  21  short and to the point.

12:21  22       THE COURT:  Very good.  I will encourage her.

12:22  23       MR. CHU:  Okay.  Thank you.

12:22  24       MR. LEE:  I'm smiling.  You just can't see it.

12:22  25       (Laughter.)

12:22    1          (Bench conference concludes.)

12:22    2          THE COURT:  Ladies and gentlemen, if I were to use an

12:22    3    analogy, we are rounding the curve and headed for home.  We

12:22    4    have one more witness, and then I will give you a -- I will

12:22    5    read to you what the law is.  You'll understand that more as I

12:22    6    read it to you.  And then we will have closing arguments in the

12:22    7    case.

12:22    8          We have a little bit of housekeeping to do, and I think

12:22    9    you all -- it'd be better -- are you all staying in while --

12:22    10   during lunch anyway?  Are you all here?

12:22    11         I think we will need until 2:00 so that we're organized

12:22    12   with everything.  But I will tell you, since you're here

12:22    13   anyway, as soon as we are wrapped up and ready to go, we will

12:22    14   bring you back in.  We'll have the witness, we'll have the jury

12:23    15   charge and we'll have the closing arguments.  And then we'll

12:23    16   talk about what to do thereafter given the lateness of the

12:23    17   hour.

12:23    18         But you should count on enjoying your lunch.  And then we

12:23    19   will do what we need to do to ministerially and then we'll get

12:23    20   started, but we will finish today.  And then your

12:23    21   deliberations, as I've said repeatedly, will be entirely up to

12:23    22   you all with the length of time.  There's no -- there is no

12:23    23   limit on that.  That's entirely up to you to come up with a

12:23    24   unanimous verdict.

12:23    25         Remembering -- this is the last time you get to hear this.

| | | |
|---|---|---|
| 12:23 | 1 | Remembering my instructions not to discuss the case amongst |
| 12:23 | 2 | yourselves, I will dismiss you.  The next time I dismiss you, |
| 12:23 | 3 | it will be exactly the opposite, unless we break for the |
| 12:23 | 4 | evening and then you'll wait on that.  But the next time you |
| 12:23 | 5 | all get together will be for deliberations. |
| 12:23 | 6 | So please -- you are excused until 2:00. |
| 12:23 | 7 | THE BAILIFF:  All rise. |
| 12:24 | 8 | (Jury exited the courtroom at 12:24.) |
| 12:24 | 9 | THE COURT:  You may be seated, Counsel. |
| 12:24 | 10 | If you'd like to go ahead, so I don't forget it, and |
| 12:24 | 11 | quickly make your motions on the record that would have been |
| 12:24 | 12 | made at the end of defendant's case.  Mr. Lee, Mr. Chu. |
| 12:24 | 13 | MR. LEE:  Your Honor, under Rule 50A, we renew the |
| 12:24 | 14 | previously made and previously denied without prejudice motion |
| 12:24 | 15 | on all issues as to which VLSI carries the burden of proof, |
| 12:24 | 16 | infringement, willfulness and damages. |
| 12:24 | 17 | There are two things I would like to specifically point |
| 12:24 | 18 | out for the record. |
| 12:24 | 19 | THE COURT:  Yes, sir. |
| 12:24 | 20 | MR. LEE:  There are two things I'd like to specifically |
| 12:24 | 21 | point out for the record.  One is the Doctrine of Equivalents |
| 12:24 | 22 | for the '373 patent.  There has been no evidence on the |
| 12:24 | 23 | Doctrine of Equivalents for the '373 patent. |
| 12:25 | 24 | I think Mr. Chu could say that they're withdrawing that |
| 12:25 | 25 | claim, and if so, we should get JMOL now.  And the second issue |

12:25  1   is --

12:25  2       THE COURT:  If he does, then I'll grant that.

12:25  3       MR. LEE:  And second is willful infringement, which I know

12:25  4   Your Honor addressed during the charging conference.  But

12:25  5   whether it's pre-suit or post-suit, we claim that there is

12:25  6   insufficient evidence for the issue of willfulness to go to the

12:25  7   jury.  And then --

12:25  8       THE COURT:  And, Mr. Lee, let me tell you now, I am going

12:25  9   to allow that -- I've made my decision, and I am going to allow

12:25  10  willfulness to go to the jury.

12:25  11      MR. LEE:  Okay.  Fair enough, Your Honor.

12:25  12      And then we will amplify this in written form.

12:25  13      And we would also move for JMOL on the invalidity of the

12:25  14  '759 asserted patent claims because it's now undisputed, I'm

12:25  15  pretty sure, that Yonah is prior art and that it satisfies each

12:25  16  and every limitation of the asserted claims.

12:25  17      Thank you, Your Honor.

12:25  18      THE COURT:  Mr. Chu?  I don't need a response to any of

12:26  19  his motions.  Just if you have a motion yourself.

12:26  20      MR. CHU:  Yes.  I'll be very brief orally and we'll follow

12:26  21  it up with a written motion.

12:26  22      VLSI is moving for judgment as a matter of law because a

12:26  23  reasonable jury would not have a legally sufficient evidentiary

12:26  24  basis to return a verdict in favor of the defendant Intel.

12:26  25  This includes the claims of infringement, willfulness,

12:26  1   Intel's -- all of Intel's noninfringement invalidity and

12:26  2   unclean hands defenses and counterclaims and any and all other

12:26  3   claims, theories and defenses that were presented at trial by

12:26  4   either of the parties.

12:26  5        So we make this short motion to preserve our position.  We

12:26  6   will be filing a written motion.  And then I have a 30-second

12:26  7   item on a completely separate subject.

12:26  8        THE COURT:  Let me first take the time to overrule all the

12:26  9   motions that are pending.

12:26  10        Yes, sir.

12:27  11        MR. CHU:  With Intel's permission and the Court's

12:27  12   permission, my assistant has brought to the Court cupcakes for

12:27  13   the jurors.  And if the Court is comfortable just stating that

12:27  14   the parties jointly -- for in the afternoon, not for lunch, but

12:27  15   in the afternoon when they may be hearing the Court's jury

12:27  16   instructions and then Mr. Lee's riveting closing argument and

12:27  17   my sleeper of a closing argument, before that, they might want

12:27  18   to partake.

12:27  19        THE COURT:  Mr. Lee, do you have any objection to that?

12:27  20        MR. LEE:  We'll pay half the cost of the cupcakes.

12:27  21        (Laughter.)

12:27  22        THE COURT:  I just think it's presumptuous of Mr. Chu to

12:27  23   believe that you're the one, Mr. Lee, that's going to do the

12:27  24   closing argument, but maybe you told him already that you are

12:27  25   going to.

12:27  1      MR. LEE:  It is, because my colleague here is going to do

12:27  2   some significant portion.

12:28  3      THE COURT:  I understand.  Yes.  We'll -- Mr. Chu, that

12:28  4   sounds wonderful.

12:28  5      I think you will find that the only issues we have left to

12:28  6   take up when we get back at 1:30 are the issues of the jury

12:28  7   charge with regard to damages.  I have dealt with the other

12:28  8   issues and hopefully my law clerk has told you how I've dealt

12:28  9   with them.  To the extent there were still controversies, we'll

12:28  10  take those up at 1:30 and resolve those.

12:28  11     Assuming -- I'd like to -- Mr. Chu, just because you're up

12:28  12  there, that's what I think we have left to resolve.  Do you

12:28  13  have any reason to think I'm wrong?

12:28  14     MR. CHU:  I'm advised that the only open issues are the

12:28  15  jury instructions.

12:28  16     THE COURT:  Well, I get that, but I'm saying the only ones

12:29  17  I think there are issues on are Instructions No. 34 and

12:29  18  Instruction No. 35.

12:29  19     (Conference between counsel.)

12:29  20     MR. CHU:  Yes.

12:29  21     THE COURT:  Okay.  Very good.  Because I want to make sure

12:29  22  we have enough time.

12:29  23     So we will resume at 1:30 with discussions over the jury

12:29  24  charge.  I'll make my rulings.  We can get that -- yes, sir.

12:29  25     MR. TOMPROS:  Your Honor, I apologize.  I think there

12:29  1   actually are two other instructions, 34 and 35 -- Your Honor,

12:29  2   34 and 35 are two where you had reserved judgment.  I think you

12:29  3   had also reserved judgment on 33.

12:29  4        THE COURT:  Let me look.

12:29  5        MR. TOMPROS:  And then on 24, that was the one where Your

12:29  6   Honor was going to look at the willful -- oh, go ahead.

12:29  7        THE COURT:  On 33, your -- maybe Evan hasn't gotten it to

12:29  8   you.  I have rewritten 33.  Essentially what it is going to say

12:30  9   is -- I'm paraphrasing whatever I've given you now.

12:30  10  Essentially it's going to be party neutral and say something

12:30  11  like:  If you find that anyone failed to do something, you can

12:30  12  hold that against whichever party failed to do it.  I don't

12:30  13  name Intel.  But during closing, the lawyers are free to say --

12:30  14  be more robust.

12:30  15        If -- Mr. Chu, if you believe, or anyone believes, that

12:30  16  the other side did this, but in my charge it will not say

12:30  17  Intel.

12:30  18        MR. TOMPROS:  Thank you, Your Honor.

12:30  19        THE COURT:  With regard to willfulness, I'm going to

12:30  20  give -- I am going to give a willfulness charge.  Is there an

12:30  21  issue over what that is?

12:30  22        MR. TOMPROS:  There is, Your Honor.  There's still the

12:30  23  open question -- that was my one other point, so thank you,

12:30  24  Your Honor.  There's an open question as to whether the willful

12:30  25  blindness --

12:30  1      THE COURT:  Tell me what page you're on, because I --

12:30  2      MR. TOMPROS:  I am on Page 29 of the instructions, and I

12:30  3  think --

12:30  4      THE COURT:  I know what I'm going to do there too.

12:30  5      MR. TOMPROS:  Okay.

12:30  6      THE COURT:  What I'm going to do on Page 29 is I'm going

12:31  7  to give the proposed instruction from VLSI with this exception,

12:31  8  the proposed sentence is:  Willful blindness is just as

12:31  9  culpable as actual willfulness.

12:31  10      That is going to read in my charge:  Willful blindness is

12:31  11  a factor to consider with respect to willfulness.

12:31  12      So here's what we need to accomplish when we get back,

12:31  13  though:  We need to accomplish resolving what the damages

12:31  14  charge is going to be, and then we need to have enough time for

12:31  15  you all to quickly put on the record what your objections are.

12:31  16  You will then know.  I won't be listening as though I'm going

12:31  17  to make any changes, but I'll make sure we have time.

12:31  18      As soon as we're done with that, we'll bring the jury back

12:31  19  in and we will resume with the next witness.

12:31  20      And then -- I'm sorry.  And then I will read this as

12:31  21  quickly as I can.  It's 47 pages.  I actually may tell the jury

12:32  22  I'm going to try and read it quickly to save them some time.

12:32  23  They'll have a copy of it.

12:32  24      And then my plan is for each side to have 45 minutes per

12:32  25  side for closing.

1468

12:32  1        If we -- depending on what time it is when I finish, if I

12:32  2   can give you all a little more time, I will.  I would like to

12:32  3   get finished with everything no later than 6:00.  That is my

12:32  4   thinking.

12:32  5        Mr. Chu?

12:32  6        MR. CHU:  Yes.  There is one other item.

12:32  7        THE COURT:  Okay.

12:32  8        MR. CHU:  We had filed a motion about the following:

12:32  9   During the course of the trial, there was some back and forth,

12:32 10   back and forth, it was a ping pong ball that had to do with the

12:32 11   Federal Circuit opinion in Wisconsin Alumni Research Foundation

12:32 12   versus Apple.

12:32 13        And Mr. Lee was reading from it and essentially was

12:32 14   arguing to the jury that -- against the credibility of

12:32 15   Professor Conte.

12:32 16        In fact, it was a claim construction issue.  That's my

12:33 17   understanding of it, being very familiar with the case, and

12:33 18   that was Professor Conte's.

12:33 19        Our motion seeks to preclude both sides from arguing

12:33 20   before the jury the Federal Circuit opinion, what it means,

12:33 21   reading from it, and the like.

12:33 22        It may be said that we started down the path, but here's

12:33 23   what happened:  Earlier in the trial, Intel brought up a fact

12:33 24   that Professor Conte had been engaged by several Irell clients.

12:33 25   In response to our questions, he said he understood one of the

12:33  1    reasons why VLSI engaged him.  He testified before two Texas

12:33  2    juries where USAA had brought claims against Wells Fargo, and

12:33  3    he said something to the effect, I think, the verdicts were 250

12:33  4    million.  They were actually 300 million.  That -- to some of

12:34  5    us, that's still real money.

12:34  6        And then Mr. Lee got up and started reading parts of the

12:34  7    Federal Circuit opinion.

12:34  8        So I think it would just be unseemly for either side to be

12:34  9    arguing about the meaning of the Federal Circuit opinion.

12:34  10       THE COURT:  Mr. Lee?

12:34  11       MR. LEE:  Your Honor, you recall that they opened the

12:34  12   door.  I objected.  And you said to them:  If you open the

12:34  13   door, it's open to both of us.  They walked through with just

12:34  14   an oral recitation of the other cases.

12:34  15       I talked both orally and from the opinion.  It's in the

12:34  16   record.  And we're entitled to argue what's in the record.

12:34  17   There's nothing unseemly about it.  And the quotes that I read

12:34  18   are directly from the Federal Circuit's opinion.

12:34  19       If they had not opened the door, as I said, Your Honor, we

12:34  20   wouldn't have done it.  But having had them open the door and

12:34  21   suggesting that they're allowed to have these -- this

12:35  22   $250 million verdict or more in the jury's memory but we're not

12:35  23   allowed to argue what we said in opposition would be very

12:35  24   prejudicial and unfair.  You can't open the door and then

12:35  25   decide that you don't like what happened when the door got

12:35   1   opened.

12:35   2         THE COURT:  I'm going to -- I'm going to deny Mr. Chu's

12:35   3   request.  However, I'm going to limit you to speaking only as

12:35   4   to what was -- I'm not going to let you get into anything about

12:35   5   the case.

12:35   6         If something was asked or answered during the trial and I

12:35   7   allowed it in, you can refer to the record of what was said

12:35   8   during the trial specifically.

12:35   9         MR. LEE:  That's my plan.

12:35  10         THE COURT:  No one's going to read from that case.  No

12:35  11   one's going to discuss the case.  It's only whatever evidence

12:35  12   was admitted into the case and the question and answering

12:35  13   specifically.

12:35  14         MR. LEE:  Everything that I'm going to say is in a

12:35  15   question or answer from Dr. -- between Dr. Conte and me.

12:35  16         MR. CHU:  Your Honor, the problem is they were

12:36  17   disagreeing -- there's this Q and A between Mr. Lee and

12:36  18   Professor Conte.

12:36  19         Mr. Lee says:  Isn't it that no reasonable jury could find

12:36  20   X?

12:36  21         Yes, the line is there.  But it was a claim construction

12:36  22   issue in which the case turned.

12:36  23         Professor Conte then said:  My understanding was claim

12:36  24   construction.

12:36  25         Mr. Lee reads more.  Professor Conte goes back and forth.

12:36  1    THE COURT:  And, Mr. Chu, you can put in that your witness

12:36  2  believed it was a claim construction issue.  It -- whatever was

12:36  3  said during the trial can be -- I can't keep out -- I can't

12:36  4  keep aside from arguing what was admitted at trial.  It's in

12:36  5  the record.

12:36  6    MR. CHU:  Yeah.  We do think --

12:36  7    THE COURT:  I can't -- I can't fix that now by limiting it

12:36  8  now.  It -- it's in the record.

12:36  9    MR. CHU:  Okay.  Just so the record's clear, we had

12:36  10  objected when Mr. Lee proceeded down this particular line.  And

12:37  11  we do believe that the Court has discretion, in matters of this

12:37  12  kind, to limit or prevent lawyers from making arguments on

12:37  13  things that are so far afield.  Even if it, in fact, "came in"

12:37  14  on questions and answers, but there was no affirmative

12:37  15  evidence.

12:37  16    THE COURT:  Mr. Chu.

12:37  17    MR. CHU:  He's just reading an opinion.

12:37  18    THE COURT:  I -- if I admitted -- if I admitted something

12:37  19  into evidence over your objection, it's in evidence.  And

12:37  20  whatever's in evidence is free to be discussed by either party.

12:37  21    Anything else?

12:37  22    MR. CHU:  No, Your Honor.

12:37  23    THE COURT:  We will be back -- I'll be back as close to

12:37  24  1:30 as I can.

12:37  25    THE BAILIFF:  All rise.

| | | |
|---|---|---|
| 12:37 | 1 | (Recess taken from 12:37 to 1:37.) |
| 01:37 | 2 | THE BAILIFF:  All rise. |
| 01:37 | 3 | THE COURT:  Thank you.  You may be seated. |
| 01:37 | 4 | Okie dokie.  Just so you all know, I've made a decision |
| 01:38 | 5 | primarily motivated by the fact that we're having issues with |
| 01:38 | 6 | how we get the exhibits to the jury. |
| 01:38 | 7 | We are not going to be able -- there are a number of |
| 01:38 | 8 | exhibits we are not going to be able to load on the system |
| 01:38 | 9 | between now and when the jury starts deliberating tomorrow. |
| 01:38 | 10 | So if we have them on the system now, good.  If we don't |
| 01:38 | 11 | have them on the system now, you all need to make -- get a |
| 01:38 | 12 | printed copy of everything we don't have, and we'll do it the |
| 01:39 | 13 | old-fashioned way with all the other exhibits.  And that way |
| 01:39 | 14 | they'll have all the exhibits, the ones we have now, loaded -- |
| 01:39 | 15 | they'll be loaded.  The ones that are not loaded will be in |
| 01:39 | 16 | paper but they'll be available. |
| 01:39 | 17 | You all will need to do whatever magic you all need to do |
| 01:39 | 18 | to make sure they have all the exhibits physically available. |
| 01:39 | 19 | But because of that, whenever we finish today, I'm going to |
| 01:39 | 20 | tell them to go home.  That way they won't begin deliberating |
| 01:39 | 21 | until they have all the exhibits. |
| 01:39 | 22 | So that being said, we have two issues to take up. |
| 01:39 | 23 | Mr. Chu, I'll begin with you or whoever's going to be speaking |
| 01:39 | 24 | on behalf of how we submit the damages. |
| 01:39 | 25 | Oh, yes, ma'am. |

01:39  1        MS. PROCTOR:  For the jury instructions?

01:39  2        THE COURT:  Yes.

01:39  3        MS. PROCTOR:  So, Your Honor, on the comparable license

01:40  4   instruction that's No. 33.

01:40  5        THE COURT:  Okay.

01:40  6        MS. PROCTOR:  Is it 33 -- or is it 34?  34 in yours, I

01:40  7   think, now.

01:40  8        So on 34, the comparable license issue, basically there

01:40  9   are two competing instructions.  There's -- we proposed about a

01:40  10  paragraph; they proposed a longer instruction.  And there are

01:40  11  two primary issues with what they have proposed.

01:40  12       THE COURT:  Okay.

01:40  13       MS. PROCTOR:  A lot of it overlaps.  But theirs is -- it's

01:40  14  a good bit longer, and one of the things it includes that ours

01:40  15  does not is a discussion of an analogy to a house and

01:40  16  determining the value of a house.

01:40  17       And we just think that's improper, especially in light of

01:40  18  the analogies that their expert used.  We don't want the Court

01:40  19  to be endorsing those kinds of comparisons.

01:40  20       THE COURT:  I will tell you that I felt the same way

01:40  21  when -- after I heard -- I mean, I was agnostic when I read

01:40  22  both of them.  I wasn't sure what the issue was.  But having

01:40  23  heard the way that Intel put on their damages -- that, I

01:41  24  thought seemed inappropriate, given the analogy that they used.

01:41  25  I'll hear from counsel for Intel.  But that -- that's my issue.

01:41  1          MR. TOMPROS:  I think, Your Honor, at the end of the day

01:41  2   we could live without the house analogy, and that's okay, Your

01:41  3   Honor.

01:41  4          THE COURT:  Okay.

01:41  5          MS. PROCTOR:  Great.  And so there's one other issue that

01:41  6   we think our instruction addresses more clearly here.  And that

01:41  7   is the standard and the fact that the licenses have to actually

01:41  8   be comparable in order to be relevant.  And so our instruction

01:41  9   includes the sentence, it's sort of near the end here, that if

01:41  10  they choose to rely upon evidence from any license agreements,

01:41  11  you must account for any differences between those licenses and

01:41  12  the hypothetically negotiated license.  It goes on, in terms of

01:41  13  the technologies' economic circumstances.

01:41  14         THE COURT:  Okay.  Let me -- I don't mean to cut --

01:41  15  ordinarily I wouldn't cut you off.  I've just -- for Intel, if

01:41  16  I were to give Intel's instruction minus the house analogy and

01:42  17  added the sentence that said -- began with, "However," to the

01:42  18  end of it or wherever, would Intel be okay with that?

01:42  19         MR. TOMPROS:  That would be fine, Your Honor.

01:42  20         THE COURT:  And I'm going to put it at the end unless you

01:42  21  all tell me that there's -- someone's unhappy about that.

01:42  22         MS. PROCTOR:  So I do still have one final concern with

01:42  23  this one, before we get to the part about settlements, which we

01:42  24  can address in a moment.  And that's just that it's a very long

01:42  25  instruction already, if we use theirs.  And, especially, if you

—1475—

01:42  1    now add a big chunk of ours --

01:42  2        THE COURT:  You're going to have a hard time -- it's

01:42  3    47 pages -- convincing me that --

01:42  4        MS. PROCTOR:  I hear you, Your Honor.

01:42  5        THE COURT:  So here's what I'm going to do on 34.  I'm

01:42  6    going to give Intel's proposal.  What I want someone to do is

01:42  7    make sure with -- I act like I know what I'm talking about

01:42  8    here.  When you say -- when one side says, I want this removed,

01:42  9    make sure Evan knows what it is you want removed and that

01:42  10   you've agreed to.  I'm okay with that.

01:42  11       And then we'll take the sentence how -- beginning with,

01:43  12   "however," if you choose, that's in red, and we will put that

01:43  13   at the end of the blue language, and that will be this

01:43  14   instruction.

01:43  15       MR. TOMPROS:  Thank you, Your Honor.

01:43  16       THE COURT:  And so then we're turning to --

01:43  17       MS. PROCTOR:  Can I just -- sorry -- clarify one little

01:43  18   thing?  Are you -- for that last bit that they proposed on

01:43  19   litigation-related agreements, are you planning to include that

01:43  20   or not?  Because, obviously we don't think that's appropriate,

01:43  21   and I can explain why.

01:43  22       THE COURT:  Yeah.  I'm sorry.  I missed that.  I mean, I

01:43  23   missed that when I read this.

01:43  24       I'm not going to -- again, I'm not going to include

01:43  25   anything that has to do with being influenced by a desire to

01:43  1    avoid the cost of further litigation.

01:43  2        MR. TOMPROS:  May I be heard on that?

01:43  3        THE COURT:  Yes, sir.

01:43  4        MR. TOMPROS:  I would just say, Your Honor, this is an

01:43  5    instruction that we only proposed in the alternative, as you

01:43  6    can kind of see there, because our view was that licenses that

01:43  7    were the product of litigation should not be introduced at all.

01:44  8    As you heard during the examination this morning -- the

01:44  9    cross-examination this morning, Mr. Mueller objected precisely

01:44  10   to those, asked for and got a standing objection to those,

01:44  11   which Your Honor overruled.

01:44  12       Now there is evidence in the record of licenses that are

01:44  13   driven by litigation that have different numbers.  The Court

01:44  14   in -- the Federal Circuit in the Prism case made very clear

01:44  15   that those are different and the litigation impact of those

01:44  16   must be considered.

01:44  17       And this instruction that we proposed is directly from the

01:44  18   Federal Circuit Bar Association model instruction B59.  That's

01:44  19   where that paragraph comes from.  If they hadn't been in the

01:44  20   case at all, of course there'd be no need for an instruction.

01:44  21   But having overruled that objection, we do think it's necessary

01:44  22   to instruct.

01:44  23       THE COURT:  Yes, ma'am.

01:44  24       MS. PROCTOR:  So the instruction they have in there is

01:44  25   very one-sided.  And, of course, we have to take into account

01:44  1    the facts that are actually in the case.  And so the facts that

01:45  2    actually came into evidence, Your Honor, are about settlement

01:45  3    agreements where the values are very high, 300 million,

01:45  4    1.5 billion.  These are not agreements that are trying to avoid

01:45  5    the cost and burden of litigation, right?  There's more to it

01:45  6    that -- than that.

01:45  7           And, in fact, we think Your Honor has prevented us from

01:45  8    talking about the fact that the low lump sum agreements Intel

01:45  9    is relying on are actually the ones that are being influenced

01:45  10   by litigation.  But because we have not been able to make that

01:45  11   argument, we think that this one-sided jury instruction should

01:45  12   not be included.

01:45  13          THE COURT:  Okay.  Just give me one second.

01:46  14          See, so I don't even think this is necessarily accurate

01:46  15   because it might -- I think what I heard also is that you might

01:46  16   do this to avoid litigation at all.  And so that -- that is my

01:46  17   problem here.  But give me a second to think.

01:46  18          MR. TOMPROS:  Happy to address that, Your Honor.

01:46  19          THE COURT:  Yes, sir.

01:46  20          MR. TOMPROS:  I would say that the instruction actually --

01:46  21   I -- it is -- it's the model language and it is trying to

01:46  22   encompass a series of different scenarios.  But I do think it

01:46  23   is -- it does encompass the scenario that was addressed both by

01:47  24   Mr. Sullivan's cross-examination and, frankly, what we expect

01:47  25   VLSI will put on through Mr. Chandler, the last -- the last

01:47  1    witness, who addresses litigation settlement agreement.

01:47  2         The first point I would say, it specifically says "may

01:47  3    consider," right?  So this is an additional factor about a

01:47  4    license that the jury may consider.  And the second --

01:47  5         THE COURT:  But -- yeah.  But here's my problem is is this

01:47  6    is focusing the jury on one of the other things that might be

01:47  7    considered.  And it seems to me that it does skew towards

01:47  8    Intel's benefit that this is the one that I singled out, is the

01:47  9    problem I'm having.

01:47  10        MR. TOMPROS:  And, Your Honor, we agree that it is one of

01:47  11   several considerations.  And I do think that the absence of it,

01:47  12   though, is -- skews the other direction, right?  Not -- not

01:47  13   instructing the jury that when something is part of a

01:47  14   litigation, its value can be and should be adjusted because of

01:47  15   that.  And I think that skews the other direction.

01:47  16        That was exactly the problem with that Prism case, the

01:47  17   Federal Circuit case from 2017.

01:47  18        So there's very clear law that the fact that a license was

01:48  19   the result of litigation affects it economically.

01:48  20        THE COURT:  Here's what I'm going to do.  I'm going to

01:48  21   give this sentence to the point where it says, "When

01:48  22   determining if a license agreement is comparable to" -- "the

01:48  23   hypothetical to" -- "the hypothetical license, you may consider

01:48  24   whether the license agreement is between" -- is -- I'm going to

01:48  25   say "is" or "was between parties who are involved in a

01:48  1    lawsuit."

01:48  2         I'm going to stop there, and I'm going to -- as I said

01:48  3    earlier, with the concern Mr. Chu raised that if there's

01:48  4    something in the record that I admitted that either side wants

01:48  5    to discuss related to these license agreements, you can do so.

01:48  6    If it's -- if I've admitted it in the record, I just don't want

01:48  7    you to -- I don't want either side to be able to point where --

01:49  8    where I say -- where you can say, look, the judge tells you

01:49  9    this.

01:49  10        I don't want there to be the weight of judicial imprimatur

01:49  11   on any one specific issue.  But you all are free in your

01:49  12   closing to discuss anything related to this that has been

01:49  13   admitted into evidence.  And so that will take care of that, I

01:49  14   hope.

01:49  15        And then the lump sum versus a running royalty.  We need

01:49  16   to wrap this up pretty quickly, but let me start with

01:49  17   plaintiff's counsel.

01:49  18        MS. PROCTOR:  Thank you, Your Honor.  So we have a concern

01:49  19   with this that also relates to the verdict form, and they've

01:49  20   actually proposed a final question that says, are you awarding

01:49  21   a lump sum for past and future damages or just a running

01:49  22   royalty for past damages.

01:49  23        THE COURT:  I've seen that.

01:49  24        MS. PROCTOR:  So that's really our concern.  We don't want

01:49  25   to instruct the jury on this because we think that verdict form

01:49   1   question is improper.  It is -- as you heard on Friday night,

01:49   2   the parties have agreed that the financial data Intel produced

01:50   3   only goes through December 31st, 2019.  We do not have

01:50   4   financial data beyond that and --

01:50   5       THE COURT:  But I never heard Dr. Sullivan mention a

01:50   6   running royalty.

01:50   7       MS. PROCTOR:  Oh, he absolutely -- his testimony was --

01:50   8   it's built on a foundation of a running royalty, right?  He --

01:50   9       THE COURT:  Well, it is, kind of.

01:50  10       MS. PROCTOR:  He tied it over and over again -- and

01:50  11   that -- so sorry.

01:50  12       THE COURT:  It is, kind of.  I'm not really sure how to

01:50  13   accurately describe Dr. Sullivan's testimony.  It certainly

01:50  14   seemed more like he came up with a lump sum to me than a

01:50  15   running royalty.

01:50  16       MS. PROCTOR:  And, Your Honor, that's actually exactly

01:50  17   part of the problem here.  Because what he did is it -- he said

01:50  18   he was calculating it based on the use Intel made but only for

01:50  19   certain dates, right?  And so it is a running royalty, but he's

01:50  20   calculated it as a lump sum.

01:50  21       And so it's just extremely confusing to the jury.  We give

01:50  22   them a line for a lump sum, and then we ask them whether it's a

01:50  23   lump sum or a running royalty.  It's not understandable for the

01:51  24   jury.

01:51  25       And it also implicates our legal rights.  We think these

01:51  1  are equitable questions about whether we get an ongoing

01:51  2  royalty, for example, postjudgment.

01:51  3      THE COURT:  I understand what the problem is.  But what

01:51  4  I'm saying is, what I heard Dr. Sullivan say was whatever --

01:51  5  however he said he got there, the way I heard -- I think you

01:51  6  accurately quoted it, which was "I'm giving a lump sum for the

01:51  7  damages that our guys have incurred because of past

01:51  8  infringement."

01:51  9      But that -- that's the language he used.  That's the

01:51  10 reason we had the whole fight over royalty rate per unit.

01:51  11     And so I'm -- my fear is the opposite of yours.  I get why

01:51  12 there may be a problem with what happens if you win, and if the

01:51  13 plaintiff comes in and says, you know, we ought to get more

01:51  14 money for -- going forward.  I had one of these cases as a

01:51  15 plaintiff.  I'm -- I get it.

01:52  16     But your -- the evidence in the case, the testimony from

01:52  17 your witness basically said, here's a lump sum amount.

01:52  18     MS. PROCTOR:  For a certain period, Your Honor.  So it

01:52  19 absolutely is a running royalty for that period.

01:52  20     THE COURT:  Okay.  Well, it is a running royalty for a

01:52  21 period that's given in a lump sum.

01:52  22     MS. PROCTOR:  Yes.  And that's part of the issue with the

01:52  23 instruction they want to give, because it will not be

01:52  24 understandable in light of that.

01:52  25     And that was in part to accommodate the verdict form as

01:52  1    well.  We wanted to have a single number -- the parties had

01:52  2    already agreed on the portion of the verdict form that would

01:52  3    just be a line with a dollar amount.

01:52  4         And so we wanted to give the jury the number they needed

01:52  5    for that line.  But of course it is based on a running royalty,

01:52  6    and Intel does not dispute that it only goes through those

01:52  7    financial data they provided through December 31st, 2019.

01:52  8         THE COURT:  No.  I --

01:52  9         MR. TOMPROS:  I mean, respectfully, Your Honor, we don't

01:52 10    dispute that the financial data goes there.  But I think as --

01:52 11    this is part of why this instruction makes a whole lot more

01:53 12    sense after you've seen our damages clarification.

01:53 13         As you heard today, our view is that the appropriate

01:53 14    reasonable royalty would be a comparable royalty for a fully

01:53 15    paid-up license, like was discussed today.  And that is

01:53 16    precisely a lump sum.

01:53 17         It's been the position we've taken throughout the case,

01:53 18    and it's absolutely in the record as of today.  And this idea

01:53 19    of a per-unit royalty was, you know, as you heard, what Mr. Lee

01:53 20    objected to before.

01:53 21         THE COURT:  Well, that's not going to really be a problem

01:53 22    here, I don't think.

01:53 23         MR. TOMPROS:  I agree.

01:53 24         THE COURT:  Because I don't -- but the language we choose

01:53 25    here, given the way this was put on, is -- it is -- I want to

01:53   1   protect Intel, and so I definitely want to allow you all to

01:53   2   argue the -- based on what your expert said.

01:53   3       But the way the plaintiff's case was put on, I'm not sure

01:53   4   that the first line of your instruction, "a reasonable royalty

01:54   5   can be paid either in the form of a one-time lump sum payment

01:54   6   or as a running royalty," in that they did present it, the

01:54   7   running royalty, and again, what they did was they came up with

01:54   8   the lump sum amount that they thought was appropriate.

01:54   9       And I -- you know, I went back today, as your damages

01:54  10   expert was testifying, to make sure -- I thought I'd done the

01:54  11   right thing when you all -- and I'm sure -- if the plaintiff

01:54  12   wins, I'm sure three other people will decide whether I did or

01:54  13   not.  But I went back and verified for my own comfort that

01:54  14   there is an economic -- an established economic methodology

01:54  15   that supports Dr. Sullivan.

01:54  16       Now, whether that -- whether it should come in in a patent

01:54  17   case or not, I guess we may find out.  I am comfortable that

01:54  18   the methodology that he employed is something that is

01:55  19   recognized in economic theory.  Whether or not it's appropriate

01:55  20   to use it for patent cases or not, you know, we're going to --

01:55  21   I guess we'll have to see.

01:55  22       And so -- which makes Daubert, as you know, very hard

01:55  23   because the plaintiff, I thought, did a very good job of taking

01:55  24   an established methodology -- recognized established

01:55  25   methodology and then buttressing it with the evidence from the

—1484

01:55  1    technical experts here to say, here's how I'm getting to that.

01:55  2         So I thought both the method and the methodology used

01:55  3    survived Daubert.  But here, I guess I'm paying the price for

01:55  4    this by having to figure out how to phrase the charge to the

01:55  5    jury.

01:55  6         MR. TOMPROS:  Your Honor, I would just add, obviously you

01:55  7    heard our arguments on Daubert on exactly this issue.  And we

01:55  8    agree that this is a new and different version that the

01:56  9    plaintiff has put forward of a damages theory.

01:56  10        The theory that Intel has put forward, we think, is

01:56  11   actually pretty standard.  And that's why this is a standard

01:56  12   instruction in the --

01:56  13        THE COURT:  I personally have put on exactly the damage

01:56  14   case that you put on this morning other times.  So I recognize

01:56  15   that one.  I totally get that one.  So give me one second here.

01:56  16        Okay.  Here's what I'm going to do.  I'm going to -- I'm

01:57  17   not going to give the first sentence of the Intel suggestion.

01:57  18   I'm going to take -- I'm going to skip over that paragraph for

01:58  19   a second.

01:58  20        I'm going to start off with "reasonable royalty awards."

01:58  21   I'm going to give the -- Intel's second paragraph will be the

01:58  22   first paragraph.  Then it will say, "Reasonable royalty awards

01:58  23   may take the form of a running royalty."  That will be the

01:58  24   second paragraph.

01:58  25        The third paragraph will be the one submitted by VLSI.

01:58  1    And then I'm going to take the two sentences from the first

01:58  2    paragraph, I'm going to insert them as a final paragraph in

01:58  3    this.

01:58  4        So the last paragraph will read, any -- "all of these

01:58  5    methods are designed to compensate the patent owner for any

01:59  6    infringement.  It is up to you, based on the evidence, to

01:59  7    decide what type of royalty, if any, is appropriate in this

01:59  8    case."

01:59  9        And under this, the plaintiff will be able to argue what

01:59  10   Dr. Sullivan submitted and Intel can certainly argue based on

01:59  11   this what its expert submitted.

01:59  12       Do we have anything else we need to take up?

01:59  13       MR. TOMPROS:  We would like to put our objections on the

01:59  14   record.

01:59  15       THE COURT:  Of course.  I'm sorry.  Oh, we also need to

01:59  16   take up the verdict form as well.

01:59  17       MS. PROCTOR:  Yes, Your Honor.

01:59  18       THE COURT:  So give me one second.  So I'm going to

01:59  19   start with the plaintiff's verdict form in terms of formatting.

01:59  20   Doesn't mean I -- and so -- so I've got plaintiff's form.

02:00  21   I'm -- let me just walk through this, and I'll ask counsel for

02:00  22   Intel to tell me, on Page 1 --

02:00  23       MR. TOMPROS:  I may be able to shortcut it considerably,

02:00  24   Your Honor.

02:00  25       THE COURT:  Yes, please.

02:00   1          MR. TOMPROS:  I think we would be willing to agree with

02:00   2     plaintiff's form with the exception of the addition of the lump

02:00   3     sum checkbox that we described before.  Again, with the caveat

02:00   4     that we are preserving our prior objections on willfulness and

02:00   5     equivalence.

02:00   6          THE COURT:  Sure.  No.  Right now, all we're talking about

02:00   7     is formatting.

02:00   8          MR. TOMPROS:  Yep.

02:00   9          THE COURT:  And so I'm not -- let the record be clear, and

02:00  10     you'll get to do this formally in a few seconds where you

02:00  11     actually put on the record your objections.  But for right now,

02:00  12     in terms of format, let's go on the record with -- tell me

02:00  13     again what Intel is unhappy with.

02:00  14          MR. TOMPROS:  That -- specifically that at the end of the

02:00  15     plaintiff's form, there is not the question that we have

02:00  16     proposed, which is the one that Ms. Proctor was just discussing

02:01  17     with you, which is, is the total amount you found in this

02:01  18     question a one-time lump sum for past and future sales or a

02:01  19     royalty for past sales only?  Check one, one-time lump sum or

02:01  20     reasonable royalty.

02:01  21          So our question for 1b, we would propose --

02:01  22          THE COURT:  Let me throw this out.  And again, when I ask

02:01  23     you this, I'm preserving Intel's objection to all of this.

02:01  24     We're talking formatting now because I want to preserve this.

02:01  25          Given that I have given an alternative that wasn't

02:01  1   followed by the -- Intel, what if on the verdict form it was --

02:01  2   the -- instead of just -- let me find it real quick.  Sorry.

02:02  3        Oh, let me digress for just a second.  On Intel's form, on

02:02  4   Page 6, I think Intel included, but the plaintiff did not, the

02:02  5   language that -- it comes right under the title "Damages,"

02:02  6   where it says, you know, you have to find something is

02:02  7   infringed and not invalid.  I think that that ought to be

02:02  8   included.

02:02  9        Does the plaintiff have an objection to that?

02:02  10       MS. PROCTOR:  We do object to that, Your Honor.  We think

02:02  11  ours is clear based on the question flow.

02:02  12       THE COURT:  Where do you have a -- where -- let me make

02:02  13  sure you understand what I'm saying.

02:02  14       MR. TOMPROS:  Yeah.  If I may, Your Honor.  I think

02:02  15  Ms. Proctor and I may actually be saying the same thing.  So

02:03  16  their Questions No. 6 and 7, in the body of the question, it

02:03  17  just says, answer it if you found yes to Question No. 1 --

02:03  18       MS. PROCTOR:  Thank you.  That is correct.

02:03  19       MR. TOMPROS:  So that's why we didn't have a problem with

02:03  20  their version.  But if Your Honor wants to --

02:03  21       THE COURT:  No, no, no.  I just wanted to make sure it was

02:03  22  in there.  And so that's fine.  Okay.

02:03  23       So turning to what hopefully is the final -- is the final

02:03  24  issue.  Give me just one second here.

02:03  25       I wish I could look up to the clock on the wall and know

02:03   1    what time it is.

02:03   2         MS. PROCTOR:  2:03, Your Honor.

02:03   3         And we're happy to take -- obviously preserving our

02:03   4    objection to this question about the lump sum, we're happy to

02:03   5    take a shot at adding it to our form in a way that makes

02:04   6    logical sense.

02:04   7         THE COURT:  No.  I'm doing that right now.

02:04   8         MS. PROCTOR:  We would ask, then, that Your Honor put in

02:04   9    parentheses next to one-time lump sum "for Intel," next to

02:04   10   royalty for past sales "for VLSI," as we've done for other

02:04   11   questions for clarity for the jury.

02:04   12        THE COURT:  I'm not going to -- I'm coming up with another

02:04   13   option.

02:04   14        MS. PROCTOR:  Oh, okay.

02:05   15        THE COURT:  I'll start with the plaintiff.

02:06   16        Here's what I'm suggesting we ask, which I think is

02:06   17   consistent with the way you all are going to present your

02:06   18   arguments, is the total amount of damages you found in

02:06   19   Questions 6 and 7, one, a running royalty in the form of a lump

02:06   20   sum for past damages or, two, a lump sum for all damages?

02:06   21        MR. TOMPROS:  No objection from Intel, Your Honor.

02:06   22        MS. PROCTOR:  Can we just clarify, Your Honor, with a

02:06   23   parenthetical which one is for VLSI and which one is for Intel?

02:06   24        THE COURT:  No.

02:06   25        MS. PROCTOR:  Your Honor, we're just really concerned it's

02:06  1    going to create jury confusion.  Because we really -- obviously

02:06  2    everyone's goal is to have a consistent verdict --

02:06  3         THE COURT:  Let me -- I get that.  But let me suggest that

02:06  4    during closing argument, you can certainly say to the jury that

02:07  5    you believe that the appropriate method to use is a reasonable

02:07  6    royalty in the form of a lump sum for past damages.

02:07  7         MS. PROCTOR:  It's going to be a long night, Your Honor.

02:07  8    I don't know how much the jurors are going to remember, and I

02:07  9    think it's just cleaner to let them have that in front of them.

02:07  10        THE COURT:  I'm going to allow you all to argue it however

02:07  11   you want to argue it.  I'm not going to let them pick a format

02:07  12   because they want one side or the other to win.

02:07  13        And so they -- if -- they get to -- they get to decide

02:07  14   which format they think is appropriate.  You all can make clear

02:07  15   in your closing arguments which you think is appropriate.

02:07  16        And so I'm not restricting VLSI in any way from saying,

02:07  17   "We believe that the correct answer in the judge's instruction

02:07  18   should be a reasonable royalty in the form of a lump sum for

02:07  19   past damages."

02:07  20        And if the jury can't figure out that -- which side wants

02:08  21   what, then we're lost anyway.

02:08  22        MS. PROCTOR:  Okay.  I understand, but I'll also just note

02:08  23   that we maintain our objection to the jury deciding future

02:08  24   damages at all.

02:08  25        THE COURT:  They're not -- well, okay.  I got that.  But

02:08   1   there is -- but the way that -- here's the problem, is the

02:08   2   defendant has presented a model where they said the appropriate

02:08   3   amount is a lump sum that gives us the freedom to use this now

02:08   4   and forever.  So that is a -- that is an answer that's

02:08   5   supported by the evidence.

02:08   6       MS. PROCTOR:  And we think it's contrary to law, Your

02:08   7   Honor, for them to be able to extinguish our equitable rights

02:08   8   in the future.

02:08   9       THE COURT:  Well, you have no equitable rights.  You have

02:08  10   no equitable rights.  You have -- in this case, you have rights

02:08  11   only to damages because you're not a practicing entity.

02:08  12       MS. PROCTOR:  Well, we could certainly seek an injunction.

02:08  13   And if that were denied, we could --

02:08  14       THE COURT:  How would you seek an injunction?

02:09  15       MS. PROCTOR:  We could file the motion is what I mean,

02:09  16   Your Honor.  And then there's an alternative of an ongoing

02:09  17   royalty that absolutely is available.  It's an equitable remedy

02:09  18   to nonpracticing entities.

02:09  19       THE COURT:  But they present -- I'm not going to argue too

02:09  20   much longer.  They -- they will have presented to the jury

02:09  21   evidence that says the appropriate amount of the use is this,

02:09  22   and for that -- I've made clear on my record why I'm doing it.

02:09  23   So -- and that I'm doing it is either right or wrong.  It

02:09  24   doesn't get better or worse because I add VLSI in one place and

02:09  25   Intel in the other.

—1491—

02:09  1       I'm either -- if I'm wrong for allowing Dr. Sullivan to

02:09  2   have put on this -- this methodology, we'll find out in the

02:09  3   future.

02:09  4       If I'm wrong for having allowed Intel to say it's a lump

02:09  5   sum and it's this amount, we'll find out in the future.  I'm

02:09  6   just going to -- I'm doing the best I can right now to -- to

02:09  7   give a jury charge that is faithful to what the evidence was in

02:09  8   the case.

02:10  9       MS. PROCTOR:  Understood, Your Honor.

02:10  10       THE COURT:  So assuming that I put in here -- what I'm

02:10  11   going to add to -- I'm going to add a question to the

02:10  12   plaintiff's -- everything else will be the same.  Everything

02:10  13   will be the -- as the plaintiff gave it to me, with the

02:10  14   exception there will be a new Page 7, which will read, "Is the

02:10  15   total amount of damages you found in Questions 6 and 7, one, a

02:10  16   running royalty in the form of a lump sum for past damages

02:10  17   only; or, two, a lump sum for all damages?"

02:10  18       And I understand you're going to -- you're unhappy about

02:10  19   that.  But let me -- I just need to have Evan --

02:10  20       Evan, can you add that?

02:10  21       LAW CLERK:  Yes.

02:10  22       THE COURT:  So why don't we go ahead now, and whoever's

02:10  23   going to make the objections to my charge on behalf of

02:10  24   plaintiff, please do so.  Please do it as quickly as you can

02:11  25   just so we can bring the jury back in.

02:11  1        MS. PROCTOR:  Thank you, Your Honor.

02:11  2        MR. HATTENBACH:  Good afternoon, Your Honor.

02:11  3        THE COURT:  No stall points here.

02:11  4        MR. HATTENBACH:  No.  I'm going to try to make this as

02:11  5   quick as possible.  I don't know exactly what form you want it

02:11  6   in, so let me try this and make sure -- if it doesn't work for

02:11  7   you, I can do a more detailed version.

02:11  8        There are a number of jury instructions that we object to

02:11  9   as unduly prejudicial, misstating the law and the record, and

02:11  10  confusing.  And those are the ones with --

02:11  11       THE COURT:  You left out "respectfully" somewhere in

02:11  12  there.

02:11  13       (Laughter.)

02:11  14       MR. HATTENBACH:  I --

02:11  15       THE COURT:  You should say either "respectfully" or "with

02:11  16  all due respect."

02:11  17       MR. HATTENBACH:  I -- I apologize.  I did draw the short

02:11  18  straw.  I have not been looking forward to this all week, as my

02:11  19  colleague said about reading the exhibits into the record.  But

02:11  20  the ones that we object to on that basis are portions of

02:11  21  instructions 2, 3, 11, 13, 16, 17, 21, 22, 24, 25, 27 through

02:12  22  29, 30, 32 through 34, and 35.

02:12  23       We also object to the noninclusion of certain material

02:12  24  that we requested to be included in instructions 4, 15, 19, 20

02:12  25  and 35.  And if you would like any more detail, I'd be glad --

02:12  1      THE COURT:  As long as Intel -- and this is bilateral.  As

02:12  2  long as -- we had your proposals.  I think you've faithfully

02:12  3  articulated what your proposals were.  But if someone's just

02:12  4  out there listening to what you said, they'd feel like I really

02:12  5  screwed this up.  That was a lot of objecting.  But --

02:12  6      MR. HATTENBACH:  Right.  But I'm referring to material

02:12  7  that we've discussed with Your Honor, I believe it was Thursday

02:12  8  night in a document that had red type and blue type,

02:12  9  signifying --

02:12  10      THE COURT:  Oh, no.  No.  No.  I -- I'm good with that.

02:12  11      MR. HATTENBACH:  Okay.

02:12  12      THE COURT:  I think the way you did it is fine.  And we

02:12  13  went over each of the -- each of the pages that you submitted.

02:13  14  And I -- I -- I either refused to give those proposals, or I

02:13  15  gave -- or I gave proposals that you're unhappy with.  That's

02:13  16  fine with me.

02:13  17      MR. HATTENBACH:  That's all I have.  Thank you, Your

02:13  18  Honor.

02:13  19      THE COURT:  Thank you, sir.

02:13  20      And for Intel?

02:13  21      MR. TOMPROS:  Thank you, Your Honor.  On behalf of Intel,

02:13  22  we respectfully and very respectfully object --

02:13  23      (Laughter.)

02:13  24      MR. TOMPROS:  -- under Rule 51(c) to the following

02:13  25  instructions:  2 through 4, 13 through 15, 17 through 24, 29

02:13  1    through 35 and the verdict form, on the basis that they are

02:13  2    contrary to law and consistent with the evidence in the case

02:13  3    and/or unduly prejudicial for the reasons we have previously

02:13  4    stated.

02:13  5        We'll also provide the Court with a chart of our specific

02:13  6    objections and alternatives prior to the charge.

02:13  7        Thank you, Your Honor.

02:13  8        THE COURT:  Sounds to me like you are equally unhappy with

02:13  9    me which hopefully means I did a decent job.

02:14  10       So what we're going to do now is I'm going to take a short

02:14  11   break.  Here, let me do this.  I'm just trying to figure out

02:14  12   from you all's perspective.  We're going to have a witness,

02:14  13   short witness.  I always used to -- the judge I clerked for

02:14  14   always used to make a joke about, "Oh, is it a short witness?"

02:14  15   I haven't done that yet.

02:14  16       But -- and then I'll allow you all to tell me if you would

02:14  17   like to take a short break after I read the charge so that we

02:14  18   can roll through the entire closing.  I'm happy to do that as

02:14  19   well.

02:14  20       But my suggestion is we bring the jury in.  We finish with

02:14  21   the witness.  I read the charge.  And then we take a short

02:14  22   break.  Unless -- but I'm -- if any of you want -- need a break

02:14  23   in some other way so that we can get through the closing

02:14  24   arguments without taking one, just let me know.  So we'll stand

02:14  25   in recess for only about five minutes.  But take whatever break

02:14   1   you need and we'll come back in.

02:15   2        THE BAILIFF:  All rise.

02:15   3        (Recess taken from 2:15 to 2:23.)

02:23   4        THE BAILIFF:  All rise.

02:23   5        THE COURT:  Please remain standing for the jury.

02:23   6        (The jury entered the courtroom at 2:23.)

02:23   7        THE COURT:  Thank you.  You may be seated.

02:23   8        If you would give me one second.

02:23   9        Mr. Chu?

02:23   10        MR. CHU:  Thank you very much, Your Honor.

02:23   11        Good afternoon, ladies and gentlemen.  I have the pleasure

02:23   12   of introducing to you Charlotte Wen who's going to be

02:23   13   questioning the closing witness for our trial.  I had the great

02:24   14   pleasure of meeting Ms. Wen when she was a summer intern at our

02:24   15   law firm.

02:24   16        MS. WEN:  Good afternoon, everyone.  My name is Charlotte

02:24   17   Wen.

02:24   18                    DIRECT EXAMINATION

02:24   19   BY MS. WEN:

02:24   20        Q.   And now that I've introduced myself, Mr. Chandler,

02:24   21   could you please introduce yourself to the jury?

02:24   22        A.   Yes.  Hi.  My name is Mark Chandler.  I'm managing

02:24   23   director of Upstream Partners.  We're an intellectual property

02:24   24   consulting firm.

02:24   25        Q.   And have you prepared any slides for your testimony

02:24   1   today?

02:24   2       A.   Yes.  I have.

02:24   3       Q.   Can you tell the jury a little bit about your

02:24   4   educational background?

02:24   5       (Brief off-the-record discussion.)

02:24   6       (The witness was sworn.)

02:24   7   BY MS. WEN:

02:25   8       Q.   So let's try that again.  Could you please introduce

02:25   9   yourself to the jury?

02:25  10       A.   Yes.  My name is Mark Chandler.  I'm managing

02:25  11   director of Upstream Partners.  We're an intellectual property

02:25  12   consulting firm.

02:25  13       Q.   Have you prepared slides for your testimony today?

02:25  14       A.   Yes.  I have.

02:25  15       Q.   And could you tell the jury a bit about your

02:25  16   educational background?

02:25  17       A.   Yes.  I earned my bachelor's degree in electrical

02:25  18   engineering from Bucknell University.  And I earned my MBA from

02:25  19   the Wharton School of the University of Pennsylvania.

02:25  20       Q.   Do you have any other credentials?

02:25  21       A.   Yes.  I have the credential of a certified licensing

02:25  22   professional, and that is accredited by the Licensing Executive

02:25  23   Society.

02:25  24       I've also been recognized by my peers as one of the top IP

02:25  25   strategists -- top 300 IP strategists for intellectual asset

02:25  1    management for the -- in the first year they compiled that list

02:25  2    in 2010, all the way through last year, 2020.  For every year.

02:25  3        Q.   And how long have you worked in intellectual property

02:25  4    licensing and valuation?

02:26  5        A.   I've been licensing patents and valuing intellectual

02:26  6    property for about 25 years now.

02:26  7        Q.   Has any of that work involved the semiconductor

02:26  8    industry?

02:26  9        A.   Yes.  Much of that has been in semiconductors and

02:26  10   electronics.

02:26  11       Q.   And have you ever personally negotiated a patent

02:26  12   license?

02:26  13       A.   Yes.  I license patents -- negotiate licenses on a

02:26  14   weekly basis.  I've over my career negotiated well over 100

02:26  15   patent licenses and other agreements.  Across a full range of

02:26  16   technologies.  I've negotiated against large companies and

02:26  17   small companies, providing them licenses.

02:26  18       In addition, I've negotiated four large companies, small

02:26  19   companies, as well as universities, many of which you'll see

02:26  20   here on the screen.

02:26  21       Q.   And how many licensing agreements have you analyzed

02:26  22   in your career?

02:26  23       A.   Oh, well over 2,000 agreements.

02:26  24       MS. WEN:  Your Honor, we offer Mark Chandler as an expert

02:26  25   in patent licensing, acquisition and valuation.

02:26   1        MR. MUELLER:  No objection, Your Honor.

02:27   2        THE COURT:  You'll be so approved.

02:27   3  BY MS. WEN:

02:27   4        Q.   Mr. Chandler, are you being compensated for the

02:27   5  investigation that you performed in this case?

02:27   6        A.   Yes.  My firm is being compensated at my standard

02:27   7  hourly rate of $540 an hour.

02:27   8        Q.   And does that compensation depend at all on your

02:27   9  testimony, on your opinions or the outcome of this case?

02:27  10        A.   No.  Not at all.

02:27  11        Q.   What is your role in this case?

02:27  12        A.   I've been asked to review and analyze Intel's

02:27  13  arguments with regard to patent licenses and patent acquisition

02:27  14  agreements.

02:27  15        Q.   Were you in the courtroom today for Mr. Huston's

02:27  16  testimony?

02:27  17        A.   Yes.  I was here.

02:27  18        Q.   Do you agree with Mr. Huston's opinions?

02:27  19        A.   No.  I completely disagree.

02:27  20        MS. WEN:  So turning to PDX-6.4.

02:27  21  BY MS. WEN:

02:27  22        Q.   At a high level, could you please explain why you

02:27  23  disagree?

02:27  24        A.   Yes.  Well, in my opinion, Mr. Huston's analysis

02:27  25  is --  is deeply flawed.  And that's primarily because he's

02:27  1   failed to take into account the most important aspect that one

02:27  2   needs to consider in a proper damages analysis.  And that is

02:28  3   the actual value of VLSI patents that Intel has received in its

02:28  4   products.

02:28  5        In addition, you know, a second point, you heard

02:28  6   Mr. Huston talk about, you know, five aspects of real-world

02:28  7   evidence.  Well, for each of those he's simply taken an amount

02:28  8   of a transaction and divided by the number of patents.  And not

02:28  9   all patents are created equal.  Each patent is its own unique

02:28  10  invention and has its own unique value.

02:28  11       In addition, in none of this real-world evidence that

02:28  12  Mr. Huston considered has taken into consideration the use of

02:28  13  VLSI patents in actual real-world Intel products or the

02:28  14  benefits that those patents have provided to those products or

02:28  15  the sales of those products to real-world Intel customers.

02:28  16  Dr. Sullivan has taken just an -- that kind of an approach.

02:28  17       Q.  So why does the value of Intel's use of VLSI's

02:28  18  patents matter?

02:28  19       A.  Well, because it's the law.  As we've heard in this

02:29  20  trial, a patent gives the owner of the patent the right to

02:29  21  exclude others from making products or selling products based

02:29  22  upon their patent.

02:29  23       So the value of a patent is not necessarily confined to

02:29  24  the use of -- made by that patent by the patent owner, but it

02:29  25  must include -- it relates to value used by other parties.

1500

```
02:29   1        And that's very clear in the statute that you need to
02:29   2   account for Intel's use of the VLSI patents.
02:29   3        Q.   And do you recall Mr. Huston's testimony about
02:29   4   Freescale's acquisition of SigmaTel and Freescale's subsequent
02:29   5   merger with NXP?
02:29   6        A.   Yes.  I do recall that.
02:29   7        Q.   How does Mr. Huston's testimony about those
02:29   8   transactions fail to account for Intel's use of VLSI's patents?
02:29   9        A.   Well, those transactions were not about Intel.  They
02:29  10   were not about Intel's use of the VLSI patents.  They did not
02:30  11   take into account the value of the '373 patent or the '759
02:30  12   patent, and they certainly didn't account for any use of those
02:30  13   patents in Intel's products.  So those transactions could not
02:30  14   have captured the value of those patents to Intel.
02:30  15        Q.   And do you recall Mr. Huston's testimony about
02:30  16   various allegedly comparable agreements and offers?
02:30  17        A.   Yes.  I do.
02:30  18        Q.   How does that testimony fail to account for the value
02:30  19   of Intel's use of VLSI's patents?
02:30  20        A.   Well, these 20 agreements and supposed offers that
02:30  21   Mr. Huston referred to, for each of those agreements -- well,
02:30  22   first of all, these agreements did not include and were not
02:30  23   about the '373 patent or the '759 patent.
02:30  24        In addition, for those 20 agreements there's been no
02:30  25   evidence submitted by Mr. Huston or Intel in this matter that
```

02:30 1  they ever used the patents in those agreements in any actual

02:30 2  products by Intel.

02:30 3       And if you don't have any evidence of use in products, you

02:31 4  can't possibly know anything about the value that any products

02:31 5  are getting from those patents.  So it can't be -- cannot be --

02:31 6  couldn't have anything to do to relate to the value of the VLSI

02:31 7  patents to Intel.

02:31 8       Q.  Are there any other reasons that you disagree with

02:31 9  Mr. Huston?

02:31 10      A.  Yes.  Mr. Huston has selected 20 agreements that are

02:31 11 all for low lump sum payment amounts.  But, in fact, he's

02:31 12 cherry-picked these agreements from well over 300 agreements

02:31 13 that have been produced by Intel in this matter, many of which

02:31 14 have been for amounts of hundreds of millions of dollars, even

02:31 15 billions of dollars.

02:31 16      Q.  So taking a step back, what materials did you

02:31 17 consider in reaching your conclusions?

02:31 18      A.  Well, I have a slide that shows them.  I certainly

02:31 19 reviewed the patents, the sworn testimony, deposition of

02:31 20 various parties, correspondence and background information,

02:31 21 some legal documents.  Before he had to leave for a medical

02:32 22 issue, I spoke with Mr. Stolarski.  I spoke with Dr. Conte on a

02:32 23 number of matters.

02:32 24      In addition, I've read each of the 20 agreements that

02:32 25 Mr. Huston has handed-picked, as well as the more than 300 that

—1502

02:32  1    have been produced by the parties in this matter.

02:32  2        Q.   Now, we've heard a lot about so-called real-world

02:32  3    licenses and offers from Mr. Huston.  Are there ways in which a

02:32  4    hypothetical negotiation differs from a negotiation in the real

02:32  5    world?

02:32  6        A.   Yes.  There's many ways.  You may have heard last

02:32  7    week that one of the foundational rules of the hypothetical

02:32  8    negotiation is both parties would acknowledge that the patents

02:32  9    are both valid and being infringed.

02:32 10        In a real-world negotiation, this is often disputed.  You

02:32 11    know, a party seeking a license will rarely admit that a patent

02:32 12    is valid and also rarely never admit that they are seeking a

02:32 13    license.

02:32 14        In fact, we've heard in this case that Intel doesn't

02:32 15    even -- didn't even look into whether it used the patents of

02:32 16    those 20 agreements that the -- Mr. Huston referred to.

02:33 17        Secondly, both parties are assumed to be -- they

02:33 18    understand the need to reach an agreement.  So you have a

02:33 19    willing licensee and you have a willing licensor.

02:33 20        In the real world, a company such as Intel can just simply

02:33 21    refuse to reach an agreement, and then the patent owner is

02:33 22    forced to take them to court to pursue a license.

02:33 23        MR. MUELLER:  Your Honor, I object.  It's the issue

02:33 24    discussed this morning.

02:33 25        THE COURT:  Overruled.

02:33   1   BY MS. WEN:

02:33   2       Q.  Are there any other differences between a

02:33   3   hypothetical negotiation and a real-world negotiation?

02:33   4       A.  Yes.  As we heard Dr. Sullivan mention last week,

02:33   5   both parties would have complete access to the other parties'

02:33   6   information.

02:33   7       So from a patent owner's perspective, they would have the

02:33   8   full information on Intel's, you know, use of their patents,

02:33   9   the benefits provided to the products and then the sales and

02:33   10   profits being generated.  So they'd be in a position to make a

02:34   11   fully informed decision that reflects the actual value of

02:34   12   the -- being made by the licensee of their patents.

02:34   13       Q.  And how would having full access to information be

02:34   14   helpful in a negotiation?

02:34   15       A.  Well, it'd make all the difference in the world.  You

02:34   16   know, the hypothetical negotiation can be thought of as a card

02:34   17   game which all the cards are face up on the table.  So both

02:34   18   sides would know where the other one stands.

02:34   19       MS. WEN:  So, Mr. Simmons, if you could please pull up

02:34   20   PDX-6.4.

02:34   21   BY MS. WEN:

02:34   22       Q.  So I am referring to now to the categories of

02:34   23   information that Mr. Huston talked about in Categories 3

02:34   24   through 5.  Do you recall when Mr. Huston discussed those, that

02:34   25   evidence?

02:34  1        A.   Yes.  I do.

02:34  2        Q.   And so turning to these allegedly comparable

02:34  3   agreements and offers, as an initial matter, did any of these

02:35  4   agreements and offers in Categories 3 through 5 involve the

02:35  5   VLSI patents that are asserted at this trial?

02:35  6        A.   No.  None of them involved the patents.

02:35  7        Q.   And you mentioned earlier that one major reason that

02:35  8   you don't agree with Mr. Huston is because he doesn't account

02:35  9   for the value of VLSI's patents to Intel.  Do you remember

02:35 10   that?

02:35 11        A.   Yes.  I do.

02:35 12        Q.   Is it possible to analyze whether an agreement is

02:35 13   economically comparable to the hypothetical license if you

02:35 14   don't know whether the patents are being used in Intel's

02:35 15   products?

02:35 16        A.   No.  Mr. Huston could not have conducted any sort of

02:35 17   economic analysis on the licenses that he says are comparable

02:35 18   because Intel hasn't identified any products that actually use

02:35 19   those patents.  So he could not have conducted that.

02:35 20        And if you don't have evidence of use of a patent in a

02:35 21   product, then you don't have any evidence of the benefits and

02:35 22   you certainly don't have any understanding of the value of

02:35 23   those patents to Intel.

02:35 24        MS. WEN:  And, Mr. Simmons, could we please have PDX-6.14?

02:36 25   BY MS. WEN:

02:36   1        Q.   And is this a problem -- the problem that you've been

02:36   2   describing, is that a problem with every single one of the

02:36   3   agreements that Mr. Huston has identified?

02:36   4        A.   Yes.   Every single one.

02:36   5        MS. WEN:   At this point, Your Honor, I think we'd like to

02:36   6   go on the confidential record for Intel confidential

02:36   7   information.

02:36   8        THE COURT:   Okay.   If anyone is in the courtroom who is

02:36   9   not under the protective order, you'll need to step out for a

02:36  10   few seconds.

02:36  11        MS. WEN:   All right.

02:36  12        THE COURT:   We'll also go off the public audio record.

02:36  13        MS. WEN:   Thank you.

02:36  14        (Sealed proceedings.)

02:36  15        MS. WEN:   At this point, we can go back on the public

02:42  16   record, I believe.

02:42  17        THE COURT:   Okay.

02:42  18   BY MS. WEN:

02:42  19        Q.   And so what is missing from Mr. Huston's analysis of

02:42  20   the agreements and offers that he's identified?

02:42  21        A.   Well, he's identified, you know, a number of

02:42  22   transactions, acquisitions and some agreements.

02:42  23        With regard to the acquisitions, you know, these

02:42  24   acquisitions, these transactions, had nothing to do with Intel.

02:42  25   And these transactions did not take into consideration anything

—1506—

02:42  1    about the '373 or the '759 patent or their use and value

02:43  2    provided to Intel.

02:43  3         And with regard to the so-called offers and the agreements

02:43  4    that Mr. Huston has selected, these didn't involve the VLSI

02:43  5    patents at all.  As I mentioned, Intel has not submitted any

02:43  6    evidence that it ever used the patents that were transacted in

02:43  7    these agreements in real-world products.

02:43  8         And finally, you know, certainly these had nothing to do

02:43  9    with the value that Intel has received from its using the '373

02:43  10   and the '759 patents in their products.

02:43  11        Q.   So in your opinion, are any of Mr. Huston's

02:43  12   agreements or offers comparable to the licenses that would have

02:43  13   resulted from the hypothetical negotiation here?

02:43  14        A.   No.  None of them are.

02:43  15        Q.   And can you please summarize what the problems are

02:43  16   with Mr. Huston's analysis?

02:43  17        A.   The problem with Mr. Huston is he's taken an indirect

02:43  18   approach to try to infer or -- or guess the value of the VLSI

02:44  19   patents to Intel.  And he's done so by referring to agreements

02:44  20   that really have nothing to do with the patents and nothing to

02:44  21   do with the value of those patents to Intel.

02:44  22        In contrast to that was Dr. Sullivan's direct approach

02:44  23   where he has directly analyzed the -- the usage of the patents

02:44  24   in real-world Intel products.  He's directly determined the

02:44  25   value of those -- of those patents in their products, as

02:44  1    required by the statute.

02:44  2         You know, so Dr. Sullivan has directly looked at the use

02:44  3    of the patented technology in Intel products.  He's determined

02:44  4    the benefits of that patented technology as provided -- as

02:44  5    provided to the products.  And he's determined the profits and

02:44  6    sales that Intel has earned from those products.

02:44  7         And Dr. Sullivan's, you know, indirect approach cannot

02:44  8    reference the value of the VLSI patents as being used by Intel.

02:44  9    Dr. Sullivan has conducted that exact analysis.

02:45  10        Q.   So did you mean Dr. Huston's -- Mr. Huston's indirect

02:45  11   approach?

02:45  12        A.   I'm sorry.  Mr. Huston's indirect approach cannot

02:45  13   properly refer to the value of VLSI.  Thank you.

02:45  14        MS. WEN:  Thank you, Mr. Chandler.

02:45  15        I pass the witness.

02:45  16        THE COURT:  Mr. Mueller?

02:45  17        MR. MUELLER:  Yes, sir.

02:45  18                        CROSS-EXAMINATION

02:45  19   BY MR. MUELLER:

02:45  20        Q.   Good afternoon, sir.  My name is Joe Mueller.  May I

02:45  21   ask you a few questions?

02:45  22        A.   Yes.

02:45  23        Q.   Now, sir, you referred a few times in your testimony

02:45  24   just now to what you called Intel's use of the patents.  Do you

02:45  25   recall that, sir?

-1508-

02:45  1    A.   Yes.  I do.

02:45  2    Q.   Now, you have a degree in electrical engineering,

02:45  3  correct?

02:45  4    A.   Yes.  I do.

02:45  5    Q.   And I think you showed the jury that you had some

02:46  6  experience at a John Hopkins laboratory.  There was some work

02:46  7  you did on applied physics; is that right?

02:46  8    A.   Johns Hopkins University.  Yes.

02:46  9    Q.   Johns Hopkins.  I apologize.  But you did some --

02:46  10   A.   Happens all the time.  Yes, I did.  I've worked in

02:46  11 atomic clocks.

02:46  12   Q.   You have some technical training, fair to say?

02:46  13   A.   Yes.  That is true.

02:46  14   Q.   And, sir, you've offered no opinion whatsoever that

02:46  15 Intel actually infringes the two patents in this case, correct?

02:46  16   A.   That's correct.  That was not my assignment.

02:46  17   Q.   And so when you say use of the patents, let's be

02:46  18 clear.  You don't have an opinion yourself on whether they're

02:46  19 actually using the patents, correct?

02:46  20   A.   I've relied upon others' opinions.  Yes.

02:46  21   Q.   Now, you've referred a lot to Intel's use of the

02:46  22 patents.  I noticed you didn't say much about the owner's use

02:46  23 of the patents, did you?

02:46  24   A.   No.  I did not.

02:46  25   Q.   Because, in fact, they haven't used them, correct?

02:46  1        A.   I have no way of knowing one way or the other.

02:46  2        Q.   You have no opinion on that issue either, right?

02:46  3        A.   I -- I have no way of knowing.

02:46  4        Q.   You characterized the patents just now as the

02:46  5   equivalent of an oil well underneath the motel, right?

02:47  6        A.   I made that comparison, yes.

02:47  7        Q.   In that analogy, the evidence in this case has shown

02:47  8   the owners have never tapped into that well themselves.  They

02:47  9   have oil and have chosen not to use it, according to your

02:47 10   analogy, correct?

02:47 11        A.   Perhaps.

02:47 12        Q.   Now, you've been retained by VLSI, right?

02:47 13        A.   I've been retained by counsel for VLSI.

02:47 14        Q.   Paid hundreds of thousands of dollars, correct?

02:47 15        A.   Low hundreds.  Yes.

02:47 16        Q.   Low hundred -- low hundreds, but hundreds of

02:47 17   thousands of dollars, right?

02:47 18        A.   Yes.  That's correct.  My firm has been paid.  Let's

02:47 19   make that clear.

02:47 20        Q.   You've worked with these lawyers in ten other cases,

02:47 21   haven't you?

02:47 22        A.   Ten or less, perhaps.

02:47 23        Q.   Now, in this case, you showed the ladies and

02:47 24   gentlemen of the jury several agreements that Intel entered

02:47 25   into.

1510

02:47  1         MR. MUELLER:  And, Your Honor, if I could briefly go in

02:47  2    the sealed record?

02:47  3         THE COURT:  Yes, sir.

02:47  4         (Sealed proceedings.)

02:47  5         MR. MUELLER:  We can take this off, Your Honor, and go off

02:49  6    the sealed record.

02:49  7         THE COURT:  Okay.

02:49  8    BY MR. MUELLER:

02:49  9         Q.   Now, Mr. Chandler, you have reviewed for your work on

02:49  10   this case over 350 agreements, correct?

02:49  11        A.   Yes.  That is correct.

02:49  12        Q.   And those include the agreements we just saw and

02:49  13   several hundred other agreements that Intel entered into over a

02:49  14   very long period of time, right?

02:49  15        A.   Yeah.  That is correct.  Yes.

02:49  16        Q.   The vast majority of which had nothing to do with

02:49  17   litigation.  They were voluntary license agreements, right?

02:49  18        A.   I don't know if it's the vast majority or not.

02:49  19        Q.   Okay.  Now, you know, because you're a licensing

02:49  20   expert that in this hypothetical negotiation, it's not a

02:49  21   hypothetical negotiation to resolve a litigation.  It's a

02:49  22   hypothetical negotiation for a license, right?

02:49  23        A.   Yes.

02:49  24        Q.   And you understand, because you've done cases like

02:49  25   this before, that one thing the jury can consider in analyzing

—1511—

02:49  1    a hypothetical negotiation is something called comparable

02:50  2    agreements.  You know what that term means, right?

02:50  3         A.   I do.  If they are comparable, indeed.

02:50  4         Q.   And a comparable agreement is a particular agreement

02:50  5    that an expert has said is technologically and economically

02:50  6    comparable to what would have been the subject of this

02:50  7    hypothetical negotiation, right?

02:50  8         A.   There are other aspects that need to be considered as

02:50  9    well.  But those are -- those are two of them.  Correct.

02:50  10        Q.   Now, Mr. Huston took the stand just this morning,

02:50  11   correct?

02:50  12        A.   Yes.

02:50  13        Q.   And you're not here to question his credentials, are

02:50  14   you?

02:50  15        A.   I'm not -- I -- I'm not sure if I can answer that yes

02:50  16   or no.

02:50  17        Q.   Sure.  Let me put it another way.  You understand

02:50  18   that he's a trained engineer, correct?

02:50  19        A.   Yes.  I do.

02:50  20        Q.   Has a master's degree in engineering, right?

02:50  21        A.   Yes.

02:50  22        Q.   Had 22 years of experience licensing negotiations at

02:50  23   IBM, correct?

02:50  24        A.   That's what I understand, yes.

02:50  25        Q.   He negotiated hundreds of agreements as a lead

02:50  1  negotiator, right?

02:50  2      A.   I believe so. Yes.

02:50  3      Q.   So you're not here to say he's unqualified to offer

02:50  4  the opinions he offered, are you?

02:50  5      A.   That's correct.

02:51  6      Q.   Now, he went through a lot of agreements himself, and

02:51  7  he identified 18 comparable license agreements, correct?

02:51  8  That's what he said are comparable?

02:51  9      A.   That's correct.

02:51  10     Q.   He also identified some prior sales agreements for

02:51  11 the patents-in-suit, right?

02:51  12     A.   Prior -- I'm not sure if that was multiple.  There

02:51  13 were prior transactions for companies.

02:51  14     Q.   There were three, correct?  Three transactions that

02:51  15 cover the patents-in-suit, among other things?

02:51  16     A.   Cover -- but you said they were trans- -- I'm sorry.

02:51  17 You asked me were they transactions for the patents-in-suit?

02:51  18     Q.   They were part of deals?

02:51  19     A.   There's a distinction there.  They -- the first two

02:51  20 were not -- the company acquisitions were clearly not

02:51  21 transactions for --

02:51  22     Q.   Excuse me.

02:51  23     A.   I'm -- I'm just clarifying.  Sorry.

02:51  24     Q.   You can finish your answer.

02:51  25     A.   You asked me if they were for transactions in suit.

02:51  1    I said basically no.

02:51  2        Q.   There were three transactions that included the

02:51  3    patents-in-suit, among other things too, correct?

02:51  4        A.   That would be a correct statement.

02:52  5        Q.   Now, Mr. Huston identified from this big body of

02:52  6    evidence things that he thought were comparable, correct?

02:52  7        A.   Yes.

02:52  8        Q.   You looked at 350 agreements, including the

02:52  9    agreements you showed the jury and many others, right?

02:52  10       A.   That's correct.

02:52  11       Q.   And, sir, out of all of those, you didn't identify a

02:52  12   single agreement that you viewed as comparable, did you?

02:52  13       A.   No.  I did not.

02:52  14       Q.   And, in fact, those settlement agreements you just

02:52  15   showed the jury, you didn't even find those to be comparable,

02:52  16   did you?

02:52  17       A.   Informative but not comparable.  Correct.

02:52  18       Q.   Sir, informative but not comparable, correct?

02:52  19       A.   Correct.

02:52  20       Q.   Now, Mr. Huston went further.  He actually provided

02:52  21   the jury with a number that he said would have been the result

02:52  22   of this hypothetical negotiation, correct?

02:52  23       A.   That is correct.

02:52  24       Q.   You yourself, sir, in other cases, have performed

02:52  25   that same function.  You've analyzed a hypothetical negotiation

02:53  1   and come up with a number that you thought would have been the

02:53  2   result, right?

02:53  3        A.   In other cases, yes, that has been my role.  Not in

02:53  4   this case.

02:53  5        Q.   In this case you've been paid hundreds of thousands

02:53  6   of dollars, but you didn't come up with a number, did you?

02:53  7        A.   That was not my assignment.

02:53  8        Q.   Sir, whether it was your assignment or not, you did

02:53  9   not come up with a number, did you?

02:53  10       A.   That is correct.  Dr. Sullivan did.

02:53  11       Q.   Now, you have watched the trial testimony in this

02:53  12   case; is that fair?

02:53  13       A.   Much of it.  Yes.

02:53  14       Q.   And you know the one and only one witness who's taken

02:53  15   the stand and said that Intel is actually using these patents

02:53  16   is Dr. Conte who testified this morning, right?

02:53  17       A.   That is correct.

02:53  18       Q.   And as you saw this morning, he disagrees with

02:53  19   Intel's engineers on certain technical issues, right?

02:53  20       A.   I didn't see all his testimony this morning.

02:53  21       Q.   Let's put it this way.  If the ladies and gentlemen

02:53  22   of the jury decide that Intel's engineers are right, Dr. Conte

02:53  23   is wrong and there's no infringement, what would be the

02:54  24   appropriate reasonable royalty?

02:54  25       A.   Under those conditions, it would be zero.

02:54   1          Q.   Thank you, sir.

02:54   2          MR. MUELLER:   I have no further questions.

02:54   3          THE COURT:   Redirect?

02:54   4                          REDIRECT EXAMINATION

02:54   5   BY MS. WEN:

02:54   6          Q.   Just a few questions.

02:54   7          A.   Uh-huh.

02:54   8          Q.   Mr. Chandler, do you recall when Intel's counsel

02:54   9   asked you about the prior work you've done with my firm?

02:54   10         A.   Yes.  I do.

02:54   11         Q.   When you provide expert testimony, are you trying to

02:54   12   provide testimony to help the party you're working with or

02:54   13   provide your neutral opinions?

02:54   14         A.   When I'm hired, I'm asked to conduct an analysis to

02:54   15   take in the facts, to discern that and form my own independent

02:54   16   opinions.  And I've done this work for plaintiffs and

02:55   17   defendants.

02:55   18         Q.   And does it matter what law firm you're working with?

02:55   19         A.   No.  It doesn't matter at all.

02:55   20         Q.   And recall when you were asked about the settlement

02:55   21   agreements that you talked to the jury about?

02:55   22         A.   Yes.  I do.

02:55   23         Q.   Why did you talk about the settlement agreements?

02:55   24         A.   Well, as I mentioned, in my view, the parties to the

02:55   25   hypothetical negotiation would have found those agreements to

02:55  1   be informative, informative of licensing behavior, past history

02:55  2   of one of the two parties that's at the table at the

02:55  3   negotiation.

02:55  4       And as I mentioned, these were seven agreements when cases

02:55  5   have proceeded into litigation, where they've settled for

02:55  6   hundreds of millions, if not billions of dollars.

02:55  7       MS. WEN:  And can we go briefly on the confidential record

02:55  8   to discuss one of the agreements?

02:55  9       THE COURT:  Yes.

02:55 10       (Sealed proceedings.)

02:58 11       MS. WEN:  Thank you, Mr. Chandler.

02:58 12       MS. WEN:  I pass the witness.

02:58 13       THE COURT:  Mr. Mueller?

02:58 14       MR. MUELLER:  We can go back on the public record, Your

02:58 15   Honor.

02:58 16                         RECROSS-EXAMINATION

02:58 17   BY MR. MUELLER:

02:58 18       Q.   Just a couple final questions, Mr. Chandler.

02:58 19       Again, you studied over 300 agreements for your work on

02:58 20   this case, correct?

02:58 21       A.   That is correct.

02:59 22       Q.   You concluded that not a single one was comparable,

02:59 23   right?

02:59 24       A.   Yes.  As I just mentioned.

02:59 25       Q.   You were not able to find a single comparable

02:59  1   agreement to the damages demand that VLSI is making of billions

02:59  2   for two patents, correct?

02:59  3        A.   Not through comparable agreement analysis.

02:59  4        Q.   You had no comparable, did you?

02:59  5        A.   That is correct.

02:59  6        MR. MUELLER:  No further questions.

02:59  7        THE COURT:  You may step down.

02:59  8        Does the plaintiff have any other witness?

02:59  9        MR. CHU:  VLSI rests its case.

02:59  10       THE COURT:  Mr. Lee?

02:59  11       MR. LEE:  Two things, Your Honor.  One is we would renew

02:59  12   our motions again as we're obligated to do, and Intel rests.

02:59  13       THE COURT:  Ladies and gentlemen, if you'll give me just

02:59  14   two minutes to step back with my clerk and make sure we're

02:59  15   ready to go, I think I'll come back in and be able to read you

03:00  16   the jury charge, which is only 44 pages long.

03:00  17       So I'm going to go back and just make sure we are ready to

03:00  18   go.  I'll come out.  I'll read it to you.  When I finish

03:00  19   reading it to you, we'll take a short break and then we'll have

03:00  20   the closing arguments.  If you all just will hold fast for a

03:00  21   one or two minutes.

03:00  22       THE BAILIFF:  All rise.

03:00  23       (Recess taken from 3:00 to 3:01.)

03:02  24       THE COURT:  Thank you.  You may be seated.

03:02  25       Yes, sir.

03:02    1          MR. CHU:  We just wanted to renew our motions.

03:02    2          THE COURT:  Okay.

03:02    3          MR. CHU:  Thank you.

03:02    4          THE COURT:  Thank you, sir.  And for the record, they're

03:02    5    denied.

03:02    6          Okay.  Ladies and gentlemen of the jury -- let me ask one

03:02    7    question of the lawyers.  Typically I don't read the verdict

03:02    8    form.  But if either counsel cares for me to do that, I'll do

03:02    9    that.  Just let me know.

03:02   10          MR. CHU:  It's fine with us if you do not read the verdict

03:02   11    form.

03:02   12          MR. LEE:  It's fine with us.  They'll have a hard copy.

03:02   13          THE COURT:  Yes, sir.

03:03   14          Are you all ready?

03:03   15          Very good.  Members of the jury, it is my duty and

03:03   16    responsibility to instruct you on the law you are to apply in

03:03   17    this case.  The law contained in these instructions is the only

03:03   18    law that you may follow.  It is your duty to follow what I

03:03   19    instruct you the law is regardless of any opinion that you

03:03   20    might have as to what the law ought to be.

03:03   21          Each of you is going to have your own printed copy of the

03:03   22    final jury instructions that I'm giving you so there is really

03:03   23    no need for you to take notes unless you want to.

03:03   24          If I have given you the impression during the trial that I

03:03   25    favor either party, you must disregard that impression.  If I

03:03 1 have given you the impression during the trial that I have an

03:03 2 opinion about the facts of this case, you must disregard that

03:03 3 impression.

03:03 4     You are the sole judges of the facts of this case.  Other

03:03 5 than my instructions to you on the law, you should disregard

03:03 6 anything I may have said or done during the trial in arriving

03:03 7 at your verdict.  You should consider all of the instructions

03:04 8 about the law as a whole and regard each instruction in light

03:04 9 of the others without isolating a particular statement or

03:04 10 paragraph.

03:04 11     The testimony of the witnesses and other exhibits

03:04 12 introduced by the parties constitutes the evidence.  The

03:04 13 statements of counsel are not evidence.  They are only

03:04 14 arguments.

03:04 15     It is important for you to distinguish between the

03:04 16 arguments of counsel and the evidence on which those arguments

03:04 17 rest.  What the lawyers say or do is not evidence.  You may,

03:04 18 however, consider their arguments in light of the evidence that

03:04 19 has been admitted and determine whether the evidence admitted

03:04 20 in this trial supports the arguments.

03:04 21     You must determine the facts from all of the testimony

03:04 22 that you have heard and the other evidence submitted.  You are

03:04 23 the judges of the facts, but in finding those facts, you must

03:04 24 apply this law as I instruct you.

03:04 25     You are required by law to decide this case in a fair,

03:04  1    impartial and unbiased manner based entirely on the law and on

03:05  2    the evidence presented to you in the courtroom.  You may not be

03:05  3    influenced by passion, prejudice or sympathy that you might

03:05  4    have for VLSI or Intel in arriving at your verdict.

03:05  5         After the remainder of these instructions, you will hear

03:05  6    closing arguments from the attorneys.  Statements and arguments

03:05  7    of the attorneys, I remind you, are not evidence.  They are not

03:05  8    instructions on the law.  They are intended only to assist the

03:05  9    jury in understanding the evidence and the parties'

03:05  10   contentions.

03:05  11        A verdict form has been prepared for you.  You are to take

03:05  12   this verdict form with you to the jury room.  And when you have

03:05  13   reached a unanimous decision or agreement as to the verdict,

03:05  14   you are to have your foreperson fill in the blanks in the

03:05  15   verdict form, date it and sign it.

03:05  16        Answer each question in the verdict form from the facts as

03:05  17   you find them to be.  Do not decide who you think should win

03:05  18   the case and then answer the questions to reach that result.

03:05  19   Again, your answers and your verdict must be unanimous.

03:05  20        I will now summarize the issues that you must decide and

03:05  21   for which I will provide instructions to guide your

03:06  22   deliberations.  You must decide the following four main issues:

03:06  23   Whether VLSI has proven by a preponderance of the evidence that

03:06  24   any of the following claims are infringed by Intel:  Claims 1,

03:06  25   5, 6, 9 and 11 of the '373 patent by the Haswell client and

03:06 1    Broadwell client products by literal infringement, and

03:06 2    Claims 14, 17, 18 and 24 of the '759 patent by the Skylake

03:06 3    client and server, Kaby Lake client, Coffee Lake client,

03:06 4    Whiskey Lake client, Amber Lake client, Cannon Lake client, Ice

03:06 5    Lake client and server, Cascade Lake server and Tiger Lake

03:06 6    client, products that include Speed Shift technology by literal

03:06 7    infringement or under the Doctrine of Equivalents.

03:06 8         Patent infringement is determined on a claim-by-claim

03:06 9    basis.  You may find that one claim of a patent is infringed

03:06 10   while other claims of the same patent are not infringed.

03:06 11        No. 2, whether VLSI has proven by a preponderance of the

03:06 12   evidence that Intel's infringement of any of the claims was

03:07 13   willful.

03:07 14        3, whether Intel has proven by clear and convincing

03:07 15   evidence that any of the following claims are invalid:

03:07 16   Claims 14, 17, 18 and 24 of the '759 patent.

03:07 17        Patent invalidity is determined on a claim-by-claim basis.

03:07 18   You may find that one claim of a patent is invalid while other

03:07 19   claims of the same patent are not invalid.

03:07 20        4, if any claims of any patents are infringed and not

03:07 21   invalid, what amount of damages, if any, VLSI has proven by a

03:07 22   preponderance of the evidence for infringement of those claims.

03:07 23        3, evidence.  The evidence you are to consider consists of

03:07 24   the testimony of the witnesses, the documents and exhibits that

03:07 25   I admitted into evidence and any facts the lawyers agreed or

03:07  1   stipulated to.  You are to apply any fair inferences and

03:07  2   reasonable conclusions you draw from the facts and

03:07  3   circumstances that you believe have been proven.  Nothing else

03:07  4   is evidence.

03:07  5       As a reminder, here are some evidence of what is not

03:08  6   evidence:  The fact that VLSI filed a lawsuit is not evidence

03:08  7   that is entitled to a judgment.  The act of making a claim in a

03:08  8   lawsuit by itself does not in any way tend to establish that

03:08  9   claim -- that claim and is not in evidence -- and is not

03:08  10  evidence.

03:08  11      Likewise, the fact that Intel has raised arguments against

03:08  12  the claim or claims asserted is not evidence that Intel is

03:08  13  entitled to a judgment.  The act of making defensive arguments

03:08  14  by itself does not in any way tend to establish that such

03:08  15  arguments have merit and is not evidence.

03:08  16      The statements, arguments and questions by the attorneys

03:08  17  are not evidence.  Objections to questions are not evidence.

03:08  18  The attorneys that are seated in front of you may object if

03:08  19  they believe that documents or testimony that is attempted to

03:08  20  be offered into evidence are improper under the rules of

03:08  21  evidence.

03:08  22      During the trial I may not have let you hear the answers

03:08  23  to some of the questions the lawyers asked.  I may have ruled

03:08  24  that you cannot see some of the exhibits that the lawyers

03:08  25  wanted you to see.  Further, sometimes I may have ordered you

03:08  1    to disregard things that you saw or heard, or struck things

03:09  2    from the record.

03:09  3         You must follow my rulings and completely ignore all of

03:09  4    these things.  Do not speculate about what a witness might have

03:09  5    said or what an exhibit might have shown.  These things are not

03:09  6    evidence and you are bound by your oath not to let them

03:09  7    influence your decision in any way.

03:09  8         Generally speaking, there are two types of evidence.  One

03:09  9    is direct evidence, such as testimony of eye witnesses.

03:09  10        The other is indirect or circumstantial evidence.

03:09  11   Circumstantial evidence is evidence that proves a fact from

03:09  12   which you can logically conclude another fact exists.

03:09  13        As a general rule, the law makes no distinction between

03:09  14   direct and circumstantial evidence.  It simply requires that

03:09  15   you determine the facts from all of the evidence that you hear

03:09  16   in this case, whether direct, circumstantial or any

03:09  17   combination.

03:09  18        As I instructed you before the trial began, in judging the

03:09  19   facts you must consider all the evidence, both direct and

03:09  20   circumstantial.  That does not mean you have to believe all of

03:09  21   the evidence.  It is entirely up to you to give the evidence

03:09  22   you receive in this case whatever weight you individually

03:09  23   believe it deserves.  It'll be up to you to decide which

03:10  24   witnesses to believe, which witnesses not to believe, the

03:10  25   weight you give any testimony you hear and how much of any

03:10  1  witness' testimony you choose to accept or reject.

03:10  2       You should never be influenced by any ruling on any

03:10  3  objection.  If I sustained an objection, then just pretend the

03:10  4  question was never asked.  If there was an answer given, ignore

03:10  5  it.  If I overruled the objection, act like the objection was

03:10  6  never made.  If I gave you an instruction that some item of

03:10  7  evidence was received only for a limited purpose, you must

03:10  8  follow that instruction.

03:10  9       If I gave any limiting instruction during the trial, you

03:10  10  must follow it.  Any testimony I tell you to exclude or

03:10  11  disregard is not evidence and it may not be considered.

03:10  12       You must not conduct any independent research or

03:10  13  investigation.  You must make your decision based only on the

03:10  14  evidence I have defined here and nothing else.

03:10  15       Some evidence was admitted for a limited purpose only.

03:10  16  When I instruct you that an item of evidence has been admitted

03:10  17  for a limited purpose, you must consider it only for that

03:10  18  limited purpose.

03:11  19       You have heard certain arguments and evidence regarding

03:11  20  Intel's patents.  The fact that Intel has patents does not mean

03:11  21  that it has a right to use VLSI's patented technology and has

03:11  22  no impact on whether Intel has or has not infringed the

03:11  23  asserted patents.

03:11  24       Certain charts and summaries have been shown to you to

03:11  25  help -- solely to help you explain or summarize the facts

03:11 1    disclosed by the books, records and other documents that are in

03:11 2    evidence.  These charts and summaries are not evidence or proof

03:11 3    of any facts unless I specifically admitted a chart or summary

03:11 4    into evidence.

03:11 5        You should determine the facts from the evidence.  Certain

03:11 6    exhibits shown to you, such as PowerPoint presentations,

03:11 7    posters or models or illustrations of the evidence but are not

03:11 8    themselves evidence.  It is a party's description, picture or

03:11 9    model used to describe something involved in the trial.

03:11 10       It is your recollection of the evidence.  If your

03:11 11   recollection of the evidence differs from the exhibits, rely on

03:12 12   your recollection.

03:12 13       Witnesses.  You alone determine the credibility, questions

03:12 14   of credibility or truthfulness of the witnesses.  In weighing

03:12 15   the testimony of witnesses, you may consider the witness'

03:12 16   manner and demeanor on the witness stand, any feelings or

03:12 17   interest in the case, any prejudice or bias about the case and

03:12 18   the consistency or inconsistency of the witness' testimony

03:12 19   considered in the light of circumstances.

03:12 20       Has the witness been contradicted by other credible

03:12 21   evidence?  Has the witness made statements at other times that

03:12 22   are contrary to those made here on the witness stand?

03:12 23       You must give the testimony of each witness the

03:12 24   credibility you think it deserves.  Even though a witness may

03:12 25   be a party to the action, and, therefore, interested in the

03:12  1   outcome, you may accept the testimony if it is not contradicted

03:12  2   by direct evidence or by any inference that may be drawn from

03:12  3   the evidence, if you believe the testimony.

03:12  4       You are not to decide the case by counting the number of

03:12  5   witnesses who have testified for the different sides.

03:13  6       Witness testimony is weighed.  Witnesses are not counted.

03:13  7   The test is not the relative number of witnesses but the

03:13  8   relative convincing force of the evidence.

03:13  9       The testimony of a single witness is sufficient to prove

03:13  10  any fact, even if a greater number of witnesses testify to the

03:13  11  contrary, if -- after you've considered all the evidence --

03:13  12  other evidence, you choose to believe a single witness.

03:13  13      Deposition testimony.  Certain testimony has been

03:13  14  presented to you through a deposition.  A deposition is the

03:13  15  sworn, recorded answers to a question a witness was asked in

03:13  16  advance of the trial.  Under some circumstances, if a witness

03:13  17  cannot be present to testify from the witness stand, that

03:13  18  witness' testimony may be presented under oath in the form of a

03:13  19  deposition.

03:13  20      Sometime before the trial, attorneys representing the

03:13  21  party in this case questioned this witness under oath.  A court

03:13  22  reporter was present and recorded the testimony.  The questions

03:13  23  and answers may be shown to you.  The deposition testimony is

03:13  24  entitled to the same considerations and is to be weighed and

03:14  25  otherwise considered by you in the same way as if the witness

03:14  1    had been present and had testified from the witness stand in

03:14  2    court.

03:14  3         In addition, some of the video recordings of witnesses you

03:14  4    see may be of lower quality because the witness had their

03:14  5    deposition taken from home.  This was due to COVID-19

03:14  6    restrictions in place at the time and in the location where the

03:14  7    witness was located.  You should not hold the quality or lack

03:14  8    of quality of the video, the location of the witness or any

03:14  9    other circumstances arising from COVID-19 restrictions against

03:14  10   either party.

03:14  11        Expert testimony is testimony from a person who has a

03:14  12   special skill or knowledge in some science, profession or

03:14  13   business.  This skill and knowledge is not common to the

03:14  14   average person but has been acquired by the expert through

03:14  15   special study or experience.

03:14  16        In weighing expert testimony, you may consider the

03:14  17   expert's qualifications, the reasons for the expert's opinions

03:14  18   and the reliability of the information supporting the expert's

03:14  19   opinions as well as the factors that I previously mentioned for

03:15  20   weighing testimony of any other witness.

03:15  21        Expert testimony should receive whatever weight and credit

03:15  22   you think appropriate, given all the other evidence in the

03:15  23   case.  You're not required to accept the opinion of any expert,

03:15  24   rather, you are free to accept or reject the testimony of

03:15  25   experts just as with any other witness.

03:15  1        A stipulation is an agreement.  When there is no dispute

03:15  2   about certain facts, the parties may agree to stipulate to the

03:15  3   facts.  You must accept a stipulated fact as evidence and treat

03:15  4   that fact as having been proven in court.

03:15  5        Do not let bias, prejudice or sympathy play any part in

03:15  6   your deliberations.  Whether you're familiar with one party or

03:15  7   the other should not play any part in your deliberations.

03:15  8        A corporation and all other persons are equal before the

03:15  9   law and must be treated as equals in a court of justice.  In

03:15  10  any legal action, facts must be proved by a requirement of

03:15  11  evidence known as the burden of proof.

03:16  12       The burden of proof in this case is on VLSI for some

03:16  13  issues and on Intel for others.

03:16  14       There are two burdens of proof that you apply in this

03:16  15  case.  One is the preponderance of the evidence, and the other

03:16  16  is clear and convincing evidence.

03:16  17       The burden of proof applicable to VLSI in this case is

03:16  18  known as the preponderance of evidence.  VLSI has the burden of

03:16  19  proving patent infringement by a preponderance of the evidence.

03:16  20       VLSI further has the burden of proving willful patent

03:16  21  infringement by a preponderance of the evidence.  VLSI further

03:16  22  has the burden of proving damages for any alleged patent

03:16  23  infringement by a preponderance of the evidence.

03:16  24       A preponderance of the evidence means to prove something

03:16  25  is more likely so than not so, i.e., evidence that persuades

03:16   1   you that a claim is more probably true than not true.

03:16   2   Sometimes this is talked about as being the greater weight and

03:16   3   degree of credible testimony.

03:16   4       You may think of this preponderance of the evidence

03:16   5   standard as slightly greater than 50 percent.

03:16   6       Intel does not have any burden of proof on the issues of

03:17   7   patent infringement and damages.

03:17   8       Intel has the burden of proving patent invalidity by clear

03:17   9   and convincing evidence.

03:17   10      Clear and convincing evidence means evidence that produces

03:17   11   in your mind a firm belief or conviction as to the truth of the

03:17   12   matters sought to be established.  It is evidence so clear,

03:17   13   direct, weighty and convincing as to enable you to come to a

03:17   14   clear conviction without hesitancy.

03:17   15      The standard is different from the preponderance of the

03:17   16   evidence standard which applies to VLSI's burden of proving

03:17   17   infringement or damages.

03:17   18      These standards are different from what you may have

03:17   19   learned about in criminal proceedings where a fact is proven

03:17   20   beyond a reasonable doubt.  On a scale of the various standards

03:17   21   of proof, as you move from the preponderance of the evidence

03:17   22   where the proof need only be sufficient to tip the scales in

03:17   23   favor of the party proving the fact to the other end beyond a

03:17   24   reasonable doubt, where the fact must be proven by a very high

03:17   25   degree of certainty.  You may think of clear and convincing

03:18   1   evidence as being between those two standards.

03:18   2       VLSI does not have any burden of proof on the issue of

03:18   3   patent validity or prior art.

03:18   4       As I did at the start of the case, I will now give you a

03:18   5   summary of each side's contentions in the case.

03:18   6       I will then provide you with detailed instructions on what

03:18   7   each side must prove to prevail on each contentions.

03:18   8       VLSI is the owner of two patents in this case.  They are

03:18   9   United States Patent No. 7,523,373, the '373 patent, and United

03:18   10   States Patent No. 7,725,759 or the '759 patent.

03:18   11       These patents collectively have been referred to as the

03:18   12   VLSI patents or the asserted patents.

03:18   13       VLSI contends that Intel infringes Claims 1, 5, 6, 9 and

03:18   14   11 of the '373 patent by literal infringement and Claims 14,

03:18   15   17, 18 and 24 of the '759 patent by literal infringement and

03:19   16   under the Doctrine of Equivalents.  The claims may be referred

03:19   17   to as the VLSI patent claims or a certain asserted claims.

03:19   18       VLSI contends that Intel directly infringes the asserted

03:19   19   claims by importing, making, using, offering to sell or selling

03:19   20   certain microprocessor products.

03:19   21       The names of these Intel products by code names and by

03:19   22   patents are Haswell client and Broadwell client products for

03:19   23   the '373 patent and Skylake client server, Kaby Lake client,

03:19   24   Coffee Lake client, Whiskey Lake client, Amber Lake client,

03:19   25   Cannon Lake client, Ice Lake client and server, Cascade Lake

03:19  1   server and Tiger Lake client products, including Speed Shift

03:19  2   technology for the '759 patent.

03:19  3        There are two ways in which a patent claim can be

03:19  4   infringed.  First, a claim can be literally infringed.

03:19  5        Second, a claim can be infringed under what's called the

03:19  6   Doctrine of Equivalents.

03:19  7        To determine infringement, you must compare the accused

03:19  8   products with each claim that is asserted in the VLSI patents

03:20  9   that VLSI asserts is infringed.

03:20  10       Additionally, VLSI alleges that Intel willfully infringed

03:20  11  each of the '373 patent and '759 patents.

03:20  12       VLSI further contends that it is entitled to recover

03:20  13  damages for Intel's infringement.

03:20  14       Intel denies that it infringes any asserted claims of the

03:20  15  asserted patents.  Noninfringement is a defense to a charge of

03:20  16  infringement.  Intel also contends it has not willfully

03:20  17  infringed any asserted claim of the asserted patents.

03:20  18       In addition, Intel contends that the asserted claims of

03:20  19  the '759 patent, but not the '373 patent, are invalid.

03:20  20  Invalidity is a defense to infringement.

03:20  21       Intel contends that VLSI is not entitled to damages.

03:20  22       Although the Court and parties may have referred to the

03:20  23  claims collectively, you must conduct your invalidity analysis

03:20  24  as to each claim individually.

03:21  25       Before you can decide many of the issues in this case,

03:21  1    you'll need to understand the role of the patent claims.

03:21  2        The claims of a patent are the numbered sentences at the

03:21  3    end of the patent.  The claims define the patent owner's rights

03:21  4    under the law.  The claims are important because it is the

03:21  5    words of the claims themselves that define what the product

03:21  6    covers.

03:21  7        The figures and the text in the rest of the patent provide

03:21  8    a description or examples of the claimed invention.  They

03:21  9    provide a context for the claims, but it is the claims that

03:21 10    define the breadth of the patent's coverage.

03:21 11        Each claim is effectively treated as if it were its own

03:21 12    separate patent.  And each claim may cover more or may cover

03:21 13    less than any other claim, therefore, what a patent covers

03:21 14    collectively or as a whole depends on what each of its claims

03:21 15    cover.

03:21 16        You will first need to understand what each claim covers

03:21 17    in order to decide whether or not there's infringement of that

03:22 18    claim and decide whether or not the claim is invalid.  You are

03:22 19    to use the plain and ordinary meaning of the words of the

03:22 20    patent claims as understood by a person of ordinary skill in

03:22 21    the art, which is to say in the field of technology of the

03:22 22    patent at the time of the alleged invention.

03:22 23        The meanings of the words of the patent claims must be the

03:22 24    same when deciding both the issues of invalidity and

03:22 25    infringement.

03:22   1        I'll now explain how a claim defines what it covers.  A

03:22   2   claim sets forth, in words, a set of requirements.  Each claim

03:22   3   sets forth its requirements in a single sentence.

03:22   4        If it is a device or method that satisfies each of the

03:22   5   requirements in that sentence, then it is covered by "infringes

03:22   6   the claim."

03:22   7        There can be several claims in a patent.  A claim may be

03:22   8   narrower or broader than another claim by setting forth more or

03:22   9   fewer requirements.  The coverage of a patent is assessed in a

03:22   10  claim-by-claim basis.

03:23   11       In patent law, the requirements of a claim are often

03:23   12  referred to as claim elements or claim limitations.  When a

03:23   13  product or method meets all of the requirements of a claim,

03:23   14  where it meets all of its limitations or all of its elements,

03:23   15  the claim is said to cover that product or method and that

03:23   16  product or method is said to fall within the scope of that

03:23   17  claim.

03:23   18       In other words, a claim covers a product or method where

03:23   19  each of the claimed elements or limitations is present in that

03:23   20  product or method.

03:23   21       If a product or method is missing even one limitation or

03:23   22  element of the claim, the product or method is not covered by

03:23   23  that claim.

03:23   24       If the product or method is not covered by the claim, the

03:23   25  product or method does not infringe the claim.

03:23   1        The case involves two types of patent claims:  Independent

03:23   2   claims and dependent claims.

03:23   3        An independent claim sets forth all of the requirements

03:24   4   that must be met in order to be covered by that claim.  Thus,

03:24   5   it is not necessary to look at any other claim to determine

03:24   6   what an independent claim covers.

03:24   7        In this case the following claims are independent claims:

03:24   8   Claims 1 and 9 of the '373 patent and Claims 14 and 18 of the

03:24   9   '759 patent.  The remainder of the asserted claims of the VLSI

03:24   10  patents are dependent claims.  A dependent claim does not

03:24   11  itself recite all of the requirements of the claim.  It refers

03:24   12  to another claim for some of its requirements.

03:24   13       In this way the claim depends on another claim.  A

03:24   14  dependent claim incorporates all of the requirements of the

03:24   15  claims to which it refers.

03:24   16       The dependent claim then adds its own additional

03:24   17  requirements.  To determine what a dependent claim covers, it

03:24   18  is necessary to look at both the dependent claim and any other

03:24   19  claims to which it refers.

03:24   20       A product or process that meets all of the requirements of

03:25   21  both the dependent claim and the claims to which it refers is

03:25   22  covered by the dependent claim.  If any requirement of the

03:25   23  dependent claim is not met, or if any requirement of the

03:25   24  independent claim from which the dependent claim depends is not

03:25   25  met, then the product or process does not infringe that

03:25 1  dependent claim.

03:25 2      On the other hand, if the requirement of an independent

03:25 3  claim are all met but a requirement of a dependent claim is not

03:25 4  met, the independent claim is still infringed.

03:25 5      In this case the following claims are dependent claims:

03:25 6  5, 6 and 11 in the '373 patent and 17 and 24 of the '759

03:25 7  patent.

03:25 8      Comprising claims.  The preamble to each of the asserted

03:25 9  claims of the VLSI patents uses the word "comprising."

03:25 10     For example, in the phrases, "a method comprising" or "a

03:25 11 system comprising," the word "comprising" means "including the

03:26 12 following" but "not excluding others."

03:26 13     A claim that includes the word "comprising" is not limited

03:26 14 to products or methods having only the elements recited in the

03:26 15 claims but also cover products or methods to add additional

03:26 16 elements.

03:26 17     For example, a claim to a table comprising a tabletop,

03:26 18 legs and glue would be infringed by a table that includes a

03:26 19 tabletop, legs and glue, even if the table also includes wheels

03:26 20 on the table's legs.

03:26 21     If you find that Intel's products or methods include all

03:26 22 of the elements to a claim, literally or under the Doctrine of

03:26 23 Equivalents where applicable, even if Intel's products or

03:26 24 methods include additional components or steps, you must find

03:26 25 that Intel's products or methods infringe the claims.

03:26  1      I like Page 23.  Every page should be as long as Page 23.

03:26  2      The use of the terms "a" or "an" in a claim is a term of

03:27  3  art, which has a special meaning in the context of a patent

03:27  4  claim.  When used in a claim, the term "a" or "an" means one or

03:27  5  more.

03:27  6      I will now instruct you as to the rules you must follow

03:27  7  when deciding whether or not VLSI has proven that Intel

03:27  8  infringed any of the claims of the '373 and '759 patents.

03:27  9      Patent law gives the owner of a valid patent the right to

03:27  10  exclude others from importing, making, using, offering to sell

03:27  11  or selling within the United States a product claimed in the

03:27  12  patent or performing within the United States a method claim to

03:27  13  the patent.  During the term of the patent, any person or

03:27  14  business entity that is engaged in any of those acts without

03:27  15  the patent owner's permission infringes the patent.

03:27  16      Here VLSI alleges that Intel infringes the following

03:27  17  claims through its accused products:  Claims 1, 5, 6, 9 and 11

03:27  18  of the '373 patent and Claims 14, 17, 18 and 24 of the '759

03:28  19  patent.

03:28  20      And in determining infringement, you must compare Intel's

03:28  21  accused products and methods to the claims of the '373 and '759

03:28  22  patents when making your decisions regarding infringement.

03:28  23      As explained further in the following instructions,

03:28  24  infringement results if the defendant makes, uses, sells or

03:28  25  offers to sell a product or method that infringes a claim,

03:28  1    either literally or under the Doctrine of Equivalents.

03:28  2         In this case VLSI asserts that Intel has directly

03:28  3    infringed each of the VLSI patents.  Intel is liable for

03:28  4    directly infringing each asserted claim of the VLSI patents.

03:28  5    If you find that VLSI has proven that it is more likely than

03:28  6    not that Intel made, used, imported or offered to sell or sold

03:28  7    the invention defined in at least one claim of the patent in

03:28  8    the United States, a device recited in the claim or performed

03:28  9    in the United States, a method recited in at least one claim.

03:28  10        A party can directly infringe a patent without knowing of

03:28  11   the patent or without knowing that what the party is doing is

03:29  12   patent infringement.

03:29  13        Even if the party individually -- independently creates

03:29  14   the accused product or method, it can still infringe.

03:29  15        Literal infringement.  There are two types of

03:29  16   infringement:  Literal and infringement under the Doctrine of

03:29  17   Equivalents.

03:29  18        I'll now instruct you on literal infringement and then

03:29  19   will provide instruction on infringement under the Doctrine of

03:29  20   Equivalents.

03:29  21        In order to prove literal infringement of a patent claim,

03:29  22   VLSI must prove by a preponderance of the evidence that it is

03:29  23   more likely than not that Intel made, used, sold, offered for

03:29  24   sale within or imported in the United States a product or

03:29  25   process that meets all of the requirements of a claim and did

03:29  1   so without VLSI's permission.

03:29  2         You must compare the product or process with each and

03:29  3   every one of the requirements of a claim to determine whether

03:29  4   or not all the requirements of that claim are met.

03:29  5         A claim element is literally present if it exists in the

03:29  6   accused product or is performed by the accused method as it is

03:29  7   described in the claim language.

03:30  8         You must determine separately for each asserted claim

03:30  9   whether or not there is infringement for dependent claims.  If

03:30  10  you find that a claim to which a dependent claim refers is not

03:30  11  infringed, there cannot be infringement of that independent

03:30  12  claim.

03:30  13        On the other hand, if you find that an independent claim

03:30  14  has been infringed, you must still decide separately whether

03:30  15  the product or method meets the additional requirements of any

03:30  16  claims that depend from the independent claim to determine

03:30  17  whether those dependent claims have also been infringed.  This

03:30  18  is because the dependent claim includes all the requirements of

03:30  19  any of the claims to which it refers, plus additional

03:30  20  requirements of its own.

03:30  21        Doctrine of Equivalents.  If a company makes, sells, uses,

03:30  22  offers to sell within or imports into the United States a

03:30  23  product or process that does not literally meet all the

03:30  24  limitations of a claim and then does not literally infringe

03:30  25  that claim, there can still be direct infringement if that

03:30  1   product or process satisfies the claim limitation under the

03:31  2   Doctrine of Equivalents.

03:31  3        Under the Doctrine of Equivalents, a product or process

03:31  4   infringes a claim if the accused product or process contains

03:31  5   elements or performs steps that literally meet or are

03:31  6   equivalent to each and every limitation of the claim.

03:31  7        You may find the limitation or step is equivalent to an

03:31  8   element of a claim that is not met literally if a person having

03:31  9   ordinary skill in the field of technology of the patent would

03:31  10  have considered the differences between them to be

03:31  11  insubstantial.

03:31  12       You may find that an element or step is equivalent to an

03:31  13  element of a claim that is not met literally if the element or

03:31  14  step, one, performs substantially the same function; and, two,

03:31  15  works in substantially the same way.  And -- I'm sorry.  No

03:31  16  "and."  Three, to achieve substantially the same result as the

03:31  17  limitation of the claims.

03:31  18       In order to prove infringement by equivalents, VLSI must

03:31  19  prove the equivalency of the element or steps to the claim

03:31  20  limitation.  Thus, each element of a claim must be met by the

03:31  21  accused product or process, either literally or under the

03:32  22  Doctrine of Equivalents, for you to find infringement.  VLSI

03:32  23  must prove infringement by a preponderance of the evidence.

03:32  24       Known interchangeability of the claim limitation and the

03:32  25  proposed equivalent of a factor that can support a finding of

—1540—

03:32  1    infringement under the Doctrine of Equivalents.  In order for

03:32  2    the element or step to be considered interchangeable, the claim

03:32  3    element must have been known at the time of the alleged

03:32  4    infringement to a person having ordinary skill in the field of

03:32  5    technology of the patent.  Interchangeability at the present

03:32  6    time is not sufficient.

03:32  7         VLSI contends that if you find Intel does not infringe the

03:32  8    asserted claims of the '759 patent literally, then they do so

03:32  9    and infringe the asserted claims of the '759 patent under the

03:32  10   Doctrine of Equivalents.

03:32  11        In this case VLSI argues that Intel willfully infringed

03:32  12   the asserted patents.  If you have decided that Intel has

03:33  13   infringed any claims of the VLSI patents, you must go on and

03:33  14   address the additional issue of whether or not the infringement

03:33  15   was willful.

03:33  16        Willfulness requires you to determine whether VLSI proved

03:33  17   that it is more likely than not that the infringement by Intel

03:33  18   was willful.  You may not determine that it was willful just

03:33  19   because you find that Intel was aware of the VLSI patents and

03:33  20   infringed them.  Instead, you must also find that Intel

03:33  21   deliberately infringed the VLSI patents.

03:33  22        To determine whether Intel acted willfully, consider all

03:33  23   facts and assess Intel's knowledge at the time of the

03:33  24   challenged conduct.

03:33  25        Facts that may be considered include, but are not limited

03:33  1  to, one, whether or not Intel acted consistently with the

03:33  2  standards of behavior for the industry; two, whether or not

03:33  3  Intel intentionally copied a product of VLSI or a prior patent

03:33  4  owner that is covered by the VLSI patents; three, whether or

03:33  5  not Intel reasonably believed it did not infringe or that the

03:33  6  patent was invalid; four, whether or not Intel made a good

03:34  7  faith effort to avoid infringing the VLSI patents.  For

03:34  8  example, whether Intel attempted to design around the VLSI

03:34  9  patents; and, five, whether or not Intel tried to cover up its

03:34  10  infringement.

03:34  11      An infringer may be found liable for willful infringement

03:34  12  even if it did not have actual knowledge of the patent or

03:34  13  infringement if the infringer intentionally took steps to

03:34  14  remain unaware of the patent or infringement.  This is known as

03:34  15  willful blindness.  Willful blindness is a factor to consider

03:34  16  with respect to willfulness.

03:34  17      An infringer may be found liable for willful infringement

03:34  18  only if it had actual knowledge of the patent or deliberately

03:34  19  infringed the patent or deliberately acted despite a risk of

03:34  20  infringement that was so obvious it should have been known.

03:34  21      I will now instruct you on the rules that you must follow

03:34  22  in deciding whether or not Intel has proven that the asserted

03:34  23  claims of the '759 patent are invalid.  Intel does not contend

03:34  24  that the asserted claims of the '373 patent are invalid.

03:35  25      To prove that any claim of a patent is invalid, Intel must

03:35   1   persuade you by clear and convincing evidence.  That is, you

03:35   2   must be left with a clear conviction that the claim is invalid.

03:35   3       Even though at least two Patent Office examiners have

03:35   4   allowed the asserted claims are valid, you have the

03:35   5   responsibility for deciding whether Intel has met its burden of

03:35   6   proof -- burden of proving by clear and convincing evidence

03:35   7   that the claims of the patents are invalid.

03:35   8       In order for someone to be entitled to a patent, the

03:35   9   claimed invention must actually be new over what came before,

03:35   10  which is referred to as the prior art.

03:35   11      The parties agree that Intel's Yonah processor can be used

03:35   12  as prior art.

03:35   13      VLSI denies that Intel's Yonah processor anticipates any

03:35   14  of the claims of the '759 patent because it did not have each

03:35   15  and every one of the elements of any of those claims arranged

03:36   16  as in the claim.

03:36   17      When a party challenging the validity of a patent presents

03:36   18  evidence that was not considered by the Patent Office examiners

03:36   19  during the prosecution of the application and not cumulative of

03:36   20  other evidence that was considered by the Patent Office which

03:36   21  resulted in the issued patent, such new evidence may be given

03:36   22  more weight and may make it easiest to satisfy a party's clear

03:36   23  and convincing evidence burden.

03:36   24      The patent laws of the United States require that an

03:36   25  invention must be new for a person to be entitled to a patent.

03:36  1    Anticipation must be determined on a claim-by-claim basis for

03:36  2    anticipation.

03:36  3        Intel must prove by clear and convincing evidence that all

03:36  4    the requirements of a claim are present in a single piece of

03:36  5    prior art.

03:36  6        To anticipate the claim dimension, the prior art does not

03:36  7    have the use -- have to use the same words as to the claim, but

03:36  8    all requirements of the claim must have been disclosed and

03:36  9    arranged as in the claim.

03:37 10        The claim requirements must be disclosed explicitly or

03:37 11    expressly, such that a person having ordinary skill in the

03:37 12    art -- in the art of computer processors, looking at that one

03:37 13    reference could make and use the claimed invention.

03:37 14        Damages.  If you find that Intel infringed any valid claim

03:37 15    of either of the VLSI patents, you must then consider what

03:37 16    amount of damages to award to VLSI.

03:37 17        I will now instruct you about the measure of damages.  By

03:37 18    instructing you on the damages, I'm not suggesting which party

03:37 19    should win the case on any issue.  If you find that Intel has

03:37 20    not infringed any valid claim of either of the asserted

03:37 21    patents, then VLSI is not entitled to damages.  The damages you

03:37 22    award, if any, must be adequate to compensate VLSI for its

03:37 23    infringement -- for the infringement by Intel.

03:37 24        They are not meant to punish an infringer.  Your damage

03:37 25    award, if you reach this issue, should not be less than what

—1544—

03:38  1    the patent holder would have received had it been paid a

03:38  2    reasonable royalty.

03:38  3        VLSI has the burden to establish the amount of its damages

03:38  4    by a preponderance of the evidence.  In other words, you should

03:38  5    award only those damages that VLSI establishes that are more

03:38  6    likely than not.

03:38  7        While VLSI is not required to prove the amount of its

03:38  8    damages with mathematical precision, it must prove them with

03:38  9    reasonable certainty.  You may not award damages that are

03:38  10   speculative, that are only possible or that are based on

03:38  11   guesswork.

03:38  12       In this case VLSI seeks damages in the form of what it

03:38  13   contends to be a reasonable royalty.

03:38  14       You must be careful to ensure that award is no more and no

03:38  15   less than the value that the patented inventions have provided

03:38  16   to Intel.

03:38  17       A reasonable royalty is defined as the amount the patent

03:38  18   owner and the alleged infringer would have agreed to if a

03:38  19   hypothetical negotiation had taken place at the time just prior

03:38  20   to when any infringement first began.

03:38  21       In considering this hypothetical negotiation, you should

03:38  22   focus on what the expectation of the patent owner and the

03:39  23   alleged infringer would have been had they entered into an

03:39  24   agreement at that time and had they acted reasonably in their

03:39  25   negotiation.

03:39  1        Unlike a real-world negotiation, all parties to a

03:39  2  hypothetical negotiation are presumed to believe the patents

03:39  3  are valid and infringe, and that both parties were willing to

03:39  4  enter into an agreement, the reasonable royalty that you

03:39  5  determine must be a royalty that would have resulted from the

03:39  6  hypothetical negotiation and not simply a royalty either party

03:39  7  would have preferred.

03:39  8        Evidence of things that happen after the infringement

03:39  9  first began can be considered in evaluating the reasonable

03:39 10  royalty, only to the extent that the evidence aids in assessing

03:39 11  what royalty would have resulted from the hypothetical

03:39 12  negotiation just prior to the first infringement.

03:39 13        The reasonable royalty award must be based on the

03:39 14  incremental value that the patented invention adds to the end

03:40 15  product.  When the infringing products or methods have both

03:40 16  patented and unpatented features, measuring this value requires

03:40 17  a determination of the value added by the patented features.

03:40 18        An appropriate combination of royalty base and royalty

03:40 19  rate must reflect the value attributable to the infringing

03:40 20  features, if any, of the Intel products and methods and no

03:40 21  more.

03:40 22        Any amount of damages must be based on the value

03:40 23  attributable to the patented invention as distinct from

03:40 24  unpatented features of the accused products or other factors

03:40 25  such as marketing or advertising.

03:40  1       A royalty compensating the patent owner for the damages

03:40  2  must reflect the value attributable to the infringing features

03:40  3  of the product and no more.

03:40  4       The process of separating the value of the alleged

03:40  5  infringing features from the value of all other features is

03:41  6  called apportionment.  When the products accused of

03:41  7  infringement for both patented and unpatented features, your

03:41  8  award must be apportioned as to what is based only on the value

03:41  9  of the patented features and no more.

03:41  10       Page 37 is my least favorite page to have to read.

03:41  11       (Laughter.)

03:41  12       THE COURT:  Because it's single spaced, but I'll do it.

03:41  13       In determining the amount of reasonable royalty, you may

03:41  14  consider evidence of any of the following factors, in addition

03:41  15  to any other evidence presented by the parties on the economic

03:41  16  value of the patent:  Any royalties received for licensing of

03:41  17  the patents-in-suit, proving or tending to prove an establish

03:41  18  royalty rates paid by Intel to license other patents comparable

03:41  19  to the VLSI patents; the nature and scope of the license as

03:41  20  exclusive or non-exclusive as restricted or non-restricted in

03:41  21  terms of its territory or with respect to whom the manufactured

03:41  22  product must be sold; the commercial relationship between the

03:41  23  licensor and the licensee, such as whether or not they are

03:42  24  competitors in the same territory in the same line of business;

03:42  25  the effect of selling the patented products or methods in

03:42  1   promoting other sales of the licensee, which is Intel; the

03:42  2   existing value of the claimed invention to the licensor as a

03:42  3   generator of sales of its non-patented items and the extent of

03:42  4   such collateral sales; the duration of the VLSI patents and the

03:42  5   terms of the license; the established profitability of the

03:42  6   products made under the VLSI patents; their commercial success

03:42  7   and their popularity; the utility and advantages of the

03:42  8   patented invention over the old modes or devices, if any, that

03:42  9   have been used for achieving some of the results; the nature of

03:42  10  the patented inventions; the character of any commercial

03:42  11  embodiment of it as owned and produced by or for the licensor

03:42  12  and the benefits, if any, to those that have used the claimed

03:42  13  invention; the extent, if any, to which Intel has made use of

03:43  14  the claimed invention and any evidence that shows the value of

03:43  15  that use; the portion of the profit or of the selling price

03:43  16  that may be customary in the particular business or in

03:43  17  comparable businesses to allow for the use of the inventions or

03:43  18  analogs -- analogous inventions; the portion of the profit that

03:43  19  arises from the patented inventions themselves as opposed to

03:43  20  profit arising from unpatented features, such as the

03:43  21  manufacturing process, business risks or significant features

03:43  22  or improvements added by the accused infringer; the opinion

03:43  23  testimony of qualified experts; the amount that a licensor and

03:43  24  a licensee would have agreed upon at the time of the

03:43  25  infringement began if both sides had been reasonable and --

03:43  1  reasonably and voluntarily trying to reach an agreement, that

03:43  2  is, the amount which a prudent licensee who desired as a

03:43  3  business proposition to obtain a license to manufacture and

03:43  4  sell a particular article embodying the patented invention

03:44  5  would have been willing to pay as a royalty and yet be able to

03:44  6  make a reasonable profit and which amount would have been

03:44  7  acceptable by a patentee who was willing to grant a license;

03:44  8  any other economic factor that a normally prudent business

03:44  9  person would under similar circumstance take into consideration

03:44  10  in negotiating a hypothetical license.

03:44  11       No one factor is dispositive.  And you can and should

03:44  12  determine -- consider the evidence that has been presented to

03:44  13  you in the case on each of these factors.

03:44  14       You may also consider any other factor which in your mind

03:44  15  would have increased or decreased the royalty the alleged

03:44  16  infringer would have been willing to pay and the patent owner

03:44  17  would have been willing to accept acting as normally prudent

03:44  18  business people.

03:44  19       If you believe that -- that on any issue you must decide,

03:44  20  including but not limited to damages, if you determine either

03:44  21  party has failed to keep proper records, then any confusion or

03:45  22  difficulty that you encounter in resolving the issue should be

03:45  23  held against the party who failed to keep the records and not

03:45  24  against the other party.

03:45  25       The existence of any comparable damages agreement or other

03:45  1    transactions may inform your decision as to the proper amount

03:45  2    and form of the reasonable royalty award.

03:45  3         Whether a particular patent agreement or other transaction

03:45  4    is comparable to the hypothetical license depends on many

03:45  5    factors, such as whether they involve comparable technologies,

03:45  6    comparable economic circumstances, comparable structures and

03:45  7    comparable scope and agreement may be comparable even if the

03:45  8    patented technology and economic circumstances of the agreement

03:45  9    are not identical to the hypothetical license.

03:45  10        While the parties to the hypothetical negotiation assume a

03:45  11   patent is valid and infringed, an agreement may be comparable

03:45  12   even if there's been no determination or assumption by the

03:45  13   parties to the agreement that the patent is valid and

03:45  14   infringed.

03:45  15        The question is whether the agreement is sufficiently

03:45  16   comparable that it provides a reasonable indication of how the

03:45  17   parties to the hypothetical negotiation would have negotiated a

03:46  18   license to the asserted patents.

03:46  19        However, if you choose to rely upon evidence from any

03:46  20   license agreements, you must account for any differences

03:46  21   between those licenses and the hypothetically negotiated

03:46  22   license between the patent owner and the accused infringer in

03:46  23   terms of the technologies and economic circumstances of the

03:46  24   contracting parties when you make your reasonable royalty

03:46  25   determination.

03:46  1          The hypothetical license is deemed to be a voluntary

03:46  2   agreement.  When determining if a license agreement is

03:46  3   comparable to the hypothetical license, you may consider

03:46  4   whether the license agreement is or was between parties who

03:46  5   were involved in a lawsuit.

03:46  6          Reasonable royalty awards can take the form of a lump sum

03:46  7   payment.  A lump sum payment is equal to an amount that the

03:46  8   alleged infringer would have paid at the time of a hypothetical

03:46  9   negotiation for licensing covering all the sales of the

03:46  10  licensed product, both past and future.

03:46  11         When a lump sum is paid, the infringer pays a single price

03:46  12  for a license covering both past and future infringing sales.

03:47  13  In determining whether a lump sum payment is appropriate, you

03:47  14  may consider whether the parties to the hypothetical

03:47  15  negotiation accepted lump sum payments in connection with the

03:47  16  comparable patent agreements.

03:47  17         Reasonable royalty awards may also take the form of a

03:47  18  running royalty based on the revenue from the volume of sales

03:47  19  of the licensed products.  A running royalty can be calculated,

03:47  20  for example, by multiplying a royalty base by a royalty rate.

03:47  21         Running royalty awards may also be calculated as a lump

03:47  22  sum over a certain period of time, as VLSI has done here, or as

03:47  23  an effective per-unit rate for each infringing unit multiplied

03:47  24  by the total number of infringing units.

03:47  25         All of these methods are designed to compensate the patent

03:47  1    owner for any infringement.  It is up to you, based on the

03:47  2    evidence, to decide what type of royalty, if any, is

03:47  3    appropriate in this case.

03:47  4        It is now your duty -- we've basically gotten through the

03:47  5    legal part.  This is -- just applies to what you're going to do

03:48  6    now.  So I'm going to read this a little more slowly, and this

03:48  7    will instruct you how you're to comport yourself as jurors.

03:48  8        It is now your duty to deliberate and consult with one

03:48  9    another in an effort to reach a verdict.  Each of you must

03:48  10   decide the case for yourself, but only after an impartial

03:48  11   consideration of the evidence with your fellow jurors.

03:48  12       During your deliberations, do not hesitate to reexamine

03:48  13   your own opinions and change your mind if you are convinced

03:48  14   that you were wrong, but do not give up on your honest beliefs

03:48  15   because other jurors think differently or just to finish the

03:48  16   case.

03:48  17       Remember at all times you are the judges of the facts.

03:48  18       You've been allowed to take notes during the trial.  Any

03:48  19   notes that you took during the trial are only aids to your

03:48  20   memory.  If your memory differs from your notes, you should

03:48  21   rely on your memory and not your notes.  The notes are not

03:48  22   evidence.

03:48  23       If you did not take notes, rely on your independent

03:49  24   recollection of the evidence and do not be unduly influenced by

03:49  25   the notes of other jurors.  Notes are not entitled to greater

03:49  1    weight than the recollection or impression of each juror about

03:49  2    the testimony.

03:49  3        When you go into the jury room to deliberate, you may take

03:49  4    with you a copy of this charge, the exhibits that I've admitted

03:49  5    into evidence and your notes.  You must select a jury

03:49  6    foreperson to guide you in your deliberations and to speak for

03:49  7    you here in the courtroom.

03:49  8        Your verdict must be unanimous.  After you have reached a

03:49  9    unanimous verdict, your jury foreperson must fill out the

03:49  10   answers to the written questions on the verdict form and sign

03:49  11   and date it.

03:49  12       After you've concluded your service and I have discharged

03:49  13   the jury, you are not required to talk with anyone about the

03:49  14   case.  More about that after you conclude.

03:49  15       If you need to communicate with me during your

03:49  16   deliberations, the jury foreperson -- there'll be -- I'm going

03:49  17   to go a little off script here just because it is easier for me

03:50  18   to tell you what is going happen.

03:50  19       You'll have juror notes back there.  If you want to ask me

03:50  20   a question, the very first note you're going to send me is

03:50  21   this:  You're going to tell me, Ms. X or Mr. Y is the jury

03:50  22   foreperson.  And that will come out here, and I will tell the

03:50  23   ladies and gentlemen who that is.

03:50  24       From then on, if while you're deliberating you have a

03:50  25   question you would like the Court to address, you write it down

| | | |
|---|---|---|
| 03:50 | 1 | on a jury note, you hand it to our marshal, he will bring it in |
| 03:50 | 2 | to me.  I come in here.  I discuss it with the lawyers and tell |
| 03:50 | 3 | them how I'm going to respond.  I will write down an answer, |
| 03:50 | 4 | and I will send it back to you to each question.  And then we |
| 03:50 | 5 | will keep the jury notes as part of the record in this case. |
| 03:50 | 6 | Let me go back to what I've written here, though, just to |
| 03:50 | 7 | make sure. |
| 03:50 | 8 | Keep in mind, however, that you must never disclose to |
| 03:50 | 9 | anyone, not even me, your numerical division at that time. |
| 03:51 | 10 | Don't ever write down, "right now we are X versus Y number of |
| 03:51 | 11 | people."  We never -- that never gets written down.  We never |
| 03:51 | 12 | hear anything until you tell me you have the unanimous verdict, |
| 03:51 | 13 | and then I'll read the unanimous verdict. |
| 03:51 | 14 | This again is very important because you're going to go |
| 03:51 | 15 | away overnight.  During your deliberations, you may not |
| 03:51 | 16 | communicate with any information about this case to anyone by |
| 03:51 | 17 | any means.  For example, do not talk face-to-face or use any |
| 03:51 | 18 | electronic device or media, such as a telephone.  You -- I |
| 03:51 | 19 | won't read out the whole list here, but let me make sure -- |
| 03:51 | 20 | if -- and you cannot use any form of media or technology to |
| 03:51 | 21 | communicate with anyone about this case. |
| 03:51 | 22 | The only people you can talk to about this case are the |
| 03:51 | 23 | seven of you, and that's within the confines of the jury -- I'm |
| 03:51 | 24 | calling it the jury room, but wherever it is that you all are |
| 03:51 | 25 | seated right now. |

—1554—

03:51  1      You cannot talk to anyone on the phone, correspond with

03:52  2  anyone or electronically communicate with anyone in this case.

03:52  3  Remember the oath that I gave you at the beginning, and you're

03:52  4  compelled to follow my instructions.

03:52  5      So there is one stipulation I'm going to read.  And

03:52  6  remember I told you earlier, if the parties enter into a

03:52  7  stipulation, you must follow the stipulation.

03:52  8      (Sealed proceedings.)

03:52  9      MR. LEE:  Your Honor, the stipulation is not public.  This

03:52  10  was confidential.

03:52  11      THE COURT:  I apologize, Mr. Lee.

03:52  12      Then what we will do is this:  We're going to -- if --

03:52  13  with permission of counsel, we're going to take a very short

03:53  14  recess just so you all can do whatever it is you do for five or

03:53  15  ten minutes and the parties can as well.

03:53  16      What I'm going to ask is if you are not covered by the

03:53  17  protective order, please give me five minutes before you come

03:53  18  in.  If you'll stay outside, I'll make sure someone tells you

03:53  19  when we begin the closing arguments.  It'll be about five

03:53  20  minutes after I bring the jury in.  I will read to the jury the

03:53  21  stipulation, and then we'll commence with closing arguments, if

03:53  22  that's okay with counsel.

03:53  23      MR. CHU:  Yes.  It is, Your Honor.

03:53  24      THE COURT:  Mr. Lee?

03:53  25      MR. LEE:  It's good with us, Your Honor.

—1555—

03:53  1       THE COURT:  I apologize for reading that portion of it.  I

03:53  2  was unaware.

03:53  3       Ladies and gentlemen of the jury, I lied earlier.  I will

03:53  4  tell you one more time, you cannot discuss the case amongst

03:53  5  yourselves because I have not dismissed you to begin

03:53  6  deliberating.  However, that's coming soon.

03:53  7       So it is 3:53.  I'm going to -- let's start at 4:10.

03:54  8  That -- you'll have 15 minutes.  That'll give the lawyers an

03:54  9  opportunity to get coordinated.

03:54  10       At 4:10 I'm going to bring the jury in.  I'm going to read

03:54  11  you the stipulation.  And then anyone who is not -- who is part

03:54  12  of the public but not part of the protective order will be free

03:54  13  to come in and hear from counsel for the plaintiffs and

03:54  14  defendants.

03:54  15       So you can all -- you are dismissed.

03:54  16       THE BAILIFF:  All rise.

03:54  17       (Jury exited the courtroom at 3:54.)

03:54  18       THE COURT:  I assume there's nothing to take up?

03:54  19       MR. CHU:  Something very small on the verdict form.  At

03:54  20  the very end where the choice of "one-time lump sum" or

03:54  21  "royalty for past sales" was added, the lead into that reads,

03:55  22  "One, a running royalty in the form of a lump sum for past

03:55  23  damages only or, two, a lump sum for all damages," and then it

03:55  24  reverses the order.

03:55  25       So I think Ms. Proctor has already sent to opposing

03:55  1   counsel and Mr. Pearson a proposed correction, which would just

03:55  2   make it parallel in terms of the order and to use the same

03:55  3   language that's in the sentence that precedes the boxes that

03:55  4   they would check.

03:55  5       MR. TOMPROS:  And, Your Honor, I don't want you to think

03:55  6   that we were not paying attention to your instructions, but

03:55  7   Ms. Proctor and I were e-mailing during the course of that, and

03:55  8   we have reached an agreement.  And I think Mr. Pearson has it.

03:55  9       THE COURT:  I would never assume that you weren't

03:55  10  listening.  I'm surprised that anyone could survive that death

03:55  11  march, but apparently we didn't lose any jurors during the

03:55  12  course of it.

03:55  13      So but, you know, if you think about it for just a second,

03:56  14  what -- with great lawyers like you, what better lead-up would

03:56  15  you rather have to make yourselves look great than to make them

03:56  16  listen to me do that for 45 minutes?

03:56  17      If you can't -- if the two of you can't improve on what I

03:56  18  just did, then you're in the wrong profession.  And I know --

03:56  19  with a hundred years of combined experience, I don't think that

03:56  20  we're in much danger of that.

03:56  21      So I'll be back in about ten minutes, and I very much look

03:56  22  forward to these closing arguments.

03:56  23      THE BAILIFF:  All rise.

03:56  24      (Recess taken from 3:56 to 4:10.)

04:10  25      THE BAILIFF:  All rise.

04:10  1         THE COURT:  Please remain standing for the jury.

04:10  2         (The jury entered the courtroom at 4:10.)

04:11  3         THE COURT:  Thank you.  You may be seated.

04:11  4         Again, with reminder that no one who's not under the

04:11  5  protective order should be here for just the reading of the

04:11  6  stipulation.

04:11  7         (Sealed proceedings.)

04:13  8         THE COURT:  That's the end of the stipulation.

04:13  9         Hannah, why don't you go let folks know that they can come

04:13 10  in?

04:14 11         I believe what we are handing out are notebooks that

04:14 12  contain photos of all the witnesses so that if someone is

04:14 13  referenced, you can look and it's a reminder of who the

04:14 14  witnesses were.

04:14 15         LAW CLERK:  Does everybody have one?

04:14 16         THE COURT:  Mr. Chu, are you ready to proceed?

04:14 17         MR. CHU:  Yes, Your Honor.

04:14 18         THE COURT:  You may do so.

04:14 19              OPENING ARGUMENT ON BEHALF OF THE PLAINTIFF

04:14 20         MR. CHU:  May it please the Court.

04:14 21         Ladies and gentlemen of the jury, I want to thank you.

04:15 22  You were first called to jury duty quite some time ago, and

04:15 23  there were weather delays and tough times for all of us because

04:15 24  of the weather problems.  But you are serving as a part of our

04:15 25  justice system, and you help make that system work well.

1558

04:15   1       We are here in part because our founders had the foresight

04:15   2   to put a provision in the United States Constitution to promote

04:15   3   the progress of science, and that's what has happened in the

04:15   4   United States for over the last 200 years.  That has made us

04:15   5   the world's leader in technology, whether it was in the 1800s,

04:16   6   the 1900s, up until today.

04:16   7       And Congress has passed statutes protecting patents and

04:16   8   invention.  It's a bargain and it's simple.  You disclose your

04:16   9   valuable inventions, and in exchange, no one can use your

04:16   10   inventions without permission.

04:16   11       You heard from James Spehar, a vice president at NXP.  He

04:16   12   explained the relationship between NXP and VLSI and why they

04:16   13   teamed up.  If somebody's using our patent and then they won't

04:16   14   work with us on licensing, it's not our expertise.  So that's

04:16   15   why we would go with a company like VLSI.

04:16   16       And David Bearden, the '373 patent inventor, discussed the

04:17   17   cycle of innovation, NXP inventing and applying for patents

04:17   18   from the Patent Office and, if granted, then NXP could decide,

04:17   19   as it did here, to assign the patents to VLSI with the hope

04:17   20   that there would be reasonable royalties paid, and then there

04:17   21   would be some reinvestment into more R&D at NXP.

04:17   22       This is in some ways a complicated case, but in other ways

04:17   23   it's a simple case.  And here's why:  You would expect that

04:17   24   employees of the defendant, Intel Corporation, would come and

04:17   25   deny infringement.  They're obviously interested.  They're

04:17  1   full-time employees at Intel.

04:18  2        We have another group of witnesses from both sides, and

04:18  3   they are independent experts.  They're all compensated.

04:18  4   They're all compensated pretty well.  They all spent hundreds

04:18  5   of hours writing lengthy reports and having their depositions

04:18  6   taken.  They've all, in total, have had compensation that may

04:18  7   be in the several hundreds of the thousands of dollars.  But in

04:18  8   no case are they full-time employees of either side.  They are

04:18  9   in a sense independent experts even though one side or the

04:18  10  other may engage them to come and provide testimony for you.

04:18  11       This is a credibility case.  And in that sense, despite

04:18  12  all of the technology you've heard about, this case is one of

04:18  13  credibility.  It's credibility of all the witnesses, but if you

04:19  14  think of the independent experts, some engaged by Intel and in

04:19  15  one case engaged by VLSI, you have the ability as well as any

04:19  16  other human being to consider and assess the credibility of

04:19  17  witnesses.

04:19  18       That's an ability that you were born with.  That's an

04:19  19  ability that you learned over time.  It's not something that

04:19  20  someone learns going to school.  It's something you learn

04:19  21  through your life experiences.

04:19  22       And that's why in different civil cases, in criminal cases

04:19  23  and in patent cases, our system recognizes that jurors just

04:19  24  like yourself have the ability to determine the credibility of

04:20  25  one side or the other.

04:20  1        In that sense, it is a simple case despite the technology,

04:20  2   and it's a case where often, including in a patent case, the

04:20  3   case turns on credibility of expert witnesses.

04:20  4        The Court's Instruction No. 7 said, "You alone determine

04:20  5   the questions of credibility or truthfulness of the witnesses.

04:20  6   You may consider the witness' manner and demeanor, any feelings

04:20  7   or interest in the case, any prejudice or bias about the case

04:20  8   and the consistency or inconsistency of the witness'

04:20  9   testimony."

04:20  10       So let's look at some of the evidence that you heard.  The

04:20  11  notebooks you have have photographs of the witnesses and lined

04:21  12  papers if you want to take notes there or in the other

04:21  13  notebooks that you've had.

04:21  14       You will not have in the jury room these sets of slides

04:21  15  being used either by VLSI or Intel in closing argument.  So if

04:21  16  you want to make note of particular exhibits, they will be in

04:21  17  evidence or particular testimony that is in evidence, but these

04:21  18  slides will not be in the jury room.

04:21  19       So we heard from Dr. Rotem, an Intel employee, and he was

04:21  20  discussing Yonah.  And he said, "And I said Yonah did not have

04:21  21  a hardware controller."

04:21  22       This is important because Intel is trying to invalidate a

04:22  23  patent based on their claim that Yonah anticipates, meets every

04:22  24  limitation of the claims of the patent.  If one item is

04:22  25  different, it cannot anticipate and cannot, cannot invalidate

—1561

04:22  1    the patent.

04:22  2        One of the key elements in the patent claim is a

04:22  3    programmable clock controller which is a hardware controller.

04:22  4    That language is in the claims.  And Dr. Rotem, before you,

04:22  5    admitted that Yonah did not have a hardware controller.

04:22  6        That's it.  That's the end of their invalidity case.  But

04:23  7    we'll go over some additional details.

04:23  8        Here's what Dr. Grunwald, the expert engaged by Intel,

04:23  9    said on Friday, just last week:

04:23  10        "Do you agree or disagree with that testimony of

04:23  11   Dr. Rotem?

04:23  12        Answer:  "I disagree with that testimony."

04:23  13        That was very clear-cut.  He didn't like what Dr. Rotem

04:23  14   said because that gives up the invalidity case.  He has the

04:23  15   weekend.  He comes back to court today, and what did we hear

04:23  16   this morning?

04:23  17        Dr. Grunwald:

04:23  18        Question:  "You have no reason to disagree with Dr. Rotem,

04:23  19   do you?"  The question coming from Intel's counsel.

04:23  20        Answer:  "No.  None."

04:23  21        What does that tell you about credibility?  On Friday he

04:24  22   disagrees directly with Dr. Rotem.  He wants to, he has to

04:24  23   because otherwise the invalidity case is gone.  And then right

04:24  24   after the weekend, he comes back and directly contradicts

04:24  25   himself.

04:24  1      And there are general rules about credibility.  If someone

04:24  2  is making a statement on a material fact and they change their

04:24  3  testimony, and in this case a 180-degree change, that is

04:24  4  something that you as jurors can weigh and consider.

04:24  5      Here's more.  Dr. Grunwald:

04:24  6      Question:  "The '759 patent specifically discussed the

04:24  7  fact that Mr. Henson wanted to make faster speed changes in the

04:24  8  processor, correct?

04:24  9      Answer:  "I can't answer that," despite his many, many

04:25  10  hours of studying the subject matter.

04:25  11      Later the same day:

04:25  12      Question:  "Mr. Henson was actually claiming in the patent

04:25  13  claims a specific embodiment that could have speed changes up

04:25  14  to a million times a second, correct?"

04:25  15      And he was shown some evidence about that from the patent,

04:25  16  and he had to admit, yes.  Making a 180-degree change in his

04:25  17  testimony that he had spent hundreds of hours preparing for.

04:25  18      Here's Dr. Sylvester, the other Intel expert.  At first he

04:25  19  gave the testimony:

04:25  20      Question:  "Is the VCCR -- let me say that that is the

04:25  21  voltage regulator, it's the first voltage regulator on the

04:25  22  bottom of Figure 1 of the patent.  Is the VCCR regulating

04:26  23  during the ramp-down?"  Referring to the ramp-down of the

04:26  24  voltage.

04:26  25      And this is the process where the system is trying to save

04:26  1    power if the circuit doesn't need the power, so it's ramping

04:26  2    down.

04:26  3        He answers:  "No.  It is not."

04:26  4        Crystal clear answer.

04:26  5        When shown evidence, he changes his testimony because he

04:26  6    can't deny it.

04:26  7        Question:  "So the Intel engineers want to carefully

04:26  8    control their programmable ramp-down rate.  They want to

04:26  9    control or regulate the way in which that voltage was being

04:26  10   decreased to minimize the problems with the chip; is that

04:26  11   correct?"

04:26  12       Answer:  "Apparently.  Yes."

04:26  13       He's saying "apparently" because he's confronted with the

04:26  14   documents that he's had a full opportunity, since this lawsuit

04:26  15   was filed or since he was engaged to study and now he has to

04:27  16   come clean.

04:27  17       Dr. Sylvester again:

04:27  18       Question:  "You're familiar with problems that can occur

04:27  19   for Intel chips if the ramp-down is too fast; is that correct?"

04:27  20       Answer:  "No."

04:27  21       You may remember the graphic that Professor Conte showed

04:27  22   you using water as an analogy, as if water just came crashing

04:27  23   down and broke everything.  So Dr. Sylvester is saying that

04:27  24   he's not familiar with these problems.

04:27  25       Again when shown evidence:

—1564—

04:27  1      Question:  "So the Intel engineers want to carefully

04:27  2  control their programmable ramp-down rate to minimize the

04:27  3  problems with the chip; is that correct?"

04:27  4      Answer:  "Apparently.  Yes."

04:27  5      Again a 180-degree change in his testimony.

04:28  6      Dr. Sylvester again:

04:28  7      Question:  "Did you find anything in the Intel documents

04:28  8  that referred to minimum retention voltage for C6 SRAM?"

04:28  9      That's the memory that's in the Lake processors.

04:28  10      "No. I did not."

04:28  11      Let me just spend a moment because in a way there are

04:28  12  three kinds of evidence.

04:28  13      There are the Intel witnesses.  We expect them to deny

04:28  14  infringement.  That's understandable.  There are the experts

04:28  15  engaged by both sides.  And then there's a third type of

04:28  16  evidence.  It's documentary evidence that was in existence

04:28  17  before this lawsuit was ever filed.

04:28  18      Well, they can't change those documents.  So he's saying

04:28  19  that he didn't find any documents that refer to the minimum

04:29  20  retention voltage, and then we showed him on cross-examination.

04:29  21      Question:  "When Intel engineers use the phrase 'Vmin,'

04:29  22  that refers to voltage minimum, correct?"

04:29  23      Answer:  "Yes."

04:29  24      "And the Vmin for the C6 SRAM was 0.75, correct?  Am I

04:29  25  correct?

04:29    1    Answer:  "That's what the document says."

04:29    2    So he was claiming there were no documents that showed

04:29    3    that Intel knew there was a voltage minimum, but there it was

04:29    4    in black and white created by the Intel engineers before this

04:29    5    lawsuit.

04:29    6    Here's Dr. Grunwald again, at 5:17 p.m. on Friday:

04:29    7    Question:  "That signal is an output of the high-speed

04:29    8    clock, right?  Can you answer it yes or no, sir?"

04:29    9    Answer:  "No.  I can't answer that yes or no."

04:30   10    Seconds later:

04:30   11    Question:  "You can't answer whether the 100 megahertz

04:30   12    output of the BCLCK" -- those are the letters that was on that

04:30   13    diagram that we showed you -- "shown in the Intel diagram is an

04:30   14    output of the clock; is that right?  Yes or no."

04:30   15    Answer:  "No.  It is not."

04:30   16    By 5:18 p.m., he gives a third answer.

04:30   17    Question:  "When it leaves the BCLCK on its journey to

04:30   18    another component, it's an output of the BCLCK, correct?"

04:30   19    Answer:  "Correct."

04:30   20    Within the space of the minute, he gave three completely

04:30   21    different answers.

04:30   22    The BCLCK, by the way, you may remember, refers to the

04:30   23    base clock.  It is the clock that is always running at

04:31   24    100 megahertz, that's always its output and it sends that

04:31   25    output to other circuitry in the Lake processors.

04:31  1        Credibility is so important.  And I've shown you just a

04:31  2   sample of it.  If one side has experts who testify

04:31  3   inconsistently with themselves and inconsistently with other

04:31  4   fact witnesses, or inconsistently in connection with Intel

04:31  5   documents, that's something that you can weigh during your

04:31  6   deliberations.

04:31  7        So let's look more closely at the evidence relating to the

04:31  8   '759 patent.  This is the Henson or the '759 patent.  You heard

04:31  9   evidence about the old approach.  This is, in fact, the Yonah

04:32 10   approach, which used the Windows operating system, and

04:32 11   obviously Windows was designed outside of Intel.

04:32 12        And the '759 invention involved the programmable

04:32 13   controller that you see on the slide, and that's a programmable

04:32 14   controller that is inside the Intel chip itself.

04:32 15        And you may remember that one of the beauties of this is

04:32 16   when the Windows operating system wanted to make speed changes,

04:32 17   it would have to get in line where the core would have to do

04:32 18   the work, but the core was doing a lot of other things.

04:32 19        But with the new '759 invention, there's no waiting in

04:32 20   line to make those speed changes, just like in the very happy

04:32 21   circumstance that we sometimes experience when we're in the

04:32 22   supermarket and there's no waiting in line.

04:32 23        But here it's designed so that there is a dedicated

04:33 24   check-out line for the speed changes that would enable the

04:33 25   speed changes to be faster.

—1567

04:33  1       How much faster than the old Yonah chip?  How much faster?

04:33  2       You heard evidence that the Speed Shift's 300 times faster

04:33  3  using the '759 invention in the Skylake processors than the old

04:33  4  way.

04:33  5       Intel's expert thought indeed that the old approach was

04:33  6  the only approach.  He wrote this paper before he was engaged

04:33  7  by Intel for this case.  The decision to change processor speed

04:33  8  and voltage must be controlled by the operating system, such as

04:33  9  Windows.

04:33 10       And when asked if he ever had any inkling of an idea of a

04:34 11  different way to do this so it would not be controlled by the

04:34 12  operating system, he would have done research and published on

04:34 13  that, and he agreed, as you can see from this answer.

04:34 14       So he's a person of extraordinary skill in the art.  He

04:34 15  couldn't even think conceptionally to have those speed changes

04:34 16  done in a way not using the outside operating system.

04:34 17       Professor Conte explained that Matt Henson added a lot of

04:34 18  hardware.  He added pretty much a computer-in-a-computer to do

04:34 19  this control.

04:34 20       And here you see the claim language referring to a

04:34 21  programmable clock controller having an embedded computer

04:34 22  program.

04:34 23       This is a question to Dr. Grunwald:

04:34 24       "Lake product families all have a programmable clock

04:35 25  controller having an embedded computer program?"

04:35 1        He answered, "Yes."

04:35 2        He answered very clearly yes.

04:35 3        Here's a document, Intel admits infringing Speed Shift is

04:35 4  revolutionary.  And here's an area where experts on both sides

04:35 5  agree.  The PCU is a programmable clock controller.

04:35 6        Does Yonah have a PCU?  Professor Conte says no.

04:35 7  Dr. Grunwald says no.  And Dr. Rotem also says no.  So the old

04:35 8  way doesn't have the PCU.  The new way has that programmable

04:35 9  controller in the Lake products.

04:35 10       One of the arguments had to do with whether a request is

04:35 11 made.  This was a noninfringement argument.

04:36 12       Professor Conte explained that when you launch Word or

04:36 13 some other program, it sends to the PCU in the Lake processors

04:36 14 a request, the Core_Active signal.

04:36 15       And you may remember Dr. Grunwald's analogy that he put in

04:36 16 his expert report.  And he said, if the customer or patron

04:36 17 doesn't specifically expressly ask for the check, that's not

04:36 18 asking for the check.

04:36 19       But on cross-examination he admitted to the following:

04:36 20 That if, for example, the customer does not have any

04:36 21 silverware, that's not a request for more silverware.  It is a

04:36 22 statement of condition.  But then he had to admit, "I don't

04:36 23 have any silverware" is a request in his mind, so the statement

04:36 24 of condition is a request.

04:36 25       So, too, if the customer's dropped a napkin on the floor

1569

04:37  1   without saying anything to the waiter, other than "I dropped my

04:37  2   napkin on the floor," that is a statement of a condition.

04:37  3        And here's an important point to keep in mind, one could

04:37  4   twist the meaning of words, and we use words in the English

04:37  5   language, like "request," to communicate with each other.

04:37  6        But the components of a computer system are not human

04:37  7   beings.  They send signals back and forth, back and forth very,

04:37  8   very rapidly.  And that's what's happening in the infringing

04:37  9   products.

04:37  10        There's another issue about providing the clock frequency

04:37  11   of the high-speed clock.  And here's testimony about the fact,

04:37  12   the question was if they wanted to say the same clock

04:37  13   frequency, he admitted that there was no language of that sort

04:37  14   in the claims.  So he effectively was trying to add a

04:38  15   requirement for the common clock.

04:38  16        There is clear evidence that the claims at issue for the

04:38  17   '759 patent are infringed.

04:38  18        Here's evidence on the '373 patent.  We say '373, David

04:38  19   Bearden is the second named inventor.  You may remember the

04:38  20   keys to this invention.  It was adding hardware.  There were

04:38  21   two voltage regulators instead of just one, plus this

04:38  22   fast-switching mux.  And what's telltale is there's no dispute

04:38  23   that's what the infringing products have, two voltage

04:38  24   regulators and a fast-switching mux.

04:38  25        David Bearden described that this was a way selectively to

04:38  1  manage the voltages between the two circuits that could save

04:38  2  power.

04:38  3      Then there was a dispute about a minimum operating

04:39  4  voltage.  Dr. Sylvester created a graph specifically for this

04:39  5  litigation to present to you.  Earlier that day Jonathan

04:39  6  Douglas, the Intel employee, it was a handwritten graph that

04:39  7  was almost precisely the same.  Both of them showed the

04:39  8  RING_RETENTION_VOLTAGE similar to what you're looking at now

04:39  9  with one of the ring voltages, VOLTAGE_0, being below it.

04:39 10      How could it be?  Because the system wouldn't work under

04:39 11  these circumstances.  It just wouldn't work.  The memory would

04:39 12  lose current and then wouldn't function.

04:39 13      Well, you heard the explanation from Professor Conte

04:39 14  today.  Dr. Sylvester and apparently Mr. Douglas did not

04:40 15  volunteer to you that they were mixing apples and oranges.

04:40 16  Part of the data used 0 degrees Centigrade, that is the

04:40 17  equivalent of 32 degrees Fahrenheit.  That's freezing.  That's

04:40 18  when water freezes to ice.

04:40 19      In the Intel documents themselves, they explain how you

04:40 20  have to make adjustments, and they didn't make the adjustments.

04:40 21  They didn't mention that to you, and they didn't mention

04:40 22  that -- the following, that other data that they used for this

04:40 23  made-up graph was based on the boiling point of water

04:40 24  100 degrees Centigrade or 212 degrees Fahrenheit.  And they

04:40 25  were combining data from both of those on a graph to try and

04:40  1  make this point.

04:40  2       They didn't use the Intel graph from its own documents.

04:40  3  So consider that when you are thinking about credibility.  They

04:41  4  had access, obviously, to the Intel documents, and they made up

04:41  5  documents instead of using the underlying Intel documents.

04:41  6       Here's some testimony about Dr. Sylvester's faulty data,

04:41  7  where Dr. Conte made this temperature point, and then there's

04:41  8  the question about the power supply selector.  And here's the

04:41  9  evidence from the Intel documents about their power supply mux.

04:41  10  And you can see the words are matching up with Element [F] in

04:41  11  the claim with the actual Intel document.

04:41  12       The Intel documents that existed before this litigation do

04:41  13  not lie.  All the claims of the '373 patent are infringed.

04:41  14       And then there's the question of damages.  You heard

04:42  15  testimony about the hypothetical negotiation.  And the Intel

04:42  16  expert admitted this morning Intel has to assume infringement

04:42  17  by Intel of nearly a billion products.  He has to assume that,

04:42  18  following the law.  He also has to assume that the patents are

04:42  19  valid.

04:42  20       Here's part of the Court's instructions, that the awarded

04:42  21  damages should be no less than the value of the patented

04:42  22  inventions to Intel.

04:42  23       Power and speed are key to competition.  You heard that

04:42  24  from Mr. Spehar of NXP.  And he described how it could make a

04:42  25  big difference, because if you sell millions of parts or

—1572—

04:42   1  billions of parts, the value to Intel would be enormous.

04:43   2       And David Bearden, the co-inventor of the '373, also

04:43   3  described this.  If there are hundreds of millions of

04:43   4  microprocessors sold every year, the patent is used to save

04:43   5  even a little bit of power.  In each of those sales, the

04:43   6  overall benefit and the value to Intel would be enormous.

04:43   7       You heard testimony from Professor Annavaram from USC,

04:43   8  Professor Conte who teaches at Georgia Tech, and they talked

04:43   9  about the 1.11 percent performance benefit and the 5.45 percent

04:43   10  power savings.

04:43   11       You didn't hear contrary testimony from any of the Intel

04:43   12  witnesses, fact or experts.  All they did was criticize the

04:43   13  testing done by these experts.  But never did they do their own

04:44   14  testing, even though they have all the ability in the world and

04:44   15  a big performance testing group to run contrary tests.

04:44   16       The patents created speed and power benefits, and there

04:44   17  were no competing calculations.

04:44   18       Here are the real-world facts in the hypothetical

04:44   19  negotiation with all the cards on the table.  You see the power

04:44   20  savings amount, the additional revenue.  That's additional

04:44   21  revenue, not total revenue.

04:44   22       The number of about a billion units sold.  The performance

04:44   23  improvement.  And in this hypothetical negotiation all that

04:44   24  information is available to both negotiators.

04:44   25       This is information -- and I'm going to give you an

04:44  1  opportunity to write it down.  So you see the first row is the

04:44  2  '373 patent.  And then the next number over, under "Additional

04:44  3  Revenues," those are the additional revenues from the use of

04:45  4  the '373 patent.

04:45  5      And then the next number over which starts with a three is

04:45  6  the number of infringing units.  And the next two numbers are

04:45  7  the most important.

04:45  8      One is the effective rate per unit.  You can see it's a

04:45  9  reasonable number of several dollars per unit.  And then

04:45  10  because of the number of units sold, the total reasonable

04:45  11  royalty is the number you see in that last column that is

04:45  12  highlighted in yellow.

04:45  13      On the second row you see the same information for the

04:45  14  '759 patent.  The additional revenues, the infringing units and

04:46  15  then importantly, in the last two columns, the effective rate

04:46  16  per unit, which is the easiest way to judge whether this is or

04:46  17  is not a reasonable royalty.

04:46  18      So that's a very important number, the effective rate per

04:46  19  unit for each of the two patents.  And then you see the

04:46  20  reasonable royalty, the total amount, based on the number of

04:46  21  units sold.

04:46  22      Now, you see on this the exact number for the reasonable

04:46  23  royalty, but I'm going to just round it off and make it easier.

04:46  24  Because when we see numbers, it's very hard for us to determine

04:46  25  how to think about it.

04:46  1       Now, I've put in black those two numbers but in a way

04:46  2  that's easier for us to understand what they are.  Again, here

04:46  3  you see the reasonable per-unit rates.  And then let's look at

04:47  4  Intel's excuses.

04:47  5       They asked, I think, about every witness that came up,

04:47  6  fact or expert, whether it was used by Freescale or NXP.  As

04:47  7  David Bearden explained, NXP has thousands of products.

04:47  8  Figuring it out would be a nearly full-time job for many years.

04:47  9  There'd be no reason to do it because NXP has permission to use

04:47 10  the invention that they had developed.  And it's not related at

04:47 11  all to whether Intel infringes.

04:47 12       From the first witness who was asked the question, the

04:47 13  witness responded with the full answer, but they wanted to ask

04:47 14  every witness the same thing.

04:47 15       Here's a jury instruction where in determining

04:47 16  infringement you must compare Intel's accused products and

04:47 17  methods to the claims of the patents.

04:48 18       Next excuse, Intel says -- claims it has no knowledge of

04:48 19  the patents.  But a party can infringe a patent without knowing

04:48 20  of the patent or without knowing that what the party is doing

04:48 21  is patent infringement.  That's the law as you can see.

04:48 22       And here's Intel's infringement with the date of the grant

04:48 23  of the '759 patent, when Intel was designing those products,

04:48 24  when Intel launched its '759 technology and then all of those

04:48 25  processors that it brought online year after year after year so

04:48  1   that they became their mainstream processors across the board.

04:48  2         The next excuse by Intel was to say, oh, we did

04:48  3   independent development.  But even if a party independently

04:48  4   creates the accused product, it can still infringe.  And that

04:49  5   was part of the judge's instruction earlier this afternoon.

04:49  6         The next excuse was witnesses never heard of the patent

04:49  7   numbers.  Well, they're incredibly famous inventions.  Edison's

04:49  8   invention that relates to the patent on light bulbs as an

04:49  9   example.  The Wright brothers had patents on their flying

04:49 10   machine.  Nobody knows the patent numbers, but engineers know

04:49 11   when there's a great advance and engineers know when it's put

04:49 12   into as many as a billion products.  They just don't recognize

04:49 13   the patent numbers.

04:49 14         Intel has sold nearly a billion processors that infringe

04:49 15   these two patents.  That's uncontradicted.

04:49 16         In conclusion, the United States Patent Office awarded the

04:49 17   patents after careful examination.  The evidence shows that

04:49 18   Intel infringes and the damages are based on about a billion

04:50 19   Intel products that use the patented technology.

04:50 20         Thank you very much, ladies and gentlemen.

04:50 21         <u>CLOSING ARGUMENT ON BEHALF OF THE DEFENDANT</u>

04:50 22         MR. LEE:  Your Honor, ladies and gentlemen of the jury,

04:50 23   Mr. Mueller and I will be splitting the closing.  He will be

04:50 24   closing to you first, then I will follow him and finish for us.

04:50 25         MR. MUELLER:  Good afternoon, ladies and gentlemen.  And I

04:50  1   want to start by saying thank you for your careful time and

04:50  2   attention over the last week.  We are grateful.  And on behalf

04:51  3   of my colleagues and our client Intel, I just want to say thank

04:51  4   you.

04:51  5        Now, you have seen all of the evidence go in over the last

04:51  6   week.  And a series of witnesses have walked right here past

04:51  7   you to the witness stand.  And each of them stopped along the

04:51  8   way and they took the oath.  And they swore to tell the truth,

04:51  9   the whole truth and nothing but the truth.

04:51  10       And I -- even if you're not a trial lawyer, you've

04:51  11  probably heard that many times over the years in movies and TV

04:51  12  shows.  And sometimes you can hear it and not really think

04:51  13  about what it means, but it's important.  It's very important

04:51  14  to our system of justice to take the stand, take the oath, tell

04:51  15  the truth.  Tell the whole truth.  And that's what we tried to

04:51  16  do over this case.  The best way to help a jury like yourselves

04:51  17  reach a fair and just result is to tell the truth.

04:51  18       So what we have done is called as witnesses three top

04:52  19  Intel engineers with personal knowledge of how these products

04:52  20  were created.  They helped to create them themselves.  Two of

04:52  21  them are Intel fellows.  That means they're among the top 120

04:52  22  engineers out of 70,000 engineers at Intel.  Those two are

04:52  23  among the top 120.

04:52  24       The third engineer we called is a distinguished software

04:52  25  engineer, one of the most experienced engineers in writing that

04:52  1    type of computer code you heard about.  Three extraordinary

04:52  2    engineers.

04:52  3        We also called Mr. King who had many years at the company

04:52  4    and has explained the history of it to you.

04:52  5        We called two university professors, each of whom were

04:52  6    experts in the field.

04:52  7        We called Mr. Huston who worked at IBM for over 30 years,

04:52  8    for 22 years of experience sitting at the table negotiating

04:52  9    license agreements.

04:52 10        Now, we called all these folks to give you the truth, to

04:53 11    give you the whole truth about what happened in this case and

04:53 12    what matters.

04:53 13        Now, I agree with Mr. Chu.  I think all of my colleagues

04:53 14    agree with Mr. Chu on one point.  Credibility is critical.

04:53 15    It's critical.  And you are the judges of credibility in this

04:53 16    case.  It's your job to figure out who came to you and did the

04:53 17    best job they could to explain the facts, explain the evidence,

04:53 18    to explain the truth.

04:53 19        Now, again and again -- and you saw it again just now in

04:53 20    Mr. Chu's closing argument -- you've seen VLSI show you

04:53 21    portions of documents, and then later on we'd show you the rest

04:53 22    of the document or portions of a deposition transcript and then

04:53 23    we had to show you the rest of it.  Again and again and again,

04:53 24    that's happened.

04:53 25        We were trying to give you the full truth the whole way

04:53   1   through this trial, and that's what I'm going to try to do

04:53   2   right now one last time.

04:53   3        Now, Mr. Chu told you in his opening statement that there

04:54   4   are two stars, two heros in this case.  That was a promise that

04:54   5   he made to you about what the evidence was going to show.

04:54   6        Now, you've seen the evidence and you know it's just not

04:54   7   true.  Mr. Spehar, the very first witness:

04:54   8        "You hadn't even heard of these two patents until very

04:54   9   recently, correct?

04:54   10       "Until my deposition."

04:54   11       Dr. Conte, Dr. Annavaram, Dr. Sullivan, the three experts,

04:54   12   none of them had heard of these patents before this lawsuit.

04:54   13       The Intel engineers, Mr. Douglas, Dr. Rotem,

04:54   14   Mr. Borkowski, they hadn't heard one word about these patents

04:54   15   before this case started.  Not one word.

04:54   16       Dr. Sylvester, Dr. Grunwald, Mr. Huston never heard

04:54   17   anything about these patents, these heros and stars.  Never

04:55   18   heard one word about them until this case started.

04:55   19       Now, Mr. Bearden was actually one of the named inventors

04:55   20   in the '373 patent.  He testified when VLSI's lawyer asked him

04:55   21   questions about the patent.  And then it turned out when

04:55   22   Ms. Sooter cross-examined him, we learned at his deposition he

04:55   23   barely remembered anything about it.  He didn't remember any

04:55   24   details of the path to the patent.  And, in fact, he said that

04:55   25   he was asked, "Hey, do you remember this patent?"  And, you

1579

04:55  1   know, after a little bit of head scratching, then he kind of

04:55  2   said, "yeah, vaguely."

04:55  3       Just think about that.  This is one of the inventors on

04:55  4   one of the patents.  He said it was a head-scratching moment to

04:55  5   try to remember this patent.  If it were a hero, if it were a

04:55  6   star, you can rest assured the inventor would have remembered

04:55  7   it.

04:55  8       Now, Dr. Zhang is another inventor on the '373 patent, and

04:55  9   you heard a portion of his videotaped deposition.  And I'm

04:55  10  going to ask Mr. Lee to play it one more time.

04:56  11      "In your own words, can you tell (audio distortion) the

04:56  12  '373 patent is?"

04:56  13      "I did not write this document.  I don't remember it."

04:56  14      Didn't remember it.  And you heard him say that over and

04:56  15  over again at his deposition.

04:56  16      Now, Mr. Bearden said that tracking down where the

04:56  17  invention might have been used in actual product would have

04:56  18  been, as he said, would be formidable, right?  A full-time job

04:56  19  for many years.

04:56  20      So he was essentially saying, don't blame us for not

04:56  21  knowing whether we used these patents.  It's sort of hard to

04:56  22  track down whether the products were actually using the

04:56  23  inventions, as if they were an old pair of socks with holes in

04:56  24  them.  Hard to track down.

04:56  25      These are supposed to be incredible inventions, according

04:56  1  to VLSI, that provide great performance benefits.  If that's

04:56  2  true, if that's true, you wouldn't have to track it down.

04:56  3  You'd know it.  You'd know it.  More than that, you'd want it.

04:56  4  You'd want to take these patents and put them into an actual

04:57  5  product.

04:57  6      But they couldn't identify a single product out of the

04:57  7  thousands, thousands of NXP products that actually used these

04:57  8  patents, and the only conclusion you can draw is that there is

04:57  9  no such product.

04:57  10      They've never used these two patents in actual products.

04:57  11  If they were such great ideas, they had every incentive in the

04:57  12  world to do so.  They compete in the marketplace against

04:57  13  companies, including Intel.  They're looking for ways to make

04:57  14  their products better.

04:57  15      If these were truly heros and stars, they would have used

04:57  16  them.  And the reason why we have focused on this issue

04:57  17  throughout the case is because it does go to credibility.  It

04:57  18  goes to the credibility of the claim that you heard in the

04:57  19  opening statement, that these are heros and stars.  Well,

04:57  20  they're not.  If they were, they would have been used.

04:57  21      Now, witness after witness confirmed this.  Mr. Bearden,

04:57  22  "I don't know of any particular product."  Dr. Zhang, "don't

04:57  23  remember."  Mr. Spehar couldn't identify any either.

04:58  24      Dr. Conte said it wasn't his task to identify a product

04:58  25  made by SigmaTel, Freescale, NXP or VLSI that used these

04:58  1    patents.  Dr. Annavaram couldn't identify one either.

04:58  2        Now, I'm going to examine the two infringement claims one

04:58  3    by one.  Before I do, I just want to cut to the heart of what

04:58  4    they're saying here.

04:58  5        There's not a shred of evidence that the Intel engineers

04:58  6    copied these patents.  Not a shred of evidence.  There's no

04:58  7    evidence that they had these patents in one hand and were doing

04:58  8    design work in the other.

04:58  9        So the gist of the claim that's being made to you, the

04:58  10   jury, is that the Intel engineers accidentally ended up within

04:58  11   the claims of these patents.

04:58  12       Now, as a legal matter, that is possible.  You can

04:58  13   accidentally infringe a patent as a matter of law, but as a

04:58  14   factual matter, it didn't happen here.  It just did not happen

04:58  15   here.  That's not what happened.

04:59  16       So let's look at the patents one by one, and let's start

04:59  17   with the '373 patent.

04:59  18       Now, in terms of what's at issue for the '373 patent, you

04:59  19   heard from Mr. Douglas who's a lead architect for decades at

04:59  20   Intel, along with Mr. Borkowski, the distinguished software

04:59  21   engineer who has personally written much of that special kind

04:59  22   of computer code you heard about, the P-code.  And they

04:59  23   described for you the power architecture in portions of the

04:59  24   Broadwell and Haswell processors that are accused of

04:59  25   infringement by the '373 patent.

04:59  1        Now, throughout this case we did our best to try to

04:59  2   explain the facts as best we could, and we wanted you to

04:59  3   understand the facts because we believe the truth is on our

04:59  4   side.

04:59  5        So we used things like magnet boards and all sorts of

04:59  6   stuff to have the witnesses help explain the facts to you as

04:59  7   best we could.  And this is the board that we put together with

04:59  8   Mr. Douglas, and it shows the components within the ring

05:00  9   domain.  It shows these two power supplies, the VCCR and the

05:00  10  VCCIO.  It shows the package control unit that controls the

05:00  11  switch that allows for switching between these two power

05:00  12  supplies, the VCCR and the VCCIO.

05:00  13       Now, of course this is a simplified diagram.  There's

05:00  14  thousands upon thousands of components in these chips, but

05:00  15  what's at issue here is the power supply to this memory called

05:00  16  the C6 SRAM.

05:00  17       And as you learned, when the ring components are in

05:00  18  operation, the power supply comes from the VCCR and it comes at

05:00  19  different power levels depending on the level of activity of

05:00  20  the components within the ring domain.

05:00  21       When the components in the ring domain are no longer being

05:00  22  used, the PCU flips the switch and it goes to the VCCIO, which

05:00  23  supplies power to the C6 SRAM in that circumstance.

05:00  24       So this is the architecture at issue.  It's developed by

05:01  25  Mr. Douglas and his colleagues.  Mr. Borkowski and other folks

05:01  1   created the computer code that implements the architectural

05:01  2   designs of Mr. Douglas and his colleagues.  And that's how it

05:01  3   works.  It does not remotely use the '373 approach, and I'm

05:01  4   going to explain exactly how.

05:01  5        Here's the claims, okay?  Here are the claims at issue for

05:01  6   the '373 patent.  And I have shown the language from each and

05:01  7   every part of these claims.  To infringe a claim, as you heard

05:01  8   from His Honor, a product needs to do everything required by

05:01  9   that claim.  You need to look at every single part of it and

05:01  10  find something that matches either literally or equivalently

05:01  11  each and every part of the claim.  If one part is missing,

05:01  12  there's no infringement.

05:01  13       Now, as you're going to see, there are actually several

05:01  14  parts that are missing if you compare these claims to the

05:01  15  architecture that Mr. Douglas, Mr. Borkowski and their

05:02  16  colleagues developed.

05:02  17       And as we go through this, I want to emphasize that the

05:02  18  burden of proof is on VLSI.  They bear the burden on

05:02  19  infringement.  They need to convince you that each and every

05:02  20  part of those claims is actually in the Intel products.  So

05:02  21  let's go through it.

05:02  22       First, the claims require determining a minimum operating

05:02  23  voltage of the memory and storing the minimum operating voltage

05:02  24  of the memory and then doing certain things with it, which

05:02  25  we're going to come back to.  But just at the very outset, it

05:02  1   requires determining and storing the minimum operating voltage

05:02  2   of the memory.

05:02  3        Now, it turns out, as Mr. Douglas explained to you, that's

05:02  4   a complicated, inefficient process to even go about doing that,

05:02  5   and Dr. Sylvester, Intel doesn't do that.  It does not

05:02  6   determine the minimum operating voltage of the memory and store

05:02  7   it, then use it in the way that the claims describe.  It uses a

05:02  8   very different architecture.

05:02  9        Now, there's a couple of things that are problems with the

05:03  10  theory that Dr. Conte, who's the one and only one witness this

05:03  11  entire trial who says that Intel infringes.  The only one is

05:03  12  Dr. Conte.  He's referring to something called the

05:03  13  RING_RETENTION_VOLTAGE, and he's claiming that's minimum

05:03  14  operating voltage of the memory.  Okay.  That's the claim

05:03  15  requirement of the memory.

05:03  16       He says it's the RING_RETENTION_VOLTAGE.  Well, there's

05:03  17  one problem right at the outset.  It is related to the entire

05:03  18  ring domain.  He conceded this on cross-examination:

05:03  19       "What it's referring to is the entire ring domain,

05:03  20  correct?

05:03  21       "That's correct."

05:03  22       Here's the ring domain.  You've learned about all of the

05:03  23  various components within it.  It's not just the C6 SRAM.  It's

05:03  24  a whole series of components.  So it's not the minimum

05:03  25  operating voltage of the memory.  Even what he's referring to

05:03  1    is a ring domain retention voltage, not a memory retention

05:03  2    voltage.

05:03  3        There's a second problem.  It's not a minimum.  Now,

05:03  4    Mr. Chu seemed to suggest just now that Mr. Douglas and

05:04  5    Dr. Sylvester were somehow making this up.  They were.  These

05:04  6    are the facts about how this works.

05:04  7        This is a diagram that you can see right here, that Dr. --

05:04  8    I'm sorry -- Mr. Douglas testified to.  It shows the various

05:04  9    power supply levels that come out of the VCCR when the VCCR is

05:04  10   being used to supply power to the ring domain.  He testified

05:04  11   about the RING_VF_VOLTAGE_0, the RING_VF_VOLTAGE_1, the

05:04  12   RING_VF_VOLTAGE_2, and he compared it to the

05:04  13   RING_RETENTION_VOLTAGE, which is at a higher level than the

05:04  14   RING_VF_VOLTAGE_0.

05:04  15       Dr. Sylvester confirmed this through analyses of 8 million

05:04  16   chips, but Mr. Douglas was on the stand and he testified about

05:04  17   this.  Now, you just heard a few minutes ago a suggestion that

05:04  18   Mr. Douglas and his colleagues, I think to be blunt, the

05:04  19   suggestion was they were lying to you.  You have to remember

05:04  20   you heard them testify.

05:05  21       When they testified and when they were cross-examined and

05:05  22   left the stand, did you think they were lying, or did you think

05:05  23   that person just gave me useful information both on direct and

05:05  24   cross-examination?

05:05  25       And I would respectfully submit to you the record supports

05:05  1   the latter.  Each one of these engineers, including

05:05  2   Mr. Douglas, took the stand to testify to the truth and

05:05  3   provided the facts to you, including with respect to these

05:05  4   power supply levels.

05:05  5        Mr. Douglas wasn't even asked about this temperature

05:05  6   theory that we heard about for the first time today.  If that

05:05  7   was significant, if this temperature theory we heard from

05:05  8   Dr. Conte near the very end of the trial was important, why

05:05  9   didn't they ask Mr. Douglas a single question about it?  Not

05:05  10  one.  And as he said on the stand, the voltage level is higher

05:05  11  in RING_VF_VOLTAGE_0 as compared to the

05:05  12  RING_RETENTION_VOLTAGE.

05:05  13       Now, there was also some reference at the trial to this

05:06  14  Vmin, and Mr. Chu just mentioned it now.  And there's a couple

05:06  15  things to say about that.

05:06  16       First, this came up for the first time during the

05:06  17  cross-examination of Dr. Sylvester.  Mr. Chu cross-examined,

05:06  18  including using this document.  You see that reference to Vmin?

05:06  19  There was a suggestion made that that was somehow related to

05:06  20  the RING_RETENTION_VOLTAGE.  But Mr. Chu did not show

05:06  21  Dr. Sylvester the whole document.

05:06  22       And if you look at the whole document, you can see the

05:06  23  right-hand side, it refers to read and write information.  It's

05:06  24  not referring to retention.  It's referring to reading and

05:06  25  writing to memory, which is a different thing than retention.

05:06  1    This is a good example of how when you look at the full

05:06  2    document, you see the full truth, the theory collapses.

05:06  3         But it's more than that.  Dr. Conte didn't even refer to

05:06  4    this Vmin in his original testimony when he was explaining his

05:06  5    infringement theory.  It was something that was mentioned for

05:06  6    the first time by Mr. Chu in cross-examining Dr. Sylvester.

05:07  7         And not even that.  If this was significant, again, they

05:07  8    would have asked Mr. Douglas about it.  They didn't ask him a

05:07  9    single question about it.  They had the -- one of the lead

05:07  10   architects for the chips sitting there on the witness stand,

05:07  11   didn't ask one question about it.  It's a sideshow.  It's not

05:07  12   relevant.

05:07  13        Now, Dr. Sylvester said:

05:07  14        "Does this chart have anything to do with

05:07  15   RING_RETENTION_VOLTAGE?

05:07  16        "No.

05:07  17        "Does it have anything to do with what Dr. Conte

05:07  18   identified as the minimum operating voltage for his

05:07  19   infringement analysis?

05:07  20        "No.  It doesn't."

05:07  21        And that's the truth.

05:07  22        So for all these reasons the RING_RETENTION_VOLTAGE is not

05:07  23   the minimum operating voltage of the memory, and that alone is

05:07  24   reason to stop there.  There's no infringement.

05:07  25        But we can see there's further problems.  There's no

05:07  1   regulated voltage that triggers a switch between the power

05:07  2   supplies.  That is to say the minimum operating voltage is not

05:07  3   used to make the decision to switch between these two.  Instead

05:07  4   it's something called the Package C7 sleep state.  When it goes

05:08  5   into that state, the switch is flipped.  It has nothing to do

05:08  6   with the minimum operating voltage.

05:08  7        And that's a second problem.

05:08  8        The third problem is the claim requires that both of these

05:08  9   power supplies supply power-regulated voltages simultaneously.

05:08  10  And Mr. Douglas explained to you that doesn't happen.

05:08  11       When the switch is flipped from the VCCR to the VCCIO, the

05:08  12  VCCR no longer supplies a regulated voltage in that scenario.

05:08  13  It's not supplying a stable supply of electricity to the

05:08  14  components in the ring domain, and they're no long operable.

05:08  15       So that's a third reason why there's no infringement of

05:08  16  the '373 patent.

05:08  17       If you put all these reasons together, you can see the

05:08  18  long series of Xs.  All we need is one to show noninfringement,

05:08  19  but there's actually many.  It's a completely different

05:08  20  architecture that neither literally or equivalently infringes

05:08  21  the patent.

05:08  22       And to sum up, the claim requires storing the minimum

05:09  23  operating voltage.  The RING_RETENTION_VOLTAGE is not the

05:09  24  minimum operating voltage.  Claims require using the minimum

05:09  25  operating voltage for voltage selection.  The architecture of

05:09  1  Mr. Douglas and his colleagues uses Package C7 sleep state

05:09  2  instructions instead.  And the architecture of the '373 patent

05:09  3  requires supplying two regulated voltages at the same time, and

05:09  4  that just doesn't happen in the Intel chips.

05:09  5      So let's go to the second patent, and this is a really a

05:09  6  tale of two time periods.  First, we're in the early 2000s.

05:09  7  Yonah, it is undisputed, came before the '759 patent was

05:09  8  invented.  And that was back in the early 2000s.

05:09  9      And you've see the Yonah architecture.  You know it was

05:09  10  the very first Intel chip to have two core processors.  And it

05:09  11  was developed by Dr. Rotem and his colleagues.

05:09  12      This had several key characteristics.  It used explicit

05:09  13  requests to change clock frequencies.  It had a programmable

05:10  14  clock controller.  It used the same frequency for all

05:10  15  components.  And the operating system ran on the core.  That

05:10  16  was how Yonah worked as Dr. Rotem explained to you.

05:10  17      Now, the only real issue here is did Yonah include a

05:10  18  programmable clock controller?

05:10  19      And this is another one of those examples where Dr. Rotem

05:10  20  was asked about two lines of deposition testimony, and then we

05:10  21  came back and showed him the whole transcript.  And he

05:10  22  explained that it did have a programmable clock controller.  It

05:10  23  was a mixture of hardware and software.  It didn't have a

05:10  24  hardware-only controller, as he testified, but it had a mix of

05:10  25  hardware and software that together constituted the

05:10 1    programmable clock controller.

05:10 2         That was the same issue that came up with Dr. Grunwald,

05:10 3    and he said the same thing.  It had a programmable clock

05:10 4    controller.  It didn't have a hardware-only clock controller.

05:10 5    And that's really the only way in which they've tried to

05:10 6    dispute that Yonah is different from the patent.

05:10 7         Yonah was not in front of the Patent Office.  At one point

05:11 8    there was -- during Mr. Chu's cross-examination of

05:11 9    Dr. Grunwald, he suggested that the Patent Office had in front

05:11 10   of it SpeedStep, which was a clock-control technology.  But as

05:11 11   you learned this morning, the type of SpeedStep technology was

05:11 12   for the Pentium III chip.  That was one core, a single core.

05:11 13   Yonah had two.

05:11 14        It was the first two-core processor.  Why does that

05:11 15   matter?  It matters because the '759 patent requires two master

05:11 16   devices.  Yonah had it, one, two.  And the Patent Office didn't

05:11 17   know about that.  If the Patent Office had known about Yonah,

05:11 18   we believe the patent would not have issued.  As Dr. Grunwald

05:11 19   said, the Patent Office did not consider Yonah when deciding to

05:11 20   grant this patent.

05:11 21        And if you look at each part of the claims, and we

05:11 22   encourage you to look at each and every portion of the claims

05:11 23   at issue, you will find that Yonah had all of them.  And

05:11 24   therefore these claims are invalid.

05:11 25        So to sum up, Yonah had requests.  It provided a single

05:12  1  clock frequency to all of the different components.  It had the

05:12  2  one clock.  It had a programmable clock controller, and the

05:12  3  core master devices provide the request.

05:12  4      Well, now let's fast forward 11 years, to 2015, and talk

05:12  5  about a very different architecture in the Lake series

05:12  6  processors.

05:12  7      You heard about this from Dr. Rotem again.  He was

05:12  8  involved in both the early 2000s work and the work in the

05:12  9  mid-2010s, and Mr. Borkowski, who was involved in implementing

05:12  10  some of the architectural designs of this clock control

05:12  11  architecture.

05:12  12      Dr. Rotem actually created a Ph.D. dissertation on some of

05:12  13  the ideas that ultimately went into the Lake series processors,

05:12  14  and he received a Ph.D.  So he wrote this long paper describing

05:12  15  his ideas, received a Ph.D. based on those ideas in recognition

05:13  16  for the quality of his work.

05:13  17      He also presented that work at the Institute of Electrical

05:13  18  and Electronics Engineers, a prestigious organization.  He

05:13  19  wrote a paper.  It was accepted for publication in an IEEE

05:13  20  journal.

05:13  21      Now, at that time IEEE learned of his work.  Did anyone

05:13  22  say to him -- was there any evidence to you that someone said

05:13  23  to him, hey, didn't you know that was in a patent I filed many

05:13  24  years ago?

05:13  25      No one said that.

05:13  1      This was recognized as a new approach, which Dr. Rotem and

05:13  2  his colleagues believed was revolutionary.  That document that

05:13  3  you've seen from VLSI a few times that uses the word

05:13  4  "revolutionary," that's referring to his idea, Dr. Rotem's

05:13  5  idea, the work of he and his colleagues.  They were proud of

05:13  6  it.  They were proud of the work that they had done, and they

05:13  7  presented it publicly to IEEE.

05:13  8      And you can see it right here in this board.  It took

05:13  9  multiple clocks, independent clocks, no requests.  Instead

05:14  10  there's autonomous control.  It's a much more sophisticated

05:14  11  structure than the Yonah structure from 11 years before.  This

05:14  12  allows for calibrating the frequency of different components

05:14  13  using independent clocks.

05:14  14      If the graphics processor is particularly busy, you

05:14  15  increase the frequency of the clock for the graphics processor

05:14  16  and so on.  Different clocks for different components.  It's a

05:14  17  very high power -- very powerful and efficient approach that

05:14  18  reflects the hard work of Dr. Rotem and his colleagues.  And

05:14  19  it's quite different from the '759 claims.

05:14  20      No. 1, the claims require that a request be made from

05:14  21  master devices, like the cores, for a change in clock

05:14  22  frequency.  And as you've learned, that's just not how it

05:14  23  works.

05:14  24      As Dr. Rotem explained, what triggers those components to

05:14  25  provide information, "components" meaning the cores, including

05:14    1    something you learned about called the C0 residency

05:14    2    information, what triggers them to provide this information to

05:15    3    the PCU?  Nothing.  It goes all the time, even when the cores

05:15    4    are asleep.  No request?  No request.

05:15    5         As you heard, it's like a train.  It arrives on a regular

05:15    6    schedule to the PCU.  It's a set of data.  There's actually

05:15    7    many portions of data called telemetry information that goes to

05:15    8    the PCU.  The PCU conducts complicated analyses of it, then the

05:15    9    PCU decides what to do.

05:15   10         So instead of the old system where the core would make a

05:15   11    request to change the clock, in this system the cores transmit

05:15   12    information to the PCU.  The PCU is the brain that does the

05:15   13    analysis, and the PCU decides when to change the different

05:15   14    clocks.  Completely different, much more advanced architecture

05:15   15    than the '759 patent, which was nearly a decade before it.

05:15   16         Dr. Conte confirmed that -- just as he said here:

05:15   17         "Isn't it true that you also testified in the same

05:15   18    deposition that periodic reading of information is not a

05:15   19    request?

05:15   20         "Yes.

05:16   21         "All right.  So you described the accused feature as

05:16   22    periodic, correct?

05:16   23         "Yes.

05:16   24         "And you said on the very next page that a periodic

05:16   25    push-out of information is not a request, correct?

05:16 1      "That's correct."

05:16 2      Periodic push-out of information to the PCU is not a

05:16 3 request.  Despite Mr. Chu's best attempts to use restaurant

05:16 4 analogies to turn it into a request, it's just not.  It's not a

05:16 5 request.  It's the transmission of information to the PCU.  The

05:16 6 PCU does the analysis.  The PCU makes the decisions.  There's

05:16 7 no request.

05:16 8      And that's the first independent reason why none of the

05:16 9 claims are infringed.

05:16 10      Second, if you look at the claim language, and we

05:16 11 encourage you to read it precisely, every word, it talks about

05:16 12 providing a request to change a clock frequency of a high-speed

05:16 13 clock.  And then a little bit lower, providing the clock

05:16 14 frequency of the high-speed clock to a second master device,

05:16 15 and then a little bit later, providing the clock frequency of

05:16 16 the high-speed clock.

05:17 17      So we have a request for a clock frequency of a high-speed

05:17 18 clock, and then we have cross-references to the, the clock

05:17 19 frequency of the high-speed clock.  It's referring to a single

05:17 20 clock frequency in the claim.

05:17 21      We're not trying to rewrite it.  We're trying to read this

05:17 22 precisely as it's written word for word.

05:17 23      And if you look at that type of architecture, Yonah had it

05:17 24 first.  They had a single clock.

05:17 25      The Lake series processors have nothing like that.

05:17 1   Multiple clocks independent for different components, and

05:17 2   that's the second reason why there's no infringement.  As

05:17 3   Dr. Rotem confirmed, different clocks, different speeds.

05:17 4       And you saw Dr. Grunwald show you exactly what that meant.

05:17 5   '759, you move the speeds in lockstep.  In the Intel

05:17 6   architecture developed by Dr. Rotem, Mr. Borkowski and their

05:17 7   colleagues, there's independent clock control of the different

05:17 8   components.

05:17 9       That's the second reason why the '759 claims are not

05:18 10  infringed.

05:18 11      Put them all together and, again, you have many reasons

05:18 12  why these claims are not infringed.  We only need one, but

05:18 13  there's many.  It's just a very fundamentally different

05:18 14  architecture.  It's much more advanced than the nearly decade

05:18 15  old '759 patent.

05:18 16      So to sum up, the '759 patent requires requests.  The Lake

05:18 17  series processors of the 2015 and onward time period don't have

05:18 18  them.  The '759 patent requires providing the clock frequency

05:18 19  of the high-speed clock, the clock frequency.  The Intel

05:18 20  products don't do that.  They use multiple independent clocks.

05:18 21      So, again, it's a tale of two time periods.  In the early

05:18 22  2000s, Yonah came first.  Yonah had all of these ideas before

05:18 23  the '759 patent was even filed.  And you can't file a patent on

05:18 24  ideas that somebody else already came up with.

05:18 25      And if you fast forward 11 years, the Lake series

05:18  1   processors use a far more advanced architecture that is

05:18  2   different in kind from anything like the '759 patent.

05:18  3        Now, the amount of money owed by Intel is zero.  There's

05:19  4   no infringement of these patents, and the '759 patent is

05:19  5   invalid.  But we've examined the damages case here for a couple

05:19  6   of reasons, most importantly to show you the character of this

05:19  7   case and what it's really about.  And Mr. Lee's going to come

05:19  8   back to that in a bit.

05:19  9        But you also heard from Mr. Huston this morning about what

05:19  10  a real hypothetical negotiation would look like based on his

05:19  11  experience over 20 years licensing hundreds of agreements at

05:19  12  IBM.  And he showed you what you would look at for real-world

05:19  13  data points.

05:19  14       And, Your Honor, I just ask that the public monitors be

05:19  15  turned off for just a minute.

05:19  16       He showed you comparable agreements, which His Honor's

05:19  17  jury instructions have instructed you are significant for this

05:19  18  type of analysis, and it makes just good sense.

05:19  19       If you were buying a house, you'd look for comparable

05:19  20  house prices.  If you were buying a car, you'd look for

05:19  21  comparable car prices.  It just makes good economic sense to

05:19  22  look at what other prices have been for similar technology.

05:19  23  Mr. Huston took you through many different forms of such

05:20  24  comparable agreements.

05:20  25       Now, he couldn't show you an agreement in which VLSI had

05:20  1    licensed these patents to somebody else because they haven't

05:20  2    done it.  No one's paid a penny for these patents or taken a

05:20  3    license from VLSI for them.

05:20  4        So instead he took you through data after data after data,

05:20  5    including sales agreements for the patents themselves.  He took

05:20  6    you through comparable agreements between Intel and these

05:20  7    companies that own them.  He took you through offers made from

05:20  8    those companies to Intel.  He took you through 18 different

05:20  9    comparable agreements that Intel had executed with a variety of

05:20 10    parties, and he showed you what all of this data suggested.

05:20 11        And, Your Honor, we can go back on the public record.

05:20 12        THE COURT:  Thank you, sir.

05:20 13        MR. MUELLER:  Based on all of this, he suggested that in a

05:20 14    hypothetical negotiation, the appropriate amount of money for

05:20 15    these patents would be $2.2 million total lump sum,

05:20 16    one-time-only payment, based on reams of comparable agreements.

05:20 17        Mr. Chandler, who took the stand this morning, was called

05:21 18    to rebut him.  He looked at hundreds of agreements and couldn't

05:21 19    find one, not one, that he considered comparable.  And there's

05:21 20    a good reason for that.  What they're seeking in this case is

05:21 21    literally billions of dollars for two patents.  He couldn't

05:21 22    find one agreement that would be comparable to that demand.  It

05:21 23    just doesn't exist.

05:21 24        No one has ever paid anything remotely like the type of

05:21 25    money that VLSI is seeking for these two patents in the real

05:21 1   world.  And as you heard from Mr. Huston, if he'd been at the

05:21 2   negotiating table when someone made that sort of demand, he

05:21 3   would have said no and walked away quickly.

05:21 4       It's an outrageous demand and really it tells you a lot

05:21 5   about the character of the case, as Mr. Lee's going to come

05:21 6   back to in just a bit.

05:21 7       To sum up, at the beginning of this case we told you we

05:21 8   would show you that Intel has never used the '373 patent, and

05:21 9   we have showed you exactly that.  The Broadwell and Haswell

05:21 10  processors have multiple different differences -- are different

05:22 11  in multiple ways is a better way to put it from the claims of

05:22 12  the '373 patent.  There's no infringement.

05:22 13      We also told you that we would show you that Intel came up

05:22 14  with the ideas in the '759 patent first before that patent was

05:22 15  filed.  We showed you that too.  Dr. Rotem explained to you how

05:22 16  the Yonah product worked and how it had all of the ideas of the

05:22 17  '759 patent before the '759 patent.  The Patent Office didn't

05:22 18  have Yonah.  If it had, the patent wouldn't have issued.

05:22 19      And finally Intel kept innovating.  11 years later, the

05:22 20  Lake series processors used a completely different

05:22 21  architecture.  Those are what's accused of infringement, but

05:22 22  there is no infringement.  Those are fundamentally different

05:22 23  products.

05:22 24      At the end of the evidence, if you look at all of the

05:22 25  facts that you've seen, the truth and the whole truth, you can

05:22  1   see that these are not heros, these are not stars and these are

05:22  2   not infringed.

05:22  3        And that just leaves one question, why are we here?  And

05:23  4   I'm going to turn it over to Mr. Lee to answer that question.

05:23  5        MR. LEE:  Your Honor, ladies and gentlemen of the jury,

05:23  6   let me join Mr. Chu and Mr. Mueller in thanking you, thanking

05:23  7   the courtroom staff, all the judge's -- the people who work in

05:23  8   the judge's chambers for spending your last week with us.  We

05:23  9   greatly appreciate it.  You are doing an important public

05:23  10  service.

05:23  11        But let me go to the question that Mr. Mueller asked.  If

05:23  12  everything that you now heard is true, why are we here?

05:23  13        Well, we would suggest to you that we know why Intel is

05:24  14  here.  As Mr. King told you, Intel is here to defend the work

05:24  15  of its engineers.  We know that the engineers took the stand.

05:24  16  They walked right by you.  They took the oath.  They underwent

05:24  17  cross-examination, and they did the best to describe to you all

05:24  18  of the blood, sweat and tears that went into designing Intel's

05:24  19  products, including the accused features.

05:24  20        Now, there's been a suggestion today that you should

05:24  21  discount that testimony because they work for Intel.  Well,

05:24  22  each of you work for folks too.  And if you were called to

05:24  23  court and you raised your hand and you swore an oath to tell

05:24  24  the truth, I'm sure that each of you would tell the truth.  You

05:24  25  wouldn't lie just because it was your employer.

05:24  1        Sit back and think about what you saw from Dr. Rotem,

05:24  2   Mr. Borkowski, Mr. Douglas.  Think about the cross-examination.

05:24  3   Ask yourself whether you can dismiss the testimony the way that

05:25  4   Mr. Chu asked you to.

05:25  5        The reason he's trying to dismiss it is because that

05:25  6   testimony unequivocally demonstrates that we don't infringe.

05:25  7   That's why we are here.

05:25  8        We're here for another reason.  Mr. Chu suggested that it

05:25  9   was an excuse that we didn't know about the patents, that we

05:25  10  didn't copy the products.  He forgot to tell you that they're

05:25  11  accusing us of willfully infringing these patents.  And you

05:25  12  heard His Honor's instructions on willful infringement and

05:25  13  what's required.  Well, you now know that the Intel engineers

05:25  14  who designed the products did it without knowledge of either

05:25  15  patent.

05:25  16       I told you in my opening statement that there would not be

05:25  17  a shred of evidence that the Intel folks who designed these

05:25  18  products had heard about these patents, had copied these

05:25  19  patents or did anything other than their own independent work.

05:25  20  That is relevant directly to this claim that we willfully

05:25  21  infringed, and we don't.

05:26  22       As His Honor has told you on several occasions, this case

05:26  23  is important.  It is important to Intel for sure.  It's

05:26  24  important to VLSI, but it's important to real people like

05:26  25  Mr. Borkowski, Dr. Rotem, Mr. Douglas, who actually did the

05:26    1    work to bring these products to market.  And they are here

05:26    2    because when their work is attacked, they defend it.  And

05:26    3    they're here because when there are unreasonable litigation

05:26    4    claims in a lawsuit in a federal court seeking unreasonable

05:26    5    damages, it's bad for innovation.  It's bad for the economy,

05:26    6    and it's bad for the patent system.

05:26    7       But you don't have to take my word for it.  Look at what

05:26    8    Dr. Sullivan said.  He said on cross-examination that when

05:26    9    damages are objectively unreasonable, it harms the economy and

05:27   10    it harms the patent system.

05:27   11       To be clear, as Mr. Mueller says, we believe the correct

05:27   12    number is zero.

05:27   13       But the amount that VLSI has asked you to write down this

05:27   14    afternoon is not objectively reasonable.  It does not promote

05:27   15    innovation as I just suggested to you.  Instead it would tax

05:27   16    the true inventors, the true innovators, the people who

05:27   17    designed the products that came to market and have changed the

05:27   18    lives, changed all of our lives, and the manner in which we

05:27   19    enjoy many aspects of technology.

05:27   20       Now, why is VLSI here?  That's a harder question to ask.

05:27   21    And this is where you have to bring your common sense and

05:27   22    collective wisdom to bear, to think about what you've seen in

05:27   23    the last week.

05:27   24       No one from VLSI walked by you, took the oath and got on

05:27   25    the stand.  Not the CEO, Mr. Stolarski, who was introduced to

05:28  1  you on the first day of jury selection and who hasn't been here

05:28  2  since.  Not Cindy Simpson, who is the chief technology officer,

05:28  3  who just lives up in Austin.  No one from VLSI came.

05:28  4      What you know about VLSI is what we elicited on

05:28  5  cross-examination.  They don't do any research and development.

05:28  6  They don't make any products.  They don't invest in research

05:28  7  and development.  They don't make any sales.  They don't

05:28  8  generate any revenues.  They have done only one thing in their

05:28  9  four and a half years in existence, just one thing.  They have

05:28  10  acquired patents and sued Intel without ever giving Intel

05:28  11  notice.

05:28  12      They never picked up the phone and said, we've got these

05:28  13  two stars.  We've had them on the shelf for ten years.  You're

05:28  14  using them.  Come to the table and negotiate with us.

05:28  15      No.  They acquired them, and three months later they sued.

05:29  16      Now, VLSI has suggested to you that the only way to

05:29  17  evaluate the importance of their patents, the only way to

05:29  18  evaluate Intel's infringement is to have access to Intel's

05:29  19  confidential information.  Well, that's not true.  It's not

05:29  20  true for two reasons.

05:29  21      VLSI sued Intel and brought us to this federal court

05:29  22  without any access to our information.  They accused us of

05:29  23  infringing without ever having seen a shred of confidential

05:29  24  information.  And in the real world, people are negotiating

05:29  25  licenses every day without access to the other parties'

05:29  1   confidential information.  That is the way our economy works.

05:29  2       Now, again, let's look at the issue of credibility and

05:29  3   what was promised to you in opening.

05:29  4       VLSI said it teamed up with NXP, but consider what you

05:29  5   learned.  Mr. Spehar, the vice president of research and

05:30  6   development of NXP, met the CEO, met the CEO of VLSI that

05:30  7   morning in court.  The only other witness from NXP was

05:30  8   Mr. Bearden, one of the named inventors.  He had never even

05:30  9   heard of VLSI before this litigation.

05:30  10      Now, in his opening Mr. Chu showed you this cycle of

05:30  11  innovation, and he showed it to you again today.  I want to

05:30  12  walk through it very quickly once again.  Because again, it

05:30  13  goes to the arguments the parties have made to you and whether

05:30  14  those arguments can be credited and justify enormous -- the

05:30  15  enormous amount that VLSI is claiming.

05:30  16      What you actually know is NXP did not invent either the

05:30  17  '373 or the '759 patent.  They were actually patents acquired

05:30  18  from SigmaTel and Freescale.  You know that the Patent Office

05:30  19  didn't grant these patents to NXP or VLSI.  In fact, you now

05:30  20  know that VLSI has never applied for a patent.

05:31  21      Third, you know that VLSI has never licensed any patents.

05:31  22  Not the '373, not the '759, not any.

05:31  23      And fourth, you now know that not a single dollar has gone

05:31  24  from VLSI to NXP.

05:31  25      All you need to know about the cycle of innovation is it

05:31  1   hasn't happened.  Now, some of the witnesses have tried to

05:31  2   suggest to you that, well, if VLSI recovers, if it convinces

05:31  3   you to give them something, NXP will get a share.

05:31  4       Well, all we know about that is it's less than half, and

05:31  5   we know that others, Mr. Stolarski and some others who we don't

05:31  6   know, get the rest.

05:31  7       But the -- in the end, the question for you is not who

05:31  8   gets money because we say none should be awarded, but it is who

05:32  9   is the real innovator based upon what you've heard?  Who has

05:32  10  the real innovation cycle?  And the answer is it's Intel.

05:32  11      These are not made-up photos.  These are photos of what

05:32  12  Intel has actually done.  It starts with its scientists

05:32  13  innovating and inventing.  That results in thousands of

05:32  14  patents, as you've heard.  That results in manufacturing,

05:32  15  including manufacturing billions of products in the United

05:32  16  States that are then sold as real-world products, that generate

05:32  17  money.  It's invested in research and development, and the

05:32  18  cycle starts again.

05:32  19      That is a real innovation cycle.

05:32  20      Now, Intel does sell billions of microprocessors.  Those

05:32  21  billions of microprocessors come from this innovation cycle.

05:32  22  Intel is proud that it does.  But to be clear, those sales of

05:32  23  billions of dollars of processors also make Intel a target when

05:33  24  someone wants to take two patents off the shelf that haven't

05:33  25  been used for ten years and say, we'd like $2 billion.  If you

05:33  1   have been successful as a result of your own innovation cycle,

05:33  2   if you have been, you'll be a target, and that's what's

05:33  3   occurred here.

05:33  4       Now, let me provide you a couple of observations on the

05:33  5   evidence that Mr. Mueller has described to you.

05:33  6       As he said, we have tried to bring you the factual

05:33  7   witnesses, the people who actually did the work, who could

05:33  8   explain to you what they did, why they did it and what the

05:33  9   results were.  We wanted you to understand the facts.

05:33  10      What did VLSI do?  VLSI has concentrated its closing on

05:33  11  its experts.  VLSI invested more than a million dollars in

05:33  12  these experts.  Dr. Annavaram was paid hundreds of thousands of

05:34  13  dollars.  Dr. Conte, $180,000.  Dr. Sullivan, more than

05:34  14  $500,000.  Dr. Chandler, several hundred thousands of dollars.

05:34  15      Now, these are not independent experts who are coming to

05:34  16  give you a dispassionate opinion.  These are people who got

05:34  17  hired to do something and in some cases viewed themselves as

05:34  18  advocates.

05:34  19      But let's look at what the results were of this

05:34  20  investment.  This is where VLSI has invested its money.  Not in

05:34  21  research and development, not in anything else, but in this

05:34  22  litigation.

05:34  23      Only one person on the face of the earth has ever

05:34  24  suggested that Intel infringes these patents.  Only one.

05:34  25  Dr. Conte.  He disagrees with Dr. Sylvester.  He disagrees with

05:34  1    Dr. Grunwald.  He disagrees with Dr. Rotem, Mr. Borkowski and

05:34  2    Mr. Douglas.

05:35  3        Now, Mr. Mueller showed you these slides which summarizes

05:35  4    why Intel doesn't infringe.  For each of these key claim

05:35  5    limitations, Dr. Conte disagreed not just with the experts on

05:35  6    the other side, Dr. Sylvester and Dr. Grunwald, but with the

05:35  7    factual witnesses.  The people who -- and I ask you to go back

05:35  8    in your own memories and think about the time when they

05:35  9    testified, think about the cross-examination.

05:35  10       Dr. Conte disagreed with Mr. Douglas about whether there

05:35  11   was a minimum operating voltage for C6 SRAM.  Dr. Conte

05:35  12   disagreed with Mr. Douglas about RING_RETENTION_VOLTAGE and

05:35  13   whether it was a minimum.

05:35  14       Dr. Conte disagreed with Mr. Douglas on whether the VCCR

05:35  15   provides a regulated voltage during the ramp.  And Dr. Conte

05:35  16   disagreed with Dr. Rotem, who actually came up with the

05:36  17   revolutionary idea of Speed Shift, on the question of whether

05:36  18   there were requests.

05:36  19       The one person, the only person who's ever said Intel

05:36  20   infringes, Dr. Conte disagrees with every factual witness who

05:36  21   came, two experts, and with the documents.

05:36  22       And as he admitted on cross-examination, a court of

05:36  23   appeals has said that Dr. Conte, in a prior case, jumped to

05:36  24   conclusions that no reasonable jury could credit.  That's what

05:36  25   happened here.  He jumped to conclusions that are inconsistent

05:36  1   with the facts as you've heard them.

05:36  2        Now, these disagreements matter.  They matter because they

05:36  3   have the burden of proving infringement.  They have the burden

05:36  4   of showing entitlement to this enormous amount of money, and

05:36  5   they have the burden of showing you that each and every

05:37  6   limitation is present.  And even if one is missing, there's no

05:37  7   infringement.

05:37  8        But the best example that there was an investment in

05:37  9   litigation, not research and development, is Dr. Sullivan.

05:37  10       I'm going to spend a few minutes now, just a few, on

05:37  11  Dr. Sullivan's model because this is what they paid $500,000

05:37  12  for.

05:37  13       At the same time that Intel was investing in the next

05:37  14  generation of microprocessor, the next one with the smaller

05:37  15  line was, this is what they were investing in.

05:37  16       Now, Dr. Sullivan suggested to you that whether patent

05:37  17  owners ever made use of products themselves was not relevant.

05:37  18  But you now know, having heard His Honor's instructions today,

05:37  19  that's simply not correct.  What he told you was correct is

05:37  20  incorrect.

05:37  21       And when you go back and look at the Georgia-Pacific

05:38  22  factors, you remember when His Honor said, "This is the

05:38  23  instruction I don't like reading," that's the one.

05:38  24       If you read that instruction, you will see that what the

05:38  25  patent owner did, whether the patent owner had a product,

05:38  1   whether the patent owner licensed is all relevant to the value

05:38  2   of the patent.  And that just makes common sense, as Dr. Conte

05:38  3   conceded on cross-examination.

05:38  4       But Dr. Sullivan did.  And the reason he made this

05:38  5   argument to you is two things.  He ignored the rules of the

05:38  6   road.  He ignored what His Honor has now told you should govern

05:38  7   the question of damages.  But he did it for a very simple

05:38  8   reason.  It is the only way he could -- it's the only way he

05:38  9   could dismiss all of the real-world evidence.  It's the only

05:38  10  way he could dismiss license agreements, purchase transactions,

05:38  11  other events.  And instead he came up with this complicated

05:39  12  damages model.

05:39  13      And if I could put on the screen the complicated damages

05:39  14  model, I think, Your Honor, if we could just blank the public

05:39  15  screen.

05:39  16      THE COURT:  Yes, sir.

05:39  17      MR. LEE:  This is his six-part model.  This is how he gets

05:39  18  to his big number.  And all you need to know is that if any one

05:39  19  of these is wrong, the number is wrong.

05:39  20      And the second thing that you need to know is that there

05:39  21  were problems at every turn, and every single problem resulted

05:39  22  in inflating the number.

05:39  23      So what do I mean by that?  Well, first, Dr. Conte relied

05:39  24  on -- Dr. Sullivan relied upon Dr. Conte who relied upon

05:39  25  Dr. Sullivan -- on Dr. Annavaram.  But as you know, if I start

05:39  1    at the upper left-hand corner, Dr. Annavaram had some

05:40  2    limitations, I guess is the best way to put it, on his testing.

05:40  3         He tested some products that were not even accused of

05:40  4    infringement.  He measured the wrong features within those

05:40  5    products.  And these mistakes all led him to overstating and

05:40  6    inflating his number.  But that wasn't the only problem.

05:40  7         We can blank the screen, Mr. Lee.

05:40  8         That wasn't the only problem.  He relied upon Dr. Conte

05:40  9    for this one-to-one relationship.  Do you remember the

05:40  10   one-to-one relationship?  Except that the people who are

05:40  11   actually out there doing the work, Mr. Douglas, Dr. Rotem, they

05:40  12   said that one-to-one relationship isn't a relationship.  It's

05:40  13   much more complicated than that, and it depends upon what

05:40  14   you're doing.  It depends upon what your use is.

05:40  15        And then Dr. Sullivan put everything into his regression.

05:41  16   But as we heard from Mr. Huston and even Dr. Sullivan himself,

05:41  17   this hedonic regression which I mentioned to you in opening has

05:41  18   never been used in the real world to value a patent.

05:41  19        And if, Mr. Lee, if I could have DDX-20.103 on the screen.

05:41  20        Here are the people who have used hedonic regression to

05:41  21   value a patent, and here are the people who haven't.  And yes.

05:41  22   Did we ask every single person who did?  Of course, because

05:41  23   without the hedonic regression, there is no damages claim.

05:41  24        At each one of these places, Dr. Annavaram's limited

05:41  25   testing, Dr. Conte's assumption about ratios, the use of

—1610—

05:41   1   hedonic regression that hasn't been used in any other context,

05:41   2   in every step decisions were made that resulted in inflating

05:42   3   the number.

05:42   4        And that, at the end of the day, is what resulted in a

05:42   5   damages claim for a hypothetical license that has no tie to

05:42   6   anything else that has ever occurred in the real world.  It

05:42   7   results in a number that -- if I could have 106, Mr. Lee --

05:42   8   Dr. Sullivan himself describes as astronomical.

05:42   9        Now, I think VLSI is suggesting that, well, you didn't do

05:42   10  your own testing.  That argument really misses the mark for

05:42   11  three reasons.

05:42   12       First, the models were wrong.  The assumptions were wrong.

05:42   13  The data was wrong.  There was no reason for us to take the

05:42   14  wrong models, the wrong data, the wrong assumptions and try to

05:42   15  run them again to get to the wrong result.  It would make no

05:42   16  sense to do that.

05:42   17       Second, and this is critically important, the testing was

05:43   18  a testing of what Intel's products do, not what the patents do.

05:43   19  Have you seen a single test from Freescale -- from SigmaTel,

05:43   20  Freescale or NXP that shows the benefits of the patents?  No.

05:43   21  All you've seen is testing that shows the benefits, according

05:43   22  to them, of what Intel's products do.

05:43   23       And, third, that is the reason why there is no

05:43   24  relationship between what happened in the real world and this

05:43   25  number that Dr. Sullivan has given to you.  It's the reason

05:43 1    that Mr. Chandler, the last witness who got on the stand and

05:43 2    who has years licensing, was not asked to give you a reasonable

05:43 3    royalty opinion because he couldn't give you one that would be

05:43 4    even in the same universe as what Dr. Sullivan came up with.

05:44 5        Now, as I mentioned in my opening, I've been trying cases

05:44 6    for 45 years.  I've learned that in a trial like this, if the

05:44 7    facts support you, you show up.  You have witnesses get on the

05:44 8    stand.  They take the oath.  You defend yourself, and you stay

05:44 9    till the very end.

05:44 10       I've also learned that if you make a serious accusation

05:44 11   and you're asking for lots of money, you stand up and you prove

05:44 12   it.

05:44 13       No one from VLSI has come here.  Not a single person.

05:44 14   They're asking you for billions of dollars and no one even

05:44 15   bothered to come.  No one took the oath.  No one underwent

05:44 16   cross-examination.  No one let us ask them, what do you do?

05:44 17   How do you do it?  What do you invest in?  Where's the money

05:44 18   going?  Where's it coming from?

05:44 19       But you know who did get on the stand?  You know who did

05:44 20   show up?  The Intel engineers.  The Intel engineers came here,

05:45 21   got on the stand, testified in cross-examination.  They weren't

05:45 22   afraid.  They didn't run from the task.  They didn't lie.  Just

05:45 23   as every single one of you would, they stood up for their work.

05:45 24       And I'd like to ask them, to remind you, to stand up just

05:45 25   once more so you can be reminded that they stayed here till the

05:45  1   end with you.  In a courtroom where VLSI hasn't been here since

05:45  2   jury selection, hasn't got on the stand, these folks stayed

05:45  3   till the end.

05:45  4       And they stayed here till the end because they told you

05:45  5   the truth.  Because the attack on their credibility is a

05:45  6   fabrication, and because they are the people who have designed

05:45  7   and built and brought to market the products that you are using

05:45  8   every day.

05:45  9       When you go back to the jury room, we ask you to find just

05:46  10  what Mr. Mueller said.  I said at the outset, it seems like a

05:46  11  long time ago, I know you feel like you've been drinking

05:46  12  technology from a firehose, but I said the case was actually

05:46  13  straightforward.  We've never used the '373 patent.

05:46  14      For the '759 patent, we actually did it first.  There is

05:46  15  no dispute about that.  As you heard today, everybody concedes

05:46  16  we did it first.  Ten years later, we did something different

05:46  17  Speed Shift, and it doesn't infringe.

05:46  18      Ladies and gentlemen, this is our last chance to address

05:46  19  you.  Mr. Chu gets one last chance, and we don't get a chance

05:46  20  to come back.  It's got to stop at someplace.

05:46  21      I ask you just this favor.  When you go back to the jury

05:46  22  room, if there's something Mr. Chu says that I can't respond to

05:46  23  now, but you know, having been with us for a week, how we would

05:46  24  respond, when that comes up, I would just ask you to raise your

05:47  25  hand and say, yeah, VLSI said this, but I think Intel would

05:47 1   have responded this way.  That is the fair way to resolve

05:47 2   things.  Intel did not bring this --

05:47 3        THE COURT:  Mr. Lee.  You guys, you can sit down.

05:47 4        MR. LEE:  Sorry.  They're here, they're standing.

05:47 5        Ladies and gentlemen, Intel did not bring this lawsuit.

05:47 6   We're here because we had to be.  We're here because we make

05:47 7   billions of sales of microprocessors.  We're here because it

05:47 8   makes us a target.  And we're here to defend ourselves.

05:47 9        I ask you just this:  Return Intel to the marketplace

05:47 10  where it can compete on innovation, invention and products

05:47 11  rather than in the courtroom.  Let Intel do what it did for the

05:48 12  ten years when these two patents were sitting on the shelf not

05:48 13  being used by anyone, making inventions, pursuing a real cycle

05:48 14  of innovation.

05:48 15       If you think about this case in that context, if you bring

05:48 16  your collective wisdom and common judgment to bear, if you

05:48 17  think about the real credibility of witnesses, not little

05:48 18  snippets of testimony that lawyers get after 45 minutes of

05:48 19  forcing witnesses into yes or no answers, you'll know the

05:48 20  correct answer.  Thank you very much.

05:48 21            CLOSING ARGUMENT ON BEHALF OF THE DEFENDANT

05:48 22       MR. CHU:  I want to talk about witnesses first and other

05:49 23  evidence.  And then I want to talk about the regression

05:49 24  analysis.

05:49 25       Contrary to what Intel's counsel said, there were

05:50  1  witnesses from Intel who agreed 100 percent with Professor

05:50  2  Conte on some key issues.  I showed some of that earlier this

05:50  3  afternoon.  Some of those fact witnesses from Intel disagreed

05:50  4  100 percent from some of the Intel expert witnesses on key

05:50  5  facts on the prior art as well as on key facts about

05:50  6  infringement.

05:50  7       In addition, there were key Intel documents that showed

05:50  8  how the products operated.  And despite the fact that some of

05:50  9  the Intel expert witnesses tried to disagree with those

05:50  10  documents, they couldn't and when confronted on

05:50  11  cross-examination had to agree that the documents were

05:51  12  accurate.

05:51  13       One other thing about electronic products like this, you

05:51  14  have heard the phrase "source code" or "P-code."  These are the

05:51  15  detailed computer instructions that tell the products how to

05:51  16  operate.

05:51  17       Dr. Conte testified extensively, he would say, here's how

05:51  18  they operate.  And frequently not any Intel employ or an expert

05:51  19  witness on the other side said, I read that source code and it

05:51  20  operated differently.  Because he can't do that.

05:51  21       The source code prescribes exactly how the products are

05:51  22  operating.  You will remember how extensively Professor Conte

05:51  23  would discuss the source code.  So there were Intel fact

05:52  24  witnesses who agreed and -- with Dr. Conte, and disagreed with

05:52  25  Intel expert witnesses, and there were key documents including

05:52   1   the source code that supported Dr. Conte.

05:52   2       Next on the regression analysis.  There's no dispute that

05:52   3   it's a well-used technique.  There's no dispute that some Nobel

05:52   4   prizes have been awarded in connection with using regression

05:52   5   analysis.  There's no dispute that major corporations and

05:52   6   government agencies use it for many different purposes.

05:52   7       It cannot be used in normal license negotiations because

05:52   8   you need information from both sides, and normally people don't

05:52   9   exchange that information.  And you heard testimony about that

05:53  10   from Dr. Sullivan.  There was no dispute about it.

05:53  11       But he also said that there are situations in license

05:53  12   negotiations where both sides do have the information and,

05:53  13   therefore, they can use the regression analysis.  And for

05:53  14   dozens and dozens of clients, he has personally been involved

05:53  15   in using the regression analysis.

05:53  16       One other part about the expert witnesses.  Both sides had

05:53  17   expert witnesses.  Both sides, you heard testimony that they

05:53  18   were paid a certain amount and the hourly rates.  And if the

05:53  19   point of opposing counsel was it's an expensive process, I

05:53  20   guess they were trying to say it's just an expensive process

05:53  21   one way.  Both sides had numbers of expert witnesses, and there

05:53  22   isn't much choice but to go through that particular process.

05:54  23       Now, there were comments made about Mr. Stolarski.  He was

05:54  24   required --

05:54  25       MR. LEE:  Your Honor, I object to this.

05:54   1        MR. CHU:  There was testimony that he was required to --

05:54   2        MR. LEE:  Your Honor, I object to this.  I raised this to

05:54   3   Your Honor specifically.

05:54   4        MR. CHU:  I don't know what the objection was.

05:54   5   Mr. Chandler --

05:54   6        THE COURT:  Mr. Lee, I don't remember you raising this.

05:54   7        MR. LEE:  I raised it at the conference -- (inaudible.)

05:54   8        THE REPORTER:  I can barely hear you.

05:54   9        MR. LEE:  I'm sorry.

05:54  10        THE COURT:  I don't recall.  I do not recall us raising

05:54  11   this.

05:54  12        MR. LEE:  I raised specifically the question of whether

05:54  13   there could be something said about where he was and what he's

05:54  14   been doing, where we had no idea what it was.  And that's

05:54  15   exactly what's on the slide now.

05:54  16        THE COURT:  Let take the slide down, Mr. Chu.

05:55  17        MR. CHU:  I'm going to go forward, but I'm going to stay

05:55  18   on some of the other aspects about Mr. Stolarski.

05:55  19        THE COURT:  You're welcome to.

05:55  20        MR. CHU:  Yes.  Counsel for Intel made it out as if he

05:55  21   wasn't willing to testify under oath.  They took his deposition

05:55  22   for two full days under oath.  They were able to, if they

05:55  23   wanted to, play any or all of that deposition testimony, and

05:55  24   it's considered as much weight as if he was testifying in a

05:55  25   court of law.

05:55  1      And we also know that even though he is at home, he is

05:55  2  watching this proceeding, as many, many other people are.

05:55  3      You heard some comments about Professor Conte, and it was

05:56  4  also brought out during the course of this trial that he had

05:56  5  testified for USAA, which is based in San Antonio in two cases

05:56  6  against Wells Fargo for patent infringement.

05:56  7      They're cases that were tried here in Texas, actually not

05:56  8  too far from this particular courthouse.  And all of the USAA

05:56  9  patents were found valid and infringed, and there was a jury

05:56  10  verdict in the hundreds of millions of dollars.

05:56  11      Let's look at some of the evidence on '759.  Intel has the

05:56  12  burden of proving patent invalidity by clear and convincing

05:56  13  evidence.

05:56  14      The preponderance is where the scales of justice are very

05:56  15  closely, evenly balanced.  If it tilts slightly in favor of the

05:56  16  party with the burden by the preponderance, then you can

05:56  17  rightfully find for that person.  That is the burden of proof

05:57  18  on VLSI to prove infringement.

05:57  19      A peppercorn more of weight is sufficient.  That's very

05:57  20  different from a criminal case.

05:57  21      To prove invalidity, it must be by clear and convincing

05:57  22  evidence, so clear, direct, weighty and convincing as to enable

05:57  23  you to come to a clear conviction without hesitancy that the

05:57  24  patent is invalid.

05:57  25      Also as a part of the law there is a presumption of

```
05:57   1   validity.  A patent is presumed valid and one of the flaws of
05:57   2   one of the experts presented by Intel is the following.
05:57   3   Dr. Grunwald was asked today, "You did not presume validity or
05:57   4   invalidity of the '759 patent when you were working on your
05:57   5   expert report," and he said, "I don't think I can answer that,"
05:57   6   which was a common place that he hid when he didn't want to
05:58   7   answer a question.
05:58   8       The Patent Office knew about Yonah's SpeedStep technology.
05:58   9   The evidence was SpeedStep was before in this Pentium III and
05:58  10   the evidence is that SpeedStep, the technology controlling the
05:58  11   speed of the cores, was the same throughout the different
05:58  12   product lines that use SpeedStep and it worked the same way in
05:58  13   a one-core product, two-core product or four-core product.  So
05:58  14   the Patent Office did, in fact, have that SpeedStep technology
05:58  15   before it.
05:58  16       The Patent Office, therefore, knew about the Yonah
05:58  17   SpeedStep because it was the same that was in the Pentium and
05:58  18   other products.
05:58  19       Now, here's an example.  It's not as if every fact and
05:59  20   expert witness in this case were opposed to Professor Conte.
05:59  21   Dr. Grunwald said the Yonah processor -- was asked, the Yonah
05:59  22   processor did not have a hardware controller on it.  Would you
05:59  23   agree with that?  Yes or no.
05:59  24       He said no, very clearly.
05:59  25       And then we asked him questions about Dr. Rotem's
```

05:59 1    testimony.  "The Yonah processor did not have a controller?"

05:59 2         Answer:  "It did not have a hardware controller."

05:59 3         It goes to the credibility of the Intel defense when their

05:59 4    hired expert disagrees with an Intel fact witness on a key

05:59 5    point.

05:59 6         Question:  "You would agree that Dr. Rotem when he was

05:59 7    answering these questions knew more about Yonah than you?  He

05:59 8    designed it?

05:59 9         "Yes.

05:59 10        "Just to clarify, these were statements by Dr. Rotem about

06:00 11   Yonah and you disagree with both of those statements by

06:00 12   Dr. Rotem?"

06:00 13        Dr. Grunwald said, "Yes."

06:00 14        It's a question of credibility and you can judge it in

06:00 15   black and white here.

06:00 16        What has a programmable controller?  The evidence clearly

06:00 17   showed, it's described in the '759 patent.  It's in the Lake

06:00 18   products and it was not in Yonah, which is why it cannot

06:00 19   possibly invalidate the '759 patent.

06:00 20        Intel tried to make it out as if the '759 patent was old

06:00 21   and tried to make it out as if it's as old as the old Netflix

06:00 22   mail-you-a-movie-at-your-request.

06:00 23        But when confronted with the evidence, Dr. Grunwald had to

06:00 24   admit that it wasn't old, given the fact that Mr. Henson's

06:01 25   invention would permit speed changes a million times a second.

06:01 1    And he wrote that not only in the specification of the patent

06:01 2    but in the claims of the patent itself.  Claim 4 in particular.

06:01 3        The experts actually agreed on some facts, such as the

06:01 4    '759 patent is not limited to MP3 players.

06:01 5        Here's some more evidence on the '373 patent.  At first

06:01 6    Dr. Sylvester was asked, "Did you find anything in the Intel

06:01 7    documents that referred to minimum retention voltage for the C6

06:01 8    SRAM?"

06:01 9        "No."

06:01 10       And then we showed him this document for both Broadwell as

06:01 11   well as Haswell that had the Vmin.  Again, these are Intel

06:01 12   documents, not created for the purpose of litigation.

06:01 13       Voltage is used during ramp-ups and ramp-downs.

06:02 14       Dr. Sylvester testified as follows:

06:02 15       Question.  "And is the VCCR supplying a reliable voltage

06:02 16   during that ramp-down period?

06:02 17       Answer:  "No."

06:02 18       But Mr. Douglas, the Intel employee was asked, Question:

06:02 19   "Intel's ramp controller circuitry makes sure that the voltage

06:02 20   is ramped up and down at rates especially chosen by Intel,

06:02 21   correct?"

06:02 22       And he said, "Yes.  At rates chosen by Intel."

06:02 23       Again, a direct contradiction between Dr. Sylvester and

06:02 24   Mr. Douglas.  It's a question of credibility.

06:02 25       And there is the question about damages.

06:02  1      You've heard the instruction in the evidence about the

06:03  2  hypothetical negotiation.  In the real world, no one has

06:03  3  decided that the patents are valid and infringed, but that's

06:03  4  what the assumption is in the hypothetical negotiation.

06:03  5      You heard evidence about other patents from Mr. Huston,

06:03  6  but he had to admit he had zero evidence that any of those

06:03  7  patents were used by Intel in any Intel product.

06:03  8      Well, of course the amounts paid for those licenses are

06:03  9  very low because Intel wasn't getting any advantage or use of

06:03  10 those patents.

06:03  11     There was other evidence about sales and mergers of the

06:03  12 various companies that had owned the '373 and '759 patent.  But

06:03  13 they have no relationship to Intel and Intel's use, which is

06:04  14 the touchstone for damages.

06:04  15     This is a chart that Mr. Huston on the left had shown all

06:04  16 of these small, small licenses, but here on the right side are

06:04  17 other Intel licenses.

06:04  18     Here's Mr. Huston agreeing that he didn't assess whether

06:04  19 those license agreements for the small amounts involved

06:04  20 situations where Intel actually practiced any of those

06:04  21 inventions.

06:04  22     You did hear from Adam King, the first Intel employee, who

06:04  23 said there are thousands of different features.  And he said,

06:04  24 "I want to tell you about one, it's called hyperthreading,"

06:04  25 suggesting that this was technology that was created by Intel.

06:04  1       The fact is that Intel paid MicroUnity $300 million to

06:05  2  resolve a patent litigation of MicroUnity's hyperthreading

06:05  3  innovations.

06:05  4       Intel also paid $1.5 billion to Nvidia for a license to

06:05  5  their patents, and it was a cross-license between the two

06:05  6  companies.  So Nvidia received a license to a very large number

06:05  7  of the Intel patents and Intel, the much larger dominant

06:05  8  company, had to --

06:05  9       MR. LEE:  Your Honor, the last two slides are all material

06:05  10 that's under seal, has been under seal the entire trial.

06:05  11       MR. CHU:  No.  That's not so.  The MicroUnity situation

06:05  12 was published in the New York Times.

06:05  13       MR. LEE:  I'm talking about the amounts that he's put up

06:05  14 of these noncomparable licenses.

06:05  15       THE COURT:  Let's take the slides down.  But you're

06:06  16 welcome and not -- the jury's heard whatever the numbers are.

06:06  17       MR. CHU:  Okay.

06:06  18       Mr. Huston had worked for IBM.  And he testified that they

06:06  19 had this policy.  Someone wants a license for one patent, it's

06:06  20 1 percent.  Two patents, it's 2 percent up to 5 percent.

06:06  21       He was asked, "You understand that IBM's 1 percent running

06:06  22 royalty would result in more damages than Dr. Sullivan is

06:06  23 proposing, right?"

06:06  24       And he answered "Yes."

06:06  25       There are two patents in this case.  He was asked, what if

06:06  1    it was just the 1 percent for one patent, and that gives you

06:06  2    some idea about the reasonable royalty in this case.

06:07  3        It was a clear admission by him earlier today.

06:07  4        Real-world facts.  Intel has made this very large number

06:07  5    of dollars from infringing the '759 and '373 patents.  And this

06:07  6    is Intel projecting that same technology that is infringing to

06:07  7    the world at large, trumpeting its importance.

06:07  8        And here, too, is further Intel statements to the public

06:07  9    about the revolutionary approach that uses the VLSI patented

06:07 10    technology.  And here's more Intel trumpeting this as a key

06:07 11    feature for the nearly billion in infringing products sold.

06:07 12        You heard testimony from Mr. Spehar about Innography.

06:07 13    They are an independent company.  And they rate the quality of

06:08 14    patents.  Many companies subscribe to this and use it and rely

06:08 15    upon it, and the two patents in this case score in the top ten

06:08 16    percentile of patents.

06:08 17        Now, Mr. Spehar was asked about if there were moneys

06:08 18    generated from this lawsuit, where do the moneys go?

06:08 19        It was brought out on cross-examination.  These were not

06:08 20    questions that we asked, but it was Intel's counsel.

06:08 21        Question:  "O you know if anyone else other than NXP

06:08 22    stands to benefit?

06:08 23        Answer:  "Here is like teachers' unions.  It's like

06:08 24    pension funds.  Texas A&M has a vested stake too."

06:08 25        I'm going to look at the verdict form and you'll have it

06:09  1    of course in the jury room.

06:09  2         The first question asks about literal infringement of the

06:09  3    '373 patent.  The decision is yours and yours alone.  We hope

06:09  4    you do find that there's infringement of each of the claims.

06:09  5         Question 2 asks about literal infringement of the '759

06:09  6    patent.  And, again, we hope, but it's your decision, that you

06:09  7    do find infringement.

06:09  8         Question 3 asks only if you answered no to the earlier

06:09  9    question, you should fill out Question 3 and Doctrine of

06:09  10   Equivalents.  If you've answered there's infringement, then you

06:09  11   should skip this Question 3 as the instructions state.

06:09  12        Question 4 asks about willful infringement.  And you heard

06:10  13   testimony along the following lines from an Intel engineer that

06:10  14   they're discouraged from looking at patents.

06:10  15        And the reason why they're discouraged is they want to be

06:10  16   able to say everything is done independently, but they do read

06:10  17   articles and publications that may mirror the same technology

06:10  18   that is described in patents which are publicly available and

06:10  19   that any engineer or any other person with a few key strokes in

06:10  20   30 seconds of time can find the relevant patents.

06:10  21        And His Honor provided an instruction that there can be

06:10  22   willful infringement by willful blindness.  So if, for example,

06:10  23   engineers are told, oh, don't go looking at patents so you can

06:11  24   say that's what you've been told.  You're like an ostrich

06:11  25   putting your head in the ground, and willful blindness is

06:11   1   sufficient for a finding of willful infringement.

06:11   2          Question 5 has to do with the validity of the '759 patent.

06:11   3   We hope you agree and the evidence supports that the '759

06:11   4   patent is valid and, therefore, this question should be

06:11   5   answered no, in favor of VLSI.

06:11   6          Question 6 asks for damages in connection with the '373

06:11   7   patent.  I think you've seen the number during the course of

06:11   8   trial and earlier this afternoon in closing argument.  That's

06:11   9   the very specific number you were given earlier.

06:11   10         Question 7 asks about damages for the '759 patent, and,

06:11   11  again, this is a number that you've seen earlier.  Now, there's

06:12   12  a question about whether your amount of damages is based on a

06:12   13  running royalty for past sales, and here's a very important

06:12   14  fact that you should know about that not much time was spent

06:12   15  on.

06:12   16         The damages period for this trial ended more than a year

06:12   17  ago.  So Intel stopped giving VLSI and its lawyers --

06:12   18         MR. LEE:  Your Honor, I object.  We didn't stop giving

06:12   19  anything.

06:12   20         THE COURT:  Mr. Chu.

06:12   21         MR. CHU:  I'm talking about the damages period.

06:12   22         THE COURT:  Let's wrap up.

06:12   23         MR. CHU:  Sure.  Sure.

06:12   24         Here's Question 8.  Is the total amount of damages you

06:12   25  found in Questions 6 and 7 a running royalty in the form of a

06:12  1  lump sum for past damages only or a lump sum for all damages?

06:12  2      You did hear testimony that the financial information for

06:13  3  damages was cut off as of December 31, 2019 and, therefore, we

06:13  4  suggest that the proper answer is No. 1, a running royalty in

06:13  5  the form of a lump sum for past damages only as per that date

06:13  6  that I mentioned as opposed to the second choice.

06:13  7      Now, I want to share a few closing thoughts with you.

06:13  8      You've heard His Honor say that this trial is being

06:13  9  broadcast.  And many, many people who aren't in the courtroom

06:13  10 because of safety protections are watching every day.

06:13  11     The decision you make is important.  It is important for

06:13  12 the parties in this case, Intel and VLSI.  But it's important

06:14  13 for our innovation economy.

06:14  14     It's important for the encouragement of innovation and new

06:14  15 inventions.  You've heard how long it's taken us to get here,

06:14  16 and you've heard a lot of evidence about the work that needed

06:14  17 to be done.

06:14  18     When you go into the jury room, your verdict can send a

06:14  19 message that companies that use the technology of others

06:14  20 recognized by the United States Patent Office should entitle

06:14  21 those patent owners to a reasonable royalty, no more, no less.

06:14  22 Through that you will be sending a strong signal that you

06:15  23 support the innovation economy in creating the right incentives

06:15  24 and set a balance that keeps our economy strong.

06:15  25     You've been absolutely magnificent as jurors.  You've

06:15  1    listened to all witnesses and both sides.  And for that, I

06:15  2    thank you very much.

06:15  3         THE COURT:  Thank you, Mr. Chu.

06:15  4         Ladies and gentlemen, given the hour, I don't expect for

06:15  5    you all to begin deliberating tonight.

06:15  6         One of the things we have to do is get the exhibits to

06:15  7    you.  We're in an odd situation because of the pandemic where

06:15  8    we've done our best to get exhibits formatted so that they are

06:15  9    electronic.  But because we had trial today, there are a number

06:16  10   of exhibits that came in today that we're not going to be able

06:16  11   to get into electronic format for you all to have to begin with

06:16  12   tomorrow.

06:16  13        So you are going to have some of the exhibits, most of the

06:16  14   exhibits that have come in in the trial in electronic format.

06:16  15   Others will be in paper format, which is analog digital.  It's

06:16  16   like when I was a lawyer what we just had.

06:16  17        I want to make it clear to you that it doesn't -- in the

06:16  18   same way, live testimony is the same as testimony you might see

06:16  19   in a different format.  There's no difference in whether you

06:16  20   should believe or disbelieve anything that is in an exhibit

06:16  21   just because of the format.

06:16  22        The formatting, we just are saving a day by not taking the

06:16  23   paper and putting it into, you know, electronic format.  So

06:16  24   with that being said, I have again lied to you.  You cannot

06:17  25   discuss this case amongst yourselves, despite me twice having

06:17  1    said that I wouldn't say that again.

06:17  2         But this is very important.  Couple of things.  One, let

06:17  3    me echo what both counsel said, three counsel said, I

06:17  4    apologize, that you all have been magnificent throughout this

06:17  5    entire process.  There can be no doubt about that.

06:17  6         Second, you have one more evening, at least, where you

06:17  7    can't look or read or do anything, find out anything about the

06:17  8    case because you're about to begin to deliberate.

06:17  9         You can't talk about the case, even though it's over.  You

06:17  10   cannot yet begin to talk about the case with each other.  You

06:17  11   cannot begin to talk until you get together tomorrow at 9:00,

06:17  12   and at 9:00 you will -- the very first thing you have to do is

06:17  13   what?  Pick the foreperson.

06:18  14        And you pick the foreperson.  You'll give the note to

06:18  15   William or to I think whoever's sitting out monitoring you all,

06:18  16   making sure, sitting outside.  You'll give the note.  We'll

06:18  17   say -- I'll tell everyone who the foreperson is, and at that

06:18  18   point you can begin your deliberations.

06:18  19        And from there on, it's all up to you in terms of timing.

06:18  20   I very, very, very much appreciate it.

06:18  21        Let me say one more time also, because tomorrow you're

06:18  22   going to go straight to where you deliberate and I won't see

06:18  23   you.  This -- these lawyers and everyone were as fine as I've

06:18  24   ever seen since 1984 when I got out of law school.

06:18  25        This was truly the way trials should be conducted.  I

06:18  1   compliment all of the attorneys and all of their staff.  You've

06:18  2   seen their staff quietly walking around trying to make sure we

06:18  3   keep the trains running, but this is -- if every trial were

06:19  4   like this, I would probably have to work for free.

06:19  5        So it was -- they did a great job.  You all have done a

06:19  6   great job of paying attention.  I will dismiss you at this

06:19  7   point.  I look forward to having you back tomorrow morning at

06:19  8   9:00.  Go straight to the other courtroom where you'll be

06:19  9   deliberating and pick a foreperson and we'll go from there.  So

06:19  10  have a very good evening.

06:19  11       THE BAILIFF:  All rise.

06:19  12       (Jury exited the courtroom at 6:19.)

06:19  13       THE COURT:  Mr. Lee?

06:20  14       MR. LEE:  Your Honor, if I could, principally for the

06:20  15  record, first, I would ask you to have both parties lodge with

06:20  16  the Court the demonstratives they used during the closing

06:20  17  and --

06:20  18       THE COURT:  That will be granted.

06:20  19       MR. LEE:  I'm going to renew two objections, which I'm

06:20  20  sure Your Honor is going to overrule, but I think I need to do

06:20  21  it for the appellate record.

06:20  22       The first is the slides that they used with these

06:20  23  noncomparable licenses, the 1.5 billion, 300 million, they

06:20  24  didn't use those as informative.  They used those to justify

06:20  25  their royalty rate.  And that is exactly the opposite of what

06:20  1   you're entitled to do.  It's the argument we had with Your

06:20  2   Honor --

06:20  3        THE COURT:  Mr. Lee, what do you want me to do?

06:20  4        MR. LEE:  I don't think there's anything to do now, but I

06:20  5   think I have to just renew the objection.  And I don't think

06:20  6   there's anything for you to do now.

06:20  7        THE COURT:  Well, you can, but I'm not sure what the point

06:20  8   of you renewing an objection is now.  You objected during

06:20  9   closing, and I sustained what you said during the closing.  And

06:20 10   I'm -- unless you're inviting -- you're -- you can say whatever

06:20 11   you'd like, but unless you're asking me to go back and do

06:21 12   something with the jury --

06:21 13        MR. LEE:  No.  We're definitely not.  But, you know, I've

06:21 14   seen -- there have been enough occasions where someone has

06:21 15   said, well, you should have something, you waived it.

06:21 16        And the second just is that slide with Texas A&M, you

06:21 17   know, Your Honor, Texas A&M is an investor in a Fortress Fund.

06:21 18   That question wasn't asked directly on cross.  It was blurted

06:21 19   out.  And now it's --

06:21 20        THE COURT:  Well, I get that, but your person invited it.

06:21 21   And I think what happened there was -- this is my impression,

06:21 22   but I'll put on the record since you are.  My impression was

06:21 23   that whoever decided to ask that question got an answer from

06:21 24   someone who really didn't know what they were saying and

06:21 25   probably shouldn't have asked that question.

06:21 1      MR. LEE:  Your Honor, I actually agree with the first

06:21 2 part.  I don't know if I agree with the second.

06:21 3      THE COURT:  I'm saying -- let me say, I would not have

06:21 4 asked the question if I wasn't sure what the witness was going

06:21 5 to say.  And in that case I think that he was trying to get

06:21 6 something out of the witness, and he got an answer that was

06:22 7 unfavorable to Intel, was the way I took it.

06:22 8      MR. LEE:  Your Honor, just the second objection to renew

06:22 9 is allowing that argument to occur in closing when we weren't

06:22 10 allowed to explore Fortress, which owns the fund that Texas A&M

06:22 11 invests in.  That's the second objection.

06:22 12      THE COURT:  But I didn't allow that.  I mean, Mr. Chu said

06:22 13 it.  If you had objected, I would have -- in fact, I turned my

06:22 14 head to see.  I've got to learn to stop.  I have this habit of,

06:22 15 when I think something is objectionable, I instinctively turn

06:22 16 my head to see if someone's going to stand up.  And I actually

06:22 17 thought that there might be an objection at that point.  And

06:22 18 had there been one, I would have done something about it at

06:22 19 that time.

06:22 20      MR. LEE:  Well, I didn't object because, as Your Honor

06:22 21 told us earlier, if it was in the record, it's in the record.

06:22 22      THE COURT:  Well, but I understand.

06:22 23      MR. LEE:  I think I've done all that I have to do now.

06:22 24 And as Your Honor says, we're not asking you to do anything at

06:22 25 this moment.  We may at some point.

06:22  1       THE COURT:  I understand.  And -- but, Mr. Lee, and let me

06:22  2   put on the record, thank you.  And you are free to -- I know

06:23  3   you've got to skedaddle, so I know you won't be here tomorrow.

06:23  4       MR. LEE:  No.  Thank you, Your Honor.  Thank you for two

06:23  5   things.  One is thank you for getting me off to this other

06:23  6   hearing and accommodating that.  And thank you for all the

06:23  7   courtesies to everybody for the last week.

06:23  8       As I said to Suzanne and Kristie, everybody's been as

06:23  9   hospitable as they could be, and we may even come back in

06:23  10  April.

06:23  11      (Laughter.)

06:23  12      THE COURT:  I understand.

06:23  13      Yes, sir, Mr. Chu.

06:23  14      MR. CHU:  Two things.  In some jurisdictions, even when

06:23  15  lawyers have objected to jury instructions before they were

06:23  16  read, as was done here, in some jurisdictions the practice is

06:23  17  to object after the reading, so I just want the record to be

06:23  18  clear that we renew the objections that we had already put on

06:23  19  the record with respect to jury instructions.

06:23  20      And second, of course, we also thank not only Your Honor,

06:23  21  but all of your staff who are in the courtroom and everyone in

06:24  22  the courthouse, from the security people and others.  They've

06:24  23  been very accommodating to our entire staffs, on both sides, to

06:24  24  allow us to make things happen when the courthouse was closed

06:24  25  so we can move documents in here, get things wired up, and I've

06:24  1  got some magnificent restaurant recommendations for barbecue

06:24  2  and other things, particularly from some of the security

06:24  3  officers, and I look forward to trying those restaurants.

06:24  4      THE COURT:  Well, let me wrap up by saying this, and I've

06:24  5  said this a couple times:  I could not have hoped -- when I

06:24  6  came into this, I could not have told you all how well I

06:24  7  thought you all would do.  I thought this would be exceptional

06:24  8  at every level.  And yet you all exceeded what I had

06:25  9  anticipated happening.  Whether it was on opening or closing

06:25  10  or -- you noticed I did not stop you all from talking, even

06:25  11  though you both abused me by going too long.  That was -- I

06:25  12  just decided I wasn't going to say anything.  Don't think I

06:25  13  didn't know it.

06:25  14      But I just wanted you -- and -- but the lawyers were

06:25  15  exceptional in terms of their examinations, in terms of

06:25  16  presenting issues to me.  You all made it, I've told people,

06:25  17  very difficult but in a very good way because the issues you

06:25  18  presented often were tough issues.  But you did such a great

06:25  19  job on both sides arguing them, that's what made it tough.  Not

06:25  20  the normal toughness where sometimes lawyers don't really know

06:25  21  what they're doing and that's a different thing to deal with.

06:25  22      So I very much appreciate everything that has happened

06:25  23  over the past six days.  And I know we've got more time

06:26  24  together coming in a couple months.  I'm in many ways happier

06:26  25  about that probably than some of you all are.  But I look

06:26   1   forward to seeing you.

06:26   2      Again, Mr. Lee, Godspeed to you, wherever it is you're

06:26   3   headed.

06:26   4      MR. LEE:  Thank you, Your Honor.

06:26   5      THE COURT:  And, Mr. Chu, if you are staying here through

06:26   6   the -- for the jury verdict, I won't say adieu to you yet.  We

06:26   7   will be here tomorrow at 9:00 -- actually, I'm sorry.  I need

06:26   8   you all here at 8:30, right?  I need at least one or two of you

06:26   9   here at 8:30 to resolve exhibit issues so we can make sure that

06:26  10   by 9:00 the jurors have all the exhibits.

06:26  11      So I -- we'll take that up at 8:30 tomorrow.  Not everyone

06:26  12   has to be here, but someone needs to be here for each side.

06:26  13   We'll get the exhibit issues resolved.  The jury will have it

06:26  14   at 9:00.  I need again at least a couple of people here shortly

06:27  15   after 9:00 because I'll tell you all who the foreperson is.

06:27  16      And then what I really need from that time on is

06:27  17   someone -- a person from each side so that when -- if we get a

06:27  18   note we can quickly assemble and I can quickly tell you all --

06:27  19   I'll ask you what you'd like me to do, and then I can get a

06:27  20   response to the jury as quickly as possible.  So at least a

06:27  21   couple of people will need to be available to help me with the

06:27  22   notes.

06:27  23      Again, have a good evening.  It was a tremendous trial.

06:27  24   Everyone should be proud of what they did, and I will see you

06:27  25   tomorrow morning.

1635

06:27   1          THE BAILIFF:  All rise.

06:27   2          (Hearing adjourned at 6:27 p.m.)

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

*KRISTIE M. DAVIS, OFFICIAL COURT REPORTER*
*U.S. DISTRICT COURT, WESTERN DISTRICT OF TEXAS (WACO)*

1    UNITED STATES DISTRICT COURT  )

2    WESTERN DISTRICT OF TEXAS     )

3

4        I, Kristie M. Davis, Official Court Reporter for the

5    United States District Court, Western District of Texas, do

6    certify that the foregoing is a correct transcript from the

7    record of proceedings in the above-entitled matter.

8        I certify that the transcript fees and format comply with

9    those prescribed by the Court and Judicial Conference of the

10   United States.

11       Certified to by me this 8th day of March 2021.

12

13                              /s/ Kristie M. Davis
                                KRISTIE M. DAVIS
                                Official Court Reporter
14                              800 Franklin Avenue
                                Waco, Texas 76701
15                              (254) 340-6114
                                kmdaviscsr@yahoo.com
16

17

18

19

20

21

22

23

24

25