## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF TEXAS
## WACO DIVISION

VLSI TECHNOLOGY LLC,

        Plaintiff,

   v.

      Case No. 6:21-cv-00057-ADA

INTEL CORPORATION,

        Defendant.

## DEFENDANT INTEL CORPORATION'S RULE 59 MOTION FOR A NEW TRIAL[1]

---

[1] Pursuant to Fed. R. Civ. P. 50(b), Intel is concurrently filing a motion for judgment as a matter of law on infringement, invalidity, and damages ("Rule 50(b) Motion").  Intel has also separately moved for a new trial due to ███████████.  (*See* Dkt. 581.)

# TABLE OF CONTENTS

PRELIMINARY STATEMENT ................................................................................................. 1

I.    A NEW TRIAL IS REQUIRED BECAUSE VLSI'S EVIDENCE AND TESTIMONY REGARDING NONCOMPARABLE AGREEMENTS SHOULD HAVE BEEN EXCLUDED AND CANNOT SUPPORT THE VERDICT. .................... 1

    A.    The Intel Settlement And Cross-License Agreements Were Irrelevant And Were Introduced For Improper Purposes. .............................................................. 2

    B.    VLSI's Evidence And Testimony Regarding The Noncomparable Intel Agreements Was Improper Rebuttal. ...................................................................... 5

    C.    Error In The Jury Instructions Regarding The Noncomparable Agreements Also Warrants A New Trial. ...................................................................................... 5

II.    A NEW TRIAL IS REQUIRED BECAUSE DR. SULLIVAN'S THEORY SHOULD HAVE BEEN EXCLUDED AND CANNOT SUPPORT THE VERDICT. ............................................................................................................. 6

    A.    Dr. Sullivan Relied On An Unreliable Regression Analysis. ................................ 7

    B.    Dr. Sullivan Applied A Profit-Sharing Theory That Is Contrary To Law. ............. 8

    C.    Dr. Sullivan Relied On Flawed Inputs From VLSI's Technical Experts. ............. 9

    D.    Dr. Sullivan Violated The Entire Market Value Rule. ......................................... 11

    E.    Dr. Sullivan Introduced A New Per-Unit Damages Model At Trial. ................... 12

III.    A NEW TRIAL IS REQUIRED DUE TO PREJUDICIAL ERROR IN THE JURY INSTRUCTIONS. .............................................................................................. 12

    A.    The Hypothetical Negotiation Instruction Was Erroneous And Prejudicial. ........ 13

    B.    The Resolution Of Doubts Instruction Was Erroneous And Prejudicial. ............. 14

IV.    A NEW TRIAL IS REQUIRED DUE TO THE IMPROPER EXCLUSION OF MR. PASCARELLA'S RETURN-ON-INVESTMENT TESTIMONY. ........................ 15

V.    A NEW TRIAL IS REQUIRED BASED ON THE EXCLUSION OF EVIDENCE REGARDING FORTRESS. ........................................................................................ 16

VI.    A NEW TRIAL IS REQUIRED BASED ON VLSI'S STATEMENTS TO THE JURY REGARDING MR. STOLARSKI'S DISAPPEARANCE FROM TRIAL. ......... 18

VII.    IN LIGHT OF THE ABOVE ERRORS AND OVERALL PREJUDICE TO INTEL, THE APPROPRIATE REMEDY IS A NEW TRIAL ON INFRINGEMENT, INVALIDITY, AND DAMAGES. ................................................. 19

CONCLUSION ..................................................................................................................... 20

# TABLE OF AUTHORITIES

**Page(s)**

## CASES

*Advanced Display Systems, Inc. v. Kent State University*,
212 F.3d 1272 (Fed. Cir. 2000).................................................................................................12

*AVM Technologies, LLC v. Intel Corp.*,
2013 WL 126233 (D. Del. 2013).................................................................................................2

*U.S. ex rel. Barron v. Deloitte & Touche, LLP*,
2008 WL 7136869 (W.D. Tex. 2008).......................................................................................10

*Belden Inc. v. Berk-Tek LLC*,
805 F.3d 1064 (Fed. Cir. 2015).................................................................................................5

*Boyde v. California*,
494 U.S. 370 (1990)....................................................................................................................14

*Carson v. Polley*,
689 F.2d 562 (5th Cir. 1982) .....................................................................................................7

*Centocor Ortho Biotech, Inc. v. Abbott Laboratories*,
636 F.3d 1341 (Fed. Cir. 2011)..................................................................................................1

*Davidson Oil Country Supply Co. v. Klockner, Inc.*,
917 F.2d 185 (5th Cir. 1990).............................................................................................17, 20

*Dossett v. First State Bank*,
399 F.3d 940 (8th Cir. 2005) ...................................................................................................19

*Eason v. Fleming Cos.*,
1993 WL 360736 (5th Cir. 1993) ...............................................................................................5

*Elbit Sys. Land & C4I Ltd. v. Hughes Network Systems, LLC*,
927 F.3d 1292 (Fed. Cir. 2019)..................................................................................................2

*Elizarraras v. Bank of El Paso*,
631 F.2d 366 (5th Cir. 1980) .....................................................................................................4

*Ericsson, Inc. v. D-Link Systems, Inc.*,
773 F.3d 1201 (Fed. Cir. 2014)...................................................................................... *passim*

*Fury Imports, Inc. v. Shakespeare Co.*,
554 F.2d 1376 (5th Cir. 1977) .................................................................................................20

*Garretson v. Clark*,
   111 U.S. 120 (1884).........................................................................................................7

*Gasoline Products Co. v. Champlin Refining Co.*,
   283 U.S. 494 (1931).......................................................................................................20

*Giles v. General Electric Co.*,
   245 F.3d 474 (5th Cir. 2001) .........................................................................................19

*Harper v. Agency Rent-A-Car, Inc.*,
   905 F.2d 71 (5th Cir. 1990) ...........................................................................................12

*Hoard v. Hartman*,
   904 F.3d 780 (9th Cir. 2018) .........................................................................................14

*Idenix Pharmaceuticals LLC v. Gilead Sciences Inc.*,
   941 F.3d 1149 (Fed. Cir. 2019).........................................................................................1

*L & W, Inc. v. Shertech, Inc.*,
   471 F.3d 1311 (Fed. Cir. 2006).........................................................................................9

*LaserDynamics, Inc. v. Quanta Computer, Inc.*,
   694 F.3d 51 (Fed. Cir. 2012)................................................................................. *passim*

*Lucent Technologies, Inc. v. Gateway, Inc.*,
   543 F.3d 710 (Fed. Cir. 2008)...........................................................................................1

*Lucent Technologies, Inc. v. Gateway, Inc.*,
   580 F.3d 1301 (Fed. Cir. 2009).......................................................................................13

*Nestier Corp. v. Menasha Corp.-Lewisystems Division*,
   739 F.2d 1576 (Fed. Cir. 1984).......................................................................................14

*Power Integrations, Inc. v. Fairchild Semiconductor International, Inc.*,
   843 F.3d 1315 (Fed. Cir. 2016).......................................................................................14

*Power Integrations, Inc. v. Fairchild Semiconductor International, Inc.*,
   904 F.3d 965 (Fed. Cir. 2018)...........................................................................................7

*Prism Technologies LLC v. Sprint Spectrum L.P.*,
   849 F.3d 1360 (Fed. Cir. 2017).........................................................................................6

*Retractable Technologies Inc. v. Becton, Dickinson & Co.*,
   2009 WL 8725107 (E.D. Tex. 2009) ................................................................................3

*Rude v. Wescott*,
   130 U.S. 152 (1889).........................................................................................................6

*Sentius International, LLC v. Microsoft Corp.*,
  2015 WL 451950 (N.D. Cal. 2015) ................................................................3

*Siemens Medical Solutions USA, Inc. v. Saint-Gobain Ceramics & Plastics, Inc.*,
  637 F.3d 1269 (Fed. Cir. 2011).................................................................12

*Smith v. Transworld Drilling Co.*,
  773 F.2d 610 (5th Cir. 1985) ......................................................................1

*Stragent, LLC v. Intel Corp.*,
  2014 WL 1389304 (E.D. Tex. Mar. 6, 2014) ....................................... 7-8

*Stragent, LLC v. Intel Corp.*,
  2014 WL 12611339 (E.D. Tex. Mar. 12, 2014) ....................................8

*Uniloc USA, Inc. v. Microsoft Corp.*,
  632 F.3d 1292 (Fed. Cir. 2011).........................................................8, 11, 13

*VirnetX, Inc. v. Cisco Systems, Inc.*,
  767 F.3d 1308 (Fed. Cir. 2014).................................................7, 8, 10, 19

*Williams v. Slade*,
  431 F.2d 605 (5th Cir. 1970) ...................................................................19

## STATUTES AND RULES

Federal Rule of Civil Procedure 26(a)(2) ....................................................12

Federal Rule of Civil Procedure 59 ............................................................1

## EXHIBITS

The exhibits cited in this motion as "Ex. __" are attached to the Declaration of Jeffrey A. Dennhardt, filed as an attachment to this motion.

## PRELIMINARY STATEMENT

Following a six-day trial, the jury found that Intel infringed U.S. Patent Nos. 7,523,373 ("'373 patent") and 7,725,759 ("'759 patent") and had not proved the asserted claims of the '759 patent invalid.  (Dkt. 564 at 2-3, 5.)  The jury awarded VLSI a lump sum of $1.5 billion for the '373 patent and $675 million for the '759 patent.  (*Id.* at 6-7.)  This $2.175 billion award—the second largest patent damages verdict ever from a jury[2]—is contrary to law and all real-world evidence, and is not supported by the highly speculative and unreliable made-for-litigation damages methodology that VLSI's expert offered at trial.  In fact, the jury appears to have based the amount of the damages award on prior Intel settlement agreements, which VLSI's expert admitted were ***not comparable*** to the hypothetical negotiation and therefore should have had no place in the trial at all.  The jury's verdict was also tainted by multiple errors in jury instructions and evidentiary rulings that greatly prejudiced Intel's ability to present its case and receive a fair trial.  Therefore, pursuant to Fed. R. Civ. P. 59, Intel moves for a new trial on infringement, invalidity, and damages.  *See Smith v. Transworld Drilling Co.*, 773 F.2d 610, 612-13 (5th Cir. 1985) ("A new trial may be granted … [if] the verdict is against the weight of the evidence, the damages awarded are excessive, the trial was unfair, or prejudicial error was committed[.]").

## I.   A NEW TRIAL IS REQUIRED BECAUSE VLSI'S EVIDENCE AND TESTIMONY REGARDING NONCOMPARABLE AGREEMENTS SHOULD HAVE BEEN EXCLUDED AND CANNOT SUPPORT THE VERDICT.

Over Intel's repeated objections, VLSI introduced prior Intel settlement agreements with ███████████████████████████████ as well as an Intel cross-license agreement with ███████.  (Sealed Tr. [Chandler] 151:12-154:14; PTX-1154; PTX-1166; PTX-

---

[2] The three other largest patent damages verdicts ever awarded by a jury have all been vacated. *See Idenix Pharms. LLC v. Gilead Sciences Inc.*, 941 F.3d 1149, 1165 (Fed. Cir. 2019) (affirming vacatur of $2.54 billion award); *Centocor Ortho Biotech, Inc. v. Abbott Labs.*, 636 F.3d 1341, 1343-44 (Fed. Cir. 2011) (vacating $1.67 billion award); *Lucent Techs., Inc. v. Gateway, Inc.*, 543 F.3d 710, 712 (Fed. Cir. 2008) (affirming vacatur of $1.538 billion award).



Moreover, the manner in which this evidence was admitted on the last day of trial was extremely prejudicial to Intel.[3]  At minimum, a new trial on damages is required.  But because VLSI's last-minute introduction of this improper, highly prejudicial evidence likely infected the jury's deliberations on all issues, a new trial should be ordered on infringement, invalidity, and damages.  *See infra* pp. 19-20.

### A.  The Intel Settlement And Cross-License Agreements Were Irrelevant And Were Introduced For Improper Purposes.

A party may rely on a prior agreement to prove a reasonable royalty only after showing that the agreement is "***sufficiently comparable***" to a hypothetical license to the asserted patents. *Elbit Sys. Land & C4I Ltd. v. Hughes Network Sys., LLC*, 927 F.3d 1292, 1299 (Fed. Cir. 2019). Here, there was no dispute that the Intel agreements introduced by VLSI—which were settlement and cross-license agreements that covered ▮▮▮▮▮▮▮▮▮▮▮▮—were ***not comparable*** to a hypothetical license to the asserted patents. ▮▮▮▮▮▮▮

The ▮▮▮▮▮▮▮▮▮▮ agreements should have been

---

[3] The Court initially granted Intel's motion *in limine* and excluded the noncomparable settlement agreements from either party's opening.  (Dkt. 507 at 5.)  The Court then decided, for the first time on the last day of trial, to allow VLSI to introduce them.  (3/1 Tr. 1328:1-1329:18.)

[4] In *AVM Technologies, LLC v. Intel Corp.*, 2013 WL 126233 (D. Del. 2013), the district court excluded the MicroUnity, Intergraph, and Transmeta agreements because they "gave Intel a license to … dozens of patents" and "[n]o reasonable juror could consider these broad portfolio agreements to be comparable in scope to a license for" a single patent. *Id.* at *3.

excluded for the further reason that they were **settlements** "tainted by the coercive environment of patent litigation." *LaserDynamics, Inc. v. Quanta Computer, Inc.*, 694 F.3d 51, 77 (Fed. Cir. 2012).  As noted above, Mr. Chandler admitted these agreements were "not comparable" to the hypothetical license.  And no expert offered any opinion that these settlements (or the Silicon Graphics cross-license) represented the amount of a reasonable royalty for the asserted patents.

Because these settlement and cross-license agreements were admittedly noncomparable, they had no probative value and only served improper purposes.

██████████   (3/1 Tr. [Chandler] 1502:2-1503:18 ("In the real world, a company such as Intel can just simply refuse to reach an agreement and then the patent owner is forced to take them to court to pursue a license."); *id.* [VLSI Closing] at 1621:22-1622:8.) ████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████

VLSI's tactic was clear: it emphasized the large numbers from the noncomparable agreements to suggest that Intel should pay similar amounts here. And to good effect—as the jury apparently relied on the noncomparable settlements in deciding the amount of damages to award. Indeed, the $1.5 billion awarded for the '373 patent is found only one place in the record: it is the amount that Intel paid under the ████████████. (Sealed Tr. [Huston] 150:22-24; *id.* [Chandler] at 153:14-15; 3/1 Tr. [VLSI Closing] 1622:4-8; PTX-1166; PDX6.20; PDX10.96.) And while the jury's award of $675 million for the '759 patent does not appear to come from any record evidence, it matches the amount reported by the *New York Times* (and other sources) for the Intergraph settlements.[5] The amounts awarded by the jury thus underscore just how unfairly prejudicial the admission of the noncomparable agreements was to Intel. *See Elizarraras v. Bank of El Paso*, 631 F.2d 366, 373-75 (5th Cir. 1980) (remanding for new damages trial where parts of jury's award matched amount in testimony that should have been excluded).

Because the noncomparable agreements were irrelevant and highly prejudicial to Intel, the verdict should be set aside and a new trial granted. *See, e.g.*, *LaserDynamics*, 694 F.3d at 77-78 (ordering new damages trial where noncomparable settlement erroneously admitted). And

---

[5] ████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████

because VLSI's improper use of these agreements undoubtedly tainted the jury's entire verdict against Intel, a new trial is required on infringement, invalidity, and damages. *Infra* pp. 19-20.

**B.     VLSI's Evidence And Testimony Regarding The Noncomparable Intel Agreements Was Improper Rebuttal.**

Having the burden of proof, VLSI was required to offer its damages evidence in its case-in-chief. *Eason v. Fleming Cos.*, 1993 WL 360736, at *7 (5th Cir. 1993) ("[R]ebuttal evidence may not be used merely to continue the plaintiff's case-in-chief[.]"); *Belden Inc. v. Berk-Tek LLC*, 805 F.3d 1064, 1081-82 (Fed. Cir. 2015) (rebuttal limited to what "is responsive to the adversary's evidence").[6]  VLSI could have called Mr. Chandler in its case-in-chief, but chose not to.  VLSI instead waited until the last trial day to bring up the noncomparable agreements.

As a matter of fundamental fairness and under governing precedent, VLSI should not have been permitted to hold back this evidence until after its case-in-chief.  (Dkt. 522 at 2; Dkt. 529 at 1.)  This approach not only allowed VLSI to place large numbers in front of the jury and to give the false impression of past wrongdoing by Intel, it deprived Intel of a fair opportunity to respond.  It also allowed VLSI to mislead the jury into believing that Intel had been hiding these agreements during its own case, when in fact they never should have been introduced at all.  The unfair prejudice to Intel can only be remedied by a new trial.  *See infra* pp. 19-20.

**C.     Error In The Jury Instructions Regarding The Noncomparable Agreements Also Warrants A New Trial.**

The problems arising from the noncomparable settlement agreements' admission were compounded by the Court's failure to instruct the jury that, in considering license agreements between parties who were involved in a lawsuit, jurors may consider "whether any payment terms set forth in the license agreement were influenced by a desire to avoid the costs and burden

---

[6] During discovery, Mr. Chandler discussed his opinions regarding the noncomparable agreements in his opening expert report, not as a rebuttal report.  (*See* Dkt. 252-42 ¶¶ 162-66.)

of further litigation, and thus do not reflect the value that the parties attributed to the patented invention." (Dkt. 549 at 13-15; Dkt. 563 at 40; 3/1 Tr. 1550:1-5; *see* Dkt. 398-10 at 121; 3/1 Tr. 1476:4-22, 1477:20-1478:19, 1493:21-1494:7.) Settlement agreements "cannot be taken as a standard to measure the value of the improvements patented" because "[m]any considerations other than the value of the improvements patented may induce the payment in such cases." *Rude v. Wescott*, 130 U.S. 152, 164 (1889); *see Prism Techs. LLC v. Sprint Spectrum L.P.*, 849 F.3d 1360, 1369-70 (Fed. Cir. 2017). Thus, when evaluating settlement agreements, juries "must consider the license in its proper context … to ensure that the reasonable royalty rate reflects 'the economic demand for the claimed technology.'" *LaserDynamics*, 694 F.3d at 77.

Here, the jury should not have been permitted to consider the noncomparable settlements at all. But once the Court allowed them into evidence, it should have at least instructed the jury on their limited value. The omission of Intel's proposed language—which is a correct statement of law—was prejudicial because it encouraged the jury to consider the settlements without accounting for the value attributable to ending litigation. This error requires a new trial. *See Ericsson, Inc. v. D-Link Sys., Inc.*, 773 F.3d 1201, 1235 (Fed. Cir. 2014) (remanding for new trial due to instructional errors on damages issues); *infra* pp. 19-20.

## II.   A NEW TRIAL IS REQUIRED BECAUSE DR. SULLIVAN'S THEORY SHOULD HAVE BEEN EXCLUDED AND CANNOT SUPPORT THE VERDICT.

VLSI's expert Dr. Sullivan offered a six-step, made-for-litigation damages methodology that has never been published, peer reviewed, presented or discussed at a conference, or used in a real-world transaction. As Intel's *Daubert* motion explained, Dr. Sullivan's theory should have been excluded because it was unreliable, unsupported, and contrary to law.[7] (Dkt. 264 at 6-17;

---

[7] At trial, Dr. Sullivan admitted he could not identify "any license agreement … that was ***ever*** negotiated using" his "multistep process." (2/24 Tr. [Sullivan] 704:18-706:12.) He also could not identify any instance where Intel or Freescale—the parties to the hypothetical negotiation—

Dkt. 333-2 at 2-9; Dkt. 265 at 1-7; Dkt. 334-2 at 1-3; Dkt. 261 at 8-12; Dkt. 330-2 at 1-5; Dkt. 262 at 6-10; Dkt. 331-2 at 1-4.)  Dr. Sullivan's opinions were highly prejudicial to Intel because they allowed VLSI to present the jury with a $2.4 billion damages claim that vastly overstated the value of any reasonable royalty for the asserted patents.  The damages award should be vacated and a new trial ordered.  *See VirnetX, Inc. v. Cisco Sys., Inc.*, 767 F.3d 1308, 1329 (Fed. Cir. 2014) (vacating damages award based on expert's unreliable testimony); *infra* pp. 19-20.[8]

### A.    Dr. Sullivan Relied On An Unreliable Regression Analysis.

"A patentee is only entitled to a reasonable royalty attributable to the infringing features." *Power Integrations, Inc. v. Fairchild Semiconductor Int'l, Inc.*, 904 F.3d 965, 977 (Fed. Cir. 2018); *see Ericsson*, 773 F.3d at 1226 ("[T]he ultimate combination of royalty base and royalty rate must reflect the value attributable to the infringing features of the product, and no more."); *Garretson v. Clark*, 111 U.S. 120, 121 (1884) ("[P]atentee … must in every case give evidence tending to separate or apportion … between the patented feature and the unpatented features[.]").

Dr. Sullivan's methodology failed to satisfy this fundamental principle.  He relied on a regression analysis to purportedly calculate the relationship between price and frequency, even though there was no evidence that Intel, Freescale, or anyone else had ever used a regression method to value a patented feature—let alone to value individual features in products as complex as Intel's microprocessors.   (2/24 Tr. [Sullivan] 708:19-712:22; 3/1 Tr. [Huston] 1366:20-1367:1, 1375:2-7, 1380:21-1381:16.)  This is not an acceptable, or reliable, way to calculate a reasonable royalty for patent infringement.  *See Stragent, LLC v. Intel Corp.*, 2014 WL 1389304,

---

had ever applied the multistep methodology that he used.  (*Id.* at 706:13-707:4.)

[8] VLSI never actually put the damages numbers derived from Dr. Sullivan's calculations into evidence.  *See* Rule 50(b) Motion at 18.  But it appears the Court inadvertently sent unadmitted exhibits with Dr. Sullivan's calculations to the jury room.  (Ex. 1; Ex. 2 (exhibits available to jury during deliberations including unadmitted PTX-3909, PTX-3910, and PTX-3912).)  The jury's consideration of these unadmitted exhibits was prejudicial to Intel and warrants a new trial.  *See Carson v. Polley*, 689 F.2d 562, 569-71 (5th Cir. 1982).

at *4 (E.D. Tex. 2014) (Dyk, J., sitting by designation) (excluding regression-based damages theory that was "not based on any theory that meets the *Daubert* criteria of verifiability, peer review or publication, an acceptable error rate, or general acceptance in the scientific community"), *order clarified*, 2014 WL 12611339 (E.D. Tex. 2014).

Moreover, Dr. Sullivan's regression model ***included*** the value of ***non-accused*** products and features, and ***did not include*** the accused features he purported to assess.   (2/24 Tr. [Sullivan] 616:8-620:23, 713:7-723:10.)   Because his regression analysis was based not on the value of the accused features but instead on ***non-accused*** products and features, it cannot support a reasonable royalty here.  *See VirnetX*, 767 F.3d at 1326 ("[A] patentee must … seek only those damages attributable to the infringing features.").

### B.    Dr. Sullivan Applied A Profit-Sharing Theory That Is Contrary To Law.

Any split of profits allegedly made from the asserted patents and used to calculate damages must have a connection to the case (*e.g.*, a prior comparable agreement where the parties agreed to a similar split).   *VirnetX*, 767 F.3d at 1334 (vacating damages where expert relied on profit split "insufficiently tied to the facts of the case").   Yet, at trial, Dr. Sullivan took the revenues that Intel allegedly made from using the asserted patents, deducted costs, and gave VLSI the ***entire*** result—*i.e.*, 100% of the profits attributable to alleged use of the patents— without identifying any evidence that the parties to the hypothetical negotiation would have agreed to it.  (2/24 Tr. [Sullivan] 661:11-664:20.)   Because Dr. Sullivan did not identify any facts that would justify this remarkable 100/0 profit split, his opinion does not reliably value a royalty here and should have been excluded.  *See Uniloc USA, Inc. v. Microsoft Corp.*, 632 F.3d 1292, 1318 (Fed. Cir. 2011) (rejecting assumption that parties would have agreed to 75/25 split because it "had no relation to the facts of the case" and "was arbitrary, unreliable, and irrelevant").

## C.    Dr. Sullivan Relied On Flawed Inputs From VLSI's Technical Experts.

Dr. Sullivan's regression analysis—which purported to calculate the relationship between price and frequency—relied on VLSI's technical experts for (1) testing regarding the alleged performance or power savings attributable to the asserted patents and (2) the assumption that a 1% increase in frequency can be valued as a 1% increase in performance or power savings. (2/24 Tr. [Sullivan] 702:4-704:17, 728:6-729:17.)  But the record showed that those inputs were unreliable and do not reflect the value of the accused features in the accused products.

For the '373 accused products, Dr. Annavaram generated power-savings estimates based on *just one* model configuration of each accused processor family, and *assumed* the results applied equally to hundreds of other accused products with widely differing characteristics. (2/24 Tr. [Annavaram] 539:9-540:3, 554:23-555:13, 582:6-17; PDX8.16-8.17; 2/25 Tr. [Sylvester] 973:17-975:6.)  *See L & W, Inc. v. Shertech, Inc.*, 471 F.3d 1311, 1318 (Fed. Cir. 2006) (assuming that all products are similar to one product analyzed was insufficient to meet the burden of proof).  Moreover, Dr. Annavaram used a wholly unreliable method to select which Intel Power Model inputs (and settings) to use—including testing multiple computers containing *non-accused* processors and *no* accused Haswell processors, choosing the *wrong results* from the tests (using Core C7, not Package C7),[9] and using a haphazard sales-based method to choose SKU inputs.  (2/24 Tr. [Annavaram] 556:8-561:19, 578:7-581:1; PDX8.12; 2/25 Tr. [Sylvester] 975:19-976:22.)  Dr. Annavaram then inflated the purported power-savings by comparing the accused C6 SRAM power multiplexer to an alternative design that was

---

[9] VLSI's infringement theory related to the *Package C7* sleep state, not the distinct Core C7 sleep state.  (2/23 Tr. [Conte] 394:18-395:17, 388:18-24, 485:18-21; Sealed Tr. [Conte] 16:7-19, 17:16-18:14; PDX4.26, 4.87; D-1065; *see* 2/25 Tr. (Douglas) 862:15-865:18; *id.* (Sylvester) at 937:22-940:7, 960:9-961:1; Sealed Tr. [Sylvester] 92:10-95:16; D-1074; DDX7.15, 7.34-7.35.) It was therefore wrong for Dr. Annavaram to rely on Core C7 residency data, which differed significantly from Package C7 residency data.  (2/25 Tr. [Sylvester] 975:19-976:22; DDX7.47.)

significantly less power-efficient than designs Intel had actually used in earlier processors, and by implying incorrectly and without evidence that Package C7 power savings would be impossible without the accused design.  (2/24 Tr. [Annavaram] 537:12-539:8; 2/25 Tr. [Douglas] 855:25-857:11; *id.* [Sylvester] at 969:17-973:8; PTX-983.)   His analysis was thus entirely unsuitable to value the accused C6 SRAM power multiplexer feature in the accused products. *See U.S. ex rel. Barron v. Deloitte & Touche, LLP*, 2008 WL 7136869, at \*4 (W.D. Tex. 2008) (excluding damages opinion based on sampling data "so unreliable and lacking in probative force that no reasonable expert could have an opinion upon them").

For the '759 accused products, Dr. Annavaram purported to calculate performance benefits using Fox2 testing tools for only two accused product families, and ***assumed*** the results were representative of all ten accused families with no evidentiary basis to do so.  (2/24 Tr. [Annavaram] 563:8-564:16, 582:20-583:7; 2/26 Tr. [Grunwald] 1234:2-1235:13, 1236:7-17; Sealed Tr. [Borkowski] 101:13-102:13.)  He then purported to verify the reliability of these Fox2 tests based on Broadwell processors that are ***not accused*** for the '759 patent because they ***lack*** the accused features.  (2/24 Tr. [Annavaram] 562:10-563:7.)  Even within the accused products he purported to test, Dr. Annavaram failed to properly apportion because he tested the ***entire*** ring domain (which contains multiple components beyond just the accused ring), but still treated the results as measuring the accused ring component ***alone***.   (*Id.* at 564:17-566:5; 2/26 Tr. [Grunwald] 1232:8-1234:1.)  Dr. Annavaram's analysis was thus entirely unreliable and failed to value only the accused feature in the accused products.  *See VirnetX*, 767 F.3d at 1326.

Dr. Conte purported to convert Dr. Annavaram's flawed analysis regarding power and performance benefits into frequency benefits by ***assuming***, again without any reliable basis for doing so, that a 1% reduction in power consumption or a 1% increase in performance can be

valued as a 1% increase in frequency.  (Sealed Tr. [Conte] 30:12-31:17, 71:19-72:19; PDX4.242; PTX-3638.)  But Dr. Conte's assumption of a 1:1 relationship between speed and frequency was based on an ambiguous statement from a ████████████████████████████████.  (PTX-3638.)  And Dr. Conte's assumptions regarding the alleged 1:1 relationship between power and speed and between speed and frequency were contradicted by the evidence at trial.  (2/25 Tr. [Douglas]  865:24-866:6;  *id.*  [Sylvester]  976:23-981:4;  2/26  Tr.  [Rotem]  1124:4-6;  3/1  Tr. [Conte] 1441:6-22, 1458:17-25; DDX19.15.)

### D.  Dr. Sullivan Violated The Entire Market Value Rule.

Under the entire market value rule, a patentee may be awarded damages "based on the value of an entire apparatus containing several features, when the feature patented constitutes the basis for customer demand."  *LaserDynamics*, 694 F.3d at 67-68.   But here, there was no evidence—or even a contention—that the asserted patents are "the basis for customer demand" for the accused Intel products.   Nevertheless, over Intel's objections, Dr. Sullivan repeatedly referred to Intel's entire revenues from sales of the accused products.  (2/24 Tr. [Sullivan] 652:9-658:2; PTX-3903; PDX7.49; PDX7.53; 2/24 Tr. 628:12-633:2, 635:6-12; Dkt. 362 at 12-14.)  ████

████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████

████████████████████████████████████████████

Because the entire market value rule does not apply, VLSI's evidence regarding Intel's ████████████ of revenue for the '373 accused products (PDX7.49) and ████████████ of revenue for the '759 accused products (PDX7.53) was highly prejudicial and warrants a new trial.  *See Uniloc*, 632 F.3d at 1320 ("The disclosure that a company has made $19 billion … in revenue from an infringing product cannot help but skew the damages horizon for the jury, regardless of the contribution of the patented component to this revenue."); *Ericsson*, 773 F.3d at 1226-27.

### E.     Dr. Sullivan Introduced A New Per-Unit Damages Model At Trial.

Over Intel's objections, Dr. Sullivan introduced a new "effective rate per unit" model at trial, even though he never disclosed any per-unit model or rates in his report, deposition, or corrections before trial.  (2/24 Tr. [Sullivan] 663:19-665:3; PDX7.65; PDX7.67; *see* 2/24 Tr. 514:6-517:1, 628:12-649:11; Dkt. 520 at 1-2.)   In closing, VLSI referred to Dr. Sullivan's "effective rate[s] per unit" as "the reasonable per-unit rates" and "the most important" numbers. (3/1 Tr. 1573:5-1574:3.)   Dr. Sullivan's undisclosed opinion should have been excluded.  *See* Fed. R. Civ. P. 26(a)(2); *Siemens Med. Sols. USA, Inc. v. Saint-Gobain Ceramics & Plastics, Inc.*, 637 F.3d 1269, 1286 (Fed. Cir. 2011) (affirming expert "could not testify on numbers not disclosed in his expert report or deposition").  Dr. Sullivan's testimony regarding the "effective rate per unit" no doubt skewed the jury's damages horizon by focusing on per-unit rates that were relatively small next to the accused products' total revenues (which were also improperly admitted, *see supra* p. 11).  And due to the late disclosure, Intel did not have a fair opportunity to respond to any per-unit numbers—*e.g.*, to develop evidence explaining why the parties to the hypothetical negotiation would not have agreed to a per-unit structure, to show the royalty-stacking problems presented by a per-unit rate, or to otherwise rebut Dr. Sullivan's per-unit rates.

## III.   A NEW TRIAL IS REQUIRED DUE TO PREJUDICIAL ERROR IN THE JURY INSTRUCTIONS.

"A party seeking to alter a judgment based on erroneous jury instructions must establish that (1) it made a proper and timely objection to the jury instructions, (2) those instructions were legally erroneous, (3) the errors had prejudicial effect, and (4) it requested alternative instructions that would have remedied the error."  *Advanced Display Sys. v. Kent State Univ.*, 212 F.3d 1272, 1281 (Fed. Cir. 2000) (citations omitted); *see Harper v. Agency Rent-A-Car, Inc.*, 905 F.2d 71, 73-74 (5th Cir. 1990) (reversible error where jury instruction error not harmless).

Here, at least two instructions were erroneous and prejudicial to Intel, warranting a new trial.

A.    **The Hypothetical Negotiation Instruction Was Erroneous And Prejudicial.**

Over Intel's objection, the Court instructed the jury that "*[u]nlike in a real world negotiation*, all parties to the hypothetical negotiation are presumed to believe that the patents are valid and infringed and that both parties were willing to enter into an agreement." (Dkt. 563 at 35 (emphasis added to objectionable portion); 3/1 Tr. 1545:1-7; *see* Dkt. 549 at 10; 3/1 Tr. 1493:24-1494:7.)   This instruction is contrary to law because it stated that the hypothetical negotiation is "unlike … a real-world negotiation."   Comparable real-world licensing evidence, however, is highly relevant to determining a reasonable royalty.  *See Ericsson*, 773 F.3d at 1228 (finding "real world" licenses relevant to damages); *Uniloc*, 632 F.3d at 1313 (rejecting 25% rule of thumb that did not reflect value of patent in "real-world negotiation"); *Lucent Techs., Inc. v. Gateway, Inc.*, 580 F.3d 1301, 1325 (Fed. Cir. 2009) ("The hypothetical negotiation tries … to recreate the ex ante licensing negotiation scenario and to describe the resulting agreement."). Indeed, Dr. Sullivan acknowledged that "real-world facts" are relevant to the hypothetical negotiation.  (2/24 Tr. [Sullivan] 596:9-11; *see id.* at 749:3-751:9.)

This instructional error was incredibly prejudicial to Intel because it improperly favored VLSI's damages theory over Intel's.   VLSI's experts claimed there were no comparable agreements to the hypothetical negotiation and instead relied on a made-for-litigation damages methodology.  *See supra* pp. 6-11.  By contrast, Intel's rebuttal damages case emphasized **real-world evidence** including prior sales of the asserted patents, comparable microprocessor patent agreements, and offers to enter into such agreements between the parties to the hypothetical negotiation.  (3/1 Tr. [Huston] 1359:10-1366:19, 1370:3-1374:16; Sealed Tr. [Huston] 112:5-132:6; D-40, D-44, D-54, D-119, D-125-134, D-137-145, D-169, D-175, D-794, D-799, D-809, D-1583, PTX-4267; *see* 2/22 Tr. [Intel Opening] 254:11-257:8; 3/1 Tr. [Intel Closing] 1596:9-

1598:6, 1610:4-8.)  By contrasting the hypothetical negotiation with a real-world negotiation, the Court's instruction placed a thumb on the scale against Intel's real-world damages case and undermined Intel's credibility with the jury.  *Cf. Boyde v. Calif.*, 494 U.S. 370, 384 (1990) ("[A]rguments of counsel generally carry less weight with a jury than do instructions from the court.").  A new trial is required.  *See Power Integrations, Inc. v. Fairchild Semiconductor Int'l*, 843 F.3d 1315, 1331-32 (Fed. Cir. 2016) (vacating finding of induced infringement where instruction could have "tip[ped] the scales in favor of [plaintiff] at trial"); *Hoard v. Hartman*, 904 F.3d 780, 792 (9th Cir. 2018) (remanding for new trial where "instruction placed a heavy thumb on the scale" in favor of one party); *see also infra* pp. 19-20.

### B.   The Resolution Of Doubts Instruction Was Erroneous And Prejudicial.

Over Intel's objection, the Court provided the jury with an instruction titled "Damages— Doubts Resolved Against Infringer," which stated:  "If you believe that on any issue that you must decide, including, but not limited to damages, if you determine that either party has failed to keep proper records, then any confusion or difficulty that you encounter in resolving that issue should be held against the party who failed to keep the records and not against the other party." (Dkt. 563 at 39; 3/1 Tr. 1548:19-24; Dkt. 549 at 13; 3/1 Tr. 1493:21-1494:6.)  Although the Court did not read the title of the instruction into the record, it provided the jurors with a printed copy of the instruction to use during deliberations.  (3/1 Tr. 1518:21-23, 1552:3-5.)

The Court erred in giving this instruction because neither party asserted at trial that the other failed to keep proper records.  *See Nestier Corp. v. Menasha Corp.-Lewisystems Div.*, 739 F.2d 1576, 1579 (Fed. Cir. 1984) ("[A] court should not instruct on a proposition of law about which there is no competent evidence."); *Ericsson*, 773 F.3d at 1235 ("[A] district court must instruct the jury only on factors that are relevant to the specific case at issue[.]").  The instruction obviously prejudiced Intel because its title suggested that Intel was an "infringer" and it further

14

stated that "doubts" should be "resolved against" Intel.  Moreover, most of the admitted exhibits were **Intel documents**.  Thus, to the extent the jury was dissatisfied with the exhibits in evidence, it was told to hold that against Intel—and it appears the jury took this guidance to heart.  (Dkt. 559 (jury asking to see Mr. Stolarski's deposition after VLSI improperly suggested Intel should have played it); Dkt. 561 (jury asking for demonstrative that Intel used throughout trial, but being told "demonstrative exhibits … are not provided to the jury").)  This improper, prejudicial instruction warrants a new trial.  *See Ericsson*, 773 F.3d at 1235 (vacating damages where court "instruct[ed] the jury to consider irrelevant *Georgia-Pacific* factors"); *see also infra* pp. 19-20.

## IV.    A NEW TRIAL IS REQUIRED DUE TO THE IMPROPER EXCLUSION OF MR. PASCARELLA'S RETURN-ON-INVESTMENT TESTIMONY.

The Court erred by excluding Intel's expert testimony regarding the reasonable return one could expect from VLSI's investment in the asserted patents.  Although the Court excluded Mr. Pascarella's opinions, it did not explain the basis for that decision.  (Dkt. 507 at 2; 12/15/20 Hr'g Tr. 16:21-24.)  If permitted to testify, Mr. Pascarella would have calculated the expected return on investment for the asserted patents—using a type of analysis he has performed hundreds of times in the real world to value assets such as patents.  (Dkt. 276-3 ¶¶ 18-19, 45, 61.)  Mr. Pascarella's methodology was reliable and his opinions were specifically tied to the patents asserted here.  (Dkt. 288-2 at 9-14.)

The exclusion of Mr. Pascarella's testimony impeded Intel's ability to place VLSI's damages demand and Dr. Sullivan's opinions in context for the jury.  Intel was prevented from explaining that the return on investment VLSI sought—*i.e.*, ███████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

██████████—was economically unreasonable and inconsistent with any real-world investment.

The exclusion of Mr. Pascarella's testimony was additionally prejudicial because at trial VLSI emphasized the return that VLSI and select others would receive from any damages recovered in this case.  For example, VLSI told the jury that VLSI and NXP had a "cycle of innovation" where "NXP invests billions in R&D … and then NXP ultimately hopes to get a ***return*** for further [R&D]."  (2/22 Tr. [VLSI Opening] 213:3-9, 213:21-23; PDX3.12; *see* 2/22 Tr. [Spehar] 274:8-276:10; PDX13.3; 2/23 Tr. [Bearden] 330:12-20; 3/1 Tr. [VLSI Closing] 1558:11-21.)  VLSI's witnesses also testified that sympathetic entities—including "teachers unions," "pension funds," and "Texas A&M"—would benefit from any recovery in this case. (2/22 Tr. [Spehar] 300:1-12.)  Yet Intel was prevented from explaining, through Mr. Pascarella's testimony, just how economically unrealistic the return from VLSI's damages demand would be for these types of entities.  (Dkt. 276-3 ¶¶ 99, 114-116, 124.)  Again, the only remedy for this unfair prejudice to Intel is a new trial. *See infra* pp. 19-20.

## V.   A NEW TRIAL IS REQUIRED BASED ON THE EXCLUSION OF EVIDENCE REGARDING FORTRESS.



The exclusion of all Fortress-related evidence was highly prejudicial because it prevented Intel from introducing key facts that would have undermined VLSI's trial narrative.  Throughout trial, VLSI misleadingly portrayed VLSI as a "very small company" that "teamed up" with NXP to bring this lawsuit so that NXP could use the proceeds to purportedly reinvest in its own R&D as part of a so-called "cycle of innovation."   (2/22 Tr. [VLSI Opening] 212:6-213:23; *id.* [Spehar] at 274:8-276:10; PDX3.12; PDX13.3; 2/23 Tr. [Bearden] 330:12-20; 3/1 Tr. [VLSI Closing] 1558:11-21; PDX10.5-10.6.)  In reality, however, VLSI needed ***Fortress*** to bring this lawsuit ███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

██████████████████.  (Dkt. 535 at 4-5.)  Intel was permitted to tell the jury none of this.

Intel was also precluded from mentioning Fortress's ████████████████████████.  This was so even though VLSI emphasized, without mentioning ████████████  that ***NXP*** would share in any money recovered and would invest that money in its own R&D.  *See supra* p. 17.  VLSI also told the jury that sympathetic entities including "teachers unions," "pension funds," and "Texas A&M" would "stand[] to benefit" from any money recovered.  (2/22 Tr. [Spehar] 300:1-12; 3/1 Tr. [VLSI Closing] 1623:17-24.)  Yet Intel was not allowed to explain that these groups would only benefit as a result ████████████████████████.

The exclusion of this highly relevant evidence infected the entire trial and unfairly prejudiced every aspect of Intel's case.  A new trial on infringement, invalidity, and damages is required.  *See, e.g., Davidson Oil Country Supply Co. v. Klockner, Inc.*, 917 F.2d 185, 187 (5th Cir. 1990) ("[T]he exclusion of all of this evidence created an atmosphere so unreal and so prejudicial that it requires … that all issues … be remanded for a full retrial."); *infra* pp. 19-20.

## VI.   A NEW TRIAL IS REQUIRED BASED ON VLSI'S STATEMENTS TO THE JURY REGARDING MR. STOLARSKI'S DISAPPEARANCE FROM TRIAL.

Before trial, VLSI identified its CEO Michael Stolarski as a witness it planned to call at trial.  (Dkt. 398-4 at 2.)  After introducing Mr. Stolarski to the jury as VLSI's representative (2/22 Tr. 15:15-16, 18:7-13, 208:17-25), VLSI told Intel on the second trial day that Mr. Stolarski had left Texas for an undisclosed ███████████ and was not available to testify— even in response to Intel's request to call him adversely.  (Dkt. 520 at 1; Dkt. 520-1.)  When Intel informed the Court of Mr. Stolarski's absence, Intel explained that it "will argue the empty chair" and did not want VLSI to "get up in closing and provide an explanation for why [Mr. Stolarksi's not] here if it's not part of the evidentiary record."  (2/24 Tr. 508:11-510:10.)

But that is what happened.  During VLSI's rebuttal case, Mr. Chandler volunteered that he "spoke with Mr. Stolarski" "[b]efore he had to leave for a medical issue[.]"   (3/1 Tr. [Chandler] 1501:16-23.)  During its rebuttal closing, VLSI showed the jury a slide stating Mr. Stolarski had "to return home for medical issue," "[g]ave two full days of deposition Intel could have used," and was "[w]atching trial on Zoom."  (PDX10.72; *see* 3/1 Tr. 1615:23-1617:2.) None of these statements was properly in the record.  Intel objected, and the Court ordered VLSI to "take the slide down." (3/1 Tr. 1615:25-1616:16.)  But, by then, the damage was done.

Intel had already relied on Mr. Stolarski's absence to make certain arguments to the jury (3/1 Tr. [Intel Closing] 1601:24-1602:3) and was unfairly prejudiced when VLSI disclosed a new-found excuse for his disappearance in the last few minutes of the trial.  VLSI's tactic undermined Intel's credibility and clearly influenced the jury, whose first question during deliberations was ██████████████████████████████  Because VLSI's improper statements unfairly prejudiced Intel's case, a new trial is required. *See infra* pp. 19-20.

**VII.   IN LIGHT OF THE ABOVE ERRORS AND OVERALL PREJUDICE TO INTEL, THE APPROPRIATE REMEDY IS A NEW TRIAL ON INFRINGEMENT, INVALIDITY, AND DAMAGES.**

At minimum, a new trial on damages is required because the jury's $2.175 billion award is "clearly excessive," so "deference [to the award] must be abandoned." *See Giles v. Gen. Elec. Co.*, 245 F.3d 474, 488 (5th Cir. 2001). Any one of the prejudicial errors discussed above warrants a new trial on damages. Collectively, they leave no doubt that the jury's award cannot stand. *See VirnetX*, 767 F.3d at 1326-29, 1331-34 (vacating damages based on unreliable expert testimony and instructional error); *LaserDynamics*, 694 F.3d at 77-82 (ordering new damages trial due to erroneous admission of settlement agreement and unreliable damages theory).

Under the circumstances here, however, the only appropriate remedy (if the Court does not grant JMOL) is a new trial on infringement, invalidity, and damages. This is true for several reasons. ***First***, "where the damages are excessive and the verdict is the product of passion or prejudice a new trial as to all the issues must be ordered." *Williams v. Slade*, 431 F.2d 605, 609 (5th Cir. 1970). That is clearly the case here, as the jury's $2.175 billion award was excessive and the erroneous rulings discussed above surely caused the jury to view Intel in an unfavorable light overall, thereby undermining Intel's credibility and infecting the jury's judgment on liability issues as well as damages issues. *See id.* at 608 ("If the decision on the other issues could in any way have been infected by the error then a new trial must be had on all issues."); *Dossett v. First State Bank*, 399 F.3d 940, 947 (8th Cir. 2005) ("[I]f passion or prejudice influenced the jury's damages decision, then that same passion or prejudice may well have affected its decision on the issue of liability as well.").

***Second***, the jury awarded an amount that did not match Dr. Sullivan's or Mr. Huston's damages calculation and instead appears to come from noncomparable settlement agreements—which, under Federal Circuit law, cannot form the basis for a reasonable royalty. *See supra* pp.

19

1-5.  This "discrepancy … between the amount … requested and the amount the jury … awarded" indicates the jury either went "outside the evidence or … simply bec[a]me confused." *Fury Imports, Inc. v. Shakespeare Co.*, 554 F.2d 1376, 1386-88 (5th Cir. 1977).  Either way, such a discrepancy requires a new trial "on issues of liability as well as damages."  *Id.*

*Third*, the damages issues permeated the entire trial.  VLSI's fact witnesses—including the only inventor who testified live—discussed NXP's and select others' share in any damages recovery.  *Supra* pp. 16-17.  VLSI's technical experts provided testimony that VLSI's damages expert used to calculate damages.  *Supra* pp. 9-11.  And VLSI used noncomparable settlements to paint Intel as a serial infringer.  *Supra* pp. 3-4.  Because VLSI's damages evidence—and the erroneous damages rulings discussed above—were intertwined with liability issues, fairness requires a new trial on infringement, invalidity, and damages.  *See Gasoline Prods. Co. v. Champlin Refining Co.*, 283 U.S. 494, 500 (1931) ("[T]he question of damages … is so interwoven with that of liability that the former cannot be submitted to the jury independently of the latter without confusion and uncertainty, which would amount to a denial of a fair trial.").

*Finally*, several of the prejudicial errors discussed above—including the exclusion of Fortress evidence, the treatment of Mr. Stolarski's disappearance, and the instruction about resolving doubts against Intel—plainly affected Intel's entire case presentation and can only be remedied by a new trial on liability and damages.  *See Davidson Oil*, 917 F.2d at 187 ("[T]he exclusion of all of this evidence created an atmosphere so unreal and so prejudicial that it requires, in our very essential broad discretion, that all issues … be remanded for a full retrial.").

## CONCLUSION

For the foregoing reasons and those stated in Dkt. 581, Intel respectfully requests a new trial on infringement for the '373 and '759 patents, invalidity for the '759 patent, and damages.

Dated: April 9, 2021

OF COUNSEL:

William F. Lee (*Pro Hac Vice*)
Louis W. Tompros (*Pro Hac Vice*)
Kate Saxton (*Pro Hac Vice*)
WILMER CUTLER PICKERING HALE
  & DORR LLP
60 State Street
Boston, Massachusetts 02109
Tel: (617) 526-6000
Email: william.lee@wilmerhale.com
Email: louis.tompros@wilmerhale.com
Email: kate.saxton@wilmerhale.com

Gregory H. Lantier (*Pro Hac Vice*)
Amanda L. Major (*Pro Hac Vice*)
WILMER CUTLER PICKERING HALE
  & DORR LLP
1875 Pennsylvania Avenue
Washington DC 20006
Tel: (202) 663-6000
Email: gregory.lantier@wilmerhale.com
Email: amanda.major@wilmerhale.com

Respectfully submitted,

/s/ J. Stephen Ravel
J. Stephen Ravel
Texas State Bar No. 16584975
Kelly Ransom
Texas State Bar No. 24109427
KELLY HART & HALLMAN LLP
303 Colorado, Suite 2000
Austin, Texas 78701
Tel: (512) 495-6429
Email: steve.ravel@kellyhart.com
Email: kelly.ransom@kellyhart.com

James E. Wren
Texas State Bar No. 22018200
1 Bear Place, Unit 97288
Waco, Texas 76798
Tel: (254) 710-7670
Email: james.wren@baylor.edu

Harry L. Gillam, Jr.
Texas State Bar No. 07921800
GILLAM & SMITH, L.L.P.
303 South Washington Avenue
Marshall, Texas 75670
Tel: (903) 934-8450
Email: gil@gillamsmithlaw.com

*Attorneys for Intel Corporation*

## CERTIFICATE OF SERVICE

I hereby certify that all counsel of record who are deemed to have consented to electronic service are being served with a copy of the foregoing document via electronic mail on April 9, 2021.

/s/ J. Stephen Ravel
J. Stephen Ravel