# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF TEXAS
### WACO DIVISION

VLSI TECHNOLOGY LLC,

       Plaintiff,

   v.

INTEL CORPORATION,

       Defendant.

Case No. 6:21-cv-00057-ADA

████████████████

## DEFENDANT INTEL CORPORATION'S MOTION FOR A NEW TRIAL[1]

---

[1] Intel is separately filing Rule 50(b) and Rule 59 motions for judgment as a matter of law and/or a new trial on multiple grounds, including issues relating to infringement, invalidity, damages, evidentiary rulings, and jury instructions. Intel expects to file these motions on April 9, 2021 in accordance with the parties' agreed-upon briefing schedule.

**TABLE OF CONTENTS**

I.      BACKGROUND ................................................................................................ 2

        A.      Jury Selection ................................................................................... 2

        B.      The Court's Instructions To The Jury ............................................... 2

        C.      ███████████ Facebook Post During Trial ....................................... 3

        D.      The Jury's Verdict ............................................................................ 4

        E.      Intel's Discovery Of ███████ March 1 Facebook Post ................... 6

II.     LEGAL STANDARD ...................................................................................... 6

III.    ARGUMENT ................................................................................................... 8

        A.      ███████████ March 1 Facebook Post Constitutes Juror Misconduct Sufficient
                To Warrant A New Trial. ................................................................... 9

        B.      If The Court Does Not Grant A New Trial At This Time, It Should Hold An
                Evidentiary Hearing Regarding The Scope Of Juror Misconduct. ....... 15

IV.     CONCLUSION .............................................................................................. 18

# TABLE OF AUTHORITIES

**Page(s)**

**Federal Cases**

*Abell v. Potomac Insurance Co.*,
  858 F.2d 1104 (5th Cir. 1988) ...........................................................................6

*Anderson v. Ford Motor Co.*,
  186 F.3d 918 (8th Cir. 1999) ............................................................................11

*Biscotti Inc. v. Microsoft Corp.*,
  2017 WL 2537021 (E.D. Tex. 2017) .................................................................12

*United States v. Chiantese*,
  582 F.2d 974 (5th Cir. 1978) ......................................................................8, 9, 15

*Dyer v. Calderon*,
  151 F.3d 970 (9th Cir. 1998) ............................................................................14

*Haley v. Blue Ridge Transfer Co.*,
  802 F.2d 1532 (4th Cir. 1986) ....................................................................8, 9, 15

*United States v. Hodge*,
  933 F.3d 468 (5th Cir. 2019) ..............................................................................7

*United States v. Ianniello*,
  866 F.2d 540 (2d Cir. 1989)........................................................................15, 16

*Kinetic Concepts, Inc. v. Bluesky Medical Corp.*,
  2007 WL 1113078 (W.D. Tex. Apr. 4, 2007).......................................................7

*Latiolais v. Whitley*,
  93 F.3d 205 (5th Cir. 1996) ................................................................................7

*Marshall v. Jerrico, Inc.*,
  446 U.S. 238 (1980)..........................................................................................14

*Mayhue v. St. Francis Hospital of Wichita, Inc.*,
  969 F.2d 919 (10th Cir. 1992) .................................................................. *passim*

*McDonough Power Equipment, Inc. v. Greenwood*,
  464 U.S. 548 (1984)..........................................................................................13

*United States v. McKinney*,
  429 F.2d 1019 (5th Cir. 1970) ...........................................................................15

*United States v. Nickless*,
    599 F. App'x 222 (5th Cir. 2015) ...................................................................16

*Oliver v. Quarterman*,
    541 F.3d 329 (5th Cir. 2008) ............................................................7, 8, 15

*Paramount Film Distributing Corp. v. Applebaum*,
    217 F.2d 101 (5th Cir. 1954) ...........................................................................8

*Remmer v. United States*,
    347 U.S. 227 (1954) ........................................................................................8

*United States v. Scott*,
    854 F.2d 697 (5th Cir. 1988) ...............................................................7, 13, 14

*Stiles v. Lawrie*,
    211 F.2d 188 (6th Cir. 1954) ....................................................................8, 11

*United States v. Straach*,
    987 F.2d 232 (5th Cir. 1993) ...........................................................................7

*Texas & New Orleans Railroad Co. v. Underhill*,
    234 F.2d 620 (5th Cir. 1956) ...........................................................................7

*United States v. Villalobos*,
    601 F. App'x 274 (5th Cir. 2015) .....................................................................7

*Wyatt v. Wal-Mart Stores, Inc.*,
    98 F.3d 1339 (5th Cir. 1996) ......................................................................9, 15

**Rules**

Federal Rule of Evidence 606(b) ...........................................................................16

**Other Authorities**

American Bar Association Standing Committee on Ethics and Professional
    Responsibility, *Formal Opinion 466: Lawyer Reviewing Jurors' Internet
    Presence* (Apr. 24, 2014), *available at*
    https://www.americanbar.org/content/dam/aba/administrative/professional_res
    ponsibility/formal_opinion_466_final_04_23_14.pdf..........................................6

*Character: Lex Luthor*, DC Universe Infinite,
    https://www.dcuniverseinfinite.com/encyclopedia/lex-luthor/ (last visited Mar.
    24, 2021) ......................................................................................................13

Don Clark, *Intel to Pay Intergraph in Settlement*, Wall St. J. (Mar. 31, 2004), *available at* https://www.wsj.com/articles/SB108065849616269044 (last visited Mar. 29, 2021) ........................................................................................6

Laurie J. Flynn, *Intergraph and Intel Settle Chip Dispute*, N.Y. Times (Mar. 31, 2004), *available at* https://www.nytimes.com/2004/03/31/business/technology-intergraph-and-intel-settle-chip-dispute.html (last visited Mar. 27, 2021).........................................5

*FTC Settles Anticompetitive Conduct Against Intel*, IPWatchdog (Aug. 7, 2010), https://www.ipwatchdog.com/2010/08/07/ftc-settles-charges-of-anticompetitive-conduct-against-intel/id=11953/ (last visited Mar. 27, 2021) .....................12

David G. Henry, *Western District of Texas Gets an Upgrade: A Look at the New Waco Courtroom*, IPWatchdog (Jan. 20, 2021), https://www.ipwatchdog.com/2021/01/20/western-district-texas-gets-upgrade-look-new-waco-courtroom/id=129125/ (last visited Mar. 27, 2021)...................................4, 11

Dawn Kawamoto, *Intel Settles Intergraph Suit for $225 million* (Mar. 30, 2004), https://www.cnet.com/news/intel-settles-intergraph-suit-for-225-million/?utm_source=enl&utm_medium=enl&utm_content=20210305&utm_campaign=skilledintheart&utm_term=law (last visited Mar. 27, 2021) ...............6

*Lex Luthor*, DC Comics, https://www.dccomics.com/characters/lex-luthor (last visited Mar. 24, 2021).........................................................................................13

John Markoff, *Intel Settlement Revives a Fading Chip Designer*, N.Y. Times (Oct. 20, 2005), *available at* https://www.nytimes.com/2005/10/20/technology/intel-settlement-revives-a-fading-chip-designer.html (last visited Mar. 27, 2021) ...........................................6

Joseph Schuman, *Inside Intel's Intellectually Dubious Patent Study*, IPWatchdog (July 23, 2014), https://www.ipwatchdog.com/2014/07/23/inside-intels-intellectually-dubious-patent-study/id=50511/ (last visited Mar. 27, 2021) .........................12

Jonathan Stroud, *Intel Petitions Against Fortress Sub*, IPWatchdog (Aug. 27, 2020), https://www.ipwatchdog.com/2020/08/27/patent-filings-roundup-qualcomm-keeps-monterey-bay-h-board-rejects-11-intel-petitions-fortress-sub/id=124641/ (last visited Mar. 27, 2021).....................................................12

*Texas Disciplinary Rules of Professional Conduct*, Rule 3.06(f)*, available at* https://www.texasbar.com/AM/Template.cfm?Section=Home&ContentID=27271&Template=/CM/ContentDisplay.cfm (last visited Mar. 27, 2021)...................................1

## Exhibits

All exhibits cited in this motion as "Ex. __" are attached to the Declaration of Kate Saxton, filed as an attachment to this motion.

## PRELIMINARY STATEMENT

On March 23, 2021, pursuant to Texas Disciplinary Rule of Professional Conduct 3.06(f), counsel for Intel notified the Court that Intel had become aware of "improper conduct by … a juror" in this case. (Ex. 1.)[2] Following the jury's $2.175 billion verdict, Intel discovered irregularities regarding the damages award amount for one of the patents-in-suit—specifically, the damages awarded for one patent had no basis in the record but rather appears to be based on a *New York Times* article. In the course of investigating publicly available material to determine whether jurors relied on extraneous material in arriving at this damages award, counsel for Intel discovered a Facebook post made by a juror ***during trial*** that communicated information about this case and showed that the juror had consulted extra-record information, had pre-judged the case before the close of evidence, and had not been completely truthful on his juror questionnaire—all of which constitutes juror misconduct.

Based on these facts alone, it is clear that Intel did not receive a fair trial by an impartial jury and that the $2.175 billion verdict was tainted by juror misconduct. The only appropriate remedy in this situation is for the Court to order a new trial. If the Court does not order a new trial at this time, an evidentiary hearing with all jurors is required to fully examine the scope of the misconduct, including the jury's access to extraneous, non-record information. These steps are necessary to assess the integrity of the verdict in this case.

---

[2] Texas Disciplinary Rule of Professional Conduct 3.06(f) requires that "[a] lawyer shall reveal promptly to the court improper conduct by a venireman or a juror, or by another toward a venireman or a juror or a member of his family, of which the lawyer has knowledge." *Texas Disciplinary Rules of Professional Conduct*, Rule 3.06, *available at* https://www.texasbar.com/AM/Template.cfm?Section=Home&ContentID=27271&Template=/CM/ContentDisplay.cfm (last visited Mar. 25, 2021).

## I. BACKGROUND

### A. Jury Selection

On December 18, 2020, ██████████████ completed the juror questionnaire that this Court sent to the entire venire. (Ex. 2.) As relevant here, ████████ stated on his questionnaire that he had ██████████████████████████████████. (*Id.* at 4.) He also responded that he had ████████████████████████████████████████ ████████████████████████████████ (*Id.* at 3, 5.)

On February 1, 2021, ████████ made a post to his publicly available Facebook account indicating that he had received a juror summons from this Court. The post depicted an envelope marked "Official Jury Summons Enclosed" overlayed on an image of the exterior of the Waco Federal Courthouse. (Ex. 3.)

Jury selection took place on February 22, 2021. During voir dire, ████████ reported that he was retired and that his hobbies and interests are "surfing the web." (2/22 Tr. [Voir Dire] 119:16-123:11.) ████████ was one of seven people ultimately seated on the jury.

### B. The Court's Instructions To The Jury

Also during jury selection, Judge Manske cautioned the venire: "Do not try to prejudge a case and assume that you know where the trial is going. Wait until you have heard all of the evidence, the arguments of the attorneys and the Court's instructions on the law before making a decision." (2/22 Tr. [Voir Dire] 10:1-5.)

The trial began that same day. As part of its preliminary instructions, the Court told the jury that: "A corporation and all other persons are to stand equally before you. They must be treated equally in a court of justice." (2/22 Tr. 259:13-18.)

The Court also instructed the jury that "[d]uring your jury service, you may not communicate any information about this case through any means or by any tools of technology,"

including "the Internet … or website[s] such as Facebook." (*Id.* at 183:3-10; *see id.* at 182:22-183:20.) The Court further instructed jurors not to "conduct any independent investigation of this case, period" and "you may not use any electronic device or media … to research any issue that might be related to this case." (*Id.* at 184:8-185:1.) The Court repeated these instructions to the jury at several points throughout the trial. (*E.g.*, 2/26 Tr. 1305:17-18 ("[P]lease do not use social media or look at anything about the case over the weekend.").)

       **C.**                  ▆▆▆▆▆▆▆         **Facebook Post During Trial**

     At 4:48 a.m. CT on March 1, 2021 (the morning of the sixth day of trial),[3] in contravention of the Court's repeated admonitions, ▆▆▆▆▆▆ posted the following to his publicly available Facebook account:



(Ex. 4.)[4]

---

[3] The screenshot of the Facebook post is marked with the time "3:48 AM" because it was accessed on a computer located in the Mountain Time Zone.
[4] Intel did not learn of this post until March 19, 2021.

The March 1 post includes, among other things, a March 2021 calendar and several images of actors who played the role of Lex Luthor in "Superman" television shows and movies. As shown above, ███████ superimposed two images of Lex Luthor actors over a photograph of the Waco courtroom where the trial was held. ████████ also placed an image of the "LexCorp" logo (Luthor's international conglomerate) and an image stating "In Science We Trust" on top of the courtroom photograph. In the top-left portion of the post, ████████ inserted a picture of a Lex Luthor actor standing in front of the "LexCorp" logo as well as an image of another Lex Luthor actor standing in front of the Presidential seal (Luthor was elected President in this television episode and other places in the comic book world).

The photograph of the Waco courtroom used in ████████ March 1 post is taken from the "IP Watchdog" patent blog. (*See* Ex. 5, David G. Henry, *Western District of Texas Gets an Upgrade: A Look at the New Waco Courtroom*, IPWatchdog (Jan. 20, 2021), https://www.ipwatchdog.com/2021/01/20/western-district-texas-gets-upgrade-look-new-waco-courtroom/id=129125/ (last visited Mar. 27, 2021).) The same patent blog contains extraneous information about patent litigation and matters related to this case, including unfavorable characterizations of Intel and its attorneys and other prejudicial information that this Court excluded from trial. *See infra* pp. 11-12.

### D.    The Jury's Verdict

On March 2, 2021, the day after ████████ Facebook post, the jury reached a verdict after only three hours of deliberations. The jury found that Intel infringed U.S. Patent Nos. 7,523,373 ("the '373 patent") and 7,725,759 ("the '759 patent"). (Dkt. 564 at 2-3.) The jury awarded $1.5 billion in damages for the '373 patent and $675 million in damages for the '759 patent, and further indicated that both awards were in the form of a lump sum rather than a running royalty. (*Id.* at 6-7.)

As indicated by the verdict, the jury did not adopt the damages amounts or methodology provided by VLSI's expert Ryan Sullivan. Dr. Sullivan offered an opinion that a reasonable royalty would have been $1.61 billion for the '373 patent and $831 million for the '759 patent, each representing a running royalty rather than a lump sum. (PDX7.64; PDX7.66.)

Instead, the jury's $1.5 billion lump-sum award for the '373 patent matched a number found only one place in the record: a noncomparable settlement agreement between Intel and Nvidia in which Intel paid $1.5 billion. (Sealed Tr. [Chandler] 153:14-15; 3/1 Tr. [VLSI Closing] 1622:4-8; PTX-1166; PDX6.20; PDX10.96.)[5]

The jury's $675 million lump-sum award for the '759 patent does not match any number in the record. It does, however, exactly match a number ***not*** in the record: the amount the *New York Times* reported that Intel paid in total to settle other admittedly noncomparable litigation involving Intergraph. (*See* Ex. 6, Laurie J. Flynn, *Intergraph and Intel Settle Chip Dispute*, N.Y. Times (Mar. 31, 2004), *available at* https://www.nytimes.com/2004/03/31/business/technology-intergraph-and-intel-settle-chip-dispute.html (last visited Mar. 27, 2021) ("The settlement brings the total amount Intel has paid or will pay to Intergraph, a graphics software and systems company based in Huntsville, Ala., to ***$675 million***.").) The $675 million reported by the *New York Times* is different from the ▮▮▮▮▮ amount that VLSI's expert testified Intel paid in an Intergraph settlement agreement. (Sealed Tr. [Chandler] 153:12-13; PDX6.19.) But VLSI's counsel stated during closing argument that the amount Intel paid in one settlement "was published in the *New York Times*." (3/1 Tr. [VLSI Closing] 1622:1-12.) A simple internet

---

[5] Intel objected to the admission of this and other settlement agreements, which even VLSI's expert Mr. Chandler conceded were "not comparable" to the hypothetically negotiated license in this case. (3/1 Tr. [Chandler] 1513:8-19, 1516:19-1517:5.)

search returns the *New York Times* article and other articles reporting the total Intergraph settlement amount of $675 million.[6]

###### E. Intel's Discovery Of ███████████ March 1 Facebook Post

After learning of the link between the $675 million damages award and the *New York Times* reporting of the Intergraph settlement agreement, Intel undertook to determine whether any publicly available information suggested that the jurors had conducted the minimal research necessary to uncover the $675 million settlement report.[7] On March 19, 2021, Intel's counsel learned that ███████ had made the March 1 post to his Facebook account. Intel promptly notified the Court. (Ex. 1.)

## II. LEGAL STANDARD

"The Constitution, through the due process clause of the fifth amendment and the right to jury trial enshrined in the sixth and seventh amendments, requires federal courts to give every defendant a fair trial." *Abell v. Potomac Ins. Co.*, 858 F.2d 1104, 1143 (5th Cir. 1988), *vacated*

---

[6] (Ex. 7, Dawn Kawamoto, *Intel Settles Intergraph Suit for $225 million*, CNET.com (Mar. 30, 2004), https://www.cnet.com/news/intel-settles-intergraph-suit-for-225-million/?utm_source=email&utm_medium=enl&utm_content=20210305&utm_campaign=skille dintheart&utm_term=law (last visited Mar. 27, 2021) ("The agreement brings to a close all outstanding patent infringement litigation between the two parties, which has cost Intel a total of ***$675 million*** in settlement payments."); Ex. 8, Don Clark, *Intel to Pay Intergraph in Settlement*, Wall St. J. (Mar. 31, 2004), *available at* https://www.wsj.com/articles/SB108065849616269044 (last visited Mar. 29, 2021) ("[Intergraph] expects to reap a total of ***$675 million*** from the big chip maker in three settlements."); Ex. 9, John Markoff, *Intel Settlement Revives a Fading Chip Designer*, N.Y. Times (Oct. 20, 2005), *available at* https://www.nytimes.com/2005/10/20/technology/intel-settlement-revives-a-fading-chip-designer.html (last visited Mar. 27, 2021) (discussing MicroUnity settlement and referencing Intergraph settlement "***totaling more than $600 million***").)

[7] Pursuant to Formal Opinion 466 of the American Bar Association, "[u]nless limited by law or court order, a lawyer may review a juror's or potential juror's Internet presence, which may include postings by the juror or potential juror in advance of and during a trial." American Bar Association Standing Committee on Ethics and Professional Responsibility, *Formal Opinion 466: Lawyer Reviewing Jurors' Internet Presence* (Apr. 24, 2014), *available at* https://www.americanbar.org/content/dam/aba/administrative/professional_responsibility/formal _opinion_466_final_04_23_14.pdf (last visited Mar. 24, 2021).

*on other grounds sub. nom., Fryar v. Abell*, 492 U.S. 914 (1989); *see Latiolais v. Whitley*, 93 F.3d 205, 207 (5th Cir. 1996) ("There is a constitutional right to a fair trial in a civil case.").

A new trial is warranted based on juror misconduct when there is "(1) misconduct by at least one juror that (2) prejudiced the defendant to the extent that it undermined the fairness of the trial." *United States v. Villalobos*, 601 F. App'x 274, 277 (5th Cir. 2015); *see Oliver v. Quarterman*, 541 F.3d 329, 340-41 (5th Cir. 2008) ("[G]iven that there was a constitutional error because the jury consulted an external influence, we must determine if that constitutional error was harmless."); *Kinetic Concepts, Inc. v. Bluesky Med. Corp.*, 2007 WL 1113078, at *3 (W.D. Tex. Apr. 4, 2007) ("A court should order a new trial in cases of juror misconduct unless it appears reasonably certain that the misconduct did not affect deliberations.").

Juror misconduct may include review of extra-record material, failure to follow the Court's instructions, and failure to answer a question honestly during voir dire. *See United States v. Hodge*, 933 F.3d 468, 481 (5th Cir. 2019) (affirming decision to discharge juror based on juror misconduct where juror "failed to follow instructions, exhibited a lack of candor during questioning, and had engaged in threatening behavior towards other jurors"); *Oliver*, 541 F.3d at 336 ("'[T]he Supreme Court has clearly established a constitutional rule forbidding a jury from being exposed to an external influence."); *United States v. Straach*, 987 F.2d 232, 241 (5th Cir. 1993) ("[A] juror may attack the verdict (justifying a new trial) by testifying concerning outside influences on the jury (e.g., newspapers, statements by court personnel) ...."); *United States v. Scott*, 854 F.2d 697, 698-700 (5th Cir. 1988) (ordering new trial where juror failed to disclose that his brother was a deputy sheriff during voir dire); *Texas & New Orleans Railroad Co. v. Underhill*, 234 F.2d 620, 623-24 (5th Cir. 1956) (finding district court abused discretion in denying new trial where "likelihood that the outside influences affected the verdict was very

strong"); *Paramount Film Distributing Corp. v. Applebaum*, 217 F.2d 101, 121-22 (5th Cir. 1954) (holding lower court should have ordered a new trial where "the record as a whole justifies the conclusion" that "extraneous matters had a substantial influence, prejudicial to defendants, in producing the verdict in this case"); *see also Mayhue v. St. Francis Hosp. of Wichita, Inc.*, 969 F.2d 919, 922-26 (10th Cir. 1992) (new trial appropriate where jury used extra-record dictionary definitions during deliberations); *Stiles v. Lawrie*, 211 F.2d 188, 190 (6th Cir. 1954) (error to refuse a new trial when one of the jurors introduced extra-record manual into deliberations).

Where juror misconduct arises as a result of external influences—including information outside the record—courts may presume prejudice. *Oliver*, 541 F.3d at 336 (Supreme Court precedent prohibits jurors "from being subjected to 'private communication, contact, or tampering' and considers any such external influences presumptively prejudicial" (quoting *Remmer v. United States*, 347 U.S. 227, 229 (1954))); *United States v. Chiantese*, 582 F.2d 974, 979 (5th Cir. 1978) ("[A] presumption of prejudice arises when the outside influence is brought to the attention of the trial court, and it is incumbent upon the Government to rebut that presumption at a hearing." (citation omitted)); *see also Mayhue*, 969 F.2d at 922 ("A rebuttable presumption of prejudice arises whenever a jury is exposed to external information in contravention of a district court's instructions."); *Haley v. Blue Ridge Transfer Co.*, 802 F.2d 1532, 1537 (4th Cir. 1986) (court has an "obligation to invoke the presumption of prejudice when sitting jurors have been exposed to unauthorized, extraneous information that is of sufficiently prejudicial magnitude").

## III. ARGUMENT

This Court should grant a new trial based on the evidence currently available to it because ███████████ March 1 Facebook post constitutes serious juror misconduct for multiple reasons, including because: (1) it violated this Court's clear orders that jurors "may not

communicate any information about this case through any means or by any tools of technology," including "the Internet … or website[s] such as Facebook" (2/22 Tr. 182:22-183:20); (2) it shows that ███████ consulted extra-record information about this case in violation of this Court's orders that jurors "[d]on't go online" and "do not conduct any independent investigation of this case, period" (*id.* at 184:8-185:1; *see also* 2/26 Tr. 1305:17-18); (3) it shows that ███ ██████ had pre-judged the case before the close of evidence and the jury charge; and (4) it shows that ███████ was not entirely truthful in answering a material question on his juror questionnaire.

Intel was prejudiced by this juror misconduct and deprived of a fair trial, and that prejudice can only be cured by a new trial. *See Mayhue*, 969 F.2d at 922-26 (new trial appropriate where jury used extra-record dictionary definitions during deliberations); *Haley*, 802 F.2d at 1536-38 (new trial required where non-juror made remarks to jurors about the case). If the Court does not grant a new trial at this time, the fact that ███████ consulted extra-record material and posted about it during trial requires that the Court hold an evidentiary hearing to determine the full extent of juror misconduct, including any improper influence from outside sources. *See Chiantese*, 582 F.2d at 979 ("[I]n instances where the jury misconduct involves influences from outside sources, the failure of the trial judge to hold a hearing constitutes an abuse of discretion and is therefore reversible error."); *see also Wyatt v. Wal-Mart Stores, Inc.*, 98 F.3d 1339, 1996 WL 556976, at *3 (5th Cir. 1996) (remanding for party to be "given an opportunity to prove her allegations in an evidentiary hearing before the district court").

A. ███████ **March 1 Facebook Post Constitutes Juror Misconduct Sufficient To Warrant A New Trial.**

As described above (*see supra* pp. 3-4), ███████ posted on Facebook about the case while the trial was still pending and the jurors were still receiving evidence. This is misconduct

for multiple reasons.

 ***First***, in its preliminary instructions, the Court told the jurors that they were not permitted to communicate about the case at all during their jury service. Specifically, the Court instructed the jury as follows:

> ***During your jury service, you may not communicate any information about this case through any means or by any tools of technology.*** For example, ***do not*** talk face-to-face or ***use any electronic device or media, such as*** a telephone, cell phone, camera, recording device, PDA, computer, ***the Internet, any Internet service,*** any text or instant messaging service, any chat room, ***blog or website such as Facebook,*** et cetera, or any other way ***to communicate about this case***. You may not communicate to anyone any information about this case until you have gotten your verdict to me.

(2/22 Tr. 183:3-10.) On Friday, February 26, 2021, the last time the Court instructed the jurors before ███████████ post, the Court specifically warned the jury "do not use social media or look at anything about the case over the weekend." (2/26 Tr. 1305:17-18.) Despite this Court's clear instructions, ███████████ posted on Facebook about this case on Monday, March 1, 2021—while the trial was still ongoing, and early in the morning before the start of the last day of evidence. That the post was about this case is evidenced by the fact that it features a photograph, from IPWatchdog.com, of the Waco courtroom where the trial was held. *See supra* pp. 3-4. ███████████ Facebook post was thus a clear violation of this Court's orders and a clear instance of juror misconduct.

 ***Second***, in its preliminary instructions, the Court also admonished the jurors that they were not to conduct any research at all about anything relating to the case, the parties, the lawyers, the witnesses, or the Court during their jury service and that they were required to decide their verdict based solely on what was seen and heard in the courtroom. Specifically, the Court instructed the jury as follows:

> I'm going to tell you, ***do not conduct any independent investigation of this case, period.*** You must make your decision on your verdict exclusively from what you

see and hear within this courtroom. ***Do not try to obtain information from any other source.*** In particular, you may not use any electronic device or media such as a telephone or computer or any such device to research any issue that might be related to this case. ***Don't go online.*** Don't read a newspaper account of the trial or listen to any radio or newscast about it in any format. Do not visit or view any place that might be discussed in this case. Do not use Internet programs or other devices to search for or to view any place that's discussed. ***In sum, you may not ever research any information about this case***, the law or any of the people that you're going to see as witnesses in front of you or the parties, the lawyers, myself, until after you have been excused after your verdict and are no longer jurors.

(2/22 Tr. 184:9-185:1.) ███████████ March 1 Facebook post indicates that he violated this Court's instruction as well because his post includes an image of the Waco courtroom from IPWatchdog.com. *See supra* pp. 3-4. This shows that ███████████ improperly consulted extra-record material during trial, including by conducting internet research about the case and using it during the trial. *See, e.g.*, *Anderson v. Ford Motor Co.*, 186 F.3d 918, 920-21 (8th Cir. 1999) (affirming district court order granting new trial where juror "based his judgment on an out-of-court experiment in regard to a crucial issue"); *Mayhue*, 969 F.2d at 922-26 (new trial appropriate where jury used extra-record dictionary definitions during deliberations); *Stiles*, 211 F.2d at 190 (error to refuse a new trial when one of the jurors introduced extra-record manual into deliberations).

The IPWatchdog blog contains substantial amounts of extra-record information that is highly prejudicial to Intel. For example, the blog post where the photograph of the Waco courtroom appears contains information that this Court specifically excluded in its in limine rulings, including that this Court "stands as the number one patent litigation venue in the United States" and regularly handles "highly complex cases."[8] Other blog posts on IPWatchdog

---

[8] (Ex. 5, David G. Henry, *Western District of Texas Gets an Upgrade: A Look at the New Waco Courtroom*, IPWatchdog (Jan. 20, 2021), https://www.ipwatchdog.com/2021/01/20/western-district-texas-gets-upgrade-look-new-waco-courtroom/id=129125/ (last visited Mar. 27, 2021); *see* Dkt. 507 at 3 (granting motion in limine describing the Western District as a popular venue).)

contain information about the parties and the asserted patents, including information that is unfavorable to Intel. As an example, an August 27, 2020 post specifically mentions the Patent Trial and Appeal Board's denial of Intel's IPR petition on the '759 patent, one of the patents-in-suit.[9] The validity of the '759 patent was an issue for the jury in this case, and any extra-record discovery of the IPR proceedings could have unfairly led the jury to conclude that Intel could not meet its burden to prove invalidity. (*See* Dkt. 507 at 5 (excluding reference to other litigations and proceedings); *Biscotti Inc. v. Microsoft Corp.*, 2017 WL 2537021, at *1 (E.D. Tex. 2017) (the probative value in allowing the plaintiff to reference PTAB findings was "substantially outweighed by the danger of the unfair prejudice").) In addition, the IPWatchdog blog provides additional extra-record information that paints Intel in a negative light. For example, the blog includes a press release on FTC "charges of anticompetitive conduct against Intel"[10] and a critique of a purportedly "intellectually dubious" patent study co-authored by Intel and WilmerHale attorneys, including a member of the team that tried this case.[11]

It is manifestly prejudicial to Intel that a juror was consulting extra-record material during trial, despite repeated admonitions from the Court not to research information outside the record. *See Mayhue*, 969 F.2d at 922-26 (affirming district court conclusion that "jury's unauthorized consultation of a dictionary was sufficiently prejudicial to warrant a new trial").

---

[9] (Ex. 10, Jonathan Stroud, *Patent Filings Roundup: Qualcomm Keeps Monterey at Bay; H&R Block Hit with Revived Uniloc Patent; Board Rejects 11 Intel Petitions Against Fortress Sub*, IPWatchdog (Aug. 27, 2020), https://www.ipwatchdog.com/2020/08/27/patent-filings-roundup-qualcomm-keeps-monterey-bay-h-board-rejects-11-intel-petitions-fortress-sub/id=124641/ (last visited Mar. 27, 2021).)

[10] (Ex. 11, *FTC Settles Charges of Anticompetitive Conduct Against Intel*, IPWatchdog (Aug. 7, 2010), https://www.ipwatchdog.com/2010/08/07/ftc-settles-charges-of-anticompetitive-conduct-against-intel/id=11953/ (last visited Mar. 27, 2021).)

[11] (Ex. 12, Joseph Schuman, *Inside Intel's Intellectually Dubious Patent Study*, IPWatchdog (July 23, 2014), https://www.ipwatchdog.com/2014/07/23/inside-intels-intellectually-dubious-patent-study/id=50511/ (last visited Mar. 27, 2021).)

***Third***, Judge Manske cautioned the venire during jury selection: "Do not try to prejudge a case and assume that you know where the trial is going. Wait until you have heard all of the evidence, the arguments of the attorneys and the Court's instructions on the law before making a decision." (2/22 Tr. [Voir Dire] 10:1-5.) Contrary to this admonition, █████████ March 1 Facebook post shows that he pre-judged the case before the close of evidence and before the jury charge. More specifically, the Lex Luthor imagery conveys a firm conviction on the merits of the case—and against Intel in particular—before deliberations even began. Lex Luthor is a comic book supervillain who is traditionally portrayed as Superman's nemesis.[12] He is a billionaire industrialist and CEO of "Lexcorp," which is a nefarious mega-conglomerate technology company.[13] His presence in the Waco courtroom in ██████████ Facebook post shows that ████████ equated Intel with an evil technology corporation, and thus demonstrates that he had unfairly prejudged the case against Intel before the close of evidence—which constitutes juror misconduct.

***Fourth***, ██████████ March 1 Facebook post also evidences juror misconduct that warrants a new trial because it shows that ██████████ was not entirely truthful in answering a material question on his juror questionnaire. In these circumstances, a new trial is warranted if "a juror failed to answer honestly a material question on voir dire" and "a correct response would have provided a valid basis for challenge for cause." *Scott*, 854 F.2d at 698-700 (quoting *McDonough Power Equip., Inc. v. Greenwood*, 464 U.S. 548, 556 (1984)). That is what happened here.

As explained above, ██████████ indicated on his juror questionnaire that he had a

---

[12] *Lex Luthor*, DC Comics, https://www.dccomics.com/characters/lex-luthor (last visited Mar. 24, 2021).

[13] *Character: Lex Luthor*, DC Universe Infinite, https://www.dcuniverseinfinite.com/encyclopedia/lex-luthor/ (last visited Mar. 24, 2021).

███████████████████████████████████████████.  *See supra* p. 2.  Yet ████████

March 1 post equates Intel with Lexcorp, a nefarious mega-conglomerate technology company.

*See supra* p. 13.  The post thus displays a strong anti-corporate animus, and indicates that ████

███████████████████████████████████████████████████████████

████████████████████████████████████

        Had ██████████ honestly answered this question on his juror questionnaire, Intel would

have had a valid basis for a challenge for cause.  This was not a question that merely sought

general background information on questions unrelated to this case; this was a question intended

to reveal actual bias against corporations like Intel.  Indeed, no juror who was empaneled on the

jury answered that he or she had ███████████████████ opinion of large corporations.  Had

██████████ revealed on his questionnaire that he had █████████████████████████

███████████████████, that would have allowed further questioning and shown that he could

not fairly serve as a juror in this particular case.  It also would have supported a valid challenge

for cause because Intel has a constitutional right to an impartial jury.  *See Scott*, 854 F.2d at 698-

700 (granting new trial where "sufficient implication" of juror's bias arose from failure to

disclose relationship with deputy sheriff); *see also Marshall v. Jerrico, Inc.*, 446 U.S. 238, 242

(1980) ("The Due Process Clause entitles a person to an impartial and disinterested tribunal in

both civil and criminal cases."); *Dyer v. Calderon*, 151 F.3d 970, 983 (9th Cir. 1998) ("[W]e

presume bias where a juror lies in order to secure a seat on the jury.").

                                        *   *   *

        In sum, a new trial is warranted based on ██████████ March 1 Facebook post because

it shows that ██████████ researched information relating to the case and consulted extra-record

material during trial, pre-judged the case against Intel before the close of evidence, and was not

completely truthful on his juror questionnaire.  Where, as here, the juror misconduct involves a juror consulting external sources during trial, the Court should presume the misconduct was prejudicial to Intel.  *See Oliver*, 541 F.3d at 336; *Chiantese*, 582 F.2d at 979; *Haley*, 802 F.2d at 1537; *Mayhue*, 969 F.2d at 922.  Here, that presumption cannot be rebutted because ██ ████████ misconduct—which violated the Court's repeated instructions to the jury—clearly deprived Intel of a fair opportunity to defend itself and a fair trial overall.  Under these circumstances, the only way to cure the unfair prejudice to Intel is to order a new trial.

### B.     If The Court Does Not Grant A New Trial At This Time, It Should Hold An Evidentiary Hearing Regarding The Scope Of Juror Misconduct.

If the Court does not now grant a new trial based on juror misconduct, a hearing into the misconduct must be held, because "in instances where the jury misconduct involves influences from outside sources, the failure of the trial judge to hold a hearing constitutes an abuse of discretion and is therefore reversible error."  *Chiantese*, 582 F.2d at 979; *see United States v. Ianniello*, 866 F.2d 540, 543 (2d Cir. 1989) ("[A] post-trial jury hearing must be held when a party comes forward with 'clear, strong, substantial and incontrovertible evidence … that a specific, non-speculative impropriety has occurred.'"); *Wyatt*, 98 F.3d 1339, 1996 WL 556976, at *3 (remanding for party to be "given an opportunity to prove her allegations in an evidentiary hearing before the district court"); *United States v. McKinney*, 429 F.2d 1019, 1026 (5th Cir. 1970) ("[W]hen jury misconduct is alleged in the defendant's motion for new trial, the trial judge has a duty to take the following actions:  he must conduct a full investigation to ascertain whether the alleged jury misconduct actually occurred; if it occurred, he must determine whether or not it was prejudicial; unless he concludes that it was clearly not prejudicial, he must grant the motion for new trial; if he concludes it did not occur or that that it was clearly not prejudicial, he

must spell out his findings with adequate specificity for meaningful appellate review.").[14]

Here, Intel has identified serious juror misconduct as evidenced by ▮▮▮▮▮▮ March 1 Facebook post. Because Intel has "come forward with 'clear, strong, substantial and incontrovertible evidence … that a specific, non-speculative impropriety has occurred,'" if a new trial is not granted at this time, a hearing must be held to determine the full extent of the misconduct, including inquiry into ▮▮▮▮▮▮ March 1 Facebook post and the scope of the extra-record research that he (or any other jurors) conducted during trial. *See Ianniello*, 866 F.2d at 543.

As explained above, ▮▮▮▮▮▮ March 1 Facebook post already demonstrates that he searched for and reviewed extra-record material during the trial. *See supra* pp. 10-12. An evidentiary hearing would allow inquiry into the extent to which ▮▮▮▮▮▮ researched and accessed extra-record material about the case, the parties, or the Court during trial. Indeed, ▮▮ ▮▮▮▮ stated during voir dire that he spends his time "sitting at home … playing on my computer all day," and that his hobbies and interests are "[j]ust basically surfing the web." (2/22 Tr. 119:16-123:11.) These statements, coupled with ▮▮▮▮▮▮ improper March 1 Facebook post, support an inference that ▮▮▮▮▮▮ likely accessed other extra-record information during trial. The Court and the parties are entitled to know the extent to which that did in fact occur.

An evidentiary hearing would also allow investigation into whether other jurors were aware of ▮▮▮▮▮▮ extra-record research and any information he learned from that research,

---

[14] Federal Rule of Evidence 606(b) prohibits jurors from "testify[ing] about any statement made or incident that occurred during the jury's deliberations; the effect of anything on that juror's or another juror's vote; or any juror's mental processes concerning the verdict or indictment." Fed. R. Evid. 606(b). But it specifically provides that "[a] juror may testify about whether … extraneous prejudicial information was improperly brought to the jury's attention." *Id.*; *see United States v. Nickless*, 599 F. App'x 222, 223 (5th Cir. 2015) (explaining that Rule 606(b) specifically allows "a juror [to] testify about the introduction of extraneous prejudicial information or about an outside influence that was improperly brought to bear on a juror").

as well as whether the other jurors conducted any such research themselves. Indeed, the jury was made aware that there was substantial extra-record material relating to this case because it was repeatedly informed about the media attention and interest in this case. For example, the Court told the jury that the case had "been reported in the … Waco Tribune" and "other places[.]" (2/26 Tr. 1305:3-18.) Likewise, the Court informed the jury that "[p]eople all across the United States are listening in to this trial, wishing they had your seats on the jury and could be here." (2/23 Tr. 405:5-15.) VLSI's counsel also made multiple references to "many people" watching the broadcast. (3/1 Tr. [VLSI Closing] 1617:1-2, 1626:8-13.)

There is a second basis justifying an evidentiary hearing of all jurors: there is good reason to believe that someone on the jury conducted internet research that led to at least part of the jury's damages award. As explained above, the verdict for the '373 patent shows that the jury rejected Dr. Sullivan's damages analysis and instead awarded an amount that matches the $1.5 billion lump sum that Intel paid pursuant to the Nvidia settlement agreement (a non-comparable settlement agreement that should have been excluded from evidence). *See supra* pp. 4-6. It would not be surprising if the jury similarly looked to the amount of another Intel settlement agreement in deciding what to award in damages for the '759 patent. And if the jury followed the suggestion made by VLSI's counsel during his closing argument—where he stated that Intel's settlements had been reported in the *New York Times* (3/1 Trial Tr. 1622:1-12)—a simple internet search would have led to the *New York Times* article (as well as other articles) disclosing that Intel had paid $675 million to settle litigation with Intergraph. That number is found nowhere in the trial record, yet it is the exact amount that the jury awarded as damages for the '759 patent. *See supra* pp. 4-6. A hearing on juror misconduct should thus explore whether

████████, or any other juror, researched or was in any way influenced by extra-record material regarding the amount of damages to award (or any other aspect of the verdict).

## IV.    CONCLUSION

For the foregoing reasons, Intel respectfully requests that the Court order a new trial based on juror misconduct.  If the Court does not order a new trial at this time, the Court should hold an evidentiary hearing to investigate the scope of juror misconduct that occurred in this case.

Dated: March 29, 2021

OF COUNSEL:
William F. Lee (*Pro Hac Vice*)
Louis W. Tompros (*Pro Hac Vice*)
Kate Saxton (*Pro Hac Vice*)
WILMER CUTLER PICKERING HALE
   & DORR LLP
60 State Street
Boston, Massachusetts 02109
Tel: (617) 526-6000
Email: william.lee@wilmerhale.com
Email: louis.tompros@wilmerhale.com
Email: kate.saxton@wilmerhale.com

Gregory H. Lantier (*Pro Hac Vice*)
Amanda L. Major (*Pro Hac Vice*)
WILMER CUTLER PICKERING HALE
   & DORR LLP
1875 Pennsylvania Avenue
Washington DC 20006
Tel: (202) 663-6000
Email: gregory.lantier@wilmerhale.com
Email: amanda.major@wilmerhale.com

Respectfully submitted,

/s/ *J. Stephen Ravel*

J. Stephen Ravel
Texas State Bar No. 16584975
Kelly Ransom
Texas State Bar No. 24109427
KELLY HART & HALLMAN LLP
303 Colorado, Suite 2000
Austin, Texas 78701
Tel: (512) 495-6429
Email: steve.ravel@kellyhart.com
Email: kelly.ransom@kellyhart.com

James E. Wren
Texas State Bar No. 22018200
1 Bear Place, Unit 97288
Waco, Texas 76798
Tel: (254) 710-7670
Email: james.wren@baylor.edu

*Attorneys for Intel Corporation*

## CERTIFICATE OF SERVICE

I hereby certify that all counsel of record are being served with a copy of the foregoing document via electronic mail on March 29, 2021.

*/s/ J. Stephen Ravel*
J. Stephen Ravel
